## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Regeneron Pharmaceuticals, Inc., | |
| Plaintiff, | |
| v. | C. A. No.: Case #1:22-cv-00697-RGA-JLH |
| Amgen Inc., | **REDACTED PUBLIC VERSION** |
| Defendant. | **FILED: September 26, 2022** |

## PLAINTIFF REGENERON PHARMACEUTICALS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AMGEN INC.'S MOTION TO DISMISS

Dated:  September 26, 2022

David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)

WILKS LAW, LLC
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

Elizabeth Stotland Weiswasser (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
John Z. Ren (admitted *pro hac vice*)
Robert Niles-Weed (admitted *pro hac vice*)
Gabrielle H. Kanter (admitted *pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev (admitted *pro hac vice*)
Priyata Y. Patel (admitted *pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................4

STANDARD OF REVIEW ........................................................................................................6

ARGUMENT ..........................................................................................................................7

I.  Amgen's Extra-Record Contracts Are Procedurally Improper, Incomplete, And
    Self-Defeating .............................................................................................................7

    A.  Amgen's Confidential Extrinsic Evidence Cannot Be Considered. .......................7

    B.  Amgen's Incomplete Record Does Not Defeat Regeneron's Allegations.............10

    C.  The Redacted Contracts Amgen Improperly Attaches to its Motion
        Confirm the Plausibility of Regeneron's Allegations. ...........................................13

II. Amgen's Remaining, Fact-Intensive Challenges Fail To Meet Its Heavy Burden
    For Dismissal .............................................................................................................15

    A.  Amgen Barely Contests Regeneron's Allegations of Below-Cost Pricing............16

    B.  Amgen Barely Contests Regeneron's Allegations of Coercive Use of
        Market Power.........................................................................................................18

    C.  Amgen's Remaining, Fact-Intensive Challenges Fall Short................................21

        1.  Regeneron Plausibly Alleges Substantial Foreclosure. ............................21

        2.  Regeneron Alleges Anticompetitive Agreements of Sufficient Duration. 23

        3.  Regeneron's Own Practices Do Not Flip the Balance. .............................24

III. Amgen Ignores Regeneron's Distinct State-Law Claims ..................................................25

CONCLUSION.....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3Shape TRIOS A/S v. Align Tech., Inc.*,
    2020 WL 2559777 (D. Del. May 20, 2020)..................................................... *passim*

*Altitude Sports & Entm't, LLC v. Comcast Corp.*,
    2020 WL 8255520 (D. Colo. Nov. 25, 2020) .............................................7

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
    521 F.2d 1230 (3d Cir. 1975).............................................22

*Adkins v. Rumsfeld*,
    389 F. Supp. 2d 579 (D. Del. 2005) .............................................6

*Barr Labs. Inc. v. Abbott Labs.*,
    978 F.2d 98 (3d Cir. 1992).............................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................6

*Bradburn Parent/Tchr. Store, Inc. v. 3M*,
    2000 WL 34003597 (E.D. Pa. July 25, 2003).............................................7

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007).............................................7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).............................................16, 18

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) .............................................20

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) .............................................14

*Castro v. Sanofi Pasteur Inc.*,
    2012 WL 12516572 (D.N.J. Aug. 6, 2012) .............................................13

*City of Pittsburgh v. W. Penn Power Co.*,
    993 F. Supp. 332 (W.D. Pa. 1993).............................................8, 9

*Decoration Design Sols. v. Amcor Rigid Plastic U.S.*,
    2020 WL 6482696 (D.N.J. Oct. 26, 2020).............................................8

*Dowling v. City of Phila.*,
   855 F.2d 136 (3d Cir. 1988)............................................................................12

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ...........................................................................7

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992).........................................................................................10

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016).......................................................................7, 19

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   2017 WL 6524839 (D. Kan. Dec. 21, 2017)..............................................7, 21

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   44 F.4th 959 (10th Cir. 2022) ....................................................................7, 24

*Fed. Trade Comm'n v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ...................................................................18

*FTC v. AbbVie Inc.*,
   976 F.3d 327 (3d Cir. 2020).......................................................................7, 20

*FTC v. Surescripts, LLC*,
   424 F. Supp. 3d 92 (D.D.C. 2020) .................................................................24

*In re Google Digital Advertising Antitrust Litig.*,
   2022 WL 4226932 (S.D.N.Y. Sept. 13, 2022)..................................................8

*In Re Hypodermic Prod. Antitrust Litig.*,
   2007 WL 1959224 (D.N.J. June 29, 2007) ......................................................7

*Ingevity Corp. v. BASF Corp.*,
   2020 WL 1329604 (D. Del. Mar. 23, 2020) ...................................................21

*Kingray, Inc. v. NBA, Inc.*,
   188 F. Supp. 2d 1177 (S.D. Cal. 2002)............................................................9

*Kost v. Kozakiewicz*,
   1 F.3d 176 (3d Cir. 1993) .................................................................................6

*Le Page's Inc. v. 3M*,
   2000 WL 280350 (E.D. Pa. Mar. 14, 2000).....................................................20

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003).........................................................7, 16, 18, 19

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..................................................................................................15

*Ortho Biotech Prods., L.P. v. Amgen, Inc.*,
    No. 05-4850 (D.N.J. June 8, 2007) ................................................................................11

*Parrino v. FHP, Inc.*,
    146 F.3d 699 (9th Cir. 1998) ...........................................................................................9

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993) .......................................................................................4, 8

*Pfizer Inc. v. Johnson & Johnson*,
    333 F. Supp. 3d 494 (E.D. Pa. 2018) .........................................................................7, 21

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ...........................................................................................25

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    2013 WL 3936394 (C.D. Cal. July 30, 2013) .................................................................9

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) ...............................................................................................7

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ...............................................................25

*Roxul USA, Inc. v. Armstrong World Indus. Inc.*,
    2019 WL 1109868 (D. Del. Mar. 8, 2019) ......................................................................7

*Samsung Elecs. Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) .......................................................................................25

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    401 F.3d 123 (3d Cir. 2005) .............................................................................................7

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) .....................................................................................4, 8, 9

*Schuylkill Health Sys. v. Cardinal Health 200 LLC*,
    2014 WL 3746817 (E.D. Pa. July 30, 2014) .................................................................17

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*,
    2022 WL 2438934 (D. Del. July 5, 2022) .....................................................................16

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) .....................................................................................7, 19

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
    2022 WL 3588024 (E.D. Pa., Aug. 22, 2022) ............................................................7

*In re Surescripts Antitrust Litig.*,
    2022 WL 2208914 (N.D. Ill. June 21, 2022) ...........................................................23

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ................................................................................................24

*Tomaszewski v. Trevena, Inc.*,
    482 F. Supp. 3d 317 (E.D. Pa. 2020) ...............................................................9, 10

*U.S. v. Dentsply Int'l, Inc.*,
    399 F.3d 181(3d Cir. 2005).............................................................10, 19, 22, 23

*United States v. Microsoft Corp.*,
    1998 WL 614485 (D.D.C. Sept. 14, 1998) .............................................................24

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................................21

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003).................................................................................21

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ...................................................................................7

*Warren Gen. Hosp. v. Amgen Inc.*,
    2010 WL 2326254 (D.N.J. June 7, 2010), *aff'd* 543 F.3d 77 (3d. Cir. 2011) .........9

*In re Wellbutrin XL Antitrust Litig.*,
    868 F.3d 132 (3d Cir. 2017)......................................................................................7

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) ...........................................................................2, 11

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    2022 WL 4355149 (E.D. Va. Sept. 14, 2022)..........................................................7

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012).......................................................................... *passim*

**Statutes**

Fed. R. Civ. P. 12(d) ...................................................................................................12

Fed. R. Civ. P. 12(b)(6)..........................................................................................2, 8, 9

Fed. R. Civ. P. 56(d) .............................................................................................11, 12

**Other Authorities**

10 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law..............................................17, 20, 24

5A Wright & Miller, Fed. Prac. & Proc. § 1327...............................................................................8

10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2741 ................................................................12

## PRELIMINARY STATEMENT

In its hundred-page Complaint, Regeneron described in detail how Amgen launched an unlawful bundling scheme to squash competition in the market for cholesterol-lowering PCSK9 inhibitors, where Amgen's Repatha® competes with Regeneron's Praluent®. Regeneron explained how Amgen leverages anticompetitive, below-cost bundled rebates on its blockbuster products in unrelated markets to force key intermediaries ("Third-Party Payors" or "PBMs") to exclude Praluent® in favor of Repatha®, causing substantial harm to competition and patients.[1]

In particular, Regeneron offered extensive allegations about the nature of the relevant markets, including about Repatha®'s monopoly power, and described the dominance of Amgen's blockbuster drugs Otezla® and Enbrel®. Compl. ¶¶ 102–23. Regeneron further alleged that Amgen "offer[ed] and enter[ed] into illegal, anticompetitive bundled rebate agreements" by presenting key intermediaries with "an offer they cannot refuse, and one that Regeneron cannot match." *Id.* ¶ 68. And Regeneron described how Amgen's bundled rebates resulted in below-cost pricing, *id.* ¶¶ 69–94, foreclosed a substantial portion of the market, and rendered Regeneron "unable to compete viably," *id.* ¶¶ 95–101. Far from limiting its allegations to the terms of any particular contract, Regeneron cited Amgen's negotiations with Third-Party Payors, *id.* ¶ 78, and emphasized how Amgen's anticompetitive bundling was part of a broader scheme to restrict Regeneron's market access, *id.* ¶¶ 59–67, consistent with Amgen's past multi-product bundling practices, *id.* ¶ 118. Regeneron's allegations are far more detailed than those this Court found sufficient to state a plausible claim in a similar recent case—a case Amgen fails to cite, much less distinguish. *See 3Shape TRIOS A/S v. Align Tech., Inc.*, 2020 WL 2559777 (D. Del. May 20, 2020), *R. & R. adopted*, 2020 WL 6938054 (D. Del. Nov. 25, 2020).

---

[1] Terms not defined herein adopt the definitions given in Regeneron's Complaint. Emphasis in **bold, italic** text is not in the original source unless otherwise noted.

Unable to challenge the ***legal sufficiency*** of Regeneron's allegations—which is the proper purview of a Rule 12(b)(6) motion—Amgen leaps ahead and attempts to disprove them. But Amgen's ploy to short-circuit the judicial process and avoid discovery into and scrutiny of its unlawful practices utterly fails for a number of reasons. Amgen centers its Motion on a few of its confidential, highly redacted contracts with third parties that are not part of the Complaint. Indeed, Regeneron had never seen the contracts before. But Amgen urges the Court to dismiss this case at the pleading stage based on its cherry-picked record that somehow, according to Amgen, disproves Regeneron's claims. That, of course, is not how Rule 12(b)(6) works and would turn the proper judicial process on its head. Amgen's attempt to bend the rules and turn its motion to dismiss into a premature bench trial, based on an incomplete, self-serving record, fails three times over.

First, evidence outside the Complaint and previously unavailable to a plaintiff cannot be considered on a motion to dismiss. Amgen attempts to shoehorn this evidence into the pleadings record on the theory that the Complaint is "based on" those contracts. But that narrow exception does not apply where, as here, a plaintiff necessarily could not have relied on the documents when bringing suit because they are confidential. Because Amgen's improper evidence is so essential to its arguments, its Motion should be denied on this ground alone.

Second, Amgen's artificial and incomplete record, even if accepted at face value, does not refute Regeneron's allegations. Regeneron's allegations about Amgen's anticompetitive scheme extend far beyond the four corners of the contracts Amgen chose to include. And this makes sense: as one court put it, "aspiring monopolists" generally are not "foolish enough to reduce their entire anticompetitive agreement to writing"; instead, "all manner of extrinsic evidence" is available to illuminate the true scope of the anticompetitive conduct. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014). That is what Regeneron alleges here.

Third, even if the Court reviews Amgen's improperly submitted and heavily redacted contracts, they in fact corroborate Regeneron's allegations of multi-product rebates. For example, the contracts confirm that Third-Party Payors who cover Otezla® and Enbrel® receive a significant additional rebate conditioned on excluding Praluent®. Amgen disputes how these contracts should be read and the size of its rebates, but these are factual questions unripe for resolution here. At a minimum, the opaque contracts demand discovery to clarify their context and economic effects.

Amgen's Motion hardly disputes anything that matters at the pleading stage. Indeed, **Amgen concedes that it uses a multi-product bundled rebate** conditioned on exclusive coverage of Repatha®, and that—if the commercial practice is as Regeneron alleges—it results in **predatory pricing**. While Amgen claims that Otezla® has no role in the bundle, that claim is plainly false. More still, Amgen does not dispute the sufficiency of Regeneron's market definitions and it concedes Otezla®'s monopoly power. And Amgen does nothing to independently challenge Regeneron's distinct state-law claims. These omissions are fatal to Amgen's Motion.

At most, Amgen disputes the precise composition, magnitude, and effect of its bundle— but these are fact-intensive arguments that cannot be resolved at this stage, and certainly not on the selective, extra-pleading record Amgen has submitted here. Amgen likewise speculates about the future impact of its bundle due to a recently launched product, Leqvio®, another PCSK9 inhibitor, like Praluent® and Repatha®, that works by a completely different mechanism and is not a pharmacy-dispensed product subject to the same PBM contract negotiation and reimbursement process. But these arguments run headlong into Regeneron's well-pleaded allegations about harm to competition and harm to the Praluent® brand, and cannot be resolved at this stage. Finally, Amgen offers a grab bag of arguments about various other aspects of the rule-of-reason analysis— including the precise extent of market foreclosure, the anticompetitive agreements' exact duration,

and the norms of rebating in the market (including Regeneron's own practices). Regeneron's Complaint includes plausible allegations on each of these points, which (especially given the context-specific nature of the rule-of-reason analysis) suffices to justify full and fair discovery.

Amgen has ignored Regeneron's allegations and improperly submitted an incomplete factual record comprising cherry-picked and heavily redacted contracts in a quixotic effort to stop the Court and Regeneron from learning the full scope of Amgen's misconduct. The Court should not take the bait, and should instead deny the Motion to Dismiss in its entirety.

## BACKGROUND[2]

In 2015, Regeneron's life-saving medication, Praluent®, became the first FDA-approved PCSK9 inhibitor. Compl. ¶ 32. PCSK9 inhibitors treat high levels of LDL-C or "bad cholesterol" (which can lead to heart attacks and strokes) in patients whose high LDL-C levels cannot be managed through typical treatments, such as statins. *Id.* ¶¶ 30–31, 45, 129. Amgen's Repatha® is also a PCSK9 inhibitor. Many physicians and patients prefer Praluent® over Repatha® because of Praluent®'s distinctive dosing options and positive health outcomes. *See id.* ¶¶ 33–41.

Rather than compete against Praluent® on the merits, Amgen is using a below-cost, multi-product bundled rebate scheme to destroy Praluent®. In the PCSK9i market, patients receive Praluent® or Repatha® by paying a copayment at their pharmacies. *Id.* ¶ 46. Behind the scenes, patients' insurers pay the pharmacies based on the drugs' list price, and receive negotiated rebates from the manufacturers.[3] Most insurance companies and the federal government rely on

---

[2] As is required on a motion to dismiss, the following facts are taken from "only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

[3] Praluent® and Repatha® are the only PCSK9 inhibitors subject to this process, comprising the "pharmacy-dispensed PCSK9i market" in the United States. Compl. ¶¶ 103–09. Unlike Repatha® and Praluent®, a third PCSK9 inhibitor, Leqvio®, is sold directly to doctors—not patients—for in-office subcutaneous injection twice annually for $3,250 per injection. *Id.* ¶¶ 42–44. As Regeneron

intermediaries, known as Third-Party Payors, to manage these negotiations. *Id.* ¶¶ 46–47. Placement on a Third-Party Payor's official list of covered drugs—the "formulary"—is critical for patient access in the PCSK9i market. *Id.* ¶ 49. Formulary placement determines the amount patients will pay for the drug and what steps they must take to receive it, and doctors will ordinarily prescribe drugs with lower out-of-pocket costs and less hassle. *Id.* ¶¶ 49, 51, 54.

In 2020, Amgen began offering bundled rebates on its blockbuster drugs Otezla® and Enbrel® conditioned on Third-Party Payors excluding Regeneron's Praluent® from their formularies. *Id.* ¶ 68. Amgen acquired the monopoly product Otezla® in 2019 for $13.4 billion in an FTC-ordered divestiture sale and has since continued to increase Otezla®'s price without causing prescriptions to decrease. *Id.* ¶¶ 71, 113–18. Enbrel® is a $4 billion product and "one of the world's most profitable drugs." *Id.* ¶¶ 122–23. Amgen also has increased Enbrel®'s price substantially without meaningfully losing sales. *Id.* Due to their massive scale—Praluent®'s net sales are just 2.8 percent of Otezla® and Enbrel®'s—rebates on Otezla® and Enbrel® vastly exceed any rebates provided specific to the PCSK9i market. *Id.* ¶ 16.

Amgen used these bundled rebates with dominant Third-Party Payors, ESI and Optum, in both the Commercial and Medicare Part D segments. *Id.* ¶ 53. For example, starting in June 2020, Amgen offered ESI Commercial $210 million in rebates on Otezla® and Enbrel® for just over a two-year period tied to excluding Praluent®. *Id.* ¶¶ 76–78. When the cost of these rebates are attributed to Repatha®'s sales at ESI Commercial, Amgen is pricing Repatha® below cost. *Id.* ¶¶ 89–94. These rebates devastated Praluent® and its market share at ESI Commercial declined nearly 80%. *Id.* ¶ 55. Amgen made similar offers at ESI Part D, Optum, and a number of smaller Third-Party Payors, all of which now provide exclusivity or *de facto* exclusivity to Repatha®. *Id.*

---

explains in its Complaint, Leqvio® is not a substitute for Praluent® or Repatha®. *Id.* ¶¶ 107–08.

¶¶ 81–86. Between these Third-Party Payors and additional spillover effects at the provider level, Amgen has now foreclosed Praluent® from **more than 50 percent of the market**. *Id.* ¶¶ 99–140. And Amgen's misconduct continues. *See, e.g., id.* ¶¶ 86, 110, 261.

Amgen's anticompetitive bundling practices are harming competition, Regeneron, and patients who need Praluent®. If Regeneron matched Amgen's rebate, Praluent® would become unprofitable. And, in any event, given its more limited portfolio of drugs, Regeneron cannot offer a similar bundled rebate. *Id.* ¶ 79. This year, Praluent® will be unprofitable and Regeneron may have to exit the market, which will deprive patients of Praluent®'s distinctive benefits and leave Repatha® as the only pharmacy-dispensed PCSK9 inhibitor, allowing Amgen free to leverage Repatha®'s monopoly power to recoup the costs of its improper bundled rebates. *Id.* ¶ 101.

## STANDARD OF REVIEW

A complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citation omitted). To survive a motion to dismiss, a plaintiff must plead sufficient allegations that, accepted as true and construed in the light most favorable to the plaintiff, "state a claim to relief that is plausible on its face." *Id.* at 570. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, **not to resolve disputed facts or decide the merits of the case**." *Adkins v. Rumsfeld*, 389 F. Supp. 2d 579, 584 (D. Del. 2005) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)) (emphasis added). The Supreme Court has made clear that there is no "'heightened pleading standard' [that] applies in antitrust cases" and it is improper for Amgen to invite this Court to "act as [a] gatekeeper[], and … subject pleadings in such cases to heightened scrutiny." *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 569 n.14). The overwhelming majority of complex antitrust cases like this one can be resolved, therefore, only after discovery—as was the case in *every* Third Circuit antitrust case

Amgen cites[4] and the out-of-Circuit antitrust case Amgen most heavily relies on.[5]

## ARGUMENT

## I.     AMGEN'S   EXTRA-RECORD   CONTRACTS   ARE   PROCEDURALLY   IMPROPER, INCOMPLETE, AND SELF-DEFEATING.

### A.     Amgen's Confidential Extrinsic Evidence Cannot Be Considered.

Amgen asks this Court not to accept Regeneron's allegations as true. Rather than

challenging whether the facts, as alleged, would state a claim for relief, Amgen denies those

allegations on the merits, which is manifestly improper at the pleading stage. Amgen hinges its

Motion on extrinsic materials that it claims disproves Regeneron's case: confidential contracts

---

[4] *See FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) (trial); *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132 (3d Cir. 2017) (summary judgment); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016) (summary judgment); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) (trial); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) (summary judgment); *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123 (3d Cir. 2005) (summary judgment); *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc) (summary judgment); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) (trial); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98 (3d Cir. 1992) (summary judgment). Numerous other cases from this Circuit and beyond—including some Amgen relies on—confirm how ill-suited cases like this one are for resolution on the pleadings. *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (reversing dismissal of attempted monopolization claim); *Roxul USA, Inc. v. Armstrong World Indus. Inc.*, 2019 WL 1109868 (D. Del. Mar. 8, 2019) (denying summary judgment); *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494 (E.D. Pa. 2018) (denying motion to dismiss); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 2022 WL 3588024 (E.D. Pa., Aug. 22, 2022) (denying summary judgment); *In Re Hypodermic Prod. Antitrust Litig.*, 2007 WL 1959224 (D.N.J. June 29, 2007) (denying motion to dismiss); *Bradburn Parent/Tchr. Store, Inc. v. 3M*, 2000 WL 34003597 (E.D. Pa. July 25, 2003) (denying motion to dismiss); *see also, e.g.*, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) (reversing summary judgment); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) (reversing grant of motion to dismiss); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 4355149 (E.D. Va. Sept. 14, 2022) (denying summary judgment); *Altitude Sports & Entm't, LLC v. Comcast Corp.*, 2020 WL 8255520 (D. Colo. Nov. 25, 2020) (denying motion to dismiss in part).

[5] *See In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) (summary judgment). Amgen fails to mention that *EpiPen* survived a motion to dismiss and, unlike this case, did not involve multi-product bundling or predatory pricing. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2017 WL 6524839, at *19 (D. Kan. Dec. 21, 2017) (defendant's "arguments merely foreshadow factual disputes that the court cannot resolve on a motion to dismiss").

between Amgen and certain Third-Party Payors. D.I. 19, Exs. A–F. But such contracts cannot be considered on a motion to dismiss. Because these contracts are the centerpiece of Amgen's Motion and its attempt to dispute Regeneron's allegations, Amgen's Motion falls apart without them.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp.*, 998 F.2d at 1196. "[A] motion to dismiss neither allows for a factual narrative that supplements the four corners of the pleading nor a counter-narrative by the defendant." *In re Google Digital Advertising Antitrust Litig.*, 2022 WL 4226932, *3 (S.D.N.Y. Sept. 13, 2022). There is no dispute that Amgen's ***heavily redacted and filed-under-seal contracts*** were not contained in the Complaint or attached to it and are not matters of public record.

To justify this radical departure from basic procedure under Rule 12(b)(6) without opening the door to discovery (which Amgen simultaneously demands to stay), Amgen seeks to shoehorn its Motion into a very narrow exception that allows the Court to consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." D.I. 18 at 9 ("Br.") (quoting *City of Pittsburgh v. W. Penn Power Co.*, 993 F. Supp. 332, 336 n.10 (W.D. Pa. 1993)). This narrow exception—known as the "integral documents exception" because it covers only "document[s] *integral to or explicitly relied upon in the complaint*"—"hold[s] a plaintiff accountable for the contents of documents it must have used in framing its complaint[.]" *Schmidt*, 770 F.3d at 249, 250 (citation omitted). The rule applies only "when the plaintiff fails to introduce a pertinent document as part of her pleading," *i.e.*, when the plaintiff *could have* introduced the document. 5A Wright & Miller, Fed. Prac. & Proc. § 1327. "The quintessential example of this exception is a ***breach of contract action***; in such cases, the contract would be considered integral." *Decoration Design Sols. v. Amcor Rigid Plastic*

*USA, Inc.*, 2020 WL 6482696, at *3 (D.N.J. Oct. 26, 2020).

The integral documents exception does not apply here, where Amgen attempts to inject confidential documents from its own files that Regeneron could not access and could not possibly have relied on when it drafted the Complaint. As the Third Circuit held, a "complaint was not 'based' on [such documents]" where the plaintiff "claim[ed] that he never saw [them] and disput[ed] that they were publicly posted[.]" *Schmidt*, 770 F.3d at 249-50. Even where "the Complaint repeatedly refers to the [documents]," another court explained that "***Plaintiffs did not, and in fact could not, rely on those documents, because they were never disclosed to the public***." *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 327 (E.D. Pa. 2020). "Because Plaintiffs did not have access to the disputed documents until Defendants attached them to the motion to dismiss," that court concluded, "the documents could not have been integral to or explicitly relied upon in the Complaint," and could not be considered. *Id.* at 327–28.[6] The same is true here. ***Regeneron never had access to Amgen's confidential contracts with PBMs*** before filing the Complaint—and in fact only received them in redacted form after Amgen filed the instant Motion. Amgen's extra-pleading material therefore cannot be considered and should be stricken.

---

[6] The two in-Circuit cases Amgen cites (Br. at 9) are not to the contrary, as they both involved evidence available to the plaintiff when the complaint was drafted and on which the plaintiff actually relied. *See Warren Gen. Hosp. v. Amgen Inc.*, 2010 WL 2326254, at *1 n.2 (D.N.J. June 7, 2010) ("[T]he parties agree that, as documents explicitly referred to and relied on by the Complaint, the contracts [between plaintiff and defendant] may be considered by the Court"), *aff'd* 543 F.3d 77 (3d. Cir. 2011); *City of Pittsburgh*, 993 F. Supp. at 336 n.10 (relying on a "petition filed by the [plaintiff]" that was "specifically relied upon by the [plaintiff]"). Amgen also cites one out-of-Circuit case for support, Br. at 9 (citing *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 3936394 (C.D. Cal. July 30, 2013)), and offered a second case in a later letter to the Court, *see* D.I. 29 (citing *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1190 (S.D. Cal. 2002)). But those decisions do not address this issue in any depth, and Ninth Circuit precedent, just like Third Circuit precedent, allows extrinsic evidence only to "[p]revent[] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based," not to allow defendants to offer documents plaintiffs could not possibly have seen or relied on. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

Amgen's extrinsic materials are the sole support for the Motion's central claim that Amgen does not bundle Otezla®, Enbrel®, and Repatha®, and does not condition bundled rebates on Repatha® exclusivity. This claim is the centerpiece of Amgen's arguments attempting to dispute Regeneron's allegations of exclusive dealing, substantial foreclosure, below-cost pricing, and coercive use of monopoly power. Br. at 12, 14, 17, 19, 22. Amgen is wrong, as discussed below; but of course, disputing the factual allegations, rather than their legal sufficiency, is not the proper role of a Rule 12(b)(6) motion. Nonetheless, Amgen has chosen to hang its Motion on those contracts. Without them, the Motion "must be denied in its entirety because, ... the stricken documents are so intertwined with and integral to the arguments raised in the motion that it is not possible to excise the[m] or parse the proper arguments from the improper." *Tomaszewski*, 482 F. Supp. 3d at 329.

**B.    Amgen's Incomplete Record Does Not Defeat Regeneron's Allegations.**

Amgen's effort also fails on its own terms. Even were the Court inclined to consider Amgen's extrinsic evidence, it does not defeat Regeneron's comprehensive allegations. Ignoring the actual allegations of the Complaint, Amgen likens this case to a simple contract dispute that can be resolved by reading the terms of Amgen's contracts. But that is not the case. Regeneron's allegations concerning Amgen's anticompetitive conduct stretch far beyond the four corners of the few (redacted) contracts Amgen selected for its record. *See, e.g.*, Compl. ¶¶ 66, 67.

In complex antitrust cases like this one, courts do not rely solely on the terms of parties' written contracts and instead "look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.'" *ZF Meritor*, 696 F.3d at 270 (quoting *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191, 194 (3d Cir. 2005)); *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992) ("This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the

10

record" and "the economic reality of the market at issue." (citation omitted)); A.B.A. Jury Instr. Civ. Antitrust § 2.A.1. ("[T]he evidence need not show that its members entered into any formal or written agreement. The agreement itself may have been entirely unspoken.").

The Eighth Circuit, rejecting the ploy Amgen attempts here, explains why: "Perhaps there are aspiring monopolists foolish enough to reduce their entire anticompetitive agreement to writing," the court hypothesized, "[b]ut most would-be monopolists probably can be expected to display a bit more guile, jotting down only a few seemingly common terms while sealing their true anticompetitive agreement with a knowing nod and wink." *In re Wholesale Grocery Prods.*, 752 F.3d at 734. That case, like this one, "[was] not a contracts case in which the scope of the alleged anticompetitive agreement is cabined by the four corners of the written document[,]" and instead, "[plaintiff] could use all manner of extrinsic evidence to persuade a jury that what the [defendants] *actually agreed to* was [anticompetitive]." *Id.*

Here, for example, consistent with the Complaint's allegations, the evidence may show that Amgen reached a verbal agreement (perhaps alongside a written contract) to offer a substantially increased rebate rate on Enbrel® and/or Otezla® conditioned on excluding Praluent®. *See* Compl. ¶¶ 78, 84. This would constitute anticompetitive conduct, yet would be absent from Amgen's partial record if Amgen had the "guile" to keep it out of the contract—which Amgen certainly had the motivation to do given that Regeneron sent Amgen a cease-and-desist letter before it signed its Optum contract. *Id.* ¶ 79 n.66.[7]

Moreover, the attached Rule 56(d) affidavit describes key party, non-party, and expert

---

[7] Not only was Amgen on notice from Regeneron, Amgen also faced allegations of anticompetitive multi-product rebates in a prior, unrelated case—giving Amgen all the more reason to mask its misconduct. Compl. ¶¶ 118 & n.97; *see* First Amended Complaint, *Ortho Biotech Prods., L.P. v. Amgen, Inc.*, 2006 WL 3392939 (D.N.J. June 8, 2007).

evidence needed to test Amgen's defenses revealed through its Motion,[8] none of which appears in

Amgen's selective record, including:

- *Communications and documents relating to bid and negotiating history*: The full scope of the agreements between Amgen and Third-Party Payors is not limited to the contracts themselves. Amgen's—and the Third-Party Payors'—internal and external communications and meeting notes concerning the negotiation of rebates for Repatha®, Otezla®, and Enbrel® are highly relevant pieces of information that are not part of the artificial record Amgen has put before the Court. Conditions between the parties could easily have been agreed to that would not appear in the contracts—potentially by design.

- *Amgen's pricing and strategy documents for Repatha®, Otezla®, and Enbrel®*: Amgen's ordinary course business documents laying out business plans for products are critical to understanding Amgen's multi-product bundling scheme. These documents will explain how Amgen viewed the marketplace and planned to use these products together, how the bundling scheme worked, and Amgen's internal approval process for these rebates.

- *Unredacted contracts*: While Amgen asserts that the heavy redactions to its contracts "relate[] **primarily** to rebates for [other] drugs," D.I. 19 ¶ 4, that carefully worded statement begs the question: What else do the redactions relate to? Amgen cannot hide the ball, and this Court cannot decide this case on a half-hidden record.

- *Additional past and cross-referenced contracts with these same parties*: Amgen's contracts incorporate by reference other agreements that Amgen withheld.



Amgen has thus withheld contracts expressly imposing conditions on the bundled rebate at the heart of the case.

- *Contracts with other Third-Party Payors*: Amgen withholds its contracts with other Third-Party Payors specifically addressed in the pleading, based on its own "say-so" that these allegations are insufficient. *See* Compl. ¶¶ 81, 86. But this is exactly why courts decline to

---

[8] Amgen does not ask for its motion to be converted to one for summary judgment, nor could it without giving Regeneron "opportunity to obtain discovery." *Dowling v. City of Phila.*, 855 F.2d 136, 138-39 (3d Cir. 1988); *see* Fed. R. Civ. P. 12(d). As further explained in the attached affidavit, basic discovery from Amgen and third parties is needed to resolve the factual arguments Amgen raises. *See* Affidavit of Eric Hochstadt; *see generally* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit … that … it cannot present facts essential to justify its opposition, the court may … defer considering the motion or deny it."); 10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2741 (4th ed.) ("[S]ummary judgment will be held to be error when discovery is not yet completed.").

consider incomplete records, especially on a motion to dismiss. It is not for Amgen unilaterally to decide what information—known only to Amgen—is pertinent for the court's consideration, and what is not. If anything, Amgen's refusal to include this information supports an inference that there are relevant provisions in those contracts, too, and that Amgen wants to hide them from scrutiny.

- *Lay and expert testimony*: Cases like this one thus routinely hinge on lay and expert testimony clarifying the nature of the relevant markets, the full terms of the parties' agreements, the context in which they were reached, and their anticompetitive effects.

In summary, this dispute cannot be resolved by reading only Amgen's chosen redacted contracts, and should instead proceed through the ordinary discovery process. *See Castro v. Sanofi Pasteur Inc.*, 2012 WL 12516572, at *4 (D.N.J. Aug. 6, 2012) ("declin[ing] to consider [a] contract submitted with [a motion to dismiss]" where "Plaintiffs' claims are not based on that single contract; they are based on the effect of a 'web of contracts' and other activities; it is the cumulative impact of the contracts and actions that is at the heart of Plaintiffs' claims not any particular contract in isolation").

## C.   The Redacted Contracts Amgen Improperly Attaches to its Motion Confirm the Plausibility of Regeneron's Allegations.

Although the Court should not consider the cherry-picked and heavily redacted documents Amgen attaches to its Motion, if the Court does review those materials, it will see that the contracts **confirm** the plausibility of what Regeneron has alleged, *i.e.*, that Amgen used a multi-product rebate conditioned on exclusive coverage of Repatha®. Compl. ¶¶ 76–85. And the contracts flatly disprove Amgen's misleading claim that "Otezla® rebates are independent of Repatha®." Br. at 7.



13

[REDACTED]

Amgen's bundled rebate also is substantial. By claiming that it is a "small[] additional rebate" unrelated to Otezla®, Br. at 8, Amgen not only admits to the bundled rebate's existence, but also injects a factual dispute as to its precise composition and magnitude that is not only highly misleading, but inappropriate for resolution at this stage. [REDACTED]

[REDACTED]

[REDACTED][10] Amgen's contract with ESI thus fully corroborates Regeneron's allegations of a bundled rebate resulting in below-cost pricing. *Id.* ¶ 92; *cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008) (attributing the entire bundled rebate to the single product at issue to test the impact of the three-product bundle).

Second, Amgen's contract with Optum likewise supports Regeneron's claims. To be sure, Amgen's contract with Optum is even more opaque than its contract with ESI—which is no

---

[9] While Amgen suggests that this means the rebate is not an "Otezla® rebate" (Br. at 7 n.5), this is a distinction without a difference. Whether the value of the rebate is calculated based on Enbrel® sales or Otezla® sales, or else is a flat dollar amount, the economic reality is the same: a massive rebate requiring coverage of Enbrel® and Otezla® conditioned on Repatha® exclusivity.

[10] [REDACTED]

14

surprise, since it was entered into *after* Regeneron put Amgen on notice of is anticompetitive

conduct, Compl. ¶ 79 n.66—again confirming the need for full discovery. 

So while Amgen's complex contracts call for further

evidence and explanation, they strongly support Regeneron's core allegation of a significant

bundled rebate on Enbrel® and Otezla® conditioned on Repatha® exclusivity. *Id.* ¶¶ 87–94.

## II.   AMGEN'S REMAINING, FACT-INTENSIVE CHALLENGES FAIL TO MEET ITS HEAVY BURDEN FOR DISMISSAL.

Amgen does little to dispute that Regeneron's allegations, taken as true, plausibly state a

claim. What Amgen instead offers are isolated, factual arguments that improperly rewrite

Regeneron's Complaint and are particularly misplaced here, where the applicable antitrust

analysis—the rule of reason—demands "a fact-specific assessment of 'market power and market

structure ... to assess the [restraint]'s actual effect[.]'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

2284 (2018) (alterations in original) (citation omitted). "There is no set formula" for this highly fact-intensive analysis, *ZF Meritor*, 696 F.3d at 271, and "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation[,]" *LePage*'s, 324 F.3d at 162. Under that analysis, and crediting the Complaint's allegations as true, Regeneron plausibly alleges predatory pricing and a bundled rebate claim. *See 3Shape*, 2020 WL 2559777, at *8 ("[W]here the [] complaint alleges not only that a defendant with market power offered a discount for purchasing products in multiple lines, but it also alleges facts supporting the allegation that the plaintiff 'could not compete effectively' if it matched the aggregate discount applied to a single line, I think it states a plausible bundled discounting claim.") (citations omitted).[11]

## A.    Amgen Barely Contests Regeneron's Allegations of Below-Cost Pricing.

Amgen does little to dispute that, if Regeneron's allegations of Amgen's bundled rebates are taken as true—as they must be at this stage—Amgen offers a bundled rebate that results in below-cost pricing for Repatha®. Specifically, Regeneron alleges that "***Amgen is pricing Repatha® below cost*** with the bundled rebate," Compl. ¶¶ 89–94, which is "pushing Praluent® below a critical mass of market share necessary to ... remain viable," and will allow Amgen "to make up for any losses it incurred," *id.* ¶ 138. That is, Regeneron "allege[s] both (1) 'that the prices complained of are below an appropriate measure of [the defendant's] costs'; and (2) that the defendant had 'a dangerous probability[] of recouping its investment in below-cost prices." *3Shape*, 2020 WL 2559777, at *7 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco*

---

[11] Amgen's one-sentence counter-factual claim that Regeneron could make a comparable offer, Br. at 20, is inadequate to raise the argument. *See In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *14 (D. Del. July 5, 2022) ("[A] 'passing reference to an issue will not suffice to bring that issue before this court.'" (citation omitted)). In any event, Regeneron alleges it could not offer a comparable bundle given the size and scope of its own product portfolio and distribution channels. Compl. ¶ 155. Amgen's cursory mention of Dupixent® is unavailing as Regeneron does not control the marketing of that unrelated product.

*Corp.*, 509 U.S. 209, 222–24 (1993)). *See* Compl. ¶¶ 163–182 (Counts Three and Four).

Rather than accept Regeneron's allegations as true, Amgen disputes their factual accuracy and argues that, because "Amgen does *not* condition Otezla® rebates on Repatha® coverage," "the calculations in the Complaint ... cannot support Regeneron[.]" Br. at 19. Notably, Amgen does not deny that it conditions Enbrel® rebates on exclusive coverage of Repatha®—in a bundle that likewise requires exclusive coverage of Otezla®—and does not argue that, if Regeneron's allegations are taken as true, the bundled rebate results in below-cost pricing. Since Amgen's contracts cannot be considered (and, even so, support Regeneron), *see supra* at 7–10, 13–15, Amgen has no viable argument on this issue at this stage.

Amgen's remaining arguments regarding Regeneron's allegations of predatory pricing amount to (1) a factual dispute about Regeneron's allegations about the bundle's effect *on Regeneron*, and (2) a suggestion that everything is changed by Leqvio®—but both arguments ignore Regeneron's clear allegations addressing those facts. As to Amgen's first argument, Amgen says that "Regeneron has not plausibly alleged that Praluent® is in dire straits or likely to exit the market." Br. at 19. But Amgen cites nothing for its dangerous and unsupportable position that a company must be injured to death before it can bring suit.[12] Amgen also ignores Regeneron's allegations, which clearly state that Amgen's actions are "fatal to Praluent®—which now stands to lose money in 2022" and are "pushing Praluent® below a critical mass of market share necessary to compete." Compl. ¶¶ 137–38. Amgen's stray citations to extra-record evidence of Praluent®'s

---

[12] *See* 10 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 348d1 (4th ed. 2018) ("The rival's loss is compensable when it results from conduct that, *if successful*, would have caused the type of market damage the antitrust laws seek to prevent."); *see also Schuylkill Health Sys. v. Cardinal Health 200 LLC*, 2014 WL 3746817, at *4 (E.D. Pa. July 30, 2014) ("[A]s the Third Circuit has repeatedly stated ... it is not necessary that all competition be removed from the market.").

coverage by other Payors (Br. at 20) cannot overcome these well-pleaded allegations and, at most, suggest a factual dispute for a later stage. For now, Regeneron's allegations of significant harm to the Praluent® brand—which involve issues peculiarly within Regeneron's knowledge—plausibly show that Amgen's "intended target [will] likely succumb." *Brooke Grp.*, 509 U.S. at 225.

As to Amgen's second argument, regarding Leqvio® (Br. at 20), Regeneron's allegations thoroughly address Leqvio® and explain why it is not relevant to the analysis. *E.g.* Compl. ¶ 108. As Amgen admits, Leqvio® "is administered by healthcare providers and thus is a medical benefit, not a drug benefit that appears on drug formularies." Br. at 7 n.7. Leqvio® therefore does not compete in the pharmacy-dispensed PCSK9i sub-market, and Amgen nowhere disputes this plausible market definition. Compl. ¶ 104. Even within the broader PCSK9i market, Regeneron alleges that "[u]nlike Praluent® and Repatha®, which are ***self-administered by patients*** once every two weeks ... , Leqvio® is ***administered by doctors*** twice a year" and "***is not and will not be subject to the PBM contracting and rebating that drive patient access to Praluent® and Repatha®***." *Id.* ¶ 105; *see id.* ¶¶ 106–08 (Leqvio® further differs on mechanism of action and manufacture).[13]

**B.    Amgen Barely Contests Regeneron's Allegations of Coercive Use of Market Power.**

Regeneron alleges that Amgen coercively bundles Repatha® with Otezla® and Enbrel®. To state a bundling claim, *e.g. id.* ¶¶ 142–162 (Counts One and Two), a plaintiff must allege "monopoly power in a relevant market" and "that the effect of the discounts is to 'foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.'" *3Shape*, 2020 WL 2559777, at

---

[13] That Regeneron discloses Leqvio® as a "Competitor Product" in a securities filing—as Amgen again reaches outside the Complaint to note, Br. at 20—cannot resolve this issue at this stage given Regeneron's plausible competing allegations about Leqvio®. Compl. ¶ 108. In addition, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015) (citations omitted).

*7 (quoting *LePage's*, 324 F.3d at 155). Regeneron's Complaint more than clears this bar: Regeneron alleges that Otezla® has monopoly power and Enbrel® has market power, Compl. ¶¶ 113–23; that Amgen's bundled rebates have "substantially foreclosed [Praluent®] from the PCSK9i market **with no coverage from Third-Party Payors reimbursing 51 percent of prescriptions**," *id.* ¶ 20; and that Amgen's rebates "cannot be matched by Regeneron, which lacks comparable products to Otezla® and Enbrel®," *id.* ¶ 155.

Amgen does not dispute that Otezla® has monopoly power, and this is enough to resolve this issue in Regeneron's favor at this stage. Amgen argues only that, "[f]or Otezla®, the contracts show that Amgen does not condition Otezla® rebates on Repatha® coverage[,]" and that "to sustain its claims, Regeneron must plausibly allege that Enbrel® has a monopoly." Br. at 22. Amgen adds that any bundled rebate on Enbrel® is "small" and there are "numerous alternatives to Enbrel®." Br. at 17, 23.[14] But, as discussed above, this Court cannot consider Amgen's factual contentions about Otezla®, which rely solely on Amgen's improperly submitted evidence—and which in fact show that (despite Amgen's misrepresentations to the contrary) Otezla® is a critical part of the bundle. *See supra* at 7–10. Amgen has thus effectively conceded that Regeneron has sufficiently alleged that Amgen bundled Repatha® with a "product[] on which [Amgen] faced no competition" (Otezla®), which is all that is required. *SmithKline*, 575 F.2d at 1065 (defendant insulated its competitive product from price competition in violation of Sherman Act Section 2 by bundling rebates for that product with rebates for monopoly products); *see LePage's*, 324 F.3d at 157.[15]

---

[14] Amgen also suggests that "the threat of a lost discount" on a single product cannot suffice to show coercion. Br. at 17 (*Eisai*, 821 F.3d at 407). But just as in *Dentsply* and *LePage's*, Regeneron plausibly alleges that Amgen's bundled rebates on multiple, must-have products are coercive. Compl. ¶ 19; *see Dentsply*, 399 F.3d at 185; *LePage's*, 324 F.3d at 173.

[15] Amgen also does not acknowledge that its multi-product bundle design is exactly the type of anticompetitive "rebate wall" recognized by the FTC, since it forces Third-Party Payors to choose between Praluent® and the bundled rebate. *See* Compl. ¶ 136 & n.121 (citing the Federal Trade

Regeneron's allegations about Enbrel® also suffice to plausibly allege coercive use of market power—a highly fact-specific inquiry. *See ZF Meritor*, 696 F.3d at 287 (putting the issue to a jury); 10 Areeda & Hovenkamp ¶ 1752e ("[T]he language of 'coercion,' … should be understood as inviting a specific factual inquiry."). Market power is "the ability to raise prices above those that would otherwise prevail in a competitive market," and can be assessed by considering, among other factors, "[b]arriers to entry." *FTC v. AbbVie*, 976 F.3d at 371 (citation omitted); *see, e.g.*, ABA Antitrust Section, *Antitrust Law Devs.* § 1B3 (9th ed. 2022) (citing 30% share as indicative of market power). Regeneron's allegations about Enbrel® satisfy these requirements. First, Regeneron alleges that despite massive increases to Enbrel®'s list price, which have amounted to a 457 percent increase between 2002 and 2020, annual net sales of Enbrel® grew significantly over that period. Compl. ¶ 123. Second, Regeneron describes in detail (and Amgen chooses not to address) high barriers to entry in the rheumatoid arthritis market. *Id.* ¶¶ 124–28, 131–33. Regeneron has thus adequately alleged Enbrel®'s market power, especially since market power is a question of fact ill-suited for pleading-stage resolution.

Resisting this conclusion, Amgen notes that Regeneron did not provide market-share data, claims Regeneron's well-pleaded Enbrel®-specific allegations involve the wrong time period, and cites growing competition from Humira®. *See* Br. at 22–24. But none of these arguments can defeat Regeneron's allegations. First, because market power is a holistic inquiry taking into account indirect evidence of anticompetitive effects, "failure to allege a substantial market share is not itself fatal." *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 569 (E.D. Pa. 2002). Second, Regeneron's allegations of Enbrel®'s historical market power supports an inference of

---

Commission's report on rebate walls). The bundle will always win because any savings Regeneron can offer for Praluent® cannot offset the higher costs on Otezla® and Enbrel®. *See id.*

continued market power, especially since "declining market share … does not foreclose [] a finding" of market power. *Le Page's Inc. v. 3M*, 2000 WL 280350, at *11 (E.D. Pa. Mar. 14, 2000). Third, the existence of competition from Humira® is not dispositive, as both Enbrel® and Humira® may possess market power. *E.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (both Visa and MasterCard had market power with "large shares of a highly concentrated market"). Amgen thus cannot defeat Regeneron's allegations that Amgen's anticompetitive bundled rebate includes products with monopoly power (Otezla®) and market power (Enbrel®).

**C.    Amgen's Remaining, Fact-Intensive Challenges Fall Short.**

**1.    Regeneron Plausibly Alleges Substantial Foreclosure.**

Regeneron alleged that Amgen's bundled rebates at three Third-Party Payors (ESI Commercial, ESI Part D, and Optum Commercial) "account[s] for over 30 percent of the total PCSK9i market" and, combined with other smaller Third-Party Payors, results in Praluent® being "'not covered' on formularies of Payors accounting for *at least 50 percent*" of the relevant market, with still more foreclosure resulting from spillover effects at the prescriber level. Compl. ¶ 96. Nothing more is needed to plausibly allege substantial foreclosure at this stage. *See, e.g.*, *ZF Meritor*, 696 F.3d at 286 (citing "foreclosure of 40% to 50%" as substantial).[16] This is especially so given that Amgen does not dispute Repatha®'s own monopoly power in the PCSK9i market, Compl. ¶¶ 110–12, which increases the likelihood that Amgen's conduct is unlawful. *See United*

---

[16] *See generally 3Shape*, 2020 WL 2559777, at *6 ("Whether the foreclosure was *in fact* 'substantial' is a conclusion that does not need to be reached, and would be inappropriate to reach, at this stage of the litigation" as it "require[s] factual assessments and expert analyses that are inappropriate at the pleading stage."); *Ingevity Corp. v. BASF Corp.*, 2020 WL 1329604, at *2 (D. Del. Mar. 23, 2020) (Andrews, J.) ("[Substantial foreclosure] is a fact-intensive inquiry that is not properly disposed of before fact discovery."); *Johnson & Johnson*, 333 F. Supp. 3d at 505 (finding such arguments "misplaced – or rather, mistimed" on a motion to dismiss); *EpiPen*, 2017 WL 6524839, at *10 ("The question whether the alleged exclusive dealing arrangements foreclosed a substantial share of the market ... is not a proper function for the pleading stage.").

*States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("[A] monopolist's use of exclusive contracts … may give rise to a § 2 violation even though the contracts foreclose less than … 40% or 50% share[.]"); *Dentsply*, 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist.").[17]

Amgen's dispute with this well-pleaded allegation relies solely on cases resolved *after* discovery and raises contested factual arguments inappropriate for resolution at this stage. Amgen bargains down Regeneron's alleged market foreclosure by disputing its allegations about Optum Commercial and ESI Part D. As to Optum Commercial, Amgen points to its improperly submitted contracts to argue that "Regeneron does not plausibly allege that Amgen's agreement with Optum Commercial conditions any rebate on Repatha® exclusivity." Br. at 12. But this evidence cannot be considered, and in any event, construed in Regeneron's favor, it supports Regeneron's allegations. *Supra* at 7–15. As to ESI Part D, Amgen cannot cite its contract since it withheld that contract from its submission—the appropriate inference being that the contract undermines Amgen's argument. Instead, Amgen can argue only that Regeneron's allegations are "conclusory" and "implausible." Br. at 11–12. But Regeneron alleged that ESI announced Repatha®'s exclusive formulary position for ESI Part D around the same time it made the same announcement for ESI Commercial, and that "formulary access decisions for [commercial and Part D plans] are generally made on a consistent or uniform basis," including at ESI. Compl. ¶ 81. Taken as true and with inferences construed in its favor, Regeneron has plausibly alleged that Praluent®'s foreclosure at ESI Part D resulted from Amgen's anticompetitive actions with ESI Commercial.[18]

---

[17] The Third Circuit has recognized that foreclosure of 14.7% "may well offend the limitations which the Clayton Act places on exclusive contracts." *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975); *see* Compl. ¶¶ 194–204 (pleading a Clayton Act claim).

[18] That Amgen cites a different Third-Party Payor who treats the PCSK9i class differently for its commercial and Part D formularies cannot overcome the inference in favor of ESI's uniform

With Optum Commercial and ESI Part D included in the calculation, Amgen cannot and does not dispute that Regeneron adequately alleges substantial foreclosure. Amgen's remaining arguments challenging further foreclosure need not be resolved to deny Amgen's Motion. Amgen's arguments fail nonetheless. Amgen challenges Regeneron's allegations regarding smaller Third-Party Payors (Br. at 14), but argues only that these allegations do not suffice to show substantial foreclosure if Optum Commercial and ESI Part D are taken out of the mix. Amgen offers little to directly challenge Regeneron's clear allegations that these additional Third-Party Payors exclude Praluent® in favor of Repatha®. *See* Compl. ¶ 96. Similarly, Amgen's footnoted rejection of Regeneron's allegations of spillover foreclosure at the provider level (Br. at 14 n.13), offers little reason (beyond an out-of-Circuit "*see*" cite) for rejecting this plausible fact-specific allegation that Regeneron has yet to have any opportunity to prove. *See* Compl. ¶ 99.[19]

## 2. Regeneron Alleges Anticompetitive Agreements of Sufficient Duration.

Amgen next takes issue with the duration of its agreements, contending that two-and-a-half year, terminable-at-will contracts lack sufficient duration to harm competition. Br. at 15–16. But Amgen's position is contrary to controlling law. As this Court stated in *3Shape*, "the Third Circuit has declined to take the position that the short duration and ease of termination of exclusive dealing contracts mean such agreements cannot violate the antitrust laws." 2020 WL 6938054, at *2 n.2; *see Dentsply*, 399 F.3d at 194 ("[I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth.").

---

treatment across its formularies in light of Regeneron's ESI-specific allegations. Br. at 12.

[19] Amgen also disputes Regeneron's allegation that "even 'equal' formulary position [is] *de facto* exclusive." Br. 12. But proving this fact-specific allegation will require discovery into, among other things, Amgen's improper use of its salesforce to harm Praluent®. *See* Compl. ¶¶ 66–67; *see, e.g.*, *In re Surescripts Antitrust Litig.*, 2022 WL 2208914, at *10 (N.D. Ill. June 21, 2022) ("The same conditions present in *ZF Meritor* are present here, and for the same reasons, [defendant's] [agreements] ... may be considered *de facto* exclusive deals.").

The inquiry is a factual one, "weigh[ing] the probable effect of the contract on the relevant area of effective competition." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). "Even if the contracts [a]re short term and easily terminable" a plaintiff can allege that the contracts, "combined with the nature of the [] relevant markets ... had the effect of ... harming competition." *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 104 (D.D.C. 2020). This is what Regeneron alleges. While the contracts' duration "may be appropriate to consider in a final determination of whether the agreements unreasonably restrain trade[,]" it cannot defeat Regeneron's allegations at this stage. *United States v. Microsoft Corp.*, 1998 WL 614485, at *20 (D.D.C. Sept. 14, 1998).

### 3. Regeneron's Own Practices Do Not Flip the Balance.

Finally, Amgen points to Regeneron's own exclusivity on certain formularies to argue that this swings the analysis in Amgen's favor. *See* Br. at 17–18. But "the use of exclusive dealing by competitors of the defendant" is only "sometimes considered" in the rule-of-reason analysis, *ZF Meritor*, 696 F.3d at 272, and only to the extent that it "illuminates the 'particular structure and circumstance of the industry at issue,'" *EpiPen*, 44 F.4th, at 963 (citation omitted); *cf.* Areeda & Hovenkamp ¶ 361 (explaining that courts reject *in pari delicto* defenses in antitrust). Here, while formulary exclusivity may not be foreign to the pharmaceutical industry, Regeneron plausibly alleges that Amgen's below-cost, multi-product bundled rebating is a far cry from a garden-variety, single-product, above-cost rebate. *See* Compl. ¶ 69. Thus, as in *ZF Meritor*, although such "contracts were not uncommon in the industry, and were also utilized by [the plaintiff]" the alleged anticompetitive agreements were "unprecedented" and "represented a substantial departure from past practice." *ZF Meritor*, 696 F.3d at 265, 288. At a minimum, as the jury trial in *ZF Meritor* further illustrates, the magnitude of Amgen's departure from industry-standard practices and the effect of Regeneron's own past practices can be determined only with a full evidentiary record including "considerable testimony" from market participants. *Id.* at 277.

24

## III.    AMGEN IGNORES REGENERON'S DISTINCT STATE-LAW CLAIMS.

Amgen also fails to explain why Regeneron's state-law claims cannot stand on their own. Amgen ignores Regeneron's detailed allegations supporting its California UPA claim, Compl. ¶¶ 219–29, arguing that "Regeneron has not 'allege[d], in other than conclusory terms, the defendant's sales price, costs in the product, and costs of doing business,' as the UPA requires," Br. at 25. But UPA's requirements for predatory pricing claims are less demanding than those under federal law, as UPA "does not require an anticompetitive impact or … dangerous probability of recoupment" and allows any method of calculating costs that is not "arbitrary or irrational"— Regeneron's UPA claim should survive dismissal even if its federal claims do not. *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *16–19 (N.D. Cal. Oct. 18, 2013) (allowing UPA claim to survive dismissal of federal claims). If Regeneron's UPA claim survives, its UCL and tortious interference claims must survive, too, because they are independently fully supported by a predicate UPA violation.[20] Likewise, it is reversible error to dismiss a Cartwright Act claim on the ground that "California's antitrust statute [is] coextensive with the Sherman Act." *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014). Yet Amgen does not acknowledge Regeneron's well-pleaded Cartwright Act claim, Compl. ¶¶ 230–43, much less explain why it cannot survive if the federal claims are dismissed.

### CONCLUSION

For the foregoing reasons, Amgen's Motion to Dismiss should be denied.[21]

---

[20] Compl. ¶¶ 205–18, 257–62; Br. at 25 ("Regeneron's UCL claim is derivative of its antitrust claims" and its "tortious interference claim fails" because "absent an antitrust violation, there is no plausible claim that Amgen [acted] unfairly or unlawfully."); *see Aetna*, 2013 WL 5694452, at *20 (UCL "borrows violations of other laws and treats them as independently actionable").

[21] At a minimum, Regeneron should be given the opportunity to amend its Complaint at least once before dismissal. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

Dated: September 26, 2022

WILKS LAW, LLC

*/s/ David E. Wilks*
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP

Elizabeth Stotland Weiswasser (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
John Z. Ren (admitted *pro hac vice*)
Robert Niles-Weed (admitted *pro hac vice*)
Gabrielle H. Kanter (admitted *pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev (admitted *pro hac vice*)
Priyata Y. Patel (admitted *pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*