IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | |
| | ) | C. A. No.: 22-00697-RGA-JLH |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | ███████████████ |
| AMGEN INC., | ) | |
| | ) | Redacted - Public Version Filed on: |
| Defendant. | ) | **January 16, 2024** |

### LETTER TO THE HONORABLE JENNIFER L. HALL
### FROM MELANIE K. SHARP REGARDING DISCOVERY DISPUTE

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Ben A. Sherwood
Leesa Haspel
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

Ashley E. Johnson
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
(214) 698-3100

*Attorneys for Amgen Inc.*

Dated:  December 19, 2023

Dear Judge Hall:

Defendant Amgen Inc. ("Amgen") and Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron") have reached an impasse regarding Regeneron's refusal to produce a limited but important set of data relating to the drug Dupixent®. These data are relevant under Third Circuit precedent because, if it was feasible for Regeneron—either alone or together with its business partner Sanofi, S.A. ("Sanofi")—to offer third party payors a bundled rebate on Dupixent® in return for favorable coverage of Praluent®, then Regeneron's antitrust claims fail. The requested discovery will aid Amgen and the Court in assessing the economic feasibility of such a bundle.

***The Legality of Bundled Rebates Turns on Their Anticompetitive Effects.*** In its filings in this case, Regeneron has suggested that there is something inherently wrong with bundled discounts or rebates. D.I. 124 ¶¶ 22, 73. Of course, that is not the case; instead, bundled rebates are common in the pharmaceutical industry and judged by courts based on their overall competitive effects. *See, e.g., Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 503 (E.D. Pa. 2018) ("Similar to exclusive dealing agreements, bundled rebate claims are analyzed under a rule of reason framework."). A plaintiff challenging bundled rebates faces a high bar; it must show, *inter alia*, that the drugs involved have monopoly power, *see SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978), and that bundled rebates foreclosed the competitor from a substantial portion of the market, *see LePage's Inc. v. 3M*, 324 F.3d 141, 154–57 (3d Cir. 2003).

Additionally, to challenge bundled rebates, a competitor like Regeneron must also show that it "does not manufacture an equally diverse group of products and [] *therefore cannot make a comparable offer*" itself. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405 (3d Cir. 2016) (internal quotations omitted) (emphasis added). In *Eisai*, the Third Circuit emphasized that if "nothing in the record indicates that an equally efficient competitor was unable to compete," then a plaintiff's antitrust claims challenging bundled rebates will fail. *See id.* at 406. This requirement from *Eisai* is at issue in Amgen's motion to compel because it ████████████████████████████████ . ████████████████████████████████████████████████████ Dupixent® is a blockbuster drug sold in connection with a collaboration between Regeneron and its business partner Sanofi. Ex. A, 10-K at 3, 4, 17. Regeneron's annual report confirms that in 2022 alone, the U.S. net sales of Dupixent® exceeded $6.6 billion—$2.6 billion dollars more than Amgen's drug Enbrel®. Exs. A, 10-K at 5 and B, 10-K at 59. As such, the drug has significant potential for a product bundle.

Moreover, Regeneron's already-produced documents show that it ████████████████ ████████████████████████████████████████ For example, in 2021, Swaminathan Subramanian (Senior Director, Pricing Strategy) and Richard O'Neal (Senior Vice President, Market Access) ████████████████████ ████████████████████ Exs. C and D. After considering Regeneron's business, ████████████████████████████ Ex. E. ████████████████████████████████████████████████████



▮▮▮▮▮▮▮▮▮▮ *Id.* at 33; *see also id.* at 12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ), 31 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ). Mr. Subramanian and Mr. O'Neal shared this presentation with other high-level Regeneron executives, such as Steven Hyde and Jane Farber. *Id.* at cover email. Amgen's depositions of Mr. Subramanian and Mr. O'Neal are quickly approaching, and the data Amgen seeks is relevant to questioning these witnesses about the feasibility of a Dupixent®/Praluent® bundle.

***The Third Party Payor Central to Regeneron's Antitrust Claims*** ▮▮▮▮▮▮



▮▮▮▮▮▮. Discovery also shows that the major third-party payor at the heart of Regeneron's antitrust claims against Amgen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Specifically, in 2020, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. F.

***The Requested Financial Information About Dupixent® Will Assist the Court and Amgen in Analyzing the Economic Feasibility of a Dupixent®/Praluent® Bundle.*** Under *Eisai* and other Third Circuit precedent, if Regeneron could have—but chose not to—bundle Praluent® with Dupixent® in order to compete with Amgen's offers, then Regeneron's claims will fail. To support its claims, Regeneron alleges that it is not "able to match Amgen's bundled rebate by offering an equivalent bundle across its portfolio[.]" D.I. 124 ¶ 86; *see also id.* ¶ 19 (". . . Regeneron does not have the practical ability to match Amgen's multi-product bundled rebate offer with its own multi-product bundled rebate offer."). Though devoid of any supporting facts, implicit in these allegations is Regeneron's contention that it could not offer a bundled rebate that would "match" Amgen's limited bundled rebate offers—a proposition that Amgen is entitled to test though discovery.

Accordingly, and because only limited information on Dupixent®'s U.S. sales is publicly available, Amgen has requested more detailed data relating, for example, to Dupixent®'s profitability, net prices, rebates/discounts, sales volume, market share, revenue share/royalties received by Regeneron, and similar data. Ex. G at RFP Nos. 26, 28, 29, 30(b). Each request is relevant to the economic feasibility of a Dupixent®/Praluent® bundle, and could demonstrate that the margins, profitability, costs, Sanofi/Regeneron revenue share, and other financial factors made Dupixent® a feasible candidate for a bundle with Praluent®. This information is likely within Regeneron's "possession, custody or control" including as a result of its partnership with Sanofi.[1] *See* Fed. R. Civ. P. 34(a)(1).

***Production Would Not Be Unduly Burdensome, Particularly in Light of the Relevance of the Requested Data.*** Rule 26(b) entitles a party to discovery relating to "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Although courts must consider "whether the burden or expense of the proposed discovery outweighs its likely

---

[1]    Due to the relevance of these data to its defense, Amgen is simultaneously discussing obtaining information related to Dupixent® from Sanofi. However, Sanofi has thus far also refused to provide the Dupixent® data. Given Sanofi's status as a non-party to this action, Amgen is first seeking this information from Regeneron.

benefit," *id.*, Regeneron's conclusory assertion that producing the requested data would be "unduly burdensome," *see* Ex. H, is insufficient. *See Lux Glob. Label Co., LLC v. Shacklett*, C.A. No. 18-5061, 2020 WL 1700572, at *4 (E.D. Pa. Apr. 8, 2020) (granting motion to compel where non-moving party "d[id] not address [the] burden" of producing information and therefore did not "demonstrate[] that the discovery [wa]s so marginally relevant that the burden outweigh[ed] the [likely benefit of the] production"). Notably, Regeneron has refused to identify any specific burden, despite Amgen's offer to discuss ways to minimize burden. *See* Ex. I. Rather, Regeneron has simply refused to produce any Dupixent®-specific data at all. *See* Exs. H and J.

***Regeneron's Claim That Sanofi Had U.S. Marketing Rights for Dupixent® Does Not Eliminate the Relevance of the Requested Financial Information.*** Regeneron appears to contend that Dupixent® data is irrelevant because, ███████████████████████████████████████████ ████████████████████████████████████. Ex. H (internal quotations omitted). Whether that is truly an obstacle to a bundle is a question to be explored in discovery, not foreclosed by Regeneron's unilateral say-so. Even assuming that the ████████████████ ███████████████████████ Regeneron could have approached Sanofi about a joint bundle, Sanofi could have agreed, and Sanofi and Regeneron could have made ██████████████████████ ██████████ if needed. And if Sanofi were disinclined to accept the proposal (a question unproven at this time), Amgen is still entitled to discovery on why and whether Regeneron could have offered financial or other terms to convince Sanofi to proceed. Indeed, Sanofi, which is responsible for selling Praluent® globally, Ex. A, 10-K at 4, has an inherent financial interest in the success of Praluent® because increased sales momentum in the U.S. could increase Praluent®'s global profile and brand reputation to Sanofi's benefit. Moreover, Regeneron and Sanofi "co-commercialize" Dupixent® in the U.S., and split the profits 50/50. *Id.* at 17. So Regeneron could potentially grant Dupixent® rebates to third party payors to support Praluent® out of Regeneron's own share of the profits generated by Dupixent®, without impacting Sanofi's profits from the collaboration.



After ███████████████████████████████████████████████████, Ed Kirk (Regeneron's National Account Director for ESI) told Richard O'Neal that a ███████████████████████████████████████ ██████████████████████—presumably after being educated by Regeneron about its business— ███████████████████████████████. *See* Ex. E. It is ███████████████████ ███████████████████. In any event, Regeneron cannot obstruct discovery by merely claiming that ███████████████████████████████████.

In sum, given the ██████████████████████████ that ███████████████████ ████████, Regeneron's internal communications indicating that ███████████████ █████, and ████████████████████████████████, Regeneron cannot plausibly argue that discovery into whether that bundle would have been feasible fails to meet Rule 26's relevance threshold. Instead, Amgen should be allowed discovery to explore whether such a bundle was possible—both contractually *and financially*—and have access to the data necessary to determine whether such a bundle could have competed with Amgen's offers. Amgen respectfully requests that the Court order Regeneron to produce Dupixent® data and information in response to Amgen's Requests for Production Nos. 26, 28, 29, and 30(b). Ex. G.

Respectfully,

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)

MKS:mg

cc:    All Counsel of Record (via CM/ECF and e-mail)
       Clerk of the Court (via CM/ECF and Hand Delivery)

31089027.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | |
| | ) | C. A. No.:  22-00697-RGA-JLH |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| AMGEN INC., | ) | |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] ORDER

Upon consideration of Defendant Amgen Inc.'s ("Amgen's") Letter to the Honorable Jennifer L. Hall from Melanie K. Sharp Regarding Discovery Dispute dated December 19, 2023, and all related pleadings and argument, it is hereby ORDERED that Plaintiff Regeneron Pharmaceuticals, Inc. shall produce responsive, non-privileged Dupixent® data and information in response to Amgen's Requests for Production Nos. 26, 28, 29, and 30(b) within 14 days from the date of this Order or by January 12, 2024, whichever is earlier.

SO ORDERED this _____ day of _____, 2023.


_____
United States Magistrate Judge


31088889.1

# EXHIBIT A
# EXCERPTED

# 2022
# ANNUAL REPORT



**REGENERON**®



# FORM 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

　For the fiscal year ended December 31, 2022

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

　For the transition period from ＿＿＿＿＿＿ to ＿＿＿＿＿＿

Commission File Number: 000-19034

# REGENERON PHARMACEUTICALS, INC.

*(Exact name of registrant as specified in its charter)*

| **New York** | **13-3444607** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**777 Old Saw Mill River Road  Tarrytown, New York  10591-6707**
*(Address of principal executive offices, including zip code)*

**(914) 847-7000**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of each class</u> | <u>Trading Symbol</u> | <u>Name of each exchange on which registered</u> |
|---|---|---|
| **Common Stock - par value $.001 per share** | **REGN** | **NASDAQ Global Select Market** |

**Securities registered pursuant to section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.　　Yes ☒　No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.　　Yes ☐　No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.　　Yes ☒　No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).　　Yes ☒　No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒　　Accelerated filer ☐　　Non-accelerated filer ☐　　Smaller reporting company ☐　　Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.　☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.　☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).　　Yes ☐　No ☒

The aggregate market value of the voting and non-voting common stock held by non-affiliates of the registrant was $62.0 billion, computed by reference to the closing sales price of the stock on NASDAQ on June 30, 2022, the last trading day of the registrant's most recently completed second fiscal quarter. For purposes of this calculation only, the registrant has assumed that all of its directors and executive officers, and no other persons, are its affiliates. This determination of affiliate status is not necessarily a determination for other purposes.

The number of shares outstanding of each of the registrant's classes of common stock as of January 26, 2023:

| Class of Common Stock | Number of Shares |
|---|---|
| Class A Stock, $.001 par value | 1,818,146 |
| Common Stock, $.001 par value | 107,507,386 |

**DOCUMENTS INCORPORATED BY REFERENCE**

Specified portions of the Registrant's definitive proxy statement to be filed in connection with solicitation of proxies for its 2023 Annual Meeting of Shareholders are incorporated by reference into Part III of this Form 10-K. Exhibit index is located on pages 96 to 101 of this filing.

## General

Regeneron Pharmaceuticals, Inc. is a fully integrated biotechnology company that invents, develops, manufactures, and commercializes medicines for people with serious diseases. Our products and product candidates in development are designed to help patients with eye diseases, allergic and inflammatory diseases, cancer, cardiovascular and metabolic diseases, pain, hematologic conditions, infectious diseases, and rare diseases.

Our core business strategy is to maintain a strong foundation in basic scientific research and discovery-enabling technologies, and to build on that foundation with our clinical development, manufacturing, and commercial capabilities. Our objective is to continue to be an integrated, multi-product biotechnology company that provides patients and medical professionals with important medicines for preventing and treating human diseases.

Selected financial information is summarized as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
| *(In millions, except per share data)* | **2022** | **2021** | **2020** |
| Revenues | $12,172.9 | $16,071.7 | $ 8,497.1 |
| Net income | $ 4,338.4 | $ 8,075.3 | $ 3,513.2 |
| Net income per share – diluted | $   38.22 | $   71.97 | $   30.52 |

For purposes of this report, references to our products encompass products marketed or otherwise commercialized by us and/or our collaborators or licensees and references to our product candidates encompass product candidates in development by us and/or our collaborators or licensees (in the case of collaborated or licensed products or product candidates under the terms of the applicable collaboration or license agreements), unless otherwise stated or required by the context.

### *Products*

Products that have received marketing approval are summarized in the table below.

| Product | Disease | Territory | | | |
|---|---|---|---|---|---|
|  |  | **U.S.** | **EU** | **Japan** | **ROW[e]** |
| EYLEA (aflibercept) Injection[a] | Neovascular age-related macular degeneration ("wet AMD") | ✔ | ✔ | ✔ | ✔ |
|  | Diabetic macular edema ("DME") | ✔ | ✔ | ✔ | ✔ |
|  | Macular edema following retinal vein occlusion ("RVO"), which includes macular edema following central retinal vein occlusion ("CRVO") and macular edema following branch retinal vein occlusion ("BRVO") | ✔ | ✔ | ✔ | ✔ |
|  | Myopic choroidal neovascularization ("mCNV") |  | ✔ | ✔ | ✔ |
|  | Diabetic retinopathy ("DR") | ✔ |  |  |  |
|  | Neovascular glaucoma ("NVG") |  |  | ✔ |  |
|  | Retinopathy of prematurity ("ROP") |  | ✔ | ✔ |  |
| Dupixent (dupilumab) Injection[b] | Atopic dermatitis (in adults and adolescents) | ✔ | ✔ | ✔ | ✔ |
|  | Atopic dermatitis (in pediatrics 6–11 years of age) | ✔ | ✔ |  | ✔ |
|  | Atopic dermatitis (in pediatrics 6 months–5 years of age) | ✔ |  |  | ✔ |
|  | Asthma (in adults and adolescents) | ✔ | ✔ | ✔ | ✔ |
|  | Asthma (in pediatrics 6–11 years of age) | ✔ | ✔ |  | ✔ |
|  | Chronic rhinosinusitis with nasal polyposis ("CRSwNP") | ✔ | ✔ | ✔ | ✔ |

| Product *(continued)* | Disease | Territory | | | |
|---|---|---|---|---|---|
| | | U.S. | EU | Japan | ROW[e] |
| Dupixent (dupilumab) Injection[b] *continue* | Eosinophilic esophagitis ("EoE") (in adults and adolescents) | ✔ | ✔ | | ✔ |
| | Prurigo nodularis | ✔ | ✔ | | ✔ |
| Libtayo (cemiplimab) Injection[c] | Metastatic or locally advanced first-line non-small cell lung cancer ("NSCLC") | ✔ | ✔ | | ✔ |
| | Metastatic or locally advanced first-line NSCLC (in combination with chemotherapy) | ✔ | | | |
| | Metastatic or locally advanced basal cell carcinoma ("BCC") | ✔ | ✔ | | ✔ |
| | Metastatic or locally advanced cutaneous squamous cell carcinoma ("CSCC") | ✔ | ✔ | | ✔ |
| | Metastatic or recurrent second-line cervical cancer | | ✔ | ✔ | ✔ |
| Praluent (alirocumab) Injection[d] | LDL-lowering in heterozygous familial hypercholesterolemia ("HeFH") or clinical atherosclerotic cardiovascular disease ("ASCVD") | ✔ | ✔ | | ✔ |
| | Cardiovascular risk reduction in patients with established cardiovascular disease | ✔ | ✔ | | ✔ |
| | Homozygous familial hypercholesterolemia ("HoFH") | ✔ | | | |
| REGEN-COV®[f] | COVID-19 | | ✔ | ✔ | ✔ |
| Kevzara (sarilumab) Solution for Subcutaneous Injection[b] | Rheumatoid arthritis ("RA") | ✔ | ✔ | ✔ | ✔ |
| Evkeeza (evinacumab) Injection[g] | HoFH (in adults and adolescents) | ✔ | ✔ | | ✔ |
| Inmazeb® (atoltivimab, maftivimab, and odesivimab-ebgn) Injection | Infection caused by *Zaire ebolavirus* | ✔ | | | |
| ARCALYST® (rilonacept) Injection for Subcutaneous Use[h] | Cryopyrin-associated periodic syndromes ("CAPS"), including familial cold auto-inflammatory syndrome ("FCAS") and Muckle-Wells syndrome ("MWS") (in adults and adolescents) | ✔ | | | |
| | Deficiency of interleukin-1 receptor antagonist ("DIRA") (in adults and pediatrics) | ✔ | | | |
| | Recurrent pericarditis (in adults and adolescents) | ✔ | | | |
| ZALTRAP® (ziv-aflibercept) Injection for Intravenous Infusion[i] | Metastatic colorectal cancer ("mCRC") | ✔ | ✔ | ✔ | ✔ |

Note: Refer to table below (net product sales of Regeneron-discovered products) for information regarding whether net product sales for a particular product are recorded by us or others. In addition, unless otherwise noted, products in the table above are generally approved for use in adults in the above-referenced diseases.

[a] In collaboration with Bayer outside the United States

[b] In collaboration with Sanofi

[c] In collaboration with Sanofi prior to July 2022. Effective July 2022, the Company is solely responsible for the development, commercialization, and manufacturing of Libtayo. Refer to "Collaboration, License, and Other Agreements" section below for further details.

[d] The Company is solely responsible for the development and commercialization of Praluent in the United States, and Sanofi is solely responsible for the development and commercialization of Praluent outside the United States.

(e) Rest of world ("ROW"). A checkmark in this column indicates that the product has received marketing approval in at least one country outside of the United States, European Union ("EU"), or Japan.

(f) Known as REGEN-COV in the United States and Ronapreve™ in other countries.

(g) The Company is solely responsible for the development and commercialization of Evkeeza in the United States. In January 2022, the Company entered into a license and collaboration agreement for Ultragenyx to develop and commercialize Evkeeza outside of the United States.

(h) Kiniksa is solely responsible for the development and commercialization of ARCALYST.

(i) Sanofi is solely responsible for the development and commercialization of ZALTRAP.

Net product sales of Regeneron-discovered products consist of the following:

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2022 | | | 2021 | | | 2020 | | |
| (In millions) | U.S. | ROW | Total | U.S. | ROW | Total | U.S. | ROW | Total |
| EYLEA(a) | $6,264.6 | $3,382.8 | $9,647.4 | $5,792.3 | $3,450.9 * | $9,243.2 | $4,947.2 | $2,820.7 * | $7,767.9 |
| Dupixent(b) | $6,668.0 | $2,013.2 | $8,681.2 | $4,713.0 | $1,485.3 | $6,198.3 | $3,226.2 | $ 818.6 | $4,044.8 |
| Libtayo(c) | $ 374.5 | $ 203.5 | $ 578.0 | $ 306.3 | $ 151.9 | $ 458.2 | $ 270.7 | $ 77.5 | $ 348.2 |
| Praluent(d) | $ 130.0 | $ 337.4 | $ 467.4 | $ 170.0 | $ 251.1 | $ 421.1 | $ 186.0 | $ 172.8 | $ 358.8 |
| REGEN-COV(e) | $ — | $1,769.6 | $1,769.6 | $5,828.0 | $1,745.9 | $7,573.9 | $ 185.7 | $ — | $ 185.7 |
| Kevzara(b) | $ 199.7 | $ 158.3 | $ 358.0 | $ 161.9 | $ 176.1 | $ 338.0 | $ 141.6 | $ 128.3 | $ 269.9 |
| Other products(f) | $ 56.1 | $ 69.1 | $ 125.2 | $ 25.9 | $ 86.4 | $ 112.3 | $ 18.9 | $ 97.9 | $ 116.8 |

* Effective January 1, 2022, the Company and Bayer commenced sharing equally in profits and losses based on sales from Bayer to its distributor in Japan. Previously, the Company received from Bayer a tiered percentage of sales based on sales by Bayer's distributor in Japan. Consequently, the prior year net product sales amount has been revised for comparability purposes.

(a) Regeneron records net product sales of EYLEA in the United States. Bayer records net product sales of EYLEA outside the United States. The Company records its share of profits/losses in connection with sales of EYLEA outside the United States.

(b) Sanofi records global net product sales of Dupixent and Kevzara. The Company records its share of profits/losses in connection with global sales of Dupixent and Kevzara.

(c) Prior to July 1, 2022, Regeneron recorded net product sales of Libtayo in the United States and Sanofi recorded net product sales of Libtayo outside the United States. The parties equally shared profits/losses in connection with global sales of Libtayo. Effective July 1, 2022, the Company began recording net product sales of Libtayo outside the United States and pays Sanofi a royalty on global sales. Refer to "Collaboration, License, and Other Agreements" section below for further details. Included in this line item is approximately $34 million of net product sales recorded by Sanofi in the second half of 2022 in connection with sales in certain markets (Sanofi will record net product sales in such markets during a transition period until inventory on hand as of July 1, 2022 is sold through to the end customers).

(d) Effective April 1, 2020, Regeneron records net product sales of Praluent in the United States. Also effective April 1, 2020, Sanofi records net product sales of Praluent outside the United States and pays the Company a royalty on such sales. Previously, Sanofi recorded global net product sales of Praluent and the Company recorded its share of profits/losses in connection with such sales.

(e) Regeneron records net product sales of REGEN-COV in the United States and Roche records net product sales of Ronapreve outside the United States. The parties share gross profits from global sales of REGEN-COV and Ronapreve based on a pre-specified formula.

(f) Included in this line item are products which are sold by the Company and others. Refer to Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations - Results of Operations - Revenues" for a complete listing of net product sales recorded by the Company. Not included in this line item are net product sales of ARCALYST subsequent to the first quarter of 2021, which are recorded by Kiniksa.

## Programs in Clinical Development

Product candidates in clinical development, which are being developed by us and/or our collaborators, are summarized in the table below.

There are numerous uncertainties associated with drug development, including uncertainties related to safety and efficacy data from each phase of drug development (including any post-approval studies), uncertainties related to the enrollment and performance of clinical trials, changes in regulatory requirements, changes to drug pricing and reimbursement regulations and requirements, and changes in the competitive landscape affecting a product candidate. The planning, execution, and results of our clinical programs are significant factors that can affect our operating and financial results.

Refer to Part I, Item 1A. "Risk Factors" for a description of risks and uncertainties that may affect our clinical programs. Any of such risks and uncertainties may, among other matters, negatively impact the development timelines set forth in the table below.

**Collaboration, License, and Other Agreements**

*Sanofi*

*Antibody*

We are collaborating with Sanofi on the global development and commercialization of Dupixent, Kevzara, and itepekimab the "Antibody Collaboration". Under the terms of the Antibody License and Collaboration Agreement the "LCA", Sanofi is generally responsible for funding 80% to 100% of a need-up on development costs. We are obligated to reimburse Sanofi for 30% to 50% of worldwide development expenses that were funded by Sanofi based on our share of collaboration profits from commercialization of collaboration products. Under the terms of the LCA, we were required to apply 10% of our share of the profits from the Antibody Collaboration in any calendar quarter to reimburse Sanofi for these development costs. On July 1, 2022, an amendment to the LCA became effective, pursuant to which the percentage of Regeneron's share of profits used to reimburse Sanofi for such development costs increased from 10% to 20%.

Under our collaboration agreement, Sanofi records product sales for commercialized products, and Regeneron has the right to co-commercialize such products on a country-by-country basis. We co-commercialize Dupixent in the United States and in certain countries outside the United States. We supply certain commercial bulk product to Sanofi. We and Sanofi equally share profits and losses from sales within the United States. We and Sanofi share profits outside the United States on a sliding scale based on sales starting at 65% (Sanofi)/35% (us) and ending at 55% (Sanofi)/45% (us), and share losses outside the United States at 55% (Sanofi)/45% (us). In each of 2020 and 2021, we earned a $50.0 million sales-based milestone from Sanofi, upon aggregate annual sales of antibodies outside the United States (including Praluent) exceeding $1.0 billion and $1.5 billion, respectively, on a rolling twelve-month basis. In 2022, we earned two additional $50.0 million sales-based milestones, upon aggregate annual sales of antibodies outside the United States (including Praluent) exceeding $2.0 billion and $2.5 billion, respectively, on a rolling twelve-month basis. We are entitled to receive the final sales milestone payment of $50.0 million when such sales outside the United States exceed $3.0 billion on a rolling twelve-month basis.

In April 2020, the Company and Sanofi entered into an amendment to the LCA in connection with, among other things, the removal of Praluent from the LCA such that (i) effective April 1, 2020, the LCA no longer governs the development, manufacture, or commercialization of Praluent and (ii) the quarterly period ended March 31, 2020 was the last quarter for which Sanofi and the Company shared profits and losses for Praluent under the LCA. The parties also entered into a Praluent Cross License & Commercialization Agreement (the "Praluent Agreement") pursuant to which, effective April 1, 2020, the Company, at its sole cost, became solely responsible for the development and commercialization of Praluent in the United States, and Sanofi, at its sole cost, is solely responsible for the development and commercialization of Praluent outside of the United States. Under the Praluent Agreement, Sanofi pays the Company a 5% royalty on Sanofi's net product sales of Praluent outside the United States until March 31, 2032. The Company does not owe Sanofi royalties on the Company's net product sales of Praluent in the United States. Although each party will be responsible for manufacturing Praluent for its respective territory, the parties have entered into definitive supply agreements under which, for a certain transitional period, the Company will continue to supply drug substance to Sanofi and Sanofi will continue to supply finished product to Regeneron. With respect to any intellectual property or product liability litigation relating to Praluent, the parties have agreed that, effective April 1, 2020, Regeneron and Sanofi each will be solely responsible for any such litigation (including damages and other costs and expenses thereof) in the United States and outside the United States, respectively, arising out of Praluent sales or other activities on or after April 1, 2020 (subject to Sanofi's right to set off a portion of any third-party royalty payments resulting from certain patent litigation proceedings against up to 50% of any Praluent royalty payment owed to Regeneron). The parties will each bear 50% of any damages arising out of Praluent sales or other activities prior to April 1, 2020.

*Immuno-Oncology*

We previously collaborated with Sanofi for antibody-based cancer treatments in the field of immuno-oncology (the "IO Collaboration"). Under the terms of the Immuno-oncology License and Collaboration Agreement, the parties were co-developing and co-commercializing Libtayo. The parties shared equally, on an ongoing basis, development and commercialization expenses for Libtayo. We had principal control over the development of Libtayo and led commercialization activities in the United States, while Sanofi led commercialization activities outside of the United States. The parties shared equally in profits and losses in connection with the commercialization of Libtayo.

Effective July 1, 2022, the Company obtained the exclusive right to develop, commercialize, and manufacture Libtayo worldwide under an Amended and Restated Immuno-oncology License and Collaboration Agreement with Sanofi (the "A&R IO LCA"). In connection with the A&R IO LCA, in 2022, the Company made a $900.0 million up-front payment to Sanofi, as well as a $100.0 million regulatory milestone payment. In addition, Sanofi earned a $65.0 million sales-based milestone upon the achievement of a specified amount of worldwide net product sales of Libtayo in 2022, and is eligible to receive an additional $35.0 million sales-based milestone upon the achievement of a specified amount of worldwide net product sales of Libtayo in 2023. We also pay

# EXHIBIT B
# EXCERPTED

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2022
### or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### Commission file number 001-37702

# Amgen Inc.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **95-3540776** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Amgen Center Drive** | |
| **Thousand Oaks** | |
| **California** | **91320-1799** |
| (Address of principal executive offices) | (Zip Code) |

#### (805) 447-1000
#### (Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol (s) | Name of each exchange on which registered |
|---|---|---|
| **Common stock, $0.0001 par value** | **AMGN** | **The Nasdaq Stock Market LLC** |
| **2.00% Senior Notes due 2026** | **AMGN26** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

on a nonstrategic divestiture in 2022. See Part IV—Note 2, Acquisitions and divestitures, and Note 8, Collaborations, to the Consolidated Financial Statements.

## Results of Operations

*Product sales*

Worldwide product sales were as follows (dollar amounts in millions):

| | Year ended December 31, 2022 | Change | Year ended December 31, 2021 | Change | Year ended December 31, 2020 |
|---|---|---|---|---|---|
| ENBREL | $ 4,117 | (8)% | $ 4,465 | (11)% | $ 4,996 |
| Prolia | 3,628 | 12 % | 3,248 | 18 % | 2,763 |
| Otezla | 2,288 | 2 % | 2,249 | 2 % | 2,195 |
| XGEVA | 2,014 | — % | 2,018 | 6 % | 1,899 |
| Aranesp | 1,421 | (4)% | 1,480 | (6)% | 1,568 |
| Nplate | 1,307 | 27 % | 1,027 | 21 % | 850 |
| Repatha | 1,296 | 16 % | 1,117 | 26 % | 887 |
| KYPROLIS | 1,247 | 13 % | 1,108 | 4 % | 1,065 |
| Neulasta | 1,126 | (35)% | 1,734 | (24)% | 2,293 |
| EVENITY | 787 | 48 % | 530 | 51 % | 350 |
| Other products[1] | 5,570 | 5 % | 5,321 | (1)% | 5,374 |
| Total product sales | $ 24,801 | 2 % | $ 24,297 | — % | $ 24,240 |
| Total U.S. | $ 17,743 | 3 % | $ 17,286 | (4)% | $ 17,985 |
| Total ROW | 7,058 | 1 % | 7,011 | 12 % | 6,255 |
| Total product sales | $ 24,801 | 2 % | $ 24,297 | — % | $ 24,240 |

_____

[1] Consists of product sales of our non-principal products, as well as our Gensenta and Bergamo subsidiaries.

Future sales of our products will depend in part on the factors discussed in the Overview, Part I, Item 1. Business—Marketing, Distribution and Selected Marketed Products—Competition, in Part I, Item 1A. Risk Factors, and any additional factors discussed in the individual product sections below. In addition, for a list of our products' significant competitors, see Part I, Item 1. Business—Marketing, Distribution and Selected Marketed Products—Competition.

*ENBREL*

Total ENBREL sales by geographic region were as follows (dollar amounts in millions):

| | Year ended December 31, 2022 | Change | Year ended December 31, 2021 | Change | Year ended December 31, 2020 |
|---|---|---|---|---|---|
| ENBREL — U.S. | $ 4,044 | (7)% | $ 4,352 | (10)% | $ 4,855 |
| ENBREL — Canada | 73 | (35)% | 113 | (20)% | 141 |
| Total ENBREL | $ 4,117 | (8)% | $ 4,465 | (11)% | $ 4,996 |

The decrease in ENBREL sales for 2022 was primarily driven by unfavorable changes to estimated sales deductions, lower volume and lower net selling price. For 2023, we expect ENBREL to follow the historical pattern of lower sales in the first quarter relative to subsequent quarters due to the impact of benefit plan changes, insurance reverification and increased co-pay expenses as U.S. patients work through deductibles. In addition, for 2023, we expect further declines in net selling price.

The decrease in ENBREL sales for 2021 was driven by lower net selling price, volume and unfavorable changes to inventory.

# EXHIBIT C

| Date: | Thursday, June 17 2021 07:22 PM |
|---|---|
| Subject: | **Regeneron \| ████████ - ██████████ Strategy Framework Proposal** |
| From: | Swaminathan Subramanian ██████████████████████ █ |
| To: | Richard O'Neal ████████████████ |
| Attachments: | Regeneron-████████ - ██████████ Strategy Framework Proposal - 17Jun2021 cv.pdf |

Rich,

I am attaching the proposal that I had asked ████████ to put together to help us develop a framework to gain a better understanding of the nuances of ██████████████ and to enable us conduct a structured evaluation of ████████ ████████ within Regeneron.

The first phase of this project would focus on the development of framework and the second phase (as needed) could be a deep dive on specific products/therapeutic areas to develop a ████████████

I think this will be a very useful and potentially a high impact project as we prepare for future. ██████████████████ ████████████████ They have a solid team including experts on the govt. pricing side.

██████████████████████████████████████████████████████████
████████

Let me know if you are Ok with this.

On a related note, I have some insights regarding how ████████████████████████████ I can fill you in on this separately.

Thx,
Swami

REGN0135134

# EXHIBIT D

| | |
|---|---|
| **Date:** | Monday, July 19 2021 01:47 PM |
| **Subject:** | Completed: You're copied on "Regeneron: Statement of Work or Work Order█ SERVICES LLC-2021_024709" |
| **From:** | Regeneron <adobesign@adobesign.com> |
| **To:** | █ <█>;Linda Henderson <█>; Richard O'Neal <█>; |
| **CC:** | Melinda Boss █; Susan Vosler <█; Swaminathan Subramanian <█; |
| **Attachments:** | Regeneron_ Statement of Work or Work Order-█ SERVICES LLC-2021_024709 - signed.pdf |



Linda Henderson cc'd you on

# Regeneron: Statement of Work or Work Order-█ █ SERVICES LLC-2021_024709

[ **Open agreement** ]

Attached is the final agreement between:

- Regeneron
- █
- Richard O'Neal

You can also **open it online** to review its activity history.
Linda Henderson had previously added you to this agreement for your information only.

To ensure that you continue receiving our emails, please add adobesign@adobesign.com to your address book or safe list.

© 2021 Adobe. All rights reserved.

REGN0135402

**REGENERON**

Regeneron Contract Number: 2021_024709
Master Agreement: 2019_026627
PO Number: 6708

## STATEMENT OF WORK

███████████████████████ Strategy Framework

This Statement of Work (this "SOW" or "Statement of Work"), dated as of the date last signed below ("Effective Date"), shall be deemed a Statement of Work pursuant to, and governed by, the Master Services Agreement (the "Agreement") dated as of December 12, 2019 between **Regeneron Healthcare Solutions, Inc.** (together with its affiliates, "Regeneron") and ████████ ███ ███████ ████████ ███████████ ████████ ██ Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

1. **PROJECT SUMMARY**

Regeneron is pursuing ████████████████████████████████████████ ████████ and anticipates increasing its portfolio with new product launches in ████████ ██████████ With this in mind, the █████████ team will deliver a strategic framework for evaluation of ██████████████ This framework will then be used by Regeneron brand teams to help educate the organization and identify opportunities for ██████████ ████████████████████████████████████

2. **DESCRIPTION OF SERVICES**

The Services provided by Supplier pursuant to this Statement of Work will be as follows:

The project will encompass the follow three (3) steps:
1. Initiate Project
   a. Kick off project, and gather insights, existing research and current understanding from Regeneron
   b. Conduct interviews with selected, internal ████████ experts
   c. Develop hypotheses to test in research
2. Conduct Primary Market Research with Payers
   a. Develop primary market research survey and targeted discussion guide
   b. Field fifteen (15)-min online survey with N=15 access decision-makers across national / regional payers and PBMs
   c. Conduct follow-up, thirty (30)-min in-depth interviews with N=3 survey respondents
3. Synthesize Research & Deliver Final Report
   a. Synthesize results of research into ████████████████ strategic framework and summary research insights presentation
   b. Conduct team work session to refine framework and deliver recommendations and strategic direction to Regeneron market access teams, based on ████████ ████████████ guiding principles

1

REGN0135403

**REGENERON**

- **Supplier Responsibilities**:
    - Execute tasks as described above Services
    - Provide project management throughout the engagement and regular updates to the Regeneron project team
    - Appropriately escalate project risks, as needed, to the Regeneron project team and provide recommended solutions

- **Regeneron Responsibilities:**
    - Ensure timely access to the project sponsor and key team members throughout the project
    - Communicate project objectives and expected results to team members and staff
    - Provide ▮▮▮▮▮ with timely feedback on deliverables and full and timely access to all relevant data needed to conduct this project

- **Assumptions**:
    - The project will take approximately six (6) weeks to complete.
    - Expenses—such as honoraria and travel—are not included in the professional fees, and will be invoiced to Regeneron after such expenses have occurred
    - Payer recruiting efforts will be in line with previous expectations and be completed within the allotted timeframe

3. **DATA**

   Not applicable to this engagement.

3. **PRODUCTS**

   N/A – no specific product information will be assessed or evaluated as part of this engagement. This project will be evaluating payer perceptions of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮

4. **EXPECTED DELIVERABLES AND TIMELINE**

   **4.1 Expected Deliverables and Timeline**

2

▮▮▮▮▮▮▮▮▮▮▮▮                                                                    REGN0135404

**REGENERON**



## 4.2 Milestones

| Expected Deliverables | Timelines |
|---|---|
| Research Insights from Payer Decision-makers (as part of final work session and recommendations) | Week of 8/23/2021 |
| ▉▉▉▉▉▉ Strategic Framework | Week of 8/23/2021 |
| **Specific Milestones** | |
| Project Kick-off Meeting | 7/20/2021 |
| Quantitative Survey Fielding Start | Week of 8/02/2021 |
| Final Work Session | Week of 8/23/2021 |

**4.3 ACCEPTANCE.** In addition to any rights or remedies Regeneron may have available to it, following submission of any Deliverable(s) by Supplier, Regeneron Project Lead may conduct testing and review in accordance with the agreed Specifications (as defined in the Agreement), testing standards and procedures, with such testing to be completed within a time agreed by the parties, or in the absence of a prescribed period within a reasonable period of time from the date of submission. The standard of review of the Deliverable(s) shall be non-conformance with the Specifications. By the end of such review period, Regeneron will submit a written statement (a "Deliverable Review Statement") to Supplier indicating the acceptance of the Deliverable(s) ("Acceptance") or specifying in detail any non-conformity in the Deliverable(s). If Regeneron notifies Supplier that any Deliverable(s) fail to conform to the specifications set forth in this Statement of Work, then, in addition to any rights or remedies Regeneron may have available to it, Regeneron may require Supplier to correct the Deliverable(s) to conform to the specifications set forth in this Statement of Work within a commercially reasonable period of time not greater than **fifteen (15) days** at no additional compensation to Regeneron. The acceptance process shall recommence upon resubmission of the Deliverable(s) by Supplier to Regeneron. If Regeneron concludes that Supplier does not or cannot promptly conform to such Deliverable(s) after two (2) cycles of re-performance, Regeneron may reject such nonconforming Deliverable(s), may terminate this Statement of Work, and shall not be required to pay Supplier the compensation for such nonconforming Deliverable(s). In the event that Regeneron has paid in advance for such non-conforming Deliverables, Contract shall immediately refund the amount attributable to such non-conforming Deliverables. The preceding sentence shall not affect Regeneron's payment obligations in respect of Deliverables (or milestone(s) thereof) which are

3

**REGENERON**

already accepted. Deliverable(s) will be deemed to be accepted by Regeneron in the event Regeneron has not submitted a Deliverable Review Statement to Supplier before the expiration of the applicable review period.

5. **PROPOSED STAFFING PLAN, FEES AND EXPENSES**

Supplier shall be paid the following fees and expenses, **upon completion and acceptance of the milestones listed below,** as evidenced by an accompanying detailed timesheet or other time tracking documentation approved by Regeneron:

| Milestone Descriptions | Estimated Fees | Estimated Expenses | Subtotal |
|---|---|---|---|
| Project Initiation and Kickoff | | | |
| Payer Primary Research | | | |
| Synthesis and Framework Development | | | |
| SUBTOTAL | | | |
| **TOTAL PRICE NOT TO EXCEED**** | | | |

**Regeneron will be billed only for actualized fees and expenses. All agreed upon expenses are billed on a pass-through basis and receipts will be provided. All reimbursement of travel and expenses will be in accordance with Regeneron's Non-Employee Travel & Expense Policy.

6. **INVOICE REQUIREMENT**

Accounts Payable at Regeneron requires Purchase Order ("PO") Number on all invoices. Omission of any part of the PO number may delay invoice processing and payment. Include detailed description, and when applicable, include PO Line Numbers.

All invoices should be addressed to **Regeneron Healthcare Solutions, Inc.** and sent to following email ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Please do not send statements, inquiries, or company notifications to the above email addresses. They will not be read as this email address is strictly for invoice submittal.

1. Supported invoice formats are: PDF, JPG, and TIFF.
   **Note: Invoices submitted in any other format will not be processed.**

2. Each submission should only include <u>one</u> invoice per attachment; however, multiple attachments can be submitted in one email.
   **For example**: invoice numbers 1, 2 and 3 cannot be submitted as one attachment, but they can be submitted as three <u>separate</u> attachments in one email.
   **Note: Attachments that include multiple invoices as a single document will not be processed.**

3. Please do not send invoices with passwords as our system will not be able to unlock them.

4. If your invoices contain more than forty **(40)** pages, please do not email them to the above email addresses, instead contact your direct Regeneron AP Coordinator for guidance. If you are

4

**REGENERON**

unsure who your Regeneron AP Coordinator is, Diana or Janine (contact information noted below) will advise you.

5. An auto generated response will be received with each email submission.
   - If the invoice(s) was submitted per the guidelines above, you will receive an 'Invoice Submission Successful' email.
   - If there was an error with the submission, you will receive a 'Submission Failed' email.

## 7. <u>LEAD REGENERON CONTACT</u>

Swaminathan Subramanian



## 8. <u>LEAD REGENERON STRATEGIC SOURCING AND PROCUREMENT CONTACT</u>

## 9. <u>LEAD SUPPLIER CONTACT.</u>



## 10. <u>ADDITIONAL REQUIREMENT</u>

**RECONCILIATIONS AND BUDGET TRACKING MEETING**
1) Upon Regeneron's request, Supplier will provide monthly financial reconciliations for work completed during the prior month, detailing actual hours spent, out of pocket expenses, milestones achieved and any other details as agreed to by the parties from time to time.

2) Supplier will participate in status meetings with Regeneron, on a weekly basis or as required by Regeneron, and will provide Monthly Project Status/Budget Tracking Reports.

## 11. <u>SOW TERM</u>

This Statement of Work shall remain in effect from the Effective Date, until completion of all Deliverables and other work under the Statement of Work or termination of this Statement of Work or termination of the Agreement, but in no event not later than **October 15th, 2021.**

## 12. <u>APPROVED SUBCONTRACTORS</u>

N/A

## 13. <u>PRIMARY WORKPLACE</u>

5

Regeneron -

**REGENERON**

The work outlined under this SOW will be performed by Supplier personnel in the offices of the Supplier in ▮▮▮▮▮▮▮▮▮▮

### 14. CHANGES

Changes in scope and/or timeline may result in a revised Statement of Work that may include additional fees, as may be agreed to by the parties from time to time. No modifications to this Statement of Work shall be effective unless made in writing and signed by a duly authorized representative of each party.

**Should there be any changes in the scope of this engagement requested by Regeneron, Supplier will submit a change request in writing both to Regeneron's Project Lead for approval for the cost of the any changes in scope, and Strategic Sourcing and Procurement Lead (▮▮▮▮▮▮▮▮▮▮▮▮) to amend this SOW accordingly.**

### 15. COUNTERPARTS

This Statement of Work may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement. For the avoidance of doubt, in the event that any signature is delivered by electronic means or ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature were an original thereof.

IN WITNESS WHEREOF, the parties have executed this SOW as of the Effective Date.

Regeneron Healthcare Solutions, Inc.           ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By:  *Richard O'Neal*                          By:  ▮▮▮▮▮▮▮▮

Title:  VP Market Access                       Title:  Principal

Date:  Jul 19, 2021                            Date:  Jul 19, 2021

Approved as to legal form, per Regeneron Corporate Policy #950

6

# Regeneron: Statement of Work or Work Order- ██████████████████ SERVICES LLC-2021_024709

**Final Audit Report**          2021-07-19

| | |
|---|---|
| Created: | 2021-07-19 |
| By: | Linda Henderson ████████████ |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAABrWqxmb2XdWgXaBhoh3Bq125Tn_UeQZh |

## "Regeneron: Statement of Work or Work Order-████████████ ██████████ SERVICES LLC-2021_024709" History

📄 Document created by Linda Henderson ████████
2021-07-19 - 1:37:09 PM GMT- IP address: 40.114.33.16

📧 Document emailed to Christopher Nuesch (████████████████████ for signature
2021-07-19 - 1:38:17 PM GMT

📄 Email viewed by ████████████ ████████████
2021-07-19 - 1:38:46 PM GMT- IP address: 104.47.55.254

✒️ Document e-signed by ████████████ (████████████████
Signature Date: 2021-07-19 - 1:39:47 PM GMT - Time Source: server- IP address: 73.194.117.133

📧 Document emailed to Richard O'Neal ████████████████ for signature
2021-07-19 - 1:39:49 PM GMT

📄 Email viewed by Richard O'Neal (████████████████████
2021-07-19 - 1:46:34 PM GMT- IP address: 165.225.61.113

✒️ Document e-signed by Richard O'Neal ████████████████
Signature Date: 2021-07-19 - 1:47:30 PM GMT - Time Source: server- IP address: 165.225.61.113

✅ Agreement completed.
2021-07-19 - 1:47:30 PM GMT

**REGENERON** science to medicine®     POWERED BY Adobe Sign



REGN0135409

# EXHIBIT E

| From: | "Swaminathan Subramanian" < ██████████████████ |
|---|---|
| To: | "Richard O'Neal" <██████████████ "Steven Hyde" █████████████████ "Jane Farber" ████████████ |
| Subject: | Regeneron_██████████ - ███████████████ - Work Session Deck - 1 September 2021 vf.pptx |
| Date: | Wednesday, September 1 2021 01:40 PM |
| Message-ID: | <BLAPR20MB38421B7904CB57B7010B9953E4CD9@BLAPR20MB3842.namprd20.prod.outlook.com > |
| Attachments: | Regeneron_██████████ - ████████████ Strategy - Work Session Deck - 1 September 2021 vf.pptx |

Attached is the deck that ████████ reviewed this morning (*not for wider distribution*)
Please take a look and let me know if there are any specific follow-up questions.

Regards,
Swami

REGN0080342

Document Produced Natively

REGN0080343





















































































































































# EXHIBIT F

**Date:**      Wednesday, June 17 2020 06:35 PM

**Subject:**   RE: Ascnet Praluent

**From:**      Ed Kirk <█████████████████

**To:**        Richard O'Neal <█████████████████>;

**CC:**        Steven Hyde <█████████████████>;

By the way Lauren mentioned that their goal would be for REGN to ████████████████████████
████████████████████████████████████████████████████████████████████████████████████████

**From:** Richard O'Neal <█████████████████>
**Sent:** Wednesday, June 17, 2020 2:01 PM
**To:** Ed Kirk <█████████████████>
**Cc:** Steven Hyde <█████████████████
**Subject:** RE: Ascnet Praluent

Please find out how they structuring deal with different therapeutic classes – we need details on this

**Richard E. O'Neal, RPh, MBA** | Vice President, Market Access
REGENERON | 1 Rockwood Road, Sleepy Hollow, NY 10591 | █████████
**Office:** ████████ / **Cell:** ████████████  ████████████████████
Sr. Administrative Assistant: ██████████████████████████████████████

**From:** Ed Kirk
**Sent:** Wednesday, June 17, 2020 1:57 PM
**To:** Richard O'Neal <█████████████████>
**Cc:** Steven Hyde <█████████████████
**Subject:** Ascnet Praluent

Rich and Steven

Just got off a call from Lauren at Ascent. She stated that Amgen has a "ridiculous" new offer. (Steven this is a follow up for you and a heads up for you Rich)

- Amgen just came to Ascent this Monday, 6/15
- Amgen goal is exclusivity
- They have brought a portfolio offer that Ascent is valuing at ████████████████████████
  ○ The belief is they are increasing rates on Enbrel and Otezla
- She stated to me that the value lost to ESI if they were to go Parity would be ████████████████
  ○ ███████████████████████████████████████████████████
  ○
  ○
- ██████████████████████████████████████████████████████████████████████████████
- Ascent had discussions about what REGN could do to counter:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Potential response:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Lastly Ed Adamcik and Amy Bricker may be reaching out to you to discuss.

Ed

REGN0005851

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No.:  22-00697-RGA-JLH |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| AMGEN INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT AMGEN INC.'S
SECOND SET OF REQUESTS FOR THE PRODUCTION
OF DOCUMENTS FROM PLAINTIFF REGENERON PHARMACEUTICALS, INC.**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendant Amgen Inc. ("Defendant" or "Amgen") requests that Plaintiff Regeneron Pharmaceuticals, Inc. produce the documents and things described herein (collectively, the "Requests," and each, a "Request") for inspection and copying at the offices of Young Conaway Stargatt & Taylor LLP, 1000 North King Street, Wilmington, DE 19801, or at such other place upon which the parties agree, within 30 days of the service of the Requests.

**DEFINITIONS**

1.     The term "Action" refers to the above-captioned action, *Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*, C.A. No. 22-697, in the United States District Court for the District of Delaware.

2.     "Amended Complaint" means the Amended Complaint filed in this Action on August 28, 2023, D.I. 124.

3.     "Communication" or "Communications" means any contact of any nature, whether written or oral, from one person to another, and includes, without limitation, written contact by means such as letters, memoranda, telegrams, telex, facsimile, e-mails, presentations, text

1

messages, other electronic files, or oral contact including, without limitation, face-to-face meetings and telephone conversations.

4.     "Concerning" means relating to, regarding, discussing, describing, mentioning, reflecting, constituting, comprising, identifying, stating, dealing with, commenting on, connected with, analyzing, confirming, supporting, reporting, setting forth, considering, contradicting, refuting, repudiating, rebutting, undermining, pertaining to, or evidencing the subject matter of, in whole or in part.

5.     "Defendant" or "Amgen" means Amgen Inc., including its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), divisions, employees, agents, attorneys, representatives, and other persons acting or authorized to act on its behalf.

6.     "Document" or "Documents" shall have the full meaning ascribed to those terms under Rule 34 of the Federal Rules of Civil Procedure and include, without limitation, any and all Communications; agreements; contracts; drafts; correspondence; memoranda; records, reports; books; records, reports and/or summaries of personal conversations or interviews; diaries; graphs; charts; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; records, reports and/or summaries of meetings or conferences; records and reports of consultants; press releases; stenographic, handwritten, or any other notes; work papers; checks, front and back; check vouchers, check stubs, or receipts; tape data sheets or data processing cards or discs or any other written, recorded, transcribed, punched, taped, filmed or graphic matter, however produced or reproduced; things; any paper or writing of whatever description; and any computer database or information contained in any computer although not in printed form.

7.      "Including" should be read to include the phrase "including but not limited to" and is used to emphasize certain types of Documents requested and should not be construed as limiting the Request in any way.

8.      "Person" or "Persons" means, without limitation, any natural person, firm, sole proprietorship, partnership, corporation, association, trust, or organization; any federal, state, or local government or agency, department, division, branch, office, board, committee, or commission thereof; any other public or private entity; or any present or former, foreign or domestic, subsidiary, affiliate, predecessor, successor, department, board joint venture, division, committee, commission, owner, director, executive, officer, member, partner, principal, commissioner, trustee, advisor, analyst, broker, dealer, expert, official, employee, faculty, accountant, investigator, attorney, consultant, or agent of each of them.  The term "Person" has the broadest possible meaning.

9.      "Third-Party Payors" mean providers of prescription drug insurance and pharmacy benefit managers, including but not limited to the Third-Party Payors referenced in paragraphs 56 and 96 of the Amended Complaint.

10.      "You," "Your," "Plaintiff," and "Regeneron" mean Regeneron Pharmaceuticals, Inc., as well as all predecessors and successors thereof; all past or present divisions, parents, subsidiaries, and affiliates of the foregoing entity; all past or present joint ventures, partnerships, and limited partnerships of which the foregoing entity is a joint venturer or a limited general partner; and all past or present owners, directors, officers, members, employees, attorneys, agents, representatives, or other persons under the control of or purporting to act for or on behalf of the foregoing entity, either directly or indirectly.

11.     The words "or" and "and" shall be read in the conjunctive and in the disjunctive wherever they appear, and neither of those words shall be interpreted to limit the scope of a Request.  The use of the term "the" shall not be construed as limiting the scope of any Request. The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

12.     References to employees, officers, directors or agents shall include both current and former employees, officers, directors, and agents.

13.     The singular form shall be deemed to include the plural, and vice versa.

## INSTRUCTIONS

1.     The terms defined above and the Requests are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

2.     Each Request shall be answered pursuant to Federal Rules of Civil Procedure 26 and 34, and supplemented as required by Federal Rule of Civil Procedure 26(e).

3.     Each Request shall be construed independently and not with reference to any other Request for the purpose of limitation or exclusion.

4.     For the purpose of construing the scope of these Requests, the terms used shall be given their most expansive and inclusive interpretation.

5.     Each Request requires that You produce any and all responsive files from personal computers, notebook or laptop computers, file servers, personal digital assistants (PDAs), minicomputers, mainframe computers, Web servers, Internet servers, or other storage devices, including without limitation web pages, hard disk drives, floppy disks, or databases, containing the requested Documents.

6.     One copy of each Document requested is to be produced.  Any copy of a Document that varies in any way from the original or from any other copy of the Document, whether by

reason of handwritten or other notation or otherwise, shall constitute a separate Document and must be produced, whether or not the original of such Document is within Your possession, custody, or control.  Draft or non-identical copies are to be considered separate Documents for purposes of these Requests.  Any and all drafts and copies of each Document that is responsive to any Document Request shall be produced, as shall all copies of such Documents that are not identical in any respect, including without limitation copies containing handwritten notes, markings, stamps, or interlineations.  The author(s) of all handwritten notes should be identified.

7.      All Documents are to be produced either with the file folder, envelope, or other container in which the Documents are maintained, or with copies of labels or other identifying marks.

8.      All Documents produced electronically are to include all available metadata fields, consistent with the ESI Protocol in this Action.

9.      If a timely objection to any portion of a Request, definition, or instruction is asserted, Documents responsive to the remaining portion are to be produced.

10.     If any Document is withheld, in whole or in part, for any reason, including but not limited to any claim of privilege of any kind, work-product protection, trade secret, or confidentiality, to the extent that this information is not evident from the produced portion(s) of the Document, provide a privilege log as required under Rule 26(b)(5) of the Federal Rules of Civil Procedure, or as otherwise agreed between the parties.

11.     If information is redacted from a Document or thing produced pursuant to the Requests because it is protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, or doctrine, You are requested to identify the redaction by stamping the phrase "Redacted – Privileged" on the Document on the place or places where the

information has been redacted, and, as applicable, separately enter each redaction on a privilege or redaction log as required under Rule 26(b)(5) of the Federal Rules of Civil Procedure, or otherwise agreed to between the parties.

12. If You object in whole or in part to any of the Requests, please state in detail the basis for Your objection to the particular Request and all facts upon which You rely to support Your objection. In addition, You are requested to identify all Documents or things for which You are interposing any objection.

13. If You cannot comply with any of the Requests in full after exercising due diligence to secure the Documents or things, so state and produce to the extent possible. Specify Your inability to produce the remainder and state whatever information or knowledge You may have regarding the unproduced Documents and things.

14. Defendant serves these Requests without prejudice to its right to serve additional Requests for the production of Documents or to amend the Instructions or Definitions herein in response to an objection or request for clarification as to the scope of these Requests.

15. Unless stated otherwise, the time period for the Requests is January 1, 2019 to the present. If any Document is undated and the date of its preparation cannot be determined, the Document shall be produced if otherwise responsive to these Requests.

## REQUESTS FOR PRODUCTION

26. For each of Praluent® and Dupixent®, documents sufficient to show on a monthly, quarterly, and annual basis, as well as broken down by Third-Party Payor:

    a. WAC price;

    b. rebate, discount, or anything else of value offered to reduce the WAC price;

    c. net price;

d.      sales volume;

e.      revenues;

f.      market share (nationally and by Third-Party Payor);

g.      gross margins; and

h.      net margins.

27.    Documents sufficient to show Regeneron's ongoing costs of commercializing Praluent®, including costs of goods sold, distribution costs, research and development costs, and promotional and sales costs.

28.    Documents sufficient to show, company-wide and product-specific for each of Praluent® and Dupixent®, monthly, quarterly, and yearly audited and unaudited financial documents and data, including profit and loss statements, balance sheets, cash flow statements, and other financial information.

29.    All transaction-level data reflecting rebates, chargebacks, administrative fees, and all other discounts or price adjustments provided to customers for each of Praluent® d Dupixent®, including, but not limited to, Third-Party Payors, Medicare, Medicaid, other government programs, group purchase organizations ("GPO"), hospitals, long-term cares, staff model health maintenance organizations ("HMO"), and all other purchasers; at the most granular level of detail as maintained in Regeneron's contracts and rebates administration systems in the ordinary course; including but not limited to the following information:

a.      Product national drug codes ("NDCs");

b.      Product description;

c.      Type of transaction, including whether it is a rebate, chargeback, administrative fee, or some other transaction;

7

d.     Contract number and contract type, including whether it is a commercial, Medicare Part D, Medicaid, or some other type;

e.     Pricing basis by which the rebate, chargeback, administrative fee, or discount was determined (*e.g.*, rebate of 20% of WAC);

f.     The customers the transaction relates to, including information relating to the Third-Party Payor and downstream plan associated with each rebate transaction, and information on the wholesaler, the GPO, and the downstream hospital associated with each chargeback transaction;

g.     The quantity of product and unit of measure associated with the transaction;

h.     The dollar amount of the rebate, chargeback, or administrative fee;

i.     The date of the transaction;

j.     The period over which the rebate or administrative fee was determined and calculated;

k.     The formulary and formulary tier the rebate or administrative fee transaction relates to;

l.     Information sufficient to identify unduplicated units or utilization associated with rebates and administrative fees, such as the validated utilization data received from Third-Party Payors;

m.     Information sufficient to identify the unique set of units on which rebates and administrative fees were paid without double counting units that may have earned multiple rebates;

    n.    Terms of Supplemental Rebate Agreements ("SRAs") with state Medicaid programs, including Guaranteed Net Unit Price and discount off of average wholesale price ("AWP") that determined the supplemental rebate; and

    o.    Any other information recorded on each transaction as maintained by Regeneron.

30.    All data You purchase from third-party vendors, industry firms, or other outside entities, including but not limited to:

    a.    Data from Managed Markets Insight & Technology ("MMIT") relating to Praluent® and its competitor products (including, but not limited to, Repatha® and Leqvio®), reflecting monthly formulary status and covered lives by Third-Party Payor and plan, with the following fields:

        i.    The name of the product;

        ii.    The name of the formulary;

        iii.    The name of the health plan that utilizes the formulary;

        iv.    The Third-Party Payor that administers the formulary;

        v.    The number of lives covered;

        vi.    The month related to the formulary status; and

        vii.    The formulary status of the product (e.g., preferred, non-preferred, not covered).

    b.    IQVIA National Sales Perspective data, sufficient to show total monthly prescriptions of Praluent® and its competitor products, and Dupixent® and its competitor products,  with the following fields:

        i.    Month of sales;

9

   ii. Product national drug codes ("NDCs");

   iii. Quantity of units sold;

   iv. Dollar value of units sold; and

   v. Sales channel (e.g., retail, mail order, long term care, non-federal hospital, federal hospital).

 c. IQVIA National Prescription Audit data, sufficient to show total monthly prescriptions of Praluent® and its competitor products, with the following fields:

   i. Month of prescriptions;

   ii. Product national drug codes ("NDCs");

   iii. Number of prescriptions;

   iv. Quantity of units dispensed; and

   v. Payer type (e.g., Medicaid, Medicare Part D, other third party payer, cash, or some other payer).

 d. IQVIA National Disease and Therapeutic Index, sufficient to show total monthly use of Praluent® and its competitors by International Classification of Diseases, Tenth Revision (ICD-10).

 e. IQVIA PlanTrak data, sufficient to show total monthly prescriptions of Praluent® and its competitor products by payor, with the following fields:

   i. Month of prescriptions;

   ii. Product national drug codes ("NDCs");

   iii. Number of prescriptions;

   iv. Quantity of units dispensed;

    v.  Payor name; and

    vi.  Plan name.

 f.  Merative MarketScan prescription claims data (f/k/a IBM Watson or Truven MarketScan data) or other de-identified claims data, sufficient to show total prescriptions of Praluent® and its competitors, including but not limited to:

    i.  Month of prescriptions;

    ii.  Product national drug codes ("NDCs"); and

    iii.  Quantity of units dispensed.

 g.  Prescriber-level prescription data of Praluent® from IQVIA Xponent, Symphony PrescriberSource, or similar, including but not limited to:

    i.  Prescriber NPI;

    ii.  Month of prescription;

    iii.  Product national drug codes ("NDCs");

    iv.  Number of prescriptions dispensed; and

    v.  Quantity of units dispensed.

 h.  Longitudinal patient-level prescription data for Praluent® from IQVIA LAAD or similar, including but not limited to:

    i.  De-identified patient ID;

    ii.  Date of prescription fill;

    iii.  Product national drug codes ("NDCs");

    iv.  Quantity of units dispensed;

    v.  Cost of the prescription;

vi.      The patient's out of pocket costs; and

vii.     The method of payment (including whether it is cash, commercially reimbursed, Medicare reimbursed, or some other method of payment, specified).

31.    Sales representative call notes and healthcare providers ("HCP") interaction data for Praluent®, including data sufficient to show calls to and interactions with HCPs by Your sales representatives (either employed by or contracted with You) with the following information:

a.     Sales representative name or identifier;

b.     Contacted HCP name and National Provider Identifier ("NPI");

c.     Sales representative notes;

d.     Description of contact (e.g., introductory call, disease state education);

e.     The date of the interaction;

f.     The location of the interaction;

g.     The product(s) discussed during the call/interaction; and

h.     Any other information related to the interaction.

32.    Any data that You purchase, subscribe to, or maintain that reflects information regarding Leqvio®, manufactured by Novartis, including Komodo Health or other any third-party data that You utilize in the normal course of business to understand, assess, or analyze Leqvio® sales, prices, and market share.

33.    All Documents Concerning Your allegation in Paragraph 113 of the Amended Complaint that "Amgen has conditioned significant rebates for Enbrel® and Otezla® upon Repatha® exclusivity to exclude Praluent® from the formulary at . . . CVS/Zinc Commercial in July 2023."

34.     All Documents Concerning Your allegation in Paragraph 204 of the Amended Complaint that "Amgen has entered into agreements with . . . CVS/Zinc Commercial whereby Amgen has conditioned and tied the availability of rebates for Otezla® and Enbrel® upon exclusive or de facto exclusive formulary coverage for the purchase Repatha® [sic]."

35.     Documents sufficient to show the size of, cost to You and/or Sanofi of, and Your and Sanofi's investment into the Praluent® sales force quarterly from January 1, 2019 to the present.

36.     Documents Concerning the sales force/sales representatives used to market and promote Praluent®, including, but not limited to, Documents regarding (1) the size of the sales force, (2) the strategy in messaging provided to doctors, payors, patients, wholesalers, and pharmacies, and (3) comparisons with marketing and promotional efforts and sales forces of other manufacturers.

37.     All Documents Concerning Your ████████████████████████████████ ████████████████████████████████████████████████ ████████████ ████████████ .

38.     All Documents Concerning Your ████████████████████ ████████████ ████████████████████████████ .

39.     To the extent that Amgen offers (or the Court orders Amgen) to produce similar materials relating to the investigation and/or litigation (including both administrative and federal court litigation) by the Federal Trade Commission ("FTC") relating to Amgen's proposed acquisition of Horizon Therapeutics (the "FTC Matter"), Amgen requests that Regeneron produce:

        a.      All Documents produced by You or on Your behalf to the FTC in connection with the FTC Matter relating to Praluent® or Repatha®;

b. All transcripts, or portions thereof, of investigational hearings or depositions taken of You (including Your employees) by the FTC, Amgen, or others in connection with the FTC Matter relating to Praluent® or Repatha®; and

c. All portions of written or oral advocacy or other communications, including, but not limited to, white papers, letters, and PowerPoint presentations, provided by You or on Your behalf to the FTC or any other government entity relating to Praluent® or Repatha®.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Ben A. Sherwood
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

*Attorneys for Amgen Inc.*

Ashley E. Johnson
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Dated:  September 8, 2023

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on September 8, 2023, I caused a copy of

Defendant Amgen Inc.'s Second Set of Requests for the Production of Documents from Plaintiff

Regeneron Pharmaceuticals, Inc. to be served on the following counsel of record in the manner

indicated below:

**BY E-MAIL**

| | |
|---|---|
| David E. Wilks | Elizabeth Stotland Weiswasser |
| Scott B. Czerwonka | Jonathan D. Polkes |
| Wilks Law LLC | Eric S. Hochstadt |
| 4250 Lancaster Pike Suite 200 | Adam B. Banks |
| Wilmington, DE  19805 | Jessica L. Falk |
| dwilks@wilks.law | Robert Niles-Weed |
| sczerwonka@wilks.law | Rachel Williams |
| | Weil, Gotshal & Manges LLP |
| | 767 Fifth Avenue |
| | New York, NY  10153-0119 |
| | elizabeth.weiswasser@weil.com |
| | jonathan.polkes@weil.com |
| | eric.hochstadt@weil.com |
| | adam.banks@weil.com |
| | jessica.falk@weil.com |
| | robert.niles-weed@weil.com |
| | rachel.williams@weil.com |
| | |
| | Michael R. Moiseyev |
| | Priyata Y. Patel |
| | Weil, Gotshal & Manges LLP |
| | 2001 M. Street , NW |
| | Washington, DC  20036 |
| | (202) 682-7000 |
| | michael.moiseyev@weil.com |
| | priyata.patel@weil.com |

_____ */s/ Melanie K. Sharp* _____
Melanie K. Sharp (No. 2501)

30754800.1

# EXHIBIT H

**Li, Emma**

| | |
|---|---|
| **From:** | Akyol, Naz <Naz.Akyol@weil.com> |
| **Sent:** | Monday, November 20, 2023 3:24 PM |
| **To:** | Leahy, Caroline; Williams, Rachel; Corbett, Anne; Weiswasser, Elizabeth; Polkes, Jonathan; Hochstadt, Eric; Falk, Jessica; Banks, Adam; Niles-Weed, Robert; Elvig, Caroline; dwilks@wilks.law; sczerwonka@wilks.law |
| **Cc:** | Weissman, Stephen; Stock, Eric J.; Johnson, Ashley E.; Jantzi, Adam J.; Haspel, Leesa; Sherwood, Ben A.; Yang, Jialin; Mitra, Kasturi; Kutz, Michael; Li, Emma; Zavadski, Katie; msharp@ycst.com; JHiggins@ycst.com |
| **Subject:** | RE: Regeneron Pharmaceuticals, Inc. v. Amgen Inc., Case 1:22-cv-00697-RGA-JLH (D. Del.) - Letter Regarding Dupixent Data |

**[WARNING: External Email]**

Counsel,

Consistent with Regeneron's position since its March 10, 2023 objections to Amgen's first set of RFPs, Regeneron objects to any and all requests from Amgen that seek documents, data or information solely relating to Dupixent.  As explained in March concerning the relevance of any such requests, Regeneron does not control the marketing of Dupixent in the United States.  Instead, and as explained, Regeneron relies on "Sanofi's sales and marketing" of Dupixent in the United States and Sanofi is responsible for "record[ing] product sales for Dupixent in the US and leads negotiations with payors relating to this product."  Regeneron's R&Os to Amgen's First Set of RFPs, fn. 1 citing Regeneron Annual Report 2021, 49.  Nevertheless, and as Amgen knows, Regeneron has agreed, and produced, documents and information that relates to both Dupixent and Praluent, including the agreements between Sanofi and Regeneron.  Regeneron's productions to date are more than sufficient to respond to Amgen's defense, which Regeneron adamantly disputes, that Regeneron could have bundled Praluent and Dupixent.  As such, collecting this irrelevant data is unduly burdensome to Regeneron and disproportionate to the needs of this case.

Should Amgen have any further questions on this topic, we are available to discuss.

Best,
Naz



**Naz Akyol**
Pronouns: she/her

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Naz.Akyol@weil.com
+1 (212) 310 8057 Direct

---

**From:** Leahy, Caroline <CLeahy@gibsondunn.com>
**Sent:** Wednesday, November 8, 2023 4:06 PM
**To:** Williams, Rachel <Rachel.Williams@weil.com>; Corbett, Anne <Anne.Corbett@weil.com>; Weiswasser, Elizabeth <Elizabeth.Weiswasser@weil.com>; Polkes, Jonathan <Jonathan.Polkes@weil.com>; Hochstadt, Eric <eric.hochstadt@weil.com>; Falk, Jessica <Jessica.Falk@weil.com>; Banks, Adam <Adam.Banks@weil.com>; Niles-Weed, Robert <Robert.Niles-Weed@weil.com>; Akyol, Naz <Naz.Akyol@weil.com>; Elvig, Caroline

<Caroline.Elvig@weil.com>; dwilks@wilks.law; sczerwonka@wilks.law
**Cc:** SWeissman@GibsonDunn.com; Stock, Eric J. <EStock@gibsondunn.com>; Johnson, Ashley E.
<AJohnson@gibsondunn.com>; Jantzi, Adam J. <AJantzi@gibsondunn.com>; Haspel, Leesa <LHaspel@gibsondunn.com>;
Sherwood, Ben A. <BSherwood@gibsondunn.com>; Yang, Jialin <JYang@gibsondunn.com>; Mitra, Kasturi
<KMitra@gibsondunn.com>; Kutz, Michael <MKutz@gibsondunn.com>; Li, Emma <ELi@gibsondunn.com>; Zavadski,
Katie <KZavadski@gibsondunn.com>; msharp@ycst.com; JHiggins@ycst.com
**Subject:** Regeneron Pharmaceuticals, Inc. v. Amgen Inc., Case 1:22-cv-00697-RGA-JLH (D. Del.) - Letter Regarding
Dupixent Data

Counsel,

Please see the attached letter.

Best,
Caroline


**Caroline Leahy**
Associate Attorney

T: +1 212.351.3908  |  M: +1 301.335.0944
CLeahy@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193

---

This message may contain confidential and privileged information for the sole use of the intended recipient.
Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If
it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this
message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy
policy.

---

---

The information contained in this email message is intended only for use of the individual or entity named above. If the
reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended
recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com,
and destroy the original message. Thank you.

# EXHIBIT I

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY  10166-0193
Tel 212.351.4000
gibsondunn.com

Eric J. Stock
Direct: +1 212.351.2301
Fax: +1 212.716.0801
EStock@gibsondunn.com

CONFIDENTIAL

November 8, 2023

<u>VIA E-MAIL</u>

Eric S. Hochstadt
Weil, Gotshal & Manges LLP

Re:    *Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*, 22-cv-00697-RGA-JLH (D. Del.)

Counsel,

We write to follow up on our discussions at the October 27, 2023 and November 7, 2023 meet and confers regarding the Dupixent® data Amgen requested in its Requests for Production ("RFPs") 26, 28, 29, and 30(b).

As explained during the meet and confers, the Dupixent® data Amgen has requested bears on, among other things, whether Regeneron—together with its business partner Sanofi—has, or has at any point had, the ability to offer a rebate, discount, incentive, or other benefit for Dupixent® conditional on formulary coverage terms for Praluent®. The Third Circuit has found that the ability of a plaintiff like Regeneron to offer its own bundle is relevant where, as here, the plaintiff claims that alleged bundling of products by a defendant has made it difficult for the plaintiff to compete. *See, e.g.*, *Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, 821 F.3d 394, 406 (3rd Cir. 2013).

██████████████████████████████████████████ that is a question of fact to be developed through the course of this litigation. For example, it may be that Regeneron could have made a proposal to Sanofi that would facilitate a joint or collaborative offering, and failed to do so. Unless Regeneron is willing to stipulate for the purposes of this litigation that, from a financial perspective, it would have been feasible and highly effective for Regeneron and Sanofi to offer a combined bundle of Dupixent® and Praluent®, the information that Amgen has requested regarding the financial performance of Dupixent® is clearly relevant to this litigation.

Moreover, as noted in our meet and confers, Regeneron has not made any claim of burden in refusing to provide Dupixent® data. As we have repeatedly offered, Amgen is willing to be flexible about the types of Dupixent® data provided by Regeneron, but Regeneron's refusal to provide information on burden has made it impossible for the parties to identify a reasonable compromise. Please explain, in writing, any basis for an assertion by Regeneron that producing the Dupixent® data requested in RFPs 26, 28, 29, and 30(b) would be burdensome, and also explain which types of Dupixent® data can be produced by Regeneron with little to

Abu Dhabi · Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles
Munich · New York · Orange County · Palo Alto · Paris · San Francisco · Singapore · Washington, D.C.

**GIBSON DUNN**

Eric Hochstadt
Weil, Gotshal & Manges LLP
November 8, 2023
Page 2

no burden.  It is undoubtedly the case that Regeneron maintains some data on Dupixent® that it could produce with minimal burden.  Please provide a response by November 13, 2023, so that we can raise this issue to the Court if it remains unresolved.

Sincerely,

*/s/ Eric J. Stock*

Eric J. Stock

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| Regeneron Pharmaceuticals, Inc., | |
| Plaintiff, | |
| v. | C. A. No.: 1:22-cv-00697-RGA-JLH |
| Amgen Inc., | |
| Defendant. | |

### PLAINTIFF REGENERON PHARMACEUTICALS, INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT AMGEN INC.'S SECOND SET OF REQUESTS FOR <u>PRODUCTION OF DOCUMENTS</u>

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the District of Delaware, and other applicable law, Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron"), by and through its undersigned attorneys, hereby objects and responds to Amgen, Inc.'s ("Amgen") Second Set of Requests for Production of Documents to Plaintiff Regeneron ("the Requests") as follows:

### <u>PRELIMINARY STATEMENT</u>

1.      The following objections and responses to the Requests (the "Responses") are made for the sole purpose of this litigation. Each Response and any documents produced are subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, and any other objections on grounds that would require the exclusion of any response or document if such were offered in court pursuant to the Federal Rules of Evidence, which objections are reserved and may be interposed at any hearing or trial in this action.

2.      Regeneron's Responses are made based on Regeneron's present knowledge, information, and belief, and Regeneron expressly reserves the right to supplement, clarify, revise, or correct any or all of the Responses. Regeneron's Responses are without prejudice to its right to

1

modify, revise, supplement, and/or establish at a later date any additional or contrary facts that may be contained within or discovered as a result of any subsequent review of documents or discovery of additional information.

3.     Regeneron has construed and responded to Amgen's Requests and each individual Request based upon its best, good-faith common sense understanding of what is being requested in light of applicable Rules, law, and Court orders. Regeneron reserves the right to modify and/or supplement these Responses and/or interpose additional objections if and as the purported meaning and relevance of each Request is clarified by Amgen.

4.     Regeneron submits these Responses subject to, without intending to waive, and expressly preserving the right to assert additional objections to the Requests as necessary and/or appropriate.

5.     No incidental or implied admissions are intended in the Responses. Regeneron's Responses to all or any part of the Requests should not be taken as an admission that: (1) Regeneron accepts, admits, or agrees to any factual or legal conclusion set forth in or assumed by all or any part of the Requests; or (2) Regeneron has in its possession, custody, or control documents responsive to all or any part of the Requests.  Regeneron's Responses to all or any part of any Request are not intended to be, and shall not be, a waiver by Regeneron of all or any part of its objection(s) to such Request(s). Regeneron's Responses are made for the purpose of this pending action only.

6.     Any Documents produced in response to Amgen's Requests will be produced pursuant to the Protective Order entered in this action and will be stamped accordingly.

7.     Regeneron's Responses are without prejudice to its right to raise any and all future objections and defenses that may arise as the litigation proceeds.

## GENERAL PRODUCTION PLAN

1.      Unless otherwise stated herein, pursuant to the Objections and Responses to the Requests, Regeneron will search for and produce non-privileged documents responsive to Amgen's Requests that fall within January 1, 2019 through the date of the collection as agreed-upon by the Parties. The records and files that will be searched will consist of the reasonably accessible (i) custodial files and (ii) non-custodial central or shared files containing requested information.

2.      Pursuant to the Scheduling Order in this action (D.I. 67), Regeneron will produce responsive, non-privileged documents collected through a reasonable search as set forth in this General Production Plan.

3.      As a general matter, where production is being made in response to a specific Request, Regeneron will produce responsive documents and information subject to any objection incorporated into that specific Request and any further objections and responses to that specific Request.

4.      Regeneron expressly reserves the right to use computer-assisted learning, technology-assisted review, or other systems to review for documents potentially responsive to the Requests.

5.      Pursuant to the General Production Plan and subject to any objections, productions will be provided on a rolling basis.

## GENERAL OBJECTIONS

1.      Regeneron objects to each Request, Instruction, and Definition to the extent it purports to impose any requirements that are inconsistent with, or beyond those contemplated by, the Federal Rules, the Local Civil Rules of the United States District Court for the District of

3

Delaware (the "Local Rules"), or any applicable rule or law.  Regeneron will construe and respond to the Requests in accordance with the requirements of the Federal Rules, the Local Rules, and any other applicable rule or law.  Regeneron does not concede the relevance or admissibility of any information Regeneron provides in its responses to the Requests.

2.      Regeneron objects to each Request, Instruction, and Definition to the extent that it is vague, overly broad, and unduly burdensome. By way of example, some of Amgen's Requests call for the production of "all Documents" or "all data" in reference to broad and vaguely-defined categories of materials that are not reasonably tailored to the claims and defenses in this action and/or do not reasonably limit the scope of the search to be conducted by Regeneron. Regeneron is a biotechnology company with numerous subsidiaries, divisions, and medicines. It is unduly burdensome for Regeneron to guarantee collection of all responsive documents, and such collection and production would be more burdensome than beneficial under the circumstances. In response to such Requests, unless otherwise stated herein, Regeneron will produce responsive, non-privileged documents and communications located after a reasonable search based on the General Production Plan.

3.      Regeneron objects to each Request, Instruction, and Definition to the extent it purports to seek information protected from disclosure by the attorney-client privilege, work-product doctrine, common interest privilege, joint prosecution privilege, or any other applicable privilege. Any production of privileged or protected documents is inadvertent and shall not constitute a waiver, in whole or in part, of any such privilege, doctrine, or protection. Any document subject to a privilege, doctrine, or protection, if inadvertently produced, should be returned to Regeneron immediately. Amgen should not use in any manner whatsoever any

information derived from any inadvertently produced privileged or protected document.

4.      Regeneron objects to each Request, Instruction, and Definition to the extent it purports to call for production of documents or information in the possession of third parties and/or that is equally available to, or already in the possession, custody, or control of, Amgen. However, Regeneron agrees to not withhold responsive documents in its own possession, custody, or control on the basis that such documents may also be in the possession of third parties, provided that Amgen agrees to do the same.

5.      Regeneron objects to each Request, Instruction, and Definition to the extent it purports to seek the creation of documents or data compilations that are not created and/or kept in Regeneron's ordinary course of business.

6.      Regeneron objects to each Request, Instruction, and Definition to the extent it purports to seek the premature production of expert reports, analyses, opinions, or testimony. Regeneron has construed and responded to the Requests and each individual Request as not seeking premature production of expert reports, analyses, opinions, or testimony. Regeneron will make required expert-related disclosures at the time and manner set forth in the applicable rules and/or Court orders.

7.      Regeneron objects to each Request to the extent that it is redundant or duplicative of another Request(s). Where a document is reasonably responsive to more than one Request, Regeneron will produce that document only once.

8.      Regeneron reserves the right, where appropriate, to supplement and/or correct the Responses contained herein pursuant to Federal Rule 26(e).

9.      Regeneron expressly incorporates the foregoing General Objections into each and every Response. Regeneron may repeat a General Objection in a particular Response for emphasis

or for some other reason, but the failure to repeat does not waive any of Regeneron's General Objections to Amgen's Requests.

## OBJECTIONS AND RESPONSES TO
## PARTICULAR DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 26:**

For each of Praluent® and Dupixent®, documents sufficient to show on a monthly, quarterly, and annual basis, as well as broken down by Third-Party Payor:

a.  WAC price;

b.  rebate, discount, or anything else of value offered to reduce the WAC price;

c.  net price;

d.  sales volume;

e.  revenues;

f.  market share (nationally and by Third-Party Payor);

g.  gross margins; and

h.  net margins.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Regeneron objects to this request to the extent it is not relevant to any party's claims or defenses in this action.  Specifically, materials relating solely to Dupixent® are not relevant because Amgen has not plead any affirmative defenses or counterclaims that put Dupixent® at issue in this litigation.  Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business.  Regeneron objects to this Request as cumulative and duplicative of Amgen's Request for Production No. 6

to the extent both requests call for information on Praluent® sales, revenues, and margins.

Subject to and without waiving or otherwise limiting the foregoing objections, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request as it relates to Praluent®, to the extent such documents exist. Regeneron does not agree to produce documents relating solely to Dupixent®.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show Regeneron's ongoing costs of commercializing Praluent®, including costs of goods sold, distribution costs, research and development costs, and promotional and sales costs.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Regeneron objects to this Request as cumulative and duplicative of Amgen's Request for Production No. 6 to the extent both requests call for information on Praluent® costs. Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business. Additionally, Regeneron objects to this Request as vague, in that the phrases "costs of goods sold," "distribution costs," "research and development costs," and "promotional and sales costs" would require Regeneron to speculate as to what may, or may not, be responsive.

Subject to and without waiving or otherwise limiting the foregoing objections, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request as it relates to Praluent®, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 28:**

Documents sufficient to show, company-wide and product-specific for each of Praluent® and Dupixent®, monthly, quarterly, and yearly audited and unaudited financial documents and data, including profit and loss statements, balance sheets, cash flow statements, and other financial information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Regeneron objects to this request to the extent it is not relevant to any party's claims or defenses in this action. Specifically, materials relating solely to Dupixent® are not relevant because Amgen has not plead any affirmative defenses or counterclaims that put Dupixent® at issue in this litigation. Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business. Additionally, Regeneron objects to this Request as vague, in that the phrase "other financial statements" would require Regeneron to speculate as to what may, or may not, be responsive.

Subject to and without waiving or otherwise limiting the foregoing objections, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request as it relates to Praluent®, to the extent such documents exist. Regeneron does not agree to produce documents relating solely to Dupixent®.

**REQUEST FOR PRODUCTION NO. 29:**

All transaction-level data reflecting rebates, chargebacks, administrative fees, and all other discounts or price adjustments provided to customers for each of Praluent® and Dupixent®, including, but not limited to, Third-Party Payors, Medicare, Medicaid, other government programs, group purchase organizations ("GPO"), hospitals, long-term cares, staff model health maintenance organizations ("HMO"), and all other purchasers; at the most granular level of

detail as maintained in Regeneron's contracts and rebates administration systems in the ordinary course; including but not limited to the following information:

a. Product national drug codes ("NDCs");

b. Product description;

c. Type of transaction, including whether it is a rebate, chargeback, administrative fee, or some other transaction;

d. Contract number and contract type, including whether it is a commercial, Medicare Part D, Medicaid, or some other type;

e. Pricing basis by which the rebate, chargeback, administrative fee, or discount was determined (*e.g.*, rebate of 20% of WAC);

f. The customers the transaction relates to, including information relating to the Third-Party Payor and downstream plan associated with each rebate transaction, and information on the wholesaler, the GPO, and the downstream hospital associated with each chargeback transaction;

g. The quantity of product and unit of measure associated with the transaction;

h. The dollar amount of the rebate, chargeback, or administrative fee;

i. The date of the transaction;

j. The period over which the rebate or administrative fee was determined and calculated;

k. The formulary and formulary tier the rebate or administrative fee transaction relates to;

l. Information sufficient to identify unduplicated units or utilization associated with rebates and administrative fees, such as the validated utilization data received from Third-Party Payors;

    m.  Information sufficient to identify the unique set of units on which rebates and administrative fees were paid without double counting units that may have earned multiple rebates;

    n.  Terms of Supplemental Rebate Agreements ("SRAs") with state Medicaid programs, including Guaranteed Net Unit Price and discount off of average wholesale price ("AWP") that determined the supplemental rebate; and

    o.  Any other information recorded on each transaction as maintained by Regeneron.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Regeneron objects to this request to the extent it is not relevant to any party's claims or defenses in this action. Specifically, materials relating solely to Dupixent® are not relevant because Amgen has not plead any affirmative defenses or counterclaims that put Dupixent® at issue in this litigation. Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business.

Subject to and without waiving or otherwise limiting the foregoing objections, subject to any notice provisions or requirements in any controlling agreement between Regeneron and a third party, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request as it relates to Praluent®, to the extent such documents exist. Regeneron does not agree to produce documents relating solely to Dupixent®.

**REQUEST FOR PRODUCTION NO. 30:**

All data You purchase from third-party vendors, industry firms, or other outside entities, including but not limited to:

a. Data from Managed Markets Insight & Technology ("MMIT") relating to Praluent® and its competitor products (including, but not limited to, Repatha® and Leqvio®), reflecting monthly formulary status and covered lives by Third-Party Payor and plan, with the following fields:

     i.   The name of the product;

     i.   The name of the formulary;

     ii.   The name of the health plan that utilizes the formulary;

     iii.   The Third-Party Payor that administers the formulary;

     iv.   The number of lives covered;

     v.   The month related to the formulary status; and

     vi.   The formulary status of the product (e.g., preferred, non-preferred, not covered).

b. IQVIA National Sales Perspective data, sufficient to show total monthly prescriptions of Praluent® and its competitor products, and Dupixent® and its competitor products, with the following fields:

     i.   Month of sales;

     ii.   Product national drug codes ("NDCs");

     iii.   Quantity of units sold;

     iv.   Dollar value of units sold; and

     v.   Sales channel (e.g., retail, mail order, long term care, non-federal hospital, federal hospital).

c. IQVIA National Prescription Audit data, sufficient to show total monthly prescriptions of Praluent® and its competitor products, with the following fields:

     i.   Month of prescriptions;

11

ii.    Product national drug codes ("NDCs");

iii.    Number of prescriptions;

iv.    Quantity of units dispensed; and

v.    Payer type (e.g., Medicaid, Medicare Part D, other third party payer, cash, or some other payer).

d.    IQVIA National Disease and Therapeutic Index, sufficient to show total monthly use of Praluent® and its competitors by International Classification of Diseases, Tenth Revision (ICD-10).

e.    IQVIA PlanTrak data, sufficient to show total monthly prescriptions of Praluent® and its competitor products by payor, with the following fields:

i.    Month of prescriptions;

ii.    Product national drug codes ("NDCs");

iii.    Number of prescriptions;

iv.    Quantity of units dispensed;

v.    Payor name; and

vi.    Plan name.

f.    Merative MarketScan prescription claims data (f/k/a IBM Watson or Truven MarketScan data) or other de-identified claims data, sufficient to show total prescriptions of Praluent® and its competitors, including but not limited to:

i.    Month of prescriptions;

ii.    Product national drug codes ("NDCs"); and

iii.    Quantity of units dispensed.

g. Prescriber-level prescription data of Praluent® from IQVIA Xponent, Symphony PrescriberSource, or similar, including but not limited to:

    i. Prescriber NPI;

    ii. Month of prescription;

    iii. Product national drug codes ("NDCs");

    iv. Number of prescriptions dispensed; and

    v. Quantity of units dispensed.

h. Longitudinal patient-level prescription data for Praluent® from IQVIA LAAD or similar, including but not limited to:

    i. De-identified patient ID;

    ii. Date of prescription fill;

    iii. Product national drug codes ("NDCs");

    iv. Quantity of units dispensed;

    v. Cost of the prescription;

    vi. The patient's out of pocket costs; and

    vii. The method of payment (including whether it is cash, commercially reimbursed, Medicare reimbursed, or some other method of payment, specified).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Regeneron objects to this request to the extent it is not relevant to any party's claims or defenses in this action. Specifically, materials relating solely to Dupixent® are not relevant because Amgen has not plead any affirmative defenses or counterclaims that put Dupixent® at issue in this litigation. Regeneron further objects to this Request to the extent it seeks documents

13

or data that are not created and/or kept in Regeneron's ordinary course of business.

Subject to and without waiving or otherwise limiting the foregoing objections, subject to any notice provisions or requirements in any controlling agreement between Regeneron and a third party, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request as it relates to Praluent®, to the extent such documents exist. Regeneron does not agree to produce documents relating solely to Dupixent®.

**REQUEST FOR PRODUCTION NO. 31:**

Sales representative call notes and healthcare providers ("HCP") interaction data for Praluent®, including data sufficient to show calls to and interactions with HCPs by Your sales representatives (either employed by or contracted with You) with the following information:

   a.  Sales representative name or identifier;

   b.  Contacted HCP name and National Provider Identifier ("NPI");

   c.  Sales representative notes;

   d.  Description of contact (e.g., introductory call, disease state education);

   e.  The date of the interaction;

   f.  The location of the interaction;

   g.  The product(s) discussed during the call/interaction; and

   h.  Any other information related to the interaction.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Regeneron objects to this request to the extent it is not relevant to any party's claims or defenses in this action. Specifically, materials relating solely to Dupixent® are not relevant because Amgen has not plead any affirmative defenses or counterclaims that put Dupixent® at

14

issue in this litigation.  Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business.

Subject to and without waiving or otherwise limiting the foregoing objections, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request as it relates to Praluent®, to the extent such documents exist.  Regeneron does not agree to produce documents relating solely to Dupixent®.

**REQUEST FOR PRODUCTION NO. 32:**

Any data that You purchase, subscribe to, or maintain that reflects information regarding Leqvio®, manufactured by Novartis, including Komodo Health or other any third-party data that You utilize in the normal course of business to understand, assess, or analyze Leqvio® sales, prices, and market share.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

Regeneron objects to this Request to the extent it calls for legal conclusions, including, but not limited to, the products included in the relevant market.  Regeneron further objects to this Request to the extent it calls for production of documents or information that is in the possession of third parties and/or equally available to, or already in the possession, custody, or control of, Amgen.

Subject to and without waiving or otherwise limiting the foregoing objections, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 33:**

All Documents Concerning Your allegation in Paragraph 113 of the Amended Complaint that "Amgen has conditioned significant rebates for Enbrel® and Otezla® upon Repatha® exclusivity to exclude Praluent® from the formulary at . . . CVS/Zinc Commercial in July 2023."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 33:**

Regeneron objects to this Request to the extent it requires Regeneron to identify documents within Amgen's own productions.

Subject to and without waiving or otherwise limiting the foregoing objections, Regeneron will produce non-privileged documents responsive to this Request that are located through a reasonable search to the extent such documents have not already been produced by either party.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents Concerning Your allegation in Paragraph 204 of the Amended Complaint that "Amgen has entered into agreements with . . . CVS/Zinc Commercial whereby Amgen has conditioned and tied the availability of rebates for Otezla® and Enbrel® upon exclusive or de facto exclusive formulary coverage for the purchase Repatha® [sic]."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

Regeneron objects to this Request to the extent it requires Regeneron to identify documents within Amgen's own productions.

Subject to and without waiving or otherwise limiting the foregoing objections, Regeneron will produce non-privileged documents responsive to this Request that are located through a reasonable search to the extent such documents have not already been produced by either party.

**REQUEST FOR PRODUCTION NO. 35:**

Documents sufficient to show the size of, cost to You and/or Sanofi of, and Your and

Sanofi's investment into the Praluent® sales force quarterly from January 1, 2019 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

Regeneron objects to this Request to the extent it calls for production of documents or information that is in the possession of a third party. Regeneron further objects to this Request to the extent it seeks documents or data that are not in Regeneron's custody or control to the extent the Request asks for information prior to Regeneron gaining marketing control over Praluent®. Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business. Additionally, Regeneron objects to this Request as vague and overly broad, specifically the phrases "size," "investment," and "sales force." Regeneron objects to this Request as cumulative and duplicative of Amgen's Request for Production No. 3 to the extent both requests call for information on Regeneron's staff who are included in the Praluent® sales force.

Subject to and without waiving or otherwise limiting the foregoing objections, subject to any notice provisions or requirements in any controlling agreement between Regeneron and a third party, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 36:**

Documents Concerning the sales force/sales representatives used to market and promote Praluent®, including, but not limited to, Documents regarding (1) the size of the sales force, (2) the strategy in messaging provided to doctors, payors, patients, wholesalers, and pharmacies, and

(3) comparisons with marketing and promotional efforts and sales forces of other manufacturers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

Regeneron objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case in that it seeks each and every Document concerning "the sales force/sales representatives used to market and promote Praluent®." Regeneron further objects to this Request to the extent it seeks documents or data that are not created and/or kept in Regeneron's ordinary course of business. Regeneron also objects to this Request as cumulative and duplicative of Amgen's Request for Production Nos. 3 and 35 to the extent both requests call for information on Regeneron's staff who are included in the Praluent® sales force. Additionally, Regeneron objects to this Request as vague, in that the phrases "strategy" and "messaging" would require Regeneron to speculate as to what may, or may not, be responsive. Regeneron further objects to this Request to the extent it calls for production of documents or information that is in the possession of third parties.

Subject to and without waiving or otherwise limiting the foregoing objections, and further subject to the mutual agreement reached by the parties regarding this Request, Regeneron agrees to produce non-privileged documents responsive to this Request, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 37:**

All Documents Concerning Your ███████████████████████████████
████████████████████████████████████████████████████████████████
███

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

Regeneron objects to this Request as overly broad, unduly burdensome, and not

18

proportional to the needs of this case in that it seeks each and every document concerning Regeneron's ███████████████████████████████████████ ████████████████████████████████████████████████ Regeneron further objects to this Request as vague and ambiguous in that the Request does not define ███████████████████████████ Regeneron also objects to any characterization in this Request of Regeneron's agreements with ██████████████████████ Concerning Praluent® and reserves all rights.

Subject to and without waiving or otherwise limiting the foregoing objections, Regeneron will produce non-privileged documents responsive to this Request that are located through a reasonable search to the extent such documents have not already been produced, to the extent such documents exist.

**REQUEST FOR PRODUCTION NO. 38:**

All Documents Concerning Your ████████████████████████████ ████████████████████

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

Regeneron objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case in that it seeks each and every document concerning Regeneron's "██████████████████████ ██████████████████████████████ ██████ Regeneron further objects to this Request as vague and ambiguous in that the Request does not define "loss of coverage."

Subject to and without waiving or otherwise limiting the foregoing objections, Regeneron will produce non-privileged documents responsive to this Request that are located through a reasonable search to the extent such documents have not already been produced, to the extent such

documents exist.

**REQUEST FOR PRODUCTION NO. 39:**

To the extent that Amgen offers (or the Court orders Amgen) to produce similar materials relating to the investigation and/or litigation (including both administrative and federal court litigation) by the Federal Trade Commission ("FTC") relating to Amgen's proposed acquisition of Horizon Therapeutics (the "FTC Matter"), Amgen requests that Regeneron produce:

a. All Documents produced by You or on Your behalf to the FTC in connection with the FTC Matter relating to Praluent® or Repatha®;

b. All transcripts, or portions thereof, of investigational hearings or depositions taken of You (including Your employees) by the FTC, Amgen, or others in connection with the FTC Matter relating to Praluent® or Repatha®; and

c. All portions of written or oral advocacy or other communications, including, but not limited to, white papers, letters, and PowerPoint presentations, provided by You or on Your behalf to the FTC or any other government entity relating to Praluent® or Repatha®.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

Subject to and without waiving or otherwise limiting the foregoing objections, Regeneron objects to this Request to the extent it is conditional. Regeneron is willing to meet and confer to discuss the scope, relevance, and proportionality of this Request.

Dated: October 10, 2023

WILKS LAW LLC

*/s/ Scott B. Czerwonka*

David E. Wilks (Bar No. 2793)
Scott B. Czerwonka (Bar No. 4844)
4250 Lancaster Pike Suite 200

20

Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

Elizabeth Stotland Weiswasser (*pro hac vice*)
Jonathan D. Polkes (*pro hac vice*)
Eric S. Hochstadt (*pro hac vice*)
Adam B. Banks (*pro hac vice*)
Jessica L. Falk (*pro hac vice*)
Robert Niles-Weed (*pro hac vice*)
Rachel Williams (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev (pr*o hac vice*)
Priyata Y. Patel (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on December 19, 2023 I caused to be electronically filed a true and correct copy of Letter to the Honorable Jennifer L. Hall from Melanie K. Sharp regarding Discovery Dispute with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

David E. Wilks
Scott B. Czerwonka
Wilks Law LLC
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
dwilks@wilks.law
sczerwonka@wilks.law

I further certify that on December 19, 2023, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Elizabeth Stotland Weiswasser
Jonathan D. Polkes
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
Naz Akyol
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
elizabeth.weiswasser@weil.com
jonathan.polkes@weil.com
eric.hochstadt@weil.com
adam.banks@weil.com
jessica.falk@weil.com
robert.niles-weed@weil.com
rachel.williams@weil.com
naz.akyol@weil.com

Michael R. Moiseyev
Priyata Y. Patel
William Cooke
Weil, Gotshal & Manges LLP
2001 M. Street , NW
Washington, DC 20036
(202) 682-7000
michael.moiseyev@weil.com
priyata.patel@weil.com
william.cooke@weil.com

_/s/ Melanie K. Sharp_
Melanie K. Sharp (No. 2501)