**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Regeneron Pharmaceuticals, Inc., | C. A. No.: 1:22-cv-00697-JLH |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| Amgen Inc., | **REDACTED PUBLIC VERSION** |
| Defendant. | **FILED: July 3, 2024** |

**PLAINTIFF REGENERON PHARMACEUTICALS, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF
DR. ERIC M. GAIER; DR. LAUREN J. STIROH; AND MS. DEBORAH GAN**

WILKS LAW, LLC
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP
Elizabeth Stotland
Weiswasser
Jonathan D. Polkes
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron
Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................3

I.     Opinion of Dr. Eric M. Gaier...............................................................4

II.    Opinion of Dr. Lauren J. Stiroh ............................................................5

III.    Opinion of Ms. Deborah Gan................................................................5

LEGAL STANDARD..........................................................................................6

ARGUMENT .......................................................................................................7

I.     Dr. Gaier's Below-Cost Pricing Opinion Should Be Excluded Because He Misapplies *PeaceHealth*'s Multi-Product Rebate Test.......................7

    A.    *PeaceHealth* requires "allocation of the entire discount to the single product at issue."........................................................7

    B.    Dr. Gaier improperly attributes the entire bundled rebate to Repatha® *and Otezla®*. .................................................................10

II.    Dr. Stiroh's Analysis Does Not Provide A Reliable Basis For Her Opinions on Enbrel®'s Or Otezla®'s Substantial Market Power...........................14

III.    Ms. Gan's Opinion Should Be Excluded Because She Is An Irrelevant Merck Fact Witness And Not An Industry Expert ...............................................21

    A.    Ms. Gan's opinions regarding pharmaceutical industry market access and practice exceed her qualifications. ........................................21

    B.    Ms. Gan's opinions also are unreliable because she does not tie her experience to her conclusions. ............................................26

CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Bird v. Borough of Moosic*,
    2022 WL 584072 (M.D. Pa. Feb. 25, 2022) ........................................................................25

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) ..................................................................................20, 29

*In re Bristol-Myers Squibb Co. & Celgene Corp.*,
    No. C-4690 (FTC 2019)...............................................................................................15

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007).........................................................................................14

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
    350 F.3d 316 (3d Cir. 2003)...........................................................................................7

*Calvente v. Ghanem*,
    2022 WL 4272779 (N.D. Ill. Sep. 15, 2022) ...............................................................22

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ............................................................................... *passim*

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
    781 F.3d 264 (6th Cir. 2015) .........................................................................................9

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)......................................................................................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)......................................................................................................17

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)...........................................................................................7

*Fed. Trade Comm'n v. AbbVie Inc.*,
    976 F.3d 327 (3d Cir. 2020)...................................................................................14, 15

*United States ex rel. Heller v. Guardian Pharmacy of Atlanta*,
    2023 U.S. Dist. LEXIS 207629 (N.D. Ga. Sep. 30, 2023) ........................................24

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
    351 F. Supp. 3d 1187 (D. Minn. 2018).........................................................................9

*Krantz v. Steiler*,
    2024 WL 1494182 (M.D. Pa. Apr. 5, 2024) .......................................................26, 27

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) (en banc) ..............................................................1, 4, 8

*Oliver v. Am. Express Co.*,
    2024 WL 100848 (E.D.N.Y. Jan. 9, 2024), *amended in part*, 2024 WL 217711
    (E.D.N.Y. Jan. 19, 2024) ............................................................................................14

*Pan Am. World Airways, Inc. v. Port Auth. of N.Y. & N.J.*,
    995 F.2d 5 (2d Cir. 1993)............................................................................................26

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994).............................................................................................7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2022 WL 14862098 (E.D.N.Y. Oct. 8, 2022) ..............................................................9

*Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*,
    2009 WL 5217344 (C.D. Ill. Dec. 30, 2009) ...............................................................9

*QVC, Inc. v. MJC America, Ltd.*,
    2012 WL 13565 (E.D. Pa. Jan. 4, 2012) ....................................................................23

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
    96 F.4th 327 (2d Cir. 2024) ..................................................................................14, 15

*Retail Imaging Mgmt. Grp., Ltd. Liab. Co. v. Fujifilm N. Am. Corp.*,
    841 F. Supp. 2d 1189 (D. Or. 2012) .............................................................................9

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003).......................................................................................6, 7

*SmithKline Beecham Corp. v. Abbott Labs.*,
    2014 WL 6664226 (N.D. Cal. Nov. 24, 2014) .............................................................9

*Suter v. Gen. Acc. Ins. Co. of Am.*,
    424 F. Supp. 2d 781, 788 (D.N.J. 2006) ....................................................................23

*United Food & Comm. Workers Local 1776 v. Teikoku Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) .....................................................................14

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)........................................................................................20

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)...............................................................................1, 6, 19

**Statutes and Rules**

Fed. R. Civ. P. 26 ..........................................................................................................3, 25

Fed. R. Civ. P. 30(b)(1) ........................................................................................................25

Fed. R. Civ. P. 45 ...................................................................................................................3

Fed. R. Evid. 702 ........................................................................................... *passim*

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law An Analysis of Antitrust Principles and Their Application* (4th & 5th Eds., 2021 Cum. Supp. 2013-2020) ...................................................................................................8, 9, 12

FTC, Press Release, *FTC Approves Final Order Requiring Bristol-Myers Squibb Company and Celgene Corporation to Divest Psoriasis Drug Otezla as a Condition of Acquisition* (Jan. 13, 2020) ..............................................18

FTC, Press Release, *Merck Settles FTC Charges that Its Acquisition of Medco Could Cause Higher Prices and Reduced Quality for Prescription Drugs*, (Aug. 27, 1998) .............................................................................................24

Kevin Murphy et al, Competitive Discounts and Antitrust Policy, The Oxford Handbook of International Antitrust Economics § 5.3 (2014) ....................................9

M. Laurence Popofsky & Adam J. Gromfin, *Bundled Discounting: From LePage's to PeaceHealth, & Beyond*, 9 SEDONA CONF. J. 99 (2008) ....................................11

David Reichenberg & Lauren J. Stiroh, *Checking in on PeaceHealth*, The Antitrust Source (Oct. 2019) .................................................................................8

David S. Sibley, et al., *Tying and Bundled Discounts: An Equilibrium Analysis of Antitrust Liability Tests*, 13 BERKELEY BUS. L.J. 149 (2016) .....................................9

29 Wright & Miller, Fed. Prac. & Proc. § 6265 (1st ed. 2014) ....................................21

## INTRODUCTION

The parties offer dueling expert witnesses—not to mention reams of competing fact witnesses and documentary evidence—on nearly every relevant issue in this complex and fact-intensive antitrust case. It is up to the jury to weigh the conflicting evidence at trial to determine whether Amgen "willfully maintained monopoly power by predatory or exclusionary conduct, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance." *LePage's Inc. v. 3M*, 324 F.3d 141, 167 (3d Cir. 2003) (en banc); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 265, 268-69 (3d Cir. 2012). But not all of the parties' proffered expert testimony should be presented to the jury. That is because Amgen has failed to "demonstrate[] to the court that it is more likely than not that" three of its experts satisfy Federal Rule of Evidence 702's requirements for ensuring the reliability of expert testimony.

*First,* Dr. Eric Gaier, in his rebuttal of Regeneron's economic expert, Professor Fiona Scott Morton, purports to apply the "discount attribution test" set out in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008). This is a test used to assess whether a commercial practice is below cost and anticompetitive in a *multi-product* bundling case like this one. But Dr. Gaier does not apply the test as *PeaceHealth* instructs. As this Court (and many others) has explained, *PeaceHealth* requires "allocation of the entire discount to the **single product at issue in the case**" (in this case, Repatha®) to determine whether an equally efficient producer of *that product* can fairly compete. Report and Recommendation, D.I. No. 49 at 14 (Feb. 10, 2023) (citing *PeaceHealth*, 515 F.3d at 903) ("R&R").[1] Dr. Gaier admittedly does not do this and did not rely on this Court's R&R. Instead, in his first time ever conducting the *PeaceHealth* test,[2] he does the

---

[1] R&R, attached hereto as Exhibit A. Emphasis in bold, italic text is not in the original source unless otherwise noted.

[2] Gaier Dep. Tr., attached hereto as Exhibit B, 165:13-17.

calculation wrong. Specifically, he overstates Repatha®'s effective price by applying the value of Amgen's conditional bundled rebates across both Repatha® *and* the much larger Otezla® product acquired by Amgen for $13.4 billion in 2019. Dr. Gaier's basic error flouts law and economic logic, with the predictable result of immunizing Amgen's anticompetitive strategy. His opinion regarding below cost pricing must therefore be excluded.

*Second*, Dr. Lauren Stiroh's rebuttal to Professor Scott Morton asserts that "Amgen does not have monopoly power in selling Enbrel®" or "in selling Otezla®." Rebuttal Expert Report of Lauren J. Stiroh ("Stiroh Report") at i–ii.[3] But Dr. Stiroh fails to apply any "reliable principles and methods" to make that determination. Fed. R. Evid. 702. Dr. Stiroh admits that a "proper assessment of monopoly power requires analyzing the competitive constraints that a firm faces in selling the product at issue," including a "careful analysis of the degree to which decision-makers can substitute competing products in place of the product at issue." Stiroh Report ¶¶ 68, 70. And yet Dr. Stiroh fails to undertake this analysis. Instead, she observes that there are therapeutic alternatives to Enbrel® and Otezla®, notes that Amgen monitors those alternatives, and on that basis concludes there is no market power. That is not a reliable, replicable, or tested methodology for assessing market power and her opinions should accordingly be excluded. Indeed, it is for good reason that Amgen itself has previously criticized Dr. Stiroh's methods as "nothing more than junk science unsupported by evidence or economic analysis." Amgen's Motion to Exclude the Expert Testimony of Lauren J. Stiroh, *Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, No. 05-12237, ECF No. 556, 2007 WL 3284162, at *1 (D. Mass. June 28, 2007) ("Amgen's Motion to Exclude Stiroh").[4] Dr. Stiroh's opinions regarding market power must be excluded.

---

[3] Stiroh Report, attached hereto as Exhibit C.
[4] Amgen's Motion to Exclude Stiroh, attached hereto as Exhibit D.

*Third*, Amgen's purported "pharmaceutical industry" expert, Ms. Deborah Gan, should be excluded outright. Ms. Gan is a non-party fact witness masquerading as an expert. Ms. Gan's supposed expertise in the "pharmaceutical industry" is based solely on her time working at one company, Merck, as is evident from her "tendency to say 'us'" when referring to Merck "because of [her] long tenure there." Gan Dep. Tr., 79:5-8.[5] A former employee's individual testimony about her time at a single company makes her nothing more than an observer of the commercial practices of that company. And it is undisputed that Merck is not involved in this case at all: Merck never produced any discovery because Amgen never identified Merck in its Rule 26 initial disclosures or chose to subpoena Merck under Rule 45. Ms. Gan is not qualified to serve as an expert—she is at most an irrelevant fact witness. Reflecting her lack of adequate qualifications, Ms. Gan's opinions about the pharmaceutical industry do not display "a reliable application of [reliable] principles and methods to the facts of the case." Fed. R. Evid. 702. For example, despite Amgen never having used a cross-therapeutic bundled rebate until it had to compete against Regeneron, and despite Amgen's public admissions that "bundling generally is not widely used in the pharmaceutical industry," Ms. Gan's *ipse dixit* opinion is that bundled rebates are common practice. This and other opinions put forward by Ms. Gan are the unreliable assertions of an irrelevant fact witness—rather than the reliable analysis of a true expert—and should be excluded.

## BACKGROUND

Regeneron asserts eleven claims under federal and state law in connection with Amgen's unlawful use of bundled conditional rebates for Repatha® and two other much larger, unrelated drugs in unrelated therapeutic categories, Enbrel® and Otezla®. Amgen offered this "cross-therapeutic bundle," combining Repatha® with two of its blockbuster, "must have" drugs, to

---

[5] Gan Dep. Tr., attached hereto as Exhibit E.

exclude Repatha®'s only competitor, Regeneron's Praluent®, from the PCSK9 inhibitor market. *See generally* First Amended Complaint. As this Court has recognized, "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties," R&R at 7 (quoting *LePage's*, 324 F.3d at 152), and "[t]here is no set formula for evaluating the legality of an exclusive dealing arrangement," *id.* at 11. Given the context-specific nature of this analysis, Regeneron has developed a robust evidentiary record through both fact and expert discovery detailing Amgen's anticompetitive practices. In response, Amgen offers four individuals as experts including, as relevant for this Motion, Dr. Eric Gaier, Dr. Lauren Stiroh, and Ms. Deborah Gan.

## I.    OPINION OF DR. ERIC M. GAIER

Dr. Gaier, in response to one of Regeneron's economic experts, Professor Scott Morton, purports to apply the discount attribution test set out in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008). *Compare* Amended Opening Expert Report of Professor Scott Morton ("Scott Morton Opening Report"), attached hereto as Exhibit F ¶ 111, *with* Rebuttal Export Report of Eric Gaier ("Gaier Report"), attached hereto as Exhibit G § VI. Under this test, the full amount of the conditional rebates given by the defendant on the bundle is allocated "to **the single product at issue** in the case," here Repatha®. R&R at 14. "If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled [conditional rebate] is exclusionary." *PeaceHealth*, 515 F.3d at 906. Regeneron's expert applied this test as *PeaceHealth* instructs: she allocated the entire value of the bundled rebates to Repatha®, and concluded that the effective price was below an appropriate measure of Amgen's costs in selling the drug. *See* Scott Morton Opening Report § 6. In rebuttal, Dr. Gaier attempted to apply the same discount attribution test, but instead of allocating the value of the rebates only to Repatha®, Dr. Gaier allocated it to both Repatha® *and* Otezla®. Gaier Report

¶ 146. Based on his analysis, Dr. Gaier opined that "Amgen did not price Repatha® below its incremental costs." *Id.* ¶¶ 139-195.

## II.    OPINION OF DR. LAUREN J. STIROH

Amgen's expert, Dr. Lauren J. Stiroh, offered several opinions, including that Amgen does not have monopoly power in selling either Enbrel® or Otezla®. To support these conclusions, Dr. Stiroh (1) "describe[d] the many available therapeutic alternatives" to each drug; (2) "describe[d] extensive efforts that Amgen has undertaken to monitor and assess competitive pressures from those therapeutic alternatives"; and (3) "describe[d] actions by PBMs and third-party payers … with respect to formulary management." Stiroh Report ¶ 72. While Dr. Stiroh elsewhere describes the proper framework for identifying a relevant antitrust market, she does not attempt to identify a properly defined market for Enbrel® or Otezla®. Dr. Stiroh, however, asserts that if AbbVie's Humira® is in the relevant markets, then Amgen's market share for each product would be in the ███ percent range and concludes that Amgen's products lack market power. *Id.* ¶¶ 108, 153.

## III.    OPINION OF MS. DEBORAH GAN

Amgen hired Ms. Deborah Gan to respond to Regeneron's expert by providing opinions relating to "pharmaceutical industry" market access and practice. Rebuttal Report of Deborah Gan ("Gan Report"), attached hereto as Exhibit H, ¶ 2.[6] Ms. Gan bases her opinions on her experience working at Merck & Co. *Id.* ¶¶ 5-6. Ms. Gan began her career at Merck in 1989 and continued working there until her retirement in 2021. Gan Dep. Tr. 27:22-24, 96:12-19. She spent the vast

---

[6] Specifically, Ms. Gan offers the following opinions: (1) cross-therapeutic "bundling is considered part of a drug manufacturer's market access toolkit," Gan Report ¶ 21; (2) "in the industry, the terms of the executed contract ... are what matters for how rebates are paid," *id.* ¶ 23; (3) Regeneron's experts, "Ms. Bates and Dr. Scott Morton, provide theoretical views of alleged Praluent® 'foreclosure' that are inconsistent with the reality of typical industry market access practices," *id.* ¶ 20; (4) "Dr. Scott Morton . . . misunderstand[s] the nature of such negotiations [with PBMs]," *id.* ¶ 22; and (5) "Ms. Bates' and Dr. Scott Morton's spillover analyses are highly flawed and reflect a lack of understanding of how the pharmaceutical industry works." *id.* ¶ 24.

majority of her career working within a division at Merck whose mission was to create ways to increase patient "access to *Merck's* drugs." Gan Report ¶ 5. Ms. Gan's only direct experience on the PBM side is from 1994 to 1995, where she worked alongside a PBM Merck acquired. Gan Dep. Tr. 54:15-17. After retiring from Merck in 2021, Ms. Gan started her own consulting firm where she was re-hired by Merck and a handful of other pharmaceutical companies. Gan Report, App. A, attached hereto as Exhibit I. She has not consulted for any PBMs. Ms. Gan also consulted for Amgen in connection with its acquisition of Horizon Therapeutics ("Horizon"), which the FTC challenged, and during which Amgen explained that "bundling generally is not widely used in the pharmaceutical industry, and Amgen does not have many bundled contracts." Def. Amgen's Mem. of Law in Opp. to Plaintiffs' Mot. for Preliminary Injunction at 22, *Fed. Trade. Comm'n v. Amgen*, No. 1:23-CV-03503 (N.D. Ill. Sept. 11, 2023) ("Amgen's Horizon Opp."), attached hereto as Exhibit J.

## LEGAL STANDARD

Federal Rule of Evidence 702, Testimony by Expert Witnesses, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted). Under Rule 702, the district court acts "as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *ZF Meritor, LLC*, 696 F.3d at 290 (internal quotations omitted).

*Qualification*: Qualification "refers to the requirement that the witness possess specialized expertise" with respect to each matter addressed in the proposed testimony. *Schneider*, 320 F.3d at 404. "While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003).

*Reliability*: "[T]he requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994). "If the [expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 committee notes.

*Fit*: An expert's testimony must assist the fact-finder, by providing it with relevant information necessary to reach a reasoned decision of the case. *Paoli*, 35 F.3d at 742–43; *Calhoun*, 350 F.3d at 321. Even when an expert is qualified and relies on sound methodology, she must still "apply this expertise to the matter at hand." *Calhoun*, 350 F.3d at 324. An expert who renders an opinion based on factual assumptions not present in the case "cannot be said to 'assist the trier of fact,' as Rule 702 requires." *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000).

## ARGUMENT

## I.    DR. GAIER'S BELOW-COST PRICING OPINION SHOULD BE EXCLUDED BECAUSE HE MISAPPLIES *PEACEHEALTH*'S MULTI-PRODUCT REBATE TEST.

### A.    *PeaceHealth* requires "allocation of the entire discount to the single product at issue."

The Ninth Circuit's decision in *PeaceHealth* provides one standard for proving anticompetitive conduct through below-cost pricing in the context of multi-product rebates. *See*

R&R at 14.[7] Under *PeaceHealth*, "the full amount of the discounts given by the defendant on the bundle [is] allocated to the competitive product or products." 515 F.3d at 906. "If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary." *Id*. As one of Amgen's experts, Dr. Stiroh, has written, under *PeaceHealth*, "[b]undlers are granted a definitive guideline: if a firm can profitably ***apply an entire discount to a single competitive product***, given its own cost structure, then it can assume the discount is in a safe harbor." David Reichenberg & Lauren J. Stiroh, *Checking in on* PeaceHealth, The Antitrust Source (Oct. 2019) at 4.[8]

There is wide consensus that the *PeaceHealth* test requires applying the full discount to the product at issue in the case. As this Court has explained, determining the effective price for assessing below-cost pricing under *PeaceHealth* requires "allocation of the entire discount to the ***single product at issue in the case***."[9] R&R at 14. Or, as the leading antitrust treatise puts it: "To see whether a package price is 'exclusionary' in [*PeaceHealth*'s] sense, then, one simply attributes the entire discount on all products in the package ***to the product for which exclusion is claimed***." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and

---

[7] Anticompetitive conduct is an element of Regeneron's claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. R&R at 6-7. As this Court recognized, "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties." *Id*. at 7 (quoting *LePage's*, 324 F.3d at 152); *see e.g.*, *LePage's*, 324 F.3d at 155 (a bundled rebate is exclusionary "when offered by a monopolist [that] may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer"). Both parties' experts apply *PeaceHealth*. *See* Scott Morton Opening Report ¶ 111; Gaier Report § VI.

[8] Dr. Stiroh recognizes, moreover, that the *PeaceHealth* test is underprotective of anticompetitive conduct: It "fail[s] to address future competitive effects of pricing conduct" and "leaves markets vulnerable to under-correcting and allowing pricing strategies that offer consumers short-term benefits but risk competitive foreclosure over the long run." *Checking in on* PeaceHealth at 1.

[9] Dr. Gaier's erroneous calculation was the product of him not relying on the R&R. Gaier Dep. Tr. 69:3-11.

Their Application ¶ 749d3 (4th & 5th Eds., 2021 Cum. Supp. 2013-2020) (hereinafter "Areeda & Hovenkamp"). Economists who have analyzed the test are in accord.[10] And all for good reason: As *PeaceHealth* explained, with an alternative approach "[a] competitor who produces fewer products than the defendant but produces the competitive product at or below the defendant's cost to produce that product may nevertheless be excluded from the market because the competitor cannot match the discount the defendant offers over its numerous product lines." *PeaceHealth*, 515 F.3d at 904. Numerous federal courts have accordingly described and applied the test in exactly this way—attributing the rebate to *only* the "competitive" product, meaning the product for which the defendant is accused of anticompetitive foreclosure.[11] Here, that product is Repatha®.

Correctly applying the *PeaceHealth* test, Professor Scott Morton illustrates that, when Amgen's cross-therapeutic bundled conditional rebate is expressed in terms of the effective net

---

[10] *See, e.g.*, Kevin Murphy et al, Competitive Discounts and Antitrust Policy, The Oxford Handbook of International Antitrust Economics § 5.3 (2014) (attributing bundled discount only to "contestable units"); *see also* David S. Sibley, et al., *Tying and Bundled Discounts: An Equilibrium Analysis of Antitrust Liability Tests*, 13 BERKELEY BUS. L.J. 149, 161-62 (2016) (modeling the discount attribution test and applying the full rebate to only the competitive product).

[11] "[A] bundled price is legal" under *PeaceHealth* only "if, when the total discount is attributed **only to the product that less diversified competitors are trying to sell separately**, the resulting price is above the seller's average variable costs for that product." *Retail Imaging Mgmt. Grp., Ltd. Liab. Co. v. Fujifilm N. Am. Corp.*, 841 F. Supp. 2d 1189, 1197 (D. Or. 2012); *see also, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 14862098, at *15 (E.D.N.Y. Oct. 8, 2022) (denying motion to exclude expert opinion where expert correctly applied rebate to portion of bundle that was "contestable", i.e., in competition in the relevant market); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 275 (6th Cir. 2015) (applying discount attribution standard and attributing rebate on printer parts to the competitive product, ink); *Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*, 2009 WL 5217344, at *5-6 (C.D. Ill. Dec. 30, 2009) (citing expert's application of *PeaceHealth* involving different types of surgeries and attributing rebate of bundle to only the competitive product, outpatient urological ambulatory surgeries); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1210 (D. Minn. 2018) (attributing rebate of paperboard-susceptor bundle to susceptor, the competitive product), *aff'd*, 962 F. 3d 1015 (8th Cir. 2020); *SmithKline Beecham Corp. v. Abbott Lab'ys.*, 2014 WL 6664226, at *5 (N.D. Cal. Nov. 24, 2014) (allowing expert testimony where expert attributed rebate of bundled drugs to lopinavir component, the competitive product).

price of Repatha® at ESI/Ascent Commercial,[12] ***Repatha®'s effective price (as indicated by the red line) is below Repatha®'s costs (the dotted yellow line)***:

**Scott Morton Opening Report Figure 8: Amgen's Portfolio Rebate Penalty at ESI/Ascent Commercial Expressed in Terms of the Effective Net Price of Repatha®**



## B.    Dr. Gaier improperly attributes the entire bundled rebate to Repatha® *and Otezla*®.

Despite the clarity of the *PeaceHealth* test and the economic and legal consensus regarding its application, Dr. Gaier takes a different and unprecedented approach: He attributes Amgen's rebates not to Repatha® alone but rather to Repatha® ***and Otezla***®. Having never before done a *PeaceHealth* test, Gaier Dep. Tr. 165:13-17, Dr. Gaier's *ipse dixit* view is that the test requires modification and allows attributing the rebate to products whose foreclosure is not at issue in the case based on his interpretation of Amgen's contract with ███████████. Gaier Report ¶ 147. And he indiscriminately relies on Dr. Stiroh for the conclusion that Amgen lacks monopoly power in Enbrel® or Otezla®—meaning that if Dr. Stiroh's opinions are unreliable (*see infra* section II), so too are Dr. Gaier's.[13] *Id.* ¶ 142. Predictably, Dr. Gaier's decision to attribute the

---

[12] Professor Scott Morton also showed that Amgen's bundled rebate offer at Zinc/CVS resulted in a below-cost price for Repatha®. Scott Morton Opening Report ¶ 111 and Figure 8.

[13] Notably, Dr. Gaier conceded in his deposition that, *if Otezla® has market power*, then he would

same rebate value across Repatha® and Otezla® (which has revenues many times larger than Repatha®'s) yields an economically meaningless metric, the *combined* net revenue of Repatha® and Otezla®. *Id.* Fig. 15. It also vastly inflates the effective price of Repatha®. *Compare id.* § VI.B., *with* Reply Report of Fiona Scott Morton ("Scott Morton Reply Report"), attached hereto as Exhibit K ¶¶ 266-267.

### 1. Dr. Gaier's approach lacks support in law.

Dr. Gaier's decision to increase Repatha®'s effective price by applying Amgen's rebates also to Otezla® has no support in law. As explained above, this Court (and other relevant authority) has attributed the rebate only to the competitive product at issue in the case. *See supra* at 8-9. Tellingly, Dr. Gaier himself could not identify "a single application of the *PeaceHealth* test that," as he did, "attribute[d] the bundled discounts by a defendant to a product that the plaintiff does not compete against." Gaier Dep. Tr. 183:18-24 ("I didn't look for that, and I don't have an example to cite you"). *PeaceHealth* itself considered—and expressly rejected—an approach that applies the conditional rebate to more than just the competitor product in the bundle.[14] *PeaceHealth* rejected Dr. Gaier's preferred rule precisely because defendants (like Amgen) with product lines and sales volumes in other markets that dwarf the portfolios of its competitors (like Regeneron), "may too easily escape liability" if the bundled rebate is attributed across multiple products with which a plaintiff does not compete. *PeaceHealth*, 515 F.3d at 904. In such situations, bundles can

---

follow Professor Scott Morton's discount attribution test and Amgen's cross-therapeutic bundled rebate should be applied to only Repatha®, as *PeaceHealth* instructs. *See* Gaier Dep. Tr. 203:17-19 ("So if Otezla is found to have market power, then the test would collapse to the two product test, so I agree with that.").

[14] *See PeaceHealth*, 515 F.3d at 904; M. Laurence Popofsky & Adam J. Gromfin, *Bundled Discounting: From LePage's to PeaceHealth, & Beyond*, 9 SEDONA CONF. J. 99, 100 (2008) (noting that the Ninth Circuit considered a standard whereby "[b]undled discounting by a monopolist should be illegal only when the price of the bundle is below the aggregate cost of producing **all** of the products in the bundle" and that "[t]he Ninth Circuit rejected this approach").

work to "exclud[e] **less diversified** but more efficient producers." *Id.* at 897; *see id.* at 904 (explaining that the *PeaceHealth* test protects "[a] competitor who produces fewer products than the defendant but produces the competitive product at or below the defendant's cost to produce that product"). Accordingly, courts have held that *PeaceHealth* applies whenever the plaintiff "could not sell all of the same products in [the defendant's] bundle," which is indisputably the case here.[15] *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6561241, at *10 (N.D. Ohio Oct. 19, 205).

## 2. Dr. Gaier's approach runs afoul of reliable economic principles and methods.

Dr. Gaier's opinion, moreover, does not make economic sense. The *PeaceHealth* test, if applied correctly, is mathematically the same as an "incremental cost" test. Areeda & Hovenkamp ¶ 749d6. The incremental cost test isolates the net incremental effect of including the competitive product in the bundle by subtracting the standalone price of the products *other than* the competitive product at issue from the net price of the bundle after any rebates. *Id.* If the difference between those prices (*i.e.*, the net effect of adding the competitive product at issue to the bundle) is less than the cost of producing the competitive product at issue, then the bundle is exclusionary. *Id.* ("[W]hether the test is denominated 'attribution' or 'incremental cost,' it seeks to determine whether the defendant is charging enough additional money for a bundle to cover the incremental costs of the products that are added into the bundle.").[16]

---

[15] Dr. Gaier testified to the contrary, confirming his misunderstanding. Gaier Dep. Tr. 182:14-17 ("[I]t's not relevant whether Regeneron produces any of the other products besides Praluent that compete for the bundle.").

[16] *See also* Erik Hovenkamp & Herbert Hovenkamp, Exclusionary Bundled Discounts and the Antitrust Modernization Commission, 53 ANTITRUST BULL. 517, 520-21 (2008) (The *PeaceHealth* test "is the same thing as asking whether the incremental price of the bundle over the price of the A product is sufficient to cover the incremental cost of including the B product in the bundle. That is, it asks if the marginal or per-unit profitability (price minus cost) of the bundle exceeds that of A alone.").

Here, the incremental cost test compares the standalone prices of Enbrel® and Otezla® individually, unbundled, to the total price of Amgen's bundle. The difference in these two amounts yields the incremental cost of including Repatha® in the bundle, which is then compared to the cost of producing Repatha® to determine if Repatha® is priced below cost. Dr. Gaier's approach to the *PeaceHealth* test is at odds with this straightforward logic. He did not compare the price of Amgen's bundle to the standalone prices of Enbrel® and Otezla® and made no assessment of the incremental cost of Repatha®. Because he attributes the rebate to both Repatha® and Otezla®, his analysis does not isolate the incremental cost of Repatha®. Dr. Gaier's methodology, then, is not an incremental cost test and is an incorrect application of *PeaceHealth*.

Professor Scott Morton clearly explains the economic illogic of Dr. Gaier's approach:

> Dr. Gaier's approach to discount attribution—allocating Enbrel®'s ███████ rebate across both the competitive Repatha® and the monopolized Otezla®—is illogical and makes no sense as a matter of economics. ***Indeed, if the Court accepted his methodology, it would create a major loophole that would significantly limit the application of the* PeaceHealth *framework in that it would allow firms like Amgen to escape liability* simply by adding additional products to their [cross-therapeutic bundles]. A multiproduct firm with two blockbuster products A (Enbrel®) and B (Otezla®) and one competitive product C (Repatha®) could always avoid antitrust scrutiny by following the strategy implicitly proposed by Dr. Gaier's analysis. If a seller wanted to predate a rival producer of product C, the incumbent could bundle A and C and provide a bundled rebate on product A conditional on the purchase of C. However, it could easily avoid scrutiny by "conditioning" the A + C bundle also on the purchase of product B. Due of B's blockbuster status, it is a foregone conclusion that it will be purchased regardless of the additional "conditional" bundle, so the A + C and B bundle has identical competitive effects to the A+C bundle. Yet, according to Dr. Gaier's methodology, we should come to different conclusions about whether these economically equivalent bundles are anticompetitive.

Scott Morton Reply Report ¶ 267. Even Amgen's own expert, Dr. Stiroh, who has studied and published on the *PeaceHealth* test (but was not asked by Amgen to perform it in this case), recognizes that Dr. Gaier's approach is incorrect. *See supra* at 8.

In sum, Dr. Gaier's misapplication of *PeaceHealth* renders his opinion irrelevant and

unreliable. Dr. Gaier purports to conclude that Amgen does not price Repatha® below cost but relies on a legally improper and economically incorrect measure of Repatha®'s price for the purpose of that analysis. *See Intell. Ventures I LLC v. Xilinx, Inc.*, 2014 WL 1814384, at *3-4 (D. Del. Apr. 14, 2014) (excluding expert's opinion because expert's "understanding of the law is incorrect" and "renders his opinion unreliable"); *Universal Surveillance Corp.*, 2015 WL 6561241, at *10 (recommending exclusion of expert's opinion because expert purported to attribute bundled discount across products with which plaintiff did not compete). As another court explained in excluding another opinion of Dr. Gaier's: "This is precisely the sort of conclusory and internally contradictory argument that the *Daubert* gatekeeping function is meant to prevent." *Oliver v. Am. Express Co.*, 2024 WL 100848, at *12 (E.D.N.Y. Jan. 9, 2024), *amended in part*, 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024) (excluding in part the expert opinion of Dr. Gaier).

## II.   DR. STIROH'S ANALYSIS DOES NOT PROVIDE A RELIABLE BASIS FOR HER OPINIONS ON ENBREL®'S OR OTEZLA®'S SUBSTANTIAL MARKET POWER.

The methods for reliable expert analysis of market power in the antitrust context are well established. "The existence of monopoly power may be proven through direct evidence of supra competitive prices and restricted output" or "inferred from the structure and composition of the relevant market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Courts routinely recognize that "even where products are essentially identical, that alone is insufficient to require their inclusion in the relevant market" for the purposes of assessing market power. *United Food & Com. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1171 (N.D. Cal. 2017). In the pharmaceutical industry, "something more than mere therapeutic equivalency is required to define the relevant antitrust product market." *Id.* at 1172; *see also Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) (explaining that "while functional interchangeability is a *prima facie* indication that two products may be in the same antitrust market,

other economic factors may nonetheless restrict the cross-elasticity of demand between two products and confine them to different product markets") (citing *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 372-73 (3d Cir. 2020)). The U.S. antitrust agencies have excluded therapeutically equivalent drugs from a single market, instead defining relevant markets based on additional features, like method of administration. *See, e.g.*, *AbbVie Inc.*, 976 F.3d at 373 (affirming Section 2 violation where injectable therapies were excluded from the relevant market of topical therapies); Complaint & Decision, *In re Bristol-Myers Squibb Co. & Celgene Corp.*, No. C-4690 (F.T.C. Jan. 13, 2020) (requiring divestiture based on relevant market defined by method of administration).

Dr. Stiroh's opinions that Enbrel® and Otezla® lack market power are not based on the application of any reliable methods to the facts of this case. Dr. Stiroh acknowledges that this inquiry requires an "evaluat[ion of] the range of competitive alternatives that are available to a firm's customers." Stiroh Report ¶ 68. As Dr. Stiroh herself puts it, "[a]ssessing the boundaries of the relevant market, therefore, requires ***careful analysis*** of the degree to which decision-makers can substitute competing products in place of the product at issue." *Id.* ¶ 70. That analysis typically examines data and evidence relating to demand, market share, high gross margins, revenues, sales and the impact of market events such as new entry. *See* Scott Morton Opening Report ¶¶ 39-48.[17] Dr. Stiroh, however, does not conduct such a "careful analysis" here, and instead concludes that Amgen does not have monopoly power in selling Enbrel® or Otezla®. *See* Stiroh Report Part IV (Enbrel®); *id.* Part V (Otezla®). Each of Dr. Stiroh's three bases for that conclusion is unreliable.

---

[17] Dr. Stiroh's "methodology" stands in stark contrast to the robust, consensus approach to assessing market power employed by Professor Scott Morton who engages in a thorough analysis looking in detail at—among other factors—Otezla®'s and Enbrel®'s persistently high margins despite new entrants, differentiation from other therapeutically similar products, and breadth of coverage. *See* Scott Morton Opening Report ¶¶ 39-48.

*First*, Dr. Stiroh observes that "there are many drug products that are used to treat the medical conditions for which Enbrel® [or Otezla® are] indicated." *Id.* Part IV.B, V.A.1. But the mere existence of alternatives is not a sufficient or reliable methodology to determine that a product lacks market power. The relevant question is whether other products are *economic* substitutes; and, as Dr. Stiroh herself admitted in her deposition, "not every therapeutic alternative is a close economic substitute." Stiroh Dep. Tr., attached hereto as Exhibit L, 252:4-7. Economic substitutes, she explained, are "ones that you could observe or have information where you would anticipate they would be substituted if there were a change in the economic conditions under which the alternatives were being sold." *Id.* at 251:12-252:3; *see* Stiroh Report ¶ 70 ("Competition among differentiated products partly depends on how closely substitutable products are perceived to be in the eyes of consumers or other decision-makers."). These admissions—consistent with the case law—are devastating for her analysis of Enbrel®'s and Otezla®'s market power.

Dr. Stiroh, moreover, fails to apply any reliable methodology to determine which (if any) of the products she identifies are close economic substitutes to Enbrel® and Otezla®, which (by her own admission) is "a topic of ***economic*** analysis" rather than resolved by simply finding therapeutic closeness. Stiroh Dep. Tr. 69:15-70:18. For example, Dr. Stiroh includes "topical medications" to treat plaque psoriasis as examples of therapeutic alternatives, *e.g.* Stiroh Report ¶ 143, notwithstanding demonstrable differentiation from Enbrel® and Otezla® in terms of method of administration, among other things. Critically, Dr. Stiroh makes no effort to assess whether these meaningfully different products are economic substitutes for Enbrel® and Otezla® in the eyes of key economic decision-makers. Dr. Stiroh's arbitrary approach to identifying substitutes is not replicable and confirms that she is not applying reliable principles and methods to reach her opinions about market power.

*Second*, Dr. Stiroh concludes, without reference to any metrics or standards, that Amgen engages in "extensive efforts to monitor and evaluate the[se] therapeutic alternatives." *Id.* §§ IV. C.; V. 2. But the mere fact that Amgen monitors therapeutic alternatives for Enbrel® and Otezla® does not offer a reliable foundation for Dr. Stiroh's conclusion that those products lack market power. Indeed, Dr. Stiroh admitted that, over the course of her career, she could not recall having worked for a single pharmaceutical company that ***did not*** engage in these sorts of monitoring efforts. Stiroh Dep. Tr. 67:14-68:7. Allowing monitoring alone to suffice to show a lack of market power would turn settled antitrust law and practice on its head by rejecting the "factual inquiry into the 'commercial realities' faced by consumers" that courts have long required. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (citation omitted).

Dr. Stiroh's own testimony undermines the reliability of her methods, because it makes plain that she does not have a reliable and replicable standard to determine when such monitoring becomes "extensive" or indicative of a lack of market power. Dr. Stiroh testified that "[t]here is not a particular dollar threshold," or length of time, or number of people involved she applied to assess Amgen's monitoring efforts. Stiroh Dep. Tr. 64:25-65:2; *see id.* 65:15-21 (she did not "have in mind a particular length [of time]"); *id.* 66:5-20 (she did not "have a threshold in mind for the number of people that make it extensive"). To the contrary, she simply declared: "It is my opinion that what I have observed is extensive efforts." *Id.* 65:2-4. That is exactly the type of standard-less opinion testimony that misleads, rather than aids, the jury in its fact-finding role. *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 580 (1993) ("Many considerations will bear on the inquiry, including whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted

17

widespread acceptance within a relevant scientific community.").

*Third,* Dr. Stiroh cannot redeem her deficient approach to assessing market power by citing stray "actions of third-party payers and PBMs," as indicating a lack of market power. Stiroh Report ¶¶ 156-159 (Otezla®), ¶¶ 111-128 (Enbrel®). As to Otezla®, Dr. Stiroh does not even identify any *actions* on behalf of payers or PBMs that support her conclusion that Otezla® has no market power. Notably, *Dr. Stiroh could not provide a single example in which a PBM or third party covered Otezla® and then excluded it because of competitive constraints imposed by a therapeutic alternative. See* Stiroh Dep. Tr. 151:18-152:3. Without describing any methodology or analyzing any data, Dr. Stiroh simply concludes that the handful of documents she looked at "align" with her observations about the existence of therapeutic alternatives. Stiroh Report ¶ 159. Dr. Stiroh also utterly disregarded strong, relevant evidence of Otezla®'s market power. Namely, that, in the Bristol Myers-Squibb/Celgene acquisition, the FTC required Bristol Myers-Squibb/Celgene to divest Otezla®—described by the FTC as the market's "***most popular oral treatment***" for moderate to severe psoriasis—in order to secure the FTC's approval for the merger, because of Otezla®'s monopoly position in the market for oral treatment for moderate to severe psoriasis. *See* FTC, Press Release, *FTC Approves Final Order Requiring Bristol-Myers Squibb Company and Celgene Corporation to Divest Psoriasis Drug Otezla as a Condition of Acquisition*, (Jan. 13, 2020).[18] Amgen would never have acquired Otezla®—which Amgen did for over $13 billion—but for the FTC's mandate to Bristol Myers-Squibb/Celgene to divest Otezla®. *Id.* But in Dr. Stiroh's unreliable opinion, the genesis of Amgen's acquisition of this blockbuster drug has no relevance to her market power analysis for it. *See* Stiroh Dep. Tr. 162:10-164:6.

---

[18] https://www.ftc.gov/news-events/news/press-releases/2020/01/ftc-approves-final-order-requiring-bristol-myers-squibb-company-celgene-corporation-divest-psoriasis.

As to Enbrel®, Dr. Stiroh's explained that in January 2015 Enbrel® lost ███████████ ███████████████████████████████████████████ at OptumRx/UHC Commercial. Stiroh Report ¶ 115. This is the exception that proves the rule: Enbrel® lost ████████████ just once, nine years ago, for only one category of patients, and a category of patients who face the most elastic choices. For ██████████████ prescribed Enbrel®, the PBM evidently concluded that the competitive landscape did *not* allow them to drop Enbrel® from ████████████. The fact that there is no other example of Enbrel® losing ████████████ both indicates the substantial market power Enbrel® enjoys and illustrates the lack of reliability of Dr. Stiroh's analysis and the conclusions she attempts to draw from a single, isolated example rather than a reliable and replicable economic analysis. Moreover, Dr. Stiroh did not understand the basics of the two documents she chose to consider for this speculative opinion. *See* Stiroh Dep. Tr. 86:23-93:4 (admitting that, in using the underlying document for Figure 24 of her report, she did not fully consider Amgen's phrasing and decision to claw back rebates, raise the price of Enbrel®, and ultimately not compete by "walking away" from negotiations at UHC Commercial for Enbrel® coverage, at the same time Enbrel® revenues were increasing). This is not the sort of rigorous and reliable analysis that makes for proper expert testimony. *See ZF Meritor*, 696 F.3d at 291 (upholding exclusion of economic expert's damages analysis because expert lacked familiarity with the documents supporting his analysis).

In the end, at most, Dr. Stiroh suggests that Enbrel® and Otezla® lack market power because they face competition from Humira®. *See* Stiroh Report ¶ 158 (Otezla®'s competition "would have been mainly Humira); *id.* ¶ 113 ("It is particularly evident that Humira® and Enbrel® are close economic substitutes.").[19] But there is nothing in Dr. Stiroh's report that reliably supports this

---

[19] Dr. Stiroh confirmed in her deposition that it was her opinion that "even if the market in which

conclusion. Notably, Dr. Stiroh entirely ignores the possibility that more than one product in the same market can have market power. *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (affirming a post-trial violation based on the finding that both "Visa U.S.A. and MasterCard have demonstrated their power in the [relevant] market" with market shares of 47% and 26% respectively). To this point, courts have recognized that "market power is found in many highly competitive markets." *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786-87 (7th Cir. 1999). Further, Otezla® and Enbrel® do not face competition from biosimilar drugs—an important market feature that Dr. Stiroh ignores in her report. It is no surprise, then, that the net prices of Otezla® and Enbrel® have *never* decreased despite the presence of Humira® and in particular, ███████████████████ when Humira® prices dropped in the face of biosimilar entry—another key indicator of durable, significant market power. *See* Scott Morton Opening Report ¶ 43; Scott Morton Reply Report ¶ 378.

As a final matter, none of these critiques should come as a surprise to Amgen given Amgen's own prior criticism of Dr. Stiroh's economic expertise and opinions. In seeking to exclude Dr. Stiroh's testimony in another case, Amgen argued that her opinions there "amount[ed] to nothing more than junk science unsupported by evidence or economic analysis." Amgen's Motion to Exclude Stiroh at 2. Amgen criticized Stiroh for, "fail[ing] to perform any economic analysis," adopting conclusions "directly from [party] witnesses or documents, without applying any analysis at all," *id.* at 3, and failing to show that her opinions resulted from "the type of information upon which an economist normally relies" rather than "layers upon layers of impermissible speculation," *id.* at 10-11. Amgen asserted that Stiroh's opinions had "*no*

_____

Otezla competes were restricted to just Otezla and Humira, Otezla does not have monopoly power in that market," Stiroh Dep. Tr. 137:16-20, and, similarly that "even if the market for Enbrel were restricted to just Humira and Enbrel, … it does not have monopoly power," *id.* 125:16-19.

evidentiary foundation" and were "based solely on assumptions tailored to engineer a result, rather than on actual facts." *Id.* at 11 (emphasis in original).

Although Dr. Stiroh's opinions in that case were on different issues, Amgen made abundantly clear that its distrust of Dr. Stiroh was not limited to that one case or issue:

> ***This is not the first case in which Dr. Stiroh has offered a baseless and contrived "expert" opinion to serve her client.*** In *United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008 (N.D. Ill. 2006), Dr. Stiroh opined that a separate market existed for maintenance and service of equipment based on her having "concluded" that at the time of purchasing the equipment, owners lacked certain information about the maintenance policies. Judge Shadur of the Northern District of Illinois lambasted Dr. Stiroh's testimony, stating, ***"That type of analysis - or lack of analysis - borders on the absurd."*** *Id.* at 1046. More recently, Dr. Stiroh's report was withdrawn in another case on the eve of trial, after summary judgment motions had been briefed, when it became apparent that Dr. Stiroh may have blindly relied on data that lacked credibility. *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1454744 (Del. Ch. May 3, 2007).

*Id.* at 15 n.17. The Court should take Amgen's word for it. Here, too, Dr. Stiroh's opinions on market power are baseless and contrived. Indeed, Dr. Stiroh admitted that, in this case, she did nothing differently from the case in which Amgen called her methods "junk science." Stiroh Dep. Tr. 13:7-22. Just as Amgen previously argued, Dr. Stiroh's opinions here, too, should be excluded.

## III.   MS. GAN'S OPINION SHOULD BE EXCLUDED BECAUSE SHE IS AN IRRELEVANT MERCK FACT WITNESS AND NOT AN INDUSTRY EXPERT.

### A.   Ms. Gan's opinions regarding pharmaceutical industry market access and practice exceed her qualifications.

An expert witness must have "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." 29 Wright & Miller, Federal Practice and Procedure § 6265 (1st ed. 2014). It follows that an expert cannot opine on industry-wide dynamics when their experience is limited to one company and their limited experience does not reflect the industry as

a whole. *See, e.g.*, *Calvente v. Ghanem*, 2022 WL 4272779, at *8 (N.D. Ill. Sep. 15, 2022) (a professor's experience at one university qualified her to opine only about *that* university's hiring and tenure policies, but not an "industry-wide standard" for university hiring and tenure policies).

Ms. Gan, however, purports to offer an industry-wide perspective on PBM negotiations in the pharmaceutical industry writ large to rebut Regeneron's experts, but she relies solely on her experience at Merck—a single pharmaceutical manufacturer—to support these opinions. *See* Gan Dep. Tr. 100:7-20 ("Q What are your qualifications? A. So my qualifications are the 32 years that I had at Merck with the predominant period being under U.S. market access"). Ms. Gan spent the overwhelming majority of her career working in a division at Merck whose mission is "to create fast, easy, and affordable access to ***Merck's*** drugs for the benefit of patients." Gan Report ¶ 5.

Ms. Gan further admitted to having no experience "negotiating for pharmaceutical products other than those manufactured and sold by Merck." Gan Dep. Tr. 43:24-44:14. Underscoring her close and singular affiliation with Merck, and no other pharmaceutical company or PBM, Ms. Gan could not resist the "tendency to say ***us***" when referring to Merck "because of [her] long tenure there." *Id.* 79:5-8. Ms. Gan does not have any experience working for any of the "big three" PBMs—ESI, UHC/OptumRx, and CVS Health—or even any of the smaller PBMs at issue in this case. She likewise has no experience working for any of the associated GPOs—Ascent Health Solutions (ESI/Cigna/Evernorth), Emisar Pharma Services (UHC/OptumRx), and Zinc Health Services (CVS Health). Moreover, Ms. Gan has never been qualified as an expert in *any* case, nor has she ever provided testimony at *any* court hearing. *Id.* 101:19-102:9.

Ms. Gan does not and cannot show how her experience at Merck qualifies her to opine on PBM negotiations in the entire pharmaceutical industry. Ms. Gan purports to have experience with PBM contracts, but that experience is only reviewing a limited number of contracts between Merck

and a PBM. *Id.* 226:24-227:8. Ms. Gan tries to substantiate her PBM industry expertise by listing PBM executives she claims to have negotiated against as a Merck representative. *See* Gan Report ¶ 11. But she does not elaborate on the nature or dates of those negotiations, or describe how they provided her with industry-wide PBM expertise rather than Merck-specific experience. It is entirely possible that Merck's negotiations with PBMs in the past were distinct from negotiations with other manufacturers in the industry today, especially considering, as Ms. Gan opines, "PBMs are highly individualized actors and have different considerations." *Id.* § VIII.C. But Ms. Gan would have no way of knowing this and certainly does not demonstrate why her limited experience is representative, much less show that "it is more likely than not" that her "scientific, technical, or other specialized knowledge will help the trier of fact" or that her "testimony is the product of reliable principles and methods." Fed. R. Evid. 702. "An expert who testifies primarily from experience must explain 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *QVC, Inc. v. MJC Am., Ltd.*, 2012 WL 13565, at *7 (E.D. Pa. Jan. 4, 2012*) (quoting *Suter v. Gen. Acc. Ins. Co. of Am.*, 424 F. Supp. 2d 781, 788 (D.N.J. 2006)). Ms. Gan fails to meet that standard.

The contrast between Ms. Gan and Regeneron's expert, Ms. Heather Bates, illustrates the paucity of Ms. Gan's qualifications. Ms. Bates has spent her career consulting for a wide variety of PBMs and manufacturers. Heather Bates Expert Report ("Bates Report"), attached hereto as Exhibit M, Appendix 1. By contrast, Ms. Gan only spent approximately one year working *"side-by-side"* with a PBM Merck acquired in 1993, Medco Containment Services, Inc. This brief, three-decade-old experience is unlikely to provide much insight into industry-wide dynamics today. And beyond that, Ms. Gan's experience working alongside Medco is especially limited in its relevance because an investigation by the FTC revealed that "Medco ha[d] given favorable treatment to

Merck Drugs" which resulted in consumers having been "denied access to the drugs of competing manufacturers." *See* Press Release, FTC, *Merck Settles FTC Charges that Its Acquisition of Medco Could Cause Higher Prices and Reduced Quality for Prescription Drugs* (Aug. 27, 1998).[20]

Ms. Gan's PBM experience is even flimsier than that of a purported PBM expert excluded in another case. *See U.S. ex rel. Heller v. Guardian Pharmacy of Atlanta*, 2023 U.S. Dist. LEXIS 207629 (N.D. Ga. Sep. 30, 2023). Despite having "founded a PBM," working at another PBM, and consulting on "healthcare and PBM related issues," the expert did "not claim to have any experience negotiating dispensing fees" for PBMs. *Id.* at *48. The Court excluded the expert's testimony on that topic where (like Ms. Gan here) the expert made "no effort to explain ***how*** his experience [led] to the conclusion reached, why that experience is a sufficient basis for the opinion and ***how*** that experience is reliably applied to the facts." *Id.* at *49 (emphasis in original).

Ms. Gan's single-company experience means that each and every one of her opinions about the "industry" is in fact an observation about Merck alone. So when Ms. Gan opines that, in her view, cross-therapeutic "bundling is considered part of a drug manufacturer's market access toolkit," Gan Report ¶ 21, she can only mean that bundling is considered part of ***Merck's*** market access toolkit, since she has no basis for opining on any other manufacturer's toolkit. When she states that, in her view, "interim communications are a common part of negotiations, and PBMs usually drive the tone and pace of such exchanges," *id.* ¶ 85, she is actually stating only that this is the case ***at Merck***. Or, when Ms. Gan purports to challenge Ms. Bates' and Dr. Scott Morton's analyses as being, in her view, "inconsistent with how the pharmaceutical industry operates in the real world," *id.* ¶ 73, all she means is that those analyses are inconsistent with how ***Merck*** operates.

---

[20]    https://www.ftc.gov/news-events/news/press-releases/1998/08/merck-settles-ftc-charges-its-acquisition-medco-could-cause-higher-prices-reduced-quality.

But Merck's practices have no bearing on this case where Merck is neither a party, nor even a third-party. Amgen did not subpoena Merck or disclose (as required under Rule 26(a)(1)(A)(i)) that it intended to rely on Merck's information to defend this case. If Amgen thought another company's practices were relevant, Amgen knows exactly how to bring that third party into the case: For example, Amgen subpoenaed Sanofi and deposed a former Sanofi employee under Rule 30(b)(1). Even if Ms. Gan sought to testify about Merck's practices in this case, her testimony would be excluded as irrelevant, *see* Fed. R. Evid. 702, since Merck is not a market participant with respect to any of the products at issue in this case, and she provides no basis to compare what happened at Merck to what happened in this case. And, although Ms. Gan's experience at Merck is the basis for her opinions, Ms. Gan repeatedly ***refused*** to discuss Merck's practices. *See, e.g.*, Gan Dep. Tr. 156:19-157:15;[21] 227:9-16;[22] 264:12-17.[23] In short, Ms. Gan offers only "layman's testimony disguised as expert testimony"—and irrelevant layman's testimony at that. *Bird v. Borough of Moosic*, 2022 WL 584072, at *2 (M.D. Pa. Feb. 25, 2022).

Ms. Gan also cannot rely on "a combination of . . . [her] assignments after [she] left Merck" as the basis for her purported PBM industry-wide expertise. Gan Dep. Tr. 126:18-21. Ms. Gan's consulting assignments after she left Merck in 2021 are limited and fail to provide her with

---

[21] "Q. Generally speaking, would you say it was common for Merck to pay rebates on products that were not covered on a PBM's formulary? A. Again, I don't want to -- I'll speak on general terms. ***But when you start asking specifics to what Merck does in a contracting basis, that's confidential***. Q. So generally speaking, was it common for Merck to pay rebates on products that were not covered on a PBM's formulary? A. So that still feels very specific to what Merck's contracts and strategies are. ***I can speak on a very high level basis of, you know, what I observe in the industry.*** But ***I'm not comfortable speaking to what Merck does***…."

[22] "Q. Out of those approximately 40 contracts between Merck and a PBM, how many included a cross-therapeutic bundle? A. So ***I can broadly speak to one without getting into confidentiality***. There was one cross-therapeutic bundle that I was exposed to during that duration of time."

[23] "Q. In your experience at Merck, did you ever offer a PBM 1 of 1 rate that was the same as a 1 of 2 rate? A. That gets into, I feel, ***confidential details of my prior employer***."

adequate industry-wide expertise. *Cf. Pan Am. World Airways, Inc. v. Port Auth. of N.Y. & N.J.*, 995 F.2d 5, 10 (2d Cir. 1993) (upholding the exclusion of plaintiff's purported expert who had little experience in large airports and worked as an accident investigator for only eighteen months prior to rendering his opinion). In particular, since retiring from Merck, Ms. Gan has provided consulting services to five pharmaceutical companies, including among them Merck, Amgen, and a start-up pharmaceutical company that has since dissolved. *See* Gan Report App. A. And Ms. Gan's consulting engagement with the start-up pharmaceutical company involved "preapproval access strategies for an orphan drug," not the sort of market access negotiations on which she purports to opine in this case. *See id.* Ms. Gan has not consulted for any PBMs, nor has she reviewed any PBM contracts as a consultant—meaning that she has not gained any meaningful experience or expertise in this area since her departure from Merck. *See* Gan Dep. Tr. 55:20-56:18.

Nor did Ms. Gan attempt to overcome the gaps in her expertise by conducting a literature review or conducting industry surveys. Indeed, Ms. Gan testified that she did not even speak with anyone at Amgen about the specifics of Amgen's bundled rebates or the rationale behind them, nor did she want to speak to anyone at Amgen. *Id.* 25:8-26:2. The bottom line is that Ms. Gan is qualified to offer opinions only about her individual knowledge of Merck's practices, not about the industry as a whole. She is a fact witness, not an expert witness. And Merck's practices are not relevant to this case. Therefore Ms. Gan's testimony should be excluded.

**B.     Ms. Gan's opinions also are unreliable because she does not tie her experience to her conclusions.**

Unsurprisingly, given her lack of qualifications, the opinions Ms. Gan offers are unreliable and lack application of reliable principles and methods. "If the [expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is

reliably applied to the facts." Fed. R. Evid. 702 committee notes; *see, e.g.*, *Krantz v. Steiler*, 2024 WL 1494182 at *4 (M.D. Pa. Apr. 5, 2024) ("Because an industry standard describes generally accepted requirements, it cannot be reliably demonstrated by personal experience alone, even by a qualified and experienced expert."). Ms. Gan's opinions should be excluded because they do not "reflect[] a reliable application of [reliable] principles and methods to the facts," and instead ignore—and even contradict—the record evidence. Fed. R. Evid. 702.

*First,* Ms. Gan makes broad, unsupported statements about the commonality of drug manufacturers' use of cross-therapeutic bundles. Specifically, Ms. Gan states that Amgen's decision to utilize a bundle "to gain market access for Repatha® would be ***consistent with industry practices***, where a manufacturer seeks to maximize coverage for its product." Gan Report. ¶ 126. Ms. Gan adds "[t]here is nothing about cross-therapeutic bundling that is inherently outside ***the norms of the pharmaceutical industry***." *Id.* ¶¶ 110-119.

But Ms. Gan fails to describe any reliable methods she used to assess "industry practices" or "norms," and cannot show how her experience at Merck supports these sweeping conclusions. For example, Ms. Gan testified that "industry norms" are what is in a company's "market access toolbox" and are "situational"—but Ms. Gan's only experience is with Merck's toolbox. Gan Dep. Tr. 218:21-219:16. Ms. Gan did not review industry data to make such statements. To the contrary, her statements are at odds with ample evidence in the record that PBMs and Amgen viewed cross-therapeutic bundles as rare and atypical in the industry.[24]

---

[24] *See, e.g.,* AMG10935-0000735537, attached hereto as Exhibit N, at -549 (internal Amgen 2021 presentation describing the ███████████████ as "first-of-kind"); AMG10935-0000017052, attached hereto as Exhibit O, at -052 (July 1, 2020 Amgen email detailing "new contracting concepts" for ██████████, including a "first-of-its-kind deal"); Gordon, Dep. Tr., attached hereto as Exhibit P, 247:15-25 (the ██████████ contract was "the first time [he] ever had been asked to approve such a condition"); REGN0002397, attached hereto as Exhibit Q, at -397 (████████████████████████████████████████

27

Ms. Gan's testimony, moreover, is flatly contradicted by Amgen's own public statements. In the Amgen-Horizon matter[25]—which Dr. Gan consulted on—Amgen took the position that cross-therapeutic bundling was uncommon, as part of its effort to assuage any concerns that the deal was anticompetitive. Specifically, Amgen stated that "bundling generally is not widely used in the pharmaceutical industry" and (purportedly supported by Ms. Gan's analysis) that "Amgen **does not have many** bundled contracts." Amgen's Horizon Opp. at 22; *see* Gan Dep. Tr. 106:20-23; 107:19-109:2. Now that those statements no longer support Amgen's position here, Ms. Gan takes a contrary position—that cross-therapeutic bundling is common. Ms. Gan cannot explain how her current statements directly contradict those put forth by Amgen, especially given that Ms. Gan herself provided Amgen with consulting services during the Horizon merger litigation.

Worst of all, Ms. Gan's testimony on this issue is internally contradictory, as Ms. Gan herself at one point states that "cross-therapeutic bundles are **not** common," Gan Report ¶ 121, and that she saw only one cross-therapeutic bundle in her 32 years at Merck, Gan Dep. Tr. 70:8-17, 227:9-16. Ms. Gan's unsupported and inconsistent views of industry practices and norms regarding cross-therapeutic bundles lack the application of any expertise and should be excluded.

*Second*, Ms. Gan offers unreliable opinions regarding "spillover" effects—an established concept referring to the impacts formulary placement can have on a drug's likelihood of being prescribed[26]—at the PBM and prescriber levels. For example, Ms. Gan states that there are

_____

█████████████████████████████████████████████ ").

[25] In the Amgen-Horizon matter, the FTC sued to block Amgen's $27 billion dollar merger with Horizon because of anticompetitive concerns with the deal. Gan Dep. Tr. 102:10-22.

[26] *See, e.g.*, McCourt Dep. Tr., attached hereto as Exhibit R, 257:21-258:9 (explaining that exclusive coverage at one PBM "trains physicians to write the product that's exclusive" even for patients who may be covered under a different PBM); O'Neal Dep. Tr., attached hereto as Exhibit S 381:13-21 ("If enough of the market looks disadvantaged, then the message resonates across physicians to be – they may not be monitoring every single plan PBM but if enough of rejections or prior off come in and say: 'Use a product before somebody else,' that's what I'm referring to as

"*multiple industry constraints* discouraging behavior that would lead to spillover." Gan Rep. ¶ 152. But Ms. Gan has no way of knowing what those *industry* constraints are because she's only done *three* spillover analyses in her entire career, all for Merck. And despite this prior experience analyzing spillover effects at Merck, Ms. Gan does not explain how those analyses are comparable and could support her conclusions here. Even were her prior methods reliable, Ms. Gan inexplicably chose not to "conduct [her] own spillover analysis" here. Gan Dep. Tr. 279:17-24.

Ms. Gan further states there are "structural impediments," *id.* 282:3-283:1, and "constraints to spillover at the 'PBM level.'" Gan Report ¶ 150. But she does not provide support for these conclusions, much less describe the reliable methods she employed to reach them. Ms. Gan opines that "a PBM's coverage decisions depend on a variety of factors, such as the relationship between a manufacturer and PBM, and sometimes, the popularity of a particular drug among patients and physicians." *Id.* ¶ 158. But Ms. Gan fails to connect her limited experience interacting with one PBM as a manufacturer's representative to her broad opinions about constraints to spillover at the "PBM-level." As Professor Scott Morton explains, "[b]ecause of the consolidation in the PBM industry, when a [group purchasing organization] enters into a contract on behalf of a client's national formulary, each of the clients and health plans that follow the client's national formulary will tend to follow the same coverage decisions." Scott Morton Opening Report ¶ 101; *see id.* § 6.1 (implementing a reliable, replicable method to illustrate PBM spillover effects).

Ms. Gan also claims that "Regeneron's  , relative to Amgen, *could have* contributed to the market share

---

'spillover.'"); *cf. In re Brand Name Prescription Drugs Antitrust Litig.,* 186 F.3d at 787 ("[T]hough the patent [on a branded drug] may have expired, the physicians who prescribe the drug may continue to prescribe the branded version rather than the generic substitute, whether out of inertia, or because they think the branded version may be produced under better quality control[,] . . . or because the patient may feel greater confidence in a familiar brand.").

declines." Gan Report ¶ 170. But Ms. Gan is merely speculating, because she did not perform her own spillover analysis and cannot explain how her experience allows her to reach such a conclusion. Further, Ms. Gan's speculation is directly contradicted by the testimony of Amgen's medical expert Dr. Douglas Jacoby, who dismissed the impact of sales and marketing efforts on his prescribing decisions. *See* Jacoby Dep. Tr., attached hereto as Exhibit T, 110:22-25.[27]

Relatedly, Ms. Gan critiques Ms. Bates' spillover analysis as unreliable, contending that Ms. Bates' analysis is not sensitive to outside factors, such as marketing efforts. But Ms. Gan appears to fundamentally misunderstand Ms. Bates' analysis. *See* Gan Report Section X. Ms. Bates' prescriber level spillover analysis was designed to ***isolate*** the spillover effect from Amgen's cross-therapeutic bundled rebate at ESI/Ascent ***from other factors***, including broader trends and Amgen's marketing efforts. Heather Bates Expert Reply Report, attached hereto as Exhibit U, ¶¶ 23-25. Ms. Gan's mischaracterization of Ms. Bates' analysis only serves to underscore Ms. Gan's failure to reliably apply any relevant expertise.

None of Ms. Gan's opinions "reflect a reliable application of [reliable] principles and methods to the facts of the case." Fed. R. Evid. 702. And for very good reason, as Ms. Gan is not "qualified as an expert" on these topics. *Id.* Ms. Gan's opinions should be excluded in their entirety.

## CONCLUSION

For the foregoing reasons, the Court should exclude: (i) Dr. Gaier's opinions in section VI of his report; (ii) Dr. Stiroh's opinions regarding market power in sections IV and V of her report; and (iii) Ms. Gan's opinions in their entirety or, in the alternative, to the extent they purport to address industry practices involving cross-therapeutic bundling and spillover effects.

---

[27] "Q. You don't need a sales rep to tell you about these two products, do you? A. No, not -- not in this category of meds."; *see also* Exhibit S 111:11-15 ("Q. Since 2020, do you think . . . that you would have achieved any benefit from meeting with a sales rep for either Praluent® or Repatha®? A. No, not at all.").

Dated: May 28, 2024

WILKS LAW, LLC

  /s/ David E. Wilks
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP

Elizabeth Stotland Weiswasser
Jonathan D. Polkes
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk Robert Niles-Weed (admitted *pro hac vice*)
Rachel Williams 767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev (admitted *pro hac vice*)
Priyata Y. Patel (admitted *pro hac vice*)2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*