IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | |
| | ) | C. A. No.: 22-00697-JLH |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | **REDACTED VERSION – Filed July 3, 2024** |
| | ) | |
| AMGEN INC., | ) | |
| | ) | |
| Defendant. | ) | |

**AMGEN INC.'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Ben A. Sherwood
Leesa Haspel
Kate Swisher
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

Richard J. Doren
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Ashley E. Johnson
John Adams
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

*Attorneys for Amgen Inc.*

Dated: May 22, 2024

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

UNDISPUTED FACTS .......................................................................................................2

    I.    The Pharmaceutical Industry and Formulary Coverage of Prescription Drugs ...............................................................................................................2

    II.    The Parties, PCSK9i Drugs, and Enbrel® and Otezla® .........................................5

        A.    The Parties and Their PCSK9i Drugs ...............................................5

        B.    Amgen's Drug Enbrel® .....................................................................6

        C.    Amgen's Drug Otezla® .....................................................................6

    III.    Amgen's Competitive Strategy for Repatha® ......................................................7

    IV.    Regeneron's Competitive Strategy for Praluent® ...............................................8

    V.    PBM Contracts and Negotiations........................................................................9

        A.    Amgen Offers an ███████████████ ██████████ █████████████████████ . ...............................9

        B.    Amgen's Agreement with OptumRx/UHC Provides ██████ ████████ ███████████████ ████████ ..............10

        C.    CVS Intermittently Covers Repatha® and Does Not Agree to Any Linkage Between Enbrel® (or Otezla®) Rebates and Repatha®................11

        D.    Amgen Does Not Offer or Reach Bundled Rebate Agreement with Humana Part D...................................................................................13

    VI.    Regeneron Has ███████████████████ ████████████ ...........14

    VII.    Regeneron's Claims Against Amgen ................................................................14

LEGAL STANDARD ........................................................................................................15

ARGUMENT .....................................................................................................................15

    I.    Regeneron Has Not Offered Sufficient Evidence for a Jury To Find that Amgen Engaged in Anticompetitive or Exclusionary Conduct..............................15

A.   Under a Rule of Reason Analysis, Amgen's Conduct Is Not Anticompetitive..........................................................................16

1.   Exclusive Dealing Agreements Are Presumptively Lawful. .........16

2.   Amgen Did Not Substantially Foreclose the PCSK9i Market. ........................................................................18

B.   Under the Price-Cost Test, Amgen's Conduct is Not Anticompetitive..........................................................................34

C.   Amgen Did Not Have Monopoly Power Over the Products It Allegedly Bundled. ...................................................................37

II.   Amgen's Conduct Did Not Cause Anticompetitive Effects. ................................39

III.   As to Zinc/CVS, Regeneron Has Not Sustained an Antitrust Injury—or Any Injury Caused by Amgen's Allegedly Unlawful Conduct. ...........................41

CONCLUSION........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advo, Inc. v. Phila. Newspapers, Inc.,*
   51 F.3d 1191 (3d Cir. 1995)............................................................................36

*Aleksick v. 7–Eleven,*
   205 Cal. App. 4th 1176 (Cal. Ct. App. 2012) (UCL) ...........................................16

*Atl. Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990).............................................................................15, 42

*Avaya Inc., RP v. Telecom Labs., Inc.,*
   838 F.3d 354 (3d Cir. 2016).........................................................................15

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
   784 F.2d 1325 (7th Cir. 1986) .......................................................................44

*Barr Labs, Inc. v. Abbott Labs.,*
   978 F.2d 98 (3d Cir. 1992) (Clayton Act § 3) ..........................................15, 17, 25

*Bohler-Uddelholm Am., Inc. v. Ellwood Grp., Inc.,*
   247 F.3d 79 (3d Cir. 2001).........................................................................19

*Broadcom Corp. v. Qualcomm, Inc.,*
   501 F.3d 297 (3d Cir. 2007).........................................................................15

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993)................................................................................41

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)................................................................................42

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977).........................................................................2, 42, 43

*Cascade Health Solutions v. PeaceHealth,*
   515 F.3d 883 (9th Cir. 2008) ............................................................34, 35, 37, 38

*Eastman v. Quest Diagnostics Inc.,*
   2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ......................................................16

*Eichorn v. AT&T Corp.,*
   248 F.3d 131 .......................................................................................15

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
   821 F.3d 394 (3d Cir. 2016).............................15, 17, 21, 22, 30, 31, 32, 33, 34, 35, 39, 41

*In re EpiPen (Epinephrine Injection, USP),*
   44 F.4th 959 (10th Cir. 2022) .16, 17, 18, 20, 21, 22, 23, 24, 25, 28, 29, 30, 31, 32, 33, 34, 40,
   41

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of San Francisco,*
    114 Cal. App. 4th 309 (Cal. Ct. App. 2003) ................................................16

*Illinois Tool Works Inc. v. Indep. Ink, Inc.,*
    547 U.S. 28 (2006) ....................................................................................37

*Interim Healthcare, Inc. v. Spherion Corp.,*
    884 A.2d 513 (Del. Sup. Ct. 2005) ..........................................................19

*LePage's Inc. v. 3M,*
    324 F.3d 159 (3d Cir. 2003)...........................................................25, 37, 38

*Menasha Corp. v. News Am. Mktg. In-Store,*
    354 F.3d 661 (7th Cir. 2004) ....................................................................20

*Morgan v. Ponder,*
    892 F.2d 1355 (8th Cir. 1989) ..................................................................35

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC,*
    31 F.4th 651 (9th Cir. 2022) .....................................................................16

*Peerless Heater Co. v. Mestek, Inc.,*
    2000 WL 637082 (E.D. Pa. May 11, 2000) ..............................................36

*Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.,*
    886 F.3d 332 (3d Cir. 2018) .....................................................................42

*In re Processed Egg Prods. Antitrust Litig.,*
    881 F.3d 262 (3d Cir. 2018) .....................................................................44

*Race Tires Am., Inc. v. Hoosier Racing Tire Co.,*
    614 F.3d 57 (3d Cir. 2010).................................................................20, 32

*Roland Mach. Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984) ....................................................................22

*SmithKline Beecham Corp. v. Apotex Corp.,*
    383 F. Supp. 2d 686 (E.D. Pa. 2004) .......................................................43

*SmithKline Corp. v. Eli Lilly & Co.,*
    575 F.2d 1056 (3d Cir. 1978)..............................................................37, 38

*Sprint Nextel Corp. v. AT&T Inc.,*
    821 F. Supp. 2d 308 (D.D.C. 2011) ..........................................................44

*Takeda Pharms., USA, Inc. v. West-Ward Pharm. Corp.,*
    No. 1:14-cv-1268, 2018 WL 6521922 (D. Del. Dec. 12, 2018) (Andrews, J.) ....................19

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961)............................................................20, 22, 31

*TI Inv. Servs., LLC v. Microsoft Corp.,*
    23 F. Supp. 3d 451 (D.N.J. 2014) ............................................35, 36, 41

*U.S. Bank Nat'l Assn. v. Gunn*,
    23 F. Supp. 3d 426 (D. Del. 2014) (Andrews, J.) ..................................................16

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................................................29

*Van Dyk Research Corp. v. Xerox Corp.*,
    631 F.2d 251 (3d Cir. 1980)....................................................................................44

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................40

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011)......................................................................................37

*West Penn. Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) (Sherman Act § 1) ......................................................15

*Wolf Concept SARL v. Eber Bros. Wine & Liquor Co.*,
    736 F. Supp. 2d 661 (W.D.N.Y. 2010) ..................................................................16

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012).......................16, 17, 20, 22, 25, 28, 29, 30, 31, 32, 33, 34, 35, 39

## Treatises

11 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶1802g2 ...........................................31

26 Corbin on Contracts § 573 (1960) ...........................................................................................19

## Regulations

42 C.F.R. § 423.514(d) ..................................................................................................................19

## INTRODUCTION

Since the launch of Repatha® and Praluent® in 2015, competition between Amgen and Regeneron has been vigorous, as both have vied for access to the formularies of large pharmacy benefit managers ("PBMs") whose actions control the availability and affordability of drugs to millions of patients. That vigorous competition has created steady upward pressure on the rebates Amgen and Regeneron must pay to PBMs to keep these drugs available to patients. Depending on the terms offered, PBMs have varied their formulary decisions over time.



In early 2020, ███████████████████████ It ██████████████████ ██████ ███████████████████████████ █████████████████. Several of these PBMs—███████████████ █████████████████ ███████████—chose Repatha®. Regeneron, ███████████████████ █████████████, brought this action speculating that Amgen had prevented Regeneron's success by giving PBMs increased rebates on Amgen's other drugs, Enbrel® and/or Otezla®, if those PBMs would exclusively cover Repatha®.

As Amgen foreshadowed at the motion-to-dismiss stage and discovery has borne out, Regeneron's speculation was largely incorrect. In fact, Amgen provided an increased rebate on



████████████████████ █ ████████████ █ ████████████████████████████████████. But Regeneron concedes that ██████████ ███████████ is only 10% of the alleged market, which is too small as a matter of law for a contract supposedly foreclosing that portion of the market to be anticompetitive. For the same reason, even if Regeneron were correct that Amgen sold Repatha® below cost to ██████████████, that would again apply to only 10% of the market or less, which is insufficient to be anticompetitive. Regeneron thus cannot prove an antitrust violation and Amgen is entitled to summary judgment.

Undeterred, Regeneron insists Amgen had unwritten, implicit agreements on bundled rebates, and that it was injured when Amgen employees even ████████████████████

1

██████████████████████████ ████████. But there is no genuine dispute that drug manufacturers and PBMs put rebate agreements in written contracts; they do not rely on implicit understandings. Mere discussion, without agreement, is not foreclosure. And characteristics of the agreements at issue—including short duration, easy terminability, and lack of coercion—further defeat any theory that Praluent® is substantially foreclosed from competing against Repatha®.

Beyond Regeneron's lack of evidence of anticompetitive conduct, its claims fail because it cannot show anticompetitive effects. It is undisputed that the competition about which Regeneron complains has caused prices to fall, which is good for consumers. Finally, most of Regeneron's claimed damages are not "antitrust injury," as the law requires. ███████████

████████████████████████████████████████████

██████████████████████ Because these costs result from an *increase*, rather than a *reduction*, in competition, they are not recoverable under the antitrust laws.

At bottom, Regeneron asks this Court to protect it from the realities of vigorous competition by Amgen, not from any anticompetitive conduct. But it is axiomatic that the antitrust laws were enacted for "the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Each of Regeneron's claims fails, and this Court should grant summary judgment in favor of Amgen.

## UNDISPUTED FACTS

### I. The Pharmaceutical Industry and Formulary Coverage of Prescription Drugs

PBMs help commercial and government-sponsored health insurance plans administer their prescription drug plans. Ex. 1[1] (Bates Op. Rpt.) ¶¶ 9, 11. One way that PBMs do this is by

---

[1]    Citations to "Ex.__" refer to the exhibits to the Declaration of Ashley Johnson, filed contemporaneously herewith.

developing lists of medications called formularies that specify whether, and the terms under which, a medication will be covered by a plan. *Id.* ¶ 11; Ex. 2 (Gan Rpt.) ¶ 41. In a typical four-tier formulary, Tier 1 lists generic drugs, Tier 2 lists preferred brand-name drugs, Tier 3 lists non-preferred, but covered, brand-name drugs, and Tier 4 lists covered specialty drugs. Ex. 3 (Gaier Rpt.) ¶ 55. Formulary tiers create financial incentives for patients to use medications towards the top of the tier structure (*i.e.*, Tier 1 or 2). Ex. 2 (Gan Rpt.) ¶ 42.

PBMs maintain separate formularies for commercial and Medicare Part D plans. Ex. 1 (Bates Op. Rpt.) ¶ 27. For Part D, health plans with which the federal government has contracted to administer drug benefits contract with PBMs to manage those benefits. *Id.* ¶ 11. A health plan that contracts with a PBM may also, instead of using the PBM's primary formularies, develop and maintain one or more of its own "custom" formularies. Ex. 2 (Gan Rpt.) ¶¶ 67–68.

PBMs may use formulary coverage and utilization management ("UM") restrictions (*e.g.*, requiring prior authorization) to extract rebates from manufacturers. *Id.* ¶ 46. PBMs may exclude or threaten to exclude brand-name drugs from their formularies or the preferred brand tier, or to impose onerous UM criteria, unless the manufacturer agrees to pay rebates. Ex. 3 (Gaier Rpt.) ¶ 70; *see also* Ex. 2 (Gan Rpt.) ¶¶ 75–76. As rebates typically are expressed as a percentage off a drug's list price, an increase in a rebate results in a decrease of the drug's net price.

A manufacturer bids for formulary coverage by using PBM-designed matrices to propose the rebates it is willing to pay for each type of formulary coverage. *See* Ex. 2 (Gan Rpt.) ¶ 49 & App'x E. One type of formulary coverage is "1:1" (one-of-one), which means the medication will be the only drug in its therapeutic class on the relevant formulary tier. SUF 1 ¶ 3. Even where one drug is covered 1:1, patients can access other drugs in the class as non-preferred or through coverage exceptions. *Id.* A drug may also be covered "1:2" ("one-of-two"), which means the

medication is one of two in a therapeutic class on the formulary. *Id.*

PBMs have increased their already significant bargaining power through consolidation, vertical integration, and, for the commercial segment, formation of group purchasing organizations ("GPOs"). Relevant GPOs here are: (1) Ascent, whose clients include the PBMs Express Scripts ("ESI") and Prime Therapeutics ("Prime"), and the health insurer Cigna; (2) Zinc, which represents the PBMs CVS Caremark ("CVS") and CarelonRx; and (3) Emisar, which represents the PBM OptumRx. Ex. 4 (Stiroh Rpt.) at 30, Fig. 10; Ex. 2 (Gan Rpt.) ¶¶ 60–61 & Fig. 2. GPOs negotiate for rebates and collectively represent PBMs covering most commercial lives. Ex. 3 (Gaier Rpt.) ¶ 54 & Fig. 2; Ex. 4 (Stiroh Rpt.) at 30, Fig. 10. Academic and industry studies, including by Regeneron's economist, Prof. Scott Morton, have concluded that increased concentration gives PBMs tremendous bargaining power against manufacturers. *Id.* ¶ 54 & n.86 (collecting studies).

Rebate agreements are one-sided in favor of the PBM and reflect PBMs' significant negotiating leverage. Ex. 5 (Zimmer Tr.) at 89:8–90:6. While manufacturers must agree to pay the contracted-for rebates as long as the PBM meets their conditions, PBMs have no reciprocal obligation to meet those conditions and during the period of a contract can cover any medications they choose however they choose to do so, as well as access rebates from simultaneous contracts with competing manufacturers. Ex. 2 (Gan Rpt.) ¶¶ 20, 97. Similarly, PBMs frequently renegotiate mid-contract to obtain greater rebates and are free to change the medications on their formularies *at any time*, even during the contract term. SUF 1 ¶ 2.[23] As Amy Bricker, the former President of

---

[2]  Citations to "SUF __" refer to Amgen Inc's Concise Statements of Fact in Support of Its Motions for Summary Judgment, filed contemporaneously herewith.

[3]  In early 2020, CVS Commercial simultaneously had contracts with Amgen ███████ ██████████████ █████████, Ex. 8 at -1489; Ex. 9 at -3705, and was covering Repatha® 1:1. Ex. 10 (Witter Tr.) at 101:12–15. Mid-year and mid-term of the Amgen contract, ████████████████████████████████████████████████████████████ ███████████. *Id.* at 112:9–19.

ESI, testified, "███████████████████████████████████████

██████████████████████████████████████████████████████

███" Ex. 6 (Bricker Tr.) 102:13–103:3.

## II.     The Parties, PCSK9i Drugs, and Enbrel® and Otezla®

### A.     The Parties and Their PCSK9i Drugs

Amgen is a biotechnology company that "discovers, develops, manufactures and delivers innovative medicines to fight some of the world's toughest diseases." Ex. 98 at 1. It is a pioneer in the development of proprotein convertase subtilisin/kexin type 9 inhibitors ("PCSK9i"), biologics that treat cardiovascular disease by decreasing the concentration of LDL-C, or "bad cholesterol," in the bloodstream. Ex. 11 (Jacoby Rpt.) ¶¶ 23–24. Amgen's PCSK9i, Repatha®, was the first PCSK9i to obtain regulatory approval in the world. SUF 1 ¶ 4. Repatha® was also the first PCSK9i submitted to the FDA for approval, which was granted in 2015. *Id.*

Regeneron is a rival biotechnology company that reported $16.1 billion, $12.2 billion, and $13.1 billion in revenues for 2021, 2022, and 2023. Ex. 12 (Regeneron 2023 Form 10-K) at F-5. Its portfolio includes the blockbusters Dupixent® and Eylea®, which had respective U.S. sales of $8.9 billion and $5.7 billion in 2023. *Id.* at 5. Regeneron also markets the PCSK9i Praluent®, which the FDA approved five weeks before Repatha®, after Regeneron paid $67.5 million for a "priority review voucher" accelerating the FDA review period. Ex. 3 (Gaier Rpt.) ¶ 39 & n.45. Regeneron co-developed Praluent® pursuant to a collaboration with Sanofi, ████████████████

██████████████████████████████████████████████████████

███████ Ex. 14 at -0713, -0718; Ex. 15 at -8744, -8759–60.

Repatha® and Praluent® are safe, well-tolerated, and effective, and Regeneron's witnesses agree that most patients can be managed equally well on either medication. SUF 2 ¶ 7. In the rare case where a patient must take either Repatha® or Praluent® and cannot substitute the other, an

insurer that has approved coverage of one will generally honor a medical exception request or appeal and cover the other drug even if not on its formulary. Ex. 11 (Jacoby Rpt.) ¶¶ 29–30.

### B.    Amgen's Drug Enbrel®

Enbrel® is an Amgen prescription biologic approved by FDA to treat rheumatoid arthritis, psoriatic arthritis ("PsA") and plaque psoriasis ("PsO"), among other conditions. Ex. 3 (Gaier Rpt.) ¶ 41. Approved in 1998, Enbrel® competes vigorously for formulary coverage against rivals including Abbvie's blockbuster Humira®, the highest grossing drug in America from 2015 to 2020 and now second highest. SUF 1 ¶ 6. Whereas Enbrel®'s U.S. sales were $4.8, $4.3, and $4.0 billion in 2020, 2021, and 2022 (less than Dupixent®'s in 2021 and 2022), Humira®'s were much higher, at $16.1, $17.3, and $18.6 billion. *Compare* Ex. 18 (Amgen 2022 Form 10-K) at 59 *with* Ex. 19 (Regeneron 2022 Form 10-K) at 5 *and* Ex. 20 (AbbVie 2022 Form 10-K) at 95; *see* Ex. 21 at 3.

Enbrel® has not been covered consistently by the major PBMs. In 2015, OptumRx and UnitedHealthcare ("UHC") removed Enbrel® from their preferred brand tiers in favor of Humira®. SUF 1 ¶ 7. Despite allowing existing patients to continue taking it, Enbrel®'s share at OptumRx and UHC fell from ███████ in the first quarter of 2015, and then to ████ by mid-2020. SUF 1 ¶ 8. In 2021, UHC ████████████████████████████ ██████████████████████████████████████████████████████ ██████. Ex. 22; Ex. 23 at -7048–49.

### C.    Amgen's Drug Otezla®

Otezla® is a prescription oral medication indicated for the treatment of adults with PsO, PsA, or oral ulcers associated with Behçet's disease. Ex. 3 (Gaier Rpt.) ¶ 42. Amgen acquired Otezla® from Celgene Corporation in August 2019 when Bristol-Myers Squibb ("BMS") divested it as a condition of its acquisition of Celgene to preserve BMS's incentive to develop its own oral PsO product. *Id.* Otezla® is in a crowded and competitive autoimmune category and competes with

biologics such as Remicade®, Humira®, Cosentyx®, Stelara®, Taltz®, and Skyrizi®, the new orally administered biologic Sotyktu®, and other medications. Ex. 4 (Stiroh Rpt.) ¶¶ 142–43.

PBMs have leveraged the vigorous competition Otezla® faces to negotiate higher rebates. In its 2020 negotiations with Amgen, ███████████████████ ███████████████ ███████████████████████ SUF 1 ¶ 11. Since 2019, PBMs have not covered Otezla® consistently. In fact, in 2021, it was not covered on prescription drug plan Part D formularies of OptumRx and UHC, and Part D formularies of Cigna, Humana, CVS, and Anthem. *Id.* ¶ 13. Even before PsO competitor Sotyktu® launched in 2022, Otezla®'s sales were only ████ of total PsO sales and ████ of PsA sales. *Id.* ¶ 12. Amgen has consistently recognized competitive challenges to Otezla® presented by the numerous therapeutic alternatives, including "[m]ore brands targeting the same patient segments." Ex. 4 (Stiroh Rpt.) ¶¶ 148, 150–51; Ex. 26 at 22.

## III.    Amgen's Competitive Strategy for Repatha®

Amgen's main objective has long been to ███████████████████████ Ex. 27 (van Grunsven Tr.) at 45:10–14, by ████████████████████████ ███████████████████████████ *id.* at 71:15–22. As Amgen's head of Global Commercial Operations explained, ████████████████████████ ████████████████ Ex. 7 (Gordon Tr.) at 217:4–6. Amgen has thus sought to ████████████████ for Repatha®. Ex. 28 at 3; Ex. 7 (Gordon Tr.) at 34:23–35:2.

Amgen has ████████████████████████████ ████████████████. Ex. 29 at 17; Ex. 30 at 4; *see also* Ex. 3 (Gaier Rpt.) ¶ 222 & n.331; Ex. 31. And because "[p]harmaceutical firms can . . . influence the choice among drugs beyond negotiating availability on formularies, including by marketing to HCPs [*i.e.*, healthcare providers] through detailing," Ex. 32 (FSM Op. Rpt.) ¶ 272, products can perform vastly differently even when they are in the same formulary position. Amgen's efforts have given Repatha® an edge

7

against Praluent® separate from formulary coverage. Ex. 3 (Gaier Rpt.) ¶¶ 232–237; Ex. 33; Ex. 34 at 7; Ex. 35 at 2; Ex. 36 at 44; Ex. 37 (Hindman Tr.) at 68:5–17, 157:12–21; SUF 1 ¶ 23.

Regeneron's economic expert admits that Amgen's strategy has primarily been to seek ███████████████████████████████████. Ex. 83 (FSM Rep. Rpt.[4]) ¶ 11. Amgen competes with Praluent® by ████████████████████████████████████████. Ex. 39 (Chiu Tr.) at 18:18–19:1; Ex. 7 (Gordon Tr.) at 201:11–17. In fact, one of Amgen's "coverage and pricing core principles" for its "negotiation approach" is its "belie[f] that that physicians and patients ███████████████████████████ leading Amgen to ████████████████████████ SUF 1 ¶ 17.

## IV.    Regeneron's Competitive Strategy for Praluent®

Regeneron's approach was very different. ██████████████████████████
██████████████████
█████████████████████████████████████████████
██████████████. *E.g.*, *id.* ¶ 14. ████████████████████
████████████████████ *see* Ex. 42 (Schleifer Tr.) at 27:9–28:3, ███████
███████████████████████████████████████████
███████ ██████. Ex. 40 at -2527; Ex. 41 (Carnahan Tr.) at 74:8–77:12.
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████ █████████████████████
█████████ SUF 1 ¶ 15.

---

[4]  Citations to "FSM Rep. Rpt." and "FSM Op. Rpt." herein and in the SUFs refer to Fiona Scott Morton's Reply Report (Ex. 83) and Fiona Scott Morton's Amended Opening Report (Ex. 32), respectively.



Regeneron aggressively pursued its chosen strategy of ██████████████████████

████████████████████████████████████████████████████████████.

*Id.* ¶ 16. ████████████ ██████████████████████████████████████████

████████████████████████████████████," Ex. 46 at -1100. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████Because

its strategy depended on ████████ ████████████████████████████

████████████████████," Ex. 42 (Schleifer Tr.) at 142:8–143:10,

████████████████████████████████. For example, ████████████

████████████████████████████████████████████████████████,

Ex. 48; Ex. 13 (O'Neal Tr.) at 126:8–16, ████████████████████████

████████████ ██████████. Ex. 10 (Witter Tr.) at 165:12–166:10. ████████

████████████ █████████████████████████ *Id.* at 112:9–19. ████████

████████████████████████████. *See, e.g.*, SUF 3 ¶¶ 6, 16, 35.

## V.    PBM Contracts and Negotiations

### A.    **Amgen Offers an** ███████████████ ████████████████████
████████████████ ██.

Repatha® and Praluent® were both covered on ESI's National Preferred Formulary in the

early years of the drugs. In mid-2018, Praluent® became the only covered PCSK9i drug. After a

brief period of 1:2 coverage, Amgen began negotiations with Ascent (which had ESI as its largest

client) in mid-2020 for coverage of Repatha®. During the 2020 negotiations, Amgen's "████████

████████████████████████████████████. Ex. 49 at -3608; Ex. 50

at -5881. When Amgen learned that ████████████████████████████████

however, it ████████████████████████████████." SUF 1 ¶ 19.

After what ESI's CEO labeled ███████████████ ESI Commercial preferred Repatha® 1:1 starting on July 1, 2020, advising Regeneron that, when all factors were considered, Amgen ██████████████████████████ Amgen also agreed with Ascent that Amgen would provide an ██████████████████ for Ascent's clients (including ESI Commercial) that met certain conditions, including covering ████████ *Id.* ¶ 21. That rebate gave a ██



███████ ██████████████████████████████████ ███████ ███████████████ ████████████. *Id.* The agreement did not provide an Otezla® rebate conditioned on Repatha® coverage. Ex. 117.

Amgen's contracts and coverage with ESI Part D are different. In February 2020, Amgen suggested ████████ ████████████████████████████████ ████████. *See* SUF 1 ¶ 30. ESI Part D promptly ███████████████. *Id.* As a result, Amgen's ultimate contract with ESI Part D did not condition any rebates on Enbrel® or Otezla® on Repatha® coverage at any level. *Id.* ¶ 31. At no time has Amgen had such an agreement with ESI Part D.

**B.    Amgen's Agreement with OptumRx/UHC Provides** ██████████████ ████████████████████ ████████████████.

Beginning in 2019, Repatha® was covered along with Praluent® at parity (1:2) on the OptumRx/UHC Commercial national template formularies. Ex. 51. In 2021, OptumRx and UHC Commercial began new rounds of negotiations with Regeneron and Amgen. *See, e.g.*, SUF 1 ¶ 24.

As usual, Amgen "[was] pursuing ██████████████████████████████



Ex. 52 (Grennan Tr.) at 219:4–10. ████████████████████████████████ ████████████████ ████████ ████████████████ ████████████████. SUF 2 ¶ 2. ██████████████ ████████ Ex. 53 at -8414; Ex. 37 (Hindman Tr.) at 30:14–17. ██████████████████████████████ ████████ ██,

███████████████████████████████████████████████████

█████████ UHC then ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████ Ex. 37 (Hindman Tr.) at 33:25–34:16. Specifically, UHC told Amgen it was

████████████████████████████ on its national commercial formulary, Ex. 55 at -

2440, and made an █████████████████████████████████████

telling Amgen that if ████████████ UHCs ████████████████████,

Ex. 56 at -7916; Ex. 22 at -8299. Amgen responded by offering ████████████████

██████████████████████ ████████████. Ex. 57 at -7944.

A portion of the ██████ ████████████████—was available to UHC

Commercial for █████ only if it █████████████████████████████████.

Neither OptumRx nor UHC Commercial was entitled to ████████████ ████████████

████████. Ex. 58 at -5294–312. While the ██████ ████████ provision remained in the

next iteration of the contract, Ex. 59 at -2955, it has not been ████████████, Ex. 60, because

since then UHC Commercial has covered Enbrel® on its preferred brand tier, entitling it to ████

████████████████████████ ████████.[5] Ex. 37 (Hindman Tr.) at 150:22–151:16; Ex.

52 (Grennan Tr.) at 331:8–11 (as clarified in Sept. 8, 2023 errata).

Since 2016, OptumRx/UHC Part D has covered Repatha® and Praluent® at parity (1:2).

**C.    CVS Intermittently Covers Repatha® and Does Not Agree to Any Linkage Between Enbrel® (or Otezla®) Rebates and Repatha®.**

███████████████████████████████████████ Zinc/CVS Commercial

---

[5]    Since January 2022, Amgen has contracted with Emisar (OptumRx's GPO) to provide rebates for UHC Commercial and OptumRx Commercial. *See* Ex. 61 at -3029.

covered Praluent® 1:1 beginning July 1, 2020, until June 30, 2023, SUF 3 ¶ 14, ███████

████████████████████████████████████████████████████████████████████████████ At no

time has Amgen had a contract with Zinc/CVS Commercial linking any rebate on Enbrel® (or

Otezla®) to the coverage of Repatha®.

On July 6, 2021—when Repatha® was not covered at CVS Commercial—Amgen made a

████████████████████████████████████████ ████████████████████

███████ . SUF 3 ¶ 21. Consistent with Amgen's longstanding strategy, the proposal required

████████████████ . Zinc/CVS Commercial was ███████████ and ████████████████

████████████████████████████████████████████████████████████

*Id.* ¶ 23. ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ even after Amgen offered ████████████████ *Id.* ¶ 31

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████ SUF ¶ 33,

████████████████████████████ . *Id.* ¶¶ 40–41 ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Amgen did

not make Zinc/CVS Commercial any bundled rebate offer involving Repatha® in 2023, and its

contract did not condition any rebates on any drug other than Repatha® on coverage of Repatha®.

*Id.* ¶ 38.

As for CVS Part D, Amgen never offered or agreed to any linkage between any Enbrel® or Otezla® rebate and any level of Repatha® coverage. A CVS Part D witness testified that, in February 2021, Amgen made a ███████████████████████████████████████████ ████████ ████████████████████████████ *Id.* ¶ 4. But CVS Part D was not ████████, and says this concept was ████████████████ and was never ███████████████████████ in [CVS's] Medicare Part D process." *Id.* ███████████████████████████████████████████

███████████████ d, ████████████████████████████████████ *Id.* ¶ 13. █████████████████████████ ████████████████████████████ █████████████ ████████ ███████████████████████ *Id.* ¶ 29. ████████████████████ █████████ ████████████ █████████████████████████████████████████████ ███████. *Id.* ¶ 12

███████████████████████████████████████████████████████████ ███████████████████████████ █████. *Id.* ¶ 33. ███████████████████████ ████████████████ *id.* ¶ 34, █████████████████████████████████████████ ███████████████████ After Amgen offered CVS Part D a rebate rate resulting in the █████ ██████ to its clients, CVS Part D began covering Repatha® 1:1 on January 1, 2024. *Id.* ¶ 36. ███████████████████████████████████████████████████████████████ ████████████████████████████ Amgen did not suggest a bundle involving Enbrel® and Repatha® to CVS Part D in 2023. *Id.* ¶ 38.

### D. Amgen Does Not Offer or Reach Bundled Rebate Agreement with Humana Part D.

At Humana Part D, Amgen has not offered nor agreed to any rebate for Enbrel® or Otezla® that was conditioned on any coverage of Repatha®. Ex. 70. Amgen ███████████████████ ███████████████████████████████████████████████████████████████



SUF 1 ¶ 32. Unbeknownst to Amgen, before Amgen had ███████████████████, Humana Part D had decided to ███████ ██████████ ███████████████████████. Ex. 71 at -6733.

**VI.** ████████████████████████ ███████████

████████████████████████████████████ ███████

████████████████████████ SUF 1 ¶ 38. Regeneron's Executive Vice President and Head of Commercial testified ███████████████████████████████

██████████ SUF 1 ¶ 39, ██████████████████████████████

████████████████████████ *Id.* ¶ 38. ██████████████████████

████████████████████████████████████ *id.* ¶ 39,

████████████████████████████████████████

████████████ *id.* ¶ 37. ████████████████████████████████

████████ *Id.* ¶ 39.

**VII.    Regeneron's Claims Against Amgen**

Regeneron contends that Amgen has engaged in exclusionary conduct in violation of the Sherman and Clayton Acts. D.E. 124 at ¶¶ 160–222. Specifically, Regeneron contends that Amgen conditioned rebates on Enbrel® and Otezla®, which Regeneron claims have "substantial market power," Ex. 32 (FSM Op. Rpt.) ¶ 9, on PBMs covering Repatha® exclusively. D.E. 122 ¶ 13. According to Regeneron, these rebates foreclosed competition for coverage at ESI Part D; Ascent's clients, including ESI Commercial; Humana Part D; OptumRx Commercial; UHC Commercial; CVS Commercial; and CVS Part D. *Id.* ¶¶ 115–16; Ex. 32 (FSM Op. Rpt.) ¶ 152.

Counts One and Two of the Amended Complaint claim that Amgen's alleged conditioning of Enbrel® and Otezla® rebates on Repatha® coverage is an "anticompetitive bundling scheme" violating Section 2 of the Sherman Act. D.E. 124 ¶¶ 164, 173. Counts Three and Four assert "a

below-cost offer for Repatha," also allegedly violating Section 2. *Id.* ¶¶ 185, 194. Counts Five and Six assert that the contracts supposedly providing these rebates on Enbrel® and Otezla® violate Sections 1 and 3 of the Sherman and Clayton Acts, respectively. *Id.* ¶¶ 204, 215. Counts Seven through Ten bring claims under California's Unfair Competition Law, Unfair Practices Act, and Cartwright Act, as well as New York's Donnelley Act. *Id.* ¶¶ 160–274. Count Eleven asserts tortious interference with prospective business relations. *Id.* ¶¶ 275–280.

## LEGAL STANDARD

All of Regeneron's antitrust claims, no matter the label, are governed by the rule of reason, under which "courts can balance the effect of the alleged anti-competitive activity against its competitive purposes within the relevant product and geographic markets." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 20010. Each of Regeneron's claims thus requires proof that Amgen's conduct is on balance anticompetitive. *West Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (Sherman Act § 1)*; Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (§ 2 monopolization); *Avaya Inc., RP v. Telecom Labs., Inc.*, 838 F.3d 354, 393–94 (3d Cir. 2016) (§ 2 attempted monopolization); *Barr Labs, Inc. v. Abbott Labs.*, 978 F.2d 98, 110–11 (3d Cir. 1992) (Clayton Act § 3). A plaintiff must also prove that it has sustained an antitrust injury. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016). Such harm requires "injury of the type the antitrust laws were intended to prevent," *i.e.*, higher prices to consumers or reduced output. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

## ARGUMENT

**I.    Regeneron Has Not Offered Sufficient Evidence for a Jury To Find that Amgen Engaged in Anticompetitive or Exclusionary Conduct.**

Regeneron's antitrust claims fail because Regeneron cannot show that Amgen has engaged

in anticompetitive conduct.[6] Whether Amgen's conduct is anticompetitive is evaluated under the rule of reason. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012). *First*, ███ ████████ in Amgen's contracts with PBMs were not anticompetitive because they covered too small a portion of the market to substantially foreclose competition, especially in the circumstances here. *Second,* ██████████ pass the price-cost test. *Third,* ████████ could not have foreclosed competition because Enbrel® and Otezla® lack monopoly power.

## A.    Under a Rule of Reason Analysis, Amgen's Conduct Is Not Anticompetitive.

Under Third Circuit law, courts apply a rule-of-reason analysis where plaintiffs allege that "exclusive dealing arrangements" have "exclude[d] equally efficient (or potentially equally efficient) rivals" from competing in a relevant market. *ZF Meritor*, 696 F.3d at 281; *see also In re EpiPen (Epinephrine Injection, USP)*, 44 F.4th 959 (10th Cir. 2022). Regeneron alleges that "pricing for Repatha is not the clearly predominant means by which" Amgen supposedly forecloses competition, and that bundles effectively requiring exclusion of Praluent are the means of exclusion. D.E. 124 ¶¶ 166, 175. The Third Circuit's guidance for such allegations is set out in *ZF Meritor* and *Eisai* and makes clear that summary judgment for Amgen is appropriate here.

### 1.    Exclusive Dealing Agreements Are Presumptively Lawful.

Regeneron alleges that Amgen conditioned substantial rebates for Enbrel® and Otezla® on

---

[6] The Cartwright Act, UCL, and Donnelly Act claims are derivative of the federal antitrust claims. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.8 (9th Cir. 2022) (Cartwright Act); *Eastman v. Quest Diagnostics Inc*., 2016 WL 1640465, at *13 (N.D. Cal. Apr. 26, 2016); *Aleksick v. 7–Eleven*, 205 Cal. App. 4th 1176, 1185 (Cal. Ct. App. 2012) (UCL); *Wolf Concept SARL v. Eber Bros. Wine & Liquor Co.*, 736 F. Supp. 2d 661, n.5 (W.D.N.Y. 2010) (Donnelly Act). The tortious interference claim fails because, without an antitrust violation, there is no allegation that Amgen won any business unfairly or unlawfully. *See U.S. Bank Nat'l Assn. v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (Andrews, J.). And Regeneron's UPA claim fails because Amgen did not price below cost or engage in exclusionary conduct. *E.g.*, *Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of San Francisco*, 114 Cal. App. 4th 309, 322–23 (Cal. Ct. App. 2003); *infra* Arg. § I.B.

PBMs giving exclusive formulary coverage to Repatha®, thus *de facto* requiring those PBMs to exclusively list Repatha® on their formularies.[7] *See* D.E. 124, ¶¶ 164–65; Ex. 32 (FSM Op. Rpt.) ¶ 9. But even if Amgen's ██████████ agreements are considered "exclusive dealing" agreements, such agreements "are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor*, 696 F.3d at 270, 285; *see also EpiPen*, 44 F.4th at 987 (in the "prescription drug market," "[n]o one can seriously dispute that exclusive rebate agreements stimulate price competition").

Because Regeneron's theory of illegality is that Amgen's agreements are *de facto* exclusive dealing agreements, their legality "depends on whether [they] will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor*, 696 F.3d at 271.[8] This inquiry considers "the percentage of the market foreclosed," *id.*, as well as "the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *Id*. (quoting *Barr Labs*., 978 F.2d at 110–11). Notably, "to the extent that [challenged] conduct caused damage to its competitors, that is not a harm for which Congress has prescribed a remedy." *Eisai,* 821 F.3d at 399. Instead, Regeneron must show that Amgen's actions "caused broad harm to the competitive nature of the [] market." *Id*. Moreover, "the rival plaintiff must show that, once foreclosed, the defendant could reduce output or increase prices and those consumer harms would outweigh any consumer benefit received from the period of lower

---

[7] For this motion only, Amgen accepts Regeneron's alleged product market.

[8] The Third Circuit has also addressed bundling in its decision in *LePage's* but strictly limited *LePage's* to "cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines." *Eisai*, 821 F.3d at 405 (quoting *ZF Meritor*, 696 F.3d at 274 n.11). Because Regeneron is not a single-product producer, *LePage's* does not govern here. In any event, to the extent that *LePage's* has applicability, it is only to hold that bundled rebates *can* be anticompetitive in certain circumstances, which are clarified by the more detailed approaches of *ZF Meritor* and *Eisai* in cases involving exclusive dealing arrangements.

prices." *EpiPen*, 44 F.4th at 986.

### 2. Amgen Did Not Substantially Foreclose the PCSK9i Market.

Regeneron cannot show that the "bundled rebates" it challenges here are the rare examples of anticompetitive *de facto* exclusive dealing agreements. Regeneron can point to only ████████ ████████████████████████████████████ ████████ █████████████████████████ ████████████████ covered only 10% of the market. And even if the Court were to accept one of Regeneron's alternative arguments to broaden the portion of the market from which it is foreclosed, Regeneron has no evidence of foreclosure that is sufficient to be anticompetitive.

### a. The Maximum Foreclosure Regeneron Could Even Arguably Show Stems Only ██████████████████████████.

As outlined above (*see supra* pp. 9–14), Amgen's ██████████████████ █ ████ ████████████████████████████ ███████████. As Regeneron's expert explains, a PBM/GPO and manufacturer in the pharmaceutical industry engage in lengthy negotiations and memorialize the terms of their entire agreement in a written contract. Ex. 1 (Bates Op. Rpt.) ¶ 34. It is thus undisputed that the terms of rebate agreements between PBMs and manufacturers are limited to those in the written agreements. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ █████████████████████ ████████████████████████████████Amgen's own agreements confirm that; having put the terms of the ████████████ █████ in its agreement with

---

9   Amgen and PBM witnesses similarly testified that the written contracts are the only binding source of the parties' obligations. Ex. 77 (Kitson Tr.) at 170:6–16 ████████████████ ████████████████████████); Ex. 6 (Bricker Tr.) at 172:2–5 ████████); Ex. 10 (Witter Tr.) at 84:13–14 ████████████████████ *see also* Ex. 78 (Norton Tr.) at 269:15–25; Ex. 79 (Niksefat Tr.) at 231:2–6.

██████████████████████████████, it is nonsensical to imagine that Amgen maintains informal oral arrangements on the same matters with other PBMs. And in the heavily regulated Part D arena, manufacturers' government reporting obligations are inconsistent with informal understandings about undocumented rebates. *See generally* 42 C.F.R. § 423.514(d). This industry practice is consistent with the basic principle of contract interpretation that an agreement is limited to written text and does not include unexpressed intentions. *E.g.*, *Bohler-Uddelholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 556 (Del. Sup. Ct. 2005) (quoting 26 Corbin on Contracts § 573 (1960)).

Regeneron attempts to shoehorn other PBMs into exclusive dealing agreements by ignoring the plain language of those agreements or treating references in negotiations as agreements. That effort fails, and no evidence permits a finding of "extracontractual" bundled rebate conditions.

***OptumRx/UHC Commercial***. Regeneron was not foreclosed at OptumRx/UHC Commercial. *First*, Amgen's contract did not require ██████ ██████████████████ ██████████. Regeneron's expert acknowledges this, but says that the ██████████ ██████████ ████████████████████ ██████████ Ex. 32 (FSM Op. Rpt.) ¶ 72. This assertion is unfounded and irrelevant. What matters for purposes of foreclosure is what the contract provides. The undisputed evidence is that, under the contract, UHC Commercial was entitled to ████████ ██████ ████████████████████████████████████████████████████████. SUF 1 ¶ 25. A 1:2 arrangement is neither expressly nor *de facto* exclusive. In fact, it is the opposite, as this Court has recognized. *See Takeda Pharms., USA, Inc. v. West-Ward Pharm. Corp.*, No. 1:14-cv-1268, 2018 WL 6521922, at *5 (D. Del. Dec. 12, 2018) (Andrews, J.) (defendants' "1 of 2 contracts" were "an alternative to the [1:1] exclusive contract").

Regeneron's theory that UHC had ████████████████████████████ does not make a

█████████ agreement foreclosure. ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████Ex. 81; Ex. 80; Ex.

74 (Cullins Tr.) at 127:10–21; Ex. 82. █████████████████████████████

████████████████████████████████ As such, this Court can decide as a

matter of law that ████████████████████ not Amgen's conduct, ████████████

███████████████████*EpiPen*, 44 F.4th at 992 (citing *Tampa Elec. Co. v. Nashville*

*Coal Co.*, 365 U.S. 320, 330–33 (1961)) (foreclosure must be tied to the defendant's coercion, not

caused by the "behavior of market participants").

In addition, the undisputed facts establish that OptumRx/UHC, not Amgen, sought to

████████████████ ████████████████████ because UHC thought this might be

a ████████████████████ █████. Ex. 37 (Hindman Tr.) at 33:25–34:16; Ex. 56 at -

7916; Ex. 22. A business practice, *i.e.*, ████████████████ ████████████████

████████████████████████████. *See ZF Meritor*, 696 F.3d

at 270 ("[C]ompetition to be an exclusive supplier may constitute 'a vital form of rivalry,' which

the antitrust laws should encourage.") (quoting *Race Tires Am., Inc. v. Hoosier Racing Tire Co.*,

614 F.3d 57, 83 (3d Cir. 2010) (explaining that customers are "free to adopt an [exclusionary] rule

and then contract with the supplier of their choice"); *see also Menasha Corp. v. News Am. Mktg.*

*In-Store*, 354 F.3d 661, 663 (7th Cir. 2004) (exclusive arrangements "promote[] rather than

undermine[] competition" where "the consumers favor . . . [the] practice").

*Second*, there is no dispute that the ████████████ ████████████████

█████ that Regeneron could— ████████████ ████████████████████

██████. SUF ¶ 28. Regeneron thus was not foreclosed at UHC Commercial. *EpiPen*, 44 F.4th at 986. As the Third Circuit held, "[i]n analyzing the amount of foreclosure, our concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer. . . . [I]f customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted[.]" *Eisai*, 821 F.3d at 403.

**ESI Part D**. Regeneron's theory of foreclosure at ESI Part D is even weaker. Amgen's contract with ESI Part D does not condition any Enbrel® or Otezla® rebates on Repatha® formulary coverage, SUF 1 ¶¶ 29, 31, and Regeneron does not dispute this—or claim that Amgen ever had such a contractual provision with ESI Part D. Instead, Regeneron contends that ████████ ██████████████████████████████████████████████ reflect an agreement outside the contract that a portion of the Enbrel® rebate provided by Amgen for 2021 was conditioned on ESI Part D formularies covering Repatha® more favorably than Praluent®. *See* Ex. 83 (FSM Rep. Rpt.) ¶¶ 52–58. But at most these █████████████████████████ ███████████████████████████████████████████ ██████████████████████████████. It makes no sense that Amgen would have █████████████████████████████████ █████████████████████████████ but kept secret an agreement with ESI Part D to provide an additional Enbrel rebate conditioned on 1:2 coverage of Repatha®. In any event, ESI Part D ████████████████. SUF 1 ¶ 30. Regeneron thus lacks sufficient evidence to create a triable issue as to whether Amgen entered into bundled rebates foreclosing Praluent® from the business of ESI Part D.

**CVS and Humana Part D**. Regeneron does not claim that Amgen entered into a bundled rebate agreement with these accounts. Zinc/CVS ██████████████████████████

and chose to cover Praluent**®** instead. Humana was not even offered a bundled rebate. Rejected (or unmade) offers are not contracts and cannot create anticompetitive foreclosure. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 392–93 (7th Cir. 1984) (rejecting exclusive dealing claims for lack of evidence of an agreement; "One mind is not enough for a meeting of the minds."). Substantial foreclosure is "measured only by *contractual* foreclosure—that is, the percentage of the market covered by the contested *contracts*." *EpiPen*, 44 F.4th at 992 (emphases added) (citing *Tampa Elec. Co.*, 365 U.S. at 330–33); *see ZF Meritor*, 696 F.3d at 271.

Regeneron also claims foreclosure at Zinc/CVS because Amgen's rebate proposals forced Regeneron to ████████████████████████████████████████████ ████████████ But the touchstone of competition is whether the buyer is free to select an alternative product, and Zinc/CVS was always free to do so. *Eisai*, 821 F.3d at 403. The only ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████d, and ten days later Amgen agreed to provide CVS with that ███████ ███████████████████████████████████. SUF 1 ¶ 36. There is thus no material factual dispute that CVS Commercial, CVS Part D, and Humana could have covered Praluent**®** exclusively without impacting their Enbrel**®** or Otezla**®** rebates from Amgen.

In short, the undisputed facts show that CVS Commercial and Part D were entirely open to Regeneron as a competitive alternative and would not lose Enbrel**®** or Otezla**®** rebates if they switched. Even assuming Regeneron's allegations as true that ████████████████████ ████████████████████████████████ that is the result of strategic bidding behavior by CVS and the competitive process—not foreclosure. *See EpiPen*, 44 F.4th at 999 ("[W]e cannot infer substantial foreclosure simply because Sanofi had to offer lower prices through a portfolio bid to compete with Mylan.").

   b.    **Regeneron Cannot Substitute "Spillover" for Actual Foreclosure.**

Because little of the market is *actually* covered by supposedly exclusive or *de facto* exclusive agreements, Regeneron's expert claims "spillover effects": (1) prescriber-level spillover, *i.e.*, once a drug is removed from one formulary, prescribers will be "less likely to prescribe the drug" even for patients who do have coverage, and (2) PBM-level spillover, *i.e.*, "when a GPO enters into a contract on behalf of a client's national formulary," each health plan associated with clients of the GPO (including those with their own custom formularies) "tend to follow the same coverage decisions." Ex. 32 (FSM Op. Rpt.) ¶ 101. In *EpiPen*, the plaintiff offered the same expert for this same theory to artificially increase the foreclosure percentage. 44 F.4th at 994. The Tenth Circuit in *EpiPen* rejected that testimony, concluding that spillover effects are not cognizable "foreclosure" for purposes of the "substantial foreclosure" test, which seeks to identify the portion of the market in which an antitrust plaintiff is not reasonably able to compete. *Id*. at 991–94.[10]

*First,* because customers subject to "spillover effects" can still purchase alternative products and will rationally do so if presented with financially better terms, "spillover foreclosure depends on crediting market participants' irrationality as a means of measuring market foreclosure." *EpiPen*, 44 F.4th at 992. The court thus rejected this theory, because no case law suggests "market foreclosure [is] measured, not by contractual foreclosure, but by the irrational behavior of market participants." *Id*. That same reasoning applies here because there is no disputed issue of fact that the ██████████ did not require Repatha® coverage by custom formularies, nor did they require prescribers to prescribe Repatha® to patients covered by other PBMs. *See,*

---

[10]  *EpiPen* was transferred by the JPML from the Third Circuit to the Tenth Circuit, which held that the "Third Circuit's caselaw 'merits close consideration,'" and followed *ZF Meritor* and *Eisai* to grant the defendant summary judgment. *EpiPen*, 44 F.4th at 980.

*e.g.*, Ex. 3 (Gaier Rpt.) ¶ 112 & 52 n.185 ███████████████████████████

███████████████ █████ regardless of the formulary status of Repatha® or Praluent®.").

*Second*, the court in *EpiPen* held that "any spillover foreclosure is subject to neutralization by vigorous competition." 44 F.4th at 992. ████████████████████████



███████████████████████████████. *See, e.g.*, Ex. 85; Ex. 86; Ex. 87; Ex. 88. ██████████████████████ █ ███ ███████████████████████ 1 ¶ 14. ███ ████████████████████████

*Third*, the *EpiPen* court concluded that "any recognition of spillover foreclosure intolerably raises the risk of false condemnation under the antitrust laws and disincentivizes procompetitive behavior." 44 F.4th at 993. The purposes of the substantial foreclosure test is to identify the portion of the market unreachable by the allegedly foreclosed party. By "prohibiting the use of spillover foreclosure to bolster market foreclosure," the court held, it was ensuring that it did not "discourage the use of exclusive agreements by a dominant firm in a market where competition-for-the-contract is a legitimate competitive tool to bring about low prices for the consumers." *Id.*

Each of these reasons applies with full force here. Amgen's conduct must be evaluated based on the contracts it entered, not the unilateral actions of third parties (here, prescribers) or ████████████████████████████ This Court should not consider Prof. Scott Morton's theorized "spillover effects" as conduct attributable to Amgen.

      **c.**   ██████████████████ **Is Not Sufficient To Constitute Anticompetitive Conduct as a Matter of Law.**

Because Regeneron cannot adduce facts creating a genuine dispute that more than 10%

(*i.e.*, ███████████████) of the alleged PCSK9i market was covered by exclusive or *de facto* exclusive dealing agreements, its claim of anticompetitive conduct fails. Notably, even Regeneron does not appear to contend that 10% foreclosure is sufficient; its expert, Prof. Scott Morton, premises her conclusion of anticompetitive conduct instead on the outlandish claim that Amgen foreclosed (directly or indirectly) 80% of the PCSK9i market. Ex. 32 (FSM Op. Rpt.) at 92, Tbl. 4. At deposition, Prof. Scott Morton consistently refused to commit to any opinion that any lower foreclosure levels would be "substantial." Ex. 38 (Scott Morton Tr.) at 49:6–55:21.

Regeneron's attempt to artificially inflate the amount of claimed foreclosure with speculative inferences is necessitated by case law holding that "foreclosure of 40% to 50% is usually required" for liability. *ZF Meritor*, 696 F.3d at 286 (citing *LePage's Inc. v. 3M,* 324 F.3d 159 (3d Cir. 2003)). And no court has *ever* found substantial foreclosure with less than 24% of the relevant market. *ZF Meritor,* 696 F.3d at 327 (Greenberg, J., dissenting). The Third Circuit has rejected exclusive dealing challenges to agreements foreclosing just 15% of the market, *see Barr Labs.*, 978 F.2d at 111, and upheld challenges to agreements foreclosing 85% of the market, *see ZF Meritor*, 696 F.3d at 287. In *EpiPen*, the Court affirmed summary judgment for the defendant, noting that the defendant "only foreclosed [the drug] from 31% of the U.S. population," which "means [it] was still covered and available for nearly 70% of the U.S. population." 44 F.4th at 988.

Here, the market dynamics and terms of the contracts, as discussed in more detail below (*infra* Arg. § I.A.2.d), counsel in favor of requiring even *higher* foreclosure than the usual case. PBMs have often covered only one of Repatha® or Praluent®—███████████████ ████████████████████████████████████████████████████████ ████████████████████████ In an illustration of how easily PBMs can switch their coverage—and thus, the absence of coercion or market foreclosure—the PBMs have

repeatedly changed their coverage decisions to maximize rebates. For example, in mid-2020 Regeneron secured 1:1 formulary status for Praluent® at CVS. Ex. 10 (Witter) 112:9–19. Regeneron's theory would suggest Amgen was foreclosed at CVS, yet Amgen continued to compete, gaining preferred coverage at OptumRx/UHC and later CVS. The market realities thus make clear that a 1:1 formulary position with one PBM, however obtained, is not sufficient to cause anticompetitive harm. Indeed, in a two-drug market, even if one drug gained exclusive access to 50% of the market, that would still leave the other 50% available for the competitor.

        **d.**    **Regeneron Cannot Show Anticompetitive Conduct Even if It Is Permitted To Treat Amgen's Agreement with  as a *De Facto* Exclusive Dealing Agreement and To Count Its Expert's Unsupported "Spillover."**

Regeneron's expert Prof. Scott Morton tries to artificially expand the percentage of the market foreclosed to Regeneron through two primary means. First, she counts as "foreclosed" segments of the market in which no Enbrel® or Otezla® rebate conditioned on Repatha® exclusivity exists. Ex. 32 (FSM Op. Rpt.) ¶¶ 153–57. Second, as noted above, she invokes her previously rejected "spillover" concept to assert that even areas of the market not actually foreclosed should be treated as foreclosed. *Id.* ¶¶ 99–145. Even if this Court were to find a triable issue of fact as to a higher market foreclosure number, such foreclosure would still be insufficient as a matter of law.

As set forth above, the only formulary, besides ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. *See supra* pp. 10–11. At CVS and Humana Part D, Amgen had no agreement conditioning Enbrel® or Otezla® coverage on Repatha® *at all*. At CVS, Repatha® did not even have *coverage*, much less exclusivity, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ When Amgen obtained coverage, it was with a standalone rebate on Repatha®. Ex. 92 at -6911; Ex. 10 (Witter Tr.) at 204:16-22; Ex. 64 at -0697–

99. Similarly, Regeneron's only theory about Humana Part D[11] is its speculation that Amgen supposedly made a single offer in 2020 involving a bundle, but no such bundle was ever entered.[12]

As such, even if ███████████████ were included within a measure of how much of the market included challenged agreements (*i.e.*, based on ███████████████████ ██████████████████████████████████████████████████), that would only reach ████████████, not CVS or Humana Part D. And including ███████████ ████████ l would increase the total alleged "direct" foreclosure only to 12% (██████████ ██████████████████████) from the 10% for ████████████ SUF 1 ¶ 40.

Because this Court should not consider claimed "spillover," this 12% is the highest percentage even an overly generous construction of the evidence would permit. For the sake of argument, however, Amgen notes that even if this Court were to include, contrary to *EpiPen*, spillover claimed by Regeneron's expert Prof. Scott Morton, that would amount to only 17% total foreclosure at ████████████████ and 7.4% total foreclosure at ████████████, for total foreclosure of only 24.4% at the █████████████████████ ███████████. *Id.* ¶ 41.

None of these theoretical calculations of foreclosure—10% for ██████████████████ ████, 12% for ██████████████████████████████████, or 24.4% for ████████████████████████████████████, and spillover at those PBMs—is sufficient to be anticompetitive conduct in light of the undisputed realities of the PCSK9i market.[13] As this Court observed in its motion to dismiss ruling, the Third Circuit considers multiple factors to

---

[11] Prof. Scott Morton considers ████████████████████████████, so it does not add additional foreclosure. Ex. 32 (FSM Op. Rpt.) ¶ 152.

[12] While Amgen █████████████ a bundled rebate, it never did so. SUF 1 ¶ 32.

[13] Amgen reiterates that counting any spillover is legally improper (*see supra* Arg. § I.A.2.b), and that Amgen's agreement with ██████████████████████████. But Amgen mentions these numbers simply to demonstrate that even expanding the measure of foreclosure beyond that allowed by the law *still* would not entitle Regeneron to proceed.

determine whether an exclusive dealing arrangement "will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." D.E. 49, at 10 (quoting *ZF Meritor*, 696 F.3d at 271). In particular, as this Court summarized, while there "is no set formula for evaluating the legality of an exclusive dealing arrangement," "modern antitrust law generally requires a showing of [1] significant market power by the defendant, [2] substantial foreclosure, [3] contracts of sufficient duration to prevent meaningful competition by rivals, and [4] an analysis of likely anticompetitive effects considered in light of any procompetitive effects." *Id*. In addition to these "generally require[d]" characteristics, courts "will also consider [5] whether there is evidence that the dominant firm engaged in coercive behavior, and [6] the ability of customers to terminate the agreements." D.E. 49, at 10–11. Finally, "use of exclusive dealing by competitors of the defendant is also sometimes considered." *Id.*; *EpiPen*, 44 F.4th at 987–89 n.9.

*ZF Meritor* has been followed by two subsequent appellate cases that affirmed summary judgment for a defendant where, as here, the relevant factors suggest no anticompetitive conduct occurred. In *Eisai*, the Third Circuit found no anticompetitive conduct where hospitals merely "lost [a] discount" if they declined to reach a certain level of purchases. 821 F.3d at 406–07. And in *EpiPen*, the Tenth Circuit held that the plaintiff "fails to bring forth a triable issue of exclusionary conduct because exclusive rebate agreements were a normal competitive tool in the epinephrine auto-injector market, [defendant's] exclusive rebate agreements were short and easily terminable, and [defendant] did not coerce any PBMs." 44 F.4th at 990. These cases dictate the same outcome in the present case; even 24.4% foreclosure (and certainly 10% or 12%) would fall far short of creating a genuine issue of fact regarding anticompetitive conduct under the law.[14]

---

[14]    The only required element that Amgen does not discuss here is PCSK9i market power, because Amgen is not contesting for purposes of summary judgment only Regeneron's construction of the relevant market. Because this case involves bundling, rather than only exclusive dealing,

***Amount of foreclosure***. As noted above, the ███████████████████████████ ██████████████████████████████████  ██████████████████ ████████, which would foreclose only 10% of the market. SUF 1 ¶ 40. But even if this Court were to imply an exclusive agreement with OptumRx, that would raise it to only 12%. *Id.* And even if the Court were, contrary to law, to entertain as "foreclosure" Regeneron's expert's view that Repatha® had a "spillover" advantage in certain other parts of the market as a result of its wins at ████████████████, the total foreclosure would be just 24.4%, still fall far short of the 40–50% benchmark set by *ZF Meritor.* 696 F.3d at 286; *see also EpiPen*, 44 F.4th at 988 (where defendant "only foreclosed [its drug] from 31% of the U.S. population," agreements were not anticompetitive). This alone means that Regeneron cannot show that Amgen's ██████████ ████████████████████████████████ is anticompetitive.

At the motion to dismiss stage, this Court noted that while 40% foreclosure was "usually" required, in theory a number short of 40% "could be sufficient in combination with other relevant market conditions." D.E. 49, at 12 n.6; *see also EpiPen*, 44 F.4th at 988. The case law shows that unusual circumstances would be required for a number short of 40% to be sufficient. *ZF Meritor*, 696 F.3d at 286; *United States v. Microsoft*, 253 F.3d 34, 70–71 (D.C. Cir. 2001). Here, discovery has confirmed that the "additional factors relevant to the analysis" indicate that in this market, only a very high level of foreclosure would be sufficient to "substantially" foreclose. D.E. 49, at 12 n.6 (citing *ZF Meritor*, 696 F.3d at 271–72).

***Duration/terminability of contracts***. "It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire

---

Amgen's lack of market power in the markets in which Enbrel® and Otezla® compete is independently fatal to Regeneron's claim. *Infra* Arg. § I.C.

or make alluring offers to initiate termination." *EpiPen*, 44 F.4th at 988. The contracts here have even less duration than the "short-term agreements" that *ZF Meritor* held "would present little threat to competition." 696 F.3d at 286. The aspect of the contracts that Regeneron challenges— ███████ ████████████████████ ███████—has *no duration*; that is, even PBMs that cover Repatha® 1:1 are not obligated by the contracts to do so for *any time at all*. *See, e.g.*, Ex. 93 at -0757 ████████████████████████████████; SUF 1 ¶ 26. The only consequence of a PBM's removal of 1:1 coverage is that the manufacturer need not pay the rebate.

Even beyond the absolute right of PBMs to change formulary coverage, the contracts here are of "short duration." The initial term of the ██████ agreement was ██████, at which point either party could terminate the contract without cause. *Id.* ¶ 22. The ████████████ agreement had a ████████████ in effect for ████████, *see supra* p. 11, and permitted either party to terminate the agreement ██████████████," with ████████ notice. *Id.* ¶ 27.

In *EpiPen,* the court found the defendant's "exclusive rebate agreements [] short and easily terminable" where "undisputed summary judgment facts show that most of the contracts imposed terms of two and a half years or less and included provisions allowing either party to terminate the agreements without cause on 90-days' written notice or less." 44 F.4th at 988. And in *EpiPen*, as here, the "summary judgment record establishe[d] that PBMs invoked these termination provisions and renegotiated rebate agreements annually and, sometimes, even more frequently." *Id*; *see also* SUF 1 ¶ 2. This is unlike *ZF Meritor*, where the defendant "entered into long-term contracts with *every* direct purchaser in the market, which locked up over 85% of the market for at least five years." 696 F.3d at 287; *Eisai*, 821 F.3d at 407–08 (not anticompetitive where "customers had the ability to switch to competing products" but "simply chose not to do so"); *EpiPen*, 44 F.4th at 988 ("Even an exclusive-dealing contract covering a dominant share of a relevant market need have no

adverse consequences if the contract is let out for frequent rebidding.") (quoting 11 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1802g2, at 101 (4th ed. 2015)).

Regeneron's argument that the PBMs are coerced by the size of supposed bundled rebates to keep Repatha® 1:1 is no more persuasive. *See ZF Meritor*, 696 F.3d at 287. In *Eisai*, the Third Circuit rejected an attempt to find anticompetitive the "threat of a lost discount," finding it to be "a far cry from the anticompetitive conduct at issue in *ZF Meritor* or *Dentsply*." 821 F.3d at 407. Even if Regeneron could create a genuine issue of fact about whether ███████████ was financially compelled to keep Repatha® at 1:1 (which Amgen disputes), the ███████████ ████ ███████████████████. If Regeneron offered a competitive 1:2 rate to ███████████ tomorrow, nothing in the contract prevents ███████████ from adding Praluent® and adopting that rate. ███████████████████████ *See EpiPen*, 44 F.4th at 992 (citing *Tampa Elec. Co.*, 365 U.S. at 330–33).[15] In addition, the ████ ███████████████████.

***Anticompetitive and procompetitive effects***. The agreements between Amgen and the PBMs are broad, and the only terms Regeneron attacks in the ███████████ and ███████████ contracts are the ███████████ (it attacks *no* provisions in the other agreements, instead relying on negotiations). In contrast, in *ZF Meritor*, the Third Circuit held that the agreements "were replete with provisions that a reasonable jury could find anticompetitive," such

---

[15] Regeneron may argue that ███████████ cannot freely terminate its rebate agreement with Amgen due to rebate repayment penalties, but that is neither true nor relevant under the law. If ███████ sought even greater rebates from Amgen, the current rebate agreement provides only that ███████████████████████. It does not require the repayment of rebates already paid to ███████ or foreclose Amgen and ███████ from negotiating a new agreement. *See* Ex. 95 (AMG10935_OCO-0000030231) at -30245–30248. But ███████ was, and remains to this day, free to terminate its contract with Amgen; a competitor "need only offer a better product or a better deal." *EpiPen*, 44 F.4th at 989. In any event, none of the other supposed bundled arrangements have such financial terms.

as provisions limiting marketing and "preferential pricing provisions." 696 F.3d at 287–88.

As for procompetitive benefits, "[n]o one can seriously dispute that exclusive rebate agreements stimulate price competition" in the prescription drug context. *EpiPen*, 44 F.4th at 987; *see also Race Tires*, 614 F.3d at 76. Such arrangements can "offer consumers various economic benefits, such as assuring them the availability of supply and price stability." *Eisai*, 821 F.3d at 403. Even Regeneron's complaint is about the procompetitive effects of Amgen's contracts: specifically, that Amgen's ███ rebates "stimulate[d] price competition" beyond a level desirable for Regeneron. *EpiPen*, 44 F.4th at 987. Also, in contrast with *ZF Meritor*, the evidence here demonstrates that the customer—███████—sought to ███████████ ██████████████████████ ███████ ████████ ██████ was "crafted to meet customer demand to reduce prices[.]" *ZF Meritor*, 696 F.3d at 288; *see also id.* at 270 (exclusive dealing arrangements are not anticompetitive if demanded by the buyer).

1:1 contracts are not anticompetitive devices, but tools PBMs use to increase competition among manufacturers. *See* Regeneron's Resps. and Objs. to Amgen's Second Set of Interrogatories at 19–20. While the Third Circuit in *ZF Meritor* held that "no [purchaser] ever asked [defendant] to be a sole supplier, and there was considerable testimony from [purchaser] officials that it was in [a purchaser's] interest to have multiple suppliers," 696 F.3d at 288, here the evidence plainly establishes that the PBMs could, and did at times, prefer 1:1 arrangements to improve their rebates. *See* Ex. 10 (███ Tr.) at 146:23–147:24; Ex. 96 at -5293. While in *ZF Meritor*, the Court saw "considerable evidence from which a jury could infer that the primary purpose of the [agreements] was not to meet customer demand, but to take preemptive steps to block potential competition," 696 F.3d at 288, undisputed evidence shows that Amgen preferred ████████████████

███ as a response to demand by the PBMs and market conduct by Regeneron.

*No evidence of coercive behavior*. The undisputed evidence establishes that Amgen's contracting practices, far from coercing PBMs, were driven by the demands of the much larger PBMs. *See, e.g.*, Ex. 97 (Bates Tr.) at 69:10–70:14. UnitedHealth Group, for example, is the 5th largest company in the United States by revenue, with $371 billion last year; CVS Health is 6th at $358 billion, and Cigna, which owns ESI, is 15th at $195 billion. SUF 1 ¶ 1. UnitedHealth Group's and CVS Health's 2023 revenues were well over 10 times that of Amgen, and Cigna's over 6 times Amgen. Ex. 98 at 62. Unsurprisingly, the large PBMs have massive negotiating power.

In *Eisai*, the Third Circuit emphasized the importance of whether the defendant engaged in coercive behavior, holding that "if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share." 821 F.3d at 403. That is the case here: the PBMs "are free to switch" to covering Praluent® 1:1 at any time, and the record is devoid of any evidence that the PBMs were coerced in the way described in *ZF Meritor*. Instead, they simply chose the rebate option that best served their interests and those of their customers (and so testified at deposition).

*Use of exclusive dealing by competitors*. Finally, *ZF Meritor* noted that the "use of exclusive dealing by competitors of the defendant is also sometimes considered." 696 F.3d at 272. Here, to the extent the offering of a rebate that only applies where the formulary gives the drug 1:1 coverage is considered "exclusive dealing"—which is the premise of Regeneron's case—such arrangements are ubiquitous. The evidence shows that PBMs consistently ████████ ███ from Amgen and Regeneron for ██████████████████, and both companies consistently provide them. *EpiPen*, 44 F.4th at 989 ("[E]xclusive rebate agreements were a normal competitive tool in the epinephrine auto-injector market to stimulate price competition.").

33

Exclusive coverage is also commonplace. While Regeneron acts as if it is foreclosed from any portion of the market in which exclusive coverage exists, that is inconsistent with the undisputed facts reflecting that PBMs have vacillated between 1:1 coverage for Praluent®, 1:1 coverage for Repatha®, and 1:2 coverage. *See EpiPen*, 44 F.4th at 989 (rejecting argument of anticompetitive conduct where "we are left with the firm and singular conclusion that [plaintiff] 'need only offer a better product or a better deal' to reverse, and possibly wield, exclusivity."). ESI Commercial covered Praluent® 1:1 in the first part of 2019. It then reverted to 1:2 coverage from mid-2019 to mid-2020, before swapping to provide 1:1 coverage to Repatha®. Ex. 51. Repatha® was not covered by CVS Part D at any time from launch through 2023 because Regeneron had exclusive coverage for Praluent®. *Id.* And the drugs were covered at parity on UHC Commercial until September 1, 2021, when it opted to give Repatha® 1:1 coverage. Ex. 37 (Hindman Tr.) at 29:22–25; Ex. 74 (Cullins Tr.) at 110:3–5.

**B.  Under the Price-Cost Test, Amgen's Conduct is Not Anticompetitive.**

While Regeneron primarily alleges exclusive dealing, it also alleges, in the alternative, that Amgen used a "below-cost offer for Repatha to secure exclusivity, or *de facto* exclusivity." D.E. 124 ¶¶ 185, 194. Where price is the "predominant mechanism of exclusion," a "specific application of the 'rule of reason'" applies under which "so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects." *ZF Meritor*, 96 F.3d at 274–75. Of course, if the "predominant mechanism of exclusion" in Regeneron's theory is exclusive dealing, the Court need not address the price-cost test. *Id.* at 277; *see also Eisai*, 821 F.3d at 409.

Regeneron's expert's opinion is only that Amgen sold Repatha® below cost in one contract (███████), an opinion reached by improperly artificially inflating the costs of Repatha® and abandoning the terms of the price-cost test established by *Cascade Health Solutions v.*

*PeaceHealth*, 515 F.3d 883, 897 (9th Cir. 2008). Ex. 3 (Gaier Rpt.) ¶¶ 139–153. Even assuming that Prof. Scott Morton's opinion were admissible and could support a conclusion that Amgen sold Repatha® below cost to ███████████, that would at most create an issue of fact regarding foreclosure from 10% of Regeneron's proposed market. Regeneron offers no evidence, expert or otherwise, that Amgen sold or offered Repatha® below cost to any other PBM.[16] As explained above, foreclosure from ████████████ alone is insufficient to be anticompetitive. *Supra* Arg. § I.A.2; *Eisai*, 821 F.3d at 405–06; *PeaceHealth*, 515 F.3d at 897; *Morgan v. Ponder*, 892 F.2d 1355, 1362 (8th Cir. 1989) ("Courts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged for a single product out of many, or to a single customer."). Regeneron's below-cost pricing claim thus fails under the rule of reason under *ZF Meritor* and its progeny for the same reasons as its exclusive dealing claim.

Regeneron's case also fails the price-cost test because it cannot create a triable issue of fact with respect to likelihood of recoupment. *See Eisai*, 821 F.3d at 408 (below-cost pricing plaintiff must show that "the rival had a dangerous probability of recouping its investment in below-cost prices"). Unless a plaintiff is removed from the market by below-cost pricing, consumers *benefit* from that low pricing. *ZF Meritor*, 696 F.3d at 272 ("Low prices benefit consumers regardless of how those prices are set[.]") (citation omitted); *Eisai*, 821 F.3d at 408 (below-cost pricing is only actionable where defendant can "drive competitors out of the market and, once competition is eliminated, reduce[] output and raise[] its prices to supracompetitive levels"). And the "investment" a company makes in predatory pricing is only "rational" if it can "reasonably expect to recoup in the long run at least its original investment with supracompetitive profits." *TI Inv.*

---

[16]  Prof. Scott Morton does argue that Amgen priced Repatha® below its "opportunity cost," *i.e.*, that it could have made more money with a different strategy, *see* Ex. 32 (FSM Op. Rpt.) ¶ 112, but that is not below-cost pricing under the case law.

*Servs., LLC v. Microsoft Corp.*, 23 F. Supp. 3d 451, 463 (D.N.J. 2014).

Here, the only way that customers would not benefit from the alleged below cost pricing would be if Regeneron were driven out of the market and would not reenter (thus allowing higher prices), ████████████████████████████ Even with its own expert's legally unsupported foreclosure calculations, Regeneron can still compete in 15–20% of the PCSK9i market. *See* Ex. 83 (FSM Rep. Rpt.) at 74, Tbl. 1. ██████████████████████████████████ ███████████████████. *See supra* p. 14. ██████████████████████████ ███████ ██████.

As noted *supra* pages 9–13, large PBMs have repeatedly shifted between 1:2 coverage of both drugs, and 1:1 coverage of one drug. If Amgen decreased its rebates, PBMs could shift to Praluent®. While Regeneron claims it has been weakened by Amgen's bundled rebates so that it is unable to compete as effectively, that conclusory analysis has no factual basis, and Regeneron admits that it has ███████████████████. *See* Ex. 99 (Hyde 30(b)(6) Tr.) at 18:23–19:3, 22:5–12, 26:21–29:21. Moreover, if it won exclusive coverage at a major PBM, that PBM could ensure that Praluent® received the vast majority of sales there. *See, e.g.*, Ex. 100 at -3280. Courts consistently reject below-cost pricing claims absent evidence that recoupment is plausible.[17] Because Amgen could not "raise [its] prices with [Regeneron] still in the market," Regeneron cannot show a reasonable probability of recoupment. *TI Inv. Servs.*, 23 F. Supp. 3d at 463.

---

[17]   *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1200 (3d Cir. 1995) (plaintiff's theory of recoupment was "doomed to failure" because "any attempt to recoup by charging supracompetitive prices after it has gained a monopoly simply will attract new (or old) distributors who will undercut [defendant] and force prices back down to competitive levels"); *Peerless Heater Co. v. Mestek, Inc.*, 2000 WL 637082, at *8 (E.D. Pa. May 11, 2000) (granting summary judgment because "Plaintiffs submit no evidence from which a jury could reasonably conclude that [defendant's] below-cost pricing could have achieved its intended effect, namely to drive [plaintiff] from the market or eliminate [plaintiff] as a viable competitor").

### C.    Amgen Did Not Have Monopoly Power Over the Products It Allegedly Bundled.

Amgen's alleged bundles are lawful under the rule of reason for a separate and independent reason: Amgen does not possess monopoly power with respect to Enbrel® or Otezla®, the products Amgen allegedly bundled with Repatha®, so its supposed bundles cannot be anticompetitive.

The basic concept of an unlawful bundle is that a defendant foreclosed competition for a competitive product by offering customers a price concession on a different product over which the defendant has monopoly power (the "monopoly product"), conditioned on the customer purchasing the competitive product from the defendant. *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978); *LePage's*, 324 F.3d at 154–56. The notion that a bundled discount can be anticompetitive grew out of the concept of unlawful tying, where a seller conditions the sale of a monopoly product on the buyer's purchase of a competitive product. *LePage's*, 324 F.3d at 155 (analogizing bundled discounts to tying claims); *see PeaceHealth*, 515 F.3d at 900. A tying arrangement is unlawful only where the seller possesses sufficient market power to force the buyer to purchase the competitive product. *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006). So too with a bundling arrangement: it is only unlawful where the seller has monopoly power over the bundled products so it can force the buyer to purchase the competitive and non-competitive products together. *SmithKline*, 575 F.2d at 1065; *LePage's*, 324 F.3d at 154–56.

This is especially true in the Third Circuit, which does not recognize *de facto* tying claims. *See Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 87–91 (3d Cir. 2011). A plaintiff must instead bring such an action in the form of a bundling claim, but that cause of action retains the features of its illegal-tying cousin, including the need to show coercion. *LePage's*, 324 F.3d at 156. Indeed, the need for monopoly power in the products subject to the allegedly bundled rebates is greater with a bundle because bundles are generally less coercive than tying arrangements. *See*

*PeaceHealth*, 515 F.3d at 900 ("The package discount thus does not constrain the buyer's choice as much as the traditional tie.") (citing Areeda & Hovenkamp ¶ 749b2).

The District of New Jersey held as much in *Shire US, Inc. v. Allergan, Inc.* Shire argued Allergan's bundled rebates anticompetitively foreclosed Shire's dry eye disease drug, Xiidra, from PMB formularies. 375 F. Supp. 3d 538, 543 (D.N.J. 2019). But Shire's claim failed because it "ha[d] not alleged that [Allergan] ha[d] a monopoly over the glaucoma drugs which it bundle[d] with Restasis, the product competing with . . . Xiidra." *Id.* at 557; *see also SmithKline*, 575 F.2d at 1065 (condemning conditioning of rebate on "products on which [the defendant] faced no competition" on customers also purchasing a "competitive product"); *LePage's*, 324 F.3d at 157 (condemning defendant "us[ing] monopoly in transparent tape . . . to squeeze out" plaintiff from competing on other products by "bundling" those products together).

Here, Amgen ███████████████ ████████████████████████—and Enbrel® does not possess monopoly power. Enbrel® competes against several drugs including Humira®, which is the second highest grossing drug in America (behind only Pfizer BioNTech's COVID-19 vaccine), *see* SUF 1 ¶ 6. That Enbrel® is not a must-have drug is confirmed by the fact that several years ago, UHC cut Enbrel® from preferred coverage on its commercial formularies and replaced it with Humira®. *Id.* ¶ 7. UHC thereafter rapidly shifted patients away from Enbrel®, with Enbrel®'s share at those payers plummeting from ███ to ███ in just three months and to ███ by the middle of 2020—the same as its share market-wide. *Id.* ¶ 8. UHC ███████████████ ████████████████████████████████████████████ ██████ ████████████████████████████████. Ex. 22; Ex. 23 at -7048–49.



Moreover, Regeneron failed to offer any evidence to define a relevant market for Enbrel®, a necessary prerequisite to showing monopoly or market power. It pled in its Complaint a market

for rheumatoid arthritis treatment—but its expert admits that Enbrel® has only a ▮▮▮ share in that market. SUF 1 ¶ 9. Without a relevant market, Regeneron lacks sufficient evidence for a finding that Enbrel® has the power to "control prices or exclude competition." *Dentsply*, 399 F.3d at 187.

For Otezla®, any argument is irrelevant because Amgen never conditioned any rebate for Otezla® on *any* Repatha® coverage. *See* Facts § V. But even putting that aside, any argument based on Otezla® would fail because Amgen lacks market power over Otezla®, which competes against multiple biologics. SUF 1 ¶ 10. As CVS testified, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and consequently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the category. Ex. 10 (Witter Tr.) at 195:8–199:1. Ascent has observed that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ *id.* ¶ 11, which is the antithesis of monopoly power. As of July 2020, Otezla® had a ▮▮▮ market share of dispensed prescriptions in the PsO indication and ▮▮▮% in the PsA indication. *Id.* ¶ 12. And PBMs have not consistently covered Otezla®. In 2021, for instance, it was not even covered on the prescription drug plan Part D formularies of OptumRx and UHC, and the Part D formularies of Cigna, Human, CVS, and Anthem. *See id.* ¶ 13.

Because there is no genuine dispute that Enbrel® and Otezla® lack monopoly power, the challenged bundled rebates cannot be coercive or foreclose competition.

## II. Amgen's Conduct Did Not Cause Anticompetitive Effects.

Summary judgment is appropriate for a second, independent reason: Regeneron has failed to show that Amgen's actions had anticompetitive effects. Even if Amgen's actions were anticompetitive in nature—which they were not—they are still lawful unless "the probable effect of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals." *ZF Merito*, 696 F.3d at 271. When considering whether an exclusive rebate arrangement causes anticompetitive effects, the Third Circuit considers whether the actions caused "reduction of output, denial of consumer choice, [or] increasing price." *Eisai*, 821 F.3d at 407.

None of those circumstances are present here. No party argues that the contracts at issue have led to reduced output. Nor does any party contend that the price of Repatha® or any PCSK9i market product has increased. In fact, Regeneron's own expert concedes that Ascent/ESI, OptumRx/UHC, and CVS received *lower* prices as a result of Amgen's conduct than they would have received absent the challenged conduct. SUF 2 ¶ 3. ███████████████████

████████████████████████████████████████████████████████

████████████████████████ ████████████████. Ex. 102 (Mathur Op. Rpt.)

¶ 73. ████████████████████████████████ ████████████████

████████████ ████████████████████████████

████████████████████████████████ SUF 2 ¶ 1. ████████████

████████████████████ ████████████████ ████████████████████

████████████████████ ████████████████████████████." *Id.* ¶ 2.

Regeneron is thus left with arguing that Amgen's practices have denied consumer choice, but even if true, the Tenth Circuit recognized in *EpiPen* that diminution in consumer choice is not necessarily an anticompetitive effect in the prescription drug market. 44 F.4th at 985. The Court explained that the operation of our health care system necessarily limits choice; "when a patient purchases health insurance, the patient necessarily relinquishes some treatment-choice autonomy in exchange for lower premiums." *Id.* The entire framework of preferred and disfavored drugs on a formulary limits consumers' choices; that some consumers have insurance covering only Repatha® or Praluent® (but not both) is not an anticompetitive harm. *See Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."). For this reason, *EpiPen* concluded that where prescription drugs are at issue, "the only concern . . . is whether [the

40

defendant's] exclusive rebate agreements hurt or threaten to hurt consumers through reduced output or increased prices." *EpiPen*, 44 F.4th at 985.

Even if consumer choice were a valid consideration here, Amgen's contracts allow for ample consumer choice. Rebate agreements do not dictate formulary decisions nor prevent consumers from selecting drugs that are not listed on the formulary. *See Eisai*, 821 F.3d at 407–08 (finding no denial of consumer choice; "[C]ustomers had the ability to switch to competing products. They simply chose not to."); *EpiPen*, 44 F.4th at 985 ("At the outset, it is hard to say patients were ever deprived of choice. Even when a patient's health plan excluded [the drug], the patient could seek a medical necessity exemption or otherwise pay out of pocket for the device."). Nothing in the record suggests that consumers who wished to use Praluent® could not do so if there was a medical need. *See* SUF 2 ¶ 9 ████████████████████████████
████ ████████ ████████████████████████████

While Regeneron's below-cost pricing claims depend on *future*, rather than *present*, anticompetitive effects (because the claim is that Amgen's conduct is currently *reducing* prices), Regeneron's failure to show a possibility of recoupment means there is no showing of likely anticompetitive effect in the future, either. Specifically, the type of consumer injury needed to show anticompetitive effects in a below-cost pricing claim is only possible where the seller is likely to recoup its investment by demanding supracompetitive prices. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993); *TI Inv. Servs.*, 23 F. Supp. 3d at 463. Without such evidence (*see supra* Arg. § I.B), Regeneron cannot show any risk of future anticompetitive effects on its below-cost pricing claims.

### III. As to Zinc/CVS, Regeneron Has Not Sustained an Antitrust Injury—or Any Injury Caused by Amgen's Allegedly Unlawful Conduct.

While the court need not assess the following argument in light of Amgen's entitlement to

summary judgment on the arguments above, there is a separate and independent argument for partial summary judgment specific to Regeneron's claims involving its contracts with Zinc/CVS Commercial and CVS Part D: Regeneron's claimed harm from charging *lower* prices due to competition is not antitrust injury. A plaintiff may recover damages under the federal antitrust laws only to the extent it claims "antitrust injury: *i.e.*, injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield*, 495 U.S. at 334. Regeneron's attempt to recover for the claimed loss of profits caused by *increased* competition does not flow from any alleged *harm* to competition, much less "from a competition-*reducing* aspect" of Amgen's conduct, *id.* at 344, and thus is invalid under settled antitrust law.

It has been clear for decades that "a plaintiff who wants . . . less competition or higher prices, that would injure consumers, does not suffer antitrust injury." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 345 (3d Cir. 2018) (citation omitted) (dismissing claim by taxi association that Uber's "ability to operate at a lower cost" "caused [the taxi drivers] economic harm"). In the seminal *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* decision, the Supreme Court squarely rejected the notion that a competitor can be compensated for "the profits they would have realized had competition been reduced." 429 U.S. at 488. In *Brunswick*, the plaintiff challenged as violative of the antitrust laws the defendant's acquisitions of bowling alleys that would otherwise fail, arguing that the plaintiff would have made more profits if the acquired bowling alleys had failed, decreasing competition. *Id.* at 480–82. The Court held its claim failed as a matter of law because the antitrust laws "were enacted for 'the protection of competition, not competitors," *id.* at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Regeneron's theory of harm as to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under *Brunswick*. Because Regeneron won the contracts for those PBMs, its only complaint is that those contracts,

while profitable, were less profitable than Regeneron would have liked. Ex. 32 (FSM. Op. Rpt.) ¶ 11.e. To the extent it seeks damages for the rebates it paid to ████████████████ Regeneron asks this Court to award it "damages for losses which are of no concern to the antitrust laws," and are therefore unrecoverable. *Brunswick*, 429 U.S. at 486–87.

Post-*Brunswick*, district courts have rejected Regeneron's argument in comparable circumstances. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686, 697–98 (E.D. Pa. 2004) (license to sell a generic version of a drug did not produce antitrust injury merely because the plaintiff was "denied certain benefits it expected to reap" by virtue of its previously greater market share). The Southern District of New York's decision in *Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*, is particularly instructive. No. 1:93-cv-6658, 1994 WL 561377, at *4 (S.D.N.Y. Oct. 12, 1994). Plaintiff Viacom argued that defendants had participated in a competing bid to purchase Paramount, and that the competing bid had caused Viacom to pay "approximately $2 billion more for Paramount than it otherwise would have paid." *Id*. Viacom alleged that this harm was antitrust injury based on a "raising rival's costs" theory, just as Prof. Scott Morton does here. *Id*.; *see* Ex. 32 (FSM Op. Rpt.) ¶ 11.e. The Court disagreed, holding that "[j]ust as plaintiffs in Brunswick were seeking to obtain the profits they would have realized had competition been reduced, Viacom is seeking to recoup the loss it suffered as a result of a competitive bidding process." *Viacom*, 1994 WL 561377 at *4. The court held that even if the defendant participated in the bidding process in furtherance of its "intent to monopolize the cable television industry," that was "not relevant because it did not cause antitrust injury." *Id*. at *5.

These cases require summary judgment for Amgen with respect to Regeneron's claim of damages at ████████████████. Independent of whether Amgen had any anticompetitive aims, Regeneron cannot recover for the lower net prices it ultimately received for Praluent®

because that harm is not antitrust injury. *See Viacom*, 1994 WL 561377 at *6 ("[T]o hold that antitrust laws protect competitors from paying too much . . . in a competitive auction would render all such auctions illegal, because . . . every losing bidder will raise its rival's costs.").

Notably, rejecting Regeneron's claim for damages resulting from its sales to CVS does not require holding that no plaintiff can ever prevail on a theory of raising its rivals' costs. If a theory that a defendant's anticompetitive conduct operates to "raise its rivals' cost of doing business," is ever actionable, it is only where the defendant "forecloses a competitor plaintiff's access to a necessary input." *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 320 (D.D.C. 2011); *see also Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1339 (7th Cir. 1986) ("When a firm finds a way to confront its rivals with higher costs, it may raise its own prices to consumers without drawing increased output from them."). As such, it suffices to hold here that the theory is "inapplicable to" an "overpayment" in the "bidding process," because such a payment does "not arise from defendants' purchase of exclusionary rights from suppliers." *Viacom*, 1994 WL 561377 at *5. That Amgen's competition forced Regeneron to give higher rebates may be bad for Regeneron, but it is good for consumers, and thus does not qualify as antitrust injury.

Regeneron's claim that it suffered damages in the form of reduced revenues or profits as a result of Amgen's ███████████ offer to Zinc/CVS also fails on the facts. To recover damages on an antitrust claim, the plaintiff must show that it suffered damages as a proximate result of the anticompetitive conduct. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 268 (3d Cir. 2018); *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3d Cir. 1980). But Regeneron has no evidence that can create a genuine issue of fact regarding ████████████████ ████████████████████████████████████ ████████████████████ ████████ ███████████████████████████████████

44

Amgen made a ███████████████ to Zinc/CVS Commercial in 2021 for an ███████████████████████████████████████ SUF 3 ¶ ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ ███████████████████████

██████████████████████████████████████████████████

█████████████████████████

Perhaps the starkest illustration of the irrelevance of Amgen's ████████████████ ██████ lies in the fact that, ████████████████████████████████████

████████████████████████ ██████████████████████████

█████████████████████████████████████████████████.

Similarly, according to CVS, Amgen's ██████████████████ ████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████. Without evidence to support a finding that Amgen's supposed ██████ offers were the proximate cause of increased Regeneron rebates, Amgen is entitled to summary judgment on Regeneron's claim for this category of damages.

## CONCLUSION

Regeneron has not mustered evidence sufficient to create a genuine issue of fact regarding exclusionary conduct, anticompetitive effects, or, with respect to ████, antitrust injury. Amgen is entitled to summary judgment.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Ben A. Sherwood
Leesa Haspel
Kate Swisher
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

Richard J. Doren
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Ashley E. Johnson
John Adams
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Dated:  May 22, 2024          *Attorneys for Amgen Inc.*

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on May 22, 2024, I caused to be electronically filed a true and correct copy of Amgen Inc.'s Opening Brief in Support of its Motion for Summary Judgment with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

David E. Wilks
Scott B. Czerwonka
Wilks Law LLC
4250 Lancaster Pike Suite 200
Wilmington, DE  19805
dwilks@wilks.law
sczerwonka@wilks.law

I further certify that on May 22, 2024, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Elizabeth Stotland Weiswasser
Jonathan D. Polkes
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119
elizabeth.weiswasser@weil.com
jonathan.polkes@weil.com
eric.hochstadt@weil.com
adam.banks@weil.com
jessica.falk@weil.com
robert.niles-weed@weil.com
rachel.williams@weil.com

Michael R. Moiseyev
Priyata Y. Patel
Weil, Gotshal & Manges LLP
2001 M. Street , NW
Washington, DC  20036
(202) 682-7000
michael.moiseyev@weil.com
priyata.patel@weil.com

*/s/ Melanie K. Sharp*
Melanie K. Sharp (No. 2501)

31678347.1