IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | |
| | ) | C. A. No.:  22-00697-JLH |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | ▮▮▮▮▮▮▮▮▮▮ |
| AMGEN INC., | ) | **Redacted – Public Version Filed on:** |
| | ) | **July 30, 2024** |
| Defendant. | ) | |

**AMGEN INC.'S ANSWERING BRIEF IN OPPOSITION TO
REGENERON'S MOTION TO EXCLUDE TESTIMONY OF
DR. ERIC M. GAIER; DR. LAUREN J. STIROH; AND MS. DEBORAH GAN**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Kate Swisher
Leesa Haspel
Ben A. Sherwood
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

Richard J. Doren
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Ashley E. Johnson
John Adams
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

*Attorneys for Amgen Inc.*

Dated:  June 25, 2024

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................... 1

LEGAL STANDARD ...................................................................................................... 2

ARGUMENT ................................................................................................................. 2

I.    Dr. Gaier's *PeaceHealth* Discount Attribution Analysis is Relevant and
Reliable, and Will Assist the Factfinder. ................................................................. 2

    A.    Regeneron Does Not Challenge the Vast Majority of Dr. Gaier's
Discount Attribution Analysis. ................................................................. 4

    B.    Dr. Gaier's ESI/Ascent Discount Attribution Analysis Spreading
the ▇▇▇ Rebate ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ Is Relevant
and Helpful to the Jury.......................................................................... 6

II.    Dr. Stiroh's Market Power Opinions Reflect a Reliable Application of
Accepted Economic Principles and Standards and Align with *Brown Shoe*. ....... 11

    A.    Dr. Stiroh's Layered Analysis of Economic Substitutes for Enbrel®
and Otezla® is Both Reliable and Relevant to the Market Power
Inquiry. ................................................................................................. 13

    B.    Dr. Stiroh's Opinions Challenging Prof. Scott Morton's Flawed
Reliance on Enbrel® and Otezla® Profit Margins and "Broad"
Formulary Coverage Are Relevant and Helpful to the Factfinder. ........... 19

III.    Ms. Gan is a Highly Qualified Expert on Market Access and PBM Contract
Negotiations, and Her Opinion Will Assist the Jury. .............................................. 20

    A.    Ms. Gan's Decades of Market Access Negotiations with PBMs
Qualifies Her to Opine on Market Access Negotiations with PBMs. ........ 22

    B.    Ms. Gan Reliably Applied Accepted Principles and Methods to the
Facts. .................................................................................................... 27

CONCLUSION ............................................................................................................. 30

i

# <u>TABLE OF AUTHORITIES</u>

## Cases

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5, 29 (S.D.N.Y. 2020) ..................................................................29

*Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*,
  2011 WL 4351600 (D. Del. Sept. 16, 2011) ......................................................2

*Auto Konnect, LLC v. BMW of N. Am., LLC*,
  590 F. Supp. 3d 977 (E.D. Mich. 2022).............................................................27

*Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*,
  2010 WL 1541641 (N.D. Okla. Apr. 16, 2010).............................................24, 28

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)............................................................................. *passim*

*Calvente v. Ghanem*,
  2022 WL 4272779 (N.D. Ill. Sep. 15, 2022) ....................................................24

*Cascade Health Sol. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ................................................................. *passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 596 (1993)............................................................................2, 19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)................................................................................15, 17

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394, 408 (3d Cir. 2016)......................................................................9

*Schneider ex rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003)............................................................................22

*Fed. Trade Comm'n v. AbbVie Inc.*,
  976 F.3d 327 (3d Cir. 2020)............................................................................13

*Hopeman Bros., Inc. v. Cont'l Cas. Co.*,
  No. 4:16-CV-187, 2018 WL 4169282 (E.D. Va. Jan. 12, 2018) ...........................22

*IAS Servs. Grp., LLC v. Jim Buckley & Assocs., Inc.*,
  2015 WL 13775347 (W.D. Tex. Sept. 10, 2015)................................................24

*In re Intuniv Antitrust Litig.*,
  496 F. Supp. 3d 639 (D. Mass. 2020) ..................................................... *passim*

*Kannankeril v. Terminix Int'l, Inc.*,
  128 F.3d 802 (3d Cir. 1997)..............................................................................2

*Krantz v. Steiler*,
  2024 WL 1494182, at *5 (M.D. Pa. Apr. 5, 2024) .............................................27

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................23, 24, 27

*Lifewatch Servs. Inc. v. Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018)...........................................................................11

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
   838 F.3d 421 (3d Cir. 2016)......................................................................12, 14

*Palacino v. Beech Mountain Resort, Inc.*,
   2015 WL 8675991 (W.D.N.C. Dec. 11, 2015) ...............................................27

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)...............................................................................2

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2022 WL 14863110 (E.D.N.Y. Oct. 8, 2022) ...............................................10

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016)..............................................................................4

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
   461 F. Supp. 2d 271 (D.N.J. 2006) ...................................................................2

*SEC v. Ambassador Advisors, LLC*,
   576 F. Supp. 3d 250 (E.D. Pa. 2021) .............................................................23

*Sikora v. AFD Indus., Inc.*,
   221 F. Supp. 2d 920 (N.D. Ill. 2002) ..............................................................27

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978).........................................................................17

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   2018 WL 563144, at *9 (D. Mass. Jan. 25, 2018) .....................................16, 20

*Stoker v. State Farm Mut. Automobile Ins. Co.*,
   2021 WL 4201583 (D. Colo. May 5, 2021) ...................................................27

*In re Suboxone Antitrust Litig.*,
   2023 WL 5617784 (E.D. Pa. Aug. 30, 2023) ................................................16

*United States v. Galloway*,
   749 F.3d 238 (4th Cir. 2014) .........................................................................27

*United States v. Smith*,
   919 F.3d 825 (4th Cir. 2019) .........................................................................27

*United States v. Wilson*,
   484 F.3d 267 (4th Cir. 2007) .........................................................................27

*Universal Surveillance Corp. v. Checkpoint Sys., Inc.*,
   2015 WL 6561241 (N.D. Ohio Oct. 19, 2015) ...............................................9

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)............................................................................2, 7, 8

**Rules**

Fed. R. Evid. 702 ...........................................................................................2, 22, 24, 27


**Treatises and Articles**

Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization (4th ed.
  2005) ("Carlton et al.") ...........................................................................................15

Herbert J. Hovenkamp & Erik Hovenkamp, Complex Bundled Discounts and
  Antitrust Policy, 57 Buff. L. Rev. 1227 (2009) ("Hovenkamp") ................................8

Kenneth G. Elzinga & David E. Mills, *The Lerner Index of Monopoly Power:
  Origins and Uses*, 101 Am. Econ. Rev. 558 (2011) ("Elzinga et al.")....................20

Kevin M. Murphy et al., *Competitive Discounts and Antitrust Policy*, 2 Oxford
  Handbook of Int'l Antitrust Econ. 89 (2015) ("Murphy et al.")................................8

M. Howard Morse, Product Market Definition in the Pharmaceutical Industry, 71
  Antitrust L.J. 633 (2003) ("Morse") ......................................................................15

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
  Principles and Their Application ¶ 749 (5th ed. 2023) ("Areeda &
  Hovenkamp").............................................................................................................8

Sumanth Addanki, *Antitrust and Intellectual Property: Developments in
  Pharmaceuticals*, The Cambridge Handbook of Antitrust, Intell. Prop., and
  High Tech 21 (2017) ("Addanki")...........................................................................20

William J. Baumol & Daniel G. Swanson, *The New Economy and Ubiquitous
  Competitive Price Discrimination: Identifying Defensible Criteria of Market
  Power*, 70 Antitrust L.J. 661 (2003) ("Baumol et al.")...........................................20

## INTRODUCTION AND SUMMARY OF ARGUMENT

Regeneron's Motion to exclude testimony from Amgen's rebuttal experts should be denied.

*Dr. Eric M. Gaier.*  Regeneron moves to exclude certain testimony from Dr. Gaier relating to his application of the discount attribution test discussed in the Ninth Circuit's *PeaceHealth* decision.  Although Regeneron's critique applies to only one of Dr. Gaier's *PeaceHealth* calculations, Regeneron seeks to sweep broadly and exclude the entirety of Dr. Gaier's *PeaceHealth* analysis.  The portion of Dr. Gaier's analysis that Regeneron does challenge should not be excluded because, if the jury finds that Amgen's drug Otezla® lacks market power, the challenged analysis is highly relevant to the jury's assessment of whether Amgen's contract was anticompetitive—both under *PeaceHealth* and the rule of reason more generally.

*Dr. Lauren J. Stiroh.*  Regeneron moves to exclude testimony from Dr. Stiroh regarding whether Amgen's drugs Enbrel® and Otezla® have monopoly power.  Regeneron takes each aspect of Dr. Stiroh's multi-step analysis of market power and attempts to argue that each step should be excluded because, standing alone, it is not sufficient to determine market power.  But Dr. Stiroh's analysis contains multiple steps that, taken together, are highly relevant to the market power inquiry and closely follow the applicable economic principles and legal precedent concerning how an economist or factfinder should assess the existence of market power for pharmaceuticals.

*Ms. Deborah Gan.*  Finally, Regeneron moves to exclude all testimony from Ms. Gan.  Ms. Gan is an industry consultant and former Merck executive who offers a variety of expert opinions relating to how "market access" issues, *e.g.*, negotiations between drug manufacturers and pharmacy benefit managers ("PBMs") for rebates and formulary access, occur in the real world.  It is well settled that an expert with experience in an industry can testify as to practices and characteristics of that industry based on that experience.  Ms. Gan's 30 years of experience provide direct support for the opinions she offers in this case.  The law provides no basis for excluding an

expert witness merely because most of her experience occurred at one company, especially where that experience involved negotiations with numerous different PBMs (including several at issue here), a diverse set of positions within that company, and review of over a hundred contracts.

## LEGAL STANDARD

Under Rule 702 the court must serve a "gatekeeping role" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  An expert opinion is reliable under Rule 702 if it is based on "good grounds."  *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271, 274-75 (D.N.J. 2006) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). "Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."  *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 2011 WL 4351600, at *1 (D. Del. Sept. 16, 2011); *see Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) ("The trial judge must be careful not to mistake credibility questions for admissibility questions.").

## ARGUMENT

I.     **Dr. Gaier's *PeaceHealth* Discount Attribution Analysis is Relevant and Reliable, and Will Assist the Factfinder.**

Regeneron's motion to exclude Dr. Gaier's testimony should be denied.  Regeneron refers to the entirety of Dr. Gaier's opinions, but the reasoning underlying its arguments applies to only a narrow aspect of his opinion, which is relevant, useful, and admissible.

Regeneron claims Amgen sold Repatha® with anticompetitive bundled rebates.  D.I. 124 ¶ 3.  To prevail on its claims, Regeneron must show, *inter alia*, that those bundled rebates foreclosed its drug Praluent® from competing in the alleged PCSK9i market.  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012).  To support this argument, Regeneron argues that Amgen sold

2

Repatha® "below cost."  D.I. 124 ¶¶ 103-111.  Regeneron proffers expert testimony from Prof. Scott Morton who opines, in part, that Regeneron was directly foreclosed from one line of business—Ascent/ESI's national commercial formularies—because Amgen's bundled rebate to Ascent/ESI on its drug Enbrel®, if attributed fully to Repatha®, results in a below-cost net price for Repatha®.  Ex. 1 (FSM Op. Rpt.) ¶ 111.  To reach this opinion, Prof. Scott Morton performs a calculation pursuant to the discount attribution test outlined by the Ninth Circuit in *Cascade Health Sol. v. PeaceHealth*, under which a firm's use of a bundled discount cannot be anticompetitive if the price of the competitive product(s) in the bundle, after applying the entire bundled discount to those product(s), is above that firm's incremental cost for producing the competitive product(s). 515 F.3d 883, 910 (9th Cir. 2008).

Dr. Gaier provides an extensive rebuttal to Prof. Scott Morton's opinions, including whether Amgen's prices for Repatha®, considering the bundled rebates, are effectively below an appropriate measure of its incremental cost.  Dr. Gaier's expert report includes a 35-page analysis (Section VI) highlighting numerous deficiencies in Prof. Scott Morton's application of the discount attribution test and offering several alternative analyses.  For example, he finds that Prof. Scott Morton artificially inflates the incremental costs of Repatha® by improperly including marketing and sales expenses.  Ex. 2 (Gaier Rpt.) ¶¶ 148-53.  Additionally, applying the logic of the *PeaceHealth* discount attribution test, he offers several alternative calculations of Repatha®'s effective net price (after attributing bundled rebates to it) that may be applicable depending on the jury's findings on various factual issues.  Two of those alternative calculations are particularly relevant here: One that uses essentially the same methodology as Prof. Scott Morton and a second that, as Dr. Gaier explains, may be useful to the jury if it determines that Otezla® lacks market power.  *Id.* ¶¶ 166-67 & n.265 (assuming Otezla® is a "competitive product" that lacks market power); *id.* ¶¶ 168-69 (following Prof. Scott Morton's methodology); *see also id.* ¶¶ 170-74; Ex.

3 (Gaier Tr.) 203:5-19 (analysis challenged here assumes Otezla® lacks market power).

The thrust of Regeneron's criticism is that Dr. Gaier supposedly misapplied the *PeaceHealth* test when, in one calculation, he allocated the ESI/Ascent bundled rebate for ███ to both ███ ███████, instead of only to Repatha®.  Mot. at 7, 10.  But that calculation is only one of several alternatives Dr. Gaier performs, and it applies specifically to the scenario where a jury finds that Otezla® lacks market power.  Ex. 2 (Gaier Rpt.) ¶¶ 166-67.  Dr. Gaier also calculates Repatha®'s net price assuming that Otezla® *does* have market power and, there, uses the same methodology as Prof. Scott Morton, attributing the full value of the rebate to Repatha® alone.

Regeneron ignores this, broadly suggesting that Dr. Gaier performs *all* of his *PeaceHealth* discount attribution analyses by attributing the bundled ████ rebates to █████████ ███.  D.I. 319 at 4-5.  As explained below, that is not the case.  Moreover, and in any event, the sole calculation that uses the method to which Regeneron objects is helpful to the jury.

## A. Regeneron Does Not Challenge the Vast Majority of Dr. Gaier's Discount Attribution Analysis.

Though Regeneron's Motion challenges just one of Dr. Gaier's discount attribution calculations, Regeneron argues the Court should strike Dr. Gaier's *entire* discount attribution analysis.  D.I. 319 at 2.  Even if this critique were valid (it is not), it is improper to exclude "all of" the expert's testimony when the challenged portion is only "one small part of an extensive economic analysis."  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 666-67 (2d Cir. 2016) (finding district court abused its discretion by excluding entire expert report where only a portion was "unreliable").  Dr. Gaier's analyses of the various bundled rebates are described below.

*ESI/Ascent.*  As noted, Dr. Gaier conducts a variety of discount attribution calculations in rebuttal to Prof. Scott Morton—most of which use the same methodology she did, *i.e.*, applying bundled ████ rebates only to Repatha®.  *See, e.g.*, Ex. 2 (Gaier Rpt.) ¶ 169 & Fig. 16; ¶¶ 170-

73 & Fig. 17; ¶ 174 & Fig. 18.  Gaier acknowledges that methodology would apply if Amgen has

monopoly power for Otezla®.  Ex. 2 (Gaier Rpt.) ¶¶ 168-69; Ex. 3 (Gaier Tr.) at 203:17-19.  In

addition, as noted, because the ESI/Ascent contract provided an ▮▮▮▮ rebate only if ▮▮▮▮

▮▮▮▮▮ ▮▮▮▮ covered by ESI/Ascent, Dr. Gaier analyzes the impact of spreading out the

bundled ▮▮▮▮ rebate to Repatha® ▮▮▮▮▮, an analysis which applies if ▮▮▮▮ lacks market

power.  Ex. 2 (Gaier Rpt.) ¶¶ 166-67 & Fig. 15. *See* Section I.B, *infra*.

*OptumRx/UHC.*  Regeneron's criticism does not concern Dr. Gaier's discount attribution

test for the ▮▮▮▮-Repatha® bundled rebate that applied at ▮▮▮▮▮ because that bundle and

analysis do not involve ▮▮▮.  Ex. 2 (Gaier Rpt.) ¶ 177 & Fig. 20.

*ESI Part D.*  There were no ▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮ conditioned on Repatha® coverage

in Amgen's contract with ESI Part D.  *Id.* ¶ 157.  But Prof. Scott Morton opines that Amgen and

ESI Part D had an extracontractual arrangement conditioning ▮▮▮▮ rebates on Repatha®

coverage.[1]  Ex. 1 (FSM Op. Rpt.) ¶¶ 72-74.  Dr. Gaier thus performs a discount attribution test

assuming this is true, applying the allegedly bundled ▮▮▮▮ rebates only to Repatha® (the same

as Prof. Scott Morton).  Ex. 2 (Gaier Rpt.) ¶ 161 & Fig. 13.

*CVS/Zinc Commercial.*  CVS/Zinc commercial rejected a bundled rebate for Repatha®, yet

Prof. Scott Morton still claims that this rejected bid affected competition.  Thus, Dr. Gaier performs

a discount attribution test.  *Id.* ¶ 181 & Fig. 22.  Again, he attributes the bundled ▮▮▮▮ rebates

solely to Repatha®, so this calculation too is unaffected by this Motion.  *Id.*  Dr. Gaier's analysis

for Humana Part D takes the same approach.  *Id.* ¶¶ 183-86.

In short, Dr. Gaier carefully applies discount attribution analysis to all of the supposed

---

[1]    Amgen has challenged this counterfactual opinion in its pending Motion to Exclude Expert
Testimony Proffered by Regeneron, D.I. 316 (May 28, 2024).

agreements and arrangements alleged by Scott Morton to determine whether they would be below cost. In nearly all cases, Dr. Gaier analyzes the prices and costs as Regeneron suggests—applying the purported bundled rebate solely to Repatha®. These calculations do not attribute any █████ █████████████████████ is in most cases not even alleged to be part of the bundle.

**B. Dr. Gaier's ESI/Ascent Discount Attribution Analysis Spreading the Enbrel® Rebate Across Both Repatha® and Otezla® Is Relevant and Helpful to the Jury.**

Dr. Gaier's discount attribution analysis for the Ascent/ESI contract that allocates the bundled rebate for Enbrel® to ███ Repatha® █████████ is relevant and will be useful to the jury if the jury finds that ██████ lacks market power.

The bundled rebate provision in the Ascent/ESI-Amgen contract provides that a member of Ascent (the Group Purchasing Organization (GPO) for ESI) can earn an extra rebate on ███████ if, in addition to covering ████████, the member also meets coverage conditions relating to ███ █████████[3] Specifically, the extra ███████® rebate may be earned if the member covers ██████, and, in addition, covers Repatha® in a ███ position.[4] In short, a rebate for ████████ is the value being provided by Amgen, and the bundled rebate incentivizes coverage of ████████ Repatha®. *See* Ex. 4 at 688-89; Ex. 5 at 645-46. This is shown in the depiction below.

---

[2]   Regeneron contends that the Ascent/ESI contract involved a bundled rebate for ███████ dependent on Ascent/ESI selecting Repatha® for ████ coverage. D.I. 124 ¶ 19; Ex. 1 (FSM Op. Rpt.) ¶ 78. Prof. Scott Morton relies on the negotiation history with ESI, as it is undisputed the contract itself contains no such rebate. *Id.* ¶¶ 75-80. Dr. Gaier explains that, even if Prof. Scott Morton is correct that certain ████████ rebates were only available to ESI/Ascent if Repatha® was covered ████, the size of these ████████ rebates does not meaningfully affect the discount attribution analysis. Ex. 3 (Gaier Tr.) 193:13-18. This dispute does not change the analysis for this Motion. The jury may not agree with Regeneron's claim about conditional ███████ rebates offered to ESI/Ascent, and find bundled rebates are for ████████. And even assuming there were extracontractual conditions on ████████ rebates, that does not change that the ████████ rebates being analyzed here were conditional on coverage of ████ Repatha® ████████████

[3]   *See* Ex. 4 at 687-90; Ex. 5 at 644-47.

[4]   *See* Ex. 4 at 688-89; Ex. 5 at 645-46.



*See* **Ex. 4 at 687-90**

Dr. Gaier analyzes the above Amgen-Ascent/ESI contractual provision by spreading the bundled ▆▆▆ rebates across *both* products whose coverage is being incentivized by the ▆▆▆ rebate—▆▆▆ ▆ Repatha®.  He explains that this analysis is helpful if the jury finds that ▆▆▆ lacks market power.  Ex. 3 (Gaier Tr.) 203:5-19.  Regeneron's complaint is that this particular analysis does not follow *PeaceHealth* because, in its view, the bundled rebate for ▆▆▆® should exclusively be applied to Repatha®, the drug competing with Praluent®.

Regeneron's argument is flawed.  To start, putting aside the *PeaceHealth* decision—which did not expressly address how to handle a bundled rebate like this one—Dr. Gaier's analysis is relevant to assessing whether the Ascent/ESI bundled rebate passes the rule of reason *more generally* in a situation where ▆▆▆ is found to lack market power.  Under the rule of reason, a jury must assess whether the bundled rebate is anticompetitive, including whether it is "coercive" on customers.  *ZF Meritor*, 696 F.3d at 269.  Dr. Gaier's challenged analysis is highly relevant to that question.  If ▆▆▆ lacks market power, then Dr. Gaier's calculation provides economic insight into how difficult it would be for Ascent/ESI to sacrifice the conditional ▆▆▆ rebate in the contract but *make up for that loss by switching* ▆▆▆ *Repatha® and* ▆▆▆ *out of its formularies in favor of lower cost competitors*.  "Coercion" is assessed from the lens of the customer, not the competitor, because it relates to the defendant's ability to "deprive customers of the ability to make

7

a meaningful choice." *Id.* at 285.  Here, Dr. Gaier's analysis sheds light on how costly that switch would be for the customer because it considers the size of the lost extra ███ rebate and compares that loss to the sales value of the ██ drugs that ESI/Ascent could choose to remove from its formularies in an effort to make up the difference.  In other words, if Ascent/ESI wanted to cover Praluent® instead of Repatha®—thus resulting in the loss of the bundled extra ███ rebate—it would not necessarily have to make up the entire lost ███ rebate from savings from Praluent® because it could also switch out ███ for a lower cost competitor and make up some of the difference from that change as well.

Dr. Gaier's analysis is grounded in established and sound economics.  It is well understood that the analysis of a bundled discount should not be confined to competition between single drugs within the bundle (*i.e.*, Repatha® vs. Praluent®), even if the complaining party makes only one competing product—it should also account for the possibility of "bundle-to-bundle" competition, including the possibility of multi-supplier bundles created by the customer.[5]  Indeed, economic scholarship indicates that in analyzing competitive effects for a bundle, a factfinder must consider the "possibility that buyers or their agents may create virtual bundles from combinations of sellers, including the plaintiff."  *See* Ex. 7 (Murphy et al.) at 113.

Even though Regeneron does not make an ███ competitor, a full competitive effects analysis should still consider that a customer can switch to an ███ alternative.[6]  As Prof. Hovenkamp explains, "the other rival need not offer the defendant's full product line.  If two or more competitors collectively produce the entire contents of the bundle, they will be able to match

---

[5]    *See* Ex. 6 (Areeda & Hovenkamp) ¶ 749d4 (no liability if the bundle can be "matched" either "by a rival manufacturer who produces the same bundle or by some union of two or more firms, each of whom makes one component of the bundle").

[6]    *See* Ex. 8 (Hovenkamp) at 1231.

the dominant firm's pricing." *Id.*  Thus a challenged bundle may not be anticompetitive or coercive if there are "effective substitutes for all products in the defendant's bundle."  Ex. 2 (Gaier Rpt.) ¶ 144; *see also Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 408 (3d Cir. 2016).

It follows that to assess the Ascent/ESI agreement under the broader rule of reason, including whether the bundled rebate is coercive, the jury would benefit from Dr. Gaier's analysis of the relative size of the conditional ███ rebate as compared to the "combined utilization [*i.e.*, sales] for Repatha® ██████."  Ex. 2 (Gaier Rpt.) ¶ 167.  Given its relevance to the rule of reason more broadly, it is unnecessary for the Court to determine whether the analysis is the right way to apply *PeaceHealth* in the specific context of this case.  Dr. Gaier's analysis is useful—regardless of whether it is the primary or only way to apply *PeaceHealth* to a bundled rebate provision that is incentivizing the use of *two* drugs.[7]

However, to be clear, Dr. Gaier's opinion is consistent with the reasoning and language of *PeaceHealth* itself.  Under the *PeaceHealth* discount attribution standard, "the full amount of the discounts given by the defendant on the bundle [is] allocated to the competitive product *or products*." 515 F.3d at 906 (emphasis added).  The *PeaceHealth* standard was articulated for a case where the defendant hospital offered bundled discounts for primary, secondary, and tertiary care, and was the only provider of tertiary care in the area.  *Id.* at 891-93.  In that context, the court was concerned about the anticompetitive potential of bundled discounts on non-competitive products (tertiary care) to support competitive products (primary and secondary care).  *Id.* at 896-

---

[7]     *See* R&R, *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, 2015 WL 6561241, at *13 (N.D. Ohio Oct. 19, 2015) ("allowing both [experts] to sift through all of this pricing evidence and offer opinions on what is the meaningful measure of discount [under *PeaceHealth*] will allow the fact-finder to reach a more educated and reasoned decision.").  Dr. Gaier's approach is not inconsistent with this Court's earlier R&R (D.I. 319 at 8); indeed, there may be multiple ways of approaching the discount attribution test articulated in *PeaceHealth*, and Dr. Gaier's analysis will enable the jury to consider a variety of economic insights from these different approaches.

97 (articulating hypothetical where company A uses discounts on conditioner "*made only by A*" to support sales of A's shampoo) (emphasis added). Because ███████ may be considered a "competitive product" if it lacks market power, *see* Ex. 2 (Gaier Rpt.) ¶¶ 142, 166 n.265, it is consistent with *PeaceHealth* to allocate the █████ rebate to ████ Repatha® █████████ under the reasoning of the decision. The cases Regeneron cites are inapposite, as they involved a bundled discount with a *non-competitive product* and thus had no reason to consider allocating a discount to multiple competitive products in the bundle.[8]  Indeed, Dr. Gaier's analysis better aligns with *PeaceHealth*'s goal to provide "adequate guidance to sellers who wish to offer pro-competitive bundled discounts[]" and allow the seller to "ascertain its own prices and costs of production and calculate whether its discounting practices run afoul" of the test.  515 F.3d at 905-06.  Because a company cannot know whether its bundle will be challenged by a seller of one, two, or multiple products contained therein, it is reasonable to *consider* how a price-cost analysis might have looked to Amgen at the time of entering into the bundle, by attributing the ███████████████████ ████████████████████████████████████.

Regeneron and Prof. Scott Morton are also wrong that Dr. Gaier's discount attribution analysis creates a "major loophole" to the *PeaceHealth* test.  D.I. 319 at 13; Ex. 9 (FSM Rep. Rpt.) ¶ 267.  Prof. Scott Morton mischaracterizes Dr. Gaier's analysis and argues that he attributes a hypothetical rebate on a "blockbuster product" to another "blockbuster product."  *Id.*  Again, Dr.

---

[8]  D.I. 319 at 8-9 & n.11.  Thus, the possibility of a multi-supplier bundle created by the customer using Repatha® and ████ alternatives makes Dr. Gaier's analysis relevant to the jury. *Cf. also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 14863110, *13-15 (E.D.N.Y. Oct. 8, 2022) (noting and not rejecting defendants' arguments that "there need not be a single competitor selling all products in the bundle[] as long as there are rivals for each product").  Regeneron's citation to a decision excluding one aspect of Dr. Gaier's opinions in another case (D.I. 319 at 14) is entirely irrelevant.  That case involved an analysis of injury "offsets" in connection with class certification (one category of which the court considered unduly speculative); that issue has nothing to do with Dr. Gaier's discount attribution analysis here.

Gaier's challenged analysis is dependent on a finding that ████ is also a "competitive" product. Ex. 2 (Gaier Rpt.) ¶¶ 166-67; Ex. 3 (Gaier Tr.) 203:5-19.  Also irrelevant is Prof. Scott Morton's contention that a firm "could always avoid antitrust scrutiny" for aiding its competitive products by including products for which purchase is a "foregone conclusion."  Ex. 9 (FSM Rep. Rpt.) ¶ 267.  If ████ does not have monopoly power then its purchase is not a "foregone conclusion," and Ascent/ESI can replace it with a competitor to replicate the bundle's savings.

Finally, Dr. Gaier's analysis is a helpful contrast to Prof. Scott Morton's, which is comparatively rigid and bound solely to Regeneron's view of the facts.  If the jury finds differently on any of these facts, Prof. Scott Morton offers no alternative calculation of the net price of Repatha® at any given PBM segment.  Dr. Gaier, however, offers the jury a broader set of discount attribution calculations to consider, depending on what the jury finds as to ████ ████ market power, as well as other issues, such as whether ████ ████ discounts were conditioned or dependent on ████ ████████████████████.

## II.     Dr. Stiroh's Market Power Opinions Reflect a Reliable Application of Accepted Economic Principles and Standards and Align with *Brown Shoe*.

Regeneron's motion to exclude the opinions of Dr. Stiroh regarding the existence of market power for Enbrel® and Otezla® should be denied.  Dr. Stiroh provides a fulsome analysis of whether market power exists for these drugs, consistent with sound economics and case law.

Market power is often examined in antitrust cases by reference to a "relevant market."  A relevant market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  The relevant market inquiry is holistic and fact-intensive and must "both correspond to the commercial realities of the industry and be economically significant."  *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018) (quoting *Brown Shoe*, 370 U.S. at

336-37).  The Supreme Court in *Brown Shoe* set forth several factors bearing on market definition, including: "[1] industry or public recognition of the []market as a separate economic entity, [2] the product's [] characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices, [6] sensitivity to price changes, and [7] specialized vendors."  370 U.S. at 325.  In the pharmaceutical industry, where most drugs face competition from other drugs that treat the same condition(s), market definition is often "established by examining both the substitutes that a consumer might employ and the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the cross-elasticity of demand."  *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 662 (D. Mass. 2020) (citation omitted); *see Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435-36 (3d Cir. 2016).

Regeneron alleges Amgen "leveraged . . . [its] massive anti-inflammatory portfolio [Enbrel® and Otezla®] to secure multi-year favorable positioning for Repatha® on PBM formularies."  D.I. 124 ¶ 15.  Prof. Scott Morton asserts that "Enbrel® and Otezla[] have substantial market power."  Ex. 1 (FSM Op. Rpt.) ¶ 11(b).  In support, Prof. Scott Morton points to Enbrel®'s and Otezla®'s "consistently high [profit] margins" as well as their "broad coverage on PBM formularies," which she contends indicate that Enbrel® and Otezla® were "must-have" products that Amgen could "leverage" to obtain favorable formulary coverage for Repatha®.  *Id.* ¶¶ 38-46.

Dr. Stiroh responds that "Prof. Scott Morton's [market power] analysis is fundamentally flawed and does not establish that Amgen has monopoly power in selling Enbrel® or Otezla®."  Ex. 10 (Stiroh Rpt.) ¶ 10.  Dr. Stiroh undertakes a multi-step analysis.  *First*, she examines therapeutic alternatives for Enbrel® and Otezla®—*i.e.*, "other products approved by the FDA to treat the same conditions [or] used by healthcare providers to treat the same conditions."  *Second*, Dr. Stiroh examines Amgen's actions to ███████████████████████████ ████████ ████████████████████████████████████ support its responses to those competitive

pressures.  *Third*, Dr. Stiroh examines PBM/payor formulary management conduct involving Enbrel® and Otezla®.  Ex. 10 (Stiroh Rpt.) ¶¶ 72, 136.  As Dr. Stiroh notes, this analysis aims to answer the following question: to what extent are there available economic substitutes for Enbrel® or Otezla® that would constrain Amgen's ability to "leverage" the bundled rebate structure?  *See* Ex. 11 (Stiroh Tr.) 137:7-138:22; Ex. 10 (Stiroh Rpt.) ¶ 66.  Dr. Stiroh then challenges Prof. Scott Morton's focus on formulary coverage and profit margins, noting these factors "cannot be used to distinguish a monopolist from a competitive firm."  *Id.* ¶ 129.  Dr. Stiroh finds that Amgen does *not* possess monopoly power in selling Enbrel® and Otezla®.  *Id.* ¶ 10, §§ IV-V.

Regeneron strips Dr. Stiroh's multi-step market power analysis down to its individual components, and then asserts that the entire analysis is unreliable and "deficient" because each of the components in itself is not determinative of market power.  D.I. 319 at 16-18.  This is wrong. *See Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 374 (3d Cir. 2020) (market power analysis correctly considered array of "relevant factors" rather than giving "dispositive weight" to one). Indeed, a proper examination of Dr. Stiroh's market power opinions reveals a robust, layered analysis that carefully tracks the factors outlined in *Brown Shoe* and reliably applies settled economic principles to the market and record evidence.

### A. Dr. Stiroh's Layered Analysis of Economic Substitutes for Enbrel® and Otezla® is Both Reliable and Relevant to the Market Power Inquiry.

Dr. Stiroh conducts a multi-step inquiry into whether there are available economic substitutes for Enbrel® and Otezla® that constrain the pricing of those products (and Amgen's ability to "leverage" them in a bundle).  Each step of her analysis is driven by one or more factors bearing on market power as outlined by the Supreme Court in *Brown Shoe* and other applicable precedent and sound economics.  370 U.S. at 325; *Intuniv*, 496 F. Supp. 3d at 662.

***Therapeutic Alternatives to Enbrel® and Otezla®.***  Regeneron argues that Dr. Stiroh's

examination of therapeutic alternatives for Enbrel® and Otezla® is "not a sufficient or reliable methodology to determine that a product lacks market power." D.I. 319 at 16. "The relevant question," Regeneron argues, "is whether other products are economic substitutes." *Id.* We agree. Dr. Stiroh states repeatedly that her analysis looks at whether "close economic substitutes" are available for Enbrel® and Otezla®. Ex. 10 (Stiroh Rpt.) ¶¶ 10(i)(a), 10(ii)(a), 10(iii)(a), 128, 136; Stiroh Tr. 251:2-252:3. Regeneron ignores that Dr. Stiroh's evaluation of therapeutic alternatives is just the *first step* in her analysis. *See Brown Shoe*, 370 U.S. at 325 (boundaries of product market determined by examining "practical indicia" like "the product's peculiar characteristics and uses").

It is axiomatic that an analysis of the relevant market in a pharmaceutical case must begin with an assessment of clinical alternatives for a given drug. *See Mylan Pharms.*, 838 F.3d at 436-37. That is precisely what Dr. Stiroh does here. As to Enbrel®, a tumor necrosis factor (TNF) blocker, Dr. Stiroh looks to industry (IQVIA) data to assess the main conditions that patients were taking Enbrel® to treat, and then generates a list of 32 other pharmaceuticals products that are approved for the same inflammatory indications. Ex. 10 (Stiroh Rpt.) ¶¶ 75-76. Similarly, as to Otezla®, Dr. Stiroh generates a list of other drug products approved for the same indications. *Id.* ¶¶ 141-43. Dr. Stiroh then, as explained below, assesses Amgen's ██████████████ ████████████████████████████████████████████████████████████████, along with how actions by PBMs, third-party payors, and other market participants demonstrate the existence of close *economic substitutes* for Enbrel® and Otezla®.



**Amgen's** ████████████████████████████████████████ ██████████████████████. Dr. Stiroh examines the "extensive efforts that Amgen has undertaken to ████████████████████████████████████████ ████████ ██ ████████████████████████████████████████ ████████████████████████████████" *Id.* ¶ 72. Once again, Regeneron

mischaracterizes Dr. Stiroh's analysis by suggesting that she cites the "mere fact that Amgen ████████████████████████████ ████████®" as a standalone basis for her conclusion that these products lack market power.  D.I. 319 at 17.  Again, Dr. Stiroh's inquiry into Amgen' ████████████████ is merely *one step* in a fulsome economic inquiry into the "close economic substitutes" for Enbrel® and Otezla®.  Ex. 10 (Stiroh Rpt.) ¶ 46.

Dr. Stiroh analyzes Amgen's ████████ to assess the "perceptions of industry participants."  *Id.* ¶ 81.  Specifically, Amgen's efforts reflect an awareness of "competitive pressures," and the information obtained through that ████████ drives marketing and promotional strategies.  *Id.* ¶ 83 & Fig. 14 (████████████████████████ ████████████████); Ex. 11 (Stiroh Tr.) 67:25-68:19 (Amgen is "████████████████████ ████████████████d).  As Dr. Stiroh notes, "████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████ for sales.  Ex. 10 (Stiroh Rpt.) ¶¶ 81-82; *see also* Ex. 12 (Carlton et al.) at 271 ("In most markets, firms compete not just on price but also along many other product dimensions, such as quality, reliability, research and development, and promotional activity.").

This analysis comports with—and is compelled by—*Brown Shoe*'s instruction to consider "industry or public recognition of the []market as a separate economic entity."  370 U.S. at 325.  In pharmaceuticals, the views of industry participants—*i.e.*, patients, physicians, PBMs, analysts, and pharmaceutical companies themselves—of the competitive market for Enbrel® and Otezla® is informative as to the existence of economic substitutes in that market.  *See, e.g.*, Ex. 13 (Morse) at 662 ("[A]ctions of pharmacists, patients, and third-party payers, as well as physicians who influence selection of particular drugs, will have to be considered in defining markets."); *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (market power analysis

inquiry requires "factual inquiry into the commercial realities faced by consumers"); *In re Suboxone Antitrust Litig.*, 2023 WL 5617784, at *6-14 (E.D. Pa. Aug. 30, 2023) (analyzing interchangeability of pharmaceutical products through assessment of "commercial realities," including formulary management and defendant's "response to . . . competition").

***Market Participant Behavior Relating to Enbrel® and Otezla®.***  A third step taken by Dr. Stiroh in her multi-prong analysis of economic substitutes for Enbrel® and Otezla® consists of an examination of PBM/third-party payor formulary management involving these products—particularly in response to rebates. Ex. 10 (Stiroh Rpt.) ¶ 72.  It is undisputed in the pharmaceutical industry that formulary decision-making bears strongly on the question of price competition—specifically, if a PBM can leverage a drug's formulary position in order to extract higher rebates, that necessarily implies that the drug has substitutes and faces price competition. Ex. 1 (FSM Op. Rpt.) ¶ 249 (PBMs "use formularies as a means to create at least some degree of price competition between sellers of substitutable treatments").[9]

Dr. Stiroh observes that PBMs/payors use formulary access as a "mechanism to instigate price competition and drive down pharmaceutical prices." Ex. 10 (Stiroh Rpt.) ¶ 111.  She then examines extensive third-party testimony and specific examples of payors' ability to leverage alternatives to Enbrel® and Otezla® in order to extract rebates. *Id.* ¶¶ 111-128, 156-159.  Based on her review of the record and market events, she concludes that there is "economically meaningful evidence" that Enbrel® and Otezla® have close substitutes that constrain their pricing and provide leverage for payors to negotiate substantial rebates from Amgen. *Id.* ¶¶ 111, 156.

---

[9]  *See Intuniv*, 496 F. Supp. 3d at 664 (brand manufacturer's "use of rebates and coupons. . . provide[s] evidence that [brand manufacturer] was competing with other . . . treatments"); *In re Solodyn Antitrust Litig.*, 2018 WL 563144, at *9 (D. Mass. Jan. 25, 2018) (accepting economic expert analysis that "determine[d] whether there was any effect on new prescriptions . . . based upon effective price changes corresponding with certain marketplace events").

As to Enbrel®, Dr. Stiroh conducts an extensive review of Amgen internal documents, which reveal intense competitive pressure faced by Enbrel®, particularly by █████████ ████████████████. Dr. Stiroh points to Amgen documents reflecting the █████████████████ ██████████████████████████████████. *Id.* ¶¶ 114-116.  These documents show ████████████████████████████████████████████████████████████████████████████ █████████████████████████. *Id.* ¶ 115.  In late 2014, OptumRx and UHC reopened the formulary position for bid, and Enbrel® *lost the bid* to Humira® due to Humira®'s ██████████. *Id.* Following this ██████ competition, Enbrel® lost ████████ status on those formularies, and Enbrel®'s share of sales at those PBM segments ████████ dramatically—████████████████████████ ██████████████████████████████ the change for two years. *Id.*

By contrast, after ████████████████████████████, its market share at OptumRx and UHC ████████████████ in the first quarter of 2015. *Id.* Fig. 24.  Dr. Stiroh explains how, far from a "stray" event or "exception" (D.I. 319 at 18-19), the shift of volume from Enbrel® to Humira® at OptumRx/UHC in response to price changes is a stark example of fierce price competition over formulary access, as well as "economic evidence of cross-price elasticity of demand between Enbrel® and Humira®." Ex. 10 (Stiroh Rpt.) ¶ 115; *Brown Shoe*, 370 U.S. at 325 (factor bearing on market definition is "sensitivity to price changes"); *see Eastman Kodak*, 504 U.S. at 469 (market definition considers "extent to which consumers will change their consumption of one product in response to a price change in another").  Moreover, Dr. Stiroh observes that contrary to Scott Morton's assertion, "OptumRx's and UHC's actions demonstrate that Enbrel® is not a must-have product for a PBM." Ex. 10 (Stiroh Rpt.) ¶ 115.  This assessment is highly relevant in a bundling case where, to show anticompetitive effects, the plaintiff must show that the defendant used a bundled rebate on a must-have product. *See SmithKline Corp. v. Eli Lilly & Co.*,

575 F.2d 1056, 1065 (3d Cir. 1978).[10]

Similarly, as to Otezla®, Dr. Stiroh cites numerous third-party payor and Amgen internal documents reflecting economic evidence that "PBMs and third-party payers use close substitutes to Otezla® as leverage to negotiate substantial rebates for Otezla® and thereby constrain its pricing." Ex. 10 (Stiroh Rpt.) ¶ 156. Specifically, she references an internal ESI/Ascent document which states ███████████████████████████████████████████████████ ██████████" *Id.* ¶ 157. Julie Kitson, ESI's 30(b)(6) witness, testified that this was Ascent's effort "████████████████████████████████████████" *Id.* Dr. Stiroh also cites Amgen's internal planning documents, which show █████████ ████████████ ████████████████████████████████████████████ *Id.* ¶¶ 157-158. Dr. Stiroh explains how this evidence shows how payors clearly leverage available therapeutic alternatives to Otezla®, thereby constraining its pricing. *Id.* ¶ 159.

As a last effort, Regeneron argues that "at most, Dr. Stiroh suggests that Enbrel® and Otezla® lack market power because they face competition from Humira® . . . [b]ut" perhaps *both* Humira® and Enbrel® (and Otezla® too) have market power. D.I. 319 at 19-20. Maybe Regeneron (or its expert) will assert that both Humira® and Enbrel® (and Otezla®) have market or "monopoly" power, but the jury need not accept that extreme position. Dr. Stiroh's analysis provides clear evidence that Humira® was exerting strong competitive pressure on Enbrel®, and that a customer faced with a bundled rebate for Enbrel® could choose not to provide preferred coverage for Enbrel® and instead cover Humira® ███████████ The same for Otezla®. Dr. Stiroh also cites data for Enbrel® and Humira® from 2009-2019, showing little growth in Enbrel® as compared to Humira®

---

[10]   Additionally, Dr. Stiroh describes other PBM efforts to leverage the availability of Enbrel® alternatives to drive rebates, and cites 30(b)(6) testimony from ████████████████████ ████████ ████████████. *Id.* ¶¶ 122-128.

over the same period, Ex. 10 (Stiroh Rpt.) ¶ 113 & Fig. 24; and ████████████████████████

████████████████████████ *Id.* ¶ 158.

Dr. Stiroh's opinions showing close economic substitutes for Enbrel® and Otezla® based on market participant behavior comport with the *Brown Shoe* factors and reflect a reliable application of accepted economic methods.[11]   Regeneron might disagree with Dr. Stiroh's conclusions, but as her testimony is clearly qualified and reliable, that disagreement is more properly reserved for cross-examination at trial.  *Daubert*, 509 U.S. at 596.

### B. Dr. Stiroh's Opinions Challenging Prof. Scott Morton's Flawed Reliance on Enbrel® and Otezla® Profit Margins and "Broad" Formulary Coverage Are Relevant and Helpful to the Factfinder.

Regeneron separately argues that Dr. Stiroh's market power analysis "stands in stark contrast" to Prof. Scott Morton's approach, which focuses on Enbrel®'s and Otezla®'s profit margins and broad formulary coverage.  D.I. 319 at 15 n.17.  But Dr. Stiroh explains why neither "consistently high profit margins" nor broad formulary coverage is determinative of market power. Ex. 10 (Stiroh Rpt.) ¶¶ 129-34.  Specifically, Amgen's documents show it expected a ████████ ██████████████████████████ ████████████ due to the market entry of biosimilar competitors.  *Id.* ¶ 131.  Dr. Stiroh observes that from an economic perspective, estimates like these—of sales volume and net price—are more indicative of competitive constraints than profit margins.  *Id.*  She notes "broad formulary coverage" is equally consistent with a firm competing vigorously (*i.e.*, paying higher rebates for coverage) as it is with monopoly power.  *Id.* ¶ 130.  Thus,

---

[11]   Regeneron cites a 17-year old motion by Amgen to exclude a damages expert opinion from Dr. Stiroh in an unrelated case.  That motion was found moot, and Regeneron also concedes that "Dr. Stiroh's opinions in that case were on different issues."  D.I. 319 at 20-21.  Amgen's criticism of the *damages* opinion and methodology in that case—relating to a different case, claims, and product—has no bearing on the *market power* opinions Dr. Stiroh offers in this case.

Prof. Scott Morton's reliance on profit margins and broad formulary coverage is flawed because these data "cannot be used to distinguish a monopolist from a competitive firm." *Id.* ¶ 129.

Economic literature supports Dr. Stiroh's opinion, particularly for "highly competitive" markets with high fixed costs, such as the pharmaceutical industry.[12]  Furthermore, Dr. Stiroh's opinion is consistent with other pharmaceutical antitrust cases that considered (and questioned) the same types of "direct evidence" of market power.  *See Intuniv*, 496 F. Supp. 3d at 659-60 (noting possibility that higher prices for the brand are driven by procompetitive factors and not "market power"); *see also Solodyn*, 2018 WL 563144, at *12 ("Absent any evidence of restricted output, . . . evidence of high margins is insufficient direct evidence as a matter of law to demonstrate market power.").  Indeed, courts have warned about "the dangers in inferring market power from high margins alone." *Id.*; *see also Intuniv*, 496 F. Supp. 3d at 659 ("for a product with high fixed costs, such as a brand pharmaceutical product . . . even competitive prices may exceed marginal cost") (internal citations and quotes omitted).

III.     **Ms. Gan is a Highly Qualified Expert on Market Access and PBM Contract Negotiations, and Her Opinion Will Assist the Jury.**

Regeneron's motion to exclude Ms. Gan lacks merit.  Ms. Gan has 30 years of experience in market access strategies, including over 20 years of payor contract negotiation experience, which provides a direct and strong foundation for the opinions that she proffers in her expert report. Regeneron offers putative expert opinions from Prof. Scott Morton and Ms. Bates that make

---

[12]     *See, e.g.*, Ex. 14 (Baumol et al.) at 684 ("[P]rices that exceed marginal costs[] should be viewed as commonplace in highly competitive markets."); Ex. 15 (Elzinga et al.) at 561 (a firm's high price-cost margins "may reflect 'superior skill, foresight and industry' that is the *very result of competition*[, or] . . . nothing more than the necessity of covering fixed costs"); Ex. 16 (Addanki) at 32 ("[T]he unique institutional features of the pharmaceutical industry and markets can effectively preclude the use of some otherwise well-accepted analytic tools in assessing monopoly power . . . and also rule out so-called 'direct tests' of monopoly power or competitive effects.").

numerous assumptions about the pharmaceutical industry, particularly regarding how drug manufacturer-PBM negotiations for drug rebates and formulary access (sometimes called "market access") take place.  Specifically, Prof. Scott Morton opines that (1) written agreements between Amgen and PBMs containing cross-therapeutic bundles foreclosed Regeneron from competing at those PBMs; (2) her review of informal Amgen-PBM communications supports the existence of "extracontractual" agreements that foreclosed Regeneron from competing; and ██████████

████████████████████████████████████████████████████████████████████

████████████████████   Ex. 1 (FSM Op. Rpt.) ¶¶ 9-11, 80.  Similarly, Ms. Bates opines that (1) Amgen's rebates for Enbrel® contingent on Repatha® coverage functionally serve as rebates on Repatha®; (2) those bundled rebates are highly atypical in the industry; and (3) PBMs' formulary decisions have "spillover" effects across the market.  Ex. 17 (Bates Op. Rpt.) ¶ 5.

In response to this and other testimony, Amgen offers rebuttal expert testimony from Ms. Gan.  Ms. Gan has over 30 years of real-world experience with market access negotiations, was considered the company expert on PBMs by one of the largest drug manufacturers in the world, and has multifaceted and in-depth work experience—including with the market for cholesterol-lowering drugs specifically—that provides her with strong insight into the complex and dynamic relationships among PBMs and manufacturers.  Ms. Gan offers several opinions based on her extensive industry experience: (1) Ms. Bates' and Prof. Scott Morton's foreclosure theories ignore important practical realities of how actual market access negotiations are undertaken.  ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████   (3) Prof. Scott Morton's conclusion that informal negotiation communications between Amgen and PBMs constitute binding "agreements" or prevented Regeneron from competing at PBMs is implausible given the

procedures PBMs use to make their formulary coverage decisions, the expectations market access negotiators have about such communications, and the frequency at which final contracts are renegotiated by PBMs. (4) Bundled rebates, including cross-therapeutic bundles, regardless of frequency of use, are considered by industry players to be a market access strategy within the parties' "toolkit" and can be employed when in both parties' interests. (5) Prof. Scott Morton and Ms. Bates' "spillover" analyses fail to account for certain important industry features and practices by PBMs that make their claims of large-scale spillover effects across PBM clients highly implausible.  Ex. 18 (Gan Rpt.) ¶¶ 19-24.

Incredibly, Regeneron asks the Court to exclude Ms. Gan's opinions in their entirety, arguing that her opinions "exceed her qualifications."  D.I. 319 at 21.  But expert testimony does not require PhDs or years of professional testifying to satisfy Rule 702.  Expert testimony can be based on "knowledge, skill, experience, training, or education," Fed. R. Evid. 702.  Regeneron's assertion that Ms. Gan's 30 years of experience is inadequate because it was "limited to one company" finds no support in the caselaw, and Regeneron cites none.  D.I. 319 at 21.  In addition, Regeneron's argument that Ms. Gan fails to tie her experience to the facts of this case is utterly unfounded.  The Court should deny Regeneron's Motion as to Ms. Gan.

### A. Ms. Gan's Decades of Market Access Negotiations with PBMs Qualifies Her to Opine on Market Access Negotiations with PBMs.

Ms. Gan's decades of experience in market access more than qualifies her to testify about the mistaken assumptions on which Prof. Scott Morton's and Ms. Bates' opinions rely.  As a preliminary matter, "courts have been reluctant to exclude an expert on the ground that he is unqualified."  *Hopeman Bros., Inc. v. Cont'l Cas. Co.*, No. 4:16-CV-187, 2018 WL 4169282, at *13 (E.D. Va. Jan. 12, 2018).  And as this circuit has noted, "a broad range of knowledge, skills, and training qualify an expert."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404

(3d Cir. 2003). The Supreme Court has further observed that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). Here, Ms. Gan's opinions are predicated on her "extensive and specialized experience" in pharmaceutical market access negotiations and business decisions. It is well-settled that persons with adequate experience in an industry may provide expert testimony on, for example, an industry's "customs and practices." *See SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 250, 257 (E.D. Pa. 2021).

Ms. Gan holds a B.S. in Mathematics from Pennsylvania State University and an MBA in Pharmaceutical Marketing from St. Joseph's University. She also has over three decades of work experience in 11 different positions at Merck, ranging from Senior Contract Analyst to National Account Director to Executive Director of Global Market Access. Ex. 18 (Gan Rpt.) ¶ 5. In her roles at Merck, Ms. Gan directly performed and oversaw negotiations with PBMs, reviewed hundreds of PBM contracts, and was Merck's expert on PBMs and market access. *Id.* ¶¶ 6-12.

Specifically, Ms. Gan's roles required her to "act[] as, the company expert on Medicare, federal and state policies impacting the 340B drug pricing program, PBMs, copay maximizers and accumulators, benefit designs, value-based contracting, and health care system dollar flow." *Id.* ¶¶ 5-8. Ms. Gan also helped develop a "market access strategy for PBMs" in which she "identified challenges and opportunities of the PBM business model and developed an understanding of how PBMs make money." *Id.* ¶ 9. Additionally, she has over 20 years of experience in negotiations with "national PBMs, regional health plans, and managed Medicaid plans," involving "meetings concerning significant strategic market access policy issues" with individuals from the PBM ESI and the payor UHC. *Id.* ¶¶ 10-11. Ms. Gan has extensive consulting experience "following payer trends, conducting payer market research, and analyzing political and regulatory developments impacting both pharmaceutical companies and PBMs." *Id.* ¶ 15. She even has experience with

and exposure to the development of cholesterol lowering drugs.  *Id*.  Regeneron's effort to cast

Ms. Gan's extensive and successful career at Merck as disqualifying rings hollow.  Mot at 22-23.

*First*, Regeneron fails to cite a single case in which an expert was disqualified because his

or her employment experience was at one company.[13]  Nor could it.  The Federal Rules of Evidence

speak only to whether the proposed expert "will help the trier of fact to understand the evidence

or to determine a fact in issue."  Fed. R. Evid. 702.  When the expertise being offered relates to

practical industry considerations—like how market access negotiations are conducted, or what

might be the ordinary expectations of negotiators involved in those discussions—extensive

practical experience of the kind that Ms. Gan offers will undoubtedly be helpful to the jury.  *See*

*e.g.*, *Kumho*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion

from a set of observations based on extensive and specialized experience").  That the majority of

Ms. Gan's experience was obtained from a career at a "single employer . . . is properly understood

to go to the weight of [her] testimony, and not its admissibility."  *IAS Servs. Grp., LLC v. Jim*

*Buckley & Assocs., Inc.*, 2015 WL 13775347, at *4 (W.D. Tex. Sept. 10, 2015).

*Second*, Regeneron argues that Ms. Gan's expertise only qualifies her to speak to Merck-

specific issues.  D.I. 319 at 12, 24.  Not so.  Ms. Gan's opinion is based in part on her direct

interactions with numerous PBMs and payers, which established her broad expertise on PBM

conduct and market access in the healthcare industry.  This expertise is not Merck-specific.  *See*

*Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, 2010 WL 1541641, at *5 (N.D. Okla.

Apr. 16, 2010) (finding that because expert was a "buyer" does not disqualify him to testify based

---

[13]    Regeneron cites *Calvente v. Ghanem*, 2022 WL 4272779, at *8 (N.D. Ill. Sep. 15, 2022).
D.I. 319 at 21-22.  However, the disqualified expert in *Calvente* only had knowledge of *one*
university's internal policies and could not opine on other universities' policies.  *Id.*  By contrast,
Ms. Gan's opinion is based on her observations of various PBMs over her decades of experience
negotiating with them and formulating market access strategies to compete for their business.

on his experience as to motivations of sellers); *IAS Servs. Grp.*, 2015 WL 13775347, at *4 (expert who worked for a "single employer" was qualified to testify because of personal experience with "25-30 acquisitions" . . . "in a discrete industry").  For that same reason, Regeneron's argument that Ms. Gan is unqualified because she never worked for the "big three" PBMs falls flat. Moreover, Regeneron ignores that while at Merck, Merck and Ms. Gan were involved in joint ventures with Pfizer, BMS, and Bayer where she collaborated on access strategies for the drugs they had in joint development.[14]  Additionally, since leaving Merck, Ms. Gan continues to conduct extensive market research in her work as a consultant, working with numerous different clients.

*Third*, Regeneron attacks Ms. Gan's expertise only in the most general terms and does not even attempt to engage with her actual opinions.  But examining Ms. Gan's actual opinions shows that each of them is firmly grounded in her years of experience in pharmaceutical market access:

| Opinion From Ms. Gan | Examples of Relevant Experience |
|---|---|
| Ms. Bates' and Dr. Scott Morton's opinions "that Amgen 'pressured' or 'coerced' PBMs to accept Amgen's offers to secure ▮▮▮ formulary coverage for Repatha® . . . drastically underestimate the bargaining power of PBMs." Ex. 18 (Gan Rpt.) ¶ 74. | Ms. Gan has "been involved in over 30 negotiations on behalf of Merck" involving "national PBMs, regional health plans, and managed Medicaid plans." Ex. 18 (Gan Rpt.) ¶¶ 6, 10.  "[D]ue to their greater bargaining power over drug manufacturers, PBMs drive the market access negotiation process," in part, because they can "'shop' offers, play manufacturers against one another, and either signal or bluntly tell a manufacturer if its offer is not competitive." *Id.* ¶¶ 76-77. |
| Ms. Bates' and Prof. Scott Morton's reliance on "informal text messages, as well as emails and oral conversations between Amgen personnel and PBMs" to establish that Regeneron could not compete at a PBM is inconsistent with the expectations of PBMs | Ms. Gan's personal involvement "in over 30 negotiations on behalf of Merck" involving "national PBMs, regional health plans, and managed Medicaid plans," *Id.* ¶¶ 6, 10, gave her direct experience with the types of negotiations at issue in this case, including |

---

[14]  *See, e.g.*, Press Release, "Merck and Pfizer's SGLT2 Inhibitor STEGLATRO™ (ertugliflozin) Meets Primary Endpoint in VERTIS CV Trial for Patients with Type 2 Diabetes and Atherosclerotic Cardiovascular Disease," merck.com (June 16, 2020), https://tinyurl.com/5yhsm746.

| | |
|---|---|
| and manufacturers in that context who would not "understand such communications to be formal offers." *Id.* ¶ 87. | PBM reactions to drug manufacturer negotiating positions, and PBM coverage decisions afterwards. The communications relied upon by Ms. Bates and Prof. Scott Morton are the "type of typical 'back and forth' I would expect to occur in any negotiations between a manufacturer and a PBM." *Id.* ¶ 88. |
|  ." *Id.* ¶ 118. | In addition to Ms. Gan's direct negotiation experience, she "led U.S. Market Access Product Strategies for Merck's Primary Care Business Unit with $6 billion in annual sales . . . includ[ing] developing access and contracting strategies" and she "routinely modeled different rebate scenarios and partnered with legal teams to develop the contracting terms." *Id.* ¶¶ 6, 10. This included consideration of whether to seek exclusive formulary positions and the potential positive/negative outcomes of that strategy. |
| "Cross-therapeutic bundling, although not common, is also a method that can be used by manufacturers to improve or maintain access, and PBMs may choose to accept such bundles based on their own preferences and capability," and "the rarity of a tool [. . .] does not render it unusable for purposes of market access, nor suggest that PBMs would only adopt such a provision unwillingly. *Id.* ¶¶ 119, 122. | Ms. Gan has decades of experience with the types of payment arrangements that are available in the industry, including helping to develop novel rebate strategies, such as "Merck's first alternative payment models" including "a type of bundled arrangement called value-based contracts, which based rebates on achieving certain predetermined outcomes." *Id.* ¶ 6. She has reviewed over one hundred rebate contracts. |
| "Ms. Bates and Dr. Scott Morton inappropriately rely on the 'Best Price' calculation of the Center for Medicare and Medicaid Services ('CMS') as supposed evidence of a relevant bundle. But this reliance reflects a misunderstanding of the purpose of the CMS definition of a 'bundled sale.'" Ex. 18 (Gan Rpt.) ¶ 132. | Ms. Gan has "significant experience at Merck relating to compliance with government pricing regulations . . . and worked closely with Merck's Finance, Government Pricing Department, and the Government Pricing attorney when accounting for 'Best Price' exposures in our rebate offers to payers." Ex. 18 (Gan Rpt.) ¶ 13. |
| "Dr. Scott Morton's view of spillover is not reflective of industry realities where there are several constraints to spillover at that 'PBM-level,'" and both she and Ms. Bates "fail to take into account the realities of market access strategies" when conducting their spillover | As part of Ms. Gan's role after being promoted to a position at Merck headquarters, she "worked closely with my team's data scientists to understand reasons for share changes in various drugs (a concept known in the industry as "spillover" or the "halo effect.") *Id.* ¶ 14; |

| analyses. *Id.* ¶ 150-151. | *see* Ex. 19 (Gan Tr.) 276:9-279:16. |

**B. Ms. Gan Reliably Applied Accepted Principles and Methods to the Facts.**

Regeneron claims Ms. Gan's opinions discussing cross-therapeutic bundles and critiquing Ms. Bates' spillover analyses are unreliable because she "does not tie her experience to her conclusions" and "ignore[s] . . . the record."[15] D.I. 319 at 26-27.  Not so.  As shown above, Ms. Gan's opinions are directly tied to experiences she has had over the course of her career.  "[T]here exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).  "Experiential expert testimony" is appropriate even though it typically "does not 'rely on anything like a scientific method.'" *Id*.  Rather, it is proper for an expert whose qualifications are based on specialized knowledge to weigh information before them against "general truths derived from specialized experience." *Kumho*, 526 U.S. at 148–149; *Sikora v. AFD Indus., Inc.*, 221 F. Supp. 2d 920, 923 (N.D. Ill. 2002) (qualifying expert used experience-based methodology of "comparing the evidence before him against" industry knowledge).

Ms. Gan's methodology is proper under Fed. R. Evid. 702,  even if it "does not lend itself to a direct correlation between one experience and one opinion."  *See United States v. Smith*, 919 F.3d 825, 836 (4th Cir. 2019) ("it would be impossible to ask [the] expert to lay such a precise foundation"); *United States v. Galloway*, 749 F.3d 238, 245 (4th Cir. 2014) (accepting experts' "method of applying their extensive experience to analyze the meaning of the conversations

---

[15]   Regeneron cites *Krantz v. Steiler*, 2024 WL 1494182, at *4 (M.D. Pa. Apr. 5, 2024). Unlike Ms. Gan, the expert in *Krantz* did not have decades of relevant industry experience. Regeneron also ignores case law where an expert's testimony is "reliable as to industry norms and practices" based on their "long history of working in [their industry]." *Palacino v. Beech Mountain Resort, Inc.*, 2015 WL 8675991, at *4 (W.D.N.C. Dec. 11, 2015); *see also Stoker v. State Farm Mut. Automobile Ins. Co.*, 2021 WL 4201583, at *4-5 (D. Colo. May 5, 2021).

through context"); *Auto Konnect, LLC v. BMW of N. Am., LLC*, 590 F. Supp. 3d 977, 983-84 (E.D. Mich. 2022) (expert may testify on whether conduct comported with industry custom and practice based on industry experience and review of record); *Ben-Trei Overseas*, 2010 WL 1541641, at *2 (methodology of "applying his experience to the issues in general . . . [was] sufficiently reliable").

Ms. Gan opines that cross-therapeutic bundles are a tool that "can be used by manufacturers to improve or maintain access, and PBMs may choose to accept such bundles based on their own preferences and capability." Ex. 18 (Gan Rpt.) ¶ 119.  This is not a complicated opinion requiring extensive analysis.  And Ms. Gan does ground her opinion in the evidence in this case, noting that the PBMs verified they had ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ *Id.* ¶ 121. And she finds ███████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ *Id.* ¶ 122.

In an attempt to attack Ms. Gan's opinion, Regeneron's asserts that Ms. Gan testified that cross-therapeutic bundles are "common."  D.I. 319 at 27.  To the contrary, Ms. Gan states that cross-therapeutic bundles are "***not*** common."  Ex. 18 (Gan Rpt.) ¶ 121.[16]  But more importantly, Ms. Gan testified that the relative rarity of a type of bundle says very little about whether it is an available option under industry custom and practice: "[product] bundling is considered *part of a drug manufacturer's market access toolkit*" and "industry norms *do not preclude* the use of cross-therapeutic bundles."  Ex. 18 (Gan Rpt.) ¶ 21 (emphasis added).  These opinions offer important information about industry custom and practice for the jury to consider.

With respect to Ms. Gan's opinion critiquing Ms. Bates and Prof. Scott Morton's spillover

---

[16]   *See also* Ex. 19 (Gan Tr.) 107:15-18 (bundling is "very situational, and that it's reasonable that they're less common."); 112:12-14 ("I state that bundles are less common.  And I still hold that view."); 115:2-4 (same); 224:18-21 ("I believe that cross-therapeutics are not common.").

analyses, Regeneron complains that Ms. Gan did not conduct her own spillover analysis.  But "[t]he 'task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.  There is no requirement that a rebuttal expert himself offer a competing analysis.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020).  That is what Ms. Gan does here.  She opines that Bates and Scott Morton fail to grapple with even the most basic industry considerations that would impact a spillover analysis.  Ms. Gan explains that Prof. Scott Morton's spillover opinion "fails to consider industry features that would limit spillover across participants and plans within GPO/PBMs" because "[h]er analysis overlooks the reality that a significant portion of a PBM's clients control their own formularies."  Ex. 18 (Gan Rpt.) ¶ 156.  Ms. Gan cites to multiple sources in support of this proposition, including formulary status announcements and documents in the record.  *Id.*

██████████████████████████████████ ███████████████████

█████████████████████████████, Ms. Gan explains that based on her "observations and further supported the record in this case, PBMs can and typically do decide coverage of Commercial and Part D formularies independently of each other," noting that "Commercial and Part D formulary negotiations often occur during different time cycles."  Ex. 18 (Gan Rpt.) ¶¶ 153-54.  Ms. Gan further notes as an example that although "Prime Therapeutics and Cigna are both clients of ESI," "Cigna had previously disadvantaged Praluent® when ESI had it in a ████ position."  *Id.* ¶ 156.  Ms. Gan also opines that Ms. Bates's and Prof. Scott Morton's spillover analyses fail to "account for many factors that influence changes in prescriber habits" such as "the impact of direct sales efforts . . . changes in market access strategy, and other industry

events." *Id.* ¶ 162.  Ms. Gan is qualified to critique Regeneron's experts on all these factors.[17]

### CONCLUSION

For the foregoing reasons, the Court should deny Regeneron's Motion.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

| | |
|---|---|
| GIBSON, DUNN & CRUTCHER LLP | Melanie K. Sharp (No. 2501) |
| Eric J. Stock | James L. Higgins (No. 5021) |
| Kate Swisher | Stephanie N. Vangellow (No. 7277) |
| Leesa Haspel | 1000 North King Street |
| Ben A. Sherwood | Wilmington, DE  19801 |
| 200 Park Avenue | (302) 571-6600 |
| New York, NY  10166-0193 | msharp@ycst.com |
| (212) 351-4000 | jhiggins@ycst.com |
| | svangellow@ycst.com |

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

*Attorneys for Amgen Inc.*

Richard J. Doren
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Ashley E. Johnson
John Adams
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Dated:  June 25, 2024

31786497.1

---

[17]   Regeneron also mischaracterizes Ms. Gan's testimony regarding her experience with spillover analyses and suggests that she has only performed three such analyses in her career.  D.I. 319 at 29.  Ms. Gan was actually describing three *reasons* to perform a spillover analysis in the within-PBM context.  Ex. 19 (Gan. Tr.) 276:9-279:16; *see* Ex. 18 ¶ 14.

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 25, 2024, I caused to be electronically filed a true and correct copy of Amgen Inc.'s Answering Brief in Opposition to Regeneron's Motion to Exclude Testimony of Dr. Eric M. Gaier; Dr. Lauren J. Stiroh; and Ms. Deborah Gan with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

David E. Wilks
Scott B. Czerwonka
Wilks Law LLC
4250 Lancaster Pike Suite 200
Wilmington, DE  19805
dwilks@wilks.law
sczerwonka@wilks.law

I further certify that on June 25, 2024, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Elizabeth Stotland Weiswasser
Jonathan D. Polkes
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119
elizabeth.weiswasser@weil.com
jonathan.polkes@weil.com
eric.hochstadt@weil.com
adam.banks@weil.com
jessica.falk@weil.com
robert.niles-weed@weil.com
rachel.williams@weil.com

Michael R. Moiseyev
Priyata Y. Patel
Weil, Gotshal & Manges LLP
2001 M. Street , NW
Washington, DC  20036
(202) 682-7000
michael.moiseyev@weil.com
priyata.patel@weil.com

_/s/ Melanie K. Sharp_
Melanie K. Sharp (No. 2501)

31786516.1