**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| Regeneron Pharmaceuticals, Inc., <br><br>　　　　　Plaintiff, <br><br> v. <br><br> Amgen Inc., <br><br>　　　　　Defendant. | C. A. No.: 1:22-cv-00697-JLH <br><br> **JURY TRIAL DEMANDED** <br><br> **REDACTED PUBLIC VERSION FILED: July 30, 2024** |

**REGENERON PHARMACEUTICALS, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO AMGEN INC.'S MOTION FOR SUMMARY JUDGMENT**

WILKS LAW, LLC
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Elizabeth Stotland Weiswasser
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated:  June 21, 2024

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ....................................................................................6

    A.    Amgen's strategy is to dominate the PCSK9i market. ............................6

    B.    Amgen's effort to secure 100% market share first plays out (unsuccessfully) in court. ............................................................7

    C.    Amgen pivots to anticompetitive bundling and below-cost pricing to secure and maintain a monopoly......................................................8

        1.    Amgen forecloses Praluent® ███████████ at ESI Commercial and Part D.................................................................10

        2.    ████████ ..........................................................11

        3.    Undeterred, Amgen forecloses Praluent® from Humana Part D.............11

        4.    Amgen next █████████ foreclose Praluent® from UHC Commercial.......................................................................12

        5.    Amgen finally forecloses Praluent® at CVS Commercial and Part D. ......12

        6.    Praluent® is now foreclosed from ███ of the PCSK9i market due to Amgen.....................................................................13

LEGAL STANDARD............................................................................................14

ARGUMENT.........................................................................................................14

I.    There is more than enough evidence to justify a trial...........................................14

II.    Amgen's arguments all rest on disputed facts. ..................................................19

    A.    Amgen cannot prove that its conduct is procompetitive as a matter of law. .........19

        1.    Amgen ██████████████████████ and procured Repatha® exclusivity at each ....................................20

        2.    Amgen cannot rule out spillover effects as a matter of law....................27

        3.    Amgen cannot prove that its bundling scheme is lawful even at lower foreclosure levels and under the *ZF Meritor* factors. ................................30

B. The evidence shows Amgen engaged in unlawful below-cost pricing.................34

C. Enbrel® and Otezla® have market power, and the issue is not dispositive. ..........36

D. Whether Amgen's conduct caused anticompetitive effects is a disputed issue of fact. ........................................................................39

E. Amgen cannot show as a matter of law that Regeneron sustained no antitrust injury ███████████ at CVS/Zinc............................41

III. Amgen waives challenges to Regeneron's state-law claims.................................44

CONCLUSION............................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
   521 F.2d 1230 (3d Cir. 1975).................................................................................31

*Amgen Inc. v. Sanofi*,
   598 U.S. 594 (2023).........................................................................................8
   872 F.3d 1367 (Fed. Cir. 2017).....................................................................6, 8
   2019 WL 4058927 (D. Del. Aug. 28, 2019) ................................................8
   2017 WL 61725 (D. Del. Jan. 5, 2017)........................................................8

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985).......................................................................................33

*Assocs. Cap. Servs. Corp. v. Fairway Priv. Cars, Inc.*,
   590 F. Supp. 10 (E.D.N.Y. 1982) ................................................................45

*Bacchus v. N.Y.C. Dep't of Educ.*,
   137 F. Supp. 3d 214 (E.D.N.Y. 2015) .........................................................45

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946).......................................................................................42

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
   49 F.4th 520 (5th Cir. 2022) ........................................................................43

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)..........................................................................41

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).......................................................................................35

*Cascade Health Solutions v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ..........................................................17, 32, 35, 37

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   84 F.4th 1157 (10th Cir. 2023) .........................................................22, 29, 41

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) ......................................................................27

*Complete Ent. Res. LLC. v. Live Nation Ent., Inc.*,
2017 WL 6512223 (C.D. Cal. Oct. 16, 2017) ........................................................................ 19

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ................................................................................................. 27, 29

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) .................................................................................... 42

*Dial Corp. v. News Corp.*,
165 F. Supp. 3d 25 (S.D.N.Y. 2016) ...................................................................... 19, 39

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) .......................................................................................... 14, 29, 36

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ....................................................................... 16, 31, 32, 40
2014 WL 1343254 (D.N.J. Mar. 28, 2014) ............................................................. 32

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .................................................................................... 45

*Fisherman's Wharf Bay Cruise Corp. v. Superior Court*,
7 Cal. Rptr. 3d 628 (Cal. Ct. App. 2003) ............................................................... 45

*FTC v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020) ................................................................................. 14, 37

*FTC v. Surescripts, LLC*,
424 F. Supp. 3d 92 (D.D.C. 2020) ......................................................................... 33

*Indivior Inc. v. Alvogen Pine Brook LLC*,
681 F. Supp. 3d 275 (D.N.J. 2023) ...................................................................... 39, 42

*In re: Asbestos Prod. Liab. Litig. (No. VI)*,
873 F.3d 232 (3d Cir. 2017) .................................................................................... 44

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ................................................................ 22, 29, 30, 40, 41

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) .................................................................................... 14

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012) ..................................................................................... 20

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
622 F. Supp. 3d 22 (E.D. Pa. 2022) ...................................................................... 38

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  752 F.3d 728 (8th Cir. 2014) ...........................................................................21
  2012 WL 3031085 (D. Minn. July 25, 2012) ................................................40

*Ingevity Corp. v. BASF Corp.*,
  No. CV 18-1391-RGA (D. Del. Aug. 24, 2021)..............................................27

*Insight Equity A.P. X, LP v. Transitions Optical, Inc.*,
  2016 WL 3610155 (D. Del. July 1, 2016) ......................................................20

*Int'l Constr. Prods., LLC v. Caterpillar Inc.*,
  2024 WL 1619836 (D. Del. Apr. 15, 2024).....................................................44

*InterVest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003).............................................................................21

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
  119 F.3d 1070 (3d Cir. 1997)...........................................................................44

*LePage's, Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) (en banc).................................5, 14, 15, 16, 18, 29, 30, 32, 36, 39

*Lorin Journal Co. v. United States*,
  342 U.S. 143 (1951).........................................................................................41

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ..............................................................................44

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
  2006 WL 1236666 (C.D. Cal. Mar. 22, 2006) ................................................31

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ...................................................................18, 42

*Meredith Corp. v. SESAC, LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) .................................................................19

*Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*,
  101 F.3d 939 (3d Cir. 1996).............................................................................44

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
  2013 WL 5694452 (N.D. Cal. Oct. 18, 2013)..................................................45

*Roxul USA, Inc. v. Armstrong World Industries, Inc.*,
  2019 WL 1109868 (D. Del. Mar. 8, 2019) .........................................19, 31, 38
  2019 WL 1101385 (D. Del. Mar. 8, 2019) ......................................................42

*Safeway Inc. v. Abbott Lab'ys*,
   2010 WL 147988 (N.D. Cal. Jan. 12, 2010) .................................................35

*Scott v. Harris*,
   550 U.S. 372 (2007)......................................................................................14

*Shire US, Inc. v. Allergan, Inc.*,
   375 F. Supp. 3d 538 (D.N.J. 2019) ...............................................................36

*Sidibe v. Sutter Health*,
   2024 WL 2822733 (9th Cir. June 4, 2024) ....................................................40

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978)..............................................................14, 16, 42

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961).......................................................................................29

*Tevra Brands LLC v. Bayer HealthCare LLC*,
   2024 WL 1909156 (N.D. Cal. May 1, 2024) ..................................................33

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
   959 F.2d 468 (3d Cir. 1992)...........................................................................38

*Twin City Sportservice, Inc. v. Charles O. Finely Co.*,
   676 F.2d 1291 (9th Cir. 1982) .......................................................................31

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)...............................................................33, 37, 40

*United States v. Google LLC*,
   687 F. Supp. 3d 48 (D.D.C. 2023) ...................................................29, 33, 34

*United States v. Grinnell Corp*,
   384 U.S. 563 (1966).......................................................................................39

*United States v. Heatherly*,
   985 F.3d 254 (3d Cir. 2021)...........................................................................21

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) (en banc) ..............................................30, 39, 44

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)...............................................................31, 38, 41

*Viacom International Inc. v. Tele-Communications, Inc.*,
   1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) ..................................................43

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ..................................................................44

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969)..............................................................................20

*ZF Meritor v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)........................................14, 15, 16, 21, 30, 31, 37, 40

**Statutes and Rules**

15 U.S.C. § 2 ..........................................................................................21, 33

15 U.S.C. § 14 ...............................................................................................31

15 U.S.C. § 45(a) ..........................................................................................41

Fed. R. Civ. P. 56(c) ...................................................................................14

**Other Authorities**

Our Products, Amgen.......................................................................................6

6C Areeda & Hovenkamp, Antitrust Law ¶ 651e1 (updated May 2024) ...................39

*Drug Pricing Investigation: Amgen—Enbrel® and Sensipar*, Staff Report,
  Committee on Oversight and Reform, U.S. House of Representatives
  (Oct. 2020) ..................................................................................................9

*In re Merck & Co.*,
  127 F.T.C. 156 (1999)................................................................................40

Press Release, *FTC Approves Final Order Requiring Bristol Myers Squibb
  Company Celgene Corporation Divest Psoriasis Drug Otezla as a Condition
  of Acquisition*, FTC (Jan. 13, 2020) .............................................................9

Public Decision and Order, *In re Amgen, Inc & Horizon Therapeutics plc*,
  No. DO9414 (F.T.C. Dec. 13, 2023) .........................................................20

Hayden Consulting Grp., *PBM Consolidation and its Impact on Geo Prescribing
  Patterns* (Nov. 28, 2023) ..........................................................................28

Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising
  Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209 (1986)...................18

Press Release, *Amgen to Pay U.S. $24.9 Million to Resolve False Claims Act
  Allegations*, Office of Public Affairs (Apr. 16, 2013) ...................................20

About, Regeneron ............................................................................................6

Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 ANTITRUST L.J. 371 (2017) ...............................................................................40, 42

U.S. DOJ, ANTITRUST DIVISION, FEDERAL ANTITRUST CRIME: A PRIMER FOR LAW ENFORCEMENT PERSONNEL (Oct. 2023) ..................................................................21

Y. Richard Wang & Mark V. Pauly, *Spillover Effects of Restrictive Drug Formularies; A Case Study of PacifiCare in California*, 11 Am. J. Managed Care 24 (Jan. 2005) ...........................................................................................28

Y. Richard Wang, *Spillover Effects of Restrictive Drug Formularies in the Statin Class*, 19 Managed Care Interface 32 (Nov. 2006) ........................................27, 28

**INTRODUCTION**

This is the rare case where the plaintiff caught the defendant red handed. In June 2020, Regeneron's CEO, Dr. Leonard Schleifer, spoke with Express Scripts ("ESI"), the second largest pharmacy benefit manager ("PBM") in the country, ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ ████████████████████████████████████████████

████████████████████ Ex. 1 at 223:18-20.[1] That comment sent "██████████████

████████████████ *Id.* at 223:21-22. Although ESI's ████████████████████

████████████████████████████████████████████████████████ ██

████████████████ ██████████████████████. *Id.* at 223:22-224:13.

This was an especially coercive and rare ██████████████████████ ██

██████—blockbuster anti-inflammatory medications having nothing to do with the treatment of cardiovascular disease—██████████████████████████████████ Ex. 2 at 395:18-396:8; *see also* Ex. 3. ████████████████ Amgen when it got word that "████████

████████████████████████████. 4 at -8866, Ex. 5 at -8868.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ██████████████████████████. Ex. 6. But that only led Amgen to move its unlawful conduct underground and implement its scheme through oral arrangements and unwritten mutual understandings with PBMs. Amgen's anticompetitive cross-therapeutic bundles harmed Regeneron, distorted competition in the U.S. PCSK9i market, and, most

---

[1] Emphasis added throughout unless otherwise noted.

concerning, harmed patients and prescribers who have lost access to a life-saving drug.

Amgen first tested the waters at <u>ESI Part D</u>. Amgen believed ███████████████ ███████████████████████████ but, after ESI Part D ███████████████ Amgen suggested a ████████████████████ Ex. 7 at -4550-51. By the time Amgen began negotiating with <u>ESI Commercial</u>, Amgen had become emboldened: Amgen knew ████ ████████████████. After Amgen ████████████, which ESI Commercial ████████ ██████████████████ ██████████ that were so ████████████████████ ████████████, Ex. 3 at -5853; Ex. 8 at -8571, that ████████████████████ ████████████ Ex. 2 at 396:24-397:6. ESI was right. ██████████████ ████████████████████████ ████████████████████████████████████ ████████████████████ ████████████ ████

At yet another PBM, <u>Humana Part D</u>, Amgen ████████████████████ ████████████████████████████ Ex. 9. ████████████████ ████████████████████ Amgen told Humana Part D that it would ████ ████████████████ Ex. 10 at -2822. The following year, another PBM, ████████████████████████████," Ex. 11, and Amgen made clear that ████████████████████████████ ████████████████████████, Ex. 12. Displaying a clear consciousness of guilt, ████████████████████████████ ████████████ Ex. 13 at -8981.

All the while, Amgen repeatedly ████████████████, where Praluent® had succeeded before ████████. Amgen ██████ <u>CVS Commercial</u> ██████████████ ████████████ with rebates estimated at ████████████ Ex. 14 at -2175; Ex. 15.

Regeneron plainly ████████████████████████████████ █████████████████████████████████████████████

███████████████████████████████████████.” Ex. 2 at 226:20-22. And <u>CVS Part D</u> also found

itself on the receiving end of Amgen's ███████████████████████. Ex. 16.

There is no question that Amgen's intended goal was to ████████████ Ex. 17 at -0000.

Amgen's own employees discussed how Amgen's scheme would ████████████████████████

██ ████████████████████████████████. Ex. 18 at -9061. Amgen was clear about

its intent to entrench its monopoly status so that it could raise prices in a sworn filing it made in

connection with its earlier patent case: Amgen sought a permanent injunction to prevent the sale

of Praluent® in the United States in 2014, and, by 2019, Amgen claimed that competition from

Praluent® was "eroding both Amgen's market share, which should be 100%, and Repatha's net

price." Ex. 19 at 9.  After realizing it would lose its patent case, Amgen began its bundling and

predatory pricing scheme to achieve the same ends by different means.

Ultimately, Amgen's anticompetitive strategy succeeded. Amgen has transformed the two-

player PCSK9i market and entrenched its monopoly—growing Repatha®'s share while preserving

its margins to the detriment of consumers and competition. Today, ████ of the market is foreclosed

to Regeneron. Prices exceed competitive levels, innovation has slowed, ████████████████

████████████████████████ ████████████████████████

Despite this mountain of evidence, Amgen advances a series of arguments in support of its

motion for summary judgment that involve highly disputed factual issues—each of which strongly

favors Regeneron, or is, at most, disputed. Indeed, Amgen does not contest Repatha®'s monopoly

in the U.S. PCSK9i market, and Amgen now *admits* that it ████████████████████████████

████████████████████████████████████████████████████████████

████ ████████████████. Because Amgen cannot dispute that it did exactly what Regeneron

alleges (at least once, when it already had a monopoly share of the PCSK9i market) or that a substantial and growing percentage of patients (now ███) can no longer access Praluent®, Amgen resorts to fact-intensive disputes about the precise *cause* of Regeneron's broad exclusion and the nature and extent of the *effects* of that exclusion—two issues universally recognized as ill-suited for summary judgment. In doing so, Amgen ignores extensive contrary evidence and testimony and fails to reckon with the holistic inquiry antitrust law requires.

On *causation*, Amgen's defense regarding the other PBMs where Regeneron has been excluded rests, as it did at the motion to dismiss stage, on Amgen's theory that the only evidence that counts in this antitrust case are words written in a contract. This Court already rejected that defense, correctly finding it wrong as a matter of law. And it is at odds with the extensive factual record developed in this case. For good reason: Monopolists do not always reduce their anticompetitive schemes to writing. After Regeneron caught Amgen in its scheme ████████ ████████, Amgen hid its conduct, ████████████████████████ ████████████████████████████████████████. Amgen would blame Regeneron's exclusion on Regeneron's marketing strategy, not ████████████ ████████████████████ D.I. 309 ("Br.") at 16-34. This made-for-litigation theory does not pass the smell test. Amgen's own medical expert ████████████ ████████████ on prescribing decisions in the PCSK9i market; CVS told Amgen ████████ ████████████████████; and reams of evidence and testimony show that Amgen's cross-therapeutic bundled rebates—not marketing—caused Regeneron's exclusion at each PBM.

Amgen also advances arguments on a variety of other disputed, fact-intensive issues: the precise foreclosure percentage, the contracts' exact duration, the competitive landscape, Amgen's market power in Otezla® and Enbrel®, and so on. The evidence now shows that Amgen should

lose each and every fight it picks. Moreover, none of the issues Amgen raises is dispositive under the holistic rule of reason inquiry antitrust law demands. In short, there is more than enough evidence to comfortably sustain a jury verdict that Amgen "willfully maintained monopoly power by predatory or exclusionary conduct, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance." *LePage's, Inc. v. 3M*, 324 F.3d 141, 167 (3d Cir. 2003) (en banc). Nothing more is required to deny Amgen's motion.

As for the *effects* of Amgen's anticompetitive scheme, Amgen merely identifies classic battles of the experts for the jury to weigh at trial. Regeneron's economic expert, Dr. Fiona Scott Morton, formerly the DOJ Antitrust Division's Chief Economist, opines at length that the evidence shows that Amgen's conduct harmed competition and consumers. (Amgen did not move to exclude this particular opinion in its kitchen-sink *Daubert* motion. D.I. 316.) Tellingly, Amgen has offered *no* procompetitive justification for its first-ever use of cross-therapeutic bundled rebates to hobble its sole competitor in the PCSK9i market and cement its monopoly.

The evidence also shows that Amgen used anticompetitive *below-cost pricing* to erode Regeneron's ability to compete. ██████████████████████████████████ ███████████████ Amgen largely ignores Regeneron's below-cost pricing claims, and what it does say (in under three pages) does not come close to justifying summary judgment. Amgen contends that its ████████████████████████████ and that it cannot recoup its losses. The evidence shows otherwise. And, regardless, substantial foreclosure and recoupment are not necessary elements of Regeneron's below-cost pricing claims. Amgen's arguments on Regeneron's standalone below-cost pricing claims should be rejected.

As a final matter, Amgen does not meaningfully challenge Regeneron's five state-law claims, which reach different conduct from Regeneron's federal claims. So there is no question

that summary judgment is not appropriate for those claims, which must proceed to trial, where Regeneron should prevail on all of its claims. Of course, Amgen can try to convince the jury of its sanitized (and fictitious) narrative, but Amgen certainly has no entitlement to summary judgment.

## STATEMENT OF FACTS

### A.    Amgen's strategy is to dominate the PCSK9i market.

Regeneron is a leading innovator in the pharmaceutical industry. Led by co-founders and renowned scientists Dr. Leonard Schleifer and Dr. George Yancopoulos, Regeneron has a portfolio of twelve FDA-approved or authorized medicines.[2] Amgen is a pharmaceutical company that has amassed (often through acquisitions) a portfolio almost three times larger, with thirty-four FDA-approved or authorized medicines.[3] Amgen's CEO is former banker Robert Bradway.

This case concerns Regeneron's path-breaking specialized cholesterol medication Praluent®, and Amgen's unlawful efforts to bully Praluent® out of the market. In July 2015, Praluent® became the first FDA-approved fully human monoclonal antibody, and the first drug approved to lower cholesterol by targeting a protein called PCSK9. *See Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1372 (Fed. Cir. 2017). By "inhibiting" PCSK9 (hence the label "PCSK9i"), Praluent® boosts the body's natural ability to extract LDL-C ("bad cholesterol") from the bloodstream. *See id.*; Ex. 20 ¶¶ 53-54. PCSK9i's serve a unique patient population, including those who cannot tolerate statins or for whom statins fail to reduce cholesterol to acceptable levels. *Id.* ¶¶ 19-20. After the FDA approved Praluent®, it approved Amgen's Repatha®, another monoclonal antibody PCSK9i. *See Amgen*, 872 F.3d at 1371. Praluent® and Repatha® remain the only FDA-approved patient-administered PCSK9i's, and Amgen does not dispute in its summary judgment motion that these two products alone comprise the relevant market. Ex. 20 ¶ 20; Br. 17 n.7.

---

[2] *See* About, Regeneron, https://www.regeneron.com/about.
[3] *See* Our Products, Amgen, https://www.amgen.com/products.

Repatha® is ████████████████████████████████████████████

████████ Ex. 21 ¶ 17. Amgen, however, recognized early on that competition from Praluent®

meant less revenue for Amgen. "But for Praluent," Amgen stated in 2019, "Repatha would be the

only PCSK9 antibody sold in the U.S." Ex. 19 at 9. Instead, Praluent® was "***eroding both Amgen's***

***market share, which should be 100%, and Repatha's net price.***" *Id.* Amgen expected that

competing with Praluent® would ████████████████████████████ Ex. 22 slide 3;

Ex. 23 slide 30; Ex. 24 ¶ 55 fig. 2. If Amgen could sideline Praluent®, then it ████████████

████████████████████████████████████████████████████████████████

████████████ Ex. 25 slide 1, 6; Ex. 22 slide 3, 7. Mr. Bradway put it bluntly in June of 2019:

████████████████████████████████████████ Ex. 26 at -1248. And Repatha®'s

importance to Amgen has ████████████████ With other products in its portfolio facing patent

cliffs, Amgen believes, according to statements by Mr. Bradway in 2022 and 2023, that "████████

████████████████████████████████████████ Ex. 27 at -0693; *accord*

Ex. 28 at -9445, and will ████████████████████████████████ Ex. 29 at -

2443. To achieve those ████████ goals, ████████████████████████ Ex. 30 at -1667.

But Repatha® faced some hurdles. Unlike Praluent®, Repatha®'s clinical trials did not show

any reductions in patient deaths, certain kinds of heart attacks, or unstable angina (reduced blood

flow to the heart) requiring hospitalization. Ex. 20 ¶¶ 8, 12, 26. Additionally Repatha®, unlike

Praluent®, does not offer a low-dose option, which physicians (including Amgen's medical expert

in this case) prefer for some patients. *Id.* ¶¶ 10, 63-79; Ex. 31 at 81:12-17.

**B.    Amgen's effort to secure 100% market share first plays out (unsuccessfully) in court.**

Unwilling to compete on the merits, Amgen determined to force Praluent® from the market

by other means. In 2014, before Repatha® was even approved, Amgen sued Regeneron and Sanofi

(with whom Regeneron had co-developed Praluent®), seeking to bar Praluent® from the market—

and thus deny patients access to it. Amgen argued that Praluent® infringed an overbroad patent that, as the Supreme Court would later explain, invalidly sought "to monopolize … an entire universe of antibodies." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 613 (2023). To cement its advantage, Amgen even took the aggressive step of seeking a permanent injunction against Praluent®. *Amgen Inc. v. Sanofi*, 2017 WL 61725 (D. Del. Jan. 5, 2017), *vacated* 872 F.3d 1367 (Fed. Cir. 2017).

Amgen's strategy started to stall in mid-2019, when Judge Andrews declared Amgen's patents invalid, presaging Amgen's later unanimous losses before the Federal Circuit and the Supreme Court. *Amgen Inc. v. Sanofi*, 2019 WL 4058927 (D. Del. Aug. 28, 2019), *aff'd*, 987 F.3d 1080 (Fed. Cir. 2021), *aff'd*, 598 U.S. 594 (2023). This loss led to ███ at Amgen, as Amgen was ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████. Ex. 22 slide 7, 9; Ex. 23 slide 30; *see also* Ex. 32 at -9699, -9709 ██████████████████████████████████████████████████.

Then, ███████████████████████████████████████████████ █████████████████████████████ and quickly secured exclusive coverage for Praluent® on CVS formularies, effective July 2020. That deal alone cut away at 15% of Repatha®'s business. Ex. 33. Mr. Bradway, upon learning the news, responded that Amgen was ███████████ ████████████████████████ *Id.* ██████████████████████████████████ ████████████████████████████████ Ex. 34 slide 9-13. Amgen was ████████. *See* Ex. 35. Amgen saw Praluent® ████████████████████████████ not just Repatha®'s, and acted unlawfully to fight it.

## C.    Amgen pivots to anticompetitive bundling and below-cost pricing to secure and maintain a monopoly.

Unwilling to compete on the merits, and unsuccessful in court, Amgen turned to flouting

antitrust law. By early 2020, Amgen already had a ▮▮▮ share of the two-player PCSK9i market and wanted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 24 ¶ 210 fig. 24 (citing Amgen data); Ex. 36 at -5372; Ex. 37 at 217:6-7. Due to its larger portfolio of drugs, Amgen had a further advantage over Regeneron: Amgen had two blockbuster drugs in unrelated markets that it could leverage to drive Praluent® out of the much smaller PCSK9i market. One drug is Otezla®, the only oral product approved to treat moderate-to-severe psoriasis when Amgen acquired it in 2019 for $13.4 billion in an FTC-ordered divestiture. Ex. 38 slide 9.[4] The other is Enbrel®, which has been "one of the world's most profitable drugs"[5] since Amgen acquired it in 2002 as part of a $10 billion acquisition of Immunex. Ex. 24 ¶ 41. So Amgen set out to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 18 at -9061.[6] With Praluent®'s net sales reaching *just* ▮▮▮ of Otezla® and Enbrel®'s, Ex. 24 ¶ 68 fig. 5(b), it would be easy for Amgen to leverage these megaproducts to strangle Praluent®.

Amgen operationalized this scheme by offering cross-therapeutic bundled rebates on Otezla®, Enbrel®, and Repatha® to "Payors." Payors are companies (including "PBMs," Pharmacy Benefit Managers, and "GPOs," Group Purchasing Organizations) that manage the medication-related benefits insurance companies provide to patients. One way they do so is to maintain lists, or "formularies," of covered medications. Patients are generally required to pay out-of-pocket for medications not listed, with some exceptions. The Payor market is highly concentrated with three companies—ESI, OptumRx/UHC, and CVS/Zinc (the "Big 3")—covering the vast majority of

---

[4] *See* Press Release, *FTC Approves Final Order Requiring Bristol Myers Squibb Company Celgene Corporation Divest Psoriasis Drug Otezla as a Condition of Acquisition*, FTC (Jan. 13, 2020) https://www.ftc.gov/news-events/news/pressreleases/2020/01/ftc-approves-final-order-requiring-bristol-myers-squibb-company-celgene-corporation-divestpsoriasis.

[5] *Drug Pricing Investigation: Amgen—Enbrel® and Sensipar*, Staff Report, Committee on Oversight and Reform, U.S. House of Representatives, at 5 (Oct. 2020).

[6] Amgen's references to ▮▮▮▮ and ▮▮▮▮▮ appear to be Amgen's misogynistic and pejorative way to refer to Regeneron's CEO and Praluent®. *E.g.*, Ex. 39 at -8810 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

U.S. lives: 84% of those covered by commercial insurance and 81% of those covered by Medicare Part D. Ex. 24 ¶ 102. This consolidation, per Amgen, creates a ███████████████████ at any of the Big 3, which affects ████████████████ Ex. 40 slide 7.

In short, Amgen's scheme was to condition massive rebates on Otezla®, Enbrel®, or both, on exclusive coverage of Repatha® instead of Praluent®. Given the relative scale of these products, even small rebates on Otezla® and Enbrel® would cause PBMs to lose enormous value if they did not agree to exclude Praluent®. In the words of one PBM executive, ████████████████ ██████████████████████ Ex. 41.

Amgen has been successful: Praluent® has been steadily foreclosed from the PCSK9i market, beginning with ████ foreclosure in April 2020 and reaching ████ as of January 1, 2024. Ex. 42 ¶¶ 194-95 tbl. 1, fig. 11. ████████████████████████ ██████████████████████ts. Ex. 24 ¶ 210 fig. 24; Ex. 43 at 3. In contrast, Praluent®'s ex-U.S. market share has ████████████ from 2020-2023, █████████████████████ Ex. 24 ¶ 211 fig. 25 & n. 336.

1.    **Amgen forecloses Praluent®** ██████████ **at ESI Commercial and Part D.**

In ████████ Amgen began ████████████████ ██████████ to secure exclusive formulary coverage for Repatha® on ESI's commercial formularies. Amgen offered Ascent, ESI Commercial's GPO, ████████████████████████ ████████████████████████████ ████t®. Ex. 44 at -3666 (emphasis in original). This ████████████████ ████████ Ex. 45 at -4444, ████████████████████ Ex. 46, would ████████████████████████ ████████████████████. Ex. 42 ¶ 266. An ████████████████████ ████████████████████████. Ex. 2 at 396:24-

10

397:4. In fact, **Regeneron** ██████████████████████████████████████ ████████

███████████████ Ex. 24 ¶¶ 197-98. So, although ████████████████████████████

███████████████████ began to cover Repatha® exclusively. Ex. 47. Amgen further ██████████

█████████████████████████████████████████████████████████████████████.

Ex. 48 at -8837. Amgen's message was clear: ████████████████████████████████████

██████████████████████████ Ex. 49 at -2719. If ESI ████████████████████████████

█████████████████████████████ s. It did not matter to Amgen that the ████████████████

████████████████████ ████████████████████████ Ex. 24 ¶ 111 & fig. 8. Amgen was ████████████

████████████████████████ Ex. 50 at -4357, because, as an Amgen executive has explained,

██████████████████████████████████████ Ex. 51.

A similar story played out at ESI Part D a few months prior to Amgen's dealings with ESI

Commercial. Amgen ████████████████████████ ██████████ ████████████████████████

████████████████████████ ████████████████████ Ex. 7 at -4550-51. ESI Part D,

however, was ████████████████████████████████████████████████████████

████████████████████████." *Id.*

**2.    Regeneron confronts Amgen and tells it to stop its anticompetitive conduct.**

In August 2020, ████████████████████████████████████████████████████████████

████████████████████████ Ex. 6. Amgen did not ████████████████ ████ ████████

██████████████████████████████████████████████████████." Ex. 52 at 2.

**3.    Undeterred, Amgen forecloses Praluent® from Humana Part D.**

Just four days after receiving ████████████████████████████ Amgen ██████████████████

████████████ to Humana Part D (the third largest Payor for Medicare Plans). Ex. 9; Ex. 53 at

-0281. Now on notice that its conduct would be scrutinized, Amgen told Humana Part D it would

████████████████████████. Ex. 10 at -2822. Amgen also ██████████████████████████

████████████████████████████████████████████████████

███████ ████████████████████████████████████████████

██████ ████████████ . Ex. 54 at -6498; Ex. 55 at 158:24-159:6.

**4.    Amgen next ████████████ to foreclose Praluent® from UHC Commercial.**

Amgen moved on to OptumRx next. During 2021 negotiations with OptumRx on behalf of its largest client UnitedHealthcare ("UHC") Commercial, ████████████████████ ██████ ██████████████████████████████." Ex. 56 at 30:11-13. In response, ████████████████████████ ████████████████ ██████████ Exs. 57, 58; Ex. 59; Ex. 56 at 33:21-24. Although ████████████████████████ ████████████████████████████████████████████████ ████████████████ ██████████████████████████████ . *Compare* Ex. 56 at 30:14-21 and Ex. 60 ████████████████ ████ *with* Ex. 61 at -8212 ████████████████ ). Amgen ████████████████████████ al," and, as a result, ████████████████ ████████████████ Ex. 62 at -2332; Ex. 63.

**5.    Amgen finally forecloses Praluent® at CVS Commercial and Part D.**

As noted above, ████████████████████████████████ , ████████████ ████████████████████████████████████████ ESI, Humana Part D, and UHC Commercial. With its new unlawful strategy, Amgen ████████████████████ ██ . Amgen's CEO, Bob Bradway, met with CEO of CVS Health Karen Lynch to ████████ ████████████████████████████████████ ████████████████████████ Ex. 64. Amgen's sales executives made sure to have Mr. Bradway ████████████████████████ ██ ████████████████████████████████ *Id.* In 2021, even though CVS ████████ ████████ . 65 at -5432, Amgen ████████████████████████████████ ███████████████ ████████████████████████████████████████

███████ Ex. 14 at -2175; Ex. 15. This ████████████████████████████████████

Ex. 99 at -1591. Like ██████████████████████ █████████████████ Ex. 24 ¶ 132

& fig. 15. After CVS Commercial ████████████████████████████████████████

████████████████████. Ex. 2 at 245:4-11; *see also* Ex. 66 at -1596. In response, a CVS

Commercial executive informed Regeneron that ████████████████████████████████

████████████████████████████████ ████████████████████████████████████

████████████████████ Ex. 2 at 226:2-22; 406:22-407:4.

    Amgen ████████████████████████████████ to CVS Part D Ex.

16; *see also* Ex. 67 at 76:4-78:16; Ex. 68 at 148:10-11. And Amgen ████████████████████

████████████████████████████████ Ex. 69 at -5701.

    Amgen's offers ██████████████████████████████████████ ██

████████████████████████████████████████. Ex. 70 slide 3, 6-7, 12;

Ex. 71 at 237:16-21; Ex. 24 ¶ 92. Regeneron ████████████████████████████████

████████████████████. Ex. 72 at -2888; Ex. 71 at 234:7-22. ████████████████████

████████████████████████████ ████████████████████████████████

██████ Ex. 73; Ex. 74; Ex. 75 at -0855.

    **6.**    **Praluent® is now foreclosed from ████ of the PCSK9i market due to Amgen.**

    Amgen's cross-therapeutic bundle has foreclosed Praluent® from ████ of the PCSK9i

market such that a vast majority of U.S. patients lack any meaningful choice in the PCSK9i market.

Ex. 42 ¶ 194 tbl. 1; Ex. 24 ¶¶ 214-15. It is undisputed (at least in Amgen's motion) that Repatha®

has monopoly share in the PCSK9i market. Ex. 24 ¶ 11.b; Br. 17 n.7. And Praluent®'s dwindling

market share has allowed Amgen to retain a higher net price on Repatha® than Amgen otherwise

could without its unlawful bundle and enables Amgen to further raise Repatha®'s prices in the

future. Ex. 24 ¶¶ 212-13, 216-25. Amgen's conduct also reduces the incentives for Regeneron—

or any other company—to invest in innovation in the PCSK9i market. *Id.* Amgen's unlawful bundling has led Regeneron's market share to drop from ▉ to under ▉ (with less than a ▉), and caused Regeneron over $100 million in damages, with the amount increasing each day. Ex. 24 ¶ 210 fig. 24; Ex. 43 slide 3; Ex. 76 ¶ 8 tbl. 1.[7]

## LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must view the evidence and inferences in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). In antitrust cases, courts apply "the same summary judgment standards that apply in other contexts." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004); *see Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 468 (1992). It is for this reason that complex antitrust cases like this one frequently proceed to trial.[8]

## ARGUMENT

### I.    THERE IS MORE THAN ENOUGH EVIDENCE TO JUSTIFY A TRIAL.

The record more than suffices to support a jury verdict in Regeneron's favor. At a minimum, there are numerous disputed issues of material fact that preclude summary judgment. Regeneron's federal antitrust claims share a common element of anticompetitive conduct.[9]

---

[7] Regeneron's damages are even higher than those currently calculated by its expert, Dr. Divya Mathur. Data was only available through mid-2023 and thus did not reflect certain of Regeneron's damages—▉ ▉ Ex. 76 ¶ 76. Regeneron reserves the right to supplement Dr. Mathur's calculations with refreshed data for trial.

[8] *See, e.g., LePage's*, 324 F.3d at 145 (9-week trial); *ZF Meritor v. Eaton Corp.*, 696 F.3d 254, 263 (3d Cir. 2012) (4-week trial); *FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) (2-week bench trial); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1059 n.1 (3d Cir. 1978) (bench trial).

[9] Regeneron's state-law claims are addressed in greater detail below. *See* Part III, *infra.*

Because "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties," courts evaluate anticompetitive bundling under various rubrics. D.I. 49 ("R&R") at 7 (quoting *LePage's*, 324 F.3d at 152). "Under *LePage's*, an antitrust plaintiff must show that **the effect of the discounts is to 'foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products** and who therefore cannot make a comparable offer.'" *Id.* at 14 (quoting *LePage's*, 324 F.3d at 155). Bundling may also be considered as exclusive dealing, which, under *ZF Meritor*, has "**no set formula**," but "generally requires a showing of [1] significant market power by the defendant, [2] substantial foreclosure, [3] contracts of sufficient duration to prevent meaningful competition by rivals, and [4] an analysis of likely anticompetitive effects considered in light of any procompetitive effects" as well as "[5] whether there is evidence that the dominant firm engaged in coercive behavior, and [6] the ability of customers to terminate the agreements. [7] The use of exclusive dealing by competitors of the defendant is also sometimes considered." *Id.* at 11 (quoting *ZF Meritor*, 696 F.3d at 271-72). Alternatively, "**setting prices below one's costs** can constitute anticompetitive predatory pricing (if other requirements are met)." *Id.* at 7. Accordingly, the question for the jury is broad: Whether Amgen "willfully maintained monopoly power by predatory or exclusionary conduct, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance." *LePage's*, 324 F.3d at 167.

There is more than sufficient evidence, construed in the light most favorable to Regeneron, to satisfy each of these standards. First, *LePage's*. There is ample evidence that Amgen's bundled rebates have ███████████████████████████████████████████ ████████████████████ *Id.* at 155. This includes testimony that ████████████████████ ████████████████████, *e.g.*, p. 10, *supra*, and expert analysis confirming that ████████████████

have a product portfolio that could support a comparable offer, Ex. 24 ¶¶ 66-71; Ex. 42 ¶¶ 43-48.[10]

Amgen does not argue that Regeneron cannot satisfy *LePage's*. Amgen hardly addresses *LePage's* at all, except to claim in a footnote (Br. 17 n.8) that *LePage's* does not apply because Regeneron makes more than one product. Amgen's attempt to bury this directly on point en banc Third Circuit precedent admits the weakness of its motion. Amgen's purported limitation of *LePage's* to businesses that sell only one product cannot be reconciled with *LePage's* itself, where the plaintiff, LePage's, "sold a variety of office products." 324 F.3d at 144. Thus, while *ZF Meritor* used the phrase "single-product producer" in distinguishing *LePage's*, it is clear from context that the *ZF Meritor* court was referring to a business that produces only a single-product "across [the] multiple different product lines" covered by the challenged bundle. 696 F.3d at 274 n.11.[11]

Next, there is sufficient evidence to show that Amgen's bundled rebates are anticompetitive exclusive-dealing arrangements under *ZF Meritor*'s seven-factor inquiry:

1. From the bundling scheme's inception through today, Repatha® had an undisputed monopoly in the PCSK9i market. Ex. 24 ¶ 11.b; Ex. 42 ¶¶ 226, 261.

2. Due to Amgen's conduct, Praluent® has been substantially foreclosed from that market, starting with ▓▓▓ and, with the Big 3 PBMs going Repatha® exclusive one-by-one, reaching ▓▓▓ today. Amgen's scheme has devastated Praluent®'s share growth to the point that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 42 ¶¶ 194-95, tbl. 1 & fig. 11.

3. Amgen employed agreements of sufficient duration (including up to ▓▓▓▓) to prevent meaningful competition by Regeneron; and in any case, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 24 ¶ 100.

---

[10] This case is stronger than *LePage's*—where 3M leveraged products without market power to benefit one with it, 324 F.3d at 155—or *SmithKline*—where the defendant "link[ed] products on which [it] faced no competition … with a competitive product." 575 F.2d at 1065. Amgen bundled two products with market power with a monopoly product. "The result was to sell all three products on a non-competitive basis in what would have otherwise been a competitive market." *Id.*

[11] Amgen also says that *LePage's* analysis has been "clarified" by *ZF Meritor* and *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016). But *ZF Meritor* and *Eisai* expressly declined to apply or clarify *LePage*'s—much less could they overrule en banc precedent—and instead charted an additional path to establishing anticompetitive conduct. *ZF Meritor*, 696 F.3d at 274 n.11; *Eisai*, 821 F.3d at 405-06.

4.    Amgen's rebate strategy has put Praluent® out of reach for a majority of U.S. patients and left them with Repatha®, a medicine that does not offer Praluent®'s unique benefits. Amgen has reduced incentives to innovate, kept prices on Repatha® higher than they would otherwise be, and provided no procompetitive benefits in return. *Id.* ¶¶ 213-25.

5.    Amgen used coercive tactics by ███████████████████████████████████ ██████ ███████████████████████████████. *Id.* ¶¶ 57, 99.

6.    Amgen's bundling scheme included ████████████████████████████████████ ████████████. *Id.* ¶ 77.

7.    Amgen's conduct is highly suspect, as Amgen admits that cross-therapeutic bundling in exchange for exclusivity is exceedingly rare and was indeed the ████████████ for Amgen.[12] ███████████████████████████████████████████

Especially given that these factors are non-exclusive and non-dispositive under the rule of reason, there is more than enough evidence to justify sending this complex question to the jury.

The evidence also shows below-cost pricing. The parties agree that *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), provides a standard for assessing below-cost pricing.[13] *PeaceHealth* asks whether, "after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products," the evidence shows that "the defendant sold the competitive product or products below its average variable cost of producing them." *Id.* at 910. Applying this test to the record evidence, Regeneron's economic expert, Dr. Scott Morton, concludes that Amgen's "cross-therapeutic rebates resulted in effective net prices of Repatha® below an appropriate measure of Amgen's costs." Ex. 24 ¶ 11.c; *see id.* ¶ 111 & fig. 8 (██████████████); *id.* ¶ 132 & fig. 15 (██████████████). In other words, ***Amgen effectively paid to give Repatha® away to undercut Praluent®***, ████████████████████████████████████

---

[12] *See, e.g.*, Def. Amgen's Mem. of Law in Opp. to Plaintiffs' Br. for Preliminary Injunction at 22, *FTC v. Amgen*, No. 1:23-CV-03503 (N.D. Ill. Sept. 11, 2023) ("Horizon Amgen Opp.") ("[B]undling generally is not widely used … and Amgen does not have many bundled contracts.").
[13] To be sure, the parties dispute how *PeaceHealth*'s test applies here. Amgen's expert applies the test incorrectly for reasons addressed in Regeneron's *Daubert* motion, D.I. 319 at 7-14, but it suffices to deny summary judgment that the parties' experts reach conflicting conclusions.

███████████████████████████ Ex. 51. Any way the Court looks at it—and any of these three standards can suffice—a reasonable jury could find that Amgen's conduct is anticompetitive.

The evidence also suffices for a jury to find that Amgen's misconduct directly caused significant harm to competition and damages to Regeneron. Ex. 24 ¶¶ 209-25; *see LePage's*, 324 F.3d at 167. Prior to Amgen's anticompetitive conduct, Regeneron successfully placed Praluent® with Payors and the patients they covered. In fact, ████████████████████████████ ██████████████████████████ █████████████████████████ ████████████ Ex. 77 at -1393. Now, ███████ ████████████████ ███████████████████████████████ Amgen's conduct led to ████████ ██████████████, harming patients and competition. Ex. 42 ¶¶ 291-96; Ex. 24 ¶¶ 213-25. Even during the brief period when ████████████████████████████, Amgen's bundle █████ ██████████████████████████—a canonical example of the well-recognized "rais[ing] rivals' costs" theory of antitrust harm. *See McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) (citing Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209 (1986)); Ex. 24 ¶ 184. Amgen offers no procompetitive justification for its actions: If Amgen were a benign monopolist in the PCSK9i category, it should be able to explain why it leveraged additional, and unrelated, medications to help increase Repatha®'s market share and entrench its monopoly power. But Amgen offers no such procompetitive justification. As a result of the foreclosure caused by Amgen's anticompetitive conduct, a vast majority of American patients have lost access to a PCSK9i with unique benefits, and Regeneron has suffered over ██████████ in damages. Ex. 76 ¶ 8 tbl. 1.

Simply put, Regeneron has offered sufficient evidence on all of its federal claims to permit a reasonable jury to find in its favor. Nothing more is required to deny Amgen's motion.

## II.    AMGEN'S ARGUMENTS ALL REST ON DISPUTED FACTS.

In the face of evidence of its misconduct, Amgen offers three potential grounds for summary judgment on Regeneron's federal antitrust claims. *First*, that Amgen was not engaged in any anticompetitive conduct. Br. 15-39. *Second*, that Amgen's conduct did not have anticompetitive effects. *Id.* at 39-41. And *third*, that Regeneron did not suffer an antitrust injury in connection with CVS. *Id.* at 41-45. But Amgen simply ignores contrary fact and expert testimony and fails to engage in the holistic inquiry antitrust law requires. The record evidence cuts overwhelmingly in Regeneron's favor. At a minimum, it shows that there are disputes of fact on each issue Amgen moves on and confirms that Amgen's arguments should be made to a jury.[14]

### A.    Amgen cannot prove that its conduct is procompetitive as a matter of law.

Amgen devotes the lion's share of its brief to arguing that "[u]nder a rule of reason analysis, Amgen's conduct is not anticompetitive." Br. 16-34. Amgen, however, does not argue that Regeneron cannot satisfy *LePage's*—and summary judgment as to anticompetitive conduct can be denied on this ground alone. *See* pp. 15-16, *supra*. Instead, relying on *ZF Meritor's* exclusive-dealing framework, Amgen first disputes the precise magnitude of foreclosure. But whether foreclosure is "substantial" is a holistic, fact-intensive inquiry to be considered in context—including, among other considerations, whether the conduct is engaged in by a monopolist like Amgen. And there is record evidence showing foreclosure increasing from ▮ in April 2020 to ▮ by January 2024 through both direct foreclosure at specific PBMs and spillover effects—

---

[14] This case parallels *Roxul USA, Inc. v. Armstrong World Industries, Inc.*, 2019 WL 1109868, at *6-20 (D. Del. Mar. 8, 2019), where summary judgment was denied when the motion merely highlighted factual disputes, including on substantial foreclosure, market power, duration, pro/anticompetitive effects, coercion, and antitrust injury. *See also Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 29-38 (S.D.N.Y. 2016) (similar). Given the complex and fact-intensive inquiries at play, courts typically find a trial necessary in rule-of-reason cases. *See also, e.g., Complete Ent. Res. LLC v. Live Nation Ent., Inc.*, 2017 WL 6512223, at *3 (C.D. Cal. Oct. 16, 2017); *Meredith Corp. v. SESAC, LLC*, 1 F. Supp. 3d 180, 196 (S.D.N.Y. 2014).

confirming that Amgen has, at most, identified a factual dispute for the jury.[15] Amgen then disputes the factual underpinnings of each of *ZF Meritor*'s factors for assessing exclusive dealing. But these are quintessential factual disputes, with ample evidence cutting against Amgen. In any event, the *ZF Meritor* factors are non-exclusive and non-dispositive. The remainder of Amgen's brief is a smorgasbord of underdeveloped arguments that mischaracterize governing law and ignore swaths of the record, which includes contrary evidence on every issue Amgen raises.

1. **Amgen** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **and procured Repatha® exclusivity at each** ▓▓▓▓▓▓

Amgen's foreclosure arguments begin from the erroneous and hotly disputed proposition that "the maximum foreclosure Regeneron could … show stems ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ which Amgen views as covering just 10% of the market. Br. 18. But the record is squarely to the contrary: the evidence shows that Amgen deployed its bundling scheme across multiple Payors, successfully foreclosing Regeneron at each.

The core premise of Amgen's argument is the flawed "only written contracts matter"-theory of antitrust law that this Court has already rejected. In Amgen's view, "[w]hat matters for purposes of foreclosure is what the contract provides." Br. 19. But, as this Court explained, Amgen's "entire agreements with" Payors "might not have been written down at all." R&R 9. Indeed, the FTC, recognizing as much, recently entered a consent order prohibiting ***Amgen*** from offering certain bundles "directly, ***indirectly***, explicitly, or ***implicitly***."[16] This is simply "not a

---

[15] *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 69 (2d Cir. 2012) (reversing a denial of summary judgment because "causation is [] a jury question."); *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, 2016 WL 3610155, at *11-12 (D. Del. July 1, 2016) (similar). To show causation a plaintiff need show only that the conduct was a material cause of the injury, not the *sole* cause. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n. 9 (1969).

[16] Public Decision and Order at 5, *In re Amgen, Inc & Horizon Therapeutics plc*, No. DO9414 (F.T.C. Dec. 13, 2023); *see also* Press Release, *Amgen to Pay U.S. $24.9 Million to Resolve False Claims Act Allegations*, Office of Public Affairs (Apr. 16, 2013), https://www.justice.gov/opa/pr/amgen-pay-us-249-million-resolve-false-claims-act-allegations

contracts case in which the scope of the alleged anticompetitive agreement is cabined by the four corners of the written document." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014). Regeneron may "use all manner of extrinsic evidence to persuade a jury" that Amgen's written contracts do not paint a full picture of its scheme—as Amgen's own witnesses ████████. *Id.*[17] Just because Amgen was "foolish enough to reduce" its ████████ ████████ "to writing" does not mean Amgen did not "display a bit more guile" implementing its bundling scheme after being caught red handed. *Id*. The full nature of Amgen's agreements and whether they evince anticompetitive conduct is for the jury to decide.[18]

Indeed, Amgen's motion is a bald-faced attempt to leverage the deliberate disguise it put on its misconduct. Amgen was well-aware of the unlawful nature of its scheme and thus knowingly hid it.[19] Now, Amgen points to its sanitized contracts and asks this Court to overlook the very scheme it put in place that discovery has exposed. This Court should decline that invitation. The relevant evidence at each PBM (including ████████) more than suffices for a jury to conclude that Amgen's conduct foreclosed Regeneron:

**OptumRx/UHC Commercial.** The parties agree that Amgen's ████████ contract

---

(Amgen settling claim that it secretly "paid kickbacks to long-term care pharmacy providers").
[17] *See* Ex. 78 at 19:21-20:10 ("[I]t's not my job to tell a fact finder how to weigh the evidence"); *id.* at 73:5-75:7 (████████); Ex. 55 at 158:13-159:6 (Amgen's "████████); Ex. 68 at 91:14-22. Contrary to Amgen's suggestion (Br. 18), ████████

[18] The factfinder in antitrust cases must "look past the terms of [a] contract to ascertain the relationship between the parties and the effect of the ***agreement*** 'in the real world.'" *ZF Meritor*, 696 F.3d at 270. This is especially so for Regeneron's Section 2 monopolization claims where "an agreement is not necessarily required." *Id.* n.10 (citing 15 U.S.C. § 2). Even for its Section 1 and Clayton Act claims, which require "[e]vidence of an agreement," *id.*, Regeneron may "rely solely on circumstantial evidence." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003). "A 'tacit agreement' is enough." *United States v. Heatherly*, 985 F.3d 254, 262 (3d Cir. 2021).
[19] This kind of activity "demonstrate[s] consciousness of guilt, which [will be] powerful evidence for the jury." U.S. DOJ, ANTITRUST DIVISION, FEDERAL ANTITRUST CRIME: A PRIMER FOR LAW ENFORCEMENT PERSONNEL 7 (Oct. 2023), https://www.justice.gov/atr/page/file/1091651/dl.

negotiated by OptumRx on behalf of UHC Commercial █████████████ ███████████████ ██████, and that UHC agreed to cover Repatha® exclusively. *See* Ex. 24 ¶ 83; Ex. 79 ¶ 119. The evidence shows that UHC ███████████████████████████████████████████████ ████████████ ██████████████████████████. *See* p. 12, *supra*.[20]

Amgen insists there is nothing to see here because the parties' contract did not ██████ ████████████ ███████████████ ████████. Br. 19-20. But the evidence shows that the parties ████████████████████████████████. ███████████████████████████████ ███████████████████ ███████████████████████████ ██████. *E.g.*, Ex. 80 slide 4; Ex. 81 at -2564. ██████████████████████████████████ Ex. 11, and that ████████████████████████████████████████████ Ex. 12. Amgen ████████████████████████████████████████████████████████ ████████████████████████ Ex. 61. This, per Amgen, was ███████████████████ ██████████████████ Ex. 62 at -2332-33. ████████████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 13 at -8981. That is, Amgen ████████████████████████████████████████ ████████████████████████████████ ████████████████████████ ██████████ Ex. 82 ¶ 76; *see also* Ex. 83 at -4827-28. The only way for this arrangement (█████ ████████████████████████████████████) to make practical and economic sense is if the

---

[20] This is one of many ways this case is not like *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022)—an out-of-circuit case that is Amgen's most cited authority. Whereas the *defendant* in *EpiPen* "offered better prices," *id.* at 990, Amgen's ████████████████████████████████████████████████████████. The Tenth Circuit has refused to apply *EpiPen* to facts like these. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1175 (10th Cir. 2023) (finding a genuine dispute of fact on the plaintiff's exclusive dealing claims because "the record shows that [the plaintiff] offered a better price for a higher-quality product," unlike *EpiPen*, where the plaintiff "didn't offer a better price").

parties ███████████████████████████. *See* Ex. 24 ¶ 264; Ex. 82 ¶ 27.

Amgen also argues that Regeneron could not have been foreclosed at UHC because Regeneron could have offered a better and still-profitable rebate on Praluent® that exceeded the effective rebate on Repatha®. Br. 20-21. But there is evidence to the contrary: An OptumRx/UHC representative told Regeneron that ████████████████████████████████ ██████ ███████ Ex. 84 at -1210. And, without access to Amgen's internal data and pricing, ████████████████████████████████████████ ████████ Put simply, the evidence shows that ████████████████████████████. Ex. 11. Or, at least, construing all the evidence and inferences in Regeneron's favor, a reasonable jury could conclude as much.

**ESI Part D.** Amgen admits that ██████████████████████ ██████ to ESI Part D but argues that ████████████████████████ Br. 21. ESI's ████████████ however, is subject to dispute. In ██████████, Amgen ████████████ ██████████████████████ ████████████████████████████████ ████████████████████████. Ex. 85 at n.24. ██████████████████████ ████████████████████████ ████████████████████████████████████████████ ████████████████████████. Ex. 86.[21] ████████████ ████████████████████████████████████████████ ██████████████████████ Ex. 87 at -0663; Ex. 88 at -2332.

Amgen wanted to ████████████████████████ but when ESI Part D

---

[21] ████████████████████████████████████████████ ████████████████████████. Ex. 86.

███████████████████████████████████████████████████████████████

████████████████████ Ex. 7 at -4550-51. In the end, the parties' contract mentioned ███

███████████ ██████████████████████████████████████ ESI Part D moved

Repatha® to its preferred brand tier. *See* Exs. 89, 90, 91. ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Ex. 90. A reasonable jury could easily conclude that the parties ██████████████████

█████████████████ █████████████████████████.

**Humana Part D.** All Amgen argues with respect to Humana Part D is that "Humana was

not even offered a bundled rebate." Br. 22. But the evidence shows Amgen's ██████████

██████████████████████████████. ██████████████████████████████

███████ ██████████████████████████████ *See* Ex. 92 at 178:8-24; Ex.

93 at -5207; Ex. 94 at -1281; Ex. 95 at -4791. Amgen documents reveal that soon after████

██████████████████████████████ ████████████████████████████

██████████████████████ ██ ██ ████ ████████████████

███████████████████████████ █ ████████████████

Ex. 9; *see also* Ex. 68 at 134:4-15; Ex. 96. ████████████████████████

█████ however, ***Amgen told Humana that it*** █████████████████ Ex. 10 at 822.

Just like at ESI Part D, ██████████████████████████████████████████

█████████████ ███ *see* Ex. 53 at -0277, -0281, while maintaining exclusive coverage of

Repatha®.[22] Here too, a reasonable jury could easily conclude that the parties' functional

---

[22] Amgen further negotiated a ████████████████████████████████████

███████████████████®. Ex. 54 at -6498; Ex. 55 at 158:24-159:6.





agreement for ███ ████████ ████████████████████████████ ██████ .

**CVS Commercial and Part D.** As for CVS, Amgen claims that that there was no foreclosure as a matter of law because CVS never *accepted* a bundled rebate agreement and was "entirely open to Regeneron as a competitive alternative." Br. 21-22. But this mischaracterizes the record. In 2021, Amgen ████████████████ █████ to undermine the ████████████████████ Amgen ██████ CVS Commercial ████████

████████████████████████████████████

████████████ Ex. 14 at -2175.[23] ████████████

████████████████ ████████████████████████

████████████████████████ Ex. 100 at -0006. ████████

████████████████████████████████████

████████████ ████ Ex. 101 at -0188-89.[24] Amgen's own representative was

████████████████████████ Ex. 102 at -9939.

After CVS Commercial ████████████ , Amgen deployed ████████████████

██ . Ex. 2 at 245:4-11; *see also* Ex. 103 at -6283. ████████████████

████████████████████████████████████

████████ ██ Ex. 2 at 226:2-22; *see also* Ex. 66 at -1596. Amgen ████████████ CVS Commercial by ████████

████████████████████ ████████████████████ —

totaling an estimated ████████████ . *See* Ex. 104 at -8212; Ex. 105.[25]

---

[23] *See also* Ex. 97 at -5870 (Amgen would ████████████████████ ); Ex. 98 at -6141 ("I think we can do a ████████████████████████ ); Ex. 99 at -1591.
[24] This was consistent with Amgen's stated intent ████████████████
████████████ " Ex. 48 at -8837.
[25] Amgen executives knew that w ████████████████████████████████████
████████ . *See* Ex. 106. Amgen even discussed news of ████████████████████

Amgen's ███████████ to CVS Commercial did not merely "offer lower prices" pursuant to a "competitive process." Br. 22. Rather, per Dr. Scott Morton, ███████████ ███████████████████████. Ex. 24 ¶ 132 & fig. 15. Amgen itself calculated that its ████████████████████████ Ex. 99 at -1591. Predictably, the result of Amgen's ██████████ was an anticompetitive process to ████████ ████████████████████████████████ ██████ There were ███████ instances of ██████████████████████ because of the ████████████████████████████████ ██████████ Ex. 71 at 237:16-21; *see also* Ex. 103 at -6282-83. ██████████ ████████████████████ ██ Ex. 24 ¶ 92; *see* Ex. 72 at -2888. ████████ ████████████████████████ *See id.* Amgen's ████████ ████████████████████████ thus caused CVS Commercial to remove Praluent® and replace it with Repatha®. *See* Ex. 74 at -7913; Ex. 75 at -0855.

The evidence shows a similar story at CVS Part D. Testimony and documents from both Amgen and CVS Part D confirm that Amgen ████████████████████████ ████████████████████████ Ex. 16.[26] Amgen documents indicate Amgen was ████████████████████████ ██████████. Ex. 69 at -5701. Here too, Dr. Scott Morton opines that Amgen ████ ████████████████████████" Ex. 42 ¶ 93. This led Regeneron to

---

████████. *See* Ex. 107. Though this ████████████████████, it further shows Amgen coercing CVS into covering Repatha® exclusively.
[26] *See also* Ex. 67 at 77:23-78:5 ████████████████████████ ████████████████); Ex. 68 at 148:10-11; Ex. 108 at -7136.



██████████████████████████████ *see* Ex. 72, ██████████ ████████
████████████████████, Ex. 67 at 92:23-94:6.

\*\*\*

Amgen would have the Court artificially "limit[]" its inquiry to Amgen's "written agreements," Br. 18, and conclude that its anticompetitive cross-therapeutic bundle caused Regeneron's foreclosure ████████████████. To do so, the Court would have to blind itself to all of the evidence showing how Amgen ████████████—in ██████████████ ██████████████████████—to foreclose Regeneron at PBM after PBM, directly foreclosing ████ of the market by January 2024. Ex. 42 ¶ 194 tbl. 1. Amgen's approach cannot be reconciled with the summary judgment standard or the antitrust laws and should be rejected.[27]

### 2.    Amgen cannot rule out spillover effects as a matter of law.

Amgen also disputes the remaining ████ of Regeneron's foreclosure by rejecting the well-recognized phenomenon of spillover effects. Br. 23-24. Regeneron's experts, Dr. Scott Morton and Ms. Heather Bates, explain that there are two well-recognized types of spillover, or "halo," effects resulting from Amgen's bundling scheme. Prescriber-level spillover occurs when a health care provider defaults to prescribing Repatha® as opposed to Praluent® without referring to an individual patient's insurance coverage, because the provider knows Repatha® is more likely to be covered or has "greater experience with [it]." Ex. 24 ¶ 100; Ex. 82 ¶ 99.[28] In this way, "a dominant

---

[27] *See* Order on Summary Judgment Motions at 3-4, *Ingevity Corp. v. BASF Corp.,* No. CV 18-1391-RGA (D. Del. Aug. 24, 2021), ECF No. 525 ("[T]he parties['] dispute [regarding] the amount of foreclosure … is an issue the jury should determine."). Regeneron "should be given the full benefit of [its] proof"—construing all the evidence and inferences in its favor—"without tightly compartmentalizing the various factual components." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (noting the "'synergistic effect' of the mixture of elements").

[28] Studies show that physicians prescribe medications covered by plans that offer limited coverage options more often than other functionally similar medications, even for patients whose plans cover the similar medications. *See, e.g.,* Y. Richard Wang, *Spillover Effects of Restrictive Drug*

PBM's choice of preferred products can influence prescribing market-wide."[29] PBM-level spillover occurs when a Payor enters into a contract on behalf of its primary, or national, formulary and then other health plans within that Payor group follow the same coverage decision. Ex. 24 ¶ 101. Indeed, *agreements for multiple formularies are negotiated simultaneously by the same people*, and the contracts, including ▮▮▮▮, often have clauses allowing for the inclusion of additional formularies without further negotiations. *See id.* ¶¶ 101, 261; Ex. 109 at -0679.[30]

The evidence—including ▮▮▮▮▮▮▮▮▮▮—supports Dr. Scott Morton's and Ms. Bates' conclusions about spillover effects here. At the prescriber level, Amgen itself anticipated ▮▮▮▮▮▮▮▮▮▮[31] Indeed, Amgen's *own* expert agrees that prescriber-level spillover exists. Ex. 79 ¶ 294. Amgen intended its scheme to have ▮▮▮▮▮▮▮▮▮▮[32] There is even evidence of PBM-level spillover occurring in real time: When Amgen pushed its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

*Formularies in the Statin Class*, 19 Managed Care Interface 32, 32-34 (Nov. 2006), https://link.gale.com/apps/doc/A159507863/AONE?u=nysl_oweb&sid=sitemap&xid=87f4a775; Y. Richard Wang & Mark V. Pauly, *Spillover Effects of Restrictive Drug Formularies; A Case Study of PacifiCare in California*, 11 Am. J. Managed Care 24, 24-26 (Jan. 2005), https://cdn.sanity.io/files/0vv8moc6/ajmc/c458b5e15bfe0336d58274c800149da81acf05a0.pdf/.
[29] Hayden Consulting Grp., *PBM Consolidation and its Impact on Geo Prescribing Patterns* (Nov. 28, 2023), https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/.
[30] PBM-level spillover is a natural consequence of the consolidation and vertical integration in the PBM industry, with the Big 3—or as Amgen calls them, the "MEGA" accounts—accounting for an overwhelming majority of the market. *See* Ex. 24 ¶¶ 244-45. Expert testimony, including statistically significant modeling, and ▮▮▮▮▮▮, show that Payor consolidation enhances spillover effects. *See id.* ¶¶ 101, 261; Ex. 40 slide 7.
[31] At CVS Commercial, Amgen noted the ▮▮▮▮▮▮▮ Ex. 110 at -1337, and predicted an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 111 at -9970*; see* Ex. 37 at 33:8-12 (Amgen witness testifying about ▮▮▮▮▮▮▮▮▮▮▮); Ex. 112 at 179:11-181:4, 182:2-15 (same).
[32] Amgen recognized that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 113. Amgen also noted that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 114 slide 3.

██████ Ex. 86. Additionally, after ESI Commercial dropped Praluent® from its national formulary, many other ESI-affiliated PBMs formularies followed suit. Ex. 24 ¶ 108-09, 119. The same occurred at OptumRx after the ████████████████. *Id.* ¶ 123.

Unable to dispute the real-world existence of spillover effects or the evidence of spillover here, Amgen—relying solely on *EpiPen*—argues that spillover simply does not count. In Amgen's view only "contractual foreclosure"—*i.e.*, foreclosure required by a contract's terms—is cognizable. Br. 23-24 (quoting *EpiPen*, 44 F.4th at 992). Amgen is wrong. For starters, *EpiPen*'s "contractual foreclosure" approach—which considered only prescriber-level spillover—is not the law in the Third Circuit. *LePage's*, for example, rejected this exact argument that foreclosure is measured based only on "contracts" that "expressly … conditioned discounts on exclusivity." 324 F.3d at 157. Foreclosure must instead account for the full effects of all actions "designed to induce … the exclusion" of the plaintiff. *Id.* at 157-59; *see also Cont'l Ore*, 370 U.S. at 699.[33]

Moreover, the evidence undermines *EpiPen*'s applicability, or at least shows that its conclusion rest on factual premises that are disputed here.[34] *First*, the prescriber-level spillover in *EpiPen* resulted from "irrational behavior." 44 F.4th at 992. But here, as Dr. Scott Morton notes, "[i]t is completely … rational[] that a [health care] provider who repeatedly encounters difficulty prescribing a certain medicine … may be less likely to prescribe that product." Ex. 24 ¶ 259 n.418. This is especially so because, to use Amgen's own medical expert's words, "[t]here's so many

---

[33] The rule of reason eschews Amgen's "formalistic distinctions" in favor of "actual market realities." *Eastman Kodak*, 504 U.S. at 466-67; *see generally Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326, 329 (1961) (Foreclosure is measured by the "practical" consequences of a defendant's conduct and "probable effect … on the relevant area of effective competition.").

[34] The Tenth Circuit has already limited *EpiPen* to cases where the plaintiff "didn't offer a better price," "PBMs initiated the exclusivity agreements," and the record lacks evidence that the defendant "coerce[d] the PBMs into exclusivity." *Chase Mfg.*, 84 F.4th at 1175 (reversing grant of summary judgment). This case differs from those facts in all respects. To date, no court has applied *EpiPen* to dismiss any other antitrust claims. *E.g.*, *United States v. Google LLC*, 687 F. Supp. 3d 48, 75 (D.D.C. 2023) (denying summary judgment).

different insurance companies with so many different regulations." Ex. 31 at 65:13-14. *Second*, *EpiPen* found prescriber-level spillover could have been "neutraliz[ed] by vigorous competition" in the form of "advertising to physicians or patients." 44 F.4th at 992-93. But Amgen's medical expert discounted the value of marketing efforts when it comes to prescribing Repatha® and Praluent®. Ex. 31 at 127:20-128:11. And CVS ███████████████████████████████ ████████████████████████ Ex. 115 at -8660. *Finally*, *EpiPen* worried that recognizing spillover in that case would "disincentivize[] procompetitive behavior." 44 F.4th at 993. But, unlike *EpiPen*, which was a single-product case, this case involves (1) a cross-therapeutic bundled rebate, which (2) priced Repatha® below cost. There are no procompetitive benefits of Amgen's conduct (and Amgen's brief identifies none). *See* p. 34, *infra*.

### 3. Amgen cannot prove that its bundling scheme is lawful even at lower foreclosure levels and under the *ZF Meritor* factors.

#### i. Monopolists may not maintain dominance by anticompetitive means.

Amgen cites no case supporting its proposition that a monopolist can use anticompetitive practices to entrench a (purportedly) lawfully acquired monopoly. Rather, because Amgen was and is a monopolist in the PCSK9i market—a point Amgen's motion never disputes—it cannot maintain or increase its monopoly even by gaining small amounts of share through anticompetitive means. In *LePage's*, for example, the plaintiff showed that 3M's scheme reduced LePage's market share from "14.44% of the total [relevant] market" "to 9.35%"—a 5% decrease. 324 F.3d at 159-62. But since 3M "had monopoly power in the relevant market," the Court ruled—without relying on the percentage of market foreclosure—that 3M engaged in anticompetitive conduct that "strengthen[ed] its monopoly position." *Id.* at 162, 166.[35] This Court applied this principle in

---

[35] *See ZF Meritor*, 696 F.3d at 271, 285 ("Exclusive dealing arrangements are of special concern when imposed by a monopolist"); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc) (lower levels of foreclosure can be anticompetitive when the defendant is a

denying Amgen's motion to dismiss, holding that "contracts resulting in foreclosure of at least 22.32%" could be "sufficient as a matter of law to state an antitrust claim" where "the Complaint also allege[d] that Repatha has monopoly power." R&R 11-12. The evidence now paints an even starker picture: Praluent® has now been excluded from ███ of the PCSK9i market—in which Amgen undisputedly wields monopoly power—and ███████████████████████████████ ██████████ Regardless of how Amgen acquired its PCSK9i monopoly, Amgen cannot use anticompetitive means to increase or further insulate that monopoly even incrementally.

### ii.    Amgen's conduct is anticompetitive even at lower foreclosure levels.

Even putting aside the fact that Amgen is a monopolist, there is evidence that under the *ZF Meritor* factors—which are not a "set formula," but rather considerations for the jury, 696 F.3d at 271, 286—Amgen's bundling scheme was anticompetitive even at lower foreclosure levels:

**Foreclosure.** "There is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely in the degree of foreclosure they consider unlawful." *Eisai*, 821 F.3d at 403. Still, Amgen concedes that its challenged conduct would reach anticompetitive levels if it caused 40-50% of Regeneron's foreclosure. Br. 29. Amgen's bundling scheme ████████████ ████████████████████████████████ Ex. 42 ¶ 194 tbl. 1. And courts have found conduct anticompetitive at even significantly lower foreclosure levels.[37]

---

monopolist); *Roxul*, 2019 WL 1109868, at *13 (monopolist could be liable where the plaintiff's "market share would have been 3.2% … as opposed to its actual market share of 1.9%").

[36] This stands in stark contrast to the rest of the world where Praluent®'s market share increased. Ex. 24 ¶ 211 fig. 25; *see United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241 (2d Cir. 2003) (assessing international market dynamics to ascertain domestic anticompetitive effects).

[37] *See, e.g., Twin City Sportservice, Inc. v. Charles O. Finely Co.*, 676 F.2d 1291, 1301-09 (9th Cir. 1982) (24% foreclosure). For Regeneron's Clayton Act claim, this Court has observed that "foreclosure of 14.7% 'may well'" suffice. R&R 12 n.6 (quoting *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3d Cir. 1975)); *see Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2006 WL 1236666, at *6 n.4 (C.D. Cal. Mar. 22, 2006) ("A Section 3 claim may be supported by less than 24% foreclosure."); *see generally* 15 U.S.C. § 14 (Clayton Act violated by conduct that "*may* … substantially lessen competition or *tend to* create a monopoly").

**Coercion.** Amgen argues that the record lacks evidence of coercion because Payors themselves have significant bargaining power. Br. 29-31. At best for Amgen, the issue of coercion is disputed, as it implicates complex market dynamics and competing industry expert testimony. Amgen provides ████████████ worth of rebates to PBMs each year. *See* Ex. 116 slide 26. Regeneron's experts have accordingly explained that pharmaceutical companies hold significant leverage. Ex. 42 ¶¶ 211, 346; Ex. 117 at 69:10-70:4. Even Amgen's expert agrees that pharmaceutical companies "may have a little bit of leverage." Ex. 118 at 147:23-25.

Amgen also ignores that its bundled conditional rebate includes two widely-prescribed, "must-have" medications, *see* Ex. 24 ¶¶ 39-48, making it difficult or impossible for PBMs to refuse. For example, ████████████████████████████ ████████████ ████████████████████████████████ Ex. 86. ████████████████████ ████████████████ Ex. 12. Time and again, ██████████████████████ ████████████████████████████████████████████ And the fact that Payors ████████████ ████████████████ ██ ████████████████████████████████ supports the "permissible inference" that the bundle was coercive. *PeaceHealth*, 515 F.3d at 914-15. *Compare* Ex. 56 at 30:14-21 *and* Ex. 60 ████████ ████ *with* Ex. 61 (50% Repatha® rebate). Coercion is thus an issue for trial. *See PeaceHealth*, 515 F.3d at 914-15 (reversing grant of summary judgment because, although there was "testi[mony] that [a purchaser] voluntarily entered into its contracts," "when all justifiable

---

[38] This case is unlike *Eisai*, where the "threat of a lost discount" on a single product was not coercive. *Eisai*, 821 F.3d at 407. Here, refusal to purchase one product means losing rebates on other products PBMs must purchase, and the evidence shows that these bundled rebates dictated purchasing decisions. *See LePage's*, 324 F.3d at 157; Ex. 2 at 397:5-6 (ESI); *id.* at 226:17-22, 245:8-11 (CVS). In *Eisai*, the challenged agreements also "did not prohibit hospitals from purchasing competitor … drugs." *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *26 (D.N.J. Mar. 28, 2014). Here, of course, Amgen's scheme entailed Repatha® exclusivity.

factual inferences are drawn in [plaintiff's] favor, there is no doubt that PeaceHealth's practice of giving a larger discount to [purchasers] who dealt with it as an exclusive preferred provider may have coerced some [purchasers]").

**Contract duration and terminability.** Amgen argues that its contracts were for only ███ ███████ and terminable at will. Br. 29-31. That is no basis for summary judgment, because even "short and terminable" contracts can harm competition when "combined with the nature of the [] relevant markets." *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 104 (D.D.C. 2020). The evidence here shows that "the economic elements" are such that the Payors "have a strong economic incentive to continue carrying" Repatha® exclusively even "in spite of the legal ease with which the relationship can be terminated." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193-94 (3d Cir. 2005); *see* Ex. 42 ¶¶ 211, 214, 261.[39] Confirming as much, ███████ ███ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ ██ ████████████████████████████████. *See id.* ¶ 153; Ex. 119 at 315:11-316:23.

Long-term exclusive coverage, moreover, was Amgen's clear intent.[40] Amgen admits that if a Payor chose to cover Praluent®, it would lose rebates across ████████████████████████. *See* Br. 30. ████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 120 at -0936 (ESI); Ex. 101 at -0189 (CVS). Here too, it must "await [until] trial to determine whether, as a matter of actual market reality" Amgen's contracts locked Payors into Repatha®

---

[39] *See Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 1909156, at *8 (N.D. Cal. May 1, 2024) ("[E]vidence of pressure and monetary incentives … create[s] a genuine dispute of material fact as to whether … agreements are not short-term and easily terminable.").

[40] Amgen's intent is relevant to all of Regeneron's claims, and specific intent is an element of the attempt claims. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) ("[T]he question of intent is relevant to" the offense of "monopolization"); *see* 15 U.S.C. § 2.

exclusivity. *Google*, 687 F. Supp. 3d at 73 (denying summary judgment).

**Anticompetitive/procompetitive effects and market practices.** The evidence shows that Amgen's bundled rebates have serious anticompetitive effects. Namely, a vast majority of patients lack meaningful access to Praluent®'s unique benefits; Amgen can retain higher net prices on Repatha® than it otherwise could have; and Repatha®'s dominance has reduced incentives to innovate. *See* p. 13, *supra*; Section III.D, *infra*. In response, Amgen argues that contracts providing rebates in exchange for exclusive coverage can be procompetitive *as a general matter*. Br. 31-32. But this is not a case about an ordinary single-product rebate for exclusive coverage. Here, exclusive coverage has been obtained by threatening to withhold rebates on *other* medications that treat *completely different* diseases—a practice the evidence shows is highly unusual.[41] Amgen never explains how its coercive cross-therapeutic bundles offer *any* procompetitive benefits.

Simply put, Amgen cannot overcome the overwhelming evidence of anticompetitive bundling. Amgen makes no argument under *LePage*'s. As for *ZF Meritor*'s independently sufficient standard, Amgen raises, at the very most, ancillary factual disputes for the jury to consider in its holistic inquiry into Amgen's conduct and the causes of Regeneron's exclusion.

## B.    The evidence shows Amgen engaged in unlawful below-cost pricing.

Amgen devotes a brisk two-and-a-half pages to its request for summary judgment on Regeneron's below-cost pricing claims. Br. 34-36. This is particularly surprising given that these claims provide a *separate and independent* basis for proving Amgen's liability. And, as explained, the evidence (including rigorous economic expert analysis) more than suffices to show that Amgen

---

[41] Horizon Amgen Opp. at 22 ("[B]undling generally is not widely used in the pharmaceutical industry, and Amgen does not have many bundled contracts."); Ex. 37 at 247:15-25 (Amgen executive admitting the ███████████████████████████████████████ ███████; Ex. 118, 106:20-107:5; 107:19-109:2 (Amgen expert confirming that "bundling generally is not widely used in the pharmaceutical industry.'").

engaged in below-cost pricing. *See* pp. 17-18, *supra*. Amgen's two abbreviated and half-hearted arguments on these claims get the law and the facts wrong and cannot justify summary judgment.

Amgen first argues that Regeneron ████████████████████████████████ ████████ which Amgen claims represents 10% of the market. Br. 34-35. But Amgen's argument is beside the point for two reasons: First, it is premised on Amgen's erroneous theory that incremental entrenchment by a monopolist is legal, *see* Section II.A.3.i, *supra*, and, second, substantial foreclosure is not a required element of a below-cost pricing claim, period.[42] Tellingly, *PeaceHealth* does not even address substantial foreclosure. In any event, Dr. Scott Morton calculated that Amgen's below-cost pricing accounts for foreclosure from almost ████ of the market—more than enough for a jury to find substantial, were such a finding required—given Amgen's ████████████████████████████████████. Ex. 24 ¶¶ 111 & fig. 8, 132 & fig. 15; *see id.* ¶¶ 160 & tbl. 1, 164 & tbl. 2., 170 & tbl. 3.

Amgen next argues that Regeneron cannot show a likelihood of recoupment. Br. 35-36. Amgen is again wrong on both the law and the facts. "[T]he recoupment requirement from single product cases" does not "translate[] to multi-product discounting cases." *PeaceHealth*, 515 F.3d at 910 n.21.[43] This is because, while "[s]ingle-product predatory pricing … necessarily involves a loss for the defendant," "bundling does not," as a bundled discounter "can exclude its rivals … even when the bundle as a whole, and the individual products within it, are priced above the discounter's incremental cost to produce them." *Id.* Even so, the evidence shows that Amgen wanted to ████████████████, believed it could ████████████████████████ ████ ████, and projected that ████████████████████████████████████

---

[42] In *Brooke Group v. Brown & Williamson Tobacco*, where the Supreme Court addressed single-product predatory pricing, the defendant had only a 12% market share. 509 U.S. 209, 213 (1993).
[43] *See Safeway Inc. v. Abbott Lab'ys*, 2010 WL 147988, at *4 (N.D. Cal. Jan. 12, 2010) (*PeaceHealth* "does not require that a plaintiff plead dangerous possibility of recoupment.").

██████. Ex. 19 at 9; Ex. 22 slide 3; Ex. 23 slide 30; Ex. 51. Confirming as much, Regeneron's expert explains that as Praluent®'s market share dwindles, Amgen can raise prices more freely. Ex. 24 ¶¶ 211, 217-18. And, so long as Amgen can break the competitive process at any time with its bundle, ████████████████████████ *See* p. 33, *supra*. Amgen's meager arguments for summary judgment on Regeneron's standalone below-cost pricing claims therefore fail.

**C.    Enbrel® and Otezla® have market power, and the issue is not dispositive.**

Amgen next argues that its "bundles are lawful" for the "separate and independent reason" that "Amgen does not possess monopoly power with respect to Enbrel® and Otezla®." Br. 37. Amgen yet again gets the law wrong: anticompetitive conduct does not require market power in the bundled products. In any event, these products' market power is clear, or, at least, disputed.

Regeneron's antitrust claims do not hinge on a showing of market power for Otezla® and Enbrel®. To be sure, Amgen's market power in these products provides relevant evidence of Amgen's intent and ability to bundle, and of the coercive nature of Amgen's bundled rebate offers. But a lack of monopoly power does not defeat Regeneron's claims. All that is required under all three lines of authority relevant here—*LePage's*, *ZF Meritor*, and *PeaceHealth*—is that *Amgen* has (or is at risk of gaining) monopoly power *in the PCSK9i market*, which Amgen does not dispute. In *LePage's*, 3M offered a bundled rebate to shore up its monopoly in the transparent tape market. Whether 3M had market power in the other "product lines covered by the rebate program"—product lines like "Retail Auto" and "Home Improvement Products"—was not relevant (or even discussed). *LePage's*, 324 F.3d at 144-45, 154-55.[44] Regeneron more than satisfies the standard the en banc Third Circuit actually announced. *See* pp. 15-16, *supra*. In *ZF*

---

[44] To the extent the district court in *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538 (D.N.J. 2019), read *LePage's* to incorporate a requirement that the other products in the bundle have monopoly power, that decision is incorrect. In any event, antitrust law is based on the "actual market realities" relevant to each specific case. *Eastman Kodak*, 504 U.S. at 466-67.

*Meritor*, the exclusive dealing analysis centered on the effects of tactics a business uses *to further entrench a monopoly product*; there is no requirement that those tactics involve *other* monopoly products. *See* 696 F.3d at 270-72, 281-89. As for *PeaceHealth*, while the defendant in *PeaceHealth* wielded monopoly power with respect to each product in the bundle, that fact was not pertinent to the court's analysis. Rather, just like in *LePage*'s, the "potential threat to consumer welfare" that *PeaceHealth* addressed was that a more efficient "competitor who produces fewer products than the defendant" could "be excluded from the market because the competitor cannot match the discount the defendant offers over its numerous product lines." *PeaceHealth*, 515 F.3d at 904.

In any event, the evidence shows Otezla®'s and Enbrel®'s market power—or, at least, that the issue is disputed. Dr. Scott Morton describes Enbrel®'s and Otezla®'s market power in significant detail (including durable ████ profit margins over many years despite the presence of new anti-inflammatory treatments), applying established methods of antitrust market analysis. Ex. 24 ¶¶ 39-48; Ex. 42 ¶¶ 341-78.[45] The FTC also confirmed that Otezla® has significant market power when Amgen paid $13.4 billion to acquire the product in an FTC-ordered sale. *See* p. 9 n.4, *supra*.[46] Likewise, Amgen admitted Enbrel®'s power in a March 2024 challenge to Colorado's imposition of a price cap: "Enbrel®," Amgen averred, "effectively redefined the clinical course of moderate to severe rheumatoid arthritis," and its dominant position is secured by "two patents

---

[45] "[B]oth products having high margins that are rising over time, high profits, widespread adoption on health plan formularies, and stable prices despite the launch of new products or approval of additional indications for other drugs used to treat the same conditions." Ex. 42 ¶ 342; *see also Dentsply*, 399 F.3d at 187 (a product with "less than [a] predominant share" can be shown to have "monopoly power" in light of "other germane factors … includ[ing] the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand"); *AbbVie*, 976 F.3d at 373 (finding monopoly power because, *inter alia*, the defendant "maintain[ed] its share of the [relevant] market with a profit margin of over 65[%]" "even with huge rebates").

[46] Amgen suggests that Otezla®'s divestiture was ordered "to preserve [Bristol Myers Squibb's] incentive to develop its own oral [psoriasis] product." Br. 6. But this explanation appears nowhere in the record, and Amgen's citation, Ex. 79 ¶ 42, does not mention the divestiture at all.

[that] grant Enbrel® market exclusivity and limit competing biosimilar products from entering the market until 2029 at the earliest." Compl. ¶¶ 1, 53, *Amgen v. Colo. Prescription Drug Affordability Review Bd.,* No. 1:24-cv-00810 (D. Colo. Mar. 22, 2024), ECF No. 1.

Nonetheless, Amgen insists that these medications lack market power, contending that other medications treat the same conditions and that some Payors have not always covered Enbrel® and Otezla®. Br. 37-39. At most, these arguments create a factual dispute about this canonically fact-intensive issue.[47] Regarding other medications, Amgen identifies only one medication that it says poses a threat to Enbrel® or Otezla®—Humira®. But Dr. Scott Morton shows that the net prices of Enbrel® and Otezla® have not decreased despite Humira®'s presence, indicating that Humira® is not an effective constraint on their market power. *See* Ex. 24 ¶ 43; Ex. 42 ¶ 378.[48] Amgen, moreover, did not ███████████████████████ ████████ ██████████ ████████████████████████████████        ████████████████████████ Ex. 42 ¶ 368. As for Payor coverage, Amgen identifies ***one*** time in Enbrel®'s sixteen-year history when a Payor (UHC) temporarily did not cover Enbrel® in a preferred position. Br. 38. Amgen omits that this was due to Amgen ████████████████████████████████████████████████████ ████████████████ Ex. 121 slide 3; Ex. 106 at -0850-51. Even then, all existing patients retained their preferred access to Enbrel®. In Otezla®'s ten-year history, Amgen identifies only a handful of Part D formularies that have excluded it, beginning in 2021. Br. 39. These exceptions prove the

---

[47] *See Roxul*, 2019 WL 1109868, at *15-18 (disputes of fact on market power); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22,72-75, 89 (E.D. Pa. 2022) (same); *see generally Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 481 (3d Cir. 1992) ("[M]arket power is certainly dependent on factual findings").

[48] A single market may contain multiple products with market power. *See, e.g., Visa*, 344 F.3d at 240 (Both "Visa U.S.A. and MasterCard have demonstrated their power in the [relevant] market," with shares of 47% and 26%). Dr. Scott Morton showed that limiting the markets to Humira® and Otezla® or Humira® and Enbrel® yields market shares of 41% and 35%, respectively, for Amgen's products, shares that can easily sustain findings of market power. Ex. 42 ¶ 377.

rule. In fact, formulary coverage for Enbrel® and Otezla® increased between 2019 and 2023. Ex. 42 ¶ 360. Amgen is free to argue that the disputed facts negate the ample evidence of Enbrel®'s and Otezla®'s market power; but that is an argument for the jury, not summary judgment.

**D.    Whether Amgen's conduct caused anticompetitive effects is a disputed issue of fact.**

Amgen contends that even if its *conduct* was anticompetitive, Regeneron "failed to show … anticompetitive *effects*." Br. 39-41. As Amgen sees it, there is no evidence of reduced output or increased prices, Amgen's contracts "allow for ample consumer choice," and reduced choice is "not necessarily an anticompetitive effect in the prescription drug market." *Id.*[49]

But the evidence shows Amgen's anticompetitive deeds had anticompetitive ends several times over. *First*, courts regularly recognize that monopolization—which the evidence here shows, *see* Part I, *supra*—*inherently* inflicts consumer harm. *See, e.g., LePage's*, 324 F.3d at 158-63 (preventing the plaintiff from effectively competing "harmed competition itself").[50]

*Second*, Dr. Scott Morton opines that Amgen's conduct *did* increase prices. Ex. 24 § 9.3.[51] While Amgen insists that "the price of Repatha® … has [not] increased," Br. 40, the question is not whether prices have increased as an absolute matter, but rather whether prices have remained higher ***than they would have been but-for the anticompetitive conduct***.[52] That is the case here.

---

[49] Amgen glancingly argues that Regeneron's "failure to show a possibility of recoupment" means that "Regeneron cannot show any risk of future anticompetitive effects on its below-cost pricing claims." Br. 41. This claim is wrong for all of the reasons discussed above. *See* pp. 35-36, *supra*.

[50] *See* 6C Areeda & Hovenkamp, Antitrust Law ¶ 651e1 (updated May 2024) ("[A]n expectation of consumer harm must always be at the logical end of any determination that a particular act 'monopolizes.'"); *e.g., Microsoft*, 253 F.3d at 65-67 (finding that excluding competitive threats other than on the merits established both anticompetitive conduct *and* harm to competition); *see also, e.g., United States v. Grinnell Corp*, 384 U.S. 563, 576 (1966) (acquisition unlawful because it "eliminated any possibility of an outbreak of competition that might have occurred"); *Dial Corp.*, 165 F. Supp. 3d at 37 (denying summary judgment where "[p]laintiffs present ample evidence that [defendants] intended to use their exclusive [] contracts to do just that—to exclude rivals").

[51] Contrary to Amgen's contention, Dr. Mathur does not opine otherwise. *See* Resp. to SUF 2 ¶ 3.

[52] *See, e.g., LePage's*, 324 F.3d at 165; *Indivior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 275, 303 (D.N.J. 2023) (The "key question [is] whether prices were higher and output lower than

*Third*, there is evidence of reduced consumer choice, which is a recognized anticompetitive effect. Namely, ██ of patients lack meaningful ability to access Praluent® as a result of Amgen's conduct. Amgen contends that patients with "a medical need" can obtain "a medical exception" to cover Praluent®. Br. 41. But such exceptions are uncertain and difficult to obtain, and available only to patients who cannot tolerate Repatha®. *See* Ex. 122 at 113:15-20. Thus, ██ of patients are denied, for example, Praluent®'s unique low-dose option, which Amgen's medical expert described as preferable. Ex. 31 at 81:12-17. As Amgen itself admits, Payor coverage is essential to "the availability and affordability of drugs to millions of patients." Br. 1. This case is therefore unlike *Eisai*, which Amgen cites, where the plaintiff "fail[ed] to identify *any* record evidence" showing that the challenged conduct "restricted consumer choice." 821 F.3d at 407.[53] Amgen is also wrong that "diminution in consumer choice is not necessarily an anticompetitive effect in the prescription drug market." Br. 40. Amgen again invokes *EpiPen*, which found it "hard to say patients were ever deprived of choice," where a "patient could seek a medical necessity exemption or otherwise pay out of pocket." 44 F.4th at 985. But settled Third Circuit law recognizes "limitation of choice" as an anticompetitive effect. *Dentsply*, 399 F.3d at 194.[54] And to the extent

---

they would have been but for [the defendant's] challenged conduct"); *In re Wholesale Grocery Prods. Antitrust Litig.*, 2012 WL 3031085, at *13 (D. Minn. July 25, 2012) ("[A] price may be supra-competitive without actually increasing if a competitive price would still be lower than the price charged."), *aff'd*, 752 F.3d 728 (8th Cir. 2014); Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371, 397, 416-17 (2017) ("The proper antitrust benchmark thus is the price and market output that would occur but for the allegedly anticompetitive conduct.").

[53] The fact that Amgen's entire purpose in offering its bundled rebate was to ████████████████████ confirms these anticompetitive effects. Ex. 11; *see Sidibe v. Sutter Health*, 2024 WL 2822733, at *8 (9th Cir. June 4, 2024) (vacating jury verdict for defendant).

[54] *See ZF Meritor*, 696 F.3d at 287 (recognizing "anticompetitive effect of limitations on customer choice"); *Eisai*, 821 F.3d at 407 (anticompetitive effects can be shown by "conduct restrict[ing] consumer choice"); *cf. In re Merck & Co.*, 127 F.T.C. 156, 158-59 (1999) (acquisition could "substantially [] lessen competition" by foreclosing products from formularies). These cases further serve to distinguish *EpiPen* as an outlier in which the Tenth Circuit refused "to either supplant or supplement" that circuit's unique anticompetitive-effects standard with "a consumer

Amgen seeks a context-specific ruling about the prescription drug market or PCSK9i market, there is ample evidence of consumer harm and limited access *in this case*, showing that Amgen's claim is not true (or at least disputed) for the PCSK9i market.[55]

*Fourth*, Dr. Scott Morton describes additional harms to competition that Amgen entirely ignores. For example, Dr. Scott Morton explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

Ex. 24 ¶ 223. Amgen's conduct also increases barriers to entry in the PCSK9i market; and indeed, one company recently discontinued development of a new PCSK9i. *Id.* ¶¶ 19, 224. This "loss in innovation … is a harm to competition and consumers from Amgen's conduct." *Id.* ¶ 223.[56]

At bottom, Amgen cannot identify any procompetitive effects from mixing and matching unrelated therapeutic categories to bully Praluent® out of the hands of the patients who need it. And Amgen's claim that its bundling has no anticompetitive effects cannot be reconciled with the decision by ***the FTC***—whose mandate extends ***only*** to protecting consumers and competition, 15 U.S.C. § 45(a)—to challenge Amgen's bundling practices in the Horizon acquisition. Ex. 24 ¶ 225.

**E.    Amgen cannot show as a matter of law that Regeneron sustained no antitrust injury ▮▮▮▮▮▮▮▮▮▮▮▮ at CVS/Zinc.**

Amgen's final argument is that Regeneron's claims involving CVS/Zinc fail because, from 2021 through 2023, Regeneron's asserted injury at CVS ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Br.

---

choice framework" of the sort that the Third Circuit has long applied. 44 F.4th at 984-85.

[55] *See Chase Mfg.*, 84 F.4th at 1175 & n.22 (distinguishing *EpiPen* on the ground that the plaintiff's product in *EpiPen* was "eventually recalled … for failing" to properly deliver medication, whereas the plaintiff in that case "offered … a higher-quality product").

[56] *See, e.g.*, *Lorin Journal Co. v. United States*, 342 U.S. 143, 154 (1951) (monopolist liable when it refused to do business with advertisers that worked with upstart competitor); *Visa*, 344 F.3d at 241 ("product innovation and output ha[d] been stunted"); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (defendant "harmed competition and undermined innovation").

41-45. According to Amgen, antitrust law does not provide a remedy for such injuries.

Amgen, again, is wrong. A competitor does not need to be excluded from the market or a particular portion of it in order to suffer an antitrust injury. The Third Circuit held as much in *SmithKline*. *SmithKline* affirmed the finding of an antitrust violation where the defendant offered bundled rebates on two monopoly drugs and a third drug, which faced competition from the plaintiff's drug. 575 F.2d at 1058-61. The injury in *SmithKline* was not exclusion from any portion of the market. Rather, the injury was that "in order to offer a rebate of the same net dollar amount" as the defendant's bundle, the plaintiff "had to offer … rebates of some 16% [to] 35%," whereas before it had to offer a rebate of only 5%. *Id.* at 1060, 1062. As courts have recognized, a business can "harm competition" in this way by "raising its rivals' costs sufficiently to prevent them from growing into effective competitors." *McWane*, 783 F.3d at 832; *see also Roxul USA, Inc. v. Armstrong World Industries, Inc.*, 2019 WL 1101385, at *2 (D. Del. March 8, 2019) (recognizing this theory of harm). Amgen's *own* expert describes raising rivals' costs as one mechanism a monopolist can use to "weaken[] [its] competitive constraints" and "enabl[e] it to harm consumers." Ex. 123 ¶ 66, & n. 124; *see also id.* ¶ 189 & nn. 300-05.

This is exactly the harm Regeneron alleges.[57] 

[58] Amgen did not raise

---

[57] ███████████████████████████████████████████████ The wrongdoer, not the victim, bears "the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

[58] *See* Ex. 24 ¶ 92; Ex. 72 at -2888. Amgen stresses that Regeneron still expects to profit on Praluent®. But raising rivals' costs can harm competition "even when" a rival's business has "grow[n] … [or] gained market share—but less than it likely would have.'" *Roxul*, 2019 WL 1101385, at *2; *accord Indivior*, 681 F. Supp. 3d at 302; *see also Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-91 (6th Cir. 2002) (antitrust injury exists even when plaintiff's "market share did grow"); Salop, *supra*, 81 ANTITRUST L.J. at 382-90, 393 & n.96 (similar).

████████████████████████ through an otherwise competitive process; instead, it did so by ████████

██████████████████████████████████ and █████████████████

████████████████████. Ex. 24 ¶ 132 & fig. 15.[59] Even courts that "are skeptical of raised

costs as a standalone theory," "don't doubt that raised costs can be a form of antitrust injury in

cases where the defendant has already violated antitrust law in some other way." *BRFHH*

*Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 n.4 (5th Cir. 2022).

    Amgen says "█████████████████████████

████████████████████████████████████████████████

████████████████████████ Br. 44. Not so. Regeneron executives testified ████████

████████████████████████████████████████████████

████████████████████████████████████████

Ex. 71 at 237:16-21.[60] In direct response, Regeneron █████████████████████

████████████████. Ex. 103 at -6282. In May 2022, ████████████

████████████████████████████████████████████████

*Id* at -6283. CVS stated that ████████████████████████████████

████████████████████ *Id.* And now ████████████████████ █████

---

[59] This case is thus light-years from Amgen's chief authority, the out-of-circuit district court decision in *Viacom International Inc. v. Tele-Communications, Inc.*—where the plaintiff sought to hold the "defendant … liable, simply for raising its rival's costs." 1994 WL 561377, at *5 (S.D.N.Y. Oct. 12, 1994). There, the plaintiff's injury resulted from "a *competitive* bidding process" and the court specifically distinguished that case from one (like this one) involving "below-cost pricing" *Id.* at *4-5 & n.4 (emphasis in original). The injury there also resulted from a court ordered auction that was "open[] … to all prospective bidders," which meant that the "plaintiff would have suffered the identical type of loss … had some other company participated in the bidding process and raised the price" the plaintiff ultimately paid. *Id.* at *5.

[60] Internal Regeneron notes further reflect that █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Ex. 103; *see also* Ex. 100.

*See* p. 13, *supra*. This evidence more than suffices to "create a genuine issue of fact regarding whether there was ████████████████████████████████████████████████

████████████████████████████████████ Br. 44.[61] As with everything else in Amgen's motion for summary judgment, it should be up to a jury to decide which side is correct.

## III.    AMGEN WAIVES CHALLENGES TO REGENERON'S STATE-LAW CLAIMS.

Regeneron pleads five state law causes of action. D.I. 124 ¶¶ 223-80. Amgen addresses these claims only in a footnote and only to contend that these claims "are derivative of the federal antitrust claims." Br. 16 n.6. Amgen's cursory treatment cannot defeat these independent claims.

*First*, Amgen's "[a]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).[62] Especially given Amgen's insistence on a 45-page brief and its unsanctioned decision to submit three separate statements of fact, there is no excuse for relegating its arguments on nearly half of Regeneron's claims to a short footnote—even less space than Amgen thought these same claims merited *at the motion to dismiss stage*, *see* D.I. 18 at 25.

*Second*, and in any event, Amgen's arguments fail, as Regeneron's state-law claims are not purely derivative of its federal claims. Tortious interference has an entirely different set of elements and does not require proof of substantial foreclosure, below-cost pricing, monopoly power, or anticompetitive effects, which are the only issues Amgen moves on. *See Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001). It is thus for good reason that courts allow tortious

---

[61] *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 485 (7th Cir. 2020) ("[C]ourts have inferred causation when a defendant's conduct 'reasonably appear[s] capable of making a significant contribution to … maintaining monopoly power.'" (quoting *Microsoft*, 253 F.3d at 78-79)).

[62] *See also, e.g.*, *In re: Asbestos Prod. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) (rejecting a party's "attempt to shoehorn in an argument outside the briefs" by raising it "through a footnote"); *Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 101 F.3d 939, 945 (3d Cir. 1996) ("conclusory assertions are not enough").

interference claims to proceed even where antitrust claims have failed.[63] Similarly, unlike Regeneron's federal claims, Regeneron's California Unfair Practices Act ("UPA") claim for below-cost pricing "does not require an anticompetitive impact" and allows any method of calculating costs that is not "arbitrary or irrational." *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *16, *19 (N.D. Cal. Oct. 18, 2013) (allowing a UPA claim to proceed after dismissing federal claims). The UPA, moreover, reaches "below-cost pricing for even a limited number of customers, or a market segment." *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 7 Cal. Rptr. 3d 628, 641-42 (Cal. Ct. App. 2003) (denying summary judgment).[64] Regeneron's Cartwright Act and Donnelly Act claims likewise impose different and lesser standards than the federal claims.[65] And Regeneron can prevail on its Unfair Competition Law claim without showing an antitrust or other violation.[66] Amgen's admitted, unfair conduct to secure exclusivity at ESI Commercial alone, to say nothing of all of the other evidence of Amgen's misconduct, creates a triable dispute on these claims. Amgen nowhere argues otherwise.[67]

## CONCLUSION

For the foregoing reasons, Amgen's Motion for Summary Judgment should be denied.

---

[63] *E.g. Int'l Constr. Prods., LLC v. Caterpillar Inc.*, 2024 WL 1619836, at *18 (D. Del. Apr. 15, 2024) (denying summary judgment on tortious interference claim, resulting in $100 million jury verdict in plaintiff's favor), *trial verdict*, No. 15-108-RGA, D.I. 756 (D. Del. Apr. 19, 2024).

[64] Amgen asserted a conditional counterclaim that Regeneron priced Praluent® below cost at CVS. *See* D.I. 148 ¶¶ 29-34. While not at issue here, Amgen has adduced no support for this claim.

[65] *See Fisherman's Wharf*, 7 Cal. Rptr. 3d at 650-51 (allowing a claim of 20% foreclosure to proceed to trial and recognizing that Cartwright Act eschews "rigid mathematical formula[s]"); *Assocs. Cap. Servs. Corp. v. Fairway Priv. Cars, Inc.*, 590 F. Supp. 10, 13 (E.D.N.Y. 1982) (noting that "the Donnelly Act may well forbid conduct that would not violate the Sherman Act").

[66] *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-02 (9th Cir. 2023).

[67] "[W]here, as here," Regeneron's state-law claims must "go[] forward [and are] based on the same evidence as is being relied upon for" the federal claims, "the better course is not to dismiss" any of Regeneron's claims, "as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion … was improperly granted." *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 241-42 (E.D.N.Y. 2015).

Respectfully submitted,

WILKS LAW, LLC

*/s/ Scott B. Czerwonka*

David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Elizabeth Stotland Weiswasser
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated:  June 21, 2024