**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Regeneron Pharmaceuticals, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Amgen Inc.,<br><br>Defendant. | C. A. No.: 1:22-cv-00697-JLH<br><br>**JURY TRIAL DEMANDED**<br><br>**REDACTED PUBLIC VERSION**<br>**FILED: July 30, 2024** |

**EXHIBITS 1-50 OF DECLARATION OF ERIC S. HOCHSTADT IN SUPPORT OF REGENERON PHARMACEUTICALS, INC.'S OPPOSITION TO AMGEN INC.'S MOTION FOR SUMMARY JUDGMENT**

WILKS LAW, LLC
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Elizabeth Stotland Weiswasser
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated: June 21, 2024

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
C.A. No. 22-00697-JLH
---------------------------------------x
REGENERON PHARMACEUTICALS, INC.,
Plaintiff,
- against -
AMGEN INC.,
Defendant.
---------------------------------------x
February 22, 2024
8:49 a.m.

VIDEOTAPED DEPOSITION of DR. LEN SCHLEIFER, taken by Defendant Amgen, pursuant to Federal Rule of Civil Procedure 30(b)(1) and the Local Rules for the United States District Court for the District of Delaware, held at the Westchester Marriott, located at 670 White Plains Road, Tarrytown, New York 10591, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

middle of the first page, you see you were included in this chain. 1:26:44PM 1:26:45PM

And you say, [redacted] 1:26:47PM 1:26:48PM 1:26:50PM 1:26:53PM

Do you see that? 1:26:54PM

A Yes. 1:26:55PM

Q And that was on December 11th, 2019? 1:26:55PM 1:26:56PM

A Yes. 1:26:58PM

Q [redacted] 1:26:58PM 1:27:00PM 1:27:04PM

A [redacted] 1:27:07PM 1:27:08PM 1:27:10PM 1:27:13PM 1:27:14PM

[redacted] 1:27:16PM 1:27:18PM 1:27:20PM 1:27:22PM 1:27:25PM 1:27:26PM

[redacted] 1:27:28PM
[redacted]. 1:27:30PM
Q I don't even dispute that, 1:27:32PM
sir. I'm just asking what your 1:27:33PM
recollection is. 1:27:35PM
[redacted] 1:27:35PM
A [redacted] 1:27:43PM
Q [redacted] 1:27:44PM
A [redacted] [redacted] 1:27:51PM
[redacted] [redacted] 1:27:58PM
[redacted] 1:28:02PM
(The above-referred-to 1:28:05PM
document was marked as Schleifer 1:28:05PM
Exhibit 14 for identification, as of 1:28:05PM
this date.) 1:28:05PM
Q Dr. Schleifer, the court 1:28:35PM
reporter has handed you what's been 1:28:53PM
marked as Exhibit 14. It is a four-page 1:28:54PM

e-mail chain which begins with REGN0285792. Please take a moment to review it. 1:28:58PM 1:29:02PM 1:29:08PM

A Once again, it's a very long one with a lot of stuff on it. So I'll look at it. It'll take me a long time to go through this entire set of documents, charts. There's hundreds of numbers. But I'll do the best I can if you want me to go through it in great detail. 1:29:09PM 1:29:10PM 1:29:13PM 1:29:17PM 1:29:19PM 1:29:21PM 1:29:24PM

Q [redacted] 1:29:26PM 1:29:27PM 1:29:30PM 1:29:33PM 1:29:35PM 1:29:39PM 1:29:44PM 1:29:47PM 1:29:49PM

A All right. Let me read the e-mails themselves. They're pretty long. Give me a moment. I'll go as quickly as I can. 1:29:51PM 1:29:52PM 1:29:55PM 1:29:58PM

Q Of course. 1:29:58PM

And, Dr. Schleifer -- 1:30:47PM

A Okay. 2:54:27PM
Q You wrote to 2:54:28PM
[redacted] 2:54:30PM
[redacted] 2:54:32PM
[redacted] 2:54:34PM
A [redacted] 2:54:37PM
Q [redacted] 2:54:38PM
[redacted] 2:54:41PM
[redacted] 2:54:43PM
[redacted] 2:54:45PM
[redacted] 2:54:48PM
[redacted] 2:54:51PM
As of October 21, 2021, did 2:54:52PM
you have any knowledge of any bundle 2:54:56PM
being offered by Amgen to Optum? 2:54:59PM
[redacted]
Q And elsewhere was ESI, sir? 2:55:18PM
A Yes. 2:55:20PM
Q And when did you first 2:55:21PM
become aware or when did you first come 2:55:22PM

to believe that Amgen had offered a 2:55:25PM
bundle to ESI? 2:55:27PM
A Sometime around June of 2:55:31PM
2020. 2:55:33PM
Q And how did you learn that? 2:55:35PM
A [redacted] 2:55:38PM
2:55:40PM
2:55:42PM
2:55:44PM
2:55:47PM
2:55:49PM
2:55:51PM
2:55:53PM
2:55:55PM
2:55:59PM
2:56:02PM
2:56:04PM
2:56:08PM
2:56:11PM
2:56:15PM
2:56:15PM
2:56:19PM
2:56:21PM
2:56:28PM
2:56:30PM

[redacted] 2:56:32PM
[redacted] 2:56:36PM
[redacted]

[redacted]

Q And how did you consider an 2:58:01PM
offer of a bundle to put dollars ahead of 2:58:03PM
patients' wellbeing? 2:58:05PM

[redacted]

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
---------------------------------------X
REGENERON PHARMACEUTICALS, INC.,
PLAINTIFF,
-against- Case No.:
1:22-cv-00697-JLH
AMGEN INC.,
DEFENDANT.
---------------------------------------X

VIDEOTAPED REALTIME DEPOSITION of the Plaintiff, REGENERON PHARMACEUTICALS, INC., by a Witness, RICHARD O'NEAL, taken by the Defendants, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held at the offices of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, before Karyn Chiusano, a Notary Public of the State of New York, commencing at 9:19 a.m., Thursday, January 18, 2024.

JOB No. 6408085
PAGES 1 - 430

RICHARD O'NEAL

Do you remember connecting with Len and Marion on this topic?

A. Yeah, I didn't -- yes. Whether it was a call or an e-mail, I am not sure.

Q. [redacted]

[redacted]

[redacted]

RICHARD O'NEAL

[redacted]

[redacted]

RICHARD O'NEAL

[redacted]

Q. That was in 2022?

A. That was in 2022.

Q. Okay. [redacted]

RICHARD O'NEAL

[redacted]

MR. POLKES: I'm sorry, are you -- that's not what this says. So if you're gonna -- I -- I ask that you read this accurately.

MR. STOCK: Do you want me to read that word-for-word?

[redacted]

RICHARD O'NEAL

[redacted]

Do you see that?

A. That's what she says, yes.

Q. And what does that mean? What did you interpret that to mean?

[redacted]

Q. Right.

[redacted]

Q. Okay.

A. -- is how I interpret this.

[redacted]

RICHARD O'NEAL

[redacted]

[redacted]

RICHARD O'NEAL

Q. You don't remember this happening?

A. I don't. I mean, other than her sending this to me, I don't know whether she spoke to Gary. I don't know if it was over text or how they communicated this.

[redacted]

RICHARD O'NEAL

[redacted]

[redacted]

[redacted]

RICHARD O'NEAL

[redacted]

RICHARD O'NEAL

[redacted]

[redacted]

[redacted]

MR. STOCK: Objection to form.

RICHARD O'NEAL

[redacted]

RICHARD O'NEAL

[redacted]

RICHARD O'NEAL

[redacted]

[redacted]

RICHARD O'NEAL

[redacted]

# EXHIBIT 3

**Date:** Wednesday, June 17 2020 06:38 PM
**Subject:** RE: [redacted]
**From:** Ed Kirk [redacted]>
**To:** Richard O'Neal [redacted] >;
**CC:** Steven Hyde [redacted] >;

---

[redacted]

**From:** Richard O'Neal <[redacted] >
**Sent:** Wednesday, June 17, 2020 2:37 PM
**To:** Ed Kirk [redacted] >
**Cc:** Steven Hyde [redacted] >
**Subject:** RE: [redacted]

They don't

**Richard E. O'Neal, RPh, MBA** | Vice President, Market Access
REGENERON | 1 Rockwood Road, Sleepy Hollow, NY 10591 | [redacted]

**From:** Ed Kirk
**Sent:** Wednesday, June 17, 2020 2:37 PM
**To:** Richard O'Neal [redacted]
**Cc:** Steven Hyde [redacted]
**Subject:** RE: Ascnet Praluent

[redacted]

**From:** Richard O'Neal [redacted]
**Sent:** Wednesday, June 17, 2020 2:35 PM
**To:** Ed Kirk [redacted]>
**Cc:** Steven Hyde [redacted] >
**Subject:** RE [redacted]

[redacted]

[redacted]

**Richard E. O'Neal, RPh, MBA** | Vice President, Market Access
REGENERON | 1 Rockwood Road, Sleepy Hollow, NY 10591 | [redacted]

**From:** Ed Kirk
**Sent:** Wednesday, June 17, 2020 2:33 PM
**To:** Richard O'Neal [redacted] >
**Cc:** Steven Hyde [redacted]>
**Subject:** RE: Ascnet Praluent

[redacted]

[redacted]

**From:** Richard O'Neal [redacted] >
**Sent:** Wednesday, June 17, 2020 2:01 PM
**To:** Ed Kirk [redacted]>
**Cc:** Steven Hyde [redacted]
**Subject:** RE [redacted]

[redacted]

**Richard E. O'Neal, RPh, MBA** | Vice President, Market Access
REGENERON | 1 Rockwood Road, Sleepy Hollow, NY 10591 | [redacted]

**From:** Ed Kirk
**Sent:** Wednesday, June 17, 2020 1:57 PM
**To:** Richard O'Neal [redacted]
**Cc:** Steven Hyde [redacted]
**Subject:** [redacted]

[redacted]

# EXHIBIT 4

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 3 |
| Total Messages: 1 | Date Range: 6/17/2020 |

### Outline of Conversations

**b5a3ac36-bce4-4a60-93be-5e737eb2bbfe** • 1 message on 6/17/2020 • Billy West <6159874776> • Medders <2059103484> • Tom Moore <8057449473>

**Messages in chronological order** (times are shown in GMT +00:00)

**b5a3ac36-bce4-4a60-93be-5e737eb2bbfe**

M **Medders <2059103484>** 6/17/2020, 5:07 PM

Talking to Jason now. He saic[redacted]

# EXHIBIT 5

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 3 |
| Total Messages: 1 | Date Range: 6/17/2020 |

### Outline of Conversations

**f3c36244-11d6-42dd-8fe9-45e7fdf8a41d** • 1 message on 6/17/2020 • Billy West <6159874776> • Medders <2059103484> • Tom Moore <8057449473>

**Messages in chronological order** (times are shown in GMT +00:00)

**f3c36244-11d6-42dd-8fe9-45e7fdf8a41d**

M **Medders <2059103484>** 6/17/2020, 5:08 PM

It's getting shady. They knew everything. Ascent was surprised.

# EXHIBIT 6

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 7

Phone Owner <(000) 000-0000>; Michael Rothrock <[redacted]>

Phone Owner <(000) 000-0000>

2020-02-24T13:45:30.0000000Z

Do you have a few minutes this am to talk? I am free until 9est and then again 10:30 est.

Phone Owner <(000) 000-0000>

2020-02-24T16:24:16.0000000Z

Question: for Repatha - is the [redacted]% request for EGWP only? Not Prime, right?

Michael Rothrock <[redacted]>

2020-02-24T16:25:20.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T16:41:30.0000000Z

Our [redacted] We plan to do so if we get approved.

Phone Owner <(000) 000-0000>

2020-02-24T16:43:10.0000000Z

That work for you?

Michael Rothrock <[redacted]>

2020-02-24T17:26:32.0000000Z

[redacted] [redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:26:39.0000000Z

Can you call me?

Michael Rothrock <[redacted]>

2020-02-24T17:26:47.0000000Z

Nope

Michael Rothrock <[redacted]>

2020-02-24T17:26:56.0000000Z

On a call

Phone Owner <(000) 000-0000>

2020-02-24T17:27:48.0000000Z

OK. Buzz me when you can. I will [redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:28:09.0000000Z

[redacted]

Michael Rothrock <[redacted]4>

2020-02-24T17:28:11.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:28:40.0000000Z

Yes. Our offer was [redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:29:02.0000000Z

Tony said [redacted]

Michael Rothrock <[redacted]>

2020-02-24T17:29:22.0000000Z

[redacted]

Michael Rothrock <[redacted]>

2020-02-24T17:29:28.0000000Z

Canâ€™t guarantee anything there

Phone Owner <(000) 000-0000>

2020-02-24T17:30:37.0000000Z

We need them to stay the course. I canâ€™t [redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:30:50.0000000Z

Letâ€™s discuss. This throws the whole thing off for us

Michael Rothrock <[redacted]>

2020-02-24T17:31:11.0000000Z

[redacted]

Michael Rothrock <[redacted]>

2020-02-24T17:31:34.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:32:15.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:32:26.0000000Z

Call when you can. Talk to you then.

Phone Owner <(000) 000-0000>

2020-02-24T17:32:40.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:33:28.0000000Z

We at least need [redacted]

Michael Rothrock [redacted]>

2020-02-24T17:34:08.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:35:24.0000000Z

[redacted]

Michael Rothrock <[redacted]>

2020-02-24T17:36:42.0000000Z

[redacted]

Phone Owner <(000) 000-0000>

2020-02-24T17:36:59.0000000Z

I get it. But [redacted]

Michael Rothrock <[redacted]>

2020-02-24T17:37:17.0000000Z

[redacted]

Michael Rothrock <[redacted]>

2020-02-24T17:37:21.0000000Z

Thatâ€™s my point

# EXHIBIT 8

**Date:** Thursday, June 18 2020 03:04 PM
**Subject:** RE: Express Scripts / Ascent Update
**From:** John Ryan [redacted]
**To:** Rishi Jaggernauth <[redacted]>;

**John Ryan, M.D.**
Senior Director, Cardiometabolic CBU
Regeneron Pharmaceuticals
[redacted]

**From:** Richard O'Neal
**Sent:** Thursday, June 18, 2020 7:54 AM
**To:** John Ryan [redacted]
**Subject:** FW: Express Scripts / Ascent Update

Please see below and call when you have a moment. Thanks!

**Richard E. O'Neal, RPh, MBA** | Vice President, Market Access
REGENERON | 1 Rockwood Road, Sleepy Hollow, NY 10591 | [redacted]

**From:** Richard O'Neal
**Sent:** Wednesday, June 17, 2020 9:20 PM
**To:** Leonard Schleifer [redacted]
**Cc:** Marion McCourt <[redacted]>; Joseph LaRosa [redacted]>; Justin Hallberg <[redacted]
**Subject:** Re: Express Scripts / Ascent Update

[redacted]

[redacted].

Richard E. O'Neal
[redacted]

On Jun 17, 2020, at 7:19 PM, Leonard Schleifer [redacted] wrote:

[redacted]

On Jun 17, 2020, at 7:44 PM, Richard O'Neal <[redacted] wrote:

[redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]

[redacted]

[redacted]

**Next Steps**

- [redacted]
- [redacted]

**Richard E. O'Neal, RPh, MBA** | Vice President, Market Access
REGENERON | 1 Rockwood Road, Sleepy Hollow, NY 10591 | [redacted]

# EXHIBIT 9

Message

**From:** Chiu, Andy [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DA6720D7A1754B118A5462CA452AB06B-[redacted]
**Sent:** 8/25/2020 10:25:43 PM
**To:** Darden, John [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e6e1c15918e84d84a3cc44ef68d67a6a-[redacted]
**CC:** DeVitt, Ryan [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=58f705d133fc4df9ae6780f3e182738b-[redacted]
**Subject:** RE: Approval Requested: Humana Part D Enbrel and Otezla (v3)

I approve. Thanks.

**Andy Chiu, MBA**
**Executive Director**
**Gen Med – Coverage & Pricing**
**US Value & Access**
Amgen - Thousand Oaks, CA.
[redacted]

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email.

---

**From:** Darden, John
**Sent:** Tuesday, August 25, 2020 3:25 PM
**To:** Chiu, Andy [redacted]
**Cc:** DeVitt, Ryan [redacted]
**Subject:** Approval Requested: Humana Part D Enbrel and Otezla (v3)

Hi Andy – seeking your approval for the following at Humana Part D:

**REQUEST FOR APPROVAL**

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

Humana Part D ***Otezla*** terms as follows:

- [redacted]
- [redacted]
- [redacted]
- [redacted]

Thanks,
John

# EXHIBIT 10

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 2 |
| Total Messages: 1 | Date Range: 8/25/2020 |

### Outline of Conversations

**95efd297-eb31-4203-a5ce-b5750dd97b1e** • 1 message on 8/25/2020 • Medders <[redacted] • Tony Esterly <[redacted]

**Messages in chronological order** (times are shown in GMT +00:00)

**95efd297-eb31-4203-a5ce-b5750dd97b1e**

M **Medders <[redacted]>** 8/25/2020, 9:32 PM

We are on track to deliver verbal offers to you for Repatha as well as 2021/22 enhancements for your consideration with Otezla/Enbrel. Are you working Friday? We may not have approvals until the afternoon your time...

# EXHIBIT 11

[redacted]

# EXHIBIT 12

[redacted]

# EXHIBIT 13

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 14

Message

**From:** Moore, Tom - US ACCESS [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B632C1DE8C6D478A90138F3E4496AAB7-[redacted]
**Sent:** 7/6/2021 2:21:44 PM
**To:** Wainwright, Mary Jo [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=29edec1e9fb34d26866a960ca2537fc5-[redacted] Sander, Shane [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=65d62ba3e37346f283142451847eec20[redacted]]; Chiu, Andy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=da6720d7a1754b118a5462ca452ab06b-[redacted] Menon, David [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e67b1aa26c234726abadbfb63a12017a-[redacted] Alamshaw, Anita [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=604f7d4849a146e8973f0f079a1a0f45-[redacted]
**CC:** Mandaliya, Anand [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=bb0c958f34bf4d648e19a27426f72fbc-[redacted]
**Subject:** Fwd: Approval Request for Enbrel/Otezla/Repatha at CVS

Get Outlook for iOS

---

**From:** Norton, Jennifer [redacted]>
**Sent:** Tuesday, July 6, 2021 7:20 AM
**To:** Moore, Tom - US ACCESS
**Subject:** Fwd: Approval Request for Enbrel/Otezla/Repatha at CVS

Get Outlook for iOS

---

**From:** Gordon, Murdo [redacted]
**Sent:** Friday, July 2, 2021 9:24:00 PM
**To:** Zimmer, David [redacted]; Thompson, Ian [redacted]; Norton, Jennifer [redacted]; Niksefat, Kave [redacted]
**Subject:** Re: Approval Request for Enbrel/Otezla/Repatha at CVS

I approve

---

**From:** Zimmer, David [redacted]
**Sent:** Friday, July 2, 2021 5:14:53 PM
**To:** Gordon, Murdo [redacted]Thompson, Ian [redacted] Norton, Jennifer [redacted]; Niksefat, Kave [redacted]
**Subject:** Approval Request for Enbrel/Otezla/Repatha at CVS

Murdo/Ian,

As part of our [redacted] with payers, we been engaged with CVS over recent months to explore opportunities to regain Repatha coverage in 2022 while also preserving Enbrel and Otezla coverage. CVS has

signaled [redacted] but need a response by July 9th as they finalize 2022 formulary placements. We believe the best strategic approach is [redacted] Our recommendation is [redacted] To that end, **for Zinc/CVS Commercial we are requesting approval to offer** [redacted] as highlighted in our recommended structure below (note that rates [redacted]

With this offer, we hope to achieve the following strategic objectives:

- [redacted]
- [redacted]
- [redacted]

**Note that CVS asks** [redacted]

*Rates are inclusive of all discounts, fees, and price protection*

| | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

*[redacted]

Do you approve of this approach and the outlined rates?

Please don't hesitate to call if you have any questions.

Best,
Dave

# EXHIBIT 15

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 16

# Attorneys' Eyes Only

Message

**From:** Moore, Tom - US ACCESS [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B632C1DE8C6D478A90138F3E4496AAB7[redacted]
**Sent:** 4/21/2021 3:42:48 PM
**To:** Norton, Jennifer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7fadeffa44054fe99c1b02de6f4a8d87[redacted]
**CC:** Alamshaw, Anita [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=604f7d4849a146e8973f0f079a1a0f45[redacted]]
**Subject:** TPs for Gary

- Overall assessment *seems* to be our teams are working well together *and* (1) we've resolved outstanding issues around the [redacted]; (2) working on requested options to support CVS Health growth [redacted] and (3) partnering on new launches [redacted].
  - **Probe on whether that is Gary's read, and if not what can he share?**
- Honest discussion about the future of our **relationship in cardiology** and **fact we need to be working on bigger issues.**
  - Amgen continues to substantially invest in RWE/R&D in this area, and we would very much like to see **CVS/Zinc** return Repatha to a covered product on 1/1/22. **Confirm receipt of Zinc bid to Gary & express appreciation. State our preference would be to [redacted], and that our overall portfolio and enterprise relationship should matter in CVS thinking.**
  - On **Medicare 2022** we offered [redacted] while [redacted]
  - **Reinforce positive spirit of how Joe Anderson is approaching our overall negotiation (Enbrel, Otezla, Repatha) and that we have been happy to provide his team our bids on the requested timelines.** Do not reveal we know [redacted]
- What issues does Gary see are limiting his options and/or impacting his decision-making? What can Amgen do to improve our overall B2B relationship? **Request live dinner meeting ASAP.**

**Tom Moore**
Vice President, US Value & Access
Amgen, Inc.
mooret@amgen.com
[redacted]

# EXHIBIT 17

Message

**From:** Cassidy, Pamela [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=98273461074D44C3B425B362DCA9C502[redacted]
**Sent:** 11/19/2021 5:52:36 PM
**To:** Torre, Kevin [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6d705106f81348c58c4e89874e1fc986-[redacted]
**CC:** Sciulli Greco, Melissa [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=8a57cb4e49fb4acc86e3c5fd741d57a4-[redacted] Faskhutdinova, Elina [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=[redacted] Alamshaw, Anita [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=604f7d4849a146e8973f0f079a1a0f45-[redacted]
**Subject:** RE: Repatha Performance Summary for Week Ending 11-19-2021

Oh...100%

**Pam Cassidy**
*National Account Director | Market Access*
[redacted]

---

**From:** Torre, Kevin <ktorre@amgen.com>
**Sent:** Friday, November 19, 2021 9:52 AM
**To:** Cassidy, Pamela <[redacted]@amgen.com>
**Cc:** Sciulli Greco, Melissa <[redacted]@amgen.com>; Faskhutdinova, Elina <[redacted]@amgen.com>; Alamshaw, Anita <[redacted]@amgen.com>
**Subject:** RE: Repatha Performance Summary for Week Ending 11-19-2021

It must clearly be as a result of the Repatha Pull Through Project ☺.

**Kevin M. Torre**
National Account Director
Amgen Market Access
Mobile: [redacted]

---

**From:** Cassidy, Pamela <[redacted]@amgen.com>
**Sent:** Friday, November 19, 2021 9:27 AM
**To:** Torre, Kevin <[redacted]@amgen.com>
**Cc:** Sciulli Greco, Melissa <[redacted]@amgen.com>; Faskhutdinova, Elina <[redacted]@amgen.com>; Alamshaw, Anita <[redacted]@amgen.com>
**Subject:** RE: Repatha Performance Summary for Week Ending 11-19-2021

I'm so happy that Repatha continues to crush Praluent across TRx, NRx and NBRx!

**Pam Cassidy**
*National Account Director | Market Access*
[redacted]

**From:** Torre, Kevin <ktorre@amgen.com>
**Sent:** Friday, November 19, 2021 8:53 AM
**To:** Team CVS <TeamCVS@amgen.com>
**Subject:** FW: Repatha Performance Summary for Week Ending 11-19-2021

Happy Friday! This trend is amazing...

**Kevin M. Torre**
National Account Director
Amgen Market Access
Mobile: (805)559-0180

**From:** Repatha Secondary Analytics Team <Repatha-Secondary-Analytics-Team@amgen.com>
**Sent:** Friday, November 19, 2021 8:51 AM
**To:** Mendoza, Rich <[redacted]@amgen.com>; Bayer, Tim <[redacted]@amgen.com>; Manz, Karen <[redacted]@amgen.com>; Ray, Reggie <[redacted]@amgen.com>; Revelle, George <[redacted]@amgen.com>; Licata, Leann <[redacted]@amgen.com>; Paul, Estrella <[redacted]@amgen.com>; Souza, Elaine <[redacted]@amgen.com>; Tuller, Michael <[redacted]@amgen.com>; Walker, Julia <[redacted]@amgen.com>; Oliver, Kimber <[redacted]@amgen.com>; Kammann, Tamara <[redacted]@amgen.com>; Bagmar, Priyanka - Inactive <[redacted]@amgen.com>; Luther, Thomas <[redacted]@amgen.com>; Torre, Kevin <[redacted]@amgen.com>; Bohl, Erika <[redacted]@amgen.com>; Gheorghiu, Clare <[redacted]@amgen.com>; Combe, Joshua <[redacted]@amgen.com>; Davis, Andy <[redacted]@amgen.com>; Birwadker, Shadaab <[redacted]@amgen.com>; Habib, Mohdhar <[redacted].com>; Ream, Teja <[redacted]@amgen.com>; Obeid, Nada <[redacted]@amgen.com>; Knight, Rachel <[redacted]@amgen.com>; Dey, Jessica <[redacted]@amgen.com>; Kadri, Raheel <[redacted]@amgen.com>; Kohli, Shipra - Inactive <[redacted]@amgen.com>; Nadiminti, Pavan Kumar <[redacted]@amgen.com>; Patten, Dawn <[redacted]@amgen.com>; Levy, Charlene <[redacted]@amgen.com>; Tu, Vivian <[redacted]@amgen.com>; Alvarez, Juan <[redacted]@amgen.com>; Varma, Shashank <[redacted]@amgen.com>; Burzinski, Tamara <[redacted]@amgen.com>; Gill, Anne <[redacted]@amgen.com>; Strapazon, Michael <[redacted]@amgen.com>; Swaminathan, Suriya Prabha <[redacted]@amgen.com>; Alamshaw, Anita <[redacted]@amgen.com>; Watkins, Tamara <[redacted]@amgen.com>; Murugaraj, Manju <[redacted]@amgen.com>; Broekema, Edgar <[redacted]@amgen.com>; Wylie, Vanessa <[redacted]@amgen.com>; Thangavelu, Kalaivani <[redacted]@amgen.com>; McKnight, Joe <[redacted]@amgen.com>; Parker, Clint <[redacted]@amgen.com>; Malihi, Paymaneh <[redacted]@amgen.com>; Exter, Jason <[redacted]@amgen.com>; Shapiro, David - Inactive <[redacted]@amgen.com>; Frank, Diana <[redacted]@amgen.com>; Okirie, Debbie <[redacted]@amgen.com>; Bogilla, Agasthya <[redacted]@amgen.com>; Strapazon, Michael <[redacted]@amgen.com>; Suarez, Julia <[redacted]@amgen.com>; Papadakis, Kostas <[redacted]@amgen.com>; Paparouni, Konstantina <[redacted]@amgen.com>; Soler, Bianca <[redacted]@amgen.com>; Santos, Eduardo <[redacted]@amgen.com>; Johnson, Rita <[redacted]@amgen.com>; Saroha, Puneet <[redacted]@amgen.com>; Sharma, Sujit <[redacted]@amgen.com>; Davis, Justin <[redacted]@amgen.com>; Jain, Rahul <[redacted]@amgen.com>
**Subject:** Repatha Performance Summary for Week Ending 11-19-2021

Good Morning All,

Repatha Performance update for 11/19/2021 below.

Thanks,
Kalai

**From:** Repatha Secondary Analytics Team <[redacted]@amgen.com>
**Sent:** Friday, November 19, 2021 8:46 AM
**To:** Fox, Chris <[redacted]@amgen.com>; Liu, Ellie <[redacted]@amgen.com>; Geyer, Shelby <[redacted]@amgen.com>; Shutter, John - Inactive <[redacted]@amgen.com>; Sood, Arvind <[redacted]@amgen.com>; Corbett, Paige <[redacted]@amgen.com>; Sunseri, Reid <[redacted]@amgen.com>; Bhandari, Manish <[redacted]@amgen.com>; Brant Rocha, Andre <[redacted]@amgen.com>; Davis, Justin <[redacted]@amgen.com>; Benson, Phillip <[redacted]@amgen.com>

**Cc:** Coll Crespo, Blai <[redacted]@amgen.com>; Srinivasan, Sobanbabu <[redacted]@amgen.com>; Ng, Jason <[redacted]@amgen.com>; Thangavelu, Kalaivani <[redacted]@amgen.com>; Gill, Rajesh <[redacted]@amgen.com>; Patel, Risha <rp[redacted]@amgen.com>; Jain, Rahul <[redacted]@amgen.com>; Agrawal, Paritosh <[redacted]@amgen.com>
**Subject:** Repatha Performance Summary for Week Ending 11-19-2021

Good Morning All,

Please see below for the latest performance data released on 11/19/2021.

| Product Share | Week Ending Friday | 10/22/21 | 10/29/21 | 11/5/21 | 11/12/21 |
|---|---|---|---|---|---|
| Repatha TRx Share | Share of PCSK9i TRx | [redacted] | [redacted] | [redacted] | [redacted] |
| Repatha NRx Share | Share of PCSK9i NRx | [redacted] | [redacted] | [redacted] | [redacted] |
| Repatha NBRx Share | Share of PCSK9i NBRx | [redacted] | [redacted] | [redacted] | |
| **Product Volume** | **Week Ending Friday** | **10/22/21** | **10/29/21** | **11/5/21** | **11/12/21** |
| Repatha Total Prescriptions (TRx) | **TRx** | [redacted] | [redacted] | 33,402 | [redacted] |
| | *% Change WoW* | [redacted] | [redacted] | [redacted] | [redacted] |
| Repatha New Prescriptions (NRx)* | **NRx** | [redacted] | [redacted] | [redacted] | [redacted] |
| | *% Change WoW* | [redacted] | [redacted] | [redacted] | [redacted] |
| Repatha New to Brand (NBRx)* | **NBRx** | [redacted] | [redacted] | [redacted] | |
| | *% Change WoW* | [redacted] | [redacted] | -[redacted] | |

[redacted]

*Latest 4 weeks in the above table (Launch to Date available in the attached Excel with Nov'21 Fcst.) ;

***Data Caveats:**

[redacted].

**Link to Repatha Performance Dashboard:** LINK
Updated with Sep'21. Fcst, actuals refreshed the last week of every month (Latest refresh on WE 10292021)

**Performance Charts**
(showing latest available data; holiday weeks marked with blue star)

Prescription Volume

[redacted]

[redacted]

[redacted]

[redacted]

Internal Use Only - Footer Left

# EXHIBIT 18

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 4 |
| Total Messages: 1 | Date Range: 6/16/2020 |

## Outline of Conversations

**5e2afd10-6ad1-4ce0-bc29-854095b45ca8** • 1 message on 6/16/2020 • Kave Niksefat <[redacted] • Kave Niksefat [redacted] • Kave Niksefat <[redacted] • Tom Moore <[redacted]

**Messages in chronological order** (times are shown in GMT +00:00)

**5e2afd10-6ad1-4ce0-bc29-854095b45ca8**

TM Tom Moore <[redacted] 6/16/2020, 8:06 PM

Here's the scoop - this goes up to the CEO on Friday.  Looking to make it a no-regret pitch [redacted]

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC.; AMGEN MANUFACTURING, LIMITED; and AMGEN USA INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SANOFI; SANOFI-AVENTIS U.S. LLC; AVENTISUB LLC, f/d/b/a AVENTIS PHARMACEUTICALS INC., and REGENERON PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No.: 14-1317-RGA (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>[redacted] |

**AMGEN'S OPENING BRIEF IN SUPPORT OF**
**MOTION FOR PERMANENT INJUNCTION**


YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Michelle M. Ovanesian (No. 6511)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
movanesian@ycst.com

MCDERMOTT WILL & EMERY LLP
William G. Gaede, III
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

Sarah Chapin Columbia
K. Nicole Clouse
28 State Street
Boston, MA 02109-1775
(617) 535-4074

Rebecca Harker Duttry
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8000

LONDON & MEAD
Christopher B. Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334


Dated: March 18, 2019

[redacted]

CRAVATH, SWAINE & MOORE LLP
Keith R. Hummel
David N. Greenwald
Lauren A. Moskowitz
Geoffrey G. Hu
Sharonmoyee Goswami
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Lauren Martin
Megan Y. Yung
111 Huntington Ave., Suite 520
Boston, MA 02199
(617) 712-7100

*Attorneys for Amgen Inc., Amgen Manufacturing, Limited, and Amgen USA Inc.*

[redacted]

## TABLE OF CONTENTS


I. INTRODUCTION AND SUMMARY OF ARGUMENT ....... 1

II. STATEMENT OF FACTS ....... 3

III. ARGUMENT ....... 3

A. An Injunction Should Issue Because Amgen Will Continue to Suffer Irreparable Harm If Defendants' Infringement Does Not Cease ....... 3

1. Praluent's Infringing Presence is Causing Dramatic Price Erosion, Lost Market Share and a Severely Constrained Market for PCSK9 Antibodies ....... 4

2. Defendants' Continued Infringement Is Causing and Will Cause Harm to Amgen's Business Model ....... 11

3. Defendants' Continued Infringement Is Causing and Will Cause Harm to Amgen's Reputation and the Reputation of Repatha ....... 12

B. Monetary Remedies Will Not Adequately Compensate Amgen ....... 14

1. Amgen's Practice of Not Licensing Its Patents to Enable Competitors Is an Intangible and Unquantifiable Asset, the Loss of Which Cannot Be Compensated with Monetary Damages ....... 15

2. Monetary Damages Are Inadequate to Compensate Amgen's Future Lost Profits and Market Share ....... 16

3. The Loss of Innovator Status and R&D Cannot be Calculated or Compensated by Monetary Damages ....... 16

C. The Balance of Hardships Favors Amgen ....... 17

1. Any Hardship to Sanofi or Regeneron Is Self-Inflicted ....... 17

2. Defendants Can Readily Withstand the Financial Impact of an Injunction ....... 21

D. A Permanent Injunction Will Not Disserve the Public Interest ....... 22

1. The Public Interest in Cardiovascular Health Would Not Be Disserved by an Injunction ....... 22

a. Repatha is Approved to Treat All Patients for Whom Treatment with Praluent Is Now Approved ....... 23




[redacted]

b. There Are No Clinical Advantages of Praluent Over Repatha ..... 23

(1) Praluent Has No Clinical Benefit Repatha Lacks ..... 24

(2) The 75 mg Dosage Form of Praluent Offers No Clinical Advantages ..... 27

2. The Enforcement of Patent Rights Is an Important Public Interest ..... 29

3. The Public Interest will be Served by an Injunction Because Patient Access to PCSK9 Antibodies Will be Expanded ..... 30

4. Amgen Can Supply the Entire PCSK9 Antibody Market ..... 30



[redacted]

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acumed LLC v. Stryker Corp.*,
551 F.3d 1323 (Fed. Cir. 2008)....................15

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017)....................2, 23

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
581 F. Supp. 2d 160 (D. Mass. 2008) *vacated and remanded on other grounds*, 580 F.3d 1340 (Fed. Cir. 2009)....................11, 22

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996.)....................12

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012)....................4, 11, 12, 16, 22

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)....................3, 12, 15, 16

*E.I. DuPont de Nemours & Co. v. Unifrax I LLC*,
2017 WL 4004419 (D. Del. Sept. 12, 2017)....................29

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................3

*Edwards Lifesciences AG v. CoreValve, Inc.*,
2014 WL 1493187 (D.Del. Apr. 15, 2014)....................4

*Endo Pharms. Inc. v. Amneal Pharms., LLC*,
2016 WL 1732751 (E.D.N.Y. Apr. 29, 2016)....................17

*Howes v. Med. Components, Inc.*,
741 F. Supp. 528 (E.D. Pa. 1990)....................30

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)....................14, 21, 22

*Presidio Components v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012)....................15, 16

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)....................4



[redacted]

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006).....17, 18, 20, 29

*Sanofi-Synthelabo v. Apotex Inc.*,
488 F. Supp. 2d 317 (S.D.N.Y. 2006).....20

*Schneider (Europe) AG v. SciMed Life Sys., Inc.*,
852 F. Supp. 813 (D. Minn. 1994), *aff'd*, 60 F.3d 839 (Fed. Cir. 1995).....22

*TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500 (Fed. Cir. 2008).....16

*Vanda Pharms. v. Roxane Labs.*,
203 F. Supp. 3d 412 (D. Del. 2016).....12, 17



[redacted]

## Citation and Abbreviation Conventions

**Parties**

"Plaintiffs" or "Amgen": Amgen Inc.; Amgen Manufacturing, Limited; and Amgen USA, Inc.

"Regeneron": Regeneron Pharmaceuticals, Inc.

"Sanofi": Sanofi; Sanofi-Aventis U.S. LLC; and Aventisub LLC.

"Defendants": Sanofi and Regeneron.

**Court Submissions, Declarations, and Transcripts**

"Ex.": Exhibit to Declaration of Amal El bakhar in Support of Amgen's Motion for Permanent Injunction, dated March 18, 2019.

"Bradway Dec.": Declaration of Robert Bradway in Support of Amgen's Motion for Permanent Injunction, dated March 18, 2019.

"Berndt Dec.": Declaration of Ernst Berndt in Support of Amgen's Motion for Permanent Injunction, dated March 18, 2019.

"Chattopadhyay Dec.": Declaration of Som Chattopadhyay in Support of Amgen's Motion for Permanent Injunction, dated March 14, 2019.

"Grunstein Dec.": Declaration of Jeremy Grunstein, Ph.D. in Support of Amgen's Motion for Permanent Injunction, dated March 17, 2019.

"Kessler Dec.": Declaration of Henry Kessler in Support of Amgen's Motion for Permanent Injunction, dated March 18, 2019.

"McCulloch Dec.": Declaration of Charles McCulloch in Support of Amgen's Motion for Permanent Injunction, dated March 17, 2019.

"Pieri Dec.": Declaration of Steven Pieri in Support of Amgen's Motion for Permanent Injunction, dated February 22, 2019.

"Stein Dec.": Declaration of Evan Stein in Support of Amgen's Motion for Permanent Injunction, dated March 17, 2019.

**Deposition Transcripts**

"Berndt Dep.": Transcript of the Deposition of Ernst Berndt, dated November 9, 2018.

"Besse Dep.": Transcript of the Deposition of Eric Besse, dated October 18, 2018.



[redacted]

"Carnahan Dep.": Transcript of the Deposition of Michelle Carnahan, dated August 28, 2018.

"Eckel Dep.": Transcript of the Deposition of Robert H. Eckel, dated October 30, 2018.

"Edelberg 2015 Dep.": Transcript of the Deposition of Jay M. Edelberg, dated October 7, 2015.

"Edelberg 2018 Dep.": Transcript of the Deposition of Jay M. Edelberg, dated August 9, 2018.

"Oster Dep.": Transcript of the Deposition of Sharon M. Oster, dated November 2, 2018.

"Papadopoulos Dep.": Transcript of the Deposition of Nicholas J. Papadopoulos, dated September 10, 2015.

"Pieri Dep.": Transcript of the Deposition of Steven Pieri, dated August 8, 2018.

"Stein Dep.": Transcript of the Deposition of Evan Stein, dated November 15, 2018.

"Wasserman Dep.": Transcript of the Deposition of Scott Wasserman, dated August 15, 2018.

**Acronyms**

"FDA": U.S. Food and Drug Administration.

"R&D": Research and development.

"WAC": Wholesale Acquisition Cost.



[redacted]

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

After a second jury trial, claims 19 and 29 of Amgen's U.S. Patent No. 8,829,165 and claim 7 of U.S. Patent No. 8,859,741 have again been adjudicated valid and infringed. Amgen returns after four years of expedited proceedings through two jury trials and an appeal, to press for the injunction it has sought and Defendants have evaded from the beginning: to prohibit Defendants from unauthorized use of Amgen's inventions until the patents expire. After the 2016 liability trial, Judge Robinson held a two-day injunction hearing and ultimately entered an injunction. Ex. 207 (2016 Injunction Order). The irreparable harms to Amgen alleged in the 2014 Complaint and predicted by Amgen at that hearing are manifest. Praluent's admitted infringement has decimated the market for Repatha and PCSK9 antibody therapy generally, resulting in persistent and unquantifiable damage to Amgen and most tragically the erection of unprecedented obstacles to a revolutionary, life-changing medication for patients at high risk of heart attack and stroke. The continuing harm to Amgen and the public health can only be remedied by the entry of an injunction.

But for Praluent, Repatha would be the only PCSK9 antibody sold in the U.S. and Amgen would enjoy the benefits of having made an investment of more than $2 billion (pre-launch) in its patented medicine. Praluent deprives Amgen of those benefits, eroding both Amgen's market share, which should be 100%, and Repatha's net price. The deprivation, however, has been far worse than ordinary, unlawful competition from an infringing product. Defendants' infringement has caused and continues to cause Amgen irreparable harm in the form of incalculable extreme price erosion, lost market share and reputational injury. Any attempt to quantify that harm or predict its future would be speculative. In contrast, Defendants' harm is of their own making, resulting from a calculated business decision to escalate their investment and infringing conduct in the face of Amgen's patent rights, including manufacture and launch of

[redacted]

Praluent at risk and then engaging in aggressive price competition without improving patient access to this new class of medicine, all of which has caused immeasurable harm to the market for PCSK9 antibodies and to Amgen.

Finally, an injunction will not disserve the public interest. First, the FDA has approved Repatha as safe and effective for all patients for whom Praluent is currently FDA approved. There is no FDA distinction in safety or efficacy between Repatha and Praluent based on approved doses. Any argument based on patient or doctor preference is a classic red herring. And in any event, the Federal Circuit held in this very case that physician and patient choice alone is not sufficient to avoid an injunction, noting that, if it were, injunctions would not be available in biotechnology or pharmaceutical patent cases. *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1381 (Fed. Cir. 2017). Second, the overriding public interest is served by giving force to the patent system. Amgen invested over $2 billion over 10 years in bringing Repatha from research plan to market in an industry where the failure rate is greater than 95%. If seminal composition of matter patents for a new medicine are not enforceable by injunctions in the context of the facts here, the very business model of innovative biotechnology collapses and the public will be disserved by reduced access to new treatments for serious diseases.

In reality, Praluent's presence in the market has *disserved* the public interest because it has caused restricted patient access to this new class of medicines. The efficacy and safety of Repatha and Praluent are beyond question. The clinical profile of these products is so remarkable that both companies projected that hundreds of thousands of patients would be receiving the benefit of PCSK9 antibodies by now. But the number of patients actually taking Repatha and Praluent in the U.S., *combined*, is a fraction of that (currently approximately sixty thousand patients). The constriction of the PCSK9 antibody market has been caused by



[redacted]

Defendants' infringing product, the presence of which has allowed payers to pit Praluent and Repatha against one another to extract enormous discounts/rebates and to do so without providing commensurate expansion of insurance coverage and ease of patient access. An injunction to prohibit Defendants' infringement would allow Amgen the opportunity to begin reversing some of this damage.

## II. STATEMENT OF FACTS

The evidence admitted in the 2016 hearing (testimony and exhibits) is of record. In further support of its motion, Amgen relies on the declarations from fact and expert witnesses submitted with this brief and the documents cited therein.[1]

## III. ARGUMENT

To obtain a permanent injunction, Amgen must demonstrate by a preponderance of the evidence: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by entry of an injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### A. An Injunction Should Issue Because Amgen Will Continue to Suffer Irreparable Harm If Defendants' Infringement Does Not Cease

"Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation . . . ." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). As Judge Robinson found, this case presents

[1] The Declaration of Amal El bakhar in Support of Amgen's Motion for Permanent Injunction, dated March 18, 2019, lists the exhibits included in this Memorandum and in the accompanying Declarations.



[redacted]

"traditional evidence of loss of market share and momentum," as Amgen has been "forced to compete with [D]efendants for contracts with insurers and exclusive formulary positions, particularly since [D]efendants were first to market." Ex. 207 at 5. With the Federal Circuit's stay of Judge Robinson's injunction order, Defendants continued to infringe and Amgen suffered exactly the sort of irreparable harm Judge Robinson predicted, as well as additional unforeseen harms through market constriction for Repatha and continuing harm to Amgen's business model. Absent an injunction now, Amgen will continue to suffer irreparable harm as a direct result of Defendants' infringement.

**1. Praluent's Infringing Presence is Causing Dramatic Price Erosion, Lost Market Share and a Severely Constrained Market for PCSK9 Antibodies**

Praluent and Repatha are direct competitors in a two-player market. Berndt Dec. ¶ 26. Praluent's infringing presence on the market has caused and, if not enjoined, will continue to cause, unprecedented price erosion, loss of market share and constrained market growth. Price erosion alone is sufficient to establish irreparable harm. *See Edwards Lifesciences AG v. CoreValve, Inc.*, 2014 WL 1493187, at *6 (D. Del. Apr. 15, 2014) (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). The "existence of a two-player market may well serve as a substantial ground for *granting* an injunction—e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee." *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011).

The market for pharmaceutical products in particular can allow such harm to be amplified. Prescription medicines are subject to negotiation with insurance companies and pharmacy benefit managers (collectively "payers") over whether they will cover the medicine, at what price, and for which patients. Berndt Dec. ¶¶ 10-11, 16; Pieri Dec. ¶¶ 6-7. By launching and selling Praluent at risk, especially in a newly-developing market, Defendants enabled payers



[redacted]

to pit the only two PCSK9 antibody medicines against each other to extract from both Amgen and Defendants larger and larger rebates, also called discounts, off of the list price (WAC), while also severely restricting patient access through narrow utilization management (UM) criteria and cumbersome prior authorization (PA) protocols. Berndt Dec. ¶¶ 15, 27, 44-45, 48-53; Pieri Dec. ¶¶ 16-23, 28. Defendants have used aggressive price and access concessions to capture exclusive agreements, *i.e.*, market share, to the exclusion of Amgen's Repatha. Pieri Dec. ¶¶ 16, 19-20; Berndt Dec. ¶ 35. Thus, Defendants' infringing competition causes Amgen to suffer lost market share and severe price erosion at levels that cannot be reversed during the remaining term of Amgen's patents.

To more deeply explain these harms, Amgen expected to be the first PCSK9 antibody to launch in the U.S. Pieri Dec. ¶ 8; Kessler Dec. ¶ 15. That expectation changed in July of 2014, when Sanofi spent $67.5 million to purchase a priority review voucher (PRV) and then announced it would apply the voucher to Praluent, thereby accelerating the FDA review process for Praluent. Ex. 2 (2016 Injunction Hearing Transcript) at 173:7-175:11 (Broadhurst); *Id.* at 61:1-12 (Bradway). As a result, even though Amgen filed for FDA approval of Repatha months before Defendants filed for Praluent, Defendants were able to leapfrog Amgen in the queue and secure approval for Praluent on July 24, 2015, one month before the FDA approved Repatha. Ex. 213 (Admitted Facts) ¶¶ 34, 43; Kessler Dec. ¶ 15. In [redacted]. Ex. 2 at 146:4-21 (Ryan); *Id.* at 166:17-169:16 (Broadhurst); *Id.* at 315:7-15, 316:3-20 (Terifay); Berndt Dec. ¶ 29; Pieri Dec. ¶ 23; Kessler Dec. ¶ 27, 33. Thus, when Amgen launched Repatha on August 27, 2015, it faced a very different



[redacted]

environment in which to negotiate with payers concerning coverage, UM criteria and PA requirements, from the environment it should have faced as the patent holder with the exclusive rights to market PCSK9 antibody medicine. Kessler Dec. ¶ 27.

As explained during the 2016 hearing and in the declarations of Drs. Stein and Berndt, Repatha is FDA-approved to treat all patients treatable with Praluent. Stein Dec. ¶¶ 32-35; Berndt Dec. ¶ 26. As a result, the marketplace (payers) view Praluent and Repatha as fully substitutable.[2] Ex. 2 at 216:4-219:10 (Berndt); Berndt Dec. ¶ 26. Because they are substitutable, payers do not feel compelled to cover both medicines for their patients, setting up head-to-head competition between the parties just to be covered by insurance plans (also known as to "be on formulary"). Berndt Dec. ¶¶ 15, 26; Pieri Dec. ¶ 15. By mid-2016, Repatha had in fact been excluded or received "non-preferred" status on the formularies of several major insurance plans. Ex. 2 at 223:10-224:5; 225:11-15 (Berndt) (Amgen excluded by Optum); *id.* at 162:15-20 (Broadhurst) [redacted]); Ex. 18 (PTX 7077 at -7350) (Aug. 2016 Repatha Reimbursement Access and Value Summary); Pieri Dec. ¶ 20.

In this head-to-head competition, Defendants put singular focus on price competition to gain market share. Berndt Dec. ¶¶ 24-25, 27, 60. Instead of offering payer rebates of [redacted], the rebate range Amgen expected to offer for a first-in-class therapy, Amgen was compelled to make initial offers in the range of [redacted], which quickly escalated to as high as [redacted] at the end of 2015

[2] In contrast, other LDL-C-lowering medications, like statins, are not substitutes for PCSK9 antibodies. Stein Dec. ¶¶ 28-29; Ex. 89 at 36:18–39:9 (Carnahan Dep.) ("[T]he market that is typically targeted by statins is different from the market that's targeted by PCSK9s."). To the contrary, physicians, including both parties' medical experts, prescribe PCSK9 antibodies *in addition to* statins and other LDL-lowering medications. Stein Dec. ¶¶ 28-29.


[redacted]

and even higher during 2016 and 2017. Ex. 2 at 155:23-156:15 (Ryan); Berndt Dec. ¶¶ 20, 24, 30-32, 36; Pieri Dec. ¶¶ 16-18. Instead of an environment in which payers agreed (with few restrictions) to cover any prescription written for any patient for whom Repatha was indicated on the FDA-approved label, Amgen faced payers who, because of Praluent's presence in the market, could credibly threaten to exclude Repatha from coverage altogether. Pieri Dec. ¶¶ 12, 15; Berndt Dec. ¶¶ 14-15, 24, 60-61; Kessler Dec. ¶ 28. As a result, payers could demand from Amgen high rebates and do so without providing, in return, insurance coverage and patient access (in the form of few or no UM criteria and PA procedures) that would allow the market to grow over time in line with medical (patient/physician) demand. Ex. 2 at 221:17-224:4; 224:22-225:15 (Berndt); *Id.* at 150.8-12 (Ryan); *see also* Berndt Dec. ¶¶ 24-25, 42, 44-45, 59; Pieri Dec. ¶¶ 15, 19, 31-41; Kessler Dec. ¶ 32.

Defendants' aggressive price competition has resulted in, and, if not enjoined will continue to result in, an unprecedented downward spiral of lower net prices accompanied by heavily restricted patient access, which severely constrains market growth. In terms of net price, the trend of sharply escalating rebates and rebate offers, more than [redacted] in 2018, is dramatic. *See* Berndt Dec. ¶¶ 30-40 & Figs. 4-7; Pieri Dec. ¶ 22. The escalating rebates have translated directly into Repatha price erosion to an extent not imaginable even at the 2016 hearing.[3] If

[3] Defendants will no doubt argue that this price erosion was inevitable because the WAC prices were "too high." But the facts do not support the argument. Berndt Dec. ¶¶ 72-75; Pieri Dec. ¶ 11. Remember that Defendants launched (at risk) first, and therefore were first to set the WAC for Praluent at [redacted] *See* Berndt Dec. ¶ 73. When Amgen obtained FDA approval a month later, it set the WAC for Repatha at $14,100 per year. *See id.* at ¶¶ 72, 74; Ex. 2 at 319:17-22 (Terifay). Both parties arrived at the appropriate WAC after very extensive internal research and analysis (with the aid of sophisticated consultants), taking into account not only the direct value of reducing LDL cholesterol, but also the attendant benefits of reducing the incidence of serious cardiac events, which of course endanger health and also drive expensive treatment. Berndt Dec. ¶¶ 72-75; Pieri Dec. ¶¶ 10-11.

allowed to continue, especially in the face of variables such as market forces and government regulations, any continuing price erosion from Defendants' infringement can never be recovered. Berndt Dec. ¶ 41.

Typically, in economics, you would expect lower prices to drive higher demand. Berndt Dec. ¶ 68. However, the rebates to payers, which are what drive the reduction in net price, profit the payers, not the patients. They are discounts off the WAC price, which do not, by and large, change the patients' cost. *Id.* at ¶¶ 69, 111. Commercial patients for these medicines typically pay either a fixed co-pay or a percent co-insurance based on WAC, but both Amgen and Defendants offer co-pay coupons, which can limit the commercial patient co-payment to $5 per prescription. *Id.* Medicare patients, by contrast, invariably pay a percent co-insurance for these medicines based on the WAC and are not eligible for co-pay coupons under Medicare regulations. *Id.* at ¶¶ 69 & n. 147, 111; Pieri Dec. ¶ 42. Because payer rebates benefit payers, not patients, they have not increased the market demand for PCSK9 antibodies as would have been expected. *See* Berndt Dec. ¶¶ 42, 47, 69.

It may seem counter-intuitive that payers are able to negotiate for both higher discounts (a lower net price) and tighter patient access restrictions. But in this market, with Defendants aggressively chasing market share by rapidly escalating offers of steep discounts without corresponding improvements to access, the payers are able to extract both. Berndt Dec. ¶¶ 24-25, 30-39, 42, 60-61, 68-70; Kessler Dec. ¶ 28. As of December 2018, even with average rebates/discounts over [redacted], commercial payers were rejecting prescriptions for Repatha at a rate of 55% and for Praluent at a rate of 62%. Berndt Dec. ¶¶ 24, 51; Pieri Dec. ¶ 35. These figures demonstrate that a majority of patients that fall within the FDA-approved labels, and who physicians believe need PCSK9 antibody therapy, face nearly insurmountable access restrictions



[redacted]

Case 1:14-cv-01317-RGA Document 906 Filed 03/25/19 Page 17 of 40 PageID #: 94898

and never receive insurance coverage approval. *See* Berndt Dec. ¶¶ 42, 44, 54-55; Kessler Dec. ¶¶ 31-33; Pieri Dec. ¶ 39. Indeed, the difference in actual uptake of PCSK9 antibodies in comparison to the parties' expectations and market projections is striking, as depicted in the Berndt Declaration at Figure 8. Berndt Dec. ¶¶ 46-47 & Fig. 8; Kessler Dec. ¶ 26; Pieri Dec. ¶ 28. Another real consequence of the frustratingly high rejection rates is that physicians are discouraged from writing prescriptions for PCSK9 antibodies in the first place, often because of the administrative "hassle" that many identify as the primary barrier to PCSK9 antibody uptake. Berndt Dec. ¶¶ 50, 53; Kessler Dec. ¶ 32; Pieri Dec. ¶ 40; Stein Dec. ¶ 30.

Praluent's infringement has allowed payers to leverage the competition between the parties to erect obstacles of all types against approval of prescriptions for Repatha (and Praluent). Berndt Dec. ¶¶ 44-45, 48, 49; Kessler Dec. ¶¶ 28-29. For example, although not required by the FDA, most payers have required that patients take, in addition to maximally tolerated statin therapy, another lipid-lowering therapy, ezetimibe, for six months, and still fail to achieve adequate cholesterol reduction. Pieri Dec. ¶ 30; Berndt Dec. ¶ 44; Kessler Dec. ¶ 31 (citing Ex. 15). In addition to restrictive UM criteria, Defendants' infringing competition has also allowed payers to require that physicians fill out multi-page PA forms with supporting documentation of patient medical history, lab results, family history (in some cases even when the family is deceased) and more. Pieri Dec. ¶ 32; Kessler Dec. ¶ 31; Stein Dec. ¶ 30.

In the face of unprecedented price erosion and market restriction, Amgen developed a strategy beginning in early 2018 to offer payers [redacted] in exchange for specific improvements in UM criteria and PA requirements, [redacted] in exchange for patients' ability to access Repatha commensurate with the scope of the FDA label (*i.e.*, no additional UM criteria) in order to open up patient access (which would grow


[redacted]

demand). Berndt Dec. ¶ 33; Kessler Dec. ¶ 29; *see also* Pieri Dec. ¶ 19. That strategy showed promise with payers in early negotiations, but was derailed in March 2018 when Defendants took the unprecedented step of publicly suggesting a willingness to offer rebates approaching [redacted], thereby further reducing the net price (not the WAC) of Praluent. Berndt Dec. ¶¶ 34-35; Kessler Dec. ¶ 29; Pieri Dec. ¶¶ 19-20. Despite Amgen's efforts to compete, in May 2018, Express Scripts ("ESI"), one of the two largest payers, announced that only Praluent would be listed on its national formulary, drastically decreasing Repatha's market share. Pieri Dec. ¶¶ 20-21, 36-38; *see also* Berndt Dec. ¶ 35.

Amgen's most recent effort to improve uptake of Repatha has been to offer a second "SKU" (product code) for Repatha at a 60% lower WAC ($5,850). Berndt Dec. ¶ 76; Pieri Dec. ¶ 42; Kessler Dec. ¶ 35. This extraordinary and unprecedented step was taken primarily to make Repatha more affordable for Medicare Part D plan participants, whose co-pay is set as a percentage of WAC and to whom Amgen cannot, by law, offer co-pay cards to lower out-of-pocket costs. Berndt Dec. ¶¶ 17, 69, 77, 111; Pieri Dec. ¶ 42; Kessler Dec. ¶ 37. Amgen also hoped that the introduction of a lower list price would incline Medicare Part D plans to cover Repatha on tiers with fixed co-payments. Pieri Dec. ¶ 42; Berndt Dec. ¶ 77; Kessler Dec. ¶ 38. Yet the results to date have not been encouraging. The number of patients who fulfill their prescription by paying a fixed co-pay has not increased significantly, and only [redacted] Part D plans have moved Repatha to tiers with fixed co-pay arrangements. Pieri Dec. ¶ 45; Berndt Dec. ¶ 78; Kessler Dec. ¶ 38. And, true to head-to-head competition, Defendants have followed Amgen, announcing on February 11, 2019 that they, too, would offer a second SKU for Praluent at exactly the same WAC - $5,850 - thus exacerbating the price competition. Berndt Dec. ¶ 76 n. 163; Pieri Dec. ¶ 47.



[redacted]

The effect of the extreme price erosion, lost market share, and constrained market growth is classic irreparable injury. *See, e.g.*, *Celsis*, 664 F.3d at 930 (finding price erosion and loss of business opportunities are "valid grounds for finding irreparable harm"). The continuous sale of Praluent for the past three-and-a-half years has created a pattern of rebate-driven price declines that is certain to continue and its effect cannot be predicted with any reasonable level of accuracy. Berndt Dec. ¶¶ 41, 66, 80, 83-84; Pieri Dec. ¶ 47. Defendants' expert, Sharon Oster, acknowledges as much. Ex. 92 at 82:23–83:14 (Oster Dep.) (admitting that competition drives price erosion and that price erosion in the PCSK9 antibody market might continue). An injunction is the only way to stem escalating harm to Amgen from price erosion, loss of market share and market restriction.

### 2. Defendants' Continued Infringement Is Causing and Will Cause Harm to Amgen's Business Model

Inventing and developing new medicines that safely and effectively treat human disease takes substantial human and capital investment, time, and sustainability through failure until the next success can be realized. Since its founding in 1980, Amgen has invested almost $60 billion in research and development. Ex. 2 at 56:11-57:24; Bradway Dec. ¶ 6. Why? Because the foundation of Amgen's business model is to make long-term, sustainable investments to develop breakthrough innovative products for the future. As Judge Young noted in an earlier case involving Amgen, "In order to maintain its business model and its research and development, Amgen must be able to 'demonstrate to its investors that the full investment they make can be recaptured.'" *Amgen, Inc. v. F. Hoffman-La Roche Ltd,* 581 F. Supp. 2d 160, 226 (D. Mass. 2008) *vacated and remanded on other grounds*, 580 F.3d 1340 (Fed. Cir. 2009).

Patent protection is fundamental to Amgen's business model of investing in innovation. Ex. 2 at 57:25-59:25 (Bradway); Bradway Dec. ¶ 7. Amgen's financial investment of more than



[redacted]

$2 billion in Repatha was its largest investment in the development of a new medicine. Ex. 2 at 60:1-19 (Bradway); *see* Bradway Dec. ¶ 12. Amgen made that investment relying on the strong intellectual property protection it developed for Repatha. Ex. 2 at 60:1-14; 62:5-14 (Bradway); *Id.* at 229:4-19 (Berndt); Bradway Dec. ¶ 10.[4] Without confidence that it will enjoy protection and exclusivity for its patent-protected products during the term of the patents, Amgen's future ability to attract investment and talent to develop innovative new medicines will be compromised. Bradway Dec. ¶¶ 10-13.

The financial and business model impact of Praluent's infringing competition has impacted and will continue to impact Amgen's investment in R&D. If a patentee is "required to reduce its research and development activities," that constitutes a form of irreparable harm. *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996). Because Amgen is suffering lost sales and price erosion from Defendants' ongoing infringement, it will necessarily have less money to invest in R&D. Bradway Dec. ¶ 6; *see Vanda Pharms. v. Roxane Labs.,* 203 F. Supp. 3d 412, 436 (D. Del. 2016) (irreparable harm from foregone R&D of other drugs). Since it launched its first human therapeutic product in 1989, Amgen has invested approximately 20% of its product revenue into R&D. Bradway Dec. ¶ 6. Thus, Amgen's future share and sales losses threaten a significant impact upon Amgen's R&D spending.

### 3. Defendants' Continued Infringement Is Causing and Will Cause Harm to Amgen's Reputation and the Reputation of Repatha

Harm to reputation has been long-recognized as irreparable injury. *See Douglas Dynamics,* 717 F.3d at 1344 (irreparable injury includes reputational harm); *Celsis,* 664 F.3d at

[4] As of today, Amgen's total sales revenues (not profit) worldwide from Repatha are just over $1 billion, or about ½ of its pre-launch investment. Bradway Dec. ¶ 14. And, of course, Amgen has made substantial investments since launch. Bradway Dec. ¶ 12.



[redacted]

930 ("[D]amage to reputation" is a "valid ground[] for finding irreparable harm"). As the first to invent PCSK9 blocking antibodies and to develop them for therapeutic use, Amgen and Repatha deserved exclusivity and recognition as the first in-class new medicine for the world's most serious health problem – heart disease. Instead, Defendants jumped the FDA queue, launched Praluent ahead of Repatha as this patent case was proceeding on an expedited basis towards a pre-scheduled trial and permanent injunction hearing, and declared themselves "The First U.S. FDA-Approved PCSK9 Inhibitor." *See* Berndt Dec. ¶ 86; Kessler ¶ 15; Ex. 2 at 177:5-178:8 (Broadhurst); *Id.* at 230:19-230:24 (Berndt). Indeed, as recently as the jury trial in February 2019 on liability, Regeneron's CEO introduced his company to the jury by touting Praluent as the "first . . . approved" PCSK9. Ex. 225 (2019 Trial Tr.) at 163:5-8 (Schleifer); *but see id.* at 488:13-489:3; 489:8-11 (Bradway).

The harm resulting from Amgen's reputational injury has been particularly acute in light of the role that Repatha was anticipated to play in Amgen's development of its cardiovascular business. As described fully in the declaration of Amgen's CEO, Amgen viewed Repatha not only as a breakthrough medicine, but also as a linchpin for the company to enter and establish a leadership position in biologic therapeutics to treat cardiovascular disease. Bradway Dec. ¶ 17. Indeed, Amgen invested well ahead of the projected launch of Repatha to develop and build a robust capability in the cardiovascular business, including expertise in clinical development, regulatory development and marketing. *Id.* Repatha was meant to be the anchor for Amgen's cardiovascular portfolio for many years. Berndt Dec. ¶ 87; Kessler Dec. ¶ 18; *see also* Ex. 2 at 160:9-161:7 (Broadhurst) (explaining that Repatha was meant to be the linchpin of Amgen's cardiovascular business and was an important drug for Amgen's growth). Instead, in light of Defendants in the market touting Praluent as "first," Repatha has been stunted in its ability to



[redacted]

drive Amgen's entry into the cardiovascular business by successfully addressing a significant unmet medical need as had been expected. Bradway Dec. ¶¶ 17-18; Kessler Dec. ¶ 18.

The competition from Defendants which has permitted payers to refuse coverage via UM criteria and PA protocols has also inflicted serious injury to Amgen's reputation for providing products that can be consistently accessed with reasonable effort through patients' insurance plans. Doctors and the medical community as a whole are frustrated because, after determining that a high risk patient needs Repatha and writing a prescription, that prescription is – more often than not – rejected, at least on the first try. Kessler Dec. ¶ 33. The frustration is in part evidenced by certain patient and physician groups such as the Familial Hypercholesterolemia (FH) Foundation and American Heart Association voicing their concern over limited access. *Id.* And, instead of being regarded and lauded as an innovator, patients, doctors and doctors' offices associate the "hassle" factor with the medicines, and with Amgen, further harming Amgen's reputation as a company that delivers drugs to patients in need. Kessler ¶ 32; Berndt Dec. ¶ 87; Bradway Dec. ¶ 20.

### B. MONETARY REMEDIES WILL NOT ADEQUATELY COMPENSATE AMGEN

Money damages are inadequate to compensate a plaintiff who will suffer harms in the absence of an injunction, which cannot be quantified. *See, e.g., i4i Ltd. P'ship v. Microsoft, Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010). Where, as here, Amgen "intended to use their patent to maintain market exclusivity," "monetary damages will not suffice" to make Amgen whole. Ex. 207 (2016 Injunction Order) at 5. The future harms Amgen will suffer in the absence of an injunction, though certain to occur, defy full quantification over the nine-year remaining life of Amgen's patents. Berndt Dec. ¶¶ 80, 82-83; *see also* Ex. 207 (2016 Injunction Order) at 5 ("[T]he developing PCSK9 inhibitor market, together with the reputational harm, make monetary damages speculative."); *see i4i Ltd. P'ship*, 598 F.3d at 862 (finding that "loss of market share,



[redacted]

brand recognition, and customer goodwill as the result of the defendant's infringing acts" are the type of losses that "defy attempts at valuation, particularly when the infringing acts significantly change the relevant market"). Even when damages for a portion of past harm from infringement—the only remedy now available for certain past economic harms—can be quantified with reasonable certainty,[5] damages may nonetheless be an inadequate remedy for future infringement. *E.g., Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328-29 (Fed. Cir. 2008).

**1. Amgen's Practice of Not Licensing Its Patents to Enable Competitors Is an Intangible and Unquantifiable Asset, the Loss of Which Cannot Be Compensated with Monetary Damages**

[redacted]. Ex. 2 at 68:22-69:11 (Bradway); Bradway Dec. ¶ 22. This is consistent with Amgen's historic practice of not licensing patents in circumstances where a license would enable direct competition. Ex. 2 at 68:12-15 (Bradway); Bradway Dec. ¶ 21; Grunstein Dec. ¶¶ 3-5.

The Federal Circuit has recognized that where a patentee has a history of not licensing the infringed patents in order to maintain market exclusivity, the right to exclude is viewed as "an intangible asset that is part of a company's reputation" which is "under attack by [the defendant's] infringement." *Douglas Dynamics, LLC*, 717 F.3d at 1345. A patentee's unwillingness to license the patented technology also weighs in favor of a finding of irreparable harm, since it shows that the patentee considers the right to exclude not compensable through

[5] Defendants will no doubt argue that the harms to Amgen are quantifiable and will point to the obvious fact that Amgen was prepared to put on its case for past monetary damages. But Amgen's claim for past damages captures only a portion of its past harms and, consistent with the unquantifiable nature of the injuries, does not even attempt to quantify harms from injury to reputation or business model, lost market share or the overall constriction of the market. Berndt Dec. ¶ 85.



[redacted]

licensing royalties. *Presidio Components v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363-64 (Fed. Cir. 2012).

### 2. Monetary Damages Are Inadequate to Compensate Amgen's Future Lost Profits and Market Share

Amgen will suffer lost sales, the quantity of which will never be known, lost market share, and further unpredictable price erosion from competition in the absence of an injunction. Berndt Dec. ¶¶ 80-84. Because none of these losses can accurately be projected, any money damages would be woefully inadequate to compensate Amgen. *Id.* Unknowable events, including the future demand for PCSK9 antibodies in light of the effects of Defendants' market-constricting practices and potential changes in stakeholders in the supply of pharmaceutical medicines all further confound the effort. *Id.*; *see Celsis*, 664 F.3d at 930 (affirming the district court's finding of irreparable harm in part because "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door . . . because of the existence of the infringer.").

### 3. The Loss of Innovator Status and R&D Cannot be Calculated or Compensated by Monetary Damages

Courts routinely recognize that certain types of harm, such as reputational harm and loss of innovator status, are unquantifiable and thus cannot be compensated with monetary damages. *See, e.g.*, *Douglas Dynamics*, 717 F.3d at 1344 ("Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction."); *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 532 (Fed. Cir. 2008) (finding inadequate remedy at law where "[d]efendant has taken from plaintiff not only this important business, but the recognition of being a technology innovator and the first global supplier of the patented technology, and an unquantifiable amount of business opportunities flowing therefrom").



[redacted]

Here, as detailed above, Amgen is suffering harm to its reputation, including loss of status as an innovator of an important, first-in-class biologic medicine. Defendants' economics expert Dr. Oster suggests that such harm can be quantified, but never provides a way to calculate it. Ex. 2 at 479:18-25 (Oster); Ex. 92 at 144:3-12; 144:15; 151:16-152:4 (Oster Dep.) As Amgen's expert Dr. Berndt testified in 2016, "How do you quantify the foregone R&D opportunities, the lost reputation, the imposition on Amgen of a forced change in business model to rely instead on patent protected products, on bringing products to market that will suddenly have fast followers. I don't know how you can quantify those damages with any reasonable, credible certainty." Ex. 2 at 235:8-15 (Berndt). The situation is even worse in 2019. Berndt Dec. ¶ 85.

Monetary damages are particularly ill-suited to compensate Amgen for future harms stemming from foregone R&D and reputational losses. There is no way to know what Amgen's return might have been on the R&D it will not perform over the next nine years, and no way to know whether that R&D would have yielded new approved or improved medicines. *See, e.g.*, *Vanda Pharms.*, 203 F. Supp. 3d at 436 (difficult to quantify harm from foregone investment in R&D for other drugs); *Endo Pharms. Inc. v. Amneal Pharms., LLC*, 2016 WL 1732751, at *6 (E.D.N.Y. Apr. 29, 2016) (decreased investment in research and development is a "difficult-to-quantify" harm and "precisely the type[] of irreparable harm that an injunction is designed to remedy.").

### C. THE BALANCE OF HARDSHIPS FAVORS AMGEN

#### 1. Any Hardship to Sanofi or Regeneron Is Self-Inflicted

The balance of the hardships favors the patentee if the harms the infringer contends it will face were "almost entirely preventable" harms triggered by its "own calculated risk to launch its



[redacted]

product pre-judgment" despite full knowledge of the patentee's patent. *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).

By March 2, 2009, when Praluent (then REGN727) was in its very early stages of development and months before Sanofi elected to support it, [redacted] Berndt Dec. ¶ 94. Amgen's PCT application, which later matured into the patents that Defendants infringe, included the detailed specification of the patents-in-suit and claims that would have covered Praluent, which Defendants well understood. Ex. 2 at 378:3-15 (Stahl); Ex. 198 (PTX-3888 at-3232-35). Defendants immediately appreciated the risk of [redacted]"[6] Defendants' own experiments confirmed what they had suspected: Praluent was extremely similar to the antibodies disclosed in Amgen's patent application and bound to the PCSK9 residues identified in the claims – the sweet spot.[7] Notwithstanding Defendants' knowledge, study, and understanding of Amgen's pending patent portfolio, as well as their own experimental evidence of potential infringement, Defendants elected to continue their development of and investment in Praluent. *See*, *e.g.*, Ex. 2 at 342:20-343:8, 357:9-12 (Edelberg); Ex. 232 (PTX 4051 at -878). It is undisputed that more than 90% of Defendants'

---

[6] Ex. 199 (PTX 3965 at -7299) [redacted] Ex. 237 (PTX 3957 at-6360) [redacted] *see also* Ex. 244 (PTX 3968 at -3462) [redacted]

[7] *See, e.g.*, Ex. 2 at 198:8–203:6 (Engel); Ex. 200 (PTX 3972 at -4764); Ex. 239 (PTX-6077 at-1792); Ex. 240 (PTX-4203 at-1825, 828-29).



[redacted]

Case 1:14-cv-01317-RGA Document 906 Filed 03/25/19 Page 27 of 46 PageID #: 74908

development costs occurred after Defendants became aware of Amgen's PCT application in 2009. Berndt Dec. ¶ 95.

Even if the Court were to countenance Defendants' hubris in moving forward in the face of Amgen's patent applications, Defendants' actions after Amgen's U.S. patents issued and this lawsuit was filed in October 2014 cannot be ignored. Defendants intentionally accelerated their launch by exercising a priority review voucher to speed up the FDA approval process and their commercial launch. Ex. 2 at 61:2-13 (Bradway); *id.* at 174:1-13, 175:16-176:13 (Broadhurst); Berndt Dec. ¶ 96. Defendants then chose to launch Praluent at risk despite the fact that the Court had discussed, and then implemented, an accelerated trial and permanent injunction hearing schedule in lieu of preliminary injunction proceedings. *See* Ex. 233 (Compl.); Ex. 1 at 12:14-24; 16:25-17:4 (Sch. Conf. Tr.); Ex. 234 (Scheduling Order). More than 50% of Defendants' development and commercialization investment was incurred *after* Amgen filed suit in 2014. Berndt Dec. ¶ 94 & Fig. 12.

Moreover, it appears from limited discovery that Defendants manufactured enormous quantities of Praluent in the U.S. in anticipation of their at-risk launch and since – more than *6 times* the amount sold in the U.S. to date. [redacted]



[redacted]

[redacted] The unused stock presumably either remains in U.S. inventory or has already been moved outside the U.S. to be combined into pharmaceutical compositions for future sales. Ex. 235 at 210:20-211:6 (Edelberg 2015 Dep.); *see also* Ex. 202 (PTX 7543) (reflecting shipment dates to "LT," or Le Trait, France, the location for filling and finishing of bulk alirocumab drug substance lots manufactured in the United States). To the extent any "hardship" claimed by Defendants stems from investment in manufactured infringing product or unused inventory; that "hardship" was caused by Defendants' intentional stockpiling of inventory, which cannot be countenanced. *See Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 345 (S.D.N.Y. 2006) (infringer would not have lost the value of its investment of supply if it did not amass the supply in anticipation of an at-risk launch.). Indeed, Defendants helped themselves to infringing sales and market share in the face of an impending and then an issued injunction. Berndt Dec. ¶ 96. Moreover, to the extent this unaccounted for inventory has been shipped overseas for foreign sales in competition with Amgen, Amgen is unlikely to ever be fully compensated.

Defendants made their choice. Defendants took the "calculated risk" of stockpiling infringing goods, launching Praluent before a judgment in this case, and continuing to manufacture and sell infringing product after the first jury verdict (and now after a second jury verdict). Berndt Dec. ¶¶ 93-94, 96. Any losses they face as a result of an injunction were "'entirely preventable[,]'" and for that reason alone, any hardships Defendants cite should not receive weight. *Sanofi-Synthelabo*, 470 F.3d at 1383.


[redacted]

### 2. Defendants Can Readily Withstand the Financial Impact of an Injunction

The balance of hardships accounts for "the parties' sizes, products, and revenue sources." *i4i Ltd. P'ship*, 598 F.3d at 862. If an infringing product "relates to only a small fraction" of an infringer's business, then the third *eBay* factor favors the plaintiff. *Id.* at 863.

Sanofi will not be significantly impacted by the injunction requested. Berndt Dec. ¶¶ 97-100. Sanofi is one of the world's largest pharmaceutical companies, with a diversified portfolio of products that includes at least 40 pharmaceuticals on the market in the United States. *Id.* at ¶ 97. In 2017, Sanofi reported 2017 global net revenues of $43 billion. *Id.* U.S. sales of Praluent accounted for less than 0.5% of those revenues. *Id.*; Ex. 75 at 144:4–21 (Edelberg 2018 Dep.); Berndt Dec. Fig. 13.

The injunction requested would similarly have little impact on Regeneron. Regeneron earned global net product sales of approximately $6.5 billion in 2017 and $8.2 billion in 2018. Berndt ¶ 97. Of that, its revenue from U.S. sales of Praluent was less than 3% of its global net sales. *Id.*

Sanofi has also insulated Regeneron from financial risk in the event that sales of Praluent are enjoined. [redacted] Regeneron is not responsible for reimbursing Sanofi for *any* of these costs unless and until the collaboration becomes net profitable, which it currently has not. Berndt Dec. ¶ 98; Ex. 236 at 46:7–12, 63:2–8 (Besse 2018 Dep); *see also* Berndt Dec. ¶ 99. Thus, Regeneron has not yet reimbursed Sanofi at all and may very well never have to do so. Berndt Dec. ¶ 98; Ex. 236 at 46:2–6 (Besse 2018



[redacted]

Dep). [redacted]

### D. A Permanent Injunction Will Not Disserve the Public Interest

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i Ltd. P'ship*, 598 F.3d at 863. Far from disserving the public interest, an injunction in this case will promote medical innovation and broaden access to the PCSK9 antibody class, without impairing the health of patients.

#### 1. The Public Interest in Cardiovascular Health Would Not Be Disserved by an Injunction

An injunction will not disserve the public interest because Repatha is FDA approved to safely and effectively treat every patient now taking Praluent. Repatha's and Praluent's efficacy are clinically indistinguishable and they are both very safe. Stein Decl. ¶¶ 11-15, 32-102. No patient currently prescribed Praluent will go without effective and safe anti-PCSK9 antibody therapy if Praluent is enjoined. Stein Dec. ¶ 16. Accordingly, an injunction is appropriate here as it has been in other cases with similar findings. *See Celsis*, 664 F.3d at 932 ("[T]he public can obtain the products" from the patentee); *Amgen*, 581 F. Supp. 2d at 213 (granting an injunction where it was "not clear that [the infringing drug product] offers significant clinical advantages over [the patented drug]"); *Schneider (Europe) AG v. SciMed Life Sys., Inc.*, 852 F. Supp. 813, 850–51 (D. Minn. 1994), *aff'd*, 60 F.3d 839 (Fed. Cir. 1995) (granting an injunction where the patented and infringing products were "generally interchangeable"). Any argument by Defendants that an injunction is improper because some physicians and patients might prefer to have the choice of Praluent is a red herring. The Federal Circuit made clear in its remand



[redacted]

decision that "eliminating a choice of drugs is not, by itself, sufficient to disserve the public interest." *Amgen*, 872 F.3d at 1381.

**a. Repatha is Approved to Treat All Patients for Whom Treatment with Praluent Is Now Approved**

The current FDA labels for Repatha and Praluent make clear that Repatha can treat every patient now taking Praluent. Stein Dec. ¶ 31-35. According to their respective FDA labels, any patient with a condition for which Praluent is approved can take Repatha instead. *Id.*

The FDA approved labels reflect the clinical and practical reality that Repatha is wholly substitutable for Praluent. Ex. 2 at 119:7-14 (Stein) ("these products are essentially identical"); Ex. 114 at 170:11-171:1 (Wasserman Dep.); Stein Dec. ¶¶ 12, 36. The drugs bind to the same "sweet spot" on the same molecule, PCSK9, and share the same mechanism of action. Stein Dec. ¶ 36; Ex. 25 (JTX-524, at 9); Ex. 26 (JTX-523 at 8-9). Both drugs reduce LDL cholesterol for the same duration. Stein Dec. ¶ 36. As Regeneron's Head of Therapeutic Proteins testified in 2015, there are no advantages to Praluent over Repatha in terms of "purity, potency, stability, in vitro or in vivo biological activity." Ex. 19 at 323:1421 (Papadopoulos 2015 Dep.). Current prescribing guidelines do not distinguish between Repatha and Praluent. Stein Dec. ¶ 36.

**b. There Are No Clinical Advantages of Praluent Over Repatha**

The results of two major clinical trials assessing clinical outcomes for Repatha (FOURIER; results published and adopted in FDA label in 2017), and Praluent (ODYSSEY; results published in 2018), also show that both Repatha and Praluent do what physicians prescribe them to do—reduce LDL cholesterol and thereby reduce cardiovascular risk—to similar extents. Stein Dec. ¶ 13, 37-54. The fact that payers routinely opt to cover only one (and not the other) confirms this. Berndt Dec. ¶ 26.



[redacted]

### (1) Praluent Has No Clinical Benefit Repatha Lacks

Defendants may contend that the ODYSSEY trial showed that Praluent has certain clinical properties that Repatha lacks. The most notable is a purported ability to reduce the incidence of death from any cause, a so-called "all-cause death benefit." They base this claim on the observation that of 726 patients in the 18,924 ODYSSEY trial who died for any reason, 58 more (392 vs. 334) were in the group of patients that did not receive Praluent. Stein Dec. ¶¶ 14, 53 (reprinting Ex. 254 (DTX-3200 at Table 2)). But the numeric difference in the incidence of all-cause death between drug and placebo groups was not statistically significant under the protocols of the ODYSSEY trial itself. McCulloch Dec. ¶¶ 37-39; Stein Dec. ¶¶ 54, 60. In this respect, ODYSSEY and Amgen's FOURIER study each failed to meet a statistical endpoint for reducing what is called "all-cause mortality." Stein Dec. ¶¶ 14, 52. No conclusion about mortality can therefore be drawn from either the FOURIER or the ODYSSEY study data.

Defendants may suggest to the Court that Praluent should stay on the market "just in case," contrary to all meaningful evidence, Praluent alone has some inexplicable ability to reduce all-cause mortality. But that suggestion is so detached from science that even Defendants' medical expert distanced himself from it. After admitting that it is currently "unanswerable" whether Repatha has the ability to prevent death (Ex. 243 at 34:8-35:1 (Eckel 2018 Dep.)), Defendants' expert Dr. Eckel acknowledged that the "right way" to compare Repatha and Praluent's efficacy and safety would be through a head-to-head clinical trial. *Id.* at 35:10-36:1; Stein Dec. ¶¶ 14, 55. Given everything we know about these two PCSK9 antibodies (FDA-approved to treat the same patients, same binding site on PCSK9, identical mechanism of action), it is not credible to claim that "Praluent possess[es] some clinical benefit not possessed by Repatha." Stein Dec. ¶¶ 55-56. Indeed, in the drug marketing context, the FDA has advised that claims of drug superiority based on studies not specifically designed to compare the drugs



[redacted]

are misleading. *Id.* This was one of the reasons a German patent court last September denied Defendants' request for a compulsory license:

> "The described studies [FOURIER and ODYSSEY] consequently cannot replace a direct comparison of the effects of the two antibodies, such as is examined in a so-called equivalence study ("head-to-head study") in which a standardized patent pool is administered either the one or the other antibody as the active ingredient under a standardized study design."

Ex. 241 (PTX-7551 at-1733).[8]

More fundamentally, the ODYSSEY mortality data do not show that Praluent reduces the incidence of death. The data do not demonstrate a reduction in death from cardiovascular causes. Stein Dec. ¶ 60. It is biologically implausible that a drug whose sole mechanism of action (a mechanism explicitly recited in Praluent's label) results in lowering LDL cholesterol and related lipids could somehow have a greater effect on death from non-cardiovascular causes than on death from cardiovascular causes. *Id.* at ¶ 61. As a leading biostatistician has commented, "the all-cause death finding rests on combining nonsignificant reductions in both CV and non-CV deaths (31 and 27 fewer deaths, respectively), and *the latter has no obvious rationale*." *Id.*

[redacted]

[8] Outside the litigation context, Sanofi and Regeneron physicians and their own statistical expert in this case recognized that differences between the patient populations in these trials could account for the different mortality observations. Stein Dec. ¶ 77.



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



[redacted]

[redacted]

[redacted]

(2) **The 75 mg Dosage Form of Praluent Offers No Clinical Advantages**

Another purported clinical difference to which Defendants point is that Repatha does not have a twice monthly 75 mg dose, whereas Praluent is approved for twice monthly dosing at 75 mg or 150 mg. Defendants will argue that these two doses ("low" and "high") are important for physician choice. But the FDA has approved all dosage forms of Repatha and Praluent as safe and effective. Stein Dec. ¶ 15. And Repatha is FDA-approved to treat every patient that Praluent is approved to treat no matter the dose. Stein Dec. ¶¶ 12, 31-35. Speculative concerns that 140 mg Repatha or 150 mg Praluent might drive LDL cholesterol levels "too low" (which Defendants internally dismiss (Ex. 238 (PTX 3881 at -3886) ("the lower the cholesterol level, the better, there is no low limit")) are based on two misimpressions.

The first is that LDL cholesterol should not be lowered below a certain level (although Defendants have a shifting position on what that level is). But trials of statins and PCSK9 antibodies have shown that achieving very low levels of LDL-C (as low as below 10 mg/dL) do not present any increased safety risk or risk of side effects. Ex. 2 at 97:8-106:12 (Stein); Stein Dec. ¶¶ 88-89, 92-96. Indeed, when testifying to the FDA to secure approval for Praluent, Defendants represented that low LDL-C levels achieved with Praluent did not present any safety



[redacted]

risk.[9] And Sanofi's Dr. Edelberg testified in this case that the higher dosage form of Praluent is as safe as the 75 mg dose. Ex. 75 at 127: 7-15 (Edelberg 2018 Dep.) ("we have not seen any difference in the safety nor tolerability of either of the doses"); *see also* Ex. 2 at 279:11-16 (Victoria Carey (Sanofi)) (testifying that side effect profile of 75 mg and 150 mg dosage forms "very similar").

Second, Defendants are incorrect to suggest that the 75 mg dose keeps LDL cholesterol from falling below some purportedly dangerous floor. In fact, the 75 mg dose and the higher doses (140 mg and 150 mg) bring about approximately the same reductions in LDL-C over the first half of the two-week dosing cycle. Ex. 2 at 88:6-92:20; 128:17-130:6 (Stein); Stein Dec. ¶ 101. It is only in the second week that LDL-C levels rise somewhat in patients taking 75 mg Praluent, but it does not avoid the low LDL-C levels which Defendants' opportunistically suggest are dangerous. *Id.* at 92:7-17 (Stein); Stein Dec. ¶ 101. In other words, if there is an LDL level that is "too low" (a supposition for which there is no evidence) 75 mg Praluent will plumb to that same depth as surely as Repatha will. Ex. 2 at 88:6-92:20; 128:17-130:6 (Stein); Stein Dec. ¶ 101. Thus, even if some floor below which LDL-C levels should not drop existed, and it does not, 75 mg Praluent does not avoid it.

Importantly, following the publication of the safety and efficacy results from the very large and long-term FOURIER clinical trial for Repatha, the FDA removed a cautionary statement from Repatha's initial label that "the long-term effects of very low levels of LDL-C

---

[9] Dr. Ned Braunstein, Senior Vice President, Regulatory Affairs, Pharmacovigilance, and Risk Management at Regeneron, told the FDA that, "The overall rates of treatment-emergent adverse events, serious adverse event events, deaths, or adverse events leading to treatment discontinuation were similar in patients with low LDL cholesterol values compared to the overall population." Ex. 69 (PTX-4972 at -7106). And Sanofi's Dr. Edelberg stated that Defendants "didn't see any safety signal" in patients taking Praluent who achieved LDL-C levels less than 25 mg/dL. *Id.* at -7125.



[redacted]

induced by REPATHA are unknown." Stein Dec. ¶¶ 15, 93. This Court need not substitute its own judgment for the FDA's. *See* Ex. 207 at 6 (Judge Robinson unwilling to "delve into weighing testimony on the propriety of treating patients" with different doses of PCSK9 antibodies).

**2. The Enforcement of Patent Rights Is an Important Public Interest**

This Court's inquiry into the public interest needs to include consideration of the "'public interest in encouraging investment in drug development and protecting the exclusionary rights conveyed in valid pharmaceutical patents.'" *Sanofi-Synthelabo*, 470 F.3d at 1383–84. As this Court has noted, guarding against infringement, even where the patentee and the infringer are the only suppliers of a lifesaving product, can "foster the development of more technologies aimed at enhancing public safety." *E.I. DuPont de Nemours & Co. v. Unifrax I LLC,* 2017 WL 4004419, *5 (D. Del. Sept. 12, 2017). The exclusionary rights conveyed by valid patents are particularly critical in the biopharmaceutical industry, because innovative companies, like Amgen, use revenues from patented drugs to fund the multi-billion dollar investments necessary to discover new medicines and bring them to market. Bradway Dec. ¶¶ 7-10; Ex. 2 at 58:15-60:11 (Bradway); Berndt Dec. ¶¶ 103-105.

The patents-in-suit here are prime examples of patents whose exclusive rights should be enforced. Berndt Dec. ¶ 105. Amgen invented the first biologic directed at the treatment of high cholesterol. It reduces LDL cholesterol approximately 60% above and beyond the reductions achieved with the most effective statins, i.e., when administered on top of statins. Stein Dec. ¶¶ 10, 26. Thus, a patient taking the most effective statins plus Repatha could see remarkable LDL cholesterol reductions of about 80%. *Id.*



[redacted]

**3. The Public Interest will be Served by an Injunction Because Patient Access to PCSK9 Antibodies Will be Expanded.**

Because of the profound, unique benefits PCSK9 antibodies offer, the public interest is served by ensuring that this therapy is available to every patient for whom it is appropriate. As described above, the competition from Praluent has caused severely restricted patient access in the form of onerous payer UM criteria and PA protocols, depriving high-risk patients PCSK9 medicine. Berndt Dec. ¶¶ 106-110; Kessler Dec. ¶¶ 28-31; Pieri Dec. ¶ 28. Absent an injunction, Amgen lacks the leverage to negotiate with payers to remove the access barriers for these patients. Historically, 80% of patients' attempts to get access to PCSK9 antibodies through their insurance fail after a first attempt. Berndt Dec. ¶ 53. An injunction will end the direct and destructive competition between Repatha and Praluent, allowing Amgen to use much-improved leverage during contract negotiations with payers to lift current patient access restrictions on Repatha.

**4. Amgen Can Supply the Entire PCSK9 Antibody Market**

There is no harm to the public interest where the patentee "can fully meet the increased demand that the injunction creates" for the patented product. *Howes v. Med. Components, Inc.*, 741 F. Supp. 528, 534–35 (E.D. Pa. 1990). Amgen has the manufacturing and marketing capacity to supply the entire U.S. PCSK9 antibody market going forward if an injunction issues. *See* Chattopadhyay Dec. ¶¶ 14-23; Kessler Dec. ¶¶ 39-44.



[redacted]

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Michelle M. Ovanesian (No. 6511)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
movanesian@ycst.com

*Attorneys for Amgen Inc., Amgen Manufacturing, Limited, and Amgen USA Inc.*

OF COUNSEL:

MCDERMOTT WILL & EMERY LLP
William G. Gaede, III
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

Sarah C. Columbia
K. Nicole Clouse
28 State Street
Boston, MA 02109-1775
(617) 535-4074

Rebecca Harker Duttry
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8000

LONDON & MEAD
Christopher B. Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334



[redacted]

CRAVATH, SWAINE & MOORE LLP
Keith R. Hummel
David N. Greenwald
Lauren A. Moskowitz
Geoffrey G. Hu
Sharonmoyee Goswami
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Lauren Martin
Megan Y. Yung
111 Huntington Ave., Suite 520
Boston, MA 02199
(617) 712-7100

Dated: March 18, 2019

01:24290252.1



[redacted]

# EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| REGENERON PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>AMGEN INC.,<br><br>Defendant. | C. A. No.: 22-00697-JLH<br><br>**CONFIDENTIAL** |

**OPENING EXPERT REPORT OF ROBERT H. ECKEL, M.D.**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. SUMMARY OF OPINIONS .......... 3

III. BACKGROUND OF CARDIOVASCULAR DISEASE .......... 7

IV. THE RESULTS OF THE ODYSSEY OUTCOMES TRIAL DEMONSTRATE THAT PRALUENT® OFFERS SIGNIFICANT BENEFITS TO PATIENTS THAT HAVE NOT BEEN SHOWN WITH REPATHA .......... 11

- A. Overview of the ODYSSEY OUTCOMES trial .......... 12
- B. Overview of Amgen's FOURIER Trial .......... 17
- C. The Mortality Benefit Demonstrated by Praluent® Is Significant to Patients, Clinicians and the Medical Community .......... 18
- E. Praluent® Significantly Reduces the Risk of Unstable Angina Requiring Hospitalization; Repatha® Does Not .......... 21
- F. Praluent® Reduced the Incidence of Type 2 Myocardial Infarctions; Repatha® Did Not .......... 22

V. THERE ARE PATIENTS WHO REQUIRE PRALUENT® RATHER THAN REPATHA® BECAUSE THEY EITHER DO NOT ACHIEVE SUFFICIENT LDL-C LOWERING WITH REPATHA® OR CAN NOT TOLERATE REPATHA® .......... 24

VI. PRALUENT®, UNLIKE REPATHA®, IS AVAILABLE IN A LOW-DOSE OPTION, ALLOWING PHYSICIANS TO TREAT TO A TARGET LDL-C .......... 29

- A. Praluent's Different Dosing Options .......... 29
- B. There is No Consensus that Achieving Very-Low Levels of LDL-C is Safe or Beneficial .......... 31

VII. ALTERNATIVE TREATMENTS TO PCSK9 FOR LOWERING LDL-C .......... 37

I, Robert H. Eckel, hereby declare and state as follows:

## I. INTRODUCTION

1. I submit this Opening Expert Report on behalf of Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron") in support of Regeneron's Complaint against Amgen Inc. ("Amgen") in the above-captioned matter. I have been asked to provide opinions on what cardiovascular disease is and how it is treated. I have further been asked to provide opinions on the manner in which PCSK9 inhibitors are differentiated from other FDA-approved treatments for lowering cholesterol and how PCSK9 inhibitors are differentiated from each other. I have further been asked to provide opinions on the unique patient populations that Praluent® serves.

2. I am the past Interim Vice Chancellor for Research and Professor of Medicine, Emeritus at the University of Colorado Anschutz Medical Campus. I received a Bachelor of Science in Bacteriology with Honors from the University of Cincinnati in 1969 and a Doctor of Medicine degree from the University of Cincinnati College of Medicine in 1973. I completed an internship (1973-74) and residency (1974-1976) in internal medicine at the University of Wisconsin Hospitals in Madison. I completed a Senior Fellowship in Endocrinology and Metabolism at the University of Washington School of Medicine in Seattle in 1979. I then joined the faculty at the University of Colorado Health Sciences Center ("UCHSC"), which eventually became known as the University of Colorado Denver ("UCD"), and most recently the University of Colorado at Anschutz Medical Campus ("UCAMC"). I am board certified in Internal Medicine and Endocrinology and Metabolism. Although I remain active academically, I formally retired from my positions at the University of Colorado Anschutz Medical Campus in 2019. I performed numerous roles and held numerous positions during my tenure at UCHSC/UCD/UCAMC. The primary focus during my career was as a translational investigator as a physician scientist where I maintained an active laboratory that performed clinical and basic

`

science research focused on lipid and carbohydrate metabolism, and how macronutrient metabolism relates to energy balance and body weight regulation on the one hand, and to insulin action and cardiovascular disease prevention on the other hand.

3. My clinical practice was directed to how disorders of endocrinology, metabolism and diabetes related to preventive cardiology. Because I had a joint appointment in cardiology in addition to endocrinology, metabolism and diabetes, my clinic was located in the Heart Center of the University of Colorado Hospital for the last 15-20 years of my career. My work in the clinic primarily focused on reducing the risk of cardiovascular disease (heart attack, stroke, peripheral vascular disease) related to metabolic diseases, utilizing lifestyle, pharmacological interventions and subspeciality referrals when needed.

4. My clinical practice involved the diagnosis and treatment of patients with conditions such as metabolic syndrome, Type 1 Diabetes, Type 2 Diabetes, and complex disorders of lipid and lipoprotein metabolism (high or very high LDL cholesterol ("LDL-C")), high and very high triglycerides ("TG"), low and very low HDL-C, high lipoprotein(a) ("LP(a)"), and other rare genetic diseases of lipid and lipoprotein metabolism. In my clinical experience, I often prescribed PCSK9 inhibitors such as Praluent® (alirocumab) and Repatha® (evolocumab) to patients to lower their LDL-C levels and have remained educated on recently approved therapies including a long-acting injectable, Leqvio® (inclisiran) to lower PCSK9 levels, and cardiovascular outcome trials ("CVOTs") related to all lipid lowering pharmaceuticals.

5. I have had the opportunity to serve in a number of leadership positions in the academic community and received numerous awards and recognitions in my career. For example, I am a Distinguished Alumnus of the University of Cincinnati College of Medicine. In

`

1996, I served as the President of the North American Association for the Study of Obesity ("NAASO") now renamed The Obesity Society. From 2005-2006, I served as the President of the American Heart Association ("AHA") and in 2010 I was awarded the Gold Heart Award from the AHA. The Gold Heart Award is the AHA's highest volunteer honor and has been presented to outstanding volunteers every year since 1950. In 2020, I also served as the President of Medicine and Science of the American Diabetes Association. A more complete list of my experience and awards is included in my *curriculum vitae* (attached as Exhibit A).

6. I have published over 400 peer-reviewed papers, articles, editorials, and book chapters primarily related to my funded clinical and basic science, and on cardiometabolic issues including guidelines and reviews.[1]

## II. SUMMARY OF OPINIONS

7. In my opinion, both as an academic and a practicing clinician, Praluent® is an important and unique prescribing option for physicians.

8. First, Praluent® provides unique and important clinical benefits to patients and physicians which Repatha® does not:

- In a summary of CVOT data, Praluent® (chemical name, alirocumab) compared with placebo decreased the risk of cardiovascular disease ("CVD") events, with an odds ratio ("OR") of 0.87 (95% confidence interval ("CI") 0.80 to 0.94; 10 studies, 23,868 participants; high-certainty evidence), **and decreased the risk of mortality, (OR 0.83, 95% CI 0.72 to 0.96; 12 studies, 24,797 participants; high-certainty evidence).** In comparison, Repatha® (chemical name, evolocumab) compared with placebo: for CVD, the OR was 0.84, (95% CI 0.78 to 0.91; 3 studies, 29,432 participants; high-certainty evidence); but there was no reduction in mortality, the OR

[1] A list of my publications is included in my *curriculum vitae* (Exhibit A). I have also made numerous presentations locally, nationally, and internationally regarding various topics related to my profession, which are also reflected in my attached *curriculum vitae* (Exhibit A).

`

was 1.04 (95% CI 0.91 to 1.19; 3 studies, 29,432 participants; high-certainty evidence).[2]

- Praluent® has been proven to reduce the risk of death in patients, as compared to placebo, by 15%. In higher-risk patients with baseline low-density lipoprotein cholesterol ("LDL-C") levels of 100 mg/dL or more, Praluent® has been shown to reduce overall mortality by 29%, coronary heart disease ("CHD") death by 28%, and CV death by 31%. In contrast, Repatha® has not been shown to reduce the risk of death. In fact, in Amgen's large cardiovascular outcomes trial, numerically more patients died while taking Repatha® than placebo.

- Praluent® has also been proven to significantly reduce the risk of unstable angina requiring hospitalization, a medical emergency. Repatha® has not demonstrated any such benefit.[3]

- In addition, Praluent® has been found to significantly reduce the risk of Type 2 myocardial infarctions (heart attacks), which are associated with a higher incidence of death than other types of heart attacks. Repatha® has not demonstrated any ability to reduce the incidence of Type 2 myocardial infarctions.[4]

9. Second, there are patients who require a PCSK9 inhibitor who respond differently to Praluent® and Repatha®. For example, some patients have experienced a difference in efficacy between the two drugs, in that their LDL-C is not lowered by Repatha® but is by Praluent® (or vice versa). In addition, certain patients experience certain side effects from one drug, but not the other. Thus, there are certain patients for whom Praluent® is their only feasible option.

10. Third, Praluent® is available in both a lower 75 mg dose and a higher 150 mg dose. Each dosage offers different amounts of LDL-C lowering. In contrast, Repatha® comes

---

[2] Schmidt, Amand F., et al., "PCSK9 monoclonal antibodies for the primary and secondary prevention of cardiovascular disease." *Cochrane Database of Systematic Reviews*, Vol. 10, 10 (2020): CD011748, PMID: 33078867.
[3] Geng, Qiang, et al., "Efficacy and safety of PCSK9 inhibition in cardiovascular disease: a meta-analysis of 45 randomized controlled trials." *Cardiology Journal*, Vol. 29, 4 (2022): 574-581, PMID: 34581425.
[4] White, Harvey D., et al, "Effects of alirocumab on types of myocardial infarction: insights from the ODYSSEY OUTCOMES trial." *European Heart Journal*, Vol. 40, 33 (2019): 2801-2809 PMID: 31121022.

`

only in one strength, offering a high amount of LDL-C lowering. Importantly, there are still unknown benefits and/or risks of maintaining very low LDL-C levels over the long-term. Only Praluent® allows doctors to treat patients to LDL-C targets without going to potentially unsafe levels.

11. On examination of studies on the various LDL-C reducing agents including statins, ezetimibe ("Improve-It") and Praluent® ("ODYSSEY OUTCOMES"), on the absolute, not relative, risk of CVD events in patients with an acute coronary syndrome ("ACS"), the below Figure shows that the maximum benefit of LDL-C lowering appears to plateau at levels between 30 and 70 mg/dL. FOURIER was a similar trial involving Repatha® but done in patients with a known history of CVD wherein the expected risk of an event is ~50% of that in ACS patients who were studied in the Praluent® ODYSSEY OUTCOMES study. When FOURIER results are included in this analysis, wherein the maximum LDL-C lowering was greater than observed in ODYSSEY OUTCOMES, the below Figure shows that the relationship between the levels of LDL-C lowering achieved and absolute number of events is unchanged. Thus, the lower dosage of Praluent® to achieve this level of LDL-C, *i.e.*, 75 vs. 150 mg every 2 weeks, is an important option that should be available to the health care provider when making prescribing decisions.

`

## Absolute Risk Reduction of LDL-C Lowering Begins to Plateau




Adapted from O'Keefe, J. et al., *JACC* 43:2142, 2004 + RHE 2019

12. For convenience, I provided a table of some of the key distinctions between Praluent® and Repatha, all of which I discuss in detail below.

| | **Praluent®** | **Repatha®** |
|---|---|---|
| **LDL-C reduction** | Approximately 45% (75 mg dose) or 60% (150 mg and 300 mg doses) | Approximately 60% (140 mg and 420 mg doses) |
| **Demonstrated to reduce patient death** | Yes | No |
| **Demonstrated to reduce unstable angina requiring hospitalization** | Yes | No |
| **Demonstrated to reduce Type 2 heart attacks** | Yes | No |
| **Differential responses** | Certain patients respond to Praluent® but not Repatha® | Certain patients respond to Repatha® but not Praluent® |
| **Differential side effects** | Certain patients better tolerate Praluent® than Repatha® | Certain patients better tolerate Repatha® than Praluent® |

13. For all these reasons, Praluent® is a unique, life-saving drug that is an important option for practitioners and their patients.

## III. BACKGROUND OF CARDIOVASCULAR DISEASE

14. Heart disease and cardiovascular disease ("CVD") are two "catch-all" terms that are commonly used to refer to diseases of the heart and blood vessels. CVD is the leading cause of death world-wide, being responsible in 2021 for approximately 17.3 million deaths annually, or about 30% of all deaths each year, a figure expected to grow to greater than 23.6 million deaths per year by 2030 according to the World Health Organization.[5] In the United States, cardiovascular disease accounted for approximately 931,578 deaths in 2021, which was more deaths than those attributable to all forms of cancer and chronic lower respiratory disease combined.[6]

15. The most common form of CVD is atherosclerosis, which refers to plaque buildup inside the arteries. LDL-C, as well as other risk factors, contribute to atherosclerosis. As plaque builds from the wall of an artery, the inside of the artery can narrow, which can lessen or block the flow of blood. The plaque can also become unstable and break or bleed within the artery wall creating a clot that may obstruct blood flow and result in a heart attack if the clot occurs in a blood vessel that feeds the heart or a stroke if the clot occurs in a blood vessel that feeds the brain. Subsequently, coronary heart disease can weaken the heart muscle and lead to heart failure and cardiac rhythm disturbances (arrhythmias).

16. One type of CVD is acute coronary syndrome ("ACS"), an umbrella term for situations where the blood supplied to the heart muscle is compromised, causing a heart attack or

---

[5] McClellan, Mark, et al., "Call to Action: Urgent Challenges in Cardiovascular Disease: A Presidential Advisory From the American Heart Association," *AHA Circulation*, Vol. 139, 9 (2024), 44-54 available at https://www.ahajournals.org/doi/full/10.1161/CIR.0000000000000652.

[6] "2024 Heart Disease and Stroke Statistics Update Fact Sheet, At a Glance." American Heart Association, available at https://professional.heart.org/en/science-news/-/media/E93F4970FF834DA592B486DE74704BBB.ashx.

`

unstable angina. Despite the benefits of modern therapy, patients suffering from ACS are at high risk for recurrent cardiovascular events and premature death. Registry data indicate cardiovascular mortality to be as high as 13% at five years for these patients, with many of these deaths occurring after initial discharge from the hospital, supported by a rate of recurrent events being higher in the first months after discharge.[7]

17. Significantly, the risk of recurrent cardiovascular events after ACS in some patients remains associated with elevated levels of LDL-C or "bad cholesterol."[8] Controlling LDL-C levels is thus a critical part of preventing CVD in general.

18. Statins are among the most studied drugs in CVD prevention and are prescribed as a first-line therapy over other lipid-modifying treatments ("LMT") unless there are tolerability issues. The clinical guidelines from the American Heart Association and American College of Cardiology on the management of blood cholesterol (the "AHA/ACC Guideline"), most recently updated in June 2019, support the use of statins for primary and secondary prevention of atherosclerotic cardiovascular disease ("ASCVD").[9]

---

[7] Fox, Keith A., et al. "Underestimated and underrecognized: the late consequences of acute coronary syndrome (GRACE UK-Belgian Study)" *European Heart Journal*, Vol. 31, 22 (2010): 2755-2764.

[8] *See* Schwartz Gregory G., et al. "Effect of alirocumab, a monoclonal antibody to PCSK9, on long term cardiovascular outcomes following acute coronary syndromes: rationale and design of the ODYSSEY OUTCOMES trial." *American Heart Journal*, 168, 5 (2014), 682-689 at 683.

[9] *See* "2018 AHA/ACC Guideline on the Management of Blood Cholesterol", *American College of Cardiology* (Updated June 2019), available at https://www.acc.org/~/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/Guidelines/2018/Guidelines-Made-Simple-Tool-2018-Cholesterol.pdf. Statins are recommended for primary prevention of ASCVD in all patients with a diagnosis of familial hypercholesterolemia (high cholesterol); in patients ages 20-39 if there is a family history of premature ASCVD and if the patient has an LDL-C above 160 mg/dL; in patients age 40-75 whose LDL-C is greater than 70 mg/dL but less than 190 mg/dL who do not have diabetes, but have either a borderline 10 year risk of ASCVD and other risk enhancers or are at intermediate or high 10-year risk of an ASCVD event; and in patients with diabetes between the ages of 40 and 75. Statins are also recommended as a secondary prevention to

`

19. According to the American Heart Association, about one in three Americans has elevated levels of LDL-C.[10] However, there are many patients who either do not tolerate statins or do not achieve sufficient LDL-C lowering while on statins.[11] These patients remain at a very high risk of developing conditions leading to CVD and other life-threatening cardiovascular problems and therefore need additional therapies for LDL-C lowering and CVD prevention. Those ACS patients with LDL-C levels above 100 mg/dL are at the highest risk of future major adverse cardiovascular events.[12]

20. If statin therapy alone is not providing sufficient LDL-C lowering (or statins are not well-tolerated), there are many other treatment options that can be used in conjunction with a statin, such as ezetimibe, bempedoic acid, bile acid sequestrants, fibrates, niacin and LDL apheresis. For patients in need of a stronger therapeutic option, clinicians are currently able to prescribe the self-administered PCSK9 inhibitors Praluent®, with two dosage options, or Repatha®, with only one dosage option, both of which lower cholesterol more effectively than the other available alternatives to statins.[13]

21. The AHA/ACC Guideline recommends that the use of PCSK9 inhibitors be considered in two patient populations: (1) for secondary prevention of ASCVD in very high-risk

---

reduce the risk of another ASCVD event for patients who have had a serious cardiovascular incident or cardiovascular procedure.

[10] *See* Soto, Lucy, "New guidelines: Cholesterol should be on everyone's radar, beginning early in life." *American Heart Association News* (Nov. 10, 2018), available at https://www.heart.org/en/news/2018/11/10/new-guidelines-cholesterol-should-be-on-everyones-radar-beginning-early-in-life. .

[11] Fitchett, David H, et al., "Statin Intolerance." *AHA Circulation*, Vol. 131, 3 (2015): 389-391, available at https://doi.org/10.1161/CIRCULATIONAHA.114.013189.

[12] Steg, Philippe G., et al., "Effect of Alirocumab on Mortality After Acute Coronary Systems." *Circulation*, Vol. 140, 2 (2019): 103-112, PMID: 31117810.

[13] Clinicians also have available the less potent, physician-administered PCSK9 inhibitor inclisiran (Leqvio®). I discuss that product in Section VII below.

`

patients with multiple high-risk clinical factors who are already on maximally-tolerated statin therapy and ezetimibe yet whose LDL-C levels remain above 70 mg/dL;[14] and (2) for primary prevention of ASCVD in patients with familial hypercholesterolemia (high cholesterol), *i.e*. patients whose LDL-C is greater than 190 mg/dL.[15]

22. The choice of a treatment, including a PCSK9 inhibitor, will depend on the characteristics of each individual patient as well as physician judgment. Physicians differ based on their comfort in prescribing new medications, their preferences and medical judgment regarding treating patients to a specific numeric LDL-C goal or treating to achieve the lowest possible LDL-C level, and concerns about patient compliance, tolerability, safety, and cost of treatment for the patients.

23. Deciding what LDL-C lowering therapy to prescribe is necessarily a case-by-case determination based on, among other things, whether the patient has had a previous CVD event such as a heart attack or stroke, the amount by which the patient's LDL-C should be reduced, the therapies the patient has previously been on and the response to treatment, whether the patient has or had a certain level of intolerance to statin therapy, and the patient's personal preference for taking self-injectable drugs.

---

[14] Very high risk refers to a history of multiple major ASCVD events, such as an ACS within the past year, a history of myocardial infarction, a history of ischemic stroke, diabetes, hypertension, current smoking, persistently elevated LDL-C despite maximally tolerated therapy and ezetimibe and a history of congestive heart failure. *See* AHA/ACC Guideline at 23-24.

[15] This patient population includes patients with heterozygous familial hypercholesterolemia (HeFH), a genetic disorder that causes dangerously high levels of LDL-C, who are unable to achieve an LDL-C of 100 mg/dL or less while on maximally-tolerated statin and ezetimibe therapy, as well as non-HeFH patients with a baseline LDL-C level of 220 mg/dL or higher whose LDL-C remains above 130 mg/dL while on maximally-tolerated statin and ezetimibe therapy. AHA/ACC Guideline at 25.

`

24. As I discuss herein, statins, ezetimibe, bempedoic acid, bile acid sequestrants, fibrates and niacin are typically among the first line of treatment for LDL-C lowering. While physicians make use of all the tools in their arsenal for LDL-C lowering, including these other therapies, the self-administered PCSK9 inhibitors are the most effective alternative to statins. Another LDL-C lowering therapy that launched in 2022 is doctor-administered Leqvio® (chemical name, inclisiran) which is a small interfering RNA that acts as an inhibitor of PCSK9 by reducing translation or production of the PCSK9 protein. Although approved for the treatment of LDL-C, CVOTs are currently in progress to determine whether this drug also reduces CVD events.[16]

## IV. THE RESULTS OF THE ODYSSEY OUTCOMES TRIAL DEMONSTRATE THAT PRALUENT® OFFERS SIGNIFICANT BENEFITS TO PATIENTS THAT HAVE NOT BEEN SHOWN WITH REPATHA

25. Repatha® and Praluent® have been the subject of large cardiovascular outcomes trials (FOURIER and ODYSSEY OUTCOMES, respectively), providing important insights into the benefits of the two drugs in reducing the risk of major adverse cardiovascular events ("MACE") and death, which may help accelerate adoption of PCSK9 inhibitor therapy among prescribers.

26. The two cardiovascular outcome trials, and now nearly eight years of treatment with this class of drugs, also make clear that there are important efficacy and safety differences between Praluent® and Repatha® (discussed in further detail below):

- Praluent® is associated with a lower risk of death from any cause; Repatha® has not been associated with any such reduction.
- Praluent® is associated with reduced risk of hospitalization for unstable angina, Repatha® has not demonstrated any such reduced risk.

[16] As discussed below, I understand these the results of the CVOTs for Leqvio® will not be available until 2026.

`

- Praluent® is associated with a reduced risk of type 2 myocardial infarction for patients that had a prior heart attack; Repatha® did not demonstrate any such reduction in the risk of a subsequent type 2 myocardial infarction.

## A. Overview of the ODYSSEY OUTCOMES trial

27. The results of Regeneron's ODYSSEY OUTCOMES trial were published in the venerated New England Journal of Medicine on November 7, 2018.[17] ODYSSEY was an international, multicenter, double-blind trial that studied whether the addition of Praluent® to intensive statin therapy would reduce the risk of cardiovascular events and cardiovascular mortality after ACS. This was of particular interest given that the ongoing cardiovascular risk after ACS is associated, in part, with levels of LDL-C.[18]

28. In ODYSSEY, one to 12 months after experiencing an index ACS event (a heart attack or unstable angina requiring hospitalization), 18,924 patients were randomly assigned to receive Praluent® 75 mg every 2 weeks or placebo. Given their recent ACS event, patients were at high risk of another cardiovascular event given that the median time since their ACS "index" event was only 2.6 months.[19] Enrolled patients in both the Praluent® and placebo arms of the study were treated with the best standard of care (e.g., statins) as background stable lipid-modifying therapy. Only those patients not reaching pre-specified lipid levels at their qualifying visit proceeded into the double-blind treatment period.[20] At baseline, 92.1% of qualifying

---

[17] *See* Schwartz, Gregory G. et al., "Alirocumab and Cariovascular Outcomes after Acute Coronary Syndrome," *New England Journal of Medicine*, Vol. 379, 22 (2018): 2097-2107 (referred to as "Schwartz NEJM 2018").
[18] *Id*. at 2.
[19] Schwartz NEJM 2018, at 4.
[20] *Id*. at 2-3.

`

patients had an LDL-C level of 70 mg/dL or higher.[21] Almost 90% of the patients were treated with high-intensity statin therapy from randomization through the conclusion of the study.[22]

29. The median duration of treatment of patients in ODYSSEY OUTCOMES was 2.8 years, with a maximum treatment period of 4 years.[23] The study's objective was to reduce LDL-C levels to a target range of between 25 and 50 mg/dL.[24] 72% of patients randomized to Praluent® initially received the lower 75 mg dose, and throughout the course of the treatment 77% received the 75mg dose at some point.[25] From the 75 mg dose, Praluent® was blindly uptitrated to 150 mg if LDL-C remained 50 mg/dL or greater, or blindly switched to placebo to mitigate very low LDL-C levels, if two consecutive LDL-C readings were below 15 mg/dL.[26] From a baseline median LDL-C level of 87 mg/dL, a mean LDL-C of 38 mg/dL was achieved at 4 months among patients taking Praluent®.[27]

30. The study met its primary efficacy endpoint, meaning it demonstrated that in patients with established cardiovascular disease who were already being treated with the best standard of care, including optimized statin therapy, Praluent® significantly reduced the risk of

---

[21] *Id*. at Figure 2.
[22] *Id*. at 9.
[23] Schwartz NEJM 2018 at 4.
[24] *Id*. at 3.
[25] Schwartz NEJM (2018) at 23.
[26] Schwartz NEJM (2018) at Supp Figure 2. If a patient's LDL-C levels were less than 25 mg/dL on any two consecutive measurements on the 150 mg dose, the dose was reduced to 75 mg. *Id.* If the LDL-C levels were less than 25 mg/dL but greater than 15 mg/dL on two consecutive measurements on the 75 mg dose, the dose was continued but the patient was monitored for safety. *Id.* If LDL-C levels were less than 15 mg/dL on two consecutive measurements during treatment with the 75 mg dose, active treatment was discontinued, and placebo injections were substituted in a blinded manner for the remainder of the study. *Id.*
[27] *Id*. at 6.

`

MACE by 15% as compared to the patients just on statins and a placebo.[28] Praluent's MACE benefit was evidenced early in the study as the curves showing the incidence of MACE between Praluent® vs. placebo separated at about one year of treatment and continued to separate until the end of the study, illustrating the benefit of Praluent®.[29]

31. As shown in the table below, reproduced from Steg 2018 ACC, a risk reduction in favor of Praluent® was observed in the non-fatal MI (14% reduction), stroke (27% reduction), and unstable angina requiring hospitalization (39% reduction) endpoints.[30]

ACC.18

**Primary Efficacy and Components**

| Endpoint, n (%) | Alirocumab (N=9462) | Placebo (N=9462) | HR (95% CI) | Log-rank P-value |
|---|---|---|---|---|
| MACE | 903 (9.5) | 1052 (11.1) | 0.85 (0.78, 0.93) | 0.0003 |
| CHD death | 205 (2.2) | 222 (2.3) | 0.92 (0.76, 1.11) | 0.38 |
| Non-fatal MI | 626 (6.6) | 722 (7.6) | 0.86 (0.77, 0.96) | 0.006 |
| Ischemic stroke | 111 (1.2) | 152 (1.6) | 0.73 (0.57, 0.93) | 0.01 |
| Unstable angina | 37 (0.4) | 60 (0.6) | 0.61 (0.41, 0.92) | 0.02 |

ODYSSEY OUTCOMES 32

[28] Schwartz NEJM 2018, at 7. Table 2 of the NEJM reports a hazard ratio of 0.85. The percentage of risk reduction experienced by patients taking Praluent as opposed to placebo can be expressed as 1 minus the "hazard ratio" or, in this case a 15% risk reduction. Table 2 also reports a confidence interval of 95%. A confidence interval refers to the range within which there is a 95% chance that the true hazard ratio falls. For the 15% reduction in risk seen in MACE in ODYSSEY, the 95% confidence interval was 0.78-0.93, meaning that it was very likely that the true reduction in risk of MACE from taking Praluent as opposed to the placebo was between 22% (1.0-0.78) and 7% (1.0-0.93). The p-value for this finding was 0.0003, meaning in laymen's terms that the probability that this finding was due to chance was approximately three in ten thousand, or extremely unlikely.

[29] *Id.* at Figure 2.

[30] The slide was reproduced from Steg, Philippe G. et al., "The ODYSSEY OUTCOMES Trial: Topline Results Alirocumab in Patients After Acute Coronary Syndrome." *American College of Cardiology*, 67th Scientific Sessions, March 10, 2018 ("Steg 2018 ACC") at 32. *See also* Schwartz NEJM 2018 at Figure 2.

`

32. The major secondary efficacy endpoints for the ODYSSEY OUTCOMES trial were tested in a pre-specified hierarchical sequence.[31] As shown in the figure below reproduced from Steg 2018 ACC, all key secondary efficacy endpoints showed consistent benefit of treatment with Praluent®.

ACC.18

**Main Secondary Efficacy Endpoints:**
**Hierarchical Testing**

| Endpoint, n (%) | Alirocumab (N=9462) | Placebo (N=9462) | HR (95% CI) | Log-rank P-value |
|---|---|---|---|---|
| CHD event | 1199 (12.7) | 1349 (14.3) | 0.88 (0.81, 0.95) | 0.001 |
| Major CHD event | 793 (8.4) | 899 (9.5) | 0.88 (0.80, 0.96) | 0.006 |
| CV event | 1301 (13.7) | 1474 (15.6) | 0.87 (0.81, 0.94) | 0.0003 |
| Death, MI, ischemic stroke | 973 (10.3) | 1126 (11.9) | 0.86 (0.79, 0.93) | 0.0003 |
| CHD death | 205 (2.2) | 222 (2.3) | 0.92 (0.76, 1.11) | 0.38 |
| CV death | 240 (2.5) | 271 (2.9) | 0.88 (0.74, 1.05) | 0.15 |
| All-cause death | 334 (3.5) | 392 (4.1) | 0.85 (0.73, 0.98) | 0.026* |

*Nominal P-value

ODYSSEY OUTCOMES 33

33. Of significant importance, Praluent® reduced the risk of death from any cause (all cause death) by 15% in patients as compared to placebo.[32] That means fewer patients died taking Praluent® than placebo. As shown in the table below, reproduced from Steg 2018 ACC, Praluent's mortality benefit was evidenced early in the study, as the Praluent® versus placebo cumulative incidence curves separated at about eighteen months and continued to separate up to the end of the study.[33] In other words, beginning at approximately eighteen months, there were fewer total instances of death for patients taking Praluent® than for patients taking placebo. That difference in total deaths between the Praluent® and placebo groups continued to widen up to the end of the study, indicating the greater benefit seen with Praluent®.

---

[31] Schwartz NEJM 2018, at 3.
[32] Schwartz NEJM 2018 at Table 2.
[33] *See also* Schwartz NEJM 2018 Supp at 37, Figure S7 (G0).

`




34. ODYSSEY OUTCOMES also convincingly demonstrated that for patients at very high risk of recurrent cardiovascular events, *i.e.*, those patients with a prior ACS event and a baseline LDL-C greater than or equal to 100 mg/dL, treatment with Praluent® reduced the risk of MACE by 24% as compared with a 15% reduction in MACE for the study population as a whole.[34] To further explore the greater benefit seen in this highest-risk subgroup of patients as demonstrated in pre-specified analyses, a post-hoc subgroup analysis was extended to the study's mortality endpoints. As shown in the table below from Steg 2018 ACC, the same high-risk population with a baseline LDL-C ≥ 100 mg/dL demonstrated the greatest reduction in the risk of CHD death (28%), of CV death (31%) and of all-cause death (29%).[35]

35. Subsequent post hoc analysis showed that even a short period of LDL-C levels <39 mg/dL (1.00 mmol/L) achieved with statin and Praluent®, followed by statin monotherapy, was associated with lower risk of MACE than statin monotherapy throughout the observation period. This clinical benefit persisted for several years.[36]

[34] Schwartz NEJM 2018 Supp. at 40, Table S3
[35] *See also* Schwartz NEJM 2018 Supp. at 40, Table S3.
[36] Schwartz, Gregory G., et al., "Transiently achieved very low LDL-cholesterol levels by statin and alirocumab after acute coronary syndrome are associated with cardiovascular risk reduction: the ODYSSEY OUTCOMES trial." *European Heart Journal*, Vol. 44, 16 (2023): 1408-1417, PMID: 36879424.

`

ACC 18

Efficacy: Subgroup with Baseline LDL-C≥100 mg/dL (Median Baseline LDL-C 118 mg/dL)

| Endpoint, n (%) | Alirocumab (N=2814) | Placebo (N=2815) | Absolute risk reduction (%) | HR (95% CI) |
|---|---|---|---|---|
| MACE | 324 (11.5) | 420 (14.9) | 3.4 | **0.76** (0.65, 0.87) |
| CHD death | 69 (2.5) | 96 (3.4) | 1.0 | **0.72** (0.53, 0.98) |
| CV death | 81 (2.9) | 117 (4.2) | 1.3 | **0.69** (0.52, 0.92) |
| All-cause death | 114 (4.1) | 161 (5.7) | 1.7 | **0.71** (0.56, 0.90) |

ODYSSEY OUTCOMES 42

## B. Overview of Amgen's FOURIER Trial

36. The results of Amgen's FOURIER trial were first published in the New England Journal of Medicine on March 17, 2017.[37] FOURIER studied Repatha® in an international, multicenter, double-blind trial that randomized 27,564 lower-risk patients with atherosclerotic cardiovascular disease ("ASCVD"). Patients recruited in FOURIER displayed stable cardiovascular disease as exemplified by the fact that, on average, 3.2-3.4 years had elapsed since their most recent cardiovascular event (ischemic stroke or myocardial infarction).[38] At baseline, 69.3% of patients were taking high intensity statin therapy and the median LDL-C level was 92 mg/dL.[39] Patients in FOURIER were randomly assigned to receive Repatha® (either 140 mg every two weeks or 420 mg monthly) or matching placebo.[40] The median duration of follow-up in FOURIER was 2.2 years.[41]

37. When added to statin therapy, Repatha® lowered LDL-C levels by on average 59% from baseline levels as compared with the placebo.[42] More specifically, after 48 weeks,

---

[37] Sabatine, Marc, et al., "Evolocumab and Clinical Outcomes in Patients with Cardiovascular Disease." *New England Journal of Medicine*, Vol. 376, 18 (May 27, 2017) ("Sabatine NEJM 2017").
[38] Sabatine NEJM 2017 at Table 1.
[39] *Id.*
[40] *Id.* at 1714.
[41] *Id.* at 1715.
[42] *Id.*

`

LDL-C was reduced to 70 mg/dL or lower in 87% of patients, 40 mg/dL or lower in 67% of the patients, and 25 mg/dL or lower in 42% of patients taking Repatha®.[43] Repatha® also reduced the primary composite end point of cardiovascular death, myocardial infarction, stroke, hospitalization for unstable angina or cardiovascular revascularization by 15% and the secondary composite end point of cardiovascular death, myocardial infarction or stroke by 20%.[44]

38. While there were reductions of between 21% and 27% in the risk of myocardial infarction, stroke and coronary revascularization, Repatha® showed no observed effect on the rates of hospitalization for unstable angina, cardiovascular death or death from any cause.[45] In fact, the FOURIER trial showed a slight <u>increase</u> in all cause death and CV death in patients taking Repatha® as compared with patients taking placebo.[46] There were 444 patients who died while taking Repatha®, as compared to 426 patients who died while taking placebo.[47]

### C. The Mortality Benefit Demonstrated by Praluent® Is Significant to Patients, Clinicians and the Medical Community

39. As described above, ODYSSEY OUTCOMES demonstrated a significant mortality benefit for all patients taking Praluent® and an even greater benefit for those patients taking Praluent® who were at highest risk with baseline LDL-C levels equal to or greater than 100 mg/dL. The mortality benefit demonstrated in ODYSSEY OUTCOMES is even more notable considering that patients enrolled in ODYSSEY OUTCOMES were already being treated with state-of-the-art background therapy for ACS.

40. I believe that the mortality benefit demonstrated in ODYSSEY is a significant one, as the data are consistent and convincing. As a clinician, Praluent®'s mortality benefit

---

[43] *Id.*
[44] *Id.* at Table 2.
[45] *Id.* at 1718.
[46] *Id.*
[47] *Id.*

`

would be an important consideration for me in deciding to prescribe Praluent® instead of Repatha® to my patients, particularly in those patients who are at very high risk, *i.e.*, those patients with established ASCVD or ACS and who have a baseline LDL-C of 100 mg/dL or greater. The ability of a drug like Praluent® to save lives is paramount to the patient taking the drug, the clinician prescribing the drug, and the medical community in general.

41. Other opinion leaders in the field have also shared my view about the significance of the ODYSSEY OUTCOMES study results. For example, Dr. Valentin Fuster, M.D., Ph.D., editor-in-chief of the highly respected Journal of the American College of Cardiology (JACC) and the former director of Mount Sinai Heart, stated at the time the results were released that the ODYSSEY OUTCOMES study could change the practice because of, among other reasons, the finding that "[o]n all-cause mortality, the reduction was 15%, and in patients with LDL[-C] ≥100[mg/dL], it was 29%."[48] Likewise, Dr. Mary Norine Walsh, M.D., FACC, past president of the American College of Cardiology, also highlighted at the time "[i]t's more than not negative, it shows a mortality benefit."[49] At that same conference, Dr. Clyde Yancy, M.D., Chief of Cardiology at Northwestern University Feinberg School of Medicine and a past president of the AHA, also commented, "[t]his is a remarkable breakthrough . . . This marks an inflection point . . . Let's accept that we have clear evidence that PCSK9 inhibitors are an effective therapy for patients with known cardiovascular disease, and I think that includes sufficient evidence of a mortality benefit."[50]

42. The mortality benefit demonstrated in ODYSSEY OUTCOMES was also reported by the New England Journal of Medicine and the Journal of American College of Cardiology,

---

[48] Peterson, Lynn, "Trends-in-Medicine." *American College of Cardiology*, (Mar. 10-12, 2018).
[49] *Id*. at 5.
[50] *Id*.

`

two leading medical journals. In addition to reporting the 15% in reduction in all cause mortality, the New England Journal of Medicine included the 29% reduction in all-cause death for those higher-risk patients whose baseline LDL-C is equal to or greater than 100 mg/dL.[51] Likewise, the Journal of the American College of Cardiology published a manuscript from the ODYSSEY OUTCOMES trialists that provides full statistical information for Praluent's all-cause death benefit.[52]

43. Likewise, European regulatory agencies have found the mortality benefit to be "statistically compelling and clinically relevant" warranting inclusion of the data in alirocumab's European label.[53] Thus, the European Commission approved a label for Praluent® which includes the mortality benefit for Praluent® in the Clinical Studies section of the label, as well as the p-value for Praluent's all-cause mortality benefit.[54] Thus, the European Commission recognizes that Praluent's mortality benefit was significant enough that it should be disclosed in the label so that clinicians could view the results of the study.

44. Furthermore, the Institute for Clinical and Economic Review (ICER), the independent nonprofit organization research institute that produces reports analyzing the effectiveness and value of drugs and other medical services, also recognized the importance of

---

[51] *See* Schwartz NEJM 2018 at Table 2; Schwartz NEJM 2018 Supp at Table S3.
[52] Szarek, Michael, et al., "Alirocumab Reduces Total Nonfatal Cardiovascular and Fatal Events: The ODYSSEY OUTCOMES Trial." *Journal of the American College of Cardiology* 387 (Feb. 5, 2019) (Table 4) (referred to as Szarek JACC 2019).
[53] *See* European Commission Guidelines on Summary of Product Characteristics, at 20 (Sept. 2009).
[54] *See* EU Label of Praluent at Table 3 available at https://www.ema.europa.eu/en/documents/product-information/praluent-epar-product-information_en.pdf.

`

Praluent®'s mortality benefit by ascribing a higher value to Praluent® than to Repatha® because of that benefit.[55]

45. In contrast to ODYSSEY OUTCOMES, as noted above, in FOURIER, Repatha® had no observed effect on mortality. Indeed, in the FOURIER trial, there was a slight <u>increase</u> in the number of patients suffering all-cause death and CV death in the treatment arm (those patients taking Repatha®) as compared with the control arm (those patients taking placebo—444 vs. 426 all-cause deaths and 251 vs. 240 CV deaths).[56] The authors of the FOURIER study concluded that "[i]n terms of individual outcomes, [Repatha®] had no observed effect on cardiovascular mortality[.]"[57]

**E. Praluent® Significantly Reduces the Risk of Unstable Angina Requiring Hospitalization; Repatha® Does Not**

46. In addition to reducing the risk of death from any cause, Praluent®, unlike Repatha®, significantly reduced the risk of unstable angina requiring hospitalization. Unstable angina is a serious medical condition that causes unexpected and severe chest pain, and often occurs while resting. The heart fails to receive enough blood flow and oxygen, and this may lead to a heart attack. Unstable angina is treated as an emergency and patients with symptoms of unstable angina require admission to a hospital.

---

[55] *Compare* ICER, "Evolocumab for Treatment of High Cholesterol: Effectiveness and Value, New Evidence Update," at 9 (Sept. 11, 2017), *with* ICER, Alirocumab for Treatment of High Cholesterol: Effectiveness and Value, New Evidence Update, at 10-11 (Feb. 15, 2019) (commenting that the primary reason that Repatha's value is lower than Praluent's was that while "[Repatha®] combined with statin therapy is effective in reducing the incidence of cardiovascular events such as MI and stroke, the evidence did not demonstrate a reduction in CV or all-cause mortality. In contrast, the point estimates for CV and all-cause mortality in ODYSSEY . . . were consistent with the reduction seen in CV events . . ." and further noting that there may be "actual differences in the clinical effectiveness of the two drugs" that would explain Praluent®'s mortality finding).
[56] Sabatine NEJM 2017 at 6.
[57] *Id*. at 7.

`

47. In ODYSSEY OUTCOMES, patients taking Praluent® experienced a 39% reduction in hospitalization for unstable angina as compared to those in the placebo group.[58] By contrast, in FOURIER, patients taking evolocumab experienced no reduction in hospitalization for unstable angina.[59]

48. Both the Praluent® and placebo group had the nearly identical percentage of statin-naïve patients at baseline and the nearly identical percentage of patients on intensive statin therapy during the study, so any effect that statin might have played in reducing the incidence of unstable angina was the same for both groups, yet the Praluent® group still demonstrated a significant (39%) reduction in the incidence of unstable angina requiring hospitalization as compared to placebo. This further demonstrates the mortality benefits of Praluent® relative to a statin.

49. ODYSSEY OUTCOMES' results regarding unstable angina is another important point of differentiation between Praluent® and Repatha® that would be important to clinicians in deciding whether to prescribe Praluent® instead of Repatha®.

### F. Praluent® Reduced the Incidence of Type 2 Myocardial Infarctions; Repatha® Did Not

50. A myocardial infarction ("MI"), commonly known as heart attack, is a life-threatening condition that occurs when blood flow to the heart muscle is abruptly cut off, causing tissue damage. In 2007, the Universal Definition of MI Task Force introduced a classification of five types of MI based on presumptive mechanism of action, including Type 1 due to plaque rupture or fissuring with thrombosis, Type 2 due to heart muscle oxygen supply and/or demand

---

[58] Schwartz NEJM 2018 at Table 2.
[59] Sabatine NEJM 2017 at Table 2.

`

imbalance, and Type 4 related to percutaneous coronary intervention ("PCI").[60] In the FOURIER and ODYSSEY studies, MIs were the most common event in the primary composite endpoints.[61] In the shorter duration FOURIER study, there were a total of 1,288 myocardial infarctions whereas in the longer duration ODYSSEY study, there were 1,383 patients who experienced a total of 1,860 myocardial infarctions.[62]

51. In both studies, approximately 65% of the reported MIs were Type 1, 15% were Type 2 and 15% were Type 4.[63] While both Praluent® and Repatha® reduced the occurrence of post randomization MIs versus placebo and reduced the occurrence of Type 1 MIs, a prespecified analysis of Praluent®'s effect on reducing different types of MIs that was recently submitted for publication demonstrated that Praluent® reduced the occurrence of Type 2 MIs.[64] Because the study also showed that the mortality incidence of patients who suffer a Type 2 myocardial infarction is almost twice as high as the mortality incidence of patients who suffer a Type 1 myocardial infarction (25.4% vs. 11.9%), preventing Type 2 myocardial infarctions through Praluent®-induced treatment would be especially important to me as a clinician.

---

[60] Thygesen, Kristian et al., "Universal Definition of Myocardial Infarction," *Journal of the American College of Cardiology*, Vol. 50, 22 (2007): PMID 18036459. Type 3 MIs are characterized by cardiac death suggestive of MI without biomarker elevation whereas Type 5 MIs are related to coronary bypass surgery. *Id.* at 5.
[61] *See* Schwartz NEJM 2018 at Table 2; Sabatine NEJM 2017 at Table 2.
[62] White, Harvey D. et al., "Effects of alirocumab on types of myocardial infarction: insights from the ODYSSEY OUTCOMES trial," *European Heart Journal*, Vol. 40, 33 (2019) PMID: 31121022; Wiviott, Stephen, et al., "Effect of Evolocumab on Type and Size of Subsequent Myocardial Infarction: A Prespecified Analysis of the FOURIER Randomized Clinical Trial", *JAMA Cardiology*, Vol. 5, 7 (2020) PMID: 32347885.
[63] *Id.*
[64] *See* White, Harvey D. et al., "Effects of alirocumab on types of myocardial infarction: insights from the ODYSSEY OUTCOMES trial." *European Heart Journal*, Vol. 40, 33 (2019) PMID: 31121022.

`

52. By contrast, in FOURIER, Repatha® had no similar observed effect in reducing Type 2 myocardial infarctions. In fact, there were more Type 2 MIs in patients taking Repatha® than in patients taking placebo.[65] Praluent®'s benefit in reducing the number of Type 2 MIs is another differentiation point that clinicians would consider important in deciding whether to prescribe patients Praluent® instead of Repatha®, particularly in those subgroups of high-risk patients who had a previous heart attack. In my experience as a physician, limiting access to Praluent® and its benefit in reducing the number of Type 2 MIs would hurt patients and public health.

## V. THERE ARE PATIENTS WHO REQUIRE PRALUENT® RATHER THAN REPATHA® BECAUSE THEY EITHER DO NOT ACHIEVE SUFFICIENT LDL-C LOWERING WITH REPATHA® OR CAN NOT TOLERATE REPATHA®

53. Although Praluent® and Repatha® are both PCSK9 inhibitors, they are different molecules and bind to different sites on PCSK9 and this was confirmed at the February 2019 liability trial in the patent infringement case brought by Amgen. In the trial, immunology expert Dr. Scott Boyd testified that Repatha® and Praluent® have different heavy chain CDR3 sequences and "an antibody scientist looking at this would say, they're nothing alike... they're completely different."[66] Structural biology and biochemistry expert Dr. Michael Eck testified that "if we look at Praluent® on the right, we see an entirely different structure. There's nothing in common with the way Repatha® binds" to PCSK9;[67] and "[t]hey could have very different properties as a drug. That's in general why we have different drugs within the same class and

---

[65] *See* Wiviott, Stephen, et al., "Effect of Evolocumab on Type and Size of Subsequent Myocardial Infarction: A Prespecified Analysis of the FOURIER Randomized Clinical Trial", *JAMA Cardiology*, Vol. 5, 7 (2020) PMID: 32347885.
[66] *Amgen v. Sanofi*, civ. no. 14-1317-RGA (D. Del. February 19-21, 2019) Tr. (referred to as "Trial Tr.") 231:5-233:10.
[67] Trial Tr. 435:15-437:25; *see also* Trial Tr. 791:8-18 (testimony of expert Dr. Tony Rees that Repatha® and Praluent® bind to some different amino acids on PCSK9).

`

same kind of condition or target. We have a lot of different statins that . . . bind to the same target, but those different structures of those different drugs work better for some people than for others.”).[68]

54. Although Praluent® and Repatha® have a similar primary mechanism of action that relates to PCSK9 and how that impacts the LDL receptor in the liver cell, the two drugs may well have different properties and could cause different effects in the human body. PCSK9 is expressed mainly in the liver, but it is also expressed in many other cells and tissues, including in the brain, and PCSK9 has been postulated to play a role in the development of the central nervous system.[69] Because a complete understanding of PCSK9 remains uncertain, the mere fact that two different molecules such as alirocumab (Praluent®) and evolocumab (Repatha®) both inhibit PCSK9 does not mean that they would not have different effects on patients in terms of efficacy and side effects.

---

[68] Trial. Tr. 479:25-480:11. *See also* Trial Tr. 381:16-19 (testimony of expert Dr. Randal Ketchem agreeing that “a single amino acid change in the protein could affect the biological properties of the protein”); Trial Tr. 388:17-389:8 (testimony of expert Dr. Mehlin stating “I have been surprised” where a “conservative mutations is not conservative at all . . . in terms of the protein function”). Indeed, Amgen’s senior leadership has testified that even biologics intended to be identical (unlike Praluent® and Repatha®) are unlikely to be so. Part 15 Public Hearing on Approval Pathway for Biosimilar and Interchangeable Biological Products, Food and Drug Administration, at 201:7-13 (November 2, 2010) (Amgen’s then SVP of R&D testifying before FDA that “two biological products are unlikely to ever be identical”); Hearing before the Senate Judiciary Committee, at 85 (June 23, 2004)) (Amgen statement that even having the same “active ingredients … is inadequate to ensure sameness of efficacy (*i.e.*, ‘biological activity’) and sameness of safety (i.e., no unexpected adverse reactions, including immunogenic responses).”); Public Workshop on Scientific Considerations Related to Developing Follow-on Protein Products before FDA, at 51 (Sept. 15, 2004) (Amgen’s then VP of Regulatory Affairs testifying before FDA that, “[T]he same protein can cause different kinds of antibody responses when administered to different patients in different clinical settings.”).

[69] *See* Mannarino, Massimo R. et al., “PCSK9 and neurocognitive function: Should it be still an issue after FOURIER and EBBINGHAUS results?” *Journal of Clinical Lipidology*, Vol. 12, 5 (2018):1123-1132, PMID: 30318062.

`

55. Indeed, there are many patients who experience differential responses to Praluent® as compared to Repatha®. This is not unexpected, given that the two drugs are different molecules, patients have idiosyncratic responses to different drugs, and that biologic immunology is complicated and can be unpredictable.

56. These differential responses take the following forms: experiencing a difference in efficacy between the two drugs in terms of LDL-C lowering, including cases where a patient experiences no response to one drug, but responds well to the other; experiencing certain adverse reactions or side effects on one drug but not the other; or experiencing more severe adverse reactions on one drug than on the other drug.

57. There is no clear systematic way for identifying occurrences of differential responses in patients on Repatha® and Praluent®. That is because a physician may or may not report certain side effects or a lack of an expected response to a drug company. And even if the lack of response to Repatha® is reported to Amgen, for example, the physician would not likely report the same patient's subsequent normal response on Praluent® to Amgen. In the absence of head-to-head or cross-over trials that compare the efficacy and side effects of one drug to other, which in the case of Praluent® and Repatha® would be extremely costly and impractical, the best evidence of differential responses that is currently available are adverse event reports, customer inquiries, and other anecdotal evidence identifying cases where patients had substantively different responses to two drugs, such as Repatha® and Praluent®. Adverse event reports are typically prepared by the treating clinician based on the clinician's knowledge of the patient's medical and dosing history and his or her interactions with the patient in which the patient reports and the doctor can observe potentially adverse effects from the drug.

`

58. There are numerous published instances where patients were switched from Repatha® to Praluent® and reportedly experienced increased efficacy (usually measured by lowering of LDL-C) on Praluent®. As one example, there is published account by a physician, Dr. Michael Doyle, in which the physician's patient, who had heterozygous familial hypercholesterolemia, experienced "superior efficacy" on Praluent® as compared to Repatha®. According to the publication, the patient initially started on a 140 mg dosage of Repatha®, taken bi-weekly. His LDL-C level decreased 11% in five weeks on Repatha®, from 124 to 110 mg/dL. After 23 weeks on Repatha®, the patient's LDL-C had increased to 133 mg/dL, at which point treatment was stopped. Eight months later, the patient began treatment with Praluent®, taking a 150 mg dose, every 2 weeks. After three weeks on Praluent®, the patient's LDL-C level had decreased by 76%, from 179 to 43 mg/dL. At seven weeks on Praluent®, his LDL-C level had decreased to 25 mg/dL. The patient was then switched back to Repatha®,[70] and after 15 weeks on the 140 mg dosage, his LDL-C had increased back to 96 mg/dL.[71]

59. The variation in responses to Repatha® and Praluent® is not surprising. Even within the controlled clinical trials of FOURIER and ODYSSEY OUTCOMES, there were substantial variations in the responses individual patients had to Repatha® and Praluent® in terms of LDL-C lowering.[72] Indeed, a subsequent analysis of the FOURIER data found interindividual variation in the percentage of LDL-C lowering for patients taking Repatha. Four

---

[70] According to Dr. Doyle, he switched the patient back to Repatha® because Amgen sales representatives told him that Praluent® would no longer be available to patients due to an injunction. *Amgen v. Sanofi*, civ. no. 14-1317-RGA (D. Del. June 13, 2019), Injunction Hearing Transcript, at 367:6-18. Having samples of Repatha on hand, Dr. Doyle switched the patient back to Repatha® to test the patient's reponse. *See id*.
[71] DOYLE0003-0004.
[72] Evolocumab Clinical Study Report; Sabatine NEJM 2017.

`

weeks after baseline, while the median reduction in LDL-C was 66%, almost 20% of the patients had less than a 50% reduction. More significantly, 53 patients had no LDL-C reduction after one year.[73]

60. The two drugs are not simply interchangeable, despite having similar indications and mechanisms of action.[74] Prescribing physicians take seriously the experience of their patients on a drug when making prescribing decisions. That experience is an important factor when a clinician determines whether to continue the patient on the prescription, or to prescribe an alternative medication. If a patient reports having difficulty tolerating a drug, physicians do not and cannot run a clinical trial to determine whether the patient's issue is caused by the drug. Instead, a physician must care for his or her patient and address the issue — whether it be by perhaps adding an antihistamine to the drug regimen, discontinuing the drug altogether, or switching the patient to an alternative drug.

61. Moreover, a patient who experiences severe adverse drug reactions or a lack of efficacy with a certain drug is likely to discontinue the use of that drug, often at the recommendation of their physician. Even, however, if their physician does not recommend discontinuing treatment, patients are less likely to continue using a drug that does not work well for them and/or has uncomfortable side effects. On the other hand, patients who can switch to an alternative option within the same drug class and who experience increased efficacy and/or

---

[73] *See* Qamar, Arman, et al., "Interindividual Variation in Low-Density Lipoprotein Cholesterol Level Reduction With Evolocumab An Analysis of FOURIER Trial Data," *JAMA Cardiology*, Vol. 4, 1 (2019) 59-63.
[74] *See, e.g.*, Bramlet, D. and Kienle, J., "Case Report: Can a Different PCSK9I be used after Intense Local Reaction to Another PCSK9I?" *Journal of Clinical Lipidology*, Vol. 12, 2 (2018) 549-550 ("Although both available PCSK9I therapies are monoclonal IgG antibodies, they are delivered in injectable vehicles with significant differences[.] Intense local reactions to one PCSK9I does not necessarily mean that a similar or worse local reaction to the other will necessarily occur.").

`

decreased severity, or incidence of side effects are more likely to continue their drug treatment and get the benefit of LDL-C reduction.

62. Some patients will respond better or suffer fewer or less severe adverse drug reactions on one of the PCSK9 inhibitors as compared to the other. Having both PCSK9 inhibitors available is thus important to physicians in their clinical practice. Without multiple PCSK9 inhibitors available, physicians and patients will otherwise often be left with the choice to either continue treatment on a drug that is not very effective and/or induces potentially debilitating side effects or to stop treatment with the drug class all together, leaving those patients exposed to a heightened risk of heart attacks, strokes and death.

## VI. PRALUENT®, UNLIKE REPATHA®, IS AVAILABLE IN A LOW-DOSE OPTION, ALLOWING PHYSICIANS TO TREAT TO A TARGET LDL-C

63. Unlike Repatha®, which comes in only a single strength, Praluent® provides both a low dose option and a high dose option. Praluent®'s dosing options provide an important tool for physicians and their patients in managing the risks associated with elevated LDL-C levels and gives the treating physician the flexibility to down-titrate the patient's dosage to maintain a targeted LDL-C level, and avoid the unknown risks associated with very low levels of LDL-C. Repatha® does not offer the same dosing regimen.

### A. Praluent's Different Dosing Options

64. Praluent® is approved in three doses in the U.S.: 75 mg every two weeks, 150 mg every two weeks, and now 300 mg once monthly. The recommended starting dose for Praluent® is 75 mg, and it is also the most frequently prescribed dose.[75] Repatha® is approved in two doses

---

[75] FDA Label: Praluent, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125559s029s030lbl.pdf.

`

but does not offer a low-dose option. Rather, Repatha® only offers a 140 mg every two weeks and a 420 mg once monthly dose.[76]

65. In terms of percent LDL-C reduction, the 75 mg every two weeks Praluent® dose provides a reduction of approximately 45% in LDL-C level compared to baseline, and the 300 mg once monthly dose provides a reduction of approximately 60%.[77] The 140 mg every two weeks and 420 mg once monthly doses of Repatha® and the 150 mg every two weeks dose of Praluent® each provide a reduction of approximately 60% in LDL-C levels.[78]

66. Praluent®'s low and high dose options allow doctors to: (1) start patients on the low dose (75 mg) and then up-titrate to the higher dose (150 mg) if additional LDL-C reduction is necessary; or (2) start with the higher dose (150 mg) and then down-titrate to the lower dose (75 mg), if LDL-C levels are too low. The 300 mg-once-monthly dose provides an alternative starting dose for patients who prefer less frequent dosing, while still achieving approximately 55% LDL-C reduction. Repatha® simply does not provide any flexibility, as its two different high doses provide the same 60% reduction in LDL-C.

67. Significantly, Praluent® and its flexible dosing options are important for doctors aiming to treat a patient's LDL-C to a "target," *i.e.*, a desired LDL-C number that is sought without going too far below that number. This target is based on medical judgment and various

---

[76] FDA Label: Repatha, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125522orig2s000lbl.pdf.
[77] Praluent® FDA Label; *See also* Müller-Wieland, Dirk et al. "Efficacy and Safety of Alirocumab 300 mg Every 4 Weeks in Individuals With Type 2 Diabetes on Maximally Tolerated Statin." *The Journal of Clinical Endocrinology and Metabolism*, Vol. 104, 11 (2019): 5253-5262, PMID 31166599.
[78] Repatha® FDA Label.

`

guidelines, as discussed below, because of uncertainty as to whether very low levels of LDL-C provide any therapeutic benefit and concern about the long-term risks of very low LDL-C levels.

68. At least one additional study actually looked at the Praluent® 75 mg dose.[79] The 2014 study of Praluent's 75 mg dose given subcutaneously found that it reached its maximal LDL-C lowering potential of between 35-45% (depending on the injection site) at approximately two weeks after injection, as shown in the chart below, reproduced from the Lunven article:




**Figure 1** Mean (SD) alirocumab concentration (**A**), free PCSK9 levels (**B**), and percentage change in LDL-C from baseline (**C**) after subcutaneous administration of alirocumab 75 mg. LDL-C, low-density lipoprotein cholesterol; PCSK9, proprotein convertase subtilisin/kexin type 9; SEM, standard error of the mean; SD, standard deviation.

### B. There is No Consensus that Achieving Very-Low Levels of LDL-C is Safe or Beneficial

69. As noted above, the availability of Praluent's low and high dose is important because there is no consensus in the medical community that achieving very low levels of LDL-C is safe or whether the benefit of lowering LDL-C levels below 40 mg/dL carries additional benefits without concomitant risks. Indeed, there are data that suggest that there may be an

[79] *See* Lunven, Catherine et al., "A Randomized Study of the Relative Pharmacokinetics, Pharmacodynamics, and Safety of Alirocumab, a Fully Human Monoclonal Antibody to PCSK9, After Single Subcutaneous Administration at Three Different Injection Sites in Healthy Subjects," *Cardiovascular Therapeutics*, Vol. 32, 6 (2014): 297-301.

increased risk to patients if LDL-C levels go too low.[80] Since then, there are additional data that there may be an increased risk to patients if LDL-C levels go too low.[81] Lacking in the literature is longer-term data that could indicate what the risk may be.

70. Even the most recent AHA/ACC Guideline (issued after the results of FOURIER and ODYSSEY OUTCOMES) unequivocally states that "[i]f patients develop 2 consecutive LDL-C levels less than 25 mg/dL while on a PCSK9 inhibitor, clinical judgment should be used to determine whether de-intensification of lipid lowering regimen is warranted as long-term safety of such low levels of LDL-C remains unknown."[82]

71. The Journal of the American Medical Association Cardiology published an editorial by Dr. Antonio M. Gotto, Jr., a cardiovascular specialist at Weill Cornell in New York and past president of the AHA, entitled "Low Density Lipoprotein Cholesterol and Cardiovascular Risk Reduction: How Low is Low Enough Without Causing Harm?".[83] In the editorial, Dr. Gotto notes that while the combination of statin therapy with a PCSK9 inhibitor can

---

[80] *See* Everett, Brendan, M. et al., "Safety Profile of Subjects Treated to Very Low Low-Density Lipoprotein Cholesterol Levels (<30 mg/dl) With Rosuvastatin 20 mg Daily (from Jupiter)," *American Journal of Cardiology*, Vol. 114, 11 (2014) 1682-1689 ("[r]ecent US guidelines expand the indications for high-intensity statin therapy, yet data on the safety of attaining very low-density lipoprotein (LDL-C) levels are scarce."). This article analyzed data from the JUPITER trial involving rosuvastatin and concluded that "[i]n participants with an LDL-C 30 mg/dl, we observed an increase in the risk of physician-reported type 2 diabetes with an adjusted hazard ratio (95% confidence interval) of 1.56 (1.09 to 2.23, p=0.01) and physician-reported hematuria (hazard ratio 2.10 (1.39 to 3.19), p <0.001 compared with rosuvastatin-treated participants with LDL-C ≥ 30 mg/dl. There was also an increased risk of certain musculoskeletal, hepatobiliary and psychiatric disorders.

[81] *See* Olsson, A.G., et al., "Can LDL cholesterol be too low? Possible risks of extremely low levels," *Journal of Internal Medicine*, Vol. 281, 6 (2017): 534-553.

[82] AHA/ACC Guideline at 20-21.

[83] Gotto, Antonio M. Jr., et al., "Low-Density Lipoprotein Cholesterol and Cardiovascular Risk Reduction: How Low Is Low Enough Without Causing Harm?." *JAMA Cardiology*, Vol. 3,9 (2018): 802-803.

`

drive LDL-C levels to extremely low levels (less than 15 mg/dL in some cases) while still reducing cardiovascular risk, and that so far such treatment has proven safe, the studies of PCSK9 inhibitors were of "a relatively short duration, and uncommon side effects may take a long time to be detected."[84] Dr. Gotto noted that "[t]he association of diabetes with statin use was not fully described until 23 years after lovastatin approval and millions of patients had received statins."[85] Dr. Gotto also noted that newborns have a reported LDL-C level of 22-45 mg/dL and that detecting adverse events when LDL-C is reduced to levels less than birth "may require longer periods of follow-up than were included in FOURIER and ODYSSEY OUTCOMES trials."[86] I agree with Dr. Gotto's view that "[w]hile it is possible to calculate how low LDL-C levels can be reduced while still detecting a cardiovascular benefit, one reaches a point of diminishing returns, and it is not clear how low it is safe to go."[87]

72. I note that the issue of LDL-C levels going too low was also a point of discussion between the FDA and each of Regeneron/Sanofi and Amgen during the Endocrinologic and Metabolic Drugs Advisory Committee (EMDAC) meetings in June 2015. EMDAC advises the FDA on the science behind new pharmaceuticals and devices. I participated in the EMDAC meeting on behalf of Regeneron and Sanofi to explain the need for additional LDL-C lowering therapy to reduce CVD risk, specifically, the benefit of alirocumab in this setting. One of the questions posed at the EMDAC meeting was "[d]iscuss your level of concern regarding the safety of achieving very low levels of LDL-C induced by" either alirocumab (Praluent®) or evolocumab (Repatha®). In the EMDAC meeting for Praluent®, numerous EMDAC committee

---

[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*

`

members made comments reflecting their concern on low levels of LDL-C.[88] Likewise in the Repatha® EMDAC meeting, many of the same committee members, as well as additional ones, made comments reflecting their concern about low LDL-C levels.[89] Amgen's 2015 label contained a warning about the unknown effects of achieving low levels of LDL-C.[90] While Amgen was permitted to remove that warning from its 2017 label, that does not affect the concerns that I have regarding the long term effects of patients maintaining low levels of LDL-C.

73. Importantly, PCSK9 inhibitors are intended to be life-long therapeutic drugs to reduce LDL-C levels, which could mean decades on the drugs. The only studies that have analyzed whether maintaining LDL-C levels below 40 mg/dL are beneficial in reducing MACE events are short-term studies. For example, the median duration of follow-up in FOURIER was only 2.2 years,[91] and the median duration of followup in ODYSSEY OUTCOMES was 2.8

---

[88] *See* EMDAC Praluent Hearing Transcript, at 328:6-7 (Dr. Peter Wilson of Emory University: "I don't think we have enough safety date here"); *id.* at 329:7-11 (Dr. William Hiatt of the University of Colorado: "The approach to this question, I think, would be what's the benefit and what's the risk of very low levels. In addition to the risk, Dr. Wilson described, there may be other unknown risks. But I guess the question is why go there?"); *id.* at 333:8-16 (Dr. Abraham Thomas of NYU Lutheran: "We don't know there's a benefit in achieving very low levels of LDL cholesterol. And there's no point in achieving those levels in safety if there's no benefit there"); and *id.* at 340:19-341:4 (Dr. Robert Smith of the Alpert School of Medicine, Brown University: "it's acknowledged that there is little or no evidence that low LDL levels, low LDL Cholesterol levels are harmful. But that does not give panel members in general comfort that there might not indeed be adverse consequences of very low LDL levels.").

[89] *See* EMDAC Repatha® Hearing Transcript at 310:21-311:3 (Dr. Daniel Budnitz of the Center for Disease Control and Prevention: "we really just do have a paucity of data still"); *id.* at 312:3-6 (Dr. Philip Sager of Stanford University School of Medicine: "maybe extremely low is just absolutely fine, but there's lack of data, and maybe it isn't actually okay."); *id.* at 314:16-21 (Dr. Michael Blaha of Johns Hopkins University School of Medicine: "I don't think anyone in the room would say they have no concern. I don't have a high level of concern based on the combination of genetic, biologic, mechanistic data, but I certainly have some concern and long-term data is needed:); *id* at 315:4-16 (Dr. Robert Smith of the Alpert School of Medicine "the data really are not satisfactory in terms of other studies. So it remains an open question.").

[90] Repatha® 2015 Label, at 6.

[91] Sabatine NEJM 2017.

`

years;[92] thus, any conclusions regarding the added benefit of low and very low-LDL-C levels induced by these life-long therapies require clinical trials lasting much longer than FOURIER and ODYSSEY OUTCOMES.

74. Considering this uncertainty, there is no LDL-C level that is accepted as being the "correct" LDL-C level for patients. Instead, each patient should be evaluated and, based on the available information and circumstances, a desired level of LDL-C for that patient should be identified. I continue to believe that it is not appropriate for a physician to reduce a patient's LDL-C level to as low as it will go without knowing whether the benefit of doing so outweighs the risks. Prescribing more medication than is needed is counter to what doctors are taught as early as medical school: avoid harm to patients by using the minimum amount of medication that is necessary to achieve the desired clinical result. Many physicians, including myself, are reluctant to prescribe more medication than is absolutely necessary. Indeed, there is no reason to over-treat patients (*i.e.*, reduce a patient's LDL-C to very low levels) because, as noted above, there are insufficient data to show any additional benefits or lack of safety risk in reducing a patient's LDL-C to very low levels.

75. In my opinion, once a patient's LDL-C level drops below 40 mg/dL, a doctor should proceed with caution and, if a patient's LDL-C level falls below 25 mg/dL, I believe that the treatment should be changed to bring the patient's LDL-C level up, rather than have it remain at a very low level. There is just no evidence that an LDL-C of 25 mg/dL or lower is better than an LDL-C of 40 mg/dL. The dosing regimen or Praluent® allows this.

76. Overall, the medical community is clearly concerned about very low levels of LDL-C and recommends that a clinician exercise clinical judgment as to whether to de-intensify

[92] Schwartz NEJM 2018 at 4.

`

the lipid lowering treatment if LDL-C levels get too low. One of the advantages of having Praluent® on the market is that if the patient's LDL-C levels get too low and the patient is on a high dose of Praluent®, the clinician can down-titrate that patient to the 75 mg low dose. If the patient is on Repatha®, the clinician is foreclosed from exercising that judgment because there is no low dose option for Repatha®. Thus, for many patients, the 75 mg low dose of Praluent® may be the medically preferred PCSK9 treatment.

77. The lack of access to Praluent® on the market would leave patients on the 75 mg dose of Praluent® with one of two unappealing options: (1) stop taking a PCSK9 inhibitor, leaving their LDL-C sub-optimally treated with other lipid lowering therapies, and thereby increasing their CVD risk; or (2) take what is the maximum dose of a PCSK9 inhibitor—the 140 mg or 420 mg dose of Repatha® when it may not be needed and, potentially reduce their LDL-C levels far below target and to potentially very low levels of LDL-C. Assuming the absence of proven long term safety of very low levels of LDL-C, stopping PCSK9 therapy altogether may be the only option for some patients. Physicians and their patients should not have to make these choices.

78. There is also another important benefit of Praluent®'s low dose option — the ability to mitigate side effects. I personally treated a patient who experienced a significant injection site reaction, which was mitigated by using the 75 mg dose of Praluent®. This is another benefit of adhering to the principle, noted above, to use the least amount of medication necessary. This patient, and others like her, would be left without a PCSK9 inhibitor without Praluent®'s low dose option.

79. Both Repatha® and Praluent® are now part of many guidelines and are being used increasingly. It would be a disservice to patients if they lacked meaningful access to

`

Praluent® because even more differences in efficacy and safety may be discovered. And if safety concerns with Repatha® were to ensue, it is important to have Praluent® widely accessible to assure that patients who need their LDL-C levels lowered by a PCSK9 inhibitor proven to reduce CVD events can still do so without facing a safety risk.

## VII. ALTERNATIVE TREATMENTS TO PCSK9 FOR LOWERING LDL-C

80. Statins are the drug of choice to lower LDL-C levels and CVD risk. There are seven statins available, in various strengths. Even though Repatha®'s label indicates its use as a first line therapy to lower LDL-C, given statins' efficacy, safety, and cost, I do not believe that physicians would treat patients with Repatha® as a first line therapy for lowering LDL-C, without first making use of statins.

81. Other treatments have been shown to be safe, effective, and tolerable treatment options for patients requiring treatment for high LDL-C levels. Until retirement, I continued to make use of these treatments in my clinical practice as alternatives to or in addition to PCSK9 inhibitors, though none are as quite effective as the two patient-administered PCSK9 monoclonal antibodies—Praluent® and Repatha®. The newer drug, Leqvio®, is being tested in several Phase 3 randomized CVOTs.[93] Once the LDL-C lowering effect of inclisiran (Leqvio®) is demonstrated to reduce CVD events, and assuming patients can easily access it, the drug could become an additional option for lowering LDL-C. I understand Novartis does not currently expect the results of the CVOTs will be available until at least 2026.[94] Unfortunately, Leqvio®

---

[93] Ray Kuasik K. et al., "Long-term efficacy and safety of inclisiran in patients with high cardiovascular risk and elevated LDL cholesterol (ORION-3): results from the 4-year open-label extension of the ORION-1 trial." *The Lancet. Diabetes & Endocrinology*, Vol. 11, 2 (2023): 109-119, PMID: 36620965.

[94] Results of those CVOTs are not expected until at least 2026. *See* Novartis 4Q23 Earnings Presentation, Earnings Call Transcript and Press Release.

`

must be administered in a physician's office, and the infrequent interval of administration poses a risk of patient noncompliance. Lastly, Leqvio®'s LDL-C lowering capability is ~50%, which is somewhat lower than that of the monoclonal antibody PCSK9 inhibitors.[95]

82. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: February 9, 2024.



Dr. Robert H. Eckel, M.D.

[95] Ray et al., "Long-term efficacy and safety of inclisiran," *supra.*

`

# EXHIBIT A

**ROBERT H. ECKEL, M.D.**

**Professor of Medicine, Emeritus**
**University of Colorado Anschutz Medical Center**
Division of Endocrinology, Metabolism and Diabetes
Division of Cardiology
18582 Stone Gate Dr.
Morrison, Colorado 80465
[redacted]

## COMPENSATION STATEMENT

For my work on this matter, I was compensated at my hourly rate of $1,000. My compensation is not contingent on my opinions or the outcome of the litigation.

## EDUCATION

**1969** Bachelor of Sciences, Bacteriology, University of Cincinnati, Cincinnati, Ohio

**1973** Doctor of Medicine, University of Cincinnati College of Medicine, Cincinnati, Ohio

## POSTGRADUATE TRAINING

**1973-74** Internship in Medicine, University of Wisconsin Hospitals, Madison, Wisconsin

**1974-76** Medical Residency, University of Wisconsin Hospitals, Madison, Wisconsin

**1976-79** Senior Fellowship in Metabolism and Endocrinology, Department of Medicine, University of Washington School of Medicine, Seattle, Washington

## LICENSURE TO PRACTICE

Wisconsin, July 10, 1974, License No. 18866
Washington, July 10, 1976, Certificate No. 25209
Colorado, July 10, 1979, License No. 22425

## APPOINTMENTS

**2019-present** Professor of Medicine, Emeritus

**2018-2019** Interim Vice Chancellor of Research
UC Denver, Anschutz, and Downtown campuses

**2013-2014** Director Clinical Translational Research Centers Network, Colorado Clinical Translational Sciences Institute, Aurora, Colorado

**2008-2013** Director Discovery Translation, Colorado Clinical and Translational Science Institute
UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado

**2006-2019** Faculty Appointment, Biomedical Sciences Program
UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado

**2006-2019** Professor Adjunct of Pharmacy, Department of Clinical Pharmacy,
UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado

**2002-2019** Professor of Medicine, Division of Cardiology
UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado

**2000-2019** Charles A. Boettcher Endowed Chair in Atherosclerosis, Department of Medicine,

`

| | |
|---|---|
| | UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado |
| **1998-2004** | Vice-Chair, Research Affairs, Department of Medicine, UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado |
| **1997-2010** | Associate Director, Center for Human Nutrition, UC Denver, Aurora, Colorado |
| **1997-2010** | Co-Director, Nutrition Obesity Research Center UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado |
| **1995-2019** | Professor of Physiology and Biophysics, UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado |
| **1993-2008** | Program Director, Adult General Clinical Research Center, UCHSC/A/K.A. University of Colorado Anschutz Medical Campus, Denver/Aurora |
| **1991-1997** | Co-Director, Center for Human Nutrition, UC Denver, Denver, Colorado |
| **1990-2019** | Graduate Faculty Appointment, Department of Food Science and Human Nutrition, Colorado State University, Fort Collins, Colorado |
| **1989-2019** | Professor of Medicine, UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado |
| **1989-1995** | Professor of Biochemistry, Biophysics and Genetics, UCHSC, Denver, Colorado |
| **1989-1990** | Faculty Affiliate, Department of Food Science and Human Nutrition, Colorado State University, Fort Collins, Colorado |
| **1985-1989** | Associate Professor of Medicine, UCHSC, Denver, Colorado |
| **1984-2019** | Graduate Faculty Appointment, UCHSC/A.K.A. University of Colorado Anschutz Medical Campus (UCAMC), Denver/Aurora, Colorado |
| **1983-1985** | Acting Chair, Division of Endocrinology, UCHSC, Denver, Colorado |
| **1981-1993** | Associate Program Director, Adult General Clinical Research Center, UCHSC, Denver, Colorado |
| **1979-1985** | Assistant Professor of Medicine, UCHSC, Denver, Colorado. |

## BOARDS

Diplomat, National Board of Medical Examiners, July 1974
Diplomat, American Board of Internal Medicine, June 16, 1976; ID #54464
Diplomat, American Board of Endocrinology and Metabolism, June 19, 1979; Recertified May 1, 2008; ID #54464

## HONORS

| | |
|---|---|
| **1969** | Bachelor of Sciences Cum Laude in Bacteriology, University of Cincinnati, Cincinnati, Ohio. |
| **1973** | Alpha Omega Alpha, University of Cincinnati College of Medicine, Cincinnati, Ohio. |
| **1987** | American Society for Clinical Investigation. |
| **1987-88** | Full-Time Faculty House Staff Teaching Award, Department of Medicine, UCHSC, Denver, Colorado. |

`

| | |
|---|---|
| **1990** | Moses Barron Award, American Diabetes Association, Minnesota Affiliate. |
| **1991** | Award of Excellence, Colorado Dietetic Association. |
| **1994-2023** | Best (Top) Doctors in America Recognition. |
| **1997** | Association of American Physicians. |
| **1998** | Excellence in Teaching, Medical Student Council. |
| **1999** | Outstanding Teaching Award, Clinical Science Program, UCHSC. |
| **2000** | Charles A. Boettcher Endowed Chair in Atherosclerosis, Department of Medicine, UCHSC, Denver, Colorado. |
| **2000** | Robert H. Williams-Rachmiel Levine Award, Western Metabolism Club. |
| **2001** | Robert W. Schrier Award of Excellence, Department of Medicine, University of Colorado School of Medicine. |
| **2002** | The Alexander Marble Lecturer at the Elliott P. Joslin Research Laboratory, Harvard Medical School. |
| **2003** | Fellow of the American Heart Association and the Council on Nutrition, Physical Activity and Metabolism. |
| **2004** | Frank and Sheila Thompson Lectureship in Endocrinology, Scott & White Clinic, Temple, Texas. |
| **2004** | Ruth Gray Lecture Award from Evanston Hospital, Northwestern University. |
| **2005** | TOPS (Take Off Pounds Sensibly) Award for Research in Obesity – North American Association for the Study of Obesity. |
| **2006** | Edwin Bierman Lectureship, American Diabetes Association 66th Scientific Sessions, Washington, DC. |
| **2007** | Eugene Drake Award, 57th Session of the Maine Affiliate, American Heart Association, Jan 27, 2007 |
| **2007** | Stare-Hegsted Award in Nutrition Science. Harvard School of Public Health, April 5, 2007 |
| **2007** | Gertrude and Florian Nelson Cardiovascular Research Lecture, University of Mississippi Medical Center, May 7, 2007 |
| **2008** | Joseph Stokes Award, American Society for Preventive Cardiology, Colorado Springs, March 14, 2008 |
| **2009** | Robert Levy Award, Nutrition, Physical Activity and Metabolism Council, American Heart Association Annual Scientific Sessions, New Orleans, November 10, 2008 |
| **2010** | Top Doctors, 5280: Denver Magazine |
| **2010** | Dorothy M. Kahkonen Lecturer, Henry Ford Hospital, Detroit Michigan, May 6, 2010 |
| **2010** | Gold Heart Award, American Heart Association, Dallas Texas, June 22, 2010 |

`

| | |
|---|---|
| **2010** | W. L. Isley Lecturer, Division of Endocrinology, Diabetes, Nutrition, and Metabolism, Mayo Clinic, December 1, 2010 |
| **2011** | Robert H. Herman Award, American Society for Nutrition, Washington D.C., April 10, 2011 |
| **2011** | Outstanding *Obesity* Journal Research Article, the Obesity Society, Oct 1, 2011 |
| **2011** | Wu Lectureship Columbia University Institute of Human Nutrition, Oct 27, 2011 |
| **2013** | Distinguished Alumni Award, University of Cincinnati College of Medicine, April 12, 2013 |
| **2014** | Robert W. Schrier Award of Excellence, Department of Medicine, April 11, 2014 |
| **2015** | Gerald T. Gau Lectureship, Mayo Clinic, January 13, 2015 |
| **2015** | Huldrick Kammer Memorial Lectureship, Portland Providence Medical Center, September 23, 2015 |
| **2015** | Nutrition Obesity Research Center Award for Outstanding Mentoring, December 18, 2015 |
| **2016** | Clinical Investigator Award of the Endocrine Society, April 2, 2016 |
| **2016** | George L. Blackburn Lecturer, 29th Obesity Treatment Symposium, Boston, MA, June 3, 2016 |
| **2016** | President's Council on Fitness, Sports & Nutrition Science Board, 2017-2019. |
| **2017** | W. Virgil Brown Distinguished Achievement Award and Lectureship, National Lipid Association, Philadelphia, PA, May 20, 2017. |
| **2018** | Guenther Boden Memorial Lecture, Department of Medicine, Temple University Lewis Katz School of Medicine, April 11, 2018. |
| **2020** | MMS Ahuja Oration, 19th Annual International Diabetes Conference, Mumbai, India, January 18, 2020. |
| **2020** | John W. Ensinck Memorial Lecture, University of Washington Division of Endocrinology and Metabolism, February 28, 2020. |
| **2020** | The Banting Medal of the American Diabetes Association, June 14, 2020. |
| **2020** | Brown Barnstable Diabetes Center Annual Lecture and Dean's Distinguished Lecturer. University of Kentucky, November 5, 2020 |
| **2020** | Fred and Marcielle de Beer Award, University of Kentucky, November 5, 2020. |
| **2021** | Luminary in Cardiometabolic Medicine Lecture and Award, 5th Heart in Diabetes Meeting, New York, September 10-12, 2021. |
| **2022** | Scientific Achievement Award, Asia Pacific Conference on Metabolic Syndrome, Seoul, Feb 18,19, 2022. |
| **2023** | Honorary Membership Award, Academy of Nutrition and Dietetics, Denver, October 9, 2023. |

## GRANTS

`

**7/77-6/79** Juvenile Diabetes Foundation Research Fellowship. Cultured Fibroblasts as a Cellular Model of Diabetes Mellitus and its Complications.

**4/79-3/80** University of Colorado Research Assistance, BRS699 Grant: Hormonal Control of Adipose Tissue Lipoprotein Lipase.

**12/79-5/05** NIDDK, Grant: DK26356, Hormonal (Tissue Specific) Control of Adipose Tissue Lipoprotein Lipase.

**09/80-08/82** Juvenile Diabetes Foundation Research, Grant: 80R055 Pathophysiology of Adipose Tissue Lipoprotein Regulation in Diabetes: Use of Cultured Human Preadipocytes.

**7/82-6/84** Cambridge Quest Foundation. Adipose Tissue Lipoprotein Lipase Regulation after Weight Reduction in Obese Humans.

**11/84-10/86** Mead Johnson, Nutritional Division. Regulation of Adipose Tissue Lipoprotein Lipase Before and After Weight Loss in Obese Subjects. Response to Variable Fatty Acid Chain Length Formula Diets.

**04/86-03/89** NIDDK, Grant: AM30747. Diabetes Mellitus in the San Luis Valley, Colorado. Principal Investigator: Richard F. Hamman, MD

**02/87-01/90** NICHHD, Grant: HD19547. Physiological Factors Affecting Human Lactation. Principal Investigator: Margaret C. Neville, PhD. A

**03/89-02/90** Procter and Gamble Co. Effect of Medium Chain Triglycerides on Glucose and Lipid Metabolism in Type II Diabetes Mellitus.

**1/90-12/92** NIDDK, Grant: DK42266. Nutrition, Lipoprotein Lipase and Body Weight Regulation.

**09/92-08/94** USDA, Grant: 92-37200-7522. Transcriptional Control of Lipoprotein Lipase by Cytokines.

**08/94-07/01** NIDDK, Grant: DK46881. Diet, Lipoprotein Lipase, Insulin Action and Weight Gain.

**01/95-09/02** NIDDK, Grant: Clinical Nutrition Research Unit, Metabolic Core Director.

**01/95-11/03** NIDDK, Grant: DK42266. Lipoprotein Lipase, Nutrition and Nerve Myelination.

**12/96-06/98** Amgen, Effect of Leptin on Postprandial Lipid Metabolism.

**09/97-03-99** Merck Unrestricted Grant 97-033, Assessment of Coronary Atherosclerosis in Young Adults with Type 1 Diabetes by Ultrafast Computerized Tomography.

**03/98-02/04** Slim-Fast Nutrition Institute, Effects of Weight Loss with Reduced-Weight Maintenance and Subsequent High-Carbohydrate vs. High-Fat Macronutrient Feeding on Neck Morphology, Whole-Body Energy Metabolism, Sleep Dynamics, Pulmonary Function, and Insulin Sensitivity in Severely Obese Humans.

**02/99-06/02** Abbott, Effect of Triglyceride-Lowering on Endothelial-Dependent and Endothelial-Independent Arterial Vasodilation, Independent of the Known Effects of Hypercholesterolemia on Endothelial Function.

**07/99-05/10** NHLBI, K-30 Grant: Co PI, Advanced Training for Clinical Investigators.

**07/00-07/04** American Diabetes Association, Mentor Based Postdoctoral Fellowship: 'Lipoprotein Lipase and Diabetic Neuropathy.'

`

**12/01-03/04** Merck and Co., PNO111-057 Grant: The Impact of HMG Co-A Inhibitors on C-Reactive Protein in Patients with Type 2 Diabetes.

**08/02-07/04** Eli Lilly and Company, Acute Effects of Feeding High Fat Diets on Insulin Clearance.

**08/03-07/08** NIH, DK61668: Grant: Mechanisms Defending Fat Mass in Humans After Lipectomy.

**10/03-09/04** National Multiple Sclerosis Society. Lipoprotein Lipase and Nerve Myelination.

**07/07-06/08** **S**anofi-Aventis U.S. LLC. 0608-067 Grant: The Importance of the CB1 Receptor in Muscle to Energy/Fat Expenditure and Balance in Mice.

**07/07-06/11** American Diabetes Association Mentor-Based Postdoctoral Fellowship Award, Mechanisms Defending Fat Mass in Humans after Lipectomy.

**05/08-04/18** NIH-NCATS, UL1TR001082, TL1TR001081, KL2TR001080. Colorado Clinical and Translational Sciences Institute, PI-Ronald J. Sokol, MD

**01/10-12/12** American Diabetes Association**,** Lipoprotein Lipase in the CNS: Impact on body Weight and Energy Balance.

**07/10-01/12** GlaxoSmithKline, Lovaza and the Regulation of Energy Balance and Body Weight in NEXLPL-/- Mice.

**06/11-05/15** NIH, DK089309-01A1, Mechanisms of Obesity in Mice with Neuron-Specific Lipoprotein Lipase Deficiency.

**05/12-04/14** Elliman Butcher Foundation Seed Grant, Treatment of Lipoprotein Lipase (LPL) Deficiency with Induced Pluripotent Stem Cells (iPSCs).

**08/11-06/15** NIH, DK63003512. Metabolic and Cognitive Consequences of Sleep Loss. Co-PI on Subcontract. Kenneth Wright – PI.

**04/13-03/14** Esperion Therapeutics. Evaluation of Energy Balance Outcomes Associated with Body Weight Loss and Glucose-Lowering Efficacy of ETC-1002 or ESP41091 in Diet Induced Obese Mice.

**01/14-12/14** Janssen Research & Development. Canagliflozin and Lipoprotein Lipase in Mice with Streptozotocin-Induced Diabetes.

**07/14-06/17** NIH T32 HL116276-01A1, Obesity and Cardiovascular Disease – PI.

**01/15-01/18** Ionis Pharmaceuticals Inc., Lipoprotein Lipase Enzyme Activity Assessment for Clinical Trials

**11/15-10/18** UniQure Biopharma, Post-heparin Plasma Lipoprotein Lipase (LPL) & LPL Gene Therapy

**03/16-03/17** CCTSI Pilot Project, Lipid Metabolism in the Brain during Injury and Repair

**04/18-03/20** NIH R21NS102506 - 01A1, Exploring the Role of Microglial Lipoprotein Lipase in Remyelination and Repair - PI.

**06/18-11/18** ENDECE, LLC, Mechanism of Action of NDC-1308 KDB2 – PI.

`

**01/19-11/20** NIH R21AG061549 – 01, Microglial Lipoprotein Lipase; A Novel Therapeutic Target for Alzheimer's Disease –Co- PI.

## TRAINEES

### Past Trainees

| Name | Pre/Post Doctorate | Dates in Lab | Degree | Last Known Position |
|---|---|---|---|---|
| Craig Sadur | Post | 07/80-06/82 | M.D. | Private practice, Oakland, CA |
| Phil Kern | Post | 07/81-06/85 | M.D. | Prof of Medicine, Univ. of Kentucky, Lexington, KY |
| Mary O'Shea | Post | 07/84-06/85 | M.D. | Private practice |
| Tami Gregg | Pre | 1988-1989 | BS | Dietitian, Hudson, Wisconsin |
| Paul Rudolf | Post | 07/85-06/87 | M.D. | Private practice, Washington DC |
| Daniel Rule | Post | 09/86-07/87 | Ph.D. | Prof, Animal Sciences, Univ. of WY, Laramie, Wyoming |
| Daniel Bessesen | Post | 07/87-12/90 | M.D. | Prof. of Medicine, UCAMC, Denver/Aurora, CO |
| Mary Kay Rozmyslovicz | Post | 07/88-06/90 | M.D. | Private Practice, Denver, CO |
| Mary Raynolds | Post | 05/88-07/92 | Ph.D. | Current position unknown |
| Jamie Erskine | Pre | 09/90-09/92 | Ph.D. | Prof, Food, Nutrition & Diabetes, Univ of Northern Colorado, Greeley, CO |
| Jacqueline, Berning | Pre | 09/90-12/94 | Ph.D. | Prof, Biology Dept., Univ. of Colorado, Colorado Springs, CO |
| Sharon Travers | Post | 07/92-07/94 | M.D. | Assoc. Prof, of Pediatrics, UCAMC, Aurora, CO |
| Hong Liu | Pre | 09/92-06/94 | Ph.D. | Current position unknown |
| Carrie Ganong | Post | 07/94-1997 | M.D. | Private practice, Sanford Health, Klamath Falls, OR |
| Cathy Morin | Post | 09/92-06/98 | Ph.D. | Current position unknown |
| Patricia Uelmen Huey | Post | 09/96-09/99 | Ph.D. | Asst. Prof. Georgia Gwinnett College, Lawrenceville, GA |
| Paul Poirier | Post | 02/98-12/99 | M.D. | Scientific Director, Cardiovascular Rehabilitation Program, Quebec Heart Institute/Laval Hospital, Quebec, Canada |
| Luis Ferreira | Post | 11/98 –10/01 | Ph.D. | Exercise Biochemist, University of Western Australia, Perth, Australia |
| William Troy Donahoo | Post | 07/95-02/04 | M.D. | Clinical Assoc. Prof. of Medicine, Univ. Florida, Gainesville, FL |
| Lisa Kosmiski | Post | 07/93-06/04 | M.D. | Assoc. Prof of Medicine, UCAMC, Aurora, Colorado |
| Alison M. Morris Coates | Post | 09/01-09/04 | Ph.D. | Senior Lecturer, School of Health Science, University of South Australia, Adelaide, AU |
| Dean J. Calsbeek | Post | 07/02-10/04 | Ph.D. | Prof., Kinesiology, Dean, Natural and Applied Sciences. Northwestern College, Orange City, Iowa |
| Bakary J. Sonko | Post | 11/00-10/05 | Ph.D. | Obesity Consultant, Univ. of Cambridge, UK |

`

| | | | | |
|---|---|---|---|---|
| Warren H. Capell | Post | 07/01-07/06 | M.D. | Clinician-Scientist, CPC Research, Assoc. Prof of Medicine, UCAMC, Aurora, CO |
| Linda Barbour | Post | 09/02-07/05 | M.D. | Prof. of Medicine, OB/GYN, UCAMC, Aurora, CO |
| Paul Wischmeyer | Post | 11/02-07/05 | M.D. | Prof. of Anesthesiology, UCAMC, Aurora, CO |
| Nicole R. Stob | Post | 08/06-11/09 | Ph.D. | Instructor, Univ. Colorado Boulder, Boulder, CO |
| Rachel C. Lindstrom | Pre | 07/06-12/08 | Ph.D. | Senior Medical Liaison, Amgen, Denver, CO |
| Amy Steig | Pre | 07/06-05/09 | Ph.D. | VP Clinical Affairs, GraftWorx, UCAMC, Aurora, CO |
| Leigh Perreault | Post | 11/02-01/09 | M.D. | Assoc. Prof of Medicine, UCAMC, Aurora, CO |
| Bryan C. Bergman | Post | 04/03-04/10 | Ph.D. | Prof of Medicine, UCAMC, Aurora, CO |
| Teri Hernandez | Pre | 09/01-12/09 | PhD, RN | Assoc. Prof of Medicine and Nursing, UCAMC, Aurora, CO |
| Marybeth Allian-Sauer | Post | 08/06-07/09 | MD | Senior Instructor, UCAMC, Aurora, CO |
| David Maahs | Post | 07/01-06/11 | MD, Ph.D. | Prof., Pediatrics, Stanford Univ. Medical Center, Palo Alto, CA |
| Charles Rehrer | Post | 06/10-04/12 | Ph.D. B.S. | Area Technical Operations Manager, Fresenius Medical Care, Santa Fe, NM |
| Martina King | Pre | 09/12-08/13 | | Private Practice, Denver CO |
| Madiha M.F. Abdel-Maksoud | Post | 01/08-12/13 | MD, Ph.D. | Asst. Prof, Dept. of Epidemiology, Colorado School of Public Health, Aurora CO |
| Isabel Schlaepfer | Post | 01/09-present | Ph.D. | Asst. Prof, Department of Pharmacology, UCAMC, Aurora, CO |
| Annie Ferland | Post | 07/09-08/12 | Ph.D. | Instructor, Laval University, Quebec City, Quebec, CA |
| Hong Wang | Post | 09/06-08/16 | Ph.D. | Asst. Prof of Medicine, UCAMC, Aurora, CO |
| Tian Yu | Post | 07/11-08/16 | Ph.D. | Instructor, UCAMC, Aurora, CO |
| Walter Conwell | Post | 07/12-06/15 | M.D. | Private Practice, Kaiser Permanente, Denver, CO |
| Kimberley Bruce | Post | 05/15-07/19 | Ph.D. | Asst. Pro of Medicine, UCAMC, Aurora CO |
| Paul Holland-Price | Post | 07/17-06/19 | M.D. | T32 Research Fellow |

`

## PROFESSIONAL ORGANIZATIONS

American College of Cardiology, Fellow
American College of Physicians, Fellow
American Diabetes Association
American Federation for Clinical Research
American Heart Association, FAHA
Council on Arteriosclerosis, Thrombosis, and Vascular Biology
Council on Nutrition, Physical Activity, and Metabolism
American Society for Clinical Investigation
American Society for Nutrition
American Society for Preventive Cardiology
Association of American Physicians
Association for Patient-Oriented Research
Endocrine Society
International Atherosclerosis Society, Member-at-Large
National Lipid Association, Fellow
The Obesity Society, Fellow
Western Association of Physicians
Western Society for Clinical Investigation

## COMMITTEES - LOCAL

1. Animal Care Control Committee, UCHSC, Denver, Colorado 1980-1983
2. Intern Selection Committee, Department of Medicine, UCHSC/UCAMC, Denver/Aurora, Colorado 1980-2014
3. American Diabetes Association, Colorado Affiliate, Organizational Committee, 1980-1985
4. Juvenile Diabetes Foundation, Denver, Colorado Denver Medical Advisory Board, 1980-1981
5. Attending Physician, Gordon Meiklejohn Service, Department of Medicine University of Colorado, Denver, Colorado 1980-1993; Ward Darley Service, 1993-2010; Internal Medicine 1, 2010-2014.
6. Scientific Advisory Committee, Adult General Clinical Research Center, UCHSC/UCAMC, 1981-2014
7. Grant Review Committee, Colorado Heart Association, 1983-1987
8. Dean's Subcommittee on "Centers of Excellence" in Cardiovascular Disease, UCHSC, Denver, Colorado 1984
9. Faculty Senate, UCHSC School of Medicine, Denver, Colorado 1985-1987, 1989-1999
10. Research and Development Committee, Veterans Administration Medical Center, Denver, Colorado, Dean's Committee Representative, 1985-1988
11. Curriculum Review Committee, University of Colorado College of Medicine 1986-1994.
12. Inter-Departmental Steering Committee on Nutrition, University of Colorado College of Medicine, 1987-1990.
13. University of Colorado/Colorado State University Consortium for Human Nutrition, Board Member, 1988-2000
14. Nutrition Support Subcommittee, University of Colorado Hospital, Department of Medicine Representative, 1990-1992.
15. Search Committee, Executive Director, Barbara Davis Childhood Diabetes Center, 1991-1992.
16. Metabolic Regulation of Fetal Growth Center Grant: Internal Advisory Committee, UCHSC, 1991-1997.
17. Faculty Communications Committee, University of Colorado College of Medicine, 1991-1993.
18. University of Colorado School of Medicine Faculty Council Representative, Clinical Trials Office Committee, 1992-1994.
19. Graduate School Governance Committee, UCHSC, Denver, Colorado 1996-1999.
20. Doctor of Philosophy in Biology, Clinical Investigation Track Curriculum Committee. UCHSC, 1997-2001.
21. The Robert W. Schrier Award of Excellence Committee, 1997.
22. UCHSC Committee on Planning and Fiscal Policy, 1997-1999.

`

23. Denver Metro Physicians Advisory Council, American Heart Association, Colorado Affiliate, 1997-1998.
24. American Heart Association of Colorado, Public Affairs Committee, 1998-2000.
25. Electives Committee, University of Colorado School of Medicine, 1999-2003.
26. Clinical/Translational Research Committee, University of Colorado School of Medicine, Co-Chair, 2001
27. Veterinarian Pathologist Search Committee, 2002-2003.
28. University of Colorado Hospital Research Committee, 2002-2012.
29. Co-Chair Advanced Studies Curriculum Committee, University of Colorado College of Medicine, 2004–2006.
30. Clinical Research Advisory Committee, University of Colorado School of Medicine, 2004-2014.
31. Search Committee, Director, Division of Cardiology, 2004–2006.
32. Executive Committee, Colorado Center for AIDS Research, 2008-2011.
33. Executive Committee, Colorado Clinical Translational Sciences Institute, 2008-2014.
34. University of Colorado Denver Inter-Disciplinary Committee for the Policy to Limit Conflicts of Interest between Healthcare Professionals and Industry Representatives, 2008-2010.
35. Neuroscience Program, University of Colorado of Medicine, 2010-2019
36. BERD/CBC Director Search Committee, CCTSI, 2011
37. University of Colorado Hospital/University of Colorado Denver Research Advisory Committee, 2011-2014.
38. Member, Committee to Review of the Division of Clinical Pharmacology and Toxicology, Department of Medicine, UCAMC, 2011-2013.
39. Chair, Robert W. Schrier Event Committee, 2012.
40. Dean's Advisory Committee, 2013-2019; Chair 2014-2019
41. Member, American Heart and Stroke Association, Denver Chapter, 2013-2014.
42. Member, Barbara Davis Childhood Diabetes Center, Research Director Search Committee, 2014-2015.
43. Center for Innovative Design and Analysis Steering Committee, UCAMC, 2018-2019.
44. Cardiometabolic Center Alliance Advisory Board, St. Luke's Hospital Medical Center,2020-present.

**THESIS COMMITTEES**

Numerous - >20, not listed.

**COMMITTEES – NATIONAL/INTERNATIONAL**

1. **Member**, National Eye Institute, Diabetes Retinopathy Study II, Medical Therapy Committee, 1977-1978.
2. **Councilor**, American Federation for Clinical Research (Western Section), 1982-1984.
3. **National Councilor**, American Federation for Clinical Research, 1984-1988.
4. **Secretary-Treasurer**, American Federation for Clinical Research (Western Section), 1985-1988.
5. **Councilor**, North American Association for the Study of Obesity, 1987-1990.
6. **Member**, Technical Advisory Board, Institute for Creation Research, El Cajon, California, 1988-2010.
7. **Member**, Program Committee, Council on Nutritional Sciences and Metabolism, American Diabetes Association, 1989-1991.
8. **Member**, Education Committee, North American Association for the Study of Obesity, 1991-1992.
9. **Member**, National Institutes of Health Nutrition Study Section; July 1, 1989 - June 30, 1993; **Chair**; July 1, 1991 - June 30, 1993.
10. **Chair**, Publications Committee, North American Association for the Study of Obesity, 1991-1994.
11. **Member**, External Advisory Committee, Nutrition Training Grant: University of California, Davis, 1990-1995.
12. **Vice-President**, North American Association for the Study of Obesity, 1993-1994.
13. **Member**, Program Committee, International Association for the Study of Obesity, Toronto, August 1994.
14. **President**, North American Association for the Study of Obesity, 1995-1996.
15. **Member**, Executive Committee, General Clinical Research Center Program Directors, 1995-2008.

`

16. **Member**, Nutrition Committee, American Heart Association, 1996-present; **Vice-Chair** 1997-1998, **Chair** July 1998-2001.
17. **Co-Chair**, Annual Meeting of the North American Association for the Study of Obesity, 1996.
18. **Member**, Program Committee, International Association for the Study of Obesity, October 1996.
19. **President's Committee**, North American Association for the Study of Obesity/The Obesity Society, 1996-present.
20. **Member**, Long Range Planning Committee, North American Association for the Study of Obesity/The Obesity Society, 1996-2001.
21. **President**, Western Society for Clinical Investigation, 1997-1998.
22. **Co-Chair**, Planning Committee, General Clinical Research Program Directors Meeting, 1998.
23. **Member**, Executive Board, Kern Aspen Lipid Conference, 1997-present.
24. **Member**, Boston Obesity Nutrition Research Center, Scientific Advisory Committee, 1998-2001.
25. **Member**, Board of Directors, Association for Patient-Oriented Research, 1998-2006.
26. **Co-Chair**, Program Committee, Association for Patient-Oriented Research, 1999-2001.
27. **Vice-Chair**, Council on Nutrition, Physical Activity and Metabolism, American Heart Association, 2000-2002.
28. **Secretary-Treasurer**, Association for Patient-Oriented Research, 2001-2003.
29. **Chair**, Prevention VII: Obesity, A Worldwide Epidemic Related to Heart Disease and Stroke, American Heart Association, Honolulu, Hawaii, April 26-27, 2002
30. **Chair**, Council on Nutrition, Physical Activity and Metabolism, American Heart Association, 2002-2004.
31. **Chair**, Kern Aspen Lipid Conference, Fatty Acid Transport and Metabolism: Impact on Insulin Action/Secretion and Body Weight Regulation, 2002
32. **Member**, Science Advisory and Coordinating Committee, American Heart Association, 2002-2007.
33. **Member,** University of North Carolina Chapel Hill, Member of External Advisory Committee for Mentored Clinical Research Scholar Program, NIH K-12 Award RR-02-2001, 2002-2005.
34. **Member**, CNRU NIDDK sponsored "National Task Force on Prevention and Treatment of Obesity," 2003-2008.
35. **Member**, NIDDK Advisory Council, 2003-2006.
36. **Member**, American Board of Internal Medicine Endocrinology Subspecialty Writing Committee 2003-2009.
37. **Member**, Keystone Symposia Scientific Advisory Board, 2003-2012.
38. **Member**, Program Committee, L.J Filer Symposium, American Heart Association, San Francisco, CA, March 2004.
39. **President**, Kern Aspen Lipid Conference, 2002-2012.
40. **President-Elect**, Association for Patient Oriented Research, 2003-04.
41. **President**, Association for Patient Oriented Research, 2004-05.
42. **President-Elect**. American Heart Association, 2004-05.
43. **President,** American Heart Association, 2005-06.
44. **Immediate Past President,** American Heart Association, 2006-07.
45. **Co-Chair**, AHA Obesity, Lifestyle & Cardiovascular Disease Committee, 2005-06.
46. **Board of Directors**, Global Alliance for the Prevention of Obesity and Related Chronic Diseases, 2005-2009.
47. **Member,** Executive Board, National Lipid Association, 2005-2007
48. **Co-Chair**, AHA Childhood Obesity Healthcare Expert Panel, 2006-2008.
49. **Chair,** AHA Manuscript Oversight Committee, 2006-2007.
50. **Chair,** AHA Awards and Nominating Committee, 2006-2007
51. **Member**, America's Health Insurance Plans Advisory Panel on Cardiometabolic Risk Factors Reduction Initiative, 2007- 2011
52. **Member**, American College of Sports Medicine RC Advisory Board, 2007-2009.
53. **Member**, NIDDK Intramural Scientific Director Review Committee, 2007.
54. **President,** AHA Trans Fat Initiative, 2007-2010.
55. **Member**, External Advisory Board of the Pennington Biomedical Research Center, 2007-2015.
56. **Member**, Oregon Clinical & Translational Research Institute External Advisory Committee, 2007-2012.
57. **Member**, Diabetes Surgery Summit Taskforce, 2007-present.
58. **Member**, Publications Board, The Obesity Society, 2007-2009.

`

59. **Member,** Executive Committee, NHLBI Cardiovascular Disease Guidelines, 2008-2013.
60. **Co-Chair,** Lifestyle Work Group, NHLBI Cardiovascular Disease Guideline/ ACC/AHA Cholesterol Guideline, 2008-2013.
61. **Member,** National Cholesterol Education Program Adult Treatment Panel IV Update Panel/ACC/AHA Cholesterol Guideline Committee, 2008-2013.
62. **Chair,** AHA Food Icon Initiative, 2008-2012.
63. **Member**, Diabetes Committee, NPAM Council, American Heart Association, 2009-2011.
64. **Delegate**, American Heart Association to the Inter-Society Steering Committee for the Obesity Medicine Physician Certification Program 2009-2011.
65. **Member**, Finance Committee, The Obesity Society, 2009-2011.
66. **Member,** External Advisory Committee, COBRE, University of Kentucky, 2010-present
67. **Member,** Committee on the Prevention of Weight Gain in the Worksite. American Cancer Society, American Diabetes Association, American Heart Association. 2010-2011.
68. **Co-Chair,** Committee on the Pathogenesis and Treatment of Obesity and Type 2 Diabetes: What Can be Unified and What Needs to be Individualized, the Endocrine Society, the American Diabetes Association, and the European Association for the Study of Diabetes, 2010-2012.
69. **Member**, American Diabetes Association Committee on Scientific Sessions, 2010-2012.
70. **Member,** Committee to Appoint the Next Editor of *Arteriosclerosis, Thrombosis, and Vascular Biology* for the American Heart Association, 2011.
71. **Member,** GRADE (Glycemic Reduction Approaches in Diabetes: A Comparative Effectiveness Study) EEC, NIDDK, 2011.
72. **Chair**, Scientific Advisory Committee, American Heart Association/Unilever Joint Venture, 2011-2013.
73. **Member**, External Advisory Committee, Pennington Biomedical Research Center, LSU, 2012-2015.
74. **Member,** VA-FIT Clinical Trial Executive Committee, 2012-present.
75. **Member**, Data Monitoring Committee (DMC), The Takeda TAK-875 Program, 2012-2014.
76. **Member**, Vivus CVD Trial Executive Committee, 2012-2015.
77. **Topic Group Expert,** Epidemiology/Prevention, World Heart Federation Meeting, 2013-2014.
78. **Member**, American Diabetes Association Research Committee, 2013-present
79. **Member**, Executive Committee for the Regional Federation for the Americas, International Atherosclerosis Society, 2013-present.
80. **Member**, Division of Nutrition Research Coordination Working Group, National Institute of Diabetes, Digestive and Kidney Diseases, NIH, 2013-2015.
81. **Co-Chair,** NIDDK-NHLBI Workshop on Cardiovascular Disease in Type 1 Diabetes, 2013-2015
82. **Member,** Epidemiology of Diabetes Interventions and Complications (EDIC) Observational Safety and Monitoring Board, July 2014- present.
83. **Member**, NIDDK Type 1 Diabetes Congressional Special Appropriations, April 2015-present
84. **Member**, Scientific Advisory Board of iMed – The Helmholtz Initiative on Personalized Medicine, 2014-present.
85. **Member**, American Diabetes Association Board of Directors, 2016- 2021
86. **Member,** Target Cholesterol Advisory Group of the American Heart Association/American Stroke Association, 2016-2018.
87. **Member**, Endocrine Society Annual Meeting Steering Committee, 2017-2020
88. **Chair**, Governance Task Force, American Diabetes Association Board of Directors, 2017-2018.
89. **Member**, Board Development Committee, American Diabetes Board of Directors, 2018-2019.
90. **Member,** Executive Compensation Committee, American Diabetes Board of Directors, 2018-2019.
91. **President-Elect**, American Diabetes Association, 2019
92. **Member**, Scientific Committee, Know Diabetes by Heart, AHA & ADA Joint Venture, 2019-2022
93. **President, Medicine and Science,** American Diabetes Association, 2020
94. **Executive Team Member,** China Diabetes Cardiovascular (CDCV) Initiative. AHA, ADA, 2020-2021
95. **Member,** Research in America Steering Committee, NIDDK, 2020-2021
96. **Member,** Precision Medicine Diabetes Initiative Executive Committee, ADA; 2019-present
97. **Member,** NIDDK Advisory Council Expert Advisor, May 12,13, 2021
98. **Chair,** Cardiometabolic Health Congress Cardiometabolic Health Certification Course, 2022- present
99. **Chair,** American Diabetes, Association, Precision Medicine Diabetes Research, 2021-2022.

`

**JOURNAL REVIEWS**

*Acta Diabetologia, Advisory Board,* 2024-present
*Acta Endocrinologica*

*Adipocytes: An International Journal Devoted to Basic and Clinical Research on Adipocyte and Adipose Tissue Biology, Editorial Board*
*American Heart Journal*
*American Journal of Clinical Nutrition, Editorial Board,* 1997-1999
*American Journal of Hypertension*
*American Journal of Managed Care*
*American Journal of Medical Sciences*
*American Journal of Medicine, Editorial Board,* 1998-2015
*American Journal of Pharmacy Benefits*
*American Journal of Physiology*
*Applied Physiology*
*Anthropology*
*Endocrinology and Metabolism*
*Heart and Circulatory*
*Regulatory Integrative Comparative*
*American Journal of Respiratory and Critical Care Medicine*
*American Journal of Kidney Diseases*
*Annals of Epidemiology*
*Annals of Internal Medicine*
*Archives of Biochemistry and Biophysics*
*Archives of Internal Medicine*
*Arteriosclerosis, Thrombosis and Vascular Biology, Editorial Board,* 2001-2023
*Arthritis and Rheumatology*
*Atherosclerosis*
*Biochimica Biophysica Acta*
*Biochimica Biophysica Acta, Molecular and Cell Biology of Lipids*
*BMC Medicine, Editorial Board*
*British Journal of Nutrition*
*Cell*
*Cell Metabolism*
*Chemical Reviews*
*Circulation, Associate Editor,* 2006-present
*Circulation: Cardiovascular Quality and Outcomes*
*Circulation Journal*
*Circulation Research*
*Cleveland Clinic Journal*
*Clinical Chemistry*
*Clinical Endocrinology*
*Clinical Genetics*
*Clinical Science*
*Clinical and Translational Science, Editorial Board,* 2007-prseent
*Comparative Biochemistry and Physiology*
*Coronary Artery Disease*
*Diabetes, Editorial Board,* 1988-1992
*Diabetes Care*
*Diabetes, Obesity and Metabolism*
*Diabetes/Metabolism Research and Reviews*
*Diabetes Research and Clinical Practice*
*Diabetes Technology and Therapeutics*
*Diabetologia*
*eLife*
*Endocrine*

`

*Endocrinology*
*European Journal of Cardiovascular Prevention & Rehabilitation*
*European Journal of Clinical Investigation*
*European Journal of Pharmaceutical Sciences*
*Experimental Gerontology*
*Food and Chemical Toxicology*
*Gene*
*Hepatology*
*Hormone and Metabolic Research*
*Human Gene Therapy*
*Hypertension*
*In Vitro*
*International Journal of Behavioral Nutrition and Physical Activity*
*International Journal of Molecular Sciences*
*International Journal of Obesity, Editorial Board, 1989-1998*
*JAIDS*
*Journal of the American Heart Association*
*Journal of the American Medical Association*
*Journal of the American Medical Association Cardiology*
*Journal of the American Society of Nephrology*
*Journal of Biological Chemistry*
*Journal of Cardiopulmonary Rehabilitation*
*Journal of Cardiovascular Research*
*Journal of Cellular and Molecular Medicine*
*Journal of Cellular Physiology*
*Journal of Clinical Apheresis*
*Journal of Clinical Endocrinology and Metabolism, Editorial Board*, *2003-2012; Associate Editor, 2015-2019*
*Journal of Clinical Investigation*
*Journal of Clinical Lipidology, Editorial, 2011-2017*
*Journal of Clinical Medicine*
*Journal of Diabetes and its Complications*
*Journal of the Endocrine Society*
*Journal of Epidemiology and Community Health*
*Journal of Gerontology*
*Journal of Hepatology*
*Journal of Investigative Dermatology*
*Journal of Laboratory and Clinical Medicine*
*Journal of Lifestyle Medicine*
*Journal of Lipid Research*
*Journal of Neurochemistry*
*Journal of Neuroinflammation*
*Journal of Nutrition, Health and Aging*
*Journal of Nutritional Biochemistry*
*Journal of Pediatric Gastroenterology*
*Journal of Pediatrics*
*Journal of Women's Health*
*Lancet*
*Lancet – Diabetes and Metabolism*
*Liver Transplantation*
*Mayo Clinic Proceedings*
*Mechanisms of Ageing and Development*
*Med*
*Metabolic Syndrome and Related Disorders, Editorial Board,* 2003-present
*Metabolism*
*Metabolites*
*Molecular and Cellular Biology*
*Molecular Genetics and Metabolism*
`

*Molecular Medicine*
*Nature*
*Nature Clinical Practice Endocrinology and Metabolism, Advisory Board,* 2005-present
*Neuroendocrinology*
*New England Journal of Medicine*
*Nutrition*
*Nutrition Research*
*Obesity Facts*
*Obesity Research, Editorial Board,* 1993-2006
*Obstetrics and Gynecology*
*Plos One*
*Proceedings of the National Academy of Sciences*
*Proceedings of the Society for Experimental Biology and Medicine*
*Science*
*Science Translational Medicine*
*Scientific Reports*
*The Online Journal of Current Clinical Trials*
*Vascular Health and Risk Management*

**INVITED PARTICIPANT**

1. Adipose Tissue Development and Metabolism Satellite Symposium to the Third International Congress on Obesity; Gothenburg, Sweden; October 4-6, 1980.
2. First International Symposium on Acarbose; Montreux, Switzerland; October 8-10, 1981.
3. National Institutes of Health Workshop on the Classification of Obesity; Poughkeepsie, New York, October 17-19, 1982.
4. American Diabetes Research Symposium; Denver, Colorado; January 10-12, 1983.
5. National Institutes of Health Special Study Section; Bethesda, Maryland; August 9, 1983.
6. National Institutes of Health Site Visit; East Carolina University; July 23-25, 1985.
7. Joint Conference on Obesity and Non-Insulin Dependent Diabetes Mellitus; Toronto, Ontario, Canada; October 30 - November 1, 1985.
8. National Institutes of Health Reverse Site Visit; Bethesda, Maryland; October 8-10, 1986.
9. General Clinical Research Center Site Visit; Stanford University; December 3-4, 1986.
10. Council on Nutritional Sciences and Metabolism of the American Diabetes Association: Program on Obesity and Exercise in Type II Diabetes; Indianapolis, Indiana; June 6, 1987.
11. American Diabetes Association, Northern Illinois Affiliate, Thirtieth Professional Symposium; Chicago, Illinois; October 14, 1987.
12. Seminars in Medicine, Beth Israel Hospital, Harvard Medical School; Boston, Massachusetts; December 15, 1987.
13. The Endocrine Society National Meeting, Symposium on Hormonal Control of the Adipose Cell; New Orleans, Louisiana; June 9, 1988.
14. American Diabetes Association Symposium on Current Issues in Nutrition and Metabolism; San Francisco, California; October 7, 1988.
15. National Institutes of Health Nutrition Study Section, Special Reviewer; Bethesda, Maryland; October 6-17, 1988.
16. General Clinical Research Center Site Visit; University of Cincinnati; December 1-2, 1988.
17. National Institutes of Health Metabolism Study Section, Special Reviewer; Bethesda, Maryland; December 15, 1988.
18. General Clinical Research Center Site Visit; Brown University; April 5-6, 1989.
19. American Society for Clinical Nutrition Postgraduate Course; Washington, D.C.; April 27-28, 1989.
20. American Diabetes Association National Meeting. Symposium: Issues in the Nutritional Management of Patients with Diabetes; Detroit, Michigan; June 6, 1989.
21. FASEB Summer Conference on the Regulation of Energy Balance; Vermont Academy; July 31 - August 4, 1989.
22. National Institutes of Health Workshop on Basic and Clinical Aspects of Regional Fat Distribution; Bethesda, Maryland; September 9-11, 1989.

`

23. International Symposium on Lipoprotein Metabolism and Lipid Lowering Agents; Netherlands; February 27 - March 2, 1990.
24. National Institutes of Health, Genetics of Obesity; Phoenix, Arizona; March 26-27, 1990.
25. General Clinical Research Center Site Visit; University of Florida; April 10-11, 1990.
26. The Endocrine Society National Meeting. Symposium on Control of Regional Fat Distribution; Atlanta, Georgia; June 21, 1990.
27. The Aspen Bile Acid/Cholesterol Conference. Hepatic Cholesterol and Postprandial Lipoproteins; August 18-21, 1990.
28. International Symposium on Obesity and Diabetes Mellitus; Nagoya, Japan; October 18-19, 1990.
29. North American Association for the Study of Obesity Symposium on the Treatment of the Patient with Medically Significant Obesity; Atlanta, Georgia; December 1, 1990.
30. Keystone Symposia. The Adipose Cell: A Model for Integration of Hormone Signaling in the Regulation of Cellular Function; Park City, Utah; January 18-24, 1991.
31. The Science of Food Regulation Symposium. Pennington Biomedical Research Center; Louisiana State University; Baton Rouge, Louisiana; March 14-15, 1991.
32. North American Association for the Study of Obesity/Society for the Study of Ingestive Behavior National Meeting; Sacramento, California;' October 20-28, 1991.
33. FASEB Summer Conference on Regulation of Energy Balance: From Organism to Gene; Copper Mountain, Colorado; August 2-7, 1992.
34. North American Association for the Study of Obesity Symposium Obesity Update: Pathophysiology, Clinical Consequences and Therapeutic Options; Atlanta, Georgia; August 31-September 2, 1992.
35. American Heart Association Scientific Conference on Central Obesity/Insulin Resistance Syndrome and Coronary Artery Disease; Washington, DC; April 22-23, 1993.
36. International Symposium on Insulin Resistance as a Risk Factor for Cardiovascular Disease; Ste-Adèle, Québec, June 22-24, 1993.
37. North American Association for the Study of Obesity. National Meeting; Milwaukee, Wisconsin; October 17-20, 1993.
38. International Symposium on Atherosclerosis; Montreal, Ontario; October 9-12, 1994.
39. Master Clinical Dieticians; Key Biscayne; January 14, 1995.
40. NIDDK Program Project on Body Composition Site Visit, St. Luke's-Roosevelt Hospital, Columbia University; New York, New York; April 5-7, 1995.
41. North American Association for the Study of Obesity. National Meeting; Baton Rouge, Louisiana; October 14-17, 1995.
42. NIDDK Program Project on Body Composition, Columbia University; Reverse Site Visit, Washington, D.C.; March 24-25, 1996.
43. NIDDK Symposium on Transgenic Animals in Nutrition Research, FASEB Meeting; Washington, D.C.; April 14, 1996.
44. NIDDK Metabolism Study Section, Special Reviewer; Bethesda, Maryland; July 2, 3, 1996.
45. The Endocrine Society Clinical Endocrinology Update; Chicago, Illinois; October 9, 1996.
46. General Clinical Research Center Site Visit, University of Alabama; Birmingham, Alabama; December 17-18, 1996.
47. Kern Aspen Lipid Conference; Aspen, Colorado; August 15-18, 1997.
48. Satellite Symposium of the 11th Annual International Symposium on Atherosclerosis; St. Malo, France; October 3-5, 1997.
49. American Heart Association Annual Sessions, Plenary speaker; Orlando, Florida; November10-13, 1997.
50. Pennington Biomedical Research Symposium on Obesity; Baton Rouge, Louisiana; March 1-3, 1998.
51. American Heart Association, Obesity: Impact on Cardiovascular;, Amelia Island, Florida; May 22-24, 1998.
52. American College of Sports Medicine; Orlando, Florida; June 3-6, 1998.
53. American Diabetes Meeting; Chicago; June 13-16, 1998.
54. FASEB Summer Conference on Behavioral and Metabolic Sub-phenotypes in Obesities, Genetic and Molecular Aspects, Pathophysiology and Therapeutic Implications; Snowmass, Colorado; June 20-25, 1998.
55. NIDDK Metabolism Study Section, Special Reviewer; July1-2, 1998.
56. General Clinical Research Center Site Visit, Beth Israel Deaconess, Harvard Medical School; July 13-15, 1998.

`

57. NIDDK Diabetes Complications Special Study Section, Chair; July 30-31, 1998.
58. 8th International Congress on Obesity, Plenary speaker; Paris, France; Aug 29-Sept 3, 1998.
59. American Association of Cardiovascular and Pulmonary Rehabilitation Annual Meeting; Denver, CO; Oct 15, 1998.
60. Joslin Diabetes Center 100th Anniversary; Boston, Mass; Oct 22-24, 1998.
61. FASEB, 50th Anniversary of NIDDK, San Diego Convention Center, April 17, 2000.
62. NIDDK Special Study Section on Lipids and Lipoproteins, Chair, June 18, 19, 2000.
63. North American Association for the Study of Obesity, Women's Health and Obesity Across the Life Span Symposium speaker, Oct 31, 2000.
64. American Heart Association Annual Sessions, Cardiovascular Seminar on Secondary Prevention in the Elderly, Nov 13, 2000.
65. American Heart Association Annual Sessions, Special Session on It's Time to Treat Obesity, Nov 15, 2000.
66. American Heart Association Prevention VI on Cardiovascular Disease and Diabetes Mellitus, Orlando, Jan 18-20, 2001.
67. NIDDK Special Study Section on Lipids and Lipoproteins, Chair, Feb 21, 2001
68. NHLBI-NIDDK Working Group on The Pathophysiology of Obesity-Associated Cardiovascular Disease, Chair, May 23, 24, 2001.
69. NIDDK Special Study Section on Lipids and Lipoproteins, Chair, June 18, 2001.
70. The Endocrine Society Annual Meeting, Meet the Professor on Hyperlipidemia, June 20, 2001.
71. The American Dietetics Annual Meeting, 'Beyond the AHA Guidelines', St. Louis, Oct 22, 2001
72. American Diabetes Association Meeting on Insulin Resistance. Tempe, Arizona, Dec 6-8, 2001.
73. American Heart Association Prevention VII: Obesity, a Worldwide Epidemic Related to Heart Disease and Stroke, Honolulu, April 26-28, 2002, Chair.
74. The Kern Aspen Lipid Conference, 'Fatty Acid Transport and Metabolism: Impact on Insulin Action/Secretion and Body Weight Regulation', Aspen, Aug 17-20, 2002, Co-Chair.
75. MSDM (Multiclinical Study for Diabetic Macrovascular Complication) Tokyo, Japan October 11-12, 2002
76. U.S.-Japan Panel on Nutrition and Metabolism Tokyo, Japan October 13, 2002.
77. American Heart Association Scientific Sessions, Moderator "Emerging Epidemics, Obesity, Diabetes Mellitus, Sedentary Lifestyle" and "Curbing the Diabetic Epidemic," Chicago, IL, November 17, 2002.
78. American Heart Association Scientific Sessions, November 18, 2002, Plenary Session "Metabolic Syndrome: Pathogenesis of CVD in Metabolic Syndrome and Diabetes," Chicago, IL, November 17, 2002.
79. American Heart Association Scientific Sessions, "Role of Diet in the Statin Era". Chicago, IL, November 18, 2002.
80. Keystone Symposia's Role in Translational Medicine, January 14, 2003.
81. 2005 Keystone Symposia Planning Committee, January 15, 2003.
82. NPAM and ATVB Councils of American Heart Association "Skeletal Muscle Lipoprotein Lipase, Nutrient Partitioning and Insulin Action." Washington, DC, May, 2003.
83. UCLA SCOR Atherosclerosis Grant Review, Lipoprotein Lipase, Nutrient Partitioning and Insulin Action." Lake Arrowhead, California, September, 2003.
84. Metabolic Syndrome Clinical Conference, Washington, DC. "Obesity and its Metabolic Complications."
85. Frontiers in Cardiovascular Science Meeting, Israel Atherosclerosis Society, "Skeletal Muscle Lipoprotein Lipase, Nutrient Partitioning and Insulin Action." Eilat, Israel, October, 2003.
86. American Heart Association Scientific Sessions "The Skinny on Weight Reduction Diets," Orlando, FL, November 2003.
87. American Heart Association Scientific Sessions, "Postprandial Lipemia and Diet" Orlando, FL, November 2003.
88. Co-Chair, NIH, Adipose Tissue Secretory Function and Its Role in Obesity-Associated Co-Morbidities, Washington, DC, 2003.
89. Duke CRI Conference Medical Problem- Medical Approach, Experience to Date Emerging Therapeutic Targets, McLean, VA, January 2004.
90. NIH/NIDDK, "Lipids and the Pathophysiology of Obesity", Washington, DC, May, 2004.
91. FDA/NIDDK, Joint Symposium on Diabetes", Bethesda, MD, May, 2004.

`

92. AHA, "Quality of Care and Outcomes Research in Cardiovascular Disease and Stroke", Washington, DC, May, 2004.
93. Endocrine Society, "The Metabolic Syndrome: The Most Important Risk Factor for Coronary Heart Disease?" New Orleans LA, June 17, 2004.
94. Kaplan Lectureship Program: Obesity, "Translation of Basic Science to Clinical Research & Practice in Obesity Management". Cincinnati OH, August 27-28, 2004.
95. American Heart Association: Prevention of Vascular Disease, "The Current National Epidemics of Obesity, Diabetes and the Metabolic Syndrome, Including the Effects and Relationships of These Diseases on Cardiovascular Disease". Detroit MI, September 9, 2004.
96. Carousel of Hope Ball/Symposium, "Obesity, Dyslipidemia and Inflammation". Beverly Hills, CA, October 23, 2004.
97. DALM Symposium, "Lipoprotein/Free Fatty Acids Partitioning In Skeletal Muscle and Insulin Resistance". Venice, Italy, October 24-27, 2004.
98. American Heart Association Scientific Sessions, Moderator "Joint AHA/JCS: Metabolic Syndrome and Cardiovascular Disease;" "How to Session: Quick Weight Loss;" New Orleans, LA, November 9-10, 2004.
99. WCFS Food Summit, "Metabolic Syndrome and Cardiovascular Risk." Wageningen, The Netherlands, December 8-10, 2004.
100. NIH Forum on Diet and Weight Control, "Dietary Fat, Fat Balance and Body Weight Regulation." Bethesda, MD, February 8, 2005.
101. Kids At Risk: The Overweight Generation, "Future Trends." New York, NY, March 9, 2005.
102. Childhood Obesity Launch with former President Bill Clinton. New York, NY, May 3, 2005.
103. 4th Symposium International de Quebec, "Is There a Better Diet for Cardiopulmonary Prevention/Rehabilitation?" Quebec, QC, Canada, May 8-10, 2005.
104. American College of Cardiology Chicago Cardiovascular Symposium, "Obesity, the Metabolic Syndrome and Cardiovascular Risk." Chicago, IL, May 13-15, 2005.
105. National Governor's Association Meeting. Washington, DC, June 8, 2005.
106. American Heart Association Book Launch, "No Fad Diet." New York, NY, June 9-10, 2005.
107. Australian Technology Network of Universities, Centre for Metabolic Fitness Annual Networking Forum, Inaugural Keynote Speaker, Adelaide, South Australia, July 1, 2005.
108. European Society of Cardiology Congress, "Lifestyle and Dietary Interventions." Stockholm, Sweden, September 3-7, 2005.
109. White House Conference on Aging, "The Healthy Heart Luncheon." Closing Plenary Session Speaker, Washington, DC, December 14, 2005.
110. National Governor's Association 'Healthy America' National Forum, "Where We Learn: Wellness in Our Classrooms & Lunchrooms." Washington, DC, February 25-26, 2006.
111. American College of Cardiology 55th Annual Scientific Sessions, "Report on key initiatives." Atlanta, GA, March 11-14, 2006.
112. 72nd Annual Meeting of the German Cardiac Society, Session Chair: "Basic Science for Young Clinicians." Mannheim, Germany, April 20-22, 2006.
113. Metabolic Syndrome Symposium, Session Chair: "Physiological Response to Interventions for Metabolic Syndrome/Metabolic Risks." San Francisco, CA, May 3-5, 2006.
114. Chicago World Congress Summit, "Prevention and Treatment of Childhood Obesity." Chicago, IL, June 1-2, 2006.
115. American Diabetes Association 66th Scientific Sessions, Bierman Lecture, "Lifestyle and CVD Prevention: An Obesity Emphasis." Washington, DC, June 9-13, 2006.
116. Endocrine Society's 88th Annual Meeting, Arguing in favor: "Metabolic Syndrome: Important Predictor, Need for Intervention?" Boston, MA, June 24-27, 2006.
117. Nutrition Society Summer Meeting, "Mechanisms contributing to the pathogenesis of the metabolic syndrome that predisposes to diabetes and atherosclerotic vascular disease." Aberdeen, Scotland, July 3-6, 2006.
118. Children's Diabetes Foundation/Barbara Davis Center Conference, "Diabetes & Hyperlipidemia." Keystone, CO, July 19, 2006.
119. American Heart Association Childhood Obesity Healthcare Panel Leadership Meeting. Dallas, TX, September 6, 2006.
120. American Dietetic Association Foundation at the American Dietetic Association Conference, "Heart Health, Lifestyle and Obesity." Honolulu, Hawaii, September 16, 2006.
`

121. Committee on Energy and Commerce NIH Hearing, United States House of Representatives, "National Institutes of Health Reform Act of 2006," Washington, DC, September 19, 2006.
122. NIDDK Predictors, Pathogenesis, and Prevention of Insulin Resistance and Type 2 Diabetes Meeting. Bethesda, MD, October 4-5, 2006.
123. American Heart Association Trans Fat Industry Conference. Washington, DC, October 10-11, 2006.
124. American Beverage Association Annual Meeting, "Health & Wellness/School Beverage Guidelines." Las Vegas, NV, October 24, 2006.
125. Cardiometabolic Health Congress, "Physical Mechanisms of Adiposity." Boston, MA, October 19-21, 2006.
126. McGill Integrative Health Challenge Think Tank, Keynote Commentary. Montreal, Quebec, Canada, October 25-27, 2006.
127. American College of Cardiology, Brown-Bag Lunchtime, "Using Pharmacotherapy to Manage Obesity", New Orleans, March 26, 2007
128. American College of Cardiology, Co-Chair ACC Symposium, "Management of Obesity for the Cardiologist", New Orleans, March 26, 2007.
129. American College of Cardiology, "Clinical Implications of Obesity for Cardiovascular Disease", New Orleans, March 26, 2007
130. European Congress on Obesity, "Nutrient Partitioning, Insulin Action, and Body Weight Regulation", Budapest, Hungary, April 23, 2007.
131. Global Epidemic of Prediabetes Meeting, "Metabolic Syndrome: Pathophysiology and Clinical Treatment Options", Barcelona, Spain April 6, 2007.
132. Drugs Affecting Lipid Metabolism, "Cutting Through the Controversies of the Metabolic Syndrome", New York City, Oct 6, 2007.
133. AHA Scientific Sessions, "The Metabolic Syndrome Controversy", Orlando, Nov 5, 2007.
134. Department of Health and Human Services Prevention and Health Summit 2008, "Understanding the Complexity of Trans Fatty Acid Reduction", Washington D.D., Nov 28, 2007.
135. Global Diabetes Summit, "Metabolic Syndrome and Cardiovascular Disease: Therapeutic Management", Columbus OH, Nov 30, 2007.
136. Pennington Biomedical Research Center, The 20 Most Significant Advances in Obesity Research, Prevention, and Treatment. "Obesity Research in the Next Decade", Baton Rouge LA, Mar 4, 2008.
137. American Heart Association Nutrition, Physical Activity and Metabolism Conference, "Macronutrient Partitioning and Body Weight Regulation", Colorado Springs CO, March 12, 2008.
138. International Atherosclerosis Society, "Pharmacological Alternatives in Dyslipidemia" Vina Del Mar, Chile, April 24, 2008.
139. International Atherosclerosis Society, "Management of Obesity Co-Morbid Conditions" Vina Del Mar, Chile, April 25, 2008.
140. DERC Metabolic Symposium, "Metabolic Syndrome: Update on the Controversies", University of Washington, Seattle, May 13, 2008.
141. American College of Physicians Annual Meeting, "Lipid Update 2008", Washington D.C., May 9, 2008.
142. Southwest Lipid Association Annual Meeting, Keynote Lecture "Lifestyle and Cardiovascular Risk Reduction", and "Diet and Weight Loss Controversies", Denver CO, July 18-19, 2008.
143. Democratic National Convention, The Obesity Society Policy Forum, "Obesity, Complications, Prevention", Denver CO, August 25, 2008.
144. Cardiometabolic Health Congress, "Dilemmas in the Metabolic Syndrome", Boston MA, Oct 16, 2008
145. Cardiometabolic Health Congress, "Management of the Hypertriglyceridemic Patient", Boston MA, Oct 18, 2008.
146. Arteriosclerosis, Thrombosis and Vascular Biology Annual Conference, "How to Captivate your Audience from the Podium", Washington DC, April 30, 2009.
147. Commentary, "Clinical Trials in Diabetes: Cardiovascular Effects of Metabolic Interventions" Scientific Sessions, American Heart Association, Orlando FL, Nov 16, 2009
148. International Atherosclerosis Society Symposium on Critical Issues for Future Guidelines Regarding Cardiovascular Risk Management, "Metabolic Syndrome and Type 2 Diabetes", Vina Del Mar, Chile, Nov 29, 2009.
149. Chilean Atherosclerosis Working Group Symposium, "Obesity: The New Pandemic", Vina Del Mar, Chile, Nov 30, 2009.

`

150. World Congress of Cardiology, "Interaction of Combined RAAS and PPAR Therapies for Atherosclerosis", "Dyslipidemia in the Elderly", "Coronary artery Disease Can be Reversed by Lifestyle", "Obesity, Genes or Environment", "Insulin Resistance: How to Detect and Treat", and "Clinical Trials Review: Arbiter-6 HALTS", Beijing, China, June 17-19, 2010.
151. American Diabetes Association, "Is the Patient with Type I Diabetes Still at Risk for Cardiovascular Disease?" Orlando FL, June 29, 2010.
152. American Heart Association, "Lipid Management in Diabetes - Which Foci? Which Therapies?" Chicago, IL, Nov 14, 2010.
153. National Institute of Diabetes Digestive and Kidney Diseases, Chair, Nutrition Obesity Research Centers Grant Reviews Study Section, Bethesda MD, Dec 7-8, 2010.
154. City of Hope 11th Annual Rachmiel Levine Diabetes and Obesity Symposium, "Which Non-Traditional Risk Factors Should be Measured?" Pasadena CA, March 13, 2011
155. Council on Nutrition, Physical Activity and Metabolism, AHA, 10th Anniversary Lecture, "The Rationale Behind Obesity Prevention: Personal and Public Challenges", Atlanta GA, March 23, 2011
156. World Congress on Interventional Therapies for Type 2 Diabetes, "CV Risk, CVD and Diabetes-Related Mortality: Impact of Pharmacologic Approaches", New York City, NY, March 28, 2011
157. 4th International Congress on Prediabetes and the Metabolic Syndrome, "Treating Each Component of the Metabolic Syndrome Will Reduce the Risk of Cardiovascular Outcomes", and "CVD in Adults with Diabetes: Glycemia and Beyond", Madrid, Spain April10, 2011
158. 34th Steenbock Symposium, "Lipoprotein Lipase in the Brain Regulates Energy Balance and Body Weight", University of Wisconsin, May 23, 2011.
159. Juvenile Diabetes Foundation and University of Colorado Practical Ways to Achieve Targets in Diabetes Care Symposium. "Aggressive Lipid Management for Diabetes", Keystone, Colorado July 16, 2011
160. Kern Aspen Lipid Conference, "Routing Lipids Away from Muscle and Brain", Vail, Colorado Aug 9, 2011
161. European Association for the Study of Diabetes, "Obesity and Type 2 Diabetes: Pathogenesis". Lisbon, Portugal, Sept 13, 2011
162. World Congress' 6th Annual Obesity and Wellness Congress, "Community Engagement: Promoting Wellness at the Local Level", Vienna VA, Sept 22, 2011
163. The Obesity Society, "Lipid and Lipoprotein Metabolism in the CNS", Orlando, Florida, Oct 2, 2011
164. Cardiometabolic Health Congress, "Why is Weight Loss So Hard to Sustain?" Boston, Massachusetts, Oct 20, 2011
165. American Diabetes Association The Brain and Diabetes Meeting, "The CNS and Lipoproteins: Molecular Components of Brain Lipid Signaling and Obesity, Alexandria, Virginia, Oct 30, 2011
166. American Heart Association Scientific Sessions, "Sugar Sweetened Beverages and Obesity", Orlando Florida, Nov 15, 2011
167. American College of Nutrition, "The Reduced Obese State: The Challenge of Weight Maintenance", Morristown, NJ, Nov 17, 2011
168. International Diabetes Federation Meeting, Debate and Pro position, "C-Reactive Protein is Critical for Identifying CVD Risk", Dubai, United Arab Emirates, Dec 6, 2011
169. American Society for Nutrition Middle East Congress, ""CVD & Diabetes - Current and Future Strategies for Prevention & Treatment, Istanbul, Turkey, Feb 15-16, 2012.
170. Food and Drug Administration Endocrine and Metabolism Drug Advisory Committee (EMDAC), "Pathophysiology of Obesity and Cardiovascular Disease", March 28, 2012
171. World Congress of Cardiology, "The Obesity Epidemic - Individual & Population Approaches"; "Where is the important fat in the Metabolic Syndrome?"; Genetics of the Metabolic Syndrome"; "Obesity as a Worldwide Epidemic"; "Prevention & Management of Obesity in Diverse Populations" ; "Genetics of Changes in HDL Pathways", Dubai, U.A.E, April 18-21, 2012.
172. National Lipid Association, "Metabolic Changes Caused by Weight Loss", Scottsdale, AZ June 2, 2012.
173. The 1st International Congress on Lipid Metabolism & Atherosclerosis and the 44th Fall Conference of the Korean Society of Lipidology & Atherosclerosis. "The Metabolic Syndrome: The Elephant in the Room" and "Hypertriglyceridemia: Controversies Regarding Mechanisms and Management", Seoul, Korea, September 14-15, 2012.
174. Academy of Nutrition and Dietetics Annual Meeting, "Diet & Lifestyle Innovations for CVD Prevention: New NIH Expert Guidelines", Philadelphia, PA, October 8, 2012.

`

175. Cardiometabolic Health Congress, “Guidelines Updates & Implications for Clinical Practice” and “Severe Hypertriglyceridemia”, Boston, MA, October 17-20, 2012.
176. American Heart Association Scientific Sessions, “Lifestyle Recommendations” and “Controversies in Diabetes: Dyslipidemia; Which Lipid Targets and Which Agents?” Los Angeles, CA, November 5-8, 2012.
177. World Congress of Internal Medicine, “Statins: Beyond Cholesterol Lowering”, “The Metabolic Syndrome: Why All the Controversies?” and “The Link between Obesity and Type 2 Diabetes: What is Known and what’s Not Known and How is Treatment Affected” Santiago, Chile, November 13-15, 2012.
178. First American Diabetes Association Middle East Congress, “Metabolic Basis of Cardiovascular Disease Prevention”, “Cardiovascular Disease in Type 1 Diabetes – is the Complication the Same as in Type 2 Diabetes?”, “Fibrate and Statin Therapy – Where do we Stand?”, and “Tight Glycemic Control and Cardiovascular Disease Outcome”, Dubai, United Arab Emirates, December 4-6, 2012.
179. Statin-Intolerance Think Tank, Duke University CRI, “Statin Dose Reduction and Switch”, Pentagon City, January 14-15, 2013.
180. ASP Workshop on Diabetes Mellitus and Cardiovascular Disease in Older Adults, “Hyperlipidemia and Dyslipidemia” Washington D.C., April 4-5, 2013.
181. Prediabetes Meeting, “How Important is Treating Dysglycemia for Cardiovascular Disease Prevention?, Vienna, Austria, April 17-19, 2013.
182. The Endocrine Society, Meet the Professor “Lipids Master Class” and “Emerging Risk Factors for Cardiovascular Disease”, San Francisco, CA June 14-15, 2013
183. American Diabetes Association, “The New Agents for Obesity Management and Their Place in Therapy”, Chicago IL, June 22, 2013
184. Cardiometabolic Health Congress, “Type 1 Diabetes 2013: Translating the Latest Advances into Clinical Practice”, Boston, MA October 4, 2013.
185. The Endocrine Society Endobridge, “Obesity: Myths and Facts”; “Lipids/Obesity Case Discussion”, Antalya, Turkey, October 24-25, 2013
186. American Heart Association Scientific Sessions 2013, “Pathophysiological Underpinnings Linking Obesity and CVD”; “Cardiovascular Dysfunction in Metabolic Syndrome”; “Osler Trial: Discussant”; 2013 /AHA Guideline on Lifestyle Management to Reduce Cardiovascular Disease Risk”, November 17-20, 2013
187. Österreichische Diabetes Gesellschaft, Keynote Address “The Metabolic Basis of Cardiometabolic Disease Prevention”. Salzberg, Austria, November 21, 2013
188. International Diabetes Federation, “Glucose and Lipids”, Melbourne, Australia, December 4, 2013.
189. World Congress of Cardiology, “When does obesity shorten life expectancy?” and “Midlife Adulthood: Interventions to promote healthy lifestyles in overweight/obese adults”, Melbourne, Australia, May 4-7, 2014
190. American Diabetes Association Meeting, “Are the New ACC/AHA Guidelines for Lipids Appropriate for Diabetes?”, San Francisco CA, June 17, 2014
191. The Endocrine Society Meeting, “Update on the ACC/AHA Lipid Guidelines” and “Master Clinicians Session – Lipids”, Chicago IL, June 21, 2014.
192. Cardiometabolic Health Congress, “Lifestyle and Obesity Guidelines” in CVD Prevention Guidelines Update: Clinical Impact and Current Controversies. Boston MA, October 23, 2014.
193. The American Heart Association Scientific Sessions, “High/Low, Good/Bad: What’s the Skinny on Dietary Fat?” Chicago IL, November 17, 2014.
194. Diabetes/India, “Hypertriglyceridemia: The Most Difficult Lipid Disorder to Evaluate and Treat”, Chennai, India, April 11, 2015
195. American Diabetes Association Meeting, “Meet-the-Expert – Similarities and Differences between the ADA and AHA Lipid Guidelines”, Boston, MA, June 15, 2016.
196. National Lipid Association Meeting, “ACC/AHA Lifestyle Guidelines”, Chicago IL, June 12, 2015.
197. Third World Congress and Diabetes Surgery Summit II, “Cardiometabolic Risk in Type 2 Diabetes”, September 28, 2015.
198. The American Heart Association Scientific Sessions, “Teaching Patients Healthy Nutrition Behaviors”, Orlando FL, November 9, 2015.
199. Vanderbilt University Diabetes Day 2015, Plenary Lecture, “Diabetes-Associated Cardiometabolic Disease, from Mechanisms to Clinical Opportunities”, November 19, 2015.
200. Endocrine Society Annual Meeting, “An Update on PCSK9 Inhibitors”, Boston, MA, April 2, 2016.
`

201. The American Heart Association Scientific Sessions, "Lifestyle Modifications and CVD Risk in Patients with Diabetes, New Orleans, LA, November 13, 2016.
202. Tyler Memorial Lecture, Division of Endocrinology, University of Utah, March 2, 2017.
203. Endocrine Society Annual Meeting, "Meet the Professor, Lipid Update 2017", Orlando FL, April 1,'17
204. Advances in Cardiovascular Risk Reduction, "Differences in CVD Risk between Type 1 and Type 2 Diabetes", NYU School of Medicine, New York, NY, April 10, 2017.
205. National Lipid Association, W. Virgil Brown Lecture, "Lipoprotein Metabolism: From Bench to Guidelines", Philadelphia, PA, May 20, 2017.
206. American College of Cardiology Meeting, Debate - "Hold the Salt? Optimum Intake in Hypertension is <2300 mg/day", Orlando FL, March 11, 2018.
207. American College of Cardiology Meeting, Debate – "Trim the Fat, It's Good for you", Orlando FL, March 11, 2018.
208. Endocrine Society Meeting, "The Metabolic Syndrome as a Paradigm of Insulin Resistance" Chicago, IL, March 16, 2018.
209. Endocrine Society Meeting, "Raising Awareness to Improve Patient Outcomes", Chicago, IL, March 18, 2018.
210. Diabetes Updates, 'ACC/AHA CVD Guidelines, and 'CVD Risk Factors in the Elderly', May 11-13, 2018, in Athens, Greece.\

**Many but none listed after June 2018**

## BIOGRAPHY

## PEER-REVIEWED PUBLICATIONS

1. **Eckel RH**, Crowell EB Jr, Waterhouse BE, Bozdech MJ. Platelet inhibiting drugs in thrombotic thrombocytopenic purpura. *Arch Int Med* 37:735-737, 1977.
2. **Eckel RH**, Fujimoto WY, Brunzell JD. Development of lipoprotein lipase in cultured 3T3-l1 cells. *Biochem Biophys Res Comm*; 78:288-293, 1977.
3. **Eckel RH**, Fujimoto WY, Brunzell JD. Insulin regulation of lipoprotein lipase in cultured 3T3-l1 cells. *Biochem Biophys Res Comm*; 84:1069-1075, 1978.
4. **Eckel RH**, Fujimoto WY, Brunzell JD. Gastric inhibitory polypeptide (gip) enhanced lipoprotein lipase activity in cultured preadipocytes. *Diabetes*; 28:1141-1142, 1979.
5. **Eckel RH**, Green WL. Postpartum thyrotoxicosis in a patient with Graves disease association with low radioactive iodine uptake. *J Am Med Assoc*; 243:1454-1456, 1980.
6. **Eckel RH**, Albers JJ, Cheung MC, Wahl PW, Lindgren FT, Bierman EL. High density lipoprotein composition in insulin-dependent diabetes mellitus. *Diabetes*; 30:132-138, 1981.
7. **Eckel RH**, Fujimoto WY. Insulin stimulated glucose uptake, leucine incorporation into protein and uridine incorporation into RNA in skin fibroblast cultures from patients with diabetes mellitus. *Diabetologia*; 20:186-189, 1981.
8. **Eckel RH**, Albers JJ, Cheung MC, McLean EG, Bierman EL Plasma lipids and microangiopathy in insulin-dependent diabetes mellitus. *Diabetes Care*; 4:447-493, 1981.
9. **Eckel RH**, Fujimoto WY. Quantification of cell death in human fibroblast by measuring the loss of [$14^c$] thymadine from prelabeled cell monolayers. *Anal Biochem*; 114:118-124, 1981.
10. **Eckel RH**, Fujimoto WY, Brunzell JD. Effect of *in vitro* lifespan of 3T3-l1 cells on hormonal responsiveness of lipoprotein lipase activity. *Int J Obesity*; 5:571-578, 1981.
11. Brunzell JD, Schwartz RS, **Eckel RH**, Goldberg AP. Insulin and adipose tissue lipoprotein lipase activity in humans. *Int J Obesity*; 5:685-694, 1981
12. Sadur CN, **Eckel RH**. Insulin stimulation of adipose tissue lipoprotein lipase: use of the euglycemic clamp technique. *J Clin Invest*; 69:1119-1125, 1982.
13. Kern PA, Knedler; **Eckel RH**. Isolation and culture of microvascular endothelium from human adipose tissue. *J Clin Invest,* 71(6):1822-1829, 1983.
14. Sadur CN, **Eckel RH**. Insulin-mediated increases in the HDL cholesterol/cholesterol ratio in humans. *Arteriosclerosis*; 3:339-343, 1983.
15. **Eckel RH**, Prasad JE, Kern PA, Marshall S: Insulin regulation of lipoprotein lipase in cultured isolated rat adipocytes. *Endocrinology*; 114:1665-1671, 1984.

`

16. Kern PA, **Eckel RH**. Absence of lipoprotein lipase in cultured human adipose stromal cells. *Arteriosclerosis,* 4:232-237, 1984.
17. Sadur CN, Yost TJ, **Eckel RH**. Fat feeding decreases insulin responsiveness of adipose tissue lipoprotein lipase. *Metabolism*; 33:1043-1047, 1984.
18. **Eckel RH**, Robbins RJ: Lipoprotein lipase is produced, regulated and functional in rat brain. *Proc Natl Acad Sci USA*; 81:7604-7607, 1984.
19. Sadur CN, Yost TJ, **Eckel RH**. Insulin responsiveness of adipose tissue lipoprotein lipase is delayed but preserved in obesity. *J Clin Endocr Metab*; 59:1176-1182, 1984.
20. Kern PA, Marshall S, **Eckel RH**. Regulation of lipoprotein lipase in primary cultures of isolated human adipocytes. *J Clin Invest*; 75:199-208, 1985.
21. Berr F, **Eckel RH**, Kern F Jr. Plasma decay of chylomicron remnants is not affected by heparin-stimulated plasma lipolytic activity in normal fasting men. *J Lipid Res*; 26:852-859, 1985.
22. Berr F, **Eckel RH**, Kern F Jr. Contraceptive steroids increase hepatic uptake of chylomicron remnants in healthy young women. *J Lipid Res*; 27:645-651, 1986.
23. Garvey WT, Grundy SM, **Eckel RH**. Xanthogranulomatosis in an adult: lipid analysis of xanthomata and plasma. *J Am Acad Derm*; 16:183-187, 24, 1987.
24. Baron AD, **Eckel RH**, Schmeiser L, Kolterman OG. The effect of short term $\alpha$-glucosidase inhibition on carbohydrate and lipid metabolism in type II diabetics. *Metabolism*; 36:409-415, 1987.
25. Kern PA, Mandic A, **Eckel RH**. Regulation of lipoprotein lipase by glucose in primary cultures of isolated human adipocytes: relevance to the hypertriglyceridemia of diabetes. *Diabetes*; 36:1238-1245, 1987.
26. **Eckel RH**, Yost TJ. Weight reduction increases adipose tissue lipoprotein lipase responsiveness in obese women. *J Clin Invest,* 80:992-997, 1987.
27. **Eckel RH**, Goldberg IJ, Steiner L, Yost TJ, Paterniti JR ,Jr. Plasma lipolytic activity. Relationship to postheparin lipolytic activity and evidence for metabolic regulation. *Diabetes* 1988; 37(5):610-5, 1988.
28. **Eckel** RH, Sadur CN, Yost TJ. Deficiency of the insulin/glucose-mediated decrease in serum triglycerides in normolipidemic obese subjects. *Int J Obesity*; 12:369-376, 1988.
29. Yost TJ, **Eckel RH**. Fat calories may be preferentially stored in reduced-obese women: a permissive pathway for resumption of the obese state. *J Clin Endocr Metab*; 67:259-264, 1988.
30. Draznin B, Sussman KE, **Eckel RH**, Kao M, Yost TJ, Sherman N. Possible role of cytosolic free calcium concentrations in mediating insulin resistance of obesity and hyperinsulinemia. *J Clin Invest*.; 82:1848-1852, 1988.
31. Yost TJ, **Eckel RH**. Hypocaloric feeding in obese women: metabolic effects of medium-chain triglyceride substitution. *Am J Clin Nutr*; 49:326-330, 1989.
32. **Eckel RH**, Yost TJ. HDL subfractions and adipose tissue metabolism in the reduced-obese state. *Am J Phys*. 256:E740-746, 1989.
33. Kern PA, Svoboda ME, Graves D, **Eckel RH**, Van Wyk JJ. Insulin-like growth factor action and production in adipocytes and endothelial cells from human adipose tissue. *Diabetes,* 38:710-717, 1989.
34. **Eckel RH**. Lipoprotein lipase: A multifunctional enzyme relevant to common metabolic diseases. *N Engl J Med*; 320:1060-1068, 1989.
35. Samuels MH, **Eckel RH**: Massive insulin. overdosage: Detailed studies of free insulin levels and glucose requirements. *Clin Tox J Tox*; 26:157-168, 1989.
36. Lorentsen KJ, Hendrix CW, Collins JM, Kornhauser PM, Perry BG, Klecker RW, Flexner C, **Eckel RH**, Bartlett JG, Leitman PS. Dextran sulfate is poorly absorbed after oral administration. *Ann Int Med*; 111:561-566, 1989.
37. Brass EP, Tserng K-Y, **Eckel RH**. Urinary organic acid excretion during feeding of medium-chain or long-chain triglyceride diets in patients with non-insulin dependent diabetes mellitus. *Am J Clin Nutr*; 52:923-926, 1990.
38. **Eckel RH**, Raynolds MV, Bessesen DH, Farese RV Jr, Ohtake A, Yost TJ. Lipoprotein lipase: hormonal and nutritional regulation. *J Drug Devel*; 3 Suppl 1:91-94, 1990.
39. Raynolds MV, Awald PD, Gordon DF, Gutierrez-Hartmann A, Rule DC, Wood WM, **Eckel RH**. Lipoprotein lipase gene expression in rat adipocytes is regulated by isoproterenol and insulin through different mechanisms. *Mol Endocr*; 4:1416-1422, 1990.
`

40. Farese RV, Jr, Yost TJ, **Eckel RH**. Tissue-specific regulation of lipoprotein lipase activity by insulin in normal weight humans. *Metabolism*; 40(2):214-6, 1991.
41. Neville MC, Waxman LJ, Jensen DR, **Eckel RH**. Lipoprotein lipase in human milk compartmentalization and effect of fasting, insulin and glucose. *J Lipid Res*; 32:251-257, 1991.
42. Jensen DR, Bessesen DH, Etienne J, **Eckel RH**, Neville MC. Distribution and source of lipoprotein lipase in mouse mammary glands. *J Lipid Res*; 32:733-742, 1991.
43. Regensteiner JG, Mayer EF, Shetterly SM, **Eckel RH**, Haskell WL, Marshall JA, Baxter J, Hamman RF. Relationship between habitual physical activity and hyperinsulinemia among non-diabetic men and women: The San Luis Valley Diabetes Study. *Diabetes Care*; 14:1066-1074, 1991.
44. Bessesen DH, Robertson AD, **Eckel RH**. Weight reduction increases adipose but decreases cardiac LPL in reduced-obese Zucker rats. *Am J Phys*; 261:E246-E251, 1991.
45. Mayer EJ, Burchfiel CM, **Eckel RH**, Marshall JA, Haskell WL, Hamman RF. The role of insulin and body fat in associations of physical activity with lipids and lipoproteins in a bi-ethnic population: The San Luis Valley Diabetes Study. *Arteriosclerosis and Thrombosis*; 11:973-984, 1991.
46. Yost TJ, **Eckel RH**. Regional similarities in the metabolic regulation of adipose tissue lipoprotein lipase. *Metabolism*; 41:33-36, 1992.
47. Sniderman A, Cianflone K, **Eckel RH**. Levels of acylation stimulating protein in obese women before and after moderate weight loss. *Int J Obesity*; 15:327-332, 1991.
48. Barchiesi BJ, **Eckel RH**, Ellis PP. The cornea and disorders of lipid metabolism. *Surv Ophthalmol,* 36:1-22, 1991.
49. Glaser DS, Yost TJ, **Eckel RH**. Preheparin lipoprotein lipolytic activities: Relationship to plasma lipoproteins and postheparin lipolytic activities. *J Lipid Res*; 33:209-214, 1992.
50. **Eckel RH**, Hanson AS, Chen AY, Berman JN, Yost TJ, Brass EP. Dietary substitution of medium-chain triglycerides improves insulin-mediated glucose metabolism in non-insulin dependent diabetics. *Diabetes*; 41:641-647, 1992.
51. Fulton-Kehoe DL, **Eckel RH**, Shetterly S, Hamman RF. Determinations of total HDL and HDL subfraction cholesterol levels among Hispanic and non-Hispanic white subjects with normal glucose tolerance. The San Luis Valley Diabetic Study. *J Clin Epidemiol*; 45:1191-1200, 1992.
52. Currie RA, **Eckel RH**. Characterization of a high affinity octamer transcription factor binding site in the human lipoprotein lipase promoter. *Arch Biochem Biophys*; 298(2):630-639, 1992.
53. Yost TJ, Jensen DR, **Eckel RH**. Tissue-specific lipoprotein lipase: Relationship to body composition and body fat distribution in normal weight humans. *Obesity Res*; 1:1-4, 1993.
54. **Eckel RH**. Insulin Resistance: An adaptation for weight maintenance. *Lancet*; 340:1452-1453, 1992.
55. Bessesen DH, Richards CL, Etienne J, Goers JW, **Eckel RH**. The spinal cord is the most abundant source of lipoprotein lipase in the central nervous system. *J Lipid Res*; 34:229-238, 1993.
56. Yost TJ, Rodgers CM, **Eckel RH**. Suction lipectomy: Outcome relates to region-specific lipoprotein lipase activity and interval weight change. *Plastic Reconstr Surg*; 92:1101-1108, 1993.
57. Ferraro RT, **Eckel RH**, Larson DE, Fontvieille A-M, Rising R, Jensen DR, Ravussin E. Relationship between skeletal muscle lipoprotein lipase activity and 24-hr macronutrient oxidation. *J Clin Invest*; 92:441-445, 1993.
58. Jensen DR, Gavigan S, Sawicki V, Witsell DL, **Eckel RH**, Neville MC. Regulation of lipoprotein lipase activity and MRNA in the mammary gland of the lactating mouse. *Biochem J*; 98:321-327, 1994.
59. Erskine JM, Jensen DR, **Eckel RH**. Macronutrient regulation of lipoprotein lipase is posttranslational. *J Nutrition*; 124(4):500-7, 1994.
60. Yost TJ, Erskine JM, Gregg TS, Podlecki DL, Brass EP, **Eckel RH**. Dietary substitution of medium chain triglycerides (mct) in non-insulin dependent diabetes mellitus in an ambulatory setting: impact on control and insulin-mediated glucose metabolism. *J Am Col Nutrition*; 13:615-622, 1994.
61. Bagdade JD, Dunn FL, **Eckel RH**, Ritter MC. Intraperitoneal insulin therapy corrects abnormalities in cholesteryl ester transfer and lipoprotein lipase activity in insulin-dependent diabetes mellitus. *Arterioscler Thromb*; 14:1933-1939, 1994.
62. Yost TJ, Froyd KK, Jensen DR, **Eckel RH**. Change in skeletal muscle lipoprotein lipase activity in response to insulin/glucose in non-insulin-dependent diabetes mellitus. *Metabolism*; 44:786-790, 1995.

`

63. Travers SH, Jeffers BW, Bloch CA, Hill JO, **Eckel RH**. Gender and Tanner Stage differences in body composition and insulin sensitivity in early pubertal children. *J Clin Endocr Metab*; 80:172-178, 1995.
64. **Eckel RH**, Yost TJ, Jensen DR. Alterations in lipoprotein lipase in insulin resistance. *Intern J Obesity* 19:S16-S21; Supplement 1, 1995.
65. **Eckel RH**, Yost T, Jensen DR. Sustained weight reduction in moderately obese women results in decreased activity of skeletal muscle lipoprotein lipase. *Eur J Clin Invest*; 25:396-402, 1995.
66. Bessesen DH, Rupp CL, **Eckel RH**. Trafficking of dietary fat in lean rats. *Obesity Res*; 3:191-204, 1995.
67. Bessesen DH, Rupp CL, **Eckel RH**. Dietary fat is shunted away from oxidation towards storage in obese Zucker rats. *Obesity Res*; 3:179-190, 1995.
68. Morin CL, Schlaepfer IR, **Eckel RH**. Tumor necrosis-α eliminates binding of NF-Y and an octamer-binding protein to the lipoprotein lipase promoter in 3T3-L1 adipocytes. *J Clin Invest*; 95:1684-1689, 1995.
69. Regensteiner JG, Shetterly SM, Mayer EJ, **Eckel RH**, Haskell WR, Baxter J, Hamman RF. Relationship between habitual physical activity and insulin area among persons with impaired glucose tolerance: The San Luis Valley Diabetes Study *Diabetes Care*; 18:490-497, 1995.
70. Yost TJ, Sadur CN, **Eckel RH**. Glycohemoglobin levels relate to the response of adipose tissue lipoprotein lipase to insulin/glucose in obese non-insulin-dependent diabetes mellitus. *Metabolism*; 44:1475-1480, 1995.
71. Morin CL, **Eckel RH**. Transcriptional regulation of the lipoprotein lipase gene. *Atherosclerosis*; X:231-235, 1995.
72. Yost TJ, Jensen DR, **Eckel RH**. Weight regain following sustained weight reduction is predicted by relative insulin sensitivity. *Obesity Res*; 3:583-587, 1995.
73. Coppack SW, Yost TJ, Fisher RM, **Eckel RH**, Miles JM. Periprandial and regional lipase activity in normal men. *Am J Physiol*; 270:E718-E722, 1996.
74. Gnudi L, Jensen DR, Tozzo E, **Eckel RH**, Kahn BB. Adipose specific overexpression of the GLUT4 glucose transporter in transgenic mice alters lipoprotein lipase activity in muscle and adipose tissue: Implications for regulation of nutrient partitioning. *Am J Physiol*; 270 (Regulatory Integrative Comp. Physiol.39):R785-R792, 1996.
75. Donahoo WT, **Eckel RH**. Adipocyte metabolism in obesity. IN: *Current Opinions in Endocrinology and Diabetes*; 3:501-508, 1996.
76. **Eckel RH**, Jensen DR, Schlaepfer IR, Yost TJ. Tissue-specific regulation of lipoprotein lipase by isoproterenol in normal weight humans. *Am J Physiol,* 271(5 Pt 2):R1280-6, 1996.
77. Bagdade, JD, Kelley DE, Henry RR, **Eckel RH**, Ritter MC. Effects of multiple daily insulin injections and intraperitoneal insulin therapy on cholesteryl ester transfer and lipoprotein lipase activities in non-insulin-dependent diabetes mellitus. *Diabetes*; 46:414-420, 1997.
78. Mehler PS, Lezotte, D, **Eckel RH**. Lipid levels in anorexia nervosa. *Int J Eating Dis*; 24:217-221, 1998.
79. Morin CL, Pagliassotti MJ, Windmiller D, **Eckel RH**. Adipose tissue-derived tumor necrosis factor-α is elevated in older rats. *J Gerontol*; 52:B190-B195, 1997.
80. Jensen DR, Schlaepfer IR, Morin CL, Pennington DS, Marcell T, Ammon SM, Gutierrez-Hartmann A, **Eckel RH**. Prevention of diet-induced obesity in transgenic mice overexpressing skeletal muscle lipoprotein lipase. *Am J Physiol,* (Regulatory Integrative Comp. Physiol 42.).273:R683-R689, 1997.
81. Morin CL, **Eckel RH**, Marcel T, Pagliassotti MJ. High fat diets elevate adipose tissue-derived tumor necrosis factor-α activity. *Endocrinology*; 138:4665-4671, 1997.
82. Morin CL, **Eckel RH**. Transgenic and knockout animals: Novel mechanisms of body weight regulation. *J Nutr Biochem*; 8:702-706, 1997.
83. Donahoo WT, Jensen DR, Yost T, **Eckel RH**. Isoproterenol and somatostatin decrease plasma leptin in humans: A novel mechanism regulating leptin secretion. *J Clin Endocrinol Metab*; 82:4139-4143, 1997.
84. **Eckel RH.** Obesity and heart disease: a statement for healthcare professionals from the Nutrition Committee, American Heart Association. *Circulation*. Nov 4; 96(9):3248-50, 1997.

`

85. Travers SH, Labarta JI, Gargosksy SE, Rosenfeld RG, Jeffers BW, **Eckel RH**. Insulin-like growth factor binding protein-1 (IGFBP-1) levels are strongly associated with insulin sensitivity and obesity in early pubertal children. *J Clin Endocrinol Metab*; 83:1935-1939, 1998.
86. Bagdade JD, Teuscher A, Ritter MC, **Eckel RH**, Robertson RP. Alterations in cholesterol ester transfer, lipoprotein lipase, and lipoprotein composition following combined pancreas-kidney transplantation. *Diabetes*; 47:113-8, 1998.
87. Yost TJ, Jensen DR, Haugen B, **Eckel RH**. Effect of dietary macronutrient composition on tissue-specific lipoprotein lipase activity and insulin action in normal-weight subjects. *Am J Clin Nutr*; 68:296-302, 1998.
88. Kosmiski L, **Eckel RH**. The use of anorectic agents in non-insulin dependent diabetes mellitus. IN: *Current Opinions in Endocrinology and Diabetes,* 1998.
89. Regensteiner JG, Bauer TA, Reusch J EB, Brandenburg SL, Sippel JT, Vogelsong AM, Smith S, Wolfel EE, **Eckel RH**, Hiatt WR. Abnormal oxygen uptake kinetic responses in women with type II diabetes mellitus. *J Applied Physiol*; 85;1, 310-7, 1998.
90. Donahoo WT, **Eckel RH**. Lipid management post-myocardial infarction: Outcomes and cost. *Primary Care Case Reviews*; 1:4, 158-167, 1998.
91. Huey PU, Marcell T, Owens GC, Etienne J, **Eckel RH**. Lipoprotein lipase is expressed in cultured Schwann cells and functions in lipid synthesis and utilization. *J Lipid Res*; 39 2135- 2142, 1998.
92. Schlaepfer IR, **Eckel RH**. Plasma triglyceride reduction in mice following direct injections of muscle-specific lipoprotein lipase DNA. *Diabetes*; 48:223-227, 1999.
93. **Eckel RH**. The importance of timing and accurate interpretation of the benefits of weight reduction on plasma lipids. *Obes Res*, Mar; 7(2):227-8, 1999.
94. Ginzinger DG, Clee SM, Dallongeville J, Lewis ME, Henderson HE, Bauje E, Togers QR, Jensen DR, **Eckel RH**, Dyer R, Innis S, Jones B, Fruchart JC, Hayden MR. Lipid and lipoprotein analysis of cats with lipoprotein lipase deficiency. *Eur J Clin Invest*; 29; 1: 17-26, 1999.
95. Grundy SM, Benjamin IJ, Burke GL, Chait A, **Eckel RH,** Howard BV, Mitch W, Smith SC, Sowers JR. Diabetes and cardiovascular disease: a statement for healthcare professionals from the council on arteriosclerosis, thrombosis and vascular biology of the American Heart Association. *Diabetes Care*; 22, C21-24, 1999.
96. Mehler PS, **Eckel RH,** Donahoo WT**.** Leptin levels in restricting and purging anorectics. *Int J Eat Disord*. Sep;26(2):189-94, 1999.
97. Shepard TY, Jensen DR, Blotner S, Zhi J, Guerciolini R, Pace D, **Eckel RH**. Orlistat fails to alter postprandial plasma lipid excursions or plasma lipases in normal weight male volunteers. *Int J Obesity Relat Metab Disord*; (2):187-94, 2000.
98. Smith SJ, Cases S, Jensen DR, Chen HC, Sande E, Tow, B, Sanan DA, Raber J, **Eckel RH**, Farese, Jr. RV. Obesity Resistance and multiple mechanisms of triglyceride synthesis in mice lacking DGAT. *Nature Genetics,* 25:87-90, 2000.
99. Poirier P, Marcell T, Uelmen Huey P, Schlaepfer IR, Owens GC, Jensen DR, **Eckel RH**. Increased Intracellular Triglyceride in C2C12 Muscle Cells Transfected with Human Lipoprotein Lipase. *Biochem Biophys Res*, 270:997-1001, 2000.
100. Brown NS, Smart A, Sharma V, Brinkmeier ML, Greenlee L, Camper SA, Jensen DR, **Eckel RH**, Krezel W, Chambon P and Haugen BR. Thyroid hormone resistance and increased metabolic rate in the RXRγ deficient mouse. *J Clin Invest*, 106:73-79, 2000.
101. Donahoo WT, Jensen DR, Shepard TY, **Eckel RH**. Seasonal variation in lipoprotein lipase and plasma lipids in physically active normal weight humans. *J Clin Endo Metab*, 85:9: 3065-3068, 2000.
102. Shepard TY, Weil KM, Sharp TA, Grunwald GK, Bell ML, Hill JO, **Eckel RH**. Occasional physical inactivity combined with a high-fat diet may be important in the development and maintenance of obesity in human subjects. *Am J Clin Nutr,* 73:703-708, 2001.
103. Backus RC, Ginzinger DG, Ashbourne Excoffon KJD, Clee SM, Hayden MR, **Eckel RH**, Hickman A, Rogers QA. Maternal expression of functional lipoprotein lipase and effects on body fat mass and condition scores of mature cats with lipoprotein lipase deficiency. *Am J Vet Res,* 62:264-269, 2001.
104. Jensen DR, Gayles EC, Ammon S, Phillips R, **Eckel RH**. A self-correcting indirect calorimeter system for the measurement of energy balance in small animals *J Appl Phys,* 90:912-918, 2001.

`

105. Krauss RM, **Eckel RH**, Howard B, Appel LJ, Daniels SR, Deckelbaum RJ, Erdman JW, Kris-Etherton P, Goldberg I, Kotchen TA, Lichtenstein AH, Mitch WE, Mullis R, Robinson K, Wylie-Rosett J, St. Jeor S, Suttie J, Tribble DL, Bazzarre TL. AHA Dietary Guidelines Revision 2000: A statement for healthcare professionals from the Nutrition Committee of the American Heart Association. *J Nutr*, 131:1; 132-146, 2001.
106. Krauss RM, **Eckel RH**, Howard B, Appel LJ, Daniels SR, Deckelbaum RJ, Erdman JW, Kris-Etherton P, Goldberg I, Kotchen TA, Lichtenstein AH, Mitch WE, Mullis R, Robinson K, Wylie-Rosett J, St. Jeor S, Suttie J, Tribble DL, Bazzarre TL. AHA Dietary Guidelines: revision 2000: A statement for healthcare professionals from the Nutrition Committee of the American Heart Association. *Stroke*. Nov; 31(11):2751-66, 2000.
107. Davies PJ, Berry SA, Shipley GL, **Eckel RH**, Hennuyer N, Crombie DL, Ogilvie KM, Peinado-Onsurbe J, Fievet C, Leibowitz MD, Heyman RA, Auwerx J. Metabolic effects of rexinoids: tissue-specific regulation of lipoprotein lipase activity. *Mol Pharmacol*, Feb; 59(2):170-6, 2001.
108. Ferreira LDMC-B, Pulawa LK, Jensen DR, **Eckel RH.** Overexpressing human lipoprotein lipase in mouse skeletal muscle is associated with insulin resistance. *Diabetes*, 50:1064-1068, 2001.
109. Kris-Etherton P, **Eckel RH**, Howard BV, St. Jeor S, Bazzarre T. The Lyon Heart Study: Benefits of a Mediterranean style NCEP/AHA Step 1 dietary pattern for cardiovascular disease. *Circulation*, 103:13; 1823-1825, 2001.
110. Monks J, Huey PC, Hanson L**, Eckel RH**, Neville MC, Gavigan S. Cholesterol-depleted, low density lipoprotein-sized particles are present in the milk of lactating mice. *J Lipid Research*, 42:686-696, 2001.
111. Kosmiski LA, Kuritzkes DR, Lichtenstein KA, Glueck DH, Gourley PJ, Stamm ER, Scherzinger AL, **Eckel RH.** Fat Distribution and Metabolic Changes are Strongly Correlated and Energy Expenditure is Increased in the HIV Lipodystrophy Syndrome. *AIDS*, 15:1993-2000, 2001.
112. Kris-Etherton P, Daniels SR, **Eckel RH**, Engler M, Howard BV, Krauss RM, Lichtenstein AH, Sacks F, St. Jeor S, Stampfer M, Grundy SM, Appel LJ, Byers T, Campos H, Cooney G, Denke MA, Kennedy E, Marckmann P, Pearson TA, Riccardi G, Rudel LL, Rudrum M, Stein DT, Tracy RP, Ursin V, Vogel RA, Zock PL, Bazzarre TL, Clark J. AHA scientific statement: summary of the Scientific Conference on Dietary Fatty Acids and Cardiovascular Health. Conference summary from the Nutrition Committee of the American Heart Association. *Circulation*. Feb 20; 103(7):1034-9, 2001.
113. St. Jeor S, Howard BV, Prewitt, TE, Bovee V, Bazzarre T, **Eckel RH**. Dietary Protein and Weight Reduction. *Circulation*, 104:1869-1874, 2001.
114. Poirier P, **Eckel RH.** Management of Diabetes and Heart Disease. *Cardiology Special Edition* 7:17-21, 2001.
115. Huey PU, Waugh KC, Etienne J, **Eckel RH**. Lipoprotein lipase is expressed in rat sciatic nerve and regulated in response to crush injury. *J. Lipid Research*, 43:19-26, 2002.
116. Ludwig DS and **Eckel RH.** The Glycemic Index at 20 yr *Am J Clin Nutr* 76(suppl):264S-265-S, 2002.
117. Ferreira LDMC-B, Huey PU, Pulford BE, Ishii DN and **Eckel RH.** Sciatic nerve lipoprotein lipase is reduced in streptozotocin-induced diabetes and corrected by insulin. *Endocrinology*, 143(4): 1213-1217, 2002.
118. Hokanson JE, Cheng S, Snell-Bergeon JK, Grow MA, Hung C, Erlich HA, Erlich J, **Eckel RH,** Rewers M. A common promoter polymorphism in the hepatic lipase gene (LIPC-480C>T) is associated with an increase in coronary calcification in Type 1 Diabetes. *Diabetes*, Apr. 51:4; 1208-1213, 2002.
119. **Eckel RH**, Ershow AG, and Barouch WW. Report of the NHLBI-NIDDK Working Group on the Pathophysiology of Obesity-Associated Cardiovascular Disease. *Circulation*, 105:2923-2928, 2002.
120. Chen HC, Smith SJ, Ladha Z, Jensen DR, Ferreira LD, Pulawa LK McGuire JG, Pitas RE, **Eckel RH,** and Farese RV Jr. Increased insulin and leptin sensitivity in mice lacking acyl CoA:diacylglycerol acyltransferase. *J Clin Invest*. 109(8):1049-55, 2002.
121. Travers SH, Jeffers BW, and **Eckel RH**. Insulin Resistance During Puberty and Future Fat Accumulation. *J Clin Endo and Metab*, 87:3814-3818, 2002.
122. **Eckel RH**, Wassef M, Chait A, Sobel B, Barrett E, King G, Lopes-Virella M, Reusch J, Ruderman N, Steiner G, and Vlassara H. Prevention Conference VI Diabetes and Cardiovascular Disease Writing Group II: Pathogenesis of Atherosclerosis in Diabetes. *Circulation*, 105:e138-e143, 2002.

`

123. Grundy SM, Smith S Jr**.**, **Eckel RH**, Redberg R, and Bonow RO. Prevention Conference VI: Diabetes and Cardiovascular Disease: Executive summary: conference proceeding for healthcare professionals from a special writing group of the American Heart Association. *Circulation*, 105:2231-9, 2002.

124. Plenge JK, Hernandez TL, Weil KM, Poirier P, Grunwald GK, Marcovina SM and **Eckel RH**. Simvastatin lowers C-reactive protein within fourteen days: An effect independent of LDL cholesterol reduction. *Circulation*, 106:1447-1452, 2002.

125. Pulawa LK and **Eckel RH.** Overexpression of Muscle Lipoprotein Lipase and Insulin Sensitivity. *Current Opinion in Clinical Nutrition and Metabolic Care*, 5; 569-574, 2002.

126. Pearson TA, Blair SN, Daniels SR, **Eckel RH,** Fair JM, Fortmann SP, Franklin BA, Goldstein LB, Greenland P, Grundy SM, Hong Y, Houston-Miller N, Lauer RM, Ockene IS, Sacco R, Sallis, Jr, JF, Smith SC, Jr, Stone NJ, Taubert KA. AHA Guidelines for Primary Prevention of Cardiovascular Disease and Stroke: 2002 Update: Consensus Panel Guide to Comprehensive Risk Reduction for Adult Patients without Coronary or Other Atherosclerotic Vascular Diseases. American Heart Association Science Advisory and Coordinating Committee. *Circulation*, July 16, 106:3; 388-391, 2002.

127. **Eckel RH,** Barouch WW, Ershow AG**.** Report of the National Heart, Lung, and Blood Institute-National Institute of Diabetes and Digestive and Kidney Diseases Working Group on the pathophysiology of obesity-associated cardiovascular disease. *Circulation*. Jun 18: 105 (24):2923-8, 2002.

128. Merkel M, **Eckel RH**, Goldberg IJ. Lipoprotein lipase: genetics, lipid uptake and regulation. *J Lipid Res*, 43:12: 1997-2006, 2002.

129. Poirier P and **Eckel RH.** Obesity and Cardiovascular Disease, *Curr Atheroscler Rep*. Nov;4(6):448-53, 2002.

130. Capell WH, DeSouza CA, Poirier P, Bell ML, Stauffer BL, Weil KM, Hernandez TL and **Eckel RH.** Short-term triglyceride lowering with fenofibrate improves vasodilator function in subjects with hypertriglyceridemia. *Arterioscler Throm Vasc Bio*, 23:307-13, 2003.

131. Chen HC, Jensen DR, Myers HM, **Eckel RH,** and Farese RV., Jr. Obesity resistance and enhanced glucose metabolism in mice transplanted with white adipose tissue lacking acyl CoA:diacylglycerol acyltransferase 1. *J Clin Invest* 111:1715-1722, 2003.

132. Schlaepfer IR, Pulawa LK, Ferreira LDM C-B, James DE, Capell WH, and **Eckel RH.** Increased expression of the SNARE accessory protein Munc18c in lipid-mediated insulin resistance. *J Lipid Res*, 44: 1174-1181, 2003.

133. Duncan GE, Perri MG, Theriaque DW, Hutson AD, **Eckel RH,** Stacpoole PW. Exercise training, without weight loss, increases insulin sensitivity and postheparin plasma lipase activity in previously sedentary adults. *Diabetes Care*. Mar;26(3):557-62, 2003.

134. Kosmiski L, Kurtizkes D, Lichtenstein K, **Eckel RH**. Adipocyte-derived hormone levels in HIV lipodystrophy. *Antivir Ther*. Feb; 8(1):9-15, 2003.

135. Hokanson JE, Kamboh MI, Scarboro S, **Eckel RH**, and Hamman RF. Effects of the hepatic lipase gene and physical activity on coronary heart disease risk *Am. J. Epidemiology*, 158(9); 836-843, 2003.

136. Kosmiski LA, Kuritzkes DR, Sharp TA, Hamilton JT, Lichtenstein KA, Mosca CL, Grunwald GK, **Eckel RH**, Hill JO. Total energy expenditure and carbohydrate oxidation are increased in the human immunodeficiency virus lipodystrophy syndrome. *Metabolism*. May; 52(5):620-5, 2003.

137. Kosmiski L, Kuritzkes D, Hamilton J, Sharp T, Lichtenstien K, Hill JO, **Eckel RH**. Fat distribution is altered in HIV-infected men without clinical evidence of HIV lipodystrophy syndrome. *HIV Med*. Jul; 4(3):235-40, 2003.

138. Poirier P, Hernandez TL, Weil KM, Shepard TJ and **Eckel RH**. The impact of diet-induced weight loss on cardiac autonomic nervous system and arrhythmias in subjects with severe obesity. *Obesity Research*. 11; 1040-1047, 2003.

139. Dabelea D, Kinney G, Snell-Bergeon JK, Hokanson JE, **Eckel RH,** Erlich J, Garg S, Hamman RF and Rewers M. Effect of type 1 diabetes on the gender difference in coronary artery calcification: A role for insulin resistance? The Coronary Artery Calcification in Type 1 Diabetes (CACTI) Study. *Diabetes*, Nov; 52(11):2833-2839, 2003.

`

140. Snell-Bergeon JK, Hokanson JE, Jensen L, MacKenzie T, Kinney G, Dabelea D, **Eckel RH,** Ehrlich J, Garg S. and Rewers M. Progression of coronary artery calcification in type1 diabetes. *Diabetes Care* 26:2923-2928, 2003.
141. Hokanson JE, MacKenzie T, Kinney G, Snell-Bergeon JK, Erlich J, **Eckel RH**, and Rewers M. Evaluating changes in coronary artery calcium: An analytical approach that accounts for inter-scan variability. *Am J Roentgenology*, 182:1327-1332, 2004.
142. Matthan NR, Welty FK, Barret HR, Harausz C, Dolnikowski GG, Parks JS, **Eckel RH**, Schaefer EJ, and Lichtenstein AH. Dietary hydrogenated fat increases HDL apoA-1 catabolism and decreases LDL apoB-100 catabolism in hypercholesterolemic women. *Arterioscler Throm Vasc Bio* 24(6):1092-7, 2004.
143. Haugen BR, Jensen DR, Sharma V, Pulawa LK, Hays WR, Wojciech K, Chambon P, **Eckel RH.** RXRγ deficient mice have increased skeletal muscle lipoprotein lipase activity and less weight gain when fed a high fat diet. *Endocrinology*, 145:3679-85, 2004.
144. Capell WH, Spiegelman KP, and **Eckel RH.** Therapeutic targets in severe hypertriglyceridemia. Review Article. *Drug Discovery Today: Disease Mechanisms.* Volume 1, Issue 2, November 2004, Pages 171-177.
145. Klein S, Burke LE, Bray GA, Blair S, Allison D, Pi-Sunyer X, Hong Y, **Eckel RH**. Clinical implications of obesity with specific focus on cardiovascular disease: A Statement for Professionals from the American Heart Association Council on Nutrition, Physical Activity, and Metabolism. *Circulation*. 110:2952-67. Epub 2004 Oct 27.
146. Sutherland JP, McKinley B and **Eckel RH**. The Metabolic Syndrome and Inflammation. *Metabolic Syndrome and Related Disorders.* 2; 82-104, 2004.
147. Morris AM, Calsbeek DJ and **Eckel RH**. Lipid Metabolism and Nutrient Partitioning Strategies. *Current Drug Targets-CNS & Neurological Disorders*, 3; 411-430, 2004.
148. **Eckel RH**, York DA, Rossner S, Hubbard V, Caterson I, St. Jeor ST, Hayman LL, Mullis RM, Blair SM. Prevention Conference VII: Obesity, a Worldwide Epidemic Related to Heart Disease and Stroke Executive Summary. *Circulation*. 2004; 110:2968-2975.
149. Maahs DM, Ogden LG, Kinney GL, Wadwa RP, Snell-Bergeon J, Dabelea D, Hokanson JE, Erlich J, **Eckel RH**, Rewers M. Low plasma adiponectin levels predict progression of coronary artery calcification. *Circulation*. 2005 Feb 15; 111(6):747-53.
150. Maahs DM, Kinney GL, Wadwa P, Snell-Bergeon JK, Dabelea D, Hokanson J, Erlich J, Garg S, **Eckel RH**, Rewers MJ. Hypertension prevalence, awareness, treatment, and control in an adult type 1 diabetes population and a comparable general population. *Diabetes Care*. 2005 Feb; 28(2):301-6.
151. Cornier MA, Donahoo WT, Pereira R, Gurevich I, Westergren R, Enerback S, Eckel PJ, Goalstone ML, Hill J, **Eckel RH**, Draznin B. Insulin sensitivity determines the effectiveness of dietary macronutrient composition on weight loss in obese women. *Obesity Research* 2005 13: 703-709.
152. Sennello JA, Fayad R, Morris AM, **Eckel RH**, Asilmaz E, Montez J, Friedman JM, Dinarello CA, Fantuzzi G. Regulation of T-cell mediated hepatic inflammation by adiponectin and leptin. *Endocrinology*, May 2005; 146: 2157 - 2164.
153. Turek FW, Joshu C, Kohsaka A, Lin E, Ivanova G, McDearmon E, Laposky A, Losee-Olson S, Easton A, Jensen DR, **Eckel RH**, Takahashi JS, Bass J. Obesity and metabolic syndrome in circadian clock mutant mice. *Science*. 308:1043-1045, 2005.
154. **Eckel RH**, Grundy SM, Zimmet PZ. The metabolic syndrome: Epidemiology, mechanisms and therapeutics. *Lancet* 365:1415-28, 2005.
155. Daniels SR, Arnett DK, **Eckel RH**, Gidding SS, Hayman LL, Kumanyika S, Robinson TN, Scott BJ, St. Jeor S, Williams CL. Overweight in children and adolescents: Pathophysiology, consequences, prevention, and treatment. *Circulation*. 2005 April 19; 111:1999-2001.
156. Schlaepfer IR, Pulawa LK, **Eckel RH**. Cloning and characterization of Munc18c(L), a novel murine Munc18c gene paralog. *Biochemical Biophysical Research Communications*. 334:911-6, 2005.
157. Capell WH, **Eckel RH**. Severe hypertriglyceridemia with history of treatment failure. *Nature Clinical Practice Endocrinology & Metabolism* 1, 53-58, 2005.
158. Grundy SM, Cleeman JI, Daniels SR, Donato KA, **Eckel RH**, Franklin BA, Gordon DJ, Krauss RM, Savage PJ, Smith, Jr. SC, Spertus JA, Costa F. Diagnosis and management of the metabolic syndrome: A Statement for health care professionals. *Circulation*. Oct; 112: e285 - e290, 2005.
`

159. Poirier P, Giles TD, Bray GA, Hong Y, Stern JS, Pi-Sunyer X, **Eckel RH**. Obesity and Cardiovascular Disease: Pathophysiology, Evaluation, and Effect of Weight Loss; an update of the 1997 American Heart Association Scientific Statement on Obesity and Heart Disease From the Obesity Committee of the Council on Nutrition, Physical Activity, and Metabolism. *Circulation*. Feb 14;113(6):898-918, 2006.
160. Douglas PS, **Eckel RH**, Gray DT, Loeb JM, Straube BM. Coming together to achieve quality cardiovascular care. *Circulation*. Feb; 113: 607 – 608, 2006.
161. Morris AM, Sennello JA, Fayad RA, **Eckel RH**, Dinarello CA, Fantuzzi G. T cell-mediated hepatic inflammation modulates adiponectin levels in mice: role of tumor necrosis factor alpha. *Metabolism*. Apr; 55(4):555-9, 2006.
162. **Eckel RH**, Hernandez TL, Bell ML, Weil KM, Shepard TY, Grunwald GK, Sharp TA, Francis CC, and Hill JO. Carbohydrate balance predicts weight and fat gain in adults. *Am J Clin Nutr*, 83: 803 – 808, 2006.
163. Gibbons RJ, **Eckel RH**, Jacobs AK. American Heart Association Science Advisory and Coordinating Committee. The utilization of cardiac imaging. *Circulation*. 2006 Apr 4;113(13):1715-6.
164. Netea MG, Joosten LAB, Lewis E, Jensen DR, Voshol PJ, Fantuzzi G, Kullberg BJ, Tack CJ, van Krieken H, Kim S-H, Stalenhoef AF, van de Loo FA, Verschueren I, Pulawa L, Akira S, **Eckel RH**, Dinarello CA, van den Berg W, van der Meer JWM. Deficiency of interleukin-18 in mice leads to obesity, insulin resistance, and hyperglycemia. *Nat Med.* 2006 Jun; 12(6):650-6.
165. Kretowski A, Hokanson JE, McFann K, Kinney GL, Snell-Bergeon JK, Maahs DM, Wadwa RP, **Eckel RH**, Ogden LG, Garg SK, Li J, Cheng S, Erlich HA, Rewers M. The apolipoprotein A-IV Gln360His polymorphism predicts progression of coronary artery calcification in patients with type 1 diabetes. *Diabetologia*. 2006 Aug; 49(8):1946-54.
166. **Eckel RH**. Preventive cardiology by lifestyle intervention: opportunity and/or challenge? Presidential address at the 2005 American Heart Association Scientific Sessions. *Circulation*. 2006;113:2657-2661.
167. **Eckel RH**, Kahn R, Robertson RM, Rizza RA. Preventing Cardiovascular Disease and Diabetes: A call to action from the American Diabetes Association and the American Heart Association. *Diabetes Care.* Jul; 29(7):1697-9, 2006.
168. **Eckel RH** and Grundy SM. Insensitivity to insulin and obesity: the underlying cause. *Diabetes Voice, special issue*. 51; 28-30, 2006.
169. Capell WH and **Eckel RH**. 2006. Treatment of hypertriglyceridemia. *Curr Diab Reports* 6: 230-40.
170. **Eckel RH.** Mechanisms of the components of the metabolic syndrome that predispose to diabetes and atherosclerotic CVD. *Proc Nutr Soc*, 66:1-13, 2007.
171. Bergman BC, Jensen DR, Pulawa LK, Ferreira LD, **Eckel RH**. Fasting decreases free fatty acid turnover in mice overexpressing skeletal muscle lipoprotein lipase. *Metabolism*. Nov; 55(11): 1481-1487, 2006.
172. Hernandez TL, Capell WH, Wolfe P, Gerard LA, **Eckel RH**. Time Course of C-reactive protein reduction with simvastatin therapy in patients with type 2 diabetes mellitus. *Am J Cardiol.* Dec 15; 98(12):1656-9, 2006.
173. Maahs DM, Wadwa RP, McFann K, Nadeau K, Williams MR, **Eckel RH**, Klingensmith GJ. Longitudinal lipid screening and use of lipid-lowering medications in pediatric type 1 diabetes. *The Journal of Pediatrics,*150: 146-150, 2007.
174. Kretowski A, McFann K, Hokanson JE, Maahs DM, Kinney GL, Snell-Bergeon JK, Wadwa RP, **Eckel RH**, Ogden LG, Garg SK, Li J, Cheng S, Erlich HA, Rewers M. Polymorphisms of the renin-angiotensin system genes predict progression of subclinical coronary atherosclerosis. *Diabetes,* 56:863-871, 2007.
175. Pulawa LK, Jensen DR, Coates A, **Eckel RH**. Dose-dependent reduction of plasma triglycerides in apolipoprotein CII transgenic mice with skeletal muscle specific overexpression of lipoprotein lipase. *Journal of Lipid Research,* Jan 48(1):145-151, 2007.
176. Yokayama M, Seo T, Park T, Yagyu H, Hu Y, Son NH, Augustus AS, Vikramadythian RK, Ramakrishnan R, Pulawa LK, **Eckel RH**, Goldberg IJ. Cholesterol uptake into heart and skeletal muscle of lipoprotein lipase transgenic mice: Evidence that statin therapy increases muscle lipid uptake. *Journal of Lipid Research,* Mar; 48(3):646-55, 2007.

`

177. Buse JB, Ginsberg H, Bakris GL, Clark NG, Costa F, **Eckel RH**, Fonseca V, Gerstein HC, Grundy S, Nesto RW, Pignone MP, Plutzky J, Porte D, Redberg R, Stitzel KF, Stone NJ. Primary Prevention of Cardiovascular Diseases in People with Diabetes Mellitus: A Scientific Statement from the American Heart Association and the American Diabetes Association. *Circulation* Jan 115: 114-126, 2007.
178. Wu X, Zvonic S, Floyd ZE, Kilroy G, Goh BC, Hernandez TL, **Eckel RH**, Mynatt RL, Gimble JM. Induction of circadian gene expression in human subcutaneous adipose-derived stem cells. *Obesity,* Nov 15:1-11, 2007.
179. Schroeder-Gloecker* J, Rahman* SM, Janssen R., Shao J, Qiao L, Roper M, Fisher S, Lowe E, Orlicky D, Mcmanaman J, Palmer C, Gitomer WL, Huang W, O'Dohrety RM, Becker TC, Klemm DJ**,** Jensen DR, Pulawa L, **Eckel RH**, Friedman JE. CCAAT/Enhancer Binding Protein β (C/EBPβ) deletion reduces adiposity, hepatic steatosis, and hyperglycemia in *Lepr* $^{db/db}$ mice. *Journal of Biological Chemistry,* May 25; 282(21):15717-29, 2007.
179. Maahs DM, Ogden LG, Snell-Bergeon JK, Kinney GL, Wadwa RP, Hokanson JE, Dana Dabelea D, Kretowski A, **Eckel RH**, Rewers M. Determinants of serum adiponectin in persons with and without type 1 diabetes *American Journal of Epidemiology* Sep 15; 166(6):731-40, 2007.
180. **Eckel RH**, Borra S, Lichtenstein AH, Yin-Piazza SY. Understanding the Complexity of *Trans* Fatty Acid Reduction in the American Diet. American Heart Association *Trans* Fat Conference 2006. Report of the *Trans* Fat Conference Planning Group. *Circulation,* Apr 24; 115(16):2231-46, 2007.
181 Hajri T, Jensen DR, Pietka T, Drover V, Pietka TA, Tao H, **Eckel RH**, Abumrad NA. Fatty acid sensing and leptin release: CD36 deficiency protects against adiposity and diet-induced obesity by decreasing PPARλ activity and increasing leptin secretion. *Diabetes,* Jul;56(7):1872-80, 2007.
182. Linnebur SA, Capell WH, Saseen JJ, Wolfe P, **Eckel RH**. Plant sterols added to combination statin and colesevalam hydrochloride therapy failed to lower low-density lipoprotein cholesterol concentrations. *J Clin Lipidology,*1: 626-633, 2007.
183. Jensen DR, Knaub LA, Konhilas JP, Leinwand LA, Maclean PS, **Eckel RH**. Increased thermoregulation in cold exposed transgenic mice overexpressing lipoprotein lipase in skeletal muscle: An avian phenotype? *Journal of Lipid Research,* Apr; 49(4):870-9, 2008.
184. Grinspoon S, Grunfeld C, Kotler D, Currier J, Lundgren J, Dubé MP, Lipshultz SE, Hsue P, Squires K, Schambelan M, Wilson P, Yarasheski K, Hadigan C, Stein JH, **Eckel RH**. Executive Summary: State of the Science Conference: Initiative to Decrease Cardiovascular Risk and Increase Quality of Care for Patients Living with HIV/AIDS. *Circulation* Jul 8;118(2):198-210, 2008.
185. Cornier M-A and **Eckel RH**. Cardiometabolic syndrome and CVD prevention. IN: *Therapy of Diabetes and Related Disorders,* 2008.
186. **Eckel RH**. Diabetic Dyslipidemia and Cardiovascular Disease Risk. *Current Diabetes Reports.* 8:421-423, 2008.
187. **Eckel RH**. Obesity Research in the Next Decade, *International Journal of Obesity*, Dec;32 Suppl 7:S143-51, 2008.
188. **Eckel RH**, Non-surgical management of obesity in adults. *New England Journal of Medicine*, May 1, 358(18):1941-50, 2008.
189. Allison DB, Downey M, Atkinson RL, Billington CJ, Bray GA, **Eckel RH**, Finkelstein EA, Jensen MD, Tremblay A. Obesity as a Disease: A White Paper on Evidence and Arguments Commissioned by the Council of the Obesity Society. *Obesity, 16 (6)*:1161-1177, 2008.
190. Perreault L, Bergman BC, Playdon MC, Chiara DM, Cabelli C, **Eckel RH**. Impaired fasting glucose with or without impaired glucose tolerance: progressive or parallel states of pre-diabetes. *American Journal of Physiology-Endocrinology and Metabolism,* Aug; 295(2):E428-35, 2008.
191. Hernandez TL, Ballard RD, Weil KM, Shepard TY, Scherzinger AL, Stamm ER, Sharp TA, **Eckel RH**. Effects of maintained weight loss on sleep dynamics and neck morphology in severely obese adults. *Obesity,* Jan;17(1):84-91, 2009.
192. Bergman BC, Cornier, M-A, Horton TJ, Bessesen DH, **Eckel RH**. Skeletal muscle munc 18c and syntaxin 4 in human obesity. *Nutrition and Metabolism,* Jul 24; 5:21-27, 2009.
193. **Eckel RH**, Kris-Etherton P, Lichtenstein AH, Wylie-Rosett J, Groom A, Stitzel KF, Yin-Piazza S. Americans' awareness, knowledge and behaviors regarding fats: 2006-2007. *J. American Diabetics Association,* Feb: 109(2):288-296, 2009.
`

194. Donahoo WT, Hernandez TL, Costa JL, Jensen DR, Morris AM, Brennan MB, Hochgeschwender U, **Eckel RH**. Plasma α-melanocyte stimulating hormone (α-MSH): Gender differences and correlations with obesity. *Metabolism,* Jan; 58(1):16-21, 2009.
195. Cornier M-A, Dabalea D, Hernandez T, Lindstrom R, Steig AJ, Stob NR, Van Pelt RE, Wang H, **Eckel RH**. The metabolic syndrome. *Endocrine Reviews,* Dec: 29(7):777-822, 2008.
196. Wang H, Knaub LA, Jensen DR, Jung DY, Hong E-G, Ko H-J, Coates AM, Goldberg IJ, de la Houssaye BA, Janssen RC, McCurdy CE, Rahman SM, Choi CS, Shulman GI, Kim JK, Friedman JE, **Eckel RH**. Skeletal Muscle-Specific Deletion of Lipoprotein Lipase Enhances Insulin signaling in skeletal muscle but causes insulin resistance in liver and other tissues. *Diabetes,* Jan;58(1):116-124, 2009.
197. Steinberger J, Daniels SR, **Eckel RH**, Hayman L, Lustig RH, McCrindle B, Mietus-Snyder ML. Progress and challenges in metabolic syndrome in children and adolescents. *Circulation,* Feb 3; 119(4):628-647, 2009.
198. Denberg TD, Myers BA, **Eckel RH**, McDermott MT, Dickinson WP, Lin C-T, A Patient Outreach Program between visits improves diabetes care. *International Journal of Health Care*, 21:130-136, 2009.
199. Poirier P, **Eckel RH**. Cardiovascular consequences of obesity. *Drug Discovery Today: Therapeutic Strategies*. 5:45-51, 2008.
200. Snell-Bergeon JK, Chartier-Logan C, Maahs DM, Ogden LG, Hokanson JE, Kinney GL, **Eckel RH**, Erlich J, Rewers M. Adults with type 1 diabetes eat a high-fat atherogenic diet that is associated with coronary artery calcium. *Diabetologia*, 2009; 52:801-809.
201. Goldberg IJ, **Eckel RH**, Abumrad NA. Regulation of fatty acid uptake into tissues: Lipoprotein lipase- and CD36-mediated pathways. *Journal of Lipid Research*, 2009; 50 Suppl: S86-90.
202. Wang H, **Eckel RH**. Lipoprotein Lipase: From Gene to Obesity. *Amer. J. Physiology Endocrinology and Metabolism*, 2009; 297:E271-E288.
203. Daniels SR, Jacobson MS, McCrindle BW, **Eckel RH**, Sanner BM. American Heart Association Childhood Obesity Research Summit: Executive Summary. *Circulation* 2009 119:2114-2123.
204. Lewis CE, McTigue KM, Burke LE, Poirier P, **Eckel RH**, Howard BV, Allison DB, Kumanyika S, Pi-Sunyer FX. Mortality, health outcomes, and body mass index in the overweight range: A Science Advisory from the American Heart Association. *Circulation,* 2009;119 3263-3271.
205. Bergman BC, Perreault L, Hunerdosse DM, Koehler MC, Samek AM, **Eckel RH**. Intramuscular lipid metabolism in the insulin resistance of smoking. *Diabetes* 2009; 58:2220-2227.
206. Alberti KGMM, **Eckel RH**, Grundy SM, Zimmet PJ, Cleeman JI, Donato KA, Fruchart JC, James PT, Loria CM, Smith SA. Harmonizing the Metabolic Syndrome: A Joint Statement of the International Diabetes Federation Task Force on Epidemiology and Prevention; National Heart. Lung, and Blood Institute; American Heart Association; World Heart Federation; International Atherosclerosis Society; and International Association for the study of Obesity. *Circulation,* 2009; 120:1640-1645.
207. **Eckel RH**, Alberti KGMM, Grundy SM, Zimmet PJ. Metabolic syndrome update. *The Lancet,* 2010; 375:181-183.
208. Perreault L, Bergman BC, Hunerdosse DM, Playton MC, **Eckel RH**. Inflexibility in intramuscular triglyceride fractional synthesis distinguishes pre-diabetes from obesity in humans. *Obesity* 18:1524-1531, 2010.
209. Hernandez TL, Sutherland JP, Wolfe P, Allian-Sauer M, Capell WH, Talley ND, Wyatt HR, Foster G, Hill JO, **Eckel RH**. Lack of suppression of circulating free fatty acids and hypercholesterolemia during weight loss on a high fat, low carbohydrate diet. *American Journal of Clinical Nutrition*, 91:578-585, 2010.
210. Kaul S, Bolger AF, Herrington D, Giugliano R, **Eckel RH**. Advisory on thiazolidinedione drugs and cardiovascular risks. *Circulation.* 121(16):1868-1877, 2010.
211. Levine GN, D'Amico AV, Berger P, Clark PE, **Eckel RH**, Keating NL Milani RV, Sagalowsky AI, Smith MR, Zakai N. Androgen deprivation in prostate cancer and cardiovascular risk. *Circulation*.121:833-840, 2010.
212. **Eckel RH**. Approach to the patient who is intolerant of statin therapy. *Journal of Clinical Endocrinology and Metabolism.* 95(5):2015-2022, 2010.

`

213. Perreault L, Bergman BC, Hunerdosse DM, **Eckel RH**. Altered intramuscular lipid metabolism relates to diminished insulin action in men, but not women, in progression to diabetes. *Obesity,* 18:2093-2100, 2010*.*
214. Bergman BC, Perreault L, Hunerdosse DM, **Eckel RH**. Increased intramuscular lipid synthesis and low saturation relate to insulin sensitivity in endurance-trained athletes. *J. Appl Phys,* 108(5):1134-1141, 2010.
215. Donahoo WT, Stob NR, Ammon S, Levin N. **Eckel RH**. Leptin increases skeletal muscle ipoprotein lipase and postprandial lipid metabolism in mice. *Metabolism,* 60:438-443, 2011.
216. Maahs DM, Hokanson JE, Wang H, Kinney GL, Snell-Bergeon JK, East A, Bergman B, Schauer IE, Rewers M, **Eckel RH**. Lipoprotein subfraction cholesterol distribution is pro-atherogenic in women with type 1 diabetes and insulin resistance. *Diabetes.* 59(7):1771-1779, 2010.
217. Capell WH, Schlaepfer IR, Wolfe P, Watson PA, Bessesen DH, Pagliasotti MJ, **Eckel RH**. Fatty acids increase glucose uptake and metabolism in $C_2C_{12}$ myoblasts stably transfected with human lipoprotein lipase. *American Journal of Physiology, Endocrinology and Metabolism,* American Journal of Physiology Endocrinology and Metabolism. 299(4):E576-583. 2010.
218. Schauer IE, Snell-Bergeon JK, Bergman BC, Maahs DM, Kretowski A, **Eckel RH**, Rewers, M. Insulin resistance, defective insulin-mediated fatty acid suppression, and coronary artery calcification in subjects with and without type 1 diabetes: The CACTI study. *Diabetes,* 60:306-314, 2011*.*
219. Wang H, Astarita G, Taussig MD, Bharadwaj KG, DiPatrizio NV, Nave K-A, Piomelli D, Goldberg IJ, **Eckel RH**. Deficiency of lipoprotein lipase in neurons modifies the regulation of energy balance and leads to obesity. *Cell Metabolism,* 13:105-113, 2011.
220. Jung CM, Melanson EL, Frydendall EJ, Perreault L, **Eckel RH**, Wright K. Energy expenditure during sleep deprivation and sleep following sleep deprivation in adult humans. *The Journal of Physiology,* 589:235-244, 2010*.*
221. Perreault L, Bergman BC, Hunerdosse DM, Howard DJ **Eckel RH**. Fenofibrate administration does not affect muscle triglyceride concentration or insulin sensitivity in humans. *Metabolism,* 60:1107-1114, 2011.
222. Hernandez TL, Kittelson JM, Law CK, Ketch LL, Stob NR, Lindstrom RC, Scherzinger A, Stamm ER, **Eckel RH**. Fat distribution following suction lipectomy: Defense of body fat and patterns of restoration. *Obesity,* 19:1388-1395, 2011.
223. **Eckel RH**, Kahn SE, Ferrannini E, Goldfine AB, Nathan DM, Schwartz MW, Smith RJ, Smith SR. Obesity and Type 2 Diabetes: What can be unified and what needs to be individualized? Jointly published in *Journal of Clinical Endocrinology and Metabolism* 96:1654-1663, 2011 *and Diabetes Care,* 34:1424-1430, 2011.
224. Goldberg IJ, **Eckel RH**, McPherson R. Triglycerides and heart disease, still a hypothesis? *Arteriosclerosis, Thrombosis, and Vascular Biology,* 31:1716-1725, 2011*.*
225. Cornier M-A, Marshall JA, Hill JO, Maahs DM, **Eckel RH**. The prevention of overweight/obesity as a strategy to optimize cardiovascular health. *Circulation,* 124:840-850, 2011*.*
226. Kinney GL, Snell-Bergeon JK, Maahs DM, **Eckel RH**, Ehrlich J, Rewers M, Hokanson JE. Lipoprotein-associated phospholipase $A_2$ activity predicts progression of subclinical coronary atherosclerosis. *Diabetes Technology and Therapeutics* 13:381-387, 2011.
227. Steig AJ, Jackman MR, Giles ED, Higgins JA, Johnson GC, Mahan C, Melanson EL, Wyatt HR, **Eckel RH**, Hill JO, Maclean PS. Exercise reduces appetite and traffics excess nutrients away from energetically efficient pathways of lipid deposition during the early stages of weight regain. *American Journal of Regulatory Integrated Comparative Physiology* 301:R656-667, 2011*.*
228. Tschöp MH, Speakman JR, Arch JRS, Auwerx J, Brủning JC, Chan L, **Eckel RH**, Farese RC Jr. Galgani JE, Hambly C, Horvath TL, Kahn BB, Kozma SC, Maratos-Flier E, Mủller, Muenzberg H, Pfluger PT, Plum L, Reitman M, Rahmouni K, Shulman GI, Thomas G, Kahn CR, Ravussin EA Guide to analysis of mouse energy metabolism; *Nature Methods,*28:57-63, 2011.
229. Nadeau KJ, Maahs DM, Daniels SR, **Eckel RH**. Childhood Obesity and Cardiovascular Disease: Links and Prevention Strategies. 2011. *Nature Reviews Cardiology,* 14:513-525, 2011.
230. Ferland A, **Eckel RH**. Does Sustained Weight Loss Reverse the Metabolic Syndrome? *Current Hypertension Reports,* 13(6):458-464, 2011.

`

231. Wang H, **Eckel RH**. Lipoprotein Lipase in the Brain and Nervous System. *Annual Review of Nutrition,* 32:147-160, 2012.
232. **Eckel RH**, CVD Health Factors and CVD Risk Factors: State of the Science, Emerging Priorities Part 2: Obesity Prevention. *Ethnicity and Disease,* 22 (Suppl 1):S1-38-40, 2012.
233. Ferland A, Chateau-Degat M-L, Hernandez TL**, Eckel RH**. Relationship of tissue-specific responses of lipoprotein lipase to dietary macronutrient composition as a predictor of weight gain over four years. *Obesity,* 20:1006-1011, 2012.
234. Lynch AM, **Eckel RH**, Murphy JR, Gibbs RS, West NA, Giclas PC, Salmon JE, Holers VM. Prepregnancy obesity and complement system activation in early pregnancy and the subsequent development of preeclampsia. *American Journal of Obstetrics and Gynecology,* 206:428e1-8, 2012.
235. Morino K, Petersen KF, Sono S, Choi CS, Samuel VT, Lin A, Gallo A, Zhao H, Kashiwagi A, Goldberg IJ, Wang H, **Eckel RH**, Maegawa H, Shulman GI. Regulation of mitochondrial biogenesis by lipoprotein lipase in muscle of insulin resistant offspring of parents with type 2 diabetes. *Diabetes* 61:877-887, 2012.
236. Bergman BC, Howard D, Schauer IE, Maahs DM, Snell-Bergeon JK, **Eckel RH**, Perreault L Rewers M. Features of hepatic and skeletal muscle insulin resistance unique to type 1 diabetes. *Journal of Clinical Endocrinology and Metabolism,* 97:1663-1672, 2012.
237. Abdel-Maksoud MF, **Eckel RH**, Hamman RF, Hokanson JE. CHD risk is associated with triglycerides and HDL in women and non-HDL cholesterol in men. *J, Clinical Lipidology* 4:374-381, 2012.
238. Rehrer CW, Karimpour-Fard A. Hernandez TL, Law CK, Stob N, Hunter L, **Eckel RH**, Regional differences in subcutaneous adipose tissue gene expression, *Obesity,* 20:2168-2173, 2012.
239. Bergman BC, Perreault L, Hunerdosse D, Kerage A, Playdon M, Samek AM, **Eckel RH**. Novel and reversible mechanisms of smoking-induced insulin resistance in humans. *Diabetes,* 61:3156-3166, 2012.
240. Robciuc MR, Skrobuk P, Anisimov A, Olkkon V, Alitalo K, **Eckel RH**, Kostinen HA, Jauhiainen M, Ehnholm C. Angiopoietin-like 4 mediates peroxisome proliferator-activated receptor delta effect on lipoprotein lipase-dependent fatty acid uptake but not beta-oxidation in myotubes. *PlosONE,* 2012;7(10):e46212.
241. Schlaepfer IR, Hitz CA, Gijon MA, Bergman BC, **Eckel RH**, Jacobsen BM. Progestin M\modulates the lipid profile and sensitivity of breast cancer cells to docetaxel. *Molecular and Cellular Endocrinology* 363:111-121, 2012.
242. Walker AE, Kaplon RE, Lucking SMS, Russell-Nowlan MJ, **Eckel RH**, Seals DR. Fenofibrate improves vascular endothelial function by reducing oxidative stress while increasing eNOS in healthy normolipidemic older adults. *Hypertension* 60: 1517-1523, 2012.
243. Bergman BC, Howard D, Schauer IE, Maahs DM, Snell-Bergeon JK, Clement TW, **Eckel RH**, Perreault L, Rewers M. The importance of palmitoleate acid to adipocyte insulin resistance and whole-body insulin sensitivity in type 1 diabetes. *Journal of Clinical Endocrinology and Metabolism,* 98:E40-50, 2013.
244. Han SH, Oh PC, Lim S, **Eckel RH**, Kwang KK. Comparative cardiometabolic effects of fibrates and omega-3 fatty acids. *International Journal of Cardiology,* 167:2404-2411, 2013.
245. Markwald RR, Melanson EL, Smith MR, Higgins J, Perreault L, **Eckel RH**, Wright KP. Impact of insufficient sleep on total daily energy expenditure, food intake and weight gain. *Proc Natl Acad Sci USA*,110:5695-5700, 2013..
246. de Ferranti SD, de Boer IH, Fonseca V, Fox CS, Golden SH, Lavie CJ, Magge SN, Marx N, McGuire DK, Orchard TJ, Zinman B, **Eckel RH**. Type 1 diabetes mellitus and cardiovascular disease: A joint AHA/ADA Scientific Statement. *Circulation* 2014 130:1110-30; *Diabetes Care* 37:2843-63.
247. Wang H and **Eckel RH**. Why are lipoproteins in the brain? *Trends in Endocrinology and Metabolism*, 25:8-14, 2014
248. **Eckel RH**, Jakicic JM, Ard JD, de Jesus JM, Houston Miller N, Hubbard VS, Lee I-M, Lichtenstein AH, Loria CM, Millen BE, Nonas CA, Sacks FM, Smith SC, Svetkey LP, Wadden TW, Yanovski SZ 2013 AHA/ACC Guideline on Lifestyle Management to Reduce Cardiovascular Risk. A Report of the American College of Cardiology/American/Heart Association Task Force on Practice Guidelines, 2014. *Circulation* and *Journal of the American College of Cardiology* 63:2960-2984.

`

249. Stone NJ, Robinson J, Lichtenstein AH, Bairy Merz N, Blum CB, **Eckel RH**, Goldberg AC, Levy D, Lloyd-Jones DM, McBride P, Schwartz JS, Shero ST, Smith SC, Watson K, Wilson PWF. 2013 ACC/AHA Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerosis Cardiovascular Risk in Adults: A Report of the American College of Cardiology/American/Heart Association Task Force on Practice Guidelines, *In Press, Circulation,* and *Journal of the American College of Cardiology*, 63:2889-2934, 2014.
250. Pellinen J, Wang H, **Eckel RH**. Mice with altered brain lipoprotein metabolism display maladaptive responses to environmental challenges that may predispose to obesity. *Metabolic Syndrome and Related Disorders*, 12:339-346, 2014.
251. Cansell C, Castel J, Denis RG, Rouch C, Delbes AS, Martinez S, Mestivier D, Finan B, Maldonado-Aviles JG, Rijnsburger M, Tschop MH, DiLeone RJ, **Eckel RH**, la Fleur SE, Magnan C, Hinasko TS, Luquet S. Dietary triglycerides act on mesolimbic structures to regulate the rewarding and motivational aspects of feeding. *Molecular Psychiatry*. 2014 Oct; 19(10):1095-105
252. Stone NJ, Robinson JG, Lichtenstein AH, Goff DC Jr, Lloyd-Jones DM, Smith SC Jr, Blum C, Schwartz JS; 2013 ACC/AHA Cholesterol Guideline Panel. Treatment of blood cholesterol to reduce atherosclerotic cardiovascular disease risk in adults. Synopsis of the 2013 American College of Cardiology/American Heart Association Cholesterol Guideline. 2014. *Annals of Internal Medicine* 160:339-343.
253. Cornier MA and **Eckel RH**. Update on the NCEP ATP-III emerging cardiometabolic risk factors, 2014. *BMC Medicine* 12:115-122.
254. Schlaepfer IR, Rider LC, Rodrigues L, Gijon MA, Pac CT, Romero L, Cimic A, Sirintrpun SJ, Glode LM, **Eckel RH**, Cramer SD. Lipid catabolism via CPT1 as a therapeutic target for prostate cancer. *Molecular Cancer Therapeutics*, 2014 Oct; 13(10):2361-71
255. Bjornstad P, Maahs DM, Wadwa RP, Pyle L, Rewers M, **Eckel RH**, Snell-Bergeon JK. Plasma triglycerides predict incident albuminuria and progression of coronary artery calcification in adults with type 1 diabetes: the Coronary Artery in Type 1 Diabetes Study. *Journal of Clinical Lipidology*, 2014 8:576-83.
256. Lim s, **Eckel RH**. Pharmacological Treatment and Therapeutic Prevention of Metabolic Syndrome. *Reviews in Endocrine and Metabolic Disorders*. 2014, 15:329-41.
257. Pitts R, **Eckel RH**. The Emerging Role of PCSK9 Inhibitors in Preventive Cardiology. *European Cardiology Review.* 2014, In Press.
258. Samovski D, Sun J, Pietka T, Gross RW, **Eckel RH**, Su X, Stahl PD, Abumrad NA. Regulation of AMPK activation by CD36 links fatty acid uptake to beta-oxidation. *Diabetes* 2015 Feb; 64(2):353-9.
259. Meschia JF, Bushnell C, Boden-Albala B, Braun LT, Bravata DM, Chaturvedi S, Creager MA, **Eckel RH**, Elkind MS, Fornage M, Goldstein LB, Greenberg SM, Horvath SE, Iadecola C, Jauch EC, Moore WS, Wilson JA; American Heart Association Stroke Council, Council on Cardiovascular and Stroke Nursing, Council on Clinical Cardiology, Council on Functional Genomics and Translational Biology, and Council on Hypertension. *Stroke*, 2014. 45:3754-3832.
260. Cornier MA, **Eckel RH**. Non-traditional dosing of statins in statin-intolerant patients – is It worth a try? *Atherosclerosis Reports.* 2015. 17:475-481.
261. Schlaepfer IR, Glode LM, Hitz CA, Pac CT, Boyle KE, Maroni P, Deep G, Agarwal R, Lucia SM, Cramer SD, Serkova NJ, **Eckel RH**. Inhibition of lipid oxidation increases glucose metabolism and enhances 2-Deoxy-2[$^{18}$F]Fluro-D-Glucose uptake in prostate cancer mouse xenografts. 2015. *Mol Imaging Biol,* 2015. 17:529-538.
262. **Eckel RH**, Henry RR, Yue P, Dhalia A, Wong P, Jochelsen P, Belardineolli L, Skyler JS. The Effect of Ranolazine Monotherapy on Glycemic Control in Subjects with Type 2 Diabetes. *Diabetes Care,* 2015 38:1189-96.
263. Groves DW, Krantz MJ, Hokanson JE, Johnson LR, **Eckel RH**, Kinney GL, Rewers M, Snell-Bergeon JK, Alman AC. Duration of Periodontal disease is associated with progression of coronary artery calcification in type 1 diabetes. *American Journal of Cardiology,* 2015. 116:833-837.
264. Cree-Green M, Maahs DM, Ferland A, Hokanson JE, Wang H, Pyle L, Kinney GL, King M, **Eckel RH**, Nadeau KJ. Lipoprotein subfraction cholesterol distribution is more atherogenic in insulin resistant adolescents with type 1 diabetes. *Pediatric Diabetes*. 2015 10.1-9.

`

265. Bjornstad P, **Eckel RH**, Pyle L, Rewers M, Maahs DM, Snell-Bergeon JK. Relation of combined non-High density lipoprotein-cholesterol and apolipoprotein B with atherosclerosis in type 1 diabetes mellitus. *American Journal of Cardiology,* 2015. 116:1057-1062.
266. Fox CS, Golden SH, Anderson C, Bray GA, Burke LE, de Boer IH, Deedwania P, **Eckel RH**, Ershow AG, Fradkin J, Inzucchi S, Kosiborod M, Nelson RG, Patel MJ, Pignone M, Quinn L, Selvin E, Schauer PR, Valadis DK. Update on prevention of cardiovascular disease in adults with type 2 diabetes mellitus in light of recent evidence. A Scientific Statement from the American Heart Association and the American Diabetes Association. 2015. *Circulation,* 132:691-718. *Diabetes Care,* 38:1777-1803.
267. Thomas EA, McNair B, Bechtell JL, Ferland A, Cornier M-A, **Eckel RH**. Greater hunger and less restraint predict weight loss success with phentermine treatment. *Obesity,* 2016. 24:37-43.
268. Yu T, Taussig MD, DiPatrizio NV, Astarita G, Piomelli D, Bergman BC, Dell'Acqua ML, **Eckel RH ***, Wang H*. Deficiency of lipoprotein lipase in neurons decreases AMPA receptor phosphorylation and leads to neurobehavioral abnormalities in mice. *PLoS One,* Aug 11;10(8):e0135113. doi: 10.1371/journal.pone.0135113. eCollection 2015.
269. Libby A, Wang H, Mittal R, Sungelo M, Potma E, **Eckel RH**, Lipoprotein lipase is an important modulator of lipid uptake and storage in hypothalamic neurons. 2015. *Biochemical and Biophysical Research Communications,* 465:287-292.
270. **Eckel RH***, Depner CM*, Perreault L, Markwald RR, Smith MR, McHill AW, Higgins J, Melanson EL, Wright KP. Circadian time of wakefulness during insufficient sleep impacts insulin sensitivity. 2015. *Current Biology,* 25:3004-3010.
271. Al-Safi ZA, Liu H, Carlson NE, Chosich J, Harris M, Bradford AP, Robledo C, **Eckel RH**, Polotsky AJ. Omega-3 fatty acid supplementation lowers serum FSH in normal weight women but no obese women. *Journal of Clinical Endocrinology and Metabolism*, 2016; 101:324-333.
272. Jarvie JL, Wang H, Kinney GL, Snell-Bergeon JK, Hokanson JE, **Eckel RH**. Lipoprotein-associated phospholipase A2 distribution among lipoproteins differs in type 1 diabetes. 2016 *Journal of Clinical Lipidology*, 2016; 10:577-86.
273. Pettus J, McNabb B, **Eckel RH**, Skyler JS, Dhalla A, Guan S, Jochelson P, Belardinelli L, Henry RH. The effect of ranolazine on glycemic control in patients with type 2 diabetes treated with either glimepiride or metformin. 2016 *Diabetes, Obesity and Metabolism,* 2016; 18:463-474.
274. Wang H, Taussig MD, DiPatrizio NV, Bruce K, Piomelli D, **Eckel RH**. Obesity development in neuron-specific lipoprotein lipase deficient mice is not responsive to increased dietary fat content of change in fat composition. 2016. *Metabolism*, 65:987-997.
275. Chait A, **Eckel RH**. Lipids, lipoproteins and cardiovascular disease: Clinical pharmacology now and in the future. *Journal of Clinical Endocrinology and Metabolism*, 2016; 101:804-14.
276. Rubino F, Nathan DM, **Eckel RH**, Schauer PR, Zimmet PZ, Del Prato S, Ji I, Sadikot SM, Herman WH, Amiel SA, Kaplan LM, Toroncher-Oldenburg G, Cummings DE. Metabolic surgery in the treatment algorithm for type 2 diabetes: a joint statement by the International Diabetes Organizations. *Diabetes Care* 2016; 39:1-17.
277. Adams TD, Arterburn DE, Nathan DM, **Eckel RH**. Clinical outcomes of metabolic surgery: microvascular and macrovascular complications. *Diabetes Care* 2016; 39:912-923.
278. Wolfe BM, Kvach E, **Eckel RH**. Treatment of obesity: weight loss and bariatric surgery. *Circulation Research*, 2016; 118:1844-1855.
279. **Eckel RH**, Bays HE, Klein S, Bade-Horn D. Proactive and progressive approaches in managing obesity. *Postgraduate Medicine*, 2016; May 6:1-10.
280. Wang H, Wang Y, Taussig MD, **Eckel RH**. Sex differences in obesity development in pair-fed neuronal lipoprotein lipase deficient mice. *Molecular Metabolism*, 2016; 5:1025-1032.
281. Colhoun HM, Ginsberg HN, Robinson JG, Leiter LA, Muller-Wieland D, Henry RR, Cariou B, Baccara-Dinet MT, Pordy R, Merlet L, **Eckel RH**. No effect of alirocumab on the incidence of diabetes in a pooled analysis from 10 ODYSSEY Phase 3 studies. *European Heart Journal*, 2016; 37:2981-2989.
282. Yu T, Sungelo MJ, Goldberg IJ, Wang H, **Eckel RH**. Streptozotocin-treated high fat med mice: a new type 2 diabetes model used to study canagliflozin-induced alterations in lipids and lipoproteins. *Hormone and Metabolic Research*, 2016; 49:400-406.

`

283. Saxon DR, **Eckel RH**. Statin intolerance: a literature review and management strategies. *Progress in Cardiovascular Diseases*, 2016, 59:153-164.

284. Ray KK, Ginsberg HN, Davidson MH, Pordy R, Bessac L, Minini P, **Eckel RH**, Cannon CP. Reductions in atherogenic lipids and major cardiovascular events: A pooled analysis of 10 Odyssey Trials comparing alirocumab to control. *Circulation,* 2016; 134:1931-1934.

285. Patel SS, Cree-Green M, Truong U, King M, Ferland A, Moreau KL, Doroosz J, Hokanson JE, Wang H, Kinney GL, Maahs DM, **Eckel RH**, Nadeau KJ. Obese adolescents with polycystic ovarian syndrome have elevated cardiovascular disease risk markers. *Vascular Medicine*, 2017; 22:85-95.

286. Rubino F, Nathan DM, **Eckel RH**, Schauer PR, Alberti KG, Zimmet PZ, Del Prato S, Ji L, Sdaikot SM, Herman WH, Amiel SA, Kaplan LM, Taroncher-Oldenburg G, Cummings DE, Metabolic surgery in the treatment algorithm for type 2 diabetes: A joint statement by International Diabetes Organizations. 2017, *Obesity Surgery*, 27:2-21.

287. Skyler JS, Bakris GL, Bonifacio F, Darsow T, **Eckel RH**, Groop L, Handelsman Y, Insel RA, Mathieu C, McElvanie AT, Palmer JP, Pugliese A, Schatz DA, Sosenko JM, Wilding JPH, Ratner RE. Differentiation of Diabetes by Pathophysiology, Natural History and Prognosis. 2017. *Diabetes*, 66: 241-255.

288. Taha DA, Zgair A, Lee JB, de Moor CH, Barrett DA, Bruce KD, Sungelo M, **Eckel RH**, Gershkovich P. Hyperlipidaemia alone and in combination with acidosis can increase the incidence and severity of statin-induced myotoxicity. *European Journal of Pharmacological Sciences*, 2017; 100:163-175.

289. Crawford ED, Schally AV, Pinthus JH, Block NL, Rick FG, Gasnick MB, **Eckel RH**, Keane TE, Shore ND, Dandal DN, Beveridge TJR, Marshall DC. The potential role of follicle-stimulating hormone in the cardiovascular, metabolic, skeletal, and cognitive effects of associated androgen deprivation therapy. 2017. *Urologic Oncology: Seminars and Original Investigations*, 2017; 35:183-191.

290. Bruce KD, Zsombok A, **Eckel RH**. 2017. Lipid processing in the brain: A key regulator of systemic metabolism. *Frontiers in Endocrinology*, Section Neuroendocrine Science. 2017; Apr 4;8:60. doi: 10.3389/fendo.2017.00060. eCollection.

291. Alman AC, Smith SR, **Eckel RH,** Hokanson JF, Burkhardt BR, Sudini PR, Wu Y, Snell-Bergeon JK. The ratio of pericardial to subcutaneous adipose tissues is associated with insulin resistance with and without type1 diabetes. 2017; *Obesity*, Jul 25(7):1284-1291.

292 Laperrousaz E, Moulle VS, Denis RG, Kassis N, Berland C, Colsch B, Fioramonti X, Philippe E, Lacombe A, Vanacker C, Butin N, Bruce KD, Wang H, Wang Y, Gao Y, Garcia-Caceres C, Prevot V, Tschop MH, **Eckel RH,** Le Stunff H, Luaquet S, Magnan C, Curciani-Guglielmacci C. Lipoprotein lipase in hypothalamus is a key regulator of body weight gain and glucose homeostasis. *Diabetologica* 2017; 60:1314-1324.

293. Seggelke SA, Lindsay MC, Hazlett I, Sanagorski R, **Eckel RH**, Low Wang CC. Cardiovascular safety of antidiabetic drugs in the hospital setting. 2017. *Current Diabetes Reports.*Aug;17(8):64. doi: 10.1007/s11892-017-0884-1. Review.

294. Gao Y, Yi CX, Luqueet S, Magnan C, Legutko B, Wang H, Woods SC, **Eckel RH**, Garcia-Caceres C, Tschop M. Disruption of lipid uptake in astroglia exacerbates diet-induced obesity. *Diabetes*, 2017, 66:2555-2563.

295. Gao y, Vidal-Itriago A, Kalsbeek MJ, Layritz C, Garcia-Caceres C, Tom RZ, Eichmann TO, Vaz FM, Houtkooper RH, van der Wei N, Verhoeven AJ, Yan J, Kalsbeek A, **Eckel RH**, Hofmann SM, Yi CX. *Cell Reports* 2017, 20:3034-3042.

296. Bergman BC, Perreault L, Strauss A, Bacon SD, Kerege AA, Harrison K, Brozinick JT, Hunerdosse DM, Playdon MC, Holmes W, Bui HH, Sanders P, Siddall P, Wei T, Thomas MK, Kuo MS, **Eckel RH**. Intramuscular triglyceride synthesis: importance in muscle lipid partitioning in humans. *American Journal of Physiology Endocrinol Metabolism*, 2018; Feb 1;314(2):E152-E164. doi: 10.1152/ajpendo.00142.2017.

297. Gadek K, Wang H, Hall MN, Sungello M, Libby A, MacLaskey D, **Eckel RH***, Olwin BB*. Striated muscle gene therapy for the treatment of lipoprotein lipase deficiency. *PLoS One*, 2018; Jan 5;13(1):e0190963. doi: 10.1371/journal.pone.0190963. eCollection.

298. Millstein RJ, Pyle LI, Bergman BC, **Eckel RH**, Maahs DM, Rewers MJ, Schauer IE, Snell-Bergeon JK. Sex-specific differences in insulin resistance in type 1 diabetes: The CACTI cohort. *Journal of*

`

*Diabetes and Its Complications.* 2018; Apr;32(4):418-423. doi: 10.1016/j.jdiacomp.2018.01.002. Epub 2018 Jan 10.

299. Saxon DR, Rasouli N, **Eckel RH**. Pharmacological Prevention of Cardiovascular Outcomes in Diabetes Mellitus: Established and Emerging Agents. *Drugs*, 2018 78:203-214.
300. Bruce KD, Gorkhali S, Given K, Coates AM, Boyle KE, Macklin WB, **Eckel RH**. Lipoprotein lipase is a feature of alternatively activated microglia and may facilitate lipid uptake in the CNS during demyelination. *Frontiers in Molecular Neuroscience*, 2018, Mar 15;11:57. doi: 10.3389/fnmol.2018.00057.
301. Lim S, **Eckel RH**, Koh KK. Clinical implications of current cardiovascular outcome trials with sodium glucose tranporter-2 (SGLT2) inhibitors, *Atherosclerosis*, 2018 Mar 8;272:33-40. doi: 10.1016/j.atherosclerosis.2018.03.013.
302. Ibrahim M, Tuomilehto J, Aschner P, Beseler L, Cahn A, **Eckel RH**, Fischl AH, Guthrie G, Hill JO, Kumwenda M, Leslie RD, Olson DE, Pozzilli P, Weber SL, Umpierrez GE. Global status of diabetes prevention and prospects for action: A consensus statement. *Diabetes Metab Res Rev,* 2018 Sep;34(6):e3021. doi: 10.1002/dmrr.3021. Epub 2018 Jun 8. Review.
303. Palmisano BT, Zhu L, **Eckel RH**, Stafford JM. Sex differences in lipid and lipoprotein metabolism. *Molecular Metabolism* 2018, Sep;15:45-55. doi: 10.1016/j.molmet.2018.05.008. Epub 2018 May 16. Review.
304. Basu D, Huggins L-A, Scarbo D, Obunike J, Mullick AE, Rothenburg PL, Di Prospero NA, **Eckel RH**, Goldberg IJ. Mechanism of increased LDL and decreased triglycerides with SGLT2 inhibition. *Arteriosclerosis, Thrombosis, and Vascular Biology*, 2018, Sep;38(9):2207-2216. doi: 10.1161/ATVBAHA.118.311339.
305. Sasson C, **Eckel RH**, Alger H, Bozhurt B, Carson A, Daviglus M, Deedwania P, Kirley K, Lamendola C, Nguyen M, Singh RR, Wang T, Sanchez E. The American Heart Association Diabetes and Cardiometabolic Health Summit: Summary and Recommendations. *Journal of the American Heart Association*, 2018 Aug 7;7(15):e009271. doi: 10.1161/JAHA.118.009271
306. Kabakambria JD, baker R, Baker S, Courville A, Mabundo L, DuBose C, Chung S, **Eckel RH**, Sumner A. Existing waist circumference guidelines do not apply to Africans: A population-specific study. *BMJ Global Health*, 2018, Oct 15;3(5):e001057. doi: 10.1136/bmjgh-2018-001057. eCollection.
307. Vallejo-Vaz AJ, Ginsberg HN, Davidson MH, **Eckel RH**, Cannon CP, Lee L, Bessac L, Pordy R, Letierce A, Ray KK. Lower on-treatment low-density lipoprotein cholesterol and major adverse cardiovascular events in women and men: Pooled analysis of 10 ODYSSEY Phase 3 alirocumab trials*. Journal of the American Heart Association* 2018, Sept 18;7(18): e009221. doi: 10.1161/JAHA.118.009221.
308. Bjornstad P, **Eckel RH**. Pathogenesis of lipid disorders in insulin resistance. *Current Diabetes Reports*, 2018, Oct 17;18(12):127. doi: 10.1007/s11892-018-1101-6.
309. Ward NC, Watts GF[1], **Eckel RH[1]**. Statin toxicity: Mechanistic insights and clinical implications. *Circulation Research*, 2018, 124:328-350.
310. Bauer JI, Kuhn K, Bradford AP, Al-Safi ZA, Harris MA, **Eckel RH**, Robledo CY, Malkhasyan A, Johnson J, Gee NR, Polotsky AJ. Reduction in FSH throughout the menstrual cycle after omega-3 fatty acid supplementation in young normal weight but no obese women. *Reproductive Sciences*, 2019, Aug;26(8):1025-1033. doi: 10.1177/1933719119828099. Epub 2019 Feb 17 311.
311. Neeland IJ, Ross R, Despres J-P, Matsuzawa Y, Yamashita S, Shai I, Seidell J, Magni P, Santos RD, Arsenault B, Cuevas A, Hu FB, Griffin B, Zambon A, Barter P, Fruchart J-C, **Eckel RH**. Visceral and Ectopic Fat, Atherosclerosis, and Cardiovascular Disease: *A Joint Statement of the International Atherosclerosis Society and International Chair on Cardiovascular Risk Working Group on Visceral Obesity. The Lancet: Diabetes & Endocrinology,* 2019, Sep;7(9):715-725. doi: 10.1016/S2213-8587(19)30084-1. Epub 2019 Jul 10.
312. Depner CM, Melanson EL, **Eckel RH**, Snell-Bergeon JK, Perreault L, Bergman BC, Higgin JA, Guerin MK, Stothard ER, Wright KP. *Ad libitum* weekend recovery fails to prevent metabolic dysregulation during a repeating pattern of insufficient sleep and weekend recovery sleep. *Current Biology*, 2019, Mar 18;29(6):957-967.e4. doi: 10.1016/j.cub.2019.01.069. Epub 2019 Feb 28.
313. **Eckel RH**, Blaha MJ. Cardiometabolic medicine: A call for a new subspecialty training track in internal medicine. *American Journal of Medicine*, 2019, Mar 12. pii: S0002-9343(19)30222-0.

`

314. Chait A, **Eckel RH**. The chylomicronemia syndrome: A narrative review of causes and treatment. *Annals of Internal Medicine*, 2019, Apr 30. doi: 10.7326/M19-0203.
315. Price PH, Kaiser AM, Daniels SM, Jenkins TM, Inge TH*, **Eckel RH***. Physical activity improves lipid and weight loss outcomes post-metabolic bariatric surgery in adolescents with severe obesity. *Obesity*, 2019, June 27 (6):989-996.
316. Shavadia JS, Sharma A, Gu X, Neaton J, DeLeve L, Holmes D, Home P, **Eckel RH**, Watkins PB, Granger. Determination of fasiglifam-induced liver toxicity: Insights from the data monitoring committee of the fasiglifam clinical trials program. *Clin Trials*. 2019 Mar 18:1740774519836766. doi: 10.1177/1740774519836766.
317. Fruchart J-Ct; Santos RD; Aguilar-Salinas C; Aikawa M;Al Rasadi K; Amarenco P; Barter PJ; Ceska R; Corsini A; Després J-P; Duriez P; **Eckel RH**; Ezhov MV; Farnier M; Ginsberg HN; Herman MP; Ishibash Si; Karpe F; Kodama T; Koenig W; Krempf M; Lim S; Lorenzatti AJ; McPherson R; Nuñez-Cortes JM; Nordestgaard BG; Ogawa H; Packard CJ; Plutzky J; Ponte-Negretti CI; Pradha An; Ray KK; Reine Z; Ridker PM; Ruscica M; Sadikot S; Shimano H; Sritara P; Stock JK; Su T-C; Susekov AV; Tartar A; Taskinen M-R; Tenenbaum A; Tokgözoğlu LS; Tomlinson B; Tybjærg-Hansen A; Valensi P; Vrablík M; Wahli W; Watts GF; Yamashita S; Yokote K; Zambon A; Libby P. The Selective Peroxisome Proliferator-Activated Receptor Alpha Modulator (SPPARMα) Paradigm: Conceptual Framework and Therapeutic Potential A Consensus Statement from the International Atherosclerosis Society (IAS) and the Residual Risk Reduction Initiative (R3i) Foundation. *Cardiovascular Diabetology*, 2019, June 4 18(1):71.
318. Vallejo-Vaz, Ray KK, Ginsberg HN, Davidson MH, **Eckel RH**, Lee LV, Bessac L, Pordy R, Letierce A, Cannon CP, Associations between lower levels of low-density lipoprotein cholesterol and cardiovascular events in very high-risk patients: Pooled analysis of nine ODYSSEY trials of alirocumab versus control. *Atherosclerosis*, 2019, Sept;288:85-93.
319. Fruchart JC, Santos RD, Yamashita S, Libby P; International Atherosclerosis Society/R3i Foundation Consensus Panel. Residual vascular risk ikn diabetes – Will the SPARM alpha concept hold the key? *Diabetes Metab Syndrom*. 2019 Jul - Aug;13(4):2723-2725.
320. Ray KK, Vallejo-Vaz AJ, Ginsberg HN, Davidson MH, Lopuie MJ, Bujas-Bobanovic M, Minini P, **Eckel RH**, Cannon CP, Lipoprotein (a) reductions from PCSK9 inhibition sand major adverse cardiovascular events. Pooled analysis of alirocumab phase 3 trials. *Atherosclerosis*. 2019 Sept; 288:194-202.
321. **Eckel RH**, Farooki A, Henry RR, Koch GG, Leiter LA. Cardiovascular outcome trials in type 2 diabetes: What do they mean for clinical practice? *Clinical Diabetes*, 2019, Oct;37(4):316-337.
322. Mitchell S, Malanda B, Damasceno A, **Eckel RH**, Gaita D, Kotseva K, Januzzi JL, Mensha G, Plutzky J , Prystupiuk M, Ryden L, Thierer J, Virani SS, Sperling L, A roadmap on the prevention of cardiovascular disease among people living with diabetes, *Glob Heart,* Sept;14(3):215-240
323. Ross R, Neeland IJ, Shai I, Seidell J, Magni P , Santos RD, Arsenault B, Cuevas A, Hu FB, Griffin B, Zambon A, Barter P, Fruchart J-P, **Eckel RH,** Matsuzawa Y, Despres JP**.** Waist circumference as a vital sign in clinical practice: A consensus statement for the International Atherosclerosis Society and International Chair on Cardiometabolic Risk Working Group on Visceral Obesity, *Nature Reviews Endocrinology*, 2019, 16:177-189.
324. Rubino F, Puhl RM, Cummings DE, **Eckel RH**, Ryan DH, Mechankick JL, Nadgowski J, Sala X, Schauer Rr, Twenefour D, Apovian C, Aronne LJ, Butterham RI, Berhoug HR, Boza C, Busetto L, Dicker D, DeGroot M, Eisenberg D, Flint SW, Huang TT, Kaplan LM, Kirwan JP, Korner J, Koyle TK, Laferrere B, Le Roux CW, Melver L, Mingrone G, Nece P, Reid TJ, Rogers AM, Rosenbaum M, Seeley R, Torres AJ, Dixon JB. Weight bias and stigma of obesity: Prevalence, causes, consequences, and a call to action. *Nature Medicine*, 2020, Apr;26(4):485-497. doi: 10.1038/s41591-020-0803-x.
325. Ibrahim M, Davies MJ, Ahmad E, Annabi FA, **Eckel RH**, Ba-Essa EM, El-Sayed NA, Hess Fischl A, Houeiss P, Iraqoi H, Khochtali I, Khunti K, Masood SN, Mimouni-Zerguini S, Shera S, Tuomilehto J, Umpierrez GE. Recommendations for management of diabetes during Ramadan: Update 2020, applying principles of the ADA/EASD consensus. *BMJ Open Diabetes Res Care*, 2020, May;8(1):e001248. doi: 10.1136/bmjdrc-2020-001248.

`

326. Southard ER, Richie HK, Birks BR, **Eckel RH**, Higgins J, Melanson EL, Wright KP, McHill AW. Early morning food intake as a risk factor for metabolic dysregulation. *Nutrients*, 2020, 12:756-767.
327. Price PH, Kaizer AM, Inge TH, **Eckel RH**. Physical activity impacts insulin sensitivity post-metabolic bariatric surgery kin adolescents with severe obesity. *International Journal of Obesity*, 2020, May 18. doi: 10.1038/s41366-020-0585-8.
328. Bornstein SR, Rubino F, Khunti K, Mingrone G, Hopkins D, Birkenfeld AL, Boehm BO, Amiel S, Holt RIG, Skyler JS, DeVries JH, Renard E, **Eckel RH**, Zimmet P, Alberti G, Vidal J, Gelomeze B, Chan JC, Ji L, Ludwig B. Consensus recommendations for the management of diabetes in patients with COVID-19. *Lancet Endocrinology and Diabetes.* 2020, Jun;8(6):546-550. doi: 10.1016/S2213-8587(20)30152-2
329. Ibrahim M, Baker J, Cahn A, **Eckel RH**, El Sayed MA, Fischl AH, Gaede P, Leslie RD, Peralkice S, Pozelli P, Richelsen B, Roitm,an E, Sandl E, Toledano Y, Tuomilehto J, Weber SL, Umpierrez GE. Hypoglycemia, a guide for primary care providers: Hypoglycemia and its management in primary care setting. *Diabetes/Metabolism Research and Reviews, 2020*, Apr 28:e3332. doi: 10.1002/dmrr.3332.
330. Rubino F, Colten R, Mingrone G, Le Roux CW, Mechanick JI, Arterburn DE, Vidal J, Alberti G, Amiel S, Batterham R, Bornstein S, Chamseddine G, De Prato S, Dixon J, **Eckel RH**, Hopkins D, McGowan B. Pan A, Patel A, Pattou F, Schauer PR, Zimmet P, Cummings DE. DSS recommendations on the management of candidates for bariatric/metabolic surgery and prioritization of access to surgery during and after the COVID-19 pandemic. *Lancet Endocrinology and Diabetes*. 2020, May 7:S2213-8587(20)30157-1. doi: 10.1016/S2213-8587(20)30157-1.
331. Saxon DR, Reiter-Brennan C, Blaha MJ, **Eckel RH**. Cardiometabolic Medicine: Development of a New Subspecialty. *Journal of Endocrinology and Metabolism*, 2020, May 14: doi: 10.1210/clinem/dgaa261.
332. Reiter-Brennan C, Cainzos-Achirica M, Soroosh G, Saxon DR, Blaha MJ, **Eckel RH**. Cardiometabolic Medicine – The U.S. Perspective on a New Subspecialty. *Cardiovascular Endocrinology and Metabolism,* 2020, 9:70-80.
333. Tell S, Nadeau KJ, **Eckel RH**. Lipid management for cardiovascular risk reduction in type 1 diabetes. *Current Opinion in Endocrinology and Diabetes*. 2020. 27:207-214.
334. Bruce KD, Dobrinskikh E, Wang H, Rudenko I, Gao H, Libby AE, Gorkhali S, Yu T, Zsombok A, **Eckel RH**. Neuronal lipoprotein lipase deficiency alters neuronal function and hepatic metabolism. *Metabolites*. 2020, Sep 28;10(10):385. doi: 10.3390/metabo10100385.
335. Buckner T, Shao B, **Eckel RH**, Heinecke JW, Bornfeldt KE, Snell-Bergeon J. Association of apolipoprotein C3 with insulin resistance and coronary artery calcium in patients with type 1 diabetes. *Journal of Clinical Lipidology*. 2020, Oct 31:S1933-2874(20)30325-1. doi: 10.1016/j.jacl.2020.10.006.
336. Bruce KD, Tang M, Regain P, **Eckel RH.** Genetic variants of lipoprotein lipase and regulatory factors associated with Alzheimer's disease risk. *International Journal of Molecular Sciences*, 2020, 21(21), 06 Nov 2020.
337. Reiter-Brennan C, Dzaye O, Davis D, Blaha MJ, **Eckel RH**. Comprehensive care models for cardiovascular disease. *Current Cardiology Reports*, 2021 Feb 24;23(3):22. doi: 10.1007/s11886-021-01450-1.
338. Loving BA, Tang M, Neal MC, Gorkhali S, Murphy R, **Eckel RH**, Bruce KD. Lipoprotein lipase regulates microglial lipid droplet accumulation. *Cells* 2021, Jan 20;10(2):E198. doi: 10.3390/cells10020198.
339. Presby DM, Rudolph MC, Sherk VD, Jackman MR, Foright RM, Jones KL, Houck JA, Johnson GC, Neufer PD, **Eckel RH**, MacLean PS. Skeletal muscle lipid metabolism contributes to energy expenditure during weight regain. *Diabetes* 2021, Feb 3:db200763. doi: 10.2337/db20-0763.
340. Bornstein SR, Rubino R, Ludwig B, Rietzsch H, Schwarz PEH, Rodonov RN, Khunti KK, Hopkins D, Birkenfeld AL, Boehm B, Amiel SS, Holt RIG, Skyler JS, DeVries JH, Benard E, **Eckel RH**, Zimmet P, Alberti G, Vidal J, Geloneze B, Chan JC, Ji L, Spinas GA, Beuschlein F, Zimmet PZ, Mingrone G. Consequences of the COVID-19 pandemic for patients with metabolic disease. *Nature Metabolism* 2021, Feb 25. doi: 10.1038/s42255-021-00358-y.
341. Jo S-H, Han SH, Kim S-H, **Eckel RH**, Kon KK. Cardiovascular effects of omega-3 fatty acids: Hope or Hype? *Atherosclerosis* 2021, Feb 23;322:15-23. doi: 10.1016/j.atherosclerosis.2021.02.014.

`

342. Glodowski M, Christen S, Saxon DR, Hegele RA, **Eckel RH**. Novel *PPARG* mutation in multiple family members with chylomicronemia. *Journal of Clinical Lipidology*, 2021, DOI: 10.1016/j.jacl.2021.03.006.
343. Mason RP, **Eckel RH**. Mechanistic insights from REDUCE-IT STRENGTHen the case against triglyceride lowering as a strategy for cardiovascular disease risk reduction. *The American Journal of Medicine*, 2021, 134:1085-1090.
344. Steenblock C. Schwarz PEH, Ludwig B, Linkermann A, Zimmet P, Kulebyakin K, Tkacuk VA, Markov AG, Lehnert H, deAngelis MH, Rietzsch H, Rodionov RN, Khunti K, Hopkins D, Birkenfeld AL, Boehm B, Holt RIG, Skyler JS, DeVries JH, Renard E, **Eckel RH**, Alberti KGMM, Geloneze B, Chan JC, Mbanya JC, Onyegbutulem HC, Ramachandran A, Basit A, Hassaneiun M, Bewick G, Spinas GA, Beuschlein F, Landgraf R, Rubino F, M ingrone G, Bornstein SR. COVID-19and metabolic disease: mechanisms and clinical management. *Lancet Diabetes Endocrinology*. 9:7876-798.
345. Kanwal F, Shubrook JH, Younossi Z, Natarajan Y, Bugianesi B, Rinella ME, Harrison SA, Montzoros C, Pfotenhauer K, Klein S., **Eckel RH**, Kruger D, El-Serag H, Cusi K. Preparing for the NASH Epidemic: A Call to Action. *Gastroenterology* 2021, I161:1030-1042; *Diabetes Care* 2021, 44:2162-2172; *Obesity* 2021 29: 1401-1412; *Metabolism* 2021 122, September, July 19.
346. DiBartolo P, **Eckel RH**. Living with Insulin: The story of insulin from people with diabetes. *Diabetes Research and Clinical Practice*, 2021, DOI: 10.1016/j.diabres.2021.108857.
347. Depner CM, Melanson EI, **Eckel RH**, Higgins JA, Bergman BC, Perreault L, Knauer OA, Birks BR, Wright KP. Effects of *ad libitum* food intake, insufficient sleep and weekend recover sleep on energy balance. *Sleep*, 2021, Nov 12;44(11):zsab136. doi: 10.1093/sleep/zsab13.
348. **Eckel RH**, Bornfeldt KE, Goldberg IJ. Beyond glucose – cardiovascular disease in diabetes. *Cell Metabolism*, 2021, Aug 3;33(8):1519-1545. doi: 10.1016/j.cmet.2021.07.001.
349. Depner CM, Rice JD, Tussey PJ, **Eckel RH**, Bergman BC, Higgins JA, Melanson EL, Kohrt WM, Wright KP, Swanson CM. Bone turnover marker responses to sleep restriction and recovery sleep. *Bone*, 2021, Nov;152:116096. doi: 10.1016/j.bone.2021.116096.
350. Nolan JJ, Kahkoska AR, Semnani-Azad Z, Hivert M-F, Ji Luong, Mohan V, **Eckel RH**, Philipson LH, Rich SS, Gruber C, Franks PW. ADA/EASD Precision Medicine in Diabetes Initiative (PMDI): An international perspective and future vision for precision medicine in diabetes. *Diabetes Care*, 2022,45:261-266.
351. Lim S, Kim YJ, Khang AR, **Eckel RH**. Postprandial dyslipidemia after a standardized high-fat meal in BMI-matched healthy individuals, and in subjects with prediabetes or type 2 diabetes. *Clinical Nutrition*, 2021, 40:5538-5546.
352. Handelsman Y, Anderson JE, Bakris GL, Ballantyne CM, Beckman JA, Bhatt DL, Bloomgarden ZT, Bozhurt B, Budoff MJ, Butler J, Dagoga-Jack S, de Boer IH, DeFronzo RA, **Eckel RH**, Einhorn D, Fonseca VA, Green JB, Grunberger G, Guerin C, Inzucchi SE, Jellinger PS, Kosiborod MN, Kushner P, Lepor N, Mende CW, Michos ED, Plutzky J, Taub PR, Umpierrez GE, Vaduganathan M, Weir MR. DCRM multispecialty practice recommendations for the management of diabetes, cardiorenal, and metabolic diseases. *Journal of Diabetes and Its Complications,* 2021, Feb;36(2):108101. doi: 10.1016/j.jdiacomp.2021.108101.
353 Mason RP, Sherratt SCR, **Eckel RH**. Rational for different formulations of omega-e fatty acids leading to differences in residual cardiovascular risk reduction. *Metabolism Clinical and Experimental*, 2022, May;130:155161. doi: 10.1016/j.metabol.2022.155161.
354. Adhikari R, Jha K, Dardari Z, Heyward J, Blumenthal RS, **Eckel RH**, Alexander CG, Blaha MJ. National trends in use of sodium-glucose-cotransporter inhibitors and glucagon-like peptide-1 receptor agonists by cardiologists and other specialties, 2015-2020. *Journal of the American Heart Association,* 2022, May 3;11(9):e023811. doi: 10.1161/JAHA.121.023811.
355. Mason RP, Sherratt SCR, **Eckel RH**. Omega-3 fatty acids – do they prevent cardiovascular disease. *Best Practice & Research: Clinical Endocrinology & Metabolism*, 2022, Jun 3:101681. doi: 10.1016/j.beem.2022.101681.
356. Oldham D, Wang H, Mullen J, Lietzke E, Sprenger K, Reigan P, **Eckel RH**, Bruce KD. Using synthetic ApoC-II peptides and nAngptl4 fragments to measure lipoprotein lipase activity in radiometric and fluorescent assays. *Frontiers in Cardiovascular Medicine*, :926631.doi: 103389/fcvm.2022.926331. eCollection 2022.

`

357. Lightborne M, Startzell M, Bruce KD, Brite B, Muniyappa r, Shamburek R, Gharib AM, Ouwerkerk R, Waller M, **Eckel RH**, Brown RJ. Efficacy and Safety of volanesorsen, an antisense oligonucleotide to apolipoprotein C-III, in partial lipodystrophy: A double-blinded control trial with open-label extension. *Journal of Clinical Lipidology*, 2022, 16:850-862.
358. Lee MH, Sanders L, Kumar R, Hernandez-Saavedra D, Yun X, Ford JA, Perez M, Mickael C, Koyanagi DE, Harral JW, Irwin DC, Kassa B, **Eckel RH**, Shiimoda LA, Graham BB, Tuder RM. Pathogenetic contribution of fatty acid oxidation to pulmonary hypertension. *American Journal of Physiology Cell and Molecular Biology*, 2022, 323:L355-L371.
359. Aroda VR, **Eckel RH**. Reconsidering the role of glycemic control om cardiovascular disease risk in type 2 diabetes: A 21st century assessment. *Diabetes, Obesity & Metabolism*, 2022, In Press.
360. Pradhan A-D, Glynn RJ, Fruchart J-C, Mac Fadyen JG, Zaharris ES, Everett BM, Campbell SE, Oshima R, Amarenco P, Blom DJ, Brinton EA, **Eckel RH**, Elam MB, Felicio JS, Ginsberg HN, Goudev A, Ishbashi S, Joseph J, Kodama T, Koenig W, Leiter LA, Lorenazatti AJ, Mankovsky B, Marx N, Nordesgaard BG, Pall D, Ray KK, Santos RD, Soran H, Susekov A, Tendera M, Yokote K, Paynter NP, Buring JE, Libby P, Ridker PM. Triglyceride lowering with pemafibrate for cardiovascular event reduction. *New England Journal of Medicine*, 2022, 387:1923-1934.
361. Misra S, Wagner R, Ozkan B, Schon M, Seviklla-Gonzalez M, Prystupa K, Wang CC, Kreienkamp RJ, Cromer SJ, Rooney MR, Duan D, Baun Thuesen AC, Wallace AS, Leong A, Deutsch AJ, Andersen MK, Billings LK, **Eckel RH**, Huey-Herng Sheu W, Hansen T, Stefan N, Goodarzi MO, Ray D, Selvin E, Florez JC, PMDI ADA/EASD, Meigs JB, Udler MS. 2023, medRxiv BMJ Yale, In Press.
362. Tobias DK, Merino J, Ahmad A, Aiken C, Benham JL, Bodhini D, Clark AL, Colclough K, Corcoy R, Cromer SJ, Duan D, Felton JL, Francis EC, Gillard P, Gingras V, Gaillard R, Haider E, Hughes A, Ikle JM, Jacobsen LM, Kahkoska AR, Kettunen JLT, Kreienkamp RJ, Lim L-L, Männistö JME, Massey R, Mclennan N-M, Miller RG, Morieri ML, Most J, Naylor RN, Ozkan B, Patel KA, Pilla SJ, Prystupa K, Raghaven S, Rooney MR, Schön M, Semnani-Azad Z, Sevilla-Gonzalez M, Svalastoga P, Takele WW, Tam CH, Thuesen ACB, Tosur M, Wallace AS, Wang CC, Wong JJ, Yamamoto JM, Young K, Amouyal C, Andersen MK, Bonham MP, Chen M, Cheng F, ChikoworeT, Chivers SC, Clemmensen C, Dabelea D, Dawed AY, Deutsch AJ, Dickens LT, DiMeglio LA, Dudenhöffer-Pfeifer M, Evans-Molina C, Mercè Fernández-Balsells M, Fitipaldi H, Fitzpatrick SL, Gitelman SE, Goodarzi MO, Grieger JA, Guasch-Ferré M, Habibi N, Hansen T, Huang C, Harris-Kawano A, Ismail HM, Hoag B, Johnson RK, Jones AG, Koivula RW, Leong A, Leung GKW, Libman IM, Liu K, Long SA, Lowe WL Jr., Morton RW, Motala AA, Onengut-Gumuscu S, Pankow JS, Pathirana M, Pazmino S, Perez D, Petrie JR, Powe CE, Quinteros A, Jain R, Ray D, Ried-Larsen M, Saeed Z, Santhakumar V, Kanbour S, Sarkar S, Monaco GSF, Scholtens DM, Selvin E, Sheu W H-H, Speake C, Stanislawski MA, Steenackers N, SteckAK, Stefan N, Støy J, Taylor R, Tye SC, Ukke GG, Urazbayeva M, Van der Schueren B, Vatier C, Wentworth JW, Hannah W, White SL, Yu G, Zhang Y, Zhou SJ, Beltrand J, Polak M, Aukrust I, de Franco E, Flanagan SE, Maloney KA, McGovern A, Molnes J, Nakabuye M, Njølstad PR, Pomares-Millan H, Provenzano M, Saint-Martin C, Zhang C, Zhu Y, Auh S, de Souza R, Fawcett AJ, Gruber C, Mekonnen EG, Mixter E, Sherifali D, **Eckel RH**, Nolan JJ, Philipson LH, Brown RJ,. Billings LK, Boyle K, Costacou T, Dennis JM, Florez JC, Gloyn AL, Gomez MF, Gottlieb PA, Greeley SAW, Griffin K, Hattersley AT, Hirsch IB, Hivert M-F, Hood KK, Josefson JL, Kwak SH, Laffel LM, Lim SS, Loos RJF, Ma RCW, Mathieu C, Mathioudakis N, Meigs JB, Misra S, Mohan V, Murphy R, Oram R, Owen KR, Ozanne SE, Pearson ER, Perng W, Pollin TI, Pop-Busui R, Pratley RE, Redman LM, Redondo MJ, Reynolds RM, Semple RK, Sherr JL, Sims EK, Sweeting A, Tuomi T, Udler MS, Vesco KK, VilsbøllT, Wagner R, Rich SS, Franks PW. 2nd International Consensus Report on Gaps & Opportunities for the Clinical Translation of Precision Diabetes Medicine. *Nature Medicine*, 2023, In Press.
363. Misra S, Wagner R, Ozkan B, Schön M , Sevilla-González M, Prystupa K, Wang C, Kreienkamp R, Cromer S, Rooney M, Duan D, Cathrine Thuesen A, Wallace A, Leong A, Deutsch A, Andersen M, Billings L, **Eckel R**, Sheu W, Hansen T, Stefan N, Goodarzi M, Ray D, Selvin E, Florez J, ADA/EASD PMDI, Meigs J, Udler M. Precision subclassification of type 2 diabetes: a systematic review. *Communications Medicine*, 2023, In Press.
364. Zambon A, Chait A, **Eckel RH**, Vrablik M. Lipid-lowering in diabetes: An update. *Atherosclerosis*, 2023, In Press.
`

365. Ibrahim M; Ba-Essa EM; Baker J, Cahn A; Ceriello A; Cosentino F, Davies MJ; **Eckel RH**; Van Gaal L; Gaede P, Handelsman Y, Klein S, Leslie RD, PoZilli P, Del Prato S, Prattichizzo F, Schnell O, Seferovic PM, Standl E, Thomas A, Tuomilehto J, Valensi P, Umpierrez GF. Cardio-Renal-Metabolic disease in primary care setting. Diabetes/Metabolism Research and Reviews. 2023, In Press.
366. Manrique-Acevedo C, Hirsch IB, **Eckel RH**. Prevention of Cardiovascular Disease in Type 1 Diabetes. *New England Journal of Medicine*, 2023. In Press.
367. Crawford ED, Garnick MB, **Eckel RH**, Miner MM, Freedland SJ, Pachynski RK, Wassersug RJ,, Rosenberg MT, Walker LM, Fairman C, Cuirley T, Crosby M, Lin P-H, Hagron JM. A proposal for the comprehensive care of men on androgen deprivation therapy: Recommendations from the multidisciplinary prostate cancer 360 working group. *Urology Practice*, 11:18-31, 2024.
368. Abushamat L, Shah PA, **Eckel RH**, Harrison SA, Barb D. The emerging role of glucagon-like peptide-1 receptor agonists for the treatment of metabolic-dysfunction associated steatohepatitis. *Clinical Gastroenterology and Hepatology*. 2024, In Press.

## LETTERS AND EDITORIALS

1. **Eckel RH**, Sadur CN, Yost TJ. Smoking, weight change and lipoprotein lipase (Correspondence). *New England Journal of Medicine*; 311:259-260, 1984.
2. **Eckel RH** Very low Calorie Diets. *Diabetes Spectrum*; 1:33-34, 1987.
3. Knedler A**, Eckel RH,** Kern PA, Ham RG**.** Microvascular endothelial cell cultures from human omental adipose tissue. *In Vitro Cell Dev Biol*. Oct; 25(10):863-4, 1989.
4. **Eckel RH** and Kim SK. Workshop on nutrition, immunity, and infection: Introduction*. J Nutr Immunol,* 2:71-72, 1994.
5. **Eckel RH**. Insulin resistance in atherosclerosis. *Am J Clin Nutr*; 65:164-165, 1997.
6. Krauss RM, **Eckel RH**. The obesity problem. *New Engl J Med*; 338(16):1156, 1998.
7. **Eckel RH**, Krauss RM. For the Nutrition Committee of the American Heart Association. American Heart Association Call to Action: Obesity as a major risk factor for coronary artery disease. *Circulation,* 7:2099-2100, 1998.
8. **Eckel RH**. The five-to-ten percent weight loss: Long-term changes in lipids and lipoproteins and some unanswered questions. *Obesity Res,* 7; 227-228, 1999.
9. **Eckel RH.** Natural history of macrovascular disease and classic risk factors for atherosclerosis session summary. *Diabetes Care,* 22: C21-C24, 1999.
10. **Eckel RH.** Advanced glycation end products and coronary heart disease in type 2 diabetes. *Diabetes Care,* 23:1441-2, 2000.
11. **Eckel RH**. Perspectives on Vascular Biology and Diabetes. *J Invest Med*; 49:100-103, 2001.
12. **Eckel RH.** ApoA-I mutant increases atherosclerosis. *Arteriosclerosis Thrombosis Vascular Biology*, 21:1977-1983, 2001.
13. **Eckel RH.** Familial combined hyperlipidemia and insulin resistance: distant relatives linked by intra-abdominal fat? *Arteriosclerosis Thrombosis Vascular Biology,* April 21, 4:469-470, 2001.
14. Francis CC, **Eckel RH.** Assessing dietary fat intake in cardiac rehabilitation. *Journal of Cardiopulmonary Rehabilitation,* May-June; 22(3):168-9, 2002.
15. **Eckel RH**. A new look at dietary protein in diabetes. *American Journal of Clinical Nutrition*; 78:671-2, 2003.
16. Bonow RO and **Eckel RH.** Diet, obesity and cardiovascular risk, *New England Journal of Medicine*. May 22; 348(21):2057-8, 2003.
17. Donahoo WT, **Eckel RH.** Seasonal variation in serum cholesterol levels: Treatment implications and possible mechanisms, *Arch Internal Med.* Apr 2004; 164: 863 - 870.
18. **Eckel RH.** Diabetes and dietary macronutrients: Is carbohydrate all that bad? *Am. J. Clinical Nutrition*, Sep 2004; 80: 537 - 538.
19. **Eckel RH**. The dietary approach to obesity: Is it the diet or the disorder? *JAMA*, January 5, 2005; 293: 96 - 97.

`

20. Jacobs AK, **Eckel RH.** Evaluating and managing cardiovascular disease in women: understanding a woman's heart. *Circulation*. 2005 Feb 1; 111(4):383-4.
21. **Eckel RH**, Daniels SR, Jacobs AK, Robertson RM. America's children a critical time for prevention. *Circulation*. 2005 April 19; 111:1866-1868.
22. **Eckel RH**. Obesity. *Circulation*. 2005 April 19; 111:257-259.
23. **Eckel RH**. Treating the dyslipidemia of the metabolic syndrome: where's the evidence? *Nature Clinical Practice Endocrinology and Metabolism,* 2007 Jun;3(6):437.
24. **Eckel RH.** Egg consumption in relation to cardiovascular disease and mortality: The story gets more complex. *American Journal of Clinical Nutrition,* 87(4): 799-800, 2008.
25. **Eckel RH**. Obesity research in the next decade*. Int Journal of Obesity* 32:S143-S151, 2008.
26. **Eckel RH**. The fish oil story remains fishy. *Circulation,* Nov 23; 122(21):2110-2, 2010*.*
27. **Eckel RH**. The complex metabolic mechanisms relating obesity to hypertriglyceridemia. *Arteriosclerosis, Thrombosis and Vascular Biology,* 31:1946-1948, 2011.
28. **Eckel RH**, Eisenbarth GS. Autoimmune diabetes inflames the heart, *Science Translational Medicine*, 13:4(138):138fs18, 2012*.*
29. **Eckel RH.** LDL cholesterol as a predictor of mortality, and beyond: To fast or not to fast, that is the question? *Circulation,* 130:528-529, 2014.
30. **Eckel RH**. What is it about very low density lipoproteins and cardiovascular disease in patients with type 2 diabetes mellitus: Is it the triglycerides or the cholesterol? *Atherosclerosis*, 2014 Nov;237(1):138-9.
31. **Eckel RH.** Role of glycemic index in the context of an overall heart healthy diet. *Journal of the American Medical Association,* 312:2508-2509, 2014.
32. **Eckel RH.** Intestinal lipoprotein secretion: Incretin-based physiology and pharmacology beyond glucose. *Diabetes,* 2015 Jul; 64(7):2338-40.
33. **Eckel RH.** Eggs and beyond: Is dietary cholesterol no longer important? *American Journal of Clinical Nutrition*, 2015.102:235-6.
34. **Eckel RH**, Hokanson JE. The prediction of atherosclerotic cardiovascular disease in type 1 diabetes: Do we stop here? *Circulation*, 2016.113:1051-1053.
35. **Eckel RH**. Reconsidering the importance of the association of egg consumption and dietary cholesterol with cardiovascular disease risk. *JAMA*, 2019, Mar 19; 321(11):1055-1056.
36. **Ward NC**, Watts GF, Eckel RH. Response to Letter Regarding Article, "Statin toxicity: Mechanistic insights and clinical implications*. Circulation Research*, 2019, Jan 7, 124(12)e121-e122.
37. Rubino F, Amiel S, Zimmet P, Alberti GK, Bornstein S, **Eckel RH**, Mingrone G, Boehm B, Cooper M, Chai Z, DelPrato S, Ji L, Hopkins D, Herman W, Khunbtui K, Mbanya JC, Renard E. New-Onset Diabetes in COVID-19: Type1, Type 2 or a new typed of diabetes? *New England Journal of Medicine,* 2020, In Press.
38. Blaha MJ, **Eckel RH**. Cardiometabolic Medicine specialty – A streamlined, potentially time-saving approach. *Am J Med*, 2020, In Press.
39. Powers AC, Aronoff DM, **Eckel RH**. Vaccine prioritization for Type 1 and Type 2 diabetes. *Lancet Diabetes and Endocrinology*, 2021,. Jan 18:S2213-8587(21)00017-6. doi: 10.1016/S2213-8587(21)00017-6.
40. Potter H, Johnson NR, Wisniewski T, **Eckel RH**. APOE immunotherapy reduces cerebral angiopathy and amyloid plaques while improving cerebrovascular function. *Science Translational Medicine*. 2021, Vol. 13, Issue 581, eabd7522 DOI: 10.1126/scitranslmed.abd7522
41. Mason RP, **Eckel RH**. Is There Still a Role for Omega-3 Fatty Acids in Cardiovascular Disease Risk Reduction? 2022, *Lancet EClinicalMedicine,* August.
42. Cortes, **Eckel RH**. Insulin and bile acids in cholesterol homeostasis: New players in diabetes associated atherosclerosis. *Circulation* 2022, Mar 29;145(13):983-986. doi: 10.1161/CIRCULATIONAHA.122.058883.
43. **Eckel RH**, Bruce KD. Statins, Gut Microbiome, LDL-C, Glucose Intolerance: Personalized Medicine Timely? *Cell Med* 2022, Jun 10;3(6):355-357. doi: 10.1016/j.medj.2022.05.006.

`

44. Christen SL, **Eckel RH**, Garvey WT, Gordon M, Hirsh IB. Diabetic Hand Disease Associated with Long-Standing Operation of an Insulin Pump. *Diabetes Technology and Therapeuses,* May 2023, In Press.
45. Bruce KD, **Eckel RH**. Can DNA methylation predict the lipid response to dietary intervention? There's a fat chance. *Journal Clinical Endocrinology and Metabolism*, 2023, In Press.

**CHAPTERS, BOOKS**

1. **Eckel RH,** Hofeldt FD. Endocrinology and metabolism in the aged. IN: C*linical Internal Medicine in the Aged.* Schrier RW, Ed. New York, NY: WB Saunders; 222-255, 1982.
2. **Eckel RH.** Diabetes and hyperlipidemia. IN*: Clinical Guide to Diabetes Mellitus* Sussman KE, Draznin B, James WE, Eds. New York, NY Alan R. Liss, Inc.; 209-222, 1987.
3. **Eckel RH**, Kern PA, Sadur CN, Yost TJ. Methods for studying lipoprotein lipase in human adipose tissue. IN: *Methods in Diabetes Research* SL Pohl, Clarke WL, Larner J, eds. Poughkeepsie, New York John Wiley and Sons, Inc.: 259-273, 1986.
4. **Eckel RH**. Adipose tissue lipoprotein lipase. IN: *Lipoprotein Lipase* Borensztajn J, ed. Chicago, IL, Evener Publishing, Inc., 79-132, 1987.
5. Sadur CN, **Eckel RH**. Diabetes mellitus and hyperlipidemia. IN: *Current Medical Therapy*. Schrier RW, ed. New York, NY: Raven Press, 486-509, 1989.
6. **Eckel RH**, Bessesen DH, Yost TJ. Molecular regulation of lipoprotein lipase in obesity and diabetes mellitus. IN: *New Directions in Research and Clinical Works for Obesity and Diabetes Mellitus*. Sakamoto N, Angel A, Hatta H, eds. Elsevier-Science, Amsterdam: 71-75, 1991.
7. **Eckel RH**, Bessesen DH, Raynolds MV, Jensen DR, Fox D, Yost TJ. Lipoprotein lipase and nutrient partitioning. IN: *The Science of Food Regulation, Food Intake, Taste, Nutrient Partitioning, and Energy Expenditure* Bray GH, Ryan DH, eds. Baton Rouge, LA LSU Press: 187-192, 1992.
8. **Eckel RH**. Lipoprotein lipases and diabetes mellitus. IN: *Diabetes and Atherosclerosis* Draznin B, **Eckel RH**, eds. New York, NY; Elsevier-Science: 77-102, 1993.
9. Estacio R, **Eckel RH**. Abnormalities of lipids. IN: *Primary Care Secrets* Mladenovic J, ed. Philadelphia, PA Hanley and Belfus, Inc. 134-140, 1995.
10. **Eckel RH**, Ailhaud G, Astrup A, Flatt J-P, Hauner H, Levine AS, Prentice AM, Ricquier D, Steffens AB, Woods SC. What are the metabolic and physiological mechanisms associated with the regulation of body weight? IN: *Regulation of Body Weight: Biological and Behavioral Mechanisms* Bray GA, Bouchard C, eds. Dahlem Workshop Report LS 57. Chichester: John Wiley & Sons Ltd., 1996.
11. Kosmiski L, **Eckel RH**. Dyslipidemia, atherosclerosis and non-insulin dependent diabetes mellitus. IN: *Clinical Research in Diabetes Mellitus and Obesity* Volume II. Draznin B, Rizza R, eds. Humana Press, 159-185, 1997
12. Arner P, **Eckel RH**. Adipose tissue as a storage organ. IN: *Handbook of Obesity*. Bray CA, Bouchard C, James WPT, eds. Marcel Dekker, Inc. 379-396, 1998.
13. Donahoo WT, Kosmiski LA, **Eckel RH**. Drugs causing dyslipoproteinemia. IN. Endocrinology Clinics of North America J Hoeg, ed, WB Saunders, Inc.; 27: 677-698, 1998.
14. Poirier P, **Eckel RH**, Adipose tissue metabolism and obesity IN Physical Activity and Obesity Bouchard C, ed. Human Kinetics publisher, Chapter 9, p.181-200, 2000.
15. **Eckel RH**. Substrate trafficking and the regulation of adipose mass. IN: *Progress in Obesity Research* B Guy-Grand and G Ailhaud, eds, John Libbey & Company, Ltd.;50:415-422, 1999.
16. **Eckel RH.** Late breaking advances in the biological understanding of obesity and its sequelae IN: *Obesity: Impact on Cardiovascular Disease* Fletcher GF MD, ed. Armonk, NY, Futura publishing,: 205-218, 1999.
17. Poirier P, **Eckel RH**. The Heart in Obesity IN: *Hurst's The Heart*. NY, NY McGraw-Hill: 2289-2303, 2001.
18. Poirier P, **Eckel RH.** The Heart and Obesity. IN: *Hurst's The Heart: Manual of Cardiology*. McGraw-Hill, NY: 733-749, 2001.

`

19. Donahoo WT, Stephens E, **Eckel RH.** The Evaluation of Dyslipidemia and Obesity, IN: The Handbook of Diagnostic Endocrinology. Humana Press, 11:213-238, 2002.
20. Donahoo WT and **Eckel RH**. Leptin. IN: McGraw Hill Yearbook of Science, 2002.
21. Cooke PS, Naaz A, Heine PA, Zakroczymski MA, Saunders PTK, Taylor JA, **Eckel RH,** Jensen DR, Helferich WG, and Lubahn DB. Chapter 179 Effects of Estrogen and phytoestrogen signaling through estrogen receptor α {ER α} and ERβ on adipose tissue in males and females. Paris: John Libbey Eurotext. *Progress in Obesity Research*. pp. 848-851, 2003.
22. **Eckel, RH.** Obesity: A disease or a Physiologic Adaptation for Survival. IN: Obesity Mechanisms and Clinical Management. ed, **Eckel, RH**, Lippincott, Williams and Wilkins, Philadelphia, PA, p. 3-30, 2003.
23. Wolfert AL and **Eckel RH.** Abnormalities of Lipids. Chapter 31 IN: *Primary Care Secrets 3rd Edition,* Jeanette Mladenovic, M.D., ed. Hanley & Belfus, Philadelphia, PA, p.176-180, 2004.
24. Morris AM, Poirier P, **Eckel RH**. Obesity and the Heart. IN: *Adipose Tissue and Adipokines in Health and Disease*. Ed. Fantuzzi G, Totowa, N.J.: Humana Press, p. 23, c2007.
25. **Eckel RH.** The Metabolic Syndrome. IN: *Harrison's Principles of Internal Medicine*. Ed. Fauci AS, Braunwald E, Kasper DL, Hauser SL, Longo DL, Jameson JL, Loscalzo J: McGraw Hill Medical, 17th edition, pp. 1509-1514, 2008.
26. **Eckel RH.** Editor of Metabolic Risk for Cardiovascular Disease. American Heart Association Clinical Series. Oxford, Wiley-Blackwell, 2011.
27. Maahs DM, **Eckel RH**. Type 1 Diabetes and Dyslipidemia. In Dyslipidemias: Pathophysiology, Evaluation and Management, Abhimanyu Garg, Ed, Springer Press, *In Press*, 2014.
28. Maahs DM, **Eckel RH**. Type 1 Diabetes and Associated Cardiovascular Risk and Disease. IN: Diabetes in Cardiovascular Disease: A Companion to Braunwald's Heart Disease, Ed; McGuire DK, Marx N. Saunders, pp. 127-138, 2014.
29. de Jesus JM, Kahan S, **Eckel RH**. Nutrition Interventions for Cardiovascular Disease. IN: Medical Clinics of North America, Elsevier, Ed. Kahan S, Kaplan RF, pp. 1251-1264, 2016.
30. **Eckel RH**. IN: Foreword, American Diabetes Association Guide to Nutrition Therapy for Diabetes. ED. Evert AB, Franz MJ. PP xv-xvii, 2017
31. **Eckel RH**. IN: Endocrine and Metabolic Medical Emergencies. Emergency Management Related to Obesity and Clinical Lipidology Ed Martin G. pp 217-222, 2018
32. **Eckel RH**. The Metabolic Syndrome. IN: *Harrison's Principles of Internal Medicine*. Ed. Jameson JL, Fauci AS, Kasper DL, Longo DL, , Loscalzo J: McGraw Hill Medical, 17th edition, pp. 1509-1514, 2018.
33. Ward N, Watts GF, **Eckel RH**. Response to letter regarding "Statin toxicity: Mechanistic Insights and clinical implications*.* *Circulation Research*, 2019, In Press.
34. **Eckel RH**, Blaha MJ, Reiter-Brennan C, Drugs for Diabetes, IN: Opie's Cardiovascular Drugs A Companion to Braunwald's Heart Disease, 9th edition, In Press.

**ABSTRACTS** (*-Presented; **-at both regional and national meetings)

1. **Eckel RH**, Waterhouse BE, Bozdech MJ, Crowell EB, Jr. Antiplatelet drugs in thrombotic thrombocytopenic purpura (TTP). *American Society of Hematology Annual Meeting* Dallas, Texas, December, 192, 1975.
2. **Eckel RH**, Fujimoto WY, Brunzell JD. The development of lipoprotein lipase (LPL) in cultured 3T3-L1 cells. *Clin Res*; 25:495A, 1977.
3. **Eckel RH**, Fujimoto WY, Brunzell JD. The development of lipoprotein lipase (LPL) in cell culture. *Diabetes*; 26; Suppl.1:373, 1977.*
4. **Eckel RH**, Albers JJ, Wahl PW, Bierman EL. Alterations of high density lipoprotein cholesterol in juvenile onset diabetes. *Clin Res*; 26:560A, 1978.
5. **Eckel RH**, Fujimoto WY, Brunzell JD. Insulin regulation of lipoprotein lipase in culture. *Clin Res* 26:413A, 1978.*

`

6. **Eckel RH** and Fujimoto WY. Quantitation of cell death in the proliferative pool of cultured cells. Annual Meeting of the Tissue Culture Association Abstracts, 189, 1979.*
7. **Eckel RH**, Albers JJ, McLean EB, Wahl PW and Bierman EL. High density lipoprotein cholesterol and microangiopathy in juvenile onset diabetes mellitus. *Diabetes*; 27(Suppl.2):67, 1978.
8. **Eckel RH**, Fujimoto WY. Abnormalities in insulin stimulated leucine incorporation into protein and uridine incorporation into RNA in diabetic fibroblasts. *Clin Res*; 27:85A, 1979.
9. **Eckel RH**, Albers JJ, Cheung MC, Wahl PW, Bierman EL. Antiatherogenic high density lipoprotein composition in juvenile onset diabetes mellitus. *Clin Res*; 27:44A, 1979.
10. **Eckel RH**, Fujimoto WY, Brunzell JD. Gastric inhibitory polypeptide enhanced lipoprotein lipase activity in cultured cells. *Clin Res*; 27:354A, 1979.*
11. **Eckel RH**, Albers JJ, Cheung MC, Wahl PW, Bierman EL. Antiatherogenic high density lipoprotein composition in juvenile onset diabetes mellitus. *Diabetes*; 28 (Suppl.2:94), 1979.*
12. **Eckel RH,** Fujimoto WY. The decreased growth capacity of fibroblasts from diabetes donors is not attributable to enhanced cell death. *Clin Res*; 28:48A, 1980.*
13. Sadur CN, **Eckel RH**. Insulin-induced alterations in lipoprotein lipase activity: Use of the euglycemic clamp technique. *Clin Res;*29:59A, 1981.*
14. Sadur CN, **Eckel RH.** Insulin stimulation of adipose tissue lipoprotein lipase activity in man: a definite, but delayed effect. *Clin Res*; 29:421A, 1981.*
15. **Eckel RH,** Gwinner DA. Variability in lipoprotein lipase regulation in cultured preadipocytes also occurs in primary cultures. *Clin Res*;29:404A, 1981.
16. **Eckel RH,** Gwinner DA. primary cultures of rat adipocytes also demonstrate variability in lipoprotein lipase regulation. *The Endocrine Society Abstracts;* 108:370, 1981.
17. Sadur CN, **Eckel RH**. Insulin-mediated decreases in plasma cholesterol in man: use of the euglycemic clamp technique. *Diabetes*; 30; (Suppl.2):189, 1981.*
18. Sadur CN, **Eckel RH**. Alterations in insulin stimulation of adipose tissue lipoprotein lipase in obesity. *Clin Res*; 30:64A, 1982.*
19. Sadur CN, **Eckel RH**. Insulin stimulation of adipose tissue lipoprotein lipase in obesity: A deviation from insulin resistance. *Clin Res*; 30:403A, 1982.
20. **Eckel RH**, Kern PA, Prasad JE, Marshall S. Adipose tissue lipoprotein lipase regulation by insulin in the cultured rat adipocyte: A selective protein synthesis dependent effect. *Clin Res*; 30:390A, 1982.
21. Sadur CN, **Eckel RH**, Insulin-mediated lipoprotein metabolism in obesity. *Diabetes*; 31, (Suppl.2):596, 1982.
22. Kern PA, **Eckel RH**. Lipoprotein lipase activity is measurable in cultured isolated human adipocytes. *Diabetes;* 31 Suppl.2:228, 1982.*
23. Kern PA, Knedler A, **Eckel RH**. The isolation and culture of human microvascular endothelium. *Circulation*; 66:II:204, 1982.*
24. **Eckel RH,** Steiner L, Kern PA, Paterniti JR, Jr. Plasma lipolytic activity in humans: evidence for hormone regulation. *Circulation*; 66: II:282, 1982.*
25. Sadur CN, Yost TJ, **Eckel RH**. Fat feeding decreases insulin responsiveness of adipose tissue lipoprotein lipase. *Clin Res*; 31:60A and 244A3, 1983.**
26. **Eckel RH**, Prasad JE, Kern PA, Marshall S. Cultured isolated rat adipocytes. a novel system for investigation of lipoprotein lipase regulation by insulin. *Clin Res*; 31:54A, 1983.*
27. Kern PA, Marshall S, **Eckel RH**. Regulation of lipoprotein lipase in cultured isolated human adipocytes. *Diabetes*; 32, Suppl.1:55, 1982.*
28. Clark RAF, Folkvord JM, Kern PA, **Eckel RH**. Human endothelial cells from both large and small blood vessels demonstrate fibronectin dependent inherence. *J Cell Biol*; 97;327A, 1983.**
29. Kern PA, **Eckel RH**. Glucose is a more important regulator of lipoprotein lipase than insulin in cultured isolated human adipocytes. *Clin Res*; 32:49A and 400A, 1984.**
30. **Eckel RH**, Robbins RJ. Lipoprotein lipase is produced and regulated in the brain. *Clin Res*; 32:74A and 394A, 1984.*
31. Sadur CN, Yost TJ, **Eckel RH**. Glucose is the major determinant of the early response of adipose tissue lipoprotein lipase activity to insulin. *Clin Res;* 32:86A and 407A, 1984.*

`

32. Berr F, **Eckel RH,** Kern F, Jr. Plasma disappearance of retinol palmitate labeled chylomicrons is independent of enhanced plasma lipolytic activity. *Clin Res*; 32:45A, 1984.*
33. Berr F, **Eckel RH,** Kern F, Jr. Plasma clearance of retinol palmitate labeled chylomicrons is not affected by enhanced plasma lipolytic activity*. Gastroenterology* 1984. resistance: Elevated fasting (basal), yet diminished sensitivity of response. *Clin Res*1986; 34:543A, 1986.*
34. **Eckel RH**, Awald PD, O'Shea AM, Edwards DP. Heparin treatment of cultured rat adipocytes results in a quantitative and highly purified preparation of lipoprotein lipase. *Clin Res*; 34:543A, 1986.*
35. Kern PA, **Eckel RH**. Effect of glucose on lipoprotein lipase and lipolysis in cultured human adipocytes: Relevance to diabetes. *Clin Res*; 34:547A, 1986.*
36. **Eckel RH,** Yost TJ. Weight reduction increases adipose tissue lipoprotein lipase responsiveness in obese women: A potential mechanism for resumption of the obese state. *Diabetes*; 35:10A,
37. Sadur CN, Yost TJ, **Eckel RH**. Insulin stimulation of adipose tissue lipoprotein lipase is deficient in type II diabetics. *Diabetes,* 33 (Suppl.1):, 623, 1984.
38. Kern PA, Graves D, Baskin J, **Eckel RH**, Van Wyk JJ. Somatomedin-C may be a local regulator of lipoprotein lipase in human adipose tissue. *Clin Res*; 33:62A and 434A, 1985.**
39. **Eckel RH.** Glucose and protein synthesis dependency of the insulin effect on lipoprotein lipase in cultured isolated rat adipocytes. *Clin Res*; 33:102A and 429A, 1985.**
40. **Eckel RH**, Sadur CN, Yost TJ. Deficiency of the insulin, glucose mediated increase in the HDL cholesterol/cholesterol ratio in normolipidemic obese subjects. *Clin Res*; 33:429A, 1985.
41. **Eckel RH**, Sadur CN, Yost TJ. The increase in adipose tissue lipoprotein lipase activity in obese women is luteal phase-dependent. *Int J Obesity* 9:A27, 1985;.*
42. **Eckel RH.** Prasad JM. Impairment of tubulin polymerization increases intracellular lipoprotein lipase activity in cultured rat adipocytes. *Int J Obesity*; 9:A281985.*
43. **Eckel RH**, Sadur CN, Yost TJ. Low-dose insulin increases adipose tissue lipoprotein lipase in normal weight but not obese women. *Clin Res*; 34:58A, 1986.*
44. **Eckel RH**, Awald PD, O'Shea AM, Edwards DP. Lipoprotein lipase is the major protein released by heparin from cultured rat adipocytes. *Clin Res*; 34:57A, 1986.*
45. **Eckel RH**, Sadur CN, Yost TJ. Adipose tissue lipoprotein lipase in obese women, a paradox of insulin. *Clin Res*, 1987.
46. Yost TJ, **Eckel RH**. Fat calories may be preferentially stored in reduced-obese women: A permissive pathway for resumption of the obese state. *Clin Res*; 35:160A and 520A, 1987.*
47. Rule DC, Cook C, Ridgway EC, **Eckel RH**. Lipoprotein lipase may play a role in the regulation of pituitary hormone secretion. *Clin Res*; 35:516A,1987.*
48. Rudolf PM, Horwitz KB, **Eckel RH**. The metabolic effects of progesterone on parametrial adipose tissue must be indirect. *Clin Res*; 35:401A, 1987.
49. Draznin B, Sussman KE, **Eckel RH**. Role of cytosolic free calcium concentration in mediating insulin resistance of obesity and hyperinsulinemia. *Diabetes*; 36:573, 1987.
50. **Eckel RH,** Yost TJ. Increasing pounds off may predict increasing pounds on: Weight loss-dependent adipose tissue lipoprotein lipase responsiveness in reduced-obese women. *Diabetes*; 36:691, 1987.
51. Lewis D, Kao M, Yost TJ, **Eckel RH**, Leitner JW, Sherman N, Sussman KE, Draznin B. Mechanism of glucose- and insulin-induced insulin resistance in human and rat adipocytes. *Clin Res*; 36:155A, 1988.*
52. Berman JN, Yost TJ, **Eckel RH**. Dietary substitution of medium chain triglycerides for long chain triglycerides enhances insulin action. *Clin Res*; 36:148A, 1988.*
53. Coleman-Smith A, Steiner Z, Tonnensen M, Viders D, Moo-Young GA, Chase P, Peters JH, Clark RAF, **Eckel RH**. Dermal capillary basement membrane thickness is increased in Type I diabetics and correlated with the duration of diabetes and diabetic retinopathy. *Clin Res*; 36:491A, 1988.*
54. Awald PD, Gordon DF, Wood WM, Rule DC, Gutierrez-Hartmann A, **Eckel RH**. Insulin-mediated increases in lipoprotein lipase specific mRNA precede increases in lipoprotein lipase activity in cultured rat adipocytes. *Clin Res*; 36:477A, 1988.*

`

55. Viders D, Tonnensen MG, Steiner Z, Couchman JR, Smith AC, **Eckel RH,** Clark RAF. Thickened blood vessel walls in patients with type I diabetes mellitus consist of glycoproteins conjugated with n-linked mannose-type oligosaccharides. *Clin Res*; 36:380A, 1988.*
56. Christiansen C, **Eckel RH**. Is "sliding scale" insulin the optimal approach to the management of hospitalized diabetics? *Diabetes*; 37:682, 1988.
57. **Eckel RH**. Insulin regulation of lipoprotein lipase in adipose cells: relevance to common metabolic disease states. *The Endocrine Society Abstracts*; 115:12, 1988.*
58. Hanson AS, Chen AY, Berman JN, Yost TJ, Brass EP, **Eckel RH**. Medium chain triglycerides: Implications for their use in the treatment of non-insulin dependent diabetes mellitus. *Clin Res*; 37:526A, 1989.*
59. Farese RV, Yost TJ, Awald PD, **Eckel RH**. The regulation of lipoprotein lipase activity and mRNA by insulin is tissue-specific *Clin Res*; 37:570A, 1989.*
60. Lang CA, Pearson JR, **Eckel RH,** Byyny RL. The effectiveness of cholesterol screening. *Clin Res*; 37:318A, 1989.
61. Bessesen DH, **Eckel RH**. Maintenance of reduced obesity increases adipose tissue but decreases cardiac muscle lipoprotein lipase in the obese Zucker rat. *Int J Obesity*; 13:545, 1989.*
62. Schneider DJ, Arend WP, **Eckel RH**. Gamma interferon decreases human monocyte-derived macrophage lipoprotein lipase activity and mRNA: An effect distinct from that of lipopolysaccharide. *Arteriosclerosis*; 9:762A, 1989.
63. Raynolds MV, Awald PD, **Eckel RH.** Lipoprotein lipase gene expression in cultured adipocytes is regulated by insulin and isoproterenol through different mechanisms. *Circulation* 1989; 80:II-78.*
64. **Eckel RH**. Regional regulation of adipose tissue lipoprotein lipase activity. *The Endocrine Society Abstracts*; 8, 1990.*
65. Regensteiner JG, Mayer EJ, Shetterly SM, **Eckel RH**, Haskell WL, Marshall JA, Baxter J, Hamman RF. Relationship between physical activity and hyperinsulinemia among non-diabetic men and women: The San Luis Valley Study. *Soc for Epid Res Abstracts* 1990.*
66. Mayer EJ, Burchfiel CM, **Eckel RH**, Marshall JA, Hamman RF. The role of insulin in the association of physical activity with HDL cholesterol (HDL-c) and HDL subfractions: The San Luis Valley Diabetes Study. *Soc for Epid Res Abstracts* 1990.*
67. Currie RA, **Eckel RH**. Transcription control of lipoprotein lipase by octamer transcription factor-1. *Arteriosclerosis*; 10:781A, 1990.*
68. Raynolds MV, **Eckel RH.** Isoproterenol-induced decreases in lipoprotein lipase in adipocytes may be mediated by inhibitory effects of cyclic amp on lipoprotein lipase gene expression*. The Endocrine Society Abstracts*; 171,1991.*
69. Neville MC, Jensen DR, Witsell DC, **Eckel RH**. Metabolic Regulation of Mammary Lipoprotein Lipase. *FASEB,* 1991.*
70. Yost TJ, **Eckel RH**. Adipose tissue lipoprotein lipase in two subcutaneous regions: Similarities in enzyme regulation by insulin may mean more metabolically than basal differences. *Clin Res*; 39:277A, 1991.*
71. Bessesen DH, Fox D, Erskine J, **Eckel RH**. In obesity, the metabolism of chylomicron triglyceride fatty acids factors storage over oxidation. *Clin Res*; 39:277A, 1991.*
72. Bessesen DH, Etienne J, Goers J, **Eckel RH**. Lipoprotein lipase mRNA and protein in the brain: discrepancies in colocalization predict a novel regulation. *Clin Res*; 39:330A, 1991.*
73. Currie RA, **Eckel RH** (SPON: Wood WM). Transcriptional Control of Human Lipoprotein Lipase During Differentiation. *The Endocrine Society Abstracts*; 33, 1991.*
74. Raynolds MV, Jensen DR, **Eckel RH**. C2 Skeletal Myoblasts: A New Model for Studying Regulation of Muscle Specific Lipoprotein Lipase Gene Expression. *The Endocrine Society Abstracts*; 475, 1991.*
75. **Eckel RH**, Bessesen DH, Raynolds MV. Tissue-specific Regulation of Lipoprotein Lipase in Adipose Tissue and Muscle. *J Cell Biochem*; 15B:9, 1991.*
76. Raynolds MV, **Eckel RH**. Tissue-specific Regulation of Lipoprotein Lipase Gene Expression by cAMP. *J Cell Biochem*; 15B:32, 1991.*

`

77. **Eckel RH,** Currie RA. Transcriptional regulation of human lipoprotein lipase: Regulation by octamer transcription Factor-1 and TATA box factor interactions. *Gene Expression During Liver Differentiation and Disease*; 104, 1991.*
78. Raynolds MV, Jensen DR, **Eckel RH**. Divergent effects of cAMP on lipoprotein lipase gene transcription in adipocytes and myocytes. *Arteriosclerosis*; 11:1392a, 1991.*
79. Slaughter JL, **Eckel RH,** Currie RA. Transcriptional regulation of human lipoprotein lipase during differentiation. Cancer cells: Regulation of eucaryotic mRNA transcription.; 191, 1991.*
80. Yost TJ, Rodgers CM, **Eckel RH**. Results of suction lipectomy relate to region-specific changes in adipose tissue lipoprotein lipase. *Clin Res*; 39:104A, 1992.*
81. Erskine JM, Jensen DR, Raynolds MV, **Eckel RH**. Responses of lipoprotein lipase mRNA and activity to high carbohydrate and high fat diets are tissue-specific. *FASEB Journal*; 6:A1938, 1992.*
82. Bagdade J, Ritter M, **Eckel RH**, Rodby R, Thistlewaite R, Fellner S, Dunn F Jr. Insulin therapy pathologically alters cholesteryl ester transfer (CET) in insulin-dependent diabetes mellitus (IDDM). *Clin Res*; 40:208A, 1992. *
83. Raynolds MV, **Eckel RH**. Identification and localization of a muscle-specific CAMP response element in the human lipoprotein lipase promoter. *The Endocrine Society Abstracts*; 572, 1992.*
84. Ferraro RT, Jensen DA, **Eckel RH,** Ravussin E. Relationship between skeletal muscle lipoprotein lipase activity and 24-hr regulatory quotient*. Diabetes*; 41:188A, 1992.*
85. Dunn FL, Thompson MJ, **Eckel RH**, Howard BV. Intraperitoneal insulin therapy in IDDM normalizes very low density lipoprotein composition independent of improved glycemic control. *Diabetes*; 41:26A, 1992.*
86. Raynolds MV, **Eckel RH.** Cyclic AMP-mediated induction of lipoprotein lipase gene transcription in myocytes may be transduced by the nuclear factor cyclic AMP response element binding protein. *Circulation* 86:291, 1992.*
87. Ferraro RT, Jensen DR, **Eckel RH,** Ravussin E. Relationship between skeletal muscle/adipose tissue LPL activity and whole-body substrate oxidation. *Obesity Res*; 1:059, 1993.*
88. Jensen DR, **Eckel RH.** Differences in the regulation of muscle and adipose tissue lipoprotein lipase by short and long-term isoproterenol infusions. *Obesity Res*; 1:075, 1993. *
89. Bessesen DH, Richards CL, **Eckel RH**. Uptake of dietary fat by the central nervous system and pituitary of lean, obese and reduced-obese rats. *Obesity Res*; 1:016, 1993.*
90. Yost TJ, Jensen DR, **Eckel RH**. Divergent responses of skeletal muscle lipoprotein lipase to insulin in obese and lean women: relationship to insulin resistance. *Clin Res*; 41:391A, 1993.
91. Morin CL, Schlaepfer IR, **Eckel RH.** Transcriptional control of lipoprotein lipase in 3T3-L1 adipocytes by tumor necrosis factor-α is mediated by DNA:protein interactions at the proximal promoter. *Circulation* 1993.*
92. Yost TJ, Jensen DR, **Eckel RH**. Sustained weight reduction in obese women decreases skeletal muscle lipoprotein lipase: another metabolic predictor of subsequent weight gain. *Obesity Res*; 1; Suppl 2:77S, 1993.*
93. **Eckel RH**. Tissue specific regulation of lipoprotein lipase: relationship to obesity and insulin resistance. *Obesity Res*; 1 Suppl 2: 66S, 1993.*
94. **Eckel RH**. Lipoprotein lipase and dyslipidemia. *Obesity Res,* 3 Suppl 3:322S, 1995.*
95. Jensen DR, Kosmiski L, Lowell BB, Flier JS, **Eckel RH**. Divergent and altered lipoprotein lipase and hormone-sensitive lipase activities in brown adipose-deficient transgenic mice. *Int J Obesity*; 18; Suppl 2: 4, 1994.*
96. Gnudi L, Jensen DR, Tozzo E, Bliss JL, **Eckel RH**, Kahn BB. Regulation of adipose mass in transgenic mice overexpressing GLUT-4 selectively in adipocytes. *Int J Obesity*; 18; Suppl 2: 81, 1994.*
97. **Eckel RH**. Tissue specific regulation of lipoprotein lipase and nutrient partitioning. *Int J Obesity*; 8; Suppl 2: 41, 1994.*
98. Travers SH, Bloch CA, Hill JO, **Eckel RH**. Gender differences in the relationship between insulin sensitivity and body composition in early pubertal children *Int J Obesity*; 18 Suppl 2: 34, 1994.*

`

99. Morin CL, Schlaepfer IR, **Eckel, RH**. Tumor necrosis factor-α eliminates binding of NF-Y and an octamer binding protein to the lipoprotein lipase promoter in 3T3-L1 adipocytes. *J Clin Invest*; 95:1684, 1995.*
100. Berning JR, Ratliff KA, Leenders NL, Clem KL, Troup JP, **Eckel RH**. The effects of ingested medium chain triglycerides on muscle glycogen preservation during exercise. *Med Sci Sports Exerc,* 1995.*
101. Morin CL, Sundquist KO, **Eckel RH,** Pagliassotti MJ. A high fat diet (HF) elevates adipose tissue-derived tumor necrosis factor-α (AT-TNF) activity. *Diabetes*; 44; Suppl 1:203A, 1995.*
102. Jensen DR, Morin CL, Schlaepfer IR, Pennington DS, Marcell T, Gutierrez-Hartmann A, **Eckel RH**. Transgenic mice with overexpression of skeletal muscle lipoprotein lipase: divergent effects of differential overexpression on body lipid. *Obesity Res*; 3:361S, 1995.*
103. Travers SH, Labarta JI, Gargosky SE, Rosenfeld RG, **Eckel RH**. Insulin-like growth factor binding protein-1 (IGFBP-1) levels are strongly associated with insulin sensitivity and obesity in early pubertal children. *Obesity Res*; 3; Suppl 3: 403S, 1995.*
104. Yost TJ, Jensen DR, **Eckel RH**. Weight regain following sustained weight reduction is predicted by relative insulin sensitivity. *Obesity Res*; 3; Suppl 3: 367S, 1995.*
105. Jensen DR, Morin CL, Schlaepfer IR, Pennington DS, Marcell T, **Eckel RH**. Transgenic mice with overexpression of skeletal muscle lipoprotein lipase: Divergent effects of differential overexpression of body lipid. *Obesity Res*; 4; Suppl 1: 2S, 1996.*
106. Donahoo WT, Jensen DR, Yost TJ, **Eckel RH**. Tissue specific seasonal variation in lipoprotein lipase in fasted, normal weight humans. *Obesity Res*; 4; Suppl 1: 29S, 1996.*
107. Donahoo WT, Jensen DR, Yost TJ, **Eckel RH**. Isoproterenol and somatostatin decrease plasma leptin in humans. *Obesity Res;* 4; Suppl 1: 39S, 1996.*
108. Schlaepfer IR, Jensen DR, Kosmiski LA, Makovsky NJ, **Eckel RH**. Tissue specific overexpression of hormone sensitive lipase (HSL) in adipose tissue using a cationic liposome-mediated gene transfer: A promising approach for changing body weight and composition. *Obesity Res;* 4; Suppl 1: 50S6, 1996.*
109. Jensen DR, Schlaepfer IR, Pennington DS, Marcell T, Morin CL, Gutierrez-Hartmann A, **Eckel RH.** High fat feeding induced obesity is prevented by skeletal muscle overexpression of lipoprotein lipase in transgenic mice. *Circulation;* 94; Suppl 1:266, 1996.*
110. Donahoo WT, Berg CL, Marcell T, **Eckel RH**. The effect of macronutrient composition and a meal on serum leptin in humans. *J Invest Med*; 45,1:152A, 1997.*
111. Ganong CA, Schlaepfer IR, Marcell T, Jensen DR, **Eckel RH.** Cellular localization of hormone sensitive lipase mRNA in rat cardiac and skeletal muscle. *J Invest Med;* 45;1:106A, 1997.*
112. Makovsky NJ, Schlaepfer IR, **Eckel RH**. Tissue specific overexpression of hormone sensitive lipase in adipose tissue mediated by gene therapy. *J Invest Med*; 45(1):141A, 1997.*
113. Yost TJ, Jensen DR, **Eckel RH**. The effect of dietary macronutrient composition on skeletal muscle lipoprotein lipase activity reflects the oxidative fuel mix. *J Invest Med*; 45(1):105A, 1997.*
114. Regensteiner JG, Bauer TA, Brandenburg SL, Sippel J, Wolfel EE, **Eckel RH**, Reusch JEB, Vogelsong AM, Hiatt WR. Slowed oxygen uptake kinetic responses in women with non-insulin dependent diabetes (NIDDM). *J Invest Med*; 45:215A, 1997.*
115. Davy BM, Seagle HM, Kealey EH, Yost TJ, **Eckel RH,** Hill JO. A comparison of three prediction equations for estimating energy requirements. *J Am Dietetic Assn*; 97 Suppl 9: A-18, 1997.
116. Morin C, **Eckel RH,** Pagliassotti MJ. Adipose tissue-derived tumor necrosis factor (AT-TNF) activity is related to cell size and glucose uptake*. Diabetes*; 46: Supp 1; 965-965, 1997.*
117. Trouillot TE, **Eckel RH**, McKinley CL, Showalter RB, Yost TJ, Everson GT. The link Between. weight loss, gallstones and insulin action: A pathophysiologic study in humans *Hepatology,* 1997.*
118. Trouillot TE, **Eckel RH**, McKinley CL, Showalter RB, Yost TJ, Everson GT. Hepatic and total body insulin sensitivities are disassociated in obese subjects after diet-induced weight loss followed by isocaloric weight maintenance. *Hepatology,* 1997.*
119. McGinnis AR, Jensen DR, Ammon SM, Pennington DS, Schlaepfer IR, **Eckel RH**. Diet and age induced increases in body weight prevented by overexpression of skeletal muscle lipoprotein lipase. *Obesity Res*; 5; Supp I, 25S, 1997.*

`

120. Yost TJ, Jensen DR, Hill JO, **Eckel RH.** The effects of dietary macronutrient composition on fuel substrate utilization and balance in normal weight humans*. J Invest Med,* 1997.*
121. Schlaepfer IR, McGinnis AR, Marcell T, **Eckel RH**. Human lipoprotein lipase (hLPL) is overexpressed in mouse skeletal muscle following direct injection of naked plasmid DNA. *Obesity Res*; 5, Supp 1; 78S, 1997. *
122. Yost TJ, Jensen DR, Hill JO, **Eckel RH**. The effects of dietary macronutrient composition on fuel substrate utilization and balance in normal weight human subjects*. Obesity Res,* 1999; 5, Supp 1; 87S.*
123. Rewers M, Erlich J, Jensen L, Seigel R, Barriga K, Garg S, Janowitz W, **Eckel RH**. High prevalence of asymptomatic coronary atherosclerosis detected by electron beam computed tomography in young adults with IDDM. *Diabetes*; 47; Suppl 1: A12, 1998.*
124. Ferreira LDMC-B, Huey PU, Waugh KC, **Eckel RH.** The effect of acute stretozotocin-induced diabetes on rat sciatic nerve lipoprotein lipase expression. *Diabetes*; 48 Suppl 1: A2, 1999.*
125. Poirier P, Marcell T, Schlaepfer I, Owens GC, Waugh KC, **Eckel RH.** A new *in vitro* model for the study of the role of lipoprotein lipase in skeletal muscle metabolism and substrate partitioning. *Circulation,* 1999.
126. Capell WH, Poirier P, DeSouza CA, **Eckel RH**. Lowering triglycerides with fenofibrate improves vascular reactivity; impact of free fatty acids. *Circulation,* 1999.
127. Weil, KM, Shepard TY, **Eckel RH.** A diet high in fat versus carbohydrate increases insulin sensitivity in weight-maintained, reduced severely obese subjects. O*besity Res,* 7:(1),32S, 1999.*
128. Kosmiski L, Kuritzkes D, Lichenstein K, Greenberg K, Erlich J, **Eckel RH**. An increase in abdominal girth on protease inhibitor therapy is associated with visceral obesity and metabolic disturbances that closely resemble syndrome X. *Obesity Res*;7:(1),126S, 1999.*
129. Smith SJ, Jensen DR, Ammon S, Cases S, **Eckel RH,** Farese RV. Increases in metabolic rate explain the protection from obesity in high fat fed DGAT Knockout mice. *Obesity Res*; 7:(1),128S, 1999.*
130. Donahoo WT, Rothman R, Ammon S, Grunwald G, Davis J, Levin N, **Eckel RH.** Chronic leptin administration alters postprandial lipid metabolism by decreasing postprandial triglyceride excursion and increasing skeletal muscle lipoprotein lipase. *Obesity Res* ,7:(1),28S, 1999.*
131. Ferreira LDMC-B, Jensen DR, Schlaepfer I, Ammon S, **Eckel RH.** Evidence for glucose intolerance in mice overexpressing lipoprotein lipase in skeletal muscle*. Obesity Res*; 7:(1),80S, 1999.*
132. Smith, SJ Cases S, Sande E, Tow B, Yu T, Newland D, Sanan D, Jensen DR, Ammon S, **Eckel RH**, Farese, RV Jr. DGAT Knockout Mice: Resistance and evidence for an alternative tricylglycerol synthesis pathway. AHA Scientific Sessions *Circulation,* Vol 100; 18, I609, 1999.
133. Huey PJU, Waugh KC, Marcell T, Ferreira LDMC-B, Schaller K, **Eckel RH**. The effect of crush injury on lipoprotein lipase expression in rat sciatic nerve. *Soc Neurosci* 1999; 25:(Part1), 1001.
134. Schlaepfer IR, Jensen DR, **Eckel RH**. Potential Mechanisms for Increased Substrate Oxidation in White Skeletal Muscle of Mice Overexpressing Human Lipoprotein Lipase. *Obesity Res* 8:1;130S,(NAASO) 2000.*
135. Ferreira LDMC-B, Pulawa LK, Schlaepfer IR, Jensen DR and **Eckel RH**. Muscle Specific Overexpression of Lipoprotein Lipase Protects Diabetic Transgenic Mice from Hypertriglyceridemia. *Obesity Res* 8:1; 130S (NAASO) 2000.*
136. Pulawa LK, Ferreira LDMC-B, Jensen DR and **Eckel RH**. The Overexpression of Human Lipoprotein Lipase in Murine Skeletal Muscle Results in Insulin Resistance Obesity Res 8:1 130S (NAASO) 2000.*
137. Sharma V, Jensen DR, Chambon P, **Eckel RH**, Haugen BR. RXR (Gamma) Deficient Mice Have Lower Body Fat, Lower Serum Triglyceride Levels and Increased Skeletal Muscle Lipoprotein Lipase Activity. Endocrine Society Meeting 2001.*
138. Chen HC, Jensen DR, Ferreira LDMC-B, Pulawa L, **Eckel RH**, Farese RV, Farese RV, Jr. Increased Insulin Sensitivity in DGAT-Deficient Mice. Endocrine Society Meeting 2001.*
139. Heine PA, Jensen DR, Tayor JA, **Eckel RH**, Lubahn DB, Cooke PS. Estrogen Receptor Alpha (ER′a) Regulates the Effect of Estrogen on Metabolic Rate (MR). Endocrine Society Meeting 2001.*

`

140. Capell WH, Poirier P, Desouza CA, Weil KM, Stauffer BL, **Eckel RH**. Effect of Triglyceride Lowering on Endothelial Dysfunction in Patients with Hypertriglyceridemia. Clinical Research 2001.*
141. Schlaepfer IR, Ramanathan M, James DE and **Eckel RH.** Skeletal Muscle Lipoprotein Lipase-Mediated Resistance to Obesity and Insulin Action Results in Increased Expression of Munc 18c. 2001 The American Diabetes Association 61st Scientific Sessions.*
142. Ferreira LDMCB, Pulawa LK, Schlaepfer IR, Jensen DR and **Eckel RH**. Overexpression of Lipoprotein Lipase in Skeletal Muscle Protects Transgenic Mice from Diabetes-Related Hypertriglyceridemia, The American Diabetes Association 61st Scientific Sessions, 2001.*
143. Snell Bergeon J, Hokanson JE, Erlich J, Garg S, Quaife R, **Eckel RH** and Rewers MJ. Coronary Atherosclerosis Progression in Type 1 Diabetes: Importance of Age, Increasing Total and LDL Cholesterol and Pre-existing Disease. The American Diabetes Association 61st Scientific Sessions, 2001.*
144. Hokanson JE, Cheng S, Snell-Bergeon JK, Grow MA, Hung C, Erlich HA, Erlich J, **Eckel RH** and Rewers M. The Hepatic Lipase Gene Promoter Polymorphism is associated with Coronary Artery Classification in Type 1 Diabetes, The American Diabetes Association 61st Scientific Sessions, 2001.*
145. Hokanson JE, Kamboh MI, **Eckel RH** and Hamman RF. The hepatic lipase promoter polymorphism is associated with genetic susceptibility to coronary heart disease. 2001
146. Donahoo WT, Melanson EL, Pistone B, Hamilton J and **Eckel RH**. Exercise Following Weight Loss Helps Prevent the Fall in Skeletal Muscle Lipoprotein Lipase: A Potential Mechanism for Maintenance of the Reduced Obese State. NAASO, 2001.*
147. Jensen DR, Pulawa LK, Lerman I, and **Eckel RH**. Transgenic Mice Overexpressing Skeletal Muscle Lipoprotein Lipase Have Reduced Exercise Performance. NAASO, 2001.*
148. Weil KW, Shepard TY, Bell ML, Grunwald GK, Sharp TA, Hill JO, and **Eckel RH.** Carbohydrate balance on a high carbohydrate diet predicts fat gain over 4 years. NAASO, 2001.*
149. Weil KW, Shepard TY, Scherzinger AL, Stamm ER, Ballard R and **Eckel RH**. Modest weight loss in the severely obese improves the upper airway as well as sleep efficiency and oxygenation. NAASO, 2001.*
150. Chen HC, Jensen DR, Ferreira L, Pulawa LK, Standaert ML, Kanoh Y, Sajan MJ, **Eckel RH**, Farese RV and Farese, Jr. RV. Increased Insulin Sensitivity in DGAT-Deficient Mice. Endo 2001.*
151. Sharma V, Jensen DR, Krezel W, Chambon P, **Eckel RH** and Haugen BR. RXR (Gamma) Deficient Mice Have Lower Body Fat, Lower Serum Triglyceride Levels and Increased Skeletal Muscle Lipoprotein Lipase Activity. Endo 2001.*
152. Heine PA, Jensen DR, Taylor JA, Lubahn DB, **Eckel RH** and Cooke PS. Estrogen Receptor Alpha (ER$\alpha$) Regulates The Effect Of Estrogen On Metabolic Rate (MR). Endo 2001.*
153. Hokanson JE, Snell-Bergeon JK, Dabelea D, **Eckel RH,** Erlich J, Rewers M. Visceral Adiposity is Associated with the Presence of Coronary Artery Calcium in Type I Diabetes and Non-Diabetic Subjects. Endo 2001.
154. Morris AM, Donahoo WT and **Eckel RH.** Plasma Adiponectin Concentrations Are Not Acutely Affected By Diet Composition. AHA Scientific Sessions 2002. Submitted.
155. Hernandez TL, Weil KM, Shepard TY, Bell ML, Grunwald GK, Francis CC, Sharp TA, Hill JO, and **Eckel RH.** The Response to High Carbohydrate Feeding May Predict Obesity *Circulation*, 106; 19, Supp. II, 468. AHA Scientific Sessions 2002.*
156. Jensen DR, Sharma V, Pulawa LK, Morris AM, Krezel W, Chambon P, **Eckel RH,** and Haugen B. RXR$\gamma$ Deficient Mice Have Lower Body Fat and Higher Skeletal Muscle Lipoprotein Lipase Activity When Fed A High Fat Diet. 106:19 Supp. II, 122. AHA Scientific Sessions.*
157. Pulawa LK, Schlaepfer IR, Ferreira LDMC-B, and **Eckel RH**. Effects of diabetes and lipoprotein lipase on munc18c gene expression in skeletal muscle. AHA Scientific Sessions. Submitted.
158. Emily L, Laposky A, Horton T, Easton A, Jensen DR, **Eckel RH**, Olson S, Turek F, Bass J. Diet Induced Obesity in Clock Mutant Mice: Circadian Regulation of Sleep, Food Intake and Metabolism. Keystone Symposia 2002. Submitted.

`

159. Snell-Bergeon J, Hokanson, JE, **Eckel RH**, Erlich J, Ogden LG, Rewers M. Abdominal Fat by CT Is Not Superior to Anthropometric Measures As A Predictor Of Subclinical Atherosclerosis. American Heart Association Epidemiology Meetings 2002. Submitted.
160. Jensen DR, Sharma V, Pulawa LK, Morris AM, Krezel W, Chambon P, **Eckel RH** and Haugen BR. RXRγ Deficient Mice Have Lower Body Fat and Higher Skeletal Muscle Lipoprotein Lipase Activity When Fed a High Fat Diet. American Heart Association Scientific Sessions 2002.*
161. Hokanson, JE, Cheng S, Snell-Bergeon JK, Erlich HA, Erlich J, **Eckel RH**, and Rewers M. The Heptic Lipase Promoter Polymorphism Predicts Progression of Coronary Calcium Type 1 Diabetes American Diabetes Association, Submitted.
162. Chen MY, Bhola R, Snell-Bergeon JK, Kinney GL, Fisher AD, **Eckel RH**, Erlich J, Rewers M and Quaife RA. Myocardial Perfusion Reserve in Patients with Longstanding Type 1 Diabetes Mellitus and Coronary Artery Calcification. American Diabetes Association, Submitted.
163. Poirier, P, Hernandez TL, Weil KM, Shepard TJ and **Eckel RH**. The Impact of Diet-Induced Weight Loss on Cardiac Autonomic Nervous System and Arrythmias in Subjects with Severe Obesity. American Diabetes Association, Submitted.
164. Hernandez TL, Weil KM, Shepard TY, Bell, ML, Grunwald GK, Francis CC, Sharp TA, Hill JO, and **Eckel RH**. The Response to High Carbohydrate Feeding During Short-Term Inactivity Predicts Changes in Fat Mass. Baltimore Clinical Research, 2003, Submitted.
165. **Eckel RH.** Dietary and Endogenous Fat Oxidations are Similar for Mixed Meal High-Fat and Low-Fat Maintenance Treatments: A Potential Recipe for Long-Term Obesity Development NAASO.
166. **Eckel RH.** Carbohydrate overfeeding decreases endogenous but not ingested fat oxidation.
167. Hernandez T, Jensen D, Donahoo W, Costa J, Brennan M, Hochgeschwender U and **Eckel RH.** Is Alpha-Melanocyte Stimulating Hormone (α-MSH) Important in Human Obesity? NAASO, 2003.
168. Sonko B, Grunwald G, Sharp T, Perreault L, Hernandez T, Hill J, Fennessey P and **Eckel RH.** Dietary Fat Fails to Alter Endogenous Ingested Fat Oxidation: A Mechanism for Fat Storage When Fat Balance is Positive. NAASO, 2003.*
169. Morris A, Travers S and **Eckel RH.** Plasma Adiponectin Is Related to Measures of Adiposity Only in Girls. NAASO, 2003.
170. Hernandez TL, **Eckel RH.** Dietary and Endogenous Fat Oxidations are Similar for Mixed Meal High-Fat and Low-Fat Maintenance Treatments: A Potential Recipe for Long-Term Obesity Development. NAASO 2003.*
171. Hernandez TL, **Eckel RH.** Carbohydrate overfeeding decreases endogenous but not ingested fat oxidation. AHA Scientific Sessions 2003.*
172. Maahs DM, Wadwa P, Kinney GL, Snell-Bergeon JK, Garg S, **Eckel RH** and Rewers M. Hypertension Prevalence, Awareness, Treatment and Control in Type 1 Diabetes and Comparable General Population. American Heart Association Epi Program, 2004.
173. Maahs DM, Kinney GL, Wadwa P, Snell-Bergeon JK, Erlich J, **Eckel RH** and Rewers M. Low Plasma Adiponectin Levels Predict Progression of Coronary Artery Calcification. American Heart Association Epi Program, 2004.
174. Hokanson JE, Marcovina SM, Snell-Bergeon JK, Dabelea D, **Eckel RH** and Rewers M. Lp(a) Levels Predict Progression of Coronary Artery Calcium in Type 1 Diabetes. American Heart Association Epi Program, 2004.
175. Hokanson JE, Cheng S, Kinney GL, Hughes R, Snell-Bergeon JK, **Eckel RH**, Erlich HA and Rewers M. The Hepatic Lipase Gene Predicts Progression of Coronary Artery Calcium. American Heart Association Epi Program, 2004.
176. Pratte KA, Hokanson JE, **Eckel RH** and Rewers M. Association between Plasminogen Activator Inhibitor – 1 and Coronary Artery Calcium. American Heart Association Epi Program 2004.
177. Wadwa RP, Kinney GL, Maahs, DM, Snell-Bergeon JK, Garg S, **Eckel RH** and Rewers M. Prevalence, Awareness Treatment and Control of Dyslipidemia in Adults with Type 1 Diabetes Mellitus and Comparable General Population. American Heart Association Epi Program, 2004.

`

178. Obesity is a Strong, Independent Risk Factor for Subclinical Atherosclerosis in Young Adults: The Coronary Artery Calcification in Type 1 Diabetes Study. American Heart Association Epi Program, 2004.
179. Sonko BJ, Hernandez TL, Grunwald GK, Perreault L, Sharp T, Hill JO, Fennessey PV and **Eckel RH.** Carbohydrate Overfeeding Decreases Endogenous but not Ingested Fat Oxidation**.** *Circulation*, 108, 17, IV-762, 2003. AHA Scientific Sessions.
180. Hernandez TL, Weil KM, Shepard TY, Bell ML, Grunwald GK, Francis CC, Sharp TA, Hill JO and **Eckel RH.** Glucose Metabolism on a High Carbohydrate Diet Independent of Insulin Sensitivity is a Predictor of Weight/Fat Gain in Adults**.** *Circulation*, 108, 17, IV-306, 2003.* AHA Scientific Sessions.
181. Sonko BJ, Grunwald GK, Sharp TA, Perreault L, Hernandez TL, Hill JO, Fennessey PV, and **Eckel RH**. Dietary Fat Fails to Alter Endogenous and Ingested Fat Oxidation: A Mechanism for Fat Storage When Fat Balance is Positive**.** *Obesity Res.*, Vol. 11 supplement, Pg. A18, 2003.* NAASO Annual Meeting.
182. Hernandez TL, Jensen DR, Donahoo WT, Costa JL, Brennan MB, Hochgeschwender U, and **Eckel RH**. Is Alpha-Melanocyte Stimulating Hormone ($\alpha$-MSH) Important in Human Obesity? *Obesity Res,* Vol. 11 supplement, Pg A72, 2003. NAASO Annual Meeting.
183. Maahs DM, Kinney GL, Wadwa, RP, Snell-Bergeon JK, Erlich J, **Eckel RH,** and Rewers, M. Adiponectin Levels Predict Coronary Artery Calcification Progression. American Diabetes Association, 64th Scientific Sessions, 2004.
184. Smith SR, Xie H, Bogacka I, Baghian S, McNeil M, Morris AM, **Eckel RH**, and Bray GA. Subtyping Diabesity: an Adipose Tissue Perscpective. *NAASO Annual Scientific Meeting, 2004.
185. Maahs D, Wadwa R, University of Colorado Health Sciences Center/Barbara Davis Center for Childhood Diabetes, Denver, CO; Snell-Bergeon JK, Kinney G, Ogden L, **Eckel RH**, Rewers M, University of Colorado Health Sciences Center, Denver, CO. Homocysteine In Subjects With Type 1 Diabetes: Determinants And Relationship To Progression Of Coronary Artery Calcification. *Circulation*, 2004.
186. Pulawa LK, Jensen DR, Morris AM, **Eckel RH**. Skeletal Muscle Specific Overexpression of Lipoprotein Lipase Corrects Hypertriglyceridemia in ApoCII Transgenic Mice. NAASO 2005 Annual Scientific Meeting, 2005.
187. Hernandez TL, Capell WH, Wolfe P, Gerard LA, Eckel RH. Simvastatin Lowers C-Reactive Protein Within 7 Days in Patients with Type 2 Diabetes. Combined Annual Meeting, CR2005 and EB2005. Journal of Investigative Medicine, Vol. 53:(2), S398:65, March 2005.
188. Williams MR, Maahs DM, McFann K, Nadeau K, Klingensmith GJ, **Eckel RH**, Wadwa PR. Longitudinal Lipid Screening and Use of lipid-Lowering Medications in Pediatric Type 1 Diabetes Mellitus. AHA Epidemiology/Prevention Meeting, 2006.
189. Scherzinger AL, Du Y, Stamm R, **Eckel RH**, Ma J. MRI Adipose Tissue Volume Measures: Comparison of SPGR and Fast Two Point Dixon Methods at 3T. International Society for Magnetic Resonance in Medicine 14th Scientific Meeting & Exhibition, May 2006.
190. Williams MR, Maahs DM, McFann K, Nadeau K, Klingensmith GJ, **Eckel RH**, Wadwa RP. Longitudinal lipid screening and use of lipid-lowering medications in pediatric type 1 diabetes mellitus. *Circulation*. 2006;113:E355.
191. Perreault L, Bergman BC, Samek AM, **Eckel RH**. Impaired Fasting Glucose Is a Glucose Sensing, Not an Insulin Secretory, Defect. *Diabetes*, 2006;55 (1): 156-OR. American Diabetes Association's 66th Scientific Sessions.
192. Pratte K, Snell-Bergeon J, Rewers MJ, **Eckel RH**. Plasminogen Activator Inhibitor-1 Is Associated with Coronary Artery Calcium in Type 1 Diabetes. *Diabetes*, 2006;55 (1): 686-P. American Diabetes Association's 66th Scientific Sessions.
193. Allian-Sauer MB, Capell WH, Sutherland JP, Wolfe P, Talley N, Hernandez TL, Wyatt HR, Klein S, Foster G, Hill JO, **Eckel RH**. Divergent Effects of Weight Loss and Macronutrient Composition on 24-Hour Lipids with Low-Carbohydrate vs. High-Carbohydrate Diet. American Federation for Medical Research, 2006. *Journal of Investigative Medicine.*

`

194. Pulawa LK, JensenDR, Jung DY, Hong E-G, Coates AM, Friedman JE, Goldberg IJ, Kim JK, **Eckel RH**. Muscle-Specific Lipoprotein Lipase Deletion Increases Insulin Action in Skeletal Muscle with Resultant Excess Adipose Tissue Deposition and Systemic Insulin Resistance. *Diabetes 2007*.

195. Kinney GL, Snell-Bergeon JK, Maahs DM, Ogden LG, **Eckel RH**, Erlich J, Rewers M, Hokanson JE, $LpPLA_2$ Predicts Progression of Coronary Calcification. *Circulation 2007.*

196. Allian-Sauer M, Capell WH, Sutherland JP, Wolfe P, Talley ND, Hernandez TL, Wyatt HR, Foster G, Hill JO, **Eckel RH**. Failure of Suppression of Circulating Free Fatty Acids is Associated with Increased LDL Cholesterol in Response to Weight Loss. *Circulation 2007*.

**Abstracts submitted after 2007 are not listed.**

`

# EXHIBIT B

**ROBERT H. ECKEL, M.D.**

Materials Relied Upon

**Government Publications**

1. Endocrinologic and Metabolic Drugs Advisory Committee (EMDAC) Praluent Hearing Transcript, FDA (June 9, 2015)
2. Endocrinologic and Metabolic Drugs Advisory Committee (EMDAC) Repatha Hearing Transcript, FDA (June 10, 2015)
3. European Commission Guidelines on Summary of Product Characteristics (Sept. 2009).
4. EU Label of Praluent, available at https://www.ema.europa.eu/en/documents/product-information/praluent-epar-productinformation_en.pdf.
5. FDA Label: Praluent, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125559s029s030lbl.pdf.
6. FDA Label: Repatha, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125522orig2s000lbl.pdf.
7. Hearing before the Senate Judiciary Committee (June 23, 2004)
8. Part 15 Public Hearing on Approval Pathway for Biosimilar and Interchangeable Biological Products, FDA (November 2, 2010)
9. Public Workshop on Scientific Considerations Related to Developing Follow-on Protein Products before FDA (Sept. 15, 2004)

**Research Articles**

1. Bramlet, D. and Kienle, J., "Case Report: Can a Different PCSK9I be used after Intense Local Reaction to Another PCSK9I?" *Journal of Clinical Lipidology*, Vol. 12, 2 (2018).
2. Everett, Brendan, M. et al., "Safety Profile of Subjects Treated to Very Low Low-Density Lipoprotein Cholesterol Levels (<30 mg/dl) With Rosuvastatin 20 mg Daily (from Jupiter)," *American Journal of Cardiology*, Vol. 114, 11 (2014).
3. Fitchett, David H, et al., "Statin Intolerance." *Circulation*, Vol. 131, 3 (2015): 389-391, available at https://doi.org/10.1161/CIRCULATIONAHA.114.013189.
4. Fox, Keith A., et al. "Underestimated and underrecognized: the late consequences of acute coronary syndrome (GRACE UK-Belgian Study)" *European Heart Journal*, Vol. 31, 22 (2010): 2755-2764.\
5. Geng, Qiang, et al., "Efficacy and safety of PCSK9 inhibition in cardiovascular disease: a metaanalysis of 45 randomized controlled trials." *Cardiology Journal*, Vol. 29, 4 (2022): 574-581, PMID: 34581425.
6. Gotto, Antonio M. Jr., et al., "Low-Density Lipoprotein Cholesterol and Cardiovascular Risk Reduction: How Low Is Low Enough Without Causing Harm?." *JAMA Cardiology*, Vol. 3,9 (2018).

7. ICER, Alirocumab for Treatment of High Cholesterol: Effectiveness and Value, New Evidence Update (Feb. 15, 2019).

8. ICER, Evolocumab for Treatment of High Cholesterol: Effectiveness and Value, New Evidence Update (Sept. 11, 2017).

9. Lunven, Catherine et al., "A Randomized Study of the Relative Pharmacokinetics, Pharmocodynamics, and Safety of Alirocumab, a Fully Human Monoclonal Antibody to PCSK9, After Single Subcutaneous Administration at Three Different Injection Sites in Healthy Subjects," *Cardiovascular Therapeutics*, Vol. 32, 6 (2014).

10. Mannarino, Massimo R. et al., "PCSK9 and neurocognitive function: Should it be still an issue after FOURIER and EBBINGHAUS results?" *Journal of Clinical Lipidology*, Vol. 12, 5 (2018):1123-1132, PMID: 30318062.

11. McClellan, Mark, et al., "Call to Action: Urgent Challenges in Cardiovascular Disease: A Presidential Advisory From the American Heart Association," *Circulation*, Vol. 139, 9 (2024), 44-54 available at https://www.ahajournals.org/doi/full/10.1161/CIR.0000000000000652 .

12. Müller-Wieland, Dirk et al. "Efficacy and Safety of Alirocumab 300 mg Every 4 Weeks in Individuals With Type 2 Diabetes on Maximally Tolerated Statin." *The Journal of Clinical Endocrinology and Metabolism*, Vol. 104, 11 (2019): 5253-5262, PMID 31166599.

13. Olsson, A.G., et al., "Can LDL cholesterol be too low? Possible risks of extremely low levels," *Journal of Internal Medicine*, Vol. 281, 6 (2017).

14. Peterson, Lynn, "Trends-in-Medicine." *American College of Cardiology*, (Mar. 10-12, 2018).

15. Qamar, Arman, et al., "Interindividual Variation in Low-Density Lipoprotein Cholesterol Level Reduction With Evolocumab An Analysis of FOURIER Trial Data," *JAMA Cardiology*, Vol. 4, 1 (2019).

16. Ray, Kuasik K. et al., "Long-term efficacy and safety of inclisiran in patients with high cardiovascular risk and elevated LDL cholesterol (ORION-3): results from the 4-year open-label extension of the ORION-1 trial." *The Lancet. Diabetes & Endocrinology*, Vol. 11, 2 (2023), PMID: 36620965.

17. Sabatine, Marc, et al., "Evolocumab and Clinical Outcomes in Patients with Cardiovascular Disease." *New England Journal of Medicine*, Vol. 376, 18 (May 27, 2017)

18. Schmidt, Amand F., et al., "PCSK9 monoclonal antibodies for the primary and secondary prevention of cardiovascular disease." *Cochrane Database of Systematic Reviews*, Vol. 10, 10 (2020): CD011748, PMID: 33078867.

19. Schwartz, Gregory G. et al., "Alirocumab and Cariovascular Outcomes after Acute Coronary Syndrome," *New England Journal of Medicine*, Vol. 379, 22 (2018): 2097-2107.

20. Schwartz Gregory G., et al. "Effect of alirocumab, a monoclonal antibody to PCSK9, on long term cardiovascular outcomes following acute coronary syndromes: rationale and design of the ODYSSEY OUTCOMES trial." *American Heart Journal*, 168, 5 (2014).

21. Schwartz, Gregory G., et al., "Transiently achieved very low LDL-cholesterol levels by statin and alirocumab after acute coronary syndrome are associated with cardiovascular risk

reduction: the ODYSSEY OUTCOMES trial." *European Heart Journal*, Vol. 44, 16 (2023): 1408-1417, PMID: 36879424.

22. Steg, Philippe G., et al., "Effect of Alirocumab on Mortality After Acute Coronary Systems." *Circulation*, Vol. 140, 2 (2019): 103-112, PMID: 31117810.

23. Steg, Philippe G. et al., "The ODYSSEY OUTCOMES Trial: Topline Results Alirocumab in Patients After Acute Coronary Syndrome." American College of Cardiology, 67th Scientific Sessions, March 10, 2018.-

24. Szarek, Michael, et al., "Alirocumab Reduces Total Nonfatal Cardiovascular and Fatal Events: The ODYSSEY OUTCOMES Trial." *Journal of the American College of Cardiology* 387 (Feb. 5, 2019).

25. Thygesen, Kristian et al., "Universal Definition of Myocardial Infarction," *Journal of the American College of Cardiology*, Vol. 50, 22 (2007): PMID 18036459.

26. White, Harvey D., et al, "Effects of alirocumab on types of myocardial infarction: insights from the ODYSSEY OUTCOMES trial." *European Heart Journal*, Vol. 40, 33 (2019): 2801-2809 PMID: 31121022.

27. Wiviott, Stephen, et al., "Effect of Evolocumab on Type and Size of Subsequent Myocardial Infarction: A Prespecified Analysis of the FOURIER Randomized Clinical Trial", *JAMA Cardiology*, Vol. 5, 7 (2020) PMID: 32347885.

**Websites**

1. "2018 AHA/ACC Guideline on the Management of Blood Cholesterol", *American College of Cardiology* (Updated June 2019), available at https://www.acc.org/~/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/Guidelines/2018/Guidelines-Made-Simple-Tool-2018-Cholesterol.pdf.

2. "2024 Heart Disease and Stroke Statistics Update Fact Sheet, At a Glance." *American Heart Association*, available at https://professional.heart.org/en/science-news/-/media/E93F4970FF834DA592B486DE74704BBB.ashx.

3. Soto, Lucy, "New guidelines: Cholesterol should be on everyone's radar, beginning early in life." *American Heart Association News* (Nov. 10, 2018), available at https://www.heart.org/en/news/2018/11/10/new-guidelines-cholesterol-should-be-on-everyonesradar-beginning-early-in-life.

**Other Materials**

1. *Amgen v. Sanofi*, civ. no. 14-1317-RGA (D. Del. February 19-21, 2019) Tr.
2. *Amgen v. Sanofi*, civ. no. 14-1317-RGA (D. Del. June 13, 2019) Tr.
3. DOYLE0001
4. DOYLE0005
5. Novartis 4Q23 Earnings Presentation, Earnings Call Transcript and Press Release

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC.; AMGEN MANUFACTURING, LIMITED; and AMGEN USA INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SANOFI; SANOFI-AVENTIS U.S. LLC; AVENTISUB LLC, f/d/b/a AVENTIS PHARMACEUTICALS INC., and REGENERON PHARMACEUTICALS, INC.,<br><br>Defendants. | ) | C.A. No.: 14-1317-RGA (CONSOLIDATED)<br><br>[redacted]<br><br>[redacted] |

**DECLARATION OF ROBERT BRADWAY IN SUPPORT OF AMGEN'S MOTION FOR PERMANENT INJUNCTION**

I, Robert Bradway, state and declare as follows:

I submit this declaration support of Amgen's Motion for Permanent Injunctive Relief.

1. I am the Chief Executive Officer and Chairman of Amgen. I previously gave testimony at the 2016 liability trial and the 2019 liability trial, as well as the 2016 evidentiary hearing on permanent injunction in *Amgen, Inc. v. Sanofi et al.*, No. 14-cv-01317 in the United States District Court for the District of Delaware ("District Court"). Among other things, I testified regarding Amgen's innovation and its investments in Repatha, as well as the harm that Amgen has suffered, and would continue to suffer, in the absence of an injunction.

2. I have reviewed my previous testimony and understand that testimony to be part of the record before this Court. I provide this declaration to give context to and reaffirm some of my earlier testimony and to assist the Court in considering the motion for a permanent injunction following the February 25, 2019 jury verdict upholding the validity of claims 19 and 29 of Amgen's U.S. Patent No. 8,829,165 and claim 7 of U.S. Patent No. 8,859,741.

**Amgen's Investment in Innovation**

3. Amgen is regarded as a pioneer in the biotechnology industry. Amgen was founded in 1980 and quickly became recognized as an innovator and leader in the field of biotechnology and medicine. With our commitment to human therapeutics and our focus on innovation, Amgen has sustained that reputation over the 30 years since FDA approved our first product, Epogen®, in 1989. In 1989, Epogen was first in class and named Product of the Year by *Fortune* magazine. And in 1991, when we received FDA approval for our second product Neupogen®, also a first in class medicine and we again received the same honor. In 1994, Amgen won the U.S. Department of Commerce National Medal of Technology, recognizing Amgen for its leadership in developing innovative therapeutics for delivery to critically ill patients throughout the world. In 2009, Amgen was awarded "Best Biotechnology Product" for Nplate®, a drug that regulates platelet production, by Prix Galien, recognizing the outstanding achievements in improving the human condition through the development of innovative therapies. This same honor was awarded to Amgen in 2011 for both Prolia® and Xgeva®, approved in 2010. Blincyto® (the first bi-specific immunotherapy approved by FDA), which is used to treat acute lymphoblastic leukemia patients, was first approved by the FDA in 2014 and received "Breakthrough Therapy" designation because the FDA determined that it offers a substantial improvement over available therapies. It was designated for "Priority Review" (shortening the targeted FDA review cycle from ten months to six months) because the FDA determined that Blincyto could potentially provide a significant advance in medical care (without Amgen purchasing and using a voucher as Sanofi and Regeneron did with Praluent). Ex. 228 (FDA News Release on Blincyto approval). When the FDA approved Blincyto for expanded indications in 2018, it again received "Priority Review" designation and "Accelerated Approval" because of the unmet medical need in this rapidly progressing form of



[redacted]

cancer and the clinical benefit of Blincyto. Ex. 229 (FDA News Release on expanded approval of Blincyto). Similarly, when Amgen applied for FDA approval of Corlanor®, FDA designated the application for "Fast Track" review in recognition of its potential to treat an unmet medical need *and* for "Priority Review" because the FDA determined that Corlanor could potentially provide a significant advance in medical care (again not because of a purchased voucher). Corlanor® was approved by the FDA in 2015 to reduce hospitalization for worsening heart failure, and was recognized by the FDA as a "First-in-Class" medicine. Ex. 6 (PTX-9956) (2015 Novel Drugs Summary). Amgen's recently approved biologic for the prevention of migraines, Aimovig®, was also recognized by the FDA in 2018 as "First-in-Class" (Ex. 230 (2018 Novel Drugs Summary)) and was the only prescription medicine to be named *Time's* "Best Invention" list in 2018.

4. The process of developing new human therapeutics is a lengthy, risky, and expensive endeavor. In general, it can take 10-15 years to develop a new therapeutic and can require investments in excess of $2 billion to reach FDA approval and initial product launch. As an industry average, as few as one in one hundred research projects are successfully brought forward through development, regulatory approval and commercialization.

5. Amgen was founded upon, and is committed to, innovation. Embracing the attendant uncertainty of building a business on a commitment to innovation, Amgen has developed a business model that is financially disciplined in how we manage risk-based investment. We fund research and development—the lifeblood of our product candidate pipeline—from our revenues on our approved products. And we embark on large, multi-year, multi-clinical trial development with a watchful eye on projected revenues.

6. Amgen has a long history of using its product revenues to invest in research and development into future products. And, of course, to the extent we earn less revenue than we



[redacted]

anticipate, that will mean we have less to invest in research and development over time. Since 1989, when we launched our first human therapeutic product, we have invested almost $60 billion in research and development. That is approximately 20% of our revenues generated from approved products over the same period of time.

**Importance of Patent Protection to Amgen's Business Model**

7. Patent protection is foundational to Amgen's business model. We are able to make the required significant and lengthy investments in research and development of innovative new medicines because we have faith that the patent system will protect our inventions from infringing competition during the term of the patent. That patent protection enables us to earn a return on our investment (not only for the successful products, but also for our investment in the ideas and products that never make it to market) and to generate funds to invest in further research and development.

8. Our goal is to constantly reinvest in research and development to discover, develop and bring forward new innovative medicines and to ensure that once the patents on our currently marketed products expire, and face legal competition, Amgen will have a sustained flow of new innovative products moving toward FDA approval.

9. Without patent protection, we would have a very different business model from what we have today, as would everyone in the innovative biopharmaceutical industry. There would be fewer resources available to invest in discovery research and development of novel approaches to treating disease, because the return on investment would be even more uncertain. Over the long term, there would be less transformational innovation in human therapeutics and fewer new medicines for patients.



[redacted]

10. Our intellectual property position was foundational to our willingness and ability to invest heavily over a long period of time in Repatha—over a decade of work—in what we knew was a risky project. Because we believed during development, and continue to believe now, in the strength of our patent protection around PCSK9 antibodies, we had the confidence to make a sustained, and substantial, investment in Repatha.

11. Patent protection is also foundational to the willingness of investors to invest in our company and support our mission. If our patents are not enforced, our inventions and investments are not protected, which will impact our ability to attract key investors. Without investors, our ability to continue to conduct important research and development efforts that elucidate the biology of disease and focus on novel approaches to treating devastating diseases will be constrained.

12. Amgen invested over $2 billion in Repatha to bring that invention from a research plan to a new FDA-approved medicine for reduction of cholesterol levels in high risk patients. Since launch, Amgen has continued to make substantial investment in Repatha to ensure that it reaches the cardiovascular patients who may benefit from it and to build the body of evidence to support its full potential in treating cardiovascular disease. For example, Amgen has continued to invest in clinical development of Repatha, including the completion of a five-year outcomes-based study called FOURIER involving more than 27,500 patients. This clinical trial was the basis for the FDA to expand Repatha's approved indications to include the treatment of patients with established cardiovascular disease to reduce the risk of heart attack and stroke. Amgen also completed the GLAGOV clinical study focused on plaque regression involving 970 patients. And Amgen just announced the start of the VESALIUS-CV clinical study, a four-year clinical trial involving at least 13,000 patients to study the potential benefit of Repatha in preventing a first heart attack or stroke in patients with some of the most significant risk factors for a first



[redacted]

cardiovascular event. VESALIUS-CV is part of Amgen's PROFICIO program. This program of clinical studies investigates the impact of Repatha on CVD across multiple populations. To date, the PROFICIO program consists of 36 trials including more than 38,000 patients worldwide.

13. The outcome of this research is uncertain and these clinical trials are long and expensive. As I have discussed above, without meaningful patent protection against infringing competition, Amgen's ability to sustain this level of investments will be in serious doubt.

14. With Praluent on the market competing with Repatha, the cumulative worldwide Repatha product sales revenues through the end of 2018 was about $1 billion, substantially less than the overall investment Amgen made just to bring Repatha to market.

**Amgen's Investment in Manufacturing and Repatha Manufacturing Capacity**

15. Biological medicines are manufactured using living cells. As a result, manufacturing biological medicines is complex. Amgen was among the first in the biotechnology industry to bring a biological medicine to the market in the United States. Over the past 35 years, Amgen has invested heavily in the development of scalable manufacturing processes and facilities, as well as the expertise to ensure safe, reliable and efficient supply of biological medicines to patients.

16. Amgen has the ability to deliver a safe and reliable supply to meet all of the demand for Repatha worldwide as well as any increase in demand for Repatha that may result from an injunction prohibiting Sanofi and Regeneron's infringement of our patents. Repatha is an important medicine with the demonstrated potential to lower the risk of heart attack and stoke for some of the country's most at-risk patients. Amgen recognizes our responsibility to make sure we have the capacity to supply every patient who needs a PCSK9 antibody with this medicine every time.

**Repatha's Role In Amgen's Cardiovascular Business**

17. Amgen saw the extraordinary potential for Repatha at a time when we did not have a cardiovascular business. As a result of our conviction about the prospects for Repatha, we made the strategic decision to build a cardiovascular business capability, with Repatha as the flagship product. This involved recruiting experts in the cardiovascular field to help us develop the clinical and regulatory expertise, marketing and sales infrastructure to bring Repatha to patients. These investments were key in helping us enter what was a completely new market for us – focused on physicians and patients in different specialties than we had previously addressed. To support building the cardiovascular franchise in advance of Repatha's approval, we also in-licensed and brought to market a cardiovascular medicine named Corlanor, which was approved by the FDA approximately four months before Repatha. Repatha is foundational and critical to the success of our cardiovascular franchise. Defendants' launch of Praluent has irreparably damaged Amgen's expansion into this new field by stunting the uptake of Repatha and blurring Amgen's role as an innovator for this new class of medicine.

18. We continue to invest in research and development for unmet medical conditions in the cardiology field and have candidates in our development pipeline. However, the outcome of this research is uncertain and clinical development of product candidates can be long and expensive. As I have discussed above, without meaningful patent protection against infringing competition, Amgen's ability to fund R&D into new medicines to treat cardiovascular disease or the dozens of other exciting product candidates in our pipeline will not be sustainable.

**Non-Financial Harm Caused by Praluent's Presence on the Market**

19. Praluent's infringing competition has also harmed Amgen's reputation. Amgen has worked hard to develop a well-deserved reputation as a pioneer and one of the world's leading



[redacted]

innovators of new biologic medicines. Amgen relies on that reputation to attract investors, recruit top talent to work at Amgen, recruit top medical opinion leaders to oversee our clinical trials and inspire our entire workforce. Praluent's presence on the market – particularly touting its "First Approved" moniker - has diminished Amgen's reputation among physicians, patients and investors as one of the world's foremost innovators in biologics.

20. Amgen's mission is to serve patients. Patients' ability to conveniently and reliably access our medicines through their insurance at an affordable price is an important part of that mission. Because of Praluent's infringing competition, payers have severely restricted patient access to Repatha and unprecedented numbers of prescriptions have been rejected, either under utilization management (UM) criteria or prior authorization (PA) protocols. As a result, patients and doctors have expressed serious frustration with the process for securing authorization to prescribe Repatha. That frustration is identified with Repatha and, by association, with Amgen and our good reputation that we have sought to extend into our new cardiovascular business.

**Amgen's Licensing Practices**

21. Amgen does not license its patented inventions to enable others to compete head-to-head with Amgen. We use patent licenses to enable others to manufacture, use or sell a product when (1) we have made a business decision not to pursue the molecule or the indication; or (2) we have made a business decision that a licensee could help us better develop or commercialize our invention, e.g., in a particular geographic region or specialized indication.

22. Consistent with this approach to patent licensing and based on our conviction about the importance of Repatha, the extensive research linking PCSK9 and high cholesterol, and our belief in the strength of our PCKS9 antibody patent rights, Amgen made the decision early that it would retain these patent rights. We made the ambitious commitment to ourselves and our



[redacted]

shareholders that we would make the necessary investments to develop, manufacture and market a PCSK9 antibody medicine on our own. [redacted] To date, we have not granted any license to our U.S. PCSK9 antibody patent rights and we do not intend to license these rights in the future, consistent with our practice of not licensing others to compete against us.

**Insufficiency of Financial Remedy**

23. A financial remedy, such as a royalty, would not be sufficient to compensate Amgen for the harm we have suffered and will continue to suffer due to Sanofi and Regeneron's patent infringement.

24. While a royalty may defray some (but not all) of the future financial harm Amgen would suffer, it would not resolve, for example, the long-lived effects of price erosion, the harm to Amgen's reputation and relationship with its customers, or the harm to Amgen's business model and the impact of foregone R&D investment opportunities. Head-to-head competition from Sanofi and Regeneron's infringing product has caused investors, potential business partners, prospective employees, physicians and patients to question whether Amgen is a true innovator, whether patients will be able to reliably access Amgen's new products under their health insurance, and whether Amgen's patents can still provide meaningful protection to support its historically successful business model. Bringing an end to Sanofi and Regeneron's infringement for the remaining term of our patents affords Amgen the best opportunity to ameliorate the harms Amgen has already suffered and to avoid further irreparable injury. It would also send an important message to investors and the biopharmaceutical industry as a whole that patents remain a meaningful foundation on which innovation-based R&D can be built. And, denying an injunction



[redacted]

in these circumstances would send a dangerous message to the industry suggesting that there is a business to be made from infringement with only the risk of financial penalty.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed in Thousand Oaks, California on March 18, 2019.

Robert Bradway



[redacted]

# EXHIBIT 22

# Document Produced Natively

# REPATHA 2019 LRS UPDATE

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Case 1:22-cv-00697-JLH Document 369-1 Filed 07/30/24 Page 250 of 918 PageID #: 20438

# EXECUTIVE SUMMARY – AIMING TO [redacted] WITH FOCUS ON [redacted]

- Propose to [redacted]
  - [redacted] s
- [redacted]
  - [redacted]
- Remaining committed to [redacted]
  - [redacted]

* [redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Repatha

# PROPOSE TO [redacted]

[redacted]

**Marketplace**

- [redacted]

**Share**

- [redacted]

**Price**

- [redacted]

**OSE**

- [redacted]

**Other**

- [redacted]

* [redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

## Slide 3 Notes

What are the medicare vs. commercial fulfillment rate

Need to better understand part D – what happens in LIS, etc.
Incliseran – build into 1.5C

Repatha

# KEY ASSUMPTION CHANGES VS MAY LRS – [redacted]

[redacted]

| Assumption | 2019 May LRS | 2019 Sep LRS | Impact |
|---|---|---|---|
| EPI | [redacted] | | |
| Peak penetration | [redacted] | | |
| Attempts | [redacted] | | |
| Fulfillment | [redacted] | | |
| Price | [redacted] | | |

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Amgen Proprietary – For Internal Use Only

AMGEN

Repatha

Directional

# STRATEGIC FOCUS ON [redacted]

Repatha Attempts

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# DELAY IN [redacted]



[redacted]

Sep LRS
vs
May LRS

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# SHORT-TERM, MAINTAIN [redacted]

[redacted]

## PCSK9i Average Weekly NBRx (IQVIA Tracking) by Month

2019 2020 2021

Average Weekly IQVIA NBRx by Month

[redacted]

0K Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4 Q1 Q2 Q3 Q4

Monthly data not phased for seasonality and holiday. 2019 and 2020 weekly phasing will be done as part of Sep forecast

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Amgen Proprietary For Internal Use Only

Case 1:22-cv-00697-JLH Document 369-1 Filed 07/30/24 Page 257 of 918 PageID #: 20445

# EXPECT TO SEE [redacted]

| TODAY | 2020 SCENARIOS |
| --- | --- |
| [redacted] | |

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Repatha

# RANGE OF RISKS AND OPPORTUNITIES

[redacted]

[redacted]

+

[redacted]

-

[redacted]

* The modeling herein does not model rebates in a one-player market starting in 2021 due to the wide degree of unknown variables associated with such a scenario
** LRS base case assumption of 1 player market starting in 2021

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# SUPPORTING DETAILS

# SALES RISKS/OPPORTUNITIES 2020

2020 Impact ($M)

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

[redacted]

Illustrative

[redacted]

- [redacted]
- [redacted]
  - [redacted]
  - [redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# NEAR TERM FOCUS ON [redacted]

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# STRATEGIC PRIORITY ON [redacted]

Illustrative

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Repatha



# ANALOGUES SHOW [redacted]

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# REPATHA NBRX TRACKING [redacted]

## Repatha NBRx vs Mar LRS

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# PENETRATION IN [redacted]

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# PLAN KEY ASSUMPTIONS

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

Repatha

# FULFILLMENT RATE EXPECTED TO [redacted]

| Sep' 19 LRS Exits | | | | | |
|---|---|---|---|---|---|
| | Dec-19 | Dec-20 | Dec-21 | Dec-22 | Dec-30 |
| Approval Rates | | | | | |

| Mar' 19 LRS Exits | | | | | |
|---|---|---|---|---|---|
| | Dec-19 | Dec-20 | Dec-21 | Dec-22 | Dec-30 |
| Approval Rates | | | | | |

[redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# '20-'22 CUMULATIVE NET SALES [redacted]

[redacted]

2018 LRS Demand Price Inventory 2019 Sep LRS

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

## Slide 20 Notes

| | | |
|---|---|---|
| (1,126) | (234) | (97) |

# REPATHA P&L





[redacted]

* Preliminary COS % based on Accelerate Oct18

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# REPATHA [redacted]

[redacted]

1 [redacted]
2 [redacted]

*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.*

# EXHIBIT 23




**APR 14, 2021**

AMGEN

Pioneering science delivers vital medicines™

Repatha

## EXECUTIVE SUMMARY – [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

2

AMGEN

Amgen Confidential—For Internal Use Only

# PART 1: DEMAND UPDATE

AMGEN
Amgen Confidential—For Internal Use Only

Repatha

# 10 YEAR REVENUE OUTLOOK

[redacted]

**Assumptions** *(bold – change vs prior LRS)*

Marketplace:

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN

Amgen Confidential—For Internal Use Only



CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# NET SALES VS 2020 LRP – DEMAND ONLY

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN

Amgen Confidential—For Internal Use Only



CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

## TOP OF FUNNEL – [redacted]

Repatha Attempts

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 6

Amgen Confidential—For Internal Use Only

Repatha

# RESETTING PCP EXPECTATIONS – [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN

Amgen Confidential—For Internal Use Only

Repatha

## PEAK PENETRATION – [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Confidential—For Internal Use Only

Repatha

## STRATEGIC OPTIONS – [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only AMGEN

# PART 2: PRICE UPDATE

AMGEN
Amgen Confidential—For Internal Use Only

# COVERAGE AND PRICING CORE PRINCIPLES

**Coverage & Pricing Core Principles will guide strategy and negotiation approach**

1) [redacted]
2) [redacted]
3) [redacted]
4) [redacted]

Amgen Proprietary—Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

# EXECUTIVE SUMMARY

- [redacted]
- [redacted]

IN 2020, [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

*Primarily driven by donut hole; includes rate impact

[redacted]

## IN 2022-25, [redacted] THE CATEGORY

[redacted]

[redacted]

[redacted]

Amgen Proprietary—Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

[redacted]

DRAFT

RECOMMEND [redacted]

Most aligned to key principles

[redacted]

| |
|---|
| LEDR Rate |
| Coverage |
| Gross Demand at Peak |
| Net Demand at Peak |
| Assumed Annual Price Increase |
| Estimated Incremental Net Demand through 2030 v. Scenario B |

*To successfully execute Option B,* [redacted]



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



[redacted]

## NET PRICE DECLINES V. 2020 LRS

[redacted]

**YOY Price Declines (%)**

[redacted]

Amgen Proprietary—Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Repatha

# NET PRICE CHANGES [redacted]

[redacted]

| [redacted] | 2022 | 2023+ |
|---|---|---|
| [redacted] | [redacted] | [redacted] |

*Net Price*

Amgen Proprietary—Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



2021 – [redacted]
2022 –
2023 –

AMGEN

# SUPPORTING DETAILS: REPATHA

Repatha

## FCST PREVIEW – [redacted]

[redacted]

*[1]WDA fees and PY DH true-ups are part of the other line item in the standardized Components of Growth calculations, but placed in net price here for management viewing purposes*

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 19

Amgen Confidential—For Internal Use Only

# PATIENT FUNNEL – OUR STRATEGIC CHOICES SINCE LAUNCH

**Marketplace Map**

[redacted]

| Time Frame | Patient Ask | Estimate |
|---|---|---|
| [redacted] | | |

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN

Amgen Confidential—For Internal Use Only




[redacted]

BACK UP

[redacted]

High level demand study takeaways:

[redacted]

# NEAR TERM – THREE PILLARS CRITICAL TO DRIVING SUCCESS WITH CARDS AND INSULATING FROM NEW ENTRANTS

[redacted]

[redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 22

Amgen Confidential—For Internal Use Only

# LONGER TERM – [redacted]

| Patient Population | Physician Archetypes |
|---|---|
| Procedure (CABG, PCI) | [redacted] |
| Soft Event (UA, TIA) | |
| PAD Event | |
| Sx PAD | |

Key: Least Aggressive Today — Most Aggressive Today

1. [redacted]
2. [redacted]
3. [redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN



Amgen Confidential—For Internal Use Only

Repatha

# 2020 PENETRATION – [redacted]

[redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 24

Amgen Confidential—For Internal Use Only

Repatha

# PEAK PENETRATION – [redacted]

[redacted]

(5.7M)+ LDL< 130with Comorbidities (5.3M)

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 25

Amgen Confidential—For Internal Use Only

Repatha

## MARKETPLACE – [redacted]

[redacted]



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 26

Amgen Confidential—For Internal Use Only

All information included in this document is for planning purposes only. It is not for use with customers or distribution and use outside Amgen. The underlying assumption in this document is that an FDA approved indication guides all promotional activities in accordance with Amgen's compliance SOPs. While this document may include analyses of information concerning product uses outside the approved package insert, Amgen does not promote or market any product for these purposes.

Amgen Proprietary - Confidential

Repatha

Updated

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 27

Amgen Confidential—For Internal Use Only

Repatha

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

*Includes FH, Hypercholesterolemia, non-specific CVD and other co-morbidities

Repatha [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

*Includes FH, Hypercholesterolemia, non-specific CVD and other co-morbidities

Repatha

Pre-read Only

# KEY ASSUMPTION CHANGES – [redacted]

| | LRS 2020 – May | LRS 2020 – Aug | LRS 2021 – Mar | vs Aug |
|---|---|---|---|---|
| EPI | [redacted] | [redacted] | [redacted] | [redacted] |
| Repatha Attempts | [redacted] | [redacted] | [redacted] | [redacted] |
| Fulfillment | [redacted] | [redacted] | [redacted] | [redacted] |
| Price | [redacted] | [redacted] | [redacted] | [redacted] |

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 30

Amgen Confidential—For Internal Use Only

Repatha

## FULFILLMENT – [redacted]

| Commercial Approval (Annual Avg) | Medicare Abandonment (Annual Avg) |
|---|---|
| [redacted] | [redacted] |

2018 2019 2020 2021 2022 2023+

2018 2019 2020 2021 2022 2023+

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

AMGEN 31

Amgen Confidential—For Internal Use Only

Attorney-Client Privileged

# REPATHA P&L W/ [redacted] – 2020 LRS

| $M | Repatha P&L (incudes Vesalius at 86% PTRS, TRx Share Stabilize at 75% by 2024) 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | CAGR '20-'24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales**[1] | [redacted] | | | | | | | | | | | | |
| *YoY %* | | | | | | | | | | | | | |
| Cost of Sales[2] | | | | | | | | | | | | | |
| **Gross Margin** | | | | | | | | | | | | | |
| *% of Net Sales* | | | | | | | | | | | | | |
| **Geographic OPEX** | | | | | | | | | | | | | |
| *YoY %* | | | | | | | | | | | | | |
| Headcount Costs | | | | | | | | | | | | | |
| Outside Expenses | | | | | | | | | | | | | |
| Central Function (244 PCP) | | | | | | | | | | | | | |
| *Build back PCP (+60 by'23)* | | | | | | | | | | | | | |
| **Contribution** | | | | | | | | | | | | | |
| *Cont. margin %* | | | | | | | | | | | | | |

*[1]2021 Prelim May LRS*

**Additional Updates Not Included Above (to come in 2021 LRS):**

- [redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



AMGEN

Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

# REPATHA CARDS-PCP BREAKOUT – 2020 LRS

Card Revenue PCP Revenue Card OpEx PCP OpEx

Revenue $M

[redacted]

Total OpEx

| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|
| **Field Card FTEs** | [redacted] | | | | | | | | |
| **Field PCP FTEs** | | | | | | | | | |
| | | | | | | | | | |
| Total Card FTE $ | | | | | | | | | |
| Total PCP FTE $ | | | | | | | | | |
| **Total FTE $** | | | | | | | | | |
| | | | | | | | | | |
| Card OSE | | | | | | | | | |
| PCP OSE | | | | | | | | | |
| **OSE** | | | | | | | | | |
| *% of Rev* | | | | | | | | | |

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

## 2020 DONUT HOLE DRIVEN BY [redacted]

[redacted]

| Year | Donut Hole Projection |
|---|---|
| 2021 | [redacted] |
| 2022 | [redacted] |

Amgen Proprietary—Internal Use Only

34

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

2020 Repatha – [redacted]


REPATHA U.S. PCP STRATEGY UPDATE
OCTOBER 27, 2020
AMGEN
Pioneering science delivers vital medicines™

# EXECUTIVE SUMMARY

1. [redacted]
2. [redacted]
3. [redacted]
4. [redacted]
5. [redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

## REPATHA LRS – [redacted]

[redacted]

Repatha Attempts

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

## MARKET CONTEXT – [redacted]




[redacted]

[1] An initiation is defined as any new-to-brand prescription or presciption of a new class of LLT (i.e., low intensity statin, medium intensity statin, high intensity statin ezetimibe, PCSK9s). Dx: Diagnosis, Rx: Prescription, Tx: Treatment. Source: IQVIA LAAD Data 01/01/2019 – 12/31/2019; ClearView Analysis

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

## REQUIREMENTS FOR LRS – [redacted]

[redacted]

■LRS PCP Initiated Patients ■PCP Total LLT Initiations

**What You Have to Believe to Reach the LRS....**

1. [redacted]
2. 

[1] LRS assumes 46% persistence rate at 12 months, resulting in a significant NBRx population required to fuel growth.
[2] Deciles for cardiologist Repatha prescribing penetration range from 1.3%-18.9%, which is defined as % PCSK9i initiations of total LLT Initiations. Source: IQVIA LAAD 01/01/2019 – 12/31/2019; ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

## CASE FOR PCP STRATEGY – [redacted]

***Reasons for Limited PCP Prescribing Historically***

[redacted]

***Reasons to Believe We Can Unlock Prescribing in PCPs***

[redacted]

Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Draft

## PCP STRATEGY APPROACH – [redacted]

| | PCP Archetyping | Prioritization of Target Patient Segments | Strategic Options to Drive Repatha Prescribing | Synthesis of Repatha PCP Strategy |
|---|---|---|---|---|
| Strategic Questions Addressed | Who is our target prescriber of Repatha amongst PCPs? | Which patients should we focus on to drive Repatha uptake? | What investments should be considered to drive PCP uptake, and what is corresponding magnitude of opportunity? | What is the recommended path forward for Repatha to drive growth within PCPs? |
| Key Sources of Insights | [redacted] | | | |

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

AMGEN

Draft

# PCP ARCHETYPES (1 OF 2) – [redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Source: PCP Interviews; ClearView Analysis.

## PCP ARCHETYPES – [redacted]

| Archetype | # of HCPs | 2019 LLT Initiated Pts | 2019 PCSK9i Initiated Pts | 2019 ISS Targeted HCPs |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] | [redacted] |

[redacted]

[1] Depth is defined as the number of patients initiated on a PCSK9 out of total patients initiated on an LLT. Source: IQVIA LAAD 01/01/2019 – 12/31/2019; ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

## CHARACTERISTICS – [redacted]

| Risk Stratification | Patient Grouping | Role & Primary Treatment Goals |
| --- | --- | --- |
| [redacted] | [redacted] | [redacted] |

Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

## INITIAL PROCEDURE PATIENT FOCUS – [redacted]

| Post-MI | PCI/CABG & UA |
|---|---|
| [redacted] | [redacted] |

[redacted]

[1] PCI/CABG and UA patients represent ~12% of ASCVD-HL practice. [2] Approximately one-third of post MI patients have also undergone PCI/CABG or experienced UA.
Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

[redacted]

## STRATEGY ROADMAP – [redacted]

| 2020 | 2021 | 2022 | 2023 | 2024 | Vesalius-CV | 2025 | ACS-REAL, PAD | 2026 |
|---|---|---|---|---|---|---|---|---|

*Card Patient Targeting:* [redacted]

1 **PCP Targeting Considerations:** [redacted]

2 **PCP Patient Targeting:** [redacted]

[redacted]

Source ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

AMGEN

Draft

## STRATEGY TOOLKIT – [redacted]

**Potential Opportunities to Increase Prescribing Volume**

[redacted]

PA: Prior Authorization; UM: Utilization Management; POC: Point of Care; DSE: Disease State Education. Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

## STRATEGIC OPTIONS – [redacted]

**Potential Investment Options**




[redacted]

**Key Strategy Enablers (All Options)**

- [redacted]
- [redacted]
- [redacted]

Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

AMGEN

Repatha

# INVESTMENT SCENARIOS – [redacted]

| 2025 PCP Investment[1] | 2025 PCP Initiated Patients (NBRx[redacted] |
| --- | --- |
| [redacted] | [redacted] |

[1] Assumes 3% inflation rate for cost per FTE; [2] Aggressive FTE expense: $293 M. Other expenses: $113 M; [3] Balanced FTE expenses: $183 M. Other expenses: $73 M; [4] Base case FTE expense: $83 M. Other expenses: $41 M. Source: ClearView Analysis.

* Assuming Aug LRS net price assumptions and no change in CARD revenue projections

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

AMGEN

## SUMMARY OF LEARNINGS AND IMPLICATIONS

| Key Learning | Implication |
| --- | --- |
| [redacted] | [redacted] |

Source ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN




For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT 24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| REGENERON PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>AMGEN, INC.<br><br>Defendant. | C.A. No. 1:22-cv-00697-JLH<br><br>ATTORNEYS' EYES ONLY |

**AMENDED EXPERT REPORT OF FIONA SCOTT MORTON
February 16, 2024**

# Table of Contents


1. INTRODUCTION ....... 4
   - 1.1 Qualifications ....... 4
   - 1.2 Assignment ....... 5
   - 1.3 Materials relied upon ....... 5
2. SUMMARY OF MAIN CONCLUSIONS ....... 5
3. RELEVANT MARKETS AND MARKET POWER ....... 7
   - 3.1 PCSK9 Inhibitors ....... 9
   - 3.2 Leqvio® and Other Products Are Not In the Relevant Market ....... 10
     - 3.2.1 Amgen’s internal documents explain that Praluent® is the only product that competitively constrains the price of Repatha® ....... 12
     - 3.2.2 PBMs also view Praluent® and Repatha® as the only products in the U.S. PCSK9i market ....... 14
     - 3.2.3 Barriers to entry into the PCSK9i market are high ....... 14
4. THE PRODUCTS INVOLVED IN AMGEN’S ANTICOMPETITIVE SCHEME TO MONOPOLIZE THE U.S. PCSK9I MARKET ....... 15
   - 4.1 Repatha® is A Central Pillar of Amgen’s Long-Term Strategy ....... 15
   - 4.2 Amgen’s Revenue Driving Auto-immune Product Portfolio ....... 16
     - 4.2.1 Enbrel® has significant market power ....... 17
     - 4.2.2 Otezla® has significant market power ....... 19
     - 4.2.3 The power of Amgen’s auto-immune portfolio ....... 22
5. AMGEN’S ANTICOMPETITIVE STRATEGY TO MONOPOLIZE THE U.S. PCSK9I MARKET ....... 23
   - 5.1 Amgen’s Patent Litigation to Exclude Praluent® from the U.S. PCSK9i Market ....... 23
   - 5.2 Amgen’s Exclusionary Commercial Strategy to Foreclose Praluent® from the U.S. PCSK9i Market ....... 27
     - 5.2.1 The role of PBMs ....... 28
     - 5.2.2 Amgen did not want Repatha® to compete head-to-head with Praluent® ....... 29

5.2.3 Amgen opted to rely on its blockbuster auto-immune portfolio products Enbrel® and Otezla® to force PBMs to exclude Praluent® ....31

5.3 Amgen's [redacted] .... 36

5.4 Amgen's [redacted] .... 38

5.5 Amgen's [redacted] .... 42

5.6 Amgen's [redacted] .... 45

5.7 Amgen's Anticompetitive Cross-Therapeutic Bundled Offers to Additional PBMs.... 47

6. THE EFFECTS OF AMGEN'S BUNDLE AT KEY PBMS ....48

6.1 Amgen's Anticompetitive Conduct Caused Spillover Effects in the Consolidated PBM Industry.... 48

6.1.1 Spillover Effects at ESI....50

6.1.2 Spillover Effects at OptumRx....60

6.1.3 Spillover Effects at CVS....66

6.1.4 Spillover Effects at Humana Part D....76

6.2 Spillover impacts on other PBMs increases foreclosure .... 77

7. THE AGGREGATE EFFECT OF AMGEN'S CONDUCT SUBSTANTIALLY FORECLOSED REGENERON FROM THE U.S. PCSK9I MARKET....80

7.1 Foreclosure at the Affected PBMs.... 82

7.1.1 Formularies directly affected by Repatha®'s anticompetitive portfolio offers ....82

7.1.2 Foreclosure due to Amgen's anticompetitive portfolio agreements goes beyond the specific contracts....83

7.1.3 Foreclosure estimates should consider formularies with Repatha® exclusivity before the portfolio offers....87

7.1.4 Total foreclosure at the affected PBMs ....87

7.2 Total Praluent® Foreclosure in the PCSK9i Market.... 90

8. AMGEN'S PORTFOLIO REBATES WERE EXCLUSIONARY AND ANTICOMPETITIVE ....92

8.1 Amgen's Portfolio Rebates as an Exclusionary Strategy .... 92

8.2 Amgen's Cross-Therapeutic Conditional Rebates Were Anticompetitive .... 98

8.2.1 Amgen's use of exclusionary portfolio rebates ....100

9. HARMS TO COMPETITION, CONSUMERS, AND REGENERON ....107

9.1 Disincentive for Amgen to Engage in Head-to-Head Competition. .... 109

9.2 Reduced Consumer Choice .... 110

9.3 Increases in Net Prices .... 111

9.4 Evidence of Reduced Investment .... 113

9.5 No Pro-Competitive Justification .... 115

10. CONCLUSIONS ....115

11. APPENDICES ....116

11.1 Appendix A: Background On Competition in the Pharmaceutical Industry .... 116

11.1.1 Pharmaceutical industry background ....116

11.2 Appendix B: Derivation of Minimum Rebate Metric .... 139

11.3 Appendix C: Data .... 139

11.4 Appendix D: Econometric Analysis of Spillover Effects. .... 141

11.4.1 Difference-in-differences econometrics ....141

11.4.2 Panel regression analysis ....143

# 1. Introduction

## 1.1 Qualifications

1. My name is Fiona Scott Morton. I am the Theodore Nierenberg Professor of Economics at the Yale School of Management, where I have taught since 1999. Between 2006 and 2010, I served as the Senior Associate Dean for Faculty Development at Yale School of Management. In addition to my time at Yale, I have also taught at the business schools of Stanford University and the University of Chicago. I received a Ph.D. in Economics from MIT in 1994.

2. At Yale University, I teach courses in the area of competitive strategy and competition economics and policy. My research is in the area of empirical Industrial Organization, the sub-field of microeconomics that includes competition economics and the study of firm behavior. I have authored or co-authored over 50 scholarly articles in a variety of areas of economics and law. Those articles have been published in leading scholarly and professional journals, including the American Economic Review, the RAND Journal of Economics, the Journal of Industrial Economics, the Quarterly Journal of Economics, the Antitrust Law Journal, and the Yale Law Journal. A particular focus of my research has been on the use of vertical contractual provisions, including the circumstances when such provisions can be anticompetitive.

3. From May 2011 through December 2012, I had the honor of serving as the Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the U.S. Department of Justice. In this position, I was the highest-ranking economist in the Department of Justice. As the chief economist in the Antitrust Division, I advised the Assistant Attorney General for Antitrust on a wide range of enforcement matters and competition policy issues. I supervised about 50 Ph.D. economists in conducting investigations of mergers and non-merger cases. I also played a leading role in formulating the Antitrust Division's position on a wide range of competition policy issues.

4. In addition to my academic work, I have served as an economic consultant for private clients as well as the Department of Justice and the Federal Trade Commission, providing both consulting and expert testimony. I have been qualified as an economic expert and have provided testimony before the International Trade Commission, in federal court, in state courts, and a variety of other venues.

5. While my academic and consulting work has involved a wide range of industries, a particular area of focus has been on pharmaceutical markets. I have published papers on innovation, entry, and branding decisions of pharmaceutical firms, the response of pharmaceutical companies to Medicaid Most-Favored-Customer provisions, and analyses of the Medicaid and Medicare programs on pharmaceutical pricing and access. I have testified about the Medicare prescription drug program before committees of both the U.S. House and Senate, and have testified as an economic expert in numerous proceedings involving pharmaceutical pricing, innovation, and marketing practices in federal and state courts. I also provided educational materials to assist the court in the Pharmaceutical Industry Average Wholesale Price litigation.

6. My qualifications, along with a list of the matters in which I have provided testimony, are set forth in greater detail in my CV, which is attached as **Exhibit A**.

### 1.2 Assignment

7. I have been asked by Counsel for Regeneron Pharmaceuticals, Inc. ("Regeneron") to: (1) provide an overview of the economics of competition in the pharmaceutical industry generally, and, in particular for PCSK9 inhibitors ("PCSK9i") in the U.S.; (2) determine the appropriate relevant market within which to assess the extent of Amgen, Inc. ("Amgen's") market power arising from its marketing and sale of Repatha®, Enbrel®, and Otezla®, as well as the competitive consequences of its actions; (3) determine whether Amgen's use of portfolio rebates was exclusionary and foreclosed Praluent® from a significant fraction of the market; (4) assess the competitive consequences of Amgen's actions on consumers, Regeneron, and the competitive process in the U.S. PCSK9i market; and (5) evaluate the extent to which procompetitive benefits (if any) outweigh the competitive harm caused by Amgen's actions.

### 1.3 Materials relied upon

8. In undertaking my economic analysis, I and those under my direct supervision have reviewed court filings, deposition testimony, documents and data produced in this proceeding (to which we had complete access), publicly available documents and data, and the relevant economic literature. In addition, I have had conversations with individuals at Regeneron. My work in this matter is ongoing. I understand that expert discovery is not complete. As new information warrants, I may update my conclusions. A listing of the materials that I have relied upon to date in forming my opinions is attached as **Exhibit B**.

## 2. Summary of main conclusions

9. Based on my review of the evidence in this case developed through discovery to date, my understanding of the pharmaceutical industry, and my economic expertise, it is my opinion that Amgen successfully engaged in exclusionary conduct that created, and allowed Amgen to maintain, a monopoly in the PCSK9i market in the U.S.[1] Amgen's exclusionary conduct ensured that Regeneron's competing PCSK9i, Praluent®, was excluded from prescription drug coverage reimbursement by the pharmaceutical benefit managers ("PBMs"), who effectively control patient access to drugs in the PCSK9i market. Amgen did so by leveraging its blockbuster products with substantial market power in unrelated markets—the auto-immune drugs Otezla® and Enbrel®— to impose or threaten to impose significant penalties through lost rebates on PBMs who refused to provide exclusive coverage of Amgen's PCSK9i drug Repatha®.

10. Amgen's conduct harmed consumers (*i.e.*, the patients and plan sponsors who pay for PCSK9i products), the competitive process, and Regeneron. Consumers have been, and will continue to be, harmed by Amgen's conduct as they have been deprived of choice (*e.g.*,

---

[1] As defined in **Section 3**.

between differentiated PCSK9i products), lost out on additional innovation for Repatha® and Praluent®, and incurred higher healthcare costs (*e.g.*, higher prices). Competition has been, and will continue to be, harmed by Amgen's conduct. Regeneron has been, and will continue to be, harmed because Praluent®, a drug that Regeneron invented and owns, has been substantially foreclosed for the PCSK9i market in the U.S., and is thus, no longer able to compete.

11. These conclusions are based on the following key findings:

a. ***The relevant market is PCSK9i products.*** The relevant antitrust market for purposes of my analysis is sales of PCSK9i (and more specifically pharmacy-dispensed PCSK9i) drugs in the U.S.

b. ***Amgen has market power[2] in the relevant market.*** Amgen's PCSK9i product, Repatha®, has monopoly power in the market for PCSK9i (and more specifically pharmacy-dispensed PCSK9i) drugs in the United States. The two other Amgen products at issue in this proceeding, Enbrel® and Otezla®, have substantial market power in their respective markets.

c. ***Amgen has engaged in exclusionary conduct in the PCSK9i market.*** Amgen engaged in exclusionary conduct by leveraging rebates on its blockbuster auto-immune products with market power to secure exclusive formulary coverage for its cardiovascular drug, Repatha®. These cross-therapeutic rebates resulted in effective net prices of Repatha® below an appropriate measure of Amgen's costs and effectively penalized PBMs who refused to exclude Praluent® by withholding conditional rebates offered for the high volume, must-have auto-immune products Enbrel® and/or Otezla®.

d. ***Regeneron has been substantially foreclosed from the U.S. PCSK9i Market.*** Amgen's exclusionary conduct had the effect of substantially foreclosing Praluent® from the U.S. PCSK9i market. Regeneron has been excluded and [redacted]. [redacted]s a result of Amgen's conduct, Praluent® was foreclosed, directly and with spillovers, from, among other PBM formularies:

i. [redacted]

[redacted] [redacted]

[2] From an economic perspective, market power and monopoly power are interchangeable. For consistency, other than describing Amgen's power in the PCSK9i market, I use the term market power throughout in this report.

iii. [redacted]

[redacted]

e. ***Amgen's exclusionary conduct raised Regeneron's costs.*** Amgen's exclusionary conduct raised Regeneron's costs because [redacted]

f. ***Amgen's exclusionary conduct has harmed consumers, competition, and Regeneron.*** Amgen's conduct has been harmful to competition and to customers, resulting in higher prices, limited choice, and a reduction in innovation in the market. There are no pro-competitive justifications for Amgen's actions. A financial contract that links products across different therapeutic classes provides no benefit to PBMs nor resource savings to any party.

12. This report establishes these findings and conclusions in five main sections. **Sections 3 and 4** describes the relevant markets and products in this case and establishes that Amgen's Enbrel®, Otezla®, and Repatha® each have market power. **Section 5** describes my understanding of Amgen's exclusionary bundling scheme. **Sections 6, 7, and 8** show that Amgen's exclusionary conduct has foreclosed Praluent® from a substantial part of the market for PCSK9i in the U.S. **Section 9** analyzes the harm to competition resulting from Amgen's exclusionary conduct. **Section 10** concludes and is followed by several appendices.

## 3. Relevant Markets and Market Power

13. Defining a relevant market is one tool that antitrust economists use for analyzing monopoly power. At its core, a relevant antitrust market is a set of products that can be profitably monopolized.[3] This concept is embodied in the tool that antitrust economists generally use to identify antitrust markets, which is the hypothetical monopolist test:[4] A set of products

---

[3] Joseph Farrell and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," 10(1) *B.E. Journal of Theoretical Economics* 1, 4 (2010).

[4] Jonathan B. Baker, "Market Definition: An Analytical Overview," 74 *Antitrust Law Journal* 129, 131 (2007).

constitutes a relevant antitrust market if a (hypothetical) single entity that sets the price for all the candidate products can profitably increase prices by at a least a small but significant amount for a sustained period of time, relative to what prices would be in a competitive market.[5]

14. Consumer demand drives this market definition exercise. For example, if the hypothetical monopolist were to increase prices above the competitive price on products in the candidate market, if a sufficient number of customers would turn to alternative products (or forgo purchasing anything) such that the hypothetical monopolist would find the price increase to be unprofitable, that cannot be a relevant market.[6] Generally speaking, the products in a relevant antitrust market are stronger substitutes for at least some of the other products in the relevant market, while products outside the antitrust market are weaker substitutes. Note that this does not mean that zero customers would substitute to products outside the relevant antitrust market following a price increase, just that this substitution is relatively small.[7] There normally would be some degree of substitution outside the market because the demand curve is downward sloping, but the elasticity is small enough that the hypothetical monopolist would still find the price increase to be profitable. In other words, in a relevant market, the amount the hypothetical monopolist earns due to the increase in the margin of price over cost more than makes up for lost sales.

15. It is also worth noting that the bounds of an antitrust market in some cases will correspond to "markets" as they are commonly labeled by industry participants, and in other cases will not. The common usage of the market terminology among industry participants can reflect a variety of factors, some of which may be less directly related to demand substitution in the specific sense used in the hypothetical monopolist test.

16. Relevant antitrust markets have two components: a relevant product market (a set of products) and a relevant geographic market (where those products are sold).[8] For a pharmaceutical product sold in the U.S., the geographic market is generally the entire U.S., since entry and marketing permission is controlled nationally by the U.S. Food and Drug Administration ("FDA"). Moreover, wholesale drug prices are set for the whole country and rebates are made available to PBMs that often operate nationwide.[9]

---

[5] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines [hereinafter "The Merger Guidelines"] §4.3.A (2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

[6] *See, e.g.*, Jonathan B. Baker and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," *Handbook of Antitrust Economics* (Paolo Buccirossi ed., The MIT Press 2008); Baker, *supra* note 4 at 129.

[7] Farrell and Shapiro, *supra* note 3.

[8] The Merger Guidelines, *supra* note 5.

[9] Note that the market is not broader than the U.S. (i.e., a worldwide market) because even though there may be a different set of products approved for use in other countries at any point in time, including generic or biosimilar versions of branded pharmaceuticals, U.S. consumers cannot turn to products sold outside the U.S. if they do not have

### 3.1 PCSK9 Inhibitors

17. As more fully described in the Report of Dr. Robert Eckel, PCSK9 inhibitors were developed to take advantage of a promising mechanism to control cholesterol by enhancing a patient's natural process for removing "bad cholesterol" from the bloodstream. PCSK9 inhibitors were a novel way to provide a next level of control for patients for whom the primary drug therapy (e.g., statins) are insufficient to control cholesterol levels or have undesirable side effects.[10] While there are other alternatives available, none have the same effectiveness as PCSK9 inhibitors in lowering bad cholesterol.[11]

18. Unlike statins, which are relatively small molecules that can be taken orally, PCSK9 inhibitors are biologic products (antibodies) comprised of a sequence of amino acids forming a unique protein that bind to PCSK9 sites. As such they are large molecules that must be administered by injection. Moreover, there are multiple proteins that can bind to the same site and function as a PCSK9 inhibitor.[12]

19. Multiple pharmaceutical companies invested in developing PCSK9 inhibitors. At least two, Pfizer Inc. and AstraZeneca plc, halted development of their products before they came to market.[13] But two received approval from the FDA for sales in the U.S.: Repatha®, which was developed by Amgen and received FDA approval in August 2015; and Praluent®, which was developed jointly by Sanofi and Regeneron and received FDA approval in July 2015.

20. Amgen also received patents that more broadly covered all potential PCSK9 inhibitors that worked in similar fashion to Repatha®. Based on these patents, Amgen filed a patent infringement suit that sought to keep Praluent® off the market. Amgen prevailed in an initial trial,

---

FDA approval. *See* Dep. Tr. J. van Grunsven, Vice President ("VP")/General Manager ("GM") of General Medicine at Amgen, 218:2-4 ("Q. And PCSK9 monoclonal antibodies include only Repatha and Praluent; correct? A. In the U.S. market, yes."); Innovent, "Innovent Announces the NMPA Approval of SINTBILO® (Tafolecimab Injection) for the Treatment of Adult Patients with Primary Hypercholesterolemia and Mixed Dyslipidemia," (Aug. 16, 2023) https://www.innoventbio.com/InvestorsAndMedia/PressReleaseDetail?key=402 (announcing Chinese approval for a drug that is not approved for use in the U.S.); AMG10935-0000503396 at slide 12 (describing a drug approved in EU but not even filed for approval in the U.S.).

[10] Expert Report of Dr. Robert Eckel at ¶ 19.

[11] Expert Report of Dr. Robert Eckel at ¶ 20.

[12] Expert Report of Dr. Robert Eckel at ¶ 53.

[13] Pfizer, "Pfizer Discontinues Global Development of Bococizumab, Its Investigational PCSK9 Inhibitor", (Nov. 1, 2016) https://www.pfizer.com/news/press-release/press-release-detail/pfizer_discontinues_global_development_of_bococizumab_its_investigational_pcsk9_inhibitor; Jonathan Gardner, "AstraZeneca gives up on Ionis' RNA drug for heart disease," *BioPharma Dive* (Sept. 23, 2022), https://www.biopharmadive.com/news/astrazeneca-ionis-antisense-cholesterol-PCSK9-end-trial/632531/.

which was followed by a lengthy appeal process that eventually reached the Supreme Court.[14] In June 2023, the Supreme Court determined that the Amgen patents were overly broad in that they did not sufficiently enable the invention of alternative PCSK9 inhibitors.[15] Accordingly, Praluent® did not infringe Amgen's patents. By April 2021, Amgen had [redacted].[16]

21. More recently in December 2021, Novartis AG received FDA approval for a PCSK9i product called Leqvio® (inclisiran). Unlike Repatha® and Praluent®, which are self-administered injectable monoclonal antibody PCSK9i products dispensed through the pharmacy benefit process, Leqvio® is a small interfering RNA administered by physicians in clinical settings and is provided to consumers through the medical benefit process.[17]

### 3.2 Leqvio® and Other Products Are Not In the Relevant Market

22. Described more fully in **Appendix A**, in the U.S., pharmaceutical drugs are either self-administered by the patient or administered by a physician. Self-administered drugs are

---

[14] *Amgen Inc. v. Sanofi*, 598 U.S. 594 (2023).

[15] *Id.*

[16] AMG10935-0000013130 at 131 (April 2021 preliminary LRS). *See generally* Dep. Tr. D. Zimmer, VP of U.S. Value & Access at Amgen, 280; *id.* at 288 ([redacted]).

[17] *See* Dep. Tr. J. Ryan, Head of Cardiometabolic and Rare Disease Business Unit at Regeneron, 339:19-341:6 ("[redacted]"). Dep. Tr. R. Pordy, Vice President of Clinical Services, Internal Medicine at Regeneron, 235:22-236:9 ("Q. So we just talked about why, but how Praluent as compared to Repatha. From your perspective as a physician, is Leqvio a therapeutic alternative to Praluent? […] [redacted] 238:7-11 [redacted]

typically acquired by the patient from a pharmacy and taken at home.[18] These drug purchases are typically covered as an insurance "prescription drug benefit" where the patient pays only a co-payment to the pharmacy. For Medicare, such a "prescription drug benefit" falls under Part D. Repatha® and Praluent® are both self-administered drugs that patients acquire from a pharmacy.

23. Physician-administered drugs are drugs that are not taken at home by the patient, but are administered—usually injected or infused—by a clinician in a clinical setting (e.g., in a physician's office). These drug purchases are typically covered as a "medical benefit" where the physician buys the drug, administers it to the patient, and then bills an insurance company.[19] For Medicare, such a "medical benefit" falls under Part B.

24. Unlike Repatha® and Praluent®, Leqvio® is a medical benefit drug, and is thus not typically dispensed through the pharmacy benefit procedures. Repatha® and Praluent® compete in a relevant market for PCSK9i products sold through the pharmacy channel, and Leqvio® does not.[20] This is corroborated by consumer experience (i.e., how the consumer receives the product), manufacturer experience (i.e., the different chemical composition of the products), and the distribution (i.e., PBMs control the consumer acquisition of Repatha® and Praluent® whereas Leqvio® is acquired via the medical benefit process outside of PBMs). Data from IQVIA show that [redacted].[21]

25. Amgen's internal documents acknowledge that the 2022 entry of Leqvio® did not constrain the price of Repatha®. This was Amgen's belief as well: in its internal forecasting materials (known as "Long Range Scenarios" or "LRS"), Amgen included an assumption that [redacted]

---

[18] Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Volume 2 at 813 (2012).

[19] AMG10935-0000615954 at 954 ([redacted]").

[20] *See FTC v. Amgen*, No. 23-3053, Dkt. No. 130, Mem. by Amgen in Opp'n to Pl.s' Motion for Prelim. Inj., at 3 (N.D. Ill. Aug. 22, 2023) ("[Pharmacy benefits and medical benefits] are vastly different reimbursement mechanisms, with meaningful substantive differences in the biopharmaceutical industry. As a result, bundling unrelated products in contracts across pharmacy and medical benefits (i.e., 'cross-benefit bundling') has never been done by Amgen—or, as best anyone can tell, by anyone in the way Plaintiffs hypothesize—and party witnesses and have testified it cannot feasibly be done due to differences in how pharmacy benefit and medical benefit drugs are covered, paid for and administered.").

[21] *See* AMG10935-DATA-0000000056-AMG10935-DATA-0000000075 (IQVIA LAAD MX); AMG10935-DATA-0000000076-AMG10935-DATA-0000000095 (IQVIA LAAD RX). Analysis based on these data sources. Data reports claims through Medical and Pharmaceutical claims for Leqvio® between January 2022 and July 2023.

[redacted] As Amgen described in the 2020 Repatha LRS, Leqvio® will have [redacted][23]

26. [redacted] Nexletol/Nilemdo (bempedoic acid) was approved for sale in the U.S. in 2020 and is distributed by Esperion Therapeutics, Inc.[24] Amgen refers to bempedoic acid as [redacted] Amgen's 2020 LRS notes that [redacted]" and [redacted].[25] Consistent with this conclusion, Amgen explained that, [redacted][26]

### 3.2.1 Amgen's internal documents explain that Praluent® is the only product that competitively constrains the price of Repatha®

27. Unlike Leqvio®, Amgen's internal documents identify Praluent® as a competitive constraint on Repatha®'s pricing. For example, in 2019 and 2020, Amgen forecasted [redacted]

---

[22] *See, e.g.*, AMG10935-0000548061 at slide 10 (Amgen "Repatha 2020 LRS" presentation on slide titles, [redacted].

[23] AMG10935-0000722094 at slide 9 (Amgen Repatha® 2020 LRS). *See also* AMG10935-0000633387 at 387-389 (describing [redacted]"); AMG10935-0000639608 at 609 ( [redacted] ); AMG10935-0000624891 at slide 13 ("[redacted] ).

[24] *See* Epresion, "Esperion Announces Two Data Presentations of NEXLETOL® (bempedoic acid) Tablet at the ESC Congress 2020," (Aug. 2020), https://www.esperion.com/news-releases/news-release-details/esperion-announces-two-data-presentations-nexletolr-bempedoic ("NEXLETOL was approved by the U.S. Federal Drug Administration (FDA) on February 21, 2020 and by the European Commission on April 6, 2020 under the name NILEMDO (bempedoic acid)"); Esperion, Annual Report (Form 10-K) (December 31, 2020), https://www.esperion.com/static-files/240b8a8b-dffd-4969-bc69-cf80fd1ce864; U.S. Food and Drug Administration, "Nexletol™ (bempedoic acid) package insert," at 1 (Feb. 2020), https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/211616s000lbl.pdf ("NEXLETOL (bempedoic acid) tablets, for oral use Initial U.S. Approval: 2020").

[25] AMG10935-0000140890 at slide 12; *see also* AMG10935-0000548061 at slide 53 (Amgen Repatha 2020 LRS: slide header highlighting "[redacted]").

[26] AMG10935-0000503396 at slide 21 (Amgen presentation "2021 Global Long-Range Strategy (LRS) Guidance").

[redacted] [27]).[28] However, when Amgen modified its "[redacted][29]

28. The price competition [redacted] is consistent with my understanding of the factors influencing demand and substitution for PCSK9i products. These therapies are generally used only with patients for whom statins are insufficient to control cholesterol levels or have undesirable side effects. Because they are much more expensive than statins, increases in price for PCSK9i products will not induce doctors to substitute statins or other cheaper cholesterol therapies—if such alternatives were medically adequate for a patient, the healthcare provider ("HCP") would not have turned to PCSK9i therapies.[30]

29. We do not need to speculate about what prices for Repatha® would be if it did not have to compete against Praluent® because [redacted] and thus that a market that includes only Repatha® and Praluent® satisfies the hypothetical monopolist test.

30. Moreover, Amgen's internal documents describing the price competition between Repatha® and Praluent® [redacted]

---

[27] The "Patent Litigation" refers to *Amgen v. Sanofi*, Civil Action No. 14-1317-RGA.

[28] AMG10935-0000140890 at slide 12; *id*. at slide 20 [redacted]

[29] AMG10935-0000779420 at slide 4. *C.f.* AMG10935-0000779420 at slides 5, 12; AMG10935-0000544590 at slide 30.

[30] Note that statins also have the advantage for patients of being an oral medication, whereas PCSK9i products are administered by injection. Therefore, PCSK9i products are all the more likely to be used only for patients who need some therapy other than statins.

[31] AMG10935-0000779420 at slides 4, 5, 12; AMG10935-0000544590 at slide 30. This is consistent with Amgen's allegations in the Patent Litigation that it suffered price erosion due to competition from Regeneron. *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 870, Def. Amgen's Br. in support of Permanent Inj., 1 (D. Del. March 18, 2019) (claiming that Praluent® was "eroding both Amgen's market share, which should be 100%, and Repatha's net price"); *id*. at 2, 5, 7 (complaining of "aggressive price competition," loss of market share for Repatha®, and an "unprecedented downward spiral of lower net prices" due to "head-to-head competition" from Praluent® in the PCSK9i market).

[redacted] t®. In other words, Amgen's documents [redacted] ®.

### 3.2.2 PBMs also view Praluent® and Repatha® as the only products in the U.S. PCSK9i market

31. Throughout the relevant period in this case, the only PCSK9 inhibitors in the PCSK9i class for PBM formulary decisions were Repatha® and Praluent®.[32] As a result, a PBM would respond to a significant increase in net price by either Praluent® or Repatha® (but not both) by reconsidering formulary placement, and potentially giving more favorable placement to the product offering a lower net price. This substitution leads to price competition between Repatha® and Praluent®, and constrains the net prices for both products.[33]

### 3.2.3 Barriers to entry into the PCSK9i market are high

32. Barriers to entry are generally very high in pharmaceutical markets given the large R&D costs, regulatory hurdles, and lengthy time period necessary for FDA approval to be able to sell a new product,[34] along with the patent protection for existing products. Because of these costs and the time lag in bringing a new product to market, new entry is unlikely to constrain the exercise of monopoly power for firms selling a patent-protected pharmaceutical product unless and until a similar product makes it through the development and regulatory hurdles. A biosimilar cannot enter until the patent term expires. As noted above, multiple PCSK9i products that had been

---

[32] *See, e.g.*, Dep. Tr. D. Zimmer, VP of U.S. Value & Access at Amgen, 208:5-6 ("[redacted]); *see also* Dep. Tr. J. van Grunsven, VP/GM of General Medicine at Amgen, 43:22-24, 44:5-6 ( [redacted] "); AMG10935-0000548061 at slide 9 [redacted]

[33] Dep. Tr. J. Witter (Zinc 30(b)(6)), 91:21-93:19 ("[redacted]

[34] *See* Dep. Tr. M. Gordon, Executive Vice President ("EVP") of Global Commercial Operations at Amgen, 22:13-25 [redacted].").

in development were withdrawn before obtaining regulatory approval. Meanwhile, the patents for Repatha® will prevent entry of biosimilar products until at least 2030.

## 4. The Products Involved in Amgen's Anticompetitive Scheme to Monopolize the U.S. PCSK9i Market

33. As I discuss more fully in **Sections 5-8** below, Amgen's anticompetitive scheme to monopolize the U.S. PCSK9i market consisted of imposing substantial monetary penalties on its must-have auto-immune products (Enbrel® and/or Otezla®) that were conditional on PBMs giving preferred formulary placement to Repatha®. These conditional penalties coerced PBMs to exclude Regeneron's PCSK9i Praluent® from the PBMs' formularies. The effect of Amgen's anticompetitive commercial strategy on Praluent®'s sales has been substantial, as Praluent® is now excluded from 80% of the U.S. PCSK9i market. To understand the effect Amgen's anticompetitive commercial strategy had on the U.S. PCSK9i market, I first analyze what products Amgen included in the bundled rebate offers Amgen made to PBMs.

### 4.1 Repatha® is A Central Pillar of Amgen's Long-Term Strategy

34. As discussed above, the relevant market in which to analyze the effects of Amgen's exclusionary monopolization strategy is the U.S. PCSK9i market, in which Repatha® and Praluent® compete. Amgen's anticompetitive strategy to monopolize the U.S. PCSK9i market was driven by Amgen's desire to grow Repatha® into its next blockbuster product. According to Amgen's Chief Executive Officer Robert A. Bradway, [redacted][36]

35. Amgen's internal documents [redacted],[37] and that [redacted]

---

[35] Dep. Tr. R. Bradway, Chief Executive Officer ("CEO") and Chairman of Amgen, 103:1-3 ( [redacted] *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 912, Decl. Robert A. Bradway in support of Amgen's Mot. Permanent Inj., ¶ 12 (D. Del. Mar. 25, 2019).

[36] AMG10935-0000221594 at slide 13 ( [redacted]; AMG10935-DATA-0000001411 ( [redacted].

[37] AMG10935-0000924565 (Bradway Exhibit 4) at 565 ( [redacted]; AMG10935-0000309444 (Bradway Exhibit 6) at 445 ( [redacted]); AMG10935-0000440691 (Bradway Exhibit 7) at 693 (Mr [redacted]"); Dep. Tr. R. Bradway, CEO and Chairman of Amgen, 109:16-20 ("Q. (…) [redacted]

[redacted] As of early 2019, Amgen expected [redacted]."[40]

36. Repatha®, however, faced substantial head-to-head competition from Regeneron's PCSK9i drug Praluent®. Mr. Bradway stated that [redacted]"[41] In addition to creating substantial competition for market share, Amgen [redacted]

37. The record in this case demonstrates that Amgen engaged in exclusionary conduct that protected Repatha® from the need to compete with Praluent® on the merits.

### 4.2 Amgen's Revenue Driving Auto-immune Product Portfolio

38. Since 2019, more than 30% of Amgen's total annual U.S. gross product sales has come from two products in Amgen's auto-immune product portfolio—Otezla® and Enbrel®.[43] As more fully described below, Otezla® and Enbrel® are not only must-have products from a PBM-perspective but dwarf the total annual U.S. gross sales attributable to Repatha® and

---

[38] [redacted]

[39] AMG10935-0000926663 (Bradway Exhibit 3) at 663.

[40] AMG10935-0000077348 (West Exhibit 30) at 349.

[41] *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 912, Decl. Robert A. Bradway, CEO and Chairman of Amgen, in support of Amgen's Mot. Permanent Inj., ¶ 14 (D. Del. Mar. 25, 2019).

[42] AMG10935-0000919698 at 711.

[43] *See* Amgen, Amgen 2019 Letter to Shareholders, at 48, 52 (March 31, 2020), https://investors.amgen.com/static-files/d45cb739-9637-4e13-856c-e2fc29571032 (Results of Operations Chart for year end Dec. 31, 2019 for the U.S., estimates combined Enbrel® and Otezla® total product sales of U.S. product sales of 31.3%); Amgen, Amgen 2020 Letter to Shareholders, at 64-65 (March 30, 2021), https://investors.amgen.com/static-files/c1b90d85-8945-4d11-8d1c-5ddc343fb699 (Results of Operations Chart for year end Dec. 31, 2020 for the U.S., estimates combined Enbrel® and Otezla® total product sales of U.S. product sales of 36.9%); Amgen, Amgen 2021 Letter to Shareholders, at 58-59 (March 29, 2022), https://investors.amgen.com/static-files/1789c7c6-0a07-49d4-bd81-e1afc7cb1f6d (Results of Operations Chart for year end Dec. 31, 2021 for the U.S., estimates combined Enbrel® and Otezla® total product sales of U.S. product sales of 35.6%); Amgen, Amgen 2022 Letter to Shareholders, at 59-60 (March 30, 2023), https://investors.amgen.com/static-files/cb90e5d6-72b9-4291-ba59-85281072b4be (Results of Operations Chart for year end Dec. 31, 2022 for the U.S., estimates combined Enbrel® and Otezla® total product sales of U.S. product sales of 33.4%).

Praluent®. It is my opinion that Enbrel® and Otezla® have significant market power in their respective markets.

#### 4.2.1 Enbrel® has significant market power

39. Enbrel® (etanercept) is a biologic product (an antibody) developed by Immunex Corporation, which Amgen acquired in 2002 for about $16 billion.[44] Enbrel® was first approved for the treatment of rheumatoid arthritis in the U.S. in 1998, and has now been approved for the treatment of various inflammatory diseases, including rheumatoid arthritis, psoriatic arthritis, and plaque psoriasis in adults and juveniles.[45] While various biosimilars for etanercept have been approved in other countries, in the U.S. Enbrel® is under patent protection until at least 2028.[46] Enbrel® was the second largest product to treat rheumatoid arthritis in 2018,[47] and its market share (in units) of scripts written by rheumatologists from Q4 2018 to Q4 2019 was 26-28%.[48]

40. In 2022, Enbrel® was Amgen's largest product both in the U.S. and worldwide with over $4 billion in sales and accounted for 22.8% of Amgen's 2022 U.S. sales

---

[44] FTC, "Resolving Anticompetitive Concerns, FTC Clears $16 Billion Acquisition of Immunex Corp. By Amgen Inc." (July 12, 2002), https://www.ftc.gov/news-events/news/press-releases/2002/07/resolving-anticompetitive-concerns-ftc-clears-16-billion-acquisition-immunex-corp-amgen-inc.

[45] Amgen, "FDA Approves Expanded Use Of ENBREL® (etanercept) To Treat Children With Chronic Moderate-To-Severe Plaque Psoriasis" (Nov. 14, 2016), https://www.amgen.com/newsroom/press-releases/2016/11/fda-approves-expanded-use-of-enbrel-etanercept-to-treat-children-with-chronic-moderatetosevere-plaque-psoriasis.

[46] Jonathan Stempel, "Amgen patents on top-selling arthritis drug Enbrel upheld, shares rise," *Reuters* (July 1, 2020), https://www.reuters.com/article/amgen-novartis-enbrel/amgen-patents-on-top-selling-arthritis-drug-enbrel-upheld-shares-rise-idINKBN2426D6/; *see also* AMG10935-0000911943 (Gordon Exhibit 5) at 943-45 ([redacted]); M. Gordon Dep. Tr. at 73:19-77:14 (same).

[47] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 67:25-68:3 ([redacted].").

[48] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 67:1-18 ([redacted]); AMG10935_OCO-0000093248 at 270 (Amgen Board of Directors Meeting Commercial and Financial Update dated) (same).

revenues.[49] As a blockbuster drug that consistently generates enormous sales, Enbrel® wields significant market power as evidenced by its broad coverage on PBM formularies, its role in Amgen's bundling scheme discussed below, and its consistently high margins that have been minimally impacted by new entry.

41. Based on evidence I have reviewed in this case, [redacted].[50] For example, since 2021, [redacted].[51] Enbrel®'s broad formulary coverage confirms that PBMs perceive there to be few substitutes in practice for Enbrel®, which is in itself evidence that Enbrel® has substantial market power. In fact, Amgen documents [redacted].[52]

42. In addition, in July 2020, 21 years post-launch, Enbrel® remained the [redacted]"[53] This made Enbrel® critical to Amgen's exclusionary strategy because PBMs could not risk losing Enbrel® value by refusing to exclude Praluent®. [redacted]®[54]—fueled by the enormous rebate revenues

---

[49] Amgen, "Amgen reports fourth quarter and full year 2022 financial results" (January 31, 2023), https://www.amgen.com/newsroom/press-releases/2023/01/amgen-reports-fourth-quarter-and-full-year-2022-financial-results (FY'22 Enbrel® gross product sales: $4,044 million (U.S.), $73 million (Rest of World), $4,117 (total); FY'22 Amgen total U.S. gross product sales: $17,743 million (U.S.), $7,058 (Rest of World), $24,801 million (total)).

[50] *See, e.g.*, [redacted].

[51] AMG10935-0000615954 at 955 ([redacted]1); AMG10935-0000902195 at 198 ([redacted] *See also* AMG10935-0000525947 (Gordon Exhibit 6) [redacted].") (emphasis added).

[52] *See, e.g.*, AMG10935-0000009524 at slide 5 [redacted]

[53] AMG10935-0000225995 (Gordon Exhibit 7) at 997; *see also* Dep Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 95:19-98:01.

[54] *See, e.g.*, Dep. Tr. J. Norton, former VP of Market Access at Amgen, 99:7-20 [redacted]").

[redacted]—allowed Amgen to [redacted]

43. [redacted] There is a [redacted] The ability to achieve and maintain high and increasing margins for Enbrel® despite new entry is evidence that Enbrel® enjoys significant market power and will continue to do so through at least 2025.

#### 4.2.2 Otezla® has significant market power

44. Otezla® (apremilast), which was originally developed by Celgene Corporation, was acquired by Amgen for $13.4 billion as a required divestiture during the Federal Trade Commission's ("FTC") investigation and resolution of Bristol-Myers Squibb Company's acquisition of Celgene.[60] Otezla® is used principally as a treatment for psoriasis and psoriatic

---

[55] *See, e.g.*, AMG10935-0000544764 at slide 12 [redacted]").

[56] *See* Express_Scripts_1330_00007167 (Dep. J. Kitson (ESI 30(b)(6)) Ex. 5) at 168-69 [redacted] (emphasis added). *See also* Express_Scripts_1330_00003912 [redacted].

[57] [redacted] is consistent with Enbrel® being a self-injected biologic product (molar mass of 51,235 g/mol) versus Otezla® which is an orally administered drug (molar mass of 460.5 g/mol). *See* Drugbank, "Etranercept," available at https://go.drugbank.com/drugs/DB00005; FDA Label, "Otezla," at 9, available at https://www.pi.amgen.com/-/media/Project/Amgen/Repository/pi-amgen-com/Otezla/otezla_pi_english.pdf.

[58] AMG10935_OCO-0000086477 at 525.

[59] *See, e.g.*, AMG10935-0000545187 at slide 2-3 ([redacted]

[60] FTC, "FTC Approves Final Order Requiring Bristol Myers Squibb Company Celgene Corporation Divest Psoriasis Drug Otezla as a Condition of Acquisition", (Jan. 13, 2020) https://www.ftc.gov/news-events/news/press-releases/2020/01/ftc-approves-final-order-requiring-bristol-myers-squibb-company-celgene-corporation-divest-psoriasis ("In the largest divestiture that the FTC or the U.S. Department of Justice has ever required in a merger enforcement matter, Bristol-Myers Squibb will divest to Amgen, Inc., for $13.4 billion, Celgene's Otezla—the most popular oral treatment in the United States for moderate-to-severe psoriasis."). The net price accounting for expected

arthritis, and has patent exclusivity in the U.S. through at least 2028.[61] Amgen has distinguished Otezla® as an oral treatment for moderate to severe psoriasis and psoriatic arthritis, in contrast with other products on the market that are administered by injection.[62] As articulated by the FTC during its review of Amgen's acquisition of Otezla®, Otezla®'s unique characteristics compared to other psoriasis treatments, its broad coverage and indications, and its high margins render Otezla® "the most significant" product on the market for the "research, development, manufacture, and sale of oral products to treat moderate-to-severe psoriasis," in the U.S.[63]

45. In 2022, Otezla® was Amgen's third largest product by sales, accounting for 10.6% of Amgen's 2022 U.S. sales revenues.[64] After Amgen acquired Otezla®, Amgen internal documents acknowledge [redacted]

---

tax benefits was $11.2 billion. *See* Press Release, *Amgen*, "Amgen To Acquire Otezla® For $13.4 Billion In Cash, Or Approximately $11.2 Billion Net Of Anticipated Future Cash Tax Benefits," (Aug. 26, 2019), https://www.amgen.com/newsroom/press-releases/2019/08/amgen-to-acquire-otezla-for-134-billion-in-cash-or-approximately-112-billion-net-of-anticipated-future-cash-tax-benefits.

[61] Amgen, "Amgen Wins Patent Appeal on Otezla (Apremilast)," (Apr. 19, 2023), https://www.amgen.com/newsroom/press-releases/2023/04/amgen-wins-patent-appeal-on-otezla-apremilast.

[62] *See, e.g.*, AMG10935-0000009524 at slide 9 ( [redacted] Amgen Earnings Call Transcript, Amgen, (Jan. 31, 2023), https://news.alphastreet.com/amgen-inc-amgn-q4-2022-earnings-call-transcript/ ("**So first on Otezla, I would start with the fact that we are the only systemic product indicated for a broad range of psoriasis patients without regard to the severity, and really makes us the ideal first-line first systemic post-topical choice of therapy**. . . . As I mentioned just a few moments ago, Otezla also enjoys very broad frontline access, that is it doesn't require that you step through another systemic therapy. And it also means that prescribers can make it the first choice. And these are busy dermatologists. They want something that's easy. . . . . Only Otezla offers that in the psoriasis market.") (emphasis added); AMG10935-0000225995 (Gordon Exhibit 7) at 998 ( [redacted] )").

[63] Complaint, *In the Matter of Bristol-Myers Squibb Co. and Celgene Corp.*, at 2 (Nov. 15, 2019), https://www.ftc.gov/system/files/documents/cases/bms-celgene_complaint.pdf. *See also* FTC, "FTC Approves Final Order Requiring Bristol-Myers Squibb Company and Celgene Corporation to Divest Psoriasis Drug Otezla as a Condition of Acquisition," (Jan. 13, 2020) https://www.ftc.gov/news-events/news/press-releases/2020/01/ftc-approves-final-order-requiring-bristol-myers-squibb-company-celgene-corporation-divest-psoriasis ("In the largest divestiture that the FTC or the U.S. Department of Justice has ever required in a merger enforcement matter, Bristol-Myers Squibb will divest to Amgen, Inc., for $13.4 billion, Celgene's Otezla—the most popular oral treatment in the United States for moderate-to-severe psoriasis.").

[64] Amgen, "Amgen reports fourth quarter and full year 2022 financial results," (Jan. 31, 2023), https://www.amgen.com/newsroom/press-releases/2023/01/amgen-reports-fourth-quarter-and-full-year-2022-financial-results.

[65] AMG10935-000865288 at 288.

[redacted][66] Indeed, Amgen documents indicate [redacted],[67] and, importantly, since Amgen did not develop the drug itself, the associated profits are not related to recovering R&D costs but are instead an anticipation of a stream of significant profits. As evidenced by [redacted].[68]

46. Sotyktu™, the only other currently available oral plaque psoriasis treatment, was launched in Q4 2022 and has had limited impact on Otezla®'s price or revenues, as Amgen documents predicted, because it is a differentiated product.[69] For example, Amgen's 2022 internal forecasts predicted that the net price for Otezla® would be higher in 2024 than it was in 2021 despite Sotyktu™'s anticipated entry.[70] This is because Otezla® has distinct characteristics that Sotyktu™ lacks,[71] including its broader indications[72] and coverage.[73] In fact, confident in the wider net it casts in both indication and coverage, Amgen sees Otezla® as

---

[66] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 143:13-145:11 (discussing AMG10935-0000911788 (Gordon Exhibit 11): [redacted]").

[67] AMG10935-0000868079 at slide 34; AMG10935-0000872308 (Gordon Exhibit 10) at 310 [redacted].").

[68] *See, e.g.*, AMG10935-0000225995 at 995 [redacted]"); *id.* at 998 ("[redacted]

[69] *See* Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 99:23-100:4 ("[redacted]"), 119:7-15 [redacted]), 118:9-15 ([redacted]").

[70] AMG10935_OCO-0000086477 at 504.

[71] *See* AMG10935-0000872305 at 305 [redacted]…").

[72] While Sotyktu™, like Otezla®, is used to treat psoriasis, it targets a different protein, TYK2, than either Otezla® or Enbrel®. *See* AMG10935-0000148145 at slide 2 ("[redacted].").

[73] *See, e.g.*, AMG10935-0000544764 at slide 2 ([redacted].

"uniquely positioned to grow in 2024 and beyond."[74] And [redacted]

47. In contrast to the [redacted]™, Amgen's LRS [redacted][76] This forecast demonstrates that Otezla®'s price today [redacted]

48. Finally, Amgen's [redacted] Even after deducting marketing and other operating expenses, [redacted][78] The high and increasing margins for Otezla®, despite new entrants like Sotyktu™, evidence significant market power through at least 2025.[79]

### 4.2.3 The power of Amgen's auto-immune portfolio

49. Ownership of Enbrel® and Otezla® gave Amgen [redacted][80] and [redacted][81] [redacted].[82] Once it began contemplating acquiring Otezla®,

---

[74] Amgen Q4 2023 Earnings Call Tr. (Feb. 2024), https://seekingalpha.com/article/4668054-amgen-inc-amgn-q4-2023-earnings-call-transcript.

[75] AMG10935-0000868079 at slide 5, 9 ([redacted]

[76] AMG10935_OCO-0000086477 at 504 (Amgen's "USBO 2022 May LRS" presentation).

[77] *Id.* at 508.

[78] *Id.*

[79] *See* Amgen Q4 2022 Earnings Call Tr. (Feb. 2023), https://news.alphastreet.com/amgen-inc-amgn-q4-2022-earnings-call-transcript/ ("Otezla also enjoys very broad frontline access. . ."); Amgen, Annual Report (Form10-K), 4, 58 (Feb. 2023), https://investors.amgen.com/node/33691/html (showing that Enbrel® is Amgen's largest single product in terms of net sales generated).

[80] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 124:7-18.

[81] *See* AMG10935-0000545187 at slide 2 ("[redacted]).

[82] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 147:9-149:4.

[redacted][84] Amgen set up an arrangement for bundling the two.

## 5. Amgen's Anticompetitive Strategy to Monopolize the U.S. PCSK9i Market

### 5.1 Amgen's Patent Litigation to Exclude Praluent® from the U.S. PCSK9i Market

50. Amgen's strategy to monopolize the U.S. PCSK9i market began in October of 2014 when Amgen sued Regeneron in Federal District Court in the District of Delaware seeking to enjoin the manufacture and sale of Praluent® in the U.S. ("Amgen's Patent Lawsuit").[85] In connection with Amgen's development of Repatha®, Amgen applied for and received U.S. patents that covered all potential PCSK9 inhibitors that worked in a similar fashion to Repatha®.[86] Amgen's Patent Lawsuit alleged that Regeneron's Praluent® infringed Amgen's patent and sought to enforce its patent rights to permanently exclude Regeneron's Praluent® from the U.S. PCSK9i market.

51. Amgen alleged that its patents entitled it to a monopoly in the PCSK9i market and that Praluent® was "eroding both Amgen's market share, ***which should be 100%***, and

---

[83] *Id.* at 135:11-138:12.

[84] AMG10935-0000865288 at 291 (Amgen "US Inflammation Franchise 2020-21" Memo of July 15, 2020).

[85] *Amgen v. Sanofi*, No. 14-01317 (D. Del. Oct. 17, 2014). Praluent® was created by both Regeneron and Sanofi through a global collaboration agreement and "invented by Regeneron using the company's proprietary VelocImmune® technology that yields optimized fully-human monoclonal antibodies." Regeneron, "Regeneron and Sanofi Offer Praluent (Alirocumab) at a New Reduced U.S. List Price," (Feb. 2019), https://investor.regeneron.com/news-releases/news-release-details/regeneron-and-sanofi-offer-praluentr-alirocumab-new-reduced-us#:~:text=About%20Praluent&text=Praluent%20was%20developed%20by%20Regeneron,optimized%20fully%2Dhuman%20monoclonal%20antibodies. As part of the agreement Regeneron "is solely responsible for the development and commercialization of Praluent in the United States and Sanofi is responsible for the development and commercialization of Praluent outside the United States." Regeneron, Annual Report (Form 10-K) (Dec. 31, 2023), https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000872589/000180422024000009/regn-20231231.htm.

[86] *See* Joseph D. Rutowski et al, "Supreme Court Unanimously Affirms Amgen Repatha® Antibody Patents Invalid for Lack of Enablement," *Mintz* (May 2023) https://www.mintz.com/insights-center/viewpoints/2231/2023-05-25-supreme-court-unanimously-affirms-amgen-repathar ("Amgen obtained patents directed to antibodies which bind to PCSK9 and inhibit its binding to LDL receptors, including U.S. Patent Nos. 8,829,165 and 8,859,741. These patents claim a genus of antibodies that 'bind to specific amino acid residues on PCSK9' and 'block PCSK9 from binding to [LDL receptors].'").

Repatha's net price."[87] In seeking a permanent injunction to take Praluent® off the market, Amgen complained of "aggressive price competition", loss of market share for Repatha® due to Regeneron "aggressively chasing market share", and an "unprecedented downward spiral of lower net prices" due to "head-to-head competition" from Praluent®.[88]

52. Amgen's internal documents reflect [redacted]:

**Figure 1: Amgen's 2019 Long Range Strategy Forecast of Repatha® Net Sales and Prices[89]**

[redacted]

53. As evidenced by Amgen's internal documents, [redacted] et.[90] Amgen [redacted] S.

---

[87] *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 870, Def. Amgen's Br. ISO Permanent Inj., 1 (D. Del. March 18, 2019); Dep Tr. R. Bradway, CEO and Chairman at Amgen, 83:16-22 [redacted]).

[88] *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 870, Def. Amgen's Br. ISO Permanent Inj., 2, 5, 7 (D. Del. Mar. 18, 2019).

[89] AMG10935-0000311298 (van Grunsven Exhibit 14) at slide 3 (Amgen 2019 LRS Update).

[90] AMG10935-0000311298 (van Grunsven Exhibit 14) at slide 7 (Amgen 2019 LRS Update).

[redacted][92]

54. By August of 2019, Amgen's Patent Lawsuit failed to remove Praluent® from the market when the District of Delaware rendered a ruling in favor of Regeneron.[93] Even though Amgen [redacted]"[94] in the Federal Circuit and, eventually at the Supreme Court—both of which rejected Amgen's appeals[95]—in parallel, Amgen continued to assume that it would prevail.

55. However, Amgen's 2019 Patent Litigation loss [redacted]®. Amgen internal documents [redacted].[96] Overall, from 2020 to 2024, Amgen predicted that competitive pressure from Praluent® would lower forecasted revenues by $874 million over four years and [redacted][97] As explained above, the price competition driven by Praluent®'s continued presence in the U.S. PCSK9i market [redacted]

---

[91] AMG10935-0000311298 (van Grunsven Exhibit 14) at slide 9 (Amgen 2019 LRS Update).

[92] AMG10935-0000919698 at 699 ("[redacted]").

[93] *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 1050 (D. Del. Aug. 28, 2019) (The Court denied judgement as a matter of law ("JMOL") on the issue of written description and, on a separate issue, granted JMOL finding a lack of enablement. Amgen's motion for permanent injunction was dismissed as moot).

[94] AMG10935-0000215204 (Gordon Exhibit 15, Bradway Exhibit 9) at 204 ("[redacted]").

[95] *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. No. 1050 (D. Del. Aug. 28, 2019).

[96] AMG10935-0000016303 at slides 2, 3, 4 (Amgen August 2020 LRS).

[97] *Id.*

**Figure 2: Comparison of Amgen's 2019 and 2020 Forecasted Repatha® Net Prices Per** [redacted] [98]

56. In April 2021, [redacted] [100]

[98] **Sources:** [1] AMG10935-0000311298 at slides 3-4 (REPATHA 2019 LRS UPDATE). [2] AMG10935-0000016303 at slide 9 (REPATHA AUG LRS 2020).

[99] AMG10935-0000013130 at 131 (April 2021 Preliminary LRS).

[100] AMG10935-0000779420 at slides 4, 5, 12 (Repatha® Preliminary 2021 May LRS); AMG10935-0000544590 at slide 30 (Repatha® Preliminary 2021 May LRS, including slides on supporting details).

**Figure 3: Amgen's Preliminary Repatha® Long Range Strategy Forecast, April 2021**[101]

[redacted]

### 5.2 Amgen's Exclusionary Commercial Strategy to Foreclose Praluent® from the U.S. PCSK9i Market

57. After Amgen's District of Delaware Court loss in August of 2019, and in the face of continued competition from Regeneron, Amgen enacted an anticompetitive commercial strategy to substantially foreclose Praluent® from the U.S. PCSK9i market.[102] Amgen's exclusionary commercial strategy to foreclose Praluent® from the U.S. PCSK9i market [redacted]). In short, Amgen has made its Cross-Therapeutic Bundle attractive to PBMs by making the alternative—refusing it—too expensive.

58. Since January of 2020, Amgen has offered and/or contracted its Cross-Therapeutic Bundle with each of the largest PBMs in the U.S.—Express Scripts, Inc., OptumRx, and CVSCaremark—as well as with other PBMs, including Humana.

---

[101] AMG10935-0000544590 at slide 30.

[102] AMG10935-0000311298 (van Grunsven Exhibit 14) at slide 2 [redacted]").

### 5.2.1 The role of PBMs

59. PBMs control their covered patients' access to, and utilization of, pharmacy benefit drugs like Enbrel®, Otezla®, Praluent®, and Repatha® by listing these drugs on their formularies. PBMs give covered pharmacy benefit drugs different types of coverage: relevant to my analysis in this report, "preferred" (as opposed to non-preferred, which means the drug is generally not covered by the prescription health benefit plan) or "exclusive" coverage (meaning the drug is the only one on a PBM's formulary in its class such that any other drugs in the same class are excluded from coverage).[103]

60. Importantly, there has been increasing consolidation among health insurers and PBMs in recent years, where large health insurers now own PBMs, group purchasing organizations ("GPOs"), pharmacies, and in some cases, even health care providers. As described in **Section 11.1.1.4**, as part of this consolidation, GPOs that negotiate rebate agreements with drug manufacturers on behalf of PBMs and their health plans have become increasingly important. These new GPOs include Ascent Health Services LLC ("Ascent"), which negotiated on behalf of Express Scripts Inc. ("ESI") and its clients (collectively, "Ascent/ESI"); Emisar Pharma Services LLC ("Emisar"), which negotiated on behalf of OptumRx (collectively "Emisar/OptumRx"); and Zinc Health Services ("Zinc"), which negotiated on behalf of CVSCaremark and CVS Health (collectively, "Zinc/CVS"). As explained in detail in the report of Heather Bates, each of these PBMs contract on behalf of numerous clients, including, among others, Cigna Healthspring, Prime Therapeutics, UnitedHealthcare ("UHC"), Anthem, WellCare Health Plans, and Kaiser Permanente.[104] This has resulted in the three GPOs controlling the formularies covering the vast majority of covered lives in the U.S., and thus amplifying the spillover effects of the prescription drug coverage driven by a single rebate agreement.

61. As explained in contemporaneous Amgen documents, [redacted]."[105] For example, a slide from an internal Amgen presentation, included here as **Figure 4**, [redacted]."[106] [redacted] As Amgen internal documents

---

[103] *See* Expert Report of Heather Bates, ¶ 29. ("Coverage corresponding to a 1:1 bid, or 'exclusive' coverage, in a two-player market ensures that only one product receives coverage and the other is either not listed on the formulary or considered non-preferred and controlled by restrictive utilization management techniques like step therapy or prior authorization requirements. Formulary positioning for a 1:2 bid instead typically ensures coverage of both products in a two-product market, each covered in a parity position relative to one another.").

[104] *Id.* at ¶ 10.

[105] AMG10935-0000115173 at slide 7.

[106] AMG10935-0000077098 at 098 (slide titled in part, "OVERVIEW OF BIG THREE PBM").

acknowledge[107] and illustrate, [redacted]

**Figure 4: Amgen Presentation Titled "US Value & Access LRS Trends"[108]**

[redacted]

### 5.2.2 Amgen did not want Repatha® to compete head-to-head with Praluent®

62. As a result of persistent competition from Praluent®, Amgen documents explain [redacted] [110]

[107] AMG10935-0000731338 at 344 [redacted].

[108] *Id.*

[109] AMG10935-0000919698 at slide 12 (Repatha® Preliminary 2021 May LRS); AMG10935-0000545450 (Chiu Exhibit 19) at slide 1.

[110] [redacted]

63. [redacted]

64. A 2020 Amgen strategy presentation observed that [redacted]

---

[redacted]

[111] [redacted]

[112] AMG10935-0000230057 at slide 8 (August 2020 LRS Follow-up).

[113] AMG10935-0000013130 at 143 [redacted] Dep. Tr. J. van Grunsven, VP/GM of General Medicine at Amgen, 108:9-12; Dep. Tr. R. Pordy, VP of Clinical Services, Internal Medicine at Regeneron, 191-193.

[114] AMG10935-0000013130 at 143; *see also* AMG10935-0000502169 at slide 14 [redacted]

[115] AMG10935-0000230057 at slide 8 (August 2020 LRS Follow-up).

[116] AMG10935-0000230057 at slide 12 (August 2020 LRS Follow-up).

65. Amgen documents [redacted]"[117] with Praluent®. Indeed, Murdo Gordon, Amgen's Executive Vice President of Global Commercial Operations, explained, [redacted],[118] because [redacted].[119] Instead, Amgen devised an exclusionary [redacted] strategy that would be more effective in gaining preferred formula placement for Repatha® while preserving higher prices, margins, and profits.

### 5.2.3 Amgen opted to rely on its blockbuster auto-immune portfolio products Enbrel® and Otezla® to force PBMs to exclude Praluent®

66. As discussed above, after Amgen's Patent Litigation stalled, and facing competition from Regeneron's Praluent®, Amgen began to implement its commercial strategy to coerce PBMs into accepting Amgen's anticompetitive Cross-Therapeutic Bundle, in which it threatened to withhold conditional rebates on its auto-immune portfolio (e.g., Enbrel® and/or Otezla®) if PBMs did not agree to exclude Regeneron's Praluent® in favor of Amgen's Repatha®.[120] Amgen's [redacted][121]

67. The key to Amgen's exclusionary commercial strategy was to leverage Enbrel® and Otezla®—two of its leading products in its unrelated auto-immune therapeutic category that have massive sales, significant market power (as explained in **Section 4.2** above) and are important for PBMs to cover— to obtain exclusive or favorable formulary coverage for its cardiovascular drug, Repatha®, relative to its only competitor in the U.S. PCSK9i market,

---

[117] *See* AMG10935-0000375371 (Chiu Exhibit 2) at 372.

[118] Dep Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 217:6-7.

[119] AMG10935-0000906831 (Gordon Exhibit 26); AMG10935-0000906834 at 861 (Repatha® projected as largest driver of growth between 2020 and 2024 ($2.5B)); AMG10935-0000908505 (Global Commercial Operations Strategy Overview) at slide 9 ("[a]chieve peak revenue of $6.4B by 2029").

[120] I understand from the Expert Report of Heather Bates that, [redacted].

[121] AMG10935-0000735537 (Bradway Exhibit 11) at slide 13 ([redacted]

Regeneron's Praluent®. Amgen's internal documents [redacted].”[122]

68. Enbrel® and Otezla® are not PCSK9 inhibitors (or even in the cardiovascular therapeutic class) and their sales are far larger than those of Praluent® and Repatha® combined. [redacted].[123] Net sales of Otezla® and Enbrel® were 5.6 times larger than net sales of Repatha® and Praluent® combined. **Figures 5(a) and 5(b)** illustrates the significant difference in scale between the PCSK9i class and Amgen's auto-immune products, Enbrel® and Otezla® in terms of (a) gross sales, and (b) net sales:

[122] *See* AMG10935-0000379900 at 900. *See also* AMG10935-0000009567 [redacted] -0000096882 ( [redacted] ); AMG10935-0000414442 (West Exhibit 28) [redacted] Dep. Tr. B. West, Executive Director of Market Access at Amgen, 175:5-15 (“ [redacted]

[123] Gross sales data available only for Q1 and Q2 2023.

**Figure 5(a): Gross Sales of Praluent®, Repatha®, Enbrel® and Otezla® U.S. 2021-June 2023[124]**

[redacted]

**Figure 5(b): Net Sales of Praluent®, Repatha®, Enbrel® and Otezla® U.S. 2021-2023[125]**




[124] **Note:** [a] 2023 YTD includes Q1 2023 and Q2 2023. Gross sales not available for later periods. **Sources:** [1] [redacted]

[125] **Sources:** [1] Regeneron, 2023 Annual Report (Form 10-K) (Feb. 6, 2023), [2] Amgen, 2022 Annual Report (Form 10-K) (Feb. 9, 2022); Amgen, "Amgen Reports Fourth Quarter And Full Year 2023 Financial Results," (Feb. 6, 2024)

69. The implication of this large difference in scale between the must-have products Enbrel® and Otezla® and the PCSK9i class is that a threat by Amgen to withhold even a small percentage rebate on Enbrel® and/or Otezla® would have the same financial impact on PBMs as losing a far higher percentage rebate on Praluent®. As illustrated in **Figure 6** below, [redacted][126]

**Figure 6: PCSK9i Gross Sales and Auto-immune Rebates 2022**[127]

[redacted]

70. Both Amgen and PBMs recognized that imposing conditional rebates on Enbrel® and/or Otezla® would coerce PBMs to provide exclusive coverage for Repatha®. Amgen internal documents [redacted] and

---

https://www.amgen.com/newsroom/press-releases/2024/02/amgen-reports-fourth-quarter-and-full-year-2023-financial-results.

[126] *See, e.g.*, Express_Scripts_1330_00002556 (Kitson (ESI 30(b)(6)) Exhibit 14) at 556 [redacted] Express_Scripts_1330_00002611 at 611 [redacted]

[redacted]

[redacted][128] Amgen recognized [redacted][129] In other words, [redacted]®. Internal documents from PBMs illustrate a similar understanding. For example, PBM documents explain the effect of Amgen's anticompetitive Cross-Therapeutic Bundle: "[redacted] This quotation illustrates that when assessing head-to-head competition between Praluent® and Repatha®, [redacted]. At bottom, as reflected in [redacted]

71. Regeneron, on the other hand, cannot match Amgen's Cross-Therapeutic Bundle with a bundle of its own to compete. First, Regeneron does not manufacture or control the commercialization of any pharmacy-dispensed blockbuster products. Regeneron's portfolio that it manufactures or controls the commercialization of instead consists largely of medical benefit drugs, like EYLEA®, which have distinct reimbursement and distribution structures. As Amgen itself has recognized, bundling pharmacy and medical benefit drugs is not a viable option.[132]

---

[128] AMG10935-0000009524 at slide 9 [redacted]

[129] AMG10935-0000098335 at 335 (internal Amgen email dated May 16, 2020 discussing bid at Ascent/ESI: [redacted]). *See also* AMG10935-0001611588 at 589 [redacted] AMG10935-0001611590 at 591 [redacted]

[130] Express_Scripts_1330_00002611 (Kitson (ESI 30(b)(6)) Exhibit 14) at 611; *see also* UHG000007905 (Hindman (UHC30(b)(6)) Exhibit 8) at 906 ([redacted]); AMG10935-0000126581 at 582 [redacted]

[131] Express_Scripts_1330_00004399 at 399.

[132] *FTC v. Amgen*, No. 23-3053, Dkt. No. 130, Mem. by Amgen in Opp'n to Pl.s' Motion for Prelim. Inj., at 22 (N.D. Ill. Aug 22, 2023) ("But as uncommon as bundling is in the pharmaceutical industry, cross-benefit bundling as theorized by the Plaintiffs is simply unheard of.").

[redacted]

### 5.3 Amgen's [redacted]

72. In January 2020, mere months after the District of Delaware rejected Amgen's attempt to enjoin Regeneron from selling Praluent® in the U.S., [redacted].[134] Specifically, Amge [redacted] [135] In February 2020, Amgen [redacted] [136]

---

[133] Dep. Tr. R. O'Neal, Senior Vice President ("SVP") of Market Access at Regeneron, 346:18-347:15 [redacted] Dep. Tr. S. Subramanian, Senior Director Pricing and Contracting at Regeneron, 400-404 ( [redacted] Dep. Tr. S. Hyde, VP of Payers & GPOs at Regeneron, 262:17-24; Regeneron, 2023 Annual Report (Form 10-K) (Feb. 6, 2023) at 45 [redacted] Dep. Tr. M. McCourt, EVP and Head of Commercial at Regeneron, 280:24-281:7 [redacted]

[134] [redacted]

[135] AMG10935-0000087408 ( [redacted]).

[136] AMG10935-0000369614 at 61 [redacted] AMG10935-0000414326 at 326 [redacted]

73. [redacted].”[137] However, [redacted].[138]

74. Ultimately, the sheer value of the conditional Enbrel® and Otezla® rebates proved too substantial for ESI Part D to resist.[139] ESI Part D [redacted] explained that he might need its largest health plan Cigna Healthspring to “take one for the team” by adopting Repatha® exclusivity,[140] which was a condition for the Repatha®/Enbrel®/Otezla® bundle, even though Cigna representatives explained that [redacted] ESI, on behalf of ESI Part D and Cigna, ultimately contracted for an Enbrel®/Otezla® bundle and shortly thereafter, [redacted]

---

change). [redacted]”).

[137] AMG10935-0000414326 (West Exhibit 4) at 326.

[138] AMG10935-0000414549 (West Exhibit 3) at 549 [redacted] (emphasis added).

[139] *See* Express_Scripts_1330_00007167 at 167-169 [redacted].

[140] Express_Scripts_1330_00007167 (Kitson (ESI 30(b)(6)) Exhibit 5) at 169.

[141] Express_Scripts_1330_00007167 (Kitson (ESI 30(b)(6)) Exhibit 5) at 167 [redacted]

[redacted][142] To this day, Repatha® is still the preferred brand for the PCSK9i category on ESI Part D and Cigna's national formularies.[143]

### 5.4 Amgen's [redacted]

75. Beginning in May of 2020, Amgen continued its efforts to contract its [redacted], this time with [redacted]

76. At the outset of the rebate negotiations, [redacted][144] [redacted]

[142] Express_Scripts_1330_00002329 (Kitson (ESI 30(b)(6)) Exhibit 6); Express_Scripts_1330_00002512 (Kitson (ESI 30(b)(6)) Exhibit 8); Express_Scripts_1330_00007330.

[143] Express_Scripts_1330_00002724 [redacted]

[144] AMG10935-0000017144 (Moore Exhibit 10) at 144-145 [redacted]"); Express_Scripts_1330_00002959 (Kitson (ESI 30(b)(6)) Exhibit 10) ([redacted]). *See also* Dep. Tr. A. Bricker, former President of ESI, 95-97, 100-101 [redacted] Kitson Exhibit 2 [redacted]

[redacted]"[145] Amgen's [redacted]

77. The bundle Amgen offered [redacted][147] As the Expert Report of Heather Bates explains, this constituted a "bundled rebate" (or "bundled sale") for government price reporting purposes.[148] Under this offer, which [redacted].[149] According to Amgen, the [redacted][150]

78. The [redacted].[151] [redacted]

---

[redacted]

[146] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 188:8-15 [redacted]").

[147] *See* AMG10935-0000225239 at 239 ([redacted]!"); REGN0158570 at 570-571 ([redacted]

[redacted]

[redacted] Gordon Exhibit 17) at 837.

[150] Dep. Tr. D. Zimmer, VP of U.S. Value & Access at Amgen, 210:4-9 ([redacted].

[151] AMG10935-0000083666 (Moore Exhibit 13) at 666 (internal Amgen email dated June 24, 2020 discussing talking points for Amgen senior executives to use with Ascent/ESI senior executives: [redacted] (emphasis in original).

[152] Express_Scripts_1330_00002718 at 719.

79. [redacted][155] [redacted].[156]

80. In the end, [redacted][157] [redacted]d."[158] Regardless of [redacted], Amgen and Ascent/ESI Commercial understood that the [redacted]

[153] [redacted]

[154] *See* Express_Scripts_1330_00002611 (Kitson (ESI 30(b)(6)) Exhibit 14) at 611; *see also* Express_Scripts_1330_00003701 at 701 ([redacted]

[155] Express_Scripts_1330_00004536 at 536 ([redacted].

[156] *See* Express_Scripts_1330_00002556 at 556 [redacted] Express_Scripts_1330_00002704 at 704.

[157] AMG10935-0000415409 (West Exhibit 14) at 409.

[158] Express_Scripts_1330_00004855 (Kitson (ESI 30(b)(6)) Exhibit 22) at 855.

[redacted][159]

81. As for Regeneron, it first learned of Amgen's offer to Ascent/ESI Commercial in June of 2020 [redacted]

82. In August 2020, [redacted][164]

---

[159] AMG10935-0000397232 (West Exhibit 26) at 233.

[160] Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 395:18-396:8 [redacted]

[161] REGN0266739 at 739 [redacted]

[162] Dep. Tr. M. McCourt, EVP and Head of Commercial at Regeneron, 278:18-279:9 ("[redacted]

[163] Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 396:24-397:4.

[164] AMG10935-0000415409 (West Exhibit 14) at 409 ([redacted]").

### 5.5 Amgen's [redacted]

83. Amgen continued to offer its Cross-Therapeutic Bundle to PBMs after its success at [redacted] In 2021, [redacted][165] Amgen introduced [redacted] Despit[redacted] Ultimately, OptumRx accepted [redacted].[166] Shortly thereafter, [redacted].[167]

84. Prior to the negotiations in 2021, Repatha® and Praluent® shared parity status on both the UHC and OptumRx Commercial formularies.[168] [redacted]

[165] [redacted]

[166] UHG000008298 at 298 [redacted] AMG10935_OCO-0000005281 (Hindman (UHC(30)(b)(6)) Exhibit 18) (Twenty-Fourth Amendment to Rebate Agreement between OptumRx/UHC and Amgen); AMG10935-0000006721 (Hindman (UHC(30)(b)(6)) Exhibit 20) (Jan. 1, 2023 Rebate Agreement between Amgen and OptumRx/UHC).

[167] *See* AMG10935-0000026314 at 315-316 (internal Amgen email from S. Hall to J. Norton, et al. regarding [redacted]).

[168] Dep. Tr. A. Grennan, Executive Director and GM U.S. Market Access at Amgen, 76:20-25.

[169] Dep. Tr. A. Hindman (UHC 30(b)(6)), 30:11-13.

[170] UHG000007640 at 640.

85. [redacted][1] [redacted] [redacted].[174]

86. In response, Amgen's deployed the Enbrel®/Repatha® Cross-Therapeutic bundle.[175] [redacted] Amgen's [redacted].[177] [redacted]

---

[171] Dep. Tr. A. Hindman (UHC 30(b)(6)), 30:14-17.

[172] Dep. Tr. A. Hindman (UHC 30(b)(6)), 30:14-21; UHG000007845 at 845 (April 2, 2021 internal email at UHC/OptumRx highlighting [redacted]

[173] UHG000007892 (Hindman (UHC(30)(b)(6)) Exhibit 6) at 892.

[174] UHG000007762 at 762 ([redacted]

[175] UHG000007892 (Hindman ([redacted] AMG10935-0000392769 - AMG10935-0000392815 (Grennan Exhibit 6, Chiu Exhibit 13) (text message exchange between Amgen's Adam Grennan and Andy Chiu highlighting "For our call with Seth [Greicar, at Optum], [redacted].");
Dep. Tr. A. Hindman (UHC 30(b)(6)), 33:21-24 [redacted]

[176] *See generally* Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 194-95 [redacted].

[177] UHG000007916 (Hindman (UHC(30)(b)(6)) Exhibit 7) at 916 ( [redacted]

[redacted] In an internal Amgen email [redacted]"[181] And by June of 2021, Amgen acknowledged [redacted][182]

88. By September 1, 2021, UHC [redacted].[183] [redacted][184] In total, by January 1, 2022, Amgen had successfully secured exclusive formulary coverage for Repatha® [redacted].

[178] UHG000007916 (Hindman (UHC(30)(b)(6)) Exhibit 7) at 916 [redacted]

[179] UHG000008374 (Hindman (UHC(30)(b)(6)) Exhibit 15) at 374 [redacted] Dep. Tr. A. Hindman (UHC 30(b)(6)), 94:25-95-6.

[180] UHG000007762 (Hindman (UHC(30)(b)(6)) Exhibit 12) at 762 [redacted].

[181] AMG10935-0000012335 (Chiu Exhibit 17) at 338-39.

[182] AMG10935-0000028211 (Grennan Exhibit 16, Moore Exhibit 20, Zimmer Exhibit 18) at 211-212 [redacted]

[183] AMG10935-0000028147 (UHC Commercial Pharmacy Benefit Coverage Update – Sept. 1, 2021).

[184] AMG10935-0000395732 at 733 (July 2021 text from A. Grennan stating "[redacted] UHG000008841 at 841 ([redacted]"); UHG000008946 at 946 [redacted]; AMG10935_OCO-0000002361 (Hindman (UHC(30)(b)(6)) Exhibit 19) (First Rebate Agreement between Amgen and Emisar Pharma Services, effective Jan. 1, 2022).

### 5.6 Amgen's [redacted]

89. In 2020, Regeneron successfully secured exclusive coverage on [redacted].[185] By 2021, [redacted] among the "big three" PBMs that did not foreclose Praluent® in response to Amgen's anticompetitive Cross-Therapeutic Bundle.

90. However, and although not initially successful, Amgen's internal documents show that [redacted][186] [redacted] l.[187] [redacted] .[189]

91. However, Amgen's internal documents show that it offered CVS/Zinc Commercial a "more aggressive" Cross-Therapeutic Bundle offer in 2022.[190] [redacted]

---

[185] *See, e.g.*, CAREMARK0001392 at 393 ("[redacted]

[186] AMG10935-0000012174 (Moore Exhibit 20) at 175 ([redacted]").

[187] *See* AMG10935-0000012174 at 175 ([redacted]"); AMG10935-0001618894 at 895 (noting that CVS is [redacted]); AMG10935-0000908659 ("[redacted]"). *See generally* Dep. Tr. M. Gordon, EVP of Global Commercial Operations, 260-267 [redacted] AMG10935-0000417134.

[188] ZINC0000186 at 186 [redacted]

[189] AMG10935-0000136911 at 911; AMG10935-0000139317 at 318 ([redacted]nt").

[190] Dep Tr. R. O'Neal, SVP of Market Access at Regeneron, 245:4-11 [redacted]

[redacted]

94. Amgen internal documents illustrate that in addition to the [redacted], Amgen [redacted].[196] For example, [redacted][197] offered to CVS/Zinc when [redacted]

---

[191] [redacted]

[192] [redacted]

[redacted]

[194] AMG10935-0000543928 at 929 (internal Amgen text regarding bid timelines).

[195] AMG10935-0000687913 at 913; AMG10935-0000800854 at 855.

[196] *See, e.g.*, AMG10935-0000797525 at 525 [redacted]"); AMG10935-0000798212 at 212 [redacted]

[197] [redacted] are [redacted]

[redacted].[198] Again, Amgen pulled [redacted].

95. [redacted]

**5.7 Amgen's [redacted]**

96. As explained below, the "big three" PBMs—ESI, OptumRx, and CVS—represent 79% of the lives covered in the U.S. However, there are many other PBMs that either received a [redacted] e.g., Humana Part D), or were impacted by the effects resulting from Amgen's [redacted] offers to the "big three."

97. In August of 2020 Amgen offered [redacted].[200] As shown in **Figure 7** below, [redacted][201] Amgen [redacted].[202]

98. Amgen's agreement [redacted].[203] However, Amgen's internal documents and witness testimony

---

[198] *See, e.g.*, AMG10935-0000797525 at 525 ([redacted]); AMG10935-0000802882 at 882 (Letter from Amgen to CVS regarding [redacted]3); CAREMARK0001421 at -421 (email from Simon Zahn, CVS Executive Director, Formulary Strategy and Operations to Gary Loeber regarding "PCSK9s Formulary Status Update" dated April 4, 2023).

[199] Dep. Tr. M. McCourt, EVP and Head of Commercial at Regeneron, 234:7-22 [redacted]

[200] AMG10935-0000548392 at 392 (Andy Chiu, Executive Director, U.S. Value and Access at Amgen, approving the "Annual Enbrel Rebate" bid to Humana Part D).

[201] AMG10935-0000083575 at 575.

[202] *See id.* (discussing the Humana bid and the rebates on Enbrel® and Otezla® for Repatha® coverage); AMG10935-0000101341at 341(reaching out to Tony Esterly of Humana in 2020 to "discuss[] Repatha, Enbrel, Otezla"); *see* AMG10935-0000015661 at 661 ("Executive Summary" showing one of Amgen's objectives as being to [redacted]

[203] *See, e.g.*, HUM000273 at 281 [redacted]).

explain that [redacted] if H[redacted]

## 6. The Effects of Amgen's Bundle at Key PBMs

### 6.1 Amgen's Anticompetitive Conduct Caused Spillover Effects in the Consolidated PBM Industry

99. Amgen successfully implemented its commercial strategy to coerce PBMs into accept Amgen's anticompetitive [redacted] threatening to [redacted] in favor of Amgen's Repatha®.[205] As discussed in detail above, Amgen managed to secure Repatha® exclusivity on key formularies of each of the "big three" PBMs—ESI Part D, Ascent/ESI Commercial, OptumRx Commercial, UHC Commercial, and CVS/Zinc Commercial and Part D—as well as the on the formularies of the other PBMs, including, but not limited to, those that follow the National formularies of the "big three."

100. Gaining exclusive formulary coverage at even one of the "big three" PBMs is a big boost for any drug, but gaining exclusivity on the majority of the "big three" PBM can insulate the exclusive product from competition and leave a competitor with very few avenues for access. Even if contracts are not long in duration, securing a large PBM can have a long-lasting effect due to market-level spillover effects, because once a drug is removed from a formulary its market shares fall as patients from that formulary are forced to change products. [206] This reduces

---

[204] AMG10935-0000016495 at 498 ("[redacted]."); *see also* Dep. Tr. K. Niksefat, Global Head of Rare Disease Marketing & Commercial Integration at Amgen, 158:24-159:6 ("Q. [. . .] [redacted]). Amgen also retained non-contracted right of first refusal agreements with Prime Therapeutics and Anthem.

[205] I understand from the Expert Report of Heather Bates that, [redacted] the U.S. Centers for Medicare & Medicaid Services, 42 C.F.R. Part 447 Subpart I. *See* Expert Report of Heather Bates at ¶ 37, 50; *see, e.g.*, AMG10935-0000139319 at 319-320 (internal Amgen email chain concerning "Otezla URA").

[206] *See* Dr. Peri Iz, "Study of Pharmaceutical Benefit Management," HCFA 38 (June 2001), https://www.cms.gov/files/document/cms20014pdf ("PBMs continue to offer more restrictive formularies and intervention programs to their clients to move market share to preferred branded products and generics."). *See also* Y. Richard Wang, "Spillover effects of restrictive drug formularies in the statin class: a descriptive study of the Medicaid preferred drug list in Texas," 19 *Managed Care Interface* 11, 24 (Nov. 2006) (explaining that a restrictive formulary

the market share of the removed drug, and means that when practitioners prescribe it, their patients discover at the pharmacy that they have no coverage and return to their prescriber to ask for a change. This process makes practitioners less likely to prescribe the drug, which in turn lowers pressure on PBMs to include the drug in the future. [207] This effect increases as time passes and more patients become settled on Repatha®.

101. Spillover effects can also be felt at the PBM-level. Because of the consolidation in the PBM industry, when a GPO enters into a contract on behalf of a client's national formulary, each of the clients and health plans that follow the client's national formulary will tend to follow the same coverage decisions. For example, [redacted] [208] [redacted] [209]

102. **Figure 4** in **Section 5.2.1** above shows the relationship between each of the "big three" PBMs and the entities who contract for them (e.g., GPOs). Consistent with Amgen's internal documents, MMIT data shows that by June 2023, the "big three" PBMs represented 84% of lives covered by Commercial plans in the U.S., and 81% of lives covered by Medicare Part D plans in the U.S. When Humana Part D is included in the Medicare Part D segment, 97% of the lives covered by Medicare Part D plans in the U.S. are covered by these PBMs. [210]

---

will result in physicians prescribing the preferred drug from the restrictive formulary more often, even for patients who are on more open formularies).

[207] *See* Dep. Tr. M. McCourt, EVP and Head of Commercial at Regeneron, 257:21-258:9 (explaining that exclusive coverage at one PBM might impact the way physicians prescribe drugs to patients who might be covered by a different PBM that does not have exclusive coverage because "[i]t trains physicians to write the product that's exclusive."). *See also* Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 381:13-21 ("If enough of the market looks disadvantaged, then the message resonates across physicians to be – they may not be monitoring every single plan PBM but if enough of rejections or prior off come in and say: 'Use product before somebody else,' that's what I'm referring to as 'spillover'."); Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 33:8-12 [redacted] ").

[208] *See* AMG10935-0000225239 at 239 [redacted] ").

[209] *See* AMG10935-0000543928 at 928 ( [redacted] ") (emphasis added).

[210] Numbers estimated based on AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT).

103. The degree of market concentration among the "big three" PBMs (and Humana Part D) is substantial in the U.S. PCSK9i market. As shown in **Figure 7** below, the "big three" PBMs represent [redacted] of Commercial claims, and the "big three" PBMs and Humana Part D represent [redacted] of Medicare Part D claims. In the Medicaid sector, which represents just [redacted] of all pharmacy claims in the PCSK9i market, the big 3 PBMs represent [redacted] of the market.[211]

**Figure 7: U.S. PCSK9i Market**
**Market Share by Pharmacy Claims, June 2023[212]**

[redacted]

### 6.1.1 Spillover Effects at ESI

104. As of June 2023, ESI, including its commercial and Medicare Part D formularies, was the largest PBM in the U.S. with 108 million lives, or 34%, of covered lives in the U.S., across all segments (Commercial, Medicare and Medicaid). In the U.S. PCSK9i market, ESI accounts for 26% of all claims across all segments, 37% of the commercial segment and 16% of claims of Medicare Part D sector.

---

[211] Medicaid FFS represents 1.99% of claims in the market and Managed Medicaid represents 2.03% of claims.

[212] **Notes:** [a] See Appendix C for a description on how MMIT and IQVIA data were combined. [Shares are based on matched observations. [b] Claims are measured in extended units as provided in IQVIA LAAD RX. They correspond to one millilitre of a product. **Source:** [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX).

105. As illustrated in **Figure 7**, Prime, Cigna, Humana, Kroger, Navitus and Magellan are all clients/participants of Ascent/ESI Commercial, and Prime and Cigna are among the clients/participants of ESI Medicare Part D.

106. MMIT data shows that, looking at all segments combined (Commercial, Medicare and Medicaid), from January 2019 to December 2019, Praluent® had parity or better placement on formularies for most of the lives covered by ESI. In December 2019, 79 million covered lives, or 77% of the combined ESI entities, were in formularies that were either at parity (e.g., "one of two" or "1:2") or had Praluent® as the preferred drug (i.e., Praluent® was covered either at parity or better). These lives represented 70% of all of the ESI entities claims in the U.S. PCSK9i market.

107. Coverage for Praluent® at ESI started to change in 2020. First, on the Medicare Part D side, as discussed in **Section 5.3**, Amgen offered ESI Part D the anticompetitive [redacted] Amgen's offer also impacted Cigna Healthspring's National formularies, which, despite having previously been likely to go with Praluent® as the preferred drug, instead followed suit "[redacted]I and reversed course to exclude Praluent®.[213] By June 2023, almost 100% of the ESI Part D formularies moved Repatha® to exclusivity, representing 5% of the total lives covered by ESI and 23% of ESI's total claims.

108. Second, in July 2020, Amgen reached a [redacted] agreement with Ascent/ESI for its commercial business (*see* **Section 5.4**) [redacted]® (i.e., lev [redacted]. The July 2020 agreement [redacted].”[214] While [redacted]”[215] In the July 2020 contract, [redacted]

---

[213] Express_Scripts_1330_00007167 at 167-169 [redacted]

[214] AMG10935_OCO-0000000672 at 688-689 (Fourth Amendment to the Rebate Program Agreement between Ascent Health Services LLC and Amgen USA Inc., Attachment A-2 to Exhibit A); AMG10935_OCO-0000030231 at 244-45, 247 (January 2023 Ascent/ESI Commercial discussing the "[redacted]ate").

[215] *Id.*

[redacted],[216] which, based on the documents and data, [redacted].[217] The contract [redacted].[218] In January 1, 2023, [redacted].[219]

109. MMIT data shows that in response to Amgen's conditional rebate in July 2020, [redacted]

110. To put Amgen's strategy into perspective, I consider the impact its portfolio rebates had on the effective price of Repatha® and Praluent® under the Ascent/ESI Commercial contract. [redacted], but also the [redacted]. The effective price of Repatha® can therefore be understood as the [redacted]. Likewise,

---

[216] Express_Scripts_1330_00001327 at 327 [redacted]; AMG10935-0000128836 at 837 [redacted]"). Kroger's commercial formularies listed Repatha® as the exclusive PCSK9i prior to the July 2021 agreement.

[217] *See, e.g.*, Express_Scripts_1330_00005159 at 159-162 [redacted] AMG10935-0000074681 at 681 (Cigna and Prime listed in the rebates recipients).

[218] AMG10935_OCO-0000000672 at 688-689 (Fourth Amendment to the Rebate Program Agreement between Ascent Health Services LLC and Amgen USA Inc., Attachment A-2 to Exhibit A, effective July 1, 2020 (Section 3. (iii), (iv), (v) and (vi) [redacted]

[219] AMG10935_OCO-0000030231 at 244-45, 247 (Jan. 2023 Ascent Agreement [redacted]).

[220] AMG10935-0000074681 at 681 (Cigna, Prime, and Kroger entities listed as recipients of the [redacted] Express_Scripts_1330_00005159 at 159-162 (Ascent/ESI email concerning [redacted]").

the price Praluent® would have to charge in order to match the effective price of Repatha® can be understood as the net price of Praluent® minus the same rebate penalties.

[redacted]

112. As the figure shows, there is substantial divergence between the net price and the effective net price of Repatha®. This difference comes from the opportunity cost that

[221] **Notes:** [a] The Repatha® price data underlying this figure restricts attention to commercial sales of Repatha® through Ascent/ESI. The net price for Repatha® is calculated at the quarterly level by taking net utilization of Repatha®, [redacted]

Amgen imposed on Ascent/ESI by [redacted] To compete with such an effective price, [redacted] In 2022, the total value of rebates conditioned on Repatha® exclusivity approximately doubled, causing the effective price of Repatha® to become negative, and thus creating a price environment that neither Praluent® nor any firm could possibly match.[222]

113. More specifically, Amgen's data [redacted]. [redacted] If Amgen [redacted][223]

---

[redacted] [b] The Praluent® price data underlying the figure is for the entire PCSK9i market. The net price for Praluent® is calculated at the quarterly level by taking total net sales and dividing by total units. [c] Cost data for Praluent® and Repatha® are calculated at the quarterly level and reflect market-wide average costs. I define Repatha®'s variable cost to be the sum of Amgen's cost of sales ("COS") and total sales and marketing costs ("S&M") that was attributed to Repatha® U.S. I define Praluent®'s variable cost to be Regeneron's cost of goods sold ("COGS") that was attributed to Praluent®. Average variable costs for the two drugs are calculated at the quarterly level by dividing variable cost by total units sold across the entire PCSK9i market, as reported in each company's respective GTN files. [d] 2020 yearly totals for Praluent® average cost are calculated using 2020 Q2-Q4 data. 2023 yearly totals for Praluent® average cost are calculated using 2023 Q1-Q2 data. **Sources:** [1] REGN-DATA-0002 – ATTORNEYS' EYES ONLY, REGN-DATA-0003 – ATTORNEYS' EYES ONLY, REGN-DATA-0018 – ATTORNEYS' EYES ONLY, REGN-DATA-0019 – ATTORNEYS' EYES ONLY. [2] AMG10935-DATA-0000001407, AMG10935-DATA-0000001411, AMG10935-DATA-0000001439. [3] 35B– Express_Scripts_1330_00002667.

[222] This analysis is conservative as the data provided by Amgen does not allow to identify Repatha® sales that belong to the affected formularies separately from other formularies. [redacted].

[223] The application of the "discount attribution test" should comport with the reality of specific industries, such as pharmaceutical or technology, where there are large up-front costs. *See, e.g.*, *SmithKline Beecham Corp. v. Abbott Lab*, 2014 WL 6664226, at *3-*5 (N.D. Cal. Nov. 24, 2014) (permitting the fact-finder to consider certain costs within research and development, marketing, promotion, sales force, and market access as part of the below-cost analysis); In re *Intel Corp.*, 150 F.T.C. 420, 2010 WL 9549985, at *9 (F.T.C. Oct. 29, 2010) (FTC complaint alleging that "Intel also offered its CPUs at prices below an appropriate measure of cost (in sales of CPUs or in kit prices of CPUs with

114. To counter Amgen's portfolio rebates, [redacted]

[redacted]

---

[redacted]

[redacted]

115. [redacted].

116. The harm caused by Amgen's conditional rebating strategy is clear: rather than competing on the merits by offering rebates on Repatha® alone to produce a competitive net price, [redacted] The magnitude

---

[redacted]

225 [redacted]

226 [redacted]

of the rebate that Amgen put at stake was so large that ESI/Ascent had no choice but to accept, and Regeneron had no way of matching.

#### 6.1.1.1 Praluent®'s lost share & but-for price at ESI

117. As a result of Amgen's portfolio rebate offer, Ascent/ESI removed Praluent® from the ESI National Preferred formularies in January 2021. The formulary change caused Praluent® to lose a significant share of the PCSK9i market. **Figure 10** shows the harm to Praluent® in terms of market share within the ESI National Preferred commercial formularies. [redacted][227]

[redacted]

---

[227] [redacted]

[redacted]

118. Had Amgen not engaged in its [redacted], Regeneron likely would have continued to offer Praluent® rebates to Ascent/ESI similar to those proposed in 2020 (i.e., the formulary year prior to losing access). Regeneron's last offer to Ascent/ESI for its commercial and Part D formularies prior to Amgen embarking on its conditional rebating strategy was in 2020 for the 2021 formulary year. Regeneron offered an all-in discount (rebate plus fees paid to ESI/Ascent) of 34% for parity coverage and 52% for exclusivity.[229] Applying that to the gross price of $225.00 per unit for Praluent® in January 2021, net prices would have been $148.50 per unit for parity ($3,861.00 annual) and $108.00 per unit for exclusivity ($2,808.00 annual), respectively. It is likely that Praluent® prices would have continued at that level had Amgen chosen to compete on the merits, since while list prices typically increase by a small percentage each year, they tend to be accompanied by annual increases in rebates that result in about the same net price each year if competitive conditions are not changing.[230]

#### 6.1.1.2 As a result of Amgen's exclusionary Cross-Therapeutic Bundle, other ESI formularies switched to Repatha® exclusivity

119. The spillover effect of the exclusion of Praluent® from ESI's Part D formulary and Ascent/ESI's Commercial National Preferred formulary was substantial. MMIT data shows that after Amgen was able to impose Repatha® exclusivity on ESI's Part D and National Preferred commercial formularies in September 2020 and January 2021, respectively, additional ESI formularies followed suit and made Repatha® exclusive as well. As of late December 2019, [redacted] of the total ESI lives had Repatha® as the preferred drug, but by August 2020 [redacted] by June 2023. A similar shift is observed when looking at claims: in December 2019, [redacted] of the total ESI claims were from beneficiaries whose formularies had Repatha® as the preferred PCSK9i drug, and by June 2023 [redacted] of claims came from Repatha®-preferred formularies.

120. **Figures 11(a) and (b)** below shows how Repatha®'s preferred positioning (meaning beneficiaries had more coverage or faced fewer restrictions) has expanded across all segments of ESI from January 2019 to the present. Panel (a) shows the impact on covered lives, and Panel (b) shows the impact on claims.

---

[229] REGN0000658 at 678 [redacted] ) [redacted]

[230] *See, e.g.*, AMG10935-0000545597 at 597 [redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

#### 6.1.2 Spillover Effects at OptumRx

121. According to the most recent available data (from June 2023), OptumRx is the third-largest PBM in the U.S. with 51 million covered lives across all segments (i.e., 16% of all U.S. covered lives). OptumRx and its clients/participants account for 22% of total claims, 16% of commercial claims, 27% of Medicare claims, and 7% of the Medicaid claims in the U.S.

122. MMIT data shows that before August 2021, [redacted] of all OptumRx covered lives, were in plans that provided parity coverage for Repatha® and Praluent® across all segments, accounting for [redacted] of OptumRx claims.

123. MMIT data also shows that Praluent® was removed from UnitedHealthcare's Commercial formularies in September 2021 (OptumRx client). [redacted] beneficiaries, or [redacted] of all OptumRx covered lives lost access [redacted] of OptumRx PCSK9i claims. Subsequently, in January 2022, [redacted]

232 **Notes:** [a] *See* **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[redacted] the number of lives with Repatha® preferred at OptumRx increased to [redacted] total OptumRx PCSK9i claims) in January 2022.

124. As discussed in **Section 5.5**, Amgen's OptumRx/UHC contract that resulted in Repatha® exclusivity across all UnitedHealthcare Commercial formularies [redacted]

125. In **Figure 12** below, I calculate the necessary price that Praluent® would have had to charge in order to obtain exclusive status on OptumRx/UHC Commercial formularies in the face of Amgen's [redacted]s. Prior to the [redacted] scheme, [redacted]. However, the necessary rebates on Praluent® grow considerably once [redacted] rebates begin to be offered. Starting in Q1 2022, in order to obtain exclusive status at OptumRx/UHC Commercial formularies, Praluent® would [redacted]

[redacted]

[redacted]

[233] **Notes:** [a] Praluent®'s list price is calculated as the average WAC price for Praluent® across the entire PCSK9i market. This calculation is performed at the quarterly level by dividing total gross sales by the total number of units reported in Praluent®'s GTN files. [b] The calculation considers the average net price needed to obtain 1:1 status on all OptumRx/UHC Commercial formularies, where net price is defined as list price minus the total rebate. To estimate units sold of Repatha® and Praluent® at OptumRx/UHC, I adjust the total market-wide sales of the two drugs according to the proportion of total PCSK9i claims for Repatha® and Praluent® covered by OptumRx/UHC Commercial formularies. Then, I calculate the PBM's total cost in two different formulary coverage scenarios: when Repatha® is exclusive (1:1) and when Praluent® is exclusive (1:1). Equating these costs identifies the necessary net sales of Praluent® that would make Praluent® 1:1 the most cost-effective option for the PBM. Dividing this figure by the total units of Praluent® sold yields the minimum net price required. [b] This estimation assumes that Praluent® would receive [redacted] PCK9i demand at OptumRx/UHC Commercial formularies if Praluent® held 1:1 status. [c] By defining net price as list price minus total rebates, the calculation depicted in the figure is a conservative estimate of the true minimum necessary net price of Praluent®. Including additional manufacturer discounts, such as administrative fees and price protection, would lower the minimum necessary net price of Praluent®. **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT); AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX); AMG10935-DATA-0000001407 (Amgen LEDR Data); AMG10935-DATA-0000001440 (Amgen - Optum Rebates Data). [2] REGN-DATA-0007 – ATTORNEYS' EYES ONLY (Regeneron COGS Data); REGN-DATA-0003 – ATTORNEYS' EYES ONLY

#### 6.1.2.1 Praluent®'s lost share and but-for price at OptumRx

126. [redacted][34]

[redacted]

127. As with ESI, had Amgen not deployed its conditional rebate strategy to impose Repatha® exclusivity for OptumRx/UHC Commercial formularies, Regeneron would

---

(Regeneron GTN 2021); REGN-DATA-0018 – ATTORNEYS' EYES ONLY (Regeneron GTN 2022). [3] AMG10935-OCO-0000005877 at 20-21.

[234] [redacted]

[235] **Notes:** [a] Vertical line denotes the last month Praluent® was available on UnitedHealthcare formularies. [b] *See* Appendix [C] for a description on how MMIT and IQVIA data were combined. **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

have continued to offer formulary rebates to OptumRx similar to those proposed prior to losing access. [redacted]

#### 6.1.2.2 As a result of Amgen's exclusionary Cross-Therapeutic Bundle, other OptumRx formularies started switching to Repatha® exclusivity

128. While less striking than for ESI, after Amgen imposed exclusivity for Repatha® at UnitedHealthcare, OptumRx expanded the number of formularies in which Repatha® was preferred (meaning beneficiaries had more coverage or faced fewer restrictions) over Praluent®. **Figures 14(a) and (b)** shows an increase in lives (Panel a) and claims (Panel b) from formularies with Repatha® preferred. [redacted]

[236] REGN0000196 at 196 (Rebate Agreement between OptumRx and Regeneron Healthcare Solutions, Inc., effective Jan. 1, 2021).

[redacted]

---

[redacted]

[redacted]

### 6.1.3 Spillover Effects at CVS

129. As of June 2023, CVS was the second-largest PBM in the U.S. in terms of covered lives representing 89 million covered lives or 28% of all covered lives in the U.S. Within the PCSK9i market, CVS is the largest PBM group across all segments (representing 37% of all claims), and the largest PBM within the commercial (representing 40% of all claims) and Medicare Part D (representing 37% of all claims) segments.

130. MMIT data shows that, until June 2020, most ([redacted] of CVS lives were covered by formularies on which Repatha® was the preferred PCSK9i drug. This changed in July 2020, when Praluent® gained exclusivity on various commercial formularies. As a result, by July 2020, Praluent® was the preferred drug on formularies representing [redacted]

[238] **Notes:** [a] *See* **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

131. As explained herein in **Section 5.6**, in the summer of 2021, [redacted]

132. The portfolio rebates in Amgen proposed to CVS/Zinc Commercial represented a significant penalty on CVS/Zinc (who had chosen to cover the PCSK9i class with only one product),[239] a penalty that, when applied as a rebate on Repatha®, would be unmatchable by Regeneron through direct Praluent® rebates. This indirect rebate on Repatha® [redacted][240] **Figure 15** shows the effect Amgen's [redacted] rebate would have had on distorting prices at CVS/Zinc Commercial in 2022. [redacted]

[239] *See* AMG10935-0000908659 at 660 ([redacted]

[240] Dep. Tr. D. Zimmer, VP of U.S. Value & Access at Amgen, 59:6-13; AMG10935-0000012174

[redacted]

---

[redacted]

[redacted]

0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT Data), AMG10935-DATA-0000001407, AMG10935-DATA-0000001438 (Amgen - CVS Rebates Data)

[242] AMG10935-DATA-0000001438 (Amgen - CVS Rebates Data).

[redacted]

---

[redacted]

134. [redacted]

135. The MMIT data produced in discovery ends in June 2023, so it is not possible to precisely calculate the effect of this formulary change in terms of covered lives, but it is possible to come up with a reliable estimate based on available information. Specifically, I assumed that the number of lives covered by CVS/Zinc formularies in June 2023 was constant in July 2023. I then evaluated individual formularies that represented 89% of claims and 51% of lives at CVS/Zinc in June 2023 to determine Repatha® and Praluent® status on these formularies based on publicly available information.[248] From that information, I was able to determine that, as

---

[244] *See e.g.*. Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 229:22-230:14 [redacted]

[245] REGN0047233 at slide 3 [redacted]

[246] AMG10935-0000543928 at 929 [redacted]").

[247] Documents produced in discovery [redacted] AMG10935-0000139350 at 350 [redacted] AMG10935-0000017816 at 816 ([redacted]"); Dep Tr. K. Niksefat, Global Head of Rare Disease Marketing & Commercial Integration at Amgen, 158:24-159:6 [redacted]

[248] Formularies are not always available for July 2023, but just for January 2024. Based on my understanding that commercial formularies adopted Repatha® 1:1 in July 2023, I assume that a formulary changed their status in July, if the value reported in January 2024 is different to the one reported in June 2023 and the formulary corresponds to a commercial formulary. For the remaining formularies I assume the coverage level remains as in June 2023.

a result of the formulary changes, by July 2023, Repatha® was preferred in formularies representing at least [redacted] The estimated effect of the formulary change is shown in **Figures17(a) and (b)**.[250]

**Figure 17(a): CVS/Zinc – Lives Covered by Formulary Status (January 2019 to July 2023 Commercial, Medicare and Medicaid Segments)[251]**

[redacted]

---

[249] The estimates are conservative as there may exist additional formularies that changed status besides those I identified.

[250] Claims data is available for July 2023, so no assumptions are necessary for the claims distribution.

[251] **Notes:** [a] [redacted].

**Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

**Figure 17(b): CVS/Zinc – Claims by Formulary Status (January 2019 to July 2023 Commercial, Medicare and Medicaid Segments)**[252]

[redacted]

#### 6.1.3.1 Praluent®'s lost share and but-for price at CVS

136. The effect of removing Praluent® from the formularies is noticeable even with just one period of data. **Figure 18** shows that [redacted] The figure only shows the effect one month after the formulary change, so the share of lives and claims attributable to [redacted]

---

252 [redacted].

**Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[redacted]

137. [redacted]

[redacted]

253 **Notes:** [redacted] [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

254 REGN0000031 at 031 ([redacted] REGN-DATA-0013.

255 REGN0000744; REGN-DATA-0013.

#### 6.1.3.2 CVS Medicare Part D segment has switched to Repatha® exclusivity

139. Following the adoption of Repatha® exclusivity on CVS/Zinc Commercial formularies, CVS also switched various CVS Medicare Part D formularies to Repatha® exclusively in January 2024.[256] The data is not available for the period, but using the same online search approach as described above, I am able to estimate the share of lives and claims affected by the formulary change. In January 2024, [redacted] of claims at CVS/Zinc are estimated to go through a formulary where Repatha® is the preferred PCSK9i. **Figures 19(a) and (b)** show the distribution of lives and claims for the 2024 prediction.

**Figure 19(a): CVS – Lives Covered by Formulary Status (January 2024 Estimated Commercial, Medicare and Medicaid segments)[257]**

[redacted]

[256] CAREMARK0001421 at 421 ("Medicare Pt. D will be Repatha® exclusive as of 1/1/2024").

[257] **Notes:** [a] *See* Appendix C for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. [b] MMIT data ends in June 2023. January 2024 figures are estimated by assuming that the formulary coverage in January 2024 is the same as for June 2023, with the exception of CVS/Zinc commercial formularies and CVS/Zinc Medicare formularies which were identified to switch to Repatha® exclusive based on online research. [c] IQVIA data ends in July 2023. Claims distribution for January 2024 are estimated assuming that the claims distribution remains as in July 2023.

**Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

**Figure 19(b): CVS – Claims by Formulary Status (January 2024* Commercial, Medicare and Medicaid segments)[258]**

[redacted]

### 6.1.4 Spillover Effects at Humana Part D

140. It is my understanding that Amgen made a portfolio offer to Humana Part D in August 2020.[259] While Repatha® was already exclusive on the Humana Part D formulary at the time, Amgen's offer operated to lock Praluent® out of Humana Part D. MMIT data shows that at the time of the offer, Humana Part D represented 17% of the Medicare segment in terms of lives,

[258] **Notes:** [a] [redacted] **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[259] Dep. Tr. A. Chiu, Executive Director, U.S. Value & Access at Amgen, 134:4-15 (Q. [redacted]).

and 22% in terms of claims. By July 2023, Humana Part D represented 19% of Medicare claims and 11% across all segments.

### 6.2 Spillover impacts on other PBMs increases foreclosure

141. A prescription drug that is excluded or disadvantaged on formularies covering a large portion of patients will tend to be prescribed less frequently even where it is at parity or preferred. This effect is referred to as a formulary "spillover" or "halo" effect."[260] One of the main factors that contribute to this spillover effect is that HCPs provide prescriptions based on what they expect is available to patients.[261] Since there are a multitude of plans, HCPs may tend to default to the product that they know is widely available in the region.[262] This phenomenon

---

[260] Y. Richard Wang, "Spillover effects of restrictive drug formularies in the statin class: a descriptive study of the Medicaid preferred drug list in Texas," 19 *Managed Care Interface* 11 (2006) ("A drug formulary restricted to a specific covered population may influence how physicians treat other patients (i.e., the 'spillover effect'). Previous studies on the proton-pump inhibitor (PPI) class revealed that spillover effects exist for restrictive drug formularies from Medicaid and private health insurance plans. Researchers have found that as a trend, the more a physician is exposed to a restrictive drug formulary, the larger its spillover effects will become. [. . .] These findings verify that spillover effects of restrictive drug formularies, previously verified for the PPI class, also exist for the statin class (albeit on a somewhat smaller scale)."); Hayden Consulting Group, "PBM Consolidation and its Impact on Geo Prescribing Patterns" (Nov. 28, 2023), https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/#:~:text=A%20positive%20POI%20indicates%20the,are%20covered%20by%20other%20payers ("Our findings reveal that in concentrated local markets, a dominant PBM's choice of preferred products_can influence prescribing market-wide, even for patients not covered by the dominant PBM. The magnitude of spillover varies by therapeutic area"); AMG10935-0000109970 at 970 ([redacted] Dep. Tr. J van Grunsven, VP/GM of General Medicine at Amgen, 179:24-182:7 [redacted]).

[261] Hayden Consulting Group, "PBM Consolidation and its Impact on Geo Prescribing Patterns," (Nov. 28, 2023), https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/#:~:text=A%20positive%20POI%20indicates%20the,are%20covered%20by%20other%20payers ("It is completely foreseeable, and rational, that a [health care] provider who repeatedly encounters difficulty prescribing a certain medicine (e.g., because it is not preferred by the dominant PBM in the local market), may be less likely to prescribe that product.").

[262] Dep. Tr. J. van Grunsven, VP/GM of General Medicine at Amgen, 179:11-181:4 ([redacted]

gives additional importance to securing access on formularies managed by the three largest PBMs. Amgen internal documents recognize the importance of spillovers. For example, when discussing the value of securing coverage for Repatha® with CVS/Zinc Commercial, Amgen noted the [redacted] s"[263] and an [redacted]."[264]

142. ESI, OptumRx and CVS represent the vast majority of PCSK9i claims, so Amgen's conditional rebating strategy to secure Repatha® exclusivity or preferred positioning can be expected to result in foreclosure beyond the lives covered by the specific formularies. In **Appendix D**, I implement two econometric analyses that estimate the magnitude of the spillover effect in the PCSK9i market. The two approaches find estimates of spillover effects that translate into a decrease of [redacted] points in Praluent® market share due to spillover effects from an initial [redacted] point decrease in Praluent® market share.

143. As an illustrative example of the spillover effect in the market, in **Figures 20(a) and (b)** I show Praluent®'s market share among National Preferred formularies and among formularies that had the same coverage status for Praluent® and Repatha®. I focus the analysis six months before and after the removal of Praluent® from ESI National Preferred commercial formularies to reduce the amount of confounding events (e.g., other big formulary changes that could contaminate the effect).

144. The figure shows in Panel (a), Praluent®'s share in units among ESI National Preferred commercial formularies before and after the Praluent® removal from ESI's commercial formularies in January 2021. Praluent®'s market share appears to be relatively stable until Praluent®'s Removal from ESI National Preferred formularies, but it drops sharply right after the removal of Praluent® from the ESI National Preferred formularies. There is a decrease in share from an average share of [redacted] before the change to 1[redacted] after the change.[265] Panel (b) shows Praluent®'s market share among formularies that had parity for Praluent® and Repatha® from July 2020 until June 2021, *i.e.*, formularies that were not directly affected by Amgen agreement. Panel B shows that the market share of Praluent® was relatively stable before January 2021, and also has a sharp reduction in Praluent®'s market share right after the Praluent®s removal from ESI National Preferred formularies. Within the window of analysis, Praluent®'s average share

---

[redacted] ."); *see also id.* at 182:2-15 [redacted] ").

[263] AMG10935-0000811337 at 337.

[264] AMG10935-0000109970 at 970 ([redacted]).

[265] The average is estimated for the months of July 2020-December 2020 and January 2021 and June 2021.

among the not-affected formularies went from [redacted] The fact that the sharp drop is happening within not-affected formularies when Praluent® is removed from ESI National Preferred formularies is due to the spillover effect.

145. The spillover translates to a decrease of [redacted] percentage points due to a [redacted] percentage point decrease in Praluent®'s market share triggered by the ESI National Preferred formularies change.[266] The econometric results I discuss in **Appendix D** find estimates of the same magnitude using two different econometric methods. Is important to note that these are lower bound estimates, as the spillover effect is dynamic (i.*e*., today's market share affects tomorrows market share *ad infinitum*).

**Figure 20(a): Praluent® Claims Market Share (Pharmacy Claims)[267]**
**Praluent®'s Market Share – ESI National Preferred Commercial Formularies**

[redacted]

---

[266] [redacted].

[267] **Notes:** [a] The grey bar in both figures denotes the last month Praluent® was available at ESI National Preferred commercial formularies. **Source:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

**Figure 20(b): Praluent® Claims Market Share (Pharmacy Claims)[268]**
**Spillover Effect – Formularies with Parity for Praluent® and Repatha®**

[redacted]

**7. The Aggregate Effect of Amgen's Conduct Substantially Foreclosed Regeneron from the U.S. PCSK9i Market**

146. ESI, OptumRx, CVS, and Humana Part D represent 95% of the U.S. PCSK9i market measured by claims and 81% of covered lives in the U.S. While gaining preferred positions with one of their national formularies could be a significant boost for a drug manufacturer, securing preferred positions among many key formularies across the three groups can effectively exclude competitors from the market by leaving them without channels to reach large numbers of customers.[269]

147. In the previous sections, I provided evidence of the effects that Amgen's strategy had in terms of removing Praluent® from key formularies. I showed evidence that the strategy was successful in (i) removing Praluent® from key formularies which in turn had a large

[268] **Notes:** [a] The grey bar in both figures denotes the last month Praluent® was available at ESI National Preferred commercial formularies. **Source:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[269] Alternative methods, such as paying the drug in cash are an unfeasible alternative for most patients given the high costs of the drug (list price is over $500). This is consistent with just around 0.2% of claims in IQVIA data being paid in cash.

effect on market shares within the affected formularies (*see* **Figure 10**, **Figure 13** and **Figure 18**), (ii) had an effect on other formularies within the same PBM that started to adopt Repatha® as the preferred drug (*see* **Figure 11** and **Figure 14**), and iii) had effect over other PBMs through spillovers effect at the prescription level (*see* **Figure 20** and **Appendix D**).

148. In this section, I consider all the effects together to estimate the amount of foreclosure in the PCSK9i market. To estimate the foreclosed share of the market, I consider the following:

a. First, the direct foreclosure from Amgen's anticompetitive strategy on the formularies affected by Amgen's [redacted] rebate offers.

b. Second, I consider the effect on other formulary decisions from the same PBMs groups. Due to spillover effects, many formularies from the same PBM groups are likely to change status *following* the changes to key formularies.

c. Third, I also consider foreclosure from other formularies that were Repatha® preferred *before* Amgen's anticompetitive offers. Due to spillover, it is likely that the decision of the formularies with a pre-existing Repatha® preferred formulary to maintain the same status was influenced by the agreements resulting from the portfolio rebates. This effect is likely to exist as contracts are often negotiated jointly and by the same persons. Regardless, the foreclosure from these formularies matters, as it still represents a share of the market to which Praluent® has no access and affects the success of Amgen's exclusionary conduct.

d. Finally, I also consider the magnitude of spillover effects that exist on other PBMs through the channel of prescriber behavior.

149. To estimate the foreclosed share of the market, I consider formularies where Repatha® is the preferred drug, either by having exclusivity or less restrictive utilization management requirements (e.g. Tier 2 vs Tier 3, or Praluent® requiring prior authorization or a patient having to try Repatha® first as a step edit). Both types of preference put Praluent® in a disadvantaged position by either removing full access to the drug to patients, or by imposing a higher cost to patients (e.g., through higher copayments or higher administrative costs such as getting prior authorization).

150. I provide estimates for July 2023 (latest date available in the data) and January 2024 (when CVS Medicare Part D formularies adopted Repatha® as the only covered drug).

151. Below I provide additional information regarding points a. to d. Then I provide estimates of foreclosure within each PBM, and finally I provide estimates at the market level.

### 7.1 Foreclosure at the Affected PBMs

#### 7.1.1 Formularies directly affected by Repatha®'s anticompetitive portfolio offers

152. Based on the documents and data I have reviewed, it is my opinion that the following formularies were directly affected, and thus Praluent® was excluded, by Amgen's anticompetitive Cross-Therapeutic Bundle scheme:

a. [redacted].[270] [redacted][271]

b. [redacted]: [redacted].[272]

c. [redacted]

d. [redacted]

[270] I use MMIT data to identify [redacted]. Since data for which specific formularies were affected by June 2023 is not available, I consider that any National commercial formulary that had Repatha® 1:1 in June and satisfied the National formulary requirement is affected by the contract.

[271] AMG10935_OCO-0000030231 at 244-45, 247 [redacted].

[272] I consider all National formularies from [redacted] that have Repatha® 1:1 since April 2020.

[redacted][273]

e. [redacted]

### 7.1.2 Foreclosure due to Amgen's anticompetitive portfolio agreements goes beyond the specific contracts

153. The effect of Amgen's conditional rebate strategy extends to other formularies. As explained herein in **Section 6.1** and **Appendix A**, changes in a formulary status influence future negotiation for other formularies (either at the same or other PBMs). When a large formulary selects a drug as the preferred one, other PBMs are more likely to make the same choice. [redacted].[274] [redacted].[275]

154. This type of spillover is likely stronger within PBMs that negotiate on behalf of multiple payors, participants, and/or clients, as one of the reasons they negotiate jointly is to pool their purchasing power. In addition, the same people often negotiate the contracts. [redacted][276] Contracts also often have clauses that facilitate the inclusion of new formularies within an existing agreement.[277] [redacted]

---

[273] The affected formularies are identified based on online research. *See* **Section 6.1.3.2** for a description.

[274] AMG10935-0000543928 at 929.

[275] AMG10935-000009231 at slide 3 ("[redacted] AMG10935-0000003029 at 065.

[276] Express_Scripts_1330_00004938 at 938 [redacted]; Express_Scripts_1330_00001813 at 815 [redacted].

[277] AMG10935_OCO-0000000672 at 679 (Fourth Amendment to the Rebate Program Agreement between Ascent Health Services LLC and Amgen USA Inc.).

[redacted]

155. MMIT data shows evidence of this type of spillover effect. **Figure 11 and Figure 14** in **Section 6.1.1** and **Section 6.1.2** show an accelerated increase in lives and claims shares for formularies with a Repatha® preferred position after the initial agreements for Ascent/ESI National Preferred Commercial formularies and OptumRx/UnitedHealthcare Commercial formularies. Evidence for CVS is not available because: (1) the changes to the CVS/Zinc Commercial formularies were implemented on the last date available in the data, and (2) consistent with the halo effect discussed above, CVS Medicare Part D adopted Repatha® as the preferred drug beginning January 1, 2024.

156. **Figures 21(a) and (b)** illustrate from the data how Ascent/ESI Commercial agreement to exclude Praluent® from its ESI National Preferred commercial formulary impacted Praluent® between January 2019 and June 2023.[279] As the figure shows, before January 2021, [redacted], but since the formulary change at ESI National Preferred the number and share of formularies with Repatha® only started to increase and reached [redacted]. Panel (b) shows the impact of the exclusivity at UnitedHealthcare commercial formularies that had Repatha® as the only covered drug on other OptumRx commercial formularies between January 2019 and June 2023. As with Ascent/ESI, there is also a clear increase in the number of formularies with Repatha® exclusivity *since* UHC's commercial formulary adopted Repatha® exclusivity. While similar evidence is not available for CVS/Zinc Commercial's agreement (the data ends in July 2023, the month of the agreement), the fact that CVS switched its Medicare Part D formularies to a Repatha® exclusivity starting January 1, 2024 is consistent with this type of spillover effect.

---

[278] Express_Scripts_1330_00007167 at 167-169 [redacted]

[279] I exclude Cigna and Prime Therapeutics formularies from the analysis as they had a significant share of pre-existing contracts with Repatha® preferred. I also exclude other PBMs part of Ascent as Humana commercial or Magellan Rx Management, to remove distortion arising from large agreements happening during the period of analysis.

**Figure 21(a): Counts and Share of Formularies with Repatha® as the Only Covered Drug Ascent/ESI Commercial Formularies, Excluding ESI's National Preferred Formularies (U.S. January 2019 to July 2023)[280]**

[redacted]

[280]**Notes:** [a] Repatha® Preferred means that Repatha® is either the only drug covered in the formulary or has a better tier placement than Praluent®. See **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. [b] Cigna formularies were incorporated into ESI as a PBM in July 2021. Cigna formularies are excluded from the ESI figure. [c] Dotted line corresponds to the month when Praluent® was removed from ESI National Preferred Formularies.. **Source:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

**Figure 21(b): Counts and Share of Formularies with Repatha® as the Only Covered Drug OptumRx Commercial Formularies, Excluding UHC (U.S. January 2019 to July 2023)** [281]

[redacted]

157. Considering the evidence of the existence of spillover effects within PBMs and GPOs, and that formulary contracts are often negotiated jointly to some extent, it is appropriate to also consider clients and participants from the same PBM/GPOs that changed their formulary to Repatha® preferred following Amgen's anticompetitive portfolio offer, but that were not eligible for the portfolio rebates, which would have otherwise counted towards direct foreclosure, as part of the foreclosure attributable to Amgen's portfolio agreements.[282]

[281] **Notes:** [a] Repatha® Preferred means that Repatha® is either the only drug covered in the formulary or has a better tier placement than Praluent®. See **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. [b] Dotted line corresponds to when Praluent® was removed from UnitedHealthcare commercial formularies. **Source:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[282] In particular, I consider all participants/clients within [redacted].

#### 7.1.3 Foreclosure estimates should consider formularies with Repatha® exclusivity before the portfolio offers

158. Even if a client/participant within an affected PBM/GPO had Repatha® as the preferred PCSK9i on its formulary before the specific portfolio offer, the decision to maintain that formulary design could also have been affected by Amgen's Cross-Therapeutic Bundle that foreclosed Praluent®. In particular, the adoption of the portfolio contract blocks any attempt by Praluent® to seek new sales through the channel of a GPO that would otherwise have responded to price competition.

159. Moreover, the extent of foreclosure deriving from Amgen's policies cannot be evaluated in isolation of the reality of the market. The higher the pre-existing foreclosed share of the market is, the easier it becomes for Amgen's exclusionary approach to remove Praluent® from the market by targeting specific formularies within the purchase groups.

#### 7.1.4 Total foreclosure at the affected PBMs

160. **Table 1** below provides foreclosure estimates *within* each PBM group for July 2023 based on claims.[283] The table splits the total foreclosure between foreclosure coming from the specific affected formularies offers (direct effect), foreclosure happening from spillover effects within the GPO formularies moving to Repatha® preferred *after* the respective agreements/offers, and from other formularies with Repatha® preferred. The table shows that by July 2023, [redacted]

**Table 1: Praluent®'s Foreclosure *Within* Each PBM Group as of July 2023[284]**

[283] As explained above, MMIT data ends in June 2023 while IQVIA data ends in July 2023. For this scenario I assume that the lives coverage in July 2023 is the same as in June 2023. I further performed online research to identify a significant share of CVS/Zinc commercial formularies that went with Repatha® preferred in July 2023.

[284] **Notes:** [a] [redacted] [h] *See* **Table 2** for details in the January 2024 scenario. [i] *See* **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. **Sources:** [1]

[redacted]

161. [redacted]

AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

285 "Direct Effect" includes formularies that received/contracted for portfolio rebates.

[redacted]

162. **Table 1** also breaks down Praluent®'s total foreclosure by source. For example, out of the [redacted] of [redacted] claims that are being directly foreclosed, [redacted] percentage points are attributable to [redacted] formularies, [redacted] percentage points to [redacted] and [redacted] percentage point to "others" (e.g., [redacted] [redacted] and [redacted]

163. As of July 2023, Praluent® is foreclosed from [redacted] of [redacted] claims: 11% of [redacted] is foreclosed due to its agreement concerning [redacted] [redacted] due to within PBM spillover effects, and [redacted] due to formularies with a pre-existing preferred status for Repatha®.

164. As of July 2023, Praluent® was foreclosed from [redacted] of [redacted]

165. At CVS, total foreclosure reached [redacted] in July 2023. This is divided between a direct effect of the formularies removed in July 2023 [redacted] of claims) [redacted]). [redacted]

**Table 2: Praluent®'s foreclosure at CVS as of January 2024**[287]

---

[286] Note that the formularies affected by the spillover effect are conservatively calculated as I cannot identify all formularies that maintained Repatha® as a preferred drug due to within-PBM spillover, so various formularies are included in the third category.

[287] **Notes:** [a] [redacted]. [f] See **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. [g] Numbers may not add up due to rounding. **Sources:** [1] AMG10935-DATA-0000000138 - AMG10935-DATA-0000001406 (MMIT). [2] AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX).

[redacted]

166. As detailed above, the extent of foreclosure at each of the PBMs is significant. Next, I estimate how the foreclosure at each PBM translates to overall foreclosure in the U.S. PCSK9i market

### 7.2 Total Praluent® Foreclosure in the PCSK9i Market

[redacted]

168. **Table 3**, below, summarizes how I reached the total foreclosure estimates. The first column shows the share of the U.S. PCSK9i market that each PBM represents. For example, the [redacted] at [redacted] given [redacted] market share, translates into [redacted] being foreclosed due to Amgen's [redacted] rebating strategy at [redacted] Once I consider each affected PBM, I find that [redacted] market is foreclosed as a direct effect of Amgen's [redacted] rebate offers and agreements. An [redacted] is foreclosed due to within-PBM spillover, and an [redacted]

169. However, I find that the effect of Amgen's conditional rebating strategy extends beyond the affected PBMs and spills over to other parts of the U.S. PCSK9i market. For this analysis, I considered three alternative methods to estimate spillover effects, and with all of them, I found spillover effects that range between [redacted] In **Table 3** below, [redacted]

[288] "Direct Effect" includes formularies that received/contracted for portfolio rebates.

170. Taking into account all of the above, I find that the total share of the market foreclosed to Praluent® [redacted]

**Table 3: Total Praluent® Foreclosure from the U.S. PCSK9i Market as of July 2023**[289]

[redacted]

171. **Table 4** shows the same break-down, but for January 2024. I find that by January 2024, Praluent® was foreclosed from [redacted]

[289] **Notes:** [a] The formularies affected by the portfolio offers are: [redacted] [c] Column *[c]* includes formularies with Repatha® preferred in July 2023 that had Repatha® as the preferred drugs in the dates from point described in *[b]* [d] MMIT data ends in June 2023. July 2023 figures are estimated by assuming that the formulary coverage from June 2023 holds for July 2023. IQVIA data that reports claims until July 2023. [e] Percentages may not add up due to rounding. [f] Coverage status at CVS/Zinc formularies in July 2023 is updated in the analysis based on online research. [g] The estimated spillover effect of 5.5pp per 10pp change is adjusted to reflect the market share of Praluent® within the specific PBM in the 6 months preceding the first anticompetitive agreement/offer, [redacted] [h] *See* **Appendix C** for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[290] "Direct Effect" includes formularies that received/contracted for portfolio rebates.

**Table 4: Total Praluent® Foreclosure from the U.S. PCSK9i Market as of January 2024[291]**

[redacted]

## 8. Amgen's Portfolio Rebates Were Exclusionary and Anticompetitive

### 8.1 Amgen's Portfolio Rebates as an Exclusionary Strategy

172. Bundled rebates that create exclusion and suppress head-to-head price competition are anticompetitive[293] The essential element of Amgen's [redacted] rebate strategy is

---

[291] **Notes:** [a] The formularies affected by the portfolio offers are: [redacted] [c] Column *[c]* includes formularies with Repatha® preferred in January 2024 that had Repatha® as the preferred drugs in the dates from point described in *[b]* [d] MMIT data ends in June 2023. January 2024 figures are estimated by assuming that the formulary coverage from June 2023 holds for January 2024. IQVIA data ends in July 2023, for the analysis, it is assumed that the claims distribution across formularies in January 2024 is the same is in July 2023. [e] Coverage status at CVS formularies in January 2024 is updated in the analysis based on online research. [f] *See* Appendix C for an explanation of the formulary classification and an explanation of how MMIT and IQVIA data were combined. [g] The estimated spillover effect of 5.5pp per 10pp change is adjusted to reflect the market share of Praluent® within the specific PBM in the 6 months preceding the first anticompetitive agreement [redacted] [h] Numbers may not add up due to rounding. **Sources:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[292] "Direct Effect" includes formularies that received/contracted for portfolio rebates.

[293] *See, e.g.*, *Cascade Health v. PeaceHealth*, 515 F.3d 883, 914-19 (9th Cir. 2008) ("To summarize, the primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival is (sic) who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter. Thus, a plaintiff who challenges a package discount as anticompetitive must prove that, when the full amount of the discounts given by the defendant is allocated to the competitive product or products, the resulting price of the competitive product or products is below the defendant's incremental cost to produce them.").

that it makes rebates for one or more essential products (Enbrel® and Otezla®) conditional on formulary placement for another product (Repatha®). If the PBM must buy Enbrel® and Otezla® then it would not make sense economically for them to risk rebates tied to those much larger products in order to obtain rebates on much smaller PCSK9i products. The way Amgen structured its [redacted], allowing Amgen to obtain favorable access for Repatha®, and exclude Praluent, without offering additional rebates on Repatha®.

173. With the [redacted] rebate strategy, Amgen is able to get preferred placement for Repatha® despite Regeneron offering larger rebates on Praluent® for similar placement on the formulary. Meanwhile, by accepting the portfolio offer, the PBM preserves higher rebates on Enbrel® and Otezla® that would be very costly to lose given the volume of sales for those two products. Avoiding those lost rebates far outweighs the higher price it pays for Repatha® versus Praluent®.

174. Note that a simple portfolio strategy does not provide PBMs with additional value on Enbrel® or Otezla® that Amgen would not otherwise provide were it to negotiate formulary placement for Enbrel®, Otezla®, and Repatha® separately. The exclusionary strategy does not require that the conditional rebates be larger than what Amgen would otherwise offer; they are simply conditioned on PBM behavior in another market. In addition, Amgen can raise its list price and increase its rebates by the same amount, leaving its net price unchanged but raising the cost to PBMs of covering Praluent®. As a result, the conditional rebates are properly considered penalties that Amgen has threatened if Repatha® is not preferred rather than additional value being provided to PBMs.

175. First, the same conditional rebate ensures formulary placement for each of the products linked in the rebate agreement. [redacted] While in an arithmetic sense no rebate increased because of the contract combining them, the [redacted] has the same impact as offering an incremental rebate of $100 million for each product if formulary placement were negotiated for each separately. Instead of agreeing to a separate large rebate for each product, Amgen gets double or triple duty from a single rebate.

176. Second, the formulary rebate is not necessarily an incremental rebate. Suppose Amgen would have offered a total rebate for Enbrel® of 40% if negotiating separately for Enbrel® placement. If Amgen instead offers a 37% rebate on Enbrel®, plus an additional three percentage points on Enbrel® conditional on formulary placement for Enbrel® and Repatha®, then there is no additional cost to Amgen. [redacted]

[redacted]e.[294] The same total rebate, with a portion recast as a [redacted] can effectively guarantee preferred placement for both Enbrel® and Repatha®.

177. Third, even if the formulary compliance rebate did offer additional rebate points on Enbrel® that the PBM would not have received if Amgen were negotiating for Enbrel® placement alone, the additional rebate will not lead to a lower net price if Amgen raises the list price for Enbrel® at the same time. [redacted] ].[295] [redacted] "[296]

178. Amgen's [redacted] [redacted] was effective because it exploited something that Regeneron could not match: other products with very large sales made to the same purchasers (PBMs). Regeneron's portfolio of products does not include other drugs sold through the pharmacy channel with sales volume anywhere close to that of Enbrel® and Otezla®. Thus, Regeneron could not match Amgen's portfolio strategy with a portfolio strategy of its own: while Amgen could condition millions of dollars of rebates for Enbrel® and Otezla® on placement for Repatha®, which the PBM would lose if it did not give Repatha® preferred placement, Regeneron did not have in its portfolio blockbuster products sold through pharmacies which could have the same influence on PBM PCSK9i formulary decisions.

179. Since Regeneron could not match a [redacted] [redacted] offer with a similar portfolio offer, the only way it could try to compete would be to offer additional rebates on Praluent® that would compensate PBMs for the rebates they would lose on Enbrel® and Otezla® if they did not give preferred formulary placement to Repatha®. [redacted] ecause of the much greater volume of Enbrel® and Otezla® sales compared to PCSK9i sales, [redacted]

---

[294] AMG10935-0000022627 at 627 [redacted] .")

[295] AMG10935-0000009567 at slide 1 (2020-2022 Ascent Commercial Bid update).

[296] AMG10935-0000009567 at slide 1 (2020-2022 Ascent Commercial Bid update).

180. The impact of this tilted playing field is clearly seen in the net price graphs shown in **Figure 22.** In the third quarter of 2020, just after Amgen first entered into a [redacted] rebate contract with PBMs, [redacted]®. Over the next three years, the Repatha® net price was [redacted]. The difference was that while Amgen was offering conditional rebates on other products, [redacted]

**Figure 22: Praluent® and Repatha® Average Net Prices, Q1 2019 – Q2, 2023**[297]

[redacted]

181. Importantly, [redacted]

[297] **Source:** [1] REGN-DATA-0002 – ATTORNEYS' EYES ONLY.XLSX, REGN-DATA-0003 – ATTORNEYS' EYES ONLY.XLSX, REGN-DATA-0018 – ATTORNEYS' EYES ONLY.XLSX, REGN-DATA-0019 – ATTORNEYS' EYES ONLY.XLSX. (Regeneron GTN) [2] AMG10935-DATA-0000001439.XLSX. (Amgen LEDR).

[redacted]

**Figure 23(a): Enbrel® Average Gross and Net Prices, Q1 2019 – Q2, 2023[298]**

[redacted]

**Figure 23(b): Otezla® Average Gross and Net Prices, Q3 2020 – Q2, 2023[299]**

[redacted]

[298] **Source:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data).

[299] **Source:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data).

182. As discussed below, some of Amgen agreements with major PBMs were multi-year contracts. However, the exclusionary impact of [redacted] contracts does not hinge on being negotiated for multiple years. An annual renewable contract that penalizes PBMs for giving Praluent® formulary access is an effective exclusionary strategy because if the incentives of the firms do not change, the same outcome will result from year to year. If a contract incorporating a threat to withdraw Enbrel® or Otezla® rebates incentivizes a PBM to exclude Praluent® one year, a similar contract would have the same effect the next year as well because the underlying economics that factor into the PBM's decision would be similar. Therefore the term of the contract is not the determinative factor in whether or not a [redacted] contract is exclusionary.

183. By leveraging the market power of Enbrel® and Otezla®, Amgen was able to [redacted]. To counteract the threat of lost rebates on Enbrel® and Otezla® if Repatha® was not given preferred formulary placement, [redacted] Raising rivals' costs is a well-recognized exclusionary strategy firms use to preserve or expand their market power.[300] [redacted] Amgen was able to expand its share of the U.S. PCSK9i market and foreclose Praluent® at the largest PBMs without appreciably dropping its net price for Repatha®.

184. Amgen's [redacted] . [redacted]

[300] Thomas G. Krattenmaker and Steven C. Salop, "Anticompetitive exclusion: Raising rivals' costs to achieve power over price," 96 *Yale Law Journal* 209 (1986); Jonathan B. Baker, "Exclusion as a core competition concern," 78 *Antitrust Law Journal* 527, 538 (2012).

[redacted]

### 8.2 Amgen's Cross-Therapeutic Conditional Rebates Were Anticompetitive

185. Given the large sales volume of Enbrel® and Otezla®, the cost to a PBM of losing several percentage points of rebate on those products is substantial. To compensate a PBM for the conditional rebates it would lose if it were to cover Praluent® on its formularies, Regeneron has to provide a similar total rebate value just on sales of Praluent®. [redacted] If PBMs cannot recover the lost rebates on Enbrel® and Otezla® through Praluent® rebates at a sustainable price level, Regeneron has no feasible strategy to retain formulary access for Praluent®.

186. There are multiple ways to illustrate how portfolio rebates can facilitate the exclusion of rivals (even equally or more efficient rivals). One way is already shown above by the effective price of Repatha® after attributing the rebates Amgen offered or gave on Enbrel® and/or Otezla®. [redacted].

187. Another way to show how portfolio rebates can facilitate the exclusion of rivals is by imposing a penalty on a PBM for choosing the rival. It helps to consider a simplified example. Suppose the list price for a particular drug is $500 and that demand for a particular PBM plan is 1,000 units per month. In exchange for exclusive coverage status, suppose that manufacturer A offers a package of rebates, fees, and price protection that is equivalent to a 30% rebate off the drug's original list price. Under the simplifying assumption that exclusive coverage status begets a market share of 100%, manufacturer A's offer of a 30% rebate implies a total cost savings of 30% X $500 X 1,000 = $150,000. This number represents the PBM plan's opportunity cost of rejecting manufacturer A's offer for 1:1 coverage. To successfully counter this offer, all that a rival manufacturer must do is offer a package of rebates, fees, and price protection that generates at least $150,000 in cost savings for the PBM plan.

188. But now suppose that manufacturer A offers a [redacted] rebate. In addition to the original 30% rebate for exclusive coverage, suppose that manufacturer A makes 1% of rebates on an unrelated drug in its portfolio conditional on the PBM giving exclusive coverage on *both* of manufacturer A's drugs. Assume this unrelated drug is both expensive and popular, with a list price of $1,500 and demand equal to 10,000 units per month. Then, the opportunity cost incurred by the PBM of not giving exclusive placement to both of manufacturer A's drugs is equal to $150,000 + 1% X $1,500 X 10,000 = $300,000. By offering a [redacted] rebate, manufacturer A has effectively doubled the required rebate that rival manufacturers must offer the PBM for it to even consider denying manufacturer A exclusive coverage. Importantly, this portfolio strategy leaves the net price of the original drug unchanged. In practice, manufacturer A could reduce the

direct rebate on the first drug and still achieve exclusive coverage. The reason: the PBM's cost of losing even a small percentage rebate on the popular drug is simply too great.

189. A simplifying feature of this example is the assumption that a rival manufacturer would capture 100% of a PBM's demand under exclusive coverage. In practice, and especially in the PCSK9i market, this assumption is unlikely to hold. Instead, exclusive coverage for a rival manufacturer's drug – in this case, Praluent® – does not necessarily result in 100% market share at a specific PBM. To account for this possibility, suppose that manufacturer A would capture 100% of demand under exclusive coverage but would still capture between 20-30% of demand when excluded from the PBM's formulary. This range of entrenched market share is consistent with both Amgen and Regeneron internal documents that Amgen would retain substantial market share even under a formulary with exclusive Praluent® coverage scenario at major PBMs: [redacted][301] For this range of entrenched market share in our example, the impact of manufacturer A's [redacted] rebate grows considerably. If a rival manufacturer would capture only 100% - 20% = 80% of demand, a 30% rebate from this rival generate cost savings for the PBM of just $30\% \times \$500 \times 80\% \times 1000 = \$120{,}000$. Thus, a 30% rebate from the rival manufacturer produces $30,000 less value for the PBM than an equivalent rebate from manufacturer A.

190. To highlight the exclusionary impact of Amgen's conduct on Regeneron's ability to compete for market access, I solve for the minimum rebate that Regeneron would have had to offer on Praluent® to remain competitive against Amgen's portfolio rebates. This minimum rebate, as shown in Appendix B, is given by a simple formula. Within the context of a specific PBM plan (or collection of plans), let $d_R$ denote Repatha®'s rebate rate (%) under exclusive coverage, let $s_R$ denote Repatha®'s share of sales under exclusive coverage, and let $s_P$ denote Praluent®'s share of sales under exclusive coverage. Then, the minimum rebate that Regeneron must offer to overcome Amgen's portfolio rebates is:

$$\bar{d} = \frac{d_R s_R + \frac{\text{Value of Portfolio Rebates for Payor}}{\text{Gross PCSK9i Sales at Plan}}}{s_P}.$$

191. This minimum rebate metric ("MRM") is analogous to the "effective entrant burden" ("EEB") metric developed by Abrahamson and Scott Morton (2017) to measure the exclusionary impact of loyalty rebates.[302] For a given [redacted] rebate agreement, a higher value of $\bar{d}$ corresponds to a higher necessary rebate that Regeneron must offer on Praluent® and, hence,

[301] AMG10935-0000655366 at slide 5.

[302] Fiona Scott Morton and Zachary Abrahamson, "A unifying analytical framework for loyalty rebates," 81 *Antitrust Law Journal* 777 (2016).

a higher likelihood of Praluent® being excluded. In our earlier example, the MRM implied by manufacturer A's [redacted] is:

$$\frac{30\% \times 100\% + \frac{\$150{,}000}{\$500 \times 1000}}{100\%} = 30\% + \frac{\$150{,}000}{\$500{,}000} = 30\% + 30\% = 60\%.$$

192. The intuition behind this MRM calculation is straightforward. Because the [redacted] doubles the PBM's opportunity cost of rejecting manufacturer A's bid for 1:1 coverage, the only way a rival manufacturer could successfully compete is to offer the PBM a rebate that is twice as large as the PCSK9i rebate offered by manufacturer A, namely $2 \times 30\% = 60\%$.

### 8.2.1 Amgen's use of exclusionary portfolio rebates

193. In the remainder of this section, I analyze the extent to which Amgen's portfolio rebates harmed Regeneron's ability to compete for market access. Specifically, I estimate the MRM implied by the specific terms of Amgen's contracts [redacted]

#### 8.2.1.1 *Ascent/ESI Commercial*

194. In July 2020, Amgen entered into an agreement with Ascent/ESI Commercial, [redacted]

303 Express_Scripts_1330_00002544 at 544 [redacted]

[redacted][305]

195. Amgen's contract with Ascent/ESI [redacted][306] [redacted]).[307] **Table 5** summarizes Ascent/ESI's own comparison of the three coverage bids made by Amgen for 2020, including the forecasted total rebate value corresponding to each bid.

[304] AMG10935_OCO-0000000672 at 688-689 (Fourth Amendment (Attachment A-2 to Exhibit A)).

[305] AMG10935_OCO-0000030231 at 231 (Fourteenth Amendment (Attachment A-2 to Exhibit A, [redacted])).

[306] AMG10935-0000128836 at 837 [redacted]

[307] AMG10935-0000000878 at 891-892 (Sixth Amendment to the Rebate Program Agreement between Ascent and Amgen, effective 1/1/2021).

**Table 5: Ascent/ESI Commercial Comparison of Forecasted Rebates Comparison Between Repatha® Exclusivity, Praluent® Exclusivity, and Parity[308]**

[redacted]

196. [redacted].[309] [redacted][310] [redacted][311] [redacted].[312]

[308] Express_Scripts_1330_00002667.

[309] AMG10935-DATA-0000001439 (Amgen - ESI Rebates Data).

[310] AMG10935-DATA-0000001439 (Amgen - ESI Rebates Data); Express_Scripts_1330_00002667 at slides 2, 3. [redacted]

[311] The number includes ESI, CIGNA, Prime and Navitus commercial formularies.

[312] AMG10935-0000655366 at 370 (Amgen slide titled "Competitive Scenario Modeling: [redacted]").

197. Putting this all together, the estimated MRM implied by Amgen's [redacted] is:

[redacted]

199. Given the sheer magnitude of the MRM implied by Amgen's [redacted]

### 8.2.1.2 *OptumRx/UHC Commercial*

200. Next, I consider Amgen's contract with OptumRx/UHC Commercial. [redacted][316] The [redacted].[317] From the data [redacted]® and [redacted].[318] Over the duration of the

[313] This is a conservative estimate of the minimum rebate for Praluent® to obtain 1:1 status at Ascent/ESI, as it does not consider the impact of additional manufacturer discounts, such as administrative fees and price protection. Including these discounts would only serve to raise the MRM implied by Amgen's contract with Ascent/ESI.

[314] REGN-DATA-0007 – ATTORNEYS' EYES ONLY (Regeneron COGS Data); REGN-DATA-0018 – ATTORNEYS' EYES ONLY (Regeneron GTN 2022).

[315] Express_Scripts_1330_00002611 at 611.

[316] AMG10935-OCO-0000005529 at 589 (Twenty-Fifth Amendment to the Rebate Agreement between Amgen and UHC/OptumRx); AMG10935-DATA-0000001407 (Amgen LEDR Data).

[317] AMG10935-OCO-0000005529 at 546, 583 (Twenty-Fifth Amendment to the Rebate Agreement between Amgen and UHC/OptumRx).

[318] MRM Calculation Sheet.

[redacted] Amgen [redacted] estimate that [redacted][320]

201. Putting this all together, the estimated MRM implied by Amgen's portfolio rebate contract at OptumRx/UHC Commercial is:

[redacted]

202. Given a list price of around [redacted] for Praluent® at this time, to make a successful exclusivity bid Regeneron would have to sell Praluent® at a net price of [redacted] per unit, which would have been [redacted] lower (equivalent to [redacted]) than the [redacted] net price offered for Repatha®.[321]

203. **Table 6** calculates the MRM implied by Amgen's contract with [redacted]

[319] MRM Calculation Sheet.

[320] AMG10935-0000655366 at 370 ([redacted]"); REGN0030688 at 688-689 (Regeneron email regarding "United Healthcare (UHC)/Optum – PRALUENT").

[321] REGN-DATA-0018 - ATTORNEYS' EYES ONLY (Regeneron GTN 2022); AMG10935-DATA-0000001407 (Amgen LEDR Data).

[322] AMG10935-0000655366 at 370; REGN0030688 at 688-689 (Regeneron email regarding "United Healthcare (UHC)/Optum – PRALUENT").

**Table 6: Praluent®'s Required Rebate to Overcome Amgen's Portfolio Rebates at OptumRx/UHC Commercial (September 2021 to December 2022)[323]**

[redacted]

204. These MRM calculations demonstrate that Regeneron could not have realistically countered Amgen's agreement with UHC [redacted] a result, Regeneron was forced, due to Amgen's conditional rebating strategy, to offer artificially higher rebates on Praluent®. Instead of using its portfolio strategy, Amgen could have used direct rebates as a competitive weapon against Regeneron. Doing so would have provided identical value to PBMs and obviously much higher value to consumers who take PCSK9i drugs. But Amgen did not.

#### 8.2.1.3 *CVS/Zinc Commercial*

205. Amgen [redacted][324] [redacted] Despite the offer's tremendous value, [redacted].[325]

206. To quantify the [redacted][326] During this time,

[323] **Source:** MRM Calculation Sheet.

[324] AMG10935-0001611588 at 589 and AMG10935-0001611590 at 591 [redacted].

[325] MRM Calculation Sheet.

[326] MRM Calculation Sheet.

Praluent® had exclusive coverage on the CVS Performance Formulary and received a market share of around [redacted][327] By contrast, Repatha®'s market share before losing exclusive status in 2020 was around [redacted][328] [redacted].[329] Entering these numbers into the MDM formula, I calculate a minimum necessary rebate on Praluent® equal to

[redacted]

207. [redacted]

208. In the evaluation of Amgen's conduct, economic theory and empirical data align. Amgen systematically pursued an exclusionary portfolio rebating strategy in the U.S. PCSK9i market. It did so for two simple reasons. First, due to its high operating expenses, Amgen was unlikely to succeed in obtaining a high market share in head-to-head competition against

---

[327] MRM Calculation Sheet.

[328] MRM Calculation Sheet.

[329] AMG10935-0001611588 at 589 and AMG10935-0001611590 at 591 [redacted]").

[330] This is a conservative estimate of the minimum rebate for Praluent® to obtain 1:1 status at CVS Performance commercial formulary, as it does not explicitly consider the impact of additional manufacturer discounts, such as administrative fees and price protection. Including these discounts would only serve to raise the MRM implied by Amgen's proposed contract with CVS/Zinc.

[331] *See e.g.*, Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 229:22-230:14 [redacted].

Praluent®. Second, using the power of its portfolio of unrelated drugs to advance Repatha®'s dominance, Amgen could cripple Praluent®'s ability to compete on the merits.

**9. Harms to Competition, Consumers, and Regeneron**

209. Amgen's conditional rebating strategy undermined Praluent®'s ability to compete,[332] as evidenced by Praluent®'s rapidly declining market share during the exclusionary period.[333]

210. **Figure 24**, shows Praluent®'s market share in the U.S. PCSK9i market, and in dotted lines the quarter before when Praluent® was removed from ESI National Preferred commercial formularies, UHC commercial formularies and CVS commercial formularies. The figure shows that [redacted]

---

[332] Dep. Tr. M. Gordon, EVP of Global Commercial Operations at Amgen, 40:10-14 (Q: [redacted] t").

[333] [redacted]

**Figure 24: Praluent® PCSK9i Claims Market Share, U.S.**[334]

[redacted]

211. **Figure 25** shows that this effect indeed can be attributed to Amgen's [redacted] rebate strategy. The figure shows Praluent®'s share of net sales in the PCSK9i market in the U.S. vs Rest of World based on Amgen and Regeneron's reports to investors. While Praluent®'s share in the U.S. [redacted] ([redacted])[335] Praluent®'s shares [redacted]. However, Praluent®'s overall market share in the U.S. has [redacted] Amgen's PBM portfolio rebates were introduced, while Praluent®'s market share in the Rest of World, where those portfolio rebates do not apply, has

[334] **Notes:** Q3 2023 YTD includes only the month of July. **Source:** AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX).

[335] In 2019, Regeneron was informed that an Amgen sales representative promoting Repatha® told a nurse in a Houston cardiology practice that, in discussing Praluent®, "pretty soon you won't be able to write that [Praluent®] anymore." Likewise, an Amgen sales representative told an Alabama cardiology group that Sanofi and Regeneron had "lost the case" and that Praluent® was being taken off the market. An Amgen sales representative in Lexington, Kentucky, told a physician that Praluent® was "being discontinued and to stop writing it," leading the doctor to believe – and for the doctor to inform three patients – that he needed to switch his patients from Praluent® to Repatha®. March 8, 2019 letter from D. Wilks to M. Sharp re Amgen Inc. et al. v. Sanofi et al. *See* Dep. Tr. M. McCourt, Executive Vice President and Head of Commercial at Regeneron, 106:15-107:8 (…"I believe it might be a reference to there was a window of time where through discussions with Amgen certain payers and even sometimes physicians in their offices were being told that because of Amgen's legal action that Praluent would be potentially taken off the market, and that of course never happened, it wasn't true, you know, the trials progressed, but I believe that's what he was referring to there.").

[redacted] Based on these reported results, Repatha®'s share of PCSK9i net sales in 2023 in the U.S. had increased to more than [redacted].[337]

**Figure 25: Praluent® PCSK9i Net Sales Market Share, U.S. vs ROW[338]**

[redacted]

### 9.1 Disincentive for Amgen to Engage in Head-to-Head Competition.

212. Amgen's exclusionary conduct allowed it to avoid pro-competitive forms of rivalry such as innovation and price competition.[339] For example, [redacted]

---

[336] In fact, Praluent®'s Rest of World market share is an interesting signal of how Praluent® could have performed absent Amgen's exclusionary conduct. *See, e.g.*, REGN0263236 ( [redacted]

[337] Earnings Call, *Amgen*, "Amgen Inc. Q3 2023 Earnings Call Transcript" (Oct. 31, 2023). *See also* AMG10935-0000143668 at slides 9, 13 [redacted] ); AMG10935-0000512428 at slide 26 (Deck from 2/8/22 noting [redacted].

[338]**Note:** [a] Market share is defined by Praluent® total net sales in the specific region divided by Praluent®+Repatha® net sales in the region. **Source:** [1] Regeneron's 10K for 2017-2023 fiscal years ending in December 31. [2] Amgen's 10K for 2017 -2022 fiscal years ending in December 31 and "Amgen Reports Fourth Quarter And Full Year 2023 Financial Results," Amgen Press Release, Feb. 6, 2024, https://www.amgen.com/newsroom/press-releases/2024/02/amgen-reports-fourth-quarter-and-full-year-2023-financial-results.

[339] See Federico, Giulio, Fiona Scott Morton, and Carl Shapiro. "Antitrust and innovation: Welcoming and protecting disruption." 20 *Innovation Policy and the Economy* 125 (2020).

[redacted][340] Amgen's own projections showed that, with Regeneron's innovative low-dosage option, [redacted][341] [redacted]e,[342] and [redacted]

213. However, [redacted] 2,[343] but in [redacted]nt®.[344] A [redacted].[345] [redacted][346]

### 9.2 Reduced Consumer Choice

214. An important element of competition is that it gives customers a choice among different products. Since customers generally have different preferences across products, choice provides value to customers by letting them pick the product that best suits their tastes, needs, or preferences. For pharmaceutical products, the best choice for a particular patient is often medically driven, given differences in symptoms, other drugs taken, allergies, and idiosyncratic responses to different drugs.[347] By foreclosing Praluent® from much of the U.S. PCSK9i market,

---

[340] *See* AMG10935-0000230057 at slides 8-10; AMG10935-0000632018 at slide 14.

[341] AMG10935-0000230057 at slide 8.

[342] *Id.* at slide 10.

[343] *Id.* at slide 14. *See also* AMG10935-0000907149 ([redacted]).

[344] *Amgen, Inc., Repatha® (evolocumab) package insert*, at 2-3 (Sept. 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125522s029s031lbl.pdf.

[345] Federico et al., *supra* note 338, at 2 ("[I]nnovation is best promoted when market leaders are allowed to exploit their competitive advantages while also facing pressure to perform coming from both conventional rivals and from disruptive entrants. . . . [A] market leader is best motivated to innovate if it fears losing its leadership position to a disruptive rival.").

[346] *See, e.g.*, Dep. Tr. M. Gordon, Executive Vice President, Global Commercial Operations, 281:24-282:15 ([redacted]).

[347] Eckel Report ¶ 9.

Amgen has effectively constrained choice for many patients to a single product, and eliminated the benefit of choice for those patients.[348]

215. There are several reasons why patients benefit from having access to Praluent®. As noted, unlike Repatha®, Praluent® is available in a low dose version, and therefore it can be beneficial to start patients on a low dose version of Praluent® before switching to a higher dose version if additional cholesterol control is needed.[349] In addition, Praluent® and Repatha® have different interactions and risks, so some patients who have particular risk factors or have issues with one product would benefit by being able to switch to the other.[350] As explained by Dr. Michael Doyle, Medical Director at the UnaSource Comprehensive Weight Loss Center, the ability of choice between PCSK9 inhibitors involves the "art of medicine [ ], to have more choices is always better than have less choices. More tools in your toolbox rather than less tools in your toolbox."[351]

### 9.3 Increases in Net Prices

216. Amgen's conduct harms (i) customers, (ii) product innovation, and (iii) competition as a whole.

217. The primary price impact from Amgen's exclusionary conduct is that net prices to PBMs for PCSK9i products are and will be higher than they would have been in the [redacted]. The threat of [redacted] compelled PBMs to give preferred access to Repatha® despite Amgen offering lower rebates (higher net prices) on Repatha® than were available on Praluent®. Rebates to PBMs are passed on to health plans, which pass on some of the lower costs in the form of lower health insurance costs.[352] Thus by offering lower rebates on Repatha® as part of its [redacted] strategy, Amgen sold

---

[348] Dep. Tr. M. Doyle, Medical Director at the UnaSource Comprehensive Weight Loss Center, 111:14-25 (in response to questioning on patient preference of Praluent® versus Repatha®, Dr. Doyle elaborated that he "would like to have all the tools in the toolbox to make the best decision for our patients for safety and efficacy . . . I would like all the tools available. I would like them not with just these two drugs. I would like it with all the drugs so we can do what's best for the patient.").

[349] Dep. Tr. R. Pordy, VP of Clinical Sciences, General Medicine, 66-68; *see also* Eckel Report Section VI, ¶¶ 64-79.

[350] Dep. Tr. R. Pordy, VP of Clinical Sciences, General Medicine, 227-230; *see also* Eckel Report Section V, ¶¶ 53-63.

[351] Dep. Tr. M. Doyle, Medical Director at the UnaSource Comprehensive Weight Loss Center, 60:23-:25; *see also*, Expert Report of Dr. Eckel at ¶ 62 ("Some patients will respond better or suffer fewer or less severe adverse drug reactions on one of the PCSK9 inhibitors as compared to the other. Having both PCSK9 inhibitors available is thus important to physicians in their clinical practice. Without multiple PCSK9 inhibitors available, physicians and patients will otherwise often be left with the choice to either continue treatment on a drug that is not very effective and/or induces potentially debilitating side effects or to stop treatment with the drug class all together, leaving those patients exposed to a heightened risk of heart attacks, strokes and death.").

[352] AMG10935-0000544275 at 301 ([redacted]).

[redacted].[353]

218. [redacted].[354] Assessing the impact on market prices is complicated by the fact that, in the but-for market without Amgen's exclusionary conduct, PBMs may have opted for either exclusive or parity coverage. However, either way, there has been harm to customers from Amgen's exclusionary conduct.

219. In the absence of portfolio rebates, Amgen and Repatha® would have competed for formulary access by each providing a menu of rebates for exclusive or parity coverage for its own individual drug, with PBMs then choosing which option provided the best option for their health plans.[355] [redacted][356] Because a portion of rebates is passed through to plan sponsors, so are higher prices. Moreover, as shown above, there is no evidence that net prices on Enbrel® and Otezla® were lower as a result of Amgen using conditional portfolio rebates.

220. The PCSK9i market in the first half of 2020 gives a good picture of what but-for prices and competitive outcomes would have been if Amgen had not engaged in using exclusionary Cross-Therapeutic Bundles. As discussed above, Amgen recognized that Regeneron [redacted] lower non-contested share of the market, which gave Regeneron more incentive to bid for an exclusive formulary position. [redacted][357] [redacted]

---

[353] Dep. Tr. J. Witter (Zinc 30(b)(6)), 80:2-11 [redacted]

[354] [redacted]. AMG10935-0000115008; AMG10935-0000022627 at slide 3.

[355] For a model of how rebates are determined through competition between pharmaceutical companies to obtain access at PBMs, *see* Ho, Kate and Robin S. Lee," Contracting over Rebates: Formulary Design and Pharmaceutical Spending," page 31 (October 2023), available at https://kateho.scholar.princeton.edu/sites/g/files/toruqf4136/files/documents/20231019_Formulary_Design.pdf.

[356] *See, e.g.*, AMG10935-0000054619 at slide 5 [redacted].); AMG10935-0000028500 at slide 2 ("[redacted].").

[357] AMG10935-0000013130 at 143-4.

[redacted].[358] The strategy worked for Regeneron and also for consumers, who benefited from lower prices.

221. For PBMs that would have chosen parity coverage, it is important to recognize that the interests of PBMs and downstream customers are largely aligned with respect to formulary choices. PBMs typically receive higher rebates from pharma companies in exchange for exclusive coverage, but doing so eliminates a preferred option for some portion of beneficiaries. Sponsors who opt for plans that give beneficiaries more choice do so because they have determined that beneficiary (often employees or purchasers of Part D policies) satisfaction outweighs the lower prices available with exclusive coverage. Those PBMs and their plan members are made better off by choosing parity formulary coverage taking into account both differences in prices and the benefits of choice. However, [redacted] Recall that by July 2023, all three major PBMs had chosen exclusive Repatha® coverage on their main commercial formularies.

222. In summary, regardless of whether in the but-for market, PBMs would have chosen exclusive or parity coverage, customers were harmed by Amgen's use of portfolio rebates through a combination of higher prices and reduced choice.

### 9.4 Evidence of Reduced Investment

223. Pharmaceutical R&D typically does not stop once a product is on the market, as pharmaceutical companies often continue to invest in ways to increase demand for the product via research on the effects and efficacy of their products, development of alternative formulations or treatment methods to improve efficacy, and expanding indications where their product can provide medical benefits.[359] To justify the investment in that research, pharmaceutical companies need to expect a return from these continued development efforts. By reducing Praluent®'s margin, market access, and share, Amgen has undermined Regeneron's ordinary incentive to continue to invest in Praluent® for the U.S. market.[360] By eliminating competition on

---

[358] AMG10935-0000230057 at slide 8.

[359] *See* Dep. Tr. R. Pordy, VP of Clinical Sciences, General Medicine, 158:11-14 [redacted]

[360] My interview of John Ryan, Head of Rare Disease & Cardiometabolic Commercial Business Unit at Regeneron, on February 8, 2024 [redacted] *See also* Dep. Tr. M. McCourt, Executive Vice President and Head of Commercial at Regeneron, 60:21-61:08 ("Q. [redacted]"), 139:12-15 [redacted]

the merits from Praluent®, [redacted]e.[361] That loss in innovation, and the associated potential benefits to patients from additional Praluent® R&D, is a harm to competition and consumers from Amgen's conduct.[362]

224. There is a broader harm to competition if [redacted] contracts across therapeutic classes are legitimized in the pharmaceutical market. Generally speaking, larger pharmaceutical companies are the only firms which have the broad portfolio necessary to implement portfolio rebates. Smaller companies and newer startups cannot match these offers from large companies and cannot effectively counteract the penalty imposed on PBMs other than by pricing at unsustainably low prices. Therefore, if [redacted] are legitimized and startups realize that they will have an uphill, possibly unwinnable battle in gaining market access against entrenched products from large companies whose exclusive access can be protected through portfolio rebates that will deter investment in innovative new startup products in the pharma marketplace.[363]

225. This concern about using a [redacted] to exclude innovative competitors was core to the FTC's review of Amgen's acquisition of Horizon Therapeutics plc. Horizon has two "orphan drugs" (the only FDA approved therapy for their respective indications) that will lose exclusivity in 2027. New products to treat these indications are being developed by other companies. The FTC concluded that, but for the restrictions in it Consent Decree, "the deal would enable Amgen to leverage its portfolio of blockbuster drugs to protect the monopoly

---

[redacted]

[361] AMG10935-0000230057 at slide 5 ("[redacted]

[362] *See* Dep. Tr. R. Pordy, VP of Clinical Sciences, General Medicine, 194:17-195:1 [redacted]

[363] Federico et al., *supra* note 338, at 156 ("[I]f a firm considering investing to develop a new product expects to make fewer unit sales and to earn a smaller margin on those sales, the firm's incentive to develop that new product will inevitably be reduced").

positions of two Horizon drugs."[364] This was based in part on Amgen's prior use of Cross-Therapeutic Bundles (which the FTC refers to as cross-product bundling) to protect the monopoly position of other products: "One exclusionary tactic that Amgen has previously deployed is cross-product bundling, where it uses its blockbuster drugs to secure from PBMs preferential placements or exclusionary access for its non-blockbuster drugs, thereby excluding rivals. This sort of cross-product bundling scheme can lock out new competitors—even if their products are more affordable or effective."[365] The FTC settlement prohibits including the acquired Horizon drugs in cross-product bundles, but there is nothing to prevent Amgen from using cross-product bundles to protect other products like Repatha® from competition from smaller firms.

### 9.5 No Pro-Competitive Justification

226. I am not aware of any pro-competitive justification for Amgen's [redacted]. As noted above, industry participants including Amgen describe [redacted]. Because the products span business units, there is no complementarity between the products for patients or HCPs. Nor is there a one-stop shop benefit since Amgen would be negotiating with PBMs for rebates on all of its products regardless of whether those rebates are conditioned on coverage across multiple products. Given the lack of pro-competitive benefits, I conclude that on balance Amgen's portfolio rebates are harmful to competition and to customers.

## 10. Conclusions

227. Amgen originally attempted to secure a monopoly position in the PCSK9i market through patent infringement litigation that would have enjoined Praluent® from sales in the U.S. When that litigation was unsuccessful, and it became clear that Praluent® was successfully competing and gaining share in the U.S. market, Amgen devised an alternative exclusionary strategy involving novel [redacted] These [redacted] conditioned the [redacted].

228. By leveraging its substantial market power over Enbrel® and Otezla®, Amgen was able to secure preferred placement for Repatha® at all three major PBMs and to exclude Praluent®, without competing head-to-head with Regeneron in providing more value to PBMs through lower rebates on PCSK9i products. [redacted]

[364] Press Release, *FTC Approves Final Order Settling Horizon Therapeutics Acquisition Challenge*, Fed. Trade Comm'n. (Dec. 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/12/ftc-approves-final-order-settling-horizon-therapeutics-acquisition-challenge.

[365] Statement, *In the Matter of Amgen, Inc. and Horizon Therapeutics plc*, Lina M. Khan et al., Fed. Trade Comm'n. (Sept. 1, 2023) https://www.ftc.gov/system/files/ftc_gov/pdf/Statement-of-Chair-Lina-M-Khan-re-Amgen-Horizon.pdf.

[redacted].

229. Amgen's [redacted] strategy was harmful to Praluent®, which would have [redacted] Such anticompetitive exclusion is harmful to competition and competitors by suppressing choice, raising costs to downstream health plans, and reducing the incentive for innovation in the market.

# 11. Appendices

## 11.1 Appendix A: Background On Competition in the Pharmaceutical Industry

### 11.1.1 Pharmaceutical industry background

230. The pharmaceutical industry involves the research, development, manufacture, and sale of branded and non-branded drugs. In this section, I provide an industry overview with particular attention paid to distinctive characteristics that are relevant to my economic analysis of Amgen's conduct in the market for PCSK9 inhibitors.

#### 11.1.1.1 *High fixed costs to bring new drug to market*

231. A pharmaceutical manufacturer must invest years of work and considerable upfront fixed costs to develop new drug products and secure regulatory approval to sell those products. The high, and increasing costs associated with the research and development (R&D) and regulatory approval of new drugs have been well documented.[366] Even a new drug that shows initial promise must go through years of clinical patient trials to test whether it is safe and effective.

---

[366] Joseph A. DiMasi and Henry G. Grabowski, "The Cost of Biopharmaceutical R&D: Is Biotech Different?," 28 *Managerial and Decision Economics* 469 (2007). This figure includes the R&D expenditures on failed products and the 'time costs' of pharmaceutical development, as many costs are expended many years before a drug is finally approved."); Olivier J. Wouters, Martin McKee & Jeroen Luyten, "Estimated Research and Development Investment Needed to Bring a New Medicine to Market," *2009-2018*, JAMA, 5 (Mar. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7054832/?report=reader (Study analyzed the R&D costs associated with 63 new drugs and biologics approved by the FDA between 2009 and 2018. Accounting for the cost of failed trials, the study found that the estimated median and average cost to bring a drug to market was $985 million and $1.3 billion, respectively.); Darius N. Lakdawalla, "Economics of the Pharmaceutical Industry," 56 *Journal of Economic*

232. The FDA, for example, typically requires a new drug to pass through what are referred to as Phase 1, 2 and 3 trials in order to receive regulatory approval for use.[367] These trials are costly and time consuming, and the vast majority of them ultimately fail at some point during process. This is particularly true for drugs that treat cardiovascular disease, where the clinical trials "tend to involve complex and expensive testing, large numbers of patients, and long timeframes."[368] A recent study found that only 4.8 percent of new drugs that treat cardiovascular disease successfully moved from Phase 1 clinical trials to final FDA approval, and that the approval process spanned nearly 12 years on average.[369] New drug failures have also taken place for PCSK9 inhibitor treatments. In November 2016, Pfizer discontinued its Phase 3 clinical trials for its PCSK9 inhibitor, bococizumab.[370] While the cost of a clinical trial can vary, one study found the median cost to be $19 million, with some trials costing more than $100 million.[371]

233. The large fixed costs associated with the R&D and regulatory approval of pharmaceutical products generate considerable scale economies in the sale of prescription drugs.[372] Government provided patent protection typically enables pharmaceutical manufacturers to recover their fixed costs by selling at a price that is substantially above their marginal costs. One consequence of this pricing and cost structure is that shifts in market share have a considerable

*Literature* 397-449 (2018), (The pharmaceutical industry "is an [sic] research and development (R&D)-intensive industry" with annual worldwide R&D expenditures of about $75 billion in 2011.) See, Joseph A. DiMasi, Henry G. Grabowski & Ronald W. Hansen, "Innovation in the pharmaceutical industry: New estimates of R&D costs," 47 *J. Health Econ.* 20, 31 (2016), https://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/12742/DiMasi-Grabowski-Hansen-RnD-JHE-2016.pdf (reporting that the average capitalized R&D costs for new drug development has continued to increase over the past two decades).

[367] In Phase 1, researchers determine the "drug's basic properties and safety profile in humans" using healthy people. Phase 2 is comprised of efficacy trials with volunteers who are part of the drug's target population, and ends with meetings with FDA officials to discuss potential concerns and protocols for the next stage. Phase 3 is typically the "most extensive and expensive" stage, where human testing continues. See, Aylin Sertkaya, Anna Birkenbach, Ayesha Berlind & John Eyraud, "Examination of Clinical Trial Costs and Barriers for Drug Development," 1–2 (July 25, 2014), https://aspe.hhs.gov/sites/default/files/private/pdf/77166/rpt_erg.pdf.

[368] *Id.* at 4-2

[369] PharmaIntelligence Informa, "Clinical Development Success Rates and Contributing Factors 2011-2020," 10–11, 24 (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf.

[370] Pfizer, "Pfizer Discontinues Global Development of Bococizumab, Its Investigational PCKS9 Inhibitor," (Nov. 1, 2016), https://www.pfizer.com/news/press-release/press-release-detail/pfizer_discontinues_global_development_of_bococizumab_its_investigational_pcsk9_inhibitor.

[371] Thomas J. Moore, Hanzhe Zhang, Gerard Anderson & C. Caleb Alexander, *Estimated Costs of Pivotal Trials for Novel Therapeutic Agents Approved by the US Food and Drug Administration, 2015-2016*, 178 JAMA Internal Med. 1451, 1457 (Sept. 24, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6248200/#!po=68.7500.

[372] Shelia Campbell,"Promotional Spending for Prescription Drugs," Congressional Budget Office, 2 (Dec. 2, 2009), ("Pharmaceutical manufacturers promote more of their products to both physicians and consumers in the first few years after a drug has received approval from the FDA."), https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/105xx/doc10522/12-02-drugpromo_brief.pdf.

impact on the profitability of pharmaceutical manufacturers, providing strong incentives for them to protect the market shares of their successful products.

#### 11.1.1.2 *Self-administered versus physician-administered drugs*

234. In general, pharmaceutical drugs are either self-administered by the patient or administered by a physician. Self-administered drugs are typically acquired by the patient from a pharmacy and taken at home.[373] These drug purchases are typically covered as an insurance "prescription drug benefit" where the patient pays only a co-payment to the pharmacy. For Medicare, such a "prescription drug benefit" falls under Part D. Repatha® and Praluent® are both self-administered drugs that patients acquire from a pharmacy, and as such insurance coverage is governed by a medical benefit plan policy.

235. Physician-administered drugs are drugs that are not taken at home by the patient, but are administered—usually injected or infused—in a physician's office. These drug purchases are typically covered as a "medical benefit" where the physician buys the drug, administers it to the patient, and then bills insurance company.[374] For Medicare, such a "medical benefit" falls under Part B. In contrast to Repatha® and Praluent®, the PCSK9 inhibitor drug Leqvio® is a physician-administered drug, and as such insurance coverage is not typically governed by a prescription drug formulary.

236. There is a separate supply chain and corresponding flow of payments for drugs acquired under a patient's prescription drug benefit versus their medical benefit.[375] Below I discuss the supply chain and flow of funds for prescription drugs.

#### 11.1.1.3 *Conventional and biological drugs*

237. At a high level, there are two groups of pharmaceutical drugs used in the treatment, prevention, or cure of disease. The first group is commonly referred to as conventional, small-molecule pharmaceutical drugs, and includes such well-known products as aspirin and penicillin. These drugs are typically manufactured by combining specific chemical ingredients,

---

[373] Scott Morton and Kyle, "Handbook of Health Economics," Chapter 12, 813 (2012).

[374] AMG10935-0000615954 at 954 ("Two types of drug benefits – Medical Benefits: physician buys medicine, administer to patient, then bills insurance company (e.g. Medicare Part B benefit, Average Selling Price reimbursement to physician) – Pharmacy Benefit: doctor prescribe medicine, filled at pharmacy (e.g. Medicare Part D benefit)").

[375] *FTC v. Amgen*, No. 23-3053, Dkt. No. 130, Mem. by Amgen in Opp'n to Pl.s' Motion for Prelim. Inj., at 3 (N.D. Ill. Aug 22, 2023) ("The Amgen products that Plaintiffs allege would be included in a bundle are patient-administered and covered under pharmacy benefit plans supervised by pharmacy benefit managers ("PBMs"), whereas TEPEZZA® and KRYSTEXXA® are intravenous infusions administered by healthcare providers and primarily covered under medical benefit plans managed by insurance payors. These are vastly different reimbursement mechanisms, with meaningful substantive differences in the biopharmaceutical industry.").

and as such the formulation of the drug is well-defined and relatively easy to manufacture and imitate.[376] Conventional drugs typically have a small molecular weight that enables them to pass through the wall of a human cell to deliver the needed treatment. For this reason, these drugs usually can be taken orally in the form of a tablet, capsule, or liquid.[377]

238. A second group of drugs, referred to as biologics, began to enter the market in the 1980s.[378] For example, Praluent® and Repatha®, both monoclonal antibodies, are biologic drugs; as are stem cell therapies. These drugs are generally derived from living cells or organisms, and they tend to have large, complex molecular structures.[379] Unlike conventional drugs, the formulation of biologics is not well-defined and as such they are more difficult and costly to produce.[380] Given their large, complex molecular structure, these drugs are typically administered

---

[376] U.S. Food and Drug Administration,"Frequently Asked Questions About Therapeutic Biological Products," (July 2015) https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequently-asked-questions-about-therapeutic-biological-products ("[C]hemically synthesized small molecular weight drugs [] have a well-defined structure and can be thoroughly characterized[.]").

[377] Amgen, "Small Molecule," https://www.amgen.com/stories/2018/08/the-shape-of-drugs-to-come/small-molecule#:~:text=Small%20molecules%20are%20usually%20taken,engage%20targets%20inside%20the%20cell ("Small molecules are usually taken by mouth in the form of a tablet, capsule, or liquid, but they can also be injected or infused. [. . .] Because of their size, these compounds can pass through cell walls to engage targets inside the cell.").

[378] Morton and Kyle Handbook of Health Economics (Chapter 12) 2012, p. 797 ("Biologics, some of which have been on the market since the 1980s [. . . ]").

[379] *Id*. at p. 772 ("Over recent decades, drug discovery has evolved from random screening of chemicals to "rational drug design," which is based on the understanding of a biological process. Drug candidates, once almost exclusively small molecules, now include large, complex molecules usually referred to as biologics."); *Drugs.com*, "What is a biologic drug?" Drugs.com, (Jan. 28, 2022), https://www.drugs.com/medical-answers/what-biologic-drug-3565613/ ("What is a biologic? A biologic is a drug or vaccine made from a living organism. A biologic can be made from proteins, sugars, DNA, cells or living tissue, for example. The source may be human, animal or a microorganism (like a bacteria or virus)."); U.S. Food and Drug Administration "Biosimilar Basics for Patients," (Oct. 26, 2023) https://www.fda.gov/drugs/biosimilars/biosimilar-basics-patients. ("What are biologic medications? Biological products (also called biologics) can be made of sugars, proteins, living cells, tissues, or a combination of these. They are made from natural and living sources like animal and plant cells, and microorganisms such as bacteria or yeast. Biological medications are usually more complex than other drugs.").

[380] U.S. Food and Drug Administration, "Frequently Asked Questions About Therapeutic Biological Products," (July 7, 2015) https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequently-asked-questions-about-therapeutic-biological-products ("[B]iological products are generally derived from living material--human, animal, or microorganism--are complex in structure, and thus are usually not fully characterized [. . .] [B]iologics are subject to provisions of both the FD&C [Federal Food, Drug, and Cosmetic] Act and the PHS [Public Health Services] Act. Because of the complexity of manufacturing and characterizing a biologic, the PHS Act emphasizes the importance of appropriate manufacturing control for products."); Drugs.com, "What is a biologic drug?" (Jan. 18, 2024), https://www.drugs.com/medical-answers/what-biologic-drug-3565613/ ("Because biologic drugs are so complex: [. . .] They are more difficult to make, and much more expensive."); Morton and Kyle Handbook of Health Economics (Chapter 12) 2012, p. 773 ("For small-molecule drugs, production costs are low relative to the cost of drug development. [. . .] For biologic drugs, manufacturing costs are a larger percentage of total cost[.]"); Darius N. Lakdawalla, "Economics of the Pharmaceutical Industry," 56 *Journal of Economic Literature* 403 (2018) ("A biologic drug is a medicinal product of biotechnology. Biologics are much more difficult to imitate than conventional small-

to a patient via injection and their effectiveness is less predictable, such that one biologic drug treatment may work better than another for a particular patient.[381]

239. Biologics are increasingly important for the treatment of disease. In 2022, biological drugs accounted for nearly a quarter of total global drug sales, up from about 19% in 2014.[382]

#### 11.1.1.4 *Third-party payors*

240. Another distinctive characteristic of markets for pharmaceutical products is that those deciding whether to use a prescription drug and, if so, which drug to buy—typically health care professionals (HCPs) and their patients—are distinct from the Third-Party Payors that pay for those pharmaceuticals, typically commercial health insurance companies, government agencies, unions, and large employers. This creates a potential moral hazard issue, since HCPs and patients may not fully internalize the cost of different treatments. This characteristic, by itself, would tend to give pharmaceutical firms significant ability to raise prices, since HCPs and patients are not fully incentivized to switch away from higher priced products.

241. In response to this seller market power, Third-Party Payors have increasingly turned to Pharmacy Benefit Managers (PBMs) in an effort to help control pharmaceutical prices by creating countervailing buyer power.[383] On behalf of Third-Party Payors,

---

molecule products, because their production depends on the cultivation of a specific biological ‘cell line’ that may be difficult to reproduce.”); U.S. Food and Drug Administration “Biosimilar Basics for Patients,” (Oct. 26, 2023) https://www.fda.gov/drugs/biosimilars/biosimilar-basics-patients. (“Biological medications are usually more complex than other drugs. They are often more complicated to purify, process, and manufacture.”).

[381] Drugs.com “What is a biologic drug?” (Jan. 18, 2024) https://www.drugs.com/medical-answers/what-biologic-drug-3565613/ (“Because biologic drugs are so complex: The response is less predictable. They may work better for some people than others, and the response may change over time. This may require changing to another biologic.”).

[382] “Size of the global chemical drugs and biologics pharmaceutical market from 2014 to 2023 (in billion U.S. dollars),” Statistica, https://www.statista.com/statistics/1085563/revenue-chemical-drugs-and-biologics-global-pharmaceuticals/ (reporting 2022 worldwide biologic sales of $371 billion and chemical drug sales of $1.156 trillion); Scott Morton, F.M., Stern, A.D. & Stern, S. The Impact of the Entry of Biosimilars: Evidence from Europe. 53 *Rev Ind Organ*, 173–210, 180 (2018) (reporting that “biologics represent a significant and growing share of global pharmaceutical spending[.]”).

[383] For the commercial segment of the market, PBMs handle the pharmacy benefit of all types of private group health plan sponsors, such as HMO plans, self-insured employer plans, indemnity plans, labor union plans, and plans covering public employees. See Ernst R. Berndt, Thomas G. McGuire, and Joseph P. Newhouse, “A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets” (National Bureau of Economic Research Working Paper No. 16879, 2011); Sara Fisher Ellison and Christopher M. Snyder, “Countervailing Power in Wholesale Pharmaceuticals,” *58 The Journal of Industrial Economics 32* (2010). See also, Darius N. Lakdawalla, “Economics of the Pharmaceutical Industry,” 56 Journal of Economic Literature 403, 428 (2018) (“Further complicating matters has been the advent of PBMs. Traditionally, PBMs focused on processing and administering prescription drug insurance claims. However, they have also become involved in the negotiation of prices and rebates

PBMs attempt to create price competition between pharmaceutical manufacturers for similar drug treatments by expanding demand for the manufacturer that offers the most favorable pricing terms and shrinking demand for those manufacturers offering less favorable terms. Taking advantage of its scale of large buyers, the PBM moves demand for the drug through assignment of drugs to formulary tiers or copays, or exclusion of the drug from the formulary altogether. The physician and the patient respond to the out-of-pocket costs (patient) or the prior authorization (physician) and tend to consume the product that is favored by the PBM. In this role, PBMs can be considered the most important U.S. buyers of self-administered prescription drugs acquired through a pharmacy.[384] The PBM is tasked to negotiate with the manufacturer for a rebate off of the drug's list price, which the manufacturer pays to the PBM in the form of a rebate.

242. PBMs also can take advantage of their informational advantage about product prices and alternatives to influence choices made by less well-informed HCPs and patients. One important tool used by PBMs to influence patient choice and mitigate supplier bargaining power is the creation of formularies. A formulary is a Third-Party Payor's official list of covered prescription drugs that may be used by patients, typically with different tiers corresponding to different levels of patient co-payments.[385]

243. Publicly funded Medicare prescription drug benefits for outpatient care are provided through what's known as Medicare Part D.[386] The federal government does not directly provide Part D coverage to patients, instead it contracts with commercial health insurance companies to offer drug coverage plans and administer healthcare to Medicare beneficiaries.[387] To receive Medicare Part D coverage, patients must sign up for a coverage plan from an approved private commercial health insurer.[388] Most commercial health insurance companies that administer Medicare plans either own or partner with PBMs to help manage the prescription drug benefits

---

in the marketplace (Scherer 2000, pp. 1325–28). Indeed, it seems natural for PBMs to negotiate, since they are also setting formulary design, which provides them with leverage against manufacturers.").

383 Scott Morton and Kyle, "Handbook of Health Economics," Chapter 12, 810, 814 (2012); U.S. Government Accountability Office "MEDICARE PART D Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization", (July 2019), https://www.gao.gov/assets/gao-19-498.pdf at 14.

384 Scott Morton and Kyle Handbook of Health Economics (Chapter 12) (2012) at 810 and 814; MEDICARE PART D Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization, U.S. Government Accountability Office, (July 2019), https://www.gao.gov/assets/gao-19-498.pdf at 14.

385 Berndt, McGuire, and Newhouse (2011).

386 Medicare under Part B also provides medical benefit coverage for outpatient services, including in-office physician-administered injections of pharmaceutical drugs such as Novartis' Leqvio. *See*, MEDICARE INTERACTIVE.org, "The parts of Medicare (A, B, C, D),", https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/original-medicare.

387 *Medicare Part D*, MEDICARE INTERACTIVE.org, https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/medicare-part-d.

388 *Medicare Part D*, MEDICARE INTERACTIVE.org, https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/medicare-part-d.

under Medicare Part D.[389] PBMs are estimated to manage about three quarters of Medicare Part D plans.[390]

244. The three largest U.S. Third-Party Payors for both commercial and Medicare Part D segments of the PCSK9 inhibitor market are Express Scripts ("Ascent/ESI"), OptumRx/UnitedHealthcare ("Optum/UHC"), and CVS Caremark ("CVS"), and together account for nearly 80% of all prescriptions filled.[391] In the U.S., they also account for more than 80% of all insured lives and about 85% of all commercially insured lives managed by PBMs.[392] [redacted].[393] Major health insurance payors are also increasingly vertically integrated, often owning PBMs, Group Purchasing Organizations

---

[389] "MEDICARE PART D [-] Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization," *U.S. Government Accountability Office*, (July 2019), p. 41, https://www.gao.gov/assets/gao-19-498.pdf.

[390] "MEDICARE PART D [-] Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization," *U.S. Government Accountability Office*, (July 2019), p. 14, https://www.gao.gov/assets/gao-19-498.pdf.

[391] See, Fein, Adam. "Top Pharmacy Benefit Managers of 2022: Market Share and Trends for the Biggest Companies," *Drug Channels*, May 23, 2023, https://www.drugchannels.net/2023/05/the-top-pharmacy-benefit-managers-of.html ("We estimate that for 2022, about 80% of all equivalent prescription claims were processed by three companies: the Caremark business of CVS Health, the Express Scripts business of Cigna, and the OptumRx business of UnitedHealth Group.").

[392] AMG10935-0000009549 at 551 ("Ascent/ESI Commercial Bid Discussion," May 15, 2020) ("[redacted] [.]" [redacted] AMG10935-0000135313 at slide 6 (Moore Exhibit 25) ([redacted]"; "[redacted]]"); AMG10935-0000138112 at 115 (Apr 6, 2022, Amgen presentation titled [redacted]n" and prepared by Tom Moore) ([redacted] also Def.'s Letter Regarding Discovery Dispute, Ex. A, Regeneron Pharmaceuticals, Inc. v. Amgen Inc., No. CV 22-00697- RGA-JLH, (D. Del. Feb. 10, 2023), ECF No. 107 (reporting that the [redacted]."); Letter from Alliance for Pharmacy Compounding, et al. to FTC and DOJ Antitrust Division re: Federal Trade Commission and Department of Justice's Draft Vertical Merger Guidelines (Feb. 26, 2020) at 2, https://www.ftc.gov/system/files/attachments/798-draft-vertical-merger-guidelines/02-26-20_joint_pharmacy_stakeholder_comments_-_ftc_doj_draft_vertical_merger_guidelines.pdf (stating that consolidation "has essentially created an oligopoly of integrated healthcare companies controlling nearly all aspects of the healthcare and pharmacy supply chain.").

[393] Dep. Tr. T. Moore, Vice President of Market Access, Marketing, Contracting, and Trade at Amgen, 40:20-23 [redacted] see also Def.'s Letter Regarding Discovery Dispute, Ex. A, Regeneron Pharmaceuticals, Inc. v. Amgen Inc., No. CV 22-00697- RGA-JLH, (Dkt. No. 107) (Feb. 10, 2023), [redacted] – who now represent over 80% of all insured lives within the United States."); AMG10935-0000615954 at 964; AMG10935-0000079826 at 11, 22.

(GPOs),[394] pharmacies, and in some cases even health care providers.[395] As such, these payors "[redacted]."[396] In response to the

---

[394] The largest PBMs have more recently launched GPOs that help negotiate drug rebates with pharmaceutical manufactures. Cigna/Express Scripts launched Ascent Health Services in 2019, CVS launched Zinc Health Services in 2020, and UHC/Optum launched Emisar Pharma Services in 2021. See, Adam Fein, "Five (or Maybe Six?) Reasons that the Largest PBMs Operate Group Purchasing Organizations," Drug Channels (May 24, 2023) https://www.drugchannels.net/2023/05/five-or-maybe-six-reasons-that-largest.html. See also, AMG10935-0000079826 at slide 15 ("In May 2019, Ascent was launched by Express Scripts to manage rebate negotiations, followed by CVS in February 2020 with Zinc."); Federal Trade Commission Press Release "FTC Further Expands Inquiry Into Prescription Drug Middlemen Industry Practices," (June 8, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-further-expands-inquiry-prescription-drug-middlemen-industry-practices ("Emisar, like Zinc and Ascent, negotiates rebates with drug manufacturers. Emisar negotiates these rebates on behalf of OptumRx and, like OptumRx, is a subsidiary of UnitedHealth Group."); Adam Fein, "Mapping the Vertical Integration of Insurers, PBMs, Specialty Pharmacies, and Providers: A May 2023 Update," Drug Channels (May 10, 2023), https://www.drugchannels.net/2023/05/mapping-vertical-integration-of.html.

[395] AMG10935-0000615954 at 964; AMG10935-0000079826 at 11 [redacted] ) and slide 27 ( [redacted] .); AMG10935-0000135313 at slide 3 (Moore Exhibit 25) ("[redacted] [.]"); *See*, e.g., *Examining the Drug Supply Chain: Hearing Before the Subcomm. On Health of the H. Comm. On Energy & Commerce*, 115th Cong. 77 (Dec. 13, 2017) (statement of Mark Merritt, President, Pharmaceutical Care Management Association), pp. 1-2, https://docs.house.gov/meetings/IF/IF14/20171213/ 106730/HHRG-115-IF14-Wstate-MerrittM-20171213.pdf ("In the past two years alone, CVS Health (which was already both the single largest pharmacy chain in the country and the second largest PBM) acquired Aetna (the third-largest health insurance company in the country); and Cigna (another of the so-called 'big-five' health insurers) acquired Express Scripts (the largest PBM). The third major PBM (OptumRx) is already affiliated with the single largest health insurer in the country (UnitedHealthcare)."); Letter from Alliance for Pharmacy Compounding, et al. to FTC and DOJ Antitrust Division re: Federal Trade Commission and Department of Justice's Draft Vertical Merger Guidelines, 2 (Feb. 26, 2020), https://www.ftc.gov/system/files/attachments/798-draft-vertical-merger-guidelines/02-26-20_joint_pharmacy_stakeholder_comments_-_ftc_doj_draft_vertical_merger_guidelines.pdf; Anna Wilde Mathews and Aisha Al-Muslim "CVS Completes $70 Billion Acquisition of Aetna," Wall Street Journal, Nov. 28, 2018, available at https://www.wsj.com/articles/cvs-completes-70-billion-acquisition-of-aetna-1543423322; "Cigna and Express Scripts Seal $54 Billion Merger," Wall Street Journal, December 20, 2018, https://www.wsj.com/articles/cigna-and-express-scripts-seal-54-billion-merger-11545327979.

[396] AMG10935-0000544275 at 279 ("[redacted] . .]"); AMG10935-0000615954 at 958 ("Payer[redacted] AMG10935-0000615954 at 964 ("[redacted] Federal Trade Commission Press Release, "FTC Deepens Inquiry into Prescription Drug Middlemen" (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-deepens-inquiry-prescription-drug-middlemen ("The largest PBMs are integrated with the largest health insurance companies and wholly owned mail-order and specialty pharmacies. They influence which drugs are prescribed to patients, which pharmacies patients can use, and how much patients ultimately pay at the pharmacy counter.").

increased importance, consolidation, and vertical integration of PBMs, the FTC has launched an inquiry into the "prescription drug middlemen industry," stating that:

> *The Commission's inquiry will examine pharmacy benefit managers' role at the center of the U.S. pharmaceutical system. Pharmacy benefit managers are the middlemen who are hired to negotiate rebates and fees with drug manufacturers, create drug formularies and surrounding policies, and reimburse pharmacies for patients' prescriptions. The largest pharmacy benefits managers are now vertically integrated with the largest health insurance companies and wholly owned mail order and specialty pharmacies.*
>
> *In these roles, pharmacy benefit managers often have enormous influence on which drugs are prescribed to patients, which pharmacies patients can use, and how much patients ultimately pay at the pharmacy counter.*[397]

245. Moreover, the PBM market has seen increasing consolidation in recent years with the rise of group purchasing organizations ("GPOs") that negotiate rebate agreements with drug manufacturers on behalf of PBMs and their health plans. These new GPOs include Ascent Health Services LLC ("Ascent") negotiating on behalf of ESI and its clients (collectively, "Ascent/ESI"); Emisar Pharma Services LLC ("Emisar") negotiating on behalf of OptumRx (collectively "Emisar/OptumRx"); and Zinc Health Services ("Zinc") negotiating on behalf of CVS Caremark and CVS Health (collectively, "Zinc/CVS"). The big three Third-Party Payors, via their GPOs and PBMs, additionally negotiate formulary placement and rebates on behalf of regional health insurance companies and smaller PBMs.[398] This further aggregates the influence and control the largest payers have over pharmaceutical drug formulary decision-making in the

---

[397] "FTC Launches Inquiry Into Prescription Drug Middlemen Industry," Federal Trade Commission Press Release, June 7, 2022, https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry ("The agency's inquiry will scrutinize the impact of vertically integrated pharmacy benefit managers on the access and affordability of prescription drugs." [. . . ] 'Although many people have never heard of pharmacy benefit managers, these powerful middlemen have enormous influence over the U.S. prescription drug system,' said Federal Trade Commission Chair Lina M. Khan. 'This study will shine a light on these companies' practices and their impact on pharmacies, payers, doctors, and patients.'); "FTC Deepens Inquiry into Prescription Drug Middlemen," Federal Trade Commission Press Release, May 17, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-deepens-inquiry-prescription-drug-middlemen; "FTC Further Expands Inquiry Into Prescription Drug Middlemen Industry Practices," Federal Trade Commission Press Release, June 8, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-further-expands-inquiry-prescription-drug-middlemen-industry-practices.

[398] Report of H. Bates, ¶ 10; AMG10935-0000121753 at p. 3 ([redacted]) [redacted]).

U.S., and as a result manufacturers of pharmacy benefit drugs find it critically important to secure formulary coverage from these payors.[399]

#### 11.1.1.5 *Pharmaceutical drug distribution supply chain and flow of payments*

246. The flow of pharmaceutical products through the supply chain from manufacturer to patient generally follows the following relatively straight-forward path: pharmaceutical firms supply the product to wholesale distributors, who distribute to pharmacies, who dispense the product to patients after those patients have secured a prescription from a health care provider.

247. The flow of money for pharmaceutical products acquired from a pharmacy reflects negotiated prices and rebates making it more complicated. Patients typically pay only a copayment ("co-pay") to the pharmacy that is governed by the formulary associated with the patient's health care plan. The pharmacy purchases from a wholesaler at close to list price, while the wholesaler in turn purchases from the manufacturer at a small rebate off list price. Typically, a patient's health care insurer (via the insurer's PBM) pays the drugstore the difference between its costs and the patient co-payment plus a dispensing fee. However, the PBM negotiates a rebated price with the manufacturer and settles up separately by receiving a rebate from the manufacturer. As will be discussed below, the multiple decision-makers in this market, each with imperfect incentives, create several opportunities for the exercise of market power.

#### 11.1.1.6 *Price competition*

248. When the PBM creates competition between patented products, one important dimension on which they compete is price. The product that can offer a lower net price (list price less a rebate) will be more attractive to the PBM. This is because such rebates lower healthcare costs and enable the PBM to offer lower prices to its consumers. Without this process the manufacturer would simply be able to sell at any price it chose because physicians are not typically aware of the prices of the drugs they prescribe and fully-insured consumers don't pay those prices.

##### *i. Importance of formularies*

249. When PBMs manage a particular drug class, they use formularies as a means to create at least some degree of price competition between sellers of substitutable treatments by incentivizing pharmaceutical firms to offer rebates off their list (or WAC) prices in exchange for better placement on the formulary. [redacted]

[399] *See* Expert Report of Heather Bates, §II.

[redacted][400] and therefore have a particular influence. As described above, a formulary is the official list of prescription drugs covered by a particular Third-Party Payor's prescription drug plan. A plan's formulary determines the out-of-pocket cost the patient will pay to acquire the drug. The formulary is the "main tool" used by Third-Party Payors to help control prices by influencing which drugs patients choose.[401] For pharmaceutical manufacturers, gaining access to a Third-Party Payor's drug formulary typically leads to much higher sales, and as such, formulary access and placement is critically important.[402]

250. At a high level of generality, in competitive markets, price competition occurs when one manufacturer offers a reduction in price in an effort to sell more of its goods. This, in turn, might cause rival manufacturers to also reduce their prices, either in an effort to mitigate the damage to their sales done by the initial price cut or in an effort to take sales away from rival sellers. The precise form that price competition takes will vary depending on the degree of competition in a market and the specifics of the market structure. As I now discuss, there are a number of particularities in pharmaceutical markets that shape the precise form that price competition takes between rival pharmaceutical manufacturers that are competing with each other in a competitive market.

251. One key distinction between pharmaceutical markets and other markets is that the ultimate consumer—the individual in need of the treatment— does not typically pay the full price of the treatment. The end consumer's health insurance typically covers at least a portion of the cost, with the end consumer paying a co-pay that is set by their plan sponsor and insurance provider. As a result, the decision making of end consumers does not fully account for the benefits that arise from price competition between rival pharmaceutical manufacturers. Lower prices from

---

[400] Dep. Tr. M. Gordon, Executive Vice President, Global Commercial Operations at Amgen, 29:10-15 ("Q. [redacted]").

[401] U.S. Dep't of Just. & Fed. Trade Comm'n, "Improving Health Care: A Dose Of Competition," Ch. 7, IV. B (July 2004), https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf ("The main tool that PBMs use to manage pharmacy benefits is the formulary, which is a list of PBM-approved drugs for treating various diseases and conditions. Through a formulary, the PBM controls the price that health plans and enrollees pay and may influence the use of various drugs and the mix of drugs dispensed.").

[402] Amgen, Form 10-K 2020, February 9, 2021, https://investors.amgen.com/static-files/31e3735e-5469-46b8-8bcd-081a176d9fb4, p. 11 ("A drug's inclusion and favorable positioning on formulary is essential to ensure patients have access to a particular drug."); M. Gordon Dep. Tr. at 30:2-7 ("Q [redacted]").

competition accrue directly to the PBM and indirectly to consumers and health plans through lower pharmaceutical costs and lower premiums.[403]

252. As noted above, PBMs typically negotiate and contract directly with pharmaceutical manufacturers on behalf of health care providers (and ultimately end consumers). PBMs are able to create at least some degree of price competition among drug manufacturers through the creation of tiered formularies, which are lists of covered drugs that are available to end consumers, typically with different tiers corresponding to different levels of end-consumer co-payments.[404] A PBM can influence choices among treatments by only including some treatments on the formulary or by putting different treatment options on different tiers.[405] Generic drugs – generally the lowest cost drugs to the PBMs – are often placed on the lowest tier (Tier 1), with the branded counterpart on a higher (less preferred) tier.[406] There may also be multiple tiers for branded drugs, with the "preferred" brand product placed on a lower tier (typically Tier 2) and the less preferred, but still available, option placed in a higher tier (typically Tier 3) with a higher patient co-payment. Formularies may have a fourth "specialty tier" for high-cost prescription drugs which often result in higher patient co-payments.[407] These different tiers can have a significant impact on demand for therapeutic substitute drugs; this is evident from the market share shifts that occur when a drug is given favorable formulary positioning and when pharmaceutical companies pay out large rebates for their drugs.[408]

253. In addition to the use of formulary tiers, PBMs have other tools that they can use in an effort to steer end consumers to particular treatments. As mentioned above, PBMs are able to omit particular treatments from their formularies altogether. When a particular drug is

---

[403] Dep. Tr. M. Gordon, Executive Vice President, Global Commercial Operations at Amgen, 41:4-7 ([redacted].

[404] Scott Morton and Kyle Handbook of Health Economics (Chapter 12) (2012) at 791.

[405] M. Gordon Dep. Tr. at 28:21-29:1 ([redacted]").

[406] Scott Morton and Kyle Handbook of Health Economics (Chapter 12) (2012) at 810; Stuart O. Schweitzer and Z. John Lu, "Pharmaceutical Economics and Policy [-] Perspectives, Promises and Problems," Third Edition, 2018, p. 10 (For drugs placed in higher tiers, "[p]atients may defect from these drugs instead of paying the high cost.").

[407] Scott Morton and Kyle Handbook of Health Economics (Chapter 12) (2012) at 810; U.S. Dep't of Health & Human Services: Centers for Medicare & Medicaid Services, Updated Contract Year (CY) 2021 Final Part D Bidding Instructions, at 2 (May 22, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2021%20mtm%20and%20specialty%20thresholds%20final%20part%20d%20bidding%2005.22.2020_8.pdf; U.S. Dep't of Health & Human Services: Centers for Medicare & Medicaid Services, Your Guide to Medicare Prescription Drug Coverage, at 28-29, (July 2022) https://www.medicare.gov/publications/11109-Medicare-Drug-Coverage-Guide.pdf.

[408] *See* Dr. Peri Iz, *supra* note 206, at 38 ("PBMs continue to offer more restrictive formularies and intervention programs to their clients to move market share to preferred branded products and generics.").

excluded from the formulary, a patient choosing to use that drug either has to successfully petition their insurance company (often with the assistance of their HCP) for a "formulary exception," or else bear its full cost.[409] This high cost to the patient (in terms of time and money) makes it less likely the patient will ultimately choose the excluded drug. Short of excluding a particular drug altogether, PBMs can list particular treatments as requiring prior authorization from a HCP, or as a step therapy, which requires the patient to first try the payer's preferred alternative and only receive reimbursement for the treatment listed as a step therapy if the alternative is found to be inadequate.[410] PBMs actively manage the use and enforcement of these other tools to ensure that its steering efforts are effective.

254. In the case where there is a generic drug, a preferred branded drug, and a second, non-preferred branded drug on the formulary, the end consumer will have the option of paying a relatively low (or, in some cases, no) co-pay for the generic drug, a higher co-pay for the preferred brand, and a still higher copay for the non-preferred branded drug.[411] Under these circumstances, all three treatments will be available to the end consumer, but the PBM creates incentives to the end consumers in the form of differences in co-pays to steer the end consumer to the PBM's preferred option.

255. In the case where there are multiple branded drugs but no available non-branded drug, such as the case for PCSK9 inhibitors, the PBM typically places no treatments on the formulary's low-cost Tier 1. Instead, PBMs typically choose one or more branded treatments to appear in the "preferred" brand tier (Tier 2). When, for example, two brands are chosen for Tier 2, both brands are considered to have "preferred" formulary coverage, and such a situation is commonly referred to as "1:2 preferred status" coverage ("1:2" for short) or "parity" coverage.[412] Here the end consumer would pay the same co-pay regardless of which of the two treatments they pick to use.

256. If instead the PBM exclusively selects only one branded drug for Tier 2, such a situation is commonly referred to as "1:1 preferred status" ("1:1" for short) coverage,

---

[409] Patient Advocacy Foundation, "Filing a Formulary Exception," https://www.patientadvocate.org/explore-our-resources/insurance-denials-appeals/filing-a-formulary-exception/; Dep Tr. M. Gordon, Executive Vice President, Global Commercial Operations at Amgen, 30:2-7 ("Q. You understand that if your drug is excluded from a drug formulary by a PBM, it is harder for a patient to access that drug if it is prescribed for them? A. If that patient is a beneficiary of that PBM, that is correct.").

[410] Mattingly, Joseph T., David A. Hyman and Ge Bai, "Pharmacy Benefit Managers – History, Business Practices, Economics, and Policy," 4 *JAMA Health Forum*, 11, pp.1-14, (2023), ("Utilization management encompasses several common practices, including prior authorization, step therapy requirements, supply limits (on dosage or number of days), and various financial incentives (eg, deductibles, co-payments, coinsurance).").

[411] *See* "Employer Health Benefits [-] 2023 Annual Survey," *KFF (formerly Kaiser Family Foundation*), (2023), https://www.kff.org/health-costs/report/2023-employer-health-benefits-survey/.

[412] AMG10935-0000079826 at slides 24-25; AMG10935_OCO-0000000001 at 005.

"preferred" coverage, or "exclusive" coverage.[413] Conversely, the other rival drug treatment is often excluded altogether from formulary coverage when the two branded drugs are perfectly substitutable from a medical perspective.[414] [redacted].[415] As mentioned above, to do otherwise, the consumer would have to successfully petition their insurance company for a "formulary exception," or pay the full cost of the rival branded drug treatment that had been excluded from coverage.

257. The larger the share of patients who change drugs in response to the incentives created by the PBM, the larger the incentive is for a manufacturer to offer a lower price in return for placement on a favorable formulary tier. The effectiveness of such steering depends, among other things, on the price sensitivity of the end consumer to co-pay differentials, the willingness of the end consumer to consider different treatments, the ease with which the end consumer can switch between competing treatments, the familiarity of the HCP with competing treatments, and the willingness of the HCP to prescribe competing treatments.

258. Research has shown that a PBM's choice of formulary placement can be effective at steering end consumers to particular treatments.[416] The degree to which efforts at such steering are effective impacts PBM bargaining power, and ultimately the size of any negotiated price savings.

### *ii. Formulary spillover effects*

259. A prescription drug that is excluded or disadvantaged on formularies covering a large portion of patients will tend to be prescribed less frequently even where it is at parity or preferred. This feedback effect is referred to as a formulary "spillover" or "halo" effect."[417] There are several factors that contribute to this spillover effect, but perhaps the most

---

[413] AMG10935-0000079826 at slides 24-25; AMG10935_OCO-0000000001 at 005.

[414] Expert Report of Heather Bates, §III(B).

[415] AMG10935-0000079826 at slides 24-25 ([redacted].

[416] Frank Limbrock, "Pecuniary and Non-Pecuniary Incentives in Prescription Pharmaceuticals: The Case of Statins," 11 *The B.E. Journal of Economic Analysis & Policy (Advances)* 2, (2011); David B. Ridley, "Payments, Promotion and the Purple Pill," 24 *Health Economics* 86 (2015).

[417] Y. Richard Wang, "Spillover effects of restrictive drug formularies in the statin class: a descriptive study of the Medicaid preferred drug list in Texas," 19 *Managed Care Interface* 11, (2006) ("A drug formulary restricted to a specific covered population may influence how physicians treat other patients (i.e., the 'spillover effect'). Previous studies on the proton-pump inhibitor (PPI) class revealed that spillover effects exist for restrictive drug formularies from Medicaid and private health insurance plans. Researchers have found that as a trend, the more a physician is exposed to a restrictive drug formulary, the larger its spillover effects will become. [. . .] These findings verify that

important is that HCPs write prescriptions based in part on what products they know are available to all of their patients.[418] Since patients are insured by a multitude of plans, it is time consuming for HCPs to take into account the formulary options for each patient when prescribing a pharmaceutical drug treatment. Instead, many HCPs tend to default to the product that they know is widely covered in the region.[419]

260. Stated in more formal economic terms, this spillover effect creates an externality in which negotiating a preferred position at one large PBM will tend to increase the drug's sales made through other PBMs and via other sales channels (e.g., uncovered customers, open formularies) in a region.[420] The spillover effect operates in part because formulary decisions are observed by physicians.

---

spillover effects of restrictive drug formularies, previously verified for the PPI class, also exist for the statin class (albeit on a somewhat smaller scale)."); Hayden Consulting Group "PBM Consolidation and its Impact on Geo Prescribing Patterns," (November 28, 2023), https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/#:~:text=A%20positive%20POI%20indicates%20the,are%20covered%20by%20other%20payers ("Our findings reveal that in concentrated local markets, a dominant PBM's choice of preferred products_can influence prescribing market-wide, even for patients not covered by the dominant PBM. The magnitude of spillover varies by therapeutic area"); AMG10935-0000109970 at 970 ([redacted]; Dep. Tr. J. van Grunsven, Vice President, General Manager of General Medicine at Amgen, 179:24-182:7 [redacted].").

[418] Hayden Consulting Group, "PBM Consolidation and its Impact on Geo Prescribing Patterns," (November 28, 2023), https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/#:~:text=A%20positive%20POI%20indicates%20the,are%20covered%20by%20other%20payers ("It is completely foreseeable, and rational, that a [health care] provider who repeatedly encounters difficulty prescribing a certain medicine (e.g., because it is not preferred by the dominant PBM in the local market), may be less likely to prescribe that product.").

[419] *See* Dep. Tr. J. van Grunsven, Vice President, General Manager of General Medicine at Amgen, 179-181 ([redacted]).

[420] "PBM Consolidation and its Impact on Geo Prescribing Patterns," Hayden Consulting Group, November 28, 2023, available at https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/#:~:text=A%20positive%20POI%20indicates%20the,are%20covered%20by%20other%20payers (finding that "in markets where one of the 'Big 3' PBMs is dominant, prescribers seem to demonstrate less autonomy to deviate from that PBM's preferred list of covered drugs, even for patients not covered by the dominant PBM. […] The bottom

261. A spillover effect can also occur at a higher level of aggregation, whereby additional GPOs and PBMs subsequently drop coverage of a drug that does not maintain widespread preferred coverage. For example, a change in a drug's formulary status at a large GPO can influence future formulary coverage negotiations with other GPOs and PBMs. This type of spillover is expected to be stronger within PBM groups as agreements are often negotiated simultaneously and often the same people negotiate the contracts, and from an administrative standpoint contracts between manufacturers and PBMs [redacted].[421] This type of spillover is also linked to the previously discussed spillover effect in the prescribing behavior of physicians. As physicians prescribe the drug less often, it tends to reduce the negotiating position of the drug manufacturer to maintain its existing formulary coverage at other PBMs, and thereby increases the likelihood that additional PBMs will drop coverage. This can be thought of as a spillover effect at the GPO or PBM level, and it results in a further reduction in PBM coverage of the drug, and thus a further reduction in sales.

262. As described in more detail in **Section 6.1**, there are two prominent examples of this GPO and PBM spillover effects recently in the market for PCSK9i treatments. First, this spillover effect was observed after ESI dropped Praluent® from its national formulary in January 2021, resulting in a steady stream of ESI-affiliated PBMs dropping Praluent® coverage in the subsequent months and years. Second, this spillover effect also appears to have influenced Amgen's negotiations with Zinc which led to CVS's decision to drop Praluent® from its national formulary in 2023.

### *iii. List price versus net price*

263. The negotiations between pharmaceutical firms and PBMs (or other buyers, such as hospitals) gives rise to a distinction between the list price (or Wholesale Acquisition Cost) for a drug and the net price actually paid, since PBMs negotiate rebates tied to the placement of a drug on a formulary. While the list price for a drug is publicly available, the rebates are proprietary and differ across products and PBMs.[422] As a result, patients and HCPs make their decisions among therapeutic options without knowing the full transaction price paid for the product they

---

line? In some cases, patient treatment is effectively being determined by an entity with no direct stake in their health: the dominant PBM in the area.").

[421] *See, e.g.*, AMG10935_OCO-0000000672 at 679 ([redacted].

[422] Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics* Chapter 12 at 790, 810 (2012).

select or the net price of alternative treatments.[423] Indeed, in most instances all the end-consumer sees is the co-pay that they pay for the selected option.

### *iv. Pharmaceutical rebates take various forms*

264. As described above, PBMs tend to use formularies as a means to create at least some degree of price competition between sellers of substitutable treatments. This competition incentivizes pharmaceutical firms to offer rebates off their list prices in exchange for better placement on the formulary. Generally, the contracts between pharmaceutical firms and PBMs offer rebates to PBMs that can take one or more of the following forms:[424]

- **Volume rebates:** specifying a rebate once a manufacturer reaches a certain volume of sales with a Third-Party Payor. For a volume rebate, the contract does not reference rival pharmaceutical firms.

- **Preferred placement rebates:** specifying a rebate provided that the pharmaceutical firm's product is placed on the Third-Party Payor's highest formulary tier (i.e., lowest patient co-pay) for branded drugs. For a preferred placement rebate, the contract does not reference rival pharmaceutical firms.

- **Exclusivity rebates and rebates that reference rival products:** specifying rebates that are conditional on disadvantaging or excluding a rival drug product, and thus fall into the category of contracts that reference rivals. Such contracts may provide rebates only if the products of competing manufacturers are excluded from the formulary or only if the Third-Party Payor buys none or only a small percentage of its needs from the rival manufacturer. In the latter case, the rebate the Third-Party Payor receives from the pharmaceutical manufacturer depends not only on its purchases from that manufacturer, but also on its purchases from competing pharmaceutical manufacturers.

- **Portfolio rebates:** specifying rebates for one or more drug products conditional on formulary placement for another product. When offered, portfolio rebates typically involve drug products within the same treatment category, such as anti-inflammatory.[425] It is very rare for portfolio rebates to involve completely

---

[423] Judith K. Hellerstein, "The Importance of the Physician in the Generic versus Trade-Name Prescription Decision," *The RAND Journal of Economics*, 108, 111 (1998).

[424] [redacted] s. *See, e.g.*, AMG10935-0000544275 at 301 [redacted]

[425] *See FTC v. Amgen-Horizon*, ECF No. 130, Def. Opp. Mot. Prelim. Inj. at 22 (N.D. Ill. 2023) ("As an initial point, the evidence will show that bundling generally is not widely used in the pharmaceutical industry[.]"); Dep. Tr. A.

unrelated drug products markets where the rebate product(s) and the conditional formulary product are in different treatment categories.[426]

### *v. Branded versus non-branded drugs price competition*

265. Once a branded drug loses its patent protection, non-branded drugs produced by rival pharmaceutical manufacturers may enter the market. There are two types of non-branded drugs, commonly referred to as generics and biosimilars. Generics are non-branded versions of conventional, small-molecule drugs, while biosimilars are non-branded versions of more novel, large-molecule biologic drugs.

266. The entry of non-branded drugs into a pharmaceutical therapeutic treatment market tends to have a large impact on drug pricing and competition. The competitive impact of generic entry tends to be larger than the impact of biosimilar entry. And the competitive impact of both generic and biosimilar entry tend to be larger than the impact of entry by additional branded drugs. As described below, these differences result from the nature of the products, the U.S. regulatory environment, and real or perceived product differentiation.

267. A generic pharmaceutical contains the exact same active chemical ingredient as a branded conventional small-molecule drug, and can be thought of as exact copies.[427] In contrast, two different branded drugs that are indicated for the same therapeutic

---

Hindman (UHC 30(b)(6)), 101:18-102:1 [redacted] Dep. Tr. A. Chiu, Executive Director of Market Access at Amgen, 138:23-139:2 ("Q. [redacted].").

[426] *See generally* Expert Report of Heather Bates, Section VI ("Opinion 2: Amgen's Cross-Therapeutic Bundled Rebates are Highly Atypical in the Industry"); *see also* Bricker Exhibit 8 (Amy Bricker former President of ESI, testimony to Congress of May 2019), https://www.congress.gov/116/meeting/house/109436/witnesses/HHRG-116-IF14-Wstate-BrickerA-20190509.pdf ("[a]t Express Scripts, we don't negotiate by bundle. So I don't negotiate-I look at the net cost of an individual product independently of all other products in a portfolio."); Dep. Tr. A. Bricker, former President of ESI, 100:5-101:16 ([redacted] AMG10935-0000735537 at 549 ([redacted]); Dep. Tr. D. Zimmer, VP of U.S. Value and Access at Amgen, 41-42; AMG10935-0000017052 at 052 [redacted]).

[427] Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," (2021) ("Unlike small-molecule drugs, biologics cannot be exactly replicated, and instead face post-exclusivity competition from inexact copies known as biosimilars.").

treatment—regardless of whether they are small or large molecule—will have distinct structures, making them distinctly different drug products. A biosimilar drug is an intermediate case. A biosimilar is very similar, but not identical, to the original branded biologic medication.[428] True generic versions of biologics cannot be produced because biologics are derived from living cells or organisms that are difficult or even impossible for rival firms to replicate without access to the original cell line used to create the branded version.[429] Despite any inherent differences between the branded biologic and one of its government-approved biosimilars, the biosimilars have "no clinically meaningful differences in terms of safety, purity, and potency (safety and effectiveness) from an existing FDA-approved biologic."[430] That said, biosimilars may be perceived by physicians and patients as differentiated to some extent from their referenced branded biologic.

268. It is well known that the entry of chemically equivalent generic drugs tends to dramatically reduce the average selling price of a particular therapeutic drug treatment.[431] Such

---

[428] U.S. Food and Drug Administration, "Biosimilar Basics for Patients," https://www.fda.gov/drugs/biosimilars/biosimilar-basics-patients ("A biosimilar is very similar, but not identical, to an original biologic medication. For biosimilars to be approved by FDA, studies must show that there are no differences in the safety and effectiveness of biosimilars and the original biologics."); Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," 8 (2021).

[429] Darius N. Lakdawalla, "Economics of the Pharmaceutical Industry," 56:2 *Journal of Economic Literature* 403 (2018) ("Biologics are much more difficult to imitate than conventional small-molecule products, because their production depends on the cultivation of a specific biological 'cell line' that may be difficult to reproduce. Thus, even if the structure of a biologic molecule is known, it may be difficult or even impossible to replicate an innovator's product without physically possessing the cell line used to produce it."); Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," ("[B]iologics are grown inside living organisms that have very specific cell lines. Only the company that manufactures the original biologic drug has access to the specific cell line used in the production process. Therefore, no other company can ever create an exact copy.") (2021).

[430] U.S. Food and Drug Administration, "Review and Approval," https://www.fda.gov/drugs/biosimilars/review-and-approval#:~:text=A%20biosimilar%20is%20a%20biologic,biologic%2C%20called%20a%20reference%20product. ("A biosimilar is a biologic that is highly similar to and has no clinically meaningful differences in terms of safety, purity, and potency (safety and effectiveness) from an existing FDA-approved biologic, called a reference product."). More recently, a biosimilar manufacturer can now seek FDA approval for status as an "interchangeable biosimilar." See *id.* ("An interchangeable biosimilar is a biosimilar that may be substituted for the reference product without the intervention of the prescribing health care provider, depending on state pharmacy laws. Not all biosimilars are interchangeable biosimilars. A manufacturer must specifically seek FDA approval for an interchangeable product.").

[431] Generic entrants tend to price very low and take nearly all of the market share, while the incumbent branded drug tends to actually increase price, selling only to a small subset of patients that have a strong brand preference. Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *6 Journal of Economics & Management Strategy 75* (1997); Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," 3-5, 22 ("Once this [patent] protection expires, identical generic competitors quickly enter the market at much lower prices, typically capturing all but a small share of the market previously held by the original brand drug. [. . .] Brand [small molecule] drugs rarely attempt to compete on price with generic entrants, preferring instead to maintain prices and sell to a small number of patients with strong brand preferences.") (2021); Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Volume 2 at 792 (2012).

undifferentiated product competition is based primarily on price and tends to be intense. Several regulatory features of the U.S. market facilitate this generic price competition. Generic drugs cost significantly less to develop and bring to market because they have a lower regulatory hurdle for approval. Generic manufacturers need only demonstrate that they are bioequivalent to the branded drug, and do not need to repeat the clinical trials showing safety and efficacy that had to be undertaken before the branded product could secure approval.[432] Moreover, under certain circumstances pharmacists are free to (and in some states, required or encouraged to) substitute generic drugs on a prescription for a branded pharmaceutical, whereas pharmacists cannot substitute one branded product for another, even when such substitution would be beneficial for the patient.[433] Given these features of the regulatory environment, generic entry often leads to a steep decline for the price available for a drug (in its generic form) when the drug comes off patent.[434] Conversely, conventional small-molecule drugs without generic competition can have significant market power.

269. In comparison, competition between patent-protected products tends to be weaker given that the patent protection typically implies the existence of medically meaningful differences (e.g., safety and efficacy) between the products. While these differences often reduce the substitutability of drug treatments, these drugs nonetheless can still place meaningful competitive constraints on each other. In such differentiated product markets, the various drug treatments often have different prices.

270. The first biosimilar was approved in the U.S. in 2015, so the competitive relevance of these drugs is relatively new.[435] While biosimilars in the U.S. are subject to a lower regulatory hurdle for government approval than their referenced branded biologics, they still face more significant entry costs than generic drugs.[436] These include significant product development efforts due to the complicated nature of biologic drugs and typical regulatory-required clinical

---

[432] Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Volume 2 at 774 (2012).

[433] *See* Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Volume 2 at 769 (2012); American Pharmacist Association, "Overview of Biologics and Biosimilar Products," https://www.pharmacist.com/Advocacy/Issues/Biosimilars#:~:text=If%20FDA%20has%20not%20concluded,a%20prescription%20specifically%20for%20it.

[434] Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *6 Journal of Economics & Management Strategy 75* (1997); Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," ("Intuitively, entry from a same-molecule entrant that is perceived as very similar would generate strong competition in the market.") (2021).

[435] Scott Morton, F.M., Stern, A.D. & Stern, S. "The Impact of the Entry of Biosimilars: Evidence from Europe." 53 *Rev Ind Organ* 173–210 at 175 (2018).

[436] Scott Morton, F.M., Stern, A.D. & Stern, S. "The Impact of the Entry of Biosimilars: Evidence from Europe." 53 *Rev Ind Organ* 173–210 at 181 (2018) ("[R]elative to small-molecule generics, the regulatory requirements and approval standards for biosimilars are still significantly higher.").

trials; the higher risk of patent litigation with the incumbent manufacturer; and the general lack of mandatory product substitution laws which apply to generics but not biosimilars.[437] Recent research suggests that biosimilar entry is less likely due to higher entry costs,[438] and when entry of biosimilars does occur, the resulting competitive impact is smaller than generic entry, with incumbent biologics retaining the vast majority of share, albeit at a lower net price.[439] This research also suggests that perceived quality differences between biosimilars and their referenced biologic tend to soften the potential competitive impact of entry in those markets.[440]

#### 11.1.1.7 *Non-price factors that impact which pharmaceutical drug is chosen for use*

271. The ultimate decision of which treatment to select is made by the end-consumer and their HCP. This decision is informed, in significant part, by the competitive forces

[437] Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," 8-9 (reporting that estimated costs of bring a biosimilar to market range from $100 to $250 million versus just $2 to $5 million for generic drugs) (2021); U.S. Food and Drug Administration, "Review and Approval," https://www.fda.gov/drugs/biosimilars/review-and-approval ("Biosimilars are evaluated for approval based on all the evidence presented by the manufacturer. FDA approves biosimilars through an abbreviated pathway. The goal of a biosimilar development program is to demonstrate biosimilarity between the proposed biosimilar and its reference product, not to independently establish the safety and effectiveness of the proposed biosimilar. This generally means that biosimilar manufacturers do not need to conduct as many expensive and lengthy clinical trials.").

[438] Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," 3 (2021) ("The production process of biologic drugs is so complex that it is impossible for anyone other than the original manufacturer to replicate the drug exactly. This prevents potential entrants from exploiting the low-cost abbreviated approval mechanisms available to copiers of small-molecule drugs, often resulting in biologic manufacturers maintaining monopoly power indefinitely."); Scott Morton, F.M., Stern, A.D. & Stern, S. The Impact of the Entry of Biosimilars: Evidence from Europe. *Rev Ind Organ* 53, 173–210 at 177 (2018).

[439] Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," 4-7 (2021) ("[W]e find that reference biologics lower prices in response to biosimilar entry, in order to maintain sales volume and formulary status. After biosimilar entry, reference biologics experience a significant fall in net price of about 20 percent, a small, noisy decline in volume sales, and a small but significant decline in formulary coverage. [. . .] The decline in net price [of the referenced biologic drug] comes almost entirely from increased discounts, as list prices are unaffected. These results suggest that manufacturers of reference biologics react to biosimilar entry by offering larger rebates to PBMs and large payers in order to maintain formulary status, and, in turn, sales volume. Overall, these efforts seem to be relatively successful, as we detect only small changes in these two variables. The response stands in stark contrast to the response of brand drugs to generic entry[.] [. . .] We find heterogeneous responses: while some biosimilars have been able to establish them- selves as viable market options, others have been actively fought by reference biologics and been unable to gain market share from the originator.").

[440] Luca Maini, Josh Feng, Thomas Hwang, Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," 22, 27-28 (2021) ("The average response of incumbent biologics is to reduce prices and maintain volume. [. . .] The main conceptual question that arises from this result is why reference biologics do not behave more like small-molecule brand drugs, which rarely compete on price with generic drugs. We conjecture that perceived differences in the quality of biosimilar drugs can soften competition in the market, making it relatively more profitable for biologics to compete on price.").

discussed above. As noted, competition may lead to different treatments being offered at different co-pay levels. All else equal, a consumer that is indifferent between the available options would prefer the one available at the lowest co-pay level. But, of course, all else is not equal, and patients (or caregivers) and HCPs are guided not just by differences in co-pays, but also by familiarity with each of the alternatives, and differences between the products such as dosages or delivery mechanisms, and any expected differences in the efficacy and risks for one treatment or another for a particular patient.[441] When two or more treatments are available on a formulary, these preferences can play a meaningful role in determining which treatment will ultimately be selected.[442] And even if a treatment is not on the formulary for a patient's insurance plan, a HCP may still be able to prescribe that product upon establishing to the satisfaction of the PBM that the treatment is medically superior for the patient relative to other covered treatments. HCPs prescribe a particular drug based at least in part on patient (or caregiver) preferences, financial incentives, and PBM formulary authorization decisions.

272. Pharmaceutical firms can also influence the choice among drugs beyond negotiating availability on formularies, including by marketing to HCPs through detailing and other channels,[443] or by marketing directly to consumers.[444] All told, the interactions between regulations, HCPs, patients, PBMs, and pharmaceutical firms result in a mesh of factors that influence the choice between competing drugs.

#### 11.1.1.8 *Competition in quality*

273. In addition to competing on price along the lines discussed above, pharmaceutical firms also compete with each other on quality. Competing firms invest (through organic development, licensing transactions, or acquisitions) in innovations that provide a superior

---

[441] *See* Dep. Tr. R. Pordy, Vice President of Clinical Services, Internal Medicine at Regeneron, 66-68, 227-230 (discussing the meaningful clinical and practical differences between Repatha® and Praluent®, and why a patient might prefer one over the other).

[442] *See* Dep. Tr. R. Pordy, Vice President of Clinical Services, Internal Medicine at Regeneron, 66-68, 215:7-25 (discussing how the different attributes of the two drugs might inform prescriber and patient choice when both drugs are available); *see also* AMG10935-0000375371 at 372 [redacted]").

[443] Scott H. Podolsky and Jeremy A. Greene, "A Historical Perspective of Pharmaceutical Promotion and Physician Education," 300 *JAMA: The Journal of the American Medical Association* 831 (2008); Darius N. Lakdawalla, "Economics of the Pharmaceutical Industry," 56:2*Journal of Economic Literature* 438 (2018) ("The largest component of marketing has typically been 'detailing' to physicians. This involves the pharmaceutical company dispatching sales representatives to visit doctors and promote their products. […] Less significant are ads placed in medical journals, as well as direct-to-consumer advertising (DTCA), which is important for a few, highly selected, high-revenue drugs (Iizuka and Jin 2005, 2007).").

[444] Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Volume 2 818 (2012); Toshiaka Iizuka & Ginger Z. Jin, "The Effects of Prescription Drug Advertising on Doctor Visits," 14 *Journal of Economics and Management Strategy* 701 (2005).

product, at least in the mind of consumers, to capture their patronage. Indeed, competition on quality even takes place between products that are therapeutically equivalent, as even in such circumstances, end consumers and HCPs may still have a preference for one treatment over another.

274. Accordingly, pharmaceutical firms do not just compete with each other through price and through negotiations that offer improved formulary placement in return for rebates. They also compete by offering more innovative and higher quality products that, they hope, end consumers will prefer. In more formal economic terms, competing treatments are differentiated from each other. As with other differentiated products, certain consumers will like the attributes of one product while others may have a preference for a different competing product. In the case of PCSK9 inhibitors, as is elaborated upon elsewhere in this report, Praluent® and Repatha® are different in important ways (e.g., different chemical structures, safety/efficacy profiles, and dosage options), and these differences cause certain end consumers and HCPs to prefer one drug over the other.[445]

275. These competitive forces not only can give rise to new innovative products, but can also spur manufacturers of incumbent products to improve their existing treatments – all for the betterment of consumers.

---

[445] Praluent® has a meaningful mortality benefit (i.e. fewer patients die taking Praluent® than a placebo), whereas Repatha® clinical trials have not yielded such results. *Compare* Gregory G. Schwartz, et al., "Alirocumab and Cardiovascular Outcomes after Acute Coronary Syndrome," 379 *New Eng. J. Med.* 2097–2107, at Table 2 (2018) *with* Marc S. Sabatine, et al., *Evolocumab and Clinical Outcomes in Patients with Cardiovascular Disease*, 376 New England J. Med. 1713–1722, at Table 2 (2017). Praluent® also comes with additional medical benefits, including potential resulting reductions in unstable angina requiring hospitalization and the need for apheresis in patients with heterozygous familial hypercholesterolemia (HeFH). Schwartz, et al., at Figure 2 (2018); Patrick M. Moriarty, et al., "Alirocumab in patients with heterozygous familial hypercholesterolemia undergoing lipoprotein apheresis: the ODYSSEY ESCAPE trial," 37 *European Heart J.* 3588–95 (2016). Repatha® comes with a risk to those with latex allergies. Amgen, "Repatha® (evolocumab) package insert," at 3 (Sept. 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125522s029s031lbl.pdf. In fact, some practitioners advise that those with latex allergies avoid Repatha®. *See* Response of Amicus Curiae Practitioners Who Currently Treat Patients with Praluent in Support of Appellants' Motion for Stay Pending Appeal, at 7, filed in *Sanofi v. Amgen, Inc.*, No. 17-1480, (Fed. Cir. Jan. 24, 2017), ECF No. 40. Praluent® presents no such risk, as it is administered with a single-dose, pre-filled pen whose shield contains no latex. Regeneron, "Praluent® (alirocumab) package insert," at 21 (Apr. 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125559s029s030lbl.pdf. Praluent® is also available in both a high- and low-dose option (75 mg and 150 mg). Regeneron, "Praluent® (alirocumab) package insert," at 1 (April 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125559s029s030lbl.pdf. Repatha® is only available at higher dosage options (140 mg and 420 mg). *Amgen, Inc., Repatha® (evolocumab) package insert*, at 1 (Sept. 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125522s029s031lbl.pdf. *See generally* Dep. Tr. R. Pordy, Vice President of Clinical Services, Internal Medicine at Regeneron, 227-230 (". . . So one important difference or probably one of the most important differences is that you have a lower dose available of Praluent.").

### 11.2 Appendix B: Derivation of Minimum Rebate Metric

276. In the U.S. PCSK9i market, suppose there are two manufacturers (A and R) and a representative PBM who decides formulary coverage of drugs. The (common) list price in the market is denoted $P$, and the (exogenous) quantity demanded for PCSK9i units is denoted $Q$ Let $d_i$ be the rebate rate (a percent) offered by manufacturer $i$ for 1:1 coverage that will generate a share of sales equal to $s_i$ (with the other manufacturer getting a $(1 - s_i)$ share of the market) and let $C_E$ denote the payer's baseline cost of another drug, say Enbrel®. Finally, let $R_E$ the total value of additional Enbrel® rebates offered by manufacturer A in exchange for 1:1 coverage on Repatha®.

277. The PBM's formulary coverage problem can be solved using cost minimization. Under a 1:1 contract with A, the payer's cost is

$$P(1 - d_A)s_A Q + P(1 - s_A)Q + C_E - R_E = PQ(1 - d_A s_A) + C_E - R_E.$$

278. Under a 1:1 contract with R, the PBM's cost is

$$P(1 - d_R)s_R Q + P(1 - s_R)Q + C_E = PQ(1 - d_R s_R) + C_E.$$

279. For R's offer to be competitive with A's, R must offer cost savings that offset the rebates offered by A on Repatha® as well as the Enbrel® additional rebate. In particular, the offer made by R must satisfy:

$$PQ(1 - d_R s_R) + C_E \leq PQ(1 - d_A s_A) + C_E - R_E.$$

280. Rearranging terms gives the minimum necessary rebate for R to obtain 1:1 coverage:

$$d_R \geq \overline{d} \equiv \frac{d_A s_A + \frac{R_E}{PQ}}{s_R}.$$

### 11.3 Appendix C: Data

281. Pharmacy claims volume ("claims data") in the U.S. and U.S. territories comes from IQVIA LAAD RX ("IQVIA"). IQVIA provides broad coverage of pharmacy claims, by time period, location, drug name, and payer.[446] Payers include specific commercial plans, Medicare plans, Medicaid plans (State Medicaid and Managed Medicaid), assistance and cash.[447] IQVIA pharmacy claims are available in claimed volumes; I use the volume of accepted pharmacy

[446] IQVIA, https://www.iqvia.com/.

[447] I use the method of payment provided in the IQVIA dataset.

claims (the quantity of dispensed units). I received IQVIA data for the period covering January 2019 to July 2023.

282. MMIT data provides the formulary status and restrictions for Praluent® and Repatha® over time. It also provides information on PBMs and the number of plan lives by state. I received MMIT data for the period covering January 2019 to June 2023.I use IQVIA's monthly bridge file to link IQVIA pharmacy claims data with MMIT formulary information. The bridge file provides a mapping between IQVIA's plan identifiers (plan ID) and MMIT's plan identifiers (formulary name) and are available from January 2019 to June 2023.[448] Because the July 2023 mapping is missing, I use the same mapping for July as is available for June 2023.[449] I combining the IQVIA and MMIT datasets, I obtain formulary information for over 88% of all claimed units for the period from January 2019 to July 2023.[450]

283. I create variables on formulary preference rankings. The dummy variables *d_PRA_preferred* and *d_REP_preferred* indicate, respectively, if the formulary ranking is favorable to Praluent or Repatha. I rank formulary statuses using MMIT's standardized universal status rollup with the following order: I rank "preferred" highest, followed by "preferred (PA/ST)", "covered", "covered (PA/ST)", and "not covered".[451] (Where the universal status rollup variable indicates "Not Listed"; I update the value of that variable with the information provided by the not listed policy variable.)

284. I identify whether a drug is restricted or not covered. The dummy variable *d_PRA_restriction* equals 1 if the universal status rollup variable for a formulary indicates "PA/ST" for Praluent, i.e., Prior Authorization (PA) or Step Therapy (ST),[452] or if the raw status variable indicates "Prior Authorization Required". Otherwise, the dummy variable equals 0 (and similarly for the dummy variable *d_REP_restriction*). The dummy variables *d_PRA_not_covered* equals 1 if the universal status rollup for Praluent in a formulary indicates "Not Covered".

[448] In instances with incomplete mapping, I use the latest available month to complete the mapping from May 2023.

[449] A single Org ID may map to multiple IQVIA Plan IDs and vice versa. To resolve the many-to-many matches, I do the following. First, I compute the national lives for the Org ID. Where one Org ID maps to multiple IMS Plan IDs (in a given month), I allocate the Org ID's national lives to each Org ID – Plan ID pair based on the relative proportions of claims (of Praluent® and Repatha® in total) for each matched Plan ID out of the total claims across all matching Plan IDs (for each month and state). Then, I assign lives and formulary characteristics to each IQVIA Plan ID. I assign lives to each IQVIA Plan ID by summing lives allocated to it (for each month and state). I assign formulary characteristics to each IQVIA Plan ID by assigning the characteristics of the matched MMIT formulary with the largest number of allocated lives (for each month and state). The crosswalks are at the national level, the sales are at the state level, and the plans are assigned at the state level.

[450] Calculations on file (in the data pack).

[451] For Repatha®, I use the best status of Repatha Pushtronex, Repatha SureClick, and Repatha Syringe.

[452] Step Therapy is "a process by which insurers (public or private) require patients to take one or more alternative medications before they can access the medicine prescribed by their provider." *See* NORD, "Step Therapy (First Fail), https://rarediseases.org/policy-issues/step-therapy/.

Otherwise, the dummy variables equal 0 (and similarly for the dummy variable and *d_REP_not_covered*).

### 11.4 Appendix D: Econometric Analysis of Spillover Effects.

#### 11.4.1 Difference-in-differences econometrics

285. The first approach I used to estimate spillover effects is a difference-in-differences analysis that compares how claims of formularies that are *not* ESI's National Preferred commercial formularies ("non-NPF formularies") evolved before and after Praluent® was removed from ESI National Preferred formularies ("NPF formularies") in January 2021. I compare the change of Praluent®'s market shares in non-NPF formularies in areas where NPF formularies had a large Praluent® market share before the formularies change (so the spillover is expected to be big) against areas where NPF formularies had a low Praluent® market share before the change (so the spillover should be small).[453] To take advantage of the variation in market shares, instead of using a binary variable for low/high share, I use the market share of NPF formularies. I use NPF market share in dispensed claims in the six months before the formulary change. To isolate the effect of the formulary change I focus on a six-month window before and after the event.

286. I implement the following regression:

$$\begin{aligned} PraluentShare_{p,s,t} &= \beta * PraluentShareOnESIPF_s * AfterAgreement_t \\ &+ \delta_1 PraluentPreferred_{p,s,t} + \delta_2 RepathaPreferred_{p,s,t} \\ &+ \delta_3 PraluentNotCovered_{p,s,t} + \delta_4 RepathaNotCovered_{p,s,t} + PlanID_p \\ &+ State_s + Time_t + \epsilon_{p,s,t} \end{aligned}$$

287. Where $PraluentShare_{p,s,t}$ corresponds to Praluent®'s share within plan *p*, in state *s* and period *t*. $PraluentSharefromNPF_s$ corresponds to share, at the state level, of Praluent®'s claims through ESI NPF during the six months before the agreement. $AfterAgreement_t$ is a dummy equal to one if period t is after the agreement. $PraluentPreferred_{p,s,t}$ is a dummy equal to one if Praluent has a better placement compared to Repatha, while and $RepathaPreferred_{p,s,t}$ is a dummy equal to one of Repatha has a better placement compared to Praluent.[454] $SamePreferred_{p,s,t}$ is a dummy equal to one if both drugs have the same status (e.g. both are Tier 2 with restriction, or both are "Not Listed"). This is the excluded category from the analysis. Finally, $PraluentNotCovered_{p,s,t}$ and

[453] If ESI NPF formularies Praluent® share among all dispensed claims is low, the formulary change should not have a significant effect on claims. However, if a state had a large share of Praluent® claims through ESI NPF formularies it is expected that a representative share of the pre-existing claims would assigned to Repatha®.

[454] The dummy takes into account whether one drugs has a restriction, or whether one of the drugs is not listed. If two drugs have the same status, e.g. "Not Listed". They would be assigned to the same status dummy.

RepathaNotCovered $_{p,s,t}$ are dummies equal to one if Praluent® or Repatha respectively are not listed or not covered.

288. Under the assumption that *all* the Praluent® claims through ESI NPF would be affected by the bundling agreement (i.e. Praluent® market share would go to zero), the relevant parameter is $\beta$ which captures how much the market share of Praluent® in a given plan would change given a 1pp decrease in Praluent®'s ESI NPF claims shares. As shown in the previous section, even after the agreement was implemented there were still Praluent® claims on ESI NPF formularies, so the estimate will be a lower bound of the true spillover effects.

289. I implemented the regression including commercial and non-commercial plans, for plans for which IQVIA data was matched to MMIT. Plans and claims that are not matched are not included in the regressions but are used to define market shares. The regressions are weighted by claims at the plan level and alternatively by lives. I also implemented the regression using plan ID fixed effects, or alternatively PBM fixed effects.

290. The results to the regression are shown in **Table 7**. The results show that an increase in the share of Praluent®'s claims through and ESI NPF formulary of 10pp (which is equivalent to the expected reduction in Praluent®'s share after the policy of 10pp) translates into an additional decrease of [redacted] due to spillover effect. The effect is statistically significant. The regression also shows that having Praluent® as the preferred drug increases Praluent®'s market share in the plan, while having Repatha® as the preferred drug decreases the market share. Furthermore, if Praluent® is not covered by the plan, the market share of Praluent® within the plan decreases, and the share increases when Repatha® is not offered.

**Table 7: Difference-in-difference econometric regression: Spillover effects**

[redacted]

[redacted]

#### 11.4.2 Panel regression analysis

291. An alternative approach leverages changes in Praluent®'s market shares in a specific state and time and estimates how this change affects future prescription of Praluent® in that state. I implement the following regression model:

$$PraluentShare_{p,s,t} = \beta_1 PraluentSpillover_{s,t-1} + \delta_1 PraluentPreferred_{p,s,t} + \delta_2 RepathaPreferred_{p,s,t} + \delta_3 PraluentNotCovered_{p,s,t} + \delta_4 RepathaNotCovered_{p,s,t} + PlanID_p + State_s + Time_t + \epsilon_{p,s,t}$$

292. Where $PraluentShare_{p,s,t}$ corresponds to Praluent®'s share in claims within plan $p$, state $s$ and period $t$. $PraluentSpillover_{s,t-1}$ is the market share of Praluent® at the state level in t-1. $PraluentPreferred_{p,s,t}$ is a dummy equal to one if Praluent® has a better placement compared to Repatha, while and $RepathaPreferred_{p,s,t}$ is a dummy equal to one of

Repatha has a better placement compared to Praluent®.[455] $SamePreferred_{p,s,t}$ is a dummy equal to one if both drugs have the same status. This is the category excluded from the analysis. $PraluentNotCovered_{p,s,t}$ and $RepathaNotCovered_{p,s,t}$ are dummies equal to one if Praluent® or Repatha® respectively are not listed or not covered.

293. The results of the analysis are included in **Table 8**. The spillover effects are in line with the previous estimates and shows that an increase in 10pp o Praluent®'s market share in t-1 translates in an increase in Praluent®'s share in period t of [redacted]

**Table 8: Panel analysis econometric regression: Spillover effects**

[redacted]

[455] The dummy takes into account whether one drugs has a restriction, or whether one of the drugs is not listed. If two drugs have the same status, e.g. "Not Listed". They would be assigned to the same status dummy.

[redacted]



Fiona Scott Morton

February 16, 2024

# EXHIBIT A

CRA Charles River Associates

# Fiona M. Scott Morton

Senior Consultant

PhD, Economics
Massachusetts Institute of Technology

BA (magna cum laude), Economics
Yale University

Fiona M. Scott Morton is the Theodore Nierenberg Professor of Economics at the Yale School of Management. From May 2011 to December 2012, she was Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the US Department of Justice. Dr. Scott Morton ensured that the Division's economic team provided sound analysis in support of the DOJ's enforcement action and policy, particularly with its work related to analyzing the competitive effects of mergers as well as assessing the competitive implications of certain contractual practices of firms. While at the DOJ, she frequently spoke on antitrust enforcement in high-technology industries as well as patents and their portfolio acquisitions.

An expert in competitive strategy, Dr. Scott Morton's research focuses on empirical studies of competition among firms in areas such as pricing, entry, and product differentiation. She has served in an editing role on various academic economics journals and has published articles in the *American Economic Review*, the *RAND Journal of Economics*, the *Journal of Industrial Economics,* and the *Quarterly Journal of Economics.*

Her expertise and research area is the study of firms, markets, and competition. Her research and consulting work have involved a variety of industries such as merchant shipping, wineries, funeral homes, ecommerce, auto retailing, magazines, healthcare and a number of areas in the pharmaceutical industry including competition, generic entry, and procurement of pharmaceuticals for Medicaid and Medicare. Professor Scott Morton's research is widely disseminated in top scholarly publications and through frequent invited research seminars and conferences.

She has taught at the business schools of Stanford and the University of Chicago and served as Associate Dean for Faculty Development at Yale School of Management from 2006–2010. She won the school's teaching award in 2007 and 2016.

## Employment and affiliations

| | |
|---|---|
| 2014–Present | *Theodore Nierenberg Professor of Economics*, Yale School of Management |
| 2008–Present | *Visiting Professor*, University of Edinburgh Economics Department |
| 2013–Present | *Senior Consultant*, Charles River Associates |
| 2002–2014 | *Professor of Economics*, Yale School of Management |
| 2011–2012 | *Deputy Assistant Attorney General for Economic Analysis*, Antitrust Division, US Department of Justice |
| 2006–2011 | *Senior Consultant*, Charles River Associates |

| | |
|---|---|
| 2006–2010 | *Senior Associate Dean for Faculty Development*, Yale School of Management |
| 2005–2006 | *Adam Smith Visiting Fellow*, Department of Economics, University of Edinburgh, Scotland |
| 2000–2002 | *James L. Frank '32 Associate Professor of Private Enterprise and Management*, Yale School of Management |
| 1999–2000 | *Associate Professor of Economics and Strategy*, Yale School of Management |
| 1997–1999 | *Assistant Professor of Economics and Strategy*, Graduate School of Business, University of Chicago |
| 1994–1997 | *Assistant Professor of Strategic Management*, Graduate School of Business, Stanford University |
| 1991–1992 | *Instructor for Economics 10*, Prof. Martin Feldstein, Harvard University |

## Scholarly publications

"Physician Agency, Consumerism, and the Consumption of Lower-Limb MRI Scans." With Michael Chernew, Zack Cooper, and Eugene Larsen Hallock. *Journal of Health Economics*, Vol. 76, March 2021.

"Surprise! Out of Network Billing for Emergency Care in the United States." With Zack Cooper and Nathan Shekita. *Journal of Political Economy*: 128: 9: 3626–3677, 2020.

"Out-Of-Network Billing And Negotiated Payments For Hospital-Based Physicians." With Zack Cooper and Nathan Shekita. *Health Affairs*: 39: 1, December 16, 2019.

"Do Increasing Markups Matter? Lessons from Empirical Industrial Organization." With Steven Berry and Martin Gaynor. *The Journal of Economic Perspectives,* 33: 3: 44–68, 2019.

"Antitrust and Innovation: Welcoming and Protecting Disruption." With Guilio Federico and Carl Shapiro. In *Innovation Policy and the Economy*, Josh Lerner and Scott Stern, eds. vol. 20. NBER, 2019.

Scott Morton, Fiona (chair) et al., (2019) Report of the Market Structure and Antitrust Subcommittee, Digital Platforms Project, George J Stigler Center for the Study of the Economy and the State, The University of Chicago Booth School of Business, June 2019.

"The Impacts of the Entry of Biosimilars: Evidence from Europe." With Ariel Dora Stern, and Scott Stern. *Review of Industrial Organization*, 53, No. 1 (August 2018): 173-210 (https://doi.org/10.1007/s11151-018-9630-3)

"The antitrust case against platform MFNs." With Jonathan Baker. *Yale Law Journal*, May 2018.

"The antitrust case against horizontal shareholding." With Herbert Hovenkamp. *Yale Law Journal*, May 2018.

"The Impact of Consumer Inattention on Insurer Pricing in the Medicare Part D Program." With Kate Ho and Joseph Hogan. *RAND Journal of Economics*, 48(4): 877–905, 2017.

"A Proposal to Limit the Anticompetitive Power of Institutional Investors." With Eric A. Posner and E. Glen Weyl. *Antitrust Law Journal*, 81(3): 669–728, 2017.

"A Unifying Analytical Framework for Loyalty Rebates." With Zachary Abrahamson. *Antitrust Law Journal*, 81(3): 777–836, 2017.

"Contracts that Reference Rivals." Chapter 7, Antitrust Economics for Lawyers. LexisNexis, 2017.

"Enabling Competition in Pharmaceutical Markets." With Lysle Boller. *Brookings Institution, Hutchins Center Paper # 30*, 2017.

"Out-of-Network Emergency-Physician Bills—An Unwelcome Surprise." With Zack Cooper. *New England Journal of Medicine,* 375(20): 1915–1918; Reprinted in *NEJM Catalyst,* December 2016.

"Market Size and Pharmaceutical Innovation." With Pierre Dubois, Olivier de Mouzon, and Paul Seabright. *RAND Journal of Economics,* 46(4): 844–871, 2015.

"Patent Assertions: Are We Any Closer to Aligning Reward to Contribution?" With Carl Shapiro. *NBER Innovation Policy and the Economy,* 2015.

"Strategic Patent Acquisitions." With Carl Shapiro. *Antitrust Law Journal,* 79(2): 463–499, 2014.

"Hospitals, Market Share, and Consolidation: How Should Policy React?" With David Cutler. *Journal of the American Medical Association,* 310(18), 1964–70, November 2013.

"Pay-for-Delay." *Competition Policy International,* 9(2), 2013.

"Research into biomarkers: How does drug procurement affect the design of clinical trials?" With Paul Seabright. *Health Management, Policy, and Innovation,* 1(3), 2013.

"Contracts that Reference Rivals." *Antitrust Magazine*, 72–79, Summer 2013.

"Developing an Administrable MFN Enforcement Policy." With Steven Salop. *Antitrust Magazine*, 65–73, Spring 2013.

"Standard Setting Organizations Can Help Solve the Standard Essential Patents Licensing Problem." With Kai-Uwe Kuhn and Howard Shelanski. *CPI Antitrust Chronicle,* March 2013.

"The Year in Review: Economics at the Antitrust Division: 2011." With W. Robert Majure. *Review of Industrial Organization*, 41(4): 321–331, 2012.

"What Matters in a Price Negotiation: Evidence from the US Auto Retailing Industry." With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 9: 365–402, 2011.

"Data Impediments to Empirical Work in Health Insurance Markets." With Leemore Dafny, David Dranove, and Frank Limbrock. *BE Journal of Economic Analysis and Policy,* 11(2): Article 8, 2011.

"The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices." With Mark Duggan. *American Economic Review Papers and Proceedings,* 101(3): 387–392, 2011.

"Pharmaceutical Markets." With Margaret Kyle. *Handbook of Health Economics*, vol. 2, ch. 12, 763–823, Elsevier, 2011.

"State Franchise Laws, Dealer Terminations, and the Auto Crisis." With Francine Lafontaine. *Journal of Economic Perspectives,* 24(3): 233–50, 2010.

"The Effect of the Medicare Drug Benefit on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review,* 100(1): 590–607, 2010.

"Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D." With Mark Duggan and Patrick Healey. *Journal of Economic Perspectives,* 22(4): 69–92, 2008.

"State Casket Sales Restrictions: a Pointless Undertaking?" With Judith A. Chevalier. *The Journal of Law and Economics,* 51(1) 1–23, 2008.

"How the Internet Lowers Prices: Evidence from Matched Survey and Auto Transaction Data." with Florian Zettelmeyer and Jorge Silva-Risso. *Journal of Marketing Research,* 43(2): 168–181, 2006.

"The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing." With Mark Duggan. *The Quarterly Journal of Economics,* 121(1): 1–30, 2006.

"Behavioral Biases Meet the Market: The Case of Magazine Subscription Prices." With Sharon M. Oster. *The Berkeley Electronic Press: Advances in Economic Analysis & Policy,* 5(1) Article 1, 2005.

"Consumer Benefit from Use of the Internet" *NBER Innovation Policy and the Economy*, 6: 67–90, 2005.

"The Strategic Positioning of Store Brands in Retailer-Manufacturer Negotiations." With Florian Zettelmeyer. *Review of Industrial Organization,* 24(2): 161–194, 2004.

"Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Woman and Minorities?" With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 1(1): 65–92, 2003.

"Love or Money? The Effects of Owner Motivation in the California Wine Industry." With Joel M. Podolny. *The Journal of Industrial Economics,* 50(4): 431–456, 2002.

"Horizontal Integration Between Brand and Generic Firms in the Pharmaceutical Industry." *Journal of Economics & Management Strategy,* 11(1): 135–168, 2002.

"Internet Car Retailing." With Florian Zettelmeyer and Jorge Silva-Risso. *The Journal of Industrial Economics,* 49(4): 501–519, 2001.

"Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry." *International Journal of Industrial Organization,* 18(7): 1085–1104, 2000.

"Social Status, Entry, and Predation: The Case of British Shipping Cartels 1879–1929." With Joel Podolny. *The Journal of Industrial Economics,* 47 (1): 41–67, 1999.

"Entry decisions in the generic pharmaceutical industry" *The RAND Journal of Economics,* 30(3): 421–440, 1999.

"Misclassification of the Dependent Variable in a Discrete-Response Setting." With J.A. Hausman and Jason Abrevaya. *Journal of Econometrics,* 87(2): 239–269, 1998.

"Entry and Predation: British Shipping Cartels 1879–1929." *Journal of Economics & Management Strategy,* 6(4): 679–724, 1997.

"The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored Customer Rules." *The RAND Journal of Economics,* 28(2): 269–290, 1997.

"The Interaction between a Most-Favored Customer Clause and Price Dispersion: An Empirical Examination of the Medicaid Rebate Rules of 1990 *Journal of Economics & Management Strategy,* 6(1): 151–174, 1997.

## Working papers

"Addictive Technology and its Implications for Antitrust Enforcement." With J. Niels Rosenquist and Samuel Weinstein, Working paper, 2020.

"Interoperability as an Antitrust Remedy." With Michael Kades, 2020.

"A Roadmap for an Antitrust Case against Facebook." With David Dinielli, Working paper, 2020.

"A Roadmap for a Digital Advertising Monopolization Case against Google" With David Dinielli. Working paper, 2020.

"A Roadmap for a Monopolization Case against Google Regarding the Search Market." With David Dinielli. Working paper, 2020.

"The 2010 HMGs Ten Years Later: Where Do We Go From Here?" With Steven Salop. Solicited for a special issue of the *Review of Industrial Organization*. 2020.

"Evaluating the Evidence on Vertical Mergers." With Marissa Beck. Working paper, 2020.

"Testing the Theory of Common Stock Ownership" NBER working paper #27515. With Lysle Boller. 2020.

"A Model of Generic Drug Shortages: Supply Disruptions, Demand Substitution, and Price Control." With Kim Sang-Hyun. 2015.

"Referring Physicians Leave Money on the Table: Where Is It?" With Michael Chernew and Zack Cooper. 2017.

"Differentiated to Death." With Judith Chevalier and David Harrington. 2011.

"Scarcity Rents in Car Retailing: Evidence from Inventory Fluctuations at Dealerships." With Florian Zettelmeyer and Jorge Silva-Risso. NBER Working Paper No. 12177, 2006.

"Cowboys or Cowards: Why Are Internet Car Prices Lower?" With Florian Zettelmeyer and Jorge Silva-Risso. NBER Working Paper No. 8667, 2001.

## Research in progress

"Performances of Indexes that Do Not Hold Rivals." With Will Goetzmann and Natalie Zhu.

"The Causes of High Pharmaceutical Prices." With Craig Garthwaite.

"Common Ownership and Index Membership." With Lysle Boller.

"The Impact of Price Information on Search and Healthcare Spending." With Michael Chernew and Zack Cooper.

"Adding Market Investigations to the US antitrust toolkit." With Michael Enseki-Frank.

## Awards

| | |
|---|---|
| 2020 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2019–20 |
| 2020 | Grant support for the Thurman Arnold Project at Yale from the Anti-Monopoly Fund and Microsoft Corporation |
| 2019 | Grant support for the Thurman Arnold Project at Yale from the Knight Foundation and Omidyar Network |
| 2016 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2015–16 |
| 2014 | HEMA/KPPI Distinguished Visitor, Kellogg GSM, Northwestern University |
| 2011 | Health Care Research Award, National Institute for Health Care Management for "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review* 100(1): 590–607. |
| 2011 | National Science Foundation Research Grant 1064341 for "*The Industrial Organization of the Biologics Industry: Theory, Empirics and Policy.*" |
| 2011 | Excellence in Refereeing Award 2011, *American Economic Review* |
| 2010 | Excellence in Refereeing Award 2010, *American Economic Review* |
| 2007 | Yale School of Management Alumni Association Teaching Award, the only teaching prize awarded at Yale School of Management for the academic year 2006–2007 |
| 2007 | Green Award, *Journal of Marketing Research*, for the paper "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data." |
| 2005–2008 | National Science Foundation Research Grant 0518858 for "The Effect of Government Procurement of Pharmaceuticals." With Mark Duggan, University of Maryland. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0518858 |
| 2001–2003 | National Science Foundation Research Grant 0111885 for "The Effect of Internet Car Shopping on Prices and Discrimination." With Florian Zettelmeyer, UC-Berkeley. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0111885 |
| 1998–2002 | National Science Foundation Research Grant 9810178 for "Studies of Competition." http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=9810178 |
| 1995 | Distinguished Teaching Commendation: One of three "second prizes" given by Stanford MBA students for excellence in teaching during the academic year 1994–95 |
| 1993–1994 | Program on the Pharmaceutical Industry, MIT, grant for full tuition and stipend |

## Courses taught

*Competition Economics and Policy*: Elective MBA course covering topics in competition enforcement such as cartels, horizontal mergers, monopolization, vertical restraints, exclusive dealing, MFNs, predatory pricing, and IP. The law is taught but the focus is on the economics and managerial implications.

*Competitive Strategy:* Elective MBA course covering topics in I.O. such as price and quantity competition, entry, and antitrust, as well as strategy concepts such as industry analysis, competitive advantage, and sustainability

*The Competitor Perspective*: One element of the core curriculum for first-year MBAs that provides introductory analysis of competition using tools from economics, marketing, accounting, and politics

## PhD students supervised (institution, year; first placement)

Andrea Coscelli (Stanford GSB, 1998; University College London)

Brian Viard (University of Chicago GSB, 2000; Stanford GSB)

Paris Cleanthous (Yale, 2003; NYU Stern)

Juan Esteban Carranza (Yale, 2004; Wisconsin-Madison)

Henry Schneider (Yale, 2006; Cornell Johnson School)

Fabian Duarte (Yale, 2010; RAND)

Maliheh Birjandi-Feriz (Yale, 2018; Analysis Group)

Rebecca McKibbin (Yale, 2018, University of Sidney)

## Memberships and professional service

American Economic Association

NBER, Research Associate, Industrial Organization

First Western Bancorp Inc. (now Sky Bank, Bowling Green, Ohio), Board of Directors (1998–1999)

StreamSage.com, Advisory Board (2000–2004)

*Economic Policy*, Panel (2002–2004)

*Review of Industrial Organization*, Editorial Board (2002–2004)

*The Journal of Industrial Economics*, Associate Editor (2003–2006)

*International Journal of Industrial Organization*, Co-Editor (2005–2008)

*BE Journal of Economics Analysis and Policy*, Editor (2006–2010)

American Economic Association Committee on the Status of Women in the Economics Profession, Board (2007–2009)

*Journal of Economic Perspectives*, Associate Editor (2007–2010)

Scientific Committee, Center for European Economic Research (ZEW) ICT conference (2010)

Program Committee, American Economic Association Meetings (2010)

Scientific Committee, FTC microeconomics conference (2010)

*American Economic Review*, Board of Editors (2011–2013)

Research Advisory Board, CEFAGE, Portugal, member (2013– )

Wharton Business Economics and Public Policy Department, External Review Committee (2016)

AEA Committee on Government Relations (2017–2019)

## Invited research presentations

Dartmouth Econ, MIT Econ, Harvard Econ, Harvard Business School, Harvard School of Public Health, Boston University, Yale Econ, Yale Law, SUNY Stony Brook Econ, Columbia Econ, Columbia Business School, NYU Stern, U. Penn Wharton School, Univ. of Maryland Econ, Department of Justice, Federal Trade Commission, Univ. of Delaware Econ, Duke Econ, Univ. of Virginia Econ, Carnegie Mellon Heinz School, Northwestern Econ, Northwestern Kellogg GSM, Chicago Econ, Chicago GSB, Purdue Econ, Univ. of Michigan Business School, Washington Univ. St. Louis Olin School, Iowa State Econ, University of Tennessee Knoxville, Univ. of Rochester Business School, Cornell Econ, Univ. of Texas at Austin, Univ. of Arizona, Stanford GSB, UC Berkeley Econ, UC Berkeley Haas School, UCLA Econ, RAND, Univ. of Toronto Econ (Canada), Univ. of British Columbia (Canada), Victoria University (Canada), HEC Montreal (Canada), Queens University (Canada), Univ. of Munich (Germany), Univ. of Linz (Austria), DG Competition (Belgium), London School of Economics (England), Office of Fair Trading (England), Oxford University (England), Cambridge University (England), University of Warwick (England), Imperial College (England), UCL (England), Edinburgh University (Scotland), Stirling University (Scotland), European University Institute (Italy), IDEI Toulouse (France), University of Auckland (New Zealand)

## Conferences (presenter or discussant)

Boston University healthcare I.O. conference: 1995, 1999, 2004

Stanford Strategy Conference: 1996, 1997 (organizer), 1999, 2000

Harvard Business School Strategy Conference: 1999, 2004

Economic Policy Conference: 2002 spring and fall, 2003 fall, 2004 fall

American Economics Assn. Meetings: 2001, 2002, 2004, 2005, 2007, 2008, 2010, 2016, 2020

NBER IO Summer Institute: 1998, 2001 (organizer and presenter), 2003, 2007 (organizer), 2008, 2010, 2013 (organizer), 2014, 2016, 2018, 2019

NBER IO Winter Meetings: 1995, 1996, 2000, 2004, 2016, 2018, 2019

NBER e-commerce group conferences: 2000, 2001

NBER conference on non-profits: 2002

NBER conference on IO of healthcare: 1998

NBER conference on innovation policy: 2005, 2015

IDEI (Toulouse) e-commerce conference: 2001, 2003 (co-author presented), 2005

IDEI (Toulouse) pharmaceutical and healthcare conference: 2008

IDEI (Toulouse) Standard Essential Patent conference: 2013

Univ. of British Columbia IO conference: 2004, 2014, 2016

WZB Institute Behavioral IO conference, Berlin, Germany: 2005

CEPR Applied IO conference: 2006

UCL Behavioral IO conference, England: 2006

NBER conference on intellectual property: 2006

ASHE conference: 2008

NBER Public Economics: spring meeting 2009

FTC Microeconomics Conference: 2010 keynote, 2019

Yale Marketing IO conference: 2011

Milton Friedman Healthcare Conference, University of Chicago: 2011

ABA Spring Antitrust meeting: 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2019, 2020 (virtual)

Northwestern Law School conference on Antitrust Economics: 2011 keynote, 2012 keynote, 2013, 2014, 2015, 2016, 2017, 2019

EARIE: 2012, 2013

Barcelona GSE Summer Forum: 2013

Kaiser Permanente Healthcare and IO conference: 2013 (organizer)

Northwestern Healthcare Markets Conference: 2014, 2017

IDEI Toulouse TIGER Health conference: 2014

FTC/DOJ Conditional Pricing Practices: 2014

NBER Innovation Summer Institute: 2014, 2015

NBER Digitization Summer Institute: 2014

NBER Economics of Health Insurance Exchanges: 2014

Utah Winter Business Economics Conference: 2014, 2017

### The Digital Broadband Migration

Silicon Flatirons conference, University of Colorado Law School: 2015, 2017

FTC/DOJ Healthcare Conference: 2015

CRESSE summer conference: 2015, 2017, 2019

Yale Conference on Healthcare Consolidation: 2015 (organizer)

FTC Auto Distribution workshop: 2016

Yale SOM Conference on Problems with Global Antitrust Enforcement: 2016 (organizer)

Searle International Competition Economist meeting: 2016

University of Montreal summer IO conference: 2016

ICN Chief Economist Workshop at UBC: 2016

Center for Equitable Growth antitrust conference: 2106

Competition, Concentration and Antitrust, Stigler Center, Booth School of Business, University of Chicago: 2017 (keynote), 2018, 2019 (chair)

American Antitrust Institute Airline roundtable: 2016

Highland Health Economics Conference: 2017 (organizer)

Law, Competition & Markets Paris conference (Columbia University): 2017

EUI: Disruptive Innovation and Competition Policy: 2017

University of East Anglia, Centre for Competition Policy, pharmaceutical conference: 2017

Academic and Practitioner Symposium on Mutual Funds and ETFs (Darden): 2017

5th BRICS International Competition Conference (Brazil): 2017

Unlocking the Promise of Antitrust Enforcement, American University: 2017 (co-organizer)

MACCI conference, Mannheim, Germany 2018, summer school: 2019

Brookings Institute conference: pharmaceutical competition 2017, patient cost-sharing: 2018

Kaiser pharmaceutical pricing conference: 2018

Bates White healthcare conference: 2018

FTC Hearings on Competition and Consumer Protection in the 21st Century: 9/21, 11/1, & 12/6, 2018

BU TPRI conference: 2018

Berlin Center for Consumer Policies conference: 2019

University of Pennsylvania Law School “Post-Chicago Antitrust Revolution,” 2019 (co-organizer)

## Other invited speaking engagements

Canadian Economics Association keynote, 2021 (scheduled)

Royal Econometric Society virtual panel, 2020

CEPR Applied IO virtual panel, 2020

Mexican Competition Authority (COFECE), 2020

American Society for Heath Economics AEA luncheon, 2020

Merrick Lecture, University of Virginia, 2019

Griswald Symposium panel, Princeton University, 2019

Shaping Competition Policy in the Era of Digitisation, European Commission, 2019

Stanford Institute for Economic Policy and Research, 2018

DG Competition, series on effects-based analysis of unilateral conduct, 2017

Scotchmer Lecture, Toulouse IDEI, 2017

EC Roundtable, Regulatory Environment for Online Platforms, 2015

Digital Forum, IDEI, Paris, France, 2015

Inaugural *NEJM Exchange* debate, 2015

Competition Policy Lecture, University of Toronto Rotman School, 2014

Landsdowne Lecture, University of Victoria, Canada, 2013

Conference on Healthcare Reform, Baker Institute, Rice University, 2013, 2019

ChIPs Women in IP Summit, 2013

## Refereed publications

*Review of Economic Studies, Quarterly Journal of Economics, The RAND Journal of Economics, The Journal of Industrial Economics, Journal of Economics & Management Strategy, Journal of Health Economics, Review of Industrial Organization, International Journal of Industrial Organization, American Economic Review, National Science Foundation, Journal of Law and Economics, Journal of Political Economy, Journal of Law, Economics, and Organization, Marketing Science, Management Science, Strategic Management Journal, Review of Economics and Statistics, Journal of Econometrics, Econometrica, European Economic Review, Berkeley Electronic Journals, The American Journal of Managed Care, Contemporary Economic Policy.*

## Government testimony

Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights on "*Your Doctor/Pharmacist/Insurer Will See You Now: Competitive Implications of Vertical Consolidation in the Healthcare Industry*," June 12, 2019

Senate Judiciary Committee on "Understanding the Digital Advertising Ecosystem and the Impact of Data Privacy and Competition Policy," May 21, 2019

House Committee on the Judiciary, Subcommittee on Regulatory Reform, Commercial and Antitrust Law on "Diagnosing the Problem: Exploring the Effects of Consolidation and Anticompetitive Conduct in Health Care Markets," March 7, 2019

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation," April 2016

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation" (April 2016).

House Oversight and Government Reform Committee Hearing, "*The Medicare Drug Benefit: Are Private Insurers Getting Good Discounts for the Taxpayer?*," July 2008

Senate Finance Committee Hearing, "*Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit*," January 2007

FTC hearings, "*Possible Anticompetitive Efforts to Restrict Competition on the Internet*," Auto Panel, October 2002

## Testimony in litigated or arbitrated matters

Retained on behalf of C R Bard, submitted report, was deposed, and testified at trial in AngioDynamics, Inc. v. C.R. Bard, Inc. et al, 1:17-CV-0598, Northern District of New York. Deposed February 25, 2020. Testified October 3, 2023.

Retained on behalf of the US Federal Trade Commission, submitted expert reports, and deposed in the Matter of Illumina, Inc. and GRAIL, Inc., US Federal Trade Commission, Docket No. 9401. Deposed August 3, 2021. Testified September 16, 2021.

Retained on behalf of HTC Corporation and HTC America, Inc., submitted expert report in arbitration proceedings between HTC Corporation, Claimant, and Telefonaktiebolaget LM Ericsson, Respondent, International Chamber of Commerce International Court of Arbitration Case No. 24176/MK, October 30, 2020.

Retained on behalf of Sanofi-Aventis U.S. LLC, submitted expert report, expert reply report, and deposed in *Sanofi-Aventis U.S. LLC v. Mylan Inc., et al.*, Case No. 3:17-cv-02763-FLWTJB (D.N.J. Apr. 24, 2017). Deposed March 12, 2019 and May 30, 2019.

Retained on behalf of the State of New York, and testified in deposition and trial in *State of New York et al v. Deutsche Telekom AG et al*, Case No. 1:19-cv-5434-VM-RWL, Southern District of New York, 2019.

Retained on behalf of HTC Corporation and HTC America, Inc., submitted expert reports, and deposed in HTC Corporation and HTC America, Inc. v. Telefonaktiebolaget LM Ericsson and Ericsson Inc., U.S. District Court, Eastern District of Texas, Case No. 6:18-cv-00243-JRG (June 2018-2019).

Retained on behalf of Apple, Inc., and deposed in *In re: Qualcomm Litigation*, Case No. 3:17-CV-00108-GPC-MDD (consolidated with Case No. 3:17-CV-01010-GPC-MDD) deposed October 26, 2018.

Retained on behalf of Apple Inc., submitted expert report, expert reply report and supplemental expert report, deposed and testified at trial *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof (II)*, before the U.S. International Trade Commission (2018), 337-TA-1093. Deposed July 31, 2018. ITC hearing testimony September 21, 2018.

Retained on behalf of the US Federal Trade Commission, submitted expert reports, and deposed *In the Matter of Otto Bock HealthCare North America, Inc*., U.S. Federal Trade Commission, Docket. No. 9378. Deposed June 15, 2018. Testified August 29-30, 2018.

Retained on behalf of ASUS Computer International and ASUStek Computer Incorporated, submitted expert reports and deposed in *ASUS Computer International and ASUStek Computer Inc. v. Interdigital, Inc., Interdigital Communications, Inc., Interdigital Technology Corp., IPR Licensing, Inc., and Interdigital Patent Holdings, Inc.*, United States District Court, Northern District Of California, San Jose Division, Case No. 15-cv-1716 BLF. Deposed July 9, 2018.

Retained on behalf of Apple Inc., submitted expert report and expert reply report, deposed and testified at trial *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof*, before the U.S. International Trade Commission (2018), 337-TA-1065. Deposed April 5, 2018. ITC hearing testimony June 25, 2018.

Retained on behalf of Tesla, submitted expert report and expert reply report, and deposed in the matter of *Tesla Motors, Inc. v. Ruth Johnson, in her official capacity of Secretary of State and Chief Motor Vehicle Administrator, Bill Shuette, in his official capacity as Attorney General, and Rick Snyder, in his official capacity as Governor.* U.S. District Court, Western District of Michigan, Case No. 1:16-CV-01158-JTN-ESC (2017-2018). Deposed June 2018.

Retained on behalf of Apple Inc., submitted expert reports and deposed *In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof*, before the U.S. International Trade Commission, Inv. No. 337-TA-1065 (2018).

Retained on behalf of Honda Motor Co., Ltd., Honda North America, Inc., American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda Manufacturing of Alabama, LLC, and Honda R&D Americas, Inc., submitted expert report and direct witness statement, and deposed *In the Matter of Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and Vehicles Containing Same II*, International Trade Commission, Inv. No. 337-TA-1073 (2017-2018).

Retained on behalf of Arista Networks Inc., submitted expert report and deposed in *Arista Networks Inc. v. Cisco Systems Inc.*, U.S. District Court for the Northern District of California, Case No. 5:16-cv-00923 (2017-2018).

Retained on behalf of Capital One Financial Corporation, submitted expert reports and declaration, and deposed in *Intellectual Ventures I LLC, et al.,* v. *Capital One Financial Corp., et al.,* v. *Intellectual Ventures Management, LLC, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC,* U.S. District Court for the District of Maryland, Southern District, Case No. 8:14-CV-00111-PWG (2017).

Retained on behalf of Microsoft Corporation, deposed in the matter of *Microsoft Corporation et al v. Evolved Wireless LLC*, U.S. District Court, District of Delaware, Case No. 1:15-cv-00547-UNA (2017).

Retained on behalf of SK hynix, deposed and testified at trial *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, International Trade Commission, Inv. No. 337-TA-1023 (2017).

Retained by Charter Communications, filed multiple statements with the FCC related to its proposed acquisition of Time Warner Cable and Bright House Networks (2015).

Retained on behalf of Microsoft Corporation and submitted expert report in *Surfcast, Inc. v. Microsoft Corporation*, U.S. District Court for the District of Maine, Case No. 2:12-CV-00333-JDL (June 2014).

Retained on behalf of Amgen, submitted expert report, and deposed in *United States of America et al. ex rel. Kassie Westmoreland v. Amgen Inc. et al.*, U.S. District Court of Massachusetts, Civil Action No. 06-10972-WGY (2011).

Retained on behalf of Johnson & Johnson and submitted expert report in *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al*., Commonwealth Court of Pennsylvania, No. 212 M.D. 2004 (2010).

Retained on behalf of BMS, submitted expert report, and testified at trial in *Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al*., Commonwealth Court of Pennsylvania, No. 212 M.D. 2004 (2010).

Retained on behalf of Chrysler Group LLC, submitted expert report, and testified in selected arbitration hearings *in re Arbitrations Pursuant to Section 747 of H.R. 3288 between Chrysler Group LLC (New Chrysler) and "Covered Dealerships*," American Arbitration Association (2010).

Retained on behalf of Johnson & Johnson and deposed in *State of Wisconsin v. Abbott Laboratories, Inc., et al.*, Circuit Court for Dane County, Wisconsin, 04 CV 1709 (2009).

Retained on behalf of AstraZeneca and testified at trial in *Commonwealth of Kentucky v. Alpharma USPD, Inc., et al.*, Franklin Circuit Court–Div. I, Kentucky, Civil Action No. 04-CI-1487 (2009).

Retained on behalf of Sandoz and testified at trial in Commonwealth of *Kentucky v. Alpharma USPD, Inc., et al.*, Franklin Circuit Court–Div. I, Kentucky, Civil Action No. 04-CI-1487 (2009).

Retained on behalf of Boehringher Ingelheim, submitted expert report, and deposed in *United States of America ex rel. Ven-A-Care of the Florida Keys et al. v. Boehrinhger Ingelheim Corp. et al.*, US District Court of Massachusetts, Civil Action No. 00-10698-MEL (2009).

Retained on behalf of Sandoz, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2009).

Retained on behalf of Pfizer, deposed, and testified at trial in *State of Wisconsin v. Abbott Laboratories, Inc., et al.*, Circuit Court for Dane County, Wisconsin, 04 CV 1709 (2009).

Retained on behalf of Bristol-Myers Squibb and deposed in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Retained on behalf of GlaxoSmithKline and Novartis, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Prepared and delivered educational materials for the Court and examined at hearing in *Commonwealth of Massachusetts v. Mylan Laboratories, Inc., Ivax Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA,*

*Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Co., and Roxane Laboratories, Inc.*, US District Court of Massachusetts, Civil Action No. 03-11865-PBS (2008).

Retained on behalf of defendants, submitted expert report, deposed, and testified at trial in *Commonwealth of Massachusetts v. Mylan Laboratories, Inc., Ivax Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Co., and Roxane Laboratories, Inc.*, US District Court of Massachusetts, Civil Action No. 03-11865-PBS (2008, 2010).

Retained on behalf of AstraZeneca, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Retained on behalf of MedStar Health and submitted expert report in *In re Hypodermic Products Antitrust Litigation*, MDL No. 1730, US District Court of the District of New Jersey, 05-CV-1602 (2007).

Retained on behalf of Schering-Plough, submitted expert report, and deposed in *In re Schering-Plough Corporation Securities Litigation*, US District Court of the District of New Jersey, 01-CV-0829 (2007).

Retained on behalf of Pfizer, submitted expert report, and deposed in *In re Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court of Massachusetts, MDL No MDL 1629 (2007).

Submitted expert report on behalf of fast-track defendants in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, US District Court of Massachusetts, MDL No. 1456, 01-CV-012257-PBS (2006).

Retained on behalf of Teva USA and submitted expert report in IP damages litigation *Abbott Laboratories v. Andrx Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. and Roxane Laboratories Inc.*, US District Court for the Northern District of Illinois Eastern Division, No. 05 C 1490 (2005).

## Administrative Hearings

Retained on behalf of Lucid USA, Inc., submitted an expert report and testified in a formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4), before the Department of Motor Vehicles for the Commonwealth of Virginia (April 28, 2021).

Retained on behalf of Rivian Automotive, LLC, submitted a witness statement for a formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4), before the Department of Motor Vehicles for the Commonwealth of Virginia (December 9, 2021).

Retained on behalf of Tesla, submitted expert report, and testified in Tesla Motors, Inc.'s application for New Motor Vehicle Dealer License before the Arizona Department of Transportation Executive Hearing Office (July 2016).

Retained on behalf of Tesla, submitted expert reports, and testified in formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4) and 46.2-1573, before the Department of Motor Vehicles for the Commonwealth of Virginia (June 2016).

Retained on behalf of Tesla, submitted expert report, and testified in Tesla Motors, Inc.'s application for Motor Vehicle Dealer License before the North Carolina Wake County Division of Motor Vehicles, Hearing Section (May 2016).

Retained on behalf of Tesla, submitted witness declaration, and testified in *Tesla Motors Utah, Inc. vs. Motor Vehicle Enforcement Division of the Utah State Tax Commission*, in a matter before the Utah State Tax Commission (August 2015).

Retained on behalf of Tesla and testified in *Georgia Automobile Dealers Association vs. Tesla Motors, Inc.*, in a matter before the Georgia Office of State Administrative Hearings (February 2015).

# EXHIBIT B

**Materials Relied Upon**

**I. Publications and Academic Articles**


1. Aylin Sertkaya, Anna Birkenbach, Ayesha Berlind, and John Eyraud, "Examination of Clinical Trial Costs and Barriers for Drug Development" (July 25, 14)
2. Darius N. Lakdawalla, "Economics of the Pharmaceutical Industry," 56 *Journal of Economic Literature* 403 (2018)
3. David B. Ridley, "Payments, Promotion and the Purple Pill," 24 *Health Economics* 86 (2015)
4. Ernst R. Berndt, Thomas G. McGuire, and Joseph P. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," National Bureau of Economic Research Working Paper No. 16879 (2011)
5. Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Volume 2 (2012)
6. Fiona Scott Morton and Zachary Abrahamson, "A unifying analytical framework for loyalty rebates," 81 *Antitrust Law Journal* 777 (2016)
7. Fiona Scott Morton, Ariel Dora Stern, and Scott Stern, "The Impact of the Entry of Biosimilars: Evidence from Europe," 53 *Review of Industrial Organization* 173 (2018)
8. Frank Limbrock, "Pecuniary and Non-Pecuniary Incentives in Prescription Pharmaceuticals: The Case of Statins," 11 *The B.E. Journal of Economic Analysis & Policy* (2011)
9. Giulio Federico, Fiona Scott Morton, and Carl Shapiro, "Antitrust and innovation: Welcoming and protecting disruption," 20 *Innovation Policy and the Economy* 125 (2020)
10. Gregory G. Schwartz, et al., "Alirocumab and Cardiovascular Outcomes after Acute Coronary Syndrome," 379 *New England Journal of Medicine* 22 (2018)
11. Jonathan B. Baker and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," *Handbook of Antitrust Economics* (2008)
12. Jonathan B. Baker, "Exclusions as a core competition concern," 78 *Antitrust Law Journal* 527 (2012)
13. Jonathan B. Baker, "Market Definition: An Analytical Overview," 74 *Antitrust Law Journal* 129 (2007)
14. Joseph A. DiMasi and Henry G. Grabowski, "The Cost of Biopharmaceutical R&D: Is Biotech Different?," 29 *Managerial and Decision Sciences* 469 (2007)
15. Joseph A. DiMasi, Henry G. Grabowski, and Ronald W. Hansen, "Innovation in the pharmaceutical industry: New estimates of R&D costs," 47 *Journal of Health Economics* 20 (2016)

16. Joseph Farrell and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," 10 *B.E. Journal of Theoretical Economics* 1 (2010)

17. Joseph T. Mattingly, David A. Hyman, and Ge Bai, "Pharmacy Benefit Managers – History, Business Practices, Economics, and Policy," 4 *JAMA Health Forum* 11 (2023)

18. Judith K. Hellerstein, "The Importance of the Physician in the Generic versus Trade-Name Prescription Decision," 29 *The RAND Journal of Economics* 108 (1998)

19. Kate Ho and Robin S. Lee, "Contracting over Rebates: Formulary Design and Pharmaceutical Spending" (Oct. 2023), https://kateho.scholar.princeton.edu/sites/g/files/toruqf4136/files/documents/20231019_Formulary_Design.pdf.

20. Luca Maini, Josh Feng, Thomas Hwang, and Jacob Klimek, "Biosimilar Entry and the Pricing of Biologic Drugs," (Sept. 9, 2021)

21. Marc S. Sabatine, et al., "Evolocumab and Clinical Outcomes in Patients with Cardiovascular Disease," 376 *New England Journal of Medicine* 18 (2017)

22. Olivier J. Wouters, Martin McKee, and Jeroen Luyten, "Estimated Research and Development Investment Needed to Bring a New Medicine to Market, 2009-2018," 323 *JAMA* 9 (2020)

23. Patrick M. Moriarty, et al., "Alirocumab in patients with heterozygous familial hypercholesterolemia undergoing lipoprotein apheresis: the ODYSSEY ESCAPE trial," 37 *European Heart Journal* (2016)

24. Peri Iz, "Study of Pharmaceutical Benefit Management," *HCFA* 38 (June 2001), https://www.cms.gov/files/document/cms20014pdf.

25. Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," 6 *Journal of Economics & Management Strategy* 75 (1997)

26. Sara Fisher Ellison and Christopher M. Snyder, "Countervailing Power in Wholesale Pharmaceuticals," 58 *The Journal of Industrial Economics* 32 (2010)

27. Scott H. Podolsky and Jeremy A. Greene, "A Historical Perspective of Pharmaceutical Promotion and Physical Education," 300 *JAMA* 831 (2008)

28. Stuart O. Schweitzer and Z. John Lu, "Pharmaceutical Economics and Policy [-] Perspectives, Promises and Problems," Third Edition (2018)

29. Thomas G. Krattenmaker and Steven C. Salop," Anticompetitive exclusion: Raising rivals' costs to achieve power over price," 96 *Yale Law Journal* 209 (1986)

30. Thomas J. Moore, Hanzhe Zhang, Gerard Anderson, and C. Caleb Alexander, "Estimated Costs of Pivotal Trials for Novel Therapeutic Agents Approved by the US Food and Drug Administration," 178 *JAMA* 11 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6248200/#!po=68.7500

31. Toshiaka Iizuka & Ginger Z. Jin, "The Effects of Prescription Drug Advertising on Doctor Visits," 14 Journal of Economics and Management Strategy 701 (2005)

32. Y. Richard Wang, "Spillover effects of restrictive drug formularies in the statin class: a descriptive study of the Medicaid preferred drug list in Texas," 19 *Managed Care Interface* 11 (2006)

## II. Depositions

1. Deposition Transcript of Adam Grennan, Executive Director and General Manager of U.S. Market Access at Amgen, and associated exhibits
2. Deposition Transcript of Alexander Hindman, UHC 30(b)(6), and associated exhibits
3. Deposition Transcript of Amy Bricker, Executive Vice President at CVS Health, and associated exhibits
4. Deposition Transcript of Andy Chiu, Executive Director of U.S. Value & Access at Amgen, and associated exhibits
5. Deposition Transcript of David Zimmer, Vice President of U.S. Value & Access at Amgen, and associated exhibits
6. Deposition Transcript of Jay Witter, (Zinc 30(b)(6)), and associated exhibits
7. Deposition Transcript of Jasper van Grunsven, Vice President, General Manager of General Medicine at Amgen, and associated exhibits
8. Deposition Transcript of Jennifer Norton, Vice President of Market Access at Amgen, and associated exhibits
9. Deposition Transcript of John Ryan, Head of Cardiometabolic and Rare Disease Business Unit at Regeneron, and associated exhibits
10. Deposition Transcript of Kave Niksefat, Global Head of Rare Disease Marketing & Commercial Integration at Amgen, and associated exhibits
11. Deposition Transcript of Marion McCourt, Executive Vice President and Head of Commercial at Regeneron, and associated exhibits
12. Deposition Transcript of Dr. Michael Doyle, Medical Director at the UnaSource Comprehensive Weight Loss Center, and associated exhibits
13. Deposition Transcript of Murdo Gordon, Executive Vice President of Global Commercial Operations at Amgen, and associated exhibits
14. Deposition Transcript of Richard O'Neal, Senior Vice President of Market Access at Regeneron, and associated exhibits
15. Deposition Transcript of Robert Bradway, Chief Executive Officer and Chairman of Amgen, and associated exhibits
16. Deposition Transcript of Robert Pordy, Vice President of Clinical Services, Internal Medicine at Regeneron, and associated exhibits
17. Deposition Transcript of Scott Cullins, National Account Director at Regeneron, and associated exhibits

18. Deposition Transcript of Steven Hyde, Vice President, Payers and GPOs at Regeneron, and associated exhibits

19. Deposition Transcript of Swaminathan Subramanian, Senior Director of Pricing and Contracting at Regeneron, and associated exhibits

20. Deposition Transcript of Thomas Moore, Vice President of Market Access, Marketing, Contracting, and Trade at Amgen, and associated exhibits

21. Deposition Transcript of William West, Executive Director of Market Access at Amgen, and associated exhibits

## III. Interviews

1. Interview of John Ryan, Executive Director, Cardiometabolic and Rare Disease Business Unit at Regeneron (Feb. 8, 2024)

2. Interview of Richard O'Neal, Senior Vice President of Market Access at Regeneron (Feb. 8, 2024)

## II. Expert Reports

1. Expert Report of Divya Mathur, Ph.D., *Regeneron Pharm., Inc. v. Amgen Inc.*, No. 22-cv-00697-JLH (Feb. 13, 2024).

2. Expert Report of Dr. Robert Eckel, *Regeneron Pharm., Inc. v. Amgen Inc.*, No. 22-cv-00697-JLH (Feb. 13, 2024).

3. Expert Report of Heather Bates, *Regeneron Pharm., Inc. v. Amgen Inc.*, No. 22-cv-00697-JLH (Feb. 13, 2024).

## IV. Cases and Court Filings

1. *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. 870, Def. Amgen's Br. in support of Permanent Inj., 1 (D. Del. March 18, 2019)

2. *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, Dkt. 912, Decl. Robert A. Bradway in support of Amgen's Mot. Permanent Inj., ¶ 12 (D. Del. March 25, 2019)

3. *Amgen, Inc. v. Sanofi*, 598 U.S. 594 (2023)

4. *Amgen, Inc. v. Sanofi*, No. 1:14-cv-01317-RGA (D. Del. Oct. 17, 2014)

5. *Amgen, Inc. v. Sanofi*, No. 1:14-cv-01317-RGA Letter from David Wilks to Melanie K. Sharp, (D. Del. Mar. 9, 2019)

6. *Amgen, Inc. v. Sanofi*, No. 1:14-cv-01317-RGA, Dkt. 1 Complaint for Patent Infringement and Decl. J. of Patent Infringement, (D. Del. Oct. 17, 2014)

7. *Amgen, Inc. v. Sanofi*, No. 1:14-cv-01317-RGA, Dkt. 1050 (D. Del. Aug. 28, 2019)

8. *Cascade Health v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008)

9. Fed. Trade Comm'n Complaint, In the Matter of *Bristol-Myers Squibb Co. and Celgene Corp.*, at 2 (Nov. 15, 2019), https://www.ftc.gov/system/files/documents/cases/bms-celgene_complaint.pdf

10. *FTC v. Amgen, Inc. and Horizon Therapeutics*, No. 1:23-cv-03053, Dkt. 22, Def. Amgen's Memo. in Opp. to Pl.'s Mot. for Prelim. Inj., (N.D. Ill. June 22, 2023)
11. *FTC v. Amgen*, No. 23-3053, Dkt. No. 130, Mem. by Amgen in Opp'n to Pl.s' Motion for Prelim. Inj., (N.D. Ill. Aug 22, 2023)
12. *In re Intel Corp*., 150 F.T.C. 420 (F.T.C. Oct. 29, 2010)
13. *Meijer, Inc. v. Abbott Labs*, 544 F. Supp. 2d 995 (N.D. Cal. 2008)
14. *Regeneron Pharm., Inc. v. Amgen Inc*., No. 22-cv-00697-JLH, Dkt. 34, Pl. Regeneron's Memo. in Opp. to Def. Amgen Mot. to Dismiss, (D. Del. Sept. 26, 2022)
15. *Regeneron Pharm., Inc. v. Amgen Inc*., No. 22-cv-00697-JLH, Dkt. 107, Letter to Judge Jennifer L. Hall from Melanie K. Sharp, (D. Del. June 8, 2023)
16. *Sanofi v. Amgen, Inc*., No. 17-1480, Dkt. 40, Resp. of *Amicus Curiae* Practitioners Who Currently Treat Patients with Praluent in Supp. of Appellants' Mot. for Stay Pend. Appeal, (Fed. Cir. Jan. 24, 2017)
17. *SmithKline Beecham Corp. v. Abbott Lab*, 2014 WL 6664226 (N.D. Cal. Nov., 2014)

**V. Data**

1. AMG-10935-DATA-0000000056 – AMG10935-DATA-0000000075 (IQVIA LAAD MX)
2. AMG10935-DATA-0000000076 – AMG10935-DATA-0000000095 (IQVIA LAAD RX)
3. AMG10935-DATA-0000000138 – AMG10935-DATA-0000001406 (MMIT data)
4. AMG10935-DATA-0000001407 (Amgen LEDR data)
5. AMG10935-DATA-0000001411 (Amgen PCUT data)
6. AMG10935-DATA-0000001438 (Amgen – CVS Rebates data)
7. AMG10935-DATA-0000001439 (Amgen – ESI Rebates data)
8. AMG10935-DATA-0000001440 (Amgen – Optum Rebates data)
9. Amgen LEDR data
10. REGN-DATA-0002 - ATTORNEYS' EYES ONLY (Regeneron GTN 2020)
11. REGN-DATA-0003 - ATTORNEYS' EYES ONLY (Regeneron GTN 2021)
12. REGN-DATA-0007 - ATTORNEYS' EYES ONLY (Regeneron COGS data)
13. REGN-DATA-0013
14. REGN-DATA-0018 - ATTORNEYS' EYES ONLY (Regeneron GTN 2022)
15. REGN-DATA-0019 - ATTORNEYS' EYES ONLY (Regeneron GTN 2023)
16. Amgen, Inc., Annual Report (Form 10-K), (Feb. 9, 2021)
17. Amgen, Inc., Annual Report (Form 10-K), (March 30, 2023)

18. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 5, 2024)
19. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 8, 2018)
20. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 7, 2019)
21. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 7, 2020)
22. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 8, 2021)
23. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 7, 2022)
24. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 6, 2023)
25. Zip- code data, USPS Postal Pro, https://postalpro.usps.com/ZIP_Locale_Detail

**VI. Other Documents**

1. "Value Formulary Quick Reference List" (Jan. 2024), https://www.caremark.com/portal/asset/state_of_ms_formulary.pdf
2. Adam Fein, Drug Channels, "Five (or Maybe Six?) Reasons that the Largest PBMs Operate Group Purchasing Organizations" (May 24, 2023), https://www.drugchannels.net/2023/05/five-or-maybe-six-reasons-that-largest.html
3. Adam Fein, Drug Channels, "Top Pharmacy Benefit Managers of 2022: Market Share and Trends for the Biggest Companies" (May 23, 2023), https://www.drugchannels.net/2023/05/the-top-pharmacy-benefit-managers-of.html
4. Aetna, "2024 Aetna Pharmacy Drug Guide, Aetna Standard Plan," (Feb. 2024), https://fm.formularynavigator.com/FBO/41/2024_Aetna_Standard_Plan_.pdf
5. Aetna, "2024 Standard Opt Out Plan – Aetna Formulary Exclusions Drug List, Drugs not covered – and their covered alternatives" (Jan. 2024), https://www.aetna.com/content/dam/aetna/pdfs/aetnacom/individuals-families-health-insurance/document-library/pharmacy/2024-standard-opt-out-plan-Aetna-exclusions-drug-list.pdf
6. Aetna, "Aetna® Medicare HMO/PPO/POS/RPPO 2024 Formulary (List od covered drugs) B2" (Feb. 1, 2024), https://www.aetnamedicare.com/documents/individual/2024/formularies/FORM_2024_24024B2GC5z_EN.pdf
7. Aetna, "Aetna® Medicare HMO/PPO/POS/RPPO 2024 Formulary (List od covered drugs) B4" (Feb. 1, 2024), https://www.aetnamedicare.com/documents/individual/2024/formularies/FORM_2024_24027B4GC5z_EN.pdf
8. Aetna, "SilverScript Choice (PDP)" (Feb. 1, 2024), https://www.aetnamedicare.com/documents/individual/2024/formularies/FORM_2024_24021SS1NGz_EN.pdf
9. American Pharmacists Association, "Overview Of Biologics And Biosimilar Products," American Pharmacists Association,

https://www.pharmacist.com/Advocacy/Issues/Biosimilars#:~:text=If%20FDA%20has%20not%20concluded,a%20prescription%20specifically%20for%20it

10. Amgen Inc. Q4 2022 Earnings Call Tr. (Feb. 2023), https://news.alphastreet.com/amgen-inc-amgn-q4-2022-earnings-call-transcript/

11. Amgen Inc. Q4 2023 Earnings Call Tr. (Feb. 2024), https://seekingalpha.com/article/4668054-amgen-inc-amgn-q4-2023-earnings-call-transcript.

12. UMWA Health & Retirement Funds, “United Mine Workers of America Health and Retirement Funds Standard Formulary 2024” (Jan. Jan. 1, 2024), https://www.umwafunds.org/wp-content/uploads/2023/12/UMWA-Standard-Formulary-01243-sec.pdf

13. Amgen Inc., “Otezla,” https://www.pi.amgen.com/-/media/Project/Amgen/Repository/pi-amgen-com/Otezla/otezla_pi_english.pdf .

14. Amgen, Inc., “2019 Letter to Shareholders” (March 31, 2020), https://investors.amgen.com/static-files/d45cb739-9637-4e13-856c-e2fc29571032

15. Amgen, Inc., “2020 Letter to Shareholders” (March 30, 2021), https://investors.amgen.com/static-files/c1b90d85-8945-4d11-8d1c-5ddc343fb699

16. Amgen, Inc., “2021 Letter to Shareholders” (March 29, 2022), https://investors.amgen.com/static-files/1789c7c6-0a07-49d4-bd81-e1afc7cb1f6d

17. Amgen, Inc., “2022 Letter to Shareholders” (March 30, 2023), https://investors.amgen.com/static-files/cb90e5d6-72b9-4291-ba59-85281072b4be

18. Amgen, Inc., “Small Molecule,” https://www.amgen.com/stories/2018/08/the-shape-of-drugs-to-come/small-molecule#:~:text=Small%20molecules%20are%20usually%20taken,engage%20targets%20inside%20the%20cell

19. Amgen, Inc., Q3 2023 Earnings Call Tr. (Oct. 2023) https://seekingalpha.com/article/4645475-amgen-inc-amgn-q3-2023-earnings-call-transcript

20. Anna Wilde Mathews and Aisha Al-Muslim, “CVS Completes $70 Billion Acquisition of Aetna,” Wall Street Journal, (Nov. 28, 2018), https://www.wsj.com/articles/cvs-completes-70-billion-acquisition-of-aetna-1543423322

21. Anna Wilde Mathews, “Cigna and Express Scripts Seal $54 Billion Merger” (Dec. 20, 2018), Wall Street Journal, https://www.wsj.com/articles/cigna-and-express-scripts-seal-54-billion-merger-11545327979

22. Anthem, “Essential Drug List Drug list – Four Tier Drug Program” (Feb. 2024), https://fm.formularynavigator.com/FBO/143/Essential_Drug_List_4_Tier_ABC.pdf

23. Anthem, “List of Covered Drugs Anthem Medicare Preferred (PPO) with Senior Rx Plus with Select Generics” (Feb. 2024),

https://www.anthem.com/ca/ms/pharmacyinformation/Part%20D%20Drug%20List%20B3.pdf

24. Blue California, “Blue Shield 65 Plus Plan 2 (HMO) 2024 Formulary (List of Covered Drugs)” (Jan. 23, 2024), https://blueshieldca.adaptiverx.com/web/pdf?key=8F02B26A288102C27BAC82D14C006C6FC54D480F80409B6804526B28BBDC6414

25. Blue Cross Blue Shield of Massachusetts, “Medication Lookup,” https://www.bluecrossma.org/medication/ (accessed Feb. 12, 2024)

26. Blue Cross Blue Shield of Massachusetts, “Standard Control with Advanced Control Specialty Formulary” (Jan. 1, 2024), https://home.bluecrossma.com/collateral/sites/g/files/csphws1571/files/acquiadam-assets/Standard%20Control%20with%20Advanced%20Control%20Specialty%20Formulary%20Comprehensive%20Covered%20Medication%20List%20January%202024.pdf

27. Blue Cross Blue Shield of Tennessee, “2024 Preferred Formulary Guide” (Feb. 2024), https://www.bcbst.com/docs/providers/2024-preferred-formulary-prescription-drug-list.pdf

28. Blue MedicareRx (PDP), “Blue MedicareRx Value Plus (PDP) 2024 Formulary (List of Covered Drugs” (Jan. 25, 2024), https://rxmedicareplans.com/pdf/CY/Value_Plus_Formulary.pdf

29. Blue Shield of California Life & Health Insurance Company, “Plus Drug Formulary” (Feb. 2024), https://blueshieldca.adaptiverx.com/web/pdf?key=8F02B26A288102C27BAC82D14C006C6FC54D480F80409B68508A1C0DBAB19E1D

30. Caremark, “FEP 5 Tier Rx Drug Formulary (607) Standard Option” (Jan. 1, 2024), https://www.caremark.com/portal/asset/z6500_drug_list.pdf

31. C-SPAN, “Prescription Drug Prices, Part 1” (May 19, 2019), https://www.c-span.org/video/?460552-1/prescription-drug-prices-part-1

32. CVS Caremark, “Advanced Control Formulary” (January Jan. 2024), https://www.caremark.com/portal/asset/Advanced_Control_Formulary_OE.pdf

33. CVS Caremark, “Performance Drug List – Standard Opt Out” (January Jan. 2024), https://www.caremark.com/portal/asset/PerformanceDL_StandardOptOut.pdf

34. CVS Caremark, “State of Tennessee Prior Authorization, Step Therapy and Quantity Limit List” (January Jan. 2024), https://www.caremark.com/portal/asset/STNRX_UM_drug_list.pdf

35. Drugbank, “Etranercept,” https://go.drugbank.com/drugs/DB00005

36. Drugs.com, “What is a biologic drug?” (Jan 18, 2024), https://www.drugs.com/medical-answers/what-biologic-drug-3565613

37. Esperion Therapeutics, Inc. Annual Report (Form 10-K) (Dec 31. 2020)

38. European Medicines Agency, "Praluent," https://www.ema.europa.eu/en/medicines/human/EPAR/praluenthttps://www.ema.europa.eu/en/medicines/human/EPAR/praluent

39. Express Scripts, White Paper: Formulary Development at Express Scripts 5 (2020)

40. Government Employees Health Association, "Performance Drug List – Standard Control for Clients with Advanced Control Speciality Formulary® - Chart for GEHA Standard Option, High Option, HDHP" (Jan. 2024), https://www.caremark.com/portal/asset/GEHA_Drug_List.pdf?_ga=2.202770962.2020986455.1706806465-1483402257.1706806465

41. Hayden Consulting Group, "PBM Consolidation and its Impact on Geo Prescribing Patterns" (Nov. 28, 2023), https://haydencg.com/pbm-consolidation-and-its-impact-on-geo-prescribing-patterns/#:~:text=A%20positive%20POI%20indicates%20the,are%20covered%20by%20other%20payers )

42. HealthFirst Health Plans, "Health First Health Plans 2024 Formulary List of Covered Drugs" (Jan. 2024), https://hf.widen.net/s/gschvftgfr/2024-medicare-formulary

43. Innovent, "Innovent Announces the NMPA Approval of SINTBILO® (Tafolecimab Injection) for the Treatment of Adult Patients with Primary Hypercholesterolemia and Mixed Dyslipidemia" (Aug. 16, 2023), https://www.innoventbio.com/InvestorsAndMedia/PressReleaseDetail?key=402

44. IQVIA, https://www.iqvia.com/ (accessed Feb. 10, 2024)

45. Jonathan Gardner, "AstraZeneca gives up on Ionis' RNA drug for heart disease" BioPharma Dive, (Sept. 23, 2022), https://www.biopharmadive.com/news/astrazeneca-ionis-antisense-cholesterol-PCSK9-end-trial/632531/

46. Jonathan Stempel, Reuters, "Amgen patents on top-selling arthritis drug Enbrel upheld, shares rise" (July 1, m 2020), https://www.reuters.com/article/amgen-novartis-enbrel/amgen-patents-on-top-selling-arthritis-drug-enbrel-upheld-shares-rise-idINKBN2426D6/

47. Joseph D. Rutowski et al., "Supreme Court Unanimously Affirms Amgen Repatha® Antibody Patents Invalid for Lack of Enablement" Mintz (May 25, 2023) https://www.mintz.com/insights-center/viewpoints/2231/2023-05-25-supreme-court-unanimously-affirms-amgen-repathar

48. KFF (formerly Kaiser Family Foundation), "Employer Health Benefits [-] 2023 Annual Survey" (Oct. 18, 2023), https://www.kff.org/health-costs/report/2023-employer-health-benefits-survey/

49. Letter from Alliance for Pharmacy Compounding, et al. to Federal Trade Commission and Department of Justice Antitrust Division re: Federal Trade Commission and Department of Justice's Draft Vertical Merger Guidelines (Feb. 26, 2020), https://www.ftc.gov/system/files/attachments/798-draft-vertical-merger-

guidelines/02-26-20_joint_pharmacy_stakeholder_comments_-_ftc_doj_draft_vertical_merger_guidelines.pdf

50. Lina M. Khan et al., "In the matter of Amgen, Inc. and Horizon Therapeutics plc" Federal Trade Commission https://www.ftc.gov/system/files/ftc_gov/pdf/Statement-of-Chair-Lina-M-Khan-re-Amgen-Horizon.pdf .

51. Medicare y Mucho Más/PMC Medicare Choice, "Formulario para 2024 (Lista de Medicamentos Cubiertos" (Jan. 23, 2024), https://www.mmm-pr.com/frontend/web/uploads/documentos/581371231mmmdiamantedoradorelaxvalorpluspmcpremierplatinofeb24esp_65bbc6ca8770f.pdf

52. Medicareinteractive.org, "Medicare Part D," https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/medicare-part-d

53. Medicareinteractive.org, "The parts of Medicare (A, B, C, D)," https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/original-medicare

54. National Association of Letter Carriers Health Benefit Plan, "NALC Prescription Drugs with Dispensing Limits or Prior Authorization Requirements" (Jan. 2024), https://www.nalchbp.org/news/body/NALC-RxQLPA-January-2024-List.pdf

55. NORD, "Step Therapy (Fail First)," https://rarediseases.org/policy-issues/step-therapy/ (accessed Dec. 20, 2023)

56. North Carolina State Health Plan, "North Carolina State Health Plan 2024 Custom Formulary" (Jan. 1, 2024), https://www.shpnc.org/documents/pharmacy-documents/2024-comprehensive-formulary/open

57. Patient Advocate Foundation, "Filing a Formulary Exception," https://www.patientadvocate.org/explore-our-resources/insurance-denials-appeals/filing-a-formulary-exception/

58. PharmaIntelligence Informa, "Clinical Development Success Rates and Contributing Factors 2011-2020" (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf

59. Press Release, *Amgen, Inc*., "Amgen reports fourth quarter and full year 2022 financial results" (January Jan. 31, 2023), https://www.amgen.com/newsroom/press-releases/2023/01/amgen-reports-fourth-quarter-and-full-year-2022-financial-results

60. Press Release, *Amgen, Inc.*, "Amgen To Acquire Otezla® For $13.4 Billion In Cash, Or Approximately $11.2 Billion Net Of Anticipated Future Cash Tax Benefits (Aug. 26, 2019), https://www.amgen.com/newsroom/press-releases/2019/08/amgen-to-acquire-otezla-for-134-billion-in-cash-or-approximately-112-billion-net-of-anticipated-future-cash-tax-benefits

61. Press Release, *Amgen, Inc*., "Amgen Wins Patent Appeal on Otezla (Apremilast)" (April 19, 2023), https://www.amgen.com/newsroom/press-releases/2023/04/amgen-wins-patent-appeal-on-otezla-apremilast

62. Press Release, *Amgen, Inc*., "FDA Approves Expanded Use Of ENBREL® (etanercept) To Treat Children With Chronic Moderate-To-Severe Plaque Psoriasis" (Nov. 14, 2016), https://www.amgen.com/newsroom/press-releases/2016/11/fda-approves-expanded-use-of-enbrel-etanercept-to-treat-children-with-chronic-moderatetosevere-plaque-psoriasis

63. Press Release, *Bristol Myers Squibb*, "U.S. Food and Drug Administration Approves Sotyktu™ (deucravacitinib), Oral Treatment for Adults with Moderate-to-Severe Plaque Psoriasis" (Sept. 9, 2022), https://news.bms.com/news/details/2022/U.S.-Food-and-Drug-Administration-Approves-Sotyktu-deucravacitinib-Oral-Treatment-for-Adults-with-Moderate-to-Severe-Plaque-Psoriasis/default.aspx

64. Press Release, *Epresion*, "Esperion Announces Two Data Presentations of NEXLETOL® (bempedoic acid) Tablet at the ESC Congress 2020," (Aug. 2020), https://www.esperion.com/news-releases/news-release-details/esperion-announces-two-data-presentations-nexletolr-bempedoic

65. Press release, *Federal Trade Comission*, Federal Trade Commission, "FTC Further Expands Inquiry Into Prescription Drug Middlemen Industry Practices" (June 8, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-further-expands-inquiry-prescription-drug-middlemen-industry-practices

66. Press Release, *Federal Trade Commission*, "FTC Approves Final Order Requiring Bristol Myers Squibb Company Celgene Corporation Divest Psoriasis Drug Otezla as a Condition of Acquisition", (Jan. 13, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/01/ftc-approves-final-order-requiring-bristol-myers-squibb-company-celgene-corporation-divest-psoriasis

67. Press Release, *Federal Trade Commission*, "FTC Approves Final Order Settling Horizon Therapeutics Acquisition Challenge," (Dec. 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/12/ftc-approves-final-order-settling-horizon-therapeutics-acquisition-challenge .

68. Press release, *Federal Trade Commission*, "FTC Deepens Inquiry into Prescription Drug Middlemen" (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-deepens-inquiry-prescription-drug-middlemen

69. Press Release, *Federal Trade Commission*, "FTC Launches Inquiry Into Prescription Drug Middlemen Industry" (June 7, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry

70. Press Release, *Federal Trade Commission*, "Resolving Anticompetitive Concerns, FTC Cleats $16 Billion Acquisition of Immunex Corp. By Amgen Inc." (July 12, 2022),https://www.ftc.gov/news-events/news/press-releases/2002/07/resolving-anticompetitive-concerns-ftc-clears-16-billion-acquisition-immunex-corp-amgen-inc

71. Press Release, *Pfizer*, "Pfizer Discontinues Global Development of Bococizumab, Its Investigational PCSK9 Inhibitor", (Nov. 1, 2016) https://www.pfizer.com/news/press-release/press-release-

detail/pfizer_discontinues_global_development_of_bococizumab_its_investigational_pcsk9_inhibitor ;

72. Regeneron Pharmaceuticals, Inc., "Regeneron and Sanofi Offer Praluent (Alirocumab) at a New Reduced U.S. List Price" (Feb. 2019), https://investor.regeneron.com/news-releases/news-release-details/regeneron-and-sanofi-offer-praluentr-alirocumab-new-reduced-us#:~:text=About%20Praluent&text=Praluent%20was%20developed%20by%20Regeneron,optimized%20fully%2Dhuman%20monoclonal%20antibodies

73. Shelia Campbell, Congressional Budget Office, "Promotional Spending for Prescription Drugs" (Dec. 2, 2009), https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/12-02-drugpromo_brief.pdf

74. State Health Benefit Plan, "2024 Preferred Drug List for Georgia State Health Benefit Plan (SHBP)" (Jan. 2024), https://www.caremark.com/portal/asset/SHBP_PDL_OE.pdf

75. Statistica, "Size of the global chemical drugs and biologics pharmaceutical market 2014 - 2023 (in billion U.S. dollars)," https://www.statista.com/statistics/1085563/revenue-chemical-drugs-and-biologics-global-pharmaceuticals/

76. Subcommittee on Health of the House Committee on Energy & Commerce, Hearing on Examining the Drug Supply Chain, Statement of Mark Merritt (Dec. 17, 2017), https://docs.house.gov/meetings/IF/IF14/20171213/ 106730/HHRG-115-IF14-Wstate-MerrittM-20171213.pdf

77. Subcommittee on Health of the House Committee on Energy & Commerce, Hearing on Lowering Prescription Drug Prices, Testimony of Amy Bricker (May 19, 2019), https://www.congress.gov/116/meeting/house/109436/witnesses/HHRG-116-IF14-Wstate-BrickerA-20190509.pdf

78. The Empire Plan, "2024 Empire Plan Advanced Flexible Formulary Preferred Drug List" (Jan. 2024), https://www.cs.ny.gov/employee-benefits/hba/shared/drug-lists/2024/empire-plan-advanced-flexible-formulary-preferred-jan-2024.pdf

79. Transcript, Amgen, Inc., Earnings Call (Jan. 31, 2023)

80. UnitedHealthcare, "Your 2019 Prescription Drug List Advantage Three-Tier" (January 1, 2019), https://das.nebraska.gov/Benefits/Active/2019/2019Jan-JunePrescriptionDrugList.pdf

81. UnitedHealthcare, "Your 2019 Prescription Drug List Advantage Three-Tier (January 1, 2019), https://m.myuhc.com/content/myuhc/Member/Assets/Pdfs/2019_Advantage_Tier_3_Prescription_Drug_List.pdf

82. UnitedHealthcare, "Your 2019 Prescription Drug List Advantage 3-Tier" (July 1, 2019), https://m.myuhc.com/content/myuhc/Member/Assets/Pdfs/100-18270_3T_Adv_7-1-19_v10FINAL.pdf

83. UnitedHealthcare, “Your 2020 Prescription Drug List Advantage 3-Tier” (January 1, 2020), https://das.nebraska.gov/Benefits/Active/docs/2019/pharmacy-pdl-3t-adv-january-2020.pdf

84. UnitedHealthcare, “Your 2020 Prescription Drug List Advantage 3-Tier” (May 1, 2020), https://das.nebraska.gov/Benefits/Active/docs/2020/Pharmacy/July20203tAdvantagePrescriptionDrugList.pdf

85. U.S. Dep’t of Justice & Fed. Trade Comm’n, Horizontal Merger Guidelines (2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf

86. U.S. Department of Health and Human Services, “Updated Contract Year (CY) 2021 Final Part D Bidding Instructions” (May 22, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2021%20mtm%20and%20specialty%20thresholds%20final%20part%20d%20bidding%2005.22.2020_8.pdf

87. U.S. Department of Health and Human Services, “Your Guide to Medicare Prescription Drug Coverage” (July 2022), https://www.medicare.gov/publications/11109-Medicare-Drug-Coverage-Guide.pdf

88. U.S. Department of Justice and Federal Trade Commission, “Improving Health Care: A Dose of Competition” (July 2004), https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf

89. U.S. Food and Drug Administration, “Biosimilar Basics for Patients,” (Oct. 26, 2023) https://www.fda.gov/drugs/biosimilars/biosimilar-basics-patients

90. U.S. Food and Drug Administration, “Frequently Asked Questions About Therapeutic Biological Products,” (July 2015), https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequently-asked-questions-about-therapeutic-biological-products

91. U.S. Food and Drug Administration, “Nexletol ™ (bempedoic acid) package insert,” (Feb. 2020), https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/211616s000lbl.pdf

92. U.S. Food and Drug Administration, “Praluent® (alirocumab) package insert” (April 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125559s029s030lbl.pdf

93. U.S. Food and Drug Administration, “Repatha® (evolocumab) package insert,” (Sept. 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125522s029s031lbl.pdf

94. U.S. Food and Drug Administration, “Review and Approval,” https://www.fda.gov/drugs/biosimilars/review-and-approval

95. Wellcare, "2024 Comprehensive Formulary (List of Covered Drugs)," (Jan. 2024), https://fm.formularynavigator.com/FBO/67/7_6T_Enhanced_MAPD_Comp_Form_24180.pdf

96. Wellmark, "Blue Rx Preferred Formulary" (Feb. 2024), https://wellmark.adaptiverx.com/web/pdf?key=8F02B26A288102C27BAC82D14C006C6FC54D480F80409B68A87F18859A559B79

## VII. Bates Stamped

1. AMG10935_OCO-0000000001
2. AMG10935_OCO-0000000601
3. AMG10935_OCO-0000000672
4. AMG10935_OCO-0000000728
5. AMG10935_OCO-0000000878
6. AMG10935_OCO-0000002361
7. AMG10935_OCO-0000003094
8. AMG10935_OCO-0000005281
9. AMG10935_OCO-0000007043
10. AMG10935_OCO-0000030231
11. AMG10935_OCO-0000086477
12. AMG10935_OCO-0000092369
13. AMG10935_OCO-0000093248
14. AMG10935_OCO-0000093398
15. AMG10935-0000000878
16. AMG10935-0000003029
17. AMG10935-0000005529
18. AMG10935-0000005877
19. AMG10935-0000006721
20. AMG10935-0000009231
21. AMG10935-0000009524
22. AMG10935-0000009549
23. AMG10935-0000009567
24. AMG10935-0000012174
25. AMG10935-0000012335

26. AMG10935-0000013130
27. AMG10935-0000015661
28. AMG10935-0000016303
29. AMG10935-0000016495
30. AMG10935-0000017052
31. AMG10935-0000017144
32. AMG10935-0000017816
33. AMG10935-0000021473
34. AMG10935-0000022627
35. AMG10935-0000026314
36. AMG10935-0000028146
37. AMG10935-0000028147
38. AMG10935-0000028211
39. AMG10935-0000028500
40. AMG10935-0000037571
41. AMG10935-0000054619
42. AMG10935-0000074681
43. AMG10935-0000077098
44. AMG10935-0000077348
45. AMG10935-0000079826
46. AMG10935-0000083575
47. AMG10935-0000083666
48. AMG10935-0000087312
49. AMG10935-0000087408
50. AMG10935-000009231
51. AMG10935-0000096882
52. AMG10935-0000098335
53. AMG10935-0000101341
54. AMG10935-0000109970
55. AMG10935-0000115008
56. AMG10935-0000115173
57. AMG10935-0000117594

58. AMG10935-0000121753
59. AMG10935-0000126581
60. AMG10935-0000128836
61. AMG10935-0000135313
62. AMG10935-0000136911
63. AMG10935-0000138112
64. AMG10935-0000139317
65. AMG10935-0000139319
66. AMG10935-0000139350
67. AMG10935-0000140287
68. AMG10935-0000140890
69. AMG10935-0000143668
70. AMG10935-0000148143
71. AMG10935-0000148145
72. AMG10935-0000215204
73. AMG10935-0000221594
74. AMG10935-0000225239
75. AMG10935-0000225951
76. AMG10935-0000225955
77. AMG10935-0000225995
78. AMG10935-0000230057
79. AMG10935-0000309444
80. AMG10935-0000311298
81. AMG10935-0000369614
82. AMG10935-0000375371
83. AMG10935-0000379900
84. AMG10935-0000392769
85. AMG10935-0000392815
86. AMG10935-0000395732
87. AMG10935-0000397232
88. AMG10935-0000414326
89. AMG10935-0000414442

90. AMG10935-0000414549
91. AMG10935-0000415409
92. AMG10935-0000417134
93. AMG10935-0000440691
94. AMG10935-0000502169
95. AMG10935-0000503396
96. AMG10935-0000512428
97. AMG10935-0000525947
98. AMG10935-0000543928
99. AMG10935-0000544275
100. AMG10935-0000544590
101. AMG10935-0000544764
102. AMG10935-0000545187
103. AMG10935-0000545450
104. AMG10935-0000545597
105. AMG10935-0000545710
106. AMG10935-0000548061
107. AMG10935-0000548392
108. AMG10935-0000615954
109. AMG10935-0000624891
110. AMG10935-0000632018
111. AMG10935-0000633387
112. AMG10935-0000639608
113. AMG10935-0000655366
114. AMG10935-0000687913
115. AMG10935-0000722094
116. AMG10935-0000731338
117. AMG10935-0000735537
118. AMG10935-0000779420
119. AMG10935-0000797525
120. AMG10935-0000798212
121. AMG10935-0000800854

122. AMG10935-0000800855
123. AMG10935-0000802882
124. AMG10935-0000811333
125. AMG10935-0000811337
126. AMG10935-0000865288
127. AMG10935-0000868079
128. AMG10935-0000872305
129. AMG10935-0000902195
130. AMG10935-0000906831
131. AMG10935-0000906834
132. AMG10935-0000907149
133. AMG10935-0000908505
134. AMG10935-0000908625
135. AMG10935-0000908659
136. AMG10935-0000911943
137. AMG10935-0000919698
138. AMG10935-0000924565
139. AMG10935-0000926663
140. AMG10935-0000972308
141. AMG10935-0001611586
142. AMG10935-0001611588
143. AMG10935-0001611590
144. AMG10935-0001611591
145. AMG10935-0001618894
146. AMG10935-DATA-0000001407
147. AMG10935-DATA-0000001411
148. AMG10935-DATA-0000001438
149. AMG10935-DATA-0000001439
150. AMG10935-OCO-0000005529
151. AMG10935-OCO-0000005877
152. CAREMARK0001392
153. CAREMARK0001421

154. Express_Scripts_1330_00001327
155. Express_Scripts_1330_00001813
156. Express_Scripts_1330_00002329
157. Express_Scripts_1330_00002512
158. Express_Scripts_1330_00002544
159. Express_Scripts_1330_00002556
160. Express_Scripts_1330_00002611
161. Express_Scripts_1330_00002667
162. Express_Scripts_1330_00002704
163. Express_Scripts_1330_00002718
164. Express_Scripts_1330_00002724
165. Express_Scripts_1330_00002959
166. Express_Scripts_1330_00003701
167. Express_Scripts_1330_00003912
168. Express_Scripts_1330_00004357
169. Express_Scripts_1330_00004399
170. Express_Scripts_1330_00004536
171. Express_Scripts_1330_00004538
172. Express_Scripts_1330_00004618
173. Express_Scripts_1330_00004855
174. Express_Scripts_1330_00004938
175. Express_Scripts_1330_00005159
176. Express_Scripts_1330_00007167
177. Express_Scripts_1330_00007330
178. HUM000273
179. REGN0000031
180. REGN0000075
181. REGN0000196
182. REGN0000295
183. REGN0000601
184. REGN0000658
185. REGN0000817

186. REGN0005850
187. REGN0030659
188. REGN0030688
189. REGN0047233
190. REGN0047243
191. REGN0114064
192. REGN0158570
193. REGN0196232
194. REGN0212888
195. REGN0263236
196. REGN0266739
197. REGN0351227
198. UHG000001673
199. UHG000007640
200. UHG000007762
201. UHG000007845
202. UHG000007892
203. UHG000007905
204. UHG000007916
205. UHG000008298
206. UHG000008374
207. UHG000008841
208. UHG000008946
209. ZINC0000186-90

# EXHIBIT 25

# Document Produced Natively

# 2018 LONG RANGE SALES SCENARIO

## GCO CONSOLIDATION

JUNE 4, 2018

AMGEN®

# CHANGE IN US KEY ASSUMPTIONS FOR 2018 VS 2017

| | 2018 LRS | 2017 LRP |
|---|---|---|
| Enbrel | [redacted] | [redacted] mira<br>3% PI taken each year in January |
| US Repatha | [redacted] | [redacted] |
| Neulasta | [redacted] | [redacted] |
| Parsabiv / Sensipar | [redacted] | [redacted] n |
| Evenity | [redacted] | [redacted] |
| ABP 501 | [redacted] | [redacted] |
| Kyprolis | [redacted] | [redacted] |
| Aimovig | [redacted] | [redacted] |
| ABP 215 / 980 | [redacted] | [redacted] |

# EXHIBIT 26

Message

**From:** Gordon, Murdo [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=65AEF22A465B405881EE343CF01B760E-[redacted]
**Sent:** 6/22/2019 1:42:15 AM
**To:** Le Goff, Corinne [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d0da449ea065429182f6e9437a1f07e0-[redacted]]; Marrache, Gilles [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c97bdfff259a4c39b05e126890766b07[redacted]Thompson, Ian [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4a1ef6a221da4da9b29562ca8e865d8a[redacted]; Wan, Penny [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=9138083a970e40faaa29423ef9465c5[redacted]]; Stewart, Gordon [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=66523999dace4046b771365e639b3d80-gstewa01]
**Subject:** Fwd: WSJ: Heart Attack at 49—America's Biggest Killer Makes a Deadly Comeback

Just to share what's on the boss's mind.

---

**From:** Bradway, Bob <rbradway@amgen.com>

**Sent:** Friday, June 21, 2019 8:55 PM

**To:** Jordan, Ray

**Cc:** Gordon, Murdo; Reese, David

**Subject:** Re: WSJ: Heart Attack at 49—America's Biggest Killer Makes a Deadly Comeback

You catch me just as I've left the courtroom in Delaware where I've been making the case for Repatha as a solution for this problem! There is no more important battle for us to win than this one. The geographic analysis is intriguing ... I will send a note to Steve Nissen now telling him he needs to get his colleagues to take their thumbs out and start driving LDL levels down!

Regards, Bob

---

**From:** Jordan, Ray

**Sent:** Friday, June 21, 2019 5:55:03 PM

**To:** Bradway, Bob

**Cc:** Irvin, Laura

**Subject:** Fwd: WSJ: Heart Attack at 49—America's Biggest Killer Makes a Deadly Comeback

Bob,
You've likely spotted this, but it adds data in support of an important - and distressing - medical trend you've long highlighted. ...Ray

**Subject:** WSJ: Heart Attack at 49—America's Biggest Killer Makes a Deadly Comeback

# Heart Attack at 49—America's Biggest Killer Makes a Deadly Comeback

Younger people, women and nonsmokers are more likely to be victims of the crisis in cardiovascular health, driven by skyrocketing obesity and diabetes

*By*

*Betsy McKay*
June 21, 2019 10:58 am ET

- SAVE
- SHARE
- TEXT
-

196 RESPONSES

One of America's greatest achievements over much of the past century has been a huge decline in death rates from heart disease and strokes. Anti-smoking campaigns, medications to control blood pressure and cholesterol, and surgical advances have extended millions of lives, fundamentally reshaping the U.S. population.

Now, progress has stalled. That's helping drive down life expectancy in the U.S. after decades in which each generation of Americans could expect to live longer than the one that came before.

The death rate for cardiovascular disease—which includes heart disease and strokes—has fallen just 4% since 2011 after dropping more than 70% over six decades, according to mortality statistics from the Centers for Disease Control and Prevention.

Particularly alarming is that the death rate is actually rising for middle-aged Americans.

**Health Reversal**

The reduction in heart disease had been so promising that it was expected to fall below cancer to become the No. 2 cause of death in the U.S. by 2020—but that no longer seems likely.




Source: Centers for Disease Control and Prevention

The overall cardiovascular-disease death rate is an under-recognized contributor to the recent decline in U.S. life expectancy. While that has been driven mostly by deaths from drug overdoses and suicides, improvements in cardiovascular health are no longer providing a counterbalance.

Among victims are John Singleton, the 51-year-old filmmaker behind the movie "Boyz N The Hood," and actor Luke Perry, the 52-year-old former star of "Beverly Hills, 90210." Both died of strokes earlier this year.

Heart disease was once on course to fall below cancer as the nation's leading cause of death, a change public-health statisticians most recently predicted would occur by 2020. No longer, said Robert Anderson, chief of the CDC's mortality statistics branch. "It's highly unlikely given the current trend that there will be a crossover anytime soon," he said.

The obesity epidemic and related rise in the prevalence of Type 2 diabetes are key culprits in the new wave of cardiovascular disease mortality, researchers and cardiologists say. Studies have linked obesity and diabetes to high blood pressure and other conditions that increase the risk of heart attacks, strokes and heart failure.

"It's a really major driver," said Stephen Sidney, director of research clinics at the Kaiser Permanente Northern California Division of Research, who has studied the changes in cardiovascular disease mortality rates. Obesity began rising across the U.S. population in the early 1980s, and Type 2 diabetes rates accelerated several years later. That has given both "enough time to really impact in a negative way on the population," Dr. Sidney said.



Dr. Steven Nissen, at the Cleveland Clinic, said cardiovascular-disease patients nowadays are younger, more obese, much less likely to be smokers and include more women. PHOTO: DUSTIN FRANZ FOR THE WALL STREET JOURNAL

Nearly 40% of U.S. adults age 20 and over are obese, another 32% are overweight, and 9.4% of U.S. adults 18 and over have diabetes, according to the CDC.

The consequences of obesity are eroding the enormous gains brought about by public-health campaigns against smoking, along with medical innovations such as cholesterol-lowering statin drugs. Statins, which were introduced starting in the late 1980s, have prevented millions of Americans from developing life-threatening blockages in their blood vessels that can cause heart attacks.

"You couldn't see the effects of the obesity epidemic when we were in the process of getting people to use statins," said Steven Nissen, chief academic officer of the Heart and Vascular Institute at the Cleveland Clinic. Now, he said, "we've got a counterforce here."

## Progress Stalls

After 60 years of steep declines, cardiovascular and heart disease death rates have been nearly stagnant since 2011.

The trend is especially bad for middle-aged Americans, who are more likely to die of cardiovascular disease now than in 2011, reversing a decadeslong improvement.

**Death rates, all ages**




**Death rate from major cardiovascular disease for people ages 45 to 64**




*Includes heart disease and stroke
Source: Centers for Disease Control and Prevention

Oscar Washington Jr., just 49 years old, wasn't feeling well when he got out of the shower one morning in April 2017 after a workout. "I think I got overheated," the utility company vice president told his wife, Doris. He lay down on their bed.

His arm was hurting, and he started to twist and turn. Ms. Washington became worried. She wondered if he was having a heart attack. Mr. Washington's father had passed away just four months earlier, of heart disease, and the couple was co-chairing a coming American Heart Association ball.

She gave her husband some aspirin and an ice pack. Then she helped him get dressed and drove him to the emergency room. Doctors there found him in the midst of a deadly heart attack, with blockages in a main artery on the heart and two others. Despite an emergency triple bypass operation, Mr. Washington died two weeks later of complications of his condition.



A family photo of Mr. Washington and his daughters in 2016. PHOTO: ANDREA MORALES FOR THE WALL STREET JOURNAL

Mr. Washington was an active member of his community who left behind a wife and two daughters. Hefty for his height, at 5 feet 6 inches and 250 pounds at the time of his heart attack, he had been on blood-pressure and cholesterol medications for years. But he worked out regularly and hadn't been diagnosed with a heart condition, his wife said.

"He didn't have any symptoms," said Ms. Washington, a 52-year-old agriculture-agency official in Little Rock, Ark., who has managed her grief and loneliness by staying busy with work, caring for her daughters, now ages 20 and 13, and setting up a scholarship fund for Arkansas high-school students in her husband's name.

Today's heart-disease victim is vastly different from the classic patient doctors and the public were trained to recognize a half-century ago: a smoker, usually male, whose LDL, or "bad" cholesterol numbers were "sky high," said Dr. Nissen. Now, the patients are younger, more obese, much less likely to be smokers and include more women, he said. Many are unaware that they are at risk.




"I've been working in a coronary-care unit for 40 years, and the patient that comes in now looks

completely different from the patient when I was starting out," he said. "It is an absolutely striking difference."

He calculated the median BMI of patients in the unit one day recently. Obesity is defined as a BMI of 30 or above. The unit's median was 34, he said. Several patients had BMIs over 40.

"I think obesity is the new smoking in terms of contribution to heart disease," said Sadiya Khan, a cardiologist and assistant professor of medicine at Northwestern University Feinberg School of Medicine. "We've made such great progress in coming up with smoking-cessation programs. For physical activity, healthy diet and weight loss we haven't found the right approach."

Dr. Khan was lead author of a 2018 study in the journal JAMA Cardiology showing the lifetime risk of cardiovascular disease and deaths from it to be higher for overweight and obese adults than for people with a normal body-mass index. The researchers analyzed data from more than 190,000 participants in 10 study cohorts going back several decades.

Cardiovascular-disease death rates rose 1.5% between 2011 and 2017 for 45-to-64-year-olds, according to CDC statistics. That includes increases in the rates of deaths from strokes, hypertensive heart disease and heart failure—all diseases associated with obesity.



Julie Kubala had a heart attack in 2016 and is now working to change a lifetime of habits. PHOTO: TIM GRUBER FOR THE WALL STREET JOURNAL

Older people still account for most cardiovascular deaths, but the cardiovascular-disease mortality rate for people 75 and older—who had benefited from the treatment advances and smoking cessation—actually fell 6% in the same years.

“I have seen 30-year-olds coming in with heart attacks,” said Robert Sanchez, medical director of cardiovascular medicine at HCA West Florida’s Northside Hospital and Tampa Bay Heart Institute. Over his 28-year career, he said, he has started to see younger patients. He also has more patients in their 90s, who have survived longer due to better health care.

The past success curbing cardiovascular deaths was hard-won. Heart disease and strokes were dreaded killers in the early- and mid-20th century. Scientists and doctors were only starting to understand the risks of smoking, high cholesterol and high blood pressure on the heart, and there were few treatments to prevent heart disease or save people.

The death rate fell steadily and sharply beginning in midcentury as public-health officials waged a war on smoking and exhorted people to eat more fruits and vegetables and to exercise. Medical advances such as coronary-artery-bypass surgery, defibrillators, better blood-pressure drugs and statins also saved lives.

The progress was so great that an editorial in the journal Science in 1996 posed the question, “Heart attacks: Gone with the century?”

But heart disease is still the nation’s top killer, and strokes, the other main component of cardiovascular disease, ranked fifth in the latest data.

## Growing Risk for Hearts

Obesity and diabetes—factors that contribute to cardiovascular disease—have skyrocketed in the U.S. since the 1980s, and more people have uncontrolled high blood pressure.




*Data are for people age 20 and older and are for two-year surveys ending in the year shown
Sources: Centers for Disease Control and Prevention (obesity, diabetes); American Heart Association (blood pressure)

Obesity and diabetes add to common risk factors such as high blood pressure that already made heart disease and stroke widespread. About 46% of American adults have high blood pressure, or hypertension, under guidelines released in 2017 by the American College of Cardiology and the American Heart Association. Of that group, three-quarters either aren't being treated with medications or don't have it under control, according to a study in Circulation, an AHA journal. High blood pressure can be caused by hereditary factors, too much sodium, excess weight and other factors. The family of Mr. Singleton, the filmmaker, said after his death that he struggled with high blood pressure, a condition that often affects African-Americans earlier in life and more severely than people of other racial backgrounds in the U.S.

In obese people, excess weight leads to elevated blood pressure in several ways, including by increasing circulating blood volume and stiffening or narrowing blood vessels. The high blood pressure, in turn, puts strain on the heart and arteries, potentially leading to a heart attack. It can make blood vessels in the brain clog or burst, causing a stroke. It can also lead to heart failure.

People with obesity and diabetes also tend to have high triglycerides, a sign of poor metabolic health, a measure of factors such as blood sugar and blood pressure, and other metabolic abnormalities that are damaging to the heart and blood vessels. Abdominal fat produces proteins that drive inflammation, which research has shown to be linked to heart disease and stroke.




Staff at the Cleveland Clinic, which is known for its Heart and Vascular Institute. PHOTO: DUSTIN FRANZ FOR THE WALL STREET JOURNAL

Heart experts say they need new tools and approaches, because today's cardiovascular disease patients differ from those of past decades, and they need to reach people young, before obesity and diabetes develop.

Researchers and doctors also need "more granular, more accurate, more timely" digital health-care data from multiple sources to verify and better understand the trend the mortality rates point to, said Harlan Krumholz, a Yale University cardiologist and health-care researcher. "We have to have great respect for the signal but need to be working to understand the signal," he said.

Julie Kubala was at a movie with her husband when she developed a pounding headache and felt mild discomfort "in my breastbone." She thought it was aftereffects of the flu that she was recovering from.



Mr. Washington, shown in 2015, had been on blood-pressure and cholesterol medications for years, but he also worked out regularly and hadn't been diagnosed with a heart condition. PHOTO: WASHINGTON FAMILY

The next morning, the pain was still there. She and her husband went to the emergency room. She was given an electrocardiogram, which showed she was having a heart attack. Doctors found an 80% blockage in her left anterior descending artery, a major pipeline of blood to the heart, and immediately placed a stent.

Ms. Kubala, who has obesity and Type 2 diabetes, was terrified from the experience, in March 2016. Until the heart attack, she had never spent a night in the hospital. "You have no idea what to do with this body now that it has betrayed you," said the 51-year-old, who lives in Superior, Wis. "You realize that you don't have the time that other people have."

She attended a cardiac-rehabilitation program, and connected with other patients on an American Heart Association support network for help dealing with the trauma and fear of mortality that patients can develop in the aftermath of a heart attack. She is exercising more and watching what she eats.

Still, she said, "the battle continues." Her blood sugar is higher than she wants it to be. The medications she is on make it hard to exercise intensely, and she spends long hours at a clerical job at a health clinic. "I can't lose a pound to save my life," she said.

Ms. Kubala said she is working to change a lifetime of habits that go back to being overweight in childhood and several years of jobs in fast-food establishments. Diabetes runs in her family but no one ever talked about the disease, risk factors, or dangers of burgers, fries and soda when she was growing up, she said. "I am of a generation that was never educated in any of that," she said.



The Washington family in Little Rock. PHOTO: ANDREA MORALES FOR THE WALL STREET JOURNAL

Write to Betsy McKay at betsy.mckay@wsj.com

# EXHIBIT 27

**ED&O 2023 Key Messages**
**Tuesday January 10, 2023**

## Making Amgen Future Ready – Bob Bradway

- Amgen Mission, Vision, Values and Strategy remain the same, but new Leadership Attributes have been added:
  - ***Inspire*** – connect staff and empower collective decisions and priorities
  - ***Accelerate*** – enable speed that matches the urgency of patient needs and encourages progress over perfection
  - ***Integrate*** – connect the dots amplify impact – look out not down
  - ***Adapt*** – embrace the change to lead your team through it instead of resisting it – we did it, it was not done to us… Focus on delivering results on priorities
- Great year, well positioned but with two significant headwinds: [redacted]
- There are also tailwinds in biotech industry's favor:
  - Mega-trend: [redacted]
  - Increasing population wealth: 700M people will join the middle class
  - Revolution in technology
- Three-time frames to consider – 2023 budget year (short), rolling 12 Quarters (medium) and 2030 Analyst promises (long term).
- Bob had audience members stand if they or a loved one was impacted by CV, Cancer or Osteoporosis – over 90% of the room was standing – we all have a stake in our impact
- Amgen is the founder of the Biotech revolution and one of two remaining Biotech pioneers who are still in business and independent - Amgen and Biogen
- About 50% of our market cap comes from pipeline

## Creating Value for Patients, Shareholders & Staff – Peter Griffith

- Long-term (2030) single-digit organic yearly revenue growth confirmed - [redacted]
- 2023 budget on track to deliver on short term, but will need continued expense discipline to achieve medium and long-term financial objectives
- "Prioritized Agenda" is the aligning principle for resource management to use to channel resources ($, HC, time) to the most important items. "Non-prioritized" are still important, but additional resources should flow prioritized activities and programs. For example, [redacted]
- GMIP [redacted] of target
- Our financial principles…
  - [redacted]
- Realign expense base for the next 12 Qtrs by…
  - [redacted]

- [redacted]

## Meeting or Exceeding our Growth Ambitions – Murdo Gordon

- Great performance in almost all brands, particularly Tezpire, Aimovig, Repatha, Lumakras, Prolia and Evenity, but still some room to grow further, e.g. in Otezla (need double-digit growth with this brand).
- China NRDL was a great upside in volume at a low price but will require additional effort to deliver supply - ~500,000 Repatha patients served in China in 2022.
- GCO decreased [redacted]
- *Murdo singled out GV&A for their contribution* to supporting the China team to achieve this 3 years ahead of plan.
- Amgevita launch will be a major catalyst for growth in the US in February, but not without its executional challenges.
- Murdo included "2w" as one of his Goals
- Mission Week had a great impact on focus on patients, and will be repeated in 2023 – however, every day should be Mission Week, not limited to a single event
- Key OPEX changes
  - [redacted]
- Building a future ready organization:
  - [redacted]
- As one Amgen team we will adapt to win in a dynamic environment

## Our Journey to 2030 – Dave Reese

- Our R&D strategic vision is unchanged: to discover, develop and deliver life changing medicines to patients everywhere
- Our organization is currently focused on 3 TAs: [redacted]. As science evolves, [redacted]
- Strategic priorities [redacted]
- [redacted]

**Future Ready Leadership – Panel**

- Other parts of the org like [redacted].

**The Power of the Prioritized Agenda – Annalisa Pizzarello**

- Use Prioritized Agenda to stay focused – [redacted]
- She mentioned Bob say the following in terms of acceleration: "Weeks, not months; hours, not days"

**Panel – Delivering Repatha Growth**

- [redacted]

**Panel – Adapting to Make Amgen Future Ready**

**Panel – Leadership Attributes**

- Workshop to personalize how each leader will integrate and exemplify the new Leadership Attributes

**Wednesday January 11, 2023**

**Patient Panel – CV Disease**

- Significant opportunity to grow volume and reach more patients - [redacted]

**Panel – Spotlight on Innovation**

**Fueling our Future Pipeline – Ray Deshaies**

**Pulling the Frame back to 2023 – Peter Griffith**

**Leadership Commitments – Emily Razaqi**

Bob's important remark in closing:

"Teams should focus on delivering and leave politics to other companies!"

- On track to meet or beat expectations
- [redacted]
- Must lead company differently with new leadership attributes and run company differently with prioritized agenda
- Making Amgen Future Ready

# EXHIBIT 28

VP Meeting Notes 6.22.22

Introduction – Bob Bradway

Why are we here?

1. [redacted]

Message for leadership:

- [redacted]

Looking back since last meeting:

- [redacted]

Context:

- [redacted]

What Does It Mean:

- [redacted]

We have what we need, our challenge is to EXECUTE. Shared reality and shared alignment absolutely critical.

**PRIORTIZED CORPORATE AGENDA** (under development since March) & **AGENDA MODEL**

Based on what absolutely has to happen to deliver on 2030 – [redacted] Once addressed

[redacted]

Adapt our operating agenda (Budget, QBR, LRS, etc):

1. [redacted]

[redacted]

Two-way accountability – are there any things getting in way of priorities (Monday morning question for Bob's LT). Have answers by Friday. [redacted]

DON'T LOSE SIGHT OF [redacted].

Peter Griffith:

Brief overview of market conditions: [redacted]

Deliver on [redacted]

Capitalize on investments made to expand geographic presence

Pipleline: [redacted]

Dynamic reallocation faster than we've historically delivered – [redacted]

2025: [redacted]

206-30: [redacted]

[redacted]

# EXHIBIT 29

V8 – 3/11/22 – ~3,300 words

To My Fellow Shareholders,

[redacted]

Total revenues in 2021 were up 2% from the prior year to a record $26.0 billion. Despite the ongoing challenges of the COVID-19 pandemic, many of our innovative medicines generated strong, volume-driven sales growth, including our cholesterol treatment Repatha® (+26%), our osteoporosis medicines Prolia® (+18%) and EVENITY® (+51%), and several of our cancer therapies, such as BLINCYTO® (+25%), Vectibix® (+8%), and KYPROLIS® (+4%). Sales of our high-quality biosimilars – which provide cost-effective treatment options for healthcare systems globally – exceeded $2 billion collectively, led by MVASI® (a biosimilar to Avastin®, +46%) and AMGEVITA™ (a biosimilar to HUMIRA®, +33%). Product sales outside the U.S. grew 12% to $7 billion, with particularly strong growth coming from the Asia-Pacific region (+36%).

We achieved record non-GAAP earnings per share in 2021 of $17.10, up 6% from the prior year, and free cash flow of $8.4 billion. Amgen's non-GAAP operating margin for the year was 51.1%, up slightly from 2020 and among the highest in the industry, driven by ongoing productivity efforts we have embedded throughout our business.

Total shareholder return was 1% in 2021 and has increased by nearly 350% over the past ten years. We returned nearly $9 billion to shareholders in 2021 through dividends and share repurchases.

We invested $4.8 billion in research and development in 2021, up 14% from the prior year, advancing numerous potential new medicines at all stages of our pipeline and securing three significant regulatory approvals:

- LUMAKRAS®/LUMYKRAS® is the first and only medicine approved for the treatment of KRAS G12C-mutated non-small cell lung cancer (NSCLC), the culmination of a 40-year quest to treat cancers with this particular mutation. First approved in the U.S. in May 2021, LUMAKRAS has now been approved in nearly 40 countries around the world. We continue to study it as both a monotherapy and in combination therapy regimens for NSCLC and other solid tumors, including colorectal and pancreatic cancer.

- TEZSPIRE™ was approved in the U.S. in December 2021 as the first and only biologic for severe asthma that does not have a phenotype or biomarker limitation within its approved label. This gives us the opportunity to reach a broad population of patients who are living with this very serious disease and are potential candidates for a biologic therapy like TEZSPIRE. We are also studying TEZSPIRE in several other indications, including chronic rhinosinusitis with nasal polyps and chronic obstructive pulmonary disease.

- Also in December, Otezla® was approved for an expanded indication in the U.S., making it the first and only oral therapy approved to treat plaque psoriasis across all levels of severity and enabling us to reach an additional 1.5 million patients. We expect Otezla – which generated



Internal Use Only General Business

CONFIDENTIAL - ATTORNEYS EYES ONLY 

[redacted]

$2.2 billion in 2021 sales globally – to be a strong contributor to Amgen's growth over the next several years.

We also completed several important transactions in 2021, adding two promising new medicines to our late-stage pipeline and strengthening our discovery research capabilities. I will discuss these in more detail later in this letter.

All in all, it was another year of strong execution in which Amgen delivered in the here and now, while setting up for continued succe [redacted]

## SERVING MORE PATIEN [redacted]

Looking to the future, this is a [redacted] when the need for innovative [redacted]

The need for innovative medicines is driven by a rapidly aging population. There are already 700 million [redacted] over the age of 65, and another 150 million people will turn 65 by the end of the [redacted] the time and cost required [redacted]

While our industry is not w [redacted] those companies that can i [redacted]

Our confidence is reflected [redacted] community in February of t [redacted] non-GAAP earnings per sha [redacted] business development acti [redacted]

**Growing Our Innovative M [redacted]**

COVID-19 has understandably overshadowed all other health concerns over the past two years. But eventually the pandemic will recede and, when it does, society will need to confront a number of other very serious health challenges that we know haven't gone away – and where Amgen has compelling solutions to offer. Our medicines already reach roughly 10 million patients around the world, but we [redacted] he needs are muc [redacted] ghlight [redacted]

- [redacted] every three deaths globally – 85% of which are due to heart attacks and strokes. With Repatha, we have an innovative medicine that significantly lowers LDL cholesterol, which is the leading modifiable risk factor for these two life-altering events. Repatha has reached roughly one million patients worldwide since its launch in 2015, but that's just a fraction of the estimated 24 million patients worldwide with



Internal Use Only General Business

CONFIDENTIAL - ATTORNEYS EYES ONLY 

atherosclerotic cardiovascular disease who are at high risk for a heart attack or stroke. Sales of Repatha were $1.1 billion in 2021 and we believe it will be a multi-billion-dollar product for us, growing steadily through 2030.

- An estimated 200 million people worldwide suffer from osteoporosis, resulting in an osteoporosis-related fracture every three seconds. With Prolia and EVENITY, we have a powerful one-two punch to significantly reduce the risk of fracture in the millions of high-risk patients who are not yet receiving treatment. These two medicines generated a combined $3.8 billion in sales in 2021. We expect Prolia to continue to grow through its loss of exclusivity in the U.S. , with EVENITY sales growing through the end of the decade.

- Despite great advances, cancer still claims more than 10 million lives a year, and five-year-survival rates across all cancers remain below 70%. We have several medicines available to patients that can make a meaningful difference in the fight against cancer, including LUMAKRAS, mentioned above, and KYPROLIS, which, in combination with two other therapies, has been shown to significantly enhance progression-free survival rates in patients with relapsed or refractory multiple myeloma. I'll also highlight import[redacted] BLINCYTO as a very effective treatment for children w[redacted] lymphoblastic leukemia, the most common form of pe[redacted]

You can find more information about all our products at www.[redacted]

**Advancing New Medicines Through Our Pipeline**

[redacted]we work to bring Amgen medicines already on the market to more patients, we are advancing a [redacted] of promising new treatments through our pipeline that offer significant opportunities for additional growth. Some of these medicines were discovered internally, while others have come to us through acquisitions and alliances – a balance that has served us well as we seek the best innovation available, regardless of origin. I'll highlight five first-in-class programs, all currently in either Phase 2 or Phase 3 clinical trials:

- Bemarituzamab is being studied in patients with gastric cancer, which is the fifth most common cause of cancer death worldwide and particularly prevalent in the Asia-Pacific region. Data from a Phase 2b trial showed a meaningful improvement in median overall survival when bemarituzumab was added to chemotherapy. This molecule came to us through our 2021 acquisition of Five Prime Therapeutics and we are also investigating its potential in other cancers, including squamous non-small cell lung cancer.

- Tarlatamab is being studied in patients with relapsed/refractory small cell lung cancer, a particularly aggressive form of cancer where neither survival rates nor treatment options have changed much in several decades. In a Phase 1 trial, tarlatamab demonstrated significant evidence of anti-tumor activity, with a preliminary median duration of response in excess of one year – an exceptional result in patients who often have only a few months to live. We believe this molecule also has potential as a treatment for neuroendocrine prostate cancer.

- AMG 451 is being studied in patients with atopic dermatitis (commonly known as eczema) in collaboration with our long-time partner Kyowa Kirin, another transaction we completed in

2021. Atopic dermatitis affects more than 30 million peo[redacted] treatment options are very much needed. Data from a Ph[redacted] substantial improvement in patients as measured by the [redacted] well as a prolonged duration of response that may allow f[redacted]

- Efavaleukin alfa is being studied in patients with two very [redacted] systemic lupus erythematosus and ulcerative colitis. This [redacted] 1] trial to increase the number of T regulatory cells, which act as a natural brake on the immune system when it goes out of balance, as occurs in many patients with these diseases.

- Olpasiran is being studied in patients with high levels of lipoprotein(a), a type of "bad" cholesterol that affects 20% of the world's population. Unlike LDL cholesterol, lipoprotein(a) levels are genetically determined and can't be modified by diet or exercise. Early data show that a single dose of olpasiran leads to profound reductions in lipoprotein(a) and that this reduction is durable, suggesting that the dosing interval can be relatively infrequent.

You can find more information about our pipeline at www.amgenpipeline.com.

**Expanding Our Biosimilars Portfolio**

About ten years ago, recognizing an emerging opportunity, we set out to build a world-leading biosimilars business – and we've done that. Today, we offer five biosimilars around the world, expanding access to high-quality biologics for patients, while also delivering cost savings to healthcare systems.

As noted above, AMGEVITA is a biosimilar to HUMIRA, the world's best-selling drug. We've launched AMGEVITA in more than 50 markets around the world and look forward to bringing it to the U.S. in January of next year. We then expect over the following several years to launch biosimilars to SOLIRIS®, STELARA®, and EYLEA® – products that collectively generated roughly $17 billion in 2021 sales – with still more launches planned after that. All told, we expect to double our 2021 biosimilars sales by the end of the decade.

**Deepening Our Global Presence**

For many years, the bulk of Amgen's sales came from a single market, the U.S. Today, our products are available in approximately 100 countries and we expect sales outside the U.S. to account for roughly 35% of our total sales by 2030, up from less than 25% ten years ago. We're especially excited by our growth prospects in the Asia-Pacific region, where China and Japan rank as the world's second- and third-largest pharmaceutical markets, respectively.

We took full ownership of our business in Japan in 2020 and our portfolio of products – such as EVENITY, which launched in Japan first among all markets – is particularly well suited to address the needs of a country where nearly 30% of the population is 65 and over. In China, which has more people over 65 than any country in the world, we continue to grow our business through products like Repatha and Prolia. Our combined sales in these two markets rose nearly 70% in 2021.

**Managing P[redacted]**

Patent expir[redacted]ll created equally. Amgen's business is heavily weighted toward biologic medicines, which are typically administered via injection and require far more expertise – and capital – to produce than small-molecule drugs, which are typically administered as pills or capsules. Because of these differences, off-patent biologics remain valuable assets to be managed thoughtfully over time. They can continue generating meaningful revenues for some time following patent expiration, while sales of most small-molecule drugs quickly decline after loss of exclusivity.

## RECONCEIVING DRUG DISCOVERY

Biopharmaceutical research and development is one of the most challenging pursuits [redacted]ng how we go about this work, especially in the area of early research.

I already mentioned our expertise in human data. We now have more than 100 petabytes of human data – that's $10^{15}$ bytes of genetic information – and that number is growing every day. These data yield powerful insights into biology and disease that inform virtually all of our programs entering clinical development, increasing their chances of success.

We have also been investing heavily in the emerging field of multi-specific medicines, which give us the potential to tackle the 85% of disease-causing targets in the body that have long been considered "undruggable." Multi-specifics generally work in one of two ways – either by using a built-in "address label" to concentrate their impact where it is most needed, or by acting as "molecular matchmakers" to link a disease-causing target to a potent natural effector in our bodies that acts upon that target.

Multi-specific drugs currently comprise approximately 60% of Amgen's preclinical pipeline, and we believe they have the potential to revolutionize our industry in much the same way biologics did 40 years ago. Our acquisitions of Nuevolution in 2019 and Teneobio last year significantly enhanced our multi-specific capabilities in small and large molecules, respectively – and three transactions we announced at the start of this year with Generate Biomedicines, Arrakis Therapeutics, and Plexium strengthen our capabilities further still.

We are also harnessing the power of artificial intelligence and machine learning to improve how we discover and develop biologic medicines. In the past, we have built these medicines using proteins that naturally occur in the human body, relying on iterative, multi-year cycles in which we engineer and test prototype after prototype before moving into clinical trials. Even then, despite our best efforts, these protein-based medicines often behaved unpredictably, failing to generate the desired effect.

Today, thanks to remarkable technological advances that have fundamentally changed our understanding of proteins, we no longer need to rely solely on Mother Nature, but can instead begin to work on building proteins from scratch with confidence that they will predictably perform a desired function. It's early days, but in those instances where we have deployed these new technological insights, we have reduced our discovery timelines by half, while doubling our success rates – very exciting progress that is enabling us to move at what we call the "speed of tomorrow."



Internal Use Only General Business

CONFIDENTIAL - ATTORNEYS EYES ONLY

[redacted]

## SUPPORTING OUR PEOPLE

My optimism for Amgen's future ultimately stems from my belief in Amgen's people. We regularly survey our employees and know they are passionate about Amgen's mission to serve patients and understand the role they play in advancing that mission. They have performed exceptionally well under very challenging circumstances over the past two years of the pandemic. Thanks to their hard work, we have in hand what we need to succeed through the end of the decade and beyond. [redacted] ~~the best in the business~~ [redacted]

[redacted]

Much has been written about the "Great Resignation," as the pandemic has prompted many people to reassess their lives. We are working hard to make sure that Amgen continues to be an attractive employer – to those already with us and those considering new opportunities. We offer the chance to do meaningful work in an increasingly diverse, inclusive environment. We have adopted a "virtual-first" approach to office-based work, giving people the flexibility to do their jobs where and when it works best for them. We emphasize career development, with more than 2,700 employees earning promotions in 2021. We have increased the mental health resources we provide, which is vitally important given the stress and strain of the current moment, particularly on parents and people of color. And we are increasingly using technology to automate or simplify many low-value tasks, freeing up our people to focus on the most important and satisfying work.

We take nothing for granted but are pleased with how we're doing. Our attrition rate is up only slightly from pre-pandemic levels and is generally lower than our industry peers. We see an acceptance rate of greater than 90% on the job offers we extend and are filling open roles at the same pace we [redacted] prior to the pandemic. We have earned numerous recognitions as a great place to work, inc[redacted] named one of "America's Best Large Employers" by *Forbes* magazine, as well as one of the "[redacted] Best Workplaces™" by *Fortune* magazine and Great Place to Work®.

## OPERATING RESPONSIBLY

Our people also want to work for a company that does more than just earn a profit – and we [redacted] too. We're fortunate that our core business of improving human health, in and of itself, con[redacted] meaningfully to the greater good. But society confronts many challenges these days, and we [redacted] working to do our part to address them. Indeed, Amgen has been a responsible corporate ci[redacted] before stakeholders came to expect that of businesses. I'll share a few [redacted]

- More than 30 years ago, we created the Amgen Foundation to inspire the next generation of innovators. Today, the Foundation provides free, world-class science education programs that reach millions of students worldwide every year.

- More than 20 years ago, we created the Amgen Safety Net Foundation to help patients in financial need gain access to our medicines, providing $6 billion worth of our medicines at no cost in just the past five years.

- Also more than 20 years ago, the first employee resource group was formed at Amgen, bringing together Black colleagues at our headquarters in Thousand Oaks, California. Today, more than 11,000 Amgen staff around the world participate in nearly a dozen employee resource groups – each of which is sponsored by one of my direct reports.

- Fifteen years ago, Amgen began implementing a series of projects to reduce our impact on the environment, resulting in a 33% reduction in carbon emissions, a 30% reduction in water use and a 28% reduction in waste, even as our business expanded. Now, we're aiming even higher, with plans to achieve carbon neutrality in our operations by 2027, along with additional reductions in water used and waste disposed of 40% and 75%, respectively.

You can learn more about our commitment to good corporate citizenship by reading our latest Environmental, Social and Governance Report found at www.amgen.com/responsibility.

## MAINTAINING LEADERSHIP

Of the thousands of companies founded during the biotech revolution of the 1980s, only two of note remain independent to this day. One of them is Amgen and that's not by chance. We wake up every morning knowing that, in our business, we innovate – or we disappear. We've had great people delivering great innovation throughout our history. I'm convinced we have the right people focused on the right things for Amgen to remain a leader through the end of this decade and beyond.

On behalf of Amgen's board of directors, our senior leadership team, and our employees around the world, I thank you for your continued support of our company and the important work we do.

Robert A. Bradway
Chairman and Chief Executive
March XX, 2022

[redacted]

**SIDEBAR 1**

In early 2022, Japan's Ministry of Health, Labour and Welfare approved LUMAKRAS, marking a paradigm shift in the treatment of patients with KRAS G12C-mutated non-small cell lung cancer (NSCLC).

"Treatment options for these patients are extremely limited," says Kazuo Hasegawa, a lung cancer survivor and one of the country's leading patient advocates. "We are encouraged to see Amgen's efforts to bring an innovative new medicine for this disease to patients in Japan."

Thousands of patients around the world have already received LUMAKRAS and Amgen is progressing the largest and broadest global KRAS G12C inhibitor development program with unparalleled speed.

**SIDEBAR 2**

The U.S. approval of Amgen's TEZSPIRE™ in late 2021 gives people living with severe asthma a compelling new treatment option. Laonis Quinn – a Registered Nurse, a Certified Asthma Educator, and an asthmatic herself – has dedicated her life to expanding awareness and understanding of severe asthma, especially within the Black community where the disease is particularly prevalent. Through the Breathe: Anthony J. Chapman Asthma Foundation, founded in honor of her late son, Laonis works to provide asthma management training to schools, churches, and youth organizations in Detroit, where she lives.

"There are thousands of people who have stories like I do," Laonis observes. "We are the faces behind severe asthma. I'm grateful to Amgen for its commitment to scientific research, and I appreciate the company's efforts to help people with this disease to live healthier lives."

Amgen values the perspectives of people such as Laonis who suffer from diseases that our medicines are intended to treat. By understanding their individual journeys, we can improve our ability to serve patients.

**SIDEBAR 3**

In November 2021, Amgen marked a significant expansion of its U.S.-based manufacturing footprint by breaking ground on a new, state-of-the-art facility near Columbus, Ohio. We expect to employ approximately 400 people at this facility who will assemble and package our medicines for the U.S. market. "Amgen Ohio" will be led by Sandra Rodríguez-Toledo, who joined the company in 2013 and previously held roles of increasing responsibility at our largest manufacturing site in Juncos, Puerto Rico.

"I'm honored to lead this new facility and help to have it up and running in 2024," Sandra says. "We look forward to doing our part in Ohio to continue Amgen's proud tradition of serving every patient, every time."

Sandra notes that Amgen's decision to locate its new plant in Ohio was driven, in part, by access to diverse talent. Amgen is a founding member of OneTen, a coalition of large companies that collectively aim to hire one million Black Americans into well-paying jobs over the next 10 years, with a particular focus on those without four-year college degrees.

"As a woman working in a traditionally male-dominated field," she says, "I am deeply committed to having the most diverse workforce possible at our new plant."

Sandra says that Amgen Ohio will also be built to exacting environmental standards, consistent with the company's goal of achieving carbon neutrality in its operations by 2027. [Need footnote on Scope 1, etc]

Amgen announced plans in 2021 to build a second new manufacturing facility, this one in the Raleigh-Durham area of North Carolina. Together, the new plants in Ohio and North Carolina represent a capital investment of $1 billion by Amgen in the U.S.

**SIDEBAR 4**

In order to advance our mission to serve patients, Amgen is committed to giving our employees the resources they need to take care of themselves. In addition to traditional benefits focused on physical health, this includes an increased emphasis on mental health given the uncertain and, at times, unsettling world we live in.

Moya Watts, who works at the Amgen Capability Center in Tampa, Florida, took advantage of these benefits last year when she began experiencing signs of burnout. "The Wellness Program manager for our site helped me establish a routine to make my mental health a priority," she says. "Amgen has been amazing during these past few years, and I really appreciate the programs and support they've provided."

As a member of the Amgen Black Employee Network, Moya was also recently given the opportunity to help select non-profit organizations in the local Tampa community that would receive grants from the Amgen Foundation to advance social justice.

"To be part of the committee that picked these organizations is more than I could've asked for," Moya says. "It makes me proud and brings me peace of mind to work for a company like Amgen that is making a real difference."

**SIDEBAR 5**

One of the signature programs supported by the Amgen Foundation is LabXchange, a free, on-line science education platform created by Harvard University and launched in 2020. LabXchange provides the opportunity for students, teachers and lifelong learners of all ages to practice scientific experiments using interactive simulations of the same cutting-edge equipment found in modern biotech laboratories. More than 16 million people have utilized LabXchange to date, with the platform proving especially valuable as schools moved to virtual learning during the COVID-19 pandemic.

"LabXchange helped me to sharpen my skills at a time when access to my physical lab at school was cut short due to constant COVID-19 lockdowns," says Rutendo Kahari, a [student] from Zimbabwe.

# EXHIBIT 30

**To:** Griffith, Peter[[redacted]@[redacted].com]
**From:** Bradway, Bob[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=[redacted]
**Sent:** Mon 11/22/2021 4:16:24 AM Coordinated Universal Time
**Subject:** RE: Weekly Operating Observations for the coming week

---

Booked in mtgs/appointments until early afternoon, then open

---

**From:** Griffith, Peter <[redacted]1@amgen.com>
**Sent:** Sunday, November 21, 2021 8:16 PM
**To:** Bradway, Bob <[redacted]@amgen.com>
**Subject:** RE: Weekly Operating Observations for the coming week

Works for me. I've got the detail budget reviews tomorrow with the three FP&A leaders each individually. I may give you a ring after those if you're around.
Best, P

---

**From:** Bradway, Bob
**Sent:** Sunday, November 21, 2021 8:12 PM
**To:** Griffith, Peter [redacted]pg[redacted]@amgen.com>
**Subject:** RE: Weekly Operating Observations for the coming week

Agree, easier to talk through this vs email, thanks

---

**From:** Griffith, Peter <pg[redacted]@amgen.com>
**Sent:** Saturday, November 20, 2021 3:42 PM
**To:** Bradway, Bob [redacted]dway@[redacted]gen.com[redacted]
**Subject:** Weekly Operating Observations for the coming week

A couple thoughts around our coming ~week. [redacted]

**Sales and Demand:**

The Weekly sales update below has now [redacted]

[redacted]

The good news is [redacted].

Note [redacted]

**Budget:**

[redacted]

[redacted]

**LRP View with 2021 Nov LO and 2022 Nov Budget Slide and Product Sales – LRP View Slide:**

I've attached these two additional slides I keep next to me. You may want to also.

**Business Development:**

My observation is [redacted]

**Buyback:**

Justin and team met with MS late Friday, and I'll get the update Monday. [redacted]. I'll get it to you Monday or so.

I'm around all through the holidays. We'll catch up Monday I'm sure, if you want to speak before don't hesitate to ring.

Best,

P

---

**From:** Cummings, Gwen
**Sent:** Saturday, November 20, 2021 12:04 PM
**To:** Gordon, Murdo <[redacted]@amgen.com>; Griffith, Peter <[redacted]@amgen.com>; Rabushka, Anton <[redacted]@amgen.com>
**Cc:** Cummings, Gwen <[redacted]@amgen.com>; Busch, Matthew <[redacted]@amgen.com>; Houtepen, Migon <[redacted]@amgen.com>; Palmer, Samantha [redacted]palm[redacted]
**Subject:** Weekly sales update -- week ended 11/21/21

Good afternoon,

Q4 QTD/YTD variance vs November forecast [redacted]. Taking timing variances into account we continue to [redacted]). This week, sales were [redacted].

Priority product highlights:

- Otezla is [redacted]
- Repatha is [redacted]
- Lumakras is [redacted]

Q4 QTD variance vs Budget is [redacted]. This is in line with last week as this week [redacted]

The attached CEO charts* reflect demand data through 11/12 for [redacted]

- Repatha: [redacted]
- Otezla: [redacted]
- Enbrel: [redacted]
- Lumakras: units are [redacted]
    - 867 Demand: Weekly demand [redacted] YTD demand [redacted]
    - Retail Unique Prescribers: [redacted]
    - NBRx: [redacted]
    - [redacted]
- Bone: [redacted]
- Aimovig: [redacted]
- Neulasta: [redacted]k
- Xgeva: [redacted]
- Kyprolis: [redacted]

**Based on September Forecast*

# EXHIBIT 31

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

___________________________

REGENERON PHARMACEUTICALS, )
INC., )
Plaintiff, ) Civil Action
-vs- ) No. 22-00697-JLH
AMGEN INC., )
Defendant. )

___________________________

VIDEOTAPED DEPOSITION OF

DOUGLAS S. JACOBY, M.D., FACC, FASPC, FNLA

HOLLAND & KNIGHT LLP

1650 MARKET STREET - SUITE 3300

PHILADELPHIA, PENNSYLVANIA 19103

FRIDAY, MAY 17, 2024

10:05 A.M.

REPORTED BY:

DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

JOB NO. NY 6700152

A. There's the 10 to 15 percent that have side effects.
Then there's, I think, another percent that worry about side effects because statins have gotten a lot of bad rap in the media.
And then there's the other sort of parallel to what I just said. You don't feel better by taking it. You have to remember to take it on a daily basis to prevent something. That's a lot to ask of people. It's really easy to just forget and you feel the same and you kind of drift off it.
Q. And if an insurance company or a benefit manager does not approve that medicine, it makes it even harder for those people to take it?
A. Absolutely.
Q. They won't take it?
Is that your experience?
A. Most -- most patients want their meds to be covered by their insurance company.
Q. Yeah. And if the insurance company won't cover a med, patient probably isn't going to take it; correct?
MR. JANTZI: Objection to form.
THE WITNESS: I -- I think that's true.

Yeah. I think you need to have your meds covered for patients to be likely to take it.

BY MR. WILKS:

Q. Yeah. Will you even prescribe a medicine for a patient if it's not covered?

A. I have the luxury of prescribing medicines relatively blind to that issue, so the answer is yes.

Q. You do?

A. I do.

Q. How did you gain that luxury?

A. There's so many different insurance companies with so many different regulations. Every insurance company, even subcategories within insurance companies, is allowed to create their own formularies and imaging studies they'll cover. And at some point what you realize is, it's hard to predict these things and the best thing for your patient is to order what you think is right for the patient and then fight to get it for them.

And so if you go back to what I told you about my PCSK9 inhibitor analysis, that's how we approached it. Spent more than two years ordering that on every patient we thought it was

the right patient to order. Analyzed how we were doing and figured out how to improve our success rate for the patient.

Q. I see. If you prescribe one of the PCSK9 inhibitors and it is not on that patient's insurance company's formulary, do you ever find that out, you personally?

A. So the way we've set it up -- I -- I really built a strong workflow to manage PCSK9 inhibitors because we order so many. My team has the -- has my permission to switch between different PCSK9 inhibitors because what I care about is the patient is on one of those PCSK9 inhibitors because I treat them as basically comparable. So if I ordered one and my patient is switched to another one, it's not going to hit my radar. As long as I got one of them approved, I'm happy.

MR. WILKS: Can you just scroll up so I can see what my last question was, please.

Got it. Thank you.

BY MR. WILKS:

Q. I want to go back to you use the word you have this "luxury" of kind of not having to worry about this.

effects are dose related. So there are people that would have side effects, for example, on a 20 milligram dose that wouldn't have it on a 10 milligram or 5 milligram dose.

For PCSK9 inhibitors, we don't really see that dose relationship to side effects very much. For the vast, vast majority of patients, the tolerability winds up being the same. So it's -- I'm more likely to just guess at dose based on how far they are from goal, but don't honestly feel that strongly about it because the -- only about 10 percent, maybe 15 percent maximum in strength difference between the two.

Q. Under what circumstances is a 75 milligram dose the preferred course for one of your patients?

A. So it's not going to -- for the vast majority of cases, it just doesn't matter. I suppose at the very extremes is when this matters.

So if -- if I want to lower the cholesterol only a small amount, so those couple patients that are really, really close to goal, yeah, Praluent® 75 is probably better. For the couple of genetic dyslipidemias that are really far from goal, Repatha® is stronger. Repatha® is

probably a little better. For most people in between, it doesn't really matter.

Q. Okay. How many people are in that first group, where they're really close and the 75 milligram dose of Praluent® is better?

A. Some, not a lot, right. I don't know. I don't know that I have an exact percentage for you. I mean -- I mean most of the time we want a lot more LDL lowering, so I'm going to say a low percentage. I don't know that I could give you an exact number.

Q. Okay. Do you subscribe to the idea that the lowest efficacious dose is generally the preferred course?

A. Uh-huh.

Q. Yes?

A. Yes. Sorry. Yes.

Q. Are there any medical guidelines out there that -- that recommend that approach, using the lowest efficacious dose?

A. It's really interesting. In the -- in the cholesterol world, the guidelines have actually typically pushed to highest tolerated dose. So it's really interesting when you look at the most guidelines related to cholesterol management push

for a preference to higher dose statins, and so they're always trying to incrementally increase the dose as opposed to minimize the dose.

Q. Yeah. So guidelines that refer to things other than cholesterol lowering, is -- are there guidelines out there that -- that subscribe to the or recommend the approach of lowest efficacious dose is the preferred course?

A. It's a good question. I could think of other guidelines where they recommend the highest tolerated dose, like a lot of the heart failure guidelines also push you to the highest dose a person could tolerate.

I can't think of a guideline off the top of my head that recommends the lowest possible dose.

Q. Do you see --

A. It could be out there.

Q. Excuse me.

A. I just can't think of it. Yeah.

Q. Do you see that as an inconsistency?

A. Explain. What's the inconsistency you're asking about?

Q. Well, just the notion that lowest efficacious dose is the preferred course as a

folks have to go through to achieve what I'm talking about?
A. Correct. All I could say is I haven't heard complaints.
Q. Yeah. You don't know what somebody has to go through to get their patient on a -- on a PCSK9 that is not on formulary for that patient?
A. Correct.
Q. Fair enough.
MR. WILKS: Anne?
Okay. Those are all the questions we have for you, Doctor. Thanks very much for your time today.
MR. JANTZI: I have just one or two questions.
MR. WILKS: Okay. He -- I still thank him.
MR. JANTZI: Sorry. It sounded like you were moving to close the deposition. I didn't mean to interrupt you either.
MR. WILKS: It's all good. It's all good.
EXAMINATION
BY MR. JANTZI:
Q. Dr. Jacoby, earlier you testified that

you personally did not currently see much benefit to seeing sales reps for either Praluent® or Repatha®.

Do you -- do you remember testifying to that in sum and substance?

A. That -- I agree with the statement.

Q. Do you have an opinion about whether doctors with less knowledge about PCSK9s than you have would -- might see some benefit from seeing a sales rep for either Praluent® or Repatha®?

MR. WILKS: Objection.

THE WITNESS: Do I still answer?

MR. WILKS: You can answer.

THE WITNESS: Okay. I don't have an opinion, but these meds have been out for, I mean, what, nine years now? More than eight. I mean, at some point I think people know what they're going to know.

BY MR. JANTZI:

Q. Do you have an opinion about, for example, whether a doctor who is newer to the practice of cardiology or lipidology might get some benefit from meeting with a sales rep for either Repatha® or Praluent®?

MR. WILKS: Objection.

THE WITNESS: Still answer?
MR. WILKS: Yes, you do.
BY MR. JANTZI:
Q. Yes.
A. Okay. I still -- I don't have a strong opinion, but on newer people coming out, were trained in the era where these drugs existed, so these aren't new meds for them. They would have been around for their entire course in medicine, residency, and fellowship. So they should know about them by the time they enter practice.
MR. JANTZI: No further questions for me.
MR. WILKS: No questions. Now I think we're done.
THE WITNESS: Okay.
THE VIDEOGRAPHER: The time is now 12:58. We are going off the record.
(Time noted: 12:58 p.m.)

A C K N O W L E D G E M E N T

I, DOUGLAS S. JACOBY, certify that I have read the transcript of my testimony taken under oath on MAY 17, 2024, and that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

________________________

DOUGLAS S. JACOBY

Signed and subscribed to
before me, this day
of , 20 .
________________________
Notary Public

# EXHIBIT 32



# REPATHA PRELIMINARY 2021 MAY LRS

APR 14, 2021

AMGEN®
Pioneering science delivers vital medicines™

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Repatha

# EXECUTIVE SUMMARY – [redacted]

- **Purpose of Meeting – Inform and seek feedback on current thinking of long range scenario**
  - [redacted]
  - 
  - 
- **Part 1: Demand Update –** [redacted]
  - 
  - 
  - 
  - 
- **Part 2: Price Update –** [redacted]
  - [redacted]
  - [redacted]
  - [redacted]



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

CONFIDENTIAL - ATTORNEYS EYES ONLY

AMGEN
Amgen Confidential—For Internal Use Only

# PART 1: DEMAND UPDATE

Repatha

# 10 YEAR REVENUE OUTLOOK – DEMAND ONLY, DOES NOT INCLUDE UPDATED PRICE SCENARIO

[redacted]

[2] LoE expected in Oct'30 (Method of Treatment claims)
[3] Includes total PCSK9i mAb market only
New LDL-lowering entrants will grow market but not impact projected PCSK9i mAb class growth

**Assumptions** ***(bold – change vs prior LRS)***

Marketplace:

- [redacted]

Share / Competition and Others:

- [redacted]

*Price: Same as '20 LRS. To be Updated*

- [redacted]

Access:

- [redacted]

Key Events:

- [redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# NET SALES VS 2020 LRP – DEMAND ONLY

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# TOP OF FUNNEL –[redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# RESETTING PCP EXPECTATIONS – [redacted]

## Marketplace Map Funnel




[redacted]

| Patient Population | Physician Archetypes | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| Procedure (CABG, PCI) | [redacted] | | | | |
| Soft Event (UA, TIA) | | | | | |
| PAD Event | | | | | |
| Sx PAD | | | | | |

Key: Least Aggressive Today — Most Aggressive Today

Repatha

# PEAK PENETRATION – [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# STRATEGIC OPTIONS – [redacted]

[redacted]

Repatha Volume

[redacted]

Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

# PART 2: PRICE UPDATE

# COVERAGE AND PRICING CORE PRINCIPLES

**Coverage & Pricing Core Principles will guide strategy and negotiation approach**

1) We believe in open access to physicians and patients
   **Implication:** [redacted]

2) We believe that physicians and patients should have the opportunity to choose their medication
   **Implication:** [redacted]

3) We believe that patient affordability is critical
   **Implication:** [redacted]

4) We believe in growing the market to serve more patients
   **Implication:** [redacted]

# EXECUTIVE SUMMARY

- [redacted]
- [redacted]
- [redacted]
  - [redacted]
  - [redacted]
- [redacted]

## IN 2020, [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

*Primarily driven by donut hole; includes rate impact

# IN 2022-25, [redacted]

[redacted]

- Amgen commands a rate advantage due to share, incumbent status at key accounts, and assumed 1:2 bids. (CVS & Optum)

DRAFT

# RECOMMEND SCENARIO B, WITH PIVOTS TO C AS NEEDED

*Most aligned to key principles*

| | |
|---|---|
| | [redacted] |
| LEDR Rate | |
| Coverage | |
| Gross Demand at Peak | |
| Net Demand at Peak | |
| Assumed Annual Price Increase | |
| Estimated Incremental Net Demand through 2030 v. Scenario B | |

***To successfully execute Option B,*** [redacted]



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

# NET PRICE DECLINES V. 2020 LRS

[redacted]

**YOY Price Declines (%)**

| Net Price Scenarios | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|
| Aug'20 L[redacted] | | | | | | | | | | |
| Scenario B -[redacted] | | | | | | | | | | |
| Scenario C -[redacted] | | | | | | | | | | |



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Repatha

# NET PRICE CHANGES V. AUGUST 20 LRS DRIVEN BY [redacted]

2021 | 2022 | 2023+

*Net Price*

[redacted]

Amgen Proprietary—Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



CONFIDENTIAL - ATTORNEYS EYES ONLY

AMGEN®

# SUPPORTING DETAILS: REPATHA

Repatha

# FCST PREVIEW – STRONGER DEMAND DUE TO HIGHER SHARE IN CVS & ESI AND BETTER ADHERENCE IS OFFSET BY PRICING ADJ'S

[redacted]

*Not yet included:* [redacted] -35 to -45

$[redacted]

[1]*WDA fees and PY DH true-ups are part of the other line item in the standardized Components of Growth calculations, but placed in net price here for managementt viewing purposes*

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

# PATIENT FUNNEL – OUR STRATEGIC CHOICES SINCE LAUNCH

Marketplace Map


[redacted]

| Time Frame | Patient Ask | Estimate |
|---|---|---|
| [redacted] | | |

# STRATEGY – [redacted]

*Total : 25.2M*

% of Segment w. LDL level

[redacted]

LDL Level:
- 190+
- 130-189
- 100-129
- 70-99
- <70

* Other = FH (1.1M) + Other CV, LDL>130 (1.4M) + Severe Hypercholesterolemia (5.7M) + LDL< 130 with Comorbidities (5.3 M)

FH extracted from claims data based on business rules in Appendix



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

# NEAR TERM – [redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up


Amgen Confidential—For Internal Use Only
CONFIDENTIAL - ATTORNEYS EYES ONLY

# LONGER TERM – [redacted]

| Patient Population | Physician Archetypes |
|---|---|
| Procedure (CABG, PCI) | [redacted] |
| Soft Event (UA, TIA) | |
| PAD Event | |
| Sx PAD | |

1 [redacted]

2

3

Key: Least Aggressive Today — Most Aggressive Today

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Repatha

# 2020 PENETRATION – [redacted]

[redacted]al : 25.2M

[redacted]ot shown)

LDL Level:
- 190+
- 130-189
- 100-129
- 70-99
- <70

Penetration

* Other = FH (1.1M) + Other CV, LDL>130 (1.4M) + Severe Hypercholesterolemia (5.7M) + LDL< 130 with Comorbidities (5.3 M)

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

AMG10935-000919721

Repatha

# PEAK PENETRATION – [redacted]

[redacted]

25.2M

LDL Level:
190+
130-189
100-129
70-99
<70

Penetration

(5.7M) + LDL< 130 with Comorbidities (5.3 M)

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# MARKETPLACE [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Repatha

Updated

[redacted]

[redacted]

%

%

%

%

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



CONFIDENTIAL - ATTORNEYS EYES ONLY
AMG10935-0000919724

Repatha

# MAINTAINING [redacted]

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

*Includes FH, Hypercholesterolemia, non-specific CVD and other co-morbidities

Amgen Confidential – For Internal Use Only



CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# MAINTAINING ASPIRATIONS WITH [redacted]

[redacted]

| Patient Type | Population Size | Current Penetration Dec'20 – New pts. of total PCSK9i untreated in a month | Peak Penetration demand study multiplier on 2020 pre-COVID exit | LRS 2020 Peak (with Vesalius) | LRS 2021 Peak (with Vesalius) PCSK9i mAb | Bempedoic Acid Post CVOT | Inclisiran Post CVOT |
|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | |

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

*Includes FH, Hypercholesterolemia, non-specific CVD and other co-morbidities



Amgen Confidential – Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

Pre-read Only

# KEY ASSUMPTION CHANGES – [redacted]

[redacted]

| | LRS 2020 – May | LRS 2020 – Aug | LRS 2021 – Mar | vs Aug |
|---|---|---|---|---|
| EPI | [redacted] | | | [redacted] |
| Repatha Attempts | | | | |
| Fulfillment | | | | |
| Price | | | | |

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Confidential—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Repatha

# FULFILLMENT – [redacted]

## Commercial Approval (Annual Avg)

[redacted]

2018 2019 2020 2021 2022 2023+

## Medicare Abandonment (Annual Avg)

[redacted]

2018 2019 2020 2021 2022 2023+

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



CONFIDENTIAL - ATTORNEYS EYES ONLY
AMG10935-0000919728

Attorney-Client Privileged

# REPATHA P&L [redacted] – 2020 LRS

[redacted]

**Additional Updates Not Included Above (to come in 2021 LRS):**

- **Net Pr** [redacted]
- **COS:** [redacted]
- **OPEX:** [redacted]



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Confidential—For Internal Use Only
CONFIDENTIAL - ATTORNEYS EYES ONLY
AMG10935-000919729

# REPATHA CARDS-PCP BREAKOUT – 2020 LRS

Card Revenue PCP Revenue Card OpEx PCP OpEx

[redacted]

600
500
400
300
200
100
0

Total OpEx

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Confidential—For Internal Use Only

# 2020 DONUT HOLE DRIVEN BY [redacted]

[redacted]

| Year | Donut Hole Projection |
|---|---|
| 2021 | [redacted] |
| 2022 | [redacted] |

Amgen Proprietary—Internal Use Only



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

CONFIDENTIAL - ATTORNEYS EYES ONLY




# REPATHA U.S. PCP STRATEGY UPDATE

OCTOBER 27, 2020

AMGEN®
Pioneering science delivers vital medicines™

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

# EXECUTIVE SUMMARY

1 [redacted]

2 [redacted]

– [redacted]s

3 [redacted]

4 [redacted]

[redacted]

[redacted]

5 [redacted]

[redacted]

# REPATHA LRS – [redacted]

| CARD | PCP | Total |
|---|---|---|

Repatha Attempts

[redacted]

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

AMG10935-000919734

# MARKET CONTEXT – [redacted]

## 2019 Marketplace Map Funnel




[redacted]

[redacted]

[1] An initiation is defined as any new-to-brand prescription or prescription of a new class of LLT (i.e., low intensity statin, medium intensity statin, high intensity statin ezetimibe, PCSK9s). Dx: Diagnosis, Rx: Prescription, Tx: Treatment. Source: IQVIA LAAD Data 01/01/2019 – 12/31/2019; ClearView Analysis



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

AMG10935-000919735

# REQUIREMENTS FOR LRS – TO MEET LRS, PENETRATION [redacted]

**LRS PCP Initiations as % of Dynamic Population[1]**

[redacted]

■ LRS PCP Initiated Patients ■ PCP Total LLT Initiations

**What You Have to Believe to Reach the LRS….**

1. [redacted]
2. [redacted]

[1] LRS assumes 46% persistence rate at 12 months, resulting in a significant NBRx population required to fuel growth.
[2] Deciles for cardiologist Repatha prescribing penetration range from 1.3%-18.9%, which is defined as % PCSK9i initiations of total LLT initiations. Source: IQVIA LAAD 01/01/2019 – 12/31/2019; ClearView Analysis.



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

# CASE FOR PCP STRATEGY – [redacted]

### *Reasons for Limited PCP Prescribing Historically*

[redacted]

### *Reasons to Believe We Can Unlock Prescribing in PCPs*

[redacted]

Source: ClearView Analysis.



Amgen Proprietary—For Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

CONFIDENTIAL - ATTORNEYS EYES ONLY

Draft

# PCP STRATEGY APPROACH – [redacted]

| | PCP Archetyping | Prioritization of Target Patient Segments | Strategic Options to Drive Repatha Prescribing | Synthesis of Repatha PCP Strategy |
|---|---|---|---|---|
| Strategic Question Addressed | Who is our target prescriber of Repatha amongst PCPs? | Which patients should we focus on to drive Repatha uptake? | What investments should be considered to drive PCP uptake, and what is corresponding magnitude of opportunity? | What is the recommended path forward for Repatha to drive growth within PCPs? |
| Key Sources of Insights | [redacted] | | | |

Draft

# PCP ARCHETYPES (1 OF 2) – [redacted]

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | | | | | |
| | | | | | |
| [redacted] | | | | | |
| | | | | | |

Source: PCP Interviews; ClearView Analysis.



Amgen Proprietary—For Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

CONFIDENTIAL - ATTORNEYS EYES ONLY

# PCP ARCHETYPES – [redacted]

| Archetype | # of HCPs | 2019 LLT Initiated Pts | 2019 PCSK9i Initiated Pts | 2019 ISS Targeted HCPs |
|---|---|---|---|---|
| Pan-TA Innovators | [redacted] | | | |
| Card-like PCPs | | | | |
| Conservative LDL Manager | | | | |
| Innovative, But Not for LDL | | | | |
| Defers to Cardiologist | | | | |
| Low LLT Initiations | | | | |
| Total | | | | |

[redacted]

[redacted]

[redacted]

[1] Depth is defined as the number of patients initiated on a PCSK9i out of total patients initiated on an LLT. Source: IQVIA LAAD 01/01/2019 – 12/31/2019; ClearView Analysis.



Amgen Proprietary—For Internal Use Only

AMGEN

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

CONFIDENTIAL - ATTORNEYS EYES ONLY

# CHARACTERISTICS – [redacted]

## Risk Stratification

Increasing Perceived Risk

[redacted]

[redacted]

## Patient Grouping

[redacted]

## Role & Primary Treatment Goals

[redacted]

Source: ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

# INITIAL PROCEDURE PATIENT FOCUS – [redacted]

| Post-MI | PCI/CABG & UA |
|---|---|
| [redacted] | [redacted] |

**Insights from qualitative research are consistent with findings from current sales reps**

[1] PCI/CABG and UA patients represent ~12% of ASCVD/HL practice. [2] Approximately one-third of post MI patients have also undergone PCI/CABG or experienced UA.
Source: ClearView Analysis.



For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

AMG10935-000919742

# STRATEGY ROADMAP - [redacted]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 | Vesalius-CV 2025 | ACS-REAL, PAD |

1

2

[redacted]

Source ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

AMG10935-000919743

Draft

# STRATEGY TOOLKIT – [redacted]

1 2 3 4 5

## Potential Opportunities to Increase Prescribing Volume

[redacted]

PA: Prior Authorization; UM: Utilization Management; POC: Point of Care; DSE: Disease State Education. Source: ClearView Analysis.



Amgen Proprietary—For Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

CONFIDENTIAL - ATTORNEYS EYES ONLY

# STRATEGIC OPTIONS – [redacted] LY [redacted]

**Potential Investment Options** | **Key Strategy Enablers (All Options)**

Repatha Volume

[redacted]

Source: ClearView Analysis.

Repatha

# INVESTMENT SCENARIOS – PROPOSE STARTING WITH FOCUS [redacted] CONSISTENT WITH LRS INVESTMENT LEVELS WITH OPTION T[redacted]

| 2025 PCP Investment[1] | 2025 PCP Initiated Patients (NBRx[redacted] |
|---|---|
| [redacted] | [redacted] |

[1] Assumes 3% inflation rate for cost per FTE; [2] Aggressive FTE expense: $293 M. Other expenses: $113 M; [3] Balanced FTE expenses: $163 M. Other expenses: $73 M; [4] Base case FTE expense: $83 M. Other expenses: $41 M. Source: ClearView Analysis.

1. Assuming Aug LRS net price assumptions and no change in CARD revenue projections

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

# SUMMARY OF LEARNINGS AND IMPLICATIONS

| Key Learning | Implication |
| --- | --- |
| [redacted] | [redacted] |

Source ClearView Analysis.

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

[redacted]

2020 2021 2022 2023 2024 2025 2026 2027 2028 2029 2030

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up



Amgen Proprietary—For Internal Use Only
AMGEN
CONFIDENTIAL - ATTORNEYS EYES ONLY
AMG10935-000919748

# EXHIBIT 33

Message

**From**: Niksefat, Kave [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=80085f1047d5465aac8ef82a5e0c30a3-kaven]
**Sent**: 5/14/2020 12:36:39 AM
**To**: Gordon, Murdo [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=65aef22a465b405881ee343cf01b760e-mgordo02]
**Subject**: Re: Do not forward Repatha CVS commercial

Thanks for sharing and thanks for the kind words this morning. My personal process in these situations is to get angry, accept the blame, and wake up the next day ready to fight. It works well for me and rallies both my troops and my partners.

Will send an additional note in a bit, but they are now targeting ESI now with a 15-point increase in rates. We're ready now and are defending against the onslaught.

---

**From:** "Gordon, Murdo" <mgordo02@amgen.com>
**Date:** Wednesday, May 13, 2020 at 5:27 PM
**To:** "Niksefat, Kave" <kaven@amgen.com>
**Subject:** Do not forward Repatha CVS commercial

The bosses reaction...

Murdo

---

**From:** Bob Bradway <rbradway@amgen.com>
**Date:** Tuesday, May 12, 2020 at 6:44 PM
**To:** "Gordon, Murdo" <mgordo02@amgen.com>
**Subject:** RE: Repatha CVS commercial

Thanks. [redacted]

---

**From:** Gordon, Murdo
**Sent:** Tuesday, May 12, 2020 1:32 PM
**To:** Bradway, Bob <rbradway@amgen.com>
**Subject:** Repatha CVS commercial

Just got off the phone with Kave and it seems Regeneron may be making a play for a 1 of 1 listing at CVS for July 1. Clearly we will work through response scenarios and I will keep you posted.

CVS commercial [redacted].

Strange move from Regeneron.

Murdo

# EXHIBIT 34

# Document Produced Natively

# FOLLOW UP FROM 8/31 MEETING ON REPATHA

- **Litigation update**
- **Repatha cost of sales:** [redacted] / patient / year (~[redacted]
- **Ex-US commercial contribution:** positive in 2020
- **Early read on hospital voucher**
  - Live for three weeks. As of 9/10 there have been 4 redemptions (3 in MI and 1 in SC).
  - Early feedback from customers is very positive and we expect to see an acceleration of redemptions in the coming weeks post Labor Day.
- **Ideations and next step**

Amgen Proprietary—Internal Use Only



For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

# COST OF SALES IS IN THE RANGE OF $[redacted] PER PATIENT PER YEAR, [redacted]% GROSS MARGIN

| Ops Finance (May LRS) | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| **Direct Cost / Pt / Year** | [redacted] | [redacted] | [redacted] | [redacted] |
| Excise Tax (~2% sales) | $[redacted] | [redacted] | [redacted] | [redacted] |
| **Total Cost / Pt / Year** | [redacted] | [redacted] | [redacted] | [redacted] |
| COS % of Net Price | [redacted] | [redacted] | [redacted] | [redacted] |
| *COS % of Gross Price* | [redacted] | [redacted] | [redacted] | [redacted] |

*Pushtronex Cost is ~[redacted] higher vs Sureclick (per pt per year)*

*Gross Margin of ~[redacted]*

# Ex-US Commercial Contribution is positive in 2020

| | Ex-US | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$M* | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
| EU[1] | [redacted] | | | | | | | | | |
| JAPAC[1] | | | | | | | | | | |
| ICON[1] | | | | | | | | | | |
| **Ex-US sales[1]** | | | | | | | | | | |
| *YoY % (EU)* | | | | | | | | | | |
| *YoY % (JAPAC)* | | | | | | | | | | |
| *YoY % (ICON)* | | | | | | | | | | |
| *YoY % (WW)* | | | | | | | | | | |
| Cost of sales[2] | | | | | | | | | | |
| **Gross profit** | | | | | | | | | | |
| *Gross margin* | | | | | | | | | | |
| EU[3] | | | | | | | | | | |
| JAPAC[3] | | | | | | | | | | |
| ICON[3] | | | | | | | | | | |
| **S&M (Excl. GMAC)[3]** | | | | | | | | | | |
| *% of sales (EU)* | | | | | | | | | | |
| *% of sales (JAPAC)* | | | | | | | | | | |
| *% of sales (ICON)* | | | | | | | | | | |
| *% of sales (WW)* | | | | | | | | | | |
| EU | | | | | | | | | | |
| JAPAC | | | | | | | | | | |
| ICON | | | | | | | | | | |
| **Contribution (Ex-US)** | | | | | | | | | | |
| *Contribution margin (EU)* | | | | | | | | | | |
| *Contribution margin (ICON)* | | | | | | | | | | |
| *Contribution margin (JAPAC)* | | | | | | | | | | |
| *Contribution margin (Ex-US)* | | | | | | | | | | |

1. **Net sales based on Jun 2020 Fcst /** [redacted]
2. **Cost of sales based on COGS (%) ba**[redacted] subject to financial information and true-up.
3. **Provided by GCO Finance on 16 July 2020.**

# GCO Regional P&Ls [redacted] as Global R&D, Ops and GMAC OpEx investment is not allocated to the regions

| $M | U.S. 2020 | U.S. 2021 | U.S. 2022 | Europe 2020 | Europe 2021 | Europe 2022 | JAPAC 2020 | JAPAC 2021 | JAPAC 2022 | ICON 2020 | ICON 2021 | ICON 2022 | Unallocated 2020 | Unallocated 2021 | Unallocated 2022 | Total 2020 | Total 2021 | Total 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net sales**[1] | [redacted] | | | | | | | | | | | | | | | | | |
| *YoY %* | | | | | | | | | | | | | | | | | | |
| Cost of sales[2] | | | | | | | | | | | | | | | | | | |
| **Gross profit** | | | | | | | | | | | | | | | | | | |
| *Gross margin* | | | | | | | | | | | | | | | | | | |
| **R&D**[3] | | | | | | | | | | | | | | | | | | |
| *% of sales* | | | | | | | | | | | | | | | | | | |
| **Ops**[3] | | | | | | | | | | | | | | | | | | |
| *% of sales* | | | | | | | | | | | | | | | | | | |
| *Salesforce FTEs (#)* | | | | | | | | | | | | | | | | | | |
| *Home FTEs (#)* | | | | | | | | | | | | | | | | | | |
| *GMAC* | | | | | | | | | | | | | | | | | | |
| FTEs ($) | | | | | | | | | | | | | | | | | | |
| OSE | | | | | | | | | | | | | | | | | | |
| **S&M**[4] | | | | | | | | | | | | | | | | | | |
| *% of sales* | | | | | | | | | | | | | | | | | | |
| **G&A**[3,5] | | | | | | | | | | | | | | | | | | |
| *% of sales* | | | | | | | | | | | | | | | | | | |
| **Other**[3] | | | | | | | | | | | | | | | | | | |
| **Total OpEx** | | | | | | | | | | | | | | | | | | |
| *% of sales* | | | | | | | | | | | | | | | | | | |
| **Operating income** | | | | | | | | | | | | | | | | | | |
| *Operating margin* | | | | | | | | | | | | | | | | | | |

1. Sales based on Jun[redacted]
2. Cost of sales based on COGS (%) based on 2019 LRS applied to all regions.
3. Consistent with U.S. Contribution, all R&D, Ops, G&A, and Other not allocated to the Region.
4. Provided by GCO Finance on 16 July 2020
5. G&A assumed [redacted].

For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

# IDEAS AND NEXT STEPS

[redacted]

[redacted]

[redacted]

# 8/31 MEETING SLIDES

AMGEN

# REPATHA PRICE/VOLUME STRATEGY DISCUSSION

**Attorney-Client Privileged**

For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

Attorney-Client Privileged

# REGENERON STRATEGY PRESSURING NET PRICES ACROSS ALL PAYER SEGMENTS WITHOUT IMPROVING ACCESS

- Praluent U.S. Commercialization rights returned to Regeneron in April
- Signals indicate Regeneron executing Payer Driven, SG&A Light strategy
  - [redacted]
- Regeneron offering steep discounts to payers solely to displace Repatha
  - [redacted]
  - Latest Praluent Humana Part D 2022 offer at ~55% 1:1 vs. Repatha 2021 contract of ~20% 1:1
- [redacted]

**Lack of differentiation amongst PCSK9s enabling Regeneron to drive market pricing**

*. [redacted]

Amgen Proprietary Internal Use Only



For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

Attorney-Client Privileged

# REPATHA NET PRICE – [redacted]

[redacted]

**2020 JunFcst Net Price**

Ascent Commercial 1:1 Rates

Increased Part D

All other adjustments

**2021 LRS Aug Net Price**

CVS Commercial

Humana D

Other Part D

**2022 LRS**

Amgen Proprietary Internal Use Only



For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

[redacted]

[redacted]





For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

# UNIT VOLUME – [redacted]

[redacted]



For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

[redacted]





For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

Attorney-Client Privileged

# REPATHA AUG LRS P&L W/ VESALIUS AT [redacted] PTRS

| | Repatha P&L (incudes Vesalius at 86% PTRS) | | | | | | | | | | | | CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | '20-'24 |
| *$M* | [redacted] | | | | | | | | | | | | |
| **Net Sales** | | | | | | | | | | | | | |
| *YoY %* | | | | | | | | | | | | | |
| Cost of Sales[1] | | | | | | | | | | | | | |
| **Gross Margin** | | | | | | | | | | | | | |
| *% of Net Sales* | | | | | | | | | | | | | |
| **Geographic OPEX** | | | | | | | | | | | | | |
| *YoY %* | | | | | | | | | | | | | |
| Headcount Costs | | | | | | | | | | | | | |
| Outside Expenses | | | | | | | | | | | | | |
| Central Function ([redacted] PCP) | | | | | | | | | | | | | |
| *Build back PCP (+[redacted] by'23)* | | | | | | | | | | | | | |
| **Contribution** | | | | | | | | | | | | | |
| *Contr. margin %* | | | | | | | | | | | | | |
| ***Global Operating Margin*** | [redacted] | | | | | | | | | | | | |
| *Operating margin %* | | | | | | | | | | | | | |

[1] Preliminary COS % based on 2020 May LRS.

[2] *Global P&L based on Jun Fcst for 2020 and May LRS for 2021+. 2021 includes ~$[redacted] non-US commercial contribution and ~($[redacted] in R&D, Ops and G&A*

Amgen Proprietary—Internal Use Only

For scenario planning & market research purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up

Attorney-Client Privileged

# POTENTIAL OPTIONS FOR DISCUSSION

- [redacted]
- [redacted]
- [redacted], [redacted]
- [redacted]

Amgen Proprietary Internal Use Only



For scenario planning purposes. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to financial information and true-up.

# EXHIBIT 35

# Document Produced Natively



# REGENERON SCENARIOS & AMGEN RESPONSE

## AUGUST 3, 2020

*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# AGENDA

| Today's Discussion | Lead |
|---|---|
| Regeneron Corporate Overview | Anand |
| Praluent Coverage Landscape | Dave |
| Regeneron Scenarios & Amgen Response | All |



*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# REGENERON CORPORATE OVERVIEW

*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# REGENERON CORPORATE PERFORMANCE

## *SOURCE: NASDAQ-GS, SEC FILINGS 10-K / 10-Q ($B, EXCEPT SHARE PRICE)*




| | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $1.5 | $1.6 | $1.7 | $1.9 | $1.7 | $1.9 | $2.0 | $2.2 | $1.8 | *TBD* |
| Net Income | $0.5 | $0.6 | $0.6 | $0.8 | $0.5 | $0.2 | $0.7 | $0.8 | $0.6 | *TBD* |
| Total Assets | $9.4 | $10.0 | $10.8 | $11.7 | $12.8 | $13.2 | $13.9 | $14.8 | $15.8 | *TBD* |
| Cash* | $3.3 | $3.7 | $4.1 | $4.6 | $5.6 | $5.6 | $6.0 | $6.5 | $7.2 | *TBD* |

**Includes Cash and Cash Equivalents & Marketable Securities (current & non-current)*
*Note: $6.6B Working Capital as of Q1 2020, Regeneron does not pay dividends*

*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# REGENERON MARKETED PRODUCTS – US NET SALES

## *SOURCE: SEC FILINGS FORMS 10-K / 10-Q*






*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# US NET SALES - 2018 VS. 2019

## *SOURCE: SEC FILINGS FORMS 10-K / 10-Q*




**All Regeneron Marketed Products with $100M+ 2019 US Net Sales recorded YoY growth, except Praluent**

*Note: Repatha experienced 5% Y-o-Y US net sales growth 2018 vs. 2019*

*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# NEW PRALUENT COLLABORATION AGREEMENT (APRIL 1, 2020)

## *SOURCE: SEC FILING 2020 FORM 10-Q*

### REGENERON

- Solely responsible for the development and commercialization of Praluent ***in the United States***
- Will ***not owe Sanofi royalties*** on the net product sales of Praluent in the United States
- ***Record net product sales*** for Praluent ***in the United States***
- Assume sole liability for IP / product liability ***litigations in the United States***



### SANOFI

- Solely responsible for the development and commercialization of Praluent ***outside of the United States***
- Will ***pay Regeneron a 5% royalty*** on Sanofi's net product sales of Praluent outside the United States ***until March 31, 2032***
- ***Record net product sales*** for Praluent ***outside the United States***
- Assume sole liability for IP / product liability ***litigations outside the United States***

*Note: Parties will evenly split of any damages arising out of Praluent sales/other activities prior to April 1, 2020*

Amgen Proprietary Internal Use Only



*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# REGENERON PIPELINE

## SOURCE: REGENERON CORPORATE WEBSITE (UPDATED: 6/10/20)

## PHASE 1

**Infectious Disease**
- ***SARS-CoV-2*** *(COVID)*

**Oncology**
- **Cemiplimab** *(cancer)*
- **LAG-3** *(solid tumors)*
- **CD20 x CD3** *(B-cell malignancies)*
- **MUC16 x CD3** *(ovarian)*
- **BCMA x CD3** *(multiple myeloma)*
- **PSMA x CD28** *(prostate)*
- **MET x MET** *(NSCLC)*

**Immunology / Inflammation**
- **BET v 1** *(Birch allergy)*

## PHASE 2

**Ophthalmology**
- **Aflibercept** *(AMD)*

**Oncology**
- **Cemiplimab** *(Basal cell carcinoma)*
- **REGN1979** *(B-cell non-Hodgkin lymphoma)*

**Immunology / Inflammation**
- **Dupilumab** *(Grass/Peanut allergy)*
- **Sarilumab** *(JIA)*
- **REGN3500** *(Asthma, COPD)*

**Pain Management**
- **REGN5069** *(Osteoarthritis Knee Pain)*

**CV / Metabolic / Rare Disease**
- **Garetosmab** *(Fibrodysplasia Ossificans Progressiva)*
- **Evinacumab** *(Refractory hypercholesterolemia)*
- **Pozelimab** *(Paroxysmal nocturnal hemoglobinuria)*
- **REGN4461**

## PHASE 3

**Ophthalmology**
- **Aflibercept** *(ROP)*

**Oncology**
- **Cemiplimab** *(NSCLC, cervical cancer)*

**Immunology / Inflammation**
- **Dupilumab** *(Pediatric atopic dermatitis, pediatric asthma, eosinophilic esophagitis, COPD)*
- **Sarilumab** *(Polymyalgia rheumatica, giant cell arteritis)*

**Pain Management**
- **Fasinumab** *(Chronic pain from osteoarthritis of the knee or hip)*

**Infectious Diseases**
- **REGN-EB3** *(Ebola)*

**CV / Metabolic / Rare Disease**
- **Alirocumab** *(HoFH in adults and pediatrics; HeFH in pediatrics)*
- **Evinacumab**

*Attorney-Client Privileged: Not for Distribution. For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# PRALUENT COVERAGE LANDSCAPE

# THE PAYER LANDSCAPE HAS BECOME INCREASINGLY CHALLENGING, WITH PRESSURE ON PRICE AND COVERAGE




*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

[redacted]



*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# POTENTIAL REGENERON SCENARIOS & AMGEN RESPONSE

# Key Questions

[redacted]

**AMGEN**

- How should we think about 2022 (1:1 or maintain parity access)?
- What do we need to do for 2021 to secure and at what cost?

| Amgen Response |
|---|
| Assess case-by-case by payer (1:1 vs 1:2); identify opportunities to loosen UM criteria in process |
| |
| |
| |
| |
| |
| |
| |

To be discussed in follow-up session

*Attorney-Client Privileged: Not for Distribution*
*For scenario planning purposes only. Does not portray impact of all historical or future market dynamics and consequences from patent infringement. Summaries of business performance and expectations are subject to final information and true up.*

# EXHIBIT 36

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 4 |
| Total Messages: 1 | Date Range: 5/14/2020 |

## Outline of Conversations

**974a9393-7961-4176-a333-cfde43fc2a4c** • 1 message on 5/14/2020 • Andy Chiu <[redacted]> • Medders <[redacted]> • Tim Bayer <[redacted]> • Tom Moore <[redacted]

**Messages in chronological order** (times are shown in GMT +00:00)

**974a9393-7961-4176-a333-cfde43fc2a4c**

TM Tom Moore <[redacted]> 5/14/2020, 5:45 PM

Ed called me:

1. Ed [redacted]
2. TM indicates [redacted]
3. Can't move forward on [redacted]
4. Ed said [redacted]

# EXHIBIT 37

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Regeneron Pharmaceuticals, Inc., | ) |
| Plaintiff, | ) C.A. No.: 22-cv-00697-RGA-JLH |
| vs. | ) |
| Amgen Inc., | ) |
| Defendant. | ) |

VIDEOTAPED DEPOSITION OF MURDO GORDON
Thousand Oaks, California
Friday, January 19, 2024
Volume I

Reported by:
NADIA NEWHART
CSR No. 8714
Job No. 6414543
PAGES 1 - 326

a beneficiary of.
Q You've heard of the term "mega accounts," right?
A No.
Q You've never heard that term used at Amgen?
A I've heard -- I've heard people call them mega accounts, but I wouldn't call it a term.
Q What's your understanding of mega accounts when you've heard it used at Amgen?
A Well, what I think people are trying to describe is the consolidation of pharmacy benefit management companies that has occurred in the United States over the last several years, which have created several large entities that control a majority of insured pharmacy benefit beneficiaries.
Q You've heard of those several large entities colloquially referred to as the big three, right?
A Yeah but not frequently.
Q Okay. We've mentioned PBMs, and you've talked about who they are. Just so we have it out on the record, that refers to ESI, right?
A Express Scripts part of Evernorth, yes.
Q CVS?
A Yes.
Q And UnitedHealthcare or Optum, right?

A Correct.
Q You understand that if your drug is excluded from a drug formulary by a PBM, it is harder for a patient to access that drug if it is prescribed for them?
A If that patient is a beneficiary of that PBM, that is correct.
Q Okay. You've heard the term "step edit," right?
A I have.
Q You understand that if a step edit is placed on your drug by a PBM, a patient will need to try another drug first before accessing your drug, right?
A Usually, a step edit refers to trying another product prior to the product that might be in the, quote/unquote, second position to that step edit.
Q You've heard of the term prior authorization as well, right?
A I have.
Q You understand that if a prior authorization is placed on your drug by a PBM, a patient will need to obtain some form of express approval by a physician to try to obtain your drug?
A Yes. It depends on the nature of the prior

authorization, and it's usually a physician that is required to provide the information requested by the prior authorization. It can sometimes be a laboratory test or a diagnostic result that the prior authorization also refers to.

Q And sometimes a prior authorization requires the doctors to fill out a lot of paperwork, right?

MR. WEISSMAN: Objection to the form.

THE WITNESS: I don't -- I don't know the current standard of paperwork, but prior authorizations or what we more broadly refer to as utilization management efforts by the pharmacy benefit managers come with administrative burden on the physician.

BY MR. HOCHSTADT:

Q Okay. Are you familiar with the concept of spillover?

A I am.

Q What is the -- what's your understanding of that term for the court?

A "Spillover" is a general term that can refer to many different situations. It can refer to receiving an indication for one disease that has a positive effect on an adjacent indication that you may have for the same product.

So this happened in my experience with Plavix as an example, where receiving the indication for acute coronary syndrome increased awareness on the part of physicians of the utility of the medicine more broadly in other indications.

And so the acute coronary syndrome indication created a spillover effect, if you will, in giving physicians familiarity with that product that made them more comfortable prescribing it in other indications.

Q Have you heard the term "spillover" used outside of the indication context of --

A I've heard it used in many different contexts.

Q Have you heard it used in the context of market access and if a PBM is covering a product a certain way, it may have a spillover on the coverage of that product by other PBMs?

MR. WEISSMAN: Objection to the form.

THE WITNESS: I have not heard it used that way.

BY MR. HOCHSTADT:

Q Never -- never at Amgen; you've never heard it used that way?

A I don't recall having heard it that way in

the context that you just described.
Q Okay. Other than spillover from one indication to another, have you ever -- do you have an understanding of the term "spillover" as it relates to market access?
A Yes.
Q Okay. What is that?
A I have heard it used in describing how a physician prescribes a medicine when you have coverage in one PBM that allows them to prescribe it for a broader group of their patients in their practice.
Q Have you heard the term "halo effect" used?
A I've heard it used.
Q And what's your understanding of the term "halo effect"?
A Again, it's used broadly to describe many things.
Q In the context of spillover as it relates to physicians that you just testified about, have you heard the term "halo effect" used?
A Well, again, I would say that it would have been used in the Plavix context that I gave you where a new indication for a product created a halo effect in the physician's frequency of prescribing

that product for other indications.
Q Outside of the indication spillover context, have you heard the term "halo effect" used?
A Yes.
Q Have you heard it used in the context of prescribers and if a drug has a certain level of market access, it creates a halo effect around the drug?
MR. WEISSMAN: Objection to the form.
THE WITNESS: Yeah, I haven't heard what you're describing specifically, but...
BY MR. HOCHSTADT:
Q Okay. Do you understand that if access to your drug is limited by a PBM, a doctor may prescribe your product less because they don't take the time to know the insurance plan of each of their patients?
A Well, I can't speak to each individual physician, but having broader PBM coverage or listing for a product helps physicians make product choices for their patients. It's also --
THE VIDEOGRAPHER: Can we -- sorry, go ahead.
THE WITNESS: It's also true that removing as many of the utilization management steps within a PBM can help a physician also use your product for

utilization and management criteria, which is the point I was making in the previous reply to his last email.

Q Okay. But if the PBM doesn't want that and you're being told that the PBM doesn't want that --

A I would wait for him to come back with that news. The PBMs [redacted] And I told Kave I would prefer [redacted]

Q We can agree you didn't respond to Mr. Niksefat when he tells you that "Praluent appears to be willing to drive price down much further than we are comfortable with," by saying, Well, let's beat them on price, right?

A There are a number of things in his email that I didn't respond to. That wasn't the way in which these processes worked. I empowered my team to negotiate with the PBM.

I gave them my preference for the outcome that I was hoping for, [redacted], as would patients, and that we would make it easier for this very valuable class of medicines to be used to help reduce cardiovascular risk for patients.

Q Why didn't you challenge your team to beat Regeneron on price?

MR. WEISSMAN: Objection; lacks foundation.

THE WITNESS: My -- my entire strategy with Repatha was to [redacted]

And that wasn't our strategy. Our strategy was to [redacted]

Q Fair to say that you didn't want a price battle in the PCSK9 class, right?

A It's fair to say that we were being prudent in our strategy to [redacted]

Q Are you able to answer my question that, fair to say that you didn't want a price battle --

A It's not fair to say that.

Q Can I just finish my question?

Is it fair to say that you didn't want a price battle in the PCSK9 class?
A It is not fair to say that.
Q But you didn't beat Regeneron on price at CVS commercial, right?
MR. WEISSMAN: Objection; calls for speculation.
THE WITNESS: Yeah, I don't know what their final price was. We did not win the business at CVS.
BY MR. HOCHSTADT:
Q And you did not win the business by beating Regeneron on the price -- the net price you were told by Mr. Niksefat that they were offering, right?
A Can you --
MR. WEISSMAN: Objection to the form.
THE WITNESS: Can you repeat that question?
BY MR. HOCHSTADT:
Q Sure. Mr. Niksefat told you what he believed Regeneron's net price was for Praluent, right?
A We believed we were done at CVS. That's what [redacted]. They said, [redacted]
Q So there was no point in trying to compete on price at that stage?

earlier today, right?

A I don't recall your question from earlier today, but I did communicate on Repatha.

Q Okay. Was this the only time that you communicated with Amy Bricker about Repatha coverage?

A I don't know.

Q Sitting here today, can you recall a single other text?

A No, but it -- it wouldn't surprise me if I -- if I had another interaction with her as this was happening.

Q Okay. And we can agree that in your text message to Amy Bricker, you don't reference Enbrel or Otezla, right?

A That's correct.

Q Okay. She then responds to you, as you related to Mr. Moore (as read):

"Thanks for the outreach, Murdo. I do appreciate it and [redacted]."

Do you see that?

A I do.

Q Did she circle back with you?
A Not that I'm aware.
Q Okay. You can put that document aside.
Amgen still has the [redacted] that we just looked at from the summer of 2020, right?
A We still have a contract. I don't know if it's the same as the one that we're talking about there.
Q Well, is it still a [redacted] contract with those three products?
A We [redacted]la.
Q Okay. Do you recall that that portfolio contract includes [redacted]?
A I think we [redacted]
Q Did you approve that condition?
A I believe so, yes.
Q Was that the first time you ever had been asked to approve such a condition?
A At Amgen, yes.

Q Did you ask Mr. Bradway for his approval to agree to that condition?
A Well, that's not the model at the company. I have the approval authority for pricing and contracting of our products with PBMs, so I didn't need to -- I might have informed them that we were making this decision.
Q Because it was the first time that this was a condition that you were approving; that's why I'm asking if you reached out to him because --
A No.
Q -- to seek his approval.
A Not because of that but because you saw from other correspondence, I generally kept Mr. Bradway informed of how we were doing in securing access to Repatha and other products, [redacted] to -- to make sure that he knew that we were doing our best to broaden the usage of Amgen products for providers and for patients.
Q And when you informed Mr. Bradway that you gave some [redacted], do you recall his response?
A I -- I don't, but it was usually -- it was usually a one-way interaction where I would let him

A It's a big account in the marketplace, not just Repatha.

Q So why was there no viable business justification to [redacted]?

MR. WEISSMAN: Objection; calls for speculation.

MR. HOCHSTADT: I'm asking the senior commercial officer of Amgen why there's no viable business justification to match an offer. I don't see how that calls for speculation.

MR. WEISSMAN: You want me to answer?

MR. HOCHSTADT: No. It's an improper objection.

MR. WEISSMAN: No, it's not.

MR. HOCHSTADT: It totally is.

MR. WEISSMAN: The objection stands.

BY MR. HOCHSTADT:

Q Okay. Go ahead, Mr. Gordon.

A Well, the broad answer is, we were doing [redacted] We were [redacted]. We were investing in [redacted], and it was also [redacted].

And we were selling through [redacted]

[redacted] so I personally didn't think that this business was essential [redacted]

And I was -- I was pushing back a little on my team on [redacted]. I felt that they were giving [redacted].

Q On the next page, she writes in the third key takeaway that she's summarizing for you (as read):

"Further context to both negotiations," referring to commercial and Medicare, right?

A (No audible response.)

Q Is that yes, Mr. Gordon?

A Sorry, yes.

Q Okay. In sub-bullet c, she writes (as read):

"[redacted]" right?

A That's what she says.

Q Okay. And the [redacted] arrangement with

[redacted] is what we've looked at with -- that Amgen was able to offer and negotiate with Ascent, right?

A At Ascent, we had [redacted]

Q Okay. And what Ms. Norton is telling you is that her takeaway from her meeting with CVS is that [redacted] right?

MR. WEISSMAN: Objection to form.

THE WITNESS: She's saying that there's [redacted], so that's what she says. I don't know what that entirely means, but that's what she says.

BY MR. HOCHSTADT:

Q And in response to this summary of her meeting, you forward this email to Mr. Bradway, right?

A That's correct.

Q Okay. And, again, because CVS is an important account in the marketplace, right?

A Yes, but as I said, it's a relatively normal practice for me to keep Bob apprised not just on what we're doing on Repatha or at CVS but in general in negotiations with PBMs.

Q And with one of your growth products, right?

A And with a volume growth driving product.
Q And in your second paragraph, you tell Mr. Bradway (as read):
"Unfortunately not great news on PCSK9," in all caps, "but not a surprise either. It doesn't mean we'll lay down either and [redacted]. As well as avoid similar outcomes on other brands," right?
A That's what I write.
Q And at the end, you say (as read):
"I will attend the strategy session she describes," referring to Jen Norton, right?
A Correct.
Q (As read):
"...and of course we will brief you on output and the role we would like you to play with their CEO," right?
A Correct.
Q Because as we already saw, Mr. Bradway had a one-on-one meeting with the then CVS CEO, right?
A The CVS CEO prior to the one that would be in

the seat at this point in time.

Q Karen Lynch is the one --

A She's the new one, and Bob had met with Larry Merlo at the time.

Q Okay. And you wanted Bob Bradway to play a role with Karen Lynch, right?

A I -- I felt that it would be important for Bob and Karen to connect given a broad number of strategic issues between our two companies.

Q And one of those broad strategic issues involved the coverage of Repatha, right?

A One of those broad strategic issues involved our focus on cardiovascular health, which was a stated strategic intent of CVS.

Q And the product that Amgen is selling at the time related to cardiovascular health is Repatha, right?

A Along with [redacted]

Q Okay.

A So there was a number of things that we were talking about that I felt that Karen and Bob would

benefit from.
Q Okay. Now, turning to Exhibit 20, which is about a month and a half later, right, July 2, 2021, the original email in the string?
A Did you say a month and a half later?
Q Yeah.
A Yeah, okay. 5/4 -- 5/14/21, and we're now looking at July 2nd.
Q 2021, right?
A Yeah.
Q So less than two months later?
A Yeah. You're looking at Exhibit 20?
Q Yeah, and comparing it to Exhibit 1.
A Okay. Yes.
Q So on Exhibit 20, in the bottom email in the string -- this is from Mr. Zimmer to you and it's a approval request for [redacted], right?
A That's correct.
Q And this is an email that you were sent and responded to as part of your job duties at Amgen?
A It is.
Q Okay. So he writes to you and Ian Thompson, who was your direct report, right?
A That is correct.

Q Okay. (As read):
"As part of our [redacted] with payers."
Do you see that?
A I do.
Q What's he referring to?
A I think he's referring to the fact that we've got multiple products that we're negotiating with payers.
Q Okay. (As read):
"...we have been engaged with CVS over recent months to explore opportunities to regain Repatha coverage in 2022 while also preserving Enbrel and Otezla coverage."
Do you see that?
A I do.
Q He then goes on to write on the next page (as read):
"We believe the best [redacted]

[redacted]" -- I think he meant
[redacted] -- "[redacted]," in all caps.
Do you see that?
A I do.
Q GTN refers to gross to net, right?
A It does.
Q What does it mean to preserve Repatha gross to net?
A Well, it would mean trying not to increase rebates over time.
Q Okay. He then writes (as read):
"Our recommendation is [redacted], with [redacted]."
Do you see that?
A I do.
Q And that's the [redacted] contract that we've looked at here today, right?
A It is a contract with multiple products in it, but we didn't look at the actual contract here today.
Q That's the negotiation, some of which we

looked at here today, right?
A It was the request for approval for terms up to including. We'd need to look at the final contract to know what was ultimately agreed to.
Q Okay. And he mentions about how the [redacted], right?
A Where do you see that?
Q In a sentence that starts (as read):
"Our recommendation is [redacted]," right?
A I see that he wrote that.
Q Okay. Now, this was again, less than two months from the email that we just looked at where Jen Norton met with representatives of CVS and she told you one key takeaway was that [redacted] right?
A She said that -- where is it?
Q It's on the second page.
A She said there is (as read):
"[redacted]

[redacted]."

Q So why was Amgen less two months later proposing an [redacted] agreement that you knew CVS didn't want?

MR. WEISSMAN: Objection to the form.

THE WITNESS: I don't know the specifics of the negotiations, but it is not uncommon, as we've seen in other documents produced today, that we often include things despite feedback from the account as part of the negotiation.

BY MR. HOCHSTADT:

Q So even though the customer is telling you they don't want a particular term, Amgen provides that anyway?

A PBMs are known to signal things that they don't always mean in a negotiation. They're positioning.

Q Well, the positioning you understood prior to this approval request is that CVS does not want a [redacted] agreement [redacted] arrangement with [redacted] right?

A They said that they would, according to Jen, have [redacted]

[redacted].

Q But that's what you were being asked to approve and you did approve, right?

A Among many other things.

Q Okay. Now, if we look at the -- the grid that's down below --

A Yes.

Q -- these are rebate rate percentages, right?

A That is what they are.

Q And the second row is "[redacted]," right? And there's an asterisk? Do you see that?

A I do.

Q And there's plus [redacted]

A I see that.

Q And the asterisk says that (as read):

"[redacted]."

Do you see that?

A I see that.

Q Did you instruct your team to make this

# EXHIBIT 38

# Document Produced Natively



# Aligning Payer Strategy & Commercial Choice

JUNE 8TH

*DRAFT: PENDING LEGAL REVIEW*

**Amgen Proprietary & Confidential —Restricted**

# Topics for our discussion today

## Our journey in optimizing the Autoimmune access strategy

**Period focus:** Prior to May 2020, reflecting work done over the last few years under a different payer/ PBM stance

**Objective:** Share highlights of work done and opportunities considered

## Aligning Payer strategy and Commercial choice across the Gen Med portfolio

**Period focus:** May 2020 and after; reflects PBM/ Payer [redacted]

**Objective:** Get alignment on proposed effort to culminate with a leadership workshop in mid-July



DRAFT: PENDING LEGAL REVIEW

Amgen Proprietary & Confidential  Restricted

# Topics

Our journey in optimizing the Autoimmune access strategy

Aligning Payer strategy and Commercial choice across the Gen Med portfolio

# Our journey in optimizing the Autoimmune access strategy has led to positive contributions over the last 3 years

**Amgen lead:** Andy Chiu

2018 — 2019 — 2020 — 2021

**Payer strategy discipline**
[redacted]
Enbrel

**Account-level bid strategy**
[redacted]
Enbrel

**Proactive defense**
[redacted]
Enbrel

*2018-19:* [redacted]

**Vision for Humira LOE**
[redacted]
Enbrel, AMJEVITA

**Enbrel/ Otezla growth options**
[redacted]
Enbrel, Otezla

**2021-23** [redacted]
[redacted]
Autoimmune portfolio

*2019-20:* [redacted]

**Capability transformation**
Launched
[redacted]
Across Gen Med teams

# Inflammation access strategy has delivered meaningful impact

**Consistently strong coverage and GTN outcomes for Enbrel**

- [redacted]
- [redacted]
- [redacted]

**Emerging growth driver for Otezla**

- [redacted]
- [redacted]

**Elevated value and access organizational capabilities**

- [redacted]
- [redacted]
- [redacted]

*Work competed Prior to May 2020*

# Enbrel/ Otezla growth options: highlights from [redacted]

## A broad set of options were considered

Enbrel coverage optimization:

- Secured CVS Part D coverage starting 7/1/20
- [redacted]

Otezla coverage optimization:

- Secured PsA 1L in ESI
- [redacted]

## ✔ Otezla 1L PsA coverage for 2H 2020 & 2021 secured across Ascent

### 1L PsA Comm coverage




- Achieved ~80% 1L Commercial coverage for Otezla, setting Otezla for further growth given the likely long-term benefits
- Reversed the potential PsA coverage loss led from Prime moving under Ascent

[redacted]

### 2020 Part D coverage

Preferred
Non-preferred




- [redacted]

*Work competed Prior to May 2020*

[redacted]

# Vision for Humira LOE: [redacted]

## Takeaways on payer management

[redacted]

[redacted]

[redacted]

## Implications for Amgen

AMJEVITA

[redacted]

AMJEVITA

[redacted]

Enbrel etanercept

[redacted]

*Work competed Prior to May 2020*

# 2021-23 [redacted]

| Contracting year | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Internal triggers | [redacted] | | | |
| External triggers[1] | | | | |
| Overall contracting priorities | | | | |
| Enbrel | | | | |
| Otezla[2] | | | | |
| AMJEVITA | | | | |

1 Projection as of Feb 12 2020, and pending 2 We will situationally/ as appropriate consider [redacted] 3 As expected

*Work competed Prior to May 2020*

# 2021-23 [redacted]

[redacted]

[redacted]

Enbrel impact | Otezla impact | Likelihood

2021 — 2022 — 2023

**Enbrel exclusion** — Low - Med

[redacted]

**Enbrel 2L post Humira LOE** — Low - Med

[redacted]

[redacted]

**Otezla net price pressure** — Med

[redacted]

**Branded move against Otezla** — Low - Med

[redacted]



Amgen Proprietary & Confidential  Restricted

# Topics

Our journey in optimizing the Autoimmune access strategy

Aligning Payer strategy and Commercial choice in the Gen Med portfolio

# Significant changes taking place in the past couple of months are reshaping Gen Med's payer strategy stance

**PBMs/ Payers are** [redacted]

**CVS** (Zinc)

- **Launched Zinc**, a new GPO seeking to extract additional value from manufacturers beyond traditional rebates
- Took action against Repatha starting July 1, 2020; [redacted]

**Optum Rx & UHC**

- [redacted]
- [redacted]

**ESI** (Ascent)

- [redacted]
- [redacted]

**These shifts are driving a change in our Gen Med Payer Strategy**

**We therefore see a need to also examine our commercial choices under select payer strategy scenarios**

# Aligning Payer strategy & Commercial choice: 5-week project to prepare for leadership workshop in mid-July

**Problem statement:**

[redacted]

## Proposed workstreams and main deliverables

| Week of 6/15 | Week of 6/22 | Week of 6/29 | Week of 7/6 | Week of 7/13 |
|---|---|---|---|---|

**A** Outline a range of Payer Strategy options

**B** Assess how Commercial model could evolve across each option

**Leadership Workshop**

**C** Develop an integrated recommendation

[redacted]

[redacted]

[redacted]

# Core questions to explore in the effort

## Core questions

**A** **Outline a range of Payer Strategy options**

[redacted]

**B** **Assess how Commercial model could evolve across each option**

[redacted]

**C** **Develop an integrated recommendation**

[redacted]

# Proposed approach

| | A Outline a range of Payer Strategy options | B Assess how Commercial model could evolve across each option | C Develop an integrated recommendation |
|---|---|---|---|
| **Key activities** | Evaluate viable options of payer strategy scenarios across Gen Med portfolio<br>Assess likely competitive responses and payer actions in each scenario<br>Assess likely market dynamics in 2023 and impact on possible payer mgmt. of biosimilars<br>Model the potential financial impact for the 2020-2024 period for the full Gen Med portfolio | In each scenario of a successful payer strategy:<br>Evaluate the likely evolution of physician/patient dynamics<br>Identify the needed adjustments in commercial levers, e.g., physician engagement model, sales team size, supporting resources<br>Develop perspectives on [redacted]<br>Understand [redacted] | Conduct a strategic workshop with a focused team<br>Develop an integrated recommendation based on workshop output |

# How to accomplish our work

FOR DISCUSSION

### Core team

- Tom Moore (lead)
- Beverly Lu
- Anand Mandaliya
- McKinsey

### Proposed workshop attendees

- Murdo Gordon
- Corinne Le Goff
- GMs
- Kave Niksefat
- SPOs
- Brand EDs
- Finance
- Core working team

### Ongoing discussions with top [redacted]

- Likely to hear on [redacted]
- CVS negotiations to continue in July across brands
- ESI discussions on [redacted]

### How this work will integrate

- To be completed by end of July (with mid-July workshop)
- Will incorporate real-time feedback from accounts as it occurs in July



Amgen Proprietary & Confidential  Restricted

# Appendix

2021-23 [redacted]

Same as LRP

| | Enbrel etanercept | Otezla apremilast |
|---|---|---|
| Current LRP assumptions | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |

# 2021-23 [redacted]

## Likely market dynamics

[redacted]

## Implications for Amgen

[redacted]

**Largely maintain current contracting**

[redacted]

# Select highlights: [redacted]

[redacted]

**Payer/ competitor dynamics in inflammation prior to Summer 2020**

[redacted]

[redacted]

# 4 Deep-dive: Innovative contracting to deliver value

Initially prioritized

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

# EXHIBIT 39

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 4 |
| Total Messages: 1 | Date Range: 6/17/2020 |

## Outline of Conversations

**RSMF_AM000617_0054992** • 1 message on 6/17/2020 • Andy Chiu <+[redacted]> • Dave Menon <+1[redacted]> • Phone Owner <(000) 000-0000> • Tom Moore <+[redacted]

**Messages in chronological order** (times are shown in GMT +00:00)

**RSMF_AM000617_0054992**

TM Tom Moore <+[redacted] 6/17/2020, 2:36 PM

Armed him with fact Lynn can't push back[redacted]

# EXHIBIT 40




MAY 17, 2021

Amgen Proprietary - For Internal Use Only

## EXECUTIVE SUMMARY

- **Multiple drivers have pressured GTN in recent years:**
  - [redacted]
  - [redacted]
  - [redacted]
  - [redacted]
- **In 2020-2021, COVID has accelerated GTN trends that are unlikely to return to pre-COVID levels**
- **In the Commercial market, [redacted]**
- **Government business [redacted]**
- **Our post-2021 strategy must [redacted]s**

## Majority of Amgen's business is through Commercial (~[redacted] followed by Medicare B (~[redacted]

**Amgen Payer Mix - 2015**

[redacted]

**Amgen Payer Mix - 2020**

[redacted]

- For 2020, [redacted]



Amgen Proprietary - For Internal Use Only

Amgen

# GROSS-TO-NET EVOLUTION: US PORTFOLIO

[redacted]

Net Sales
GPO/ Hospital
Physician
PHS - Outpatient
Gov't - Fed
Commercial
Medicare Part D
Medicaid
Other

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| GPO / Hospital | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Physician | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| PHS | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Gov Fed | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Commercial | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Other | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Amgen Proprietary - For Internal Use Only

AMGEN




Amgen Proprietary - For Internal Use Only

Commercial

# IN THE COMMERCIAL SEGMENT, COVID-19 HAS CREATED NEAR-TERM GTN PRESSURES ACROSS STAKEHOLDER GROUPS THAT ARE UNLIKELY TO RETURN TO PRE-COVID LEVELS

## Patient

- More **consumer-driven health spending** decisions and awareness
- Increasing **comfort with lower cost benefit designs**, including narrow networks and higher cost sharing
- Less likely to push payer for exceptions for non-preferred therapies – **higher acceptance of payer restrictions**

## Employer

- Increasing leverage of multiple plan choices to **drive employees to lower cost, more restrictive benefit designs**
- **Widespread acceptance of copay maximizer and accumulator programs** as a cost-saving tactic
- Growing expectation of **full rebate pass-through**, pressuring PBM revenue model

## Payer / PBM

- Massive **consolidation & fierce competition amongst 3 Mega entities**
- Reduced drug utilization during COVID-19 contributing to **pressure on rebate guarantees**
- Higher expectations of **rebate pass-through** driving new revenue models e.g., RMOs
- Focus on **Specialty and Medical** benefit

## Provider

- **Lower patient throughput** reducing buy-and-bill revenue and driving provider discount pressures
- **Provider consolidation to higher discount segments** as smaller independent practices are acquired or close
- **Reduction in more profitable procedures** in hospital setting due to COVID-19 pressure on practice capacity and revenues

Amgen Proprietary—Internal Use Only



Amgen Proprietary - For Internal Use Only

Amgen Proprietary - For Internal Use Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

Commercial

## RAPID CONSOLIDATION HAS MADE HIGHER DISCOUNTS AVAILABLE TO MORE DOWNSTREAM CLIENTS; GREATER IMPACT OF LOSING COVERAGE




*Source: MMIT Portal Data (for Jan'2021)*
*Note: Health Exchange is considered as Commercial channel; Commercial Lives excludes Govt Channel (DoD, IHS, VA)*
** FEP uses Prime for Specialty products & Repatha, and CVS for Retail products*

Amgen Proprietary—Internal Use Only 7

Amgen Proprietary - For Internal Use Only

Label for small chunks as well
Exclude Govt

Amgen Proprietary - For Internal Use Only

Commercial

## ALL MAJOR PBMS HAVE BEEN INTEGRATED VERTICALLY, WITH 3 DIFFERENT BUSINESS MODELS




8

Amgen Proprietary - For Internal Use Only

AMGEN

13 October 2023

Commercial

## Payer responses to a post-COVID world were initially mixed, but now we see them leaning on traditional tools and tactics




IQVIA Payer survey, 2020. n=43






Rebate Guarantees Continue To Increase (But At A Slower Rate), While PBMs Also Create More Caveats Which Makes Fewer Claims Rebate Eligible. Our research indicates rebate guarantees for 2022 from the big PBMs continue to increase yr/yr despite lower inflation rates, the risk of biosimilars, and several primary care classes being largely maxed out from a gross to net standpoint

We believe part of the increase in rates are being offset by PBMs taking more liberty to pullback on rebate guarantees mid-contract and implementing more caveats which include making more claims ineligible for rebates (LDDs, diabetes test strips, claims at certain contract pharmacies) and requiring the plan sponsor to follow their recommendations in regards to drugs that are experiencing biosimilar competition

Amgen Proprietary - For Internal Use Only




Chart 3:
Wow. @KalderosInc estimates [redacted]

Amgen Proprietary - For Internal Use Only

Commercial

## BIG 3 ACCOUNTS IMPACT ON AMGEN - 2020

[redacted]

Source: LEDR + non-contracted demand via C&P



Amgen Proprietary - For Internal Use Only

AMGEN

Commercial

TODAY, [redacted]

[redacted]



Amgen Proprietary - For Internal Use Only

AMGEN

CONFIDENTIAL - ATTORNEYS EYES ONLY

## OUR ABILITY TO ENGAGE DIFFERENTLY WITH THESE MEGA ACCOUNTS WILL BE CRITICAL TO OUR SUCCESS IN THE YEARS AHEAD

- [redacted]

14

Amgen Proprietary - For Internal Use Only

AMGEN

Amgen Proprietary - For Internal Use Only

# EXHIBIT 41

[redacted]

# EXHIBIT 42

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

REGENERON PHARMACEUTICALS, INC.,

Plaintiff,

v.

AMGEN, INC.

Defendant.

C.A. No. 1:22-cv-00697-JLH

OUTSIDE COUNSEL ONLY

**REPLY REPORT OF FIONA SCOTT MORTON**
**April 15, 2024**

# TABLE OF CONTENTS


Page

1. ASSIGNMENT. ......................................................................................1

2. SUMMARY OF MAIN CONCLUSIONS. ..............................................1

3. DR. GAIER AND MS. GAN ERRONEOUSLY CRITICIZE [redacted] ..............................3

3.1 Regeneron and Amgen pursued different commercial and bidding strategies for PSCK9i products. ..............................4

3.2 Ms. Gan's and Dr. Gaier's attacks on Regeneron's commercial and bidding strategy are unfounded. ..............................6

3.3 Manufacturers strategically generate additional sales through high-cost advertising or large rebates. ..............................8

3.4 Amgen's experts fail to account for market realities and relative strengths and weaknesses when they criticize [redacted] ..............................10

3.4.1 *Amgen's higher entrenched market share reduces its incentive to bid aggressively for exclusivity, creating exclusive bid opportunities for Regeneron.* ..............................10

3.4.2 [redacted] ..............................11

3.5 Amgen's [redacted] is due at least in part to the uncertainty created by Amgen's patent infringement lawsuit. ..............................12

3.6 The initial success of Regeneron's commercial and bidding strategy prompted Amgen to devise its anticompetitive Cross-Therapeutic Bundling rebate strategy. ..............................15

3.7 Dr. Gaier's claim that Regeneron could have matched Amgen's anticompetitive Cross Therapuetic Bundle is wrong. ..............................18

4. AMGEN'S EXPERTS IGNORE EVIDENCE SHOWING THAT AMGEN'S CONDUCT RESULTED IN PRALUENT®'S FORECLOSURE AT ESI PART D, ESI/ASCENT COMMERCIAL, UHC COMMERCIAL,

OPTUMRX COMMERCIAL, CVS COMMERCIAL, CVS PART D, AND HUMANA PART D. ....21

**4.1** Amgen's experts do not address, and thus fail to rebut, [redacted] ....23

**4.2** Dr. Gaier fails to address the [redacted] ....27

**4.3** Dr. Gaier ignores the [redacted] ....34

**4.4** Dr. Gaier fails to rebut my conclusion that [redacted] ....38

**4.5** Dr. Gaier fails to address [redacted] ....42

**4.6** Dr. Gaier's cursory review of the Humana Part D negotiations does not [redacted] ....43

**5.** DR. GAIER'S AND DR. STIROH'S CRITIQUES OF MY FORECLOSURE ANALYSIS ARE UNAVAILING. ....44

**5.1** Amgen's foreclosure strategy goes beyond the directly affected formularies. ....44

**5.2** Dr. Gaier and Dr. Stiroh erroneously exclude the effect of spillover effects as a key aspect of Amgen exclusionary strategy. ....45

**5.3** Amgen's conduct increased Praluent®'s foreclosure because of within PBM spillover effects. ....49

**5.3.1** *Amgen's experts' critiques of my within PBM spillover effects suffer from conceptual errors.* ....49

**5.3.2** *Dr. Stiroh and Dr. Gaier ignore and misinterpret the evidence from my Opening Report to falsely claim that there are no within PBM spillovers.* ....50

**5.3.3** *Ms. Gan acknowledges the existence of within PBM spillovers.* ....53

**5.3.4** *Evidence provided by Amgen's experts confirms that within PBM spillover effects exist.* ....54

**5.3.5** [redacted] ....60

**5.4** My prescriber-level spillover estimates are not affected by Amgen's experts' criticisms. ....63

**5.4.1** *Dr. Gaier's and Dr. Stiroh's criticisms of my illustrative example ignore the complementarity of my econometric analysis.* ....63

**5.4.2** *Dr. Gaier and Dr. Stiroh ignore the standard approach in an econometric literature.* ....65

**5.4.3** *The internal documents concerning spillover effects relied upon by Amgen's experts are either irrelevant or confirm my estimates.* ....68

**5.5** Foreclosure estimates should include certain other excluded formularies at the affected PBMs. ....69

**5.6** Ms. Bates's spillover analysis is not inconsistent with PBM spillover effects. ....70

**5.7** There is no double counting in my spillover estimates. ....71

**5.8** My analysis does not determine that mere exclusion equates to foreclosure. ....72

**5.9** Dr. Gaier's understanding of foreclosure is incorrect. ....73

**6.** AMGEN'S EXPERTS FAIL TO ACCOUNT FOR THE [redacted] ....74

6.1 Dr. Gaier incorrectly conclude that Praluent®'s foreclosure would not persist in the long term and increase if Amgen's conduct continues. ....76

7. DR. GAIER'S CLAIM THAT PRALUENT® IS NOT AN EFFICIENT COMPETITOR IS UNAVAILING. ....77

8. AMGEN'S EXPERTS MISCHARACTERIZE THE ECONOMICS OF FORECLOSURE IN THIS CASE. ....80

8.1 Amgen's "one-monopoly-rent critique" has no relevance in the PCSK9i market. ....80

8.2 Amgen's experts make numerous errors because they do not model or understand how competition operates in the PCSK9i market. ....85

8.3 Dr. Gaier fails to correctly compute average variable costs in his predatory pricing tests. ....96

8.4 [redacted]

8.5 Amgen's CTB strategy was an effective way to foreclose competition from Regeneron. ....101

9. DR. GAIER'S SO-CALLED "*PEACEHEALTH*" ANALYSIS IS INCORRECT. ....101

9.1 In his analysis at ESI/Ascent, Dr. Gaier allocates [redacted] for its CTB to the incorrect set of products. ....101

9.2 Dr. Gaier uses an incorrect definition for Amgen's incremental costs that characterizes Amgen's sales and marketing expenses as a fixed cost. ....107

10. AMGEN'S CROSS-THERAPEUTIC BUNDLES HAVE HARMED CONSUMERS. ....111

10.1 The CTBs were punitive and anticompetitive rather than incremental, and therefore did not benefit customers. ....111

10.2 Amgen's CTBs, and not deficiencies in Regeneron's strategic decisions, led to weakened competition and raised net prices to PBMs and customers. ....113

10.3 Rebates would have been higher and net prices lower absent Amgen's anticompetitive CTBs. ....114

**10.4** Amgen's conduct weakens or eliminates competitive constraints now as well as in the future and therefore harms consumers. ....................... 122

**10.5** Leqvio® has not affected Repatha® and Praluent®'s sales and clearly does not constrain the price of Repatha®. ....................................... 124

**10.6** As Repatha®'s entrenched market share increases, Regeneron's competitiveness diminishes, and Amgen offers lower rebates; therefore, consumers are harmed increasingly. ............................................ 127

**10.7** Ms. Gan's procompetitive justification for CTBs of reducing risk makes no economic sense. ............................................................... 128

**11.** DR. STIROH FAILS TO SHOW THAT AMGEN DOES NOT HAVE SIGNIFICANT MARKET POWER IN THE SALE OF ENBREL® AND OTEZLA®. ........................................................................................ 129

**11.1** Evidence about monitoring and evaluating therapeutic alternatives in uninformative about market power. ........................................................ 131

**11.2** The outlier change in formulary status for Enbrel® at Optum/UHC in 2014/2015 is not evidence of a lack of substantial market power. ............ 132

**11.3** Competition has not resulted in other products displacing Enbrel® and Otezla® for preferred positions on formularies. .................................... 133

**11.4** Competition has not eroded net prices for Enbrel® and Otezla®. ................ 140

**11.5** The high and increasing margins for Enbrel® and Otezla® are indicative of significant market power. ....................................................... 147

**11.6** Dr. Stiroh has not defined proper antitrust product markets for assessing market shares for Repatha®, Enbrel®, or Otezla®. ...................... 150

**12.** APPENDIX A ........................................................................................ 153

**12.1** Drug manufacturers submit bids to the PBM .............................................. 154

**12.2** The PBM makes offers to drug manufacturers ............................................ 155

**12.3** Summary ....................................................................................... 157

**1. Assignment.**

1. I have been asked by Counsel for Regeneron Pharmaceuticals, Inc. ("Regeneron") to respond to the rebuttal reports of Amgen's experts, and in particular, Dr. Eric Gaier and Dr. Lauren Stiroh. Specifically, I have been asked to: (1) address criticisms of Regeneron's commercial strategy for the sale of Praluent® prior to Amgen's exclusionary conduct; (2) address criticisms of my foreclosure analysis, including my spillover foreclosure analysis; (3) address Dr. Gaier's application of the discount attribution test from the case *Cascade Health Solutions v. Peacehealth* and address his analysis of whether Praluent® is an efficient competitor; (4) address their analyses about a lack of harm to consumers and competition from Amgen's exclusionary conduct; and (5) address criticisms of my assessment of Amgen, Inc.'s ("Amgen") substantial market power in the marketing and sale of Enbrel® and Otezla®.

**2. Summary of main conclusions.**

2. Based on my continued review of the evidence in this case including new evidence that has come to light since I submitted my Opening Report, my understanding of the pharmaceutical industry, my economic expertise, and my review of the rebuttal reports of Amgen's experts, it remains my opinion that Amgen successfully engaged in exclusionary conduct to monopolize the U.S. PCSK9i market. Amgen's Cross Therapeutic Bundle ("CTB") rebate strategy leveraged the substantial market power of its auto-immune drugs Otezla® and Enbrel® by offering rebates conditional on Repatha® coverage that were used to exclude Praluent® from PBM formularies. Amgen's conduct harmed consumers (*i.e.*, the patients and plan sponsors who pay for PCSK9i products), the competitive process, and Regeneron. Nothing in the Amgen expert reports has led me to change any of the opinions expressed in my Opening Report.

3. My conclusions are based on the evidence and analysis that is laid out in my Opening Report and the following sections of this Reply Report.

**Section 3** responds to Amgen's experts' claims that Praluent®'s lack of success in the PCSK9i market was due to [redacted] I reiterate and expand on the discussion and evidence presented in my Opening Report that (i) Praluent®'s lower legacy share of the PCSK9i market at the time that Regeneron assumed full control over U.S. sales and market was due in part to Amgen's attempt to exclude Praluent® through patents that were ultimately invalidated; (ii) [redacted] (iii) Regeneron's strategy was proving successful prior to Amgen's use of CTB; and (iv) that very success was the impetus for Amgen to adopt its exclusionary CTB strategy.

**Section 4** first discusses why Amgen's experts are wrong to claim that there was no CTB if it was not included in the executed contact between Amgen and PBMs, ignoring that

there are aspects to the agreements between Amgen and PBMs that were not part of the final contract. I then review and expand on the evidence that [redacted] between Amgen and ESI Part D, ESI/Ascent Commercial, UHC Commercial, OptumRx Commercial, CVS Commercial, CVS Part D, and Humana Part D.

**Section 5** responds to Amgen's experts' criticisms that the inclusion of spillovers in my estimate of the fraction of the market that is foreclosed to Regeneron is inappropriate and that my estimates of spillovers are erroneous. I explain that the spillovers observed in the market are a direct consequence of Amgen's exclusionary conduct and are properly included when determining the extent of foreclosure. I also explain why Amgen's experts are mistaken in their criticisms of my foreclosure estimates, and provide additional evidence that supports those estimates.

**Section 6** updates my estimates of foreclosure shares to reflect additional evidence uncovered since filing my Opening Report that [redacted]. [redacted]

**Section 7** shows that Dr. Gaier makes key errors when claiming that Praluent® is not an equally efficient competitor of Repatha® because he mischaracterizes the relationship between marketing expenditures, entrenched shares of demand, and economic efficiency. I show that Praluent® is, in fact, a more efficient competitor than Repatha®, which is the basis for why its strategy of bidding for exclusive formulary placement was successful prior to Amgen's use of CTBs. I also explain why Dr. Gaier is wrong to suggest that Regeneron could have responded to Amgen's CTB by jointly offering a hypothetical Praluent®/Dupixent® bundle with Sanofi.

**Section 8** explains that Amgen's experts misunderstand how the CTB operates as a raising rival's costs foreclosure strategy and demonstrates why the CTB strategy was effective at foreclosing Praluent®. I first show why Dr. Gaier's invocation of the "one-monopoly-rent critique" does not apply in this market since PCSK9i pharmaceutical manufacturers make positive gross profits that can be appropriated through foreclosure. I then use an example offered by Dr. Gaier to explain why his analysis is incomplete and why the CTB strategy would be effective at foreclosing Praluent® and would raise purchaser costs. Finally, I show that the same foreclosure logic applies even when the CTB requires only parity placement, rather than exclusive placement, for Repatha®.

**Section 9** shows that Dr. Gaier wrongly applies the *PeaceHealth* test for predation to Repatha®'s prices. He makes three principal mistakes: (i) he incorrectly applies the value

of CTB rebates to both Repatha® and Otezla®, which is contrary to the logic of the *PeaceHealth* test and also to how Amgen itself analyzes CTB rebates in their own documents; (ii) he ignores the opportunity costs arising from Repatha®'s sales even when excluded from a formulary; and (iii) he mischaracterizes sales and marketing as a fixed cost, contrary to Amgen's own documents.

**Section 10** responds to Amgen's experts' assertions that Amgen's use of CTBs has not led to harm to consumers or harm to competition. Dr. Stiroh claims that if CTBs rebates were not incremental, then the rebates could not affect Amgen's ability to compete. However, as I show in both my Opening and Reply Reports, rebates on Enbrel® and Otezla® were not incremental but were instead used as a threatened cost to PBMs if they made Praluent® exclusive. In response to criticisms, I elaborate on the explanation in my Opening Report about why Amgen CTBs weakened competition and led to higher prices to PBMs and their member health plans. I also explain why the harm to consumers increases as Praluent® is increasingly foreclosed from the market. Finally, I show that the only procompetitive justification offered by any of Amgen's experts for the CTB strategy makes no economic sense, leaving foreclosure as the only plausible explanation for Amgen's CTB strategy.

**Section 11** responds to Dr. Stiroh's assertion that Enbrel® and Otezla® do not have significant market power. While Dr. Stiroh points to some rivalry for market share, I explain why such rivalry does not distinguish whether or not firms have market power in setting prices. I also show that Dr. Stiroh's claim that PBMs constrain Enbrel® and Otezla®'s market power by removing (or threatening to remove) them from formularies is contradicted by evidence that both products have broad and increasing coverage on formularies and that the net prices for both have stayed essentially constant, and their margins have increased, despite the approval of numerous new drugs used to treat the same indications as Enbrel® and Otezla®.

## 3. Dr. Gaier and Ms. Gan erroneously criticize Regeneron for choosing a different commercial strategy than Amgen prior to Amgen's exclusionary conduct.

4. Dr. Gaier and Ms. Gan's argue that Praluent®'s foreclosure from the PCSK9i market is not due to Amgen's exclusionary conduct, but is instead related to Regeneron's commercial strategy for Praluent®.

5. As described in my Opening Report, [redacted].[1] I further described that Regeneron chose [redacted] that was both rational and profitable prior to Amgen's exclusionary conduct, in light of the challenges it faced in the market in the wake of Amgen's unsuccessful patent litigation.[2] [redacted]

[1] Scott Morton Amended Opening Report, ¶¶ 63-64.
[2] *Id.*, ¶ 64.

[redacted]

6. Amgen's experts attempt to blame Regeneron for the market foreclosure it has suffered, claiming that [redacted] They further claim that I failed to account for the impact of Regeneron's "risky" strategy. As explained in detail below, contrary to the Amgen's experts' claims, the strategy chosen by Regeneron was both rational and successful prior to Amgen's exclusionary conduct, and in fact, the very success of Regeneron's strategy is what drove Amgen to deploy its anticompetitive CTB rebates.

### 3.1 Regeneron and Amgen pursued different commercial and bidding strategies for PSCK9i products.

7. [redacted][3] [redacted] hese rebates incentivized PBMs to drive sales of Praluent through the design of their formularies. I cited evidence that [redacted][4] I additionally explained that given the relative levels of non-contested share, Amgen would have less incentive than Regeneron to bid aggressively high rebate rates for exclusive formulary position, [redacted][5] My Opening Report went on to explain the economic intuition of this result: [redacted]

8. In contrast, Amgen pursued a high-cost marketing strategy targeted primary at prescribers (who do not pay for Repatha®) to prescribe Repatha® (irrespective of its

---

[3] *Id.*, ¶ 63.

[4] *Id.*, (citing in part AMG10935-0000013130 at 143: [redacted]") and note 111 [redacted] Also citing Dep. Tr. J. Ryan, Head of Rare Disease & Cardiometabolic Commercial Business Unit at Regeneron, 89:11-18 [redacted]

[5] Scott Morton Amended Opening Report, ¶ 220.

[6] *Id.*, ¶ 64.

price).[7] Amgen also incurred costs related to "national direct-to-consumer TV advertising."[8] As Ms. Gan points out, Amgen coupled this [redacted].[9] These costs made it infeasible for Amgen to offer the same low prices to PBMs that Regeneron could offer.

9. At a high level, Amgen's experts describe the differences between the commercial strategies employed by Regeneron and Amgen in similar terms. Ms. Gan highlights that "Regeneron and Amgen had markedly different market access strategies for their PCSK9i drugs."[10] [redacted] In contrast, Ms. Gan describes Amgen as pursuing "a market access strategy that generally sought [redacted]."[12] In short, Ms. Gan asserts that Amgen had a strategic "preference for [redacted]ns."[13]

10. Dr. Gaier similarly characterizes [redacted] In contrast, he characterizes Amgen's strategy as "focused on [redacted][15]

11. I agree with Ms. Gan that [redacted],[16] [redacted]

[7] Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 160:22-161:6 (Michelle Carnahan [redacted]

[8] Gan Rebuttal Report, ¶ 167; Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 153:16-154:3 [redacted]).

[9] Gan Rebuttal Report, § VII.A ("Amgen's Market Access Strategy Was to [redacted]").

[10] *Id.*, ¶ 102.

[11] *Id.*

[12] *Id.*, ¶ 103.

[13] *Id.*, ¶ 105.

[14] *Id.*, ¶ 228.

[15] *Id.*, ¶ 247.

[16] Dep. Tr. M. McCourt, Executive Vice President and Head of Commercial at Regeneron, 139:3-15 [redacted]

[redacted] I similarly agree with Dr. Gaier that [redacted]"[18] However, they both ignore the context of Praluent®'s less favorable formulary access [redacted] in 2020. At the time, Regeneron was confronted with a product that had been damaged in the marketplace due in large part to Amgen's efforts to enjoin the sale of Praluent® via the patent litigation between the two companies. [redacted] As I discuss further in this section, that strategy was successful as it led Regeneron to capture exclusivity at one of the largest PBMs in the U.S., CVS Commercial, and see its market share rise as a result.

12. Despite our mutual understanding of the different commercial strategies chosen by Regeneron and Amgen, [redacted] And despite claims made by Ms. Gan and Dr. Gaier to the contrary, Regeneron's decision to choose a different strategy than Amgen is something that I fully took into account in my Opening Report and is a core element of why Amgen's CTB is an effective exclusionary strategy.

### 3.2 Ms. Gan's and Dr. Gaier's attacks on Regeneron's commercial and bidding strategy are unfounded.

13. In my Opening Report, I opined that Amgen engaged in exclusionary conduct that substantially foreclosed Regeneron from the U.S. PCSK9i market.

---

[redacted]

[17] Dep. Tr. M. McCourt, Executive Vice President and Head of Commercial at Regeneron, 308:6-18 (Marion McCourt [redacted]).

[18] Gaier Rebuttal Report, ¶ 228.

[19] Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 163:22-164:15 ([redacted]).

In response, Amgen's experts Ms. Gan and Dr. Gaier blame Regeneron—not Amgen's exclusionary conduct—for Praluent®'s foreclosure from key PBM formularies and the resulting loss of sales. They claim that Regeneron's [redacted]

14. In particular, Ms. Gan criticizes Regeneron's commercial and bidding strategy, stating: [redacted] which created a risk that the PBMs would favor the drug (Repatha®) with greater visibility among physicians."[21] Possibly unaware of the antitrust implications of her view, Ms. Gan further characterizes Regeneron's strategy as "very high risk" because it could lead to price competition between Praluent® and Repatha® and lower profits for Regeneron and Amgen: "[s]uch a strategy potentially leads to a downward cycle in the marketplace where a manufacturer must pay increasingly high rebates for 1 of 1 positions and this can impact the profitability of both competitive products."[22] In other words, according to Ms. Gan, Regeneron's strategy was risky because it could set off procompetitive price competition rather than the high, stable oligopoly prices that Amgen preferred.

15. Turning to Dr. Gaier, he criticizes Regeneron's strategy as "inherently risky,"[23] claiming that it "ultimately undermined Praluent®'s sales."[24] As a part his criticism, he claims that Amgen's historic promotion of Repatha® to prescribers "has put Praluent® at a disadvantage" with respect to prescriber preference and that Regeneron exacerbated this disadvantage in two ways: (1) [redacted] "[25] [redacted][26] He concludes claiming that my "raising-rival's-costs foreclosure analyses ignore strategic choices made by Sanofi/Regeneron that ultimately

[20] Gaier Rebuttal Report, ¶ 230; Gan Rebuttal Report, ¶¶ 22, 118.
[21] *Id.*, ¶ 118. *See also*, *id.*, ¶ 102 (stating [redacted] Ms. Gan claims that Regeneron "[redacted].") And *id.*, ¶ 111.
[22] *Id.*, ¶ 113. Similarly, *see id.*, ¶ 22 ("[redacted], such as provoking reactions from competitors that lead to PBMs demanding escalating rebates, and in some cases, eventual profitability erosion."), *Id.*, ¶173 ("[redacted], comes with significant risks that include PBMs demanding escalating rebates and profitability erosion.").
[23] *Id.*, ¶¶ 229-230 (Gaier states: "As Ms. Norton [a former Vice President at Amgen] surmised, [redacted]).
[24] *Id.*, ¶ 230.
[25] *Id.*, ¶ 221.
[26] *Id.*

[redacted]

16. While I agree with Ms. Gan that Regeneron's strategy for Praluent® [redacted]. As I explain below, their opinions fail to account for market realities and the relative competitive strengths and weaknesses of Praluent® and Repatha® which drove the two firms to choose different commercial and bidding strategies for their respective PCSK9i products. Contrary to the Amgen's expert's claims, the strategy chosen by Regeneron was both rational and successful prior to Amgen's exclusionary conduct, and in fact, the very success of Regeneron's strategy is what drove Amgen to deploy its anticompetitive CTB rebates.

### 3.3 Manufacturers strategically generate additional sales through high-cost advertising or large rebates.

17. When a pharmaceutical manufacturer develops a commercial and bidding strategy for a drug treatment in a drug class with few competing therapies, it must decide how to best to sell its product. At a high level, a pharmaceutical manufacturer can generate sales quantity in one of two ways, or some combination thereof. First, a manufacturer could secure enough exclusive formulary coverage with a PBM whereby the PBM effectively drives sales to the manufacturer, including accounting for spillover at other non-exclusive formularies. Second, a manufacturer could build demand for its product by directly marketing to doctors and/or patients, eschewing the need for the manufacturer to secure an exclusive formulary position.

18. Both approaches impose costs on a manufacturer but in different ways.[28] With the first approach, the manufacturer must bid high rebate rates, which can be thought of as a cost that ultimately reduces its net revenue. With the second approach, the manufacturer must incur the cost of direct sales and marketing to doctors and/or patients, which also reduced net revenue.[29]

---

[27] *Id.*, ¶ 29.

[28] From the point of view of the PBM, the two approaches have different tradeoffs. For the first approach, the PBM receives a higher rebate rate but incurs additional costs related to steering patients to the exclusive treatment. For the second approach, the PBM receives a lower rebate rate but avoids steering costs by giving both products preferred status.

[29] Dep. Tr. J. Anderson (Caremark Part D 30(b)(6)), 85:5-19 [redacted].

19. As may be obvious, [redacted] Contrary to the claims made by Ms. Gan and Dr. Gaier,[31] neither approach is inherently wrong or risky, and an approach that makes economic sense for one manufacturer may not make sense for its rival. In fact, a [redacted]. This is in fact what Regeneron did.[32] This [redacted] employed by Regeneron was a rational and profitable strategy until Amgen engaged in exclusionary conduct.

20. Ms. Gan's and Dr. Gaier's assessment that Regeneron's strategic decision [redacted] was a "risky" strategy ignores [redacted] In May 2021 meeting notes from a dinner, recorded by Jennifer Norton, former Amgen Vice President of U.S. Value & Access, Ms. Norton recounts what she was told by two senior CVS executives: "you don't need a sales force (or DTC [Direct-to-Consumer advertising]), convert that expense into discount[.]"[33] In other words, the advice from CVS Health was to adopt a commercialization strategy [redacted].

21. One of the two CVS executives present during that dinner meeting, Joseph Anderson, Vice President of Trade Relations for CVS Part D, testified that he would not be surprised if they had told Amgen that night to "just increase[e] their rebates and get[] rid of their sales force to do so" because in his words:

> As a PBM, we often think that manufacturers spend money unnecessarily on things like direct-to-consumer advertisements or unnecessarily large sales forces to call on doctors, and we would

[30] Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 160:22-161:6 [redacted]

[31] *See* Gan Rebuttal Report, ¶¶ 22, 102, 109, 118; Gaier Rebuttal Report, ¶¶ 228-30.

[32] Dep. Tr. M. McCourt, Executive Vice President and Head of Commercial at Regeneron, 143:11-145:21, 227:6-12, 288:14-290:18, 285:6-18 [redacted]

[33] AMG10935-0000012779 at 779. The two CVS Health executives present at the dinner with Amgen were Joseph Anderson, CVS Heath Vice President of Trade Relations, and Gary Loeber, CVS Health Executive Vice President Pharmaceutical Contracting and Purchasing.

much prefer that they take the money that they invest in those things and turn them into lower net costs for our clients.[34]

22. Such advice demonstrates that Regeneron's strategy was well-founded in the understanding of incentives and costs in the pharmaceutical industry. And moreover, that such a strategy was likely to be popular with PBMs, the critical consumers.

23. In the next section, I describe how Amgen's experts failed to account for market realities and relative strengths and weaknesses when they criticized Praluent®'s decision to [redacted]

### 3.4 Amgen's experts fail to account for market realities and relative strengths [redacted].

#### 3.4.1 *Amgen's higher entrenched market share reduces its incentive to bid aggressively for exclusivity, creating exclusive bid opportunities for Regeneron.*

24. When a product is excluded from a formulary, it continues to make some sales through that PBM for those patients who do not switch for whatever reason to another product that is on the formulary. Such sales are often referred to as entrenched sales or non-contested sales, and they typically are sold without any manufacturer rebate (i.e., they are effectively sold at list price).[35] As a result, these sales tend to be expensive for the PBM and on the flipside have high margins for the manufacturer.

25. As I explained in my Opening Report and more fully below in Section 8.2, differences in entrenched share between Amgen and Regeneron help explain why each firm chose different commercial and bidding strategies for their respective PSCK9i products.[36] In fact, Dr. Gaier describes (and indeed emphasizes) the impact of these entrenched shares on PBMs decisions, but completely misses that they also impact profit maximizing bidding strategies for Amgen and Regeneron.

26. As detailed in my Opening Report, [redacted].[37] From Amgen's point of view, its larger entrenched share represents an opportunity cost when it bids for exclusive formulary position. To see why,

[34] Dep. Tr. J. Anderson (Caremark Part D 30(b)(6)), 84:21-85:11 ("[redacted]).

[35] I note here that Dr. Gaier appears to have a broader definition of "entrenched share." *See* Gaier Rebuttal Report, ¶ 275 ([redacted]

[36] Scott Morton Amended Opening Report, ¶ 220.

[37] *Id.*, ¶¶ 189, 220.

consider that Amgen will retain its entrenched share even if its exclusive bid is rejected, resulting in its exclusion from the formulary. And importantly, it will retain those sales at an undiscounted list price. If Amgen were to offer and win a higher rebate in exchange for exclusivity, that rebate would apply to both its entrenched volume and any incremental volume it gains from exclusivity. In other words, Amgen recognizes that winning exclusivity with a high rebate bid means foregoing the revenue that could have been earned from its high-priced entrenched volume. In economics terms, this represents an opportunity cost for Amgen that disincentivizes Amgen from bidding aggressively for exclusive formulary position.

27. Amgen's higher entrenched market share is due at least in part to the uncertainty about Praluent®'s ongoing availability created by Amgen's patent infringement lawsuit.[38] While Amgen's patents were eventually invalidated by the U.S. Supreme Court, this patent-related uncertainty lasted for years and negatively impacted the sales of Praluent®, and as such this helps explain why Repatha® has a higher entrenched share. Any entrenched share Amgen acquired via patent-related uncertainty has nothing to do with marketing investments made by Amgen. [39]

28. While Regeneron [redacted]

**3.4.2** [redacted]

29. When two similar drug treatments are in a parity formulary position, a large share of patients are effectively up for grabs from the point of view of drug manufacturers. This is because unlike an exclusive formulary situation where the PBM

[38] Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 171:13-25 ([redacted]).

[39] Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 178:8-24 ("[redacted]); REGN0005207 (Carnahan Exhibit 10) (May 2019 email from Martin Bick to Marion McCourt explaining that Humana's move to Repatha® exclusive was "not based on the discount rate but concerns over patent litigation.").

[40] For the same reason that Repatha®'s entrenched share is artificially high, Praluent®'s entrenched share is artificially low due to the uncertainty about Praluent®'s ongoing availability created by Amgen's patent infringement lawsuit.

[41] Scott Morton Amended Report, ¶ 220 (stating "Praluent®'s lower non-contested share of the market … gave Regeneron more incentive to bid for an exclusive formulary position.").

actively steers patients to the low-cost exclusive drug by enforcing its formulary rules and utilization management protocols, with parity the PBM typically does not use such tools to steer patients to one drug or the other. That leaves it to the two manufacturers with equivalent formulary positions to influence HCPs and patients to choose their specific drug treatment.

30. To influence HCPs and patients in situations where they do not have formulary exclusivity, manufacturers can engage in various forms of advertising. In the PCSK9i market, Amgen—as part of its strategy to generally pursue parity positions[42]—has [redacted].[43] This higher advertising spend helps Amgen acquire a larger share of the large number of patients that are up for grabs in parity.[44] As Ms. Gan acknowledges, [redacted][45] In other words, Amgen preferred parity positions where it could win a higher share of up-for-grab patients while offering a relatively low rebate to PBMs. This importantly contributes to why Amgen tended to pursue parity formulary positions, and why [redacted]

### 3.5 Amgen's higher entrenched market share is due at least in part to the uncertainty created by Amgen's patent infringement lawsuit.

31. Dr. Gaier observes that "beginning in 2017" Praluent®'s share of PCSK9i prescriptions fell from about [redacted] He asserts that this "can be explained, in significant part, [redacted] Dr. Gaier omits that until 2019, Sanofi and Regeneron had a large combined sales force detailing Praluent® and that at the time, Amgen's patent infringement suit created market uncertainty concerning the future availability of Praluent®, which depressed Praluent®'s sales. The uncertainty about future availability, reinforced by Amgen in its marketing efforts, tended to make patients, health care prescribers, and PBMs less likely to

[42] Gan Rebuttal Report, ¶¶ 103, 105 (stating that Amgen pursued "a market access strategy that generally sought parity positions and less cumbersome utilization management controls[.]").
[43] Gaier Rebuttal Report, ¶¶ 28, 222-23.
[44] [redacted]).
[45] Gan Rebuttal Report, ¶ 170 [redacted]
[46] Gaier Rebuttal Report, ¶ 89.
[47] *Id.*, ¶ 286.

choose Praluent over Repatha.[48] In fact, a 2017 Regeneron presentation cited by Ms. Gan shows that Regeneron attributed Repatha®'s higher market share at the time to multiple factors including the "patent dispute."[49] Other contemporaneous evidence that Dr. Gaier does not contend with reflects Amgen's patent suit being a factor in formulary coverage decisions for PBMs[50] as well as a concern for Sanofi, which manufactured and sold Praluent® in the U.S. at the time.[51] Similarly, evidence that Dr. Gaier ignores indicates that Amgen sales reps used uncertainty created by the patent litigation to warn HCPs about prescribing Praluent®.[52]

32. As described below, the evidence that Dr. Gaier did address shows that the patent-related uncertainty did in fact negatively impact the sales of Praluent®, and as such this helps explain why Repatha® has a higher entrenched share.

33. As I explained in my Opening Report, Amgen's strategy to monopolize the U.S. PCSK9i market began in October of 2014 when Amgen sued Regeneron in Federal District Court in the District of Delaware seeking to enjoin the manufacture and sale of Praluent® in the U.S.[53]

---

[48] Dep. Tr. M. McCourt, Executive Vice President and Head of Commercial at Regeneron, 106:2-107:8 ("…I believe it might be a reference to there was a window of time where through discussions with Amgen certain payers and even sometimes physicians in their offices were being told that because of Amgen's legal action that Praluent would be potentially taken off the market, and that of course never happened, it wasn't true, you know, the trials progressed, but I believe that's what he was referring to there."); Dep. Tr. M. Carnahan, former North America Head of General Medicine at Sanofi, 171:13-25 [redacted]

[49] REGN0268650 [redacted]

[50] REGN0031281 at 281 [redacted]

[51] *See* Decl. M. Carnahan, *Amgen v. Sanofi*, No. 14-1317-RGA, Dkt, 956, p. 6-7 (Apr. 15, 2019) [redacted]).

[52] Scott Morton Amended Expert Report, note 335. *See also*, Dep. Tr. S. Hyde (Regeneron 30(b)(6), 40:4-9 [redacted] Dep. Tr. L. Schleifer, 42:19-43:4 ("We had been victimized by Amgen's patent lawsuit, which was a way overbroad patent, in my opinion, and they -- when they won some initial rounds, they went around -- from what I heard from our field team was that they were telling people that why would you prescribe PRALUENT because PRALUENT's coming off the market. And so that was a big, big overhang for us. And so we were swimming upstream from that.").

[53] Scott Morton Amended Opening Report, ¶¶ 50, 227.

34. As a part of that patent litigation, in January 2017, a U.S. District Court ruled against Regeneron's Praluent® and granted Amgen a "permanent injunction for infringement of Amgen's Repatha® Patents."[54] To announce the favorable ruling, Amgen's Chairman and CEO, Robert A. Bradway, was publicly quoted in an Amgen press release saying: "We are pleased with today's decision that recognizes Amgen is entitled to an injunction against further infringement of our patent rights."[55] Such a ruling would be expected to create uncertainty among prescribers, patients, and PBMs about whether Praluent® would continue to be available prescription.[56] As shown in Dr. Gaier's Figure 10 (reproduced below as Figure 1), the date of this important January 2017 ruling in the patent litigation (identified in the chart as one of the blue circles with an "L" indicating a "key legal decision" in the patent case) coincides with when the net sales of Praluent® and Repatha® began to significantly deviate (i.e., the first quarter of 2017). As Dr. Gaier had noted, beginning in 2017 Praluent®'s share began to fall while Repatha®'s share increased.[57] Prior to that time, as Figure 1 shows, the two products had grown at roughly the same rate and virtually mirrored one another in terms of sales since they launched in the second half of 2015 in the U.S.

35. In another phase of the patent litigation, in February 2019, a jury in a second trial delivered a favorable verdict for Amgen that upheld the validity of two patents. Again, Amgen's Chairman and CEO, Robert A. Bradway, was publicly quoted in an Amgen press release saying: "Today's decision protects intellectual property … We are thankful that the jury weighed the evidence carefully and recognized the validity of Amgen's patents."[58] Dr. Gaier's Figure 10 at Q1 2019 also appears to show that this important favorable patent ruling for Amgen contributed to a further drop in Praluent®'s net sales.

---

[54] "Court Grants Permanent Injunction For Infringement Of Amgen's Repatha® Patents," Amgen Press Release, January 5, 2017, available at https://www.amgen.com/newsroom/press-releases/2017/01/court-grants-permanent-injunction-for-infringement-of-amgens-repatha-patents.

[55] *Id.*

[56] *See* Scott Morton Amended Opening Report, note 335; REGN0268650 at 653; Dr. M. Doyle, Patent Case Hearing Testimony Tr., 367:6-16 ("Q. Did there come a time when you switched this patient off of Praluent? A. Yes. Just about that time an Amgen sales rep did lunch for our clinic, detailing Repatha and announced to us that there was an injunction, that patients – Praluent would no longer be available and I would be faced with switching my patients from Praluent to Repatha. With that in mind I thought of my whole practice where that would be a problem, but this particular patient who had shown differential response, I thought it would be not good news for him.").

[57] Gaier Rebuttal Report, ¶ 89.

[58] "Jury Upholds Amgen's Patents on Repatha® (evolocumab)," Amgen Press Release, Feb. 25, 2019, available at https://investors.amgen.com/news-releases/news-release-details/jury-upholds-amgens-patents-repathar-evolocumab.

**Figure 1: Gaier Rebuttal Report Figure 10.** [59]

**Figure 10. Regeneron summary of key events and net sales within the PCSK9i market, 2015–2020**

[redacted]

36. While Amgen's patent infringement claims were ultimately found to be invalid, the years-long uncertainty introduced by that ligation helps explain why Amgen has a higher entrenched share.

### 3.6 The initial success of Regeneron's commercial and bidding strategy prompted Amgen to devise its anticompetitive Cross-Therapeutic Bundling rebate strategy.

37. As described in my Opening Report and above, the strategy chosen by Regeneron was both rational and successful prior to Amgen's exclusionary conduct, and in fact, the very success of Regeneron's strategy is what drove Amgen to [redacted]. As detailed below, the benefits of Regeneron's strategy were evident prior to Amgen's [redacted]. Subsequent losses in Praluent®'s coverage were due to Amgen's exclusionary conduct, not deficiencies in Regeneron's marketplace offering. In fact, Amgen would have not needed to resort [redacted] if Regeneron's decision to curtail its sales and marketing as part of a low-cost, low price commercial strategy was an obvious failure that alone led to lost formulary coverage.

[59] **Sources:** Gaier Rebuttal Report, Figure 10.

38. My Opening Report provided evidence that Amgen believed Regeneron's commercial strategy would be profitable, and in fact more profitable than Amgen's strategy for Repatha®.[60] Dr. Stiroh's Figures 3 (Repatha®) and 5 (Praluent®) confirm Amgen's expectation. Figure 3 reports that Repatha® earned negative operating profits in each year from 2019 to 2022. In contrast, Figure 5 reports that Praluent® [redacted], but that its operating profit turned negative in 2022 as the impact of Amgen's anticompetitive conduct took hold. These results confirm the initial success of Regeneron's commercial and bidding strategy and also serve to undermine the claims made by Ms. Gan and Dr. Gaier that Regeneron's strategy was inherently "risky" while implying that the strategy pursued by Amgen was not.

39. Further evidence of Regeneron's initial success is evidenced by key PBM formulary placements that it secured.[61] By the beginning of 2020, Praluent® had gained traction at UHC, moving into a preferred tier status and gaining parity with Repatha®.[62] Then, effective April 2020, Anthem switched from being Repatha® exclusive to including both Repatha® and Praluent® at parity on its formulary.[63] Finally, starting in July 2020, Regeneron

---

[60] Scott Morton Amended Opening Report, ¶ 64 ("A 2020 Amgen strategy presentation observed that 'Regeneron strategy [is] pressuring net prices across all payer segments,' driving down Amgen's revenue and profits even when Regeneron is unsuccessful at improving formulary access. But the slides also recognized that Regeneron's strategy was a profitable one, with Regeneron projected to earn higher net profits on Praluent® sales than Amgen would earn on Repatha® sales in 2021. Amgen estimated that Praluent® profits would be about [redacted] million, versus about [redacted] million for Repatha®, despite Repatha® having nearly a [redacted]% share of unit sales.").

[61] When Regeneron took over the sale of Praluent® in the U.S. from Sanofi, the brand was already gathering good momentum with PBMs like ESI. "Regeneron and Sanofi to Lower Net Price of Praluent® (Alirocumab) Injection in Exchange for Straightforward, More Affordable Patient Access for Express Scripts Patients," Regeneron Press Release, May 1, 2018, https://newsroom.regeneron.com/news-releases/news-release-details/regeneron-and-sanofi-lower-net-price-praluentr-alirocumab ("- Agreement provides Praluent at lower net price and enables streamlined patient access based on physician attestation - Express Scripts to pass on savings to eligible patients from the participating commercial health plans - Express Scripts has selected Praluent as the exclusive PCSK9 inhibitor therapy on its National Preferred Formulary as of July 1, 2018"); "PCSK9 Therapy: An Example of Value-Based Care," Express Scripts Press Release, May 1, 2018, https://www.express-scripts.com/corporate/articles/pcsk9-therapy-example-value-based-care ("Beginning July 1, 2018, Praluent will be the exclusive PCSK9 inhibitor for plans enrolled in our Cholesterol Care Value program." Further states: "Today we announced a new agreement with Regeneron Pharmaceuticals and Sanofi, makers of the PCSK9 inhibitor Praluent® (alirocumab) Injection, that will greatly improve the affordability and accessibility of this medication for patients whose plans are enrolled in our Cholesterol Care Value Program, part of our SafeGuardRxSM suite of solutions. In the rhetoric around drug pricing, there has been much discussion about value-based care and how to make it happen. Today's announcement demonstrates that when you have drug makers and payers willing to work together to responsibly price a medication based on clinical and economic evidence, the result is true value-based care that leads to greater affordability, accessibility and outcomes for patients.").

[62] REGN0003326 (February 2020 announcement of Praluent®'s new position at UHC).

[63] *See* Gaier Rebuttal Report, Figure 10. *See also* REGN0341075-076 at 076 (June 8, 2020 internal email confirming approval of the Anthem parity announcement: "We would like to announce that Anthem Inc. has decided that the PRALUENT 75mg/mL Pen and 150mg/mL Pen will have improved status for Commercial patients. Effective April 1, 2020, Anthem Commercial moved PRALUENT to a Parity position with evolocumab as a Tier 3 formulary product.").

successfully secured exclusive coverage on the commercial and Part D formularies of one of the largest PBMs in the country, CVS/Zinc.[64]

40. Regeneron's initial success can also be seen in its market share leading up to mid-2020.[65] On August 28, 2019, a U.S. District Court invalidated Amgen's patent claims related to PCSK9i, providing Regeneron with a long-fought win that started to remove the existing uncertainty regarding the ongoing availability of Praluent®.[66] As shown in Figure 2 below, about a year after the favorable patent ruling, and with the exclusive coverage it had recently secured at CVS, Praluent®'s market share peaked in the 3rd quarter of 2020, and thereafter declined as the impact of Amgen's anticompetitive conduct took hold.[67] During this period, Praluent®'s share grew by over [redacted] percentage points from about [redacted] while Repatha®'s share declined by more than 6 percentage points from about 72% to 65.5%.

---

[64] Scott Morton Amended Opening Report, ¶ 89.

[65] [redacted] *See* REGN0108990 at 9008-10 ("2Q20 Commercial Q&A").

[66] "U.S. District Court Invalidates Amgen Patent Claims Targeting PCSK9," Regeneron Press Release, August 28, 2019, https://investor.regeneron.com/news-releases/news-release-details/us-district-court-invalidates-amgen-patent-claims-targeting.

[67] As a result of Amgen's conduct, Praluent® was foreclosed beginning in April 2020. *See* Scott Morton Amended Opening Report, ¶ 11.

**Figure 2: Quarterly Net Sales Market Shares, U.S.[68]**

[redacted]

41. As described in my Opening Report, but as Dr. Gaier notably does not address, Repatha® is a central pillar of Amgen's long-term strategy.[69] As a result, Regeneron's initial success surprised Amgen.[70] However, given Regeneron's different commercial strategy, Amgen did not want Repatha® to compete head-to-head with Praluent®.[71] Amgen wanted to avoid a "price war" or a "price battle" with Regeneron.[72] As a result, Amgen pivoted to its exclusionary practice of leveraging its much larger auto-immune products—Enbrel® and Otezla®—as part of a CTB rebating strategy.

### 3.7 Dr. Gaier's claim that [redacted].

42. Dr. Gaier also criticizes Regeneron's strategy for Praluent®, asserting that "Regeneron failed to offer its own bundled rebate, for example, [redacted] effectively arguing that Regeneron should have countered the Enbrel®/Otezla®/Repatha® CTBd rebates with

---

[68] **Notes:** [a] Market share for Praluent® is defined by Praluent® total net sales in the U.S. divided by Praluent®+Repatha® net sales in the U.S. [b]. Market share for Repatha® is defined by Repatha® total net sales in the specific region divided by Praluent®+Repatha® net sales in the U.S.; **Sources:** [1] Regeneron's 10K and 10Q filings for Fiscal Quarter 3 2015-Fiscal Quarter 4 2023. [2] Amgen's 10K for and 10Q filings Fiscal Quarter 3 2015-Fiscal Quarter 4 2023.

[69] Scott Morton Amended Opening Report, ¶¶ 34-37.

[70] *Id.*, ¶ 76.

[71] *Id.*, ¶¶ 62-65.

[72] *Id.*, ¶ 65.

[73] Gaier Rebuttal Report, ¶ 221 and § VIII.D ("Regeneron failed to offer its own bundle").

its own bundled offer.[74] In support of this argument, Dr. Gaier points to the large net product sales of [redacted][75] To the extent Dr. Gaier is positing that net product sales for [redacted] that [redacted] can somehow be accessed by Regeneron, he offers no explanation for why this would be true particularly given [redacted].[76]

43. Dr. Gaier goes on to suggest that [redacted]

44. [redacted]

---

[74] Dr. Stiroh makes no mention of [redacted]. Ms. Gan does not mention [redacted] other than in her discussion of the prevalence of cross-therapeutic bundles generally, where she mentions a presentation prepared by an external consultant to some individuals at Regeneron about a hypothetical [redacted] bundle. Gan Rebuttal Report, ¶ 122. Ms. Gan does not address [redacted]. None of Amgen's experts suggest that Regeneron can make bundled rebate offers with any drugs other than [redacted] and Praluent®. [redacted] *See* Dep. Tr. K. Niksefat (Amgen 30(b)(6)), 71:12-22 [redacted] *See also,* Amgen Opp. Prelim. Inj., *FTC v. Amgen and Horizon*, No. 1:23-cv-03053, Dkt. 130, p. 22 (N.D. Ill. Aug. 22, 2023,) ("But as uncommon as bundling is in the pharmaceutical industry, cross-benefit bundling as theorized by the Plaintiffs is simply unheard of.").

[75] Gaier Rebuttal Report, Figure 42.

[76] *See* Dep. Tr. S. Hyde, Vice President, Payers and GPOs at Regeneron, 262:17-24 [redacted]. *See also* Regeneron Annual Report (Form 10-K) (Dec. 31, 2022), https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000872589/000180422024000009/regn-20231231.htm [redacted]

[77] *Id.*, ¶¶ 259-260.

[78] *Id.*, ¶ 260.

[redacted]

47. A robust review of the evidence therefore shows that a hypothetical [redacted]. In reaction to Amgen's bundled rebate offer, ESI and its GPO Ascent commented that Regeneron could offer additional rebates on [redacted] apparently without any knowledge about the commercial relationship between [redacted].[84] Regardless, ESI's desire for Regeneron to somehow facilitate additional rebates on

[79] Express Scripts 1330 00003699 [redacted]

[80] AMG10935-0000016193.

[81] Gaier Rebuttal Report, ¶ 260 (quoting REGN0175080 at slide 33).

[82] Dep. Tr. S. Subramanian, Senior Director of Pricing and Contracting at Regeneron, 414:11-18.

[83] *See, e.g.*, AMG10935-0000140143 [redacted] AMG10935-0000524536-542 [redacted]

[84] *See* Express Scripts 1330 00002646 at 646 [redacted]); REGN0005850 at 850 [redacted]

[redacted]

48. Furthermore, CTB rebates are non-standard and mostly not accepted in the pharmaceutical industry.[86] And for good reason, as they are unlikely to provide any real economic efficiencies, while increasing barriers to entry for new and smaller manufacturers[87] and providing a mechanism for large firms with market power to anticompetitively foreclose rivals.

**4. Amgen's experts ignore evidence showing that Amgen's conduct resulted in Praluent®'s foreclosure at ESI Part D, ESI/Ascent Commercial, UHC Commercial, OptumRx Commercial, CVS Commercial, CVS Part D, and Humana Part D.**

49. As explained in my Opening Report, Amgen offered or provided anticompetitive CTBs to certain PBMs in order to secure formulary coverage for Repatha®.[88]

[85] *See* Dep. Tr. A. Bricker, former President of ESI, 90:16-91:10 [redacted]

[86] *See, e.g.*, Dep. Tr. J. Witter (Zinc 30(b)(6)), 72:19-21 ("[redacted]); 30(b)(6) Dep. Tr. UnitedHealthcareA. Hindman (UHC 30(b)(6))UnitedHealthcare, 101:18-102:1 ([redacted]; Dep. Tr. A. Chiu, Executive Director of Market Access at Amgen, 138:23-139:2 ("Q. And that Enbrel overlay three-year agreement with ESI commercial was the first-of-its kind agreement for Amgen? […] A. Based upon my knowledge, yes."); Dep. Tr. A. Bricker, former President of ESI, 96:11-16 ([redacted]); AMG10935-0000613768 at 768 (Zinc Health Services Commercial Prescription Benefit Management 2022 Annual Review Process bid matrix document reflecting that "No contingencies or negative impacts with respect to your other Products will be considered (i.e. no bundling)"; ZINC0000006 at 006 ([redacted].

[87] New entrants and other small manufacturers would need to merge or strategically partner with other firms in order to effectively compete. This would tend to increase concentration among pharmaceutical manufacturers, further reducing the level of competition. It also would likely lead to inefficient combinations of firms that would otherwise choose to remain independent.

[88] Scott Morton Amended Opening Report, § 5.

These anticompetitive CTBs artificially raised Regeneron's costs and ultimately foreclosed Regeneron's Praluent® from [redacted]% of the PCSK9i market as of January 1, 2024.

**Figure 3. U.S. PCSK9i Market Access as of January 2024.**[89]

[redacted]

50. Dr. Gaier argues that, for purposes of determining foreclosure and harm to competition due to the anticompetitive nature and consequences of Amgen's offers and agreements, the only evidence that should be analyzed is Amgen's executed contracts.[90] Dr. Gaier's reliance on one piece of evidence—the final, written contracts between Amgen and PBMs—to the exclusion of all other pieces of evidence in the record results in an analysis that fails to understand the economic effect of the agreements Amgen entered into or sought to enter into, or the understandings Amgen had, with key PBMs. Even Amgen's counsel has admitted in this case, contemporaneous evidence of negotiations including "texts," "emails going back and forth," and "internal documents," all of which can be used to "attempt to figure out what a contract means."[91] In addition, a key Amgen executive has, on more than one occasion, testified to an agreement between Amgen and a PBM that was not memorialized within the four corners of the final, written contract between the two.[92] As such, I find this basis for critique unpersuasive and

[89] **Notes**: See Table 1 for additional details. **Sources**: [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

[90] Gaier Rebuttal Report, § V.

[91] Teleconference Tr., March 19, 2024, 11:24-12:3.

[92] *See* Dep. Tr. K. Niksefat, Global Head of Rare Disease Marketing & Commercial Integration at Amgen, 158:24-159:6 ("What did you mean by 'right of first refusal'? A. I meant colloquially that we would get a phone call if they received a bid from Regeneron Inc. for Praluent that was contingent on removing Repatha from their formulary. Q. Was that contracted for? A. No, it was not."). *See also,* Dep. Tr. K. Niksefat (Amgen 30(b)(6)), 102:18-25 ("Again, I don't see that reflected in this particular document, but I do not have the entire scope of the contract nor all amendments

conclusory since Dr. Gaier does not even try to rebut any of the evidence on these issues included in my Opening Report.

51. Because Dr. Gaier has taken the position that only the final contracts between Amgen and each PBM reflect the agreements reached, for purposes of supporting my analysis, included below is the evidence that I relied upon to reach my conclusion that Amgen engaged in anticompetitive, exclusionary conduct that foreclosed Regeneron from [redacted] % of the U.S. PCSK9i market as of January 1, 2024 and, ultimately, harmed competition.

### 4.1 Amgen's experts do not address, and thus fail to rebut, the contemporaneous evidence showing that Amgen and ESI Part D agreed to exclude Praluent® from ESI Part D's formularies [redacted]

52. Dr. Gaier claims that because the contract between ESI Part D and Amgen does not reflect the Enbrel®/Repatha® bundle, I have inaccurately attributed Amgen's conduct to Regeneron's foreclosure at ESI Part D. In reaching that conclusion, however, Dr. Gaier fails to analyze the extensive record memorializing the [redacted]. The evidence I reviewed shows an [redacted]

53. As I explained in my Opening Report, in early February of 2020, Amgen provided ESI Part D with bid grids that included [redacted] as part of Amgen's efforts to [redacted]"[93] Throughout the ESI Part D 2020 negotiations, Amgen Executive Director of Market Access, Billy West, told ESI Part D representatives that [redacted]

---

to confirm that wasn't just subsequently done. But clearly at the time I was of the belief that the contract that we signed or the amendment that we signed included 2020, 2021 and 2022.").

[93] Scott Morton Amended Opening Report, ¶ 72 (citing AMG10935-0000087406-409 (Feb. 8, 2020 [redacted]" [redacted] id offer to ESI Part D: "[redacted])). *See also*, AMG10935-0000019498 at 498 (Feb. 8, 2020 Amgen email from Billy West, Executive Director of Market Access at Amgen: "We successfully delivered the rates to ESI tonight and [redacted]…Can I get [redacted]? I was [redacted]

and [redacted][94] [redacted] For example, Michael Rothrock, former ESI Part D Vice President of Pharma Strategy and Contracting, [redacted]

[redacted]

[94] Scott Morton Amended Opening Report, ¶¶ 72-73 (citing AMG10935-0000369614 at 615 (text message conversation between Amgen executives dated Feb. 22, 2020 stating "ESI has a [redacted] - we [redacted] AMG10935-0000414326 (West Exhibit 4) at 326 (text message conversation between Amgen executives and ESI Part D executive dated Feb. 24, 2020 stating [redacted]."); AMG10935-0000414549 (West Exhibit 3) at 549 (text message conversation between Amgen executive and ESI Part D executive dated Feb. 24, 2020; Amgen executive: [redacted]) (emphasis added)). *See also,* AMG10935-0000369906 at 907 (Feb. 24, 2020 text message from Billy West, Executive Director of Market Access at Amgen to Tony Grillo, Senior Director – Pharma Contracting and Strategy at ESI Part D: [redacted]); AMG10935-0000524587 at 588 (Feb. 24, 2020 text message from Andy Chiu, Executive Director of Market Access at Amgen: [redacted]

[95] Scott Morton Amended Opening Report ¶ 74 (citing Express Scripts 1330 00007167 (Kitson 30(b)(6) Exhibit 5) at 167-169 ([redacted].

[96] *Id.*

54. [redacted]—indeed, [redacted] Amgen's Billy West sent the following in an internal email:

> [redacted][97]

55. This understanding between Amgen and ESI Part D continued to align throughout the negotiations. In early March, Amgen internally messaged: [redacted][98] And by March 3, [redacted]

> **Amgen Message:** [redacted][100]

[97] AMG10935-0000010008 at 009 (Feb. 24, 2020 email from Billy West, Executive Director of Market Access at Amgen).

[98] AMG10935-0000370354 at 355 (Feb. 27, 2020 text message from Tom Moore, VP of Market Access, Marketing, Contracting, and Trade at Amgen; *see also*, Express_Scripts_1330_00007191 ([redacted].

[99] AMG10935-0000370662 at 663 (Mar. 3, 2020 text message from Tom Moore, VP of Market Access, Marketing, Contracting, and Trade at Amgen).

[100] Express_Scripts_1330_00002331 at 332 [redacted]).

56. [redacted] Noticeably omitted from the matrix was any mention of Repatha®—but this is not unexpected because ESI Part D repeatedly told Amgen that [redacted]"[102] and that ESI Part D would only "entertain" an [redacted][103] In response, Amgen was willing to agree to [redacted].[104]

57. As I explained in my Opening Report, even after the contracts Dr. Gaier relies on were executed, [redacted][105] Dr. Gaier's failure to consider and engage with the extensive evidence presented in my Opening Report and discussed again above underscores the overly narrow nature of his assessment and the unreliable and

---

101 Scott Morton Amended Opening Report, ¶ 74.
(citing Express_Scripts_1330_00002339 (Kitson 30(b)(6) Exhibit 6)).

102 *Id.* ¶ 73 (citing AMG10935-0000414326); *see also,* AMG10935-0000369922 at 923 (Feb. 24, 2020 text message from Billy West, Executive Director of Market Access at Amgen: "[redacted]) and continued on AMG10935-0000369930 at 931 ([redacted]).

103 Scott Morton Amended Opening Report ¶ 73 (citing AMG10935-0000414549 (West Exhibit 3) at 549-50 (text message conversation between Amgen executive and ESI Part D executive dated Feb. 24, 2020; Amgen executive: [redacted]") (emphasis added).

104 *Id.* ¶ 73 (citing AMG10935-0000414549 (West Exhibit 3) at 549 (text message conversation between Amgen executive and ESI Part D executive dated Feb. 24, 2020; Amgen executive: [redacted].")).

105 *Id.* ¶ 74 (citing Express_Scripts_1330_00002512 (Kitson 30(b)(6) Exhibit 8) at 512 ([redacted] Express_Scripts_1330_00007330 at 330 ([redacted]")).

conclusory nature of his findings. As such, my conclusion remains the same: the evidence I have reviewed shows that [redacted].

58. Finally, in one paragraph, Dr. Gaier claims that I "misconstrue the document" I cite because [redacted].[106] This mischaracterizes the reality of Amgen's agreement—Amgen sought to ensure that Repatha® was [redacted], which Amgen understood was likely to be awarded to Praluent® due to Regeneron's better offer.[107] Meaning, [redacted]®.

59. Amgen earns [redacted] Coupled with Amgen's expectation of spillover effects from ESI/Ascent's commercial formulary, and the prospect of deepening its entrenched share by preventing Praluent® from securing 1:1 coverage, it would have been palatable for [redacted] But it is important to note that [redacted]—with time, spillover and entrenched shares would compound and Amgen could then fully foreclose Praluent®. And, as it turns out, that's exactly what happened because by 2022 (and continuing to the present) ESI Part D is largely Repatha® 1:1.

**4.2 Dr. Gaier fails to address the [redacted]**

60. Dr. Gaier's analysis of the ESI/Ascent [redacted] ignores important evidence surrounding the ESI/Ascent Commercial contract, including

[106] Gaier Rebuttal Report, ¶ 105.

[107] *See* AMG10935-0000370146-70 (Feb. 25, 2020 text message chain between Billy West and Tom Moore: AMG10935-0000370146 at 147: [redacted]" AMG10935-0000370148 at 149: "[redacted]" AMG10935-0000370150 at 151: [redacted] AMG10935-0000370152 at 153: "[redacted]" AMG10935-0000370154 at 155: "[redacted]" AMG10935-0000370156 at 157: "[redacted]"" AMG10935-0000370158 at 159: "[redacted]" AMG10935-0000370160 at 161: "[redacted] AMG10935-0000370162 at 163: "[redacted]" AMG10935-0000370164 at 165: "Crucial info" AMG10935-0000370166 - 167: "[redacted]." AMG10935-0000370168 at 169: "Because of the Cigna [a]cutairues?" AMG10935-0000370170 at 171: [redacted]).

contemporaneous internal Amgen and ESI/Ascent Commercial documents. This evidence, which Dr. Gaier does not address, demonstrates that Enbrel® and Otezla® base rebate increases, in addition to the [redacted]

61. As explained in my Opening Report, in May 2020, Amgen first offered an [redacted] to ESI/Ascent Commercial[108] in which Enbrel® and Repatha® base rebates and a [redacted][109] As detailed in ESI/Ascent internal documents, [redacted][110] By June 15, less than two weeks before the ESI/Ascent Commercial agreement was executed, ESI/Ascent internal documents show that [redacted][111] [redacted]"[113] [redacted]

[108] *See* Scott Morton Amended Opening Report, § 5.4. Ascent/ESI Commercial refers to both ESI's Government commercial formulary, which was negotiated by ESI, and the ESI's commercial formulary, which was negotiated by its GPO Ascent and ESI.

[109] Express_Scripts_1330_00007337 at 337 ([redacted]); *see also*, Express_Scripts_1330_00002959 at 960 ([redacted]); Express_Scripts_1330_00004548 ([redacted].

[110] Express_Scripts_1330_00002544 at 2544 ([redacted].

[111] Express_Scripts_1330_00003699 at 699.

[112] *Id. See also*, Dep. Tr. A. Bricker, former President of ESI, 115:15-116:18 ("[redacted])

[113] *Id.*

[114] Express_Scripts_1330_00002636 [redacted] *see also*, Express_Scripts_1330_00002568 at 568 ([redacted]); Express_Scripts_1330_00002706 at 707 [redacted] Express_Scripts_1330_00002704 [redacted]); *see also*, Dep. Tr. J. Kitson (ESI 30(b)(6)), 197:3-198:1 [redacted]

[redacted]

62. Dr. Gaier argues that only Repatha® rebates were considered by ESI/Ascent when making the coverage decision in the PCSK9i class, but the evidence I have reviewed makes it clear that this was not the case. In fact, as Amy Bricker, President of Express Scripts at the time, told Tim Wentworth, Chief Executive Office of Cigna at the time, [redacted] rcial [redacted]

**Figure 5: Ascent/ESI Commercial Financial Modeling of a 2021 Praluent® Exclusive Option**[117]

---

[redacted] Dep. Tr. A. Bricker, former President of ESI, 124:5-11 [redacted])

[115] Express_Scripts_1330_00002636 at slide 2.

[116] Express_Scripts_1330_00003702 at 702.

[117] Express_Scripts_1330_00002636 at slide 3.

[redacted]

63. As identified in my Opening Report, Amgen documents similarly indicate that [redacted].[118] Amgen "[redacted] over the [redacted].[119] In a text to ESI/Ascent Commercial representatives, Tom Moore, Vice President of Value and Access at Amgen, stated [redacted]"[120] Internal Amgen text messages also stated they were [redacted]."[121] Dr. Gaier ignores all of these contemporaneous documents reflecting the [redacted] between the parties in his report.

64. Instead, Dr. Gaier relies on only the Fourth and Fourteenth Amendments to the ESI/Ascent Commercial agreements, making much of the fact that these contracts do not reflect [redacted].[122] However, and as admitted in Amgen's

[118] Scott Morton Amended Opening Report, § 5.4; *see also,* AMG10935-0000377749 at 749 (May 29, 2020 text message from Billy West, Executive Director of Market Access at Amgen, stating "Call went as good as it could. [redacted]).

[119] AMG10935-0000083666 at 666 (June 24, 2020 email from Tom Moore, Vice President of Value and Access at Amgen to Murdo Gordon, Executive Vice President of Global Commercial Operations at Amgen).

[120] AMG10935-0000379900 at 990 (June 26, 2020 text message between Billy West, Executive Director of Market Access at Amgen and Michael Rothrock, former Vice President of Pharma Strategy and Contracting at ESI).

[121] AMG10935-0000378865 at 866 (June 17, 2020 text message from Billy West, Executive Director of Market Access at Amgen, stating "Talking to Jason now. [redacted].").

[122] Gaier Rebuttal Report, § V.B; ¶ 109.

30(b)(6) deposition, the Fourth Amendment to the ESI/Ascent Commercial agreement does not reflect the totality of Amgen's offer to ESI/Ascent.[123] And it cannot—[redacted][124] Dr. Gaier selects only two of the five contracts entered into between the parties since 2020 to reach his conclusions, further evidencing the incomplete nature of his analysis.

65. Indeed, Amgen's [redacted] included value that changed in each year, meaning that the [redacted] would not be included in the Fourth Amendment that Dr. Gaier considers to be the final agreement between the parties. Dr. Gaier does not address the fact that the [redacted] that also include the [redacted] Based upon my review of these subsequent amendments, the rebates offered during 2020 negotiations have been provided: [redacted][126] Dr. Gaier notably does not discuss these base rebate increases or these amendments in his report.

66. Concerning the Fourteenth Amendment (i.e., the 2023-2024 "contract"), Dr. Gaier does not address the extensive record showing that [redacted] negotiated in 2020 even though ESI/Ascent wanted [redacted] as shown in Figure 6 below:[127]

**Figure 6: Amgen Financial Modeling of Ascent/ESI Requested Changes to the [redacted][128]**

---

[123] Dep. Tr. K. Niksefat (Amgen 30(b)(6) 101:20-102:25 ("Q. So there are no 2021 rebates included in this fourth amendment to the rebate program agreement; correct?...THE WITNESS: Again, it doesn't appear that the grid that is submitted [redacted] I'm unsure why that is the case. BY MS. WILLIAMS: Q Well, you told Murdo Gordon, though, that you signed -- not you signed, [redacted] HE WITNESS: So, again, in my shorthand at that point in time, that that would have actually referred to my belief at least that we had just signed a contract that included [redacted] and with the hope that it would be enough to keep us on formulary through that time period. Again, I don't see that reflected in this particular document, but I do not have the entire scope of the contract nor all amendments to confirm that wasn't just subsequently done. But clearly at the time I was of the belief that the contract that we signed or the amendment that we signed included 2020, 2021 and 2022.")

[124] *See, e.g.*, Express_Scripts_1330_00002636 at slide 2 [redacted]

[125] AMG10935_OCO-0000000601 at 605 [redacted]

[126] *Id.*, [redacted].

[127] AMG10935-0000074320 at slide 3 (March 14, 2022 Amgen PowerPoint presentation titled "2023 Ascent Commercial & ESI Commercial Government RFP.")

[128] *Id.*




67. Importantly, these documents show that Amgen viewed the base rebate increases and the "[redacted] value as interchangeable, which supports my determination that the [redacted]. For example, when developing the 2023 bid, Amgen evaluated shifting rebates from the [redacted] to Enbrel® base rebates: "[redacted]"

**Figure 7: Amgen Presentation on Ascent Bid and Coverage Negotiations (March 2022 Update)**[129]

[129] *Id.*

ASCENT 2023 COMMERCIAL BID – [redacted]

[redacted]

[redacted] AMGEN

68. Ultimately, Amgen renewed its [redacted] in the Fourteenth Amendment to the ESI/Ascent Commercial agreement included a renamed [redacted][130] The [redacted] agreement between the parties is still in effect today.[131]

69. An additional aspect of the ESI/Ascent Commercial agreement that Dr. Gaier does not address—despite Dr. Gaier's sole reliance on the contracts between the parties—is the [redacted]. Specifically, he ignores the contractual provision that Amgen included in its contracts to create [redacted]."[132] Dr. Gaier does not address the [redacted]"[133] In early 2022, Amgen acknowledged that Ascent/ESI Commercial "[redacted]."[134]

[130] AMG10935_OCO-0000030231 at 269 (Amgen-Ascent Fourteenth Amendment to the Rebate Program Agreement).

[131] AMG10935_OCO-0000000739 at 739 (Amgen-Ascent Fifteenth Amendment to the Rebate Program Agreement).

[132] AMG10935-0000128836 at 837; *see also*, Dep. Tr. A. Chiu, Executive Director, U.S. Value & Access at Amgen, 84:11-18 ("Q. Sure, but you were proposing a [redacted]? A. That is the hope. But not guaranteed.").

[133] AMG10935-0000000918 at -936; *see also*, Dep. Tr. J. Kitson (ESI 30(b)(6), 198:19-22 [redacted]

[134] West Ex. 27 (AMG10935-0000074278 at 278 (, Mar. 4, 2022 internal Amgen email).

[redacted].[135]

**4.3 Dr. Gaier ignores the extensive evidence showing that Amgen's [redacted] directly foreclosed Praluent®'s access to UHC's commercial formularies, and fails to rebut my conclusion that the spillover effect of the UHC Commercial decision ultimately led to Praluent®'s foreclosure at OptumRx Commercial.**

70. In my Opening Report, I found that Amgen's [redacted] resulted in the direct foreclosure of Praluent® from UHC's commercial formularies, and that spillover effects from that direct foreclosure caused Praluent® to also be foreclosed from the OptumRx commercial formularies as well.[136] Dr. Gaier, rather than take issue with my foreclosure analysis for each of OptumRx and UHC Commercial, raises a number of factual disputes regarding the premise of my analysis that I find to be unfounded. Dr. Gaier argues (1) that the [redacted] at UHC Commercial was not contingent upon Repatha® being covered 1:1; (2) that OptumRx/UHC made coverage decisions for Enbrel® and Repatha® independent of one another; and (3) that the idea of the bundle originated from OptumRx/UHC and not Amgen. None of these claims, which largely contradict or ignore the evidence I cite in my Opening Report, undermine my analysis of direct foreclosure at each of UHC and OptumRx Commercial.

71. First, Dr. Gaier argues that the language of the contract between Amgen and OptumRx for UHC commercial formulary coverage and some testimony from OptumRx/UHC and Amgen witnesses contradicts the premise that [redacted] between Amgen and OptumRx for UHC commercial formulary coverage in effect linked [redacted]®. As with the other PBM bundled offers, Dr. Gaier ignores the extensive evidence showing the [redacted] impact on OptumRx's coverage decisions for the UHC commercial formularies. However, the negotiations between Amgen and OptumRx/UHC for UHC commercial formulary coverage in 2021 make clear that the [redacted] was implemented to secure 1:1 Repatha® coverage, which continues to be the reality of PCSK9i coverage at UHC/OptumRx since September 1, 2021.

72. In January 2021, OptumRx on behalf of UHC Commercial told Regeneron that [redacted]"[137] In fact, by April 2021, it was clear that [redacted][138] At this point, the focus of the negotiations between Amgen and OptumRx on behalf of UHC

---

[135] AMG10935-0000128836 at 837.
[136] Scott Morton Amended Opening Report, § 5.5.
[137] REGN0043871 at slide 4; *see also, id.* [redacted]
[138] REGN0031210 at 210.

Commercial shifted to the [redacted][139]

73. Dr. Gaier ignores [redacted] For example, in April of 2021, Alexander Hindman, VP, Industry Relations at OptumRx, told Seth Greicar, Director, Industry Relations at OptumRx, [redacted][141] An internal email conversation between Mr. Hindman and others at OptumRx/UHC Commercial [redacted][142]

74. Dr. Gaier also ignores evidence of the same understanding on the Amgen side. And around this time, in an internal Amgen email, Adam Grennan [redacted][143] In June 2021, Andy Chiu, Executive Director, U.S. Value & Access at Amgen, sent an email to Jennifer Norton, VP, Head of U.S. Value & Access at Amgen, stating, "On a separate note, [redacted] This is [redacted] and our current [redacted] assuming [redacted]. As a reminder, the Enbrel

---

[139] AMG10935-0000022563 at 564 (Andy Chiu telling Adam Grennan, "One thing I forgot is that we may not have the [redacted] which may require some discussion." Adam Grennan responds, "One question on the [redacted] (effectively making it [redacted])?").

[140] UHG000007762 at 762 [redacted]

[141] UHG000007883 at 883; *see also,* UHG000007862 [redacted]

[142] UHG000007747 at 747.

[143] AMG10935-0000028211 at 212; *see also,* AMG10935-0000024826 at 827-28 (email from Andy Chiu to Jennifer Norton requesting approval to offer the [redacted] to OptumRX/UHC, saying, "As part of our strategy, we [redacted]").

UHC core rebates above also includes 1% Enbrel overlay specifically to preserve Repatha GTN as part of our portfolio bid."[144]

75. As the parties began to memorialize the terms of the [redacted] in a contract,[145] Amgen and OptumRx/UHC Commercial comments to the agreement [redacted]: [redacted]"[146]

76. Second, Dr. Gaier's assertion that "UHC made its PCSK9i coverage decision [redacted] is contradicted by the evidence of the negotiations between OptumRx/UHC and Amgen in 2021, which show that both sides considered the [redacted]ked. In April 2021, [redacted][148] Dr. Gaier fails to acknowledge the abundance of evidence of the Enbre[redacted] in negotiations between OptumRx/UHC Commercial and Amgen.[149]

77. Third [redacted]." However, not only is this irrelevant to my analysis of foreclosure, it is also not reflective of the full extent of the negotiations between Amgen and OptumRx/UHC or the environment in which those negotiations took place.[150] [redacted]

---

[144] AMG10935-0000012332 at 332-33.
[145] AMG10935-0000026758 at 758.
[146] AMG10935_OCO-0000008957-9050 ([redacted]
[147] UHG000007892 at 892.
[148] UHG000007916 at 916; *see also,* Dep. Tr. A. Hindman (UHC), 30(b)(6)), 81:7-15, Exhibit 2 (UHG000007762) [redacted]
[149] AMG10935-0000022627 at 627 [redacted] ng."); UHG000007762 at 762 [redacted] AMG10935-0000024829 at 832 (" [redacted]
[150] AMG10935-000392769-815 (April 13, 2021 text exchange between Adam Grennan and Andy Chiu in which Andy Chiu asks [redacted], sounds like it" and Adam Grennan responds "[y]es.").

formularies switched to Repatha® exclusive as a result of the Enbrel®/Otezla®/Repatha® bundle in the Summer of 2020.[151] Against this backdrop, the [redacted] at UHC Commercial was conceived. Furthermore, even accepting Dr. Gaier's argument that the idea for the [redacted] originated from OptumRx/UHC, Amgen formulated and presented the details of the [redacted]—with key details regarding to coverage status—as OptumRx/UHC made clear that Amgen would have to develop the first draft of any contract containing the [redacted].[152]

78. Finally, Dr. Gaier criticizes damage calculations involving Praluent®'s foreclosure from OptumRx Commercial formularies, arguing that Praluent® was not foreclosed from competing for UHC's commercial formularies or from OptumRx commercial formularies more broadly. This is incorrect and more fully discussed in Section 4 of my report. As early as 2018, Amgen and UHC/OptumRx discussed exclusive Repatha® coverage under OptumRx Commercial formularies, and Amgen submitted an unsolicited Repatha® bid consisting of a [redacted] all-in rebate to Optum Commercial (almost twice as high as the then-prevailing PCSK9i rebates ) in exchange for exclusivity.[153] In 2019, Amgen also began seeking to erode confidence with respect to Praluent® coverage on OptumRx formularies.[154]

79. Dr. Gaier ignores internal OptumRx communications which show that, beginning in 2020, OptumRx executives heard from Amgen representatives themselves that the "strategy [was] to lock out Regeneron."[155] [redacted][156] [redacted][157]

80. In denying that Amgen foreclosed Praluent OptumRx Commercial formularies, Dr. Gaier ignores Amgen's own assumptions at the time[158] [redacted]

---

[151] UHG000007686 at 68 [redacted]

[152] AMG10935-0000026758 at 758.

[153] *See* UHG000007402 at 403 [redacted]

[154] *See, e.g.*, UHG000007596 at 597 (Kave Niksefat (Amgen) sends Kent Rogers (Optum) a note discussing "New Praluent Rumors" and advises Rogers to "watch out" about any contracts they have for Praluent. He also tells Kent that it "looks like Amgen will be the only ones promoting this class going forward.").

[155] UHG000006940 at 940.

[156] *See* UHG000007892 at 892 [redacted] UHG000007882 at [redacted]

[157] *Id.*

[158] AMG10935-0000393120 at 121 (April 21, 2021 text from Shadaab Birwadker to Adam Grennan: "Quick question. Do we know what Praluent current 1 of 2 bid might be for Optum? We are trying to estimate [redacted]. Currently we are assuming Praluent is not bidding for 1 of 2 and their

[redacted].[159] Indeed, UHC and OptumRx's negotiations with Amgen took place concurrently in 2021. Just a month after UHC went Repatha® exclusive, OptumRx made the decision to prefer Repatha® 1:1 for their Commercial Premium and Select Formularies, effective January 1, 2022,[160] despite Amgen's acknowledgement that its Repatha® offer would [redacted]."[161] Dr. Gaier's criticism does not account for Praluent®'s ultimate exclusion from OptumRx Commercial formularies.[162]

### 4.4 Dr. Gaier fails to rebut my conclusion that Amgen's [redacted] to CVS/Zinc Commercial raised Regeneron's costs to the point of unprofitability, thus, directly foreclosing Praluent®'s access to the CVS/Zinc Commercial formularies.

81. Dr. Gaier claims that my Opening Report "inaccurately assert[s] that Praluent® was directly foreclosed from the CVS/Zinc commercial formularies beginning in July 2023" for two primary reasons: (1) the final contract between CVS/Zinc and Amgen for commercial formulary coverage [redacted]; and (2) based on Dr. Gaier's review, Amgen's [redacted] did not require 1:1 Repatha® coverage.[163] These claims are unavailing. More importantly though, Dr. Gaier fails to rebut my ultimate conclusion that Amgen's [redacted] to CVS/Zinc Commercial artificially inflated competition in the PCSK9i category [redacted]

82. Dr. Gaier's primary basis for rebutting my foreclosure analysis at CVS/Zinc Commercial is that the CVS/Zinc commercial contract did not include an

---

[redacted] *see also*, AMG10935-0000394182 at 183 (Adam Grennan writes: "Seth at Optum is starting to get pressure on their Repatha offer. Can we start working on getting approvals and terms moved on internally so we can speed to a quick presentation to them once UHC is finalized (hopefully on Monday)?"); AMG10935-0000028213 at 215 (In June 2021, Adam Grennan writes: "[t]here is still [redacted]siness, which is why we are not yet actively announcing the UHC decision.").

[159] *See* UHG000007883 at 883 [redacted]

[160] AMG10935-0000026317 at 319.

[161] AMG10935-0000760838 at 839.

[162] *See* AMG10935-0000395744-756:
AMG10935-0000395744: Tom Moore: "Adam just got word ORx commercial going 1:1 Repatha"
AMG10935-0000395746: "Good news. Was that expected?"
AMG10935-0000395752: Tom Moore "Hoped for … [redacted]
AMG10935-0000395756: Tom Moore "[redacted]
*See also*, REGN0035734 at 735 ([redacted].

[163] Gaier Rebuttal Report ¶ 130.

[redacted].[164] As discussed at length in prior sections, relying only the final contracts between the parties ignores the vast evidence produced by Amgen and third-parties in this case that detail the agreements ultimately reached between the parties. Moreover, it makes the naïve assumption that a final contract is not affected by the negotiation and conversations that lead to it. Nevertheless, and as I explained in my Opening Report, Amgen described the [redacted] in 2021 as similar in structure to the anticompetitive [redacted] Amgen agreed to provide ESI/Ascent Commercial.[165] I have seen ample evidence about the [redacted] that shows Amgen tied the rebates it offered for [redacted].[166]

83. Dr. Gaier also includes in his report Amgen's July 2021 [redacted] sent to CVS/Zinc that reflects the [redacted] for 2022, 2023, and 2024.[167] Although Dr. Gaier merely includes the [redacted] values in his report, Amgen's internal analysis of the bundle shows how Amgen collectively attributed the value across all of the products: "As an FYI- at CVS [redacted] … Thus [redacted], so the 2022 rate [redacted]."[168] This bid structure, [redacted][169] In short, Dr. Gaier's own report identifies the [redacted] Amgen offered CVS/Zinc Commercial in 2021 that CVS/Zinc Commercial used as leverage to artificially inflate competition in the PCSK9i category.

---

[164] *Id.*, ¶ 132.

[165] Scott Morton Opening Report, ¶ 90 (citing AMG10935-0000012174 at 175 ("Our recommendation is similar in structure to our ESI agreement last summer, with Enbrel value tied to Enbrel, Otezla, and Repatha coverage.")); AMG10935-0001618894 at 895 (noting that CVS is "open to [the] concept" of the Enbrel overlay); *see also,* AMG10935-0000536138-40 ("…Stahl called me last night. I think we can do a replay of last summer (ESI) with them. Enbrel through 23 and/or 24, lock out new orals, get Repatha 1:2"); AMG10935-0001619938 at 939 ("We're excited to put this bid in front of you and your team. It's the ESI structure; however, much more lucrative based on the higher rates you have at Zinc. (Optional-Frankly I didn't think I could even get this approved by our senior leaders at Amgen.) Looking forward to hearing your feedback.").

[166] *See* Section 4.2, *supra.*

[167] Gaier Rebuttal Report ¶ 131 (citing ZINC0000187 at 188-189).

[168] AMG10935-0001611588-90.

[169] ZINC0000187 at [redacted]

84. Dr. Gaier's claim that I have not considered Amgen's "'enhanced' offer to CVS/Zinc in which the [redacted] fail for the same reason.[170] The evidence shows Amgen [redacted][171] Although the CVS/Zinc contract does not reflect the bundled rebates, [redacted][172], CVS/Zinc representatives used Amgen's [redacted] to drive Regeneron's rebate rates on Praluent® to rebate rates above the competitive level.[173] As indicated in notes from a call on June 29, 2021 between Regeneron's Rich O'Neal and CVS's Joe Stahl, Mr. Stahl told Mr. O'Neal he [redacted]

85. Dr. Gaier offers a second, equally unavailing, assertion to rebut my findings: "taken at face value, Amgen's July 2021 offer [redacted][176] This description of Amgen's [redacted] CVS/Zinc Commercial is misleading and a mischaracterization of the evidence. Evidence I reviewed shows Amgen was focused on Repatha® coverage in its negotiations with CVS/Zinc, including for 1:1 coverage on CVS's commercial formulary.[177] In particular, Amgen acknowledged in June 2021 that "CVS is unlikely to alter its exclusive Commercial or Medicare coverage of Praluent in 2022" and with respect to exclusive coverage on CVS/Zinc's commercial formulary [redacted] While

[170] Gaier Rebuttal Report, ¶ 132.
[171] *See, e.g.*, ZINC0000006 at 006 [redacted] AMG10935-0000535604-618 (text message thread between Amgen's Kave Niksefat and Jennifer Norton in April 2021 regarding CVS/Zinc negotiations with note Ms. Norton told CVS's Gary Loeber that Gary's [redacted]); AMG10935-0000535869 at 870 (text message from Amgen's Jennifer Norton to Kave Niksefat on May 3, 2021 that Amgen's Tom Moore "ready to show up at dinner" with a CVS representative [redacted]").
[172] *See* ZINC0000186 at 186; Dep. Tr. J. Witter (Zinc 30(b)(6)), 136:6-140:5 [redacted]
[173] *See* Scott Morton Opening Report § 5.6.
[174] REGN0266282 at 282.
[175] *Id.*, at 282.
[176] Gaier Rebuttal Report ¶ 131.
[177] *See, e.g.*, AMG10935-0000535604-618 (text message thread between Amgen's Kave Niksefat and Jennifer Norton in April 2021 regarding CVS/Zinc negotiations with note that Amgen's Murdo Gordon was "[redacted]

there may be political/relationship pressures at play, the primary driver is the [redacted][178] Regardless of the language used, Amgen's documents show that it understood that CVS/Zinc was seeking exclusive coverage in the PCSK9i category.

86. Dr. Gaier also claims he is "not aware of any Amgen or CVS/Zinc documents or testimony that support any assertion of a 'more aggressive' bundled rebate offer to CVS/Zinc in 2022."[179] This claim similarly fails to address Amgen testimony and documents showing Amgen discussing the use of [redacted], including, for example, a "Tezspire/Repatha/Aimovig deal to secure all three products" or the proposal to "[redacted]." [redacted]

87. Finally, Dr. Gaier claims [redacted] "alienated CVS."[182] This argument misconstrues and misunderstands my Opening Report. As explained in the Opening Report, Amgen's [redacted] raised Regeneron's costs to maintain Praluent® coverage at CVS formularies [redacted]

88. Regarding CVS's [redacted]), Dr. Gaier asserts that [redacted] Hence, there is no causal connection

[178] AMG10935-0000509339 at 340 (May 13, 2021 internal Amgen email); *see also,* AMG10935-0000012174 at 175 (July 2, 2021 email stating "We believe the best strategic approach is a [redacted] not only to solidify [redacted]"); AMG10935-0001611873 at 874 ("Just finished up … short story is he wants to get [redacted]. They've had numerous conversations internally and [redacted] If we get [redacted] AMG10935-0001615120 at 120 (text messages between Anita Alamshaw and Jennifer Norton indicating that CVS "were only considering exclusive" and that "there was a significant gap in exclusive rates").

[179] Gaier Rebuttal Report ¶ 133.

[180] *See, e.g.*, AMG10935-0000121596 at 596 (internal Amgen memo entitled "Backgrounder for Dinner Meeting on May 10, 2022 with Gary Loeber, SVP CVS" with note that "2023 Possible Contracting Scenarios: 1. [redacted] [and] 2. [redacted]); Dep. Tr. Jennifer Norton, Vice President of Market Access at Amgen (, 198:6-202:11; Dep. Tr. R. O'Neal, SVP of Market Access at Regeneron, 245:4-11.

[181] Scott Morton Opening Report ¶ 91.

[182] Gaier Rebuttal Report § VIII.C.

[183] Scott Morton Opening Report § 5.6.

between Repatha®'s coverage at CVS formularies and the [redacted]. Indeed, CVS witnesses testified that [redacted]."[184]

89. Dr. Gaier's position that the [redacted] cannot be causally connected to Repatha®'s formulary status for reason of time delay is not based on any guiding economic principle or rule. As explained in my Opening Report, Amgen [redacted] in response to being excluded from CVS's formulary in 2022, and Amgen [redacted] after Repatha® was no longer excluded in 2023.[185]

90. My review of Amgen's own documents supports the retaliatory, coercive effect of the [redacted] Amgen executives told CVS executives that the [redacted] alued at $[redacted] for 2023, was related to the non-coverage of Repatha®.[186] CVS executives were well aware that Amgen was using the [redacted] as a proverbial stick, as CVS executive Gary Loeber told Amgen executive Jennifer Norton in 2023 that [redacted]," and "[s]pecifically, ... interest[ed] in getting [Amgen] back into 'good standing' on the [redacted] side by April, and a formulary change potentially to be made in July."[187]

91. When planning for a bid at CVS/Zinc in the PCSK9 category, Amgen again recognized the leverage of the [redacted] an internal Amgen presentation explicitly states "Amgen is also providing value in other parts of the organization including a [redacted] for Repatha[.]"[188]

92. By March of 2023, Amgen understood that Repatha® exclusivity at CVS could be attained with additional rebates and with [redacted] and planned for talking points with CVS about both rebates and [redacted].[189] By July 2023, the [redacted] was added back by Amgen at CVS.[190]

### 4.5 Dr. Gaier fails to address evidence that Praluent® was directly foreclosed from the CVS Part D formularies as a result of Amgen's anticompetitive conduct.

93. Unlike with CVS/Zinc Commercial, Dr. Gaier does not even address the significant evidence showing Amgen offered an [redacted] to gain coverage for Repatha® on the CVS Medicare Part D formulary. Although ultimately unsuccessful, the voluminous record memorializing Amgen's campaign to secure Repatha® formulary coverage on the CVS Part D formulary via the [redacted] supports my claim that [redacted]

---

[184] Gaier Rebuttal Report ¶ 285.
[185] Amended Scott Morton Opening Report ¶ 184.
[186] AMG10935-0000502336 at 337.
[187] AMG10935-0000113770 at 771.
[188] AMG10935-0000131630 at slide 4.
[189] AMG10935-0000798211 at 211, AMG10935-0000798212 at 212.
[190] *Id.*, ("Below is Amgen's offer for Retail ID. 2.5% ID per unit starting 7/1/23 throguh 25.").

[redacted]

94. Supplementing the evidence included in my Opening Report, CVS Part D representative Joseph Anderson [redacted].[191] An Amgen executive similarly testified that in 2021 Amgen offered CVS Part D a [redacted] rebate.[192] This is also consistent with the documentary evidence I have reviewed, which suggests Amgen aimed to withhold [redacted]nts to coerce a preferred Repatha® formulary status at CVS Part D,[193] and that Amgen contract negotiators corresponded about the [redacted].[194] Months later, Amgen executives internally recounted the CVS/Caremark Part D offers as "[redacted] Reinforc[ing] positive spirit of how Joe Anderson is approaching our overall negotiation ([redacted])[.]"[195]

95. [redacted]

### 4.6 Dr. Gaier's cursory review of the Humana Part D negotiations does not negate the impact of Amgen's conduct in foreclosing Praluent® from access to Humana's Part D formularies.

96. Dr. Gaier similarly ignores evidence indicating that Humana Part D was offered the [redacted][196] As explained in my Opening Report, in the early fall of 2020 Amgen was engaging Humana Medicare Part D in [redacted] that

---

[191] Dep. Tr. J. Anderson, (CVS Caremark 30(b)(6)), 77:23-78:5. [redacted] overlay concept at CVS Part D.").

[193] *See, e.g.*, AMG10935-0000525700 at 701 ("Repatha – Corinne [LeGoff, Amgen executive] will ask about [CVS Medicare Part D plan] Silver Script. I'm thinking time is right for you/Pam to press harder on it, as you know [redacted]).

[194] AMG10935-0000417134 at 136 (February 16, 2021 email stating "In addition to [redacted]: … [redacted]

[195] AMG10935-0000139350 at 350 (April 21, 2021 email from Tom Moore to Jennifer Norton).

[196] Gaier Rebuttal Report, § V.E.

appear to have included an "[redacted][197]

97. Andy Chiu, Executive Director of U.S. Value & Access at Amgen, testified that [redacted] to Humana Part D for formulary coverage from January 1, 2021 – December 31, 2023.[198] Mr. Chiu also confirmed that part of Amgen's reasoning for [redacted] it submitted to Humana Part D.[199]

98. Dr. Gaier also fails to acknowledge that the verbal "right of first refusal" agreement Amgen negotiated with Humana shows that Amgen had the power over PBMs to coerce them into first notifying Amgen of any Regeneron offers.[200] He also fails to rebut evidence showing that some of Amgen's agreements with PBMs were not included in the final contracts.[201]

## 5. Dr. Gaier's and Dr. Stiroh's critiques of my foreclosure analysis are unavailing.

### 5.1 Amgen's foreclosure strategy goes beyond the directly affected formularies.

99. In my Opening Report I calculated the percentage of the U.S. PCSK9i market that Praluent® has been foreclosed from as a result of Amgen's

[197] Scott Morton Amended Opening Report, ¶¶ 96-98 (citing AMG10935-0000548392 at 392 (Amgen approving an [redacted]); AMG10935-0000015661 at 661 [redacted]"); (AMG10935-0000083575 at 575 [redacted])); *see also,* AMG10935-0000382821 at 822 [redacted]"); AMG10935-0000014298 (text message from Billy West to Tony Esterly, Humana: "[redacted]

[198] Dep. Tr. A. Chiu, Executive Director of Market Access at Amgen, 134:4-15 ("[redacted]")

[199] *Id.*, 229:18-230:11 ("[redacted]").

[200] Scott Morton Amended Opening Report, ¶ 98 ([redacted]")

[201] Gaier Rebuttal Report, ¶ 138, note. 231.

anticompetitive conduct. In addition to identifying the sources of Praluent®'s direct foreclosure, I also explained how Amgen's foreclosure strategy had an effect beyond the directly affected formularies, i.e., spillover effects, including spillovers within a PBM, prescriber-level spillovers and additional foreclosure at the affected PBMs.[202] In my report, I provided evidence and explained why each of these additional sources of foreclosure should be considered as part of Amgen's foreclosure strategy[203] and estimated that Praluent® has been excluded from [redacted] of the market.[204]

100. In their reports, Amgen's experts attempt to decrease my foreclosure estimates by arguing that spillovers (either within PBM spillovers or prescriber-level spillovers) are not a relevant mechanism to exclude Praluent® from the market, and that there is no evidence of significant spillover effects.[205] Below, I explain why each of these arguments is wrong. First, I explain why foreclosure arises from spillovers in this case, and then I explain why the data and documents support the existence of both type of spillover effects.

### 5.2 Dr. Gaier and Dr. Stiroh erroneously exclude the effect of spillover effects as a key aspect of Amgen exclusionary strategy.

101. In their reports, Dr. Gaier and Dr. Stiroh claim that spillover effects (within PBM spillover and prescriber level spillover) should not be included in the quantification of foreclosure. Dr. Gaier claims that "[a]ntitrust economics is concerned about foreclosure mainly in circumstances where exclusion from one set of sales may weaken a competitor generally for other sales,"[206] while Dr. Stiroh asserts that "Prof. Scott Morton's spillover analyses do not demonstrate that the challenged conduct […] has diminished the ability of Regeneron to compete in that market."[207] Dr. Gaier and Dr. Stiroh's claims are incorrect, and, as I discuss below, their claims are contradicted by their own report as well as by Ms. Gan's report.

102. I agree with Dr. Gaier that foreclosure occurs in circumstances where the exclusion from sales weakens the competitor's ability to compete for other sales. As I explained in my Opening Report, and further explain below, both within PBM spillovers and prescriber-level spillovers weakened Regeneron's ability to compete for other sales.[208]

103. Regarding within PBM spillover effects, in my Opening Report I showed how, once Amgen's anticompetitive strategy began, Repatha® formulary coverage increased beyond the national formularies at ESI and OptumRx–a result of within PBM

[202] Scott Morton Amended Opening Report, ¶ 152.
[203] *See Id.*, § 7.1.2, § 7.1.3, § 7.1.4. and § 7.2.
[204] *Id.*, ¶ 171.
[205] *See* Gaier Rebuttal Report, § IX.B., Stiroh Rebuttal Report, § VI.C.3., and Gan Rebuttal Report, §§ X.A and X.B.
[206] Gaier Rebuttal Report, ¶ 291.
[207] Stiroh Rebuttal Report, ¶ 209.
[208] *See, e.g.*, Scott Morton Amended Opening Report, ¶¶ 100-101.

spillover effects.[209] In "December 2019, 30% of the total ESI claims were from beneficiaries whose formularies had Repatha® as the preferred PCSK9i drug, and by June 2023 [redacted]

104. As I show below, the sequence of formulary changes that resulted in Praluent®'s foreclosure were the result of Amgen's anticompetitive strategy. Due to the nature of formulary design and how formulary coverage negotiations occur, decisions at key formularies, such as a PBM's national formularies (i.e., the formularies that Amgen targeted with its portfolio rebate strategy), have a significant and direct effect on coverage decisions for other formularies within the same PBM.

105. As explained in my Opening Report "when a GPO enters into a contract on behalf of a client's national formulary, each of the clients and health plans that follow the client's national formulary will tend to follow the same coverage decisions."[212] This happens because formularies' plan sponsors often adopt the PBMs base or national formularies as their own or use them as the foundation for their own custom formularies.[213] While a PBM's customers could choose coverage that deviates from the national or base formularies, as I show below, in practice that generally does not occur. Furthermore, PBMs often encourage custom accounts to align with the national or base formulary coverage, [214] which also serves to increase the total formulary coverage that occurs when a manufacturer is able to secure formulary coverage on a national or base formulary.

106. Drug manufacturers are aware of the strategic value of securing exclusive coverage on a national or base formulary, and seek to secure coverage on a PBMs "national," "custom," and "base" formularies.[215] By securing coverage on the national or base formulary of a PBM through an anticompetitive offer, the manufacturer knows that the anticompetitive offer will likely impact the custom formularies that are vertically integrated

---

[209] *Id.*, § 6.1, § 7.1.2 and references in the sections.
[210] *Id.*, ¶ 119.
[211] *Id.*, ¶ 128.
[212] *Id.*, ¶ 101.
[213] *See, e.g.*, "White Paper: Formulary Development at Express Scripts" at p. 4 ("Express Scripts' plan sponsors often adopt Express Scripts-developed formularies as their own or use them as the foundation for their own custom formularies."), https://d17f9hu9hnb3ar.cloudfront.net/s3fs-public/2022-04/Formulary%20Development_April%202022.pdf; *see also*, Pharmacy and Therapeutics (P&T) Committee meeting at p. 7 ("that "[clients] may choose to utilize CVS Caremark formularies for their plans or use them as the foundation for custom formularies."), https://www.shpnc.org/documents/pharmacy-and-therapeutics/pt-booklet-may-2019-secured/download.
[214] *See, e.g.*, REGN0006102 at 103 [redacted]
[215] AMG10935_OCO-0000030231 at 236 (Amgen-Ascent Fourteenth Amendment to the Rebate Program Agreement).

within the PBM—within PBM spillovers. The within PBM spillovers can also be amplified when formulary negotiations of multiple health plans of a PBM occur simultaneously because the same people are often involved in the various formulary negotiations.[216]

107. As explained, the high degree of deference provided to national and/or base formularies shows that the impact of within PBM spillovers is critical to the proper assessment of the extent of foreclosure. Indeed, it is my position that Amgen was aware, and sought to take advantage, of the within PBM spillover effects when negotiating its anticompetitive Cross-Therapeutic Bundle with the "mega" PBMs. I find that a custom health plans's formulary coverage decision that followed a national or base formulary coverage decision arising from an anticompetitive offer is a direct effect of the anticompetitive offer.

108. As explained in my Opening Report, I showed that within PBM spillovers at ESI, OptumRx, and CVS increased Praluent®'s foreclosure by [redacted].[217] The within PBM spillovers at each of ESI, OptumRx, and CVS directly flow from Amgen's anticompetitive CTB agreement that secured coverage on the PBMs's national formularies. Because Praluent®'s foreclosure at each of these PBMs is directly attributable to Amgen's conduct, [redacted].

109. As explained in my Opening Report, prescriber-level spillovers occur because "[a] prescription drug that is excluded or disadvantaged on formularies covering a large portion of patients will tend to be prescribed less frequently even where it is at parity or preferred."[218] Because physicians care for patients with a wide range of insurers they will often consistently prescribe a product they believe has better market wide formulary access because a more widely available product is less likely to be rejected, need additional paperwork for approval, or require out-of-pocket cost for their patients. Prescriber-level spillover can be viewed as a prescriber bias that is difficult to overcome without an outside factor (i.e., a patient proactively requests an off-formulary drug).

110. Prescriber-level spillover effects are well-known in academic and industry literature, by drug manufacturers, and are recognized by Dr. Gaier,[219] and Ms.

[216] Scott Morton Amended Opening Report, ¶ 154.
[217] The foreclosure attributed to within PBM spillovers included foreclosure at CVS Part D, which, based on new evidence (see Section 4.5), should be considered as direct foreclosure. Based on this adjustment, within PBM spillovers would account for 11 pp of additional foreclosure (see Table 1).
[218] Scott Morton Amended Opening Report, ¶ 141.
[219] Gaier Rebuttal Report, ¶ 294 ("I do not dispute that such prescriber-level spillover effects could occur. Indeed, Prof. Scott Morton cites to several academic and industry studies, as well as documents and testimony in this case, that discuss potential prescriber-level spillover effects.").

Gan.[220] Importantly, drug manufacturers consider this spillover on their business decisions, e.g. when evaluating the cost of losing coverage at a formulary.[221]

111. Amgen's CTB rebate strategy directly caused Praluent® to be excluded from formularies across various PBMs, causing Praluent®'s market share to decline. As I explained in my Opening Report, this caused Praluent®'s market share to decrease even further due to prescriber-level spillover effects attributable to Amgen's exclusionary strategy.[222] Considering that prescriber-level spillover effects are widely acknowledged dynamic in the pharmaceutical industry, the impact of prescriber-level spillover arising from Amgen's CTB rebate strategy should be included in the calculation of Praluent®'s total foreclosure from the U.S. PCSK9i market.

112. Amgen's experts maintain that none of the spillover effects impaired Regeneron's ability to compete in the U.S. PCSK9i market.[223] However, as I have explained, both within PBM spillovers and prescriber-level spillovers caused Praluent®'s market share to decline. Because all of Amgen's experts agree that lower market shares have put Regeneron in a competitive disadvantage, they cannot cherry-pick which causes of market share decline to include or exclude. [redacted][227]

113. [redacted]

220 Gan Rebuttal Report, ¶ 171 ("I can attest that "pull through" access can limit negative spillover effects in certain situations").
221 *See e.g.,* REGN0160471 at slide 18, where Regeneron discusses the impact of losing ESI Commercial in June 2020. ("Based on most recent 2019 Awareness, Trial, & Usage (ATU) data, largest barrier to prescribing PRALUENT is due to coverage. We would expect lower coverage rate at PBM Level to significantly impact doctor's willingness to prescribe PRALUENT over Repatha") and at slide 19 ("Spillover effects are robust in PCSK9i space, with impact more pronounced with PCPs vs. specialists (Cardio, Endo etc.)").
222 *See generally* Scott Morton Amended Opening Report, § 7.
223 *See, e.g.,* Stiroh Rebuttal Report, ¶ 209 and Gaier Rebuttal Report, ¶ 291.
224 Gaier Rebuttal Report, ¶ 239
225 Stiroh Rebuttal Report, ¶ 216.
226 Gan Rebuttal Report, ¶ 158.
227 When discussing Praluent®'s low market shares, Amgen ignores that Praluent®'s low market shares are the result of, first, Amgen patent litigation, and second, their portfolio rebate strategy.
228 *See* Figure 15.

[redacted]

### 5.3 Amgen's conduct increased Praluent®'s foreclosure because of within PBM spillover effects.

#### 5.3.1 *Amgen's experts' critiques of my within PBM spillover effects suffer from conceptual errors.*

114. Before addressing Amgen's experts' criticism of my analyses, it is important to address two conceptual errors that Amgen's experts made.

115. First, all of Amgen's experts (Dr. Stiroh, Dr. Gaier and Ms. Gan) criticize my within PBM spillover analysis because the evidence shows that *not all* formularies within a PBM changed their coverage status when a PBM changed the coverage of a drug for its national formulary.[229] In my Opening Report, I never claimed that *all* formularies within a PBM adopted the national formulary,[230] nor did I assume that when calculating my foreclosure estimates.[231] What is relevant for my analysis, however, is that at least *some* health plans adopted the same formulary coverage as a national formulary whose coverage was the result of Amgen's anticompetitive CTB. As I show below, by securing exclusivity through an anticompetitive agreement with one national formulary, Amgen's conduct had the effect of excluding Praluent® from more than just the national formulary.

116. As I explained in my Opening Report, a health plan standing alone has less bargaining power than an aggregated PBM or GPO that negotiates on behalf of many health plans.[232] As a result, a PBM's clients often adopt the national formulary as their default.

117. The extent of foreclosure deriving from the within PBM spillover effect can increase with time if a PBM pressures its custom formularies to adopt the national

[229] *See, e.g.* Gan Rebuttal Report, ¶ 44 ("There are multiple PBMs and multiple custom clients within PBMs who *may not* adopt the PBM's national formulary.) (emphasis added); *Id.*, ¶ 59 ("[…] as I noted above, *not all* the PBM's health plan clients *necessarily* follow those national formularies) (emphasis added); Stiroh Rebuttal Report, ¶ 199 ("[…] the "downstream clients of" CVS Caremark *have not tended* to follow its national template formularies" (emphasis added)).

[230] Scott Morton Amended Opening Report, ¶ 101 ("Spillover effects can also be felt at the PBM-level. Because of the consolidation in the PBM industry, when a GPO enters into a contract on behalf of a client's national formulary, each of the clients and health plans that follow the client's national formulary **will tend to follow** the same coverage decisions" (emphasis added)) and ("the GPO Ascent contracts on behalf of ESI's Commercial formularies; Prime Therapeutics and Cigna are both clients of ESI, meaning that they are **more likely than not** (and ultimately did in the case of Amgen's exclusionary CTB) to adopt ESI's formulary decisions" (emphasis added)).

[231] My foreclosure estimates exclude formularies that have a 1:2 positioning or Praluent® as the preferred drug.

[232] Scott Morton Amended Opening Report, ¶ 60.

template, as we see in this case.[233] I have seen other internal Amgen documents that show Amgen saw strategic value in winning key formularies to secure future coverage.[234] Another example of within PBM spillover that Amgen's experts ignore is the evidence showing that ESI Part D [redacted][235]

118. Despite all of the evidence, Amgen's experts miss the key point: not all of a PBM's clients need to adopt a national formulary for within PBM spillover effects to exist—if even a single PBM client adopts the same coverage as a national formulary that was the result of an anticompetitive offer, there is some within PBM spillover effects.[236] Amgen's experts mistakenly conclude that if they show any formularies that do not follow the national formulary, they have shown that there can be no within PBM spillover, which makes no sense and is simply not the case.

119. The second conceptual mistake Amgen's experts make is their claim that I consider exclusion from a formulary to be the same as foreclosure.[237] As explained, foreclosure occurs in this case when Praluent® has been excluded as a result of Amgen's CTB strategy.

### 5.3.2 *Dr. Stiroh and Dr. Gaier ignore and misinterpret the evidence from my Opening Report to falsely claim that there are no within PBM spillovers.*

120. In my Opening Report, I provided empirical evidence of within PBM spillover effects that shows how Amgen's CTB impacted formulary decisions of health

---

[233] *See, e.g.*, REGN0006102 at 103 [redacted]

[234] AMG10935-0000012200 at 201 (In a July 2021 internal Amgen email, Steve Hall writes: "This outcome is the conclusion of more than 18 months' worth of work. Thank you to all of those who have helped throughout this negotiation including the V&A teams under Andy Chiu, the SPC team, our medical partners, and others. Without this great teamwork, we wouldn't have come to the same outcome. We are already putting the plans in place to maximize these wins with OptumRx downstream clients, as well with the UHC pull through calls.").

[235] Scott Morton Amended Opening Report, ¶ 74.

[236] For instance, Amgen bid at ESI include bids made jointly for "[redacted]. These bids are for the same level of coverage and bid the same value, *See, e.g.,.,.,.,* AMG10935_OCO-0000000601 at 605 and AMG10935-0000000937 at 941. As additional examples, ESI Express maintains that "Express Scripts' plan sponsors often adopt Express Scripts-developed formularies as their own or use them as the foundation for their own custom formularies" and CVS Caremark says that "[clients] may choose to utilize CVS Caremark formularies for their plans or use them as the foundation for custom formularies." *See* "White Paper: Formulary Development at Express Scripts" at p. 4, https://d17f9hu9hnb3ar.cloudfront.net/s3fs-public/2022-04/Formulary%20Development_April%202022.pdf; Pharmacy and Therapeutics (P&T) Committee Meeting at p. 7, https://www.shpnc.org/documents/pharmacy-and-therapeutics/pt-booklet-may-2019-secured/download. *See also,* AMG10935-0000043636 at 639 ("Custom clients control their own formularies but will reference national decisions for guidance").

[237] Gaier Rebuttal Report, ¶ 299. ("As her assertions make clear, Prof. Scott Morton's spillover analyses inappropriately equate *exclusion* of Praluent® from a given formulary with anticompetitive *foreclosure* of Praluent®.").

plans and clients of ESI and OptumRx. In particular, I showed that clients of ESI and OptumRx adopted Repatha® preferred formulary coverage *only after* [redacted].[238] I also cited evidence that shows the mechanisms through which within PBM spillovers appear: custom formularies following the structure of a national formulary,[239] decisions of formulary coverage being made jointly (e.g., in the same contract or negotiated by the same GPO), or members of one PBM pressuring other members to adopt formulary coverage decisions they were not planning to adopt (i.e., [redacted][240] In their reports, Dr. Stiroh and Dr. Gaier ignore this evidence and claim inaccurately that I provided no evidentiary support for the existence of within PBM spillovers effects.

121. Dr. Stiroh falsely claims that I "[provide] no empirical (or even anecdotal) support for [my] assertions."[241] But Dr. Stiroh fails to consider my Opening Report in which I addressed this topic, concluding that foreclosure due to Amgen's anticompetitive CTB agreements goes beyond the specific contracts and citing to empirical evidence and specific documents showing examples of how within PBM spillovers operate.[242] She also ignores the fact that there exist contracts that often show that some custom formularies and national formularies are negotiated jointly.

122. Dr. Gaier similarly ignores my Opening Report and claims that I provided no academic or industry studies to support my assertions of PBM level spillover effects.[243] Such general principles might be interesting to study as a matter of academic scholarship, but they are completely unnecessary in an environment with hard data and facts showing actual marketplace outcomes, which is what I have provided here.[244]

123. Dr. Gaier also misunderstands one of the examples provided in my Opening Report to explain additional channels through which within PBM spillover effects appear. He discusses the example where I argue that since Ascent negotiates on behalf of clients of Prime Therapeutics and Cigna, Prime Therapeutics and Cigna are more likely than not to adopt similar coverage decisions.[245] According to Dr. Gaier, this cannot be evidence of spillover effects as Cigna and Prime are already included in my assertion of direct effects from Amgen's conduct. Dr. Gaier misses the point: this is an example of the *mechanism* that may arise in other circumstances, such as with smaller customers that follow the National template as a default. Dr. Gaier also ignores evidence that shows other mechanisms that

[238] Scott Morton Amended Opening Report, Figure 11, Figure 14, Figure 21(a) and Figure 21(b).
[239] *Id.*, ¶ 101.
[240] *See e.g., Id.*, ¶ 154.
[241] Stiroh Rebuttal Report, ¶ 197.
[242] Scott Morton Amended Opening Report, Section 7.1.2.
[243] Gaier Rebuttal Report, ¶ 294.
[244] The lack of academic research could be due to the fact that data for custom formularies that adopt a national formulary template are not generally available to academics.
[245] Gaier Rebuttal Report, ¶¶ 294-295.

generate spillover effects: individuals in charge of different accounts talk with each other, and in some instance they also pressure each other to influence formulary decisions.[246]

124. Dr. Gaier also dismisses the evidence provided in Figure 21(a) and Figure 21(b) of my Opening Report that show that the adoption of Repatha® as a preferred drug on the formularies of ESI and OptumRx's clients started *only after* the Amgen's [redacted]. According to him I "merely observed that plans associated with a given PBM switched additional formularies to cover Repatha® 1:1 after Amgen's challenged conduct."[247]

125. Both Figure 21(a) and Figure 21(b) (reproduced below as Figure 8 and Figure 9) show that the share of formularies, excluding National Preferred formularies and UHC Commercial, with Repatha® preferred formulary coverage were almost flat before the anticompetitive agreements began. In the case of ESI/Ascent, the share of formularies that had Repatha® as the preferred drug was virtually constant around [redacted] between January 2019 and December 2020. In the case of OptumRx commercial the share remained also relatively flat around [redacted] for more than 2 years and a half, between January 2019 and August 2021. Nevertheless, the adoption of Repatha® as the preferred drug started to increase *only* after Praluent®'s exclusion from ESI National Preferred formularies and OptumRx/UHC Commercial formularies. At ESI/Ascent Commercial, just one year after Amgen's [redacted] was reached, the share of formularies, excluding National Preferred formularies, that adopted Repatha® as the preferred drug grew from [redacted] one month before the exclusion to [redacted] a year later, and climbed to [redacted] two and a half years later. Similarly, at OptumRx the share of formularies that adopted Repatha® as the preferred drug more than doubled just one year later.

**Figure 8: Figure 21(a) from Scott Morton Amended Opening Report: Counts and Share of Formularies with Repatha® as the Only Covered Drug Ascent/ESI Commercial Formularies, Excluding ESI's National Preferred Formularies (U.S. January 2019 to July 2023)** [248]

---

[246] Scott Morton Amended Opening Report, ¶ 74 ("Ultimately, the sheer value of the [redacted]. ESI Part D lead negotiator Mr. Rothrock explained that he might need its largest health plan [redacted].").

[247] Gaier Rebuttal Report, ¶ 297.

[248] **Notes:** [a] Figure reproduces Figure 21(a) from Scott Morton Amended Opening Report. The figure has been modified to include the arrows in the figure. [b] Repatha® Preferred means that Repatha® is either the only drug covered in the formulary or has a better tier placement than Praluent®. [c] Cigna formularies were incorporated into ESI as a PBM in July 2021. Cigna formularies are excluded from the ESI figure. [d] Dotted line corresponds to when Praluent® was removed from ESI National Preferred formularies.

[redacted]

**Figure 9: Figure 21(b) from Scott Morton Amended Opening Report: Counts and Share of Formularies with Repatha® as the Only Covered Drug OptumRx Commercial Formularies, Excluding UHC (U.S. January 2019 to July 2023)** [249]

[redacted]

### 5.3.3 *Ms. Gan acknowledges the existence of within PBM spillovers.*

---

[249] **Notes:** [a] [redacted]

126. The claims of Dr. Stiroh and Dr. Gaier that within PBM spillovers do not exist are contradicted by Ms. Gan's report. In her report, Ms. Gan criticism is that "[I] similarly [fail] to consider industry features that would limit spillover across participants and plans within GPO/PBMs."[250] That is, while she considers there are mitigating factors for within PBM spillover effects, she concedes that within spillover exists.

### 5.3.4 *Evidence provided by Amgen's experts confirms that within PBM spillover effects exist.*

127. In their reports, Ms. Gan and Dr. Gaier claim that I did not consider other potential explanations for why coverage at the affected PBMs changed after the portfolio rebate strategy started and provide evidence that they claim contradicts the existence of within PBM spillover effects. As I address below, their evidence, in fact reinforces the importance of within PBM spillover effects.

128. Ms. Gan argues that my "analysis overlooks […] that a significant portion of a PBM's clients control their own formularies."[251] According to Ms. Gan my argument that since "Prime Therapeutics and Cigna are both clients of ESI [… they] are therefore more likely […] to adopt ESI's formulary decisions,"[252] is invalid because I fail "to acknowledge that Cigna and Prime have their own formularies and make their own decisions."[253] However, Ms. Gan's arguments are irrelevant because the fact is that Prime and Cigna formularies made the same decision as ESI. Moreover, both were included in the same contract as ESI and both have received the [redacted]s. While it is true that clients of ESI *could* make a different decision, the relevant fact for this case is that many *did not*.

129. Ms. Gan also claims that a significant portion of a PBM's clients make independent formulary decisions. To make her point, Ms. Gan provides Figure 9 in her report, which shows the status of OptumRx plans in January 2022, just a few months after UHC commercial formularies excluded Praluent®. Contrary to her claim, her table actually shows that within PBM spillover effects matter. Just a few months after UHC Commercial adopted Repatha®, [redacted], excluding UHC Commercial, adopted Repatha® preferred formulary coverage. MMIT data shows that the plans that adopted Repatha® preferred formulary coverage, excluding UHC Commercial represent [redacted] of commercial lives.[254] Accordingly, Ms. Gan's table not only shows that most formularies

[250] Gan Rebuttal Report, ¶ 156.
[251] *Id.*
[252] *Id.*
[253] *Id.*
[254] **Notes**: [a] Formulary status are as reported in Figure 9 of Gan Rebuttal Report. [b] Lives for Fallon Health and BCBS of MI are approximated using lives from April 2022, as this is the first month these formularies appear in MMIT data. [c] IBC Plans were not found in MMIT data. **Source:** [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

changed status, but more importantly, the plans that did change formulary status were the largest plans.

130. Moreover, the evidence I have reviewed shows that Amgen was aware that the formulary decisions of one client could impact the formulary decisions of another client of the same PBM—for example, after UHC Commercial adopted the [redacted][256]

131. Dr. Gaier instead argues that within PBM spillovers are not feasible because PBMs have both national and custom formularies, and custom formularies do not necessarily follow their PBM national formularies.[257] Dr. Gaier's argument downplays the strategic importance of national formularies, but the facts contradict him. As Amgen's documents show bids are often made for national formularies and custom formularies jointly, and PBMs design their default custom formularies based on national formularies.[258] Moreover, as explained above, not all formularies need to adopt the National formulary for within PBM spillover to exist.

132. To support his argument that exclusion only affects a subset of the PBMs' covered lives, Dr. Gaier makes the superficial observation that about [redacted] of covered lives at ESI Commercial and more than [redacted] of covered lives at Prime are custom formularies and not national formularies.[259] This fact is irrelevant because it does not matter how many custom formularies exist; what matters is the coverage decisions they make. The evidence shows that by June 2023, [redacted] of lives at ESI custom formularies had Repatha® as their preferred drug, while [redacted] of lives at Prime custom formularies had Repatha® as the preferred drug. So the evidence shows that most custom formularies adopt the same coverage as the national formularies, yet Dr. Gaier would exclude that entirely from the foreclosure analysis. Moreover, Dr. Gaier seems to be unaware that even if a formulary is "custom" it can (and

---

[255] *See, e.g.*, AMG10935-0000394974 at 975 ("I got the go ahead for you to reach back out to Matt Vesledahl on the Enbrel/Repatha decisions at UHC. With the ongoing OptumRx decision, would be helpful if he could reach out to Lisa to express [redacted].").

[256] *See e.g.*, REGN0160471 at slide 7 ([redacted]").

[257] Gaier Rebuttal Report, ¶ 301 ("Contracts produced in this case demonstrate that plans using such custom formularies frequently negotiate different rebate terms than apply to the corresponding PBM's national formulary.").

[258] *See e.g.*, "White Paper: Formulary Development at Express Scripts" at p. 4, https://d17f9hu9hnb3ar.cloudfront.net/s3fs-public/2022-04/Formulary%20Development_April%202022.pdf ("Express Scripts' plan sponsors often adopt Express Scripts-developed formularies as their own or use them as the foundation for their own custom formularies.").

[259] Gaier Rebuttal Report, ¶ 300.

often does) follow the National formulary and adopt its coverage decisions, as Amgen's documents show.[260]

133. In his report, Dr. Gaier also tries to make the point that the distinction between custom and national formularies matters because custom formularies have the freedom to select different rebates. Unfortunately for Dr. Gaier, the data he presents do not rebut within PBM spillovers. In Figure 47 he attempts to show the distribution of Amgen's bids for custom and national formularies at ESI Commercial for 1:1 and 1:2 coverage. He then argues that since the distribution of 1:2 rebates and 1:1 rebates differs between custom and national formularies, this means that there are various factors that custom formularies will consider. But the fact that there are different bids does not mean that formularies actually accept bids different to the ones offered to national formularies. As I show in the next paragraphs, this is indeed not the case, as most of ESI Commercial revenue (including CIGNA and Prima) attributed to non-National Preferred formularies comes from formularies with the same rebate as the National Preferred formularies.

134. First, Dr. Gaier's analysis is affected by various errors rendering it entirely unreliable. First, in his Figure 47 he compares the bid distribution for 1:2 and 1:1 bids for custom and national formularies. Since now [redacted] of ESI commercial custom formularies have adopted Repatha® as the preferred drug, the 1:2 bids are largely irrelevant. When looking at 1:1 bids, Dr. Gaier's Figure 47 shows that national and custom bids are usually close, suggesting that there are just small deviations from the national formulary's 1:1 bid at custom formularies.

135. Second, Dr. Gaier's Figure 47 is based on a list of all contracts and amendments to the contracts. However, sometimes the amendments change one bid while not changing the others. When this happens, he counts the amended bid again but does not take into account the fact that other bids remain the same. As a result, he is over counting bids for certain formularies.

136. Third, the bids at custom formularies used for his analysis cover contracts and amendments with effective ends dates for the period of 2018 until 2024, while for national formularies he only includes bids for the 2018-2020 period.[261] That is, he uses data *before* the alleged bundle started for national formularies, and more importantly compares different periods of the data—rendering his comparison inherently unreliable.

---

[260] AMG10935-0000053669 at 669 ("My CVS Client Manager … share [sic] with me [redacted] emplate and some more restricted books are customized.").

[261] Gaier's raw data also includes "effective start date", which covers dates from 2016 until 2024 for custom formularies, and between 2016 and 2020 for National Preferred formularies, and "date" which covers dates from 2016 until 2023 for custom formularies and 2016 to 2020 National Preferred formularies.

137. Fourth, Dr. Gaier cherry-picks which bids he includes in his analysis. He excludes all bids for "National Preferred formularies & custom formularies," and "Base" formularies.[262] That is, to prove that custom and national formulary often receive different bids, he excludes the bids that undercut his point.

138. In sum, Dr. Gaier's analysis is unreliable as it double counts bids, uses different time frames for custom and national bids, and excludes the bids that contradict his argument. Nevertheless, despite all these factors that should make custom and national bids differ more, the distribution of custom and national 1:1 bids in his figure is almost identical, which further supports my argument that the coverage decisions of national formularies highly impact their customers formulary decisions.

139. As discussed above, internal documents from Amgen contradict Dr. Gaier assertions that many customers opt for different formularies than the base (or national) templates. Internal documents provided by Amgen include files that report gross sales, rebates, admin fee, among other variables for Repatha® at the formulary level.[263] Although incomplete because it only includes data for "ESI TOP Formularies 2022" for January until September, nevertheless, it can be used to explore which rebates each formulary received during that time. The data represents [redacted] of ESI Commercial gross revenue, so it covers most of gross revenue from Repatha® during the period. The data includes [redacted] formularies of all sizes. Among the largest formularies, you can find ESI National Preferred formularies ([redacted] gross sales in the data), Cigna Standard Formulary [redacted] gross sales), Express Scripts Basic formularies ([redacted]), among others. It also includes large Prime formularies, such as Prime Performance DL ([redacted]), and also includes a long list of smaller formularies, such as Prime Empirx Total Plus NO St ([redacted], Gateway Synergy 2021 ([redacted]) or Prime Navitus Open No Um ([redacted]). Using this data I estimated the average percentage rebate received by each formulary. The average rebate for National Preferred formularies is [redacted] percent. After excluding National Preferred formularies, I found that [redacted] of the remaining formularies received the same [redacted] rebates as the National Preferred formularies.[264] Those formularies represented 80% of the gross sales at ESI Commercial, excluding National Preferred formularies, as reported in the data, and once you add National Preferred formularies into the equation, [redacted] of gross revenue in the data was tied to the [redacted].[265] That is, contrary to Dr. Gaier speculation, most of formularies accept the same rebate as the National Preferred formularies.

---

[262] Dr. Gaier raw data only includes formularies categorized as "BASE REBATES", but those observations are excluded from his analysis.

[263] *See e.g.*, AMG10935-0000076719 at 719.

[264] AMG10935_OCO-0000000601 at 605, bid for "National Preferred formularies & custom formularies."

[265] Considering that the data does not cover all formularies, this means that at least 75% of gross sales at ESI Commercial that are not attributed to National Preferred formularies have the same rebate offer as the national formulary. For the comparison I include formularies in the "Commercial" and "Comm_Govt" segments as reported in the data. The conclusions do not change if you consider only "Commercial".

140. These numbers confirm my foreclosure estimates. I find that during the period of January 2022 and September 2022, once you consider National Preferred formularies, Praluent® was for foreclosed from [redacted], which is very close to the [redacted] I find in the paragraph above. This confirms that my foreclosure estimates are indeed capturing formularies following the formulary coverage of National Preferred formularies. So contrary to Dr. Gaier's claims,[266] foreclosure cannot be limited just to National Preferred formularies.

141. Dr. Stiroh claims that "Regeneron's experience with respect to its exclusivity for Praluent® on the CVS Caremark national formularies undermines [my] assertions."[267] Dr. Stiroh discusses various internal CVS documents that, according to her, suggest that after [redacted] The evidence provided by Dr. Stiroh is misleading and, in fact, confirms my arguments. For example, while discussing Figure 43 of her report, Dr. Stiroh claims that [redacted]"[268] Dr. Stiroh recognizes that some formularies have adopted the national template formularies, agreeing with my arguments. She makes a similar mistake when she says that at CVS "Praluent® had a significantly lower dispensed prescription (TRx) share for the CVS downstream clients compared to the plans that used the national template formulary[.]"[269]

142. Additional evidence contradicting Dr. Stiroh's assessment of CVS can be found in internal documents from Regeneron. For example, on June 18, 2020 various [redacted] further supporting within PBM spillover effects.[270]

143. In fact, MMIT data confirms the existence of spillovers effects at CVS/Zinc Commercial as well. Figure 10 below is a reproduction of the same analysis from my Opening Report, but limited to CVS/Zinc Commercial. Figure 10 shows the share of formularies that have adopted Praluent® as the preferred drug, excluding CVS Caremark National Commercial formularies. Consistent with the Repatha® trends on ESI/Ascent and OptumRx commercial formularies, there is a clear increase in the share of commercial formularies adopting Praluent® as the preferred drug after Praluent® became the exclusive

[266] Gaier Rebuttal Report, ¶ 209 ("Repatha® utilization on ESI/Ascent commercial national formularies represents less than 7% of US PCSK9i utilization. Therefore, even if Praluent® was foreclosed from ESI/Ascent national commercial formularies, over 93% of the market was still available to Regeneron").
[267] Stiroh Rebuttal Report, ¶ 197.
[268] *Id.*, ¶ 199.
[269] *Id.*, ¶ 200.
[270] REGN0006102 at 103 [redacted]

PCSK9i on the CVS/Zinc national formulary. Again consistent with Repatha®'s formulary coverage on ESI/Ascent and OptumRx commercial formularies, the share of formularies using Praluent® as the preferred drug was flat between January 2019 and June 2020, and started to increase only after CVS/Zinc adopted Praluent® as the exclusive drug.

**Figure 10: Counts and Share of Formularies with Praluent® as the Preferred Drug on CVS/Zinc Commercial Formularies, Excluding CVS Caremark National Formularies (U.S. January 2019 to June 2023)[271]**

[redacted]

144. In sum, Amgen's experts have not, and cannot, rebut my conclusion that within PBM spillover effects exists, and, in fact, the evidence they rely on also confirms the existence of within PBM spillover effects. As discussed above, one of Amgen's experts' many mistakes is that they argue that for foreclosure to exist as a result of within PBM spillover effects, *all* formularies need to change coverage to Repatha® preferred. This is not the case. Rather, for the within PBM spillover effects to matter, they need to meaningfully increase the likelihood that a PBM makes formulary decisions consistent with a template (national or base) formulary, thereby reducing coverage of the impacted drug—this is confirmed by my analyses in my Opening and Reply Reports, and also by Amgen's experts' analyses and evidence.

145. Second, it is important to note that when I consider the within PBM spillover effect, I do not equate exclusion with foreclosure as Dr. Gaier claims.[272] As

[271] **Notes:** [a] Praluent® Preferred means that Praluent® is either the only drug covered in the formulary or has a better tier placement than Repatha®. [b] Dotted line corresponds to when Praluent® became the preferred drug at CVS Caremark National formularies. **Source:** [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT).

[272] Gaier Rebuttal Report, ¶ 299 ("Prof. Scott Morton's spillover analyses inappropriately equate *exclusion* of Praluent® from a given formulary with anticompetitive *foreclosure* of Praluent®. But the two concepts are not the same.").

discussed in Section 5.8 what matters is whether a product was excluded due to competition on the merits or because a competitor offered an anticompetitive bundle. For instance, since Praluent® won coverage at CVS/Zinc Commercial by offering a more favorable rebate, the resulting within PBM spillovers would not be counted towards foreclosure. But since the within PBM spillover effects that occurred at ESI/Ascent commercial were the result of Amgen's anticompetitive CTB rebate, they are properly considered as part of the foreclosed market.

146. Finally, it is important that my foreclosure estimates do not include formularies that did not adopt Repatha® as the preferred drug. That is, all the custom formularies that Ms. Gan, Dr. Gaier, and Dr. Stiroh argue have not adopted Repatha® preferred are not included in my calculations of Praluent®'s foreclosure.

### 5.3.5 *Internal documents support the existence of spillover effects between Part D and Commercial segments.*

147. In their respective reports Ms. Gan, Dr. Stiroh and Dr. Gaier criticize my within PBM spillovers estimates between one PBMs Commercial and Part D formulary decisions. Specifically, Dr. Stiroh alleges "there is no economic basis to assume that the formulary coverage decisions for the CVS Caremark Medicare Part D formularies were in any way attributable to those decisions for the CVS Caremark commercial national formularies and that the CVS Caremark Medicare Part D formularies did not make independent coverage decisions."[273] Dr. Gaier similarly would exclude the spillover effects of CVS/Zinc Commercial's decision on the decision at CVS Part D and claims that my Opening Report did not "consider Amgen's lower stand-alone Repatha® price for CVS Medicare Part D plans compared to Praluent®."[274] Their analyses ignore evidence showing the significance of Amgen's [redacted] the spillover effects of the CVS/Zinc Commercial decision to cover Repatha® 1:1 into CVS Part D.

148. As explained above (see Section 4.5), as part of Amgen's anticompetitive CTB strategy, Amgen aimed to [redacted]. Importantly, after I submitted my Opening Report, evidence that CVS Part D was offered the [redacted] provided. Amgen's offer [redacted] n light of the new evidence, I now conclude that CVS Part D was directly foreclosed as a result of Amgen's conduct., I also provide additional analysis to show that their assertion that there is no evidence of spillovers between segments is not supported.

149. In his report, Dr. Gaier presents Figure 48 and 49 that show commercial and Part D coverage at CVS and OptumRx. He claims that the figures show that

---

[273] Stiroh Rebuttal Report, ¶ 201.
[274] Gaier Rebuttal Report, ¶ 256.

the coverage of both segments do not align for certain periods, and use this as evidence to claim that there are no spillovers effects between Part D and commercial coverage decisions. As explained above, the fact that not all formularies are affected by a key formulary change does not invalidate the existence of PBM spillovers. Moreover, his analysis is selective, and omits the fact that at CVS, Repatha® is currently the preferred drug in both segments.

150. Moreover, Amgen's analysis of PBM coverage reproduced in Dr. Stiroh's report confirms that there are within PBM spillovers and contradicts Dr. Gaier's claims. Figure 46 of Dr. Stiroh's report is a reproduction of an internal Amgen chart summarizing formulary status in 2022 at national formularies and "other" formularies at the major PBMs. At this time, the national formularies for CVS/Zinc Commercial and CVS Part D were Praluent® exclusive, while the national commercial formularies for ESI, Prime and OptumRx were Repatha® exclusive, as was the national Part D formulary for ESI (including Prime). If there were no within PBM spillovers, then there would have been no reason for the distribution of coverage on other formularies at each of the major PBMs to be systematically different depending on whether the national formulary is Repatha® exclusive or Praluent® exclusive. But if there are PBM spillovers, then the other CVS formularies would be more likely to be Praluent® exclusive, while the other formularies at ESI, Prime, and Optum commercial would be more likely to be Repatha® exclusive.

151. The data reported by Dr. Stiroh are consistent with significant within PBM spillovers. [redacted] Thus, the Amgen data reproduced in Dr. Stiroh's report are fully consistent with PBM spillovers within and across segments.

152. Similarly, Ms. Gan's assertions that there are factors that limit spillovers between the commercial and Part D business are contradicted by internal documents or deposition testimony. In particular, Ms. Gan claims that "[i]t is industry standard that different teams represent the commercial and government sides during these separate negotiations," that "Commercial and Part D formulary negotiations often occur during different time cycles," and that "PBMs typically operate with firewalls between commercial and government segments."[275] These three assertions are contradicted by CVS/Zinc's 30(b)(6) deponent, Aydin Sekili, [redacted]

[275] Gan Rebuttal Report, ¶ 153.

[redacted].[276] Additionally, Joseph Anderson, CVS's Part D 30(b)(6) deponent, testified that a[redacted][277] The evidence I have review also shows that Part D and commercial segments meet and discuss decisions together with clients. For example, there is evidence of meetings between Amgen, Gary Loeber (EVP, Pharmaceutical Contracting and Purchasing at CVS Health) and Joseph Anderson (VP, Caremark Trade Relations),[278] as well as Amgen presentations for CVS that include discussions of Repatha® financials and coverage at CVS commercial and Part D.[279]

153. Ms. Gan also identified other factors she claims limit spillover effects: "(1) in general, PBMs can and regularly do make different decisions for Commercial and Part D formularies in the same time period, (2) PBMs frequently change coverage decisions, including mid-year, (3) at most major PBMs during the relevant period in this matter, Repatha® and Praluent® were frequently covered at parity, and (4) PBMs do not exhibit the same selection behavior as each other."[280] Whatever her personal experience may have been, all these claims are contradicted by documents and data. As explained above, her first statement is contradicted by Dr. Stiroh's Figure 46, which shows a strong correlation in the coverage of commercial and Part D segments. Her second statement similarly goes against what the data show: at ESI (in both segments) Repatha® has been the preferred drug in the National formularies, since September 2020 and at CVS Praluent® was the preferred drug in

---

[276] Dep. Tr. A. Sekili (CVS Caremark 30(b)(6)), 71:11-73:1 [redacted]

[277] Dep. Tr. J. Anderson (CVS Caremark 30(b)(6)), 11:11-12:3 [redacted]

[278] AMG10935-0000012779 at 779 (May 13, 2021 email from Jennifer Norton to Murdo Gordon: "Tom and I had a productive dinner meeting with Gary Loeber and Joe Anderson in Minneapolis this Tuesday. Some key takeaways are summarized below…").

[279] AMG10935-0000687879 at slide 2 (Objectives for AMGEN: CVS meeting: "Attendees…. CVS: Gary, Joe S, Joe A, VijayAmgen: Tom, Ian, Jasper, Stephanie, Nerissa").

[280] Gan Rebuttal Report, ¶ 154.

the national formularies in both segments between July 2020 and June 2023, and after a brief six month interruption between July 2023 and December 2023, on January 1, 2024 through the present, both segments have had Repatha® as the exclusive drug. Ms. Gan's third statement is also false—the only segment where Praluent® and Repatha® have been in parity since this case began is OptumRx Part D.[281] All other PBMs have had either Repatha® or Praluent® as the preferred drug for most of the time. Her last statement is also false, as of today all major PBMs, with the exception of OptumRx Medicare Part D have made the same decisions as a result of Amgen's CTB strategy: Repatha® is the preferred drug. In summary, none of the mitigating factors that Ms. Gan mentions are true.

154. In sum, given the breadth of evidence, my view that spillovers between a PBMs commercial and Part D segments can occur remains unchanged.

### 5.4 My prescriber-level spillover estimates are not affected by Amgen's experts' criticisms.

155. In my Opening Report, I estimated the magnitude of prescriber-level spillover in the U.S. PSCK9i market using three different estimation tools. The three methods provided robust and consistent estimates of approximately [redacted] points (pp) change due to spillovers results from a direct change in market shares of [redacted] change.[282] While all experts agree that prescriber-level spillovers exist, Amgen's experts criticize my estimates, claiming that they are unreliable and inconsistent with Regeneron internal data. These critiques are unfounded.

#### 5.4.1 *Dr. Gaier's and Dr. Stiroh's criticisms of my illustrative example ignore the complementarity of my econometric analysis.*

156. In my Opening Report I included two econometric analyses and an *illustrative* example to support my prescriber-level spillover analyses. Although my econometric analyses include controls for various confounding factors and are a more robust approach, Amgen's experts focused most of their criticisms on the illustrative example, largely ignoring that my two other econometric analyses addressed many of their unfounded concerns.

157. Dr. Gaier criticizes my analysis in Figure 20 (a) and (b), claiming that Figure 20 (b) "misleadingly exaggerates the purported spillover effects by truncating the vertical axis to depict only a narrow range from [redacted][283] This criticism is false. In my Opening Report I provide every single number used for estimating the spillover effect and

[281] See backup material.
[282] Scott Morton Amended Opening Report, notes 289, 291 and Table 7 and Table 8.
[283] Gaier Rebuttal Report, ¶ 314.

provide the full computation in paragraphs 144 and 145, and footnote 266. The numbers in the computation remain unchanged regardless of the axis in the Figure.

158. Dr. Gaier also claims that I ignore the long-run declining trend, and to "[t]o demonstrates the flaws in Prof. Scott Morton's analysis, [he] simply expand[s] the window of analysis from six months before and after ESI/Ascent's decision to cover Repatha® 1:1 to 12 months and extend the vertical axis to zero."[284] He then concludes that "[redacted] Dr. Gaier's criticisms show his lack of understanding of what is the relevant effect: the [redacted] which is also visible in Figure 50 of Dr. Gaier's report, and reflects the change in share resulting from Amgen's conduct.

159. More importantly, Dr. Gaier ignores the fact that the existence of a trend can be, and is, accounted for in my econometric "differences-in-differences" analysis. In this econometric analysis, I compare areas where Praluent®'s share attributed to ESI National Preferred formularies was higher (so the direct effect of Praluent® removal is bigger) to areas where the share was lower (so the direct effect of removing Praluent® is smaller or nonexistent, that is the control group). By using a control group I can control for pre-existing trends in my analysis. In fact, if I extend the window of analysis to 12 months as Dr. Gaier suggests, I found estimates of prescriber level spillovers between [redacted]

160. Dr. Stiroh's criticisms of my *illustrative* example are also misplaced. She argues that my analysis "includes plans that may have not covered Praluent® and Repatha® at parity before July 1, 2020. As such, changes to the formularies of those plans outside the period […] may have affected Praluent®'s performance in the 12-month period that [I]" study.[287] Dr. Stiroh's proposes to extend the window of analysis for the entire period of 2019 through June 2021—this is nonsensical. By extending the window of analysis Dr. Stiroh introduces confounding factors that impact the accuracy of the analysis. For example, in 2019 there were two major events in the patent litigation—when Amgen secured a jury verdict in its favor, and when that verdict was reversed. The approach that Dr. Stiroh proposes does not allow me to account for these confounding factors, which are not included in the shorter duration. More importantly, Dr. Stiroh's concerns are fully addressed by my panel econometric regression, which includes data from 2019 through June 2023, and allows me to

[284] *Id.*, ¶ 315.
[285] *Id.*
[286] **Source:** [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX). See replication package.
[287] Stiroh Rebuttal Report, ¶ 207.

implement controls for changes in coverage status on the various formularies. Notably, Dr. Stiroh does not criticize my panel data analysis.

### 5.4.2 *Dr. Gaier and Dr. Stiroh ignore the standard approach in an econometric literature.*

161. My illustrative example is supported by two econometric analyses. The only criticism that Dr. Gaier has of these analyses is that I estimated a linear model.[288] To support his claim Dr. Gaier shows a slide from Regeneron's internal documents that he claims show that spillover effects are non-linear.[289] Dr. Gaier's criticisms are unfounded and are irrelevant for purposes of my foreclosure estimates.

162. First, Dr. Gaier misunderstands one of my regressions, claiming that "both [regressions] assume a linear relationship between Praluent®'s share of PCSK9i utilization for ESI national commercial formularies and Praluent®'s share for other formularies." [290] I only compare the relationship of ESI's National Commercial formularies to other formularies in my difference-in-differences regression, and not in my panel data regression. Meaning, Dr. Gaier failed to understand my panel econometric regression, and thus, has cannot criticize it.[291]

163. Second, using linear models (as well as differences-in-differences) to estimate causal effects, as I do, is standard in the economic literature. For example, Professor Angrist (Nobel of Economics in 2021) and Professor Pischke state that "the core methods in today's econometrics toolkit are linear regression for statistical control […] and differences-in-differences methods that exploit policy changes".[292]

164. Third, the slide in Dr. Gaier's report shows that HCP have different sizes,[293] so to find a market-level estimate you need to aggregate those effects, which effectively means finding a weighted average that considers the size of each HCP. Linear models have been shown empirically to be a good approximation of the average effect in the context of non-linear models.[294] As my estimation uses weights based on the plan size, I am effectively estimating an average weighted effect.

---

[288] Gaier Rebuttal Report, ¶ 317.
[289] *Id.*
[290] *Id.*
[291] My panel regression econometric evaluates the impact of state level market shares across all segments and formularies on future usage at the formulary level in the next period.
[292] *See* "Mostly Harmless Econometrics, An Empiricist's Companion," Joshua D. Angrist and Jörn-Steffen Pischke, 2009, Book Jacket.
[293] Size in the figure is measured by size of the circle.
[294] *See* "Mostly Harmless Econometrics, An Empiricist's Companion," Joshua D. Angrist and Jörn-Steffen Pischke, 2009, p. 103 ("[T]he output from nonlinear models must be converted into *marginal effects* to be useful. Marginal effects are the (average) changes in CEF implied by a nonlinear model.") and p. 80 ("And in our empirical experience, the average derivatives (also called "marginal effects") constructed from parametric nonlinear […] are usually indistinguishable from the corresponding [linear] regression coefficients, regardless of the distribution of regressors.").

165. Fourth, while the Regeneron document Dr. Gaier cites discusses "spillovers," the numbers shown in the slide are not directly comparable to my estimates. The document shows the relationship between share of patients and HCPs that have a certain degree of coverage and the share of Praluent®'s prescription at that HCP. This is not the relationship I consider, which is the effect of market wide market shares on future market shares. My analysis is not about the degree of coverage, but about how many claims are attributed to Praluent®. While the relationship shown in the slide is very closely related to my estimates, it is not the same because there is no reason to expect that both should have the exact same shape.

166. Fifth, the methodology behind the Regeneron analysis is unexplained—there is no explanation of how the HCPs were selected, or how the baseline level without spillover is defined. However, based on only the information available in the presentation, [redacted]

167. Rather than engaging with my analysis, Dr. Gaier's only criticism of my methodology, which uses a method widely used and accepted in economics, is that it is inconsistent with one slide included in an internal Regeneron presentation that lacks enough context to properly assess what was done or how the data was selected. This is unpersuasive.

168. Dr. Stiroh only criticizes my differences-in-differences model, and does not provide any criticisms to my panel regression analysis. Dr. Stiroh claims that when she implemented my differences-in-differences model to Praluent®'s removal from UHC Commercial she found no effect.[296] However, the lack of effect she finds is caused by an improper implementation of the method. My differences-in-differences model estimates spillover effects by comparing Praluent®'s share at formularies that are not ESI National Preferred formularies in states where Praluent®'s removal from ESI National Preferred formularies was likely to have a higher impact against states where it was likely to have a low effect or no effect. To identify the states that were more likely to be affected, I estimated the share of claims at the state-level that were attributable to Praluent® through ESI National Preferred formularies before the removal. Areas that had relatively more Praluent® claims made through ESI National Preferred formularies were more likely to see a drop in Praluent® state-level market shares after the removal, than areas where Praluent® claims through ESI National Preferred formularies were low. The spillover effect is obtained by comparing how Praluent® market shares changed in more and less affected areas. However, to be able to

[295] Computations based on Bloomberg Symphony data.
[296] Stiroh Rebuttal Report, ¶ 207.

compare low and high affected areas it is necessary that there is variation in the data, or to put it more simply, that there are indeed low and high affected areas. If all areas are likely to be similarly affected then by comparing one against the other you will find no effect.

169. When Dr. Stiroh modified my code, she did not assess whether the methodology could be actually implemented to address the UHC event. Inspection of the data shows that there is not enough variation in the state-level market shares attributable to Praluent® through UHC formularies to implement the analysis. For example, the data shows that for the ESI event analysis less than 1% of observations have a Praluent® ESI NPF share of less than 1%, however, for the UHC event analysis the comparable figure is 94% of observations. That is, almost all observations for the UHC event have a very similar impact, which is close to zero. As such, it is not surprising that she finds no differences when implementing her version of the model as almost all units are affected in the same way and have little effect—meaning there are no differences to be estimated. As such, it is clear that it is not that the method is "unreliable," but that the model cannot be used for Dr. Stiroh's analysis.[297]

170. It is important to note that although the differences-in-differences model cannot be used to analyze the UHC Commercial spillover effects does not mean that there are no spillover effects. It merely means that the method used to analyze the ESI spillover effects is not appropriate to use in order to analyze the UHC spillovers. For this reason, and considering the concerns that may arise with estimating spillover effects only based on one event (Praluent® removal from ESI National preferred formularies), in my Opening Report I also estimated spillover effects based on another econometric method, a panel method model. Dr. Stiroh does not critique my panel model regression analysis, or recognize that my panel method is consistent with the results of my differences-in-differences econometrics and my *illustrative* example. The fact that my three methods of analyzing spillover effects provide consistent estimates, regardless of the approach supports the accuracy of my spillover estimates.[298]

171. While Ms. Gan does not criticize my econometric model directly, she argues that "neither Ms. Bates nor Dr. Scott Morton account for the impact of direct sales efforts (e.g., direct promotion from sales representatives, direct-to-consumer advertising investments, product samples and coupon programs), changes in market access strategy, and other industry events that could be the sources of the market share changes they claim to observe,"[299] and, thus, mistakenly concludes that the analysis is erroneous. Ms. Gan's criticisms of my analyses are unfounded. My econometric analyses includes state, PBM and

[297] Stiroh Rebuttal Report, ¶ 207 ("[H]er estimates of these spillover amounts are unreliable.").
[298] The panel econometrics method links the variation in Praluent® market shares at the state level and across time to Praluent® level utilization of a formulary in the next period. This allows me to estimate a spillover effect not only based on one event, but rather the continuous change of market shares across states and time.
[299] Gan Rebuttal Report, ¶ 162.

period "fixed effects", [300] which allow me to take into account common industry events, such as changes in market access and direct sales strategy at the national level, a PBM's fixed characteristics (e.g., preferences for a drug), as well as state-level fixed characteristics. My estimates also control for changes in coverage status.

172. Finally, Ms. Gan's argument that Regeneron should have invested in pull-through expenditures to mitigate Amgen's CTB makes little sense, as it would impose an additional cost burden to mitigate the already harmful effects of Amgen's anticompetitive strategy and run counter to the marketing strategy that had proved successful for Regeneron prior to Amgen's introduction of its exclusionary CTB strategy.

### 5.4.3 *The internal documents concerning spillover effects relied upon by Amgen's experts are either irrelevant or confirm my estimates.*

173. Amgen's experts cite to various Regeneron internal documents claiming that they invalidate my spillover estimates. Above, I explained why the document relied upon by Dr. Gaier is irrelevant, so I will not address it here again.

174. Dr. Stiroh relies on an Amgen presentation of IQVIA that evaluated the effect Amgen's loss of access at CVS.[301] The presentation compares Repatha®'s market shares at CVS/Zinc against all other commercial payers. Dr. Stiroh argues that there are no spillover effects because the document shows no significant change in other commercial payers. The presentation does not provide sufficient data or calculations to assess whether or not spillover effects exist. In order to calculate a spillover estimate, the analysis should control for, as an example, formulary coverage status. IQVIA's presentation does not do appear to include that control.[302] Similarly, the alleged lack of spillover effects shown in the slide cited by Dr. Stiroh contradict other Regeneron internal documents cited by Dr. Gaier and Ms. Gan.

175. Finally, Ms. Gan cites internal Regeneron documents that forecast that "the [redacted][303] This estimate cannot be directly compared to my estimates of spillover effects because it is using different underlying data. In order to compare this figure to my calculations, you would have to determine what the loss of coverage at ESI commercial means in terms of claims—an apples to apples comparison. As of the date of the presentation (July 2020), ESI Commercial represented [redacted] of claims in the U.S. PCSK9i market, and Praluent®'s share

---

[300] A fixed effect is a variable that captures all unobserved, constant factors that affect the outcome variable. *See e.g.*, "Introductory Econometrics, a Modern Approach", Jeffrey M. Wooldridge, International Student Edition, p. 456. *E.g.*, Time fixed effects allow to control for common factors affecting all observation in a period, such as seasonality factors, or national level changes at the industry level.

[301] Stiroh Rebuttal Report, ¶ 208.

[302] This criticism does not apply to my *illustrative* example, as I control for formulary coverage differences by focusing on 1:2 formularies.

[303] *See* Gan Rebuttal Report, ¶ 172 and REGN0160471 at slide 19.

of ESI Commercial was [redacted] which means that the loss of ESI Commercial implied a decrease of Praluent® market share at the market level of [redacted] When evaluated consistently, the [redacted] market share loss estimated in the presentation translates into a prescriber spillover effect of approximately [redacted] from a [redacted], that is, the estimates are in line with my estimates.[304]

### 5.5 Foreclosure estimates should include certain other excluded formularies at the affected PBMs.

176. Dr. Gaier criticizes my foreclosure analysis because I include formularies that covered Repatha® 1:1 before Amgen's anticompetitive CTB rebates were offered, claiming that "those plans had already demonstrated their preference for 1:1 coverage […] before the challenged conduct."[305] This criticism stems from Dr. Gaier's incorrect assumption that the relevant measure of foreclosure is whether or not the coverage status changed. However, what is actually relevant for estimating foreclosure is whether or not Praluent®'s capacity to compete for coverage was affected due by Amgen's anticompetitive CTB. If one applied Dr. Gaier's faulty logic to any foreclosure scenario (not only the one in this case), foreclosure would be limited to the market shares before the conduct started,[306] and therefore, would ignore the impact that the anticompetitive strategy had on the affected party's ability to compete.

177. As shown in the sections above, and in my Opening Report, Amgen's anticompetitive CTB offers to PBMs did affect the coverage choices of other formularies via within PBM spillover effects. This effect is most obvious for the formularies that made an actual coverage change. However, as explained in my Opening Report, Amgen's portfolio offers also affect the future decisions of health plans that had Repatha® exclusive coverage before Amgen's CTB.[307] For instance, and as highlighted in Amgen's internal documents, vertically integrated health plans use national formularies as guidance for their formulary decisions, so regardless of what the prior coverage was, a change in a national

[304] See backup material.
[305] Gaier Rebuttal Report, ¶ 298.
[306] As I discussed further in Section 5.9, Gaier applies the same faulty logic when he tries to bound the extend of foreclosure that could be attributed to Amgen's portfolio agreement. For example, in paragraph 206 of the Gaier Rebuttal Report, Dr. Gaier maintains that "Prof. Scott Morton concedes that, prior to the challenged conduct, Praluent®'s share of PCSK9i utilization was [redacted] and that Praluent® retained at least [redacted] share throughout the period of challenged conduct. Therefore, because Praluent® could not have been foreclosed from share it (1) was not able to achieve prior to the challenged conduct or (2) retained despite the challenged conduct, it could not have been foreclosed from more than [redacted] of the asserted PCSK9i market." Dr. Gaier further states in paragraph 207 that "Prof. Scott Morton contends that Praluent®'s share outside the U.S. is an appropriate competitive benchmark for Praluent®'s U.S. share and that the differences "can be attributed to Amgen's portfolio rebate strategy." Even if true, the two series have a maximum difference of about [redacted] points during the challenged conduct. Hence, even taking Prof. Scott Morton's benchmark assertion at face value, Praluent® was only foreclosed from at most [redacted] of the asserted U.S. PCSK9i market." Under Dr. Gaier's logic, what matters for foreclosure is the market share change, and not that a competitor could no longer compete for gaining market share. Under Dr. Gaier's logic foreclosure (in any case, not only this one) would be capped at whatever market shares existed when the conduct started.
[307] Scott Morton Amended Opening Report, ¶ 158.

formulary harms Praluent®'s ability to compete for the non-national formularies.[308] The fact that this is just another set of formularies affected by the within PBM spillover effects is clearly understood by Dr. Stiroh,[309] but seems to be ignored by Dr. Gaier.

178. The example of Cigna Part D helps explain Dr. Gaier's faulty logic. Cigna Part D had Repatha® as the preferred drug before the conduct started. [redacted] Under Dr. Gaier's assumption, this would not constitute foreclosure because you don't observe any change in coverage even though the decision to not prefer Praluent® is the result of actual foreclosure from a bundled offer.

179. Factors beyond whether a PBM changed coverage are necessary to consider when determining total foreclosures. First, and as discussed at length, the formularies at issue here are also affected by prescriber-level spillover effects that have impacted, and continue to impact, Regeneron's ability to negotiate formulary coverage. Prescriber-level spillover effects impact *all* formularies in the market, but I do not include all formularies with Repatha® preferred coverage at other PBMs in my analysis to ensure I have taken an conservative approach. Secondly, as explained in my Opening Report, "the extent of foreclosure deriving from Amgen's policies cannot be evaluated in isolation of the reality of the market. The higher the pre-existing foreclosed share of the market is, the easier it becomes for Amgen's exclusionary approach to remove Praluent® from the market by targeting specific formularies within the purchase groups."[310]

### 5.6 Ms. Bates's spillover analysis is not inconsistent with PBM spillover effects.

180. Dr. Gaier erroneously claims that "Ms. Bates's second empirical analysis actually undermines [my] assertion of PBM-level spillovers" because "[f]or example, for prescribers with [redacted] or more of their patients covered through ESI commercial formularies, Ms. Bates asserts that Repatha® utilization increased by [redacted]. Yet, if Prof. Scott Morton's theory of PBM-level spillover effects were valid, one would expect Ms. Bates's asserted spillover effects to be larger for ESI patients than for OptumRx patients because ESI patients would be subject to both PBM-

[308] AMG10935-0000043636 at 639 ("Custom clients control their own formularies but will reference national decisions for guidance").
[309] Stiroh Rebuttal Report, ¶ 195 ("With respect to the asserted PBM-level spillover effects, she contends that a "change in a drug's formulary status at a large GPO can influence future formulary negotiations with other GPOs and PBMs.… These effects apparently comprise Prof. Scott Morton's second and third categories of foreclosure that I identified above.") and ¶ 174 ("Her foreclosure estimate breaks down into four categories: (i) foreclosure that she attributes to the "direct effect" of Amgen's challenged conduct, (ii) foreclosure that she contends is "due to spillover effects," (iii) foreclosure that she calls "additional foreclosure within PBM group," and (iv) foreclosure that she describes as "spillover effect at other PBMs.").
[310] Scott Morton Amended Opening Report, ¶ 159.

level and prescriber-level spillover effects, while OptumRx patients would only be subject to the prescriber level spillover effects."[311]

181. Dr. Gaier's criticism omits two important considerations: (1) he ignores that the absolute size of the formularies matter when estimating the change in market shares, and (2) he ignores what the ESI includes both ESI National Preferred formularies and other ESI Formularies ("ESI non-NP formularies").

182. Dr. Gaier's ommissions matter because the ESI National Preferred formularies are the largest of the ESI commercial formularies, so most of the changes in ESI claims will be affected by a change of ESI National Preferred formularies. As such, the change in the ESI market shares in Ms. Bates figure is likely mostly driven by the direct effect and not by the spillover effects.

183. As an example that contradicts Dr. Gaier's logic, suppose that ESI National Preferred formulary represents 100 claims and has an initial Repatha® market share of [redacted]®). The other ESI formularies represent 20 claims and have a Repatha® market share of [redacted] This would mean that for all of ESI's [redacted] claims Repatha®'s market share would be approximately [redacted]). This [redacted] is consistent with Ms. Bates's analysis.

184. Now, for simplicity assume that after Praluent®'s removal the total number of claims at each formulary group remains constant, but assume that the market share at ESI National Preferred formularies increases to [redacted] while the market share at ESI's other formularies increases to [redacted]. This change would imply that the Repatha® market share at all ESI would increase from [redacted], consistent with the analysis conducted by Ms. Bates. However, the increase in the other ESI formularies, the ones that were affected by the PBM spillover effects and the prescriber-level spillover, market shares would increase by [redacted]. This is a considerably higher amount than the 1[redacted] increase at OptumRx found by Ms. Bates.

185. This simple example shows that Dr. Gaier's argument about Ms. Bates analysis contradicting the existence of PBM spillover effects is just a result or a very basic arithmetic mistake.

### 5.7 There is no double counting in my spillover estimates.

186. Dr. Gaier misunderstands how the foreclosure estimates are determined and wrongly concludes that I double count foreclosure.[312] According to Dr. Gaier, the prescriber level spillover effect that I attribute (e.g. to ESI/Ascent formularies) would

[311] Gaier Rebuttal Report, ¶ 336.
[312] *Id.*, ¶ 318.

include the effect on prescriptions at other PBMs, some of which I consider as "directly affected." This is not the case. My foreclosure estimates first consider the market share lost due to foreclosure at the affected PBMs. Since these are formularies where Praluent® lost access, there cannot be any spillover effect on these formularies. Accordingly, my estimates inherently cannot double count foreclosed market share.

### 5.8 My analysis does not determine that mere exclusion equates to foreclosure.

187. Amgen's experts try to mischaracterize my foreclosure estimates by arguing that I confuse exclusion with foreclosure. They argue that, since exclusion can happen as a result of competition, it cannot be foreclosure. For example, Dr. Stiroh claims that "obtain[ing] favorable formulary access for Praluent® and Repatha® is an important aspect of the competitive process between Amgen and Regeneron,"[313] and that it "result[s] in one PCSK9i product obtaining a preferred position on a formulary relative to the other or the products being covered at parity on the formulary for a certain time period."[314] She then proceeds to provide evidence showing that the coverage at PBMs has changed across time.[315] Dr. Gaier makes similar claims where he also tries to mischaracterize my arguments: "Exclusion happens as part of the normal competitive process and can be highly procompetitive, including in the PBM context, as Prof. Scott Morton acknowledged in her congressional testimony."[316]

188. Amgen's experts mischaracterization of my report is unavailing. As I explain repeatedly in my Opening Report, Amgen's anticompetitive CTB is not competition on the merits, which Amgen's experts noticeably ignore. While I agree with Dr. Stiroh's and Dr. Gaier's claims that part of competition between therapeutic substitutes in a pharmaceutical market is head-to-head competition for formulary exclusivities, I do not agree that Amgen's CTB are procompetitive. I find Dr. Stiroh's and Dr. Gaier's arguments to be misleading, and an incorrect understanding of my own words.

189. According to Dr. Gaier and Dr. Stiroh, since the exclusion from a formulary can happen as a result of competition, any exclusivity, however obtained, cannot be anticompetitive. Under this logic, any instance of foreclosure that removes a competitor from the market would be immunized because the same outcome can be obtained through competition. This makes no sense and would obviously render the antitrust laws meaningless. No exclusionary conduct would ever result in liability. The element Dr. Stiroh and Dr. Gaier omit from their arguments is the critical distinction and the reason for this case: whether or not the formulary exclusion happened on the merits of competition or due to an illegal anticompetitive behavior by Amgen. As I explained in my Opening Report, and in this report

[313] Stiroh Rebuttal Report, ¶ 177.
[314] *Id.*
[315] *See e.g.*, Stiroh Rebuttal Report, ¶ 179 ("Jockeying between Praluent® and Repatha® for 1:1 formulary coverage has been a feature of the competition between the two products that predates the challenged conduct").
[316] Gaier Rebuttal Report, ¶ 204.

in various sections, Praluent®'s exclusion from certain PBMs is the direct result of Amgen's anticompetitive behavior, thus, constituting foreclosure.

### 5.9 Dr. Gaier's understanding of foreclosure is incorrect.

190. Dr. Gaier attempts to artificially cap my foreclosure estimates by misinterpreting the definition of foreclosure. Dr. Gaier claims that "Praluent®'s share of PCSK9i utilization was [redacted] and that Praluent® retained at least [redacted] share throughout the period of challenged conduct… Praluent® could not have been foreclosed from share it (1) was not able to achieve prior to the challenged conduct or (2) retained despite the challenged conduct, it could not have been foreclosed from more than [redacted] of the asserted PCSK9i market."[317] Similar logic is repeated when comparing the U.S. market shares to the rest of world shares: "Even if true, the two series have a maximum difference of about [redacted] points during the challenged conduct. Hence, even taking Prof. Scott Morton's benchmark assertion at face value, Praluent® was only foreclosed from at most [redacted] of the asserted U.S. PCSK9i market."[318] This same fatally flawed logics is once more applied when discussing which formularies could have been foreclosed, where Dr. Gaier argues that plans that had Repatha® as the preferred drug before Amgen's CTB could not have been foreclosed as "those plans had already demonstrated their preference for 1:1 coverage […] before the challenged conduct."[319]

191. Dr. Gaier's proposed formulation of what constitutes foreclosure is at odds with what courts have said.[320] Foreclosure is not about the market share lost due to an anticompetitive exclusionary strategy; foreclosure is about a competitor losing access to compete in that market. According to Dr. Gaier's logic, if firms A and B sell to a market with initial market shares of 60% and 40%, respectively, and firm A manages to completely remove firm B from the market due to an anticompetitive strategy, then foreclosure would be limited to 40%. This conclusion makes no sense and assumes that firm B could not have competed to increase its market share.

192. Following Dr. Gaier's logic would mean that in this case, or any other exclusionary case, foreclosure would be capped to the market shares before the conduct, even if a competitor is fully removed from the market. This is simply not supported in economics of law.

---

[317] *Id.*, ¶ 206.
[318] *Id.*, ¶ 207.
[319] *Id.*, ¶ 298.
[320] *See United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001) (affirming a monopolization violation, rejecting Microsoft's argument that "Netscape is not completely blocked from distributing its product," and holding that "although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones"). *See also*, *United States v. Dentsply International, Inc.*, 399 F.3d 181, 197 (3d Cir. 2005); *Conwood v. United States Tobacco Corp.*, 290 F.3d 768, 795 (6th Cir. 2002) (same); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 244 (2d Cir. 2003) (same).

### 6. Amgen's experts fail to account for the recently confirmed direct foreclosure of Praluent® at CVS Part D.

193. The evidence I provided above that showed direct foreclosure at ESI, OptumRx, CVS and Humana, as well as my new evidence and Amgen's experts' evidence that actually supports the existence of within PBM and prescriber level spillovers confirms my estimate of direct foreclosure. Consequently, Dr. Gaier is completely wrong when he asserts, [redacted]

194. Based on the evidence, I consider that the only change necessary to my foreclosure estimates is the recategorization of CVS Part D from a within PBM spillover to direct foreclosure. The table below shows the updated numbers for January 2024. Since CVS Part D exclusion did not happen until January 2024, I do not need to update my foreclosure estimates for July 2023.

**Table 1: Total Praluent® Foreclosure from the U.S. PCSK9i Market as of January 2024. Updated Table 4 from Scott Morton Amended Opening Report[322]**

[redacted]

195. Additionally, in response to Dr. Gaier criticism that I offer no quantification of the asserted foreclosure prior to July 2023, Figure 11 below shows the evolution of total foreclosure since the beginning of Amgen's anticompetitive bundling

[321] Gaier Rebuttal Report, ¶ 209.

[322] **Notes**: Table based on Table 4 from Scott Morton Amended Opening Report. The only modification is to move the foreclosure attributable to CVS Part D from column [b] to column [a] **Sources**: [1] AMG10935-DATA-0000000138.TXT – AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076.CSV – AMG10935-DATA-0000000095.CSV (IQVIA LAAD RX).

agreement in April 2020 at ESI Part D.[323] The figure shows substantial foreclosure since April 2020.

**Figure 11: Total Praluent® Foreclosure from the U.S. PCSK9i Market. April 2020-July 2023, and January 2024.[324]**

[redacted]

[323] Scott Morton Amended Opening Report, § 9.

[324] **Notes:** [a] [redacted]

### 6.1 Dr. Gaier incorrectly conclude that Praluent®'s foreclosure would not persist in the long term and increase if Amgen's conduct continues.

196. In Section VII.B of his report, Dr. Gaier maintains that "exclusivity need not persist."[325] To make his point, Dr. Gaier, first, maintains that "[I] erroneously equates "exclusivity" with "foreclosure"."[326] This misinterpretation of my analyses and words have been already addressed in Section 5.3.1.1 above. I consider as foreclosure any exclusivity derived from Amgen's anticompetitive portfolio agreement.

197. Given the erroneous premise that I consider exclusivity and foreclosure the same, Dr. Gaier proceed to explain how exclusivity deals operate at PBMs. He highlights that "[w]hile the manufacturer and the PBM negotiate values for cells of a rebate matrix, the health plan (or the PBM on behalf of the health plan) … decides how to position each drug on its formulary."[327] Is important to notice that here Dr. Gaier recognizes the fact that the PBMs do play a role on selecting formulary coverage for a health plan, in line with my within PBM spillover estimates. He also highlights that even with a contract, coverage is not locked into a particular decision. And therefore, even if a PBM gives a product exclusivity, the exclusivity may not persist.[328] He then proceeds to argue that even if the [redacted] was true, nothing would forbid ESI/Ascent from seeking better terms from Regeneron.[329] He further supports his argument by maintaining that contracts are often renegotiated, so coverage is subject to constant competition.[330] In summary, Dr. Gaier arguments are that since contracts can be renegotiated (and sometimes are), it is not possible for Amgen to foreclose Praluent® as the PBMs could also try to seek better agreements from Praluent®.

198. Dr. Gaier's opinion is based on the wrong proposition that Regeneron can compete against Amgen's portfolio rebates. First, as addressed in Section 3.5, given the preexisting patent litigation that harmed Regeneron's market share [redacted]. Considering the market power and size of Enbrel® and Otezla® (see Section 11 and Section 4.2 in my Opening Report), it is impossible for Regeneron to compete against the CTB rebate strategy. This is supported by the fact that Regeneron lost coverage at all key PBMs due to the bundled agreements (see Section 4).

199. Taking into account that the CTB rebate strategy is costless for Amgen, as they are not providing additional rebates but rather threatening the PBMs that they will be removed, Amgen's strategy can continue indefinitely, and I expect foreclosure to continue through at least 2025 (if not more given the critical importance of Repatha to

[325] Gaier Rebuttal Report, § VII.B ("Exclusivity need not persist").
[326] *Id.*, ¶ 211.
[327] *Id.*, ¶ 212.
[328] *Id.*
[329] *Id.*, ¶ 213.
[330] *Id.*, ¶ 214.

Amgen's business through 2030 as described in my Opening Report). Moreover, with the continued market evolution, and the fact that as of January 2024, Regeneron market shares are at [redacted], the extent of foreclosure due to spillovers effects will increase. It is important to note that as Regeneron's market shares continue to decrease as a result of Amgen's CTB rebate strategy, it becomes harder and harder for Regeneron to compete against Amgen, in contrast to Dr. Gaier's assertion. [redacted]

## 7. Dr. Gaier's claim that Praluent® is not an efficient competitor is unavailing.

200. As described in my Opening Report and above in Section 3.1, [redacted][331] At the time, Amgen recognized that [redacted].[332] Dr. Gaier, however, attempts to argue that "Regeneron is not an equally efficient competitor" as compared to Repatha®.[333] While he never clearly defines "efficient," he appears to believe Ampgen is more efficient than Regeneron for three reasons: 1) [redacted][334] 2) [redacted][335] and 3) [redacted] Below I address his first two claims. Dr. Gaier's third claim is simply incorrect, as I explain in Section 9.2.

201. As an initial point, economic theory does not equate a higher market share with higher efficiency, and Dr. Gaier cites no authority to substantiate his claim. The use of share as a measure of efficiency is particularly flawed in this matter. As described in Section 3.5, Praluent®'s share was artificially suppressed for years due to the uncertainty created by Amgen's patent litigation against Praluent®, and the effects of this suppression lasted at least until Amgen's patent claim was ultimately determined to be invalid, and likely

331 Scott Morton Amended Opening Report, ¶ 63.

332 *Id.*, ¶ 220.

333 Gaier Rebuttal Report, ¶ 274 (Gaier claims "Amgen consistently outspent Sanofi/Regeneron on promoting PCSK9i products to prescribers. From an antitrust economics perspective, therefore, Regeneron is not an equally efficient competitor for reasons unrelated to the challenged conduct and Prof. Scott Morton's assertions that Regeneron could not compete with Amgen's offer to a given PBM do not establish foreclosure.").

334 *Id.*, ¶ 275 ("[redacted]

335 *Id.*, ¶ 274 [redacted]

336 *Id.*, ¶ 279, note 454 [redacted]

lingered even longer. Such artificial share suppression says nothing about whether Praluent® is or is not an efficient competitor.

202. Similarly, share as a measure of efficiency particularly makes no economic sense when there is alleged anticompetitive conduct such as in this matter. Suppose a firm with market power used that power to anticompetitively foreclose its rival. According to Dr. Gaier's definition, the foreclosed firm's smaller market share would itself be evidence that it was less efficient. Such a conclusion makes no economic sense.

203. Dr. Gaier's claim that Praluent® is not an efficient competitor because [redacted] is equally nonsensical, and it has no basis in economic theory. Pharmaceutical product markets in particular tend to suffer from imperfect consumer price signals which can lead to market failure. Patients typically neither know nor pay the total prices charged for the various pharmaceutical treatments they can choose from. And of course, HCPs who have influence over the patient's choice of treatment may not even know which product is more expensive, and regardless the HCP themselves do not incur any pecuniary cost for selecting a more expensive product. Pharmaceutical manufacturers can exploit these imperfect price signals by engaging in inefficient direct advertising to HCPs and patients.[337] And while inefficient direct advertising may result in a higher market share for the manufacturer, that higher share in turn says nothing about the efficiency or inefficiency of the firm.

204. Dr. Gaier, with his singular focus on advertising and promotion spend, fails to recognize that rebates are an alternative way to spend on promoting PCSK9i products. It is perfectly valid and efficient to choose to promote a product through a lower price versus through advertising. And when competitors compete head-to-head on single products—rather than via anticompetitive CTB rebates—the benefits of that competition can clearly be seen in the form of lower prices. As I testified to congress in 2007, sometimes healthy head-to-head price competition in a competitive market results in a single drug being selected as a formulary exclusive in exchange for the manufacturer offering a very low price:

> *[T]he way you get low prices in the pharmaceutical industry is by the ability to exclude drugs. What do I mean by that? You identify a few therapeutic substitutes and you essentially hold an auction. I am happy to buy any one of these cholesterol drugs. Whoever gives me the best price is the one I am going to buy from, and everybody else gets none of my business. When you can do that, you force price competition.*[338]

---

[337] Consistent with this, as described above in Section 3.3, in May 2021 CVS Health advised Amgen that "you don't need a sales force (or DTC [Direct-to-Consumer advertising]), convert that expense into discount[.]" In other words, a large buyer preferred Amgen to offer rebates rather than incur direct advertising spend. According to Dr. Gaier's twisted logic, CVS was asking its supplier, Amgen, to become less efficient, which of course is nonsensical.

[338] Drug Pricing and Negotiation: Overview and Economic Perspectives for the Medicare Prescription Drug Benefit: Hearing Before the Senate Committee on Finance, 110th Cong. 13 (2007) (statement of Fiona M. Scott Morton, PhD).

205. Dr. Gaier attempts to use my statement to Congress as evidence that Praluent®'s exclusion from key PBMs is the result of a "normal competitive process."[339] He is simply wrong. My statement was specifically in regard to head-to-head competition between manufacturers selling "therapeutic substitutes" in a competitive marketplace. In no way was my statement an endorsement of CTB rebates where manufacturers bundle must-have products from unrelated therapeutic drug classes and condition rebates in another market to exclude the one competitive product.

206. Dr. Gaier also criticizes Regeneron's strategy for Praluent®, asserting that "Regeneron failed to offer its own bundled rebate, for example, with [redacted]®,"[340] effectively arguing that Regeneron should have countered the Enbrel®/Otezla®/Repatha® CTB rebates with its own bundled offer.[341] In support of this argument, [redacted]

207. Dr. Gaier goes on to suggest that Regeneron should not have facilitated the transfer [redacted][344] And for good reason, as they are unlikely to provide any real economic efficiencies, while increasing barriers to

[339] Gaier Rebuttal Report, ¶ 29 ("Prof. Scott Morton's spillover analyses also inappropriately equate exclusion of Praluent® from a given formulary with anticompetitive foreclosure of Praluent®. Exclusion happens as part of the normal competitive process and can be highly procompetitive, including in the PBM context as Prof. Scott Morton has testified before Congress, while anticompetitive foreclosure requires a demonstration that an equally efficient competitor could not have meaningfully competed for the sale because of the challenged conduct.").
[340] *Id.*, ¶ 221 and § VIII.D ("Regeneron failed to offer its own bundle").
[341] [redacted] ¶ 122. Ms. Gan does not address Regeneron's ability to match Amgen's bundled rebate offers.
[342] Gaier Rebuttal Report, Figure 42.
[343] *Id.*, ¶¶ 259-260.
[344] Bates Opening Report, § VI.

entry for new and smaller manufacturers[345] and providing a mechanism for large firms with market power to anticompetitively foreclose rivals. An equally efficient competitor in the PCSK9i market should be able to compete head to head by offering a better price without having to resort to putting together a CTB rebate involving products in other, unrelated markets.

208. In Section 8, I show why [redacted] was initially successful, why equally efficient needs to take into account opportunity cost, and why one monopoly rent does not apply.

## 8. Amgen's experts mischaracterize the economics of foreclosure in this case.

209. Amgen's experts dismiss the foreclosure theory in my Opening Report, claiming that it lacks economic logic. However, this criticism is based on a combination of misunderstanding the model and getting the underlying economics wrong. In this section, I describe the economic logic of my foreclosure theory, show that it is consistent with rational, profit maximizing behavior on the part of Amgen, Regeneron, and PBMs, and explain why Amgen's experts' criticisms are mistaken.

### 8.1 Amgen's "one-monopoly-rent critique" has no relevance in the PCSK9i market.

210. The core of the foreclosure theory is that Amgen leverages its substantial market power on Enbrel® and/or Otezla® to foreclose Praluent® in the PCSK9i market. Dr. Gaier claims that this theory runs afoul of the "one-monopoly-rent critique."[346] In making this claim, Dr. Gaier ignores the voluminous economic literature over the last forty years showing that the one-monopoly-rent critique only applies in a narrow set of conditions, none of which is applicable here.[347] The most significant of these conditions in this context is that the critique typically assumes that the market into which monopoly power is being leveraged is characterized by perfect competition, with firms setting price equal to marginal cost. But in the duopoly PCSK9i market, where firms can earn positive gross margins on PCSK9i sales, the one-monopoly-rent critique ceases to apply because there is not just one monopoly rent, but one monopoly rent and two duopoly rents. Under these more general conditions, a dominant firm can use exclusive contracts with a downstream firm to foreclose

[345] New entrants and other small manufacturers would need to merge or strategically partner with other firms in order to effectively compete. This would tend to increase concentration among pharmaceutical manufacturers, further reducing the level of competition. It also would likely lead to inefficient combinations of firms that would otherwise choose to remain independent.
[346] Gaier Rebuttal Report, ¶ 322.
[347] For a survey of this literature, *see* Patrick Rey and Jean Tirole. "A primer on foreclosure." *Handbook of industrial organization* 3 (2007), p. 2145-2220.

the duopoly rival, extracting the rents that the rival would have earned, and sharing some of those rents with the downstream firm so that both are better off under exclusion.[348]

211. Although Amgen's experts object to the terminology,[349] PBMs are coerced into accepting Amgen's exclusionary CTB in the sense that a PBM can only reject Amgen's conditional bundled rebates by going against its own economic self-interest. This means that even though the PBM is worse off entering into an agreement with Amgen that excludes Praluent® than it would have been if Amgen had not [redacted], the PBM is nevertheless compelled to enter into this agreement.

212. Consider an illustrative example involving a formulary for a plan that spends $10 million net on Enbrel® each year, comprised of $15 million at list price less a $5 million rebate. Without bundled rebates, the plan pays $200 per unit for both Repatha® and Praluent®, and buys 10,000 units, of which 7000 are Repatha® and 3000 are Praluent®. Now suppose that Amgen offers the PBM an additional rebate on Enbrel® worth $500,000 conditioned on excluding Praluent®. To keep the example simple, suppose that if Praluent® is excluded Repatha® gets 100% of PCSK9i sales and vice versa (I will return shortly to the important fact that products excluded from a formulary still get some share of sales.) The question is whether accepting the exclusionary agreement could ever be in the best interest of the PBM and the health plan(s) it represents while still being profitable for Amgen.

213. The answer depends on an assumption about PCSK9i costs. Again, to keep things simple, I assume for this example that Repatha® and Praluent® have the same incremental costs, and later in this section will discuss the implications in cost differences between the two firms. I examine three distinct assumptions about the level of costs and the offer made by Amgen.

- **Case 1:** Consider first the case of perfect competition in the PCSK9i market, in which case the one-monopoly-rent critique holds: the per-unit cost for Repatha® and Praluent® is $200, so both firms earn $0 on incremental sales. Given that assumption, if the PBM accepts the offer and Amgen continues to charge $200 per unit, Amgen gains incremental Repatha® sales but earns no profit on them, and meanwhile loses $500,000 in revenue on Enbrel®. Alternatively, Amgen could raise the Repatha® price to, for example, $260. But in that case the PBM, if it excludes Praluent®, would be paying an additional ($260-$200) x 10,000 = $600,000 for Repatha®, offset by only $500,000 of additional Enbrel® rebates.[350] In this case, the PBM would reject Amgen's

[348] John Asker and Heski Bar-Isaac. "Raising retailers' profits: On vertical practices and the exclusion of rivals." 104 *American Economic Review* (2014), p. 672.
[349] Stiroh Rebuttal Report, ¶ 56; Gan Rebuttal Report, ¶ 74.
[350] To be clear, in this variation and the next, I assume the Enbrel® rebate is incremental, in order to show that the one-monopoly-rent critique generally does not hold even when CTB rebates are incremental. In the third variation for this example and the remainder of this section, I assume (consistent with my understanding of how the CTB was implemented in practice) that the CTB does not involved incremental Enbrel® or Otezla® rebates, but rather threatens to withdraw the conditional portion of those rebates if Praluent® is made exclusive.

offer and exclude Repatha®, thus receiving the $5 million Enbrel® rebate and $200 PCSK9i price from Regeneron that it had before Amgen offered an exclusive contract. There is no rebate and price combination that simultaneously makes Amgen better off and gives the PBM an incentive to accept the exclusive offer. In this special case with a perfectly competitive PCSK9i market, the one-monopoly-rent critique holds.

- **Case 2:** Now assume that the incremental cost of PCSK9i products is $150, and that $200 is still the equilibrium price without bundled rebates, so Amgen and Regeneron each make gross profit of $50 on each unit sold. The prices, profits, and PBM drug costs are shown below in the top panel of Table 2. Suppose Amgen offers $500,000 of additional Enbrel® rebates conditioned on exclusive coverage for Repatha® and sets the Repatha® net price at $240. Regeneron still offers a net price of $200 on Praluent®. If the PBM keeps both products, it does not get the additional Enbrel® rebate and is worse off relative to the no bundle rebate equilibrium because of the higher Repatha® price. If the PBM goes with Praluent® exclusive it can retain the $200 price for all units, but loses out on the additional Enbrel® rebate. If it chooses Repatha® exclusive, it pays an additional $40 x 10,000 = $400,000 for PCSK9i products but gains $500,000 from the additional Enbrel® rebate, so it is better off by $100,000. Therefore, at these prices, the PBM would exclude Praluent®. Regeneron would lose the Praluent® profits that it had without bundled rebates of $50 x 3,000 = $150,000. Amgen earns ($240-$150) x 10,000 = $900,000 on Repatha®. Without bundled rebates it was earning $50 x 7,000 = $350,000 on Repatha®. So its incremental Repatha® profits are $550,000, which are more than the incremental Enbrel® rebate of $500,000. Consequently, both Amgen and the PBM (and its plan members) come out ahead.

  That is not quite the end of this second case. Regeneron has another recourse, which is to lower its price enough for Praluent® exclusivity enough to make it worthwhile for the PBM to reject Repatha® exclusivity even though that means losing the additional Enbrel® rebate. In this case, Regeneron can do that by lowering the Praluent® net price below $190, and, if Amgen does not respond by changing its offer, can win Praluent® exclusivity, though at a lower price.

- **Case 3:** The third case most closely resembles what Amgen actually does with its CTB. The costs and prices in the no-bundling equilibrium are the same as in the previous case, $150 and $200 respectively for both products, as shown in the top panel of Table 2. But suppose now that Amgen does not offer an incremental rebate on Enbrel®, but instead takes $1 million from the existing $5 million rebate and designates that portion as conditional on making Repatha® exclusive. Amgen offers a price of $220 for Repatha®. The results are shown in the second panel of Table 2.

**Table 2: PBM drug costs without and with an Amgen CTB**

| No CTB | Formulary option selected by the PBM | | | | | |
|---|---|---|---|---|---|---|
| | Repatha Exclusive | | Praluent Exclusive | | Parity | |
| Supplier Profits | Repatha | Praluent | Repatha | Praluent | Repatha | Praluent |
| Price | $200 | $200 | $200 | $200 | $200 | $200 |
| Cost | $150 | $150 | $150 | $150 | $150 | $150 |
| Units sold | 10,000 | 0 | 0 | 10,000 | 7,000 | 3,000 |
| Gross profit | $500,000 | $0 | $0 | $500,000 | $350,000 | $150,000 |
| PBM drug costs | | | | | | |
| Enbrel | $10,000,000 | | $10,000,000 | | $10,000,000 | |
| Repatha | $2,000,000 | | $0 | | $1,400,000 | |
| Praluent | $0 | | $2,000,000 | | $600,000 | |
| Total cost | $12,000,000 | | $12,000,000 | | $12,000,000 | |
| CTB with $1,000,000 conditional rebate | Formulary option selected by the PBM | | | | | |
| | Repatha Exclusive | | Praluent Exclusive | | Parity | |
| Supplier Profits | Repatha | Praluent | Repatha | Praluent | Repatha | Praluent |
| Price | $220 | $150 | $150 | $150 | $220 | $150 |
| Cost | $150 | $150 | $150 | $150 | $150 | $150 |
| Units sold | 10,000 | 0 | 0 | 10,000 | 7,000 | 3,000 |
| Gross profit | $700,000 | $0 | $0 | $0 | $490,000 | $0 |
| PBM drug costs | | | | | | |
| Enbrel | $10,000,000 | | $11,000,000 | | $11,000,000 | |
| Repatha | $2,200,000 | | $0 | | $1,540,000 | |
| Praluent | $0 | | $1,500,000 | | $450,000 | |
| Total cost | $12,200,000 | | $12,500,000 | | $12,990,000 | |

- If the PBM makes Repatha® exclusive, Amgen gets profits of ($220-150) x 10,000 = $700,000 on Repatha®, which is double the $350,000 it made in the no-bundling equilibrium. Meanwhile with bundling Amgen still pays $5 million in Enbrel® rebates, so the only effect on Amgen is to increase Repatha® profits. Praluent® gets zero profits when it is excluded, so would be willing to price all the way down to marginal cost of $150 to gain Praluent® exclusivity.[351] Turning to the PBM, if it chooses parity it loses the $1 million rebate on Enbrel®, which is far larger than the change in its PCSK9i costs (which go up for Repatha® and down for Praluent®). If the PBM chooses Praluent® exclusivity, it saves ($200 - $150) x 10,000 = $500,000 in PCSK9i costs relative to the no-bundling equilibrium, but that is again swamped by the loss of $1 million in Enbrel® rebates. Finally, if the PBM chooses Repatha® exclusivity, it retains the $1 million in Enbrel® rebates, and only pays an additional ($220-$200) x 10,000 = $200,000 for PCSK9i products relative to the no-bundling equilibrium. So

[351] The willingness to price down to marginal cost here hinges on the assumption that the excluded brand makes no PCSK9i sales, as I discuss below.

Repatha® is better off with the bundle relative to the no-bundling equilibrium, the PBM is worse off (but still doing the best it can given the options available) and Praluent® is excluded even though it is equally efficient and was willing to price all the way down to marginal cost.

214. This example shows why Dr. Gaier's one-monopoly-rent critique has no bearing on exclusion in the PCSK9i market. It also illustrates that Amgen need not offer incremental Enbrel® and/or Otezla® rebates in order for the CTB strategy to successfully exclude Praluent®. And it also shows the sense in which PBMs are "coerced" into excluding Praluent®.

### 8.2 Amgen's experts make numerous errors because they do not model or understand how competition operates in the PCSK9i market.

215. Dr. Gaier makes a number of statements about what Regeneron could do or should do, but he does not base this on any model of competition and gets crucial aspects of the analysis wrong. In contrast, my description of how Amgen's CTB strategy impacts competition and allowed Amgen to foreclose Regeneron is based on a model of bargaining for formulary access between Amgen, Regeneron, and PBMs, as I discussed in my Opening Report.[352]

216. To show that Dr. Gaier's analysis is inconsistent with how competition works in this setting and how he fails to capture how the CTB rebates impact that competition, it is helpful to describe in detail a model of competition for PBM formulary access. I begin by showing the results of the model when applied to the example of PBM negotiations that Dr. Gaier gives in his report.[353] This model incorporates three critical elements that drive PBM negotiations:

- *Entrenched market shares*: When a product is excluded from a formulary, it continues to make some sales through that PBM for those patients who cannot be switched to the product on formulary, typically without offering rebates on those sales. Dr. Gaier and I agree that the entrenched share for Repatha® is higher than for Praluent®, which as I discussed in Section 3.5 is due in part to uncertainty created by Amgen's attempt to exclude Praluent via its patent litigation, despite the fact that Amgen's claims were ultimately found to be invalid. Dr. Gaier, Dr. Stiroh, and I all agree that Repatha® had an entrenched share advantage before 2020, when [redacted] and Amgen respond with its CTB strategy.[354] Dr. Gaier describes (and indeed emphasizes) the impact of these entrenched shares on PBMs decisions, but completely fails to recognize that they also impact profit maximizing bidding strategies for Amgen and Regeneron.

[352] Scott Morton Amended Opening Report, ¶ 219.
[353] Gaier Rebuttal Report, ¶¶ 239-243.
[354] *Id.*, ¶ 275; Stiroh Rebuttal Report, ¶ 181.

- *Additional PBM considerations*: PBMs evaluate different formulary options for the PCSK9i category based not only on the rebates offered on Praluent® and Repatha®, but also other factors that determine the best formulary configuration for the PBM. In particular, there are costs to the PBM of steering patients toward an exclusive PCSK9i product; these costs are avoided by giving both products preferred status.[355] Dr. Gaier emphasizes this cost, but he fails to properly account for a second cost to PBMs, which is the [redacted]

- *Differences in variable costs*: The rebate offers depend on the profits that Amgen and Regeneron will get from different formulary options. Dr. Gaier makes two critical errors in this regard. First, he does not even attempt to account for costs when characterizing the rebates each firm will offer. Second, as discussed in Section 9.2, Dr. Gaier is completely wrong in his measure of Repatha®'s variable costs and his comparison of the per-unit costs for Repatha® and Praluent®, contradicting not only the facts but also the consistent assessment of both Amgen and Regeneron.

217. In Dr. Gaier's example, both Repatha® and Praluent® have a list price of $300.[356] For shares of sales he assumes that (1) when both products are offered at parity, Repatha® gets a 70% share, (2) when Praluent® is excluded it still gets 10% of unit sales, and (3) when Repatha® is excluded it still gets 20% of unit sales. Sales when excluded are made at the full list price.[357] Dr. Gaier's example makes no mention or assumption about per-unit costs, which is itself telling: it is impossible to know if a rebate offer is rational and profit-maximizing without knowing what the costs of output are. The fact that Dr. Gaier omits costs makes it clear that he is not attempting to show whether the prices of the rebate offers in his model make economic sense for Amgen and Regeneron. This is a fatal flaw.

218. To avoid this fatal flaw, in this discussion I use the approximate per-unit costs over the period when Amgen used its CTB strategy from my Opening Report, consistent with Dr. Gaier's use of an approximate list price of $300. These per-unit costs are $100 for Repatha® and $80 for Praluent®, giving gross margin percentages of 66.7% and 73.3%, respectively.

219. Since Dr. Gaier does not model the incentives of Amgen and Regeneron, he can focus only on the average cost to the PBMs and does not need to consider

[355] "Steering costs" should not be thought of as just the costs associated with switching patients to a new drug (additional costs borne by the PBM in denying coverage, working with doctors and pharmacies to switch prescriptions, publicizing revised formularies, and the like.) As Dr. Gaier emphasizes, "PBMs … consider the impact of formulary changes on downstream plan members," citing the testimony of UHC that in addition to rebate dollars, UHC considers "member impact, because its not the best experience for members when they are forced to switch a drug." (Gaier Rebuttal Report, ¶ 241, citing Hindman 30(b)(6) at 37) In economic terms, a PBM whose formulary is exclusive has less value to plan sponsors because it constrains beneficiaries' options, but it also may be lower cost. The PBM takes both of those into account when making its formulary decision.

[356] Gaier Rebuttal Report, ¶ 239.

[357] *Id.*, ¶ 230.

the sales volumes to the sellers under exclusion or parity. To fill in that gap, I assume the total volume of PBM sales is 1000. Changing that number simply scales the profit calculations up or down proportionately and does not affect any of my conclusions.

220. In his example, Dr. Gaier focuses on the choice between making Praluent® exclusive versus making Repatha® exclusive, and simply assumes in his example that Amgen offers a net price of $200 for Repatha® if it is exclusively on the formulary, while Regeneron offers a price of $190 for Praluent® if it is exclusive.[358] However, those prices are not the outcome of rational negotiations with a PBM. To show this, consider first Repatha®. At a price of $200, the gross margin is $100, which is shown in Table 3 along with the following computations. Given a 90% share when Repatha® is exclusive and market-wide sales of 1,000 units, Repatha® sells 900 units when it is exclusive. Multiplying by the gross margin results in gross profits of $90,000. Praluent® sells the remaining 100 units at an undiscounted price of 300 when excluded, giving it profits of $22,000.

**Table 3: Profits in Dr. Gaier's Figure 38 example, using his prices**

| | Repatha Exclusive | Praluent Exclusive |
|---|---|---|
| Repatha | | |
| Share | 90% | 20% |
| Units | 900 | 200 |
| Price | $200 | $300 |
| Unit Cost | $100 | $100 |
| Gross Margin | $100 | $200 |
| Gross Profit | $90,000 | $40,000 |
| Praluent | | |
| Share | 10% | 80% |
| Units | 100 | 800 |
| Price | $300 | $190 |
| Unit Cost | $80 | $80 |
| Gross Margin | $220 | $110 |
| Gross Profit | $22,000 | $88,000 |
| PBM | | |
| Total PCSK9i Cost | $210,000 | $212,000 |

[358] Dr. Gaier also shows prices for parity coverage in his Figure 38, but does not discuss those. And in any case those prices are also cherry-picked without any modeling or justification, and at those prices parity coverage is worse for the PBM than either Repatha® exclusive or Praluent® exclusive.

221. Turning to the case where Repatha® is excluded, the share split as shown in Table 3 is 800 for Praluent® and 200 for Repatha®. Praluent® sells at $190, which gives it a gross margin of $110 and gross profits of $88,000, while Repatha® does not rebate and gets profits of $40,000.

222. The last line of Table 3 shows the total amount that the PBM pays for PCSK9i products in each formulary option, which is $210,000 when Repatha® is excluded and $212,000 when Praluent® is excluded. These are the same numbers that Dr. Gaier computes for PBM's weighted average cost after scaling for the 1000 units purchased. Dr. Gaier uses this example to say that the PBM has lower total costs choosing Repatha® exclusive even though Praluent® offers a lower price for exclusivity.

223. However, though Dr. Gaier's example stops there, these computations are only the beginning of the story. The prices in the example were presumably chosen by Dr. Gaier to make his one point, but they are not prices that reflect the outcome of PBM negotiations. As shown in Table 3, both Amgen and Regeneron make considerably more profit having exclusive formulary placement than from being excluded: $90,000 versus $40,000 in the case of Amgen, and $88,000 versus $22,000 for Regeneron. So if Dr. Gaier's prices were offered in one round of negotiation, with the PBM saying it would pick Repatha® exclusive, then, in a competitive market, Regeneron would have the incentive to offer a lower price for Praluent®, sufficiently low to make the PBM better off making Praluent® exclusive. And then, in response to Regeneron's offer, Amgen would have an incentive to increase its rebates and offer a lower net price to the PBM, and so on.

224. The key determinant of how low prices can go is what each firm earns from PCSK9i sales when it is excluded. This amount, which in bargaining theory goes by various names (threat point, outside option, disagreement profits) drives how much of a concession each firm is willing to offer to the PBM to gain exclusivity, and is one of the core elements that drives bargaining models in the economics literature.[359] With intense competition between the two sellers, each is willing to decrease its net price until it is better off conceding the battle for exclusivity and earning the profits it gets on its entrenched share when excluded. Increasing rebates for exclusivity beyond that point is irrational because the firm will get lower profits if it wins exclusivity then if it had conceded exclusivity to the other firm.

---

[359] The foundational paper that started the entire literature on bargaining theory, by Nobel laureate John Nash, accomplishes this by scaling the utility used to measure gain from trade relative to what happens with no agreement: "In a bargaining situation one anticipation is especially distinguished; this is the anticipation of no cooperation between the bargainers. It is natural, therefore, to use utility functions for the two individuals which assign the number zero to this anticipation." John F. Nash. "The bargaining problem." 18 *Econometrica* 157-158 (1950). *See also,* Alvin E. Roth. "Independence of irrelevant alternatives, and solutions to Nash's bargaining problem." 16 *Journal of Economic Theory* 247 (1977) ("In this paper we will consider a class of solutions to the classical two person bargaining problem as formulated by Nash. A bargaining problem consists of a compact convex subset *S* of the plane and a point *d*….the point *d* represents the utility levels achieved by the two players if no agreement is reached. The point *d* is call the 'disagreement point' or 'status quo.'").

225. Table 4 shows the minimum price that each firm would be willing to offer the PBM for exclusive coverage. For Repatha®, this price is constructed by dividing the profits earned when excluded ($40,000) by the units sold under Repatha® exclusivity ($900). That gives the minimum gross margin that Repatha® would be willing to accept for exclusivity ($44.44). Since unit costs are $100, that implies a price of $144.44. The analogous construction for Praluent® gives a minimum price of $107.50. Regeneron is willing to take a much lower net price for Praluent® than Amgen is willing to take for Repatha® because Regeneron has far lower profits when excluded than Amgen does.

226. Table 4 shows the total cost that the PBM would pay for the PCSK9i category at these minimum prices: When Repatha® is exclusive the total cost is $160,000, while if Praluent® is exclusive the total cost is $146,000, or $14,000 below what the PBM would pay when Repatha® is exclusive. Therefore, at these prices, the PBM would choose to make Praluent® exclusive. That reverses the result the Dr. Gaier got at the specific prices he selected, and is true even though Repatha® still gets the higher 90% share when exclusive than the 80% share Praluent® gets when exclusive.

**Table 4: Profits in Dr. Gaier's Figure 38 example, minimum prices**

| | Repatha Exclusive | Praluent Exclusive |
|---|---|---|
| Repatha | | |
| Share | 90% | 20% |
| Units | 900 | 200 |
| Price | $144.44 | $300 |
| Unit Cost | $100 | $100 |
| Gross Margin | $44.44 | $200 |
| Gross Profit | $40,000 | $40,000 |
| Praluent | | |
| Share | 10% | 80% |
| Units | 100 | 800 |
| Price | $300 | $107.50 |
| Unit Cost | $80 | $80 |
| Gross Margin | $220 | $27.50 |
| Gross Profit | $22,000 | $22,000 |
| PBM | | |
| Total PCSK9i Cost | $160,000 | $146,000 |

227. One final step is required to determine the outcome of negotiations between the PBM, Amgen, and Regeneron in this example. Regeneron wins exclusivity at a price of $107.50 but does not earn any more than when excluded. Meanwhile, the PBM is better off by $14,000 at that price, so Regeneron can increase the price somewhat and still leave the PBM better off choosing Praluent® exclusive. If Regeneron raised the price to $125, the PBM would be indifferent between choosing Praluent® or Repatha® to be exclusive (total PCSK9i costs are $160,000 either way.) The negotiated price will be somewhere between $107.50 and $125, with the precise value depending on the relative bargaining power of Regeneron and the PBM that determines how they split the gains from trade. So the equilibrium outcome is that Amgen offers $144.44 for Repatha® exclusivity, Regeneron offers somewhere between $107.50 and $125 for Praluent® exclusivity, and the PBM chooses to make Praluent® exclusive. If the price is set at the midpoint, $116.25, then Regeneron and the PBM split the benefit from making Praluent® exclusive evenly (each gets a $7000 gain from making Praluent® exclusive rather than Repatha® exclusive) as shown further below in Table 5.

228. Based on Dr. Gaier's flawed model, he concludes: "Thus, as this example demonstrates, the PBM is economically better off with Amgen's 1:1 offer, despite

Repatha®'s higher per-unit price."[360] But as shown above, he is wrong for two reasons. First, he does not consider what price both firms would optimally offer to maximize their profits; instead, he merely cherry-picks particular prices to make a point. Second, Dr. Gaier takes into account one aspect of entrenched shares, namely how they affect the weighted average cost for the PBM, but completely ignores (both in this example and in the rest of his report) the second aspect: that the entrenched shares impact how aggressively each of Amgen and Regeneron will engage in price competition. These effects go in opposite directions: the firm with higher entrenched share will tend to be picked by the PBM because of the PBM's cost of buying undiscounted units from the excluded firm, but that firm will also bid less aggressively because of the profits it receives when excluded. By only considering one of these two factors, Dr. Gaier presents an incomplete and distorted assessment of how formulary status is determined in negotiations between PBMs and PCSK9i manufacturers.

229. Dr. Gaier also incorrectly concludes: "As a matter of economics, the fact that [redacted]"[361] But this discussion shows that he is mistaken about the economics because he only considers half of the impact of entrenched shares. Regeneron is at a competitive disadvantage because of the higher PBM cost of buying Repatha® when Repatha® is excluded (which is measured by the Minimum Rebate Metric in my Opening Report in conjunction with the impact of Amgen's conditional rebates.)[362] But Regeneron is at a competitive advantage because Amgen did not have as much incentive to compete aggressively on prices because of its higher entrenched share. Those two factors work in opposite directions.

230. It is informative to ask more generally what factors lead to the PBM to choose Repatha® exclusive, Praluent® exclusive, or parity. The answer is provided by the paper cited in my Opening Report, Ho and Lee (2023), which finds the answer in a general model of formulary rebate competition: the formulary choice is the one that maximizes total surplus among the suppliers and PBM.[363] This is intuitive because if more surplus is created, then more can be allocated to all parties and so they choose the outcome that makes them better off. Here, total surplus is the sum of gross profits for Praluent® and for Repatha®, minus the total cost of PCSK9i products for the PBM along with any additional PBM considerations, as I will turn to shortly. For now, assuming there are no other PBM considerations, the formulary choice is the one that maximizes the difference between gross supplier profits and PCSK9i costs for the PBM.

[360] Gaier Rebuttal Report, ¶ 240.
[361] *Id.*, ¶ 239.
[362] Scott Morton Amended Opening Report, Section 11.2.
[363] "Contracting over Rebates: Formulary Design and Pharmaceutical Spending," Kate Ho and Robin S. Lee, (October 2023) at 14, 16.

231. One factor in determining total surplus is the per-unit costs for Praluent® and Repatha®. As unit costs go down (holding everything else constant) gross profits will increase, and therefore total surplus is also increased. It is helpful next to discuss two things that do not affect total surplus: (1) prices, and (2) entrenched shares. As the rebate for one of the products increases, total PBM costs decrease, but this also decreases that firm's gross profits by the same amount. Since total surplus adds up the gains to all the parties in the system, these two changes exactly offset each other. Therefore, a change in rebates (or equivalently, net prices) has no impact on the model's prediction of which formulary option is chosen at the equilibrium prices obtained in negotiations. The second factor not affecting formulary choice, perhaps surprisingly, is entrenched shares. Entrenched shares determine whether each unit is sold at the discounted price in exchange for exclusion or at the list price. But since prices do not impact total surplus, the difference in price driven by entrenched shares does not impact total surplus either because when one sale moves from the discounted price to the list price, that firm's gross profit increases by the same amount that total PCSK9i costs increase. Therefore, total surplus does not change with a change in entrenched share. In fact, the variable costs of the PCSK9i units sold under each of the formulary options is the only determinant of which option is chosen after negotiations when there are no other PBM considerations. This makes sense because society wants treatments at the lowest possible cost. However, entrenched shares do affect the prices that will result from negotiations, as I will return to when discussing consumer harm.

232. [redacted] when quantity is held fixed and consumers can easily switch between treatments, total surplus must be larger when the PBM buys relatively more Praluent®. The aggregate variable costs of the PCSK9i units sold will be minimized when more units of Praluent® are sold, which in turn means when Praluent® is exclusive. So, again under the assumption for now that there are not other PBM considerations, the outcome of negotiations is that the PBM will choose to make Praluent® exclusive.[364]

233. If, as in Dr. Gaier's example, the PBM focuses on choosing between 1:1 Repatha® and 1:1 Praluent®, the gain in total surplus from choosing to make Praluent® exclusive is the difference in unit costs ($100 - $80 = $20) times the number of units that switch from Repatha® to Praluent® when the PBM switches from Repatha® 1:1 to Praluent® 1:1. Those units are the contestable portion of demand and depend on the entrenched shares. In this example, Repatha® always sells 200 units and Praluent® always sells 100 units, so the remaining 700 units are contestable. Therefore, the gain in total surplus is $20 x 700 = $14,000. This amount can be seen in Table 4. At the minimum prices, Amgen and Regeneron make the same profit regardless of which formulary option is chosen, so there are no gross profits differences in total surplus. Thus the difference in total surplus is the difference in total PCSK9i costs. The difference in PBM costs is $14,000, which is computed in Table 4 as the

[364] To be clear, without Amgen's CTB the outcome chosen by the PBM could be Repatha® exclusivity or parity, depending on the magnitude of other PBM considerations such as the cost of switch patients to whichever product is exclusive.

$160,000 cost of Repatha® exclusive minus the $146,000 cost of Praluent® exclusive. That $14,000 difference is the gains from trade to be split between Regeneron and the PBM, as discussed above.

234. With no additional PBM considerations, the outcome of negotiations will result in the lower cost product, Praluent®, winning exclusivity. That advantage of the lower cost firm is the driving reason why Regeneron's strategy of going for exclusivity was successful and profitable before Amgen began using its exclusionary CTB strategy. Similarly, this analysis makes it clear just why Regeneron's lower cost was so threatening to Amgen.

235. However, as previewed, there can be additional PBM considerations driving formulary decisions, and if they are sufficiently large, these factors can change the optimal decision. One of those considerations, which Dr. Gaier emphasizes, is the cost to the PBM of switching customers away from the brand they would choose under parity.[365] These costs may be increased by marketing to doctors. I will discuss those costs shortly in the context of the OptumRx/UHC negotiations.

236. First, I consider the impact of another component of additional PBM considerations: Amgen's exclusionary CTB. In particular I consider the loss of Enbrel® rebates if the PBM makes Praluent® exclusive. There are two cases to analyze: the first is if the lost rebates are less than the gain in efficiency from making Praluent® exclusive, which in the example above is $14,000. If the size of the conditional Enbrel® rebates for this PBM are less than $14,000, then the PBM will still choose to make Praluent® exclusive despite losing the conditional Enbrel® rebate. That loss reduces the gains from trade and lowers the maximum price that Regeneron can charge while still winning exclusive formulary placement. That presumably lowers the negotiated price for Praluent®, though the actual price change depends on how Regeneron and the PBM split the gains from trade with and without the loss of conditional Enbrel® rebates.

237. If, on the other hand, the conditional Enbrel® rebates are larger than the gain in efficiency from making Praluent® exclusive, then it is in the PBM's own interest to make Repatha® exclusive so that it can retain the conditional Enbrel® rebate. Essentially, Amgen uses the Enbrel® rebate—which in this example it was giving anyway—to change the financial analysis of the PBM. In this scenario, Repatha® and Praluent® switch places in the pricing analysis. Regeneron lowers its price for Praluent® down to the minimum price in Table 4. Any lower and it is better off being excluded. Amgen's bid for Repatha® exclusivity is no longer constrained by its outside option but can be augmented by the size of the Enbrel® rebate.

238. Table 5 shows the bidding equilibrium with no CTB and with two different values for the conditional Enbrel® rebate $30,000 and $100,000. The gross revenues

[365] Gaier Rebuttal Report, ¶¶ 241-243.

for PCSK9i in this example are $300,000, so the size of these conditional rebates correspond to 10% and 33.3% of PCSK9i revenue. Given that total gross Enbrel® revenues were five to six times as large as PCSK9i revenues, $30,000 corresponds to roughly a 2% Enbrel® rebate. In some cases the conditional rebate in Amgen's CTB bundle was much larger: as shown in my Opening Report, Amgen's offer to ESI/Ascent Commercial included a conditional rebate that was 38% of PCSK9i revenues.[366] As such, the two CTB conditional rebate assumptions in the table are correlated with the lower and upper end of what Amgen offered in its CTB agreements.

239. As discussed above, the precise rebate offered by the firm that wins exclusivity is a matter of negotiation. The rebate shown in the first column of Table 5 is the one at which both Regeneron and the PBM split the gains from trade when there is no CTB and are each $7000 better off than when the PBM chooses Repatha® exclusivity.

240. With a CTB that makes $30,000 of the Enbrel® rebate conditional on PCSK9i formulary placement, the PBM switches to Repatha® exclusivity. The outcome is shown in the second column of Table 5 under the assumption that Amgen and the PBM split the gains from trade (relative to the outcome of Praluent® exclusivity and the PBM losing $30,000 in Enbrel® rebates.) Repatha® becomes exclusive even though the offer with the CTB it raises its net price offer from $144.44 in Table 4 to $153.33, and despite Praluent® lowering its price from $116.25 to the $107.50 shown in Table 4. The PBM's total cost of PCSK9i increases from $153,000 to $168,000, an increase in cost of $15,000. It does so to avoid a $30,000 increase in the cost of Enbrel® if it makes Praluent® exclusive. Amgen profits increase by $8,000, from $40,000 to $48,000, while Regeneron profits fall by $7,000, from $29,000 to $22,000. Thus the PBM (or its health plan members, if it passes on the cost increase) and Regeneron are worse off by a combined $22,000, while Amgen gains $8,000. The $14,000 difference is the loss in efficiency from the higher costs of Repatha® relative to Praluent®. In short: because of Amgen's exclusionary CTB, PCSK9i prices increase, PBMs and/or their members pay higher drug costs, Regeneron profits fall, and only Amgen is better off and earns higher profits. All of these effects of Amgen's exclusionary CTB demonstrate the harms to competition that I described in my Opening Report and discuss further in Section 10.

[366] Scott Morton Amended Opening Report, ¶¶ 196-197.

**Table 5: Results in Dr. Gaier's Figure 38 example, with no CTB rebate, a $30,000 conditional rebate, and a $100,000 conditional rebate**

| | Enbrel Conditional Rebate = $0 | Enbrel Conditional Rebate = $30,000 | Enbrel Conditional Rebate = $100,000 |
|---|---|---|---|
| Repatha | | | |
| Share | 20% | 90% | 90% |
| Units | 200 | 900 | 900 |
| Price | $300 | $153.33 | $231 |
| Unit Cost | $100 | $100 | $100 |
| Gross Margin | $200 | $53.33 | $131 |
| Gross Profit | $40,000 | $48,000 | $118,000 |
| Praluent | | | |
| Share | 80% | 10% | 10% |
| Units | 800 | 100 | 100 |
| Price | $116.25 | $300 | $300 |
| Unit Cost | $80 | $80 | $80 |
| Gross Margin | $36.25 | $220 | $220 |
| Gross Profit | $29,000 | $22,000 | $22,000 |
| PBM | | | |
| Total PCSK9i Cost | $153,000 | $168,000 | $238,000 |

241. The last column of Table 5 shows the impact of a much larger $100,000 conditional rebate. In this case, rather than splitting gains evenly, I assume that an $8,000 gain for the PBM compared to what it gets by rejecting the CTB offer is again sufficient to induce the PBM to choose Repatha® exclusivity, and the remaining value is retained by Amgen by decreasing its Repatha® rebate. Amgen profits increase by $78,000 in the example, from $40,000 to $118,000.[367] The PBM's total cost of acquiring PCSK9i products increases by $85,000, but it agrees to Repatha® exclusivity to avoid losing $100,000 in Enbrel® rebates.

242. Dr. Stiroh argues that if the conditional rebates are not incremental, then they cannot have an effect.[368] But this is clearly wrong, as these examples demonstrate. If the PBM does what Amgen wants the PBM to do (make Repatha® exclusive), it gets the same Enbrel® rebate as if the CTB had never been offered. In that sense, the conditional

[367] Note that, under the assumption that the PBM receives the same $8,000 benefit relative to Praluent® exclusivity for the $30,000 conditional rebate and the $100,000 conditional rebate, Amgen's profits rise from $48,000 to $118,000, a gain of $70,000, which is equal to the difference in the amount of conditional rebates. By threatening to withhold even more Enbrel rebates if Repatha® is excluded, Amgen captures the value of that increased threat through higher Repatha® prices.
[368] Stiroh Rebuttal Report, ¶¶ 169-172.

rebate is not incremental. But if the PBM does not do what Amgen wants, it loses some amount of its Enbrel® rebate. The threat of losing the Enbrel® rebate is enough to change the PBM's decision, without making the PBM any better off (and in fact making it worse off, as shown in these examples). Contrary to Amgen's experts' claims, the strategy succeeds by the threat to make the alternative (making Praluent® exclusive) worse. Indeed, a hallmark of Amgen's CTB is that it does *not* improve Amgen's offer but rather penalizes the PBM's purchase of Praluent®.[369]

243. Another hallmark of Amgen's CTB is that a successful agreement creates a new equilibrium; if the situation does not change, this agreement will continue to be chosen and continue to exclude Regeneron. Amgen designs an agreement that Regeneron cannot match and although worse for the PBM, is not as expensive as the Regeneron offer. In practice, PBMs go along with the incentives introduced by Amgen and Amgen does not need to withhold the Enbrel® rebate. Therefore Dr. Stiroh's observation that Enbrel® rebates for a PBM that accepts the CTB match those for a PBM that rejects the CTB contract structure entirely is consistent with the way that Amgen designed and implemented the CTB, and not at all contradictory as Dr. Stiroh claims.[370]

### 8.3 Dr. Gaier fails to correctly compute average variable costs in his predatory pricing tests.

244. Next, I show how these results would be interpreted through the lens of a predatory pricing theory of harm based on equally efficient rivals. As discussed in my first report, the proper way to understand Amgen's conduct is as a raising rival's cost strategy.[371] Using a predatory lens has many shortcomings as an alternative theory of harm, including is the issue mentioned by Dr. Gaier that the most efficient firm, as measured by incremental costs, is not necessarily the one with the best value if the buyer has some reason to prefer one product over the other, such as differences in features or quality.[372]

245. Nevertheless, Dr. Gaier's "*PeaceHealth* framework" fails to use the correct costs to assess whether Regeneron is equally efficient and whether pricing is below cost. Dr. Gaier makes a consistent error throughout his analysis: He does not take into account opportunity costs when describing the relevant average variable cost for pricing decisions. This error is fatal to his analysis.

246. It is basic economics that the cost of a product reflects how much the product (or the inputs used to make the product) would earn in another use. Suppose a firm can sell a unit of output that costs $3 to make for $10 in market A, but can only sell the same unit for $6 in market B. Then the price of the product in market B should never be set

[369] In the language of bargaining theory, Amgen uses the conditional Enbrel rebate to shift the disagreement point if negotiations fail, resulting in a more favorable agreement for Amgen.
[370] Stiroh Rebuttal Report, ¶ 173.
[371] Scott Morton Amended Opening Report, ¶¶ 183-84.
[372] Gaier Rebuttal Report, ¶ 141.

below $10. Even though the firm could make gross profits on $3 by selling the product at a price of $6, the same unit could be sold at $10 in market A for a gross profit of $7. The $10 price in market A is the opportunity cost for a unit sold in market B, and is properly treated as the incremental cost of selling the unit in market B.

247. Although this is basic economics, Dr. Gaier completely ignores opportunity costs when discussing variable costs. The key opportunity cost in this market is that firms make sales even when excluded from a formulary, and those sales are generally made at the full or undiscounted list price. Dr. Gaier himself emphasizes this point when talking about total PCSK9i costs for a PBM.[373] Therefore, when a firm is deciding what level of rebates to offer for exclusive formulary placement, it takes into account the opportunity costs of sales made when exclusive.

248. Returning to the example in Tables 3-5, when Repatha® is deciding what price to offer for 1:1 coverage, it takes into account that even when Praluent® gets exclusive coverage, Repatha® still sells 200 units at the $300 list price. So the opportunity cost for the first 200 units is $300. If Repatha® wins exclusivity, it sells 900 units, so the incremental cost for the additional 700 units is just the per-unit cost of $100 (if it does not sell those units, it does not have to produce them and saves the incremental cost of $100 per unit.) So for all 900 units, the total variable cost is 200 x $300 + 700 x $100 = $130,000. Therefore the per-unit average variable cost is $130,000/900 = $144.44. This is exactly the minimum price shown in Table 4. In other words, Amgen will be willing to cut price for Repatha® down to $144.44, but below that it will not go because then the incremental revenues would be less than variable costs once the opportunity cost of lost full price sales is taken into account. This is true despite Amgen earning a margin over per-unit production and marketing costs of $144.44 - $100 = $44.44.

249. The same is true for Regeneron. If Praluent® is excluded, it sells 100 units at a list price of 300. If it wins exclusivity, Regeneron sells an additional 700 units at an incremental cost of $80. Total variable costs (including opportunity costs) are 100 x $300 + 700 x $80 = $86,000, and average variable costs are $86,000 / 800 = $107.50. This is the minimum price below which it would be irrational to price below, as shown in Table 4, even though Regeneron makes a margin over per-unit production and marketing costs of $107.50 – $80 = $27.50.

250. Using these properly constructed variable costs, the predatory pricing framework correctly identifies the prices in Table 4 as the dividing line between prices that could be the outcome of legitimate competition and those that are irrational, in the sense that the firm would make more profit setting a higher price, unless it had some motive other than maximizing profits on sales when setting prices. But that is only true if costs are properly construed to include opportunity costs, which Amgen experts do not do. And the analysis

[373] Gaier Rebuttal Report, ¶ 239.

must include all components of variable costs, which as discussed in Section 9.2, Dr. Gaier fails to do by omitting incremental sales and marketing costs.

251. Dr. Gaier's error in computing the relevant average variable cost for his predation analysis is the same one that I discussed earlier: he considers the impact of entrenched shares on PBM decision making, but he fails to consider the impact of entrenched shares on optimal pricing by Amgen and Regeneron. Therefore, whether analyzing conduct through the lens of predatory pricing or foreclosure, Dr. Gaier gets the wrong answer, and incorrectly concludes that Regeneron was a less efficient competitor when in fact both actual per-unit costs and costs taking into account opportunity costs for Praluent® were lower than for Repatha®.

### 8.4 Regeneron was foreclosed from bidding for parity formulary placement.

252. So far, I have discussed bidding for exclusive coverage between Amgen and Regeneron. PBMs also have the option of selecting parity coverage, which Dr. Gaier primarily discusses in the context of the 2021 negotiations for the UHC Commercial agreement. This section discusses the determinants of bids for parity using the same model of rational decision making by Amgen, Regeneron and UHC, and shows that the Amgen's CTB could and did foreclose Praluent®.

253. First, it is useful to identify the aspects of Dr. Gaier's analysis of parity that I agree with:

- PBMs can have costs of steering patients away from excluded products; those costs are avoided with parity coverage.[374]
- PBMs would typically pick exclusive coverage in the absence of steering costs.[375]
- [redacted][376]
- [redacted].[377]

[374] *Id.*, ¶ 241.
[375] *Id.*, ¶ 243. While I agree with this statement, Dr. Gaier's explanation is different from mine. He cites my Congressional testimony that PBMs drive down prices by offering exclusive formulary placement. While that is certainly true, that competition also drives down the prices that suppliers would offer for parity placement to prevent being excluded. If all firms offer sufficiently low prices for parity coverage in order to prevent being excluded, the PBM could pick parity coverage. My basis for the statement was discussed earlier: in the absence of steering costs or any other preference for parity (and the absence of CTB), formulary negotiations will result in the PBM picking the formulary status that maximizes total surplus. Total surplus is maximized by making the product with the lowest per-unit costs (not including opportunity costs) exclusive.
[376] *Id.*, § VIII.B.2.
[377] *Id.*, ¶¶ 248-251.

254. The last two points are essentially two sides of the same coin, and are consistent with rational and profit-maximizing behavior on the part of Regeneron. As discussed earlier, Repatha® had a large entrenched share that was in large part a legacy of Amgen's failed attempts to exclude Praluent® through patent litigation. As a result, the [redacted]

255. [redacted] This strategy was entirely rational and profit maximizing, and is consistent with the equilibrium prices from a model of rebate competition for formulary placement as shown in Appendix A.[378] [redacted] And, as discussed above and in my Opening Report, that strategy was successful, as evidenced by winning exclusive status at CVS Commercial and Part D, until Amgen began using its exclusionary CTB strategy.[379]

256. The outcome of competition in rebates for formulary placement when the PBM can choose parity or can give exclusive coverage to one product is modeled in Appendix A. The characteristics of the equilibrium are quite similar to the outcome of competition for exclusives, as discussed above. There is an efficiency benefit of making Praluent® exclusive given its lower per-unit costs. If that efficiency benefit (the difference in cost between Repatha® and Praluent® times the incremental sales of Praluent® between exclusive coverage and parity) is larger than the PBM's cost of steering customers to Praluent®, then making Praluent® exclusive still maximizes total surplus and will be the outcome. Because total surplus is reduced by the steering costs borne by the PBM, the gains from trade are smaller and the rebate Regeneron offers for exclusivity will tend to be somewhat higher, though the exact level of rebates is still determined by the relative bargaining power of Regeneron and the PBM.

257. If the cost of steering exceeds the efficiency gain from making Praluent® exclusive, then the PBM will choose not to make Praluent® exclusive. Regeneron will bid the minimum price for exclusivity analogous to the minimum price in Table 4. Whether the outcome is parity or Repatha® exclusivity depends on various factors like the

---

[378] For both firms and in both the offer and in both the offer and bidding models, the difference in rebates between the equilibrium exclusive offer and the equilibrium parity offer is proportional to the difference in the share received with exclusive placement and the share received with parity placement. Since as just discussed, that difference in share is bigger for Praluent® than Repatha®, the equilibrium price differential between the parity rebate and the rebate for exclusivity tends to be larger for Praluent® than Repatha®.

[379] It is worth noting that Regeneron was willing to offer a more favorable contract for parity coverage if that would keep Praluent® from being excluded as a result of Amgen's CTB. *See* REGN0007891 at slide 50 ("REGN continually approaches Ascent to determine if there is anything that could be done to regain parity position, the answer is nothing at this time.").

steering costs for Repatha® exclusivity and the negotiated solution, taking into account the relative bargaining power of the three players, when choosing parity.

258. If the equilibrium outcome without Amgen's CTB is Praluent® exclusivity, then introducing [redacted] can switch the formulary option chosen by the PBM. The PBM would then forgo Praluent® exclusivity in favor of either parity or Repatha® exclusivity to avoid [redacted] This is true regardless of whether [redacted], as long as the Enbrel® rebate is lost if the PBM selects [redacted]. As long as the combination of steering costs and [redacted] is larger than the Praluent® efficiency advantage, the PBM's profit is maximized by rejecting Regeneron's offer for Praluent® exclusivity. Amgen can select a gap between its 1:2 and 1:1 offers that will induce the PBM to pick either parity or Repatha® exclusive formulary placement. Parity would be more efficient, but Amgen can make the gap between 1:2 and 1:1 coverage sufficiently large to exclude Praluent® as part of its exclusionary strategy.

259. The size of the [redacted] thus only has to be large enough to tip the balance so that total surplus favors rejecting Praluent® exclusivity. The switching costs are difficult to quantify, but it is apparent that the conditional rebate offer was large enough to switch UHC's decision. If the steering costs were large enough on their own to outweigh the efficiency advantage of Praluent®, then Amgen had no [redacted]. And the [redacted] combined with UHC's steering costs were large enough to outweigh the efficiency advantage of Praluent® because that is what UHC chose.

260. As discussed above, the firm that loses its bid for exclusivity increases its rebate to the point where it no longer makes economic sense to lower price further, given the opportunity cost of sales made when excluded. The conditional rebate in a raising rivals cost strategy only needs to be made large enough to ensure that it is not in the rival's interest to compete aggressively for share. Stating the same thing in the language of a predation test, Regeneron can be expected to price down to its costs including opportunity costs, but analysis that requires Regeneron to price even lower than variable production and marketing costs is wrong. The latter is the wrong measure of average variable cost because it does not include the true economic costs including opportunity costs. Both Dr. Gaier and Dr. Stiroh make this error: they claim that Regeneron could not have been excluded at UHC because its price was above a measure of variable costs but do not include opportunity costs.[380]

261. It is straightforward to get an estimate of the proper measure of Regeneron's variable costs taking into account opportunity costs by using the same methodology illustrated above. As shown in Appendix A, Regeneron's list price in 2021-22

[380] Stiroh Rebuttal Report, ¶ 183; Gaier Rebuttal Report, ¶¶ 280-282.

[redacted][382]

### 8.5 Amgen's CTB strategy was an effective way to foreclose competition from Regeneron.

In summary, not only was Regeneron *not* a less efficient competitor, but it was *more* efficient than Repatha® because of [redacted] That positioning caused it to devise a strategy to [redacted] that was an effective way to overcome its legacy disadvantage in entrenched share by [redacted]. Amgen responded not by competing harder in PCSK9i on the merits, but rather by [redacted], Amgen was able to undermine Regeneron's strategy of [redacted]. PBMs could still chose to exclude Repatha®, but they would now need to work against their economic self-interest (and that of their members) because of the newly-introduced threatened loss of rebates. That scheme increased Amgen's own profits, while it raised the costs of PBMs and resulted in harm to competition, harm to PBM members, and harm to Regeneron, as I discuss in Section 10.

## 9. Dr. Gaier's so-called "*PeaceHealth*" analysis is incorrect.

262. Putting aside the fact that Dr. Gaier mischaracterizes my economic theory of foreclosure, Dr. Gaier also makes several crucial mistakes in his own application of the *PeaceHealth* test. In particular, he: (1) incorrectly applies [redacted]n in his evaluation of ESI/Ascent, and (2) compares the effective price of Repatha® (or Repatha® and Otezla®, in the case of ESI/Ascent) to an incorrect, artificially low estimate of Amgen's incremental costs. In making these errors, Dr. Gaier misrepresents the economics of Amgen's CTB and substantially understates the extent to which Amgen's portfolio rebates distorted fair competition in the PCKS9i market.

### 9.1 In his analysis at ESI/Ascent, Dr. Gaier allocates Amgen's conditional rebates for its CTB to the incorrect set of products.

[381] Scott Morton Amended Opening Report, ¶ 200. Note that, if UHC chose parity rather than Repatha® exclusivity, the share for Regeneron would have been higher, and therefore the opportunity cost of bidding for Praluent® exclusivity would have been higher as well.
[382] Gaier Rebuttal Report, ¶ 282.

263. In his evaluation of Amgen's pricing of its CTB, Dr. Gaier disregards my theory of foreclosure and adopts the discount attribution standard.[383] This standard, set by the *Cascade Health Solutions v. PeaceHealth* decision, asserts that bundled rebates are illegal if they "have the potential to exclude a hypothetically equally efficient producer of the competitive product."[384] In particular, "the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products."[385] Therefore, to correctly implement the *PeaceHealth* test, one must identify the competitive products in the bundle, i.e., which products stand to benefit from the anticompetitive foreclosure? When answering this key question, Dr. Gaier makes two critical mistakes.

264. First, Dr. Gaier misinterprets the economics of Amgen's [redacted] t, so the value of the [redacted].[386] This is an incorrect view of Amgen's [redacted] e.

265. Second, Dr. Gaier misinterprets *PeaceHealth* and how [redacted] In contrast to the *PeaceHealth* standard which states that "the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products,"[387] Dr. Gaier simply allocates [redacted] In following this incorrect approach to discount attribution, he allocates a majority of Amgen's [redacted]® to a product with substantial market power (Otezla®) that does not compete in the PCSK9i market.

266. By allocating [redacted], Dr. Gaier produces misleading analysis that obscures the impact that the Enbrel® rebates had on competition in the PCSK9i market. When a rebate is conditional on several actions by the PBM, its full amount is applicable to all of those actions. From the PBM's perspective, it will lose the full rebate if it does not comply with any condition. Therefore, dividing the [redacted] across other products, particularly when those products have high revenue, incorrectly reduces the impact of the rebate on Praluent®, its target. In Figure 12 below, I show Otezla® net revenue, Repatha® net revenue, and the [redacted] Dr. Gaier considers in his Figure 15. From July 2020 to June 2023, Otezla® total net sales at ESI/Ascent Commercial were approximately $[redacted] billion, roughly [redacted] times higher than Repatha®'s net sales of $[redacted] million at ESI/Ascent Commercial over the same period.[388] Compared to Otezla® and Repatha®, the $[redacted] million in [redacted] rebates that Amgen paid

[383] *Id.*, ¶ 139.
[384] *Id.*, ¶ 140 and *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008).
[385] *Cascade Health Solutions*, 515 F.3d at 906. *Id.*
[386] Gaier Rebuttal Report, ¶ 147.
[387] *Id.*, ¶ 140 and *Cascade Health Solutions*, 515 F.3d
[388] **Source**: AMG10935-DATA-0000001439 (Amgen - ESI Rebates data).

out to ESI/Ascent between July 2020 to June 2023, indeed, appear inconsequential—less than [redacted] of total Otezla® and Repatha® sales. Compared to Repatha® or Praluent® alone, however, the size of Amgen's [redacted]—just under [redacted] of total Repatha® net sales. Dr. Gaier attempts to use this size difference between Otezla® and Repatha® to conceal the tremendous impact that [redacted] has on a competitor in the PCSK9i market. The characterization of the [redacted] an insurmountable obstacle for Praluent®'s ability to compete.

267. Furthermore, Dr. Gaier's approach to discount attribution—allocating [redacted] across both the competitive Repatha® and the monopolized Otezla®—is illogical and makes no sense as a matter of economics. Indeed, if the Court accepted his methodology, it would create a major loophole that would significantly limit the application of the *PeaceHealth* framework in that it would allow firms like Amgen to escape liability simply by adding additional products to their CTBs. A multiproduct firm with two blockbuster products A (Enbrel®) and B (Otezla®) and one competitive product C (Repatha®) could always avoid antitrust scrutiny by following the strategy implicitly proposed by Dr. Gaier's analysis. If a seller wanted to predate a rival producer of product C, the incumbent could bundle A and C and provide a bundled rebate on product A conditional on the purchase of C. However, it could easily avoid scrutiny by "conditioning" the A + C bundle also on the purchase of product B. Due of B's blockbuster status, it is a foregone conclusion that it will be purchased regardless of the additional "conditional" bundle, so the A + C and B bundle has identical competitive effects to the A+C bundle. Yet, according to Dr. Gaier's methodology, we should come to different conclusions about whether these economically equivalent bundles are anticompetitive.

**Figure 12. Otezla® and Repatha® net revenue compared to the [redacted] (Q2 2020 to Q2 2023)**[389]

[389] **Source**: AMG10935-DATA-0000001439.

[redacted]

268. From the standpoint of economic theory and practice, Dr. Gaier's application of the *PeaceHealth* test does nothing to understand the exclusionary effects of Amgen's [redacted] To prove this point even further, I review Amgen and ESI/Ascent's own interpretation of the bundle and, importantly, what was the relevant product for the purposes of the *PeaceHealth* test. From this evidence, much of which appears in my Opening Report and in Section 4.1 of this report, we can see that Dr. Gaier's interpretation of [redacted]

269. As I explained in my Opening Report, and as Heather Bates explained in her report, Amgen offered a bundle agreement to ESI/Ascent that in 2020 that linked coverage of [redacted]®.[390] Under this offer, ESI's National Preferred Formulary, Commercial Government Formularies, and its clients Prime and Cigna received a [redacted].[391] This [redacted] was well recognized by Amgen aimed at [redacted] As Amgen Executive Director of Market Access at Amgen, Billy West, said in a September 2021 text message: Amgen sought to "[redacted]rel" to secure favorable treatment (i.e., formulary

---

[390] Scott Morton Amended Opening Report, ¶ 77; Bates Report, § V.A.

[391] Scott Morton Amended Opening Report, ¶ 77; AMG10935-0000128836 at 837 (July 1, 2020 email from Amgen executive Kave Niksefat stating [redacted]").

placement) of Repatha® on ESI/Ascent commercial formularies.[392] Thus, Amgen's [redacted] rebates were wholly intended to apply to Repatha® and Repatha® alone. [redacted]: [redacted]"[393]

270. The conclusion that Amgen itself understood any [redacted] agreement as solely applying to Repatha® can additionally be seen in its 2023 strategy documents in which it considers the financial implications of [redacted] Amgen explicitly refers to its conditional [redacted] (see Figure 13 below). From this, we see that Dr. Gaier's view of the [redacted] is completely at odds with his own client's interpretation of their bundle.

**Figure 13. The [redacted]," as shown in Amgen documents[394]**




271. At no point in my review of documents produced in this case have I encountered evidence that Amgen considered the conditional value attached to the [redacted]®. To the contrary, the documentary evidence is overwhelmingly clear: all [redacted] were indented to apply to one and only one drug, Repatha®. In the words of Tom Moore, Vice President of Value and Access at Amgen, Amgen "[redacted]

[392] *See* AMG10935-0000397232 at 233.
[393] Express_Scripts_1330_00004535 at 535.
[394] *See* AMG10935-0000074320 at slide 14.

[redacted][395] Amgen clearly holds a different view than its own expert on how to go about performing discount attribution.

272. [redacted][397]

273. The documentary evidence is clear: [redacted][398] To argue that Amgen's offer was anything else, as Dr. Gaier does in his report, is to imply that both the firm offering the [redacted] (Amgen) and the firm receiving it (ESI/Ascent) somehow misunderstand the details of their own agreement.

274. As a consequence of his inappropriate approach to discount attribution, Dr. Gaier overlooks the full extent of Amgen's [redacted] His analysis solely considers [redacted] while entirely overlooking the [redacted] which both Amgen and ESI/Ascent understood were also [redacted]. This omission significantly understates both the size and the exclusionary impact of Amgen's CTB scheme.

275. Dr. Gaier argues that only contractually defined terms are relevant for his discount attribution. This argument is overly simplistic and, as I explained above, disregards the parties' own interpretation and understanding of Amgen's offer to ESI/Ascent. To critique the notion that an agreement that is not memorialized in a final written contract could not enforced, Dr. Gaier cites the economic literature on cartels. What Dr. Gaier does not acknowledge, however, is that the economics literature, especially regarding long-run repeated games, is rich with "folk theorem" results that demonstrate just how easily such agreements can be rationally sustained by the threat of future punishment—for example, the

[395] AMG10935-0000083666 at 666.
[396] Express_Scripts_1330_00002718 at 719.
[397] Express_Scripts_1330_00003699 at 699.
[398] Express_Scripts_1330_00002544 at 544.

withholding of future rebate —provided that agents are sufficiently patient or the relationship is of substantial value.[399] Given Otezla®'s significance and Amgen's long-term strategic outlook regarding its portfolio—and, in particular, Repatha [redacted] is completely aligned with long-run equilibrium behavior.

276. By excluding Otezla® base rebates from his discount attribution, Dr. Gaier significantly understates the size of Amgen's [redacted]. In my Opening Report, I use an internal ESI/Ascent forecast of different coverage scenarios to estimate the size the total amount of Otezla® base rebates that were conditioned on Repatha® exclusivity.[400] According to this forecast, accepting Repatha® exclusivity would give ESI/Ascent an estimated value of [redacted] million from Otezla® in 2021 and 2022, respectively. If ESI were to accept Praluent® exclusivity, then ESI/Ascent's estimated value from Otezla® decreases to [redacted] and an undetermined amount in 2022. Assuming that ESI/Ascent could negotiate the same Otezla® rebate in 2022 as it did in 2021 under Praluent® exclusivity (which, as I argued above, is conservative), the total amount of Otezla® rebates that ESI/Ascent understood as conditional on Repatha® exclusivity is given by [redacted] million. To put this number into perspective, [redacted][401] Thus, Dr. Gaier's discount attribution, by omitting [redacted] underestimates the true size of Amgen's [redacted] [redacted] at ESI/Ascent by nearly triple the direct value offered on Repatha®.

### 9.2 Dr. Gaier uses an incorrect definition for Amgen's incremental costs that characterizes Amgen's sales and marketing expenses as a fixed cost.

277. As explained in the previous section, Dr. Gaier's predatory pricing tests misinterpret the concept of variable cost by failing to account for the opportunity cost incurred when manufacturers sell PCSK9i products at full list price to their entrenched market share. I now describe an additional error in Dr. Gaier's variable cost calculations. Specifically, Dr. Gaier incorrectly omits sales and marketing expenditures from Amgen's incremental costs for Repatha® based on two false assertions. First, he erroneously claims that Amgen's sales and marketing expenses are a fixed cost and, thus, not incremental.[402] As I explain below, this claim is directly contradicted by Amgen's own internal documents. Second, Dr. Gaier incorrectly claims that his approach to incremental cost definition is consistent with the approach taken in Dr. Mathur's damages estimation.[403] This argument, however, relies on a

---

[399] *See* Fudenberg, D., & Maskin, E. (1986), "The Folk Theorem in Repeated Games with Discounting or with Incomplete Information," *Econometrica*, 54(3), 533–554; and Friedman, J.W. (1971), "A Non-cooperative Equilibrium for Supergames," *Review of Economic Studies*, 38(113), 1-12.
[400] Scott Morton Amended Opening Report, ¶ 111 and footnote 221.
[401] *See* Express_Scripts_1330_0042667.
[402] Gaier Rebuttal Report, ¶ 153.
[403] *Id.*, ¶ 151.

false equivalence between Amgen and Regeneron's two business models, which feature radically different approaches to sales and marketing.

278. To determine whether Amgen's sales and marketing expenses are fixed or variable, it is essential to answer two questions: First, does Amgen use sales and marketing investment as a strategic tool for achieving its goals in the PCSK9i market, such as maximizing profit in the face of changing demand conditions? Second, is there a positive relationship between Repatha® sales and Amgen's investment into sales and marketing? If the answer to both questions is yes, then Amgen's sales and marketing expenses are strategic and incrementally linked to the sales of Repatha®, indicating that they are variable costs.

279. Variable costs differ from fixed costs because they can be adjusted in the short term to maximize profits. Amgen's own LRS documents contradict Dr. Gaier's assertions that Amgen's sales and marketing investment—in particular, its sales force—is fixed over time. During the COVID-19 pandemic, for example, Amgen implemented a "marketing execution" strategy that doubled the number of sales calls each representative made to healthcare providers between Q2 2020 and Q4 2020.[404] Increasing the intensity of marketing efforts enabled Amgen to generate "strong ROIs" and "[drive] demand inflection despite COVID." These outcomes illustrate that Amgen's sales and marketing costs are indeed variable and directly correlated with Repatha® sales.

280. Moreover, Amgen's June 2021 LRS outlined a plan to [redacted].[405] The goal of this expansion was to enable "flexible and adaptive field targeting to deliver the right patient message, to the right PCP, at the right time."[406] This strategy clearly demonstrates the variable nature of these costs, as it shows Amgen's commitment to adjusting its sales force to accomplish strategic objectives in the PCSK9i market. Figure 14 below illustrates that Amgen also explicitly considered the relationship between total investment and Repatha® sales volume when assessing the trade-offs associated with different investment levels, reaffirming the role of sales effort as a component of variable costs.

**Figure 14. Sales Force Investment Opportunities (April 2021 LRS)[407]**

[404] AMG10935-0000777799 at slide 13.
[405] *Id.*, at slide 14.
[406] *Id.*
[407] AMG10935-0000779420 at slide 60.

**Potential Investment Options**

[redacted]

**Investment***

** Currently evaluating options / alternative approaches on investment*

281. In addition, Dr. Gaier's claims that his definition of incremental cost—namely, COGS only—is consistent with the approach taken in Dr. Mathur's damages estimation.[408] One can easily disprove this claim, however, with a simple reading of Dr. Mathur's report. [redacted] The situation at Amgen is markedly different. According to Dr. Gaier's calculations, Amgen made over [redacted] calls for Repatha® from Q2 2020 to Q2 2023, compared to just 20 thousand by Regeneron during the same period. This significant discrepancy highlights the distinct roles of sales and marketing in Amgen and Regeneron's respective business models.

282. Dr. Gaier's singular focus on COGS when implementing his *PeaceHealth* test omits the importance of Amgen's sales force in determining Repatha®'s competitiveness in the market which is curious given how much importance he places on that sales force as a reason for Repatha®'s popularity with physicians. Indeed, he blames low Praluent® sales on lack of sales effort. The omission of this critical variable cost means that

[408] Gaier Rebuttal Report, ¶ 151.
[409] Mathur Report, ¶ 113.
[410] *Id.*

his versions of the *PeaceHealth* test compare the effective price of Repatha® to an artificially low number that is wholly disconnected from the economic realities of how Amgen sells its drugs. This methodology creates an unsupported new standard for what pricing can be viewed as anticompetitive in markets, such as pharmaceuticals, where sales and marketing play a large role.

283. To show the importance of including sales and marketing into Amgen's incremental cost, it helps to compare the gross margins implied by Dr. Gaier's definition of Amgen's incremental cost to the gross margins implied by the definition I gave in my Opening Report. This comparison is given in Table 6 below. As a benchmark for reference, I have also included Amgen's own estimated gross margin for 2023, which is given in Figure 51 of Dr. Stiroh's report. Based on this table, we can easily see that Dr. Gaier's estimates of Amgen's incremental cost are unreliable. By omitting sales and marketing costs, Dr. Gaier's methodology implies far higher margins than Amgen itself reports. By comparison, the estimate of per-unit cost I gave in my original report, and which account for Repatha®'s sales and marketing costs, implies a gross margin that is nearly identical to the margin Amgen itself reports.

**Table 6: Comparison of Scott Morton and Gaier Estimates of Repatha® Gross Margins**[411]

| Estimated Repatha Gross Margins (2023) | | |
|---|---|---|
| Gaier | Scott Morton | Amgen |
| [redacted] | [redacted] | [redacted] |

284. As a matter of economics, different business models imply different cost structures. Amgen and Regeneron have chosen to compete using different sales and marketing strategies in their ordinary course of business and, as such, their costs are not the same. Amgen's sales and marketing expenditures, as I have discussed, are highly strategic and adjust to changes in demand, making it a significant variable cost. From 2021 to 2022, for example, Amgen expended $[redacted] million in sales and marketing for Repatha® in the US alone, which constitutes approximately [redacted] of Repatha®'s $[redacted] billion in gross sales.[412] For each unit of Repatha® sold between 2021 and 2022, Amgen spent roughly $[redacted] per unit on sales and marketing and $[redacted] on COGS, implying a per-unit incremental cost of $[redacted] for Repatha®. This is approximately $[redacted] higher than the incremental cost estimated by Dr. Mathur for Praluent®. In other words, due to its

[411] **Sources**: [1] Gaier Rebuttal Report backup; [2] AMG10935-DATA-0000001407 (Amgen LEDR Data); [3] Stiroh Rebuttal Report, Figure 51.

[412] **Source**: [1] AMG10935-DATA-0000001407 (Amgen LEDR Data); [2] AMG10935-DATA-0000001411 (Amgen PCUT Data).

payor-focused strategy, [redacted] than Repatha® and consistently higher gross margins as a result.

285. Finally, as I mentioned above, it is ironic that Dr. Gaier makes the claim that Repatha®'s sales and marketing expenses should not be considered incremental cost in the PCSK9i market, as this is a direct contradiction of his own (incorrect) assertion that Regeneron's low sales and marketing investment is the primary cause of Praluent®'s low market share.[413] Dr. Gaier's analysis chooses to ignore sales and marketing costs when it comes to Amgen. But when it comes to Praluent®, he gladly focuses on the critical role that sales and marketing plays in determining sales. This inconsistency reveals a fundamental flaw in Dr. Gaier's economic reasoning and selective interpretation of what factors are relevant to understanding market dynamics and competitive behavior in the pharmaceutical industry.

## 10. Amgen's cross-therapeutic bundles have harmed consumers.

286. Dr. Gaier seeks to dismiss that the CTBs caused any harm to consumers by arguing that rebates and net prices have no impact whatsoever on patients' expenditures.[414] He writes, "patients' costs for prescription drugs are typically a flat copayment or a coinsurance rate that is a percentage of WAC (or AWP). Moreover, patients' out-of-pocket costs are not generally impacted by rebates paid to PBMs or health plans".[415] This is misleading because it omits, first, that patients and businesses pay health plan premiums and, second, that rebates are passed through by the PBM to the payer (e.g., the employer). For example, I cited evidence in my Opening Report that CVS passes through 98% of negotiated rebates to payers.[416] Therefore, rebates affect customers, both the patients themselves and their employers (payers).[417]

287. In this section, I lay out the numerous ways in which the CTBs lead to lower rebates and higher net prices to PBMs and therefore, ultimately harm consumers.

### 10.1 The CTBs were punitive and anticompetitive rather than incremental, and therefore did not benefit customers.

288. Dr. Stiroh mischaracterizes the nature of Amgen's CTB rebates. Dr. Stiroh argues that if CTB rebates were not incremental, then the "rebates could not affect Amgen's ability to compete" [418] and consequently, consumers could not be harmed because PBMs received the

---

[413] Gaier Rebuttal Report, ¶ 221.
[414] *Id.*, ¶ 324.
[415]*Id.*.
[416] AMG10935-0000544275 at 301; Scott Morton Amended Opening Report, ¶ 217.
[417] Dr. Stiroh appears to agree that changes in net prices at PBMs are passed through to customers. While she describes reductions in net prices, the flip side is that increases in PBM net prices would also get passed on to customers as higher drug costs. Stiroh Rebuttal Report, ¶ 234.
[418] Stiroh Rebuttal Report, ¶ 10 (v) b.

rebates on Enbrel® and Otezla® in any case.[419] However, this misses the crucial point that the CTB rebates were punitive in that they were withheld if a PBM excluded Repatha®. For greater clarity, Amgen did not offer a PBM more rebates for more favorable formulary placement of Repatha® but, instead, Amgen would withhold rebates on Enbrel® and Otezla® (i.e., on unrelated products) if the PBM did not grant favorable formulary placement to Repatha®. As shown in Section 8, such a strategy was an effective way to raise Regeneron's costs, prevent Praluent® from getting exclusive formulary placement, and reduce rebates paid on Repatha®.[420] Consequently, the CTBs could not and did not reduce the cost of acquiring drugs, and in fact increased drug costs for customers.

289. Even if Amgen had offered higher total rebates on Enbrel® and Otezla® to PBMs to include Repatha® exclusively, it would not mean that CTBs benefited customers if Amgen raised list prices to cover the incremental Enbrel® or Otezla® rebate. Ultimately what matters to customers are net prices, which are list prices net of rebates. While Amgen has increased rebates for Enbrel® and Otezla®, it has also increased list prices, such that the net price of Enbrel® and Otezla® has remained flat since Amgen began its CTB strategy (see Figures 26, 27, 28 and 29). For example, despite an increase in Enbrel®'s list price from about $1,200 in Q1 2019 to nearly $1,800 in Q2 2023 (i.e., nearly a 50% increase), Enbrel®'s net price has [redacted] at about $[redacted]

290. Relatedly, Dr. Stiroh mistakenly claims that Amgen's CTBs are procompetitive,[421] and Dr. Gaier wrongly uses my congressional testimony to support the procompetitive claim.[422] In my testimony, I argued that, in a competitive market, intense head-to-head competition between rival firms benefits consumers through lower prices. Competition occurs when two products compete by offering lower prices *on the competing products themselves*

---

[419] Amgen raised its list price substantially from 2021-22 to 2023: from $258 to $287. What this shows is that, even if its conditional rebates were incremental, Amgen could easily offset these higher rebates with increases in its list price.

[420] A good example is Amgen's [redacted] I explain in Section 4.1, the evidence I have reviewed shows that [redacted]. *See* AMG10935-0000369614 at 615 [redacted]"); *see also*, AMG10935-0000369544 at 545 [dated Feb. 21, 2020] [redacted] AMG10935-0000369560 at 561, AMG10935-0000369562 at 563 (2/22/20 text: [redacted]); AMG10935-0000369572 at 573 ("[redacted]") Importantly, this harm to competition is ongoing—in November 2022 ESI Part D sought to renegotiate Repatha rates to [redacted]." AMG10935-0000038328 at 330.

[421] *See, e.g.*, Stiroh Rebuttal Report, ¶ 233. In theory, the CTBs could benefit consumers if their effect is to decrease the price of Praluent® with Praluent® in a 1:1 formulary placement. Intuitively, given that Regeneron is more efficient than Amgen at selling its PCSK9i drug, the CTBs would allow Amgen to weaken Regeneron's bid, such that Regeneron would respond by offering a higher rebate. In practice, however, as discussed further below the CTBs have led Praluent® to be excluded from the formularies of all the top three PBMs and to Regeneron being unable to constrain Repatha®'s price. Therefore, in practice, the CTBs cause unambiguous harm to consumers.

[422] *See* Gaier Rebuttal Report, ¶¶ 204, 299, and note 26.

(perhaps through a rebate) for formulary access at a PBM, thereby lowering its costs. However, in the present case, Amgen used CTBs to penalize PBMs that chose Repatha®, and in this way limited competition from Regeneron. By making [redacted]®, Amgen used unrelated products as a raising rival's cost exclusionary strategy to make Regeneron's offer less attractive to PBMs relative to Amgen's offer. Crucially, Amgen used conditional CTBs to weaken competition from Regeneron without reducing the net price of Repatha®. Therefore, rather than being procompetitive, the CTBs were detrimental to robust competition.

### 10.2 Amgen's CTBs, and not deficiencies in Regeneron's strategic decisions, led to weakened competition and raised net prices to PBMs and customers.

291. As I described in Section 4, Amgen used multiple, successive strategies to weaken competition in the PCSK9i market. Both Dr. Gaier and Dr. Stiroh ignore the impact of the patent litigation and the cease and desist letter in 2020 on Praluent®'s performance in negotiations with UHC/Optum and CVS. The patent litigation along with Amgen's costly expenditures on sales and marketing resulted in a higher entrenched market share for Repatha®. By "entrenched share" I mean the share of sales that would be captured by Repatha® absent any steering from the PBM.

292. Dr. Gaier argues that had Regeneron been an "equally efficient competitor", then Regeneron would have been able to compete even against Amgen's CTBs.[423] He defines an as efficient competitor as a firm that has the same 1:1 entrenched market share as Repatha®.[424] As discussed in Section 8, by defining "efficient" in this way, Dr. Gaier wrongly equates cost efficiency with expending resources on detailing to gain a high entrenched market share. Amgen's resource expenditures did not directly benefit PBMs or their members – it was marketing to doctors. Amgen's experts suggest that Regeneron should have pursued an equally expensive, inefficient, high-cost marketing strategy. In fact, Regeneron is not merely an as-efficient competitor but is *more* efficient than Amgen. [redacted]

293. [redacted] In contrast, Amgen pursued a cost-intensive marketing strategy targeted at prescribers (who do not pay for Repatha®) to prescribe Repatha® (irrespective of its price). Regeneron had a successful business model absent the anticompetitive CTBs because it [redacted] representatives who prefer drug companies to direct money towards additional rebates rather than marketing because they can pass those rebates on to their members, resulting in lower drug costs. However, Regeneron could not compete against Amgen's CTBs because they utilized dollars from unrelated large markets, and, as a result, consumers paid higher prices than in the but-for world without CTBs.

---

[423] Gaier Rebuttal Report, ¶ 279. *See also*, *Id.*, ¶ 274.
[424] *Id.*, ¶ 279.

294. Consistent with the above, as shown in my Opening Report, Praluent®'s net price decreased drastically relative to Repatha®'s net price, but due to the CTB Amgen was able to maintain a high market share for Repatha® despite its relatively higher net price.[425]

295. [redacted]

296. Ms. Gan agrees fully that competition for 1:1 formulary placement leads to lower net prices and benefits consumers. In her report, Ms. Gan writes that drug manufacturers should avoid such competition because this head-to-head competition leads to higher rebates, lower net prices, and erodes drug manufacturers' profits. For example, Ms. Gan writes, "There are significant risks in pursuing 1 of 1 positions, such as provoking reactions from competitors that lead to PBMs demanding escalating rebates, and in some cases, eventual profitability erosion." Similarly, she comments on Regeneron's strategy by writing, "This type of strategy can result in trading short term gains for long term negative consequences, such as escalating rebates" and, "Such a strategy potentially leads to a downward cycle in the marketplace where a manufacturer must pay increasingly high rebates for 1 of 1 positions and this can impact the profitability of both competitive products." Needless to say, PBMs do not view such an outcome as a "downward cycle" but rather as beneficial price competition that lowers costs for patients. Clearly, Ms. Gan acknowledges that competition for 1:1 rather than for 1:2 formulary placement leads to lower net prices that benefit PBMs and their members.

297. Overall, in arguing that Regeneron should have competed for 1:2 formulary placement, Dr. Gaier misses the point that [redacted] This contrasts with Amgen's strategy of litigating and spending heavily to encourage physicians to prescribe an expensive product. Regeneron's strategy would have been successful in the absence of CTBs and benefited consumers of PCSK9is.

### 10.3 Rebates would have been higher and net prices lower absent Amgen's anticompetitive CTBs.

298. In my Opening Report I described why rebates would have been higher and net drug prices lower absent Amgen's anticompetitive CTBs, and that such an outcome was consistent with a model of rebate competition for formulary placement.[427] Because of the CTBs, multiple PBMs chose Repatha® over Praluent® despite Regeneron offering higher rebates for

[425] Scott Morton Amended Opening Report, Figure 22.
[426] Gaier Rebuttal Report, ¶¶ 28, 228-230.
[427] Scott Morton Amended Opening Report, ¶¶ 219-220.

Praluent®. In other words, I show that PBMs received lower rebates and paid higher net drug prices because of the foreclosure of Praluent®.

299. Dr. Stiroh argues that the discussion of but-for rebates in my Opening Report is inconsistent with my discussion of customer harm.[428] Specifically, I showed that Regeneron was forced to increase its rebates in response to Amgen's use of bundled rebates, relative to but-for net prices without the CTBs. Dr. Stiroh then asserts that consumers are better off as a result of Amgen's exclusionary strategy because they get higher rebates.[429]

300. This assertion is wrong because it misses the point that consumers are affected not only by the rebates offered but also by the formulary choice the rebate choice forces on the PBMs. While Regeneron may have increased its rebate offer, that higher rebate has no benefit to consumers if it is not paid because the PBM is coerced into accepting a Repatha® exclusive. As a result of Amgen's [redacted] strategy, PBMs ended up getting lower rebates for Repatha® than they would have received in the but-for market without [redacted] Commercial and Part D, [redacted] oreover, Amgen's foreclosure of Praluent eliminates competition not only now and but also weakens Regeneron's ability to compete in the future, such that Amgen can raise net prices (as I explain in section 10.4). Therefore, consumers have been and will continue to be harmed. All of this was described in my Opening Report and is consistent with the model of competition between pharmaceutical companies to obtain formulary placement at PBMs that I referenced in that report.[430]

301. Dr. Stiroh claims erroneously that there is no basis for my conclusions about the impact of Amgen's CTB strategy, that I do "nothing to demonstrate this purported effect of the conduct with respect to price," and that my "economic opinions are entirely incoherent."[431] On the contrary, my Opening Report demonstrated clearly the basis for my conclusions, which were anything but incoherent. Nevertheless, in reply to Dr. Stiroh, I will use the implementation of that model shown in Appendix A to further demonstrate the impact of Amgen's CTB strategy on rebates and the resulting harm to customers.

302. The Ho and Lee (2023) model, applied to the duopoly market and formulary options at issue here, requires several inputs: the shares of PBM demand obtained by each company when either product is exclusive or when they have a parity position, and the margin on sales earned by each company. Given these inputs, the model solves for the equilibrium rebates offered

---

[428] Stiroh Rebuttal Report, § VII.A.
[429] *Id.* at ¶ 235.
[430] Scott Morton Amended Opening Report, § 9.3 and note 355.
[431] Stiroh Rebuttal Report, ¶ 235.

when each firm is maximizing its own profits and the PBM is minimizing PCSK9i costs. The Appendix A also shows how the outcome of the Ho and Lee model changes if one firm offers conditional rebates that the PBM would lose if it offers the other firm exclusive placement.

303. I apply the model using data for CVS commercial and Part D negotiations, and focus on 1:1 offers made by Amgen and Regeneron.[432] Starting with CVS Commercial, as described in my Opening Report, Repatha®'s share at when it previously had exclusive coverage was [redacted][433] Those are the figures I use for entrenched shares.

304. I use two different sets of figures for margins to capture the outcome of the model in different years. Since list prices tend to increase from year to year, as discussed in Section 11 and in my Opening Report, margins, which are computed as a percentage of list price, will tend to increase from year to year.[434] For the earlier period I use the margins corresponding to the costs in Appendix A, which are the average variable costs for Repatha® and Praluent® for the 2021-22 period. Those margins are [redacted] for Praluent®. For 2023, the margin for Praluent®, which is based on the same data source as for 2021-2022 but using data for the first half of 2023, is [redacted]. For Repatha®, I use the margin that was reported in an Amgen document reproduced by Dr. Stiroh in her report, which is [redacted][435]

305. Using these figures, and starting with the but-for outcome with no CTB, the equilibrium outcome of the model using the formulas in Appendix A is that the PBM would optimally chose to give Praluent® exclusive placement.[436] The negotiated rebate would have been in the range between [redacted] depending on the outcome of negotiations between Regeneron and CVS Commercial and how they split the gains from trade. This range is consistent with the but-for percentage rebate identified in my Opening Report, which was [redacted], giving a net price of

---

[432] As discussed in Section 8, exclusive formulary placement is the more likely outcome of negotiations unless the PBM has a strong preference for parity, and particularly given the limited benefit to Regeneron of 1:2 coverage.
[433] Scott Morton Amended Opening Report, ¶ 206.
[434] Note that this reduction in margins is consistent with firms negotiating higher rebates year after year and for net price to remain roughly constant as a result, which was described in this report and my Opening Report along with rising list prices.

It is notable that Amgen raised the list price for Repatha® significantly in 2023: the list price in 2022 was $258.38, while in 2023 it was $286.80, an increase of 11%. That gave Amgen considerable leeway to increase the percentage rebate amount without actually lowering net prices. For example, if Repatha® had a 50% rebate in 2022, Amgen could offer a 55% rebate in 2023 and still receive approximately the same net price. In comparison, the list price for Praluent® was lower than for Repatha® and the percentage increase in 2023 was smaller: the Praluent® list price was $231.89 in 2022 and $245.54 in 2023, an increase of less than 6%.
[435] This is the figure for 2022 provided in Stiroh Rebuttal Report, Figure 51.
[436] As discussed in Section 8, the PBM chooses the outcome that maximizes total surplus, which is Praluent® exclusivity because of the lower per-unit cost for Praluent®.

[redacted] per unit.[437] Amgen's but-for bid for Repatha®, according to the model, would have been 47%.[438]

306. With the large conditional rebates in the [redacted] Commercial, the model predicts that Praluent® would increase its offer to the bottom of the range above, i.e., [redacted] per unit. Nevertheless, Amgen would win exclusive placement for Repatha®. The rebate offer for Repatha® would now be the one determined by the outcome of negotiations, with a maximum rebate of [redacted] and a minimum that depends on the size of the conditional rebates. The maximum is close to Repatha®'s rebate offer reported in my Opening Report.[439] The maximum rebate implies that the offer for Repatha® would be at least $137 per unit. Therefore, the unit price would be at least $[redacted] higher per unit for Repatha® than for Praluent®. Taking into account the entrenched shares (which are sold without additional rebates) [redacted] he total PCSK9i cost under Repatha® exclusivity would have been higher. Thus without the loss of conditional rebates on other products, and even accounting for Repatha®'s higher entrenched share, the total cost to the PBM is lowered by picking Praluent®.

307. The actual Repatha® rebate offered in 2022 was [redacted].[440] This is higher than the 47% computed in the model. But it is worth emphasizing that the model only takes into account profits at, in this case, the national CVS commercial formulary, and does not incorporate spillover effects. In reality, Amgen would have had an incentive to increase the rebate to CVS commercial in expectation that there would be a substantial spillover value throughout the PCSK9i market associated with foreclosing Praluent® from the last remaining major national commercial formulary that was Praluent® exclusive. But even with this higher offer and Repatha®'s higher entrenched share, the average cost of PCSK9i to CVS was higher with Repatha® exclusive than with Praluent® exclusive.

308. With other PBMs such as ESI, Amgen's [redacted] and this is where the discussion would stop. Amgen [redacted], to get exclusive coverage despite paying a lower rebate rate (in the CVS example, [redacted]). The

---

[437] Scott Morton Amended Opening Report, ¶ 137.
[438] As discussed in Sections 3 and 8, it would not make economic sense for Amgen to increase its rebate offer beyond that level to try to win exclusive placement, despite making a positive net margin at that rebate level, because of the profits Amgen makes on its entrenched share when Praluent® is given exclusivity. However, the maximum rebate, even without the CTB strategy, could be somewhat higher given the spillover benefits to Amgen of winning Repatha® exclusivity at CVS.
[439] Scott Morton Amended Opening Report, ¶ 206. Note that the larger actual offer is consistent with Amgen trying (unsuccessfully) to overcome CVS' ethical and legal concerns, especially given the spillover benefits from excluding Praluent® from all major national formularies.
[440] AMG10935-0001611590 at 591 (Amgen message chat logs discussing rebates, [redacted].").

PBM ends up receiving lower rebates and paying higher net prices for PCSK9i than at the rebate it would have been paid in the but-for market in which Amgen competed without CTBs, (which, for CVS commercial, was 57%).

309. As discussed in my Opening Report, and in the initial report of Heather Bates, the history is more complicated with CVS.[441] [redacted]

310. Amgen continued to offer a CTB in subsequent negotiations, causing Regeneron to have to provide an even larger rebate to have a chance of neutralizing the penalty Amgen applied to the PBM for leaving Repatha®. [redacted].[444] This is consistent with Regeneron taking into account the spillover cost of losing distribution at all major national formularies, and also consistent with Regeneron being unable to justify increasing its discount any further.

311. [redacted]

[441] Scott Morton Amended Opening Report, § 5.6; *see also,* Bates Opening Report, § V.D.
[442] Scott Morton Amended Opening Report, ¶¶ 90, 205.
[443] The higher actual rebate is again consistent with Amgen trying to overcome CVS concerns about the CTB strategy, and also with Amgen taking into account the spillover value from excluding Praluent® from all major national formularies.
[444] Regeneron offered an all-in rebate of 65% at Zinc in 2022 (REGN0031628 at 628) or 68% including the 3% retail ID rebate (REGN0047233 at slide 11).
[445] AMG10935-0000798212.
[446] Regeneron offered an all-in rebate of 65% at Zinc in 2022 (REGN0031628).
[447] Scott Morton Amended Opening Report, ¶ 137.

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

313. The results for CVS Part D are similar. The computation takes into account the higher variables costs and lower margins for Part D given the requirement to discount for patients whose purchases fall into the Medicare Part D coverage gap.[450] [redacted]

[448] AMG10935-0001611590 at 591 (Amgen message chat logs discussing rebates, "[A]t CVS Enbrel is 2.2B/yr, Otezla is ~1B, repatha 200M. "Thus 1 pt is worth 22M on enbrel®, 10m on Otezla, and 2 M on repatha. 3pts on enbrel is worth 30pts on repatha, so the 2022 rate with enbrel overlay @3% and repatha @55% is effectively 85% on repatha.").

[449] Gaier Rebuttal Report, ¶ 344.

[450] Mathur Opening Report, ¶ 114.iii.b and note 229. This per-unit cost, as computed by Dr. Mathur for 2021-2022, is 15.1% of the list price. I apply the same 15.1% figure to estimate incremental Part D costs for Praluent® in 2023 and for Repatha® in both periods.

[redacted]

[redacted].

315. [redacted]

316. [redacted]

317. In summary, there is no contradiction between the increase in rebates above the competitive level that Regeneron offers when Amgen offers exclusionary CTBs and the increase in consumer prices from the CTB strategy. Given Amgen's CTB, Regeneron's rebate offers did not result in a benefit to the PBM from lower net prices; the result was the PBM paying more for PCSK9i drugs once the CTB induced them to exclude Praluent®. Given the CTB's design to successfully stop a Praluent® exclusive, Regeneron's rebate offers do not ultimately benefit consumers. PBMs and their members are better off if they accept the CTB and keep Repatha® on their formulary than the alternative of losing Enbrel® and/or Otezla® rebates. But they are worse off relative to Amgen not engaging in its exclusionary CTB strategy.

318. It is important to note that, as a result of Amgen's exclusionary conduct, [redacted], which exacerbates consumer harm by increasing Repatha®'s entrenched share. Figure 15 shows recent data provided to me by Regeneron since I

filed by Opening Report showing three measures of prescription weekly market shares for January 2023 through January 2024: total prescriptions (TRx), new prescriptions (NRx) and total new-to-brand prescriptions (NBRx). [redacted]

**Figure 15: Praluent® market shares: TRx, NRx and NBRx[451]**

[redacted]

TRx Share NRx Share NBRx Share

319. Turning to the model in Appendix A once again, bidding competition results in even worse outcome for consumers as the entrenched share for Repatha® increases due to foreclosure and spillovers. [redacted] The maximum rebate that Amgen needs to offer for Repatha® exclusivity as part of the CTB (which corresponds to an assumption that PBMs have all the bargaining power in negotiations) [redacted] the maximum Repatha®

[451] **Source**: Praluent Performance Tracking Report with Data thru 01.19.24.pptx, at slide 3.

[452] These figures use 2021-22 data.

rebate Amgen needs to offer falls to [redacted] Thus the consequence of foreclosure from all the major PBMs, which is just beginning to be observed in the market, results in ever greater harm to customers in the form of higher PCSK9i net prices.

320. Dr. Gaier offers two criticisms of the but-for net price calculations in my Opening Report: first, that evidence of declining Repatha® and Praluent® net pricing contradicts the assumption that but-for net prices would stay at about the same level over time, and second, that the net price that Amgen offered to CVS Part D for Repatha® in 2022-23 was below the but-for Praluent® net price given in my report.[453] Both criticisms reveal a miscomprehension about what "but-for price" means. The but-for price is what the net price would be in the absence of Amgen's exclusionary conduct. The Repatha® and Praluent® net prices over the last several years reflect prices that have resulted from Amgen's exclusionary conduct. Meanwhile the price offered for CVS Part D in 2022-23 is neither a but-for price nor an actual price adopted as part of CTB by a PBM, but rather the [redacted] and to foreclose Praluent®. None of those prices is a but-for price, and therefore Dr. Gaier's comparisons to those prices as evidence about what the but-for price for Praluent® would be is misguided and meaningless.[454] For the reasons discussed in my Original Report, in Section 8, and in this section, Praluent®'s but-for net price would be lower than Repatha®'s but-for net price, and Repatha®'s but-for net price would be higher than Repatha®'s net price offer in 2022-23 for CVS Commercial and Part D.

### 10.4 Amgen's conduct weakens or eliminates competitive constraints now as well as in the future and therefore harms consumers.

321. Dr. Gaier argues that PBMs are not locked into contracts with Amgen and can switch to Regeneron in the future.[455] However, as discussed in my Opening Report, if none of the factors I have explained thus far change, or if they change in a way that weakens Regeneron, the parties will all choose the same outcome again. Dr. Gaier gives no reason why PBMs would switch. His analysis fails to acknowledge that because of the CTBs and regardless of whether contracts lock customers in for some term, Regeneron – which already has lower costs than Amgen – cannot compete and is foreclosed.[456] Amgen's use of CTBs is an equilibrium in which Regeneron cannot compete such that competition is shut out indefinitely. The mere fact that agreements are renegotiated periodically does not change the outcome if circumstances have not changed. My Opening Report also discusses that even if exclusionary agreements are not of long duration, they

[453] Gaier Rebuttal Report, § XI.B.1.
[454] Note that, as discussed in my opening report, the price for Repatha® since the CTB has in fact been essentially constant; Dr Gaier gets a different result only by cherry picking a single quarter with a temporarily low net price to use in his comparison. Additional evidence for roughly constant but-for net prices is the flat net prices for Enbrel® and Otezla® discussed in Section 11; the conditional rebates tied to Enbrel® and Otezla® as part of the CTB would not have impacted Enbrel® and Otezla® pricing.
[455] Gaier Rebuttal Report, ¶ 27.
[456] Scott Morton Amended Opening Report, ¶ 182.

can still have enduring effects because of market-wide spillovers as patients are forced to switch to Repatha® and impact HCP decisions.[457]

322. Dr. Stiroh takes the extreme position that Amgen is equally constrained in pricing Repatha® independently of Praluent®'s market share,[458] and that even if no competitor to Repatha® existed, Amgen would still be constrained to the same extent due to the possibility of Praluent®'s future re-entry into the U.S. market. Dr. Stiroh therefore argues that Amgen cannot obtain monopoly power no matter to what extent Praluent® is foreclosed from the market or even if it exits. This extreme position is divorced from economic realities. Firms do not need to be literal monopolists with 100% share (and no possibility of entry) to have monopoly power. The lower threshold correctly reflects that firms can exercise monopoly power despite the presence of some fringe competitors.

323. Dr. Stiroh also erroneously asserts that should Regeneron need to exit the U.S. PCSK9i market due to Amgen's anticompetitive practices, it could always re-enter later and therefore would still be a competitive constraint.[459] This position ignores all the analysis of the case. Why would a re-entry by Regeneron result in a different outcome than it did the first time? Future re-entry would not be possible if the CTBs persist. Regeneron still could not outbid Amgen, as it could not compensate PBMs for the threatened loss of Enbrel® and/or Otezla® rebates. Consequently, Regeneron cannot exert a competitive constraint on Amgen's price of Repatha® going forward.

324. Although Dr. Stiroh admits that bundled rebates can have anticompetitive effects if they weaken the competitive constraints that the company would face absent the bundled rebates,[460] she fails to properly analyze whether Amgen's CTB weakens the competitive constraint imposed by Praluent®. Instead, Dr. Stiroh merely asserts that even if Praluent® were withdrawn entirely from the U.S. market, "Praluent®'s potential reentry would continue to impose a competitive constraint on Repatha®."[461] Even if the possibility of reentry imposes some theoretical competitive constraint, that tells us nothing about whether however, is not the relevant question of whether the constraint is weakened. According to Dr. Stiroh's own analysis, and the analysis performed by Dr. Gaier, even if Amgen were to cease its CTB bundling practices, by shrinking use of Praluent®, the CTB significantly diminishes the competitive constraint imposed by Praluent® even if Amgen were to cease its CTB bundling practices.[462]

---

[457] *Id.* at ¶ 100.
[458] Stiroh Rebuttal Report, ¶ 66. Dr. Stiroh also states that some foreclosure theories in the economic literature require showing that smaller firms cannot achieve minimum efficient scale. *Id.*, ¶ 189. However, the foreclosure theory described in my reports and supported by the economic literature cited in my reports requires no such thing.
[459] *Id.*, ¶ 10.vii.b.
[460] *Id.*, ¶ 66.
[461] *Id.*, ¶ 225.
[462] *See* AMG10935-0000016193 at slide 11 ("As RGN increases share, they improve their negotiating position with PBMs.").

325. According to Dr. Gaier's analysis, prescribers' preferences for Repatha® directly impact the competitive constraint imposed by Praluent®.[463] Dr. Gaier admits that as a result of this dynamic, Amgen has a reduced incentive to bid aggressively against Praluent® for favorable formulary position. Dr. Gaier also admits that Amgen derives much more value from parity position, reducing Amgen's incentive to provide higher rebates for exclusivity. Additionally, Dr. Gaier admits that PBMs seek to minimize "member impact"—the portion of members that have to switch drugs due to a formulary change —which further reduces PBMs' willingness to make Praluent® exclusive.

326. Dr. Stiroh ignores these dynamics that drive Amgen's rebating incentives, and instead theorizes that the competitive constraint imposed by Praluent® has not been weakened by the CTB. Indeed, she maintains that Praluent® would remain an effective comptetitor to Repatha® even if it were to exit the US market entirely. Dr. Stiroh makes this assertion "as an economic matter" yet she does not attempt to account for Dr. Gaier's observations that undermine her theory. Needless to say, Dr. Stiroh's conjecture is not supported by even a single example of a situation where a drug with zero market share in an established market has been awarded exclusivity.

327. Dr. Gaier writes that Regeneron failed to offer its own bundled rebate to PBMs, e.g., by offering additional rebates on [redacted][464] In essence, Dr. Gaier effectively suggests that Regeneron should have engaged in the same unique and anticompetitive practices as Amgen. Regeneron attempted to compete on the merits in the PCSK9i market and cannot be blamed for not engaging in anticompetitive conduct. Similarly, it is misplaced to propose that [redacted]

## 10.5 Leqvio® has not affected Repatha® and Praluent®'s sales and clearly does not constrain the price of Repatha®.

328. As I discussed in my Opening Report, Leqvio® does not constrain the price of Repatha®.[465] Leqvio® is a physician-administered drug (typically covered as a "medical benefit") rather than being dispensed in pharmacies, a fact that Ms. Gan also describes in her report.[466] Nevertheless, Dr. Stiroh argues that Leqvio® is a threat to Repatha® and therefore in the same market.[467] To address her claim, I provide evidence to show that, first, Leqvio® is administered differently to Repatha® and Praluent® (in Table 7 below) and that the entry of

[463] *See* Gaier Rebuttal Report, ¶¶ 239-244.
[464] *Id.* ¶¶ 257, 260.
[465] Scott Morton Amended Opening Report, § 3.2.
[466] Gan Rebuttal Report, ¶ 34 and Figure 4.
[467] Stiroh Rebuttal Report, ¶ 229.

Leqvio® has not affected claims of Repatha® (Figures 16 and 17 below). This evidence makes it clear that Leqvio® neither competes with nor constrains Repatha®.

329. My Opening Report explained that Leqvio® is not part of the same market as Praluent® and Repatha® because patients access the drugs differently: PBMs control the consumer acquisition of Repatha® and Praluent® through formularies whereas Leqvio® is acquired via the medical benefit process outside of PBMs. Ms. Gan describes this distinction in her report.[468] Since Leqvio® is administered by a doctor, the drug remains almost entirely distributed through the medical channel. As discussed in my first report, IQVIA data show that less than 1% of Leqvio®'s claims are made through the pharmacy channel. The data also show that despite increased formulary coverage, the number of Leqvio®'s claims through the pharmacy channel has remained almost nonexistent. As shown by Table 7, between January 2022 and July 2023, the highest number of Leqvio®'s monthly claims ever made through the pharmacy channel was [[redacted] while the number is [[redacted] through the medical channel. In 2023, the average number of monthly claims through the pharma channel was [[redacted] while it was [[redacted] in the medical channel. This contrasts with Praluent® and Repatha®, for which almost 100% of claims since 2019 have been made through the pharmacy channel.

[redacted]

[468] Gan Rebuttal Report, ¶ 39 and Figure 4.

[469] **Notes:** [a] Pharmacy claims are limited to approved claims. Medical claims are limited to paid claims. **Source:** [1] AMG10935-DATA-0000000056-AMG10935-DATA-0000000075 (IQVIA LAAD MX); [2] AMG10935-DATA-0000000076-AMG10935-DATA-0000000095 (IQVIA LAAD RX).

[redacted]

330. If Leqvio® were to compete with Repatha® and Praluent®, then Leqvio®'s inclusion on formularies should affect the volume of claims for Repatha® and Praluent®. However, there is no such empirical effect. Figure 16 below shows the combined number of Repatha® and Praluent® claims in formularies that have never included Leqvio® (first y-axis), and claims for formularies that added Leqvio® in January 2022 (second y-axis).[470] The Figure shows that the growth in the number of Praluent® and Repatha® claims was unaffected by Leqvio® being added to the formularies. Figure 17 repeats the same exercise, but looking at formularies that added Leqvio® in January 2023. Both figures show that there was no effect on the number of Praluent® and Repatha® claims. The fact that there is no effect on Praluent® and Repatha® claims is not surprising given the small number of Leqvio®'s claims made through the pharmacy channel.

**Figure 17: U.S. Praluent® and Repatha® total claims: formularies without Leqvio® coverage and formularies that included Leqvio® in January 2022[471]**

[redacted]

[470] I consider the total claims from Repatha® and Praluent® jointly to avoid any distortion being introduced into the analysis from substitution from Praluent® to Repatha® resulting from Amgen foreclosure strategy.

[471] **Notes**: [a] Formularies without Leqvio® correspond to formularies that did not include Leqvio® in any point between January 2021 and June 2023 [b] Formularies that added Leqvio® in January 2022 correspond to formularies that report Leqvio® as a covered drug for the first time in January 2022. [c] The line shows one month before Leqvio® was added to the formularies. [d] Claims reflect approved Rx claims. **Sources**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX).

**Figure 17: Praluent® and Repatha® total claims: formularies without Leqvio® coverage and formularies that included Leqvio® in January 2023**[472]

[redacted]

### 10.6 As Repatha®'s entrenched market share increases, Regeneron's competitiveness diminishes, and Amgen offers lower rebates; therefore, consumers are harmed increasingly.

331. In Section 8, I explain the critical role of the entrenched market share on rebate offers. Intuitively, a drug manufacturer with a high entrenched share offers low rebates[473] (because it knows it will enjoy sales even without offering rebates). Dr. Gaier acknowledges this repeatedly in his report.[474] In Section 8, I also explain how a high entrenched market share of Repatha® diminishes Regeneron's incentive to compete.

332. The more and the longer Praluent® is foreclosed from the PCSK9i market, the more established and uncontested Repatha® becomes. Such a development reinforces the preference of PBMs to stick with Repatha® so as to minimize disruptions from a potential switch to Praluent®.[475] In other words, the more and the longer Repatha®'s competitor is affected by anticompetitive practices, the less competitive the PCSK9i market becomes over time. This reality

---

[472] **Notes**: [a] Formularies without Leqvio® correspond to formularies that did not include Leqvio® in any point between January 2021 and June 2023 [b] Formularies that added Leqvio® in January 2023 correspond to formularies that report Leqvio® as a covered drug for the first time in January 2023. [c] The line shows one month before Leqvio® was added to the formularies. [d] Claims reflect approved Rx claims. **Sources**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT). [2] AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX).

[473] As I explain in Section 8, costs of selling the drug (among others) also affect rebates.

[474] *See, e.g.*, Gaier Rebuttal Report, ¶ 239.

[475] *See* quote of Mr. Hindman's testimony in Gaier Rebuttal Report, ¶ 241.

contrasts starkly with Dr. Stiroh's extreme position, namely, that Amgen has no market power whatsoever as long as Praluent® exists, or even if it no longer existed, if Praluent® could re-enter the PCSK9i market.

333. For greater clarity, any claim that the mere existence of an alternative PCSK9i drug constrains the net price of Repatha® ignores the crucial impact of the entrenched share on net drug prices. As Repatha®'s entrenched market share increases, Amgen can charge high prices and has every incentive to do so – even if there existed several fringe firms.

334. Therefore, future re-entry would be hampered by Amgen's growing incumbency advantage. Incumbency advantages harm competition and consumers generally. In the present case, a rising entrenched share complicates future re-entry by a competitor, and it makes entry less effective or inviable.

335. Finally, that Regeneron supplies Sanofi with Praluent® clearly has no impact on Regeneron's entrenched share in the US market. Put differently, Regeneron supplying drugs outside of the US is irrelevant to Regeneron's attractiveness to PBMs in the US.

### 10.7 Ms. Gan's procompetitive justification for CTBs of reducing risk makes no economic sense.

336. Ms. Gan argues that CTBs have a procompetitive justification of reducing the risk (i.e., volatility) of payments.[476] Repatha® is uncertain given "an unpredictable market environment in terms of category acceptance and growth" whereas demand for Enbrel® as a mature product was more predictable.[477] She argues that CTBs allow PBMs to shift rebates from uncertain demand for Repatha® to the more established and foreseeable demand for Enbrel®. This, she concludes, justifies the CTBs because it reduces risk and was "'more predictable' for payers."[478]

337. Ms. Gan's argument violates economic logic. Rebates impact payers because they reduce drug costs. Therefore it is volatility in drug costs, and not of the rebates themselves, that matter to payers. Contrary to her claim, shifting Repatha® rebates to Enbrel® would exacerbate risk, not reduce it. This is because rebates reduce the net total amount spent for the more volatile Repatha® and therefore reduce total volatility. In contrast, the more a PBM shifts Repatha® rebates to Enbrel®, the more volatile the net amount spent on Repatha® becomes. Shifting Repatha® rebates to Enbrel® would exacerbate the volatility to payers rather than reduce it, contrary to Ms. Gan's purported justification for CTBs.

338. An example will help illustrate this point. Suppose that a PBM with certainty buys $30M of Enbrel® at list price but is uncertain about its expenditure on Repatha®: it buys either $2M or $8M (with equal likelihood) of Repatha® at list price, depending on how

[476] Gan Rebuttal Report, § VIII.B.
[477] *Id.* ¶ 126.
[478] *Id.*

much HCPs prescribe PCSK9i therapy. If rebates are given on both Enbrel® and Repatha®, there is uncertainty about the value of those rebates give uncertainty about Repatha® demand. Suppose the PBM expects that if Enbrel® and Repatha® were not bundled, the result of negotiations with Amgen would be a $7.5M rebate on Enbrel® (which has certain demand) and a 50% rebate on Repatha®.[479] The rebate on Repatha® would be either $1M (if demand is low) or $4M (if demand is high); the expected rebate amount (if each outcome is equally likely) is $2.5M. The net cost of Enbrel® would then be $22.5, while with a 50% rebate the net cost of Repatha® would be either $1M (if demand is low) or $4M (if demand is high). Thus there is uncertainty in the total cost to the payer of purchasing Enbrel® and Repatha®, which ranges from $23.5M to $26.5M, depending on whether demand for Repatha® is low or high.

339. Now suppose that Amgen offers a CTB composed of Enbrel® and Repatha®, ostensibly to reduce risk. The CTB offers an incremental rebate on Enbrel® and simultaneously lowers the rebate percentage on Repatha® in a way that gives the same expected rebate payment for the Enbrel®/Repatha® bundle. The simplest case to consider is if the PBM shifts the entire expected rebate amount from Repatha® to Enbrel®. The rebate for Enbrel® would then be $7.5M + $2.5M = $10M, with no rebates on Repatha®. The cost to the payer for purchasing Enbrel® would then be $20M, while the cost of purchasing Repatha® is $2M (if demand is low) or $8M (if demand is high). The total cost of the bundle therefore would range from $22M to $28M. Rather than reducing risk for the payer, the range of drug costs for Enbrel® and Repatha® increases, making drug costs more volatile and less predictable for the payer. The same result holds for any reduction of the Repatha® rebate to something less than 50% with a corresponding increase in Enbrel® rebates such that the expected total rebate payment for the CTB remains the same. Any CTB that shifts some amount of rebate from Repatha® to Enbrel® while preserve total CTB rebate payments will increase the volatility in drug costs for the payer. This example demonstrates that Ms. Gan's procompetitive justification is contrary to economic logic. If anything, her argument explains why PBMs should not use CTBs to shift rebates from one drug to another, or at least from a drug with uncertain demand to an established drug with more predictable demand.

340. Hence, Amgen experts have provided no valid procompetitive justification for CTBs. The only remaining reason for Amgen to have used CTBs is to foreclose Praluent®, weaken competition, and increase its own profits to the detriment of PBMs and customers.

### 11. Dr. Stiroh fails to show that Amgen does not have significant market power in the sale of Enbrel® and Otezla®.

341. As an initial matter, all that is necessary for Amgen's CTB rebate strategy to work is for the other products in its bundle to compete in markets that are not perfectly competitive. If the markets where Enbrel® and Otezla® compete were perfectly competitive, then PBMs would not have any reason to go along with Amgen's linking of rebates on formulary coverage in the unrelated therapeutic class of PCSK9 inhibitors. However, in this case, Amgen's

[479] The PBM expects to receive a rebate of $2.5M on average for Repatha® (i.e., 50% times average Repatha® demand of $5M) and the remainder of $7.5M on Enbrel®.

decision to leverage rebates on Enbrel® and Otezla® results in Amgen using products from an unrelated therapeutic class that are much larger than Repatha® and that do not operate in perfectly competitive markets.

342. In my Opening Report, I described various types of direct evidence showing that Amgen has significant market power in the sales of Enbrel® and Otezla®. I showed that this market power was durable with both products having high margins that are rising over time, high profits, widespread adoption on health plan formularies, and stable prices despite the launch of new products or approval of additional indications for other drugs used to treat the same conditions.[480]

343. Dr. Stiroh argues that Amgen does not have significant market power in the sales of Enbrel® and Otezla®. The primary evidence she points to is Amgen efforts to monitor and evaluate some therapeutic alternatives to Enbrel® and Otezla®, including tracking the utilization, marketing, and perceptions of those alternatives among healthcare providers ("HCPs") and patients.[481] She also refers to documents indicating pressure on Amgen to increase rebates on Enbrel® or risk losing coverage for Enbrel® or Otezla®, though she identifies only a single instance of a PBM actually withdrawing coverage, which occurred with Enbrel® at Optum/UHC nine years ago. Dr. Stiroh then criticizes some of the analysis in my report, including the significance of high formulary coverage, the significance of high and rising margins, and whether there is a price response to entry. Finally, while she describes the framework for identifying a relevant antitrust market, she does not attempt to identify or test for a properly defined relevant antitrust product market for either Enbrel® or Otezla®. Nevertheless Dr. Stiroh asserts that if Humira® is in the relevant market for each product, then Amgen's market share for each would be around 40%, or even lower if additional products are included in the relevant market.

344. In the remainder of this section, I address each of these arguments and show that none of them are persuasive. Despite the purported competitive threats or constraints that Dr. Stiroh points to, Amgen has been able to maintain and even increase formulary coverage of Enbrel® and Otezla® without lowering net prices at all, notwithstanding the launch of various other products in the same therapeutic class. Dr. Stiroh has not shown that the presence and entry of other drugs in the therapeutic class has diminished Amgen's significant market power in the sale of both Enbrel® and Otezla®, so my conclusion remains unchanged that Amgen has significant market power in the sale of Enbrel® and Otezla®, which it leveraged in order to foreclose Praluent®'s access in the unrelated PCSK9i market. On this point, I note that none of Amgen's experts rebut the evidence in my Opening Report that sales of Enbrel® and Otezla® are many times larger than sales of Repatha®, so that a conditional rebate on Enbrel® and/or Otezla®

[480] Scott Morton Amended Opening Report, § 4.2. I use the terminology "same therapeutic class" to describe the set of products used to treat the same conditions with the understanding that these alternate drugs do not necessarily have the same mechanism of action, or that a HCP would consider them good medical alternatives for the same patient, or that the other products are economic substitutes.

[481] *See* Stiroh Rebuttal Report, §§ IV.C, V.A.2.

that is small in percentage has a large impact on swaying PBMs to choose Repatha® over Praluent®.[482]

**11.1 Evidence about monitoring and evaluating therapeutic alternatives in uninformative about market power.**

345. Dr. Stiroh discusses instances of Amgen monitoring and evaluating other products in the same therapeutic class as Enbrel® and Otezla®, which she claims indicates that these other products are competitive threats.[483] However, merely identifying alternative products is not determinative of whether products have substantial market power. Rather, the question is whether these purported competitive threats restrict Amgen's ability to exercise substantial market power. None of the evidence that Dr. Stiroh amasses about monitoring and evaluating would distinguish a market in which alternative products do constrain substantial market power and where they do not. Therefore, this extensive analysis in Dr. Stiroh's report is completely irrelevant.

346. To see this, consider a stylized and extreme version of the scenario that Dr. Stiroh is trying to disprove: suppose there are a number of drugs that are used to treat the same indications, but each of them is differentiated and is must-have for a PBM, perhaps because there is a subset of patients for some indications that can only use one of the alternatives (the reason why each is must-have does not matter for this stylized scenario.) Because each is must-have, PBMs cannot remove any of the products from their formularies, though they may threaten to do so and may have some ability to negotiate for higher rebates for preferred tiers. But this limited PBM bargaining power still allows each of the drugs to exercise significant market power.

347. In this scenario, one would expect to see evidence of the kind of monitoring and evaluating that Dr. Stiroh documents in the autoimmune therapeutic class. These individual must-have drugs would still have an incentive to compete for new patients and new prescriptions, engage actively in marketing to increase share, monitor their performance against that of other drugs in the class to ascertain the potential addressable market, and so on. In fact, because each has significant market power, they earn high margins on incremental sales and have all the more incentive to compete for share and engage in the kind of activities that Dr. Stiroh describes.

348. However, these activities to monitor other drugs and compete for share would not constrain the substantial market power of the drugs. This competition for share has no impact on the incentives to charge elevated net prices, nor does it contribute to PBM bargaining power, which depends on substitution at the PBM level, not the prescriber level.

349. Turning to the marketplace in which Enbrel® and Otezla® compete, not all the products in the therapeutic class are must-have, but they have varying degrees of market power

[482] Scott Morton Amended Opening Report, ¶¶ 68-70; *see also,* AMG10935-0000544764 at 768.
[483] Stiroh Rebuttal Report, §§ IV.C, V.A.2.

and compete for share.[484] As in the stylized example, this competition for share does not impact the relative bargaining power of Amgen and PBMs, and so has no impact on the ability of Amgen to charge high net prices. The fact that firms monitor other products and engage in activities to increase share is not an indication of limited market power, and, if anything would tend to increase when firms have substantial market power. Hence the entire discussion of these activities for Enbrel® and Otezla® does not provide any evidence about Amgen's market power for these products.

**11.2 The outlier change in formulary status for Enbrel® at Optum/UHC in 2014/2015 is not evidence of a lack of substantial market power.**

350. Dr. Stiroh and I agree that the way that PBMs can constrain, to some degree, the market power enjoyed by branded pharmaceutical products in competitive marketplaces is by using formulary access to drive rebates and reduce net prices, as I described in my testimony before Congress that Dr. Gaier quotes repeatedly.[485] Dr. Stiroh documents only one such instance of either Enbrel® or Otezla® losing [redacted] status—not losing access—on a formulary as a result of rebate negotiations, which was at [redacted] Dr. Gaier similarly cites only that event on the commercial side.[487] That paucity of evidence is itself indicative of the substantial market power held by Enbrel® and Otezla®, as there is apparently no evidence of any PBM removing Enbrel® from its formulary entirely as a result of access negotiations in the last nine years.

351. Even with respect to this one episode, [redacted] unwillingness to exclude Enbrel® from its formulary reflects Enbrel®'s market power and the significance of its rebates to PBMs. Evidence cited by Dr. Stiroh explains UHC's [redacted][488] The cost of excluding Enbrel® for patients accessing it in a [redacted] position or [redacted] was too great to make it worthwhile to [redacted]. The example highlights that, even in a [redacted] position, Enbrel® still wields considerable market power. In fact, UHC/Optum has now returned Enbrel® to preferred status, underscoring the cost to PBMs from trying to steer patients away from Enbrel®.[489] As UHC/Optum's Alexander Hindman [redacted]

---

[484] It is notable that Dr. Stiroh cites evidence that Enbrel® is the preferred first line therapy for about a quarter of patients. *Id.* ¶ 95. That leaves a lot of room to compete for share, but it is also a substantial number of members who rely on Enbrel®, consistent with the "member noise" and "economic impact" that, as discussed below, make PBMs reluctant to remove Enbrel® and Otezla® from formularies. *Id.* ¶ 136.
[485] Stiroh Rebuttal Report, ¶ 111; Gaier Rebuttal Report, ¶ 70 and notes 26, 307, 375, 485.
[486] Stiroh Rebuttal Report, ¶¶ 114-115.
[487] Gaier Rebuttal Report, note 241.
[488] Stiroh Rebuttal Report, ¶ 126 (quoting UHG000008404, [redacted]
[489] Dep. Tr. A. Hindman (UHC 30(b)(6), 150.

[redacted][490] That in turn explains why Enbrel® has had substantial and durable market power.

### 11.3 Competition has not resulted in other products displacing Enbrel® and Otezla® for preferred positions on formularies.

352. If Dr. Stiroh is correct that Enbrel® has various close substitutes, such that HCPs, patients, and PBMs are relatively indifferent between the two products, we would expect to see many instances where net prices have been bid down in exchange for exclusivity.[491] Yet Dr. Stiroh only cites to one such event regarding Enbrel® from nine years ago, and only as a non-preferred drug in a higher copay tier, and even then, Enbrel® regained preferred coverage.[492] The paucity of such examples was the basis for describing the broad formulary coverage for Enbrel® in my Opening Report as one indication of its substantial market power.[493] Far from showing that Enbrel® faces stiff competition, Dr. Stiroh's sole cited example confirms that for PBMs, removing preferred coverage for Enbrel® is painful and difficult to sustain, indicating that Enbrel® enjoys considerable market power.

353. Dr. Stiroh objects to any inference about market power from broad formulary coverage, giving two reasons.[494] The first is that it contradicts the evidence of what she claims is competitive pressure in her report. But as I have already discussed, that evidence does not show that alternative therapies are constraining prices for Enbrel®, and therefore does not show that they are constraining Enbrel®'s market power. Her second reason is that even if PBMs do not remove Enbrel®, the mere threat of removing Enbrel® can drive down prices in negotiations. If this hypothesis were correct, then one should observe two things in the marketplace: All the various therapeutic alternatives should have broad coverage, since if it is sufficient to threaten to remove a drug to drive down prices, then PBMs and their members are better off preserving coverage and access while still getting reduced prices. Also, one should see prices falling in the market, particularly as new products are introduced and as existing products are approved for new indications that expands the set of potential alternatives to Enbrel® an Otezla®.

354. In fact, neither of these implications of Dr. Stiroh's "threat of excluding" hypothesis are observed in the marketplace. I first show that, while Enbrel® and Otezla® (along with Humira®) have broad formulary coverage, the other products she identifies are covered less broadly, indicating that PBMs will withhold preferred coverage on some products in exchange for better prices for others where feasible. Then I show that net prices for Enbrel® and Otezla® have been essentially flat despite the launch of multiple new products or expanded label indications in the category. These facts show that PBMs do not have a credible threat of removing coverage for

---

[490] UHG000008374 at 374 (emphasis in original).
[491] Stiroh Rebuttal Report, ¶ 111.
[492] *Id.* ¶¶ 114-116.
[493] Scott Morton Amended Opening Report, ¶ 41.
[494] Stiroh Rebuttal Report, ¶ 130.

Enbrel® and Otezla® like they do for the other products in the therapeutic class, and that pricing for Enbrel® and Otezla® has not been further constrained by the entry of other products in the therapeutic class. These results show that Dr. Stiroh is wrong that the existence of therapeutic alternatives constrain the substantial market power of Enbrel® and Otezla®.

355. Turning first to formulary coverage for various autoimmune products, MMIT data shows that by June 2023, Enbrel® and Otezla® are covered (as preferred or non-preferred) in formularies representing [redacted] and [redacted] of covered lives, respectively. This is an increase from the shares in January 2019, which were [redacted] for Enbrel® and [redacted] for Otezla®. That is, regardless of the number of products covering Enbrel® and Otezla® indications increasing, the two drugs are more widely covered now than they were in 2019. In fact, documents cited by Dr. Stiroh in her report show the same [redacted] in coverage for Enbrel® and Otezla® over this time period, which reflects in particular the change at [redacted] to cover Enbrel® and Otezla®.[495]

356. Moreover, using MMIT data, I estimated the share of lives where Enbrel® and Otezla® are among the drugs with the best coverage in each formulary among the drugs that can be used to treat each of the product's indications. I did the exercise considering 6 alternative sets of competitors that align with the competitors used by Amgen when negotiating their contracts with one of the largest PBMs, CVS.[496] These are the main products that have been approved to treat the same indications that Enbrel® and Otezla® treat. In particular, I considered:[497]

[redacted]

357. Moreover, I also considered Juvenile Idiopathic Arthritis (JIA). The set of competitors I considered are those listed in the auto-immune therapeutic class or category in CVS

[495] "MEGA Review Series Q3 2022 Inform to USBO LT," (AMG10935-0000057248 at slides 18-19, cited in Stiroh Rebuttal Report at note 254); "US Value & Access LRS Trends," May 17, 2021 (AMG10935-0000115173 at Slide 21slide 24, cited in Stiroh Rebuttal Report at note 271).
[496] *See* AMG10935_OCO-0000006981 at 7013, 7032; AMG10935_OCO-0000007163 at 185, 186, 202.
[497] This list of alternatives largely overlaps with the list in Stiroh Rebuttal Report Exhibit 3; the exceptions are that it includes one product (Entyvio®) not in Exhibit 3, does not include the provider-administered drugs in Exhibit 3 that are largely not sold through the PBM channel, and does not include the many Humira® biosimilars that have recently been introduced.

contracts, but that have JIA as an indication approved by the FDA. This includes the following products: [redacted]

358. Figures 18-23 shows the share of lives for which different drugs are placed as one of many preferred drugs in a formulary as of June 2023 for each of the indications above. Across all of these indications, Humira®, which is the [redacted] coverage. Enbrel® and Otezla® are always the [redacted]s for the various indications, and often are very close to Humira®. Meanwhile, coverage of the other drugs is [redacted] that of Enbrel® and Otezla®, indicating that in many cases PBMs are able to credibly [redacted] coverage for these other drugs. PBMs' relative unwillingness to exclude Enbrel® and Otezla® (and Humira®) indicates that these drugs have a greater degree of market power than other products in these indications.

359. For the full auto-immune therapeutic class and the two indications served by both Enbrel® and Otezla®, plaque psoriasis and psoriatic arthritis, I have also shown the combined share of covered lives for formularies in which either Enbrel® or Otezla® has preferred coverage. In both cases, this is substantially above the share for Enbrel® and Otezla® considered separately, and indicates the additional leverage that Amgen gets by bundling both Enbrel® and Otezla® with Repatha®: substantially more plans would lose rebate dollars from excluding Repatha® if the CTB includes conditional rebates on both Enbrel® and Otezla®.

**Figure 18: Share of lives where the drug is among the preferred drugs in a formulary by Indication: Autoimmune. U.S., June 2023.[498]**

[498] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] Only drugs in the figure are considered for the comparison. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

[redacted]

**Figure 19: Share of lives where the drug is among the preferred drugs in a formulary by Indication: Ankylosing Spondylitis. June 2023.**[499]

[redacted]

**Figure 20: Share of lives where the drug is among the preferred drugs in a formulary by Indication: Plaque Psoriasis. U.S., June 2023.** [500]

[499] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] Only drugs in the figure are considered for the comparison. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

[500] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] Only drugs in the figure are considered for the comparison. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

[redacted]

**Figure 21: Share of lives where the drug is among the preferred drugs in a formulary by Indication: Psoriatic Arthritis. U.S., June 2023.** [501]

[redacted]

[501] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] Only drugs in the figure are considered for the comparison. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

**Figure 22: Share of lives where the drug is among the preferred drugs in a formulary by Indication: Rheumatoid Arthritis. U.S., June 2023.** [502]

[redacted]

**Figure 23: Share of lives where the drug is among the preferred drugs in a formulary by Indication: Juvenile Idiopathic Arthritis. U.S., June 2023.** [503]

[502] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] Only drugs in the figure are considered for the comparison. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

[503] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] Only drugs in the figure are considered for the comparison. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

[redacted]

360. It is highly informative to observe that over the last several years, as more products entered or expanded into the indications treated by Enbrel® and Otezla®, the share of coverage for both drugs has actually increased over time. This is a further indication that PBMs are not successfully using new alternatives to obtain higher rebates by excluding Enbrel® and Otezla®. Figure 24 and Figure 25 shows that the share of lives for which Enbrel® and Otezla® are the preferred drugs on formularies has increased with time. While Enbrel was a preferred drug for [redacted] of lives in January 2019 across the various indications, by 2023 it was preferred for between [redacted]-[redacted] of lives. Similarly for Otezla®, the share of covered lives for which Otezla® was preferred increased from [redacted]-[redacted] in 2019 to [redacted]-[redacted] in 2023.

**Figure 24: Share of lives where Enbrel® is among the preferred drugs in a formulary by Indication: U.S., January 2019 and June 2023.** [504]

[504] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] For each indication, the drugs considered for comparison are those included in Figures 18-23 accordingly. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

[redacted]

**Figure 25: Share of lives where Otezla® is among the preferred drugs in a formulary by Indication: January 2019 and June 2023.** [505]

[redacted]

### 11.4 Competition has not eroded net prices for Enbrel® and Otezla®.

361. Ultimately the more important question is whether whatever competition for access there has been among alternative therapies has led to reductions in net prices and margins. Given that there has been an increase in alternatives to Enbrel® and Otezla® for the various indications they treat, if Dr. Stiroh is right that PBMs use the threat to exclude to extract rebates, then more alternatives should mean higher rebates and falling net prices. However, over

[505] **Notes**: [a] Drugs are considered preferred if they are among the drugs that have the best universal status rollup in that formulary-period-indication combination. [b] For each indication, the drugs considered for comparison are those included in Figures 18, 20, and 21, respectively. **Source**: [1] AMG10935-DATA-0000000138.TXT - AMG10935-DATA-0000001406.TXT (MMIT).

the last several years, despite a large number of new entrants, the net price trend for Enbrel® and Otezla® has been essentially flat. This is a clear indication that competition among therapies is not constraining the market power or Enbrel® and Otezla®.

362. As I discussed in my Opening Report, it is common for rebates to rise over time, even for monopolized pharmaceutical products.[506] However, these increased rebates are typically associated with increased list prices over time, so that increasing rebates alone do not inform whether net prices to PBMs have been affected.[507] That has been the case for Enbrel® and Otezla®: while rebates have gone up over time, so have their list prices.

363. The result is that for Enbrel® and Otezla®, net prices have been essentially constant despite the increase in rebates. As shown in Figure 26 and Figure 27, while it is true that Enbrel® and Otezla® rebates have been increasing, gross prices have been increasing at the same pace. As a result, net prices have been essentially flat across the period: Enbrel net prices were $[redacted] in Q1 2019 (the earliest period available in the data) and $[redacted] in Q2 2023 (the latest period available in the data). The same is true for Otezla®: the price in Q3 2020 (the earliest period available in the data) was $[redacted] and was almost the same, $[redacted] in Q2 2023.

[506] Scott Morton Amended Opening Report, ¶ 118.

[507] Similar results were found for the years 2015 until 2018 in a Drug Pricing Investigation of Amgen's Enbrel® and Sensipar®. *See* Committee on Oversight and Reform, "Drug Pricing Investigation: Amgen–Enbrel and Sensipar," page ii (Oct. 2020), https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/Amgen%20Staff%20Report%2010-1-20.pdf. ("Internal data show that Amgen's list price increases for Enbrel outpaced any rebates paid. From 2015 to 2018, price increases allowed the company to maintain net revenue from Enbrel at levels well above 2014, despite the volume of sales declining and total rebates paid increasing.") A similar pattern is observed for Humira® in Sean R. Dickson, Nico Gabriel, and Immaculada Hernandez, "Contextualizing the price of biosimilar adalimumab based on historical rebates for the original formulation of branded adalimumab," *6(7) JAMA Network Open*, (July 13, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10346129/.

**Figure 26: Enbrel® Average Gross and Net Prices, and Average Rebates, Q1 2019 – Q2, 2023.**[508]

[redacted]

[508] **Notes**: [a] Average rebate is estimated as the percentage discount implied by the difference between average gross price and average net price. Average net price and gross price are obtained by dividing net sales and gross sales quantities reported in Amgen's LEDR data. **Source:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data).

**Figure 27: Otezla® Average Gross and Net Prices, and Average Rebates, Q3 2020 – Q2, 2023.[509]**

[redacted]

364. The flat net prices for Enbrel® and Otezla® are particularly striking given the evidence that in general, net prices for branded pharmaceuticals have been falling over time. The study of drug prices conducted periodically by the Drug Channel Institute determined that the average net price for brand name prescription drugs declined each year from 2018 to 2022, with a cumulative decline since 2017 of roughly 8%.[510] This is despite a cumulative increase in average list prices of roughly 27%, confirming that increases in rebates do not translate percent for percent into price reductions for health plans and their members. Given this decline in net prices across the industry, the fact that Enbrel® and Otezla® prices have been essentially constant is a good indication of their relative significant market power. A Regeneron document, citing an earlier version of the Drug Channel Institute study, reports an even larger decline in net prices at large manufacturers (roughly 10% from 2017 to 2021), and attributes the decline over time to PBM

[509] **Notes**: [a] Average rebate is estimated as the percentage discount implied by the difference between average gross price and average net price. Average net price and gross price are obtained by dividing net sales and gross sales quantities reported in Amgen's LEDR data. **Source:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data).

[510] Drug Channel Institute, "Brand-Name Drug Prices Fell for the Fifth Consecutive Year—And Plummeted After Adjusting for Inflation." (January," (Jan. 4, 2023) https://www.drugchannels.net/2023/01/brand-name-drug-prices-fell-for-fifth.html.

consolidation leading to a gradual increase in the bargaining power of PBMs.[511] But that increase in bargaining power has not impacted Amgen's pricing of Enbrel® and Otezla®.

365. The same pattern applies for each of the major PBMs that are the focus of Amgen's anticompetitive conduct: net prices at each have been essentially flat over the last several years.[512] Using rebate data provided by Amgen, I estimated the all-in rebates average net price at ESI, CVS/Zinc and OptumRx. As shown in Figure 28 and Figure 29, for each of the three major PBMs that represent [redacted] of lives covered by Commercial plans in the U.S., and [redacted] of lives covered by Medicare Part D plans in the U.S.[513] Enbrel® and Otezla® have been able to maintain stable net prices.

**Figure 28: Enbrel® all-in rebates net prices at top PBMs.[514]**

[redacted]

[511] REGN0031614 at slideslideslideslideslide 9.

[512] Average prices at the PBM level and as reported in LEDR differ because LEDR prices reflect market-wide averages.

[513] Scott Morton Amended Opening Report, ¶ 101.

[514] **Note**: For each PBM, Net Price is equal to Net Utilization / Total Units.

**Sources**: [1] AMG10935-DATA-0000001438 (Amgen - CVS Rebates Data). [2] AMG10935-DATA-0000001439 (Amgen - ESI Rebates Data). [3] AMG10935-DATA-0000001440 (Amgen - Optum Rebates Data).

**Figure 29: Otezla® all-in rebates net prices at top PBMs.**[515]

[redacted]

366. To underscore that net prices for Enbrel® and Otezla® have remained flat despite the entry of significant new products and the expansion of approved indications for others, Figures 30 and 31 repeats the graph of net prices of Enbrel® and Otezla®, while superimposing a timeline of significant new product releases and new approved indications for products with related indications. Between Q1 2019 and Q2 2023 there were at least 15 approvals to treat indications covered by Enbrel®, which include the product launches of [redacted] Furthermore, between Q3 2020 and Q2 2023 there were at least 8 FDA indication approvals to treat indications treated by Otezla®, including the release of [redacted]u®. In both cases, there is no indication that net prices responded to the new product introductions. This analysis is consistent with the discussion of entry by [redacted]u® (which Dr. Stiroh ignores) and Humira® biosimilars in my Opening Report.[516]

[515] **Note**: For each PBM, Net Price is equal to Net Utilization / Total Units.
**Sources**: [1] AMG10935-DATA-0000001438 (Amgen - CVS Rebates Data). [2] AMG10935-DATA-0000001439 (Amgen - ESI Rebates Data). [3] AMG10935-DATA-0000001440 (Amgen - Optum Rebates Data).

[516] Scott Morton Amended Opening Report, ¶¶ 43, 46-48.

**Figure 30: Enbrel® Average Net Prices, and related indication approvals, Q1 2019 – Q2, 2023.**[517]

[redacted]

[517] **Source:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data). [2] https://www.drugs.com/. See backup material for links for each specific drug release.

**Figure 31: Otezla® Average Net Prices, and related indication approvals, Q3 2020 – Q2, 2023.[518]**

[redacted]

### 11.5 The high and increasing margins for Enbrel® and Otezla® are indicative of significant market power.

367. In my Opening Report, I referred to forecasts of margins for Enbrel® and Otezla® that showed gross margins and contribution margins increasing over the next several years, and in particular increasing despite the entry of [redacted]u® and of Humira® biosimilars.[519]

368. Dr. Stiroh argues that the steady and increasing margins for Enbrel® and Otezla® are not evidence of market power. Her first claim is that margins rose because costs were falling rather than prices increasing.[520] Whether or not this is true, it is economically irrelevant. Market power is the ability to raise prices over costs, and an increase in gross margins means that the ability to raise prices relative to costs is increasing, and therefore that market power is increasing.[521] With falling costs, if prices decline at a slower rate so that gross margins increase, then that shows that Amgen is increasing its market power despite significant new entrants.

---

518 **Source:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data). [2] https://www.drugs.com/. See backup material for links for each specific drug release.

519 Scott Morton Amended Opening Report, ¶¶ 46-48.

520 Stiroh Rebuttal Report, ¶ 133 ("In fact, Amgen's 2022 long range plan indicates that Amgen estimated that the cost of sales for Enbrel® would [redacted] percent in 2023 and about [redacted] percent in 2024.").

521 Some sources define market power as the ability to set price above the competitive price. *See* Stiroh Rebuttal Report, note 9. But this is effectively the same thing: in a perfectly competitive market, price is equal to marginal cost,

369. Dr. Stiroh's other criticism is that levels of profit margins (the term which she apparently uses to refer to the contribution margins that are projected in Amgen's forecasts) are not indicative of market power because pharmaceutical firms need to recover the large R&D costs incurred to develop new products.[522] Sunk R&D costs, however are irrelevant to the question of whether the margins reflect market power for the products that are developed, and significant R&D costs do not negate the evidence that Enbrel® and Otezla® revenues are increasing at a faster rate than costs. The rising margins show that market power is not being eroded (though the increase in gross margins is a more direct indicator of the increase in market power.) While Dr. Stiroh notes that there is literature suggesting that the price cost margin, as measured by the Lerner index, cannot be used as an indicator of monopoly power, the paper she cites actually says that a high Lerner index *does* indicate significant market power.[523] Meanwhile, the undisputed fact that Otezla® has a gross margin of [redacted] makes it clear that Otezla® is at the substantial market power end of the spectrum—the margin could not get any higher.

370. Moreover, Dr. Stiroh's discussion of recovering R&D costs actually underscores the importance of the evidence about margins. I agree with Dr. Stiroh that for pharmaceutical products, the enormous R&D costs of new drugs are recovered by earning significant margins for products that make it to market. Pharmaceutical firms would not undertake R&D without the expectations of significant market power and profits if successful. Hence it should be expected that pharmaceutical products under patent can have significant market power as reflected by high gross margins. However, that does not mean that pharmaceutical firms should be free to leverage that significant market power to exclude competitors of other products in different markets.

371. My Opening Report focused on Amgen's projected margins and whether it expected the entry of significant new competitors to reduce its substantial market power in the sale of Enbrel® and Otezla®. But one can also examine actual margins to see whether any market power has been dissipated, consistent with entrants further constraining Enbrel® and Otezla®. Figure 32 shows that margins earned on Enbrel® and Otezla® have been steady or increasing over the last several years.[524] The margin over Cost of Sales for Enbrel® has [redacted] in 2019 to [redacted] in 2022, and the margin factoring in changes in sales and marketing costs has

---

so setting price above marginal cost and setting price about the competitive price are equivalent. More generally, if a competitive market is defined as one in which firms earn zero economic profits, or revenues equal economic costs, that implies that the competitive price is equal to average (economic) costs, and once again setting price above the competitive price is equivalent to setting price above the appropriate measure of cost.

[522] Stiroh Rebuttal Report, ¶ 134 ("[F]or a firm in Amgen's position, no particular value (or range of values) for a product-level annual profit margin indicates monopoly power").

[523] Stiroh Rebuttal Report, note 215, citing Kenneth G. Elzinga and David E. Mills, "The Lerner Index of Monopoly Power:Origins and Uses," American Economic Review: Papers and Proceedings 101:3 (2011), pp. 558-564 at 561. Her footnote quotes part of the paper by Elzinga and Mills, but the cited material actually contradicts her point: Elzinga and Mills say that that a sufficiently high Lerner index indicates significant market power ("firms with Lerner Indices large enough to indicate significant market power"); their point is only that the monopoly power was not necessarily acquired through anticompetitive conduct.

[524] My Opening Report documented increases in forecast margins despite expected entry of alternative therapies. Scott Morton Amended Opening Report, ¶¶ 43, 48.

increased even more, indicating that revenues are rising faster than incremental costs. Figure 33, shows that the Otezla® margin over Cost of Sales has remained [redacted] while the margin factoring in changes in sales and marketing costs has increased since 2019.[525]

**Figure 32: Enbrel® cost margins.** [526]

[redacted]

[525] As noted in my Opening Report, the higher COGS margin for Otezla® (or lower cost of goods sold as a percentage of price) is consistent with it being an orally administered drug (relatively small molecule) whereas Enbrel® is a much larger biologic drug. Scott Morton Amended Opening Report, note 57.

[526] **Notes:** [1] Margins (using COS) equals (Net Sales - Cost of Sales) / Net Sales. [2] Margins (using COS and Sales and Marketing) equals (Net Sales - Cost of Sales - Sales and Marketing) / Net Sales.
**Sources:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data). [2] AMG10935-DATA-0000001411 (Amgen PCUT Data).

**Figure 33: Otezla® cost margins.** [527]

[redacted]

372. Thus, notwithstanding all of the entry within their therapeutic class since launch, all of the evidence—the broad formulary coverage, the constant net prices, and the high and growing margins—indicates that the entry has not eroded the significant market power of Enbrel® and Otezla®.

### 11.6 Dr. Stiroh has not defined proper antitrust product markets for assessing market shares for Repatha®, Enbrel®, or Otezla®.

373. Dr. Stiroh reports what the "market shares" would be for various combinations of Enbrel® or Otezla® and other products in the auto-immune therapeutic class.[528] However, she never proposes a proper relevant antitrust market for Enbrel® and Otezla®. In apparent acknowledgement that she has not defined any antitrust markets, she sometimes refers to "market shares" using quotation marks.[529] Without defining an antitrust product market, these computations of shares have no significance for evaluating competition for Enbrel® and Otezla®.

---

[527] **Notes:** [1] Otezla® margins in 2019 are based on 2019 Q3-Q4 data. [2] Margins (using COS) equals (Net Sales – Cost of Sales) / Net Sales. [3] Margins (using COS and Sales and Marketing) equals (Net Sales - Cost of Sales - Sales and Marketing) / Net Sales.
**Sources:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data). [2] AMG10935-DATA-0000001411 (Amgen PCUT Data).

[528] *See, e.g.*, Stiroh Rebuttal Report, § V.A.2.

[529] *See, e.g.*, *Id.*, ¶ 152.

374. Although Dr. Stiroh refers to the U.S. Merger Guidelines to frame her discussion of Enbrel® and Otezla® market power,[530] she does not discuss or make any attempt to implement the market definition test described in the Merger Guidelines, which is the hypothetical monopolist test ("HMT").[531] As I discuss in my Opening Report, that test requires showing that a single owner of all the products in the candidate product market would be able to profitably raise prices over the competitive price by at least a small but significant amount for a sustained period.

375. In my Opening Report, I applied the HMT to determine whether the PBM-covered PCSK9 inhibitor products (Praluent® and Repatha®) constitute a relevant antitrust market. I showed that competition between Repatha® and Praluent® drove down Repatha® prices by at least 17%, and therefore that a hypothetical monopolist could increase prices by at least that amount.[532] Dr. Stiroh does not attempt to perform such a test, nor does she attempt to otherwise define an alternative market that includes Repatha® and Praluent®.

376. Similarly, Dr. Stiroh does not attempt to perform an HMT for Enbrel® and/or Otezla®. Based on the evidence I have presented that net prices and margins have been unaffected by the launch of the products she suggests constrain (presumably meaning that she would include in the same relevant market as) Enbrel® and/or Otezla®, had she performed the HMT, she would have found that these additional products are not properly included in the market(s) for Enbrel® and Otezla®.[533] The single piece of contrary evidence that Dr. Stiroh presents is from 2015, five years before Amgen introduced its CTB strategy.[534]

377. Among the possible market definitions that Dr. Stiroh mentions is a market composed of just Enbrel® and Humira® (or just Otezla® and Humira®). Even if that were correct (and it is not), Enbrel® and Otezla® would have more than a [redacted] market share in an Enbrel®-Humira® market or an Otezla®-Humira® market. For example, Figure 21 in Dr. Stiroh's report excerpts from an Amgen document tracking new prescriptions of drugs to treat rheumatoid

[530] Stiroh Rebuttal Report, ¶ 69.
[531] Scott Morton Amended Opening Report, ¶ 13.
[532] *Id.*, § 3.2.1.
[533] To be more precise, for any properly defined antitrust product market one can always add additional products to the market and still satisfy the HMT. Dr Stiroh quotes a sentence from the 2023 Merger Guidelines (which itself quotes from the Brown Shoe decision) that says, "The outer boundaries of a relevant product market are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" Stiroh Rebuttal Report, ¶ 69. However, she fails to quote the next sentence, "Within a broad relevant market, however, effective competition often occurs in numerous narrower relevant markets." So one could define a broad product market that includes Enbrel® and Otezla® and all of the products used to treat the same indications. Moreover, the wide variance in formulary coverage across alternative products gives some evidence that those other products with partial formulary coverage are constrained by one another, and a properly defined antitrust market for one of those products would include some number of its therapeutic alternatives. So a more precise statement is that a properly defined antitrust market for one of those other products with partial formulary coverage does not need to include Enbrel® or Otezla® (or Humira®), and that the properly defined antitrust market for Enbrel® or Otezla® need not include those products.
[534] Stiroh, Rebuttal Report, ¶¶ 115, 116. ("Below, I have excerpted a summary prepared by Amgen in May 2020 of significant events with respect to the coverage of Enbrel® on the OptumRx national formularies and the UHC formularies in and around 2015 that were driven, at least in part, by competition between Enbrel® and Humira®").

arthritis.[535] Adjusted to account for Dr. Stiroh's analysis, Humira®'s and Enbrel®'s shares are approximately [redacted] and [redacted] respectively. Similarly, Figure 35 in Dr. Stiroh's report excerpts from an Amgen document tracking prescriptions of drugs to treat psoriasis.[536] Adjusted to account for Dr. Stiroh's analysis, Humura®'s and Otezla®'s shares are approximately [redacted] and [redacted] respectively. Also, by way of example, Figure 34 in Dr. Stiroh's report excerpts from an Amgen document tracking prescriptions of drugs to treat psoriatic arthritis.[537] Adjusted to account for Dr. Stiroh's analysis, Humira®'s and the combined Enbrel® and Otezla® shares are approximately [redacted] and [redacted] respectively.

378. Notably, for the proposed market definitions Dr. Stiroh posits for just Enbrel® and Humira® (or just Otezla® and Humira®), the entry of Humira® biosimilars is directly relevant for implementing a HMT. Humira® biosimilars became available in the U.S. in 2023, and new reports estimate that in response AbbVie [redacted] on Humira® for some PBMs from [redacted][538] This price drop in response to biosimilar entry makes it clear that Humira® and its biosimilars alone satisfy the HMT and therefore constitute their own antitrust product market. Notably, however, Amgen's projected Enbrel® margins [redacted] after the entry date for Humira® biosimilars, as discussed above and in my Opening Report.[539] That Enbrel® margins [redacted] though Humira® prices (and presumably margins) were directly affected by the entry of Humira® biosimiliars suggest that Humira® and its biosimilars need not be included in an Enbrel® antitrust market to satisfy the HMT. For the same reason, a market for Otezla® need not include Humira and its biosimilars to satisfy the hypothetical monopolist test, either.[540]

---

[535] *Id.*, ¶ 103, Figure 21.
[536] *Id.*, ¶ 151, Figure 35.
[537] *Id*., Figure 34.
[538] Arthur Allen, "Save Billions or Stick With Humira? Drug Brokers Steer Americans to the Costly Choice," *KFF Health News* (Sept. 19, 2023) https://kffhealthnews.org/news/article/humira-abbvie-biosimilar-biologic-savings-pbm-rebates/. This corresponds to a 33% reduction in net price in response to biosimilar entry, from 40% off list price prior to entry to 60% off list price after entry. The same article reports a 40% drop in price at another health plan; Joshua Cohen, "Humira Biosimilars Not Gaining Traction Epitomizes Dysfunctional U.S. System," *Forbes* (Dec. 4, 2023), https://www.forbes.com/sites/joshuacohen/2023/12/04/humira-biosimilars-not-gaining-traction-epitomizes-dysfunctional-us-system/?sh=53612c8d2b8f (reporting a drop in Humira net revenues of 36% in 3Q2023 despite a small decline in sales volume.).
[539] Scott Morton Amended Opening Report, ¶ 43.
[540] Projected Otezla margins were increasing over the same period. Scott Morton Amended Opening Report, ¶ 48.

## 12. APPENDIX A

379. Consider the following model. A PBM and two drug manufacturers interact. The PBM has several possibilities in structuring its formulary. It can either give a preferred placement to both drugs on its formulary, such that the drugs enjoy a parity placement, or it can give an exclusive preferred formulary placement to only one of the two.

380. Let $s_P$ and $s_R$ denote the shares of the PCSK9i market (in units) of Praluent® and Repatha®, respectively, if both drugs have a parity position. Let $s_P^X$ and $s_R^X$ denote the shares of the PCSK9i market (in units) of Praluent® and Repatha®, respectively, if each drug has an exclusive position on the formulary. For greater clarity, if Praluent® has an exclusive position, then Praluent® has share $s_P^X$ and Repatha® has share $1 - s_P^X$. Let $l_P$ and $l_R$ denote the list prices of Praluent® and Repatha®, respectively. Let $c_P$ and $c_R$ denote the unit costs to produce and sell Praluent® and Repatha®, respectively.

381. The data points for 2021-22 I use for the various variables are shown below:

[redacted]

382. Below, I analyze the negotiations between the PBM and Regeneron and Amgen. I solve for prices and formulary placements of Praluent® and Repatha®.

541 **Sources:** [1] REGN0031081.
542 **Sources:** [1] Scott Morton Amended Opening Report, ¶ 206.
543 **Sources:** [1] Scott Morton Amended Opening Report, ¶ 206.
544 **Sources:** [1] REGN-DATA-0003 - ATTORNEYS' EYES ONLY (Regeneron GTN 2021); REGN-DATA-0018 - ATTORNEYS' EYES ONLY (Regeneron GTN 2022)
545 **Sources:** [1] AMG10935-DATA-0000001407 (Amgen LEDR Data).
546 **Sources:** [1] REGN-DATA-0005 – OUTSIDE COUNSEL ONLY. [2] REGN-DATA-0007 – ATTORNEYS' EYES ONLY., [3] REGN-DATA-0003 - ATTORNEYS' EYES ONLY (Regeneron GTN 2021), REGN-DATA-0018 - ATTORNEYS' EYES ONLY (Regeneron GTN 2022)
547 **Sources:** [1] AMG10935-DATA-0000001407. (Amgen LEDR Data),[2] AMG10935-DATA-0000001411 (Amgen PCUT data).

### 12.1 Drug manufacturers submit bids to the PBM

383. Suppose that manufacturers submit bids to the PBM. Because Regeneron has the lower production and sales cost, total surplus is maximized when the PBM picks Regeneron exclusivity.[548] Regeneron bids a unit price for Praluent® for exclusivity, $p_P^X$, such that it outbids Amgen's bid for exclusivity by making the PBM's total cost for PCSK9i products at least as good. Hence, $p_P^X$ solves

$$s_P^X\, p_P^X + (1 - s_P^X) l_R = (1 - s_R^X) l_P + s_R^X\, p_R^X \quad (1)$$

384. Amgen bids a unit price for Repatha®'s exclusivity, $p_R^X$, such that it earns no less than in the equilibrium, where it is excluded. Hence, $p_R^X$ solves

$$s_R^X (p_R^X - c_R) = (1 - s_P^X)(l_R - c_R) \quad (2)$$

385. Equations (1) and (2) suffice to determine the manufacturers' bids for exclusivity. Amgen bids a unit price for Repatha®'s parity positioning such that it earns no less if it wins than in the equilibrium, where it is excluded. Hence, $p_R$ solves

$$s_R (p_R - c_R) = (1 - s_P^X)(l_R - c_R) \quad (3)$$

386. Regeneron knows that parity will not be selected in equilibrium, and bids a unit price such that the total cost to the PBM is higher than for Praluent® exclusive. There is a range of prices that satisfy this condition. The price given here for Praluent®'s parity positioning is such that it earns no less than in the equilibrium where Praluent® has an exclusive formulary placement.

$$s_P (p_P - c_P) = s_P^X (p_P^X - c_P) \quad (4)$$

387. Solving for the four prices yields:

$$p_P^X = c_R + \frac{1 - s_R^X}{s_P^X} (l_P - c_R) \quad (5)$$

$$p_R^X = c_R + \frac{1 - s_P^X}{s_R^X} (l_R - c_R) \quad (6)$$

$$p_R = c_R + \frac{1 - s_P^X}{s_R} (l_R - c_R) \quad (7)$$

$$p_P = c_P + \frac{s_P^X}{s_P} \left[ c_R + \frac{1 - s_R^X}{s_P^X} (l_P - c_R) - c_P \right] \quad (8)$$

---

548 Ho and Lee (2023) at 14, 16.

388. Inserting shares, list prices, and costs yields the following:

[redacted]

389. The PBM selects the formulary that yields the lowest cost, i.e., the lowest average drug price. It compares the average price of granting exclusivity to Praluent®, exclusivity to Repatha®, and of parity placement. These average prices are, respectively, $s_P^X\, p_P^X + (1 - s_P^X) l_R$, $s_R^X\, p_R^X + (1 - s_R^X) l_P$, and $s_P p_P + s_R p_R$. Using the inputs shown further above and the price in Table 8 above, exclusivity for Praluent® yields the lowest average price[550] and therefore, *the PBM selects Praluent® exclusivity.*

390. Suppose that Amgen offers a cross-therapeutic bundle such that the PBM loses an amount *C* = $66M if it does not grant exclusivity to Repatha®.[551] Assuming a PCSK9i quantity of approximately *Q* = 463,000 units, this raises the cost to the PBM of choosing exclusivity for Praluent® and of choosing parity by *C/Q* = $142. Regeneron would lower its offered rebated to the level that makes it equally profitable to gain exclusivity or to be excluded, which, as shown in the next section, is $87.42. However, given the size of the PBM's loss if it chooses to make Praluent® exclusive, Regeneron would be unable to successfully compete even at the lower price.

### 12.2 The PBM makes offers to drug manufacturers

391. Suppose that the PBM makes offers to the two drug manufacturers. The PBM can make take-it-or-leave-it offers to each drug manufacturer and for each price (the exclusivity and parity price). Because the PBM has the sole power to make offers, it always offers

[549] **Source**: See back up material.
[550] By construction, the average price for Praluent® exclusivity yields the same price as for Repatha® exclusivity. But Regeneron can decrease its price by a small amount and win.
[551] AMG10935-0001611588 at 589 and AMG10935-0001611590 at 591 (Amgen message chat logs discussing rebates, [redacted]

prices that make a drug manufacturer indifferent (or just better off) between accepting and rejecting the offer. If a drug manufacturer rejects an offer, it obtains the profit of being excluded.

392. The PBM offers a unit price for Praluent® exclusivity, $p_P^X$, such that Regeneron is indifferent between accepting and rejecting. Hence, $p_P^X$ solves

$$s_P^X\,(p_P^X - c_P) = (1 - s_R^X)(l_P - c_P) \qquad (19)$$

393. The price for Repatha® exclusivity, $p_R^X$, is obtained in a similar manner. It solves the same equation as equation (2) such that $p_R^X$ is given in (6). The price for Repatha®'s parity positioning solves the same equation as equation (3) such that $p_R$ is given in (7).

394. The PBM offers a price for Praluent®'s parity positioning such that Regeneron earns no more than if Praluent® is excluded. Hence, $p_P$ solves

$$s_P(p_P - c_P) = (1 - s_R^X)(l_P - c_P) \qquad (20)$$

395. Solving for the two Praluent® prices yields:

$$p_P^X = c_P + \frac{1-s_R^X}{s_P^X}(l_P - c_P) \qquad (21)$$

$$p_P = c_P + \frac{1-s_R^X}{s_P}(l_P - c_P) \qquad (22)$$

396. Inserting shares, list prices, and costs yields the following:

[redacted]

| | | |
|---|---|---|
| | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

397. The PBM selects the formulary that yields the lowest cost, i.e., the lowest average drug price. It compares the average price of granting exclusivity to Praluent®, exclusivity to Repatha®, and of parity placement. These average prices are, respectively, $s_P^X\, p_P^X + (1 - s_P^X)l_R$, $s_R^X\, p_R^X + (1 - s_R^X)l_P$, and $s_P p_P + s_R p_R$. Using the inputs shown further above and the price in

[552] **Source**: See back up material.

Table 9 above, exclusivity for Praluent® yields the lowest average price and therefore, *the PBM selects Praluent® exclusivity*.

$$s_P^X\, p_P^X + (1 - s_P^X) l_R = \$123$$

$$s_R^X\, p_R^X + (1 - s_R^X) l_P = \$144$$

$$s_P p_P + s_R p_R = \$139$$

398. Suppose that Amgen offers a cross-therapeutic bundle such that the PBM loses an amount $C$ = \$66M if it grants exclusivity to Praluent®.[553] Assuming a PCSK9i quantity of approximately $Q$ = 463,000 units, this raises the cost to the PBM of choosing exclusivity for Praluent® by $C/Q$ = \$142. Clearly, in this case, the PBM would want to choose either Repatha® exclusivity or parity. The figures in the preceding paragraph show that the PBM would prefer choosing parity.

### 12.3 Summary

399. The table below contains results for both when manufacturers submit bids and when the PBM makes offers.

[redacted]

| | [redacted] | | [redacted] | |
|---|---|---|---|---|
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

553 AMG10935-0001611588 at 589 and AMG10935-0001611590 at 591 (Amgen message chat logs discussing rebates, “[redacted]

554 **Source**: See back up material.

[redacted]

Fiona Scott Morton

April 15, 2024

# EXHIBIT A

## Materials Relied Upon

### I. Publications and Academic Articles


1. Alvin E. Roth. "Independence of irrelevant alternatives, and solutions to Nash's bargaining problem." 16 *Journal of Economic Theory* 247, (1977)

2. Drew Fudenberg and Eric Maskin, "The Folk Theorem in Repeated Games with Discounting or with Incomplete Information," 54 *Econometrica* 533, (1986)

3. Drew Fudenberg and Jean Tirole, "Game Theory", MIT Press (1991)

4. James W. Friedman, "A Non-cooperative Equilibrium for Supergames," 38 *Review of Economic Studies* 1, (1971)

5. Jeffrey M. Wooldridge, "Introductory Econometrics, a Modern Approach", International Student Edition, (2009)

6. John Asker and Heski Bar-Isaac, "Raising retailers' profits: On vertical practices and the exclusion of rivals." 104 *American Economic Review* 672, (2014)

7. John F. Nash. "The bargaining problem." 18 *Econometrica* 155, (1950)

8. Joshua D. Angrist and Jörn-Steffen Pischke, "Mostly Harmless Econometrics: An Empiricist's Companion," Princeton University Press (2009)

9. Kate Ho and Robin S. Lee, "Contracting over Rebates: Formulary Design and Pharmaceutical Spending," Working Paper, (2023)

10. Patrick Rey and Jean Tirole, "A primer on foreclosure," 3 *Handbook of industrial organization* 2145, (2007)


### II. Depositions

1. Deposition Transcript of Alexander Hindman, UHC 30(b)(6), and associated exhibits

2. Deposition Transcript of Amy Bricker, Executive Vice President at CVS Health, and associated exhibits

3. Deposition Transcript of Andy Chiu, Executive Director of U.S. Value and Market Access at Amgen

4. Deposition Transcript of Aydin Sekili, Director of Trade Relations at CVS Health, and associated exhibits

5. Deposition Transcript of Dr. Michael Doyle, Medical Director at the UnaSource Comprehensive Weight Loss Center, and associated exhibits

6. Deposition Transcript of Jay Witter, Zinc 30(b)(6), and associated exhibits

7. Deposition Transcript of Jennifer Norton, Vice President of Market Access at Amgen, and associated exhibits

8. Deposition Transcript of John Ryan, Head of Cardiometabolic and Rare Disease Business Unit at Regeneron, and associated exhibits

9. Deposition Transcript of Joseph Anderson, Vice President of Trade Relations at CVS Health, and associated exhibits

10. Deposition Transcript of Kave Niksefat, Global Head of Rare Disease Marketing & Commercial Integration at Amgen, and associated exhibits

11. Deposition Transcript of Len Schleifer, Founder of Regeneron, and associated exhibits

12. Deposition Transcript of Marion McCourt, Executive Vice President and Head of Commercial at Regeneron, and associated exhibits

13. Deposition Transcript of Michelle Carnahan, North America Head of General Medicine at Sanofi, and associated exhibits

14. Deposition Transcript of Richard O'Neal, Senior Vice President of Market Access at Regeneron, and associated exhibits

15. Deposition Transcript of Scott Cullins, National Account Director at Regeneron, and associated exhibits

16. Deposition Transcript of Steven Hyde, Vice President, Payers and GPOs at Regeneron, and associated exhibits

17. Deposition Transcript of Swaminathan Subramanian, Senior Director of Pricing and Contracting at Regeneron, and associated exhibits

18. Deposition Transcript of Julie Kitson, ESI 30(b)(6), and associated exhibits

## III. Expert Reports

1. Amended Expert Report of Fiona Scott Morton, Ph.D., Regeneron Pharm., Inc. v. Amgen Inc., No. 22-cv-00697-JLH (Feb. 16, 2024)

2. Expert Report of Deborah Gan, Regeneron Pharm., Inc. v. Amgen Inc., No. 22-cv-00697-JLH (Mar. 29, 2024)

3. Expert Report of Divya Mathur, Ph.D., Regeneron Pharm., Inc. v. Amgen Inc., No. 22-cv-00697-JLH (Feb. 13, 2024)

4. Expert Report of Eric M. Gaier, Ph.D., Regeneron Pharm., Inc. v. Amgen Inc., No. 22-cv-00697-JLH (Mar. 29, 2024)

5. Expert Report of Heather Bates, Regeneron Pharm., Inc. v. Amgen Inc., No. 22-cv-00697-JLH (Feb. 13, 2024)

6. Rebuttal Expert Report of Lauren J. Stiroh, Ph.D., Regeneron Pharm., Inc. v. Amgen Inc., No. 22-cv-00697-JLH (Mar. 29, 2024)

**IV. Cases and Court Documents**

1. *Amgen v. Sanofi*, No. 14-1317-RGA, Dkt, 956, Decl. M. Carnahan (D. Del. Apr. 15, 2019)

2. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008)

3. *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768 (6th Cir. 2002)

4. *FTC v. Amgen*, No. 23-3053, Dkt. No. 130, Mem. by Amgen in Opp'n to Pl.s' Motion for Prelim. Inj., (N.D. Ill. Aug. 22, 2023)

5. *United States v. Dentsply International, Inc*., 399 F.3d 181 (3d Cir. 2005)

6. *United States v. Microsoft Corp*., 253 F.3d 34 (D.C. Cir. 2001)

7. *United States v. Visa U.S.A*., Inc., 344 F.3d 229 (2d Cir. 2003)

8. Teleconference Transcript (Mar. 19, 2024)

**V. Data**

1. AMG10935-DATA-0000000056 - AMG10935-DATA-0000000075 (IQVIA LAAD MX)

2. AMG10935-DATA-0000000076 - AMG10935-DATA-0000000095 (IQVIA LAAD RX)

3. AMG10935-DATA-0000000138 - AMG10935-DATA-0000001406 (MMIT data)

4. AMG10935-DATA-0000001407 (Amgen LEDR data)

5. AMG10935-DATA-0000001411 (Amgen PCUT data)

6. AMG10935-DATA-0000001438 (Amgen - CVS Rebates data)

7. AMG10935-DATA-0000001439 (Amgen - ESI Rebates data)

8. AMG10935-DATA-0000001440 (Amgen - Optum Rebates data)

9. Amgen, Inc., Annual Report (Form 10-K), (Feb. 14, 2017)

10. Amgen, Inc., Annual Report (Form 10-K), (Feb. 13, 2018)

11. Amgen, Inc., Annual Report (Form 10-K), (Feb. 12, 2020)

12. Amgen, Inc., Annual Report (Form 10-K), (Feb. 9, 2023)

13. Amgen, Inc., Annual Report (Form 10-K), (Feb. 14, 2024)

14. Amgen, Inc., Quarterly Report (Form 10-Q), (Apr. 28, 2023)

15. Amgen, Inc., Quarterly Report (Form 10-Q), (Jul. 29, 2016)

16. Amgen, Inc., Quarterly Report (Form 10-Q), (Jul. 27, 2018)

17. Amgen, Inc., Quarterly Report (Form 10-Q), (Jul. 29, 2020)

18. Amgen, Inc., Quarterly Report (Form 10-Q), (Aug. 5, 2022)

19. Amgen, Inc., Quarterly Report (Form 10-Q), (Aug. 4, 2023)

20. Amgen, Inc., Quarterly Report (Form 10-Q), (Oct. 28, 2016)

21. Amgen, Inc., Quarterly Report (Form 10-Q), (Oct 31, 2018)

22. Amgen, Inc., Quarterly Report (Form 10-Q), (Oct. 29, 2020)

23. Amgen, Inc., Quarterly Report (Form 10-Q), (Nov. 4, 2022)

24. Amgen, Inc., Quarterly Report (Form 10-Q), (Oct. 31, 2023)

25. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 9, 2017)

26. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 8, 2018)

27. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 7, 2020)

28. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 6, 2023)

29. Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K), (Feb. 5, 2024)

30. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (May 4, 2023)

31. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Aug. 3, 2017)

32. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Aug. 2, 2018)

33. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Aug. 5, 2020)

34. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Aug. 3, 2020)

35. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Aug. 3, 2023)

36. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Nov. 4, 2015)

37. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Nov. 8, 2017)

38. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Nov. 6, 2018)

39. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Nov. 5, 2020)

40. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Nov. 3, 2022)

41. Regeneron Pharmaceuticals, Inc., Quarterly Report (Form 10-Q), (Nov. 2, 2023)

42. REGN-DATA-0002 - ATTORNEYS' EYES ONLY (Regeneron GTN 2020)

43. REGN-DATA-0003 - ATTORNEYS' EYES ONLY (Regeneron GTN 2021)

44. REGN-DATA-0005 - OUTSIDE COUNSEL ONLY (Regeneron GTN 2023)

45. REGN-DATA-0007 - ATTORNEYS' EYES ONLY (Regeneron COGS data)

46. REGN-DATA-0018 - ATTORNEYS' EYES ONLY (Regeneron GTN 2022)

47. REGN-DATA-0019 - ATTORNEYS' EYES ONLY (Regeneron GTN 2023)

48. Gaier Rebuttal Report backup

49. Bloomberg Symphony data

50. Gaier Rebuttal Report data (“contract extraction”)

51. Praluent Performance Tracking Report with Data thru 01.19.24.pptx

## VI. Other Documents

1. “Court Grants Permanent Injunction For Infringement Of Amgen's Repatha® Patents,” Amgen Press Release, (Jan. 5, 2017), https://www.amgen.com/newsroom/press-releases/2017/01/court-grants-permanent-injunction-for-infringement-of-amgens-repatha-patents

2. “Jury Upholds Amgen's Patents on Repatha® (evolocumab),” Amgen Press Release, (Feb. 25, 2019), https://investors.amgen.com/news-releases/news-release-details/jury-upholds-amgens-patents-repathar-evolocumab

3. "PCSK9 Therapy: An Example of Value-Based Care," Express Scripts Press Release (May 1, 2018), https://www.express-scripts.com/corporate/articles/pcsk9-therapy-example-value-based-care

4. "Regeneron and Sanofi to Lower Net Price of Praluent® (Alirocumab) Injection in Exchange for Straightforward, More Affordable Patient Access for Express Scripts Patients," Regeneron Press Release, (May 1, 2018), https://newsroom.regeneron.com/news-releases/news-release-details/regeneron-and-sanofi-lower-net-price-praluentr-alirocumab

5. "Staff Report," U.S. House of Representatives Committee on Oversight and Reform, page ii (Oct. 1, 2020), https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/Amgen%20Staff%20Report%2010-1-20.pdf

6. "U.S. District Court Invalidates Amgen Patent Claims Targeting PCSK9," Regeneron Press Release (Aug. 28, 2019), https://investor.regeneron.com/news-releases/news-release-details/us-district-court-invalidates-amgen-patent-claims-targeting.

7. "White Paper: Formulary Development at Express Scripts," https://d17f9hu9hnb3ar.cloudfront.net/s3fs-public/2022-04/Formulary%20Development_April%202022.pdf

8. Arthur Allen, "Save Billions or Stick With Humira? Drug Brokers Steer Americans to the Costly Choice," KFF Health News (Sep. 19, 2023), https://kffhealthnews.org/news/article/humira-abbvie-biosimilar-biologic-savings-pbm-rebates/

9. "Brand-Name Drug Prices Fell for the Fifth Consecutive Year—And Plummeted After Adjusting for Inflation," Drug Channel Institute, (Jan. 4, 2023), https://www.drugchannels.net/2023/01/brand-name-drug-prices-fell-for-fifth.html.

10. Drug Pricing and Negotiation: Overview and Economic Perspectives for the Medicare Prescription Drug Benefit: Hearing Before the Senate Committee on Finance, 110th Cong. 13 (2007) (statement of Fiona M. Scott Morton, PhD). https://www.finance.senate.gov/imo/media/doc/39938.pdf

11. Actemra® drug and approval information https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/125276s138lbl.pdf

12. Cimzia® drug and approval information https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/125160s305lbl.pdf

13. Cosentyx® drug and approval information https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/125504s066,761349s004lbl.pdf

14. Enbrel® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/103795s5595lbl.pdf

15. Entyvio® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/125476s054,761133s003lbl.pdf

16. Humira® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/125057s423lbl.pdf

17. Ilumya® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/761067s014lbl.pdf

18. Kevzara® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/761037s013lbl.pdf

19. Kineret® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/103950s5189lbl.pdf

20. Olumiant drug and label information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/207924s007lbl.pdf

21. Orencia drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/125118s250lbl.pdf

22. Otezla® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/205437s012lbl.pdf

23. Rinvoq® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/211675s019lbl.pdf

24. Siliq™ drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/761032lbl.pdf

25. Simponi Aria® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125433s032lbl.pdf

26. Skyrizi® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/761105s032lbl.pdf

27. Sotyktu® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/214958s000lbl.pdf

28. Stelara® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/761044s009lbl.pdf

29. Taltz® drug and approval information
https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/125521s024lbl.pdf

30. Tremfya® drug and approval information https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/761061s007lbl.pdf

31. Xeljanz® drug and approval information https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/203214s028,208246s013,213082s003lbl.pdf

32. Skyrizi FDA Approval History (Jun. 20, 2022) https://www.drugs.com/history/skyrizi.html

33. Rinvoq FDA Approval History (May 19, 2023) https://www.drugs.com/history/rinvoq.html

34. Taltz FDA Approval History (Sep. 7, 2020) https://www.drugs.com/history/taltz.html

35. Tremfya FDA Approval History (Jan. 28, 2021) https://www.drugs.com/history/tremfya.html

36. Stelara FDA Approval History (Sep. 25, 2009) https://www.drugs.com/history/stelara.html

37. Xeljanz FDA Approval History (Dec. 14, 2021) https://www.drugs.com/history/Xeljanz.html

38. Cosentyx FDA Approval History (Oct. 31, 2023) https://www.drugs.com/history/cosentyx.html

39. Sotyktu FDA Approval History (Sep. 27, 2022) https://www.drugs.com/history/sotyktu.html

40. Joshua Cohen, "Humira Biosimilars Not Gaining Traction Epitomizes Dysfunctional U.S. System." Forbes (Dec. 4, 2023) https://www.forbes.com/sites/joshuacohen/2023/12/04/humira-biosimilars-not-gaining-traction-epitomizes-dysfunctional-us-system/?sh=53612c8d2b8f

41. Pharmacy and Therapeutics (P&T) Committee (May 2019), https://www.shpnc.org/documents/pharmacy-and-therapeutics/pt-booklet-may-2019-secured/download

42. Sean R. Dickson, Nico Gabriel, and Immaculada Hernandez. "Contextualizing the price of biosimilar adalimumab based on historical rebates for the original formulation of branded adalimumab." 6(7) JAMA Network Open., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10346129/.

## VII. Bates Stamped Documents

1. AMG10935_OCO-0000000601
2. AMG10935_OCO-0000000739
3. AMG10935_OCO-0000006981
4. AMG10935_OCO-0000007163
5. AMG10935_OCO-0000008957
6. AMG10935_OCO-0000030231
7. AMG10935-0000000918
8. AMG10935-0000000937
9. AMG10935-0000010008
10. AMG10935-0000012174
11. AMG10935-0000012200
12. AMG10935-0000012332
13. AMG10935-0000012779
14. AMG10935-0000013130
15. AMG10935-0000014298
16. AMG10935-0000015661
17. AMG10935-0000016193
18. AMG10935-0000019498
19. AMG10935-0000022563
20. AMG10935-0000022627
21. AMG10935-0000024826
22. AMG10935-0000024829
23. AMG10935-0000026317

24. AMG10935-0000026758
25. AMG10935-0000028211
26. AMG10935-0000028213
27. AMG10935-0000038328
28. AMG10935-0000043636
29. AMG10935-0000053669
30. AMG10935-0000057248
31. AMG10935-0000074278
32. AMG10935-0000074320
33. AMG10935-0000076719
34. AMG10935-0000083575
35. AMG10935-0000083666
36. AMG10935-0000087406
37. AMG10935-0000113770
38. AMG10935-0000115173
39. AMG10935-0000121596
40. AMG10935-0000128836
41. AMG10935-0000131630
42. AMG10935-0000139350
43. AMG10935-0000140143
44. AMG10935-0000369544
45. AMG10935-0000369560
46. AMG10935-0000369562
47. AMG10935-0000369572

48. AMG10935-0000369614
49. AMG10935-0000369906
50. AMG10935-0000369922
51. AMG10935-0000369930
52. AMG10935-0000370146
53. AMG10935-0000370146-70
54. AMG10935-0000370148
55. AMG10935-0000370150
56. AMG10935-0000370152
57. AMG10935-0000370154
58. AMG10935-0000370156
59. AMG10935-0000370158
60. AMG10935-0000370160
61. AMG10935-0000370162
62. AMG10935-0000370164
63. AMG10935-0000370166
64. AMG10935-0000370168
65. AMG10935-0000370170
66. AMG10935-0000370354
67. AMG10935-0000370662
68. AMG10935-0000377749
69. AMG10935-0000378865
70. AMG10935-0000379900
71. AMG10935-0000382821

72. AMG10935-0000392769-815
73. AMG10935-0000393120
74. AMG10935-0000394182
75. AMG10935-0000394974
76. AMG10935-0000395744
77. AMG10935-0000395746
78. AMG10935-0000395752
79. AMG10935-0000395756
80. AMG10935-0000397232
81. AMG10935-0000414326
82. AMG10935-0000414549
83. AMG10935-0000417134
84. AMG10935-0000502336
85. AMG10935-0000509339
86. AMG10935-0000524536
87. AMG10935-0000524538
88. AMG10935-0000524540
89. AMG10935-0000524542
90. AMG10935-0000524587
91. AMG10935-0000525700
92. AMG10935-0000535604
93. AMG10935-0000535618
94. AMG10935-0000535869
95. AMG10935-0000536138

96. AMG10935-0000544275

97. AMG10935-0000544764

98. AMG10935-0000548392

99. AMG10935-0000613768

100. AMG10935-0000687879

101. AMG10935-0000760838

102. AMG10935-0000777799

103. AMG10935-0000779420

104. AMG10935-0000798211

105. AMG10935-0000798212

106. AMG10935-0001611588

107. AMG10935-0001611590

108. AMG10935-0001611873

109. AMG10935-0001615120

110. AMG10935-0001618894

111. AMG10935-0001619938

112. Express_Scripts_1330_00002331

113. Express_Scripts_1330_00002339

114. Express_Scripts_1330_00002512

115. Express_Scripts_1330_00004548

116. Express_Scripts_1330_00002568

117. Express_Scripts_1330_00002636

118. Express_Scripts_1330_00002646

119. Express_Scripts_1330_00002704

120. Express_Scripts_1330_00002706
121. Express_Scripts_1330_00002718
122. Express_Scripts_1330_00002959
123. Express_Scripts_1330_00003699
124. Express_Scripts_1330_00003702
125. Express_Scripts_1330_00004535
126. Express_Scripts_1330_00007167
127. Express_Scripts_1330_00007191
128. Express_Scripts_1330_00007330
129. Express_Scripts_1330_00007337
130. Express_Scripts_1330_00042667
131. REGN0005207
132. REGN0005850
133. REGN0006102
134. REGN0007891
135. REGN0030283
136. REGN0031081
137. REGN0031210
138. REGN0031281
139. REGN0031614
140. REGN0031628
141. REGN0032117
142. REGN0035734
143. REGN0043871

144. REGN0047233
145. REGN0108990
146. REGN0114064
147. REGN0134791
148. REGN0160471
149. REGN0175080
150. REGN0266282
151. REGN0268650
152. REGN0341075
153. UHG000006940
154. UHG000007402
155. UHG000007596
156. UHG000007686
157. UHG000007747
158. UHG000007762
159. UHG000007862
160. UHG000007882
161. UHG000007883
162. UHG000007892
163. UHG000007916
164. UHG000008374
165. UHG000008404
166. ZINC0000006
167. ZINC0000186

168. ZINC0000187

# EXHIBIT 44

Message

**From:** Moore, Tom - US ACCESS [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B632C1DE8C6D478A90138F3E4496AAB7-[redacted]
**Sent:** 6/24/2020 2:51:29 PM
**To:** West, Billy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=49cd634b1bb04916b6aea6dbc7dc830d-[redacted]i]
**Subject:** FW: Requested Murdo Action - [redacted] before 2 pm CT (1 pm ET)

**Importance:** High

---

**From:** Moore, Tom - US ACCESS
**Sent:** Wednesday, June 24, 2020 7:51 AM
**To:** Gordon, Murdo <[redacted]@amgen.com>
**Cc:** Niksefat, Kave <[redacted]@amgen.com>; Fox, Chris <[redacted]@amgen.com>; Le Goff, Corinne <[redacted]@amgen.com>
**Subject:** Requested Murdo Action - [redacted]. [redacted] before 2 pm CT (1 pm ET)
**Importance:** High

Hi Murdo ... the meeting between ESI Leadership and Regeneron leadership is from 2-3 pm CT.

Our read: Outreach [redacted] would be helpful. [redacted] email is [redacted]

If you are able to reach out please let me know so the ESI trade relations team can work their system to ensure she is aware of the request and why it would be a good idea for you two to connect.

- Recognize [redacted]
- We have [redacted]
- Amgen is committed to cardiology, as evidenced by substantial effort to support Repatha in the market & pipeline development
  - We still have sales force
  - We still have MSLs
- We are also aware ESI has [redacted] however:
  - Our proposal would [redacted]
  - We have [redacted]
    - [redacted]
    - We are excited about the evolution of our inflammation pipeline & believe [redacted], Amy's team (led by Adam) will be meeting with your V&A leadership tomorrow on this matter
- All-in-all we appreciate the willingness of ESI to consider the Amgen offer as well as jointly evolve our thinking in AI for 2021 and beyond

**Tom Moore**
Vice President, Value and Access
US General Medicines Business Unit
[redacted]@amgen.com

[redacted]

# EXHIBIT 45

## Short Message Report

| | |
|---|---|
| Conversations: 1 | Participants: 2 |
| Total Messages: 1 | Date Range: 9/15/2020 |

## Outline of Conversations

**RSMF_AM000617_0137216** • 1 message on 9/15/2020 • Phone Owner <(000) 000-0000> • Tom Moore <+[redacted]

**Messages in chronological order** (times are shown in GMT +00:00)

**RSMF_AM000617_0137216**

PO Phone Owner <(000) 000-0000> 9/15/2020, 12:22 AM

Spoke to Harold post ESI meeting: he indicated that [redacted].

# EXHIBIT 46

[redacted]

# EXHIBIT 47

Tim Bayer <[redacted]>; Phone Owner <(000) 000-0000>

Tim Bayer <[redacted]

2020-06-26T12:53:02.0000000Z

Excellent news!! Thanks for the update & look forward to hearing the final outcome.

Phone Owner <(000) 000-0000>

2020-06-26T18:21:45.0000000Z

VAC Vote Passed!! We did it!! Now we need to get documents signed.

Tim Bayer <[redacted]>

2020-06-26T18:26:47.0000000Z

Congrats!!!

Phone Owner <(000) 000-0000>

2020-06-26T18:29:41.0000000Z

We [redacted] We [redacted]

Tim Bayer <[redacted]>

2020-06-26T18:33:41.0000000Z

Thanks for the context. I canâ€™t believe Regeneron threatened legal action.

Phone Owner <(000) 000-0000>

2020-06-26T18:36:12.0000000Z

They were acting like petulant children.... I love it!ðŸ¤£

# EXHIBIT 48

Message

**From:** Niksefat, Kave [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=80085F1047D5465AAC8EF82A5E0C30A3-[redacted]
**Sent:** 7/1/2020 4:08:11 PM
**To:** Moore, Tom - US ACCESS [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b632c1de8c6d478a90138f3e4496aab7-[redacted]
**Subject:** FW: Ascent (ESI/Cigna/Prime) - Good News

---

**From:** "Gordon, Murdo" <[redacted]@amgen.com>
**Date:** Wednesday, July 1, 2020 at 9:06 AM
**To:** "Niksefat, Kave" <[redacted]@amgen.com>
**Subject:** Re: Ascent (ESI/Cigna/Prime) - Good News

On it

Murdo

---

**From:** Kave Niksefat <[redacted]@amgen.com>
**Date:** Wednesday, July 1, 2020 at 12:01 PM
**To:** "Gordon, Murdo" <[redacted]@amgen.com>
**Subject:** Re: Ascent (ESI/Cigna/Prime) - Good News

Thanks boss. If you have a free moment today or early next week, I'd appreciate it if you could give Billy West a call or shoot him an email/text and thank him for his work in delivering this. Billy's relationship with the Trade organization saved us from getting steamrolled by Regeneron right after we got the CVS news and was critical to constantly getting information that was critical to the win. [redacted] It would mean a ton to him to hear from you. His cell is [redacted] and his email is [redacted]@amgen.com.

Sent from my iPhone - please excuse any typos

---

**From:** Gordon, Murdo <[redacted]@amgen.com>
**Sent:** Wednesday, July 1, 2020 8:54:20 AM
**To:** Niksefat, Kave <[redacted]@amgen.com>; Le Goff, Corinne <[redacted]@amgen.com>; Fox, Chris <[redacted]@amgen.com>; Jordan, Helen <[redacted]@amgen.com>
**Cc:** Moore, Tom - US ACCESS <[redacted]@amgen.com>; Rabushka, Anton <[redacted]@amgen.com>
**Subject:** Re: Ascent (ESI/Cigna/Prime) - Good News

Great work Gen Med Team! Thank you for moving quickly. Given today's other good news on Enbrel IP we have a very clear objective to [redacted]!

Have a great long weekend!

Murdo

---

**From:** Kave Niksefat <kaven@amgen.com>
**Date:** Wednesday, July 1, 2020 at 11:01 AM

**To:** "Gordon, Murdo" <[redacted]@amgen.com>, Corinne Le Goff <[redacted]@amgen.com>, "Fox, Chris" <[redacted]@amgen.com>, Helen Jordan <[redacted]@amgen.com>
**Cc:** "Moore, Tom - US ACCESS" <[redacted]@amgen.com>
**Subject:** Ascent (ESI/Cigna/Prime) - Good News

Ascent has [redacted] Under the contract, [redacted].

We continue to talk to ESI specifically about [redacted].

As you know our ability to develop and execute this contract required us to act in a nimble fashion across our business and within the ESI enterprise. As a result, we have strengthened our overall relationship and [redacted] To that end, tanks to Tom for leading these negotiations and thanks to all of you for your support in helping us achieve this win.

Kave

**Kave Niksefat**
**Vice President I Head of U.S. Value and Access**
One Amgen Center Drive I Thousand Oaks, CA 91320
[redacted]

# EXHIBIT 49

[redacted]

[redacted]

[redacted]

# EXHIBIT 50

[redacted]

[redacted]

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the *Exhibits 1-50 of Declaration of Eric S. Hochstadt in Support of Regeneron Pharmaceuticals, Inc.'s Opposition to Amgen Inc.'s Motion for Summary Judgment* was caused to be served on June 21, 2024 upon the following in the manner indicated:

**BY ELECTRONIC MAIL**

Young Conway Stragatt & Taylor, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
msharp@ycst.com
jhiggins@ycst.com

**BY ELECTRONIC MAIL**

Gibson, Dunn & Crutcher LLP
Eric J. Stock
Ben A. Sherwood
200 Park Avenue
New York, NY 10166-0193
Tel: (212) 351-4000
EStock@gibsondunn.com
BSherwood@gibsondunn.com

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
SWeissman@gibsondunn.com
RParker@gibsondunn.com

Ashley E. Johnson
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel: (214) 698-3100
AJohnson@gibsondunn.com

/s/ David E. Wilks
David E. Wilks (Bar No. 2793)