**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

Regeneron Pharmaceuticals, Inc.,

               Plaintiff,

v.

Amgen Inc.,

               Defendant.

C. A. No.: 1:22-cv-00697-JLH

**JURY TRIAL DEMANDED**

**REDACTED PUBLIC VERSION**
**FILED: July 30, 2024**

**REGENERON PHARMACEUTICALS, INC.'S**
**OPPOSITION TO AMGEN INC.'S MOTION TO EXCLUDE**
**EXPERT TESTIMONY PROFFERED BY REGENERON**

WILKS LAW, LLC
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Elizabeth Stotland Weiswasser
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Date: June 25, 2024

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ...........................................................................................................................3

I.     Professor Scott Morton's and Ms. Bates' expert opinions will help the jury understand Amgen's conduct within the complex nature of PBM formulary negotiations. ............................................................................................................3

    A.     Prof. Scott Morton and Ms. Bates are not opining about any negotiator's "state of mind." ........................................................................................3

    B.     Prof. Scott Morton and Ms. Bates are highly qualified economic and industry experts. .......................................................................................6

    C.     Prof. Scott Morton and Ms. Bates are not offering legal opinions. ........................8

    D.     Prof. Scott Morton's and Ms. Bates' testimony are not cumulative or prejudicial under Rule 403 ................................................................................9

II.     Amgen fails to show the calculation of ▮ damages is unscientific. ............................11

    A.     Prof. Scott Morton's theory of harm at ▮ is consistent with settled antitrust law ..............................................................................................12

    B.     Dr. Mathur's opinions relating to damages at ▮ are well-founded and based on sound methodologies that Amgen does not challenge ...........................14

III.     Dr. Mathur reliably calculates damages beginning in 2020. ..............................................17

IV.     Professor Scott Morton's methodologies are reliable. ......................................................19

    A.     Prof. Scott Morton's within-PBM spillover analysis is reliable. ...........................19

    B.     Prof. Scott Morton's MRM calculation is well-accepted by courts and economists .............................................................................................20

    C.     Prof. Scott Morton properly calculates costs for the *PeaceHealth* test. ...............22

    D.     Amgen's motion to exclude Prof. Scott Morton's and Ms. Bates' analysis of Amgen's best price reporting is an improper and meritless motion *in limine* ..............................................................................................25

V.     Amgen's Patent Litigation against Regeneron is relevant. ................................................27

VI.     Dr. Eckel's medical expert opinion is admissible ..............................................................28

CONCLUSION ...........................................................................................................................30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advo Inc. v. Phil. Newspapers, Inc.*,
  51 F.3d 1191 (3d Cir. 1995)................................................................................23

*Am. Eagle Outfitters, Inc. v. Walmart, Inc.*,
  2023 WL 1778751 (W.D. Pa. Feb. 6, 2023) ............................................................4

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
  2007 WL 3284162 (D. Mass. June 28, 2007)..........................................................2

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983)...............................................................................24

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946)............................................................................................15

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ............................................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)................................................................................... *passim*

*In re Domestic Drywall Antitrust Litig.*,
  322 F.R.D. 188 (E.D. Pa. 2017)..........................................................................19

*Durando v. Trustees of Univ. of Penn.*,
  2022 WL 2467080 (E.D. Pa. July 6, 2022)...........................................................26

*Eastman Kodak Co. v. Southern Photo Materials Co.*,
  273 U.S. 359 (1927)............................................................................................16

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ........................................................................19, 20

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)............................................................................................30

*Godreau-Rivera v. Coloplast Corp.*,
  598 F. Supp. 3d 196 (D. Del. 2022).....................................................................30

*Ingevity Corp., et al. v. BASF Corp.*,
  1:18-cv-01391 (D. Del. 2021)................................................................................2

*In the Matter of Intel Corp.*
   2010 WL 9549985 (F.T.C. Oct. 29, 2010)................................................................25

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*,
   845 F.2d 404 (2d Cir. 1988).....................................................................................23

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003).....................................................................................15

*In re Lidoderm Antitrust Litig.*,
   2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..........................................................15

*In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
   892 F.3d 624 (4th Cir. 2018) ...................................................................................11

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
   62 F. Supp. 3d 368 (D. Del. 2014)...........................................................................30

*McGahee v. N. Propane Gas Co.*,
   858 F.2d 1487 (11th Cir. 1988) ..........................................................................24, 25

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) ..................................................................................13

*Meijer, Inc. v. Abbott Lab'ys*,
   544 F. Supp. 2d 995 (N.D. Cal. 2008) .....................................................................25

*Morgan v. Ponder*,
   892 F.2d 1355 (8th Cir. 1989) ..................................................................................23

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   2015 WL 5767415 (E.D. Pa. July 29, 2015)................................................9, 16, 19

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981)........................................................................................24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .....................................................................................16

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)......................................................................................3, 6

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008)......................................................................................27

*In re Processed Egg Prods. Antitrust Litig.*,
   81 F. Supp. 3d 412 (E.D. Pa. 2015) ......................................................................4, 10

*Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*,
   756 F. Supp. 2d 598 (D. Del. 2010)..................................................................8

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
   2019 WL 1101385 (D. Del. Mar. 8, 2019) ................................................13, 20

*Sgouros v. Trans Union LLC*,
   2022 WL 832638 (N.D. Ill. Mar. 21, 2022)....................................................8

*Sight Sciences, Inc. v. Ivantis, Inc.*,
   No. 21-1317-JLH (D. Del. Apr. 15, 2024), D.I. 456 .............................5, 16, 23, 24

*SmithKline Beecham Corp. v. Abbott Lab'ys*,
   2011 WL 13381310 (N.D. Cal. Feb. 11, 2011) ...............................................24

*SmithKline Corp. v. Eli Lilly & Co.*,
   427 F. Supp. 1089 (E.D. Pa. 1976) .................................................................21
   575 F.2d 1056 (3d Cir. 1978)...........................................................13, 20, 21

*Stearns Airport Equip. Co. v. FMC Corp.*,
   170 F.3d 518 (5th Cir. 1999) ........................................................................23

*TQ Delta, LLC v. 2Wire, Inc.*,
   373 F. Supp. 3d 509 (D. Del. Apr. 10, 2019).....................................................1

*Trust v. Reckitt Benckiser, LLC*,
   No. 18-1855-RGA (D. Del. May. 4, 2021)......................................................30

*U.S. Football League v. Nat'l Football League*,
   634 F. Supp. 1155 (S.D.N.Y. 1986)...............................................................28

*U.S. Philips Corp. v. Windmere Corp.*,
   861 F.2d 695 (Fed. Cir. 1988).......................................................................23

*Univac Dental Co. v. Dentsply Int'l, Inc.*,
   2010 WL 1816745 (M.D. Pa. Apr. 27, 2010)...................................................14

*In re Urethane Antitrust Litig.*,
   2012 WL 6681783 (D. Kan. Dec. 21, 2012).................................................9, 10

*Valassis Commc'ns, Inc. v. News Am. Inc.*,
   2011 WL 2420048 (E.D. Mich. Jan. 24, 2011).................................................24

*ViaTech Techs., Inc. v. Adobe, Inc.*,
   2023 WL 5975219 (D. Del. Sept. 14, 2023).....................................................14

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969).......................................................................................15

*ZF Meritor LLC v. Eaton Corp.*,
    646 F. Supp. 2d 663 (D. Del. 2009) ...................................................17
    696 F.3d 254 (3d Cir. 2012)...............................................................20

**Statutes & Rules**

Fed. R. Evid. 702 .............................................................................. *passim*

**Other Authorities**

Am. Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases*, Ch. 6B,
    Instruction 8 (2016)............................................................................15

Am. Bar Ass'n, *Proving Antitrust Damages: Legal and Economic Issues* (2017)................14, 15

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application*, (4th and 5th Editions, 2021 Cum. Supp.
    2013-2020)..........................................................................................25

Patrick Bolton, Joseph F. Brodley & Michael H. Riordan, *Predatory Pricing:
    Strategic Theory and Legal Policy*, 88 GEO. L.J. 2239 (2000)................................25

Peter Herrick & Monsura Sirajee, *Scaling the 'Rebate Wall': Growing Scrutiny of
    Rebate Contracting in Pharma and Potential Responses*, 38 ANTITRUST MAG.
    2 (Apr. 5, 2024).................................................................................22

Jonathan M. Jacobson, *Cost-Based Rules in the New Economy* (Feb. 6, 2009) ..........................25

Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional
    Pricing Practices, and the Flawed Incremental Price-Cost* Test, 81
    ANTITRUST L.J. 371 (2017)...........................................................21, 25

Fiona Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework
    for Loyalty Rebates*, 81 ANTITRUST L.J. 777 (2016)................................22

29 Wright & Miller, Fed. Prac. & Proc. § 6265.4 (2d ed. 2024 update) ......................................10

## PRELIMINARY STATEMENT

Amgen mounts *fifteen* separate "*Daubert*" challenges to Regeneron's *four* experts, in an attempt to prematurely and improperly exclude evidence and testimony that Amgen does not like. D.I. 316 ("Br."). In seeking the unduly prejudicial remedy of exclusion, Amgen routinely mischaracterizes or disregards the actual testimony of Regeneron's experts and rehashes summary judgment legal arguments that are not properly addressed in a *Daubert* motion. Amgen's scattershot approach seeking to exclude nearly every opinion of Regeneron's experts amounts to nothing more than: (1) premature motion *in limine* arguments; and (2) disputes as to which "facts" are the appropriate inputs for expert analysis. But the Federal Rules of Evidence are clear: "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, advisory committee's note to 2000 amendments.[1] Because Amgen fails to lodge any proper *Daubert* challenge, Amgen's motion should be denied.

As a threshold issue, Amgen cannot reasonably dispute that each of Regeneron's four highly-qualified and distinguished experts far surpasses the "liberally" interpreted "specialized expertise" qualification requirements of Rule 702. *TQ Delta, LLC v. 2Wire, Inc.*, 373 F. Supp. 3d 509, 526 (D. Del. Apr. 10, 2019) (internal citations omitted).

- **Professor Fiona Scott Morton** is a highly renowned PhD healthcare economist. As the former Deputy Assistant Attorney General for Economics at the Department of Justice, and a current professor at the Yale School of Management, Prof. Scott Morton has published more than twenty peer-reviewed articles on the pharmaceutical industry, and testified more than twenty times in litigation, government antitrust cases, and before Congress on issues pertaining to the pharmaceutical industry, prescription drug prices, and Medicare rebates. Ex. 1 (Scott Morton Opening) at Ex. A. Prof. Scott Morton has proffered more than 300

---

[1] Emphasis added throughout unless otherwise noted.

1

pages of expert testimony (excluding exhibits) in this case, relating to the relevant antitrust markets, the market power of the products at-issue, exclusionary conduct, foreclosure, below-cost pricing, and harm to competition. *See id.*; Ex. 2 (Scott Morton Reply).

- **Dr. Divya Mathur** is a PhD economist and Managing Principal of the economic consulting and strategy firm, Analysis Group, with more than a decade of experience consulting and testifying on antitrust and damages-related matters. Ex. 3 (Mathur Opening) at Ex. A. In fact, three years ago, Dr. Mathur testified before a jury in this District (Judge Andrews) on behalf of BASF in *Ingevity Corp., et al. v. BASF Corp.*, 1:18-cv-01391 (D. Del. 2021). Her testimony on antitrust liability and damages was reliable—the jury awarded BASF nearly $85 million in damages. In this case, Dr. Mathur's opinion is limited to the damages resulting from Amgen's conduct. *See id.*; Ex. 4 (Mathur Reply). Amgen does not challenge Dr. Mathur's methodology (which Amgen's own expert also employs). *See infra* p. 16.

- **Ms. Heather Bates**, Managing Director of the consulting firm Berkeley Research Group, has more than two decades of experience consulting on issues in the healthcare industry relating to pricing, formulary coverage, claims, reimbursements, and related financial systems and data for PBMs, GPOs, and pharmaceutical companies. Ex. 5 (Bates Opening) at Ex. A. Ms. Bates is so reputable, that Gibson Dunn, Amgen's counsel, has retained her in other cases. Here, Ms. Bates provides testimony that will help the jury: She unpacks the highly complex formulary negotiation and contracting process in response to Amgen's repeated assertions that "Your Honor would be able to decide [this case] based on a small stack of contracts…" Ex. 6 (Apr. 4, 2023 Hearing Tr.) at 11:19-22.

- **Dr. Robert Eckel** is a board certified physician, with more than forty years of experience as a practicing doctor and professor, specializing in internal medicine, endocrinology and metabolism, and cardiovascular medicine. Ex. 7 (Eckel Opening) ¶ 2. Dr. Eckel has over forty years of clinical experience diagnosing and treating patients suffering from complex disorders of lipid and lipoprotein metabolism (high or very high LDL cholesterol), and since PCSK9is were first approved in 2015, he has written many prescriptions of Praluent® and Repatha®. *Id.* ¶ 4; Ex. 8 (Eckel Tr.) at 34:20-36:5. Amgen's witness, Dr. Suzanne Shugg, recognizes Dr. Eckel as a leader in the field of lipidology. *See* Ex. 9 (Shugg Tr.) at 43:2-16. Dr. Eckel provides the heartland of expert medical testimony—he explains prescribing practices and product details.

Because there is no question that Regeneron's experts are qualified, Amgen manufactures baseless disputes. Challenging all opposing experts' opinions appears to be Amgen's *modus operandi* in litigation, however, as Amgen previously sought to exclude one of its *own* economic experts in this case for engaging in "junk science." Amgen's Motion to Exclude the Expert Testimony of Lauren J. Stiroh, *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 2007 WL 3284162, at *1 (D. Mass. June 28, 2007).

2

## ARGUMENT

### I.   PROFESSOR SCOTT MORTON'S AND MS. BATES' EXPERT OPINIONS WILL HELP THE JURY UNDERSTAND AMGEN'S CONDUCT WITHIN THE COMPLEX NATURE OF PBM FORMULARY NEGOTIATIONS.

Amgen first moves to exclude any opinions of Prof. Scott Morton and Ms. Bates about "the intent and/or state of mind of Amgen or PBM negotiators" and "factual conclusions about what, if any, oral or other informal Amgen/PBM agreements may have existed." Br. at 2-6. But they offer no such opinions. Prof. Scott Morton and Ms. Bates will testify about relevant industry and economic context for understanding the parties' financial incentives and game theory in their negotiations with PBMs. This is testimony they are well-qualified to provide, it is reliable or based on "good grounds," and it will "help the trier of fact to understand the evidence" and determine whether such agreements existed. Fed. R. Evid. 702; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994).

### A.   Prof. Scott Morton and Ms. Bates are not opining about any negotiator's "state of mind."

Amgen first contends that Prof. Scott Morton's and Ms. Bates' opinions "[u]surp" the jury's role because "[e]xperts may not testify to 'intent, motive, or state of mind.'" Br. at 4-6. But these experts' testimony is not about intent, motive, or state of mind.

Regeneron's experts could not have been clearer about the scope and limits of their opinions (in testimony Amgen chooses to ignore). As Prof. Scott Morton explained:

> Question: …And you are aware that there could be a dispute as to whether those emails, text messages reflect understandings or agreements. Correct?
>
> Answer: ***That sounds like a legal distinction that I am not really opining about.*** I am looking at the managers, how they are behaving and the incentives they are creating for their customers.
> …
> Question: …You are not seeking to opine here on the state of mind of any negotiator in the case. Right?

3

> Answer: ***I don't know what the term of art state of mind means.*** I am very much focused on incentives. If somebody at Amgen says you are not going to get your Enbrel rebate unless Repatha is one of one, then that is very much about the incentives and the economics and the money that is going to flow between those parties…[2]

Ms. Bates testified similarly:

> Question: And you're not offering an opinion on what constitutes an offer from a legal perspective, are you?
>
> Ms. Bates: Correct. ***I'm not.***
> …
> Question: And so you read a number of documents and you formed an opinion on the state of mind of the individuals who were communicating with each other, correct?
>
> THE WITNESS: So, ***my opinion is about the offers themselves***, and I know that there was an offer made to ESI Part D. ***But, again, I haven't formed an opinion about the extra contractual discussions between the parties***.[3]

Amgen's true issue with Prof. Scott Morton's and Ms. Bates' testimony is that it is based, in part, on record evidence that Amgen does not like. Amgen claims that there is "no *economic methodology*" in reading texts and emails. Br. at 5. But, as discussed above, contradictory interpretations of the facts is not a basis to exclude an expert opinion. *See supra* p. 1. Moreover, "it is consistent with sound economic practice to review the factual record and formulate a hypothesis that can then be tested using economic theory—the examination of the factual record is necessary to determine which tests to run and to confirm that the stories drawn from the data and from the factual record are consistent." *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424 (E.D. Pa. 2015). An expert may opine based on the record evidence, informed by her years of industry experience, so long as she "does not opine [on] witnesses' subjective intent." *Am. Eagle Outfitters, Inc. v. Walmart, Inc.*, 2023 WL 1778751, at *4 (W.D. Pa. Feb. 6, 2023).

---

[2] Ex. 10 (Scott Morton Tr.) at 65:10-66:7 (objections omitted).
[3] Ex. 11 (Bates Tr.) at 47:11-14, 67:23-68:7 (objections omitted).

Ms. Bates, based on her PBM industry expertise and review of the record, describes "whether Amgen's offers to, and agreements with, PBMs reflect bundled rebates across Enbrel, Repatha and/or Otezla." Ex. 5 (Bates Opening) ¶ 4; Ex. 11 (Bates Tr.) at 38:20-39:17, 40:21-24. She explained that she was not giving an expert opinion about the existence of agreements not memorialized in a contract. Ex. 11 (Bates Tr.) at 41:18-21. Prof. Scott Morton, based on her expertise and review of the record, addresses the economics of Amgen's portfolio rebates and "the extent to which [they] harmed Regeneron's ability to compete." Ex. 1 (Scott Morton Opening) ¶ 193. As she explained at her deposition—in testimony Amgen ignores—she is focused on the economic incentives informing the formulary access negotiation between Amgen and the PBMs:

> **It is the role of the economist to understand the strategic game being played,** and the strategic game being played involves having agents with payoffs for different actions. **You have to know what actions they can choose, the payoffs they are going to get from each of those actions and then thinking about what their strategy is going to be to make themselves as well off as they can.** And when they understand that the arrangement is we are going to withhold a large lump of money unless you put Repatha on your formulary in a certain way, then that affects their payoffs and that affects the choices they are going to make. That is something an economist has to understand from the documentary evidence in the case. This is true of all cases that I've worked on.[4]

Amgen objects to a few stray, out of context references plucked out of hundreds of pages of expert reports. Br. at 4-6. But, as this Court knows, this is easily and properly dealt with by objection, if it is elicited at trial, or with a motion *in limine*. *See* Joint Pretrial Conf., *Sight Sciences, Inc. v. Ivantis, Inc.*, No. 21-1317-JLH (D. Del. Apr. 15, 2024), D.I. 456 at 79:4-10 (evidence experts considered is "an issue of weight and not admissibility"). These statements, properly understood in context, are part of the background these experts draw on to derive their opinions. Specifically, Ms. Bates applies her industry expertise to the formulary negotiations that occurred

---

[4] Ex. 10 (Scott Morton Tr.) at 68:20-69:13.

here. And Prof. Scott Morton applies game theory to derive the economic incentives at play when Regeneron and Amgen were bidding for PBM formulary coverage.

Indeed, Amgen's complaints regarding Prof. Scott Morton's testimony amount to a failure to understand economic game theory. For example, when asked whether she was testifying "as to whether two individuals in their minds had an agreement," Prof. Scott Morton explained: "I am testifying about something closely related, which is does the PBM think it has got to put Repatha on the formulary or else it is not going to get [Enbrel] rebates. ***This is a repeated game.*** And these parties negotiated with each other over the years at a time repeatedly. ***If they have an understanding that this is how it is going to be, then that is a critical thing to include in the economic analysis.***" Ex. 10 (Scott Morton Tr.) at 67:6-18. Amgen's baseless mischaracterizations are no basis to strike the entirety of these two experts' testimony on PBM negotiations.

## B. Prof. Scott Morton and Ms. Bates are highly qualified economic and industry experts.

Amgen similarly deploys its mischaracterization of Prof. Scott Morton's and Ms. Bates' testimony to challenge their qualifications, arguing that they are "not qualified" to testify "as to the existence of extracontractual agreements" between Amgen and PBMs. Br. at 6-8. But they are not providing this testimony, so it is irrelevant whether they would be qualified to do so.

In any event, Amgen's efforts to tarnish the sterling qualifications of these experts fail to overcome Rule 702's "policy of liberal admissibility," which can be satisfied "with more generalized qualifications." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741. As to Prof. Scott Morton, Amgen argues that she has "never worked in the pharmaceutical industry and has no real-world experience negotiating contracts" in that field. Br. at 6-7. But Prof. Scott Morton has published numerous peer-reviewed articles on the pharmaceutical industry, and testified numerous times, including in government antitrust cases and before Congress, on issues pertaining to the pharmaceutical industry, prescription drug prices, and Medicare rebates. Ex. 1 (Scott Morton

Opening) at Ex. A. She is more than qualified to provide testimony about the economic incentives surrounding contract negotiations in the pharmaceutical industry, regardless of whether she has sat in the negotiating chair. Amgen's "gotcha" deposition tactic (refusing to show Prof. Scott Morton her expert reports for 5.5 hours of questioning), and related effort to denigrate her expertise by testing if she memorized various acronyms appearing in documents cited in 300+ pages of written testimony, Br. at 6-7, cannot possibly overcome the "knowledge, skill, experience, training, [and] education" that qualifies her as an expert, Fed. R. Evid. 702.[5]

Amgen likewise complains that Ms. Bates has "no experience negotiating" or "consulting" on negotiations of PBM formulary contracts. Br. at 7-8. But Ms. Bates has over two decades of experience consulting for each stakeholder in a PBM negotiation—pharmaceutical companies, PBMs, and GPOs. (Indeed, Amgen's counsel at Gibson Dunn has retained Ms. Bates in other cases, underscoring their actual views of her qualifications.) As a result of her extensive experience, Ms. Bates is fully capable of and has analyzed PBM formulary rebate contracts and offers, including the communications and negotiations surrounding such offers and contracts. *See* Ex. 5 (Bates Opening) at Ex. A; Ex. 11 (Bates Tr.) at  32:3-16, 35:23-36:1. Amgen ignores these qualifications and instead relies on blatant mischaracterizations of Ms. Bates' testimony, which certainly do not overcome the Rule 702 standard. For example, Amgen claims that she "could not define or distinguish between █████████████████████," Br. at 7, but this could not be further from the truth. Ms. Bates testified that she could not define the "difference *at Amgen* between an █████████████████████," but instead "*adopt[ed] Amgen's terminology*," supported by

---

[5] Confirming that Amgen's trivia test is not dispositive of industry expertise and experience, even ████████████████ did not know the meaning of one of the acronyms in ████ document that Amgen's counsel asked Prof. Scott Morton to define during her deposition. *See* Ex. 12 ██████████████████████████████████████████████

her "experience and review of the documents in this case and in many other engagements." Ex. 11 (Bates Tr.) at 54:6-55:25. Amgen also complains that Ms. Bates is unqualified because she could not provide testimony that amounts to a legal interpretation of an offer: Whether an offer has to "include all of the operative terms," "the person making the offer [must] understand that if it were accepted they will be bound," or if an offer "would bind the company if accepted." Br. at 7-8. Amgen's complaint is nonsensical particularly because Amgen also seeks to exclude her purported "impermissible opinions" about "legal interpretation[s]." *Id.* at 8. These experts' qualifications are thus entirely unlike the experts excluded in the cases Amgen cites, who had not demonstrated any relevant qualifications at all. *See id.* at 6.[6]

## C.    Prof. Scott Morton and Ms. Bates are not offering legal opinions.

Amgen next argues that these experts are "providing impermissible opinions about the proper interpretation of provisions in Amgen's contracts." Br. at 8. Again, that is not true. As explained above, both Prof. Scott Morton and Ms. Bates confirmed in their depositions that they are not providing legal interpretations of evidence in the record. *See supra* p. 3-4. These experts are testifying about industry negotiation practices and the economic incentives and implications arising during these negotiations, which are well within the realm of permissible expert testimony. It is well-settled that an expert may testify about legal documents "from the perspective of [her] technical knowledge and expertise[.]" *Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 606 (D. Del. 2010) (expert properly "applied the definitions from the

---

[6] In *Genty v. Resolution Trust Corp.*, an expert was excluded where there was minimal information "in the record supporting his credentials as an expert"; "no curriculum vitae; no recitation of studies conducted or methods used; no inclusion of articles published; indeed, nothing supplementing the unadorned assertion in their brief to verify [the expert's] qualifications as an expert toxicologist." 937 F.2d 899, 918 (3d Cir. 1991). The excluded expert in *Sgouros v. Trans Union LLC*, 2022 WL 832638, at *2 (N.D. Ill. Mar. 21, 2022), had "no experience or training" whatsoever and had never "consulted clients" in the area of his testimony.

Agreement and did not expand on their legal meaning"), *aff'd sub nom.*, *Roche Diagnostics Operations, Inc. v. Lifescan Inc.*, 452 F. App'x 989 (Fed. Cir. 2012); *see also, e.g.*, *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *10 (D. Kan. Dec. 21, 2012) (allowing expert testimony that evidence was "consistent" with anticompetitive behavior), *aff'd*, 768 F.3d 1245 (10th Cir. 2014).

Confirming as much, Amgen's purported industry expert, Ms. Deborah Gan,[7] opines that the ████████████" clause contained in Amgen's ██████ contract was "███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████" Ex. 13 (Gan Report) n. 169. Because neither Prof. Scott Morton nor Ms. Bates are providing legal interpretations, Amgen's motion pertaining to this issue should be denied.

## D.     Prof. Scott Morton's and Ms. Bates' testimony are not cumulative or prejudicial under Rule 403.

Amgen's last ditch effort to exclude these experts' highly relevant testimony is its claim that Prof. Scott Morton's and Ms. Bates' opinions must be excluded as "cumulative" and "unduly prejudicial." Br. at 8-10. Amgen acknowledges, however, that these objections arise under "Federal Rule of Evidence 403," *id.* at 8, not Rule 702 and *Daubert*, meaning that these arguments are not properly raised now under the Court's Scheduling Order. D.I. 67 at 6-7. Including these arguments in Amgen's *Daubert* motion appears to be an effort to circumvent the Court's limitation of three *in limine* motions. *Id.* at 10-11. The Court should deny Amgen's motion on this basis.

Even were the Court to consider Amgen's Rule 403 arguments, they are not persuasive. The Third Circuit has "stress[ed] that pretrial Rule 403 exclusions should rarely be granted" and that "if ... testimony survives the rigors of Rule 702 ... Rule 403 is an unlikely basis for exclusion." *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *20 (E.D. Pa. July 29,

---

[7] Regeneron challenges the expert opinion of Ms. Gan due to lack of qualifications. *See* D.I. 319.

2015) (citing *Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990)). Amgen first contends

that Prof. Scott Morton and Ms. Bates offer nothing more than "a recitation of facts." Br. at 8. But

Rule 702 permits any expert testimony that "will help the trier of fact to understand the evidence

or to determine a fact in issue." Fed. R. Evid. 702. An expert "not only should, but must, examine

the factual record to arrive at [her] opinion." *In re Processed Egg*, 81 F. Supp. 3d at 422.[8] Prof.

Scott Morton and Ms. Bates do far more than that. PBM and pharmaceutical contracting,

negotiations, and economics are highly complex and unfamiliar to jurors, and the background

information included in their opinions establishes the basis for their economic and industry

analysis. *See* 29 Wright & Miller, Fed. Prac. & Proc. § 6265.4 (2d ed. 2024 update) ("Expert

testimony is also commonly found to be helpful when offered to explain the conduct of businesses

or other activities beyond the usual experience of jurors."). Their testimony is thus unlike the mere

totaling of numbers or bare recitation of the record that doomed the expert testimony in the two

cases Amgen cites to support its argument. Br. at 8-9.[9]

      Amgen next argues that Prof. Scott Morton and Ms. Bates engage in "one-sided advocacy"

that "merely parrot[s] a cherry-picked portion of the evidence." *Id.* at 9-10.[10] But far from

identifying reasons to exclude their testimony, Amgen instead surfaces disputed issues of fact to

---

[8] *See also id.* at 424 ("[I]t is consistent with sound economic practice to review the factual record and formulate a hypothesis that can then be tested using economic theory—the examination of the factual record is necessary to determine which tests to run and to confirm that the stories drawn from the data and from the factual record are consistent."); *In re Urethane*, 2012 WL 6681783, at *3 (allowing expert testimony that "particular events, assuming they occurred, are consistent with a conspiracy").

[9] In *Allscripts Healthcare, LLC v. Andor Health, LLC*, the expert simply totaled costs included in one document and did not offer any "specialized expertise." 2022 WL 3021560, at *5 (D. Del. July 29, 2022). And in *Security & Exchange Commission v. Ambassador Advisors, LLC*, the Court found that the expert "made no effort to verify" the information he relied upon and instead made "an uncritical recitation of Defendants' evidence." 576 F. Supp. 3d 250, 261 (E.D. Pa. 2021).

[10] While Amgen posits this critique of Ms. Bates' opinion, Amgen merely cites paragraphs from her Opening Report, Br. at 9, but does not identify what evidence she ignored or cherry-picked.

be resolved at trial.[11] For example, Amgen faults Prof. Scott Morton for allegedly "ignoring deposition testimony… ███████████████████████████████████████████████

███████████████████████████████████ *Id.* at 9-10. However, as Regeneron explained in its response to Amgen's statement of facts ("SOF Opp."), there is ample evidence showing that that Repatha®'s formulary coverage on ███████ formularies was dependent upon reaching an agreement on ██████ value, and that this verbal agreement was confirmed after the execution of the ██████ ████. *See* D.I. 326 (SOF Opp.) #1 ¶¶ 29-31.[12] Even Amgen's counsel admitted that communications outside of a contract are legitimate evidence for understanding what "a contract means." *See* Ex. 14 (Mar. 19, 2024 Hearing Tr.) at 11:24-12:03. Amgen also faults Prof. Scott Morton for ignoring certain evidence in assessing whether Amgen made a bundled rebate offer to ██████. Br. at 9-10. This, too, is (at most) a disputed issue of fact, and there is ample evidence supporting Regeneron's position. *See* D.I. 326 (SOF Opp.) #3. Prof. Scott Morton was entitled to rely on this evidence (among other evidence) in reaching her conclusions and Amgen will have the opportunity to cross-examine her on it at trial. Thus, it is entirely improper for Amgen to claim that Regeneron's experts have "cherry-picked" the evidentiary record when Amgen's experts ignore hundreds of documents cited in Regeneron's experts' opening reports. *See generally* Ex. 15 (comparing experts' materials relied upon).

## II.   AMGEN FAILS TO SHOW THE CALCULATION OF ████ DAMAGES IS

---

[11] Amgen's disagreement with Regeneron's experts does not come close to showing that they engaged in the sort of unreliable disregarding of material evidence in the two cases Amgen cites. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion "did not incorporate all aspects of the economic reality" leading to "deficiencies in the foundation of the opinion"); *In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 634-35 (4th Cir. 2018) (expert opinion "include[d] … the results of some tests he performed (which supported the plaintiffs' argument) but exclude[d] the results of another (which did not)").

[12] Amgen also challenges (in a footnote) Prof. Scott Morton's opinion about ████████████. Br. at 10 n. 3. To the extent this argument is raised at all, it does nothing more than identify another disputed issue of fact. *See* D.I. 326 (SOF Opp.) #1 ¶¶ 29, 32.

**UNSCIENTIFIC.**

Amgen next argues that Prof. Scott Morton's and Dr. Mathur's opinions relating to damages at ██████████████████████ should be excluded because (A) the theory of harm is contrary to settled antitrust law, Br. at 11-13; and (B) damages at ████ are unduly speculative, *id.* at 13-15. These arguments merely retread merits-based arguments Amgen makes for striking ████ from the case in its summary judgment motion and are even less compelling when offered in this posture. *See* D.I. 309 (Amgen Motion for Summary Judgement) at 41-45.

As described in greater detail in Regeneron's opposition to Amgen's summary judgment motion ("SJ Opp."), the harm Regeneron suffered at ████ is cognizable and straightforward. *See* D.I. 324 (SJ Opp.) at II.E. Namely, Regeneron's damages resulting from Amgen's conduct at ████ ██████████████████ are the result of Amgen's repeated attempts to use ██████████████ ██████████████ to penalize ████ for choosing to cover Praluent®, thereby forcing Regeneron to pay ████ rebates ***above the competitive level*** to keep its formulary position in 2022 and 2023. *See* Ex. 1 (Scott Morton Opening) § 8.2.1.3, ¶¶ 91, 211. Amgen's repeated anticompetitive conduct—not merely ██████████████████" as Amgen asserts—harmed Regeneron. Br. at 11. ████████████████████████████████████████████ ██████████████████████ as a result of Amgen's at-issue conduct.[13]

**A.     Prof. Scott Morton's theory of harm at ████ is consistent with settled antitrust law.**

Restating its summary judgment motion, Amgen argues that Prof. Scott Morton's theory of harm at ████ is contrary to antitrust law because "being required to offer lower prices in order to compete with a competitor's low prices is not a cognizable antitrust injury." Br. at 11.

---

[13] As disclosed by Dr. Mathur, these damages are not included yet because discovery did not include data after July 2023, ██████████████████████████████████ ████████ Ex. 4 (Mathur Reply) at 4, n. [1]. Regeneron reserves the right to supplement its damages calculations before trial based on such data using previously disclosed methodologies.

But the case law is clear in the other direction: A business can "harm competition" by "raising its rivals' costs sufficiently to prevent them from growing into effective competitors." *See McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015).[14] In *SmithKline Corp. v. Eli Lilly & Co.*, the Third Circuit affirmed an antitrust violation when the defendant offered bundled rebates on two monopoly drugs and a third drug, which faced competition from a drug manufactured by the plaintiff. 575 F.2d 1056, 1058-61 (3d Cir. 1978). The injury was that "in order to offer a rebate of the same net dollar amount" as the defendant's bundle, the plaintiff "had to offer … rebates of some 16% [to] 35%," increased from a rebate of only 5% before the bundle. *Id.* at 1060, 1062. This is exactly the type of harm Regeneron alleges, and that Prof. Scott Morton opines, occurred at █████ where prices were not set in a competitive marketplace, but instead in a market where competition was ***distorted***. As she explained at length, it is Prof. Scott Morton's opinion that Amgen did not raise Regeneron's costs at █████ through an otherwise competitive process, but instead did so by offering ████████████████████████. *See, e.g.*, Ex. 1 (Scott Morton Opening) ¶¶ 89-95; Ex. 10 (Scott Morton Tr.) at 56:19-57:10, 58:21-59:6, 171:22-178:2, 186:2-21. Prof. Scott Morton further opines that this conduct raised Regeneron's costs above the competitive level, harming both Regeneron and competition in the U.S. PCSK9i market. *See* Ex. 2 (Scott Morton Reply) §§ 8, 10.2-10.4. There is no cognizable procompetitive rationale for Amgen's use of ██████████████—and Amgen does not offer any.[15] Thus, whether or not

---

[14] *See also Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1101385, at *2, *8 (D. Del. Mar. 8, 2019) (denying *Daubert* challenges, including opinions relating to foreclosure, anticompetitive conduct and injury because: "We do not view *Daubert* analysis as the time to decide who is right or which theory we would adopt.").

[15] By contrast, in *Viacom International Inc. v. Tele-Communications*, *Inc.*, which Amgen cites, the plaintiff was unable to hold the "defendant … liable, simply for raising its rival's costs" where the plaintiff's injury resulted from "a *competitive* bidding process," and the court specifically distinguished that case from one (like this one) involving "below-cost pricing." 1994 WL 561377, at *4-5 & n.4 (S.D.N.Y. Oct. 12, 1994) (emphasis in original).

Amgen's conduct at ███ is "indicative of vigorous competition," as Amgen argues (Br. at 12), is a quintessential question for a jury to resolve.

**B.     Dr. Mathur's opinions relating to damages at ███ are well-founded and based on sound methodologies that Amgen does not challenge.**

Amgen asserts that Dr. Mathur's damages calculations arising from Amgen's conduct at ████████████████ should be excluded because she relies on Prof. Scott Morton's analysis of but-for world pricing. *See* Br. at 13-15. Amgen's claim is meritless.

As a threshold matter, damages experts routinely rely on findings by liability and merits experts—meaning that there is nothing wrong with Dr. Mathur relying on inputs from Prof. Scott Morton. *See ViaTech Techs., Inc. v. Adobe, Inc.*, 2023 WL 5975219, at *12 (D. Del. Sept. 14, 2023).[16] Even more, "it is perfectly acceptable for an expert to calculate an estimated amount of damages without regard to causation or any other elements of liability." *Univac Dental Co. v. Dentsply Int'l, Inc.*, 2010 WL 1816745, at *3 (M.D. Pa. Apr. 27, 2010). *See also* Ex. 16 (Am. Bar Ass'n, *Proving Antitrust Damages: Legal and Economic Issues*, II.4.A (2017) ("Damages experts likewise assume liability for the purpose of analysis, often before liability is in fact established. The damages analysis will come into play if and only if liability is established.")).

Amgen posits counter factuals involving the extreme and unusual situation in which a damages expert "accepted without question" a defendant's statements. Br. at 14 (quoting *Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*, 362 F. App'x 332, 334 (3d Cir. 2010)). That is not the case here. Dr. Mathur, a PhD economist with vast antitrust experience, *supra* p. 1, confirmed that her findings were based on her independent "review and holistic assessment of the evidence on the record," and that she reviewed Prof. Scott Morton's analyses and "determined that

---

[16] This reliance "is typically not improper because the technical expert's underlying opinions are of record in the case and can be reviewed by the factfinder and cross-examined by the opposing party." 2023 WL 5975219, at *12

there was a basis in the record for the opinions." Ex. 17 (Mathur Tr.) at 37:13-38:1; 41:7-15. As evidenced by the 160+ pages of her reports, Dr. Mathur independently reviewed and considered record evidence to support her analysis. *See, e.g.,* Ex. 4 (Mathur Opening) ¶¶ 53-55.

Amgen further contends that Prof. Scott Morton's opinions about but-for-world rebates for ███████████████████████ are "unsupported speculation" and "inconsistent with record evidence"—thus undermining Dr. Mathur's reliance on them. Br. at 13. But, Prof. Scott Morton's but-for-world prices are ***extrapolated from the actual prices*** offered by Regeneron to ████ ████████████ ***before*** Amgen's ████████████████—the only data available reflecting market pricing but-for Amgen's conduct. Ex. 1 (Scott Morton Opening) ¶¶ 137-38; Ex. 2 (Scott Morton Reply) ¶ 314. In the antitrust context, the plaintiff-victim enjoys a considerable amount of leeway in "constructing a hypothetical world free of the defendant['s] exclusionary activities[.]" *LePage's Inc. v. 3M,* 324 F.3d 141, 165–66 (3d Cir. 2003) (citations omitted).[17] *See also* Ex. 18 (Am. Bar Ass'n, *Model Jury Instructions in Civil Antitrust Cases*, Ch. 6B, Instruction 8 (2016) ("So long as the evidence presented provides a reasonable basis upon which the jury may estimate the amount of damages, weakness or imperfections in the evidence are for the jury's consideration."); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969) (Courts must "observe the practical limits of the burden of proof which [may] be demanded."); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) (observing that the wrongdoer, not the victim, shall bear "the risk of the uncertainty which his own wrong has created").

Prof. Scott Morton's "before-during" approach is a reliable, well-accepted scientific method for calculating damages. *See generally* Ex. 16 (*Proving Antitrust Damages: Legal and*

---

[17] *See also In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *18 (N.D. Cal. Feb. 21, 2017) ("What, in the end, the but-for price is determined to be is subject to further merits-based determinations and findings by the trier of fact.").

*Economic Issues*, at II.4.C.[18]). Further undermining this critique, Amgen's *own* expert, Dr. Eric Gaier, uses the "guts" of Dr. Mathur's methodology to calculate Amgen's purported conditional counterclaim damages. Ex. 19 (Gaier Report) ¶¶ 359-60, fig. 58; Ex. 20 (Gaier Tr.) at 268:20-270:24. But Dr. Gaier goes further, as he simply assumes (presumably at the request of counsel) that Amgen was damaged without relying on *any* record evidence or expert opinion. Ex. 19 (Gaier Report) ¶¶ 359-60, fig.58. If this is sufficient for Amgen's damages calculation, it must be enough for Regeneron's. At bottom, Amgen's criticisms of Dr. Mathur's reliance on Prof. Scott Morton's but-for prices do not go to the admissibility of her methodology, but rather the weight of her assumptions—which is well within the domain of the jury.[19]

Amgen's related argument that there is "no economic reasoning why, absent the bundled rebate offers, Regeneron could have won ███████ business at ████ when Amgen offered a ███████████" is at odds with the facts and is better presented to a jury assessing the weight to give Prof. Scott Morton's opinion. Br. at 14.[20] Amgen offered a ██████████████████████████ only in the ***actual world*** as part of its anticompetitive strategy to foreclose Praluent® from the PCSK9i market. Amgen's ███████████████████████ rebate offers resulted in

---

[18] Citing *Bigelow*, 327 U.S. 251, at 259-64 (comparing plaintiff's profits before the conspiracy to its profits during the conspiracy); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 376-79 (1927) (same); *In re Mushroom,* 2015 WL 5767415, at *7 (same); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671–76 (9th Cir. 2022) (same).

[19] *See, e.g.*, *In re Mushroom*, 2015 WL 5767415, at *6 ("I am only to consider 'the reliability of the expert's method, which may properly include making assumptions so long as those assumptions are sufficiently grounded in available facts.'") (quoting *Edison Wetlands Ass'n Inc. v. Akzo Nobel Chemicals, Inc.*, 2009 WL 5206280, at *4 (D.N.J. Dec. 22, 2009)); *Sight Sciences*, No. 21-1317-JLH, D.I. 456 at 78:10-79:10 (experts' different inputs for estimates of price premium analysis is "an issue of weight and not admissibility" and was not a basis to exclude testimony).

[20] *See, e.g.*, *In re Mushroom*, 2015 WL 5767415, at *6 ("*Daubert* 'does not preclude testimony merely because it may be based upon an assumption. []…Courts have found that 'most contentions that [expert] assumptions are unfounded go to the weight, not the admissibility, of the testimony, and a district court has discretion ... to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'") (citations omitted).

"repeated" instances of ███ "coming back for more from Regeneron." Ex. 21 (McCourt Tr.) at 237:16-21.[21] Prof. Scott Morton is well within the bounds of reliable economic analysis to conclude that, in a market free of Amgen's misconduct, Regeneron's Praluent® would have competed successfully head-to-head against Repatha® at its prior rebate levels. *See* Ex. 2 (Scott Morton Reply) ¶¶ 211-12, 320. This is not speculative—Prof. Scott Morton corroborated her opinion and calculation of but-for world rebates with a peer-reviewed model of bidding behavior that Amgen's counsel did not ask her a single question about in deposition. Ex. 2 (Scott Morton Reply) ¶¶ 230, 302-320, App'x A. And, further underscoring the reliability of Prof. Scott Morton's analysis, Regeneron was able to secure exclusive formulary coverage with ███ ***before*** Amgen began leveraging its ████████████████. Ex. 1 (Scott Morton Opening) ¶ 89.

Prof. Scott Morton's analysis of the rebates in the actual world before Amgen's bundle distorted competition is hardly the "slenderest of analytical threads," as Amgen suggests (Br. at 14-15), but rather a reasonable basis for arriving at rebates in the but-for world. *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 668 (D. Del. 2009) (a before-during "approach would be appropriate because 'an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities."), *aff'd*, 696 F.3d 254 (3d Cir. 2012) (citations omitted). Accordingly, Amgen's motion to exclude Dr. Mathur's opinions relating to ███ damages should be denied.

## III.   DR. MATHUR RELIABLY CALCULATES DAMAGES BEGINNING IN 2020.

Amgen briefly argues that Dr. Mathur's opinions calculating Regeneron's damages prior to ████████ should be excluded because Prof. Scott Morton "does not provide the necessary

---

[21] ████████████████████████████████████

████████████████████████████████████

████████████████████████████ Ex. 22 (REGN0266282).

opinion to support substantial foreclosure prior to January 2024." Br. at 15. This is flatly incorrect. Prof. Scott Morton opines on foreclosure **began in April 2020**. Ex. 1 (Scott Morton Opening) ¶¶ 10, 107; Ex. 2 (Scott Morton Reply) ¶ 195, fig. 11. Specifically, Prof. Scott Morton explains that Amgen foreclosed Praluent® directly and with spillovers from: ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

Far from conceding that foreclosure ███████████████ was not substantial, Prof. Scott Morton testified that even foreclosure from *one* Big 3 PBM is substantial: "[B]ig PBMs … are well more than 1 percent. They are huge. *If there is foreclosure of [a] PBM, one of the ones I analyze in my report, that is substantial foreclosure* because they are making up the bulk of the market." Ex. 10 (Scott Morton Tr.) at 50:21-51:8; *see also id*. at 51:24-52:15 ("███████████████

██████████████████████████ *And these are all very large players*."). It is well-settled antitrust law that foreclosure can be substantial at levels far lower ██████ depending upon the market in question, especially when the conduct of a monopolist like Amgen is involved. *See* D.I. 324 (SJ Opp.) at 30-31 (collecting cases). Excluding Dr. Mathur's damages opinion based on a conclusion that Regeneron fails to show substantial foreclosure would resolve the core disputed issue of substantial foreclosure. Amgen should not win this issue on summary judgment, much less can it prevail with less than two pages of argument in a *Daubert* motion.

In any event, this argument ignores—as Amgen did in its summary judgment motion—that many of Regeneron's eleven claims do not require proof of substantial foreclosure. *See* D.I. 324 (SJ Opp.) at III. Because this argument provides no basis for excluding Dr. Mathur's damages

calculations with respect to those claims, it cannot exclude these damages calculations at all.

## IV.    PROFESSOR SCOTT MORTON'S METHODOLOGIES ARE RELIABLE.

Amgen next mounts four separate challenges to discrete aspects of Prof. Scott Morton's analysis—specifically, her analysis of (A) spillovers, (B) the Minimum Rebate Metric, (C) the application of the *PeaceHealth* test, and (D) "best price"-related information. None persuades.

### A.    Prof. Scott Morton's within-PBM spillover analysis is reliable.

Amgen first challenges Prof. Scott Morton's opinion regarding "within-PBM spillover," *i.e.*, when a PBM enters into a contract on behalf of its primary, or national, formulary (here, for exclusive Repatha® coverage) and then other health plans within that PBM group follow the same coverage decisions. Br. at 16-19.[22] In Amgen's view, Prof. Scott Morton erroneously "assumes that any *correlation* between the decisions by [other] plans … reflects that [these] decisions were *caused* by the national formulary." *Id.* at 17-18. But Prof. Scott Morton applied a reliable economic methodology to assess PBM-level spillover. Specifically, she studied the causal effect of the below-cost, cross-therapeutic bundle on custom plans using difference-in-differences econometric regression analysis. Ex. 1 (Scott Morton Opening) § 11.4. Regression analysis "is one of the mainstream tools in economic study and it is an accepted method of determining damages and injury in antitrust cases." *In re Mushroom*, 2015 WL 5767415, at *6 (citation omitted); *see also In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 213-14 (E.D. Pa. 2017) (collecting cases).

---

[22] Amgen does not challenge Prof. Scott Morton's analysis of *prescriber*-level spillover (*i.e.*, when a healthcare provider defaults to prescribing Repatha® as opposed Praluent®—without referring to an individual patient's insurance coverage). Br. at 16-19. This undermines Amgen's reliance on *EpiPen*, Br. at 18-19, since that case addressed **only** prescriber-level spillover. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 992 (10th Cir. 2022), *cert. denied sub nom. Sanofi-Aventis U. S., LLC v. Mylan, Inc.*, 143 S. Ct. 1748 (2023). *EpiPen* is inapposite for the additional reasons that it did not involve a cross-therapeutic bundle and below-cost pricing. This undermined Regeneron's ability to compete for coverage in a competitive market at custom plans within a PBM and increased PBM-level spillover.

Amgen raises no specific criticisms of Prof. Scott Morton's regression analysis, which yields statistically significant results.[23] Prof. Scott Morton also analyzed multiple causal mechanisms driving PBM-level foreclosure, including custom formularies following the structure of a national formulary, formulary coverage decisions being made jointly (*e.g.*, in the same contract or negotiated by the same GPO), and members of one PBM pressuring other members to adopt coverage decisions they would otherwise not adopt. *See, e.g.*, Ex. 1 (Scott Morton Opening) ¶¶ 101, 154. Amgen's suggestions for *other* reasons why a custom plan might follow a PBM's national formulary are factual disputes that the jury may consider when weighing the evidence.[24]

## B.    Prof. Scott Morton's MRM calculation is well-accepted by courts and economists.

Amgen claims that Prof. Scott Morton "relies on an unreliable methodology"—the Minimum Rebate Metric ("MRM")—to show the minimum rebate Regeneron had to offer on Praluent® to compete against Amgen's bundle. Br. at 19. Amgen's argument is baseless.

The Third Circuit has long recognized that economic assessment of a bundled rebate requires investigating the minimum rebate needed to compete—exactly the analysis Prof. Scott Morton conducts in this case. In *SmithKline*, the plaintiff competitor "had to compete 'three-on-one'" against defendant's three-product bundle which "only gave a 3% bonus rebate," and the Third Circuit employed an analysis akin to Prof. Scott Morton's MRM to conclude that, "because

---

[23] Amgen's citation to *TASER Int'l, Inc. v. Karbon Arms, LLC* is unexplained and irrelevant. 2013 WL 6773663, at *1 (D. Del. Dec. 19, 2013). *TASER* is a patent dispute where an expert opined on reasonable royalty rates without explaining why the numbers he included were "important or how they affect the calculation of a reasonable royalty." *Id.*

[24] *Cf. Roxul*, 2019 WL 1101385, at *2 (denying motion to exclude where expert "cite[d] evidence showing, while [the defendant's] exclusivity agreements do not bind contractors, contractors may not have 'the ability to make a meaningful choice' because of their reliance on preferred distributors") (quoting *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 294, 404 (3d Cir. 2016)); *id.* at *3 ("[O]ur Court of Appeals have affirmed foreclosure findings even when the foreclosure calculations include sales the defendant would have made despite the alleged anticompetitive conduct.") (citing *ZF Meritor*, 696 F.3d at 278 and *United States v. Dentsply Int'l., Inc.*, 399 F.3d 181, 194 (3d Cir. 2005)).

of [defendant's] volume advantage, in order to offer a rebate of the same net dollar amount as [defendant's], SmithKline had to offer … rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals." *SmithKline Corp.*, 575 F.2d at 1062.[25] Economists—including Amgen's experts Dr. Gaier and Dr. Stiroh—likewise recognize that measurement of foreclosure involves calculating the price a competitor must offer to compete.[26]

Not only is Prof. Scott Morton's analysis widely accepted, the evidence shows that it is the same analysis used by PBMs, including ▮▮▮▮▮ to compare Regeneron's Praluent® rebate to Amgen's ▮▮▮▮▮▮▮▮ rebates. Ex. 1 (Scott Morton Opening) ¶ 195, tbl. 5 (citing ▮▮▮▮▮ analysis). The evidence shows that Amgen uses this analysis too. *See, e.g.*, Ex. 25 (AMG10935-0000074320) at slide 14 (▮▮▮▮▮); Ex. 26 (AMG10935-0000655366) at 370 (▮▮▮▮). Amgen fails to explain which aspect of this analysis (be it Prof. Scott Morton's, the PBM's, or Amgen's own) it believes is incorrect or unreliable.

Because Amgen knows that Prof. Scott Morton's MRM analysis is based on a reliable methodology, Amgen attempts to conflate it with another analysis Prof. Scott Morton conducted in a factually distinct case: the Effective Entrant Burden ("EEB"). Br. at 19. But Amgen does not even challenge Prof. Scott Morton's EEB analysis in its *Daubert* motion. And Prof. Scott Morton is clear that the MRM calculation is not the same as EEB. As Prof. Scott Morton explained, MRM can be *analogized* to EEB in the sense that it is a measure of exclusionary impact; but the fact

---

[25] *See SmithKline Corp. v. Eli Lilly & Co.*, 427 F. Supp. 1089, 1125 (E.D. Pa. 1976) (accepting economic expert calculation of the size of the rebate that a competitor pharmaceutical company would have to provide to match defendant's bundled rebate), *aff'd*, 575 F.2d 1056 (3d Cir. 1978).
[26] *See* Ex. 23 (Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 ANTITRUST L.J. 371, 386-88 (2017)); *see also* Ex. 24 (Stiroh Report) ¶ 66 n. 24 (quoting Salop) and Ex. 19 (Gaier Report) fig. 45 (objecting to inputs included in Prof. Scott Morton's MRM analysis but nevertheless confirming the methodology is reliable).

remains that these are two distinct analyses. Ex. 1 (Scott Morton Opening) ¶ 191. Even were these analyses the same, Amgen is wrong to assume that EEB has not been tested or accepted in the scientific community. *Id.* at 19. Prof. Scott Morton's work on EEB was peer-reviewed by the American Bar Association's Antitrust Law Journal, a publication Amgen's experts cite at length and to which Amgen's expert, Dr. Stiroh, has contributed. *See, e.g.*, Ex. 19 (Gaier Report) ¶ 199, nn. 301, 316, 475 and App'x B; Ex. 24 (Stiroh Report) nn. 124, 215, 292, 300, 303, 305, Ex. 2.[27]

Finally, Amgen states that Prof. Scott Morton "abandoned" the MRM "methodology" in her reply report. Br. at 19. This is another untrue statement by Amgen. Prof. Scott Morton does not repeat the arithmetic to calculate MRM in her reply because it is appropriately limited to responding to points made by Amgen's experts, and Amgen's economists did not challenge her MRM analysis. Amgen provides no legal requirement or logical basis for an expert to reiterate an opinion in a reply report for it to be admissible, and there is none.

**C.    Prof. Scott Morton properly calculates costs for the *PeaceHealth* test.**

Amgen challenges Prof. Scott Morton's inclusion of Amgen's sales and marketing expenses as part of the average variable costs in her *PeaceHealth* discount attribution test to show Amgen's below-cost pricing. Br. at 20-22. Here, too, Amgen is wrong on the law and the facts.

Both Prof. Scott Morton and Amgen's expert, Dr. Gaier, performed a *PeaceHealth* test to assess if Amgen's bundled rebates priced Repatha® below cost. But they use different average variable costs in their calculations. Ex. 1 (Scott Morton Opening) ¶¶ 110-113, tbl. 6, fig. 8

---

[27] Prof. Scott Morton's analysis builds on prior economic scholarship dating back to at least 1987. *See* Ex. 27 (Fiona Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 ANTITRUST L.J. 777, 793, 819 (2016) (citing Philippe Aghion & Patrick Bolton, *Contracts as a Barrier to Entry*, 77 AM. ECON. REV. 388 (1987))). Recently, the Antitrust Magazine published a survey of economic methodologies used to quantify the anticompetitive harm of bundled pharmaceutical rebates, citing Prof. Scott Morton's scholarship among others. Ex. 28 (Peter Herrick & Monsura Sirajee, *Scaling the 'Rebate Wall': Growing Scrutiny of Rebate Contracting in Pharma and Potential Responses*, 38 ANTITRUST MAG. 2 (Apr. 5, 2024)).

(███████), 132-133, fig. 15 (███████); Ex. 2 (Scott Morton Reply) § 9; Ex. 19 (Gaier Report) § 5.[28] Which cost calculation more accurately captures the right measure of costs should be left for the jury to decide. *See Sight Sciences*, No. 21-1317-JLH, D.I. 456  at 78:10-79:10 ( whether "other costs should have been included" in incremental costs is "an issue of weight and not admissibility"); s*ee also Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*, 845 F.2d 404, 408 (2d Cir. 1988) (same), *aff'd*, 492 U.S. 257 (1989); *U.S. Philips Corp. v. Windmere Corp.*, 861 F.2d 695, 704 (Fed. Cir. 1988) (same).

Rather than leaving this issue to the jury, Amgen mischaracterizes the law and Prof. Scott Morton's testimony, and ignores contradictory statements made by its own experts to conclude that her inclusion of sales and marketing costs renders her analysis unreliable. Br. at 20-22. There is no basis in law or economics to support Amgen's extreme position (which is why Amgen cites none). Under *PeaceHealth*, a product's price, with the full bundled discount properly attributed, is compared to the product's "average variable costs" as a proxy for marginal costs. 515 F.3d at 910. The Third Circuit has recognized that, for a below-cost pricing analysis, "the most important measure is marginal cost—***the cost of producing each incremental unit of output***" and that, "[b]ecause it is practically impossible to calculate the portion of variable costs attributable to each additional unit of output, [economists] argue that courts should use average variable cost as a proxy for marginal cost." *Advo Inc. v. Phil. Newspapers, Inc.*, 51 F.3d 1191, 1198 (3d Cir. 1995) (citing Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV. L. REV. 697, 716–18 (1975)).[29] Inclusion of costs such as sales and

---

[28] Regeneron challenges Dr. Gaier's fundamental misapplication of the *PeaceHealth* discount attribution test to a product in the ███████████ (███████ that Regeneron does not compete against with its own product, not any of the variables included as inputs. *See* D.I. 319.

[29] Several circuit courts have adopted the same view. *See, e.g.*, *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999); *Morgan v. Ponder*, 892 F.2d 1355, 1360 (8th Cir. 1989);

marketing "best approximates incremental costs because it takes into consideration the variable costs, beyond mere costs-of-goods-sold in accounting usage, which must be incurred, as a practical matter, to assure production of the product." *Valassis Commc'ns, Inc. v. News Am. Inc.*, 2011 WL 2420048, at *4 (E.D. Mich. Jan. 24, 2011), *report and recommendation adopted*, 2011 WL 2413471, at *1 (E.D. Mich. June 15, 2011) (adopting "the Panel's recommendation to 'define the appropriate measure of incremental cost as clearly as possible.'"); *see also Sight Sciences*, No. 21-1317-JLH, D.I. 456 at 78:10-79:10 (expert dispute about which types of costs to include in analysis is "an issue for cross-examination, not a Daubert issue").

Moreover, in *SmithKline Beecham Corp. v. Abbott Lab'ys*, a pharmaceutical bundling case involving a discount attribution test, the court rejected the argument that as a matter of law, sales and marketing costs should be excluded from variable costs. 2014 WL 6664226, at *3, *5 (N.D. Cal. Nov. 24, 2014). The court instead allowed the expert opinion that sales and marketing costs, such as developing ad campaigns, providing samples to doctors, and sending sales representatives to speak with doctors, are part of average variable costs because they vary based on the volume of product that is or is expected to be used or prescribed. *See* Tr. at 1299:18–1300:10, 1301:3–12, *SmithKline Beecham Corp. v. Abbott Lab'ys*, 2011 WL 13381310 (N.D. Cal. Feb. 11, 2011); *see also Valassis Commc'ns*, 2011 WL 2420048, at *4 (holding that the appropriate measure of costs for applying to a discount attribution test included "marketing and/or distribution costs reasonably attributable to the competitive product"). In fact, courts have accepted additional costs **beyond** variable costs to measure below-cost pricing in sectors like the pharmaceutical industry where

---

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232-33, 236 (1st Cir. 1983); *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 87-88 (2d Cir. 1981). And the only circuit to take a different approach would include average *total* costs, which indisputably include the costs Amgen fights about here. *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487 (11th Cir. 1988).

upfront costs are high.[30] Leading antitrust scholars and the Department of Justice agree with including sales and marketing costs in the analysis.[31] Put simply, Amgen cites no law or scholarship to support its radical position and it should be rejected.

**D.     Amgen's motion to exclude Prof. Scott Morton's and Ms. Bates' analysis of Amgen's best price reporting is an improper and meritless motion *in limine*.**

Amgen also seeks to exclude "opinions about Amgen's 'best price' reporting to the Centers for Medicare and Medicaid Services (CMS)" which show that Amgen reported ███████████ ███████████████████ Br. at 22-23. According to Amgen, Prof. Scott Morton and Ms. Bates lack requisite qualifications and the evidence is irrelevant and confusing. *Id.* Amgen is wrong.  Both Prof. Scott Morton and Ms. Bates are more than qualified to opine on this topic. Ms. Bates has years of experience with respect to pharmaceutical government price reporting, and in particular, best price reporting, including her work on more than twenty-five cases involving best

---

[30] *See, e.g.*, *Meijer, Inc. v. Abbott Lab'ys*, 544 F. Supp. 2d 995, 1004 n. 7 (N.D. Cal. 2008) (the "unique structural characteristics of the pharmaceutical industry" necessitate inclusion of research and development and other fixed investment costs in cost analysis); *McGahee*, 858 F.2d at 1496. *Accord In the Matter of Intel Corp.* 2010 WL 9549985, at *9 (F.T.C. Oct. 29, 2010) ("Intel also offered its CPUs at prices below an appropriate measure of cost (in sales of CPUs or in kit prices of CPUs with chipsets), or volume discounts on CPU purchases that are effectively below cost (which for purposes of this complaint includes ***average variable cost plus an appropriate level of contribution towards sunk costs***), in an effort to exclude its competitors and maintain its monopoly in the relevant CPU markets.").

[31] *See, e.g.*, Ex. 29 (Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶¶ 740, 746 (4th and 5th Editions, 2021 Cum. Supp. 2013-2020) (identifying advertising and promotional expenses as variable); *id.* ¶¶ 740d2-3 ("[I]n cases where advertising is appropriate at all it almost certainly becomes one of the incremental costs of predation.")); *see also* Ex. 23 (Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, n. 169 (including marketing commissions in price cost testing)); Ex. 30 (Patrick Bolton, Joseph F. Brodley & Michael H. Riordan, *Predatory Pricing: Strategic Theory and Legal Policy*, 88 Geo. L.J. 2239, 2272-73 (2000) (arguing for a cost measurement that "emphasizes that the relevant costs relate to research, development, marketing, and production of the predatory product")); Ex. 31 (Jonathan M. Jacobson, *Cost-Based Rules in the New Economy*, 6-7 (Feb. 6, 2009) (appropriate cost measure should "certainly include some component of R&D and advertising costs in cases where effective competition requires that those costs be incurred")).

price reporting, including regulatory advisory work, litigation, government investigations, and internal investigations. Ex. 11 (Bates Tr.) at 131:18-133:3; *see also* Ex. 5 (Bates Opening) at Ex. A. And Prof. Scott Morton is recognized in her field for her work studying CMS reimbursement and its effect on competition, and has published works on the economic study of Medicare Part D payments and Medicaid rebate rules.[32] Based on these experts' extensive research and consulting experience in the Medicare Part D and Medicaid space, there is nothing improper with Prof. Scott Morton relying on Ms. Bates' opinion that "as it was offered and operationalized at the PBMs the ██████████████████████████████████████████ for purposes of reporting Amgen's 'best price' for these products to [CMS]" Ex. 1 (Scott Morton Opening) n. 205.

This issue is also highly relevant and will not confuse the jury. Ms. Bates' opinion shows that, for purposes of its government reporting requirements, Amgen defined the rebate structure in its ███████████████ contract as a ████████████████████████████████████████ ███████. Ex. 5 (Bates Opening) ¶¶ 69-70. This representation to the government contradicts Amgen's representations to this Court denying that ██████████████████████████ *See, e.g.*, Ex. 6 (Apr. 4, 2023 Hearing Tr.) at 11:19-22, 18:6-11; *see also* D.I. 40 (Amgen's Reply ISO Motion to Dismiss) at 2 ██████████████ are conditioned on Repatha® coverage"). Evidence contradicting Amgen's denial of its conduct should not be excluded because Amgen does not want the jury to see it. At a minimum, this testimony satisfies *Daubert*'s "liberal" standard for relevance. *Durando v. Trustees of Univ. of Penn.*, 2022 WL 2467080, at *4 (E.D. Pa. July 6, 2022) (quoting

---

[32] *See* Ex. 1 (Scott Morton Opening) at Ex. A ("Her research and consulting work have involved … a number of areas in the pharmaceutical industry including competition, generic entry, and procurement of pharmaceuticals for Medicaid and Medicare."); *id.* (listing among Prof. Scott Morton's publications: "The Effect of the Medicare Drug Benefit on Pharmaceutical Prices and Utilization." With Mark Duggan. American Economic Review, 100(1): 590–607, 2010; "The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored Customer Rules." The RAND Journal of Economics, 28(2): 269–290, 1997).

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). "The Rules of Evidence embody a strong preference for admitting ***any evidence*** that ***may assist*** the trier of fact," and admitting Amgen's government reporting of its bundle to refute the denial of its conduct easily clears this low bar. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

## V.     AMGEN'S PATENT LITIGATION AGAINST REGENERON IS RELEVANT.

Amgen's next argument is a disguised *in limine* motion seeking to exclude admissions made by Amgen in the patent infringement suit it brought against Regeneron regarding Repatha® and Praluent® (the "Patent Litigation") on the grounds that these points are "untethered to any claim or defense in the case,...outside Prof. Scott Morton's expertise," and would "impermissibly...raise negative inferences." Br. at 24-26. But the Patent Litigation provides critical context for understanding (1) the PCSK9i competitive landscape, (2) the genesis of Amgen's monopolization scheme, and (3) Amgen's incentives to bid in coverage negotiations to maintain and deepen Repatha®'s market share. *See, e.g.*, Ex. 2 (Scott Morton Reply) §§ 3.4.1, 3.5.

Amgen's primary basis for excluding expert analysis or discussions relating to the Patent Litigation is that the Patent Litigation involves protected government petitioning. Br. at 24. But Regeneron is not claiming that the Patent Litigation was sham litigation. Rather, the admissions made by Amgen in its Patent Litigation assist Prof. Scott Morton in showing the trier of fact what harms to competition arise from Amgen's monopolization of the PCSK9i market, and Amgen's incentives to compete in light of its high market share. The evils from competition that Amgen and its CEO testified to and sought to stop with an injunction in the Patent Litigation—for example, "extreme price erosion" and "lost market share"—are the concrete benefits to the public that would be realized absent Amgen pivoting to its anticompetitive below cost, multi-product bundling strategy. Ex. 32 (Amgen Br. ISO Motion for Permanent Injunction, D.I. 906) at 6.

Moreover, the evidence shows that as Amgen came to realize it was unlikely to prevail in

the Patent Litigation, Amgen was revised its forecasts from a ████████████████

██████████████████████████████████████████████████████████

██████ █ ██████████████████. Ex. 33 (AMG10935-0000501172) at -1173. The

evidence also showed that Humana Part D initially chose not to cover Praluent® in part due to risk

associated with the Patent Litigation. Ex. 2 (Scott Morton Reply) n. 50 (citing Regeneron

documents). These examples of information relating to Amgen's Patent Litigation that it seeks to

prematurely exclude are important inputs to evaluating Amgen's economic incentives to compete

as well as the competitive landscape in the PCSK9i market, which Prof. Scott Morton should be

allowed to testify on to assist the jury in determining Amgen's anticompetitive intent. Indeed, the

main case Amgen relies for support only serves to confirms the relevance of this evidence to the

factfinder. As that court explained, "the admissibility or exclusion of such 'purpose or character'

evidence will be within this Court's discretion at trial … it would be premature to rule on such

matters at this time." *U.S. Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1180

(S.D.N.Y. 1986) (citation omitted). The result should be the same here.

## VI.   DR. ECKEL'S MEDICAL EXPERT OPINION IS ADMISSIBLE.

Finally, Amgen attempts to exclude the medical opinions offered by endocrinologist and

lipidoligist, Dr. Robert Eckel, on the ground that they are "unreliable and irrelevant." Br. at 26-30.

None of Amgen's three arguments justifies excluding Dr. Eckel's testimony.

First, Amgen contends that "Dr. Eckel's opinions regarding the supposedly 'unique and

important clinical benefits' of Praluent® … are based entirely on an unreliable and scientifically

invalid comparison of data from separate clinical trials." *Id.* at 26. Amgen grossly mischaracterizes

Dr. Eckel's opinion as a direct comparison of the *data* from Repatha®'s and Praluent®'s clinical

trials. As Dr. Eckel explained, he is opining on the trials' *outcomes*, which indisputably differ:

"[e]ach study stands alone and proves the clinical benefits set forth in each." Ex. 34 (Eckel Reply)

28

¶ 19. Amgen improperly treats a single input into Dr. Eckel's opinion as its sole basis. But Dr. Eckel also bases his opinions on his extensive career in the cardiovascular space. *See supra* p. 1. There can be no dispute that this experience qualifies Dr. Eckel to opine on the medical benefits of Praluent® and Repatha®, and populations who benefit from Praluent® and not Repatha®. Amgen provides no basis in law to support its assertion that Dr. Eckel's analysis is unreliable simply because certain studies he considered involve differing populations. Br. at 27.[33] In short, Dr. Eckel acknowledges that the two different studies of Praluent® and Repatha® observed different outcomes for the patients involved. That conclusion is uncontroversial and altogether reliable.

Second, Amgen seeks to exclude Dr. Eckel's testimony about Leqvio® because he retired before the product entered the market, as well as his opinion that there is a patient population that benefits from Praluent® rather than Repatha® as "not based on sufficient facts or data." Br. at 27-28. Both arguments ignore Dr. Eckel's demonstrated qualifications. While Dr. Eckel is now retired, he remains actively engaged in the academic community as Professor of Medicine Emeritus at University of Colorado Anschutz Medical Center and stays active in the cardiovascular space, including learning about Leqvio®. Ex. 8 (Eckel Tr.) at 15:15-16; 17:8-16. In any event, Amgen's medical expert, Dr. Douglas Jacoby, and Dr. Eckel **agree** that the clinical evaluation of Leqvio® is ongoing with clinical outcomes not expected until at least 2026. *See* Ex. 35 (Jacoby Report) ¶ 68. Dr. Jacoby himself can thus only speculate regarding the potential for increased compliance with Leqvio® and predicted rising prescription volumes over time. *See id.* ¶¶ 19, 70; *see also* Ex. 36 (Jacoby Tr.) at 118:14-119:15. Dr. Eckel's testimony about the benefits of

---

[33] *M.D.R. by Rivera v. Temple Univ. Hosp.*, which Amgen cites without elaboration, is inapposite. 2022 WL 15173903 (E.D. Pa. Oct. 26, 2022). *M.D.R.* is a medical malpractice case where medical experts opined, contrary to medical literature, that a particular type of injury at birth can *only* ever be caused by a clinician's intervention and *never* be caused by the maternal forces of labor. *Id.* at *9. Dr. Eckel makes no such sweeping conclusions.

Praluent®, moreover, is based on his deep experience in the field—experience that Amgen's witness, Dr. Shugg, recognizes as making Dr. Eckel a leader in his field. *See* Ex. 9 (Shugg Tr.) at 43:2-16. There is thus no need for him to precisely quantify the number of patients to conclude that there is an "important" or "substantial" category of patients that distinctly benefit from Praluent®.[34] Dr. Jacoby agrees with Dr. Eckel on this point as well, as he recognizes the benefits of Praluent®'s low-dose option. Ex. 36 (Jacoby Tr.) at 81:12-17. At bottom, Dr. Eckel's decades of experience leave Amgen with no basis to exclude his testimony.

Third and finally, Amgen's criticisms about the reliability, helpfulness, and relevance of Dr. Eckel's opinions are unfounded and go to his opinions' weight rather than admissibility. Br. at 29-30. Dr. Eckel is well qualified to help the trier of fact understand what cardiovascular disease is and how it is treated, including the benefits of treatments available. This testimony is highly relevant since Amgen's conduct has reduced patient access to Praluent®. *See* Ex. 7 (Eckel Opening) ¶ 2. Because Amgen cannot provide any legitimate basis to exclude Dr. Eckel's report, deciding which medical expert to believe and weighing the factually underpinnings of their conclusions is for the jury—not a topic to be decided in a *Daubert* motion.[35]

## CONCLUSION

For the foregoing reasons, the Court should deny Amgen's motion in full.

---

[34] *See generally Godreau-Rivera v. Coloplast Corp.*, 598 F. Supp. 3d 196, 215 (D. Del. 2022) (medical expert was not required to quantify the incidence rate of a problem, or point to a specific scientific publication, when opining based on his extensive experience).

[35] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 154, (1997) ("*Daubert* quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions, which is a matter for the jury."); *Trust v. Reckitt Benckiser, LLC*, No. 18-1855-RGA, 3 (D. Del. May. 4, 2021) (noting that a dispute between experts is an issue to be resolved at trial, not on a *Daubert* motion); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 387–88 (D. Del. 2014) (agreeing that if an expert's opinion has a logical basis, the credibility and weight of that testimony is to be determined by the jury, not the trial judge).

Respectfully submitted,

WILKS LAW, LLC

*/s/ Scott B. Czerwonka*

David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP

Jonathan D. Polkes
Elizabeth Stotland Weiswasser
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated:  June 25, 2024