# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Regeneron Pharmaceuticals, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Amgen Inc., <br><br> Defendant. | C. A. No.: 1:22-cv-00697-JLH <br><br> **JURY TRIAL DEMANDED** <br><br> **REDACTED PUBLIC VERSION** <br> **FILED: August 13, 2024** |

### REGENERON PHARMACEUTICALS, INC.'S
### REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
### <u>EXPERT TESTIMONY PROFFERED BY AMGEN</u>

WILKS LAW, LLC
David E. Wilks (DE Bar No. 2793)
Scott B. Czerwonka (DE Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Elizabeth Stotland Weiswasser
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007

Michael R. Moiseyev
Priyata Y. Patel
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Date: July 15, 2024

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

ARGUMENT ..................................................................................................................................3

I.      Amgen fails to defend Dr. Gaier's erroneous interpretation of *PeaceHealth*.......................3

II.     Amgen fails to save Dr. Stiroh's testimony by rewriting it. ................................................8

III.    Amgen fails to show how Ms. Gan's Merck experience can support her industry expert testimony...................................................................................................................12

CONCLUSION.............................................................................................................................15

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Auto Konnect, LLC v. BMW of N. Am., LLC*,
 590 F. Supp. 3d 977 (E.D. Mich. 2022) ................................................................................. 12

*Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*,
 2010 WL 1541641 (N.D. Okla. Apr. 16, 2010) ........................................................................ 3

*Bird v. Borough of Moosic*,
 2022 WL 584072 (M.D. Pa. Feb. 25, 2022) ........................................................................... 15

*Brown Shoe, Co. v. United States*,
 370 U.S. 294 (1962) ......................................................................................................... passim

*Butler v. First Acceptance Ins. Co.*,
 652 F. Supp. 2d 1264 (N.D. Ga. 2009) ................................................................................... 13

*Cascade Health Sols. v. PeaceHealth*,
 515 F.3d 883 (9th Cir. 2008) ........................................................................................... passim

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
 781 F.3d 264 (6th Cir. 2015) .................................................................................................... 5

*Hopeman Bros., Inc. v. Cont'l Cas. Co.*,
 2018 WL 4169282 (E.D. Va. Jan. 12, 2018) .......................................................................... 13

*IAS Servs. Grp. v. Jim Buckley & Assocs., Inc.*,
 2015 WL 13775347 (W.D. Tex. Sept. 10, 2015) .................................................................... 13

*IGT v. All. Gaming Corp.*,
 702 F.3d 1338 (Fed. Cir. 2012) .............................................................................................. 10

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
 351 F. Supp. 3d 1187 (D. Minn. 2018) .................................................................................... 5

*Lifewatch Servs. Inc. v. Highmark Inc.*,
 902 F.3d 323 (3d Cir. 2018) ..................................................................................................... 8

*Murray v. Marina Dist. Dev. Co.*,
 311 F. App'x 521 (3d Cir. 2008) .............................................................................................. 8

*In re Paoli R.R. Yard PCB Litig.*,
 35 F.3d 717 (3d Cir. 1994) ..................................................................................................... 12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
　2022 WL 14863110 (E.D.N.Y. Oct. 8, 2022) ................................................................6, 7

*Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*,
　2009 WL 5217344 (C.D. Ill. Dec. 30, 2009) .........................................................................5

*Retail Imaging Mgmt. Grp. v. Fujifilm N. Am. Corp.*,
　841 F. Supp. 2d 1189 (D. Or. 2012) ......................................................................................5

*SmithKline Beecham Corp. v. Abbott Lab'ys.*,
　2014 WL 6664226 (N.D. Cal. Nov. 24, 2014) ......................................................................5

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
　875 F.2d 1369 (9th Cir. 1989) ...............................................................................................9

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*,
　858 F.3d 787 (3d Cir. 2017).................................................................................................12

**Other Authorities**

Amgen, Annual Report (Form 10-K) (Feb. 14, 2024),
　https://investors.amgen.com/node/34836/html. ....................................................................3

Fed. R. Evid. 702 ............................................................................................................... *passim*

Hovenkamp, Herbert, *Antitrust Market Definition: The Hypothetical Monopolist
　and Brown Shoe*, Univ. of Penn., Inst. for Law & Econ. Research Paper No.
　24-13 (Mar. 26, 2024), available at https://ssrn.com/abstract=4746039. .................................9

29 Wright & Miller, Federal Practice and Procedure § 6265 (1st ed. 2014) .................................15

## INTRODUCTION

Amgen's opposition distracts from and barely responds to Regeneron's *Daubert* Motion. To protect the jury in this case from being confused and misled, Regeneron's Motion (D.I. 319, "Mot.") presented three targeted challenges to Amgen's experts and aspects of their opinions. Regeneron supported each argument with relevant citations to the record and to case law. In response, Amgen's Opposition (D.I. 330, "Opp.") mischaracterizes Regeneron's arguments and defends points Regeneron does not challenge. Even when Amgen addresses Regeneron's arguments, Amgen ignores on-point authority and offers little to no support for its experts' reliability and qualifications. Amgen has failed to carry its burden to "demonstrate[]… that it is more likely than not that" its experts can overcome Regeneron's challenges. Fed. R. Evid. 702.

*Dr. Gaier.* Regeneron's first challenge is to Dr. Eric Gaier's opinion that Amgen did not price Repatha® below cost. Regeneron argued that Dr. Gaier improperly applied *PeaceHealth*'s discount attribution test by dividing the ███ ██████████████ █ ██████ ███ Repatha® alone. Mot. at 7-14. Regeneron cited no fewer than a dozen cases and academic articles (including one by Amgen's expert, Dr. Lauren Stiroh) to explain why Dr. Gaier's approach finds no support in law or economic logic. And Regeneron explained in detail how Dr. Gaier's approach improperly masks the anticompetitive effect of the bundled rebate in the PCSK9i market at issue in this case. In response, Amgen mainly defends aspects of Dr. Gaier's testimony which, Amgen acknowledges, "Regeneron [d]oes [n]ot [c]hallenge." Opp. at 2-6. When Amgen finally addresses Regeneron's challenge, Amgen merely asserts that Dr. Gaier's analysis is "highly relevant" and "grounded in established and sound economics." *Id.* at 8. The degree to which Amgen ignores Regeneron's authority is striking. *Compare, e.g.*, Mot. at 9 n.11 (citing six on-point cases), *with, e.g.*, Opp. at ii-iv, 10 (omitting five of the six and citing the sixth for an unrelated proposition with a "*cf. also*" signal). This is no way for Amgen to defend Dr. Gaier's challenged

1

opinion and methodology. Moreover, Amgen admits that Dr. Gaier's analysis is dependent upon (1) "a finding that Otezla® is also a 'competitive' product," and (2) "what the jury finds as to Enbrel® and Otezla® market power[.]" Opp. at 11. That is, Amgen concedes that Otezla®'s market power is a material factual issue. If the jury finds that Otezla® has market power (as Regeneron argues), then Amgen offers *no expert opinion* on its below-cost pricing of Repatha® ███████.

*Dr. Stiroh*. Regeneron's second challenge is to Dr. Lauren Stiroh's opinion that both Otezla® and Enbrel® lack market power. As Regeneron showed, she reached this opinion based solely on her review of those products' labeled indications, Amgen's efforts to monitor therapeutic alternatives, and stray actions by PBMs in connection with the products—not based on any assessment of economic substitutability. Mot. at 14-21. Amgen's Opposition dodges the challenge, arguing that Dr. Stiroh's considerations are generally relevant to the market power inquiry and to rebutting the testimony of Regeneron's expert. *See, e.g.*, Opp. at 19. But Regeneron did not challenge the relevance of Dr. Stiroh's conclusory analysis. Rather, Regeneron challenged the reliability of the basis for her specific conclusions that Enbrel® and Otezla® lack market power. To the extent Amgen defends those conclusions, it is to argue that Dr. Stiroh was assessing market power based on the factors set forth in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). *See* Opp. at 11-12. This is plainly not the case, since Dr. Stiroh conspicuously omits any mention of *Brown Shoe* in her report and did not address many of the *Brown Shoe* factors. She also did not claim to have used that (non-economic) approach in her deposition. In reality, she performed no economic analysis to support her opinion that Enbrel® and Otezla® lack market power.

*Ms. Gan.* Finally, Regeneron challenged Ms. Deborah Gan's pharmaceutical industry expertise, arguing that her limited experience, based solely on her time working at Merck years ago, could not support her opinions about industry-wide contracting practices today. Mot. at 21-

2

30. While Amgen endeavors to identify the best support for its argument that Ms. Gan is qualified, these arguments collapse on close inspection, as Amgen's cited evidence of her qualifications bears little relationship to the opinions she is offering.

In summary, Amgen's Opposition fails to save any of the expert analysis Regeneron challenged. What's more, Amgen's Opposition defends its experts by identifying multiple disputed issues of fact where Amgen believes expert testimony is needed. This approach dooms Amgen's pending motion for summary judgment, which is premised on Amgen's argument that there are no such disputed issues. Regeneron's Motion to exclude these expert opinions should be granted.

## ARGUMENT

### I. AMGEN FAILS TO DEFEND DR. GAIER'S ERRONEOUS INTERPRETATION OF *PEACEHEALTH.*

This case is about Amgen's anticompetitive scheme to monopolize and maintain a monopoly in the U.S. PCSK9i market. D.I. 122 (Am. Compl.) ¶ 7. There can be no dispute that the competitive products in this case are the two PCSK9 inhibitors that compete in U.S. PCSK9i market—Amgen's Repatha® and Regeneron's Praluent®. D.I. 122 ¶ 8. But Amgen seeks to have Dr. Gaier tell the jury that Amgen priced Repatha® *above* its costs using bogus math that spreads Amgen's costs over both Repatha® and Amgen's blockbuster *anti-inflammatory* drug, Otezla®. Opp. at 8. To be clear, Otezla® is not a PCSK9i.[1] Rather than rebutting Regeneron's challenge to Dr. Gaier's flawed assumption, Amgen manufactures new disputes not at issue to distract from the fact that Dr. Gaier misapplied a well-established economic test, which renders his conclusions unreliable, and thus, unhelpful, confusing, and prejudicial to the jury.

---

[1] Otezla® is "a small molecule that inhibits phosphodiesterase 4 (PDE4)." Amgen, Annual Report (Form 10-K) (Feb. 14, 2024), https://investors.amgen.com/node/34836/html.

As explained in Regeneron's Motion, one way to prove Amgen's anticompetitive conduct is to show that Amgen's bundled rebate, which conditioned rebates on Amgen's ███████ ████████████ ██████ █████████████ coverage of Repatha®, constitutes below-cost pricing *of Repatha®*. *See generally* Mot. § I.A. The well-established method to evaluate whether Repatha® is priced below Amgen's costs (known as the *PeaceHealth* test) is to compare the profit of selling *Repatha®* against the full amount of the *cross-therapeutic bundled rebate*. This comparison assesses whether Amgen is offering its customers more for Repatha®'s formulary placement than its profit *on Repatha®*. *Id.* Regeneron's expert, Prof. Fiona Scott Morton, performs the *PeaceHealth* test by applying the full amount of the ██████████ rebates (*i.e.*, the bundled products) to the profits on Amgen's competitive product, Repatha®. Mot. Ex. F (Scott Morton Opening) ¶¶ 110, 132, Mot. Ex. K (Scott Morton Reply) ¶¶ 266-67. As Prof. Scott Morton's analysis shows, and as Amgen effectively concedes in its dispositive motion briefing, D.I. 348 at 14-15, Amgen priced Repatha® below cost at ████████████████████ ██████████ Mot. Ex. F ¶¶ 11-12, 132; figs. 8, 15.

Dr. Gaier, however, fundamentally misapplies *PeaceHealth*'s discount attribution test. *See* Mot. at 10-11. He fabricates his own version of the test by allocating rebates from only one of the products in Amgen's bundle ██████ to ██ Repatha® ██████████ Mot. Ex. G (Gaier Report) ¶ 147. This is more than a dispute for a fact-finder about the proper costs to include in the below-cost calculation. Amgen asserts that Dr. Gaier's application of the *PeaceHealth* test is "consistent with the reasoning and language of *PeaceHealth*" because the test requires the "full amount of the discounts given by the defendant on the bundle allocated to the competitive product *or products*." Opp. at 9 (citing *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008)). But this is a self-serving and incorrect reading of *PeaceHealth* to obscure the magnitude of Amgen's

4

anticompetitive bundle. Dr. Gaier's and Amgen's explanation for his unprecedented and unreliable methodological choice is not grounded in economic logic or case law. In its Opposition, Amgen doubles down on Dr. Gaier's unsupported view that Otezla® is a "competitive product" for purposes of the *PeaceHealth* test. According to Amgen, it is proper to allocate the ███████ ████ ██████████ █ Repatha® because (1) the PBM contract terms—not the actual agreement—describe the Amgen bundle ████████████████ ██████ ██████, or, (2) alternatively, because Otezla® lacks market power. Opp. at 7-10. Amgen is wrong.

First, Dr. Gaier testified that Regeneron does not manufacture *any* products that compete with Otezla®, and that anti-inflammatory drugs like Otezla® do not compete with PCSK9i's such as Repatha® and Praluent®. Ex. 1 (Gaier Tr.) at 183:2-8. Tellingly, Amgen does not address Dr. Gaier's fatal admission or the established case law Regeneron cited in its Motion that confirms that the bundled rebate should be applied only to the competitive product at issue in this case. *See, e.g.*, *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 275 (6th Cir. 2015) (explaining that the goal of the discount attribution standard is to ascertain whether the defendant was "in effect selling ink [the market in which the plaintiff was foreclosed] below its incremental cost"); *Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*, 2009 WL 5217344, at *5 (C.D. Ill. Dec. 30, 2009) (applying the bundled discount only to the competitive product in the market where plaintiff was foreclosed); *Inline Packaging, LLC v. Graphic Packaging Int'l*, LLC, 351 F. Supp. 3d 1187, 1210 (D. Minn. 2018), *aff'd,* 962 F.3d 1015 (8th Cir. 2020) (same); *SmithKline Beecham Corp. v. Abbott Lab'ys.*, 2014 WL 6664226, at *5 (N.D. Cal. Nov. 24, 2014) (same); *Retail Imaging Mgmt. Grp. v. Fujifilm N. Am. Corp.*, 841 F. Supp. 2d 1189, 1197 (D. Or. 2012) (same). This alone makes Dr. Gaier's inclusion of Otezla® as a competitive product for purposes of the *PeaceHealth* test unreliable.

Second, Amgen defends Dr. Gaier's methodology on the basis that ESI/Ascent "would not necessarily have to make up the entire ▅▅▅▅▅ rebate from savings on Praluent®" because ESI/Ascent could theoretically ▅▅▅▅▅ from its formulary in favor of another competitor's product. Opp. at 8. According to Amgen, this hypothetical scenario converts Dr. Gaier's flawed analysis into "economic insight" about whether Amgen's bundle was coercive. *Id.* at 7-8. But there is no requirement of coercion for the *PeaceHealth* test to apply. *PeaceHealth* provides a clear and complete framework for assessing whether a multi-product bundled discount drives the price of the "competitive product" below cost. 515 F.3d at 906. It also is no answer for Amgen to suggest that the Court abdicate its gatekeeping role for proper scientific testimony because this is a "rule of reason" antitrust case. Opp. at 9 ("Given [Dr. Gaier's analysis'] relevance to the rule of reason more broadly, it is unnecessary for the Court to determine whether the analysis is the right way to apply *PeaceHealth* in the specific context of this case."). Rule 702 applies here as elsewhere.

In addition, neither Dr. Gaier nor any of Amgen's other experts ever conducted a so-called "full competitive effects analysis" of whether a PBM could have "matched" Amgen's bundled rebate with a hypothetical combination of rebates on drugs from other manufacturers. *Id.* at 8. Dr. Gaier never assessed whether there are lower cost competitors for Otezla®; whether ▅▅▅▅▅ ▅▅▅▅▅ considered ▅▅▅▅▅; what that alternative drug would be or at what price; or whether the alternative drug is an "effective" competitor against Amgen's cross-therapeutic rebates. *Id.* at 9. Even if Amgen had supplied evidence that a PBM could buy a group of drugs similar to Amgen's bundle from various other manufacturers, the *PeaceHealth* test is still applicable. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 14863110 (E.D.N.Y. Oct. 26, 2022) (applying the *PeaceHealth* test notwithstanding the fact that the defendant has rivals for each of its bundled products).

6

As to Dr. Gaier's reliance on a hypothetical jury finding that Otezla® lacks market power, Amgen does not cite a single case holding that lack of market power of a product in the bundle modifies the application of the *PeaceHealth* test. In fact, Amgen addresses only one of the six cases cited by Regeneron to make the misguided point that Dr. Gaier's unreliable analysis may be "relevant to the jury," and misrepresents the court's holding in that case, *Payment Card.* Opp. at 10, n. 8.² Indeed, the *Payment Card* court recognized that the *PeaceHealth* test can apply *even if* the defendant (like Amgen) faces competition for each product in the bundle. *Payment Card*, 2022 WL 14863110 at *15. This directly contradicts Dr. Gaier's re-written *PeaceHealth* test to "appl[y] specifically to the scenario where a jury finds that Otezla® lacks market power." Opp. at 4.

Finally, Amgen's for-this-purpose-only argument that including ▮▮▮▮ in the bundle makes it *harder* to show that the rebates were anticompetitive cannot be reconciled with Amgen's (incorrect) argument throughout the duration of this case that its behavior is not anticompetitive because ▮▮▮▮ is *not* in the bundle.³ If Dr. Gaier's novel approach were correct, a monopolist like Amgen could immunize an anticompetitive below-cost bundled rebate simply by including

---

² *Payment Card* concerned the admissibility of economic expert testimony on the *PeaceHealth* discount attribution test. *2022 WL 14863110*, at *13. Rather than citing the court's holding, Amgen quotes from the court's discussion of the plaintiff's expert opinion. *Id.* Visa (like Amgen) asserted that it faced competition from rivals for its credit and debit products and thus that plaintiff's expert opinion should be excluded. *Id.* But Amgen omits that the court rejected Visa's argument. *Id.* at *14 ("**The Court is not persuaded** that it should exclude [plaintiff expert]'s application of the DAT [discount attribution test] based on Defendants' argument that other companies also offer credit and debit services. First, ***it is not clear*** from the caselaw that, as Defendants argue, ***the DAT is inapplicable so long as 'there are rivals for each product***.'").

³ *See* Amgen's Opening Br. ISO Mot. To Dismiss § II.B.1, D.I. 18 (Aug. 1, 2022) ("The Contracts Do Not Provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Amgen's Letter Regarding Disc. Dispute at 1, D.I. 107 (June 8, 2023) ("Amgen has a strong case for eliminating from the case any claims of Otezla® bundling[.]"); Amgen's Letter Mot. in Supp. of Amgen's Mot. for Leave to File Mot. Summ. J. and to Stay Disc. at 5 n. 13, Aug 13, D.I. 136 (Aug. 13, 2023) (describing Regeneron's allegation that the bundled rebates were ▮▮▮▮▮▮▮▮▮▮▮▮ was "meritless" but "propos[ing] instead to move forward with its motion based on substantial foreclosure").

7

*more* and *bigger* products in its bundle. This approach would undermine the *PeaceHealth* test and invite more below-cost multi-product bundling. Not surprisingly, scholars and courts agree that the bundled rebate gets attributed "**to the product for which exclusion is claimed**." Mot. at 8[4] (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 749d3 (4th & 5th Eds., 2021 Cum. Supp. 2013-2020)). At bottom, the relevant economic question that the *PeaceHealth* test seeks to answer is whether Amgen is effectively pricing Repatha® below Amgen's cost to exclude Praluent®. By including Otezla® as a competitive product in his analysis of only Repatha®'s pricing, Dr. Gaier shirks well-established, reliable methodologies rendering his analysis unreliable. Because unreliable methodologies cannot aid the jury, Dr. Gaier's improper *PeaceHealth* test must be excluded. *See, e.g.*, *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008) (affirming exclusion of expert opinion that fails to identify reliable methodology because it "would not assist the jury in understanding or determining a fact in issue, as required under Fed. R. Evid. 702 and *Daubert*.").

## II.  AMGEN FAILS TO SAVE DR. STIROH'S TESTIMONY BY REWRITING IT.

Regeneron explained in its Motion why Dr. Stiroh's consideration of only (1) therapeutic alternatives, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and (3) isolated examples of PBM behavior cannot reliably support her conclusion that Enbrel® and Otezla® lack market power. Mot. at 14-21. Amgen tries to rehabilitate Dr. Stiroh's analysis by re-characterizing it as applying *Brown Shoe*'s "practical indicia" for market definition analysis. Opp. at 14.[5] This is not what Dr. Stiroh did, and

---

[4] Emphasis in bold, italic text is not in the original source unless otherwise noted.
[5] Additionally, Amgen admits that any market analysis is "holistic and fact-intensive" – an admission that contradicts its pending motion for summary judgment, in which Amgen argues that the issue of market definition can be resolved as a matter of law based on undisputed evidence. Opp. at 11. Indeed, in a case cited by Amgen, the Third Circuit stated "'in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities[.]'" *See Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018) (quoting *Queen City*

8

Amgen's post hoc reframing cannot save her unreliable conclusions.

First, general references to the *Brown Shoe* factors are not a substitute for economic analysis. As Prof. Hovenkamp (an antitrust legal scholar Amgen cites in its Opposition) recently wrote, compared to the economic test, the *Brown Shoe* factors are "nearly always overinclusive, underinclusive, or irrelevant."[6] Indeed, the factors have been criticized precisely because they "[do] not sufficiently account for the *basic economic* principles that, according to the Supreme Court, must be considered under modern antitrust doctrine." *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1059 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

Even so, Dr. Stiroh was not even properly applying *Brown Shoe*. Dr. Stiroh never once mentioned *Brown Shoe* in her report or deposition. This is no surprise since she never came close to covering the "practical indicia" identified in that case, including: "[1] industry or public recognition of the []market as a separate economic entity, [2] the product's [] characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices, [6] sensitivity to price changes, and [7] specialized vendors." 370 U.S. at 325; Opp. at 12. "[A]n **indispensable component** of any market analysis based on the practical indicia identified in *Brown Shoe* is an **evaluation of the economic significance of the[] indicia**." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 993 (C.D. Cal. 2012).[7] Nowhere does Dr. Stiroh explain how each of her

---

*Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).
[6] Ex. 2 (Hovenkamp, Herbert, *Antitrust Market Definition: The Hypothetical Monopolist and Brown Shoe*, Univ. of Penn., Inst. for Law & Econ. Research Paper No. 24-13 (Mar. 26, 2024), available at https://ssrn.com/abstract=4746039).
[7] *See also Thurman Indus., Inc. v. Pay'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (*Brown Shoe* analysis must consider whether "the factors used to define the []market are 'economically significant'"); *IT&T v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) ("Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are 'economically significant' in terms of the alleged anticompetitive effect.").

9

conclusions that Regeneron is challenging are economically significant. Amgen admits as much by arguing that Dr. Stiroh's opinions about therapeutic alternatives, monitoring, and PBM behavior, are economically significant *only* if viewed holistically. Opp. at 13. At best, Dr. Stiroh properly evaluates one, maybe two, of the *Brown Shoe* factors (industry recognition; product characteristics), and does so without any economic rigor, which is far from sufficient to support her market-related opinions. *See IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012) (it is insufficient to rely "entirely on a single Brown Shoe factor"); *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 989-93 (excluding expert's market definition in part because he only relied on a single *Brown Shoe* practical indicium, industry/public recognition, and did not provide "meaningful expert economic analysis" of the other factors). While Amgen argues that Regeneron challenges each of Dr. Stiroh's three market-related considerations individually and not collectively, Opp. at 13, that is incorrect, *see* Mot. at 15. In any event, Amgen offers no support for its 0 + 0 + 0 = 1 theory of reliability for defining a proper antitrust market. That is because Amgen cannot: If none of Dr. Stiroh's considerations are reliable individually, they are no more reliable together. And Amgen fails to adequately defend any of Dr. Stiroh's three considerations.

*Therapeutic Alternatives.* Amgen argues that Dr. Stiroh's "evaluation of therapeutic alternatives is just the *first step* in her analysis." Opp. at 14 (emphasis in original). Her conclusions are unreliable whether they are a "first step" or otherwise because Dr. Stiroh is not a medical doctor and lacks the requisite knowledge to determine whether drugs with similar therapeutic indications are substitutes. Mot. at 16-17. Even if she had that expertise, therapeutic substitutability is not economic substitutability. She admitted as much in her deposition when she confirmed that she is **not** providing an opinion as to whether drugs with similar therapeutic indications are medical substitutes, much less economic substitutes. Ex. 3 (Stiroh Tr.) at 46:14-22; 252:4-7 ("[N]ot every

10

therapeutic alternative is a close economic substitute.").

*Amgen's Monitoring Activity.* Amgen claims that Dr. Stiroh's review of Amgen's competitive monitoring documents was pursuant to *Brown Shoe*, which considers "industry or public recognition of the []market." Opp. at 15 (quoting 370 U.S. at 325). But Amgen's monitoring activity, standing alone, cannot offer a reliable foundation for Dr. Stiroh to assess industry recognition, much less conclude a lack of market power. As Dr. Stiroh acknowledges, she is not aware of a single pharmaceutical company that ***does not*** engage in similar monitoring efforts. Mot. at 17 (citing Stiroh Tr. 67:14-68:7). And Dr. Stiroh provides no explanation of the "economic significance" of a competitor maintaining data for products in a therapeutic class.

*PBM Behavior.* Amgen contends that "price competition" is part of Dr. Stiroh's analysis, Opp. at 16, but absent in Dr. Stiroh's report is any price competition analysis for Otezla®. *See* Mot. at 18. Amgen asserts that Dr. Stiroh "examines extensive third-party testimony and specific examples of payors' ability to leverage alternatives to ▇▇▇▇ ▇▇▇▇▇▇▇ to extract rebates," Opp. at 16. Yet, Amgen never explains how Dr. Stiroh's observation of ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇, ***nine years ago***, and only for some patients on one formulary, is economically or legally sufficient support for Dr. Stiroh's sweeping conclusion that there is "fierce price competition over formulary access." *Id.* at 17.

At bottom, were Dr. Stiroh permitted to retrofit her observations about therapeutic alternatives, monitoring, and stray PBM behavior into the *Brown Shoe* factors to show a lack of market power, then the *Brown Shoe* factors would be meaningless and automatically tip in favor of a finding of lack of market power for virtually every product at virtually every pharmaceutical company. That cannot be a reliable conclusion. Because each of Dr. Stiroh's so called factors fail independently, and also collectively, Amgen's last ditch effort to save her analysis is to argue that

11

Dr. Stiroh's opinions are "[r]elevant and [h]elpful to the [f]actfinder." *Id.* at 19. This is beside the point since Regeneron did not challenge the relevance of Dr. Stiroh's opinion. Mot. at 21. Because Dr. Stiroh's analysis concerning Enbrel®'s and Otezla®'s market power is based on unreliable methodologies, or at best unreliable applications of methodologies shoehorned in by Amgen's lawyers post hoc, her opinion should be excluded.[8]

### III. AMGEN FAILS TO SHOW HOW MS. GAN'S MERCK EXPERIENCE CAN SUPPORT HER INDUSTRY EXPERT TESTIMONY.

As Regeneron laid out in its Motion, Amgen's purported pharmaceutical industry expert, Ms. Deborah Gan, does not hold the requisite qualifications to provide industry-wide expert opinions, and is, instead an undisclosed third-party fact witness. Mot. at 21. Amgen responds by enumerating Ms. Gan's Merck-specific qualifications. Opp. at 25-27. Amgen even includes a chart in its Opposition outlining the various sources of Ms. Gan's expertise, ***all of which come only from her experience at Merck***. *Id.* Regeneron does not dispute that Ms. Gan had a long career at Merck. Instead, Regeneron contends that, given the limited nature of Ms. Gan's experience at Merck, without any experience at a PBM, health plan, or even another drug manufacturer, Ms. Gan does not have "specialized knowledge" as to any other participant in the pharmaceutical industry and she therefore cannot opine as to what is typical industry-wide. Fed. R. Evid. 702.

Amgen fails to rebut Regeneron's argument that because Ms. Gan's experience was obtained only at Merck, she cannot offer conclusions about industry negotiation practices or about the commonality of drug manufacturers' use of cross-therapeutic bundles. Mot. at 27. Amgen

---

[8] "[T]he requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994); *see also In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 800 (3d Cir. 2017) ("Indeed, '*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*.'") (quoting *In re Paoli*, 35 F.3d at 745) (emphasis in original).

claims that there is "no support in the caselaw" that an expert can be found inadequate because their experience is limited to one company. *See* Opp. at 22, 28. But a case Amgen cites holds otherwise. *See* Opp. at 28; *Auto Konnect, LLC v. BMW of N. Am., LLC*, 590 F. Supp. 3d 977, 985 (E.D. Mich. 2022). In *Auto Konnect*, the district court held that an expert was "properly excluded under *Daubert*" and could not testify about "industry customs and norms" because he had experience only at "a single OEM for ten years," which was "unlike [the other expert's] decades of experience with multiple OEMs." *Id.* Another district court has similarly found that an expert was not qualified to "offer an opinion on the 'industry standards'" because "his **experience with a single [] company cannot translate into knowledge of the industry standards**." *Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1272-73 (N.D. Ga. 2009).[9] This is exactly the case here, as Ms. Gan's experience in PBM negotiations is decades old and limited to one company. Mot. at 22-23.

Amgen's attempts to support Ms. Gan's expertise are unavailing. None of the cases Amgen cites are on point.[10] Nor can Amgen show Ms. Gan's experience or expertise with respect to the

---

[9] The Court added: "Mr. Puckett has not shown how his years working only for State Farm would give him the background and experience to opine on matters of the broader insurance industry. To find Mr. Puckett's testimony reliable, the court would have to 'take a leap of faith' and rely on Mr. Puckett's 'ipse dixit and assurance that his testimony is based on nationally accepted standards.'" *Butler*, 652 F. Supp. 2d at 1273.

[10] For example, Amgen cites a case where the court was analyzing an expert's specific conclusions, not his qualifications. *Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, 2010 WL 1541641, at *5 (N.D. Okla. Apr. 16, 2010). The court ruled that because the expert had experience as a buyer, he wasn't speculating as to how sellers behave. *Id.* In any event, the court permitted the expert only to "**testify generally**, based on his experience" and cautioned that "if his trial testimony is more specific… defendants may raise the issue at trial." *Id.* Amgen also cites a case where the challenged expert, unlike Ms. Gan, had been previously accepted by other courts. *Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 2018 WL 4169282, at *13 (E.D. Va. Jan. 12, 2018). And Amgen cites *IAS Servs. Grp. v. Jim Buckley & Assocs., Inc.*, 2015 WL 13775347, at *4 (W.D. Tex. Sept. 10, 2015). But there, the expert was found qualified after the district court noted that the expert was a senior executive at "not one but two of the largest companies in the world." *Id.* at *3.

13

main PBMs at issue in this case. While Amgen claims that Ms. Gan has experience negotiating with ESI, Ms. Gan specified in her deposition that her experience negotiating with ESI occurred over a decade ago, was limited to one year after ESI acquired Medco (another payor), and was performed while working alongside the Merck representative in charge of the ESI relationship. Ex. 4 (Gan Tr.) at 32:18-33:9. Prior to the ESI-Medco acquisition in 2012, Ms. Gan was not the Merck representative responsible for ESI. *Id.* at 33:11-14. Similarly, regarding UHC, Ms. Gan clarified in her deposition that she was involved only in "somewhat of an indirect negotiation" during her time at Merck. *Id.* at 32:6-15. What precisely it means to be involved in "somewhat of an indirect negotiation" is anybody's guess, but it certainly does not mean that Ms. Gan had first-hand experience directly negotiating with UHC. Other than that "indirect negotiation," Ms. Gan did not have any direct negotiations with representatives from UHC. *Id.* at 33:15-20. And Ms. Gan had no responsibilities directly negotiating with CVS. *Id.* at 34:8-13. Also, during this time, Ms. Gan was "predominantly" negotiating coverage for Merck's drugs in the "primary care women's health space," a therapeutic area not relevant to this case. *Id.* at 47:7-13. So while Amgen touts Ms. Gan's involvement in "over 30 negotiations" over the course of her career, those negotiations offer limited insight into the negotiations at issue in this matter. Opp. at 25-26. This is especially concerning given that, as Ms. Gan states in her report, "***PBMs are [h]ighly [i]ndividualized [a]ctors and have [d]ifferent [c]onsiderations***." Mot. Ex. H (Gan Report) § VIII.C.

As for her opinions about bundling, Ms. Gan claims that cross-therapeutic bundles are in a company's "market access toolbox." Ex. 4 (Gan Tr.) at 218:21-219:16. But this testimony is directly contradicted by *Amgen's position* in the Amgen-Horizon Therapeutics FTC merger challenge in which Amgen argued that "***bundling generally is not widely used in the pharmaceutical industry***." Ex. 5 (Amgen's Horizon Opp.) at 22. Amgen attempts to explain that

14

"record evidence in this case" led to Ms. Gan's conclusion, Opp. at 28-29, but this only proves that Ms. Gan could not have come to that conclusion based on her industry experience. Ms. Gan could only rely on party discovery, which a jury is fully capable of doing. At bottom, Amgen's recitation of Ms. Gan's Merck-only experience does not save Ms. Gan's industry-wide opinions relating to PBM negotiation practices or bundling: "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." 29 Wright & Miller, Federal Practice and Procedure § 6265 (1st ed. 2014); *see* Fed. R. Evid. 702.

Ms. Gan also should not be allowed to provide unreliable opinions about "spillover" effects at the PBM and prescriber levels. Ms. Gan and Amgen fail to show how she used any of her Merck experience to come to her conclusion on spillover effects. And this makes sense because Ms. Gan's conclusions in this case are at odds with her experience. For example, in her report, Ms. Gan concludes that "[commercial] and government formularies therefore act independently, limiting spillover between these formularies." Mot. Ex. E (Gan Report) ¶ 153. However, in her deposition, Ms. Gan describes a spillover analysis she conducted at Merck that analyzed spillover at the PBM level. Ex. 4 (Gan Tr.) at 277:20-288:15. Ms. Gan's conclusions therefore are directly at odds with her Merck experience. Unable to rely on her experience, Ms. Gan claims to rely only on "evidence in this case." Mot. Ex. H ¶ 154. But if that is all she is doing, that is a job for the jury. Since Ms. Gan can only offer a "layman's testimony disguised as expert testimony" she must be excluded. *Bird v. Borough of Moosic*, 2022 WL 584072, at *2 (M.D. Pa. Feb. 25, 2022).

## CONCLUSION

For the foregoing reasons, the Court should grant Regeneron's Motion in full.

15

Respectfully submitted,

WILKS LAW, LLC

*/s/ Scott B. Czerwonka*

| | |
|---|---|
| David E. Wilks (DE Bar No. 2793) | WEIL, GOTSHAL & MANGES LLP |
| Scott B. Czerwonka (DE Bar No. 4844) | |
| 4250 Lancaster Pike Suite 200 | Jonathan D. Polkes |
| Wilmington, DE 19805 | Elizabeth Stotland Weiswasser |
| Telephone: (302) 225-0850 | Eric S. Hochstadt |
| Fax: (302) 225-0851 | Adam B. Banks |
| | Jessica L. Falk |
| | Robert Niles-Weed |
| | Rachel Williams |
| | 767 Fifth Avenue |
| | New York, NY 10153-0119 |
| | Telephone: (212) 310-8000 |
| | Fax: (212) 310-8007 |
| | |
| | Michael R. Moiseyev |
| | Priyata Y. Patel |
| | 2001 M Street, NW |
| | Washington, D.C. 20036 |
| | Telephone: (202) 682-7000 |
| | Fax: (202) 857-0940 |

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated: July 15, 2024

16