IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | C. A. No.:  22-00697-JLH |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | ▮ |
| | ) | |
| AMGEN INC., | ) | **REDACTED - PUBLIC VERSION** |
| | ) | **FILED AUGUST 13, 2024** |
| Defendant. | ) | |

## AMGEN INC.'S REPLY BRIEF
## IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Ben A. Sherwood
Leesa Haspel
Kate Swisher
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

Richard J. Doren
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Ashley E. Johnson
John Adams
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

*Attorneys for Amgen Inc.*

Dated:  July 12, 2024

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .......................................................................................................................1

I.  Regeneron Has Not Created a Genuine Issue of Fact That Amgen Engaged in
    Anticompetitive or Exclusionary Conduct...............................................................1

    A.  Regeneron Ignores Binding Case Law To Avoid a Standard It Cannot Meet........2

    B.  Under a Rule of Reason Analysis, Amgen's Conduct Is Not Anticompetitive. ......3

        1.  Amgen's Only ▮▮▮▮▮▮▮▮▮▮ Rebate ▮▮▮▮▮▮▮▮▮▮▮▮▮
            Covers a Maximum of ▮▮▮ of the Market, Which Cannot Constitute
            "Substantial Foreclosure" as a Matter of Law. .............................................3

            a.  Regeneron Has Offered No Valid Theory of Foreclosure. ............. 3

            b.  The Speculative Agreements Underlying Regeneron's
               Substantial Foreclosure Theory Do Not Foreclose........................ 5

            c.  Regeneron Cannot Count "Spillover" as Actual Foreclosure......... 9

            d.  Foreclosure of ▮▮▮ of the Market Is Not Substantial and Thus
               Not Anticompetitive....................................................................... 10

        2.  Even Crediting Regeneron with a Higher Share of Foreclosure Is Not
            Anticompetitive Under *ZF Meritor* and Its Progeny. ...............................11

    C.  Under the Price-Cost Test, Amgen's Conduct is Not Anticompetitive................14

    D.  Regeneron's Claims Fail Because Enbrel® and Otezla® Lack Market Power.......16

        1.  The Law Requires Proof of Monopoly Power for Enbrel® and Otezla®. ..16

        2.  Regeneron Cannot Prove Market Power for Enbrel® or Otezla®. ............17

II.  Amgen's Conduct Did Not Cause Anticompetitive Effects. ...............................................19

III.  As to Zinc/CVS, Regeneron Has Not Sustained an Antitrust Injury—or Any Injury
    Caused by Amgen's Allegedly Unlawful Conduct.............................................................20

IV.  Regeneron Cannot Salvage Its State Law Claims by Summarily Asserting They Can
    Survive the Absence of Anticompetitive Conduct or Anticompetitive Effects.................22

CONCLUSION.......................................................................................................................23

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appl. Inc. v. Tyco Health Care Grp.*,
592 F.3d 991 (9th Cir. 2010) ...................................................................................3, 4

*Ass'n of Indep. Television Stations, Inc. v. Coll. Football Ass'n*,
637 F. Supp. 1289 (W.D. Okla. 1986) ..........................................................................20

*Astra Media Grp., LLC*,
414 Fed. Appx. 334, 336 (2d Cir. 2011) .......................................................................14

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) ...............................................................................21, 22

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983) .....................................................................................4, 5

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1988).........................................................................................8

*Brooke Grp Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).......................................................................................14, 15, 16

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ................................................................................15, 16

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015) .....................................................................................17

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) .....................................................................................21

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
598 F. Supp. 2d 394 (S.D.N.Y. 2008)...........................................................................3

*Eisai Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016)..............................................2, 3, 4, 5, 9, 10, 11, 12

*In re EpiPen (Epinephrine Injections, USP) Mktg., Sales & Antitrust Litig.*,
44 F4th 959 (10th Cir. 2022) ........................................................3, 5, 9, 10, 13, 20

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of San Francisco*,
114 Cal. App. 4th 309 (2003)......................................................................................23

*FTC v. Surescripts, LLC*,
424 F. Supp. 3d 92 (D.D.C. 2020) ..............................................................................12

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
351 F. Supp. 3d 1187, 1210 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir.
2020) .........................................................................................................16, 17

*Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.*,
   2012 WL 1155218 (E.D. Va. Apr. 5, 2012), *aff'd*, 748 F.3d 160 (4th Cir.
   2014) ................................................................................................................3

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003)........................................................2, 3, 9, 10, 19, 22

*Mazda v. Carfax, Inc.*,
   2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ......................................................3, 5

*McWane v. FTC, Inc.*,
   783 F.3d 814 (11th Cir. 2015) ..................................................................21, 22

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
   2016 WL 5817176 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir.
   2017) ................................................................................................................3

*Morgan v. Ponder*,
   892 F.2d 1355 (8th Cir. 1989) ................................................................14

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
   838 F.3d 421 (3d Cir. 2016)................................................................18

*OJ Com., LLC v. KidKraft, Inc.*,
   34 F.4th 1232 (11th Cir. 2022) ................................................................11

*People v. Rattenni*,
   81 N.Y.2d 166 (1993) ................................................................23

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)................................................................18

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).......................3

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
   2019 WL 1101385 (D. Del. Mar. 8, 2019) ................................................................21

*Shire US, Inc. v. Allergan, Inc.*,
   375 F. Supp. 3d 538 (D.N.J. 2019) ................................................................16, 17

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978)................................................................21

*In re Solodyn Antitrust Litig.*,
   2018 WL 563144 (D. Mass. Jan. 25, 2018) ................................................................18

*Sprint Nextel Corp. v. AT & T Inc.*,
   821 F. Supp. 2d 308 (D.D.C. 2011) ................................................................22

*Tarabishi v. McAlester Reg'l Hosp.*,
   951 F.2d 1558 (10th Cir. 1991) ................................................................20

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966) ..................................................................................................... 17

*U.S. v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ....................................................................................... 19

*UAS Mgmt., Inc. v. Master Misericordiae Hosp.*,
    169 Cal. App. 4th 357 (2008) .................................................................................... 23

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ....................................................................................... 22

*Varentec, Inc. v. Gridco, Inc.*,
    2017 WL 2438846 (D. Del. June 6, 2017) ................................................................. 14

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................... 20

*Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*,
    1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) .............................................................. 21

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .................................................... 2, 3, 4, 5, 9, 10, 19

**Treatises**

3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶749d3 .......................... 17

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Title of Document(s) | Docket Number(s) |
|---|---|---|
| Br. | Amgen Inc.'s Opening Brief in Support of Its Motions for Summary Judgment | D.I. 309 |
| Ex(s). __ to Br. | Exhibits to Declaration of Ashley Johnson in Support of Amgen Inc.'s Opening Brief in Support of Its Motions for Summary Judgment | D.I. 310, 311 |
| Opp. | Regeneron Pharmaceuticals, Inc.'s Memorandum of Law in Opposition to Amgen Inc.'s Motion for Summary Judgment | D.I. 324 |
| Ex(s). __ to Br. | Exhibits to Declaration of Eric S. Hochstadt in Support of Regeneron Pharmaceuticals, Inc.'s Opposition to Amgen Inc.'s Motion for Summary Judgment | D.I. 327, 327-1–327-11 |
| SUF | Amgen's Concise Statements of Facts in Support of Its Motions for Summary Judgment | D.I. 308 |
| Resp. to SUF | Regeneron Pharmaceuticals, Inc.'s Response to Amgen Inc.'s Concise Statement of Facts in Support of Its Motion for Summary Judgment | D.I. 326 |
| Ex(s). | Exhibits to Declaration of Ashley Johnson in Support of Amgen Inc's Reply Brief in Support of Its Motions for Summary Judgment | Filed Contemporaneously |

**INTRODUCTION**

Regeneron's Opposition feigns outrage at Amgen for being caught "red handed" competing on price with Regeneron and ███████████ to—in most cases, only ████—bundled rebates. Opp. at 1. Indeed, Regeneron sees foreclosure as so ubiquitous that it asserts foreclosure not only every single time Amgen won a competitive bidding process, but also when *Regeneron* won the parties' competitions for business. But foreclosure is not so meaningless a concept that a company faces antitrust liability if it even ███████████ whether to offer a bundle.

To survive summary judgment, Regeneron must show more than that Amgen's competition was to the detriment of Regeneron, which would be better off if Amgen did not compete at all. Regeneron must show Amgen hurt competition itself by blocking Regeneron from any opportunity to compete and depriving PBMs of a choice between drugs. Regeneron cannot make this showing.

Regeneron's Opposition distorts the record and tries to demonize Amgen based on snippets of colorful language or expressions of competitive intent. This is not an antitrust claim. ████████ ███████████ ███████████ making Repatha® more valuable to PBMs responding to the desires of insurers, doctors, and patients. Those PBMs demanded terms from Amgen and Regeneron. When PBMs chose Repatha®, ███████████████ ███, Regeneron ran to the Court for relief from the PBMs' decisions in a competitive market.

Antitrust law does not shield parties from aggressive competition or customer choices. Regeneron has shown no genuine issue of fact on its claims. Amgen should get summary judgment.

**ARGUMENT**

**I.    Regeneron Has Not Created a Genuine Issue of Fact That Amgen Engaged in Anticompetitive or Exclusionary Conduct.**

Regeneron admits its "federal antitrust claims share a common element of anticompetitive conduct," Opp. at 14, but fails to create a genuine issue of fact. Since anticompetitive conduct is

also required for its state-law claims (Section IV), summary judgment is appropriate on all claims.

### A.    Regeneron Ignores Binding Case Law To Avoid a Standard It Cannot Meet.

Regeneron first tries to change the governing law, asserting that "context" allows this Court to ignore the Third Circuit's direction that *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), must be read "narrowly." Opp. at 16. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 274 n.11 (3d Cir. 2012); *Eisai Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405 (3d Cir. 2016). After assigning *LePage's* an undefined, yet expansive, scope, Regeneron falsely claims that Amgen does not dispute that Regeneron can satisfy *LePage's*. Opp. at 19. But Amgen argued that Regeneron cannot proceed under *LePage's*. Br. at 17 n.8. Regeneron cannot survive summary judgment whether the governing framework is *LePage's*, *ZF Meritor/Eisai*, or a combination of these standards.

The Third Circuit has "limited the reasoning in *LePage's* 'to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines.'" *Eisai*, 821 F.3d at 405 (quoting *ZF Meritor*, 696 F.3d at 274 n.11). Regeneron is not a "single-product producer," so *LePage's* does not apply. Regeneron asks this Court to ignore *Eisai* and apply *LePage's* to a plaintiff that, like Regeneron, has many other products, if it does not sell precisely the same products as defendant—dramatically expanding *LePage's*. Opp. at 16. *Eisai* and *ZF Meritor*, controlling authority here, reject that expansion.

Even if *LePage's* were applicable outside the single-product-producer context, Regeneron still could not survive summary judgment. In *LePage's*, the Third Circuit held that bundling and exclusive dealing contracts can be exclusionary where they cause "foreclosure of markets," which may occur when a competitor "does not manufacture an equally diverse group of products and . . . therefore cannot make a comparable offer." 324 F.3d at 155, 158. Regeneron fails this test. At CVS, Regeneron defeated Amgen by ████████████████ ██ Regeneron has

offered no evidence showing it could not have made a comparable offer to Amgen at other PBMs with Praluent® alone, or by bundling Praluent® with one of its blockbuster drugs like Dupixent®, or by partnering with PBMs on Eylea®. Br. at 5; Ex. 103 to Opp. It thus cannot show foreclosure.

Nothing in *LePage's* allows Regeneron to proceed with antitrust claims without evidence creating a material issue of fact on substantial foreclosure. *ZF Meritor* and *Eisai* simply reaffirm the defects in its case by identifying factors—harmful to Regeneron—to determine if "there is some element of coercion present" to create the "rare case in which exclusive dealing would pose a threat to competition." *ZF Meritor*, 696 F.3d at 284–85 (citing *LePage's*, 324 F.3d at 159).

**B.     Under a Rule of Reason Analysis, Amgen's Conduct Is Not Anticompetitive.**

Regeneron's core argument is that "substantial foreclosure," which it mislabels "causation," is too "fact-intensive" to allow summary judgment. Opp. at 4, 19. To so argue, Regeneron ignores that both *Eisai* and *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022), affirm summary judgment granted to defendants on precisely this issue. The law is replete with summary judgment grants where a plaintiff failed to offer the exceptional facts necessary for substantial foreclosure.[1] The same is appropriate here.

**1.     Amgen's ███████ ████████ Rebate ███████████ Covers a Maximum of ████ of the Market, Which Cannot Constitute "Substantial Foreclosure" as a Matter of Law.**

**a.     Regeneron Has Offered No Valid Theory of Foreclosure.**

Regeneron's failure to identify any anticompetitive foreclosure makes a claim of

---

[1] *E.g.*, *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *10–15 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017); *Allied Orthopedic Appl. Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010); *Mazda v. Carfax, Inc.*, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016); *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 406 (S.D.N.Y. 2008); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 387–94 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003); *Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.*, 2012 WL 1155218, at *13–18 (E.D. Va. Apr. 5, 2012), *aff'd*, 748 F.3d 160 (4th Cir. 2014).

"substantial foreclosure," as required for each of its claims, impossible. Even if Regeneron's factual claims about secret agreements could support its speculation (*see* Opp. at 21–27), those agreements would be routine market-driven agreements that do not foreclose any of the market.

Foreclosure exists where "a monopolist '[has] use[d] its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice.'" *Eisai*, 821 F.3d at 404 (quoting *ZF Meritor*, 696 F.3d at 285). In *Eisai*, plaintiff claimed foreclosure because customers "had no choice but to purchase" defendant's product. *Id*. The Court rejected this theory on the facts, distinguishing cases where plaintiffs had prevailed on similar claims as involving "threat[s] to cut off supply [that] ultimately provided customers with no choice but to continue purchasing from the defendants." *Id*. at 406. It cautioned that, "[i]n analyzing the amount of foreclosure, our concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer." *Id*. at 403; *see Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (no substantial foreclosure where customer "is not a small firm that [defendant] could likely bully into accepting a contract that might foreclose new competition"); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 997 (9th Cir. 2010) (summary judgment of no foreclosure where affected customers "could choose at anytime to forego the discount offered by [defendant] and purchase from a generic competitor").

Regeneron cavalierly labels every agreement it speculates Amgen secretly reached "foreclosure," but does not tie that label to case law. Regeneron titles its key section, for example, "Amgen ████████████████████████████████ and procured Repatha® exclusivity at each." Opp. at 20. But an ██████████████████ is not foreclosure; it is impossible to claim that a customer "had no choice" but to take an ████████. *Eisai*, 821 F.3d at 404. And it is impossible for Regeneron to be foreclosed from a PBM where Praluent® has

*exclusive* coverage. As to exclusivity, Regeneron's expert concedes that she does not "consider exclusion from a formulary to be the same as foreclosure." Ex. 42 to Opp. ¶ 119; *see also Mazda v. Carfax, Inc.*, 2016 WL 7231941, at *13 (S.D.N.Y. Dec. 9, 2016) (rejecting "flaw" in expert analysis of "assum[ing] that all of the 'exclusive' … [a]greements foreclosed competition").

Tacitly admitting ▮▮▮▮and exclusivity are not enough, Regeneron cites stray excerpts from documents that it speculates reflect implicit bundled agreements. Opp. at 20–27. But even crediting Regeneron's speculation does not create a question of fact as to *foreclosure*. Exclusive agreements are "often entered into for entirely procompetitive reasons," *ZF Meritor*, 696 F.3d at 270, and, in the "prescription drug market," "[n]o one can seriously dispute that exclusive rebate agreements stimulate price competition," *EpiPen*, 44 F.4th at 987. Regeneron thus must show that these posited agreements "br[oke] the competitive mechanism" and left customers with no "ability to make a meaningful choice." *Eisai*, 821 F.3d at 404. It does not even try to do this.

It bears emphasis that the line between permissible discounting and impermissible foreclosure is critically important, and courts are loathe to risk penalizing discounts without a strong showing of harm to the competitive process. As then-Judge Breyer cautioned 40 years ago, "we must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Barry Wright*, 724 F.2d at 234; *EpiPen*, 44 F.4th at 993 (disapproving any rule that "might discourage the use of exclusive agreements by a dominant firm in a market where competition-for-the-contract is a legitimate competitive tool to bring about low prices for the consumers"). Regeneron's labeling of ordinary, procompetitive contracts as "foreclosure" presents just this risk.

> **b.    The Speculative Agreements Underlying Regeneron's Substantial Foreclosure Theory Do Not Foreclose.**

Regeneron relies on stray references in documents to speculate that Amgen could have

reached undocumented agreements where a PBM implicitly or verbally agreed to cover Repatha®
1:1. Regeneron's speculation does not create an issue of fact as to foreclosure at any PBM.

First, the only rebate Amgen ████████████████████ ██████████ ████████████████

██████████████████ ████████████████████████████████████████. Regeneron's

erroneous claim that Amgen "admits foreclosure" there (Opp. at 21) by ████████████████

████████ evidences its misunderstanding of the law. As Amgen explained, because PBMs can

easily switch coverage, there is a total "absence of coercion or market foreclosure" anywhere in

the market, as demonstrated by Amgen's ability to regain coverage for Repatha® at CVS after a

period of exclusivity for Praluent® there. Br. at 25–26. Amgen applied the *ZF Meritor* factors to

analyze the ████ of the market covered by ██████████—here and in its opening brief—only for

the sake of argument if this Court wishes to proceed beyond the issue of whether there is *any*

foreclosure to whether, if ██████████were (improperly) considered to be foreclosed because of

the bundled rebate and Regeneron's allegations of below-cost pricing, that foreclosure would be

"substantial," as required to show anticompetitive conduct. Br. at 27–34. Given Regeneron's

failure of proof of foreclosure, this Court need not do that analysis.

Regeneron's claims of foreclosure at the other PBMs fail for the additional reason that

Regeneron must first speculate that an unwritten agreement provides a bundle conditioned on

exclusivity before it can even reach the fatal flaw of no foreclosure.

At **<u>OptumRx/UHC Commercial</u>**, Regeneron speculates that UHC Commercial secretly

agreed to cover Repatha® 1:1, even though the contract gave it ████████████ ████████████

████████████████ ████████████ That ████████████ ████ at UHC lasted for ████████████████.

Br. at 11. Even accepting speculation of a secret understanding, Regeneron does not dispute that

nothing in the contract would have prevented UHC from simply changing its mind during ████████

(or afterwards). Given that the ████████████ no longer applies based on ███████████████,
Regeneron has no theory under which this contract could cause foreclosure today.[2]

Regeneron also does not explain why the posited agreement foreclosed it. It cannot dispute
that ██████ was not a "must-have" for UHC, which had ████████████████████████ ████
██████ and █████████████████████ █████████████████████. Br. at 11,
20. A customer █████████████ is the opposite of deprivation of choice. Regeneron
contends UHC told it that ███████████████████████. Opp. at 23. The
document actually says that ███████████████████████████████
███████████████████. Ex. 84 to Opp. at -1210 (emphasis added).
████████████████████████████████████████████████
*Id.* Regeneron's expert admits Regeneron ███████████████████████,
so ██████ did not prevent Regeneron winning the contract. SUF 1 ¶ 28; *see* Br. at 20–21.

At **ESI Part D**, Regeneron claims that Amgen and ESI reached a secret agreement that ESI
Part D "███████████ ██████████" even though Regeneron admits that "the parties'
contract mentioned ███████████ ████████ e." Opp. at 24. Regeneron implies Amgen used
secret agreements in reaction to a ███████████████ Regeneron sent to Amgen. *Id.* at 1–2. But
Regeneron alleges that a supposed secret agreement with ESI Part D was made, at the latest, in
██████, *id.* at 23–24; Ex. 90 to Opp.—three months before ███████████████████,
*see* Opp. at 11. Nothing in the text message thread Regeneron cites says anything about exclusivity
for Repatha®, referencing only ████████████████████████. Ex.
7 to Opp. at -4550. ███████████████████ cannot be considered an exclusive

---

[2] Regeneron distorts a comment in a document clawed back for privilege that refers to legal advice.
Ex. 13 to Opp. at -8981. It claims the comment shows Amgen and UHC Commercial ███████
████████████ Opp. at 22, but the comment does not support any inference of ██████████ "

dealing agreement at all, much less an anticompetitive one. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 520 (3d Cir. 1988).  In any event, Regeneron also ignores that ESI Part D unequivocally stated there would be ████████████████████ ████████████████ ████████████████████████████████████████████ Ex. 7 to Opp. at -4550.[3]

Regeneron also offers no evidence—or even *theory*—explaining why this secret agreement would foreclose it at ESI Part D. Instead, Regeneron argues only that "the parties reached an understanding that █████████████████████ ██████████." Opp. at 24. That is a procompetitive ██████████ agreement, not foreclosure. Regeneron argues nothing about Enbrel® or Otezla® here, what (if any) importance they had for ESI Part D, or what effect Repatha® coverage had on the rebates ESI Part D would have otherwise received on Enbrel® or Otezla®.

At **Humana Part D**, Amgen never even *offered* a Repatha® bundle, Br. at 13–14, nor does Regeneron seriously contend the evidence shows any, *see* Resp. to SUF 1 ¶ 32. Regeneron instead suggests that Amgen likely offered a bundle because, Regeneron claims, Amgen told Humana Part D ████████████████████████. But the exhibit Regeneron cites (Ex. 10 to Opp.) states only that Amgen was ██████████████████████████████████████████████ ████████████████████████████████████████████" It does not say Amgen would ██████████████████. In fact, Amgen ████████████████████████████ ██████ ████████████e. Ex. 1 (HUM000527); Ex. 2 (HUM000543).

In any event, once again, Regeneron's only conclusion about Humana Part D is speculation that the parties had a "functional agreement for Enbrel® and Otezla® rebates" that was "predicated

---

[3] That PBMs with different preferences reached different deals with Amgen is procompetitive. While ████████████████████████████████████████ █ ██ ████████████████████████████████████████ ████████████████████. SUF 1 ¶¶ 21, 25, 30; SUF 3 ¶¶ 23–25; Ex. 125 to Br. Each obtained what it sought.

on Repatha® exclusivity." Opp. at 24–25. As with ESI Part D, this is just speculation that there was an exclusive dealing agreement; it says nothing about whether that agreement, even if it existed, distorted competition or somehow foreclosed Regeneron.

Finally, at **<u>CVS Commercial and Part D</u>**, Regeneron *admits* that CVS  . *Id.* at 25–26. It is undisputed that Amgen has not had *any* rebate on Enbrel® or Otezla® at CVS that is dependent on *any* Repatha® coverage. Regeneron cites no case law including in "foreclosure" an ; and then agreeing to a different deal once the competitor that won the contract .[4] *See Eisai*, 821 F.3d at 404.

### c. Regeneron Cannot Count "Spillover" as Actual Foreclosure.

Without actual foreclosure, Regeneron resorts to meritless claims of "spillover." As an initial matter, Regeneron's claim of spillover foreclosure depends on there being direct foreclosure at each of the PBMs. Because Regeneron has not shown foreclosure, there is nothing to spill over.

Regeneron also has no case law that supports treating spillover as foreclosure. *LePage's* certainly does not. Regeneron says *LePage's* "rejected th[e] . . . argument that foreclosure is measured based only on 'contracts' that 'expressly . . . conditioned discounts on exclusivity.'" Opp. at 29 (quoting *LePage's*, 324 F.3d at 157). That means only that even a *de facto* exclusive contract can foreclose competition (*LePage's*, 324 F.3d at 157; *ZF Meritor*, 696 F.3d at 270), not that there can be foreclosure other than "contractual foreclosure." *EpiPen*, 44 F.4th at 992.

Nor does Regeneron persuasively distinguish *EpiPen*'s repudiation of prescriber-level spillover foreclosure. In *EpiPen*, plaintiff—represented by the same counsel as Regeneron here—

---

[4] Regeneron also alleges Amgen linked a Repatha® ▮▮▮ rebate to coverage, but that relates only to Repatha®, not any other drug. ▮▮▮ . Ex. 3 (Witter Tr.) at 55:4–8; Opp. at 24 & n.25.

argued that prescriber-level spillover was foreclosure, but the court disagreed "for both factual and legal reasons." 44 F.4th at 991–93. One of the legal reasons was that prescriber-level spillover necessarily depends on assuming "irrational behavior" by prescribers, which applies equally here. *Id.* Also, Regeneron's economic expert concedes that it could ██████████████████████████ by ████████████████████████████████, Ex. 42 to Opp. ¶ 30, and admits that Amgen's bundled rebates benefited consumers by lowering their premiums for prescription drug coverage. *Id.* ¶ 251. Recognizing spillover foreclosure could "disincentivize[] procompetitive behavior." *EpiPen*, 44 F.4th at 993. ████████████████████████████, to the extent any exists, by vigorously competing for coverage at PBMs' custom clients, ██████████████████████ ████████████████ *See* Br. at 24. Regeneron has just chosen not to do so. *See id.*

**d.    Foreclosure of ██████ of the Market Is Not Substantial and Thus Not Anticompetitive.**

Even treating the bundle agreement with ████████ as foreclosure, that agreement would foreclose only ██████ of the market, which is insufficient to be "substantial foreclosure." *ZF Meritor*, 696 F.3d at 286 ("foreclosure of 40% to 50% is usually required"). Regeneron thus seeks to erase the substantial foreclosure requirement entirely, urging that Repatha® has a monopoly and thus *any* increase, no matter how small, in its market share is actionable. Opp. at 30–31.

While Regeneron points to *LePage's* as authority for this novel claim, *id.* at 30, *LePage's* does not support it. Regeneron notes that LePage's market share dropped only 5 percentage points (i.e., from 14.44% to 9.35%), but ignores that what must be "substantial" is the share of the market LePage's was *foreclosed from*, not the absolute reduction in its share.  In *LePage's*, the Court held that the challenged conduct "could have eventually forced LePage's out of the market entirely." *LePage's*, 324 F.3d at 162. Moreover, both *LePage's* and *Eisai* reiterated the "usual[]" standard of "roughly 40% or 50%" foreclosure. *Id.* at 158–59; *Eisai*, 821 F.3d at 403.

10

The Eleventh Circuit has rejected Regeneron's exact theory. *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232 (11th Cir. 2022). In *OJ*, plaintiff argued that "substantial foreclosure is not an essential element of a section 2 claim and that a lesser degree of foreclosure is required when the defendant is a monopolist." *Id*. at 1249. The court disagreed, holding that "'substantial foreclosure' continues to be a requirement." *Id*. at 1250 (quoting *Eisai*, 821 F.3d at 403)).

Notably, Regeneron's novel theory would not, even if valid, defend the bulk of its damages claim. Even if Regeneron could create an issue of fact as to foreclosure at ███████, and if that were enough to survive summary judgment on an antitrust claim, that claim would only be for damages at ████████—roughly ███ of Regeneron's asserted damages. Ex. 199 to Opp., tbl. 15.

### 2. Even Crediting Regeneron with a Higher Share of Foreclosure Is Not Anticompetitive Under *ZF Meritor* and Its Progeny.

Because Regeneron barely claims—and has no evidence—that it was foreclosed outside of ███████, it has no plausible claim of substantial foreclosure, and this Court need not delve further into *ZF Meritor* and its progeny. But even if the Court were to assume *arguendo* a higher percent of foreclosure, Regeneron cannot create a genuine issue of material fact as to whether Amgen's conduct is anticompetitive under the *ZF Meritor* factors. *See* Opp. at 16–17, 31–34.

***Amount of Foreclosure.*** As set forth above (*supra* Section I.B.1.a-b), Regeneron has failed to explain, much less offer sufficient evidence to prove, its theory that there is any foreclosure at all, particularly outside of ███████ To illustrate how the *ZF Meritor* factors apply, and for the sake of argument, Amgen's opening brief analyzed a range from ███ foreclosure for ███████, to ███ if ████████ were included, to ███ if spillover from those ███████ were considered. Br. at 29. These numbers are far less than the 40-50% presumptive minimum. Regeneron's discussion of this factor does not justify its foreclosure claims, but simply asserts that Amgen caused at least 40-50% foreclosure. That conclusory assertion is not sufficient.

***Duration/Terminability of Contracts****.* Regeneron does not dispute that Amgen's contracts are "short and terminable," instead claiming that even such contracts can be anticompetitive. Opp. at 33. But it relies only on a case holding that the FTC had alleged "sufficient facts to move beyond the pleadings stage," even though "further factual development may vindicate [defendant's] position." *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 104 (D.D.C. 2020). Whatever authority *Surescripts* may have provided for Regeneron to proceed to discovery, it provides none for surviving summary judgment. That the PBMs covering Repatha® 1:1 remain free, at any point, to instead cover Praluent® 1:1 or both drugs at parity, while Amgen remains obligated to pay the rebates provided by the contract, means that even the speculative agreements Regeneron imagines can be terminated at any time (and the ███████████████████████████). This easy terminability weighs heavily against deeming the agreements being anticompetitive.

***No evidence of coercive behavior****.* Regeneron labels the issue of coercion "disputed," based on its erroneous assertion (Section I.D) that Enbrel® and Otezla® are "must-have drugs." Opp. at 32. But there is no claim here that Amgen denied Enbrel® or Otezla® to any PBM that rejected its bundled agreement. Indeed, CVS ██████████  ████████  ███ ████████████ █. *See* Ex. 3 (Witter Tr.) at 97:10–14. Regeneron claims only that customers faced "the threat of a lost discount" on those products, which "is a far cry from the anticompetitive conduct" the Third Circuit has labeled coercive. *Eisai*, 821 F.3d at 407. Whether Enbrel® and Otezla® are "must-have drugs" has no connection to whether a PBM that intended to have these drugs had to have them with a certain rebate. Moreover, Regeneron fails to develop any argument or evidence about how this supposed status as "must-have drugs" affected what PBMs considered or could agree to; its mere say-so does not create an issue of fact.

Regeneron's assertion that coercion is "disputed" also ignores the reality that the massive

PBMs either ███████████████ in the case of ████████████████, or ███████████

███ Amgen's ████████████████ in the case of ██████████████. Br. at 31–33.

Regeneron's limited evidence of coercion depends on equating PBMs viewing Repatha® (either

alone or in combination with Enbrel® and Otezla®) as a *better deal* with PBMs having no choice

but to cover Repatha® exclusively. Opp. at 32. Regeneron's conclusory assertion that any Amgen

win is coercive echoes its failure of proof on foreclosure generally. "Coercion" is just Regeneron's

euphemism for Amgen offering a better price than Regeneron was willing to offer.

*Anticompetitive Effects/Procompetitive Benefits.* Regeneron does not dispute that

exclusive dealing agreements are generally procompetitive, but asserts that Amgen "never

explains" how its agreements have any procompetitive effects. *Id.* at 34; *see also EpiPen*, 44 F.4th

at 987 ("No one can seriously dispute that exclusive rebate agreements stimulate price

competition"). That is wrong; as Amgen explained, Regeneron's entire theory is that Amgen's

bundled rebates were *too good* for customers and reduced prices below ██████████████

████ Br. at 32. A reduction in the overall price of drugs, "crafted to meet customer demand to

reduce prices," is by definition procompetitive. *Id.* Regeneron does not dispute that the agreements

here, unlike those in *ZF Meritor*, lack any other purportedly anticompetitive effects, arguing only

that the rebate agreements are anticompetitive because Enbrel® and Otezla® treat "completely

different diseases." Opp. at 34 (emphasis removed). Regeneron does not explain why that is

anticompetitive; increased rebates *overall* are plainly better for PBMs than ██████████████

████████████████████████████ ██████████. *Id.*

*Use of exclusive dealing by competitors.* Finally, Regeneron conveniently omits the use of

exclusive dealing by competitors—notably, that Regeneron ████████████████████

████████████████ *See* Ex. 42 to Opp. ¶ 11. Indeed, it is striking that Regeneron purports

to be appalled by ███████ ███████ when Regeneron's ███████████████

████████████ SUF 1 ¶ 16. Regeneron's only discussion of whether any practice was

used in the industry is its claim that cross-therapeutic rebates are unusual, a claim that has nothing

to do with whether *exclusivity* is unusual. Whether exclusive deals are linked with bundles, cross-

therapeutic bundles, intra-therapeutic bundles, or some other arrangement is an arbitrarily selected

detail employed by Regeneron to try to create a question about the entirely commonplace practice

of seeking exclusive coverage of a medication. Regeneron does not offer any reason—or any case

authority—to support the notion that this arbitrary point about how closely related the bundled

products are has anything to do with whether a bundle is anticompetitive.

### C.      Under the Price-Cost Test, Amgen's Conduct is Not Anticompetitive.

Regeneron's cursory analysis of below-cost pricing confuses the issues and mistakes the

law. Regeneron claims it is "beside the point" that it ████████████████████████████

███████, because substantial foreclosure is supposedly not required for a below-cost pricing

claim. Opp. at 35. But regardless of whether labeled "foreclosure," for below-cost pricing to be

*anticompetitive*, it must "pose[] a genuine threat to the *overall* competition." *Morgan v. Ponder*,

892 F.2d 1355, 1362 (8th Cir. 1989); *see also Varentec, Inc. v. Gridco, Inc.*, 2017 WL 2438846,

at *5 (D. Del. June 6, 2017) ("assertions 'limited to a single bid for a single contract'" insufficient

for predatory pricing claim) (quoting *Astra Media Grp., LLC*, 414 Fed. Appx. 334, 336 (2d Cir.

2011)). Regeneron's inability to identify █████████████████████████████████████

████████████████████████ was not anticompetitive, just as the absence of "substantial

foreclosure" means that agreements foreclosing ████ of the market would not be anticompetitive.[5]

---

[5] Regeneron's cite to *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 213 (1993) is consistent. While Regeneron observes that defendant "had only a 12% market share," Opp. at 35, it omits that the Court rejected the predatory pricing claim because the defendant could

Even if Regeneron were correct that below-cost pricing can be anticompetitive where only a small portion of the market is affected, that would not support its claims here.  Regeneron seeks ███████ damages resulting from foreclosure alleged in ████ of the market. Below-cost pricing ████████████, even if wrongly deemed anticompetitive, would not support Regeneron's claims for harm supposedly suffered from foreclosure at other PBMs.

Regeneron also attempts to find more below-cost pricing by asserting that Amgen ██████ ████████████████████████████████████████████████████. But Regeneron offers no authority for its novel ████████████████ theory. Opp. at 35. The rationale for a prohibition on below-cost pricing is that a party could theoretically price below cost, thereby drive its competitors out of the market, and then raise prices. *Brooke Grp.*, 509 U.S. at 224–25. If a customer █████████████████████████████, this chain is broken at the first step: the below-cost sale is not made, so it does not drive the competitor out of the market, and no later price increase is possible. Even when Regeneron ████████████ ███████, Amgen did not offer, and CVS did not agree to, any arrangement that Regeneron asserts is below cost.

Regeneron's claim falters on a second, independent ground: a lack of evidence that Amgen could recoup any loss from below-cost prices when every buyer is free at any moment to shift to covering Praluent® 1:1. Regeneron argues that *Cascade Health Solutions v. PeaceHealth* excuses it from showing recoupment, but *PeaceHealth* only held recoupment was unnecessary "to prove exclusionary conduct."  515 F.3d 883, 910 n.21 (9th Cir. 2008). *PeaceHealth* did not excuse the private plaintiff from the longstanding requirements of anticompetitive effect and antitrust injury.

---

not raise prices to a supracompetitive level to a significant portion of the market, given its low market share. *Brooke Grp.*, 509 U.S. at 228–29.

Here, there is no evidence of harm to competition or antitrust injury because there is no evidence that Amgen's contract with ███████ would ██████████████████ or let Amgen raise prices. *Brooke Group*, 509 U.S. at 224 ("That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured:  It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'").

Finally, Regeneron briefly suggests it can show recoupment, pointing to a vague reference to ████████████ that says nothing about whether ██████████ would be facilitated in any way by the bundled rebate or whether they would be above a competitive level. Opp. at 36. ████████, particularly in a growing market like PCSK9s, do not necessarily signal that prices are supracompetitive. *See Brooke Group*, 509 U.S. at 237. Even generously reading this document to suggest that Amgen thought ███████████████████████████, the issue is not what ██████████████, but what Amgen could actually do or threaten to do. Because Regeneron does not claim that ██████████ ██████████, Amgen has no ability whatsoever to raise prices above a competitive level without PBMs changing their coverage to Regeneron. In such circumstances, "it is not reasonable to conclude that [Amgen] threaten[s] in a serious way to restrict output [or] raise prices above a competitive level." *Id.* at 242.

**D.    Regeneron's Claims Fail Because Enbrel® and Otezla® Lack Market Power.**

**1.    The Law Requires Proof of Monopoly Power for Enbrel® and Otezla®.**

Regeneron seeks to avoid the result in cases such as *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 557 (D.N.J. 2019) and *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1030 (8th Cir. 2020)—cases indistinguishable from this one—where the plaintiffs' claims of bundled rebates were dismissed due to their failure to allege the defendant's competitive product was bundled with a product with monopoly power. *Id.* Regeneron dismisses *Shire* in a footnote, Opp. at 36 n. 44, but the Eighth Circuit held similarly in *Inline*. Regeneron is wrong.

16

Regeneron claims that "[a]ll that is required" is that Amgen have monopoly power in the alleged PCSK9i market. *Id.* at 36. But Regeneron confuses two separate requirements of its antitrust claims. A monopolization claim requires plaintiff to show, first, that defendant has monopoly power in the alleged market being restrained, and second, that defendant engaged in exclusionary conduct to maintain such power. *E.g.*, *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Regeneron's claim of monopoly power in the alleged PCSK9i market goes to prong one, but not prong two. Regeneron must still show Amgen engaged in exclusionary conduct to obtain or maintain monopoly power.

Here, Regeneron's only theory of exclusionary conduct is anticompetitive leveraging from a second market. Ex. 42 to Opp. ¶ 210 (Regeneron's theory is that Amgen "leverage[d] its substantial market power on Enbrel® and/or Otezla® to foreclose Praluent®"). Prong two thus requires Regeneron to prove monopoly power in that second market. *Shire*, 375 F. Supp. 3d at 557; *Inline Packaging*, 962 F.3d at 1030; *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 277 (6th Cir. 2015) ("[w]ithout substantial market power over refurbished printheads, Kodak would be unable to use a threatened printhead price increase to 'force' buyers to buy its ink"). Otherwise, the bundle is not coercive but an option that the customer may accept or decline. "[A]n essential element of unlawful package discounting is that the purchaser be 'forced' to take the bundle—which means that a rational, profit-maximizing buyer did not have good competitive options." *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1210 (D. Minn. 2018) (quoting 3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 749d3 at 326), *aff'd*, 962 F.3d 1015 (8th Cir. 2020).

### 2.    Regeneron Cannot Prove Market Power for Enbrel® or Otezla®.

Regeneron fails to define a relevant market in which Enbrel® or Otezla® has monopoly power, thus failing to raise a triable issue of fact. Regeneron calls this a "canonically fact-intensive

17

issue," Opp. at 38, but the "canonically" first step of the analysis is to define a relevant market in which the products plausibly have monopoly power. Regeneron fails to do so. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

Regeneron seeks to avoid market definition—and deflect the low market shares of Enbrel® and Otezla®—by merely alleging their profit margins (███). Opp. at 37. But profit margins are "insufficient direct evidence as a matter of law to demonstrate market power," at least "[a]bsent any evidence of restricted output," which Regeneron makes no attempt to show. *In re Solodyn Antitrust Litig.*, 2018 WL 563144, at *12 (D. Mass. Jan. 25, 2018). That is because high margins are common among branded drugs; the margins do not account for, among other things, high R&D costs to develop a new branded drug. *See Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434-35 (3d Cir. 2016) (requiring restricted output and "abnormally high" margins).

There is no dispute here that Humira® is a significant competitor to Enbrel®. The undisputed facts show extensive rebate (price) competition between Enbrel® and Humira® leading to switches from Enbrel® to Humira®. The same is true for Otezla®. Ex. 10 to Br. at 195:24–197:21. Regeneron argues that the net price of Enbrel® did not decrease due to Humira®'s presence (Opp. at 38) but the quoted sources analyze a █████████████████████████████████████████ ████████████████████████████████████████████████. Ex. 24 to Opp. ¶ 43; Ex. 42 to Opp. ¶ 378.

Regeneron also belatedly argues a market limited to Enbrel® (or Otezla®) plus Humira® but that fails. Opp. at 38 n.48. Regeneron concedes Humira's share is *larger than Enbrel®'s* (and

Otezla®'s) in such market, so Enbrel® and Otezla® lack monopoly power. Ex. 24 to Opp. ¶ 43. Regeneron cites *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), to say more than one seller (Visa and MasterCard) can have *market* power, but only one product in a market has *monopoly power.* And *Visa*'s reasoning of "must have" products does not apply here because it is evident that PBMs need only cover as preferred *one* of Humira® and Enbrel®—not both—i.e., what UHC did. Regeneron's evidence shows not all PBMs cover both Humira® and Enbrel® (or Otezla®). Ex. 42 to Opp., fig. 18. That does not show monopoly (or market) power or "must have" products.

## II.    Amgen's Conduct Did Not Cause Anticompetitive Effects.

Nothing in Regeneron's Opposition salvages its lack of evidence of anticompetitive effects.

*First*, Regeneron's assertion that "monopolization . . . *inherently* inflicts consumer harm," Opp. at 39, demonstrates a fundamental misunderstanding of the law. If a finding of monopolization necessarily implied a finding of anticompetitive effects, then a court's inquiry would end if it determined that a defendant was a monopolist. But *ZF Meritor* and *LePage's* hold that even where a firm is a monopolist, the court must still find that the monopolist's conduct inflicted consumer harm. *ZF Meritor*, 696 F.3d at 264, 289; *LePage's*, 324 F.3d at 151, 159–63 (same).

*Second*, Dr. Scott Morton's unsupported opinion that Amgen's conduct raised prices has no basis in the record and is inconsistent with the entire premise of Regeneron's case—that Amgen discounted too much. Regeneron itself claims that Amgen's conduct ████████████████ by ████████████ . *See* Br. at 40; Opp. at 39. ██████████████████ ████████████████ ████ ██████████████ ███████████████ . Br. at 40. And ████████████████████ that ████████ ████████████████████████ ████████ ████████████████ ████████████████████

███. *Id.*; Ex. 79 to Opp. ¶ 239.

*Third*, Regeneron's attempt to distinguish *EpiPen*'s recognition that reducing consumer choice does not necessarily have an anticompetitive effect in the prescription drug market (where the formulary framework limits consumers' choices) is unavailing. Opp. at 40; Br. at 40–41. Harm to competition must be evaluated in "the particular structure and circumstances of the industry at issue." *Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). As *EpiPen* held, reduction of consumer choice should not be actionable in the prescription drug industry: "the patient necessarily relinquishes some treatment-choice autonomy in exchange for lower premiums." 44 F.4th at 985.[6] Even if considering consumer choice were sensible here, it is undisputed that, where a medical necessity exception applies, consumers who wish to use Praluent® can do so. Br. at 41; *see* Opp. at 40. There is also no evidence that, absent the challenged conduct, any PBM would have adopted parity coverage, as opposed to Repatha® or Praluent® 1:1.

*Fourth*, Regeneron asserts that Amgen's conduct harmed competition by undermining Regeneron's ███████████████████ Opp. at 41. Regeneron does not cite any Third Circuit exclusive dealing case reaching a similar holding. Regeneron also does not offer any *evidence* of ████████████, only a conclusory allegation from its expert that Regeneron's █████ ████████████████████ That does nothing to compare innovation efforts with and without Amgen's bundles. *Id.* (citing Ex. 24 to Opp. ¶¶ 223–24).

## III.     As to Zinc/CVS, Regeneron Has Not Sustained an Antitrust Injury—or Any Injury Caused by Amgen's Allegedly Unlawful Conduct.

Regeneron's Opposition only summarily addresses Regeneron's lack of antitrust injury at

---

[6] Regeneron claims the Tenth Circuit has a "unique anticompetitive-effects standard," Opp. at 40 n.54, but it considers reduction of choice as an anticompetitive effect in other contexts. *E.g.*, *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991); *Ass'n of Indep. Television Stations, Inc. v. Coll. Football Ass'n*, 637 F. Supp. 1289, 1305 (W.D. Okla. 1986).

CVS, relying on a decision *that did not address antitrust injury*. Opp. at 42 (*SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1058–61 (3d Cir. 1978)).[7] Regeneron buries key authority—*Viacom*, which rejected a raising rivals' costs theory akin to that raised by Regeneron—in a footnote, dismissing it because it involves an injury from a "competitive bidding process." Opp. at 43 n.59 (citing *Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*, 1994 WL 561377, at *4 (S.D.N.Y. Oct. 12, 1994)). But that is precisely the case here. Amgen and Regeneron competitively bid for business at CVS; as in *Viacom*, Regeneron claims Amgen's bidding involved an "intent to monopolize" (*Viacom*, 1994 WL 561377, at *5), yet Regeneron won the bid. Even assuming Regeneron suffered "injury" from ███████████████████   ████████████ ███ from Amgen, █████████████ did not arise from competition-reducing aspects of Amgen's conduct (later foreclosure), and thus these ████████ are not "antitrust injury."

Regeneron urges a novel application of the "raising rivals' cost theory" under which raising a rival's costs by *competing with it on price* is anticompetitive. Even if that theory could support a violation, it does not give rise to the claimed antitrust injury here. *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986) (injuries to rivals that "are byproducts of vigorous competition" not cognizable); *Viacom*, 1994 WL 561377, at *4.

Regeneron has distorted the raising rivals' costs theory in any event. Raising rivals' costs, to the extent viable as an antitrust theory, targets costs imposed on rivals by depriving them of key inputs or customers—not by forcing them to compete with a low net price (which is all a higher

---

[7] In fact, none of Regeneron's cited authorities is relevant. *McWane v. FTC, Inc.*, 783 F.3d 814 (11th Cir. 2015), is an FTC enforcement action where antitrust injury is not a requirement. *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1101385, at *2 (D. Del. Mar. 8, 2019), involves the question of whether raising rival's costs can be foreclosure. The only case that relates to antitrust injury is *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789–91 (6th Cir. 2002), which allows antitrust injury when market share grows, a holding not relevant here.

rebate is). *E.g.*, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191–96 (3d Cir. 2005) (Dentsply cut off access to dealers which would have "reduce[d] the manufacturer's distribution costs"); *LePage's*, 324 F.3d at 160 ("3M's exclusionary conduct cut LePage's off from key retail pipelines necessary to permit it to compete profitably").[8] Otherwise, a party would "raise rivals' costs" in every back-and-forth bidding process. Where a party cannot profitably compete because it has no access to an input, the harm claimed is at least plausibly one arising from the competition-reducing aspect of the conduct; where a party has to match competition, and wins, the same is not true.

Finally, Regeneron has not introduced sufficient evidence to show a causal connection between Amgen's ████████████████ and Regeneron's rebates at CVS. Regeneron does not seriously dispute that ████████████████████████████████████████ ██████████████████████████████████. Br. at 44–45; Opp. at 43–44. ████████



Br. at 12. At CVS Part D, █████████████████████████ ███████ ███████████████████████████████████████ SUF 3 ¶¶ 1–13. CVS Part D informed Regeneron that ███████ ████████████████████████████████████████████████ ████████ ████████ ████████████████████████. *Id.* ¶¶ 9–12.

## IV.   Regeneron Cannot Salvage Its State Law Claims by Summarily Asserting They Can Survive the Absence of Anticompetitive Conduct or Anticompetitive Effects.

Regeneron inexplicably claims that Amgen waived its challenges to Regeneron's state law

---

[8] *See also, e.g.*, *McWane*, 783 F.3d at 838 (defendant had "deprived its rivals . . . of distribution sufficient to achieve efficient scale, thereby raising costs"); *Ball Mem'l Hosp.*, 784 F.2d at 1339; *Sprint Nextel Corp. v. AT & T Inc.*, 821 F. Supp. 2d 308, 321 (D.D.C. 2011).

claims. Opp. at 44. But Amgen argued in its opening brief that "each of Regeneron's claims fails" as set forth in that brief, and that "Regeneron's antitrust claims fail because Regeneron cannot show that Amgen has engaged in anticompetitive conduct." Br. at 2, 15–16. Amgen added further case authority to support this as to the state law claims. *Id*. at 16 n.6. Regeneron may disagree that the state claims fail for the same reasons as the federal claims, but Amgen waived nothing.

As for Regeneron's arguments that its state law claims require separate analysis, none are persuasive. Most fundamentally, the theoretical scope of the law is not relevant; what matters is the claims Regeneron brought. Regeneron's complaint is clear that each of its state law claims is based on the same theory as its federal antitrust claims.[9] Regeneron's failure to show substantial foreclosure is fatal to each of these claims. Regeneron has not put this Court or Amgen on notice of any state law claim that rests on different allegations and cannot concoct one now.[10]

**CONCLUSION**

Regeneron lacks enough evidence to create a genuine issue of fact on exclusionary conduct, anticompetitive effects, or, as to CVS, antitrust injury. Amgen should receive summary judgment.

---

[9] D.I. 124 ¶¶ 228, 230 (California UCL claim echoing allegations of monopoly, bundling, and foreclosure), ¶¶ 242, 244 (California UPA claim echoing allegations of monopoly, below-cost pricing, and foreclosure), ¶¶ 253, 255, 265, 267 (California Cartwright Act and New York Donnelly Act claims echoing allegations of bundling and foreclosure), ¶ 277 (tortious interference claim alleging Amgen interfered "[b]y engaging in the anticompetitive practices" set forth in the balance of the complaint).

[10] In addition to the fatal lack of foreclosure, Regeneron does not even purport to show, "in other than conclusionary terms, [Amgen's] sales price, costs in the product, and costs of doing business," as the UPA requires. *Fisherman's Wharf Barey Cruise Corp. v. Super. Ct. of San Francisco*, 114 Cal. App. 4th 309, 322 (2003). Regeneron's inclusion of non-incremental costs and nonexistent Otezla® rebates on that claim fails its own standard of being not "arbitrary or irrational." Opp. at 45. Its Cartwright Act claim requires that for this type of anticompetitive conduct, the seller "use its market power in one market to force or coerce a buyer to purchase its product or service in a distinct market . . . or to refrain from buying from the seller's competitor." *UAS Mgmt., Inc. v. Master Misericordiae Hosp.*, 169 Cal. App. 4th 357, 368–69 (2008). And the Donnelly Act "was modeled on" and closely follows the Sherman Act. *People v. Rattenni*, 81 N.Y.2d 166, 171 (1993).

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Ben A. Sherwood
Leesa Haspel
Kate Swisher
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

Richard J. Doren
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Ashley E. Johnson
John Adams
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Dated:  July 12, 2024                    *Attorneys for Amgen Inc.*

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, hereby certify that on July 12, 2024, I caused to be electronically filed a true and correct copy of Amgen Inc.'s Reply Brief in Support of its Motions for Summary Judgment with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

David E. Wilks
Scott B. Czerwonka
Wilks Law LLC
4250 Lancaster Pike Suite 200
Wilmington, DE  19805
dwilks@wilks.law
sczerwonka@wilks.law

I further certify that on July 12, 2024, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Elizabeth Stotland Weiswasser
Jonathan D. Polkes
Eric S. Hochstadt
Adam B. Banks
Jessica L. Falk
Robert Niles-Weed
Rachel Williams
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119
elizabeth.weiswasser@weil.com
jonathan.polkes@weil.com
eric.hochstadt@weil.com
adam.banks@weil.com
jessica.falk@weil.com
robert.niles-weed@weil.com
rachel.williams@weil.com

Michael R. Moiseyev
Priyata Y. Patel
Weil, Gotshal & Manges LLP
2001 M. Street , NW
Washington, DC  20036
(202) 682-7000
michael.moiseyev@weil.com
priyata.patel@weil.com

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)