**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| |
|---|
| Regeneron Pharmaceuticals, Inc., |
|          Plaintiff, |
| v. |
| Amgen Inc., |
|          Defendant. |

C. A. No.: Case #1:22-cv-00697-JLH

**FINAL JURY INSTRUCTIONS**

**CONTENTS**

GENERAL INSTRUCTIONS ...................................................................................... 1

1. INTRODUCTION ............................................................................................ 1
2. JURORS' DUTIES .......................................................................................... 2
3. PARTIES' CONTENTIONS ............................................................................ 3
4. BURDENS OF PROOF ................................................................................... 4
5. EVIDENCE DEFINED .................................................................................... 5
6. DIRECT AND CIRCUMSTANTIAL EVIDENCE ......................................... 6
7. CREDIBILITY OF A WITNESS .................................................................... 7
8. NUMBER OF WITNESSES ........................................................................... 8
9. EXPERT WITNESSES .................................................................................... 9
10. USE OF DEPOSITION TESTIMONY ........................................................... 10
11. EXHIBITS WITH MARKINGS OR NOTATIONS ....................................... 11
12. OVERVIEW OF REGENERON'S CLAIMS .................................................. 12
13. OVERVIEW AND PURPOSE OF ANTITRUST LAWS ............................... 13

COMMON ANTITRUST ELEMENTS ...................................................................... 14

14. OVERVIEW OF PLAINTIFFS' ANTITRUST CLAIMS .............................. 14
15. RELEVANT MARKET—GENERAL .............................................................. 15
16. RELEVANT MARKET—PRODUCT MARKETS ........................................... 16
17. RELEVANT MARKET—GEOGRAPHIC MARKET ..................................... 18
18. INTERSTATE COMMERCE .......................................................................... 19
19. RULE OF REASON—OVERVIEW ................................................................ 20
20. RULE OF REASON—PROOF OF COMPETITIVE HARM ......................... 21
21. RULE OF REASON—BELOW-COST PRICING .......................................... 23
22. RULE OF REASON—COMPETITIVE BENEFITS ....................................... 24
23. RULE OF REASON—BALANCING ............................................................... 25

SHERMAN ACT SECTION 2 ..................................................................................... 26

24. OVERVIEW ..................................................................................................... 26
25. MONOPOLIZATION—OVERVIEW (COUNTS ONE AND THREE) ............. 27
26. MONOPOLIZATION—MONOPOLY POWER DEFINED ............................ 28
27. MARKET OR MONOPOLY POWER .............................................................. 29
28. MONOPOLIZATION—WILLFUL ACQUISITION OR MAINTENANCE ... 32

29. ATTEMPTED MONOPOLIZATION—OVERVIEW (COUNTS TWO AND FOUR) ................................................................................................ 33

30. ATTEMPTED MONOPOLIZATION—SPECIFIC INTENT ......................... 34

31. ATTEMPTED MONOPOLIZATION—DANGEROUS PROBABILITY OF SUCCESS ................................................................................................ 36

SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE (COUNT FIVE) ............................................................................................. 37

32. OVERVIEW AND ELEMENTS ................................................................ 37

33. AGREEMENT DEFINED ......................................................................... 38

34. EXCLUSIVE DEALING ........................................................................... 39

35. EXCLUSIVE DEALING--ADDITIONAL CONSIDERATIONS [DISPUTED] ........... 41

CLAYTON ACT SECTION 3 CLAIM (COUNT SIX) ........................................... 44

36. OVERVIEW—ELEMENTS ...................................................................... 44

37. SUBSTANTIAL LESSENING OF COMPETITION ................................... 45

ANTITRUST INJURY AND CAUSATION ......................................................... 47

38. ANTITRUST INJURY AND CAUSATION GENERALLY .......................... 47

39. BUSINESS OR PROPERTY DEFINED .................................................... 49

STATE LAW CLAIMS ..................................................................................... 50

40. INTRODUCTION ..................................................................................... 50

41. CALIFORNIA UPA—ELEMENTS (COUNT EIGHT) ................................ 51

42. CALIFORNIA UPA—PRESUMPTIONS CONCERNING COSTS .............. 52

43. CALIFORNIA UPA—METHODS OF ALLOCATING COSTS ................... 53

44. CALIFORNIA UPA—AFFIRMATIVE DEFENSE TO BELOW COST SALES—MEETING COMPETITION ....................................................... 54

45. CALIFORNIA CARTWRIGHT ACT—ELEMENTS (COUNT NINE) ......... 55

46. CARTWRIGHT ACT—RULE OF REASON ............................................. 56

47. NEW YORK DONNELLY ACT (COUNT TEN) ........................................ 57

48. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (COUNT ELEVEN) ............................................................. 59

49. COMPETITION AS PROPER OR IMPROPER INTERFERENCE .............. 61

50. DAMAGES—INTRODUCTION................................................................ 62

51. ANTITRUST COMPENSATORY DAMAGES—PURPOSE ....................... 63

52. ANTITRUST COMPENSATORY DAMAGES—CALCULATION ............. 64

53. ANTITRUST COMPENSATORY DAMAGES—CAUSATION AND DISAGGREGATION ................................................................... 65

54. ANTITRUST COMPENSATORY DAMAGES—LOST PROFITS .............................. 67

55. ANTITRUST COMPENSATORY DAMAGES—MITIGATION ................................. 68

56. CALIFORNIA UPA AND CALIFORNIA CARTWRIGHT ACT—DAMAGES .......... 69

57. NEW YORK DONNELLY ACT—DAMAGES ............................................................ 70

58. TORTIOUS INTERFERENCE COMPENSATORY DAMAGES ................................. 71

59. TORTIOUS INTERFERENCE PUNITIVE DAMAGES ............................................. 73

60. DELIBERATIONS AND VERDICT [DISPUTED] ..................................................... 74

**GENERAL INSTRUCTIONS**

## 1. INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. I will start by explaining your duties and the general rules that apply in every civil case. I will explain some rules that you must use in evaluating particular testimony and evidence. I will explain the positions of the parties and the law you will apply in this case. Last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 2.     JURORS' DUTIES

You have **two** main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on each of the issues presented. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

### 3. PARTIES' CONTENTIONS

This case arises out of Regeneron's allegations that Amgen is engaged in an anticompetitive scheme to eliminate Regeneron's specialized cholesterol-reducing medication, Praluent, from the U.S. market for PCSK9 inhibitors. Regeneron alleges that Amgen's conduct violates Section 2 of the Sherman Antitrust Act (the "Sherman Act"); Section 1 of the Sherman Act; Section 3 of the Clayton Act; California's Unfair Practices Act ("CUPA"); California's Cartwright Act; and New York's Donnelly Act. Regeneron also asserts a claim for tortious interference with prospective business relations.

Amgen denies Regeneron's claims and asserts several affirmative defenses. In particular, Amgen contends that its conduct was lawful and benefited customers and competition and that Praluent's losses in the market for PCSK9 inhibitors are the result of Regeneron's own business decisions.

### 4.      BURDENS OF PROOF

This is a civil case. Regeneron is the party that brought this lawsuit. Amgen is the party against which the lawsuit was filed. Regeneron has the burden of proving its case by what is called the preponderance of the evidence. That means Regeneron has to prove to you, in light of all the evidence, that what it claims is more likely so than not so. To say it differently: if you were to put the evidence favorable to Regeneron and the evidence favorable to Amgen on opposite sides of the scales, Regeneron would have to make the scales tip somewhat on its side. If Regeneron fails to meet this burden, the verdict must be for Amgen. If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

On certain issues, called affirmative defenses, Amgen has the burden of proving the elements of the defense by a preponderance of the evidence. I will instruct you on the facts that will be necessary for you to find on this affirmative defense. An affirmative defense is proven if you find, after considering all evidence in the case, that Amgen has succeeded in proving that the required facts are more likely so than not so.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this. So you should put it out of your mind.

### 5. EVIDENCE DEFINED

The evidence from which you are to find the facts consists of the following:

1. The testimony of the witnesses;

2. Documents and other things received as exhibits; and

3. Any facts that are stipulated--that is, formally agreed to by the parties.

The following things are not evidence:

1. Statements, arguments, and questions of the lawyers for the parties in this case;

2. Objections by lawyers;

3. Any testimony I tell you to disregard; and

4. Anything you may see or hear about this case outside the courtroom.

You must make your decision based only on the evidence that you see and hear in court. Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

### 6. DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence." An example of "direct evidence" is when a witness testifies about something that the witness knows through his own senses—something the witness has seen, felt, touched or heard or did. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is its existence or current condition.

The other type of evidence is circumstantial evidence. "Circumstantial evidence" is proof of one or more facts from which you could find another fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

You should consider both kinds of evidence that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

## 7. CREDIBILITY OF A WITNESS

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief. You may believe everything a witness says or only part of it or none of it. In deciding what to believe, you may consider a number of factors, including the following:

(1)  the opportunity and ability of the witness to see or hear or know the things the witness testifies to;

(2)  the quality of the witness's understanding and memory;

(3)  the witness's manner while testifying;

(4)  whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

(5)  whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

(6)  how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

(7)  any other factors that bear on believability.

**8. NUMBER OF WITNESSES**

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.

### 9.     EXPERT WITNESSES

Certain testimony has been given in this case by experts. An expert is someone who is specially qualified by experience or training and possesses knowledge on matters not common to jurors in general. In a trial, an expert is permitted to give his or her opinions regarding such matters. The testimony of experts is to be considered like any other testimony, is to be tried by the same tests, and should receive such weight and credit as you deem it entitled to, when viewed in connection with all the other facts and circumstances.

The opinions of the experts should receive whatever weight and credit, if any, you think appropriate, given all the other evidence in the case.

### 10. USE OF DEPOSITION TESTIMONY

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

Deposition testimony that was presented during trial is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

**11.    EXHIBITS WITH MARKINGS OR NOTATIONS**

The parties presented exhibits during the course of trial.  Some of the exhibits may have had markings such as "privileged," "redacted," "under legal review," "attorney's eyes only," "outside counsel only." Those markings are not relevant to the trial or the issues in this case and you should disregard them as you weigh the evidence.

### 12. OVERVIEW OF REGENERON'S CLAIMS

Regeneron is bringing ten counts against Amgen that you must decide. Regeneron's Counts One through Six are brought under federal antitrust laws called the Sherman Act and the Clayton Act. The remaining Counts are brought under California, New York, and Delaware state law.

I am going to first give you instructions about the federal antitrust claims. I will then give you instructions on the state law claims.

### 13.    OVERVIEW AND PURPOSE OF ANTITRUST LAWS

The purpose of the antitrust laws is to preserve free and unfettered competition in the marketplace. The antitrust laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

**COMMON ANTITRUST ELEMENTS**

### 14.   OVERVIEW OF PLAINTIFFS' ANTITRUST CLAIMS

As I mentioned, Regeneron has brought six claims against Amgen under federal antitrust law. Regeneron brings one claim under Section 1 of the Sherman Act, which prohibits a person or corporation from entering into contracts, combinations, and conspiracies that unreasonably restrain trade in a relevant market. Regeneron brings four claims under Section 2 of the Sherman Act, which prohibits a company from anticompetitively acquiring or maintaining a monopoly in a relevant market or anticompetitively attempting to acquire a monopoly in a relevant market. Regeneron brings another claim under Section 3 of the Clayton Act, which prohibits the use of exclusive dealing contracts to foreclose competition in a relevant market.

I will start with instructions about the common elements that will apply to all of Regeneron's federal antitrust claims. I will then provide you with instructions about the elements Regeneron must prove for its Section 2, Section 1, and Section 3 claims respectively. Finally, I will provide you with instructions about Regeneron's burden to prove injury caused by the alleged conduct, which also is a common element of all of Regeneron's federal antitrust claims.

### 15.    RELEVANT MARKET—GENERAL

You will see that each of Regeneron's federal antitrust claims under the Sherman Act and Clayton Act (Counts One through Six) require you to consider a relevant market. Here, Regeneron must prove by a preponderance of the evidence that a market for PCSK9i drugs, or for pharmacy-dispensed PCSK9i drugs is a relevant antitrust market.

There are two aspects you must consider in determining whether Regeneron has met its burden to prove the relevant market. The first is the relevant product market. The second is the relevant geographic market.

### 16.   RELEVANT MARKET—PRODUCT MARKETS

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material--such as aluminum foil, cellophane, or even plastic containers--to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets;

- the views of Regeneron and Amgen regarding who their respective competitors are; and

- the existence or absence of different customer groups or distribution channels.

In this case, Regeneron contends that the relevant product market is the market for PCSK9i drugs, or for pharmacy-dispensed PCSK9i drugs. By contrast, Amgen contends that Regeneron has failed to allege the proper relevant product market. Amgen contends that Regeneron's proposed product market is too small because it excludes Leqvio, a PCSK9i drug that is not typically dispensed by a pharmacy. If you find that Regeneron has proven a relevant product market, then you should continue to evaluate the remainder of Regeneron's antitrust claims. However, if you find that Regeneron has failed to prove such a market, then you must find in Amgen's favor on these antitrust claims.

## 17.     RELEVANT MARKET—GEOGRAPHIC MARKET

The relevant geographic market is the area in which Amgen faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases.  When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Regeneron has the burden of proving the relevant geographic market by a preponderance of the evidence.  In this case, Regeneron claims that the relevant geographic market is the United States of America. In determining whether Regeneron met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which Amgen sells and where Amgen's customers are located;

- the geographic area to which customers turn for supply of the product;

- the geographic area to which customers have turned or have seriously considered turning;

- the transportation cost differences between areas;

- the geographic areas that suppliers view as potential sources of competition; and

- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

### 18. INTERSTATE COMMERCE

Antitrust law applies only to conduct or restraints that affect interstate commerce. In this case, the parties agree that Amgen's conduct affects interstate commerce.

### 19.    RULE OF REASON—OVERVIEW

Under the federal antitrust laws, a restraint of trade or conduct is illegal only if you find it to be unreasonable. You must determine, therefore, whether the conduct challenged here is unreasonable.

In making this determination, you must determine whether Regeneron has proven that the challenged restraint or conduct has resulted in a substantial harm to competition in the relevant market. If you find that Regeneron has proven that the challenged restraint or conduct results in a substantial harm to competition in the relevant market, then you must consider whether the restraint or conduct produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged restraint or conduct is illegal under the antitrust laws only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

## 20.     RULE OF REASON—PROOF OF COMPETITIVE HARM

As I mentioned, to prove that the challenged restraint or conduct is unreasonable, Regeneron first must demonstrate that restraint or conduct has resulted or is likely to result in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of Regeneron is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged restraint or conduct has not resulted in or is not likely to result in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint or conduct has produced or is likely to produce competitive harm, you may look at the following factors:

- the effect of the restraint or conduct on prices, output, product quality, and service;

- the purpose and nature of the restraint or conduct;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint or conduct was imposed; and

- whether Amgen possesses market power on Repatha.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or

services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Amgen possesses market power is Amgen's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. If Amgen does not possess a substantial market share, it is less likely that Amgen possesses market power. If Amgen does not possess market power, it is less likely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market.

### 21. RULE OF REASON—BELOW-COST PRICING

Regeneron contends that Amgen engaged in bundled rebates that were below cost.

When calculating Amgen's total price for Repatha, rebates given by Amgen on other drugs (e.g., Enbrel) that are dependent on Repatha coverage may be allocated to reduce the implied Repatha price.

In deciding whether Amgen's pricing was "below cost," you must examine Amgen's costs. There are two kinds of costs. The first kind of cost is a fixed or indirect cost—a cost that the seller has to bear whether or not it manufactures a particular product or makes a particular sale. An example of a fixed cost might be the rent on the seller's plant or store. The second kind of cost is referred to as "variable cost." Variable costs are those costs that increase with the production of each additional unit of the product. Variable costs typically include such things as the cost of manufacturing a product. "Average variable cost" is the sum of all variable costs, divided by the total number of units expected to be produced and sold.

The cost test for below-cost pricing is whether Amgen expected that the price it set would be sufficient to cover at least the average variable cost of production and sales of the relevant products. If you find that Amgen expected that the price charged by Amgen for Repatha, at the time the price was set, and after allocating the rebates for any other product(s) to Repatha that are dependent on Repatha as described above, is below Amgen's average variable cost of manufacturing and sales of Repatha, then you may find that Amgen's price was below cost. On the other hand, if you find that Amgen expected that the price charged by Amgen for Repatha, at the time the price was set, and after allocating the rebates for any other product(s) to Repatha that are dependent on Repatha as described above, would cover its average variable cost, then you may not find that Amgen sold at a below cost price.

## 22. RULE OF REASON—COMPETITIVE BENEFITS

If you find that Regeneron has proven that the challenged restraint or conduct resulted in substantial harm to competition in the relevant market, then you next must determine whether the restraint or conduct also benefits competition in other ways.

If you find that the challenged restraint or conduct does result in competitive benefits, then you also must consider whether the restraint or conduct was reasonably necessary to achieve the benefits. If Regeneron proves that the same benefits could have been achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint or conduct.

### 23. RULE OF REASON—BALANCING

If you find that the challenged restraint or conduct was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint or conduct.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint or conduct is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint or conduct is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Regeneron bears the burden of proving that the anticompetitive effect of the restraint or conduct substantially outweighs its benefits.

**SHERMAN ACT SECTION 2**

### 24. OVERVIEW

Section 2 of the Sherman Act prohibits monopolization. Regeneron alleges that Amgen unlawfully monopolized or attempted to monopolize the relevant market and injured Regeneron as a result.

### 25.    MONOPOLIZATION—OVERVIEW (COUNTS ONE AND THREE)

Regeneron states that Amgen unlawfully acquired or maintained monopoly power in the market for PCSK9i drugs, or for pharmacy-dispensed PCSK9i drugs. To prevail on these claims, Regeneron must prove each of the following elements by a preponderance of the evidence:

1) the relevant market is a valid antitrust market;

2) Amgen possessed monopoly power in the relevant market;

3) Amgen willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

4) Amgen's conduct occurred in or affected interstate commerce; and

5) Regeneron was injured in its business or property because of Amgen's anticompetitive conduct.

If you find that Regeneron has failed to prove any of these elements, then you must find for Amgen and against Regeneron on the Sherman Act Section 2 monopolization claims (Counts One and Three). If you find that Regeneron has proved each of these elements by a preponderance of the evidence, then you must find for Regeneron against Amgen on these claims.

I already instructed you on the first element, Relevant Market (Instructions 15 through 17); on the third element, whether Amgen engaged in anticompetitive conduct, which is evaluated under the Rule of Reason (Instructions 19 through 23); and on the fourth element, whether Amgen's conduct occurred in or affected interstate commerce (Instruction 18). I will now proceed to instruct you on the second element and will provide some additional instructions for applying the Rule of Reason to these particular claims. I will later instruct you on the fifth element.

### 26. MONOPOLIZATION—MONOPOLY POWER DEFINED

To prove its Sherman Act Section 2 monopolization claims (Counts One and Three), Regeneron must prove that Amgen has monopoly power with Repatha in the relevant market. Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Regeneron has met its burden of proving Amgen's monopoly power in a relevant market.

### 27.      MARKET OR MONOPOLY POWER

If you find that Regeneron has proven a relevant market, then you should determine whether Amgen has market power and/or monopoly power in that market. Market power is a company's ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market.

Monopoly power is a more significant and durable degree of market power: It refers to the power to control prices, restrict output, and exclude competition for a significant amount of time in a relevant antitrust market. A firm has monopoly power if it can profitably raise prices substantially above the competitive level by restricting output for a significant period of time.

For Regeneron's Counts One and Three, you should determine whether Amgen has monopoly power in the PCSK9i market or the submarket for pharmacy-dispensed PCSK9i drugs. Regeneron has introduced evidence of the structure of the market that it claims shows Amgen has monopoly power with Repatha. This includes evidence of Amgen's market share including market share trends, barriers to entry and expansion, entry and exit by any other companies, and the number and size of any other competitors. If this evidence establishes that Amgen has the power to control prices and exclude competition in the PCSK9i market or the submarket for pharmacy-dispensed PCSK9i drugs, then you may conclude that Amgen has monopoly power in the PCSK9i market or the submarket for pharmacy-dispensed PCSK9i drugs.

***Market Share***. The first factor that you should consider is Amgen's share of the PCSK9i market or the submarket for pharmacy-dispensed PCSK9i drugs. Amgen must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs, such as market share trends, the existence of barriers to entry (that

is, how difficult is it for any other producers to enter the market and begin competing with Amgen for sales), the entry and exit by any other companies, and the number and size of any competitors. Along with Amgen's market share, these factors should inform you as to whether Amgen has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

*Market Share Trends*. The trend in Amgen's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing market share might show that a company does not have monopoly power.

*Barriers to Entry*. You may also consider whether there are barriers to entry that make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Amgen does not have monopoly power, regardless of Amgen's market share, if you find that new entry would be timely, likely and sufficient in scale to prevent or reduce Amgen's exercise of monopoly power. By contrast, evidence of high barriers to entry along with high market share may support an inference that Amgen has monopoly power.

*Entry and Exit by Any Other Companies*. The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors, if any, or expansion of existing competitors, if any, may be evidence that Amgen's market share overstates its power in the market

because it is likely to be diminished below monopoly levels in the near future. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Amgen's market share reflects durable monopoly power.

***Number and Size of Competitors***. You may also consider whether the financial strength, market shares, and number of competitors act as a check on Amgen's ability to price its products. If Amgen's competitors are vigorous or have large market shares, this may be evidence that Amgen lacks monopoly power. On the other hand, if you determine that Amgen's competitors are weak or have small or declining market shares, this may support an inference that Amgen has monopoly power with Repatha.

## 28. MONOPOLIZATION—WILLFUL ACQUISITION OR MAINTENANCE

The next element Regeneron must prove is that Amgen willfully acquired or maintained monopoly power through anticompetitive acts or practices.

Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. A monopolist may compete aggressively without violating the antitrust laws. Mere possession of monopoly power does not violate the antitrust laws, and acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful. A monopolist's conduct only becomes unlawful where it involves anticompetitive conduct. In determining whether Amgen's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For anticompetitive acts to result in the acquisition or maintenance of monopoly power they must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was not taken for a legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

### 29. ATTEMPTED MONOPOLIZATION—OVERVIEW (COUNTS TWO AND FOUR)

In Regeneron's Sherman Act attempted monopolization claims (Counts Two and Four), Regeneron claims that it was injured by Amgen's unlawful attempt to monopolize the market for PCSK9i drugs, or for pharmacy-dispensed PCSK9i drugs.

To prevail on its claim of attempted monopolization, Regeneron must prove each of the following elements by a preponderance of the evidence:

1) Amgen engaged in anticompetitive conduct;

2) Amgen had a specific intent to achieve monopoly power in the relevant market;

3) there was a dangerous probability that Amgen would achieve its goal of monopoly power in the relevant market;

4) Amgen's conduct occurred in or affected interstate commerce; and

5) Regeneron was injured in its business or property by Amgen's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Amgen and against Regeneron on Regeneron's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Amgen, then you must find for Regeneron and against Amgen on the Sherman Act Section 2 attempted monopolization claims (Counts Two and Four).

I already instructed you on the first element, whether Amgen engaged in anticompetitive conduct, which is evaluated under the Rule of Reason (Instructions 19 through 23). I also already instructed you on the fourth element, whether Amgen's conduct occurred in or affected interstate commerce (Instruction 18). I will instruct you on the fifth element, whether Regeneron was injured by Amgen's anticompetitive conduct, in a moment. I will now proceed to instruct you on the remaining elements.

### 30. ATTEMPTED MONOPOLIZATION—SPECIFIC INTENT

The second element that Regeneron must prove for its Sherman Act Section 2 attempted monopolization claims (Counts Two and Four) is that Amgen had a specific intent to monopolize a relevant market. If Regeneron proves both that the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs, is a relevant market and that Amgen had a specific intent to monopolize the relevant market, you must find that Regeneron has proven this element of its attempted monopolization claims and you should consider the other elements of the claims. If you find that Regeneron fails to prove either of these points, then you must find for Amgen on Regeneron's Sherman Act Section 2 attempted monopolization claims (Counts Two and Four).

If you find that Regeneron has proven a relevant market as defined in Instructions 15-17, you must then decide whether Amgen had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Amgen acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market.

There are several ways in which Regeneron may prove that Amgen had the specific intent to monopolize. There may be evidence of direct statements of Amgen's intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Amgen at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Amgen. You must be careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Amgen actually intended to obtain a monopoly, specific intent may be inferred from what Amgen did. For example, if the evidence shows that Amgen lacked a legitimate business justification and the natural and probable

consequence of Amgen's conduct in the relevant market was to give Amgen control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Amgen, then you may (but are not required to) infer that Amgen specifically intended to acquire monopoly power.

### 31. ATTEMPTED MONOPOLIZATION—DANGEROUS PROBABILITY OF SUCCESS

If you find that Amgen had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows there was a dangerous probability that Amgen would succeed in achieving or maintaining monopoly power if it continued to engage in the same or similar conduct.

In determining whether there was a dangerous probability that Amgen would acquire or maintain the ability to control price in the market, you should consider such factors as:

- Amgen's market share;

- the trend in Amgen's market share;

- whether the barriers to entry into the relevant market made it difficult for competitors to enter the market; and

- The likely effect of any anticompetitive conduct on Amgen's share of the relevant market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Amgen would acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Amgen would ultimately acquire monopoly power.

**SHERMAN ACT SECTION 1 – UNREASONABLE RESTRAINT OF TRADE (COUNT FIVE)**

### 32. OVERVIEW AND ELEMENTS

Regeneron has alleged that Amgen entered into unlawful agreements with PBMs by bundling rebates on Enbrel and/or Otezla in exchange for Repatha. To prevail on this claim, Regeneron must prove each of the following elements by a preponderance of the evidence:

(1) Amgen entered into an agreement with PBMs to bundle Repatha with Enbrel and/or Otezla;

(2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in a relevant market;

(3) Amgen had substantial market power in the market for PCSK9i drugs, or for pharmacy-dispensed PCSK9i drugs

(4) Amgen's conduct occurred in or affected interstate commerce; and

(5) Regeneron was injured in its business or property because of Amgen's conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Amgen and against Regeneron on Regeneron's exclusive dealing claim. If you find that the evidence is sufficient to prove all five elements as to Amgen, then you must find for Regeneron and against Amgen on Regeneron's exclusive dealing claim.

### 33.    AGREEMENT DEFINED

To prove a violation of Section 1 of the Sherman Act, Regeneron must prove that Amgen entered into one or more agreements with the PBMs that contained a bundled rebate. Such agreements require a unity of purpose or a common design and understanding or meeting of the minds. The agreements may be either expressly stated in a contract or inferred from the circumstances. Actions by a single company that are not made as part of an agreement with another company, no matter the motivation, are not unlawful under Section 1.

Regeneron may prove the existence of the alleged agreement through direct evidence, circumstantial evidence, or both. Direct evidence, as defined in Instruction 6, is explicit and requires no inferences to establish the existence of the alleged agreement. Direct evidence of an agreement may not be available, and therefore an agreement also may be shown through circumstantial evidence. Circumstantial evidence, as defined in Instruction 6, may require inferences and is proof of one or more facts from which you could find another fact.

If you conclude that Amgen did not have a bundled rebate agreement related to Repatha with a certain PBM, you should not further evaluate the terms of the Amgen's agreement with that PBM or the reasonableness of that agreement.

## 34. EXCLUSIVE DEALING

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. Some may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers. Exclusive dealing arrangements and partial exclusive dealing arrangements, whatever form they may take, are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing or partial exclusive dealing arrangement violates the Sherman Act, Regeneron must establish each of the following elements by a preponderance of the evidence:

(1) an agreement between the buyer(s) and the supplier that totally or in substantial part forecloses the buyer(s) from purchasing the product from competing suppliers;

(2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in a relevant market;

(3) Amgen had substantial market power in the relevant market;

(4) the agreement occurred in or affected interstate commerce; and

(5) Regeneron was injured in its business or property because of the agreement.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Amgen and against Regeneron on Regeneron's exclusive dealing claim. If

you find that the evidence is sufficient to prove all five elements as to Amgen, then you must find

for Regeneron and against Amgen on Regeneron's exclusive dealing claim.

### 35. EXCLUSIVE DEALING--ADDITIONAL CONSIDERATIONS [DIS-PUTED]

Regeneron alleges that Amgen entered into bundled rebate agreements that amounted to actual or *de facto* exclusive dealing agreements. In determining whether Amgen's alleged [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements] had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements] in the relevant market, whether PBMs have independent reasons for entering into [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements] or were coerced into entering into them, whether other competing drug manufacturers also offer [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements], the extent of competition among competing drug manufacturers for [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements] with PBMs, Amgen's position in the marketplace, the competitive alternatives to Amgen's products or services, the reasons Amgen and PBMs entered into the alleged [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements] at issue, and the effect of the use of [**AMGEN'S PROPOSAL:** exclusive dealing contracts] [**REGENERON'S PROPOSAL:** bundled-rebate agreements] on the ability of new firms to enter the market and on price and other competition in the market.

[**AMGEN'S PROPOSAL:** You also should consider whether the PBM is the final end user of the product. If the PBM is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the PBM's purchases and makes it more likely that competition may be harmed if the PBM represents a substantial portion of the

market. On the other hand, if the PBM is a distributor or reseller, and there are other alternatives for competing sellers to market their products to end users, then an exclusive dealing agreement may not foreclose competitors' access to the market and, thus, not substantially harm competition.]

In determining the extent to which Amgen's alleged bundled rebates foreclose competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusionary conduct forecloses less than 20 percent of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition [**REGENERON'S PROPOSAL:** , unless the economic incentives indicate that the contractual relationship will continue]. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the PBM as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of a contract is not the period in which it has a competitive effect.

In determining if Amgen's bundled rebates substantially harmed competition, you also should consider Amgen's market power. If Amgen does not possess market power, then there cannot be substantial harm to competition from Amgen's conduct, and you must find for Amgen on this claim. If you decide that the PBMs are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power Amgen might otherwise have. If Regeneron cannot show that Amgen had the power to coerce buyers to enter into agreements they did not want, this would be an indication that defendant lacks market power.

In this context, coercion exists if Amgen's conduct deprived PBMs of the ability to make a meaningful choice [**REGENERON'S PROPOSAL:** between Repatha and Praluent on a head to head basis].

Finally, you should consider whether the process in which Amgen secured exclusivity itself involved competition. If you determine that the PBMs formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for coverage against Amgen, this is also evidence that Amgen does not have market power.

By considering all of these factors, you should determine whether the exclusionary conduct adversely affected the price paid by PBMs, output, or the quality of products offered in the relevant market. Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

**Amgen's Source(s)**: ABA Section of Antitrust Law Model Jury Instruction (2. INSTRUCTION 6: EXCLUSIVE DEALING–ADDITIONAL CONSIDERATIONS, ABA-JI-CIVANTI 2.D.6).

**Regeneron's Source(s)**: ABA Section of Antitrust Law Model Jury Instruction (2. INSTRUCTION 6: EXCLUSIVE DEALING–ADDITIONAL CONSIDERATIONS, ABA-JI-CIVANTI 2.D.6); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193-94 (3d Cir. 2005) ("Given the circumstances present in this case, there is no ground to doubt the effectiveness of the exclusive dealing arrangement. … [I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 285 (3d Cir. 2012) (holding that coercion is present where "a monopolist … use[s] its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice" and explaining that in *Dentsply*, *supra*, the Court "found coercion even though the relationship between the customers and the defendant was not totally one-sided").

**CLAYTON ACT SECTION 3 CLAIM (COUNT SIX)**

### 36. OVERVIEW—ELEMENTS

Regeneron's Clayton Act Section 3 claim (Count Six) states that Amgen offered bundled rebates on Enbrel and/or Otezla and Repatha, to exclude Praluent.

To succeed on this claim, Regeneron must prove the following elements by a preponderance of the evidence:

> (1) that Amgen bundled rebates on Repatha with rebates on anti-inflammatory drugs;

> (2) that in its sales or agreements with PBMs for Repatha rebates, Amgen established an agreement or understanding that the customer would exclusively cover Repatha;

> (3) the effect of such condition, agreement, or understanding may be to substantially lessen competition or tend to create or maintain a monopoly in the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs;

> (4) Regeneron was injured in its business or property as a proximate result of Amgen's conduct.

If you find that Regeneron has proven each of these elements by a preponderance of the evidence, then you must find for Regeneron and against Amgen on the Clayton Act Section 3 claim (Count Six). If you find that Regeneron has failed to prove any of these elements by a preponderance of the evidence, you must find for Amgen and against Regeneron on this claim.

Amgen's agreements may be found to be exclusive if they had the practical effect of substantially preventing the purchase of Regeneron's drug, Praluent. An agreement may be exclusive even if it does not require a 100% commitment to sell only Amgen's product.

## 37.     SUBSTANTIAL LESSENING OF COMPETITION

You must also determine whether Regeneron has proven, by a preponderance of the evidence, that those agreements substantially lessened competition or tended to create a monopoly in the PCSK9i market or the submarket for pharmacy-dispensed PCSK9i drugs.

In deciding this issue, you should consider the structure of the relevant market and the percentage of the relevant market closed off by, or tied up because of, actual or de facto agreements. In this regard, you may consider how many companies were in the market and whether the agreements significantly limited the opportunities for competing sellers to enter or remain in the market.

You must consider the probable effect that the agreements had on competition in the market. If you find that Amgen's agreements did not substantially lessen competition or tend to create a monopoly, then you must find in favor of Amgen.

If you find that Regeneron has proven that Amgen's agreements with PBMs substantially lessened competition or tended to create or maintain a monopoly in the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs, then you must go on to consider whether there is any legitimate business justification for the agreements and whether they are reasonable. Only unreasonable restraints or conduct of this type are unlawful. In this regard, you should consider such factors as:

- the circumstances under which Amgen set up these agreements and what reasons it had for doing so;

- the relative bargaining strength of the parties to the agreement. If the parties had relatively equal bargaining strength, then the agreement are less likely to be unreasonable;

- how long in time the agreements were effective. If the agreements lasted a relatively short time and did not significantly limit the opportunity for competing sellers to enter or remain in the market, then they were less likely to be unreasonable;

- any favorable effects on competition that the agreements produce; and

- any alternative channels of distribution that may have remained available to Regeneron.

If you find that the agreements foreclosed competition in a substantial portion of the relevant market, and that the anticompetitive effects of those agreements outweigh any procompetitive effects, you must consider whether Regeneron was injured as a result of these agreements. I will instruct you on this element in a moment.

**ANTITRUST INJURY AND CAUSATION**

### 38. ANTITRUST INJURY AND CAUSATION GENERALLY

If you find that Regeneron has proven the elements of a Section 1, Section 2, or Section 3 claim as alleged by Regeneron, then you must decide if Regeneron is entitled to recover damages from Amgen. Regeneron is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation by a preponderance of the evidence:

1) that Regeneron was in fact injured as a result of the accused violation of the antitrust laws;

2) that the alleged illegal conduct was a material cause of Regeneron's injury; and

3) that Regeneron's injuries are injuries of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Regeneron to establish that it is entitled to recover damages, it must prove that it was injured as a result of the stated violation of the antitrust laws. Proving causation does not require Regeneron to prove the precise dollar value of its injury. It requires only that Regeneron prove that it was in fact injured by the alleged antitrust violation.

The second element requires Regeneron to offer evidence that establishes as a matter of fact and with a fair degree of certainty the alleged illegal conduct was a material cause of Regeneron's injury. This means that Regeneron must prove that some damage occurred to it as a result of the alleged antitrust violation and not some other cause. Regeneron is not required to prove that the accused conduct was the sole cause of its injury; nor is Regeneron required to eliminate all other possible causes of injury. It is enough if Regeneron has proven that the alleged antitrust violation was a material cause of its injury.

Under the third element, Regeneron must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Regeneron's injuries were caused by a reduction in competition, including reduced investment in innovation, increased prices relative to a competitive market, and reduced consumer choice, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Regeneron's injuries are antitrust injuries. On the other hand, if Regeneron's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, such as lower prices, then Regeneron's injuries are not antitrust injuries.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against - such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit - and the antitrust laws do not permit Regeneron to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

However, if Regeneron can establish that it was in fact injured by Amgen's conduct, that Amgen's conduct was a material cause of its injury, and that Regeneron's injury was the type that the antitrust laws were intended to prevent, then you should find that Regeneron has met its burden of proof on this element of its claims.

### 39. BUSINESS OR PROPERTY DEFINED

Regeneron must establish that the injury it claims to have suffered was an injury to its "business or property." The term "business" includes any commercial interest or venture, and you are instructed that Regeneron has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Amgen's alleged antitrust violation. The term "property" includes anything of value Regeneron owns or possesses or in which Regeneron has a protectable legal interest. Regeneron has been injured in its property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of Amgen's alleged antitrust violation. Regeneron has been injured in its property if you find that it has paid an inflated price for goods, services, any legal interest of value, or has lost money as a result of Amgen's alleged antitrust violation.

**STATE LAW CLAIMS**

**40.     INTRODUCTION**

Regeneron has brought four separate state law claims against Amgen that you must decide. Regeneron's first state-law claim is under Section 17043 of California's Unfair Practice Act which prohibits a person or corporation from selling products at less than the product's cost for the purpose of injuring competitors or destroying competition. Regeneron's second state law claim is under Section 16720 and 16727 of California's Cartwright Act, which prohibits unreasonable restraints on trade. Regeneron's third state-law claim is under Section 340 of New York's Donnelly Act, which prohibits unreasonable restraints on trade. Regeneron's fourth state-law claim is a tortious interference with prospective business relations claim.

### 41.    CALIFORNIA UPA—ELEMENTS (COUNT EIGHT)

Regeneron also claims that Amgen engaged in unlawful sales below cost, contrary to the California Unfair Practices Act ("UPA") (Count Eight). To establish this claim, Regeneron must prove all of the following:

1) That Amgen offered to sell Repatha in California at a price that was below cost;

2) That Amgen's purpose was to injure competitors or destroy competition;

3) That Regeneron was harmed; and

4) That Amgen's conduct was a substantial factor in causing Regeneron's harm.

If Regeneron proves that Amgen offered to sell or sold Repatha at a price that was below the cost of Repatha and that Amgen's acts harmed Regeneron, you may assume that Amgen's purpose was to injure competitors or destroy competition. To overcome this presumption, Amgen must present evidence of a different purpose. Amgen claims that it has presented evidence that demonstrates that its purpose was to obtain coverage for Repatha and to benefit competition. Considering all of the evidence presented, you must decide whether Regeneron proved that Amgen's purpose was to injure competitors or destroy competition.

It is only when a defendant sells below cost and does so with the purpose, that is, desire of injuring competitors or destroying competition, that such conduct is unlawful under California law. Accordingly, if you find Amgen liable for this claim, and that Regeneron was damaged, any corresponding damages must be limited to damages caused by the price or contract that you find was below cost and made with the purpose of injuring competitors or destroying competition.

### 42. CALIFORNIA UPA—PRESUMPTIONS CONCERNING COSTS

A manufacturer's costs include the cost of raw materials and the cost of manufacturing.

The cost of manufacturing is the average cost of manufacture over a reasonable time, rather than the cost of one item at a particular time.

### 43. CALIFORNIA UPA—METHODS OF ALLOCATING COSTS

Although no formula for determining the appropriate cost of a particular product/service is set by law, the determination of the appropriate cost of manufacture of a particular product must be reasonably related to the burden the product puts on Amgen's overall cost of doing business.

**44.    CALIFORNIA UPA—AFFIRMATIVE DEFENSE TO BELOW COST
SALES—MEETING COMPETITION**

Amgen claims that any below cost sales proven by Regeneron are justified by the need to meet competition. To succeed, Amgen must prove that the sales of Repatha were made in an attempt, in good faith, to meet the legal prices of a competitor selling the same product in the ordinary course of business in the same area.

To meet legal prices means to lower the price to a point that Amgen believes in good faith is at or above the legal price of the competitor it is trying to meet.  That is, Amgen may attempt to "meet," but not "beat," what in good faith it believes to be that competitor's legal price.

## 45.    CALIFORNIA CARTWRIGHT ACT—ELEMENTS (COUNT NINE)

Regeneron also brings a California Cartwright Act claim (Count Nine) and alleges that

Amgen engaged in bundling of Enbrel and/or Otezla with Repatha to exclude Praluent from the in

the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs.

To establish this claim, Regeneron must prove all of the following:

1) That Amgen engaged in bundling of Enbrel and/or Otezla with Repatha to require customers to exclude Praluent;

2) That the purpose or effect of Amgen's conduct was to restrain competition;

3) That the anticompetitive effect of the restraints outweighed any beneficial effect on competition;

4) That Regeneron was harmed; and

5) That Amgen's conduct was a substantial factor in causing Regeneron's harm.

**46.      CARTWRIGHT ACT—RULE OF REASON**

In deciding whether Amgen's challenged restraint or conduct had an anticompetitive or beneficial purpose or effect on competition under the Cartwright Act, you should consider the results the restraint or conduct was intended to achieve or actually did achieve. In balancing these purposes or effects, you also may consider, among other factors, the following:

- The nature of the restraint or conduct;

- The probable effect of the restraint or conduct on the business involved;

- The history of the restraint or conduct;

- The reasonableness of the stated purpose for the restraint or conduct;

- The availability of less restrictive means to accomplish the stated purpose;

- The portion of the market affected by the restraint or conduct; and

- The extent of Amgen's market power.

**47.     NEW YORK DONNELLY ACT (COUNT TEN)**

Regeneron also brings a New York Donnelly Act claim (Count Ten) and claims damages for Amgen's alleged violation of Section 340 of the General Business Law. In order to recover, Regeneron has the burden of proving that Amgen violated that law and that the violation was a substantial factor in causing damage to Regeneron.

Section 340 of the General Business Law provides that any contract, agreement, arrangement, or combination that restrains competition or the free exercise of any business activity is against public policy and illegal.

To restrain competition or the free exercise of any business activity means to interfere unreasonably with the ordinary, usual and freely competitive pricing system in such business activity.

To prove a violation of Section 340 of the General Business Law, Regeneron must show both that Amgen entered into a contract, agreement, arrangement, or combination that tended to restrain competition or the free exercise of business activity and that they acted to carry out that contract, agreement, arrangement, or combination. There need not have been a formal agreement, either written or oral. The law covers not only a contract or agreement but also an arrangement or combination as well. It therefore includes an understanding that is less formal than a contract and, if you find the evidence warrants, such an understanding may be inferred from the conduct of Amgen. There can be no contract, agreement, arrangement, or combination without at least two participants.

In order to prove a violation of the law, it is not essential that the agreement or arrangement be completely successful. If Amgen entered into an agreement or arrangement that had the tendency to restrain competition and Regeneron was damaged as a result, that would be sufficient to find a violation of the law.

You must proceed to decide whether Amgen's actions resulted in an unreasonable restraint of trade. In determining whether the claimed restraint of trade was unreasonable, you will evaluate the evidence concerning the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs, the nature and effects of the agreement, arrangement, or contract and the economic impact of the agreement, arrangement, or contract on trade in the in the PCSK9i market, or the submarket for pharmacy-dispensed PCSK9i drugs.

If you find that the agreement, arrangement, or contract resulted in an unreasonable restraint of trade, then you must find that the effect of the agreement, arrangement, or contract was to restrain the free exercise of Regeneron's business and you will proceed to consider whether Regeneron has sustained any damage. If Regeneron sustained damage, you will award Regeneron such an amount as you find will fairly compensate it for the damage it has sustained as a result of the violation of the Donnelly Act claim (Count Ten). If you find that the agreement, arrangement, or contract did not result in an unreasonable restraint of trade, or even if it did, that Regeneron sustained no damage as a result, then you will find for Amgen on the Donnelly Act claim (Count Ten).

### 48.    TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELA-
###         TIONS (COUNT ELEVEN)

In addition to Regeneron's claims under the antitrust laws, Regeneron contends that Amgen intentionally interfered with Regeneron's prospective business relationships (Count Eleven). Amgen denies these allegations.

You cannot find in favor of Regeneron on this claim unless you find that Amgen employed "wrongful means" to interfere with Regeneron's prospective contractual or business relationship.

In order to prove its claim for tortious interference with prospective business relations, Regeneron must prove each of the following elements by a preponderance of the evidence:

1) the existence of a prospective business relationship between Regeneron and a third party;

2) an intent on the part of Amgen to harm Regeneron by interfering with that prospective business relationship;

3) knowledge of the relationship or expectancy on the part of Amgen;

4) the absence of a privilege or justification on the part of Amgen;

5) actual damage to Regeneron caused by Amgen's interference; and

6) a reasonable likelihood that the prospective relationship between Regeneron and a third party would have occurred if not for Amgen's alleged interference.

A "prospective" relationship is something less than an actual contract but more than just hope on Regeneron's part that it would enter into the relationship with the third party.

In determining whether Amgen intentionally interfered with Regeneron's prospective business relationship with a third party, you must consider whether the purpose of Amgen's conduct was to protect a legitimate interest and evaluate that against Regeneron's interests. In evaluating these interests, you will consider:

- the expectations of Amgen and Regeneron;

- the relations between Amgen and Regeneron;

- the interest Amgen sought to advance;

- whether Amgen's conduct was done for the purpose of causing the interference or whether it was merely incidental to another purpose, and

- whether Amgen's conduct is permitted by the "rules of the game" which society has adopted for business competition.

### 49.    COMPETITION AS PROPER OR IMPROPER INTERFERENCE

I will now instruct you as to a defense that Amgen is raising to Regeneron's Interference with Prospective Contractual Relations Claim. Amgen bears the burden of proving this defense by a preponderance of the evidence.

Amgen asserts that its conduct was proper because it occurred during the course of competition between Amgen and Regeneron. The law recognizes that a person is justified in causing a third party not to enter into a contract with the person's competition as long as the conduct relates to competition between the two competitors and the person is acting, at least in part, to advance his or her own commercial interests in such competition, and as long as the person does not use wrongful means to compete.

You must first determine, then, whether Amgen's conduct relates to competition between Amgen and Regeneron for third-party PBM business. If you find that it does, then you must determine whether Amgen's purpose was, at least in part, to advance Amgen's interest in competing with Regeneron. For example, if you find that Amgen was seeking to acquire for itself the business diverted from Regeneron, then as long as Amgen's conduct was at least in part directed toward gaining business, the fact that you may find it was also motivated by other reasons does not make it improper in the eyes of the law.

You are entitled to conclude that conduct by Amgen that violates the antitrust laws defeats this competitive privilege defense.

## 50.    DAMAGES—INTRODUCTION

If you find that Amgen violated one or more of the federal antitrust or state laws, then you must determine the amount of damages, if any, that Regeneron is entitled to recover. I will instruct you on the law that applies to the determination of damages.

**51.    ANTITRUST COMPENSATORY DAMAGES—PURPOSE**

If you find that Amgen violated one or more of the federal antitrust laws (Counts One through Six) and that this violation caused injury to Regeneron, then you must determine the amount of damages, if any, that Regeneron is entitled to recover for each count. The fact that I am giving you instructions concerning the issue of Regeneron's damages does not mean that I believe Regeneron should, or should not, prevail in this case. If you reach a verdict for Amgen on the issue of liability on the antitrust claims, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that Regeneron should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of conduct you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured party as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages--or to deter particular conduct in the future. Furthermore, you are not permitted to award Regeneron an amount for attorneys' fees or the costs of maintaining this lawsuit.

### 52.    ANTITRUST COMPENSATORY DAMAGES—CALCULATION

You are permitted to make just and reasonable estimates in calculating damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Regeneron must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

You are permitted to make reasonable estimates in calculating damages. So long as there is a reasonable basis in the evidence for a damages award, Regeneron should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.

If you find that Regeneron has provided a reasonable basis for determining damages, then you may award Regeneron damages based on a just and reasonable estimate supported by the evidence.

If you find that Regeneron has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

### 53. ANTITRUST COMPENSATORY DAMAGES—CAUSATION AND DIS-AGGREGATION

If you find that Amgen violated any of the federal antitrust laws (Counts One through Six), and that Regeneron suffered an antitrust injury as a result of that violation, then Regeneron is entitled to recover damages for such injury that was the direct result or likely consequence of the unlawful acts of Amgen. Regeneron bears the burden of showing that its injuries were caused by Amgen's antitrust violation, as opposed to any other factors. If you find that Regeneron's alleged injuries were caused in part by Amgen's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of Regeneron's alleged injuries that was caused by Amgen's alleged antitrust violation.

Regeneron claims that it suffered injury via lost sales and profits, and increased costs, as a result of Amgen's bundled agreements and below cost pricing. Amgen claims that any profits or sales lost by Regeneron occurred as a result of other factors that have nothing to do with the alleged antitrust violation including Regeneron's own marketing decisions, Amgen's superior responsiveness to the needs and desires of its customers, and independent decisions by PBMs. Regeneron is not entitled to recover for lost profits that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean Regeneron did not suffer antitrust injury, but Regeneron is not entitled to recovery for damages caused by them. Regeneron only may recover for damages caused by the alleged antitrust violation.

Regeneron bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that Regeneron was injured by Amgen's alleged antitrust violation, and there is a reasonable basis to apportion Regeneron's alleged injury between lawful and unlawful causes, then you may award damages. If

you find that Regeneron has not proven that it suffered injuries that were caused by unlawful conduct by Amgen as opposed to other reasons, then you should not award damages.

### 54.     ANTITRUST COMPENSATORY DAMAGES—LOST PROFITS

Regeneron claims that it was harmed  due to its lost profits and increased costs as a result of Amgen's alleged federal antitrust violations. Regeneron claims its increased costs are due in part to rebates it offered that were above competitive levels. If you find that Amgen committed an antitrust violation and that this violation caused injury to Regeneron, you now must calculate the profits that Regeneron lost as a result of Amgen's antitrust violation. To calculate lost profits, you must calculate net profits: the amount by which Regeneron's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues. You may calculate the net profit by the following measure: calculate the lost profits damages to Regeneron as the difference between profits that Regeneron would have earned on sales of Praluent in the absence of Amgen's exclusionary conduct (But-For Profits) and the profits that Regeneron earned on sales of Praluent in the actual world, *i.e.*, in the presence of Amgen's exclusionary conduct (Actual Profits). You must consider both the revenues, if any, that Regeneron lost and the expenses, if any, it saved as a result of Amgen's alleged anticompetitive conduct.

### 55. ANTITRUST COMPENSATORY DAMAGES—MITIGATION

Regeneron may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence. Regeneron is not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If Regeneron failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to Regeneron than it would have suffered had it taken those steps, then Regeneron may not recover any damages for that part of the injury it could have avoided.

Amgen has the burden of proof on this issue. Amgen must prove by a preponderance of the evidence:

(1) First, Regeneron acted unreasonably in failing to take specific steps to minimize or limit its losses;

(2) Second, the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

(3) Third, the amount by which Regeneron's loss would have been reduced had Regeneron taken those steps.

In determining whether Regeneron failed to take reasonable measures to limit its damages, you must remember that the law does not require Regeneron to take every conceivable step that might reduce its damages. The evidence must show that Regeneron failed to take commercially reasonable measures that were open to it. Commercially reasonable measures mean those measures that a prudent businessperson in Regeneron's position would likely have adopted, given the circumstances as they appeared at that time. Regeneron should be given wide latitude in deciding how to handle the situation, so long as what Regeneron did was not unreasonable in light of the existing circumstances.

### 56. CALIFORNIA UPA AND CALIFORNIA CARTWRIGHT ACT—DAMAGES

If you decide that Regeneron has proven its claims against Amgen under the UPA and/or Cartwright Act (Counts Eight and Nine), you also must decide how much money will reasonably compensate Regeneron for the harm. This compensation is called "damages."

The amount of damages must include an award for all harm was caused by Amgen's wrongful conduct, even if the particular harm could not have been anticipated.

Regeneron must prove the amount of its damages. However, Regeneron does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following is the specific item of economic damages claimed by Regeneron:

- Loss of reasonably anticipated sales and profits;

- An increase in Regeneron's expenses The amount of the lost profits and increased costs need not be calculated with mathematical precision, but there must be a reasonable basis for computing the amounts.

### 57. NEW YORK DONNELLY ACT—DAMAGES

If you find that Regeneron has proven its Donnelly Act claim (Count Ten) against Amgen, Regeneron is entitled to full compensatory damages. If Regeneron sustained damage, you will award Regeneron such an amount as you find will fairly compensate Regeneron for the damage Regeneron has sustained as a result of the violation of the law.

The burden of proving damages is on the Regeneron, who must present a proper basis for ascertaining the damages sought that must consist of some reasonable standard of computation other than conjecture or guesswork, however, Regeneron is not held to any hard and fast rule in this regard when measuring prospective damages.

## 58.    TORTIOUS INTERFERENCE COMPENSATORY DAMAGES

If you find that Regeneron has proven that Amgen engaged in tortious interference (Count Eleven), then you must determine what amount, if any, of damages Regeneron would be entitled to recover. It would be such a sum as you believe, from the evidence, will fairly and reasonably compensate Regeneron for any damage Regeneron has suffered by reason of Amgen's conduct. Such sum should include the lost profits of which Regeneron was deprived, provided they are of such a nature to be beyond the speculative stage.

In determining compensatory damages, you may consider whether Regeneron suffered any measurable loss of profits as a result of Amgen's conduct. In this case, Regeneron claims that its business was affected because of increased costs and the loss of sales and profits Regeneron might have earned but for Amgen's conduct.

For lost sales and profits to be recovered, there must be a reasonable basis for computing them. Ordinarily, it is sufficient for this purpose to show actual past profits and losses; that is, past receipts and expenses in Regeneron's business.

Although they cannot be taken as an exact measure of future or anticipated profits, you, the jury, should consider those past profits and losses together with the uncertainties and contingencies by which they probably would have been affected. It would be proper for you to consider any normal increase in business that might have been reasonably expected in the light of past developments and existing conditions in Regeneron's business. You may also take into consideration future uncertainties, such as increased competition, increased operating costs, and changes in economic trends. Losses and profits that are mere guesses, speculative, remote, or uncertain, or unwarranted estimates of witnesses, should not be considered.

Damages, if any, should be restricted to such losses, if any, as are proved by facts from which their existence is logically and legally inferable. The general rule on the subject of damages

is that all damages resulting necessarily, immediately, and directly from the wrong are recoverable, and not those that are contingent and uncertain or mere speculation.

The difficulty or uncertainty in ascertaining or measuring the precise amount of any damages does not preclude recovery, and you, the jury, should use your best judgment in determining the amount of such damages, if any, based upon the evidence. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.

On the other hand, the law does not require Regeneron to prove the amount of its losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

That Amgen did not actually anticipate or contemplate that these losses would occur is not a relevant factor for you to consider.

If you find that Regeneron is entitled to a verdict in accordance with these instructions, but you do not find that the evidence before you is sufficient to show that Regeneron has sustained any substantial damages, then you may return a verdict for Regeneron and fix the amount of the compensatory damages in a nominal sum such as one dollar. Such a verdict would determine the rights of the parties, and the court can then issue orders directing their future conduct.

### 59.     TORTIOUS INTERFERENCE PUNITIVE DAMAGES

If you decide to award compensatory damages to Regeneron under its Tortious Interference claim (Count Eleven), you must determine whether Amgen is also liable to Regeneron for punitive damages.

Punitive damages are different from compensatory damages. Compensatory damages are awarded to compensate Regeneron for the injury suffered. Punitive damages, on the other hand, are awarded in addition to compensatory damages.

You may award punitive damages to punish a party for outrageous conduct and to deter a party, and others like it, from engaging in similar conduct in the future. To award punitive damages, you must find by a preponderance of the evidence that Amgen acted intentionally. Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

Intentional conduct means it is the person's conscious object to engage in conduct of that nature.

The law provides no fixed standards for the amount of punitive damages.

In determining any award of punitive damages, you may consider the nature of Amgen's conduct and the degree to which the conduct was reprehensible. Finally, you may assess an amount of damages that will deter Amgen and others like it from similar conduct in the future. You may consider Amgen's financial condition when evaluating deterrence. Any award of punitive damages must bear a reasonable relationship to Regeneron's compensatory damages. If you find that Regeneron is entitled to an award of punitive damages, state the amount of punitive damages separately on the verdict form.

### 60.    DELIBERATIONS AND VERDICT [DISPUTED]

Let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

When you retire to the jury room to deliberate, you may take with you these instructions, your notes, and the exhibits that the Court has admitted into evidence. You should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest convictions

about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the jury officer, to me or to anyone but each other about the case. During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a cell phone, smart phone, or computer of any kind; the internet, any internet service, or any text or instant messaging service; or any internet chat room, blog, website, or social networking service—such as Twitter/X, TikTok, Instagram, Facebook, or Reddit—to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. Information that you might see on the internet or on social media has not been admitted into evidence and the parties have not had a chance to discuss it with you. You should not seek or obtain such information and it must not influence your decision in this case.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

A form of verdict has been prepared for you. It has a series of questions for you to answer. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in. The final section of the form includes "Special Interrogatories." These questions [**REGENERON PROPOSAL:** are separate and apart from the first series of questions on the verdict form and] should have no bearing on how you answer the preceding questions on the verdict form. [**REGENERON PROPOSAL**: Only after you have reached unanimous agreement as to your verdict should you answer the "Special Interrogatories", and][**AMGEN PROPOSAL:** After completing the form,] have your foreperson date and sign the form. You should each then sign the form.  You will then return to the courtroom and your foreperson will give your verdict. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.