IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

REGENERON PHARMACEUTICALS, INC., )
)
Plaintiff, )
) C.A. No. 22-697-JLH
v. )
) JURY TRIAL DEMANDED
AMGEN, INC., )
)
Defendant. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Thursday, April 24, 2025
1:03 p.m.
Pretrial Conference

BEFORE: THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

WILKS LAW FIRM
BY: DAVID E. WILKS, ESQUIRE

-and-

ORRICK HERRINGTON & SUTCLIFFE
BY: ERIC HOCHSTADT, ESQUIRE

-and-

WHITE & CASE LLP
BY: JONATHAN D. POLKES, ESQUIRE
BY: ADAM B. BANKS, ESQUIRE

-and-

APPEARANCES CONTINUED:

WEIL GOTSHAL & MANGES LLP
BY: JESSICA LYNN FOLK, ESQUIRE

For the Plaintiff

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY: MELANIE K. SHARP, ESQUIRE

-and-

GIBSON DUNN & CRUTCHER LLP
BY: ERIC STOCK, ESQUIRE
BY: ASHLEY E. JOHNSON, ESQUIRE
BY: COURTNEY L. SPEARS, ESQUIRE
BY: RICHARD J. DOREN, ESQUIRE
BY: SAMUEL LIVERSIDGE, ESQUIRE

For the Defendant

12:38:46
12:38:46
12:38:46

*** PROCEEDINGS ***

12:38:46
12:39:21
12:39:21

01:02:26 COURTROOM DEPUTY: All rise. Court is now in
01:03:50 session. The Honorable Jennifer L. Hall presiding.
01:03:50 THE COURT: Please be seated, everyone.
01:03:52 MR. WILKS: Good afternoon, Your Honor.
01:04:00 THE COURT: Good afternoon.
01:04:00 MR. WILKS: David Wilks for Regeneron
01:04:02 Pharmaceuticals. If I may, I'd like to introduce some folks
01:04:06 you're going to be spending some time with over the next
01:04:08 couple of weeks, and you're going to spend some time with
01:04:10 this afternoon.
01:04:11 From White & Case, Jonathan Polkes.

MR. POLKES: Good afternoon, Your Honor.

MR. WILKS: And Adam Banks.

MR. BANKS: Good afternoon, Your Honor.

MR. WILKS: They're each -- they each have matters that I think are going to come up today.

Also, Jessica Folk of the Weil Gotshal firm, and Eric Hochstadt from Orrick Herrington in case some issues come up that they're well versed in.

Obviously, Ms. Sharp is going to introduce her team. I would love the opportunity, Your Honor, just to kind of walk you through the way we all see the case coming in.

This is your courtroom. Plainly, you're going to tell us how you want to conduct today's conference, but we do have some things we would like to discuss with Your Honor.

THE COURT: Okay. Your side does or you've agreed that --

MR. WILKS: Sorry?

THE COURT: Your side has some things you'd want to discuss with us, or you've agreed that your side should get things to discuss with us or you have things that you-all have agreed that you want to talk about?

MR. WILKS: A little bit of both, Your Honor.

THE COURT: Okay. All right.

01:04:57 MR. WILKS: Yeah.
01:04:58 THE COURT: Thank you.
01:04:59 MS. SHARP: Good afternoon, Your Honor. Melanie Sharp from Young Conaway on behalf of Amgen. My co-counsel from Gibson Dunn is known to Your Honor, Richard Doren.
01:05:12 MR. DOREN: Good afternoon, Your Honor.
01:05:13 MS. SHARP: Ashley Johnson.
01:05:13 MS. JOHNSON: Good afternoon, Your Honor.
01:05:15 MS. SHARP: Eric Stock.
01:05:15 MR. STOCK: Good afternoon, Your Honor.
01:05:15 MS. SHARP: Courtney Spears.
01:05:15 MS. SPEARS: Good afternoon, Your Honor.
01:05:18 MS. SHARP: And also Sam Liversidge.
01:05:24 And, certainly, there are issues that we want to discuss. We're happy to proceed in whatever order Your Honor thinks makes most sense.
01:05:31 THE COURT: All right. Great.
01:05:32 Did you-all have a chance to discuss what order you wanted to proceed in?
01:05:35 MS. SHARP: No, we have not. I would propose that maybe, if it's acceptable, it makes sense to do the MILs first, before turning to the Pretrial Order, and then miscellaneous issues.
01:05:50 THE COURT: Okay.
01:05:51 MR. WILKS: Whatever Your Honor wants is fine

with us.

THE COURT: Did you have a -- it sounded like maybe you had a statement about how you thought the trial was going to happen that, to the extent the parties wanted to do that and there were no objections, that might be helpful, just because it might provide some context for the MILs. But I'll let you --

MR. WILKS: There are some things that we have reached agreement on that just had to do with sort of how the evidence is going to come in. There's some funkiness of us calling their witnesses in our case and vice versa. We have an agreement on how that would go.

We have issues about playing videos that we just want to get Your Honor's signoff on, candidly. So a lot of nuts and bolt stuff.

There are some evidentiary things that we're going to need rulings on from Your Honor. The order in which Your Honor does it makes no difference to me.

THE COURT: Well, let's start by talking to things we all agree on, and maybe that will get us all in the mood to compromising and agreeing on stuff.

MR. WILKS: Okay. Well, let's start with one where we agree, because that just makes us all feel good.

THE COURT: Okay. Yeah.

MR. WILKS: The order of examinations. As I had

mentioned, Your Honor, we have agreed that, with Your Honor's permission, we will be calling each other's, you know, employee witnesses in our case-in-chief. For instance, Regeneron will be calling Amgen employees witnesses in our case-in-chief.

So what do we do about that? So what typically works in other courts in other cases I've had, we will call an Amgen witness in our case, for example. Amgen will then conduct the direct exam. We would then cross-examine that witness, but the cross is not limited -- the scope of the cross is not limited to the scope of the direct. That way each live witness only comes once and is only presented once.

That's what we've worked out. It's worked well for us in the past. We just hope Your Honor is okay with that.

THE COURT: So when you're saying you're going to call their witness in your case-in-chief, you mean the witness is going to come up here, but the other side is going to go first?

MR. WILKS: Correct. Yes.

THE COURT: Okay. All right.

MR. WILKS: But it's still in our case, but then they don't have to recall that witness when their case comes around. It just makes for a much more efficient

01:08:02 presentation. I think it's easier for the jury.

01:08:04 THE COURT: Okay. And we have agreement on that?

01:08:05 MS. SHARP: Not quite. Should I address this?

01:08:09 MR. WILKS: Shoot.

01:08:09 MS. SHARP: So we're in agreement on the goal of trying to efficiently present things. So when they call one of our witnesses, we would go first.

01:08:20 The only part where we diverge is we may need to recall our witnesses because they're then taking our witnesses out of order. And although we'll do our best, we're not certain that our witnesses will cover everything that comes up later in trial.

01:08:37 THE COURT: So the way that we normally do this is that the Plaintiff leaves its case open, and then we hear from the Defendant's witnesses. And then the Plaintiff can cross-examine outside the scope of the direct, because they wanted those witnesses to come in as part of the Plaintiff's case.

01:08:56 But it sounds like the way you-all want it is for these witnesses to come earlier and so we don't have agreement.

01:09:02 MS. SHARP: So we have agreement on the first part which is --

01:09:06 THE COURT: Right.

01:09:07 MS. SHARP: -- try to let them come earlier, try to do everyone once. And I diverge with Mr. Wilks with respect to, I've never seen it done this way, but we don't have a complete objection to doing the order they propose.

01:09:22 The one small caveat is our witnesses are going out of order. There may be something that arises that causes us to need to call them again later in the case. And --

01:09:35 THE COURT: Got it.

01:09:36 MS. SHARP: -- that's the only bit of this that I think --

01:09:37 MR. WILKS: Yeah.

01:09:38 THE COURT: And it sounds like you're okay with that?

01:09:41 MR. WILKS: Sure. Yeah, of course.

01:09:42 THE COURT: All right. Then we're good.

01:09:44 Does everybody understand how we're going to proceed?

01:09:48 MR. DOREN: Yes, Your Honor.

01:09:48 THE COURT: Yes? Yes. Okay.

01:09:50 MR. WILKS: Great.

01:09:51 THE COURT: Okay. Great.

01:09:52 MR. WILKS: Videos. We have some witnesses who are unavailable who reside outside, you know, this Court's subpoena jurisdiction. There's Robert Bradway, Thomas

01:10:03 Moore. There are witnesses for the pharmacy benefit managers. Amy Bricker is one of them. There may be others. We've made efforts to secure their attendance at trial. We have not been successful.

01:10:14 So I don't think there's an issue there, but we will be playing those deposition videos with Your Honor's permission.

01:10:21 THE COURT: Okay. We have agreement on that?

01:10:23 MR. DOREN: Yes, Your Honor.

01:10:24 THE COURT: Okay.

01:10:25 MR. WILKS: Thank you.

01:10:26 THE COURT: Great. As long as we're talking about depositions, too --

01:10:28 MR. WILKS: Yes.

01:10:29 THE COURT: -- this was on my checklist. And to the extent the parties have worked out when they want to exchange objections to deposition designations and counter designations, that's all fine.

01:10:44 The only thing that I would say is this: If you need to have a ruling from me, for example, on a Tuesday so that you can prepare your video to play to the jury on Wednesday, that should be brought up at the Tuesday morning dispute resolution conference before the jury comes out for the day, which means that I need to have it to my email box at 7:00 a.m. the morning you need the ruling.

01:11:08 MR. WILKS: Yeah.

01:11:09 THE COURT: Okay.

01:11:09 MR. WILKS: Understood. Thank you, Your Honor.

01:11:11 THE COURT: Okay.

01:11:12 MR. WILKS: Where we don't have agreement, I'm afraid, on the videos is just sort of the manner in which they're presented. And this, I'm kind of going backwards on, Your Honor, on what I -- the first thing I brought up.

01:11:25 And that is this: There's a huge disparity in the length of the designations that the parties have made. We've designated about three hours, and we've broken it out into our affirmative designations and our counter designations.

01:11:41 Amgen has designated about 10, 10-and-a-half hours worth and have not broken it out. So that being the case, we're concerned that -- I mean, we're going to put on this video, and it's going to play forever where we only have little bits and snippets. We don't want to leave the impression to the jury that we're the ones who are making them watch the paint dry. And, also, sort of the impact or the import of the testimony that we do want to present is completely lost.

01:12:11 So our solution to that that we've proposed, and Amgen has not agreed to is, why don't we just play our designations in our case, and you play your designations in

your case. Seems to solve the problem.

We do not have agreement on that, so we would like Your Honor's guidance.

THE COURT: So normally I would say no to that, but you intrigued me when you said that you only have little snippets. What are we talking about in terms of your snippets? Are we talking about a couple lines? Because normally we would just play these once and we'd include all the designations and counter designations.

MR. WILKS: Yeah. I think it's a mixed bag, Your Honor. And some we're going to be able, I think, to get rid of based on rulings that I'm hoping Your Honor is going to give us today. But in total we have, as I said, three hours, a little bit less. It's probably going to be considerably less than that against their 10, 10-and-a-half hours.

THE COURT: Okay.

MR. WILKS: So for that reason -- excuse me just one second. For that reason, we would like to just present them in our own case.

THE COURT: All right. Let me hear from the other side.

MR. DOREN: Thank you, Your Honor. Richard Doren.

It's not 10 hours, Your Honor. The witnesses

who are on their witness list who they intend to play by video, their total designations are 3 hours and 20 minutes. Our total designations currently are 5 hours and 30 minutes. And, obviously, we, in no way, want to waste this Court's time or our time on the chess clock. And to the extent we can narrow those, and I expect, frankly, that we can, that they will come in even tighter to par.

And, obviously -- or not obviously, Your Honor, but certainly, my experience is similar to the Court's, which is, as with a live witness, one starts the testimony, sees it soup to nuts, and it's done. And they will be, as a whole, equally allocated.

THE COURT: Okay. So here's what I'll say because this may -- I think some of this dispute may go away, because we need to keep in mind that we're on a time limit here. And so I don't know that you're going to have time to play five hours or three hours of deposition designations, because I need to tell you what I'm thinking. And it's probably pretty close to what you-all were thinking, that to get this all done in time in light of the lengthy jury instructions that you-all have proposed, is that it's probably going to be about 17 hours per side.

MR. WILKS: Seventeen per side, yeah.

THE COURT: Yeah. And so 10 hours or 5 hours of deposition designations aren't going to work.

So here's what I'll say on this: The presumption should be that the deposition videos are getting played once. Each witness is going to have one video played.

If there is a particular case where one side has just got two or three lines and the other side has three hours, I'll take that up in the morning you want to play it, and we can go case by case if there's something that's really an outlier like that.

MR. WILKS: So one example, we have one witness. We have 20 minutes. They have an hour and a half. So 20 minutes is more than two lines for sure.

THE COURT: My guess is that you're not going to have that whole 20 minutes, and they're not going to have that whole hour and a half when this comes down to it. So let's deal with it when it comes up.

MR. WILKS: Fair enough. Thanks, Your Honor.

That's all I have to say about witnesses.

Some things on exhibits. So there's the witness list or -- excuse me -- the witness lists in this case are long. And I think Your Honor's -- what Your Honor just said probably applies to the exhibits, also.

THE COURT: I think there was something like 5,000 exhibits.

MR. WILKS: It's close to that, I imagine.

Yeah. Certainly, 3,000. There's 22 on the Amgen side. We have, I think, less than a thousand or so.

THE COURT: Okay. 3,000.

MR. WILKS: 3,000. 3,000. So that's a lot for a seven-day trial. So --

THE COURT: It's a lot for any trial.

MR. WILKS: I completely agree. So method of presentation. We would love to forego the constant laying the foundation where there can really be no dispute on authenticity 803(6) on business records.

We've talked about this, and we have agreement on one piece of it, and that is party exhibits. Documents that we have produced and Bates stamped, documents that Amgen has produced and Bates stamped, those are deemed authentic. We don't have to go through a 901 foundation for every single one of those. That seems easy.

Where we don't agree, when it comes to party exhibits, is whether they're business records. Now, Amgen suggests we should have to lay that foundation for every single exhibit.

Now, are we going to put in 900 exhibits? Of course not. But we're going to put in a lot, and that is tedious. It's time consuming. And where there is really no reasonable objection that these are not business records. I mean, there's case law on this. The Third Circuit has

01:17:08 written on it. This Court's written on it.

01:17:11 We would love to have a convention from Your Honor that if there is a prima facie case to be made that these are business records, for instance, a Bates number of -- on a document produced by a party in this litigation, that's a business record.

01:17:25 Now, if there are odd balls, a specific exhibit, or two, or three or ten that Amgen can identify, say, Hey, listen, I don't think you can lay a foundation. This is not a business record. We can talk about that. They can raise that. We can either argue it, we can try to lay a foundation and succeed or fail. But to have a blanket thing that we have to lay that foundation for every single exhibit, I mean, that's going to be a half a day or more of the trial just doing that.

01:17:56 Vice Chancellor Laster did actually a study on this, how long it takes out of a given trial, and it's shocking. So we would ask that we have a convention, Your Honor, that the documents produced by the parties are both authentic for both 901, as we have agreed, and that they are business records under 803(6).

01:18:12 If we don't have that, these documents will come in, if not under 803(6), there are other bases. We would just like to forego that wasteful exercise.

01:18:24 THE COURT: So the problem right now for me in

assessing your request is that I don't exactly know what we're talking about. Are we talking about emails? Are we talking about presentations?

MR. WILKS: Yeah.

THE COURT: I don't know what --

MR. WILKS: The bulk of it, Your Honor, is emails.

THE COURT: So you're worried they're going to make a hearsay objection, and you want to get in their emails is what I'm kind of taking from you, but I'm not entirely sure.

MR. WILKS: Well, yeah. The bulk of it is emails. There's some texts, but they're clearly, you know, produced by the parties in response to discovery requests. They pertain to the business of these two parties. There just can't be a bona fide objection to that on a blanket basis. If we can slice it up into categories, we can call it all emails. Fine. And we'll do the authentication for the other stuff.

That's -- not authentication, excuse me. The foundation for the other stuff, fine. But must we do this for every single exhibit? We hope not.

THE COURT: Well, let me hear what the other side's position on this is, and then I think I'll be able to give you some comments.

MS. SPEARS: Thanks, Your Honor. Courtney Spears.

So really there's kind of an interrelated set of issues here that involves kind of the business records exception to hearsay, the authenticity requirement and then the sponsorship witness requirement. Amgen's position is kind of one that involves all of those things, which is if a document is going to be shown to a witness, it should be shown to a fact witness that can provide factual foundation and provide context for that document.

Our understanding is that Regeneron wants to say that all of Amgen's and third-party documents are business records under 803(6) and authentic under Rule 901, so that they can either just directly put them into evidence without showing the fact witness those documents or to have their experts opine on what those documents show or mean without asking the witnesses who are actually coming to trial what they show or mean.

And our understanding is that the general rule in this Court and in your Court specifically is that a sponsoring witness is typically required so that a document can be shown to that witness, and they can provide the necessary context for the jury to understand that document. We think that rule is especially appropriate here when the bulk of the documents are very informal communications like

emails or even text messages where it really requires the testimony of a witness who sent or received that message to say, Here's what was meant by this conversation, not an expert providing that context or no context provided at all.

THE COURT: Okay.

MR. POLKES: Your Honor, may I?

THE COURT: Yes.

MR. POLKES: Good afternoon, Your Honor. Counsel just sort of pivoted to this issue about whether or not an exhibit has to be shown to a witness who's on the stand.

And I agree, these issues are all interrelated. I see it all as really going to good housekeeping for how the trial's going to be conducted. And whether or not, as I said, we have -- there's 3,000 exhibits.

I can give you specific categories of documents, just as examples, where it makes no sense and would be prejudicial to require that each one be shown to a witness, identified and discussed.

Let me give you some examples. Of the 3,000 exhibits, there are thousands of pages of contracts in this case. Not surprising.

For me to have to have a shopping cart and walk up to a witness and say, Look through these thousands of pages. Are these the contracts at issue wastes time.

01:22:08 They're not going to know at a glance and shouldn't be required, when these are Amgen's own contracts that they've produced. We should just be able to say at the beginning of the day -- and there's actually a provision for this in the PTO.

01:22:22 Your Honor, today we'll be moving into evidence the following exhibits, read them. Let's say they're the contracts in this case. You can look at them, say, Do you have an objection? No. Now the contracts are in evidence, so I can use them, not use them, show them to a witness if it's appropriate or not, but they're in the record.

01:22:39 There's no reason and there's certainly no basis in law, and there's certainly no basis in the Federal Rules of Evidence to require that that document or exhibit be shown to a witness just to sort of check a box before it can be put into evidence. And it's going to as -- you can see how it's going to sort of be dilatory and interrupt the flow of the trial.

01:23:00 Let me give you a second category. There's a witness who works for -- worked for one of the PBMs. In this case, Mr. Moore, who's not available. We'll be playing his deposition, to the extent it's appropriate.

01:23:15 He has lots of exhibits. Do we have to play an hour of his testimony of him just saying, Yes, I recognize Exhibit 10, and 11 and 12 when that is just purely to check

01:23:27 a box?

01:23:28 What we think makes more sense and is consistent with the Federal Rules of Evidence would be for me to be able to say at the beginning of the day, Your Honor, today we'll be moving into evidence the following exhibits. Read them. Some of them will be Mr. Moore's.

01:23:40 Now they're in the record. I don't need to waste everyone's time playing his deposition just to have him identify them.

01:23:48 The same is true of other absent PBM witnesses. There are many of them who aren't coming. And the -- what was it 3-and-a-half hours of ours can be reduced to about an hour if we don't have to go through the rigamarole of simply having them identify a series of exhibits. They could be just moved into the record.

01:24:09 That's three categories.

01:24:11 So let me give you a fourth. Just by way of illustration, there may be documents that are admissible. Remember, we're talking here about documents as to which there's no objection, or if there is, it's been overruled. So these are admissible documents. They're trying to superimpose an additional requirement that's not in the Federal Rules of Evidence, that even if a document has been deemed by Your Honor to be authentic or even conceded to be authentic, not hearsay, otherwise admissible, there's an

additional requirement, which it's got to be shown to somebody simply to check a box.

Now, suppose there's such a document that's fully admissible, and I'm doing a cross-examination. And I decide I'm done. I don't need to keep asking this witness questions. They're saying that the remaining documents that I have not yet shown that witness can't be moved into evidence. Because, again, it's an arbitrary rule. It's not in the Federal Rules of Evidence. It's going to waste everyone's time.

I would have to theoretically finish my cross with another half hour of just marching through a series of documents. And all they would be saying is, Yes, that's my email. And now supposedly there's a magic, you know, box that's been checked, so now I can move it into evidence.

So I submit, Your Honor, that the sponsorship rule that they're proposing is not a rule. I'll say it again. It's not in the Federal Rules of Evidence.

There is no case requiring it anywhere. We've looked. They certainly haven't cited one. And the Third Circuit has specifically said there is no such rule and no such requirement, and that it's error to impose one.

THE COURT: Where is the -- where is it said that it's error to impose one? It's certainly within the discretion of the Court to organize and control the

01:25:57 proceedings.

01:25:59 MR. POLKES: Of course. And Your Honor would have the discretion to do that. But in *McQueeney vs. Wilmington Trust*, 779 F.2d. 916 at Page 930, the Court said, "Counsel is entitled to proffer unobjectionable exhibits" -- this is a quote -- "without any authenticating testimony or other foundation."

01:26:24 So for all those reasons, Your Honor, A, it's an invention. Certainly, within the Court's discretion. I don't mean in any way to suggest it's not. But I think in this case, we have 17 hours. We have lots of business to get through. I think the only -- and as I pointed out, there are many categories of documents where it really is utterly arbitrary.

01:26:46 I think that's the reason it's being asked for by the Defendants. It will be dilatory. It will waste time. It will eat the clock. There are lots and lots of exhibits to go through. And it literally adds nothing because, according to what they want me to have to do, I show a witness a document. I say, Is this your email? They say, Yes. I'm now good to go. I can then just move on to the next document. There's -- it's completely arbitrary.

01:27:09 So what I would ask the Court -- and I know Your Honor was in the U.S. Attorney's Office. I've been doing this in Federal Court for 30 years -- is at the beginning of

the day -- and, remember, the PTO requires us to exchange the list of exhibits that we intend to be using the next day. I think it's a 24-hour requirement, which fits perfectly with what I'm suggesting, which is I would come in in the morning and say, Judge, we would like to move into evidence now, outside the presence of the jury -- it's much more considerate of their time as well -- the following 20 exhibits.

I read them. You look at them. You say, Do you have any objections? They say yes. They say no. We work it out. Those documents are now in evidence.

I can use them with the witness or I can decide not to use them with the witness. And I can -- they're part of the record. So I think that's the far more sensible and appropriate way to go.

I think it's important in a case of this magnitude in terms of documents. I think it's much more considerate of the jury's time. And I think that the only purpose for which this is being -- they haven't articulated why they even want this rule.

All it's going to do in this case is serve to interfere with our smooth presentation of our case and be highly prejudicial to us for that reason.

THE COURT: All right. Thank you.

Let's hear from the other side.

MS. SPEARS: Thanks, Your Honor.

You know, I'll just first note we've been meeting and conferring about this for over a month. This is the first we've heard of this Third Circuit case. So I'd love if we could take a look and, you know, see in what context that sentence came up, because I'm not aware.

I think I stated before, but I'll reiterate briefly why we think this rule is important here. And it's so that a witness can provide context for the documents to the jury.

And, yes, it is our position that if they want a document to be in evidence, it should be shown to a witness. Now, are there certain categories of documents like the contracts that maybe it makes more sense to not show each one to a jury? Perhaps, and we are open to discussing that for something like the contracts. But, also, I will caveat for Your Honor that we do not expect that all 900 contracts will be moved into evidence.

But, in general, you know, I think just reiterating my prior point that we really think that a fact witness should be able to provide the context for a document before it's moved into evidence. And, you know, whether they're just moving it into evidence and it's going back with the jury, or they're moving it into evidence and then their expert is going to get on the stand and try to tell

the jury what that document or communication says, or means or shows, we don't think that's appropriate.

So we'll submit, Your Honor.

THE COURT: Okay. You can have a seat.

So there were a lot of points of dispute here. So let's start with the easy one, for me at least, which is that, consistent with my practice as well as the practice of the majority of the judges on this Court, if not all of them, documents should be moved into evidence through the testimony of the witness on the stand.

However, I think we did have agreement from Amgen's side that certain things like contracts, maybe we can reach some agreement to get those batches admitted, to the extent that both sides agree.

And that rule isn't to slow things down. The rule is to, among other things, make sure that the jury and the Court are pointed to the relevant parts of the exhibit, rather than have 50,000 pages of documents where something is buried deep in one of them that the jury was never focused on, that now the Third Circuit is focused on a year from now.

So that's one of the reasons for that. But it also focuses everyone to make sure that we're only admitting relevant evidence.

All right. So we had that talk.

01:31:04 With respect to the discussion about business records, so let's just see how it goes for the first couple days. Obviously, the procedure that the parties have discussed, which is consistent with my procedure in other cases, is that we're going to have an exchange of the list of exhibits that are going to be shown to the witnesses. And if there's an objection based on hearsay to one or more of those exhibits, then you-all should discuss whether or not it's a business record. And we can bring that up in the morning and discuss whether a foundation needs to be laid, and we'll just see how it goes for a couple days. And then if we come up with some sort of general rule, we'll move forward with that.

01:31:44 This hasn't really been a problem in the many patent cases that we've tried in the last couple years, so I'm not sure why that's an issue in this case.

01:32:00 Amgen suggested that they want to make sure that documents only get admitted by somebody who has personal knowledge of the document. That, to me, is taking it a step too far.

01:32:16 If an expert has relied on a number of documents in forming their opinions, and if some or more of the documents are admission of a party opponent and look like a legitimate authentic email, I'm not going to say that that can't get admitted through the testimony of the expert.

01:32:32 And then with respect to the deposition
01:32:41 testimony about having long deposition designations just to
01:32:49 get exhibits in, if that really is what is going on, I feel
01:32:53 like the parties should be able to work out an agreement for
01:32:55 that to minimize the amount of time those have to get shown
01:32:59 to the jury. If there's one reason or the other that a
01:33:01 party wants that to be played, then I guess we'll hear about
01:33:07 it if you can't work it out. And maybe -- and if you can
01:33:10 explain some reason why that needs to happen, then we'll eat
01:33:13 it out of your time, if that's what needs to happen.
01:33:16 I think I addressed everybody's points on those.
01:33:23 MR. WILKS: I think you did, too.
01:33:24 THE COURT: Maybe not very articulately --
01:33:26 MR. WILKS: No, no.
01:33:26 THE COURT: -- but you were all nodding so I
01:33:28 think --
01:33:28 MR. WILKS: Clear as a bell.
01:33:29 THE COURT: -- everybody was tracking.
01:33:30 MR. WILKS: There's only one thing, I think, to
01:33:32 clean up on that, and that is the third-party production.
01:33:37 So we've drawn exhibits from the productions that we've
01:33:40 gotten in response to subpoenas. You know, we subpoenaed
01:33:43 the pharmacy benefit managers for business records, that's
01:33:47 what it says in the subpoena. And they dickered with us, of
01:33:51 course, over the scope, and then they made productions with

their Bates numbers and so forth.

We have proposed, just as we agreed on the party exhibits, why can't we just stipulate that those are satisfactory for Rule 901 purposes. We do not have agreement on that.

Now, that's one where this Court, Judge Connolly in the *Power Systems Technology* case a couple years ago, he wrote on this. He cited also this *McQueeney* case from the Third Circuit and others that the -- I think the Third Circuit says the burden of proof under Rule 901 is slight is the word the Third Circuit uses.

And if there is -- if there is a prima facie case made through -- it wasn't produced in discovery, it satisfies Rule 901. We would just like to dispense with -- I understand what Your Honor said --

THE COURT: Are they really making an authenticity objection, or is there something else going on here?

MR. WILKS: We asked them, Would you stipulate under Rule 901? And they said, No. Would you stipulate on the business records thing that -- Your Honor already talked about that on the parties and --

THE COURT: Do you have business record certifications from the third parties that we could --

MR. WILKS: Yeah. I mean, there's a lot of

time-consuming ways that we can establish that, and that's fine. We're just trying not to spend the time on that.

But the 901 thing, it's pretty barn door clear under Third Circuit case law. These are authentic for 901 purposes. Must we really jump through that hoop, too, for these third-party productions? We think we should not have to do at least that piece.

THE COURT: All right. Again, it's hard for me without --

MR. WILKS: Yeah.

THE COURT: -- seeing what documents we're talking about. Does anybody from the other side have something they want to say about this?

MR. DOREN: Just real quickly, Your Honor. The way this worked is subpoenas were issued. Documents were produced. Depositions were taken.

Some subset of those documents, witnesses were examined on. To the extent witnesses were examined on specific documents, and they want to -- we want to collectively save time by not have authenticating testimony designated, happy to talk about that.

What counsel is referring to is the corpus of documents that weren't used with witnesses for which no foundation has been laid and no business record certification has been obtained. The only party that has

obtained one of those is us from Sanofi. None of the other third parties have produced a business record certification.

So we think it's wholly inappropriate that documents that were not used with a witness from that third party, produced by that third party now come into evidence without any witness here confident to lay a foundation.

THE COURT: So I take it, though, do you have a real concern that these aren't business records, or are you more concerned that you -- there's nobody that can stand on the stand and provide context to whatever the document is?

MR. DOREN: I would think, Your Honor, again, as you say in the abstract, it's a difficult discussion to have as to business records. I think that's an issue, but I also think plucking documents out of a stack and handing them to your expert and having your expert start opining on what this means and why it supports their opinion is simply wholly improper.

THE COURT: Right. Okay.

All right. Counsel.

MR. WILKS: If I might, Your Honor. I want to make sure Your Honor understands.

This huge corpus of documents, there's 29. There's only 29 of these third-party documents that we're talking about. It shouldn't be very hard, I think, maybe for Amgen to go through that 29 and tell us, Hey, we don't

01:37:17 think that's a business record.

01:37:19 THE COURT: Right. So I'm going to ask the parties to work this out. So I think some of this is subsumed by what I already said, which is Amgen's request that we have to have somebody who authored the document on the stand to admit it, we're not going to follow that procedure. Theoretically, this could come in during an expert who relied on it. If there was a business record certification, that would be the way that it would bypass the hearsay rule --

01:37:47 MR. WILKS: Yeah.

01:37:48 THE COURT: -- with the expert on the stand. And so if Amgen has a legitimate reasonable belief that some of these aren't business records, you should meet and confer about that. And if there really is a belief that it might not be a business record, you can bring that to me and we'll get you a ruling on those.

01:38:06 MR. WILKS: Of course. And I chose 803(6) because that seems to be the easiest one. There are others. A lot of these are non-hearsay. They're -- they meet other exceptions.

01:38:14 So I think we should be able to work it out, but if not, we certainly understand Your Honor's instruction.

01:38:20 THE COURT: All right.

01:38:21 MR. WILKS: I have two more things I'd like to

bring up.

THE COURT: Sure.

MR. WILKS: One I want to do before I forget, because I have the privilege of holding a Delaware Bar card. My colleagues do not. I doubt a lot of my friends on the other side do.

Would Your Honor please issue an Order that allows these folks to bring their electronics upstairs?

THE COURT: So there's a procedure by which that gets done, and my staff issues those for me. So --

MR. WILKS: Okay.

THE COURT: -- we should check with what the procedure is, which I think is on the Court's website. And once that Order gets signed, you should be able to get through the front.

I can't have my own procedure --

MR. WILKS: Very good.

THE COURT: -- because the folks at the front are dealing with a lot of different judges. And if we each did our own thing, a lot of people would get frazzled by that.

MR. WILKS: Understood. I'll take care of that, Your Honor.

Thank you.

THE COURT: All right.

MR. WILKS: My last thing, it has to do with these very voluminous contracts, these PBM contracts that both parties have. What we've agreed, I'm almost certain we've agreed, is we're not going to object, under the completeness rule, to the introduction of bits and pieces or parts or sections. We're not going to object to each other's introduction of parts of the contracts on that basis. If there's other bases, fine, but we're not going to argue the completeness rule on any of the contracts.

And I like to think that we do have agreement on that. That's the last thing I have.

I think maybe Mr. Polkes has something else to raise. There are motions in limine we still have to get through, so --

THE COURT: All right. Does anybody have anything to say about the contract?

MR. DOREN: Only, Your Honor, that we do agree less than the entirety of a voluminous document can be admitted without a completeness objection, subject to whatever part it is they're referring to. We would want to consult with them prior to admission that it's a complete part.

THE COURT: Right. So, I mean, I think this should get worked out when you-all are exchanging exhibit lists before you bring them to me. So share with the other

side the parts of it that you want to include, and then we'll deal with any issues about that in the morning.

MR. WILKS: Thanks, Your Honor.

THE COURT: Yeah.

MR. BANKS: All right. Good afternoon, Your Honor. Adam Banks from White & Case.

I'm going to present Regeneron's motion in limine with respect to the EpiPen litigation.

THE COURT: All right. Let's wait on the motions in limine as long as we're into the --

MR. BANKS: Okay.

THE COURT: Yeah. Anything else that you had besides the motions in limine?

MR. BANKS: That's all, I think, from our side, Your Honor.

THE COURT: Okay. Great.

Anything else? Any housekeeping stuff that you think we need before we go through the Pretrial Order?

MS. SHARP: Well, one thing I would raise, Your Honor, is that, as in most of these trials, there may be issues that pertain to confidentiality. Certainly, the PBMs have raised concerns and pointed to contractual obligations that presumably apply to both.

We are trying -- because the PBMs have reached out to us, we're trying to work those out, minimize the

01:41:22 scope of the objections and see where we can get on it. And we would hope that Regeneron will work together with us on that and perhaps reach some kind of resolution like we did for the summary judgment hearing where we're both in agreement about what's confidential and what's not. If the courtroom needs to be sealed or if we can use some of the customary mechanisms to bypass sealing the courtroom.

01:41:48 There may also be a very small quantity of Amgen or perhaps Regeneron information that is confidential as well, and we would hope, with respect to that, to work together and reach agreement on what we should do and then present that to the Court.

01:42:03 THE COURT: Absolutely. Thank you very much.

01:42:05 And so what I'll say about this, and it's also addressed in Paragraph 110 of the Pretrial Order, that we need to have discussions about this before there is a request to seal the courtroom. I'm generally disinclined to seal the courtroom. If any party anticipates at any point during the course of the trial day that the courtroom might need to be sealed, there needs to be a meet and confer with the other side about how that can happen, and we need to be notified in the morning.

01:42:54 So what we can't have happen is just all of a sudden at 2:00 p.m. somebody asks to seal the courtroom out of nowhere. We need to know that that's about to happen.

And so what we prefer to have happen is if it's a particular number in a document that folks are worried about, potentially we could have a redacted version up on the screen with the jurors being handed copies of the full document. If it's a slide and a demonstrative, we could hand that out to the jurors. But we need to have an understanding about what it is, and we need to try to minimize any sealing of the courtroom.

Does anybody have any questions about that?

MR. WILKS: No, Your Honor.

MS. SHARP: No, Your Honor.

THE COURT: Okay. Great.

Okay.

MR. STOCK: Your Honor, we have one other thing before the in limine motions.

THE COURT: Yes.

MR. STOCK: This is the Mathur expert.

Your Honor, I'm sorry to have to raise this. You issued an Order permitting Plaintiff's expert on damages to replace her projections with actual numbers, and that's all you permitted them to do, to my recollection.

THE COURT: That is my recollection.

MR. STOCK: Unfortunately, we asked Regeneron for a new expert report, and instead of replacing the projections with actual numbers, they replaced a very

important projection with a number that then adopted a new methodology never disclosed in any of the earlier reports. And instead of the formula that Dr. Mathur used in all of her original reports where she took operating expenses and deducted them from damages, in the new report, instead of taking operating expenses themselves, she adopted a new methodology of prorating them and discounting them by 80 percent before putting them into her damages number.

That methodology is totally inconsistent with her prior reports. It's justified by a claim that we're not including CVS damages. But in her prior report, she didn't include Optum Part D damages. In her new report, she doesn't include ESI Part D damages. She's expressly said in her prior reports that these operating expenses do not depend on PBM.

And so this is a brand new methodology and it violates Your Honor's record expressly. And we want Your Honor to consider enforcing your Order, please.

THE COURT: Okay. So you have a facility with the facts that I don't have, because you're very deep in the weeds with it. So I'm going to need briefing on this.

MR. STOCK: Okay.

THE COURT: When did you get this supplemental report that you say goes outside the Court's Order?

MR. STOCK: I believe Monday.

THE COURT: Okay. All right.

Why don't you -- well, when do you think you could get me a letter about it?

MR. STOCK: On Monday, Your Honor.

THE COURT: Yeah. That's fine.

And then I'll have a responsive letter from the other side by Wednesday. And then we'll get you-all on the phone.

Does that work?

MR. HOCHSTADT: Thank you, Your Honor. I disagree with the characterization.

THE COURT: I understand, but you can say whatever you want, and it's going to be Greek to me, because I need to take a look at it.

MR. HOCHSTADT: Understood.

MR. STOCK: Your Honor, two-page letters? Does that sound good?

THE COURT: If you can get it done in two pages, that's fine with me. All right. And make sure you have the attachments of the reports. It's just much --

MR. HOCHSTADT: We'll provide a copy, Your Honor.

THE COURT: Thank you.

MR. HOCHSTADT: Thank you.

THE COURT: Okay. All right.

Let's go through some other things from the Pretrial Order before we get into the MILs.

Paragraph 27 talks about the parties requesting that the Court read uncontested facts during the jury trial. And, similarly, Page 64, or, I'm sorry, Paragraph 64 talks about trial admissions.

Unless both sides agree to something different, what you need to do is meet and confer with the other side about what you want the Court to read. And the Court would be inclined to read whatever fact that is along with the Third Circuit model jury instruction, which I think those are covered in 2.4, 2.5 and 2.6. So just put it all together in a package for me that has the instruction, exactly what you want, and then what you want read, and that should be agreed on with the other side. And any disputes over that, we'll deal with the morning that you want it read.

Does that make sense?

MR. BANKS: Yes, Your Honor.

MS. SHARP: Yes, Your Honor.

THE COURT: And then we talked about this a little bit already. There was a dispute in Paragraph 47 about what can be published to the jury.

So our general practice, which will continue here, is that we're not going to publish anything to the

jury unless it's been admitted into evidence. So nothing should go up on the Elmo until it's been admitted.

Amgen had a part in here that I was curious about. Here it says, "Except for purposes of impeachment." So I really wanted to make sure I understood what Amgen had in mind that we were going to put something up on the Elmo that wasn't in evidence and that you wanted the jury to see for purposes of impeachment.

What were we thinking of there?

MR. DOREN: Your Honor, we can strike that.

THE COURT: Okay. All right. Great.

Once admitted, counsel may publish exhibits to the jury without requesting to do so. That's fine.

Okay. So that's Paragraph 47.

Paragraph 49, I think we have already resolved today. No exhibit may be admitted without a sponsoring witness, but that doesn't mean that the witness has to be the author of the exhibit. If it otherwise can be admitted, because it's a party admission, for example, and there's no dispute about whether it's authentic or a business record, it can come in.

Paragraph 87, we talked about a bit already, and I don't think we need to say anything more about that today until we see what the designations are.

Going back to 52, Paragraph 52. How you get

those exhibits to us is up to you. A shared link is fine or a flash drive is fine, but we need to have all the exhibits so we can have them uploaded onto our computers -- the Friday of jury selection is fine.

Fifty-three, we'll take two copies of any binders that are used with witnesses. We will probably give those back to you at the end of each day, but we need to have them here in case there's any disputes we need to resolve while the witness is on the stand.

Relatedly, the parties need to make sure that we have a binder of only admitted exhibits that can go back to the jury room. This needs to be prepared by the end of the Court's reading of the final jury instructions. I don't know if there are going to be any native files or any videos that are going to be admitted. If there are, those need to be loaded onto a clean laptop or a separate flash drive with a clean laptop that we can send back to the jury so that they can view that during their deliberations.

Are we anticipating that deposition designations are going to be played to the jury from the video or read?

MR. POLKES: Video, Your Honor.

MR. WILKS: All video.

THE COURT: Okay. Great.

On the day that those are played for the jury, the parties need to have already met and conferred and be

01:52:51 prepared to provide to Mr. Koehler the time split up for the
01:52:55 deposition video.

01:52:59 Also, we find that it goes a lot easier if the
01:53:12 deposition exhibit numbers are different than the trial
01:53:14 exhibit numbers. If at the end of the deposition video
01:53:17 being played, we have somebody stand at the podium and let
01:53:22 the jury know what the trial exhibit numbers are for each of
01:53:27 the deposition exhibit numbers. This is a great job maybe
01:53:31 for an associate who can have a chance to present to the
01:53:34 jury, get a little time on their feet.

01:53:40 When the videos are played, we also need two
01:53:54 copies of the full transcript with just the parts that are
01:53:59 being played highlighted so that we can have one for the
01:54:02 court reporter and one for the Court.

01:54:05 The Pretrial Order has the parties agreed on the
01:54:19 procedure for raising morning disputes with the Court.
01:54:25 You-all have agreed to have the email sent to the Court by
01:54:31 midnight, which is fine.

01:54:34 MS. SHARP: Your Honor, that makes life easier
01:54:38 for people at our end.

01:54:39 THE COURT: Absolutely. I can promise you that
01:54:42 we will read them before we come out in the morning. It may
01:54:45 not be at midnight. We just need that email by 7:00 a.m.
01:54:48 the next morning. But if you-all want to have it submitted
01:54:50 by midnight, that's fine with me. I need it no later than

01:54:54 7:00 a.m. So midnight is fine, and that's what we'll order as part of the Pretrial Order.

01:54:59 We already talked about if you need to have a dispute resolved that day, it needs to be raised with us by that morning. If the dispute is about a deposition designation or counter designation, we're going to need a courtesy copy of the entire deposition transcript that clearly highlights the dispute at issue. And I think parties have done a great job using color-coding and then just using a PDF editor to say, you know, Defendant objects, FRE 403. So it's right in there and it's easy for us to review.

01:55:50 And then, along with the transcript, we need a cover email or letter that identifies what the pending objections are and just a brief indication on the basis for the objection. One to three sentences. So the parties have proposed somewhere having a page on each side. I don't need or want a page on each side for each objection. Just a one to three sentence stating what the basis of the objection is. And that goes for the deposition disputes as well as any disputes over exhibits.

01:56:24 So the parties have agreed on providing the jury with a glossary of terms if it can be agreed upon. I'll say that I don't want to resolve any disputes about a glossary of terms. So if the parties agree on the glossary, that's

01:56:56 fine with me. It can go in the juror notebook. If you
01:56:59 don't, then we're not going to have one.

01:57:01 Paragraph 109, the parties requested access to
01:57:08 the courtroom. You should coordinate that with Mr. Koehler.

01:57:12 Judge Hatcher's going to do the jury selection
01:57:16 on Friday, May 2nd. My thinking was, to try to save as much
01:57:21 time as we can, to have her read the preliminary jury
01:57:24 instructions.

01:57:25 Any objections to that?

01:57:28 MR. DOREN: No, Your Honor.

01:57:31 MR. BANKS: No, Your Honor.

01:57:32 THE COURT: Okay. All right.

01:57:35 We got copies of your preliminary jury
01:57:37 instructions. We're working on those, and we'll get our
01:57:43 proposal for how the disputes should be resolved up on the
01:57:47 docket and back to you shortly.

01:57:49 We noticed the preliminary instructions didn't
01:57:51 mention Amgen's counterclaim. Do you know if you're trying
01:57:57 that counterclaim?

01:58:04 MS. JOHNSON: No, Your Honor. We're not.

01:58:06 THE COURT: Okay. All right.

01:58:08 The voir dire we've looked at, and we're done
01:58:10 with that. We'll get that back to you tonight or tomorrow.

01:58:14 The main changes we made were combining some of
01:58:19 the questions so that we have less questions that we're

01:58:22 asking. And we need those all to be yes or no questions to comply with our procedure and how we select a jury.

01:58:34 I think local counsel is all familiar with how we do a jury. But if you have any questions about that, or if you want me to walk through it with you, now would be the time to ask.

01:58:45 Does everybody know how we're going to proceed with the jury selection?

01:58:49 MR. WILKS: I've been there before, Your Honor.

01:58:51 THE COURT: All right.

01:58:52 MS. SHARP: Yes, Your Honor.

01:58:52 THE COURT: You're good to go. Okay. So we got rid of the open-ended questions.

01:58:58 MS. SHARP: Your Honor, could I ask one -- just a very narrow question about that?

01:59:02 THE COURT: Yeah.

01:59:02 MS. SHARP: Sometimes the jurors do not complete the full form that is provided by the Juror Services Office. So we would request, and I don't think we've discussed this yet, but we had raised it on a meet and confer, that we would ask that we be permitted to get at least the basic information from those jurors by perhaps calling them back for the individual examination.

01:59:29 THE COURT: All right. Why don't you raise that with Judge Hatcher, to the extent that we have a juror that

didn't respond fully. I haven't focused on that before, but if you think it's been an issue, you can raise that with her.

MS. SHARP: Thank you, Your Honor.

THE COURT: All right. We've got Proposed Verdict Forms and Proposed Final Jury Instructions from both sides. So I just wanted to double-check with you-all about the status of these. They're kind of like ships passing in the night.

Does anybody have anything they want to say?

MR. BANKS: Yes, Your Honor. We have tried meeting and conferring. I think one of the things -- there, obviously, are substantive differences between the instructions. There are, also, just like order and process differences.

We had discussed, had not completed, but are making some effort to get at least that Order straight for Your Honor so that the substantive disagreements can be, you know, argued and cited.

THE COURT: Okay. So we'll look at these as sort of an interim submission.

So just for the record, I think I have 79 pages of jury instructions from one side and 87 from the other, and it's just beyond the scope of what we could accomplish even in a week to get -- figure out what the disputes were

and then make a new book of jury instructions.

So what we need to have happen before we get to the charge conference stage is we at least need one joint set. And then if there are particular provisions that you-all don't agree on, competing proposals in the same document so that we can make decisions about those.

I can generally tell you this: To the extent you-all are disagreeing about, you know, what the format should be, I'm inclined to read -- the default should be the Third Circuit model jury instructions and the ABA antitrust model instructions. And that's what the default should be.

And my thinking would be the default would be -- I don't know if it's the order of claims or order of instructions within claims, but my thinking would be to do what the ABA does, unless somebody could tell me a good reason that they got it wrong.

Ms. Johnson.

MS. JOHNSON: I don't think that it's they got it wrong, I think it's a little -- so there's a lot of -- I know, you know, there's a lot of differences.

There are a couple of structural differences that I think are in the nature of the parties, amazingly enough, despite the length, trying to keep them short. And then we've tried to put some common issues, but we don't necessarily agree on what the common issues are.

02:02:16 And then we -- like we all know the rule of reason applies, but we disagree on what's the best way to lay it out. So there are some instructions that I think will be very susceptible of what you're saying of like, Here's our proposal. Here's their proposal.

02:02:31 There's a couple of like broader structural disagreements that we may have to get some insight on before we can then organize them in that structure and have competing proposals, if that makes sense.

02:02:44 MR. BANKS: Yes, that makes sense. But I think Your Honor is on the right track with respect to generally following the model --

02:02:49 THE COURT: Right. So if it's helpful to you, that's what I would do --

02:02:52 MS. JOHNSON: Yes.

02:02:52 THE COURT: -- absent any other good compelling reason to not do that.

02:02:56 MS. JOHNSON: Yes, I think that -- yes, and that -- I totally agree with that. And I guess my point was only I think that will not resolve some of the structural disagreements. But within the specific instructions, I think we probably can narrow the disputes some in terms of complying back to the model.

02:03:10 THE COURT: Okay. Great. Thank you so much.

02:03:12 All right. And then it seemed like the verdict

02:03:16 forms are also ships passing in the night. I'm not going to make any rulings on it.

02:03:22 I'll just say my comments, what I noticed when I read them, and I'm not saying that I'm right. Maybe there's a good reason you can explain this to me. But when I read Regeneron's, I noticed that it asked about liability and damages for each count. It wasn't clear to me that there was going to be time to trial these different claims. So maybe some of that will go away.

02:03:48 It also wasn't clear to me how we were going to prevent double counting of damages by asking for a damages number for each count. So I was worried about that.

02:03:56 For Amgen, I noticed that it looked like Amgen had separated out elements of each claim, which is not something we would normally do. But, of course, maybe it helps you out with whatever argument you might intend to make on appeal, but it's not something we would normally do.

02:04:17 But Amgen also separated out liability and damages by PBM, which might not be a terrible idea, but had one damages number at the end which seemed to me a good idea. So that those were my comments, but you can tell me why I got it wrong when we discuss the verdict form.

02:04:36 I've got to tell you that I'm anticipating this charge conference as potentially being one of the most -- I don't know what the right adjective is -- one of the most

blank of my career. And it may be yours, too. I'll let you fill in the blanks for that.

I'm just not seeing this as going efficiently or fast. So anything we can do to try to minimize disputes before we get into it, and I honestly don't know when we're going to do it. I don't think it makes probably any sense to really get my involvement until after we've seen Regeneron's case.

On the other hand, we could -- that might mean we go late into the night on the Monday, Tuesday -- Monday or Tuesday, the 12th or the 13th.

Does anybody have any comments about any of that? Have I got it wrong?

MR. BANKS: No, Your Honor. I think that seems like the right timing, unfortunately.

MS. JOHNSON: Your Honor, we have a little bit of concern on the most significant issues that it may influence from the opening and from the cross-examinations. I don't think that, obviously, we need a complete set of final jury instructions at the beginning, but I do think there are probably less than five sort of significant issues that it would be helpful to know what the jury is going to be instructed about what the standard is, as far as the *LePages*, the *ZF Meritor*, some of those issues we talked about at summary judgment, that will affect certainly the

relative weight we put on different parts of testimony, but even what arguments we need to be making as far as the opening.

THE COURT: Yeah. So how do we think we should resolve this? Do you think maybe the parties should meet and confer and see if they could come -- I'd be willing to give you some of my time, notwithstanding that we actually have a lot going on with other cases as well.

Do you -- if the parties were able to meet and confer and come up with some issues that you both think would be helpful to have some clarity on, at least what the substantive law is going to be provided to the jury, I could give you some time potentially late next week.

MS. JOHNSON: I do think that would be helpful. I suspect that the parties -- there may be disagreements, but I suspect that there are some issues that any objective person, we can all agree, are substantial significant issues that we would want input on. And so I -- that would make sense to me to try to identify a few that we could look at upfront.

THE COURT: Well, I'll tell you this: Why don't you get me a letter by Monday saying that you think that that would be required. And then if it is, just so we know it's coming, give us a letter by Monday.

MS. JOHNSON: Okay.

02:07:40 THE COURT: And then by Wednesday at noon, why don't the parties submit a joint letter raising no more than five disputes about final jury instructions with the parties' perspective positions.

02:07:59 MS. JOHNSON: That works.

02:08:00 THE COURT: Is that okay?

02:08:02 MR. POLKES: Your Honor, of course, we're happy to do that if Your Honor wants. I just don't want to leave the impression that I have some dispute about what *LePages* or *Meritor* is going to change the openings. I'm not sure that's true, but we'll see what they have in mind. Because, as Your Honor said, the normal thing to do would be to wait until our case is over and we all figure it out. But if they -- obviously, if they think there is a fundamental issue or perhaps two that's going to really impact their opening, I'm happy to work it out with them.

02:08:28 THE COURT: And I can't promise you that I will get you an answer. We'll take a look at what you have to say, and you should make a proffer as to why that would change your opening.

02:08:36 MR. POLKES: Yeah.

02:08:37 THE COURT: I know what you're talking about, and I think you know what she's talking about, too, and what she's going to ask for. And so at least we have it and can take a look at it, and we'll be able to tell you whether or

not we can tell you ahead of time or not.

MS. JOHNSON: Okay. Thank you, Your Honor.

THE COURT: Okay. And just to make clear, if the parties think that a particular ABA model instruction doesn't cover some point of substantive law, or that there is no instruction for that -- and it looked to me like there were some holes in those instructions, given what I think are the theories that are going to be presented -- we need to have the competing positions and then, of course, footnotes to the authority for that point of law.

Okay. I already told you that we're going to give each side 17 hours. That would include opening statements, closing arguments, witness examinations, as well as time spent by the Court dealing with arguments in the morning before the jury comes out. In general, any time that we're on the bench is going to be counted towards the time.

If we have to let the jury recess to decide an objection during trial, the time relocating the jury will also be assigned to one side or the other. Generally, it's assigned to the loser of the objection, but the Court might do it differently if something else would be more fair.

The parties agreed in Paragraph 103 to a max -- oh, that's a maximum of 60 minutes for opening statements. That's fine.

I'm also going to require that each side reserve at least one hour for closing arguments. So we're going to cut off your evidentiary presentation at 16 hours to ensure that you have at least one hour for closing. So if you've saved more than that, you can use that.

Does that make sense to everybody?

MR. POLKES: Yes, Your Honor.

THE COURT: Okay. The parties should plan to be here by 8:30 every morning. We'll try to take the bench at 8:30 or soon thereafter to resolve any objections. And then if the jury gets here early, we'll bring them out as soon as we're all here. Otherwise, the jury will plan to come out at 9:00.

We'll do a normal 15-minute break in the morning and in the afternoon, and then we'll take a lunch break between 30 minutes and an hour.

Will the parties agree to provide lunches for the jurors?

MR. WILKS: Of course, Your Honor.

MS. SHARP: Yes.

THE COURT: Okay. That's fine.

So we'll have you coordinate with Mr. Koehler about lunches. I find our jurors are a lot happier when parties are arguing about millions of dollars if they're being fed nice lunches.

We also may be -- I'm sure that this trial is going to be very exciting, but I can say that we are getting short on caffeine drinks for the jurors as well. And so coordinate with Mr. Koehler on that. We may need some more Red Bull.

All right. After the trial, we'd actually like any final redactions for what needs to be sealed as well as any corrections to the court reporter within two weeks after trial.

I didn't say that very clearly. If the courtroom has been sealed, we need to have you clarify which portions of the transcript need to remain under seal within the transcript. So we're not going to have a request after the trial to seal something that was presented in open court.

You're all nodding. That happens every trial, and I don't know why or how. So if it has already been sealed, we need what portions need to be redacted. And the reason for that is we need to have a final transcript as soon as possible.

MS. SHARP: And, also, the corrections within two weeks?

THE COURT: The corrections within two weeks. Yeah. We don't want everyone to start briefing and then have to have a bunch of corrected briefs because the

transcript got corrected.

So any motions for judgment as a matter of law can be made at the break that's after the appropriate time to make the motion. So you can wait until the next break to make it. We don't need to have written motions filed, but you should be prepared to make the motion and briefly state all the grounds upon which it rests. And that will be enough to preserve your rights.

In Paragraph 124, the parties wanted a couple issues to be decided outside the presence of the jury, namely injunction requests and treble damages. What we're going to have you do after the trial is over is submit a joint status report on how the parties think the additional proceedings should happen and when. And you should address the timing for that in the joint status report after the trial.

Okay. That was all I had with respect to miscellaneous items in the Pretrial Order.

Does anybody have anything else they wanted to say before we get to the motions in limine?

MR. BANKS: No, Your Honor.

THE COURT: Okay. So we can hear Regeneron's motion in limine.

I have to tell you, I'm inclined to grant your request, as well as Amgen's requests, about the prior

statements with respect to Dr. Stiroh. You can put whatever you want to put on the record.

MR. BANKS: Thanks, Your Honor. I -- that was our proposal, too, with counsel for Regeneron and hoping that would be how this would be resolved.

THE COURT: Okay. Thanks very much.

We'll give you a chance to have the last word on this one, because I take it they oppose. So we'll hear from Amgen first.

MR. STOCK: Thank you, Your Honor. I understand you're leaning, and I think in order to convince you otherwise, I really need to establish that the EpiPen decisions, there are three of them. There's two District Court opinions and one Tenth Circuit decisions that are really on all fours with what Professor Scott Morton is testifying to in this case, because that's what would make them legitimate for a reliability challenge for -- on cross. So that's what I'm going to present to you, Your Honor.

I'll give you some quotes from Judge Crabtree's decision in the District of Kansas, and I think that this will resonate with you in terms of how close it is to what -- well, actually let me start with the Tenth Circuit, Your Honor, on spillover.

So in the Tenth Circuit decision, the Tenth Circuit and the District Court before it held that spillover

is not foreclosure, and that it's not reliable to point to the fact that a prescriber may make an irrational decision. They assume that a drug is not covered when it, in fact, is.

And what the Tenth Circuit said and Judge Crabtree is that Fiona Scott Morton, the very same expert here, was assuming that prescribers would be irrational, number one. And number two, that there would be no way to counteract that.

And the Tenth Circuit was very clear that that is not a reliable methodology to calculate foreclosure or to even factually present foreclosure, because a party is not foreclosed by irrational behavior that can be counteracted by -- you know, can be neutralized, in the words of the Tenth Circuit by, you know, competition on the merits, meaning educating the physicians to say, Hey, you know, actually our -- you know, maybe our drug is not covered on this PBM, but it is covered on this other one.

And so if you look at the language from the -- from both the District Court and the Tenth Circuit, I think you'll find it is squarely, squarely on all fours with this case. And I think that's the -- that's what puts this -- makes this different from the -- from the motion with respect to Dr. Stiroh.

I'll just read you from the District Court decision. The Court says -- the Court, "Sanofi's argument

about spillover effects doesn't translate into a showing of market foreclosure. Sanofi's expert, Dr. Scott Morton, opines that spillover effects increased Mylan's entrenched share throughout the market. By leveraging" an exclusive -- "exclusionary restrictions, it secured at some of the largest PBMs to prevent physicians from prescribing Sanofi's product."

And then the Court says, "In any instance" -- "the Court cannot make the leap to infer foreclosure from" what -- "from Dr. Scott Morton's opinion." In any instances where a spillover effect occurred, a patient whose PBM or payor covered Sanofi's product wasn't prevented from accessing that product. With her opinion, Dr. Scott Morton simply asserts that spillover effects increased Mylan's entrenched market share, but not that any market foreclosure occurred."

Your Honor, that is a factual critique on the reliability of Professor Scott Morton's opinion where she translates spillover in effect that is easily counterable and easily neutralized, and she tries to portray it as foreclosure.

Now, we did not move to exclude that particular argument because we think it's a matter for cross. We think it's a factual point that she was found unreliable on this issue. And we can -- just like if someone -- some learned

scholar wrote an article saying that her analysis was unreliable, we could present that on cross. And this is, similarly, something that she should have to explain on the stand as to why this -- she disagrees with the Tenth Circuit and the District Court in EpiPen, and why her analysis in this case is somehow distinguishable from what we view as a statement from the Court -- from two Courts that are on all fours with this case.

That's spillover, Your Honor.

The second issue is also extremely clear. Professor Scott Morton admits in her expert report that her MRM measure is exactly the same as or she says it's based on the EEB entry burden analysis that she performed in *EpiPen* that was excluded by Judge Crabtree in his Daubert decision.

Now, that one we did move to exclude. Your Honor did not exclude it, but we believe that we're entitled to present the flaws that Judge Crabtree found with her analysis, which is on reliability. We believe that we're entitled to present that to the jury and that Dr. Scott Morton should have to answer that.

And we're -- and this is clearly supported by the applicable law, Your Honor. We cite the *SEC vs. Ambassador* decision. This is Judge Gallagher. I believe it's the Eastern District of Pennsylvania.

And he says -- he says, Not all Dauberts can be

used on cross. He says, If it's about case-specific issues, if it's about the appropriate fit of, you know, an expert's opinion with the facts of the case, that shouldn't be used on cross. But if it relates to reliability of a methodology that's being used in the case, the *SEC vs. Ambassador* case says that those types of Daubert decisions -- again, I don't see any reason why a Court would be less appropriate for cross-examination, a judicial decision than a scholarly article that we could for sure present to the jury.

And so following *SEC vs. Ambassador*, I believe that the EpiPen decisions, both on MRM and on spillover are appropriate for cross-examination in this case. They're very precisely on point, and I believe they fall into the rule that is enunciated by *SEC vs. Ambassador*.

THE COURT: All right. Thank you.

MR. BANKS: Thank you, Your Honor. I think I'll start with the spillover piece.

You know, as my colleague mentioned, you know, the Tenth Circuit and the District Courts before it made both legal and fact-record-specific observations about the spillover analysis that was done in that case.

Starting with the legal piece, the fact that the Tenth Circuit came to a legal conclusion about spillover is not something that should be presented to the jury. As my colleague mentioned, he didn't ask for a legal ruling on

spillover here. And so whatever the Tenth Circuit said about the law in that case about spillover isn't relevant to how Your Honor's going to instruct the jury and what the jury is going to see as to the facts.

On the factual piece, I mean, I think that's even more of a story you see in the excerpts that my colleague read. The Court was talking about the facts that Dr. Scott Morton analyzed in that case as related to the facts of spillover in that case and whether spillover was demonstrated in that case.

This is a completely different case with a completely different record. And as I'm sure Your Honor's familiar, you know, what a Court has to say about something is going to carry significant weight with the jury and will be significantly prejudicial as they're trying to determine what the facts are in the case in the record that they are having to determine here. So that's the spillover piece.

On the MRM piece, the EEB piece, it's a similar story. Your Honor already said in her Daubert ruling that it's more likely than not that what Dr. Scott Morton did in this case was reliable. To have the Court hear -- to have the jury hear that a different Court reached a different legal conclusion on different facts, again, is highly prejudicial given the weight that a judicial opinion will have before the jury.

02:24:50 And if you look at the very specific reasons that the Court gave in its Daubert opinion in EpiPen, it made very clear that it was finding on the record in that case that she hadn't demonstrated reliability or in the record in that case the facts didn't quite fit her theory.

02:25:06 That's precisely the type of Daubert motion that is inadmissible, even under the *SEC vs. Ambassador* case that my colleague cited. So we think, for those reasons, Your Honor should grant our motion.

02:25:19 THE COURT: Thank you very much. All right.

02:25:20 I took some notes on the argument. And after a recess, I'll be prepared to give you a ruling on that.

02:25:27 Let's move on to Amgen's Motion in Limine Number 1. So I appreciate Amgen's point about some of these statements.

02:25:46 And the challenge that I have here is what type of ruling I could give you that would be generally applicable to what we think might happen at the trial. My inclination is to say that we shouldn't be hearing fact witnesses testify about whether they think, in their opinion, that an opponent's conduct is good or bad, or fair, or right or wrong or anticompetitive. Maybe we can have fact witnesses talk about the effect certain things had on their company, if that's relevant to the claim or defense. And maybe we could have fact witnesses using figure of

speech -- figures of speech like level playing field because that's helpful to the jury to understand what they're talking about.

But beyond that, I'm not sure what other ruling I could give you that would address your concerns.

MS. JOHNSON: So I think that would address a lot of it. I think -- a couple other things.

I think the lecturing of the lawyers, the sort of shame on you over there, and you should be assumed of yourself that happened at the depositions should not happen.

THE COURT: Well, that's not going to happen; right?

MR. BANKS: Yeah. No, Your Honor.

THE COURT: That's not going to happen. And if you want an Order, I'm ordering the parties to instruct their witnesses that no lawyer should be shamed at all.

MR. WILKS: Understood, Your Honor.

MS. JOHNSON: Or witnesses.

THE COURT: Or witnesses.

MS. JOHNSON: And the other thing that we had in here that I think might be -- which one was it? Now, I can't -- oh, yeah. I would not want to get into commentary on who did or did not tell the truth in the patent case. I know we need to talk about the patent case separately. But even if the patent case comes in, we don't need to be going

back and saying, Well, what this person actually said was this.

THE COURT: Right. And I'm not sure how that's relevant, so we'll hear from the other side if they disagree.

MR. BANKS: We don't disagree, Your Honor.

THE COURT: Okay. Is there anything else that you think that I can address now?

MS. JOHNSON: No. I think that what you said upfront covers the rest of our motion.

THE COURT: Okay. Counsel, any need for a clarification on any of that?

MR. BANKS: Just a couple points to address.

THE COURT: Okay. Sure. We'll let you have the last word, Ms. Johnson.

MS. JOHNSON: Okay. Thank you.

MR. BANKS: Your Honor, we're talking mainly about the testimony of Regeneron's CEO. I think that's who they -- you know, their motion is based on, who, obviously, is very passionate about this company and about the circumstances that brought, you know, us here today.

And so he's going to -- you know, the laying -- level playing field, you know, for example. I mean, I think that is sort of the sine qua non of what, you know, antitrust law is about is about whether the parties are

operating on a level playing field or not. So I certainly think he should be able to offer his commentary with respect to, you know, what happened here and how that situated his company and, you know, the hurdles that this -- that the litigation -- you know, this dispute has put for his company and the passion that he feels behind it.

So that, I think, is sort of fair game, I think, and --

THE COURT: He needs to understand that his opinions about their conduct, though, are not entirely relevant to the -- except to the extent they had some effect on his company that he's trying to explain.

MR. BANKS: Sure. I think that's correct, Your Honor. And I also think that, obviously, when the jury is instructed, they'll be instructed about what the law is from you and not from him, obviously, as a fact witness in this respect. But, of course, he is going to describe what happened and the reasons why they feel aggrieved, let's just say, in the facts of what he's explaining, the conduct that's at issue here. And I think that's certainly fair for him to say.

You know, and I'll just -- a few other things that are in his motion or in their motion are about his -- certain things he said are baseless, or certain things he said are not true, or certain things he said have no basis

in science or fact.

I mean, that's all fodder for cross-examination, Your Honor. I think he -- to the extent they think he's not telling the truth, to the extent they think he's saying something that doesn't have a basis in fact, you know, I think that's where -- that's where cross-examination comes in. I think every day you have that situation.

THE COURT: Yeah. Did we get agreement from you that he's not going to be saying that they lied in the patent?

MR. BANKS: Correct. He's not going to say they lied in the patent case, right, but he is -- he has, you know, certain views about, you know, the facts of what the Praluent drug does. You know, he's allowed -- I think he will be allowed to testify to those views.

To the extent they have different views, that's certainly something that is, you know, the venue of cross-examination.

THE COURT: Certainly. So here's what I'll say about this: I think I put some good guideposts down that the parties should be able to consult the transcript and have a talk with their witnesses.

I will say that you are on notice about this particular witness. And if we need to recess the jury and decide on curative instructions, that time will be charged

02:30:39 to your side. So --

02:30:41 MR. BANKS: Got it. Understood, Your Honor.

02:30:42 THE COURT: -- make sure everybody is prepared
02:30:43 to keep the colloquial language out, except to the extent
02:30:47 that it is relative to a claim or defense in the case.

02:30:49 MR. BANKS: Thank you, Your Honor.

02:30:49 THE COURT: Yeah.

02:30:55 MS. JOHNSON: The only last point I would make
02:30:57 on that, just to make it clear what our issue is on the
02:31:00 level playing field, is he -- there's a lot that
02:31:04 Dr. Schleifer does not know about, like the terms of the
02:31:06 contracts, because some of those are attorneys' eyes only
02:31:09 and have not been seen by him. So some of the factual
02:31:13 opinions he gives are -- when we say they're -- he doesn't
02:31:16 know, like we're saying literally he is giving an opinion
02:31:19 that he's not got a level playing field because of an
02:31:22 agreement he has come up with.

02:31:23 So that's the other thing is we would just ask
02:31:26 that he also be constrained to testify to facts that he
02:31:29 knows, rather than sort of coming up with stuff.

02:31:33 THE COURT: So that's a little bit harder to
02:31:35 give you a ruling --

02:31:36 MS. JOHNSON: Right.

02:31:36 THE COURT: -- at pretrial on. But certainly
02:31:40 pointing out what he doesn't know, that sounds like will be

great fodder for cross-examination.

MS. JOHNSON: Yes.

THE COURT: All right. So that's Amgen's Motion in Limine Number 1.

Number 2 had multiple parts. We already talked about the last part, which is the Stiroh part. Everybody understands that we're not going to have discussion about Amgen's challenge to Dr. Stiroh from a proceeding from 20 years ago. Yes?

MR. BANKS: Yes, Your Honor. I mean, to the extent that Your Honor's ruling on the EpiPen motion bears on that one.

THE COURT: But you want it in; right? Well, just giving you a preview of how I'm going to rule.

MR. BANKS: Understood.

THE COURT: I don't have written down my articulation for it. Understood.

All right. Then we've got the Horizon merger.

So here's how I'm seeing this: I agree with Amgen that statements by the Government in an FTC Complaint and allegations by the Government should not come in. That said, it sounds like there are Amgen's own statements that may have been made in another proceeding that Regeneron is thinking should come in. I'm not sure what those are, though.

02:33:12 MR. STOCK: Your Honor, I was similarly challenged in reading their papers to come up with what they think needs to come in. I did see a line in their papers about Amgen admitting in FTC papers that cross therapeutic bundles are not widely used. But as we explained in our papers, we're not claiming in this trial that cross therapeutic bundles are widely used.

02:33:35 So the only purpose of bringing in that admission would be to kind of emphasize to the jury that there was an FTC proceeding. So I'm kind of in alignment with what you're saying that there's impermissible purposes here bringing in the FTC using a settlement negotiation. And I'm not sure what the permissible purpose is that Regeneron is proposing to use.

02:33:57 THE COURT: And is it -- I don't happen to know -- is whoever made that statement in the FTC proceeding going to be a witness in this case or is this just sort of generally --

02:34:05 MR. STOCK: It's in outside counsel's brief --

02:34:05 THE COURT: Right.

02:34:07 MR. STOCK: And so they've got an admission from our expert on this issue, so there's really no need to raise it.

02:34:13 THE COURT: Counsel.

02:34:14 MR. BANKS: Can I address that, Your Honor?

THE COURT: Yes.

MR. BANKS: The statement that was made in a public filing, so it was made in an FTC proceeding, but there's nothing secret or settlement, you know, related as to the -- it's, you know, the statement in a brief that was filed on a motion for a preliminary injunction, I believe. You know, and our point -- the reason why it's relevant, and just to -- you know, they admitted here, I mean, in that proceeding that, you know, bundling is rare and rarely used. And if -- you know, we want to be able to explore that with witnesses who are claiming that -- you know, if it's rarely used, why was it done at least once here by their own admission, and we think many more times.

I mean, I think there's certainly a relevance to it. There's no prejudice to it, given that it's a public statement that they made on the record, you know, in public -- in a public filing. There's no -- there's no -- there's no 408 reason, you know, for that.

So I think that one comes in. There's a couple other -- just to clear the record, you know, we're not asking that the FTC's statements come in, either. I do think that the facts of the proceedings are relevant in two respects.

The first proceeding is the Horizon acquisition in which they -- which, you know, they were, you know,

required -- they made admissions like the one I just mentioned. And they also agreed not to bundle for 15 years going forward. And they agreed not to bundle implicitly for 15 years going forward.

Now, they've made the argument multiple times in this Court that bundling only happens in a written agreement. And yet, they agreed in the course of that transaction not to bundle implicitly.

So what does implicitly mean if there's no -- if it always happens in a written agreement? That's a clear relevant, you know, point of examination which we want to pursue.

And, again, there's no 408 protection around the fact that that's what they had agreed to. They're not admitting to anything the FTC alleged. We're not going to be reading the FTC's allegations into the -- you know, as for their truth. And so there's no 408 issue with that one.

The second one is the *Celgene* BMS transaction, which Amgen was not a party to the consent. So they can't hide behind 408 with respect to an agreement they weren't a party to.

They were forced to -- they acquired Otezla in the course of that transaction, so that's a highly relevant fact for the reasons --

THE COURT: You have other evidence that Otezla

has market power, though; right?

MR. BANKS: We certainly do. Yeah, for sure.

THE COURT: Yeah.

MR. BANKS: But it's certainly -- you know, a brick is not a wall, Your Honor. Right. And so we can keep adding -- we can keep adding to the evidence we have that it has market power. It's certainly a highly relevant fact in that respect.

THE COURT: All right. Thank you.

Counsel.

MR. STOCK: So I'm looking for permissible purposes. I see -- I don't want to be repetitive, but I see a series of impermissible purposes citing the complaints, the allegations of the FTC in the *Celgene* case as somehow being evidence. That's not evidence.

That's what the *Williams vs. Pennsylvania* case says. That's what a litany of cases say.

So the *Celgene* BMS is just allegations by the FTC. That's not evidence. It's not a shortcut to making their proof on Otezla. They can make their proof if they want. They can't somehow claim some imprimatur from what the FTC says. That's not evidence and that's clearly prejudicial.

The other impermissible purpose, as I mentioned before, is saying that Amgen's settlement of the Horizon

case should be somehow used as evidence of -- that what it agreed to do, you know, is somehow admissible for a relevant fact. But when it -- when Rule 408, it's not -- by the way, also Rule 407, subsequent remedial measure, a commitment not to do something can't be used as evidence that, you know, that that is impossible to do or that it's inappropriate to do. So I think --

THE COURT: Yeah. I agree with you on that.

MR. STOCK: Okay. The only thing left is this issue about what we admitted to in a public document. And I -- and they've only pointed to one sentence that bundling is not widely used. And as I told Your Honor, our expert admitted in her deposition and I think in her report that cross therapeutic bundles are not common.

So this is not an issue that is in dispute. And there's no need to raise this issue except to try to get in front of the jury the fact that Amgen had to respond to an FTC brief.

THE COURT: So if any of your witnesses are asked by the other side: Are cross therapeutic bundles widely used, are any of them going to say, yes, they are commonly and widely used?

MR. STOCK: I don't know, but I think we would be comfortable with -- if anyone says cross therapeutic bundles are widely used, we can reassess the outcome of this

02:39:20 motion.

02:39:21 MR. BANKS: Well, Your Honor, their expert in her report says it's one tool in a tool box. So, I mean, it's in the record in that respect. And I think it's a slightly different statement to say they are widely used and they're not widely used at all. I mean, they're not exactly the same kind of statement, if Your Honor understands.

02:39:35 THE COURT: I understand. All right. Thank you very much.

02:39:37 Anything else on this one? I tend to know how I'm going to rule on this, but I do want to consult my notes before I give you a final decision.

02:39:44 MR. STOCK: Do you have any questions?

02:39:45 THE COURT: No, I don't. Thank you.

02:39:46 MR. STOCK: Thank you, Your Honor.

02:39:46 THE COURT: Okay. And then, finally, we're at Amgen's Motion in Limine Number 3.

02:39:53 And I feel like we've covered this already. So I don't want to say anything more to muddy the record than what I've already said, which is that Amgen's intent -- well, I don't want to say -- I just said I wasn't going to say anything more.

02:40:09 Is there anything else more I need to say?

02:40:11 MS. JOHNSON: So, Your Honor, two things.

02:40:13 One is we -- so after -- we read your Order,

obviously. We cited your Order in here. We went back and tried to figure out like what are the permissible purposes that could be probative and are those purposes outweighed by the undue prejudice.

We tried to confer. We did not get anything from them. So then we got the opposition which lays out the purposes for which they want to use it.

Our view is that reading those purposes, none of those are -- they're either marginally or not at all probative, or they are exactly what we understood you to have said they cannot do for -- such as the core issue of monopolistic intent. And that's the main -- that's what they want to use it for.

And so I would say, you know, first, reaffirming that ruling, no. If that's the ruling, great.

Number two, though, I would say that while we went in looking for -- you know, you said you didn't think it was -- you could see that you would exclude it entirely, so we tried to figure out, Okay, what should we ask for as the line. Because, for example, one issue that we didn't talk about at summary judgment or Daubert was they have asked witnesses about, You lost 9-0 at the Supreme Court. Well, that's not relevant to anything, and it's not intended to show intent. Presumably, it's just intended to show that Amgen suggests it was a very weak claim or something.

02:41:37 So we were trying to go through and say, Okay. 02:41:39 Well, there's a lot of things that are prejudicial about 02:41:41 this patent litigation other than just saying -- directly 02:41:46 saying it goes to intent, which they say they intend to do. 02:41:49 But even separate from that, there are other problems like 02:41:52 the -- they try to use this document that's -- or the 02:41:56 preliminary injunction motion that says Amgen said that its 02:42:00 share should be 100 percent.

02:42:02 Okay. Well, we should not be in the position of 02:42:04 trying to explain to the jury that if your share should be a 02:42:07 hundred percent because you think you have a patent, that is 02:42:11 different from an opinion later that your share should be a 02:42:14 hundred percent through bundling or some other contracts. 02:42:17 And so I would say, you know, what you said at the summary 02:42:21 judgment and Daubert, we agree with, except that we think 02:42:24 that there's not a good place to draw the line, so we end up 02:42:27 needing to exclude it all.

02:42:29 But we think it probably needs a little bit more 02:42:31 color to make clear that some of these other things they're 02:42:34 trying to do are not appropriate, either. And I view the 02:42:37 patent litigation as something that if it's going to come in 02:42:41 and have relevance, it needs to be in a constrained, 02:42:45 specific way to some point to which they have argued and you 02:42:50 have ruled is relevant.

02:42:52 And I think we're still waiting on that, because

the points they have given so far are not points to which it is relevant permissibly. And I'm happy to go through the four in the opposition.

THE COURT: That's fine. Let's go through it.

MS. JOHNSON: So the four reasons they gave, and this was also in their -- the parties have been exchanging proposed limiting instructions, and so just to take a step back for a minute.

From our perspective, there are two issues. One is what are they allowed to say about it, regardless of what instruction is given.

And then, two, what kind of instruction is necessary? If you excluded it entirely, obviously, no instruction would be necessary. But I do want to separate those questions because no instruction can cure some of the things that they want to do. And so they just shouldn't be able to do them separate from the instruction.

So they have said that the patent litigation is relevant to Amgen's budget and financial expectations for Repatha. I think that what they mean by that is there are documents in which Amgen was discussing that if it was the only PCSK9 on the market -- this is before Leqvio was on the market -- that would affect its projections of how much its share would be and what its profit would be. So that is just sort of a backdoor way of saying the patent litigation

is relevant to the expectation you had back in 2018, or '19 or whenever it was that you would end up being the only one on the market. It's not relevant to what's going on after 2020 with the contracts that they're challenging. But it is -- it is a backdoor way of getting to the point that Amgen was projecting at one point that there would only be one of Repatha and Praluent on the market. And at some point later, it changed that projection and, therefore, financial expectations based on the outcome of the patent case.

So we view that as not a -- it's not probative of anything, because we're talking about a past time period. And it is just intended to get to that same point of intent of you were trying to monopolize and get a hundred percent.

The second point that they say that the patent litigation is relevant to is defining the relevant market. And their analysis here is that because Amgen said in briefing in the patent litigation that Praluent -- the competition from Praluent would affect its price, that shows what the relevant market is.

There's not any dispute in this case that Praluent and Repatha compete or that Praluent's -- that they're driving each other's prices down when they go up against each other. There's nothing necessary about bringing in the patent litigation to show that Repatha and

Praluent are competitive products that have some effect on each other.

And one of the -- one of the principles in thinking about whether something is sufficiently probative to warrant the risk of prejudice is whether this is actually adding anything to the mix of evidence that's going to be in without causing this prejudice. And it's not, because everybody agrees that Repatha and Praluent directly compete and their prices constrain each other.

Their third point of relevance is that it's relevant to the intent to monopolize. And that is -- that is the core of the relevance theory. It's in the first page of their Complaint. It's in their expert's report.

They want to come in and say that Amgen always wanted to monopolize a market for PCSK9s, and it tried to do it with the patent. And when that failed, in needed a new method, so it turned to bundling. That is the argument.

THE COURT: But isn't it different to say -- I can tell the jury, which I think we all agree on, or at least it's what I've said before, and I'm not inclined to change my mind, that whatever your intent was in bringing the patent litigation, that is not bad intent. That is not -- that can't be used as evidence of the antitrust violation.

But if you said something during the course of

the patent litigation about how much money we're going to make if you were the only one on the market, isn't that -- that fact hasn't changed. Isn't that still relevant to your motive of what you did after?

MS. JOHNSON: I mean, I guess it may be relevant in the sense that it is prejudicial. That's exactly what the Court -- the Supreme Court and the other Courts are worried about is that a jury who does not have a sophisticated understanding of the patent system or the fact that you're entitled to a monopoly will say, Okay. Well, you filed a patent litigation to try to be the only one on the market. So that does seem like some evidence to me that you probably did something wrongful to be the only one on the market.

And that is the inference that is so problematic, because it means that when you think about filing a patent suit, you should say, Well, if I file this patent suit, somebody's going to come back later and say that I was always the type of -- I always had monopolistic intent. And so what you are ultimately doing if you file a patent litigation, if that is -- if that's the rule, if you can come back -- if a litigant can come back later and say the fact that you wanted to have a patent-protective monopoly means that you are a person with anticompetitive intent or a company with anticompetitive intent, it means

that there is a risk of liability to you, antitrust liability that goes up because you exercise your constitutionally protected right to file a lawsuit.

And that is not -- it's not allowed under Noerr-Pennington. And none of their cases do it. I think that's telling, because I went through -- they have a long footnote of cases, and I went through, at great length, all of these cases they cite. And there are not cases where the Courts say, the fact that you intended to get a monopoly protected by patent laws should be given to the jury as evidence that you have anticompetitive intent now.

THE COURT: And I agree with that. I think what -- and I don't think they're going to say that. Well, they're definitely not going to say that, because I've said they can't.

But what they can say, though, is things that they said during the course of their protected petitioning about what the financial impact to them, that is still evidence of what the financial impact of them would be after the petitioning was over.

And isn't that relevant? No?

MS. JOHNSON: I don't think it is evidence. Like what the financial impact is of what? I mean, so in 2017, and I don't know the dates, but we'll see in 2017. We're saying based on the market as it looks right now, if

we win this patent litigation, we expect the following outcome. Right. That is not evidence of what effect Amgen's agreements with ESI, and Optum and UH -- and CVS in 2020 and later had on Regeneron's pricing.

Like those are just different things. Because in -- when you're talking about the patent suits, you're talking about what will be the effect on Amgen's financial expectations if Praluent is off of the market. But there's no issue after the patent case, setting aside the patent case. There's no issue in this case about Praluent being taken off the market.

Praluent is on the market. And they have not claimed that Praluent is going to leave the market. Praluent is profitable.

And so I don't think there's any sort of direct relevance or direct probative value. But if there is any, it is so tenuous because you're talking about 8 -- 7, 8 years ago, before Leqvio was on the market. So you didn't know like what effect that was going to have.

And so you're in such a different world that the only -- it's -- let's put it this way: It's not evidence that anybody would try to use financial expectations, but for the fact that they want to get in the fact that there was a patent litigation and that we expected to be the only one in the market, because it is such indirect evidence of

that point.

THE COURT: Okay.

MS. JOHNSON: And then, again, that relates to -- their fourth point really falls under that, which is effect on pricing and that they want to show that we were saying that if Praluent was on the market, it would decrease our prices. And that really doesn't have anything to do with whether us being one of one on a formulary or them being one of one on a formulary affects what our prices are or their prices are.

It's just a different question when you're talking about the effect of excluding Praluent from the market entirely versus the existence of a market in which there are different contractual arrangements. And so -- but we don't think that you have to go all the way to saying, I see no relevance whatsoever, because some of them -- maybe there's some tenuous tangential relevance. But what do they really need to prove their case compared to the very substantial risk that this evidence and argument that they want to make about how Amgen has been trying to secure the whole market for ten years, and it's just changed tactics.

That inference, even if -- even if you give an order that says, Okay. Well, you can't directly make that inference or you can't directly tell the jury that they should link the attempt to get a monopoly then to the intent

now. We think it's unavoidable that the jury would reach -- that they could lead them down the road to that inference without ever saying anything that violated the Court's direction.

And that's what -- I thought the two cases that I found the most helpful that we cited in our brief are the Third Circuit *Merck* case which just came out last year where the Court granted summary judgment on a Noerr-Pennington basis. And then the *USFL* case from the Southern District of New York.

And both of those cases -- well, the *USFL* case in particular says, you know, it's great to give a curative instruction, but if the evidence is being laid out in such a way as to lead the jury to this conclusion that there's, you know, bad intent, the instruction may not go very far at getting you there.

And so that's why the *USFL* case said when you're talking about permissible purposes of admitting petitioning activity, purpose and character, which is what they talk about, it tends to be more prejudicial than probative. Your presumption should be that it's more prejudicial than probative.

And the only other thing I just want to make sure, because they do have -- they make two arguments about the case law. Neither one of which I think is consistent

with the case law, so I just want to clarify them.

One is they quote this language from *Merck* and other cases that says that Noerr-Pennington is not a rule of evidence about excluding petitioning activity. And they are trying to suggest that that means that Noerr-Pennington does not exclude petitioning activity.

That is not what the cases say. What the cases are saying is this is not a rule of evidence that says petitioning activity is out, non-petitioning activity is in.

This is a substantive rule of law that says that if what you are doing is imposing an antitrust penalty for petitioning activity, that is impermissible. So that's not a license to introduce petitioning activity if the only thing it's relevant to is an intent to impose liability for petitioning activity.

And it is not -- it is a -- what the Third Circuit was saying and what other Courts are saying is it is more than a principle of evidence. It is a substantive rule of law that if what you are trying to do is impose a penalty for petitioning activity, that is not okay.

And that, I think, any evidence that brings in the idea that Amgen expected to have a hundred percent of the share, whether that is said to be an intent rule or it's said to be about financial projections, anything that brings in the idea that Amgen was seeking a hundred percent of the

market is allowing the jury -- opening the door to the jury, imposing liability for that petitioning activity.

And then the second thing that I wanted to say is they quote a few cases that say that it is relevant to intent. And I think that is an attempt to -- I mean, that is, at least as I read it, an attempt to change your prior statement that it should be relevant to intent, and the evidence of petitioning activity. And that is also not what the cases say.

So when cases say it is relevant to intent, it tends to be in a circumstance like, for example, somebody is writing or seeking a certain relief shows that they had knowledge of what the law required. And so, because they were asking Congress to change it.

And so once you show that they were asking Congress to change the law, that is evidence of their knowledge of the law; and therefore, their intent to violate the law that they were asking Congress to change. That is very, very different from saying anticompetitive intent.

So we are happy -- I mean, if there are very narrow and specific things -- that's what we would ask you to do is if there are areas where you think, I really believe that the patent litigation should come in for this narrow purpose, it is probative of that purpose. What we would ask is that it be constrained to that, and that it be

clear, not just that they can't do -- can't make arguments that it shows anticompetitive intent, but they also -- they cannot say the Supreme Court decided 9-0. And they cannot say that we said our share should be 100 percent.

Those are all things that -- they're intended to push the jury towards thinking we have monopolistic intent, even if they don't say the words. And so that's why we think it's better to have a rule of -- or a order, a line of permissible uses of the patent litigation, rather than just say it's impermissible to go to intent. It's impermissible to do some other things, too, and we think that, regardless of what the curative instruction is, they need to be constrained pretty tightly in what uses they can make of it.

THE COURT: All right. Thanks very much.

MR. POLKES: May I, Your Honor?

THE COURT: Yeah. So here's what I'm inclined to say, and then you can tell me --

MR. POLKES: Okay. Thank you.

THE COURT: Here's what I'm inclined to say: We're not going to use the fact that a patent litigation was brought as evidence of anticompetitive intent. You already know this. And --

MR. POLKES: Completely agree. Understood.

THE COURT: -- we're also not going to have anyone make comments about the strength of the patent case,

given that there's no allegation that it was a sham.

MR. POLKES: Agreed.

THE COURT: With respect to the --

MR. POLKES: Or the Supreme Court case, Your Honor. We're not going to get into that.

THE COURT: Right, right. You're not going to get into that.

MR. POLKES: No.

THE COURT: With respect to the rest of it, it's a challenge to me because I do think that the patent case is necessary for the jury to understand the timing and the context of what happened. That said, Ms. Johnson is very persuasive about that there might be some statements in there that might be prejudicial.

The problem is I don't have those statements. So what I'm inclined to say is with respect to particular documents, you're going to exchange with them the ones that you intend to use with your witnesses. And I'm inclined to hear her 403 arguments on a document-by-document basis. And at that point in time, you can tell me what the argument is to the jury in your closing with that document, and I can make a better assessment.

Any objection to that?

MR. POLKES: No. I think that makes perfect sense, Your Honor.

I'd also like to add something that counsel didn't tell you. Your Honor did previously ask us to work on a curative instruction. We found one that Judge Andrews used in this courthouse in exactly the same situation. It was the extent to which a patent case could be introduced as evidence in an antitrust case.

We're happy with that instruction that was used and approved there. We have it. I can hand it up to the Court now if Your Honor wants.

THE COURT: That's fine. Do you have a copy of it?

MS. JOHNSON: We got it about noon today. It is -- the first paragraph is more acceptable. The second paragraph is --

THE COURT: So in that case, I don't want to see it now. So why don't you-all work together. And if we have competing proposals, I'll take a look at those.

Given that this is, I think, the fourth time we've been through this, my inclination is whichever proposal is the most reasonable is the one I'm going to agree to as opposed to splitting the baby. So that's what we'll do the next time I see the proposals on this.

Any other questions or anything else, Ms. Johnson in particular, that you have questions for counsel about?

MS. JOHNSON: Well, the one other thing I was going to say is I believe we're going to exchange direct exhibits, but not necessarily exchange cross-examination exhibits. And so I would just say we need some mechanism to make sure if they're planning to go into a document that addresses the patent litigation on cross that we have the chance to raise that with you.

THE COURT: Understood. That's a great question, counsel.

MR. POLKES: So it's all been marked as exhibits. They have them all. And --

THE COURT: Right, but they don't know which ones you're going to use on cross. And it sounds like there's a document that says a hundred percent somewhere that you're particularly worried about.

MS. JOHNSON: There is a -- the -- Amgen's motion for a preliminary injunction in the patent case says something about Amgen's market share should be 100 percent. So that's -- that's -- it's like -- it's on the intro. It's like your improper presence in the market is decreasing our market share which should be 100 percent.

THE COURT: Yeah, that seems like it has very little relevance.

Counsel, were you going to use that document?

MR. POLKES: Your Honor, like you, I don't want

to have to think on the fly with regard to what that -- it says other things, too. I think that's the same one that says, and but for your competition, we could charge more money, which is a -- in a patent case, that's one thing.

In terms of that being an admission that they understand that if they have no competition later after they've lost the patent case, that they could then charge whatever they want, it's clearly got relevance and it's probative.

I think there's a pretty bright line distinction that could be tried. I don't want to snatch defeat out of the jaws of victory.

THE COURT: Yeah, careful. Yeah.

MR. POLKES: I'm going to let it go.

THE COURT: I'll hear argument about that if you think it might be used with somebody. I've got to tell you, I mean, these preliminary injunction or, in patent cases, affidavits kind of right themselves, so I know what it says. I'm not seeing any particular relevance to it that the jury needs to see, but --

MS. JOHNSON: I agree. I won't snatch defeat from the jaws of victory. No, I completely agree. And there -- the other category, but I think we can -- I mean, I think we can talk about them as they come up as long as we have some mechanism for -- I mean, they don't have to tell

us every document they're using on cross. It's the ones that include allegations about the market during the patent litigation. I mean, I think we know what their financial projections that project a win in the patent litigation.

THE COURT: Okay. So I think where I was getting confused was I thought we were talking about internal documents about the market that might have relevance, regardless of the patent litigation. If we're actually talking about documents that were filed in court, that's a different situation. And those, I'm not -- I can't see how we'd let those go to the jury, but I would hear argument on it.

Counsel.

MR. POLKES: And it's both, Your Honor. Again, I sort of -- if Your Honor is still comfortable with the idea that, in general, the patent case is going to come in for the various purposes we've discussed, documents that they want to object to on a case-by-case basis, we'll deal with it during the course of the trial.

Your Honor is going to see a lot more about the contextual significance of the patent case, because in our presentation it sets the entire stage for the antitrust scheme, which arose out of the loss of the patent case. I don't want to have to disclose my entire theory of the case right here now, but Your Honor is going to see that play

out. And we perfectly understand Your Honor's position that after you've heard it, after you've seen it, as we introduce documents, they can object on a case-by-case basis. That's all we need for now.

THE COURT: Okay. Well, but you should be prepared that there could be a strong limiting instruction, and that it will be read multiple times. So --

MR. POLKES: Understood.

THE COURT: Good.

MR. POLKES: Yeah. And, again, Your Honor, I could go in -- more into some of these issues, but I would --

THE COURT: I understand what's going on.

Ms. Johnson, anything else?

MS. JOHNSON: Only two things. One is what he just said is the thing that gives me so much pause that he wants to make a centerpiece of his case that the patent litigation sets the stage for the anticompetitive scheme. I mean, that sounds like a real problem.

But I think then, separate from that, which I think should be limited throughout the trial, I -- opening is the other time that they could stand up and set the -- talk about how the patent litigation set the stage for anticompetitive scheme. So we -- I think we need, in terms of the documents, to know for both opening and crosses what

they plan to use so we can talk about it.

And then I think no -- again, no limiting instruction is enough. If he stands up in opening and says, you know, they started with the patent litigation. When they couldn't get it that way, they went and got it another way.

THE COURT: I get it. And so I understand. I think in terms of setting the stage, I think it's important for the context. Because for me, I think the end of the patent litigation sort of saying somebody had a monopoly until you lost the patent litigation is not really that different than setting the context and saying there was a new entrant onto the market. And I think that can be cured with a limiting instruction.

Here's how I want to end it for today is this: If somebody intends to use one party's or the other party's document from another proceeding that wasn't before this Court, that that needs to be on direct or for impeachment, that that's going to need to be cleared with me in advance, just because of the vast potential for prejudice given that we've got -- you have documents for each side on this, and you-all have been litigating for a long time and attacking each other's experts and whatever and your own experts. So let's just have those cleared in advance.

MS. JOHNSON: And can we also flag the internal

financial projections that talk about how many people would be on the market and what Amgen is projecting about whether Repatha would be on the market? Because I think those would warrant a discussion in the context of the specific document before they put it up.

THE COURT: You can show me what -- I'm not going to make them flag it for you, but you can show me what you're worried about in a morning dispute if you think it's going to come up.

MS. JOHNSON: Okay. Thank you, Your Honor.

THE COURT: Okay. All right.

So I owe you a decision on some of these MILs, and it's good time for a break. So let's take 15 minutes.

COURTROOM DEPUTY: All rise.

(A recess was taken.)

COURTROOM DEPUTY: All rise.

THE COURT: All right. Please be seated.

All right. So we had two motions in limine that we took under advisement.

So Regeneron's motion had to do with excluding evidence about what the Tenth Circuit and the District Court said about certain opinions given by Professor Fiona Scott Morton in the *EpiPen* case. We considered the briefing before the hearing today. We also considered the arguments today during the hearing, and that motion will be granted.

To the extent Amgen wants to make the point that certain testimony is contrary to what the legal standard is, the way to address that is to ask for a particular legal standard be given to the jury in jury instructions. To the extent -- well, let me say this: I'm also not persuaded that the other Court's determination about the professor's testimony in the other case on another record is relevant at all, but any minimal probative value is substantially outweighed by the risk of unfair prejudice and the potential for juror confusion.

Again, it's a different case, different factual record, different circuit law. It's going to waste time on satellite issues.

Of course, Amgen is free to make the same points about concerns with the professor's testimony that the Tenth Circuit made. And they can do that through the presentation of contrary evidence and cross-examination. We're just not going to introduce statements from those Courts into evidence or discuss them during the trial.

And then we have Amgen's Motion in Limine Number 2. All the rulings I'm about to give are based on Federal Rules of Evidence 402 and 403.

So I think I already said that the Government's allegations in the FTC proceeding, those aren't coming in. Amgen's agreement not to bundle in a merger, that's not

03:26:58 coming in. Amgen's declaration in the patent case or another case that bundling is not common, that's not coming in unless Amgen opens the door at trial with testimony that suggests that it is common, or commonplace, or regular or normal.

03:27:21 Evidence that Amgen acquired Otezla in a divestiture, that fact can come in, but it's not going to be argued that the fact that the divestiture shows market power.

03:27:39 And then Amgen's argument about things said in a prior litigation about Dr. Stiroh, that is not coming in.

03:27:48 So I think that addresses all of the outstanding motions in limine. Is there anything I forgot?

03:27:59 MR. POLKES: I don't think so, Your Honor.

03:28:01 THE COURT: No? Okay.

03:28:04 All right. That was all I had, except for the final question, which I'm not -- I always get nervous when I ask pharma companies about this, because I'm not sure what's permitted: Have you all discussed settlement? Maybe there's a reason you can't settle it. It could be itself some kind of a violation.

03:28:22 MR. WILKS: So there was a discussion, Your Honor.

03:28:24 THE COURT: There was?

03:28:25 MR. WILKS: There was.

THE COURT: Okay. All right.

Is there anything I can do to facilitate it?

MR. WILKS: We will advise, Your Honor, if we could use your help, but I don't think there's any help we need at the moment.

THE COURT: Anything anybody else wants to say?

MS. SHARP: No. The only thing I would add, Your Honor, is that the parties have been at this for a long time. Regeneron and Amgen have been in litigation since 2014. Our MILs were informed by that -- on our side by that experience, and I think it's an important context to provide for Your Honor.

I think it wouldn't be fair to imply to the Court that there's been a robust discussion about resolution, but I think that that's because of where the parties are.

THE COURT: Right. Well, I understand that there's a lot of emotions on both sides, I'm sure. So if there's anything you think I can do to help, I'm happy to get involved. Let me know.

All right. Anything else?

MR. WILKS: No, Your Honor. Thank you.

MS. SHARP: Thank you.

THE COURT: All right. Thanks.

COURTROOM DEPUTY: All rise.

03:29:37 ALL COUNSEL: Thank you, Your Honor.

(Court was adjourned at 3:29 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court