IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

REGENERON PHARMACEUTICALS,      )
INC.,                          ) Trial Volume IV
                                )
            Plaintiff,          )
                                ) C.A. No. 22-697-JLH
v.                              )
                                ) JURY TRIAL DEMANDED
AMGEN, INC.,                    )
                                )
            Defendant.          )

                                J. Caleb Boggs Courthouse
                                844 North King Street
                                Wilmington, Delaware

                                Wednesday, May 7, 2025
                                8:46 a.m.
                                Jury Trial

BEFORE:   THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

            WILKS LAW FIRM
            BY:  DAVID E. WILKS, ESQUIRE

                    -and-

            ORRICK HERRINGTON & SUTCLIFFE
            BY:  ERIC HOCHSTADT, ESQUIRE

                    -and-

            WHITE & CASE LLP
            BY:  JONATHAN D. POLKES, ESQUIRE
            BY:  ADAM B. BANKS, ESQUIRE

                    -and-

APPEARANCES CONTINUED:

                    WEIL GOTSHAL & MANGES LLP
                    BY:   JESSICA LYNN FALK, ESQUIRE

                                        For the Plaintiff


                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
                    BY:   MELANIE K. SHARP, ESQUIRE

                                    -and-

                    GIBSON DUNN & CRUTCHER LLP
                    BY:   ERIC STOCK, ESQUIRE
                    BY:   ASHLEY E. JOHNSON, ESQUIRE
                    BY:   COURTNEY L. SPEARS, ESQUIRE
                    BY:   RICHARD J. DOREN, ESQUIRE
                    BY:   SAMUEL LIVERSIDGE, ESQUIRE
                    BY:   BETTY X. YANG, ESQUIRE

                                        For the Defendant



                    ***   PROCEEDINGS   ***


          COURTROOM DEPUTY:  All rise.  Court is now in session.  The Honorable Jennifer L. Hall presiding.

          THE COURT:  Please be seated.  Good morning, everyone.

          ALL COUNSEL:  Good morning, Your Honor.

          THE COURT:  All right.  I have a couple objections that came in.

          Did anyone want to add anything to what's in the papers?

          MS. JOHNSON:  I'm not sure that I do on the

objections.

THE COURT:  Okay.  I think that makes sense.

MS. JOHNSON:  Yeah.

THE COURT:  Anything?

MR. POLKES:  No, Your Honor.

THE COURT:  Okay.  That's fine.

So the first objection has to do with some demonstratives, and everyone agrees that this objection comes within the scope of the Court's prior ruling.  And Amgen acknowledges it's making this objection to preserve it.  So I'll say that if Amgen wants the curative instruction read again, I'm happy to do that.  But I won't make that decision on my own.  You need to ask for it at the appropriate time.

The second set of objections had to do with certain documents relied on in Professor Fiona Scott Morton's report.  Everyone acknowledges that the Court's already ruled on the question of whether the experts can opine on whether secret deals existed or what a party intent was.  We can't do that.  But Regeneron can introduce evidence that its expert relied on in her report.

So these documents are going to come in.  Again, it was cited in the report.  It was relied on by the expert.  The documents are consistent with the expert's opinions and it's Amgen's own statement, so it's not hearsay and no one's

saying that it is.

Regeneron has made it clear that it understands and will abide by the Court's rulings about impermissible expert testimony, and, of course, Amgen can and should object contemporaneously if the testimony violates those rulings.  So we're going to allow these documents to come in during the course of Professor Scott Morton's testimony, so I think that takes care of both of the objections.

Is that right?

MS. JOHNSON:  Yes, Your Honor.

THE COURT:  Is there anything else we need to address?

MS. FALK:  One.

The parties entered some expert stipulations on the docket.  I request that you please introduce the experts before they testify with their field of expertise.  I can -- I have copies for you.

THE COURT:  Yeah.  That would be great.  Thank you.

MS. FALK:  May I approach?

THE COURT:  Yeah.

So how do you want this to happen?  You're going to call the expert and then?

MS. FALK:  After they're sworn in, Your Honor, you just read them.

THE COURT: So after the party is sworn in, I will say that the parties have -- ladies and gentlemen of the jury, the parties have stipulated that this expert is qualified to testify in the field of and then I just read.

MS. FALK: Yeah, that --

THE COURT: Does that work for Amgen?

MS. JOHNSON: Yes, that works.

THE COURT: Okay. Okay. Anything else from Regeneron?

Okay.

Amgen?

MS. JOHNSON: One -- well, two small things, Your Honor.

One is when looking at the transcript yesterday, we used with Dr. Schleifer, a Plaintiff's Exhibit 963, which we thought was already in evidence, but it was a different version of the document that was in or a different copy of it. So we wanted to just go ahead and move into evidence Exhibit 963, PTX-963, which was shown to the jury and used with Dr. Schleifer, which I think Regeneron has no objection to.

MR. BANKS: No objection, Your Honor.

THE COURT: All right. So I'll admit it into evidence now.

(PTX Exhibit no. 963 was admitted into

evidence.)

Do you think I need to say that in front of the jury or are you okay?

MS. JOHNSON:  No.

THE COURT:  Okay.

MS. JOHNSON:  I think it's fine.  The only other issue is that PTX-963 is a duplicate of PTX-735, which was previously admitted.  So the document has been admitted before the jury, just not under that number, so we just want to clean up the record on that.

THE COURT:  That's great.  Perfect.

MS. JOHNSON:  And then my only other point is we anticipate there may be some confidentiality issues that come with Dr. Scott Morton.  She will be coming later today after Mr. Gordon finishes and then Heather Bates.  And so I don't think they need to be dealt with now, but we just wanted to let you know so you could deal with them when you wanted to.

THE COURT:  Okay.  Absolutely.

So have you talked to the other side about how this is going to happen?  Can you do the exhibits all sort of together so if we need -- are we sealing the courtroom, or are we just having exhibits handed out to the jury?

MS. JOHNSON:  I'll let Mr. Stock address it.

MR. STOCK:  Thank you, Your Honor.  The first

issue is that Professor Scott Morton, Regeneron intends to introduce some number of data files, Excel files together with Professor Scott Morton.  And we have a confidentiality concern.  We don't object to the procedure.  I don't know if you want to address with them what procedure they'd like to adopt for the potential introduction of hundreds of Excel files, but our objection is just to make sure that they're kept under seal because they're extremely detailed -- have extremely detailed information about Amgen's business.

THE COURT:  Okay.  Can you ask to move them in under seal?

MR. HOCHSTADT:  That's fine, Your Honor.

THE COURT:  Okay.  So when you introduce them, just make clear, Your Honor, we want to admit this into evidence under seal, and then we'll have no objection if it's admitted under seal and then we'll deal with it later, to the extent we can have redacted versions.

MR. STOCK:  Perfect.  And then there's one slide from Professor Scott Morton that -- there's one number that's confidential in it.  It's grayed out, and so we've -- both sides have agreed that they'll either try to redact it in the version that goes on the screen or we'll just let it go up.  It's grayed out.  It's very hard to see, and we'll just redact it after the trial.

THE COURT:  Okay.  That's fine.  Agreed.

MR. HOCHSTADT:  Agreed.

THE COURT:  The only other thing I was going to say, as long as we're talking about cleaning up the record, we're getting a little -- well, let's put it this way.  You can have a seat.

We're getting a lot more from the parties in terms of briefing on the evidentiary objections than we normally get.  Normally, we just get a sentence that says object under Rule 403, and then we hear argument.  So that's not what we talked about, but it's okay.

But I do think in light of all of the papers that are stacking up that we really should put these on the docket so that it's very clear on what basis everything was objected to and exactly what exhibits are objected to, because I don't think any of us have been doing a great job about making that clear in the oral arguments, which is fine.  So I think what we'll do is stack up all of the briefing papers and put those on the docket at the end of the week for this week, and then we'll do the same thing next week, just so it's all clear for the record.

Does anybody have any concerns about that?

If we don't include the exhibits, I don't think we're going to have any confidentiality problems.

MS. SHARP:  No.  And it's understood, Your Honor.

THE COURT:  Okay.  Great.

Are we okay on the other side?

MR. BANKS:  We are, Your Honor.

THE COURT:  Okay.  Great.

Do we have all the jurors here?

COURTROOM DEPUTY:  We do.

THE COURT:  Does anybody need a break before we bring them out?

Okay.  We're ready to go.

(Jury entering the courtroom.)

THE COURT:  Please be seated.  Welcome back, ladies and gentlemen.

Let's have our next witness.

Oh, we have cross-examination.  We're continuing.

MR. POLKES:  Mr. Gordon.  Thank you.

THE COURT:  Let's have Mr. Gordon retake the stand.

MR. POLKES:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Gordon, welcome back.  I'll remind you that you're still under oath.

THE WITNESS:  Thank you.  Thank you, Your Honor.

THE COURT:  Let's continue.

CONTINUING CROSS-EXAMINATION

BY MR. POLKES:

Q.    Good morning, Mr. Gordon.

A.    Good morning.

Q.    One thing I neglected to ask you yesterday, we talked about Amgen's a public company; right?

A.    It is.

Q.    Meaning that the public owns -- owns shares of stock in Amgen; right?

A.    Yes, members of the public can own shares of Amgen.

Q.    And the market -- and I asked you about revenue, and you said it was about $30 billion a year?

A.    Over 30 billion, yes.

Q.    Over 30 billion a year.  I neglected to ask you about the total value of the company as measured by the share price that everyone in the public owns.  It's called market capitalization; is that right?

A.    That's correct.

Q.    And what's the total market capitalization of Amgen?

A.    Depends on any given day, and I haven't looked at the stock price in a couple days because I've been busy --

Q.    Yeah.

A.    -- here.  But I think it's in the neighborhood of $150 billion.

Q.    Okay.  Thank you.

        So we were looking at Exhibit 474.

        MR. POLKES:  Can we put that back up where we

left off yesterday?

THE WITNESS:  Big binder still?

BY MR. POLKES:

Q.    Big binder still.  474.  Towards the front of your binder.

A.    I have it.

Q.    Page 4.

A.    Page 4?

Q.    Yeah, please.

A.    Okay.

Q.    So you remember we were looking at this yesterday?

A.    I do.

Q.    Yeah.  It's the page that has the no-bundling rule on it; right?

Item Number 5.

A.    I don't see that language.

Q.    Item Number 5?

A.    Yeah, it says "No contingencies or negative impacts with respect to your other products will be considered (i.e. no bundling)."

Q.    Yeah.  Is that not a no bundling rule?

A.    It doesn't -- no, it's not a rule.  We covered this yesterday.  This is a guideline for manufacturers to submit their bids to the PBM.

Q.    We did cover that yesterday, and we also covered --

if you look at the highlighted language at the top that they refer to as requirements; right?

A.    Well, you can also look at the first and the second to -- the first and second paragraphs where it says, "Category where you process guide -- review process guide."

The word "guide" is used in this document. That's how we interpret it.

Q.    No, actually it's referring to a separate document called the process guide, isn't it?

A.    It's referring to the overall process of how we submit bids --

Q.    No, I don't think so.

A.    -- of which -- of which this is a document.

Q.    Let's take a look.  If you look at the first sentence, please, at the top.

"Zinc Health Services is inviting you to participate in the category review process and requests that you review the prescription benefit rebate category review process guide."

Is it not true that the process guide you're referencing is a separate document?

A.    It's a document that's inclusive of this one.

Q.    Yeah.  And this one lists the requirements; right?

A.    This document is in the guidance that the PBM provides to manufacturers.

Q.    Now, you -- I asked you -- I asked you about the language that calls this requirements; right?

Right?

Just now.

A.    What was your question?

Can you remind me?

Q.    My question is that, about 60 seconds ago, I asked you if the numbered items here were requirements.

Do you remember me asking you the question?

A.    I remember you asking me that now, yes.

Q.    And you said, "No, they're just a guide"; right?

A.    I don't know what we said before because I'm trying to understand what it is that you want me to say here.

Q.    It's 60 seconds ago.  I asked you if there were requirements and you said "no."  Earlier in the document, it calls them just "the guide."

Do you remember that?

A.    Well, at the top.  At the top of all of these bullets, it does say, "Please consider the following requirements."

Q.    Yes.  And --

A.    So it says that in the document.

Q.    I'm asking you about your testimony just now. Everyone here heard you.  You said, "No, it's just a guide," and you pointed to the language earlier in the same

Gordon - Cross

document.

Do you remember that?

Do you remember saying that?  Yes or no?

A.    I think I was responding, though, to you calling it a rule.

Q.    Is it your testimony, sir, that when there is a reference earlier in this document to a separate thing called "the category review process" -- excuse me -- "prescription benefit rebate category review process guide," that that means everything in here is just guidance?

Is that your testimony or not?

A.    Well, again, I think we covered this yesterday.

Q.    I'm asking you today.  I'm asking you today.

A.    Well, let me restate what I said yesterday then, because --

Q.    Go ahead.

A.    -- I still stand by that.

When we work with the PBMs in the process of submitting a bid -- that's what "process" here is referring to, the whole process of submitting an offer to a pharmacy benefit manager -- they set out these guidelines.  And, yes, these requirements, as if they want to standardize how manufacturers, not just Amgen, but all their manufacturers, submit their offers to the PBM.

What we will sometimes do is we will say, Okay,

we have -- we have another offer that doesn't fit these requirements.  But we don't want to just send it in.  We're going to call them up and deal with our counterparts.  We're going to say, "Look, we know it says this in your requirements, but would you be okay if we sent this, which doesn't fit your requirements"?  We're very explicit about it.  We're not -- we're not doing anything that we don't check in with them first.  We say, "We know you don't want that, but is it okay if we try it with this particular offer?"

And oftentimes, not just with Amgen, but with other manufacturers, it's been my experience in, you know, the 20 years I've been working in the U.S. in this industry, PBMs will entertain other offers than what are specified in the requirements in a document like this.  So I'm not arguing that this is what they want, but they sometimes allow different types of offers.

Q.    If the offer includes a couple of hundred million extra dollars?

A.    If the offer is different, these requirements are sometimes relaxed or release the manufacturer from the requirements.

Q.    So they relax their requirements for you if you throw them a couple of hundred million dollars; is that right?

A.    Well, I think we've established that pharmacy benefit

managers are always looking for more rebate value from manufacturers.  That is what they do.  These middlemen are looking to get value so that they can manage what they call revenues in the form of rebates from manufacturers.  That's their business.  That's what they do.

Q.    Okay.  So I'm going to ask you about something you literally just said.  Okay?  I heard you to say they call these requirements -- this is a quote -- "as if they want to standardize the process."

A.    They are trying to standardize their process.

Q.    Well, are you saying it's as if they're trying to standardize it, like they're not really trying to standardize it?

      Is that what you meant?

A.    No, that's not what I meant.  Their preference is to standardize.

Q.    Why do you think that is?

A.    Because they have a lot of companies that they do business with, and they have a lot of products at each company.  So it's a complicated business that they run.

Q.    Isn't it also to ensure fairness?

A.    Probably.

Q.    Isn't --

A.    Yes.

Q.    -- it also to ensure that there's a level playing

Gordon - Cross

field?

A.      Yes.

Q.      So do you think they're acting as if they want to create a level playing field --

A.      No --

Q.      -- or do you think they really want to create a level playing field?

A.      No, they want a level playing field.

Q.      So when you call them and say, "We'll offer you a couple hundred million extra dollars if you break your rules," are you basically disrupting the level playing field?

A.      Well, I would never call them and say that.  That's not -- that's not how we operate.

Q.      Take a look at the top -- very top of the document.  There's a heading on the right side.

        Is yours blocked by the exhibit number?

A.      What page are we on?

Q.      It's right there.  It's the same page.

A.      Same page?  Okay.

Q.      That's it right there.

        This is, in fact, the bidding form for PCSK9.  That's your Repatha product; right?

A.      Yes.

Q.      2022, so this would have been done in 2021; right?

Gordon - Cross

The 2022-year; correct?

A.      That's -- that's what it says at the top, yes.

Q.      Yeah.  And then it says, "Amgen-Repatha"; right?

A.      That's what it says.

Q.      It doesn't say "Otezla," does it?

A.      It doesn't say that.

Q.      It doesn't say "Enbrel," does it?

A.      It doesn't say "Enbrel."

Q.      It doesn't say "anti-inflammatory category," does it?

A.      No.

Q.      So this is the bidding form.  There was a bidding process for PCSK9s only.

        Do you agree with me?

A.      This document is concerning Repatha only.

Q.      Okay.  And let's take a look at Page 15.

        The language at the top says, "Commercial prescription benefit rebate response matrix."

        Do you see that?

A.      I do.

Q.      What's a -- you talked about this yesterday.

        What's a response matrix that you submit to the PBM?

A.      What is it?

Q.      Yeah.

A.      Well, it's --

Q.    Okay.  Go ahead.

A.    It's a way for the pharmacy benefit manager to ask the manufacturer to formally submit what we have sometimes called in this discussion a grid, a bid grid.

Q.    That's where the bid goes; right?

A.    It's where the bid is described.

        MR. POLKES:  Okay.  Can you pull up the detail, please, Kim?

BY MR. POLKES:

Q.    It says, "This rebate response matrix is submitted by:  Amgen for Repatha."

        Do you understand that?

A.    I understand it.

Q.    Anything confusing about that to you?

A.    No.

Q.    It goes on to say, "This product is part of the following competitive category:  PCSK9."

        Do you see that?

A.    I do.

Q.    And then it says, "Products (manufacturers) in the competitive category."  It lists "Praluent," it says, (Regeneron)."  It lists "Repatha," it says, "(Amgen)."  It lists "Repatha" again.  "Pushtronex System (Amgen)."  And then it says, "Repatha SureClick Amgen."

        Do you see that?

A.    I do.

Q.    Do you see Enbrel included in this category?

A.    No.

Q.    Do you see Otezla included in this category?

A.    No, they would have been on separate sheets that would have traveled with this one.

Q.    In separate categories, separate therapeutic categories; is that right?

A.    Yes, but in -- but in the same bidding process.

Q.    Do you see that anywhere on this form?

A.    No, but I can tell you that's what happened.

Q.    In fact, doesn't this form say that the competition is supposed to be between Praluent and Repatha?

A.    No, it doesn't say that.

Q.    It doesn't say that?

      Everyone's looking at it right now.

A.    It doesn't say that.

Q.    Products in the competitive category, Praluent and Repatha.

      Do you see anything else?

A.    They were describing the category that way, but that's not what you said.

Q.    Well, I'm reading literally from the form.

      Do you agree with me that the product -- the only products listed in the competitive category for this

Gordon - Cross

bid are Praluent and Repatha?

Do you agree with that?

A.    I agree with that statement, I just didn't agree with the one you made prior.  I'm not trying to be argumentative --

Q.    And you agree --

A.    I'm not trying to be argumentative, I'm just trying to make sure we are all agreeing on what's on the document.

Q.    And you agree -- well, I'm not -- I'm asking you about your knowledge of the document, too, sir.  Those are the rules.

Isn't the rule of this bidding competition that the only two products in the category are Praluent and Repatha?

Yes or no?

A.    No.

Q.    Okay.  And do you see that anywhere on this form?

A.    See what?

Q.    That it -- that that's not the rule?

A.    I don't see --

Q.    That the rule is not that the competition -- do you see anywhere on this bidding form that the competition -- I see you're smiling.

Do you think this is funny?

A.    No.  I -- I'm finding it repetitive.

Q.    Do you see anything on this form which indicates to you that any other drug is permitted in this competitive category, besides Repatha or Praluent?

A.    In this competitive category, Repatha and Praluent are the only two products mentioned.

Q.    And that's to ensure a level playing field; right?

A.    Yes.

Q.    That's to ensure standardized bidding as between Repatha and Praluent; right?

A.    Well, the whole process, as we've covered, is designed to have a level playing field.  And this particular bid matrix is required to have our bid for Repatha in the category of PCSK9s, which includes Regeneron -- Regeneron's Praluent.

Q.    And it also said no bundling; right?

A.    That -- that was one of the requirements on a prior sheet.

Q.    And you bundled; right?

A.    Well, we approached the PBM and we asked them if they would be interested in an offer that included Otezla, Enbrel and Repatha, which were described in similar sheets, along with their competition, and an Enbrel overlay for a portfolio bundle.  And they said, Yes, they'd be interested.

Q.    All the major portfolio benefit managers have a no bundling rule; right?

A.     I don't know for sure, but it's common to see that language in their guidelines.

Q.     Take a look at your smaller book, if you would for me, please.  And it's got Exhibit 118 in it.

A.     I have it.

MR. POLKES:  And I'm representing, Your Honor, this is -- 118 is in evidence already.

And if you would, please, you can -- you can put it up on the screen, just the first page here.

BY MR. POLKES:

Q.     And I want you to see -- have a look at it.  That's the cover and you can flip through it.  I'm not going to ask you about every page.

But do you see that this is the minutes of a hearing that was held in Congress before the Committee on Energy and Commerce in the House of Representatives on May 9th, 2019?

A.     I see that.

Q.     And do you see that -- what the hearing was about at the top?

A.     I see that.

Q.     It's about lowering prescription drug prices; right?

A.     That's what it's about.

Q.     Okay.  And are you familiar with this hearing?

A.     I believe so, but I haven't had a chance to review

Gordon - Cross

the document.  So I'm not 100 percent sure I'm familiar with it, if that's the question.

Q.    Give me a second, please.

If you can look at Page 5, again, using the Bates stamp numbers, you see that there's a list of the witnesses that testified at this congressional hearing?

A.    I see that.

Q.    And if you look at the second person listed, it says, Kave Niksefat, Vice President, Value and Access, from Amgen.

Do you see that?

A.    I do.

Q.    We already discussed that Mr. Niksefat is standing right -- or sitting right behind me; right?

He's your --

A.    Yes.

Q.    He works for Amgen?

A.    He's still there, yeah.

Q.    He's still there.

And so he testified at this hearing; right?

A.    He did.

Q.    Do you remember now that --

A.    I remember -- I remember --

Q.    -- he testified he was --

A.    -- he was on this witness panel.  Yes.

Q.    And if you look down two names, you see Amy Bricker,

Vice President, Supply Chain, from Express Scripts.

Do you see that?

A.    I do.

Q.    Do you know Ms. Bricker?

A.    I do know Amy Bricker.

Q.    Who is she?

A.    She was, at the time I knew her, an executive at Express Scripts.

Q.    And she was one of the people who -- a senior person at Express Scripts; right?

A.    Very senior.

Q.    Very senior.

And she was one of the people responsible for negotiating your Express Scripts' deal for Repatha; right?

A.    I don't know if she was directly involved in that, but she was somebody who was familiar with that negotiation.

Q.    Yeah.  Senior to the people who were actually doing the negotiation --

A.    Yes.

Q.    -- right?

A.    Yes, yes.  Correct.

Q.    Did you interface with her directly?

A.    I -- I spoke to Amy a few times over the course of the years that she worked at Express Scripts.

Q.    Would Amy Bricker lie to Congress under oath?

A.      I hope not.

Q.      Okay.  Well, I do, too.

        Let's take a look at Page 118, at the very top of the page.

A.      Sorry.  What page number?

Q.      118.  Using the Bates stamp numbers that we've been using on the bottom right.

A.      I have it.

Q.      Okay.  Let's look at the top.

        Ms. Bricker, she says, just the first paragraph here, "At Express Scripts, we don't negotiate by bundle.  So I don't negotiate -- I look at the net cost of an individual product independently of all other products in a portfolio."

        See that?

A.      I see that.

Q.      So do you agree with me, sir, that Express Scripts does not negotiate by bundle?

A.      Well, I agree that that is Ms. Bricker's testimony at this panel.

Q.      Under oath; right?

A.      I -- I believe she was under oath.

Q.      And yet, you already testified yesterday that you negotiated a bundle deal with Express Scripts for Praluent -- or excuse me, for Repatha; right?

A.      Yes.  I think that occurred after this, though.

Didn't it?

Q.    So does that make it okay?

A.    Well, it -- it means it's not inconsistent with her testimony if it happened after.

Q.    I'm just asking you:  Didn't she tell the United States Congress, in connection with a hearing on lowering drug prices, that she only evaluates the net cost of an individual product independently?

That's what she said; right?

A.    Well, she said they don't negotiate by bundle.  So, "I don't negotiate, I look at the net cost of an individual product independently of all products in the portfolio." That's what she said.

Q.    And that was absolutely false in connection with your bundle deal at Express Scripts; right?

A.    Well, I -- all I know is subsequent to this testimony, we were able to negotiate a portfolio bundle deal at Express Scripts that included Enbrel, Otezla, and Repatha.

Q.    Well, Mr. Niksefat was one of the people who negotiated the bundle; right?

A.    His team did.

Q.    He was one of the people who was interfacing directly with Express Scripts; right?

A.    He definitely met with Express Scripts, yes.

Q.      And he was at this hearing; right?

A.      He was there.

Q.      So did Amgen, anyone -- to your knowledge, did anyone at Amgen say to Express Scripts, I know you told Congress you don't do this, but we'd like you to bundle?

        Did anyone have that conversation with Express Scripts?

A.      I -- I don't know.  All I know is we asked them if they'd be interested and they said, Yes.

Q.      Is it still your -- so -- so you've told me that there is this general rule against no bundling; right, at the PBMs?

A.      I didn't say that.

Q.      You didn't say that just a minute ago?

A.      I said that there is guidance from the PBM not to include, in their process, their bid sheets, a deal with a bundle.  And that is the guidance.

        And when we -- when we called them up and we said, "We know your guidance is not to include a bundle, here is what we have on offer:  It's an Otezla, Enbrel and Repatha portfolio deal, with an Enbrel overlay.  Would you be interested?"  And they said, "Yes."

Q.      When Ms. Bricker testified before Congress at a hearing about lowering drug prices, did she say this no bundling is just guidance?

Gordon - Cross

A.    I -- I haven't read all her testimony, but I can -- I can read what's on there and I -- I know that to be the way in which her testimony is recorded, so...

Q.    All right.  You've been in this business for decades.

Do you think this testimony is consistent with your understanding that the no bundling thing is just guidance?

A.    Can you repeat that question?

Q.    Yeah.  Do you -- I know you weren't there, but you can read what she said.  Okay?

Is -- the understanding that you've told this jury about the no bundling rule, that it's just guidance, is that consistent with what she told Congress or not?

A.    Well, again, I can't evaluate what she told Congress because I haven't read the whole document.  But all I can tell you is when we were negotiating to have Otezla, Enbrel and Repatha on their preferred tier formularies and we offered them discrete rebates on each one of those products, and then an overlay deal with Enbrel, they were interested. They said, Yeah, let's talk.

I mean, we just asked them before we submitted any bid deal and they said, Yes, we'd be interested.  So there was nothing -- like, we weren't trying to deviate from their rules, we weren't trying to work differently on their guidance.  We were asking them if they'd be interested and

Gordon - Cross

they said, Yes.

Q.   Let me ask you this:  If another pharmaceutical company is playing by the rules -- or let me make you happier, by the guidelines -- how are they ever going to win if you guys are -- are willing to break the rules?

A.   Every company does what we did.  Every company will approach -- if they have something that they want to offer the PBM and it doesn't look like it fits within the guidance on the bid matrix or on the bidding process, they will pick up the phone or they'll call a face-to-face meeting and they'll say, "Hey, we've got -- we have an offer.  It doesn't fit your process.  It doesn't fit your guidance.  It doesn't fit your bid matrix.  We'd like to talk to you about it before we send it in."

Q.   So --

A.   And -- and every company does that.  I did it at my previous company and Amgen does it, and I know it's common practice in the industry.

Q.   So if a pharmaceutical company adheres strictly to the rules -- bear with me -- adheres strictly to the rules, or the guidelines, as you like to call them, and doesn't approach the insurance company and say, "Hey, I'd like to do something that violates your guidelines, are you okay with it?"  If they just play by the rules, are they suckers, in your view?

A.    It's a hypothetical I can't answer.

Q.    Okay.  Let's take a look at Exhibit 1014, please.

It's the last one in the -- in your big book.

A.    Big book.  Okay.

The number again, please?

Q.    It's the last one.  It's 1014.

A.    I have it.

Q.    At the top, you see it says, "Amgen Global Corporate Compliance Policy."

Do you see that?

A.    I do.

Q.    And you see it's on Amgen document -- it's an Amgen document.  If you look at the bottom right, it says, "Amgen"?

A.    Yes.

Q.    And it says the policy is effective as of July 15, 2020.

Do you see that?

A.    I do.

MR. POLKES:  We offer Exhibit 1014 into evidence.

MR. DOREN:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1014 was admitted into evidence.)

MR. POLKES:  If you could put it up on the screen, Kim.

BY MR. POLKES:

Q.    And I just want you to walk us through the top of the document.

Amgen Global Corporate Compliance Policy, you see that?

A.    I do.

Q.    What is that?

A.    It's --

Q.    Well, just for people who haven't been in a big company, explain what a global corporate compliance policy is.

A.    Yes, so in order for a company to ensure that its employees behave in a way that's in accordance with the rules, regulations, laws of the land and company values, we will set policies in place.  And this one deals with compliance policy, so in order to ensure everybody's doing the right thing for our shareholders and for patients.

Q.    Okay.  And if you look on the right side, it says, "Antitrust and Unfair Competition."

Do you see that?

A.    I do.

Q.    Okay.  So do you agree with me that this was, as of July 15th, 2020, your -- Amgen's official global corporate

policy regarding unfair competition?

A.    I agree that that's what this document is.

Q.    Okay.  Take a look at the bottom of Page 2, please, dealing with customers and distributors.

Are the insurance companies, in the context we've been discussing, customers?

A.    They could be defined as such, yes.

Q.    Okay.  It says, "Companies must ensure their business practices and competitive actions do not give the appearance of an attempt to engage in unfair competition."  It then says, such as -- or, "(for example, abuse of a dominant position in the marketplace)."

You see that?

A.    I do.

Q.    And then it says, "Accordingly, you should exercise caution and must consult with the law department before engaging in any conduct of the type noted below, especially when it involves products for which Amgen has high market shares or market power."

Do you see that?

A.    I do.

Q.    Do you agree with me that Enbrel was your number one selling drug at this time?

A.    I agree with that statement, yes.

Q.    Do you agree with me that it had high market shares

or market power?

A.      It had reasonable market share.

Q.      Well, it was your number one selling drug?

A.      Yeah, but it was in a very big category with some very big competition.  We were not the market leader.

Q.      Okay.  And it goes on to say -- so then you agree with me that afterwards, there's a list.  So it says, "Consult with the law department before engaging in any conduct of the type noted below."

You see that?

A.      I see that.

Q.      Read to us what the first bullet is under that list, please.

A.      "Selling multiple Amgen products together for a discounted rate (i.e. bundling)."

Q.      So do you agree with me, sir, that the very first example given of unfair business practices for which you must consult the legal department before considering, the very first one is bundling; is that right?

A.      That's an incorrect statement.

Q.      Put it any way you want.  Go ahead.

A.      Well, if we read the document, it says, "engaging in any conduct of the type noted below, especially when it involves products for which Amgen has high market share or market power, the following things should be consulted with

the law department."

Q.    And the very first thing that's listed is bundling; right?

A.    The very first bullet point is, indeed, related to Amgen products being sold together for a discounted rate, i.e., bundling.

Q.    Why do you think that is, that it's the first item listed under the list of things you need to be careful of with regard to fair competition?

A.    Well, all -- all of our contracting activities are conducted with very close partnership with the law department.  And all of these activities are important.

Q.    Most definitely not the answer to my question.  I'm going to ask you again, and I'd ask you to listen carefully to my question, sir.

A.    Certainly.

Q.    It's a very open question.  It's not even a leading question.

       Why do you think that the very first item listed under unfair trade practices in your own compliance policy is bundling?

A.    I don't know if there's an importance to the order, but it's very important that we work closely with our law department so that we do not engage in anticompetitive practices.

Q.    Yes.  That's a generic statement.  But why is bundling listed as an example of something that can get you in trouble?

A.    Well, bundling activity is something that we engage in to ensure that we're trying to help provide our products to our customers in an affordable way.  And it is a rare activity.  It's not common practice.  And our legal department would want to see that we are not doing anything in an anticompetitive way, and I agree that that's a very prudent thing to do.

Q.    So are you saying that bundling is something that can be done in an anticompetitive way?

A.    No.

MR. DOREN:  Your Honor, I would just object to the extent this may call for privileged communications, legal training and the like over the course of his career.

MR. POLKES:  Your Honor, let me make -- can I withdraw the question and make it clearer --

THE COURT:  You may withdraw the question.

MR. POLKES:  -- to address this?

Thank you, Your Honor.

BY MR. POLKES:

Q.    Mr. Gordon, listen carefully to my question, if you would.  I don't want you to tell me anything in your answer that divulges any communications you've had with these

Gordon - Cross

lawyers or your in-house lawyers.  Okay?

So with that said, why is it that bundling is something that can raise unfair competition concerns?

A.    There are a number of reasons.

Q.    Go ahead.  Tell us.

A.    I'm not -- I'm not an anticompetitive lawyer, which is why it's on the list to have legal discussion.  And that'd be a question better posed to an antitrust lawyer, so...

Q.    So why don't we --

A.    That's why this document says you should work with the legal team so that you understand those reasons.  That's why it's on the document.

Q.    Thirty years.  More than 30 years in the business; right?

A.    Yeah, as a sales and marketing professional.

Q.    Sales and marketing.  You're in charge of all commercial activities for $30 billion worth of revenue at one of the largest pharmaceutical companies in the world; isn't that right?

A.    Yes, I'm very fortunate to have that responsibility at Amgen.

Q.    You are, indeed.  And you're someone who would sign off on the global compliance policies, aren't you?

A.    No, not this one.  This wouldn't be one that I would

sign off on.

Q.    Well, you said sales and marketing.  The heading of this section is "Dealing with Customers"; right?

A.    Right.

Q.    Hang on.  Hang on.  The heading here says, "Dealing with Customers"; correct?

A.    Yes.

Q.    Let's see.  Who deals with customers?

Oh, sales and marketing people; right?

A.    Yes.

Q.    Okay.  So doesn't this policy directly address your area of business concern?

A.    Absolutely.

Q.    And so when it says that your sales and marketing people have to be careful when bundling because it could lead to unfair competition, why do you think that is?

A.    Again, there are a number of areas.

MR. DOREN:  Your Honor, objection.  Calls for a legal conclusion.

THE COURT:  Sustained.  Let's move on.

BY MR. POLKES:

Q.    Isn't it a fact, sir, that Amgen had never engaged in a cross-therapeutic bundle before the Express Scripts Repatha/Enbrel/Otezla bundle?

A.    Well, I can't -- I can't speak to never, but not in

my experience.

Q.    Do you know who Mr. Zimmer is?

A.    Yes.

Q.    Who is he?

A.    Dave -- David Zimmer is an employee of Amgen that works in our value and access organization in the U.S.

Q.    Does he generally know what he's talking about when he puts something in writing about your business?

A.    Dave's a very smart individual, but I need to see what you're talking about to answer your question specifically.

Q.    Fair enough.

        MR. POLKES:  Your Honor, may we approach with one additional exhibit?

        Counsel has it.

        THE COURT:  Yes.

        MR. POLKES:  Thank you.

        THE WITNESS:  Thank you.

BY MR. POLKES:

Q.    Okay.  I want you to have a look at this exhibit, please.

A.    Let me just put this big binder up.

Q.    Yeah, yeah.  Take your time.

A.    I'm ready.

Q.    You see it says "U.S. VA New Hire Onboarding"?

A.    I do.

Q.    What's "U.S. VA"?

A.    The United States Value and Access organization.

Q.    Is that a group at Amgen, a business group?

A.    It is.

Q.    And you see it's on Amgen paper?

A.    I see that.

Q.    Amgen presentation paper?

       You see it's dated October 28th, 2021?

A.    Yes.

       MR. POLKES:  Your Honor, we offer Exhibit 612 into evidence.

       MR. DOREN:  No objection.

       THE COURT:  It's admitted.

       (PTX Exhibit No. 612 was admitted into evidence.)

BY MR. POLKES:

Q.    If you look at the first page of the exhibit, it's page -- it says Page 2.  And it says, "About me:  Dave Zimmer."  So you just told us Dave Zimmer is the -- is he the head of this organization in the United -- "U.S. VA?"

A.    He is now, but at this point in time, I don't think he was.

Q.    Okay.  Please look at Page 13 of the exhibit.  And I'll remind you, the date here of the document is

October 28th, 2021.  And under the -- on the right side, under "General Medicine," I want you to see "executed first-of-a kind portfolio contracts."

A.     I see that.

Q.     And the second bullet says, "First portfolio cross BU ESI autoimmune plus Repatha preserving coverage on Repatha and increase Otezla coverage."

       Do you see that?

A.     I see that.

Q.     Does BU stand for -- does BU stand for business unit?

A.     It does.

Q.     Autoimmune, we've discussed that Enbrel and Otezla are autoimmune drugs?

A.     They are.

Q.     So do you agree with me that Mr. Zimmer is writing here that this was the first time you had ever engaged in a cross-therapeutic bundle?

A.     It looks that way, yes.  That's what it looks like what he's describing.

Q.     Would he know what he's talking about?

A.     Dave, yes.

Q.     And I'd like you to look, please, at Exhibit 1814, in your large book.

A.     I'm there.

Q.     Do you see that this is a transcript of a

Gordon - Cross

third-quarter 2023 earnings call given by Amgen Corporation?

A.    Yes.

Q.    Amgen Inc.

Do you see that?

A.    I see that.

Q.    Okay.  And are you one of the people who participated in that earnings call?

A.    I am.

MR. POLKES:  Your Honor, we offer Exhibit 814 into evidence.

MR. DOREN:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 814 was admitted into evidence.)

BY MR. POLKES:

Q.    So why don't we tell the jury what an earnings call is.

Do you mind doing that?

A.    Yeah.  My pleasure.

So at the end of each quarter, financial quarter we, as Amgen, will host a public call for our investors and shareholders to understand how the company performed in that quarter.  It's usually an audio call or a webcast, and we have prepared remarks, and we show some slides.  And then we do a Q-and-A session after.

Gordon - Cross

Q.    And you participate in those earnings calls?

A.    I do.

Q.    Okay.  You participated in this one?

A.    Yes, apparently.  Yeah.

Q.    Let's take a look at Page 29, please.

And, actually, yeah, if you look at the very bottom of Page 28, you see there's a question from someone named Geoff Meacham.

Do you see that?

A.    Yes.

Q.    And the question actually runs on to the top of 29.

Who's Geoff Meacham?

A.    Geoff Meacham is what we would call an analyst, somebody who works for an investment company who would do research on our company for shareholders of our -- for investors who rely on Mr. Meacham's research.

Q.    So Geoff Meacham sort of works for Wall Street, as commonly used; right?

A.    Yeah, he works for an investment firm.

Q.    Okay.  And he's asking you information so that he can provide information to public investors; right?

A.    That is correct.

Q.    And you're answering his questions so that the public has full information about your company; right?

A.    Yes, that is my intent.

Gordon - Cross

Q.    And they want -- and the public people who own shares, or are buying shares or selling shares, they want to know about your revenue, don't they?

A.    Among other things, yes.

Q.    How much money you guys are making by selling your drugs; right?

A.    They're interested in our financial performance.

Q.    Okay.  So here's a question:  He says "Murdo," so he's talking directly to you; right?

      Do you know the guy?

A.    I've met him.

Q.    He says, "Murdo, it's been a long time coming for Repatha in submission.  Are you guys finally hitting a commercial tipping point with payers, or do you think there's an increasing interest among cardiologists?  I wasn't sure how you know the current market is, and looking forward, how about the impact?  How do you guys see it?"

      Do you see that?

A.    I see that.

Q.    When he says "payers," that's what we've also been calling the insurance companies?

A.    Yes.

Q.    And the pharmacy benefit managers, it's all the same thing; right?

A.    Well, it's not all the same thing, but it's a general

term that describes insurance companies and pharmacy benefit managers.

Q.     And then you go on to answer his question.  "Thanks for the question, Geoff.  Yes, it's been a bit of a journey. And the COVID pandemic didn't help us in our efforts to educate and convince cardiologists that they needed to do more to be more aggressive in treating their patients."

And I believe in your direct testimony yesterday, you said that you thought COVID had slowed down the growth of Repatha; right?

A.     Definitely.  Unfortunately, a lot of people were unable to see their doctor during COVID and get regular cardiovascular care.

Q.     And you're saying -- that's more or less the same thing you're saying here in your testimony?

Or excuse me, in your earnings call?

A.     Yes.

Q.     Okay.  And then you go on to say, "I think we've reached a tipping point in cardiology, and I do think we've reached a tipping point with payers.  We now have over 90% of commercial lives covered."

Do you see that?

A.     I do.

Q.     And that was on October 31st, 2023.

Do you see that?

A.      Yes.

Q.      So on October 31st, 2023, you had 90 percent of the market for PCSK9s.  That's what you're telling the public; right?

A.      No.  That's inaccurate.

Q.      Okay.  Go ahead.

A.      Not 90 percent of the market.  Of all the commercial insured patients, Repatha was available to 90 percent of those commercially insured patients.  Not market share. Market share is a different calculation.  We were just available.  So we might have been available, Praluent would have been available.  Remember, there's still some formularies here where both drugs are available.

Q.      That's not true at CVS, is it?

A.      No.  CVS commercial, at this point in time, I believe we were 1 of 1.

Q.      Wasn't true at CVS Part --

A.      Actually, let me just -- let me clarify that.

        The CVS national template formulary, which is roughly half of the CVS total book of business, we were 1 of 1.  Some of their custom plans had Praluent listed, so it's a little bit less absolute than the way you described it. But Praluent was available at CVS for commercial in some of their custom plans.

Q.      Not at the national formulary?

A.      Not in the national template formulary; correct.

Q.      And Praluent was not available at the CVS Part D national formulary at this time, was it?

A.      I need to -- I need to check whether or not that's true.  I think that's accurate, but I can't remember the timing of Part D when we were listed in relation to this call.

Q.      And Praluent wasn't available at UnitedHealthcare Commercial or Part D at this time, was it?

A.      Again, on national template formulary, right, so that's about half of the total --

Q.      Mm-hmm.

A.      -- of Commercial lives.  We were preferred there as 1 of 1.

Q.      And you were also preferred exclusively at Express Scripts; right?

A.      Again, on their national template formulary, which is roughly half.  So on the other customs, Praluent still had coverage.

Q.      And so you agree with me that within two years of your instituting the bundle, you had 90 percent of commercial lives covered?

A.      I would not connect those two events.  I would say that in the two years where we worked hard with the PBMs to secure access for the portfolio of medicines for Amgen, we

were able to ensure that Repatha was available on national template formularies and also some of the customs.

Q.    Okay.  On January 1st, 2020, Praluent was available at CVS, was it not?

National formulary, Part D and Commercial?

A.    At CVS, Praluent was available on their national template formularies.

Q.    On January 1st, 2020, it was available -- Praluent was available at Express Scripts national formularies; correct?

A.    I believe so.  Yes.

Q.    Yeah.  And on January 1st, 2020, Praluent was available at UnitedHealthcare on their national formulary; correct?

A.    Yes.

Q.    And by the time you're testifying, it was available on none of those formularies; correct?

A.    On the national template site, that's correct.

Q.    Okay.  And what happened in May of 2020 is you instituted your very first cross-therapeutic bundle that's ever happened at Amgen; correct?

A.    We had one cross-therapeutic bundle -- portfolio bundle with ESI.  That was the only one at this point in time that we had for -- for -- that included Repatha.

Q.    And you offered the cross-therapeutic bundle for

Repatha at UnitedHealthcare?

A.    Yeah, but at this point in time, the only bundle that was in place at any formulary was the one at ESI.

Q.    Not my question.  In 2021 -- we talked about this yesterday.  Your testimony is on the record.

In 2021, you offered the cross-therapeutic bundle, the same one to UnitedHealthcare; correct?

A.    Yes, and then --

Q.    And in 2021, you offered it again to CVS; correct?

A.    Yes.

Q.    And you offered it again to CVS in 2022?

A.    Yes, but they didn't take it.

Q.    And so by 2023, when you're giving this answer publicly, you had 90 percent of commercialized covered and Praluent had no access to any of the major formularies; correct?

A.    That is not correct.

Q.    And is it your testimony, that that's just a coincidence?

A.    I'm sorry.  What is just a coincidence?

Q.    Before you said -- when I asked you the same question, you said, "Well I wouldn't connect those two things."  I said to you, "Isn't it true that this all happened after you instituted the bundle?"  And you said, "Well, I wouldn't connect those."

Gordon - Cross

A.      Yeah.

Q.      So if you're not connecting them, are you saying it's a coincidence?

A.      What I'm telling you is it's not what drove it because --

Q.      Then why did you do it?

Why did you do the bundle if it wasn't going to drive increase payer coverage?

A.      Let me just clarify, though, why I said I wouldn't connect those two.  Okay?

At this point in time, there's only one bundle portfolio deal in place and it is at ESI.  There's no bundle in place at UnitedHealth and there's no bundle in place -- that includes Repatha.  There's no bundle in place at CVS. So that is not what drove this.

What drove this was we were leading in the market in promoting to physicians and helping patients.  We were growing Repatha.

Now, at this point in time, we're still -- like, think about the market.  Less than 5 percent of patients who have elevated LDL cholesterol, who are at very high risk of cardiovascular events, are actually accessing these medicines.  Less than 5 percent.  And we were focused -- as the question asked by Mr. Meacham, we were focused on cardiology, and we were focused on helping patients access

these medicines.

I've also said here in this courtroom, these PBMs were trying to constrain that.  They were trying to prevent patients from accessing this medicine and doctors from prescribing it.  We had also opened that up.  We had removed a lot of those restrictions through hard, tough negotiations with these PBMs.

Q.    Were you answering any question just now?

A.    Yeah.  I'm trying to explain why I wouldn't connect what you said to why we had 90 percent covered lives.

Q.    Well, you're telling in answer to -- what's his name -- Mr. Meacham's question?

A.    Yes, which is a broad question.

Q.    Broad, narrow, whatever.  An answer --

A.    Well, no.  It's important.  He's asking me a question about the market.

Q.    Let me ask you a question.

When you answered Mr. Meacham about whether you'd reached the tipping point, you said, "Yes, because we now have 90 percent of covered lives at the payers"; right?

A.    Yes.

Q.    And that's after you instituted the bundle; right, and after Praluent was excluded from every national formulary; right?

A.    I think you're trying to distort the reality of the

situation.

Q.    Well, let's see what you go on to say in your answer.

A.    Please.

Q.    "We anticipate being able to continue to progress our Medicare Part D coverage."

A.    Yes.

Q.    "And we're seeing, you know, the PCSK9 category driven primarily by our 80% share of that category."

So isn't it true that by having maximal coverage with the insurance companies, that was driving your PCSK9 market share?

A.    No.

MR. POLKES:  I have nothing further, Your Honor.

THE COURT:  Thank you.

MR. DOREN:  We can just go ahead and put up, while I get organized, please, Exhibit 612 at Page 3.

Can you blow that up a little bit?

THE WITNESS:  Okay.  612.

MR. POLKES:  Blow that up.

Just let everybody have a little break here while I get organized.  Mr. Zimmer's children.

All right.  You can take that down.

THE WITNESS:  Mr. Zimmer is a single dad and he does a nice job with those kids.

MR. DOREN:  Thank you.  And they have a nice --

nice ability to grow mustaches, it looks like.

REDIRECT EXAMINATION

BY MR. DOREN:

Q.     Mr. Gordon, let's take it from the back to the front a little bit, and let's start, please, with PTX-814, which is the earnings call.  And let's go, please, to Page 29.

Now, first of all, Mr. -- or counsel for Regeneron was asking you whether this occurred -- this 2023 call had occurred within two years of the -- the rolling out of the bundles.

Do you recall that generally?

A.     Generally, yes.

Q.     Did this also occur within two years of Regeneron having terminated its entire sales force and slashed its sales and marketing budget?

A.     Yes, it occurred within two years of them firing their sales force.

Q.     And, sir, as the -- as the Chief Commercial Officer at Amgen, do you consider that to be a factor in your success in the market in the subsequent three years?

A.     Absolutely.

Q.     Can you tell us why?

A.     Well, as I've been describing for the benefit of the Court, we felt that it was really important to educate physicians, cardiologists, and primary care doctors and

patients on the importance of treating LDL cholesterol.

To do that, you need a sales force, you need a medical team. You need an access team. You need lots of advertising investment. And that is what we were doing and what we were actually doing is growing the PCSK9 categories.

A lot more patients were coming in and getting a PCSK9, Praluent and Repatha, because of our promotional efforts.

Q.    And, sir, someone who's been in the business for 30-odd years, and head of sales and marketing at two significant drug companies, what strategy, business strategy does the slashing of expenses and the withdrawal from the customer-facing market suggest to you?

A.    It suggests what I would call a cannibalization strategy where a company is trying to cannibalize the market by shrinking all of their sales and marketing activities and negotiating with PBMs for share conversion from one product to another. It is not a strategy to promote, to educate, to describe the benefits of their medicine to the audience that will prescribe it, doctors, or the patients who will take it.

Q.    And you mentioned in the last few questions that there was only one contract in place, that being at ESI Commercial, at which the Enbrel overlay, as it's been called, was subject to 1 of 1 coverage for Repatha on the

national formulary -- the national template formulary.

Does that block, in your opinion, sir, Regeneron from competing at any other formulary -- for any other formulary or any other PBM?

A.    No, sir.

Q.    And, in fact, you also drew a distinction between the national template formularies and the custom plans.  And the questions moved on quickly from there, but I believe you testified that the national template formulary makes up about 50 percent of -- I think we started to hear the term "covered lives."  But the folks who are on formularies controlled by CVS makes up about 50 percent of those lives; is that right?

A.    Roughly, yes.

Q.    And can you explain, again, what the other 50 percent are?

A.    Certainly.

So the -- the pharmacy benefit managers try to standardize and have a national template for the majority of their customers.  Remember, their customers are companies, corporations, that want the PBM to manage the drug benefit for their employees.

So half of their customers, the companies that need a drug plan, will go with that national template formulary.  But some companies might say, Yeah, we don't

want a national template, we actually want a slightly different formulary, because we want either a more strict formulary or a more open formulary for patient -- for employees of our company.  And those are called customized formularies.

So some companies go with the standard, some companies want it tailored for their own employee needs.

Q.    And is that, also, the case at ESI and all other PBMs?

A.    Every PBM has a similar setup, yes.

Q.    And is there anything about Amgen's contract regarding the ESI national template formulary that impairs or impedes Regeneron's ability to compete for that half of the business?

A.    There is not.

Q.    And regarding CVS, you were asked questions about what the -- the positions were on the national template formularies as of today.

Do you recall, sir, that it was Regeneron that voluntarily terminated its -- its contracts with CVS at the end of 2022?

A.    I do recall that.

Q.    After the filing of this lawsuit; correct?

A.    I'm not sure of the timing, but...

Q.    Fair enough.

A.     Okay.

Q.     Fair enough.  It's a blessed life if you don't know the timing of the lawsuit.

All right, sir.  And by the way, before we move on, just above "Operator," we see the paragraph that says, "So the phases are pretty clear, payer coverage established, affordability for patients established, cardiologists are now prescribing with frequency and now moving into primary care."  And we're adding direct to consumer campaign investment to that mix.

Are these the phases of growth that you referred to the other day?

A.     These are the activities that are described in our phases of growth.

Q.     And in the three years since Regeneron terminated its sales force and slashed its sales and marketing budgets and withdrew from the customer-facing market, these were the things that Amgen was pursuing; is that right?

A.     That is correct.

Q.     Let's take a look back, if we can, please, now at PTX-1014.  And this is the global corporate compliance policy.

Do you see that?

A.     I do.

Q.     And let's go down to the bottom of Page 2, where it

is stated in the second sentence, "Accordingly, you should exercise caution and must consult with the law department before engaging in any conduct of the type noted below."

First of all, sir, does any contract leave your organization without being reviewed by the legal department?

A.    Never.

Q.    And are all contracts approved by the legal department that leave the company for execution by a counterparty?

A.    One hundred percent.

Q.    And does the law department have all the information it needs relevant to the terms and conditions of those contracts in making that assessment?

A.    They have everything.

Q.    And is that an important part of Amgen's governance structure?

A.    It's an essential part of our governance structure.

Q.    Why is that, sir?

A.    We work in a highly regulated and complex environment and I value the assistance of our law department in all of our activities, including our payer negotiations.

Q.    Well, let's talk about ESI for just a moment.

You and counsel had an extended discussion about the CVS RVP -- excuse me, RFP, request for proposal -- and we'll circle back to that in a minute, but I promise it will

be a lot briefer.

And then we saw testimony from somebody from another company or we -- you discussed the testimony of Ms. Bricker, who didn't work at CVS; correct?

A.    She never started at CVS.

Q.    She worked at ESI; is that right?

A.    She worked at ESI.

Q.    All right.  So we had a little bit of a mash-up there.

And as you noted, her testimony was from a year earlier than the contract that was entered in July 2020; is that right?

A.    That's right.

Q.    And then, secondly, did you see anything in Ms. Bricker's testimony about how they -- how they -- how they would evaluate a bundle and whether they would evaluate it on a drug-by-drug basis?

A.    I didn't read all of her testimony, so...

Q.    And you testified yesterday about one of the reasons that bundles are not common is because of the challenges of modeling them and assessing them when you're looking at how -- how rebates apply across products; correct?

A.    Yes.

Q.    And in your experience, sir -- and understood you've only dealt with a handful of bundles, but in your

experience, are those bundles evaluated with the -- with the rebate allocated across products?

A.      Well, they're evaluated for the discrete rebates and, in addition, the overall overlay rebate across products.

Q.      All right.  And so as to the practices within ESI, we don't actually know exactly what they did in terms of evaluating the bundle a year after Ms. Bricker's testimony?

A.      We don't.

Q.      Okay.  So at the end of July 2020, after the ESI contract had been entered, Regeneron had 1 of 1 coverage at CVS Commercial; correct?

A.      At the national template formulary.

Q.      Thank you.

        For half their business; correct?

A.      Correct.

Q.      And Regeneron had 1 of 1 coverage on the national template formulary for CVS Medicare; correct?

A.      For Part D, yes.

Q.      Yes, sir, Part D.  Thank you.

        And Amgen had 1 of 1 coverage at ESI Commercial on their national template formulary; correct?

A.      Correct.

Q.      But not the other half of the business?

A.      Not the customs, no.

Q.      And it also had 1 of 1 coverage on the ESI Part D

national template formulary; correct?

A.      Correct.

Q.      But not their custom formularies?

A.      No.

Q.      So both companies had a PBM on their national template formularies; is that right?

          MR. POLKES:  I'm just going to object to the leading, Your Honor.  If I could just do that as a --

          THE COURT:  Okay.  All right.

          Why don't you rephrase the question.

          MR. DOREN:  Sure.

BY MR. DOREN:

Q.      So how many PBMs did ESI Part D -- did Amgen have exclusive coverage on national template formularies for?

A.      One.

Q.      And how many PBMs did Regeneron have exclusive coverage on national template formularies for?

A.      One.

Q.      So they each had one?

A.      Yes.

Q.      And were they both able to compete at other PBMs after that?

A.      Yes.

Q.      Just one small point, but I think it's a point of interest.  If we could look, please, at PTX-350.

And you may remember, sir, that you were asked for some extended number of minutes about the reference to Regeneron in the email from Mr. Niksefat to you on July 1, 2020.

A.    Just a second.

Q.    Of course.  Of course.  It's a big binder.

A.    It's a big binder.  It's taking -- I'm getting a workout here today.

Q.    And this would be --

A.    I have it.  Yeah.

Q.    -- the email on the first page, please.  And you see the reference to Regeneron in the middle.

Do you see that, sir?

A.    I see that.

Q.    And do you recall the questioning about and the figurative table pounding about how the only point of interest in this whole thing was -- was coverage for Repatha?

A.    I remember that.

Q.    Let's look, please, at the second email.  And counsel spent -- actually, let's go down to the first email in the chain, please.

Counsel spent time with you on the first paragraph and the third paragraph, but he skipped right over the second paragraph.

Can you read what Mr. Niksefat was telling you in Paragraph 2 regarding the ESI deal?

A.    The one that starts with "we continue"?

Q.    Yeah.  Just go ahead and read that for us for starters.

A.    "We continue to talk to ESI specifically about other possibilities in the autoimmune category, but this seals off any risk they wander towards, a potential 'no-Enbrel' strategy before 2023."

Q.    What did you understand him to mean by "no-Enbrel strategy"?

A.    Well, we were concerned that ESI were going to remove Enbrel from their preferred formulary, the national template formulary because of other competitors in that category, in the inflammation category and because there were biosimilars coming into the market in this time frame.

Q.    And can you explain, in terms I'd understand, what a biosimilar is?

A.    It's like a generic.  It's like a copy of a drug.  If you -- if you have a pill, it's called a generic.  And if you have an injectable, it's called a biosimilar, but essentially, it's a copy from another manufacturer after the patent expires on the brand name product.

Q.    And was the drug for which biosimilars were going to be coming out, was that Humira?

A.      That's correct, the market leader.

Q.      And I was just going to ask you that.  And so, sir, along with Humira and yesterday, you testified to -- I won't try to remember the number, but many other competitors, would this add still additional competition to the category?

A.      Yes.  I mean, I can't remember specifically, but there was about a half a dozen biosimilar versions of Humira, copies of Humira that were coming into the market, and they were all talking to the PBMs about what they wanted to do in this formulary.  And so we -- we were worried about that.  We thought Enbrel was exposed to being taken off formulary.

Q.      And was that putting pricing pressure on Enbrel as well?

A.      Absolutely.

Q.      And so were you concerned as well about a potential no-Enbrel strategy at the PBMs?

A.      Yes.

Q.      Was that one of the reasons for considering portfolio agreements such as this?

A.      It was a main reason for considering portfolio agreements.

Q.      You also testified yesterday about references to clawback language in the ESI contract.

        Do you recall that generally?

A.    Generally, yes.

Q.    And, first of all, in terms of this clawback, did Amgen have the ability to actually claw any money back from PBMs?

A.    No.

Q.    What was the impact, if enforced, of that provision?

A.    So if -- in this specific instance, if ESI were to take Enbrel off formulary, they would lose that overlay component on a go-forward basis from the day that they would do that.

Q.    Was there anything in that provision that prohibited -- that prohibited ESI from coming back to renegotiate?

A.    No.

Q.    Was there anything that prohibited ESI from coming back and asking for more?

A.    No.

Q.    And given the concern about a no-Enbrel scenario, in your opinion, as the Chief Commercial Officer, despite that provision, was there a risk as to whether -- as to them coming back and asking for more?

A.    Yes.

Q.    So why have this provision?

A.    Well, at the point -- at this point in time, all three products were being threatened by removal from

national template formulary preferred listing status.  And we felt that, given that we were negotiating three products all at the same time, that we would have discrete rebates on all three.  To get all three positioned, we decided to add the overlay.

Q.      Thank you.

Now, counsel spent a good deal of time calling you a bank robber, and a rule breaker and a cheater.  Most of that in the context --

MR. POLKES:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. DOREN:

Q.      Most of that in the context of CVS.  And so I want to talk about that for a minute.  And one thing counsel did not address with you is all -- is the end result.  So I'd like to cut through the arm waving and get to the end result.

In 2021, I believe you testified that Amgen approached CVS and offered a bundle that included the three products; correct?

A.      Correct.

Q.      Now, in the case of that offer, was that bundle stated in terms of 1 of 1 coverage for Repatha or 1 of 2 coverage for Repatha?

A.      One of 2 or better.

Q.      So had that bundle been accepted as offered by Amgen,

would it have precluded Praluent from being on the formulary?

A.    No.  They could have added Praluent to the formulary alongside Repatha at parity.

Q.    And I guess as I say that, I'm forgetting myself.

Praluent was already on the formulary; correct?

A.    Correct.

Q.    Were you simply seeking to have Repatha added to the formulary alongside Repatha?

A.    Yes.

Q.    Why would you be willing to accept parity coverage there?

A.    Well, our whole strategy from the beginning of this commercialization of this product was to give physicians the choice.  And we had the ability to talk to physicians and describe our product and help the physicians decide which product they wanted to use.  We didn't want the PBM making that choice for the doctors.  We didn't really want the PBM making that choice for patients.  It was the PBM that negotiated, that decided they were going to have one product in the category.  And I would argue that the PBM did that because they were being offered rebates from Praluent to exclude us.

Q.    And when you say that you wanted doctors to have a "choice," that's -- I get it.  But as counsel pointed out,

you're a publicly traded company, and you've got shareholders.  So how do you think you were going to beat the competition at parity?

A.     We were confident in the clinical data that we had generated for Repatha.  We were confident in the professionalism of our sales force and our medical staff. We were confident in the effectiveness of our patient advertising and the support services that we had and the co-pay assistance that we had.  We had a large organization deployed to educate customers, physicians, to understand both products and to understand which one to choose for their patients.  And we felt good about our ability to do that.

Q.     Did Regeneron have that?

A.     They did not.

Q.     That was a little bit of a competitive advantage for you, wasn't it?

A.     Yeah.

        MR. POLKES:  Objection to the leading, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  It was a competitive advantage for us to have maintained and, in fact, increased our investment in our sales force, in our patient direct-to-consumer advertising, in all of the other services that we were

providing to help support patients once they were prescribed the product, and Regeneron had fired their sales force. They did not have that capability in the market. And so we were the ones talking to the doctors who had to do the prescribing and the care for their patients as Amgen.

We also, by the way, at the same time, were working with the American Heart Association, the American College of Cardiology and the National Lipid Association, the Family Heart Foundation to help grow the PCSK9 market. And we were doing that by working with those organizations to have guidelines updated to include our clinical trials and to have that be made available for the prescribing community and for the patient community.

BY MR. DOREN:

Q.    And by the way, did much of that work go to PCSK9s generally as opposed to Repatha specifically?

A.    Well, when you do that, when these guidelines are written, they don't name specific products as recommended or preferred like the PBMs. They talk about the categories. So, absolutely. We were driving PCSK9 utilization in general.

Q.    So just to follow through to the end of this CVS story, a 1 of 2 -- and I'm now talking about Repatha. A bundle including 1 of 2 coverage for Repatha was proposed.

Did CVS ever accept a bundle that included

anything to do with Repatha?

A.    No.

Q.    So has there ever been a bundled agreement with CVS that included, or connected or related in any way to Repatha?

A.    No.

Q.    Was an Otezla/Enbrel bundle accepted by CVS?

A.    It was.

Q.    Can you tell us about that, please?

A.    So our -- our offer included Otezla and Enbrel in preferred -- well, in preferred formulary positions, again, with an overlay on Enbrel.

Q.    And by the way, when CVS decided they would take the Enbrel and Otezla and -- with the overlay, was Amgen able to decrease the rebates on either Enbrel, or Otezla or the overlay amount?

A.    No.

Q.    Even though Repatha was no longer included?

A.    Even though Repatha was not included.

Q.    Why not?

A.    The Enbrel overlay was the same.

Q.    Why?

A.    That's the way they negotiated with us.

Q.    Couldn't you just tell them no?

A.    It was hard to do.  We were really competing hard for

those positions.

Q.     Now, let's look at PTX-474, the great mosh pit of your cross-examination.  And if we could look, please, at Page 4.  "In the list of rebate response matrix, and please consider the following requirements."

Do you see that?

A.     I do.

Q.     You remember that lengthy discussion you had around this?

A.     I do.

Q.     Now, yesterday, we spoke about grid responses and off-grid responses or bids.

Do you recall that?

A.     Yes.

Q.     And here we're talking about responses to the rebate response matrix.  Are those on-grid, off-grid or something else?

A.     Rebates to the response matrix are usually on-grid.

Q.     Okay.  And can you tell -- and that is what these rules would relate to?

A.     I wouldn't call them rules, but that's what -- that's what -- that's what this list of recommendations, requirements are trying to relate to.

Q.     I thought I'd get you on that one.

All right, sir.  So tell me about off-grid.

Tell us about off-grid bids, again, briefly, and how that relates to these sort of on-grid responses.

A.     Yeah.  So at times, when several of your products are being negotiated at the same time and you have an offer that includes elements that are not consistent with the requirements in the template process, you would engage with the pharmaceutical -- the pharmacy benefit manager and you would say, "We're proposing something that's different than the requirements, than what's on this page.  Are you willing to entertain that?"  And if they say, "No, stick to the grid," you stick to the grid.  And if they say, "Yes, tell us what you've got, and we'll take a look at it."

        And that's what ESI did in this case.  They said, "Yes, tell us what you've got, and we'll take a look at it."

Q.     And in your -- in your experience, sir, with two different pharmaceutical companies and exposure to the industry for 30 years, would all sophisticated drug companies know that that's how it's done?

A.     Yes.

Q.     And in -- but you wouldn't know if a company that had assumed commercialization responsibilities for a drug for the first time by itself would know it or not; is that right?

A.     Could you just ask that question one more time,

please?

Q.    Sure.  In this case, Regeneron, this is the first time it had ever had sole responsibility for the commercialization of the drug.

Do you know whether they knew how this worked?

A.    I don't know.

Q.    And by the way, speaking of these rules, if we look at Item 6 on this list, it states, "The minimum rebates offered are required to be at least equal to the rebates currently offered or contracted to Zinc and its participants, including the value of any price protection payments currently paid."

What's that mean?

A.    It's a complicated way of saying that you've got to be at least as high as the rebates you're already paying.

Q.    In other words, don't come back and offer us a lower rebate?

A.    Correct.

Q.    So if Regeneron had asked CVS to negotiate a lower rate in December 2022, would that have been a violation of this rule?

A.    Oh, yeah.

Q.    And I did mean rule in that one, but it's the guideline, as you say?

A.    Yeah, it would have been -- it would have been

noncompliant with their guideline.

Q.      And by the way, if CVS were offended and put out by the fact that Amgen had offered -- had proposed to offer a bundle, did it have to entertain it?

A.      No.

Q.      Again, who has the negotiating leverage in PBM and drug company negotiations?

A.      The pharmacy benefit manager has the leverage.

Q.      But in this case, they did not.

        Is it correct that they did not accept a bundle that included Repatha?

A.      CVS did not accept a bundle including Repatha.

Q.      And by the way, sir, I think in one of your responses you said that a bundle had also been offered in 2022.  I can't remember if you said it or it was in a question you said yes to.

        Do you know whether, in fact, a bundle was offered in 2022?

A.      I thought it was.

Q.      Okay.  We'll see what the evidence shows down the road.

A.      Okay.

Q.      But, sir, that does -- does that change or does that -- does that thought change in any way?

A.      Sorry, 2022 was not.  That was 2023 year.  The bundle

was not offered in 2022.

Q.    Thank you.

A.    Because they had approached us and just wanted a 1 of 1 bid for Repatha.  That's what I recall.

Q.    Thank you, sir.

Let's take a quick look, if we can, please, at Exhibit 506.  And, again, substantial time was spent on this document without asking you about the resulting contracts, which we've just discussed.  But there's just a couple things here I'd like to cover.

Go down, please, if we could -- and first of all, to get us oriented, this is an email from Tom Moore to Andy Chiu, where they have forwarded it, and it was originally from Jen Norton to you.

Do you see that?

This is PTX-506.

A.    Yes.  I see that.

Q.    And this was the email about the report on the dinner with Gary Loeber and Joe Anderson at CVS; do you recall?

A.    I do.

Q.    All right.  And down under Item 3 in the list, there's an A, B and C?

A.    Yes, I see that.

Q.    And counsel read half of that to you.  He read that "CVS had no willingness to do an overlay agreement (e.g.

portfolio arrangement with Enbrel)."  That's as far as he got.

Do you recall that?

A.    I do.

Q.    And then -- but Ms. Norton went on to tell you, "Due in part to complexity of implementation with downstream clients/wide range of formularies."

Do you see that?

A.    I do.

Q.    And can you explain to the jury what that's referring to?

A.    Well, as -- as I've said in a couple of different instances, the portfolio arrangements are complicated.  They have multiple connected elements, so they're complicated for the manufacturer and they're complicated for the PBM.  And what's specifically being said here is the -- once the pharmacy benefit manager builds the formulary, after they accept the contract from us, they then have to go out to their customers and explain how products are placed on their formularies.

And bundles make that complicated, because they've got to go out and explain it.  And the more complicated that is, the more difficult it is for them to explain it to their customers.

Q.    And did Ms. Norton report to you that CVS thought

bundles were in any way improper?

A.    She did not.

Q.    Or in any way a violation of their rules?

A.    No.

Q.    Or in any way unethical?

A.    No.

Q.    And, sir, you were asked a few questions about whether or not Regeneron had its own anti-inflammatory drugs.

Do you recall that?

A.    I do.

Q.    And Regeneron owns a drug called Dupixent; correct?

A.    Correct.

Q.    Is Dupixent a large seller, a big seller?

A.    Huge.

Q.    Does it -- is there -- what are its sales relative to Enbrel?

A.    Oh, they're a multiple of what Enbrel's sales are.

Q.    And does Dupixent have a special place in the market in terms of its use?

A.    Yes.

Q.    And what is that?

A.    It is used for atopic dermatitis.

Q.    And if Regeneron were to offer a bundle of Dupixent, along with Repatha, in your opinion, sir, based on your

experience in the industry, would that likely be able to

drive value for PBMs and coverage for Regeneron?

A.    Absolutely.

Q.    Okay.  Let's talk for just a minute about United

Healthcare.

So, once again, there were a lot of questions

about the bidding process, not too many about the outcome.

You testified yesterday that the contract entered into with

UHC provided that Repatha would be covered 1 of 2 or better.

Do you recall that?

A.    I do.

Q.    And, again, it feels like we've been in here forever,

but it's only day three.  So I'm going to ask you to tell us

all one more time what 1 of 2 refers to.

A.    Yes.  So 1 of 2 is when you're asking to have your

product on the formulary, but it allows for another drug

that does the same thing to be alongside your drug on the

formulary.  Parity coverage, equal.

Q.    And in this case, in the PCSK9 class, back in 2020,

would that mean Repatha and Praluent?

A.    Yes.

Q.    And so did the contract entered into between Amgen

and UnitedHealthcare limit, in any way, UnitedHealthcare's

ability to include Praluent on its national template

formularies?

A.      It did not.

Q.      Did it prohibit in any way or impair in any way the ability of Regeneron to compete for placement on that formulary?

A.      It did not.

Q.      Now, yesterday, counsel asked you repeatedly whether you knew that UnitedHealthcare was planning to select just one PCSK9.

        Do you recall that generally?

A.      Generally.

Q.      But when Amgen bid, how did it price its bid, for 1 of 1 or 1 of 2?

A.      The same.

Q.      Okay.  Same for either?

A.      The same for either.

Q.      And if UnitedHealthcare chose to include just one PCSK9 and that one was Repatha, does Amgen have anything to do with that decision?

A.      No, that's their choice.

Q.      And if Regeneron could make an offer that was attractive to UnitedHealthcare, did Amgen's contract stand in the way of it joining Repatha on the formulary?

A.      It did not.

Q.      And let's look, please, if we can, at Exhibit 527.

        And this, sir, just to get everybody oriented,

is another document you were shown yesterday.  It's from Jen Norton to Andy Chiu and others regarding "Request for Approval:  UHC Enbrel."

Do you see that?

A.    I do.

Q.    And if we go down to the bottom of the page, there is a reference to information on Repatha.

Do you see that?

A.    I see that.

Q.    And if you take a look, it says that "This is aligned to what UHC have signaled all along and our current all-in rate of 50% for Repatha is in a good place."

Now, first of all, one thing we touched on a little bit that I don't think we've ever taken a minute to really talk through, does market share impact the value of a particular rebate number for a PBM?

A.    Yes.

Q.    And can you explain that to the jury, please?

A.    Yes.  So the -- the rebate is a percentage of the sale of a product.  So the more volume you generate, the more market share you have, the greater the total dollars from that rebate can be generated for the PBM.  So they generally want to put high market share products on their formulary because it will generate more rebate dollars.

Q.    And in those instances, depending on the -- the

market share, can a lower rebate number actually generate greater revenue for a PBM?

A.     Yes.  In absolute dollars, a lower rebate of a larger product can generate more rebate dollars of a -- compared to a higher rebate on a smaller product.

Q.     And does that mean, sir, that -- and -- sorry.

       And is that something PBMs look at in conducting their analyses?

A.     All the time.

Q.     And yesterday you saw a few different documents and counsel was pointing out that there were lower rebate numbers here and higher rebate numbers for Regeneron.

       Would you need to look at the market share and the utilization of that PBM to really understand what the math is on which one was a superior offer?

A.     Yes.

Q.     Did -- did anyone do that with you yesterday?

A.     No.

Q.     This document, then, goes on to say, "Repatha is in a good place (no rate increase, no specialist, attestation only)."

       Can you explain what each of those is, starting with no rate increase?

A.     So no rate increase would be we don't have to add any more rebate percentages.  No specialist would mean -- in

some cases, PBMs would restrict the prescribing of a PCSK9 to specialists only, like cardiology only.  They wouldn't let primary care doctors prescribe and get approval.

And then the last one is attestation only, meaning the -- the physician doesn't have to provide paperwork and lab tests.  They just sign the document saying this patient should get Repatha and that they have elevated LDL or they can't tolerate statins.  And they would just have to attest to that, they wouldn't have to prove that a patient was on statins and whether the effects were harmful. They didn't have to do all that paperwork, that administrative stuff.

Q.    And were these things that were negotiated by Amgen with UnitedHealthcare?

A.    Yes.

Q.    And why does Amgen care about dropping those barriers to access?

A.    Well, it was clear in the market, and we do a lot of market research and we ask doctors lots of questions as to why don't you prescribe more PCSK9s?  And the number one answer that would come back is it's too difficult because the PBMs make it hard to prescribe.

All these prior authorizations are a pain in the neck, they're driving our office staff nuts, and we just -- we don't want to use your drug because it's a real hassle.

Gordon - Redirect

Q.      And the -- at UHC, in the Enbrel context -- context, was there a specific issue relating to something called "grandfathering"?

A.      Yes.

Q.      Can you explain to the jury, first of all, what grandfathering is?

A.      Yes.  I'll try.  So the -- let's say you're on a formulary in a preferred position and you have been for a while.  And then the PBM decides that they're going to remove you from the formulary, they can do that in a number of different ways.  They can remove you and then all the patients that are on your medicine have -- still have access to your medicine, even though you're no longer on that formulary.  New patients cannot get your medicine, but the ones who were already taking it are "grandfathered," maintained, in terms of their coverage for your drug.

Q.      And as to Enbrel at UnitedHealthcare, was UnitedHealthcare making demands of Amgen related to grandfathered Enbrel patients?

A.      Yes.  We had -- Enbrel was not a preferred drug at United Healthcare, but we did have a lot of patients still taking Enbrel who were UnitedHealthcare beneficiaries and they were grandfathered.  And UnitedHealthcare was not happy about that because we weren't paying any rebate on those patients, and they wanted to put a rebate requirement in

place to maintain that grandfathering.  That's what they were negotiating with us at the time.

Q.    And did Amgen ultimately agree to provide an Enbrel-specific rebate to address that concern?

A.    We did.

Q.    Now, you were asked questions yesterday and shown graphs and charts about the growth of Repatha into the future.

        Do you recall that generally?

A.    I do.

Q.    How does Amgen intend to achieve that growth into the future?

A.    We intend to expand the number of patients that are prescribed and take Repatha over time.

Q.    And how do you intend to do that, sir?

A.    We're going to do it, doctor by doctor, patient by patient, using our sales force, our medical teams, our advertising and promotion dollars.  A lot of our -- our programs with the American Heart Association, American College of Cardiology, all of the other patient associations.  We're going to educate, educate, educate, and we're going to, hopefully, help more and more patients.

        As I said, less than 5 percent of the patients that need this type of medicine to lower their LDL are actually getting it.  And it's because of this complicated

history, as you now know, about restrictions and PBMs getting in the way.  We are now finally getting to a point where doctors are appreciating that it's easier to prescribe Repatha, it's quicker to get patients on it.

And our field forces -- in this phases of growth project that we're running -- our field forces, our sales people, and our medical people -- are now finally seeing doctors say, I'm going to go and give it another try and I'm going to treat these patients.  So we are seeing some good growth as a result of that.

Q.    Well, could Amgen have simply cut its sales force, and slashed its R&D budget, and slashed its sales and marketing budget and shoved that money into trying to increase rebates?

Couldn't it have done that?

A.    Well, so you can do that.  But if there's nobody promoting the -- the drug to the physician and there's nobody promoting the medicine to the patient, eventually that market is just going to stop growing and maybe even decline.

Q.    In your opinion, sir, again, based on your experience, as you're growing the market for Repatha, are you benefiting Praluent?

A.    Praluent and inclisiran.

Q.    And what is inclisiran, sir?

A.    It's another PCSK9 product in the market.

Q.    When did that enter the market?

A.    Oh, you're testing my memory here.  I don't recall exactly.  It's been -- I want to say about three years now it's been in the market.

Q.    And is that also known as Leqvio?

A.    It is.

Q.    Is that the brand name?

A.    Yes, that's the brand name.

Q.    Leqvio?

A.    Yes.

Q.    And is Leqvio -- and what pharmacy -- or what pharmaceutical company developed Leqvio; do you remember?

A.    Well, the company that developed it was --

MR. POLKES:  Objection, Your Honor.  I believe this is beyond the scope of the cross.  It could have been done in direct.

MR. DOREN:  That may be right, Your Honor.

THE COURT:  Okay.  In that case, the objection will be sustained.

And the jury is instructed to disregard the last question and response.

MR. DOREN:  Thank you, Your Honor.

BY MR. DOREN:

Q.    Now, Regeneron's lawyer, as best I could tell, was

accusing you of not liking low prices and rebates.

Now, during your tenure at the company, am I -- am I recalling correctly that Amgen has lowered the list price of Repatha by 60 percent?

A.      That is correct.

Q.      And then did you testify yesterday that there are then rebates offered on top of that?

A.      That's correct.

Q.      And, again, do rebates impact patients directly?

A.      Not directly, no.

Q.      Where do the rebates go?

A.      The rebates go to the pharmaceutical benefit manager, the middleman involved.

Q.      What does benefit patients directly?

A.      List price reductions.

Q.      And does the elimination of hurdles to coverage, such as specialists and documentation requirements, does that benefit patients directly?

A.      Yes.  It makes it easier for them to be able to access the medicine.

Q.      What about co-payments?

What -- tell me about how co-payments impact patients directly.

A.      Well, co-payments can raise or lower the out-of-pocket costs for the patient.  So if you can

negotiate lower -- lower co-payment in the benefit for your product, you can help patients with the affordability of that product.

Q.    Thank you.

And, sir, I believe I heard that Regeneron objects to the ESI, that one contract with an Enbrel overlay conditioned on exclusive coverage for Repatha.

Did you get that message yesterday?

A.    I remember a general discussion on that topic.

Q.    So isn't it Regeneron's complaint that Amgen is actually paying too much rebate, not too little?

A.    That could be one way to interpret it.

MR. DOREN:  Thank you, sir.

No more questions, Your Honor.

THE COURT:  All right.  Thanks very much.

Ladies and gentlemen, we're going to go ahead and take our morning break.  It's about 10:45 right now. We'll come back at 11:00.

(Jury leaving the courtroom.)

THE COURT:  All right.  We'll be back in 15.

MR. DOREN:  Thank you, Your Honor.

MR. POLKES:  Thank you.

(Recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  All right.  Please be seated.

All right.  Who are we going to have next?

MR. HOCHSTADT:  Your Honor, we're going to play a deposition video of Ms. Kitson from Express Scripts and then we'll be calling Professor Scott Morton.

THE COURT:  Oh, okay.  And how long is the deposition, approximately?

MR. HOCHSTADT:  Approximately a half hour, Your Honor.

THE COURT:  Okay.  So we're going to get into that before lunch.

MR. HOCHSTADT:  Yeah.  The direct exam will start before lunch.

THE COURT:  Okay.

MR. DOREN:  And, Your Honor, would you like us to hand up the exhibit binders before the jury comes back in?

THE COURT:  No, that's fine.  We can just do it the way we've been doing it.

Okay.  Let's bring out the jury.

(Jury entering the courtroom.)

THE COURT:  All right.  Please be seated. Welcome back.

Are we ready to call our next witness?

MS. AKYOL:  Good afternoon.  The parties intend to introduce deposition testimony from Julie Kitson, Vice

President of formulary solutions of Express Scripts.

Regeneron is offering the following exhibits into evidence:  PTX-198, PTX-204, PTX-300, PTX-308, PTX-329 and PTX-964.

Amgen is offering the following exhibits into evidence:  DTX-1154, DTX-1162, DTX-1893 and DTX-1894.

1894 is subject to the Court's ruling on sealing.

THE COURT:  All right.  Thank you very much.

Any objection?

MR. DOREN:  No, Your Honor.

THE COURT:  All of those are admitted.

(PTX Exhibit Nos. 198, 204, 300, 308, 329, and 964 were admitted into evidence.)

(DTX Exhibit Nos. 1154, 1162, 1893, and 1894 were admitted into evidence.)

MS. AKYOL:  May I approach with the exhibits?

THE COURT:  Yes.

MS. SPEARS:  May I approach as well, Your Honor?

THE COURT:  Yes.

MS. SPEARS:  These are Defendants' exhibits. Thank you.

THE COURT:  Thank you.

All right.  Let's proceed.

MR. WILKS:  May we proceed with the video,

Kitson - Video

Your Honor?

THE COURT:  Yes.

(Beginning of videotape deposition of Ms. Kitson.)

Q.    Good morning, Ms. Kitson.

How are you today?

A.    Good morning.

Q.    Okay.  What is your current role?

A.    Sure.  I'm the Vice President of formulary solutions at Express Scripts.

Q.    Okay.  And what are the PCSK9s that ESI negotiated rebates for in 2019?

A.    Repatha and Praluent.

Q.    Okay.  Can -- I'm going to hand you Regeneron Exhibit 5.  This is Bates label ending 7167.

Please take a look at it.  And while you're reviewing for the record, this is an internal ESI chat conversation between Michael Rothrock and Scott Litow that is dated February 24, 2020.

Okay.  Well, we're going to go through this document.

Do you know who Mr. Litow is?

A.    I know the name.  I never worked with him.

Q.    Okay.  And it looks like Mr. Litow's email address is HealthSpring.

Do you see that?

A.    Correct.

Q.    So you understand that he is at Cigna?

A.    Yes.  HealthSpring, they're Medicare.

Q.    Okay.  And you said Mr. Rothrock was responsible for negotiating PCSK9 formulary coverage for Part D in 2020.

Correct?

A.    He was responsible for negotiating rebate contracts for Medicare in 2020, yes.

Q.    Okay.  So it looks like at -- actually, first, is this -- does ESI have internal chat systems that people communicate business purposes on?

A.    Yes.

Q.    Does this look like that internal chat system?

A.    Yes.

Q.    Let's look at Mr. Rothrock's chat to Mr. Litow at 12:59.  He asks, "For 2021, what is the likelihood you move Repatha to NPB tier."

Do you see that?

A.    Yes.

Q.    What is "NPB tier"?

A.    Non-preferred brand.

Q.    And Mr. Litow responds, "Extremely."

Do you see that?

A.    Yes.

Q.   And then it looks like Mr. Litow responds again at 1 o'clock, "Hi, we fully intend to unless you have a good reason not to."

Do you see that?

A.   Yes.

Q.   And then Mr. Rothrock responds, "Rebate would go away and trying to push them to 25 percent for 1:2 at PB tier."

Do you see that?

A.   Yes.

Q.   What does 1 of 2 mean?

A.   1 of 2 products.

Q.   Okay.  And what about "PB"?

A.   Preferred brand.

Q.   So, Mr. Litow, who responded -- who is a Cigna representative, is saying, "We would rather not have Repatha on preferred brand tier"; is that correct?

A.   Yes.

Q.   And then he continues at 1:02, "I really don't want them PB tier.  It's not worth the selection."

Do you see that?

A.   Yes.

Q.   Then ten minutes later, he responds again, "If you need it in order to bring us more value, though, we could be convinced, but would rather not."

Do you see that?

A.    Yes.

Q.    And then Mr. Rothrock responds, "May need it.  Here's what I am working on:  Repatha 1 of 2 now is at 20 percent, pushing for 25 percent."

"Enbrel:  Half point starting 5/1 through 6/30/2020 then one full point 7/1/2020 through EOY. For 2021, you would get another full point one on Enbrel for fiscal year 2021."

"Amgen is needing Repatha for us to help deliver this all.  Amgen rate with double step would start on 7/1/2020."

Do you see that?

A.    Yes.

Q.    Okay.  Mr. Litow continues, "If we keep Repatha PB... yeah.  Okay.  I'll bring it back, but I really don't like Repatha."

Do you see that?

A.    Yes.

Q.    And again, "PB" is preferred brand?

A.    Yes.

Q.    And then Mr. Rothrock responds, "Yes... Repatha is key for them at PB tier."

Do you see that?

A.    Yes.

Q.    And "PB", again, is preferred brand?

A.      Yes.

Q.      Okay.  So it looks like there's some discussion of other Medicare formularies, and then let's look at 1:25 p.m. on the next page.

So Mr. Rothrock continues, "Once you determine if AARP has moved it to PB tier for 2020 -- and we can revisit -- I just know from an enterprise perspective in Medicare, there is a lot of money here (particularly with the Enbrel value), so we may need to look at this holistically.

Do you see that?

A.      Yes.

Q.      And then Michael Rothrock responds again, "May need you to take one for the team (and I don't ask for those very often)."

Do you see that?

A.      Yes.

Q.      Okay.  I'm going to hand you another document.  So this is Regeneron Exhibit 6.  Please take a second to look at it.

While you're reviewing, for the record, it is Bates ending 2329, and it is another internal chat between Michael Rothrock and Tony Grillo, and it's dated March 3, 2020.

Okay.  And this is another internal chat that

ESI uses for business purposes?

A.    Yes.

Q.    And Mr. Grillo responds at 9:33 a.m., "We still need the Enbrel enhancement effective 4/1.  Billy said you'd okayed that coming by the end of the week.  We have everything else on the grid except the 2020 Enbrel enhancement."

Do you see that?

A.    Yes.

Q.    Do you have any idea who "Billy" is?

A.    Yes.  So it sounds like that's Billy West from Amgen.

Q.    At 12:28, Tony Grillo messages Mr. Rothrock.

"Are you okay with me telling Billy Repatha is safe on PDP as long as we get that matrix back ASAP?

A.    Yes, I see that.

Q.    What is "PDP"?

A.    Prescription drug program.

Q.    What does it mean -- what do you understand it to mean when he says, "Repatha is safe on PDP"?

A.    I think these are the Cigna HealthSpring PDP formularies.

Q.    So that's interesting.  There's no contingencies on Repatha in the contract is what you're testifying?

A.    It would be helpful to see the contracts, but I believe that is correct.

Q.    Yes, please.  Definitely feel free to go back and look at Exhibit 5.

A.    Yes, and, you know, I would also say, without looking at the contracts, emails are very hard to interpret.

Right?

There can be a lot of back and forth, but ultimately, what's in the contract is what ended up in the contract.  So I think it's -- would be really helpful to be able to see the contracts.

Q.    Thank you.

So we discussed earlier that ESI evaluates products individually, but when a portfolio is offered, they consider the value of the portfolio when reviewing bids. Right?

A.    We look at the products head-to-head, and when I reviewed the modeling, it appears we are just looking at the two PCSK9s head-to-head, the modeling that went to VAC.

Q.    So you said that you were evaluating the PCSK9s on -- based on their stand-alone offers on Repatha and their stand-alone offer on Praluent?

A.    Correct.

Q.    And why would you do that?

A.    So our standard, the way that we -- every year for the Express Scripts formularies we review all of the different therapy classes, and we look at the modeling of

those products and the rates that are offered.

So in that model that we have for the PCSK9s, we were looking at the Repatha offer and Praluent offer.

Q.    Throughout the negotiations for commercial formulary coverage, PCSK9s, in May of 2020, Amgen continued increasing its rebate offers on Repatha, Enbrel and Otezla, conditioned on Repatha exclusivity.  Correct?

A.    So negotiations typically happen over a period of time; right?

The goal is to increase the value that we can offer to our clients.  I don't believe that there is a tie, contingency from Repatha exclusive to Otezla anywhere in the ultimate contract.

Q.    Thank you.

Exhibit 13.  Okay.  For the record, this is Bates ending 2544.  It is an internal chat between Michael Rothrock and Jeannette Novatski.  It is dated May 29, 2020.

A.    Yes.

Q.    And, again, this is an internal chat that ESI employees use in the ordinary course of business; correct?

A.    Yes.

Q.    So Mr. Rothrock messages her at 3:18, "Amgen update is SWEET," in all caps.

Do you see that?

A.    Yes.

Q.   And she says, "Do tell."

Do you see that?

A.   Yes.

Q.   And he responds, "We have to go exclusive on 1/1 -- Repatha 1 of 1 at 54 percent.  Enbrel 2022 equals plus five; Otezla 2022 equals plus 4.5."

Do you see that?

A.   Yes.

Q.   And then Ms. Novatski asks, "2022, what about 2021?"

Do you see that?

A.   Yes.

Q.   And Mr. Rothrock responds, "Yes ... that is to lock in two years.  2021 numbers equal no change Otezla from current.  2022, 7/1 equals +2 on Enbrel.  2021 equals +2.5 on Enbrel.  2022 equals +5 on Enbrel.  All tied to Repatha exclusivity -- exclusive."

Do you see that?

A.   Yes.

Q.   And I'm going to hand you Exhibit 14.  For the record, this is Bates ending 2611.  It is an email chain among Express Scripts employees, including Tony Grillo, Adam Kautzner, Michael Rothrock and David Rhodes.

The subject is "Amgen updated offer value," and it is dated June 8th through June 11, 2020.

A.   Okay.

Q.    Okay.  So let's take a look at Mr. Grillo's email, so the first in the chain.  It's on June 8th at 2:27.

Do you see that?

A.    Yes.

Q.    Okay.  So Mr. Grillo emails David Rhodes, and if we're looking at the email right above it, it looks like David Rhodes is the "Director of Financial Analysis, Pharma Forecasting & Analytics at Express Scripts"; is that right?

A.    Yes.

Q.    Sure.  That's more than enough.  Thank you.

And Mr. Grillo emails Mr. Rhodes, "Have you run any analysis on the updated Amgen offer around exclusive Repatha for Commercial?"

Do you see that?

A.    Yes.

Q.    He continues, "We are trying to understand the 2020 value of the two point in formulary compliance across the book as well as the 2021 value for Enbrel and Repatha, and the 2022 value across Enbrel and Otezla."

Do you see that?

A.    Yes.

Q.    And the last line is, "Amgen put the 2020 Enbrel formulary compliance value at 16 million."

Do you see that?

A.    Yes.

Q.    Okay.  It looks like they have a call on June 10th, and then Mr. Grillo forwards this email chain to Adam Kautzner.

Do you see that?

A.    Yes.

Q.    Okay.  And he says, "Adam, the attached slide illustrates the value of Amgen's offer for exclusive Repatha across the ESI nationals versus 1 of 2."

Do you see that?

A.    Yes.

Q.    Okay.  And then it looks like he summarizes what the attached slide says.  "The short of it is, if we go exclusive Repatha effective 1/1/21, Amgen pulls in approximately 20 million into 2020.  The 2021 value is the same between both offers, and the Repatha exclusive offer locks in an incremental five points on Enbrel and Otezla for 2022 worth 110 million."

Do you see that?

A.    Yes.

Q.    And then he continues, "Mike and I are supportive of the value provided in the exclusive Repatha offer."

Do you see that?

A.    Yes.

Q.    And then Mr. Grillo responds -- can you read Mr. Grillo's response starting, "The Praluent exclusive

offer"?

A.     Sure.   "The Praluent exclusive offer is a bit better than Repatha exclusive when looking head-to-head without the additional value on Enbrel and Otezla.  The difference in rebate value is just under 1 million annually, but Amgen pays two more points on the CVD compared to Regeneron, which doesn't make up the entire difference, but it's close. There is not much comparison versus Praluent exclusive, they are very close, just looking at the PCSK9s head-to-head, the additional value Amgen is putting in the deal blows Regeneron out of the water here."

Q.     So this is ESI Exhibit 16, Bates ending 266.  The email is -- are between Tony Grillo, Adam Kautzner and Michael Rothrock of ESI.  The subject is "Repatha-Praluent offers."

A.     Okay.

Q.     So in mid-June, Amgen and ESI were still negotiating formulary coverage for the PCSK9 category; correct?

A.     So they were still negotiating the contracting.  I would say they're not negotiating for formulary coverage. Formulary coverage is completely separate from contracting.

Q.     Okay.

A.     Just to make that distinction.

Q.     So in mid -- in mid-June of 2020, ESI and Amgen were negotiating the contracting for the PCSK9 category?

A.      Yes.

Q.      Okay.  And the subject of this email is "Repatha-Praluent offers"; right?

A.      Yes.

Q.      Okay.  So looking at Mr. Grillo's email from June 19th at 3:00, he says, "Here's how the points shake out across the different buckets by year."

        Do you see that?

A.      Yes.

Q.      What do you understand a point to be?

A.      A point is, generally speaking, a percentage, an additional percentage point in a rebate.

Q.      When you say, "in a rebate," do you mean a base rebate?

A.      Typically, yes.

Q.      Okay.  So Mr. Grillo writes to Mr. Kautzner and Mr. Rothrock, "Here's how the points shake out across the different buckets by year."

        And there is an Enbrel section.

        Do you see that?

A.      Yes.

Q.      And the Enbrel section is 2020-2 points; 2021-3 points; 2022-5 points.

        Do you see that?

A.      Yes.

Q.     And then the Otezla section is 2020-3 points; 2021-2.5 points; and 2022-4.5 points; right?

A.     Yes.

Q.     Okay.  We'll leave that there.  And as we discussed earlier, the -- there was Enbrel and Otezla value being offered during the PCSK9 negotiations; right?

A.     So there were Enbrel and Otezla rebate enhancements being offered as part of the overall Amgen offer.

Q.     This is ESI Exhibit 18.

       For the record, this is Bates ending 2704.  It is a chat communication between Ms. Kitson and Michael Rothrock.  It is dated June 26, 2020.

A.     Yes.

Q.     Okay.  And this is a chat that you exchanged with Mr. Rothrock in the ordinary course of business?

A.     Yes.

Q.     Okay.  And Mr. Rothrock messages you, "GM...IM."

       Do you see that?

A.     Yes.

Q.     And you respond, "Hi, let's chat live on PCSK9s"; right?

A.     Yes.

Q.     Why did you want to chat live with Mr. Rothrock on PCSK9s?

A.     I don't know.

Q.    And then Mr. Rothrock responds, "Just to be clear for VAC today, the Amgen (Enbrel/Otezla/Repatha exclusive) is a two-year deal with incremental on both years for all products."

Do you see that?

A.    Yes.

Q.    And VAC is the -- what does VAC stand for again?

A.    Value Assessment Committee.

Q.    Okay.  And -- and you testified earlier that the Value Assessment Committee only looked at Repatha stand-alone versus Praluent stand-alone offers; correct?

A.    Yes, that's what the models reflect.

Q.    Okay.  And Mr. Rothrock is telling you, "Just to be clear for VAC today, the Amgen (Enbrel/Otezla/Repatha exclusive) is a two-year deal with incremental on both years for all products"; correct?

A.    Yes.

Q.    Okay.  And then he asks you, "How did VAC go?"

A.    Yes.

Q.    Do you see that?

A.    Yes.

Q.    And you say, "Passed."

A.    Yes.

Q.    And then Mr. Rothrock responds, "Good."  And he says, "So we can now communicate to Amgen we can move forward for

the value on 7/1 with the VAC vote."

Do you see that?

A.    Yes.

Q.    Okay.  And I think you testified before that your -- when the VAC determined to select Repatha as the 1 to 1 choice for the Commercial formularies of Express Scripts, the VAC only considered value provided on PCSK9s, meaning the value provided for Repatha rebates and the value provided for Praluent rebates; is that correct?

A.    That is correct.  In looking at the models that were shared to VAC on -- on June 26th, that is how it appears; correct.

Q.    Okay.  And what -- do you recall what you assumed about the share shift for Repatha as compared to the share shift for Praluent?

A.    Yeah, we did assume a bit more aggressive share on Repatha exclusive.  The reason is the indications -- did have some additional indications at the time.  And then, you know, we also had added Repatha back on, I believe, 7/1/2019, and so we were seeing a pretty steep trajectory of share that was moving back to Repatha.

So it seemed to be, you know, where the market was going, so it was just a slight increase in share shift on Repatha than in the Praluent exclusive scenario.

Q.    Okay.  And so you determined, based solely on a

head-to-head comparison of Praluent versus Repatha and not considering value provided on any other drug, that more value was provided for Repatha for Express Scripts' commercial clients; correct?

A.    For the national preferred formulary; correct.

Q.    Okay.  When the decision was made with respect to 2022 coverage at the VAC, there was no consideration of Enbrel or Otezla rebates when Express Scripts determined that it was in the interest of its Part D clients to select Repatha instead of Praluent; correct?

A.    Correct.

Q.    And in 2020 and 2021, Enbrel or Otezla rebates were not considered in -- were not considered by Express Scripts when determining how to cover Praluent and Repatha for its Part D plans; correct?

A.    That is correct.  In all of the models that were submitted, they all appear to be within the PCSK9 class alone.

         MR. STOCK:  Okay.  What exhibit is this?

         THE REPORTER:  Twenty-three.

         MR. STOCK:  That's okay.

Q.    Do you see at the bottom where Mr. Wentworth has drafted an email?

         And it's Number 2, Mr. Wentworth's email says, "Based on the status of the current bid cycle, which

accounts for a number of factors, including discounts and prescriber behavior, our clients will save more by preferring the competitor PCSK9?"

Do you see that?

A.     Yes.

Q.     And do you see where he also says, "To be clear, we will not discuss competitor pricing or contracts other than to say then they, meaning Amgen, beat your PCSK9 price and clinically, we don't need both on the formulary"?

A.     Yes.

Q.     Mr. Wentworth was correct in that statement; correct?

A.     That is my recollection of the models, yes.

Q.     And he refers both to "discount" and "prescriber behavior."

A.     Yes.

Q.     And -- and once -- after the VAC at Express Scripts decided to cover Repatha 1 to 1 for the Commercial formularies in 2020, it could have decided to revisit that decision in 2021; correct?

A.     Correct.

Q.     You could also make mid-year determinations or changes, if circumstances call for it; correct?

A.     Yes.  We do typically have a 7/1 change cycle as well.

Q.     And there's no reason you couldn't have considered

Praluent again in 2021, or in mid-2021 or at the end of 2021; correct?

A.    That is correct.  And where we see when we are making a decision, if it doesn't appear that the -- that things are happening as we were anticipating, then, yes, we absolutely can bring things back as, you know -- if there's something different than the assumptions that we made with the best of intentions where it is necessary to add a product back.

Q.    And there's nothing in the contract with Amgen that prohibits VAC from reconsidering its earlier decisions; correct?

A.    That is my understanding of the contract, that there was not language stating there was any kind of pullback if a different decision was made.

Q.    Do you -- are you aware that Amgen, when negotiated with Express Scripts, emphasized that Amgen is the one with the sales force and Regeneron doesn't?

        Does that ring a bell?

A.    I do not specifically recall that.

Q.    And that second bullet says, "Stressed that they are the only ones with a sales force."

        Does that indicate to you that Amgen had emphasized to Express Scripts that one value of selecting Repatha for the formulary was that Amgen had a sales force promoting and educating physicians about Repatha?

You can answer.

A.    Okay.  Yes, it appears that that must have been stated to Ed at Ascent.

Q.    And ESI selected Repatha because it was -- because it offered the best deal, not because ESI was coerced by Amgen.

Is that fair to say?

A.    So, yeah, the VAC model is the model.  The financials are the financials.  So, no, that is not being coerced when the financials are playing out in favor of Repatha.

Q.    And so just to be clear, there was no coercion.  ESI just made the best decision for its clients; fair?

A.    Fair.

Q.    We can go to the next document.  Do you recognize this document, Ms. Kitson?

A.    I do not, but I do see where I'm included in at least a piece of it.

Q.    Okay.  I'd like to turn your attention to Page 2 of the document, the email from Ms. Newport.

A.    Yes.

Q.    And it reports -- Ms. Newport is reporting to Adam Kautzner, Michael Rothrock and Tony Grillo that she received an updated offer, actually two, from Amgen.

Do you see that?

A.    Yes.

Q.    And there are certain highlights that Ms. Newport

sets forth below?

A.     Yes.

Q.     And in particular, there's "plus two in formulary compliance starting 7/1/20," and there's a reference to of "1 of 2 Repatha status" being part of that line.

Do you see that?

A.     Yes.

Q.     And then do you also see that at the end of the Enbrel sub-bullet, there's a comment about these -- there's three bullets all related to formulary compliance, right, under Enbrel?

A.     Yes.

Q.     And it says all -- the sub -- the last sub-bullet after those three bullets referring to formulary compliance rate says, "All rates require Enbrel (RA, PSA, AS) and Otezla (PSO, PSA) to have preferred status; Repatha must be 1 of 2 in 2020 and 1 of 1 for the year 2021."

Do you see that?

A.     Yes.

Q.     And that all appears as a sub-bullet under Enbrel; correct?

A.     Yes.

Q.     And then there's another bullet, a new bullet, for Otezla; correct?

A.     Yes.

Q.    And there's references to 2020 rates for Otezla; correct?

A.    Yes.

Q.    And there's rebate -- and there's reference to 2021 rebates for Otezla; correct?

A.    Yes.

Q.    And there's references to 2022 rebates for Otezla; correct?

A.    Yes.

Q.    And there's no reference to any dependency on Repatha coverage for any of those rates for 2020, 2021 or 2022 for Otezla; correct?

A.    Correct.

Q.    And with -- in terms of the way you characterize the contract in your deposition or the actual contract's terms, which would you defer to as more authoritative?

A.    The actual contract terms.

Q.    And why?

A.    Which I -- I hope I had made clear earlier, like that is -- that is what matters.  What is in that contract is absolutely what matters, not documents and IMs.  Like that is the source of truth.

Q.    And why is that?

A.    Because emails, things can be iterative.  In IMs, people are speaking fast.  You can see in some of them,

there's multiple conversations happening.

So we have to have a source of truth, that source of truth is the contract.

Q.    Okay.  And you're not aware of any agreements outside the scope of the contract that determine the economic relationship between Express Scripts and Amgen; correct?

A.    Correct.

Q.    The Part D and Commercial formulary decisions at ESI are entirely separate; correct?

A.    Correct.

Q.    And the fact that Repatha was selected in 2020 for ESI's Commercial formularies did not mean that it was going to be selected for ESI's Part D formularies; correct?

A.    Correct.  We have separate VAC meetings and there are separate voters, and I have separate teams who are doing the modeling.

Q.    I've entered as Exhibit 27 Express Scripts ending in 3434.

Do you recognize this document, Ms. Kitson?

A.    Yes, I do.

Q.    What is this?

A.    We had a strategy session with Ascent in advance of the bid cycle and so I believe these are some information put together by Ascent.

Q.    And could you take a look at Slide 20?

It may not have a number on it.

A.   Inflammatory Conditions:  Current state.

Q.   And does this identify different inflammatory conditions and the competitive alternatives for each?

A.   Yes.

Q.   And if -- if Enbrel -- if Amgen did not provide the rebates that the VAC thought were appropriate, the VAC would have the option of making Enbrel one of the orange choices here, where there was a double step before patients were reimbursed for Enbrel; correct?

A.   Assuming that's within the clinical guidance, yes.

Q.   Okay.  And none of these indications here have less than -- less than three competitors; right?

A.   Correct.

Q.   And none of them with Enbrel have less than five competitors; right?

A.   That's correct, yes.

Q.   Okay.  And -- and Otezla also appears on this chart; correct?

A.   Yes.

Q.   Psoriatic arthritis --

A.   Mm-hmm.

Q.   -- PSA, it's one of six drugs that are approved by the VAC with no step; is that right?

A.   Yes.

Q.      Could you take a moment to review this document?

A.      Sure.

Q.      Okay.  And there is a -- on the bottom of this email, which I guess is from Adam Kautzner, there is a reference to PCSK9s towards the bottom of this page and it says, "View on the physician-administered inclisiran.  Will payer/PBM favor or disfavor this approach (assuming similar efficacy/safety profile to SC injectables)."

        Do you see that?

A.      Yes.

Q.      And then do you see there's a note from Mr. Kautzner, I think:  We see this as another competitor to the existing PCSK9s.

        Do you see that?

A.      Yes.

        (Conclusion of videotape deposition of Ms. Kitson.)

        MR. HOCHSTADT:  Your Honor, at this time, Regeneron calls Professor Fiona Scott Morton to the stand.

        With the Court's permission, Your Honor, my colleague, Matt Tonglet, will pass out the exhibit binders with the demonstratives to the witness, the Court and counsel.

        THE COURT:  That's fine.  And we have some extra binders up here at the witness stand, too, to pick up as

well.

COURTROOM DEPUTY:  Move a little closer.

Please remain standing and raise your hand.

Please state and spell your name for the record.

THE WITNESS:  Fiona Scott Morton.  F-i-o-n-a.  Last name, S-c-o-t-t, M-o-r-t-o-n.

COURTROOM DEPUTY:  Do you swear or affirm that the testimony you give to the Court and jury will be the truth, the whole truth, and nothing but the truth, so help you God, or you do so affirm?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you.  You may be seated.

FIONA SCOTT MORTON, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

MR. HOCHSTADT:  Your Honor, at this point, I'd ask, with the Court's permission, if the Court would qualify the witness as an expert.

THE COURT:  Sure.

Ladies and gentlemen of the jury, the parties have stipulated that Professor Fiona Scott Morton is qualified to testify in the field of economics.

MR. HOCHSTADT:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HOCHSTADT:

Q.    Good morning, Professor Scott Morton.

A.    Good morning.

Q.    Okay.  So you're the first economist to testify before the jury.

Can you give the jury an overview of what an economist does?

A.    I'm an academic economist.  That means I'm a professor.  I teach different kinds of students at Yale: MBA students, undergrads, law students.  And I do research in the area of competition, which means prices, how firms compete with each other, entry, exit.  These kinds of topics we've been listening to today and yesterday.

Q.    And when you teach your students, do you use slides sometimes to help you?

A.    I do.

MR. HOCHSTADT:  Okay.  With the Court's permission, I'm going to ask Ms. Wu to pull up PDX-004. Great.

All right.  And I have the clicker today.  I'm going to turn to the first slide that we're going go over.

BY MR. HOCHSTADT:

Q.    So, Professor Scott Morton, can you give the jury a little bit of a sense of your background, starting with where you teach, where you're an academic professor?

Scott Morton - Direct

A.     Yes.  I'm a professor at the Yale School of Management.  I have a PhD in economics from MIT.  I majored in economics as an undergraduate, also.  And I spent since 1999 at Yale.

Q.     Okay.  You -- you took a leave of absence, though, at some point, to go work for the Government.

Can you tell us what you did at the United States Department of Justice Antitrust Division?

A.     Yeah.  I was something called the Deputy Assistant Attorney General for economic analysis, which is a long way of saying the Chief Economist.  And that's the person who supervises the PhD economists that work at the Government and analyze mergers, and monopolies and cartels and try to figure out all the economics needed to enforce in that area.

Q.     Within the field of economics, has the pharmaceutical industry been an area of focus for you?

A.     Yes.  Actually, it was my first area of interest.

When I was a PhD student, I started studying the pharmaceutical industry and I have remained interested in it since then.

Q.     And as part of that interest, have you been asked to testify before the United States Congress?

A.     Yes, I have.

Q.     Okay.  And as part of that interest, have you written and published a number of academic articles?

Scott Morton - Direct

A.    Yes, I have.

Q.    Okay.  Let's turn to your assignment in this case, Professor Scott Morton.

Did you investigate whether Repatha has a monopoly?

A.    Yes, I did.

Q.    Okay.  Did you investigate what antitrust market Repatha has a monopoly in?

A.    I did.

Q.    And did you investigate whether Amgen's strategy caused any competitive effects in that market?

A.    Yes, I did.

Q.    Did you investigate what the impact of those effects were in the real world?

A.    Yes.

Q.    Okay.  I want to turn next to the work that you did to answer those questions.

So let's start with the first bullet here, "Research and study for pharmaceutical competition and drug pricing."

How did that help you answer those questions?

A.    Well, as I mentioned, since graduate school, I've been doing research -- empirical research on pricing in the pharmaceutical industry, mostly in the United States.  And so over the course of decades, I've worked with lots of data

sets and evaluated different laws and policies and studied different aspects of the industry. So I have just a lot of general knowledge of the way -- the way the industry works.

Q.    Okay. And turning to data, one of the other things that you did in this case, did you look at pricing data, prescription data, formulary coverage?

A.    In the course of getting the evidence for -- for the case, a lot of that economic evidence is part of what's collected, not just the emails that you've been seeing, and so my team takes that data and tries to organize it in a way that we can study. So figuring out what an average price is or figuring out the total units of a product sold or how many prescriptions there are, that kind of -- that kind of thing, but...

So the evidence covers all the -- the -- not just the documents, but through into very detailed data.

Q.    And where did this data come from? Did it come from the parties that are here, the insurers that the jurors have heard about, other third-party sources?

A.    We use everything. Third-party sources are -- are one source of evidence, but really the most important in this case is the data that comes from the companies themselves because they are the ones who know what the rebates are, and these rebates vary by purchaser and they're quite confidential. So the only reliable place to get them

is from the company that's selling the drug.

Q.    And what role did economic tests and models play in your work in this case?

A.    Well, then, of course, I used the tools of economics to assess what's going on with price and price competition, how to think about the impact of the -- of the bundle.

Q.    Okay.  So beyond the data, did you look at documents from Regeneron, Amgen, these insurers and the testimony of the witnesses in the case?

A.    Yes, I did.  That's very important because what we're talking about here is corporate strategy and what the managers are deciding to do to try to get their company an advantage.

And so what the managers say and what they understand and their incentives, how they're thinking about the business problem, how they're setting price.  All of that -- that -- you know how they're talking about the -- the decision-making of the managers is really important.

Q.    And is that something that's part of your focus at the Yale School of Management?

A.    Yes, I teach MBA students that are about to go off and become managers, and this is a focus of my research and, of course, teaching and their interest.

Q.    Okay.  Did you also interview Regeneron employees?

A.    Yes, I did.

Q.      Why was that important to you?

A.      Again, sometimes the record is not entirely complete about what the manager -- what decision they made, and what the incentive was and why they made it, and so I had a couple of questions in that regard.

Q.      Okay.  So I know you said you're an economist, but it sounds a little bit like you are a scientist, so that's part of it.

        Is that -- is that part of the work?

A.      Well, I mean, there's definitely a scientific method to the way we do economics.  That's why you can get a PhD in economics.  That's why publishing requires doing a high level of work.

Q.      Okay.  And for this work that you and your team did, are you compensated by Regeneron?

A.      Yes, I am.

Q.      Okay.  But is your compensation dependent in any way on the outcome of this case?

A.      No, it's not.

Q.      Okay.  Okay.  Also, I should mention, Professor Scott Morton, have you been here in the courtroom to hear the testimony that's come in over the past two days?

A.      Yes, I have.

Q.      Okay.  Did you reach opinions about those four questions that you looked into?

A.      Yes, I did.

Q.      Okay.  Starting with the first question, what did you conclude about whether or not Repatha has a monopoly?

A.      Repatha has a monopoly.

Q.      Okay.  What did you conclude about what antitrust market Repatha has a monopoly in?

A.      Repatha's monopoly is in the PCSK9 market in the United States.

Q.      Okay.  What did you -- what did you conclude about whether or not Amgen's strategy caused anticompetitive effects in that market?

A.      It caused anticompetitive effects for sure.

Q.      And what were the -- what was the real-world impact of that conduct?

A.      The conduct caused a breakdown in competition, which leads to higher prices and harm to patients.

Q.      Let's turn to your next slide.  As an economist -- I mean, this case is about cardiovascular, heart attack, number one killer still.

        Is there -- from an economic standpoint, are there certain metrics to see whether competition is healthy that an economist looks at?

A.      Yes, a big one, and the one that I highlight on this slide is what you see, the difference between Praluent and Repatha that you see that's very striking is that Praluent's

price is lower than Repatha's price. And I'll show you some data on that. It's quite a bit lower.

And yet, Repatha's market share is increasing, and Praluent's market share is decreasing. And why are those market shares moving the way they are? It's because of coverage at the big PBMs that we've heard about today and yesterday.

And that's really odd because in economics, when a product is half the cost of another product and treats the same disease or satisfies the same need, you tend to see that product gaining market share because people like lower prices. So this is not a usual situation.

Q. Okay. So let's turn back to that first assignment question you looked into, whether Repatha is a monopolistic product.

And, first, start out by explaining to the jury: What is monopoly power? Monopolist, monopoly has been thrown around a bit in the courtroom.

Can you level set for us, Professor Scott Morton?

A. Yeah. A monopolist is a firm that has so much market power that they can raise price and their customers don't leave. Their customers continue to buy because there aren't good substitutes. So that's what we mean by monopoly, and we show that typically by some combination of high prices,

Scott Morton - Direct

high market shares and high entry barriers.

Q.     Okay.  So let's look to high prices.

Did you find that Repatha's price is high in this case?

A.     Yes, I did.  I think this might be the first time that the jury's seeing this information, so let me just slow down and unpack it a little bit.  What you're seeing here is the price graphed over time from 2020 to the middle of 2023.  And Repatha's in red.

And the first thing to notice is that there's a list price that you've heard about and that list price by the end of 2023 is $574 a month.  Okay.  This is -- these are monthly list prices, but you'll notice that the net price is much lower.  It's down at $203.  So, in other words, there's so many rebates that this 574 price is -- which is what's the list, is not actually what Repatha's selling for.  It's selling for 200.

But if you look at Praluent, you see that Praluent's list price is somewhat lower than Repatha at 492.  And Praluent's sales price is 98.  So Repatha's price is double the price of Praluent.  It's 200 and Praluent is about 100.

And that's what I mean by saying -- and you can see that Praluent's price has been coming down over the last four years.  So that's a sense in which I mean if you lower

your price, people generally -- in a normal market, consumers respond by wanting to buy more.

Q.    Professor Scott Morton, let's just focus on the lower part, which is those net prices that you were talking about after the rebates that the jury has heard about here.

For the period of time that you're looking at, from the second quarter of 2020 to the second quarter of 2023, is the price of Praluent lower than the price of Repatha?

A.    Yes, it is.

Q.    For that entire time period?

A.    Yes, it is.

Q.    Okay.  Now, let's turn to the list price, because we heard a fair bit about the list prices earlier.

How is Repatha's list price compared to Praluent's list price?

A.    Well, first of all, it's rising.  And, certainly, for most of the period, it's higher.

Q.    Okay.  And were you here when Mr. Gordon testified about Medicare patients having to pay a percentage of the list price?

A.    Yes, he was very concerned that Repatha be good to patients, but at the same time, he wanted -- he said the patients were paying the list price.  So this is, obviously, going to be causing rising costs for people on Medicare.

Q.    Okay.  We also heard from Mr. Gordon and Amgen's counsel about a list price reduction that Amgen took back in 2018.  Okay.  But you're looking at prices from the second quarter of 2020 forward.

Why are you looking at that time period forward versus 2018 and the past?

A.    Because the anticompetitive conduct begins in 2020. So whatever was happening before 2020, I'm assuming we've got competition, and indeed, competition between Praluent and Repatha might be why -- one reason why prices are falling in that early period.  The anticompetitive conduct doesn't begin until 2020.

Q.    Okay.  Professor Scott Morton, before we leave this slide, we also heard a fair bit from Mr. Gordon and Amgen's counsel about rebates and how they do not directly benefit patients.

Do you recall that?

A.    I do.

Q.    As an economist who specializes in the pharmaceutical industry, is Mr. Gordon correct?

A.    No, he's not.

Q.    Why not?  Please explain that to the jury.

A.    Because the rebate lowers the price that's actually paid for the drug.  So we're not paying $574 for Repatha. The -- the PBM buying it, which is ultimately the employer

buying it, is paying $203 for Repatha.

Now, when the price of drugs fall, that's a benefit to patients because it means the cost of healthcare has fallen.  So that means the cost, whether you -- if you get that through Medicare, then that means the Government's expense has fallen, and we could all pay lower taxes because we don't have to pay for such high drugs.

If it's the employer, then the employer's plan costs are lower, and that means the employer both doesn't have to charge their employees as much for pharmaceutical insurance and, also, can set up the beneficiary schedule to be more favorable.  So when prices rise for drugs, what employers tend to do is they raise deductibles, they raise out-of-pocket costs, they raise co-insurance because the plan -- because the costs are so high.

So when those costs come down, employers can set a benefits schedule that's more favorable to patients.

Q.    Professor Scott Morton, before we leave this slide, because it's going to come up on a few slides, your time period ends Q2 2023.  We're here, May 2025.

Can you just explain to the jury why they're going to be different end points that aren't to the present?

A.    Yes.  This chart comes from my report, which was due a long time ago.  And so I had to -- I took the data that was the most recently available at the time I was writing

the report and that was the second quarter of 2023 and then I had to turn it in in 2024.

Q.    Okay.  Let's turn to the next indicator of monopoly power for Repatha, which is market shares.

What did you find based on your analysis of the data in this case?

A.    I found that Repatha has a high market share.  It's almost 70 percent when the period starts.  And it's up to 85 by the end of my data.  And this is a two-player market.  So that means that Praluent has the rest.  And that means Praluent's down to about 15 percent.

Q.    When your data starts here, is 69.2 percent or 70 percent, is that a high market share from a monopoly power?

A.    It's a very high market share.  It's well more than half of the market.  It's more than two-thirds of the market, and economists consider that level of market share to be a monopoly level of market share.

Q.    Okay.  Professor Scott Morton, the jury saw a document with Mr. Gordon that we'll show a little bit afterwards that went to the board that had a hundred-percent share for Repatha projected in 2024.

To have monopoly power, do you need to have a hundred-percent share for a product?

A.    No.  An antitrust is kind of like a special term.  It

means that you have a very high market share, but you don't have to have a hundred percent to have monopoly power.

Q.    On the flip side, would Praluent have to go out of business, exit the marketplace before somebody could say Repatha has a monopoly?

A.    No, that's not the case.  As I said, the monopoly power just means a lot of market power, and that means you have a really high share.  So 70 percent is a really high share for one company to have in a marketplace.  And that's sufficient for monopoly power.

Q.    And so by the time that your data ends here, right around, you know, end of the year 2023, what is -- what's Repatha's market share?

A.    Eighty-five percent.

Q.    And were you here for my questioning of Marion McCourt yesterday?

A.    Yes, I was.

Q.    Okay.  Did you hear what Ms. McCourt said Praluent's share is currently today?

A.    Yes.  I particularly remember she said that for new patients, Praluent is down to 6 percent, which in a two-player market means that Repatha's up to 94 percent of the new -- new prescriptions.

Q.    And for all patients of Praluent's share, is that 9, 10 percent?

What does that mean for Repatha's share for existing patients and new patients today?

A.    Ninety, 91 percent.

Q.    Okay.  Let's turn to the last indicator of monopoly power, Professor Scott Morton, barriers to entry.

Did you find that they're high in this market?

A.    Yes, I did.  In the pharmaceutical industry, it's not that -- like, a new competitor would just say, "Wow, the price of Repatha is high.  I'll come in and compete."

They have to invent a drug.  Then they have to get it approved by the FDA.  Then they patent the drug.  So the whole thing takes many years, and we don't expect to see entries just coming in in a minute.

Q.    Okay.  So after your first assignment, what -- just remind the jury, what did you find as to whether or not Repatha has monopoly power?

A.    I found that Repatha has monopoly power.

Q.    Okay.  Let's turn to what market Repatha has monopoly power in.  And you said here that the PBMs or insurers have answered the question as to what the market is in this case.

And why is that?

A.    Well, when we define a market in economics, and the economics of antitrust, we look at what the consumers think are the subsidies.  And you heard a lot about the PBMs trading off the choice of Praluent and Repatha.  So

that's -- that's our market.  That's easy to determine.

Q.    And can you explain to the jury what piece of evidence that we're looking at here and this is just excerpted?

A.    Oh, this is the PBM's bid grid, essentially.  And they're saying this is the defined drug market, and it's the PCSK9 class.  We know -- we know that.  And there are two competitors in it.

Q.    And Professor Scott Morton, for this one, we actually have the final contract of Regeneron and UnitedHealthcare for 2022.  But a bid grid did come up today with Mr. Gordon.

      Were you here when there was a discussion about the CVS bid grid?

A.    Yes, I was.

Q.    And what was the competitive category -- what were the two products in the competitive category that was discussed earlier today?

A.    Repatha and Praluent.

Q.    Okay.  So did you -- as part of your analysis in this case, did you look beyond what the insurers say the market is in terms of what the parties -- like what Amgen believes the market is?

A.    Yes, I did.

Q.    Okay.  Let's turn to the next slide, and this was an internal Amgen document.  And the jury can see the title of

the slide excerpted, "Repatha Preliminary 2021 May LRS, Long-Range Scenario, April 2, 2021."

Why was this document relevant to your analysis of what is the market definition in this case?

A.    Well, remember, I said that a monopolist can raise price and people don't leave.  They can make more money when they raise price.  And what you see here is Amgen answering the question:  What's the difference between having two players in our market and one player in our market?  And at the bottom in yellow, you can see a 1.6K.  That's $1,600 -- is Amgen's forecast of the annual price they're going to get for -- for Repatha if there's a two-player market.  And on the left, you see that goes up to $2,500 that they could get if they're a monopolist.  And so we see there that Amgen understands that it has this market power inside its PCSK9 market.

MR. HOCHSTADT:  Okay.  Bear with me one second, Your Honor, just a minute of housekeeping.  Going back to the last slide, Slide 12.  I'd like to move PTX-922 into evidence.

MR. LIVERSIDGE:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 922 was admitted into evidence.)

MR. HOCHSTADT:  Similarly, I'd like to move

PTX-897, which is Slide 13 here, into evidence.

MR. LIVERSIDGE: No objection.

THE COURT: It's admitted.

(PTX Exhibit No. 897 was admitted into evidence.)

MR. HOCHSTADT: Thank you.

BY MR. HOCHSTADT:

Q. Okay. I said we'd get back to this document. So this was a document that the jury saw yesterday with Mr. Gordon. This is the projection of Repatha share in 2024 that Mr. Gordon presented to the board in September of 2021.

Why was this document relevant to your opinion that the market for -- that Repatha has monopoly power in is -- is Praluent and Repatha?

A. Because here we see Amgen describing the market as PCSK9s. And that has two competitors in it, Praluent and Repatha. Though we see that Regeneron's projection is that they want to have 100-percent share in this market.

Q. You mentioned Regeneron there. Did you mean Repatha?

A. Sorry. I meant Repatha. Excuse me.

Q. Okay. And just for the jury, the note that you've highlighted, the market basket, PCSK9i MaBs, is that monoclonal antibodies?

A. Yes, it is.

Q. All right. So once you come to the opinion that

Amgen has a monopoly with Repatha in the PCSK9 market in the United States, did you analyze how, if at all, competition from Regeneron threatened that monopoly?

A.      Yes, I did.

Q.      Okay.  To set that up, Professor Scott Morton, the jury has heard a fair number of these names so far.  I -- I believe -- were you here when Mr. Gordon testified that the three largest PBMs cover 80 to 90 percent of the market?

A.      Yes, I was.

Q.      Okay.  Did you independently investigate that as part of your work in this case?

A.      I did.

Q.      Okay.  Was there any Amgen documents that were particularly informative or corroborative of what Mr. Gordon testified about?

A.      Yes, this one that's up on the screen is essentially just a pie chart showing the share of the market that's held by each of the three big PBMs.

        On the left is the commercial, so that means employers, employer insurance.  And on the right is Medicare.  And you can see that on the left that most of the market is taken up by UnitedHealthcare, Express Scripts and CVS, and there are three different colors.  And then on the right, we add Humana as a fourth big player.

Q.      And, Professor Scott Norton, I'm going to try and do

this and see if it will work.  Okay, it does.

Okay.  So sticking with the blue wedge here in -- for the commercial lives, which is 167 million, there's a couple of rings; right?  The first -- and just to be clear, is Ascent the largest of the big three for commercial lives in this Amgen document?

A.    Yes, it is.

Q.    Okay.  And so Ascent is the inner ring.

What are the outer rings where we see prime, and ESI PBM and then we keep going even further out and the jury can see Express Scripts, Cigna, others, others and a few other names like Blue Cross Blue Shield of Massachusetts?

Explain what's going on there.

A.    Well, those are the different subformularies.  If you have Blue Cross Blue Shield of Massachusetts, they're part of this Ascent family and they -- that -- there's a national formulary that Ascent runs.  But sometimes the subformularies will do something a little bit different.  That's the custom formulary that we talked about earlier in the trial.  And those are -- they are all part -- they're all blue because they're all part of that one negotiating entity.  But the national formulary is the center ring, and then the custom formularies flow out from that.

Q.    And we're going to come back to this a little later, but just as a preview for the jury, did you analyze whether,

in this case, those custom formularies followed what the national formulary did?

A.      Yes, I did analyze that.  And, yes, they do.

Q.      Okay.  All right.

So getting back to Regeneron, did you analyze what the -- what strategy Regeneron came up with to compete in the marketplace when they got the rights back to this product in 2020 in the United States?

A.      Yes, I did.  And I think Ms. McCourt explained it really well on Tuesday.  What -- what Regeneron decided it had to do is that Sanofi's strategy of lots of marketing people was not working.  And what Regeneron thought would work would be to not use all of those resources on marketing, save a lot of costs and pass that cost through to the PBM by cutting the price of the drug.

So they went straight to the PBM and said, We'll offer you a low price, but we can only offer you this low price because we're not doing any of our own marketing.  So we're relying on you, the PBM, to tell your patients to use Praluent and tell the doctors to use Praluent, which means we need an exclusive position.  We need you to be preferring Praluent so that everybody will use it.

Q.      So, Professor Scott Morton, just to put a visual on it, Regeneron lowered their marketing cost as part of this new strategy?

A.     That's right.

Q.     They put that into lowering the price of Praluent to the insurers.

Is that the lower net price?

A.     Yes, that's right.

Q.     And the hope, and we'll get to CVS Commercial, is they'd win with the best price?

A.     Yes, because, and it has been emphasized repeatedly, the PBM is interested in obtaining drugs for less money. That's their -- that's the goal of the PBM to try to have less expensive drugs, which they can then pass on to employers and patients.

Q.     Professor Scott Morton, Mr. Gordon called Regeneron's plan a "very dramatic strategic change."  And this was at 628, Line 1 of the transcript yesterday.

As an economist, how, if at all, does competition from a disruptive rival like Regeneron impact competition?

A.     Well, it's a really classic strategy.  The idea of just sharply cutting price and trying to get share with that lower price.  Mr. Gordon described it as a battle that Regeneron started, and they're just trying to buy share with a bigger rebate.  And it was unnecessarily aggressive.  And all of that is completely consistent with the fact that what Regeneron's doing is starting price competition.  They're

dropping price and trying to get customers with a low price.

Q.    Professor Scott Morton, Mr. Gordon and Amgen's counsel have suggested that this strategy is risky.  I think this morning I heard it called "cannibalization strategy."

Do you agree with that?

A.    I mean, all strategies have an element of risk, but I'll say this is a real classic.  Lowering your price to try to get people to buy the product is a well-known strategy. It works a lot of the time because people tend to like low prices.

Q.    Turning to Amgen, was its strategy perfect and riskless?

A.    Again, I think all strategies have their risks.

For example, Amgen is sinking hundreds of millions of dollars into clinical trials.  Those might not turn out scientifically quite the way they thought, and that would be a -- kind of a risk of going down that route, for example.

Q.    And as an economist, this competition of consumers, are we all better off if firms copy each other's strategies or if they go to market with different ways to reach consumers?

A.    Well, one of the great things about the free market is that each company gets to do their business the way they want to do their business.  And if they are not violating

any laws, not interfering with other people's strategies, then they carry out their own the way they want.

If Amgen wants to do clinical trials and have lots of marketing people, they can do that.  And what we want is for Regeneron to be able to cut price and be allowed to do that.

Q.    Professor Scott Morton, Mr. Gordon said that it would be anticompetitive to call Regeneron up on the phone and say, "Let's stop competing."  This was yesterday's transcript, Page 649, Line 7 through 16.

As an economist, would it be good or bad for competition if Amgen used its economic power to force Regeneron to stop competing the way it wants to and start competing the way Amgen wants to?

A.    It would be bad for consumers.  If Regeneron wants to lower prices and compete that way, then that's really good for consumers because then we get access to, first of all, another different strategy and also lower prices.

Q.    I'm going to come back to the strategy, but just an order of housekeeping.

MR. HOCHSTADT:  Just Slide 16, Your Honor, we'd ask to move PTX-511 into evidence.

MR. LIVERSIDGE:  No objection.

THE COURT:  It's admitted.

MR. HOCHSTADT:  Thank you.

Scott Morton - Direct

(PTX Exhibit No. 511 was admitted into evidence.)

BY MR. HOCHSTADT:

Q.    So was this winning strategy actually successful for Regeneron in early 2020?

A.    The first time they tried it, it was.  They successfully got the account at CVS Commercial and as an exclusive at -- at that account.

Q.    Well, let's start with that.  So Regeneron, with a low price, got the exclusive.

As an economist, is there anything wrong with that?

A.    No, because both firms, Repatha and Praluent, have the opportunity to compete for that exclusive by -- by setting a price.  And the PBM picks the one that they like the best.  That might be on the basis of price.  There might be some clinical factors involved, but the -- but the point is that it's head-to-head competition between two choices that the PBM gets to make a decision between and figure out which one is going to be most beneficial.

Q.    Okay.  Let's look at this slide that you prepared.

Are you -- are you showing here the national formularies of the big insurers?

A.    Yes, I am.

Q.    Okay.  And walk the jury through.  What -- what was

the coverage mix at these big insurers in, you know, first half of 2020 when Regeneron's competing head-to-head with this new commercialization strategy?

A.    Yeah.  What you see is that both Regeneron and Praluent have successfully obtained an exclusive position at one of the PBMs and that the other two, Express Scripts and UnitedHealthcare, have parity, have both of the -- both of the drugs on the formulary.

And this is the kind of thing you would expect to see in a freely competitive market.  One of the drugs wins one, one of the drugs wins the others.  Some PBMs are having both, and, in general, everybody is able to compete head-to-head for the business that they want.

Q.    Going back to those metrics that we looked at as to whether a market is healthy or not, is this a healthier indicator?

A.    This is a healthy indicator.  It -- it looks like there's competition between the two products.

Q.    Okay.  And we heard a fair bit from Amgen and Mr. Gordon about Praluent's market share sliding/declining.

Did you investigate and analyze, based on the data, what happened to Praluent's market share as a result of the win at CVS Commercial with this new strategy?

A.    Yes, I did.

Q.    Okay.  What did you find?

A.     I found that Praluent's market share went up, as you would expect when you would get coverage at one of the big PBMs on the national formulary.  So we see 27.6 up to 33.2.

Q.     Okay.  Did you investigate how, if at all, Regeneron's strategy impacted Amgen?

A.     I did.

Q.     Okay.  Let's turn to the next slide here.  And this is -- I'll just say it, because I think it's been referred to as such at the trial, this is the "onslaught" email from May 12th to 14, 2020, when Amgen learns that CVS Commercial is going to go with Praluent with its new strategy.

As an economist, why was this document important to you understanding the competitive dynamic that was going on?

A.     Because it indicates to me that Amgen has realized that price competition has arrived in their market and that's a new thing.  They call it an "onslaught."

Mr. Gordon in court called it "the battle that Regeneron started for exclusivity."  Again, he called it "unnecessarily aggressive" and "they're just trying to buy share."  Well, buying share is another word for cutting price to try to get people to buy your product.

And this response is completely consistent with a company that has not been competing on price and now realizes that it faces a competitive threat.

Q.   Okay.  Did you analyze -- Professor Scott Morton, did you analyze the strategy and the economics behind how Amgen responded to this competition from Regeneron that threatened the Repatha monopoly?

A.   Yes, I did.

Q.   Okay.  So let's turn to Amgen's response.  The jury has seen this email as well.  Okay.

Why was this document important to your analysis in assessing the competitive response from a monopolist to a threat from Regeneron?

A.   Well, this document is very important because it describes the bundle that Repatha is going to be an exclusive.  And then in exchange, the PBM is going to get the full amount of their Enbrel and Otezla rebates, which they otherwise would not get if they bought Praluent -- if they put Praluent on the formulary.

What Mr. Gordon explained yesterday was that he was trying to maintain Repatha's high price.  He didn't want price erosion, he didn't want a gross-to-net erosion, and he was trying to do that without competing on price -- without a battle with Regeneron to compete on price for the exclusive at any one of these PBMs.

And how do you avoid competing on price to get on the formulary of a PBM when Regeneron wants to compete on price?

You have to find that -- you don't want to go head-to-head because that brings down the price and that is the gross-to-net erosion that is the thing that Mr. Gordon doesn't want to do.  And so this bundle cleanly enables him to escape --

MR. LIVERSIDGE:  Your Honor --

THE WITNESS:  -- having that price competition.

MR. LIVERSIDGE:  Your Honor, I am making an objection.  This is in violation of the prior Court's Order.

THE COURT:  Let me see counsel at sidebar.

(Beginning of conference held at sidebar.)

THE COURT:  What part did you think, in particular, was objectionable?

MR. LIVERSIDGE:  She started to describe what his intent was and what he intends to do in response to this competitive threat and interpreting the document that way for the jury.

THE COURT:  Plaintiff.

MR. HOCHSTADT:  Your Honor, Professor Scott Morton is a qualified economist at Yale School of Management.  This slide was disclosed overnight to them.  There was no objection about the slide.  She's testifying about the strategic response and the economic impact on Amgen, and their response to that strategy by Regeneron and the economic offer that Amgen came up with to respond to the

threats to protect the monopoly.  This is squarely down the lane.

I'm not asking in my questions for Amgen's intent and they use -- I didn't use that word in my question.

THE COURT:  Yeah.  So I was watching the answer as it was happening.  I didn't see anything that crossed the line with respect to the Court's prior rulings.

That said, I thought there might be an objection based on her characterization about what a witness said, maybe it wasn't entirely accurate.  So just be careful about that.

So the objection right now is going to be overruled, but we just need to watch it.

MR. HOCHSTADT:  Okay.  Thank you, Your Honor.

(Conclusion of conference held at sidebar.)

THE COURT:  That objection has been overruled. Let's continue.

BY MR. HOCHSTADT:

Q.    Professor Scott Norton, I want to turn to the economic effect of this two-and-a-half-year portfolio contract that the jury has heard about.  I'm going to use Mr. Gordon's term, "portfolio bundling."  I think that will be easier.

So what was the effect of an outcome of this

portfolio bundle at Ascent on the three formularies that are being discussed with respect to Repatha?

A.    Well, the effect of it was that the -- the PBM, Ascent, would lose some of its Enbrel rebate if they did not put Repatha on the formulary as an exclusive and not cover Praluent.  So that Enbrel money, which was an Enbrel rebate -- because Enbrel is so big as a drug, some of that Enbrel money could be leveraged to control the PBMs' choice about what drug to put on in the PCSK9.

Q.    And, Professor Scott Morton, if we can look at the PBM's choice, "For Repatha, will maintain its 1 of 1 position at Cigna/Prime."

       Let's stop there.  Cigna/Prime, we saw reference to that in the cheese-wheel slide, I'll refer to it as.

       Does that mean that the effect of that portfolio bundle at Ascent meant that Repatha will keep an exclusive position at the Cigna/Prime outer parts of that cheese wheel?

A.    That's correct.

Q.    Okay.  And then the email goes on to say, "And obtain a 1 of 1 position at ESI."

       And was the -- what was the effect of the portfolio bundle contract at Ascent on ESI's coverage outcome?

A.    It's the same thing.  ESI is going to take Repatha

exclusively, also.

Q.     Okay.  I want to turn, Professor Scott Morton, to the bottom portion of the slide that the jury has seen and Mr. Gordon has testified about.

What was the -- did you analyze the effect on Amgen in terms of whether it was going to change the way that it competes against Regeneron at insurers other than Ascent?

A.     Yes.  This strategy is going to work to get ESI to take Repatha and exclude Praluent, and Amgen says, "Wow, this is a great strategy and we're going to seek to replicate it moving forward with UnitedHealthcare and CVS," the other two big ones in the cheese-wheel slide.  And that's going to protect Repatha from having to engage in price competition against Praluent.

Q.     Let's turn to that.

Did you analyze, in this case, the economic effect of this portfolio bundle to protect this Repatha monopoly from price competition?

A.     Yes, I did.

Q.     Okay.  Did you see references to that being referred to -- and I think the jury has -- as minimizing GTN erosion at Repatha?

Can you explain -- and the jury sees that here in this document -- and I'll point to specifically, "to

preserve Repatha GTN."  What does that mean?

Can you explain that to the jury?

A.    Yeah.  Gross-to-net is just this -- remember there are two lines that the -- the list price and then the real price, the net price, and it's that drop in the net price that is what we're talking about here, this gross-to-net. And that is the ultimate number that is the money that Amgen is bringing in from selling Repatha.  And it does not want that -- that price to go down because then its profits also go down.

And you can see here that above, it says, "e.g, no rate increase."  That means no rebate increase, that means a higher price.  Okay.  And so that's how you preserve the gross-to-net is to have a higher price.

Q.    And, Professor Scott Morton, the document prior we were looking at related to Ascent and talked about replicating the strategy at UnitedHealthcare.

Does this document relate to UnitedHealthcare?

A.    Yes, it does.

MR. HOCHSTADT:  Okay.  Your Honor, at this time, I'm just going to ask to move into evidence, PTX-348.

MR. LIVERSIDGE:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 348 was admitted into evidence.)

BY MR. HOCHSTADT:

Q.    Professor Scott Morton, as an economist, is preserving Repatha's gross-to-net a procompetitive justification for Amgen's portfolio bundling?

A.    Definitely not.  What's procompetitive is to have low prices for patients and consumers and to lower the cost of healthcare.  That's what procompetitive is.

Q.    Is "trying to slow down the rate of price erosion," and I put that in quotes, on Repatha, a procompetitive justification to an economist?

A.    No.  I was struck when Mr. Gordon yesterday said "enough is enough" in response to the price drops in Repatha.  He seemed to be finished with price competition and wanted to end it, but...

            MR. LIVERSIDGE:  Objection.

            THE WITNESS:  -- in a capitalist --

            THE COURT:  Overruled.

            You can finish.

            THE WITNESS:  In a capitalist economy, if the other party you're competing against decides to lower price, then you have a choice of either matching that and -- and trying to keep your customers or keeping your price high and hoping your customers like you better.

            But -- but those lower prices and that process of competing is what really benefits consumers.  We want

those low prices.

BY MR. HOCHSTADT:

Q.    Professor Scott Morton, Mr. Gordon talked about clinical trials and other activities that he wants to engage in to promote Repatha.

Did Regeneron's new strategy prevent Amgen from doing any of those things?

A.    No, it did not.  Amgen's completely free to market its products and have as many clinical trials as it wants, clearly.

Q.    As an economist who is the former top economist at the Department of Justice, did Mr. Gordon give you a single good, procompetitive, proconsumer reason for Amgen's portfolio bundling?

A.    No, he did not.

Q.    Okay.  Professor Scott Morton, I want to turn to our next segment of your examination, which is this portfolio bundling here.  It's called cross-therapeutic bundling; right?  Whether -- if a monopolist does that, is that bad for competition?

And I want you, first, to explain to the jury, who no doubt has seen the commercials like I have, you're going to bundle auto and home insurance or things like that. Is that the kind of bundling that's going on here?

A.    No.  There's a lot of perfectly harmless bundles.  If

you go to -- into a restaurant and there's a bundle of a hamburger, and fries and a drink, that kind of thing is not a problem because every fast food restaurant can offer hamburgers, fries and a drink.  There's just no problem with head-to-head competition on the bundle.

Here, the problem is that the Enbrel and Otezla drugs are ones that the PBMs need.  And so they can't just say, "Well, we'll walk away from those rebate dollars and never mind.  We prefer to have Praluent, even though that would cause us to lose Enbrel rebate dollars."

They can't really do that.  It's not realistic.

Q.    Professor Scott Morton, the jury's heard a fair bit of back and forth on this, even today.

As an economist, does it matter whether this portfolio bundling, cross-therapeutic bundling is an accepted business practice in the pharmaceutical industry?

A.    Well, it does in the sense that if it's procompetitive and the customers want it, it's going to be really common.  So you would expect PBMs to embrace it if they thought it was going to be good for them.

The reason they have rules saying, "We don't want" portfolio -- "this portfolio bundling" is because it disguises the head-to-head competition.  It stops them from being able to promote that you -- you know, which of you is offering me the lower price and let me try to figure that

out in a clean way, instead of having these other drugs mixed in.

Q.     Professor Scott Morton --

THE COURT:  Counsel, I think we need to break for lunch right now.  I understand that the jurors' lunches have arrived.  It's 12:25 right now, so I'm going to ask the jury to be ready to come back at about ten after 1:00.

Mr. Koehler.

(Jury leaving the courtroom.)

THE COURT:  You may step down.

Is there anything we're going to need to address when we come back from the lunch break?

MR. HOCHSTADT:  Not --

MS. JOHNSON:  Only the possibility of a confidentiality issue.

(Reporter clarification.)

MR. DOREN:  Only the possibility of a confidentiality issue, Ms. Johnson said.

THE COURT:  Okay.  So if there's an issue that you-all can't agree on, just let me know.  I'll try to come back about 1:00 or you can let Mr. Koehler know if you don't have any disputes, and then we can all finish the lunch break until ten after.

MR. DOREN:  We will.  Thank you, Your Honor.

COURTROOM DEPUTY:  All rise.

(Luncheon recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  All right.  Please be seated.  Let's have the witness retake the stand.

Counsel.

MR. HOCHSTADT:  Your Honor, I have one exhibit to correct.

THE COURT:  Okay.

MR. HOCHSTADT:  PTX-348, which was the last exhibit introduced into evidence, should have been PTX-527.  I alerted counsel.  I understand there's no objection.

MR. LIVERSIDGE:  No objection.

THE COURT:  All right.  We'll admit that.

(PTX Exhibit No. 527 was admitted into evidence.)

THE COURT:  Did you want me to say that in front of the jury?

MR. HOCHSTADT:  That's all right.

THE COURT:  All right.  Thank you.  I understand --

MR. HOCHSTADT:  We resolved the confidentiality issue.

THE COURT:  Fantastic.  I understand we had a little tech issue that got worked out, so let's bring the jury back out.

(Jury entering the courtroom.)

THE COURT:  Okay.  Please be seated.  Let's continue with the direct examination.

BY MR. HOCHSTADT:

Q.    Professor Scott Morton, two quick questions.  Going back to our relevant antitrust market, there's been passing reference to a product named Leqvio.

When you started analyzing the challenged conduct in this case in 2020, was Leqvio sold in the United States?

A.    I don't recall.  I don't think so.

Q.    Okay.  And when Leqvio later launched, did you analyze whether or not Leqvio was in the U.S. PCSK9 market?

A.    Yes, I did.

Q.    And what did you conclude?

A.    That it's not because it's an infused product.  You have to go to the doctor's office and sit there in a chair and be infused.  It doesn't run through the pharmacy channels that the PBMs are -- are running.

Q.    And when you say "it doesn't run through the pharmacy channels," meaning the Praluent patients or Repatha patients, you're going with a prescription to a CVS or Walgreens retail pharmacy.  Not the case for Leqvio?

A.    That's correct.

Q.    Okay.  All right.  So back to where we were that

Amgen's portfolio bundling or cross-therapeutic bundling is different from the home/auto insurance bundling that we might see commercials for.

Did you prepare a few teaching slides as to why this portfolio bundling can be particularly powerful?

A.    I did.

Q.    Okay.  So, Professor Scott Morton, this is an illustrative example, but can you walk the jury through how normal healthy competition should be working?

A.    I can.  So, here, I have two drugs.  The prices are stylized.  They're not -- they're not from the data, but they're close to what I showed you from the data.  $200 for Repatha.  $100 for Praluent.  That's the monthly cost to the PBM.  And normally a PBM would assess those, say, "Well, both of them work to lower cholesterol.  I'm going to pick the one that's less expensive."  And we would get a winner on the right-hand side, Praluent at the lower price.

Q.    Okay.  So let's turn to what's going on here as a result of Amgen's portfolio bundling.

Oh, can we go back?

Sorry.  Bear with me here.

Okay.  So tell us what happened -- this is what should happen normally?

A.    Yes.  With the portfolio bundling, again, it's those Enbrel rebates that Amgen contracts to say to the PBM, "You

Scott Morton - Direct

don't get those if you buy Repatha."

And if you just illustrate on the slide, the impact of that from the PBM's perspective is if they lose those Enbrel and Otezla rebates -- let's call that $400 -- now when the PBM thinks about buying Praluent, it's only $100 for the Praluent, but they're going to lose those -- those rebates on Enbrel and Otezla.  And they're going to compare that total amount, which in my example here is $500 to the Repatha $200.  And the result of that is Repatha looks cheaper.

So from a perspective of what's actually going to happen to the bottom line of the PBM, Repatha is cheaper, but not because the drug is cheaper.  The drug is, in fact, more expensive.  It's because the penalty from the Enbrel rebates is overlaid on top.

And I call it a penalty because it comes to the PBM.  If they buy Repatha, they get their Enbrel rebate like normal, but they don't get it if -- if they buy Praluent.

Q.    This is your teaching example.

Did you analyze the evidence in the record to see if, in fact, these are penalties?

A.    Yes, I did.

Q.    Okay.  Let's look at the next slide here, Professor Scott Morton.

MR. HOCHSTADT:  And for the record, this is

PTX-655.  I'd like to move that into evidence.

MR. LIVERSIDGE:  Sorry.  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 655 was admitted into evidence.)

BY MR. HOCHSTADT:

Q.    Okay.  So, Professor Scott Morton, let's orient the jury.  This is with Ascent.

Is that Ascent that includes Express Scripts, Cigna/Prime that we've seen a bit in the case?

A.    Yes, exactly.

Q.    Okay.  And earlier in your testimony, we looked at that email that the jury has seen about the two-and-a-half-year portfolio contract at Ascent from the middle of 2020.  We're now looking at a document from March of 2022 from Amgen's files related to the 2023 bidding.

So can you explain to the jury what's going on here?

A.    Yes.  It's the end of the -- the first contract's coming to an end, and Amgen wants to re-up for a second contract.  And what Ascent is asking for -- you see Ascent requested -- they want a change, and they want to take Repatha out of this bundle and continue to pay the same amount for Enbrel and -- and Otezla.

Q.    And just so we're all following, Professor Scott

Morton, you're referring to this top box, where it says, "Ascent requested changes to the Enbrel/Otezla/Repatha bundle"?

A.    Yes.   That's correct.   And so they want to pull Repatha out, and Amgen's internal recommendation is no overlay points if Repatha is not in the bundle.   That's the yellow at the bottom.   And they're saying, You don't get your whole Enbrel rebate unless you buy Repatha.

Q.    Is that the penalty in the teaching example that we just looked at?

A.    Yes, it is.

Q.    Okay.   So what would be the economic effect on Ascent/Express Scripts if it was able to pull Repatha out of this bundle?

A.    Well, then, it could ask Repatha and Praluent to compete head-to-head and decide which one it liked better and which one had the lower price.   Then Repatha would have to engage in normal price competition with Praluent, and Express Scripts would decide which one had the more favorable price and terms.   And that intense price competition would be head-to-head just on those drugs, and the Enbrel and Otezla part would be in a different part of the purchase.

Q.    Is that the price competition that we've seen references to minimizing the gross-to-net on Repatha?

915
Scott Morton - Direct

A.    Exactly.  Because that would expose Repatha to a lower price, which is a lower gross-to-net, which is the thing that -- that Mr. Gordon said he did not want to do --

Q.    Okay.

A.    -- yesterday.

Q.    So, Professor Scott Morton, explain to the jury -- now we have heard from Amgen, Mr. Gordon, that, you know, the PBMs are the powerful ones here, the insurers.

So why can't Ascent just tell them, No, I'm not going to cover Enbrel, if you don't do what I want, and take Repatha out of that bundle?

A.    Because Enbrel and Otezla are giant drugs.  Thousands and thousands of people are on them.  And employers and people who want pharmaceutical coverage expect to have Enbrel and Otezla on their formulary.  I did an analysis of how many formularies have coverage of Enbrel and Otezla, and it's over 80 percent.  Almost all of them do.

Q.    Did you analyze other data in the case like the actual gross sales of these products in the United States?

A.    Yes, because Enbrel and Otezla are so big -- this is gross sales in billions of dollars in the United States -- the rebates on Enbrel are giant, and they completely swamp the size of these PCSK9 drugs, which are much smaller, half a billion dollars or one and a half billion dollars.  So withholding a share of Enbrel rebates, you can quickly see

is going to overwhelm price differences between the two, the Praluent and the Repatha.

Q.    And just so the jury understands, you looked at the sales of these four products at the list prices.

Is that what gross sales is?

A.    Yes.  Gross sales is list, and then the orange box there -- the yellow box is the size of the rebate.  So when you think about what is ultimately being earned by Amgen, it's the part of the red bar that's above the rebate.  But remember, the rebate is the penalty.  The rebate is the thing that Amgen can withhold from the PBM, and that's an awful lot of power because there's a lot of withhold -- there's a lot of rebates there.

Q.    Is the size of the rebates that Amgen gave the insurer in 2021 on Enbrel and Otezla bigger than both the gross sales of Repatha and Praluent?

A.    Yes, it is.

Q.    By a lot?

A.    By a lot.

Q.    Okay.  Professor Scott Morton, earlier when you were going through indicators of power that products have, one of the things that you looked at was different data.  So I want to walk through different pieces of data that you looked at from the company's files, from Amgen's files on Enbrel and Otezla.

Can you explain to the jury, starting with Enbrel, what we're looking at here?

A.    Yes.  These are the profit margins of Enbrel and Otezla, and what that means is the amount over the cost of making the drug, or in the case of the dashed line, making and marketing the drug.  And what you can see is that the profit margins are very big.  So of a dollar pulled in by Enbrel, most of it is gross profit, and only a little bit is the cost of making the drug and marketing the drug.

So 80 -- you know, in the mid-80s is the profit margin for Enbrel.

Q.    Are these profit margins that we see in the 80-to-90-percent range for Enbrel, 70-to-90-percent for Otezla, are those high profit margins?

A.    Yes, they are.

Q.    Okay.  To an economist, is that an indicator of the power of those products?

A.    Yes, it is.

Q.    And just for the jury's reference, Enbrel, at this point in the time period you're looking at, 2019 to 2022, how many years has Enbrel been being sold in the market in the United States at this point?

A.    A long time.

Q.    And it still has those profit margins?

A.    It does.

Q.    Okay.  Let's turn to -- did you look at prices next?

A.    I did.  And what you can see, again, is this chart with the list price in the dash line on the top, and then the net price after the rebates in the solid line on the bottom.

Q.    Let's stick with the list price because I think we heard from Mr. Gordon and Amgen, list price is really important; right?  They were talking about how list prices went down for Repatha in 2018.

What's happening to the list price of Enbrel from Amgen's own data from Q1 2019 to Q2 2023?

A.    Well, it's rising quite substantially.  That -- that rise is about 40 percent from $5,287 a month to $7,524 a month.

Q.    And what's happening to the solid line on the bottom, which is the net price after rebates?

A.    It's really not moving very much from the beginning of the period to the end.  24.85, 24.52, those are very close, so it's largely flat.

Q.    So how can that be?

What are we missing here?

So the list price is going up, but the net price is staying the same.

Tell us what's -- as an economist, what's going on here?

A.    Well, you can easily see just from the picture, the gap between the two lines is the rebates.  The rebates are going up, up, up because if you keep the price the same, and you raise the list price, you've got to be giving more rebates to get the consumer back down to the same number that they were paying before.

Q.    So if that net price is staying flat and the list price is going up, does that mean that for the price increase that's being taken, they're giving back the same amount in rebates?

A.    That's right.  So they're raising the list price and then increasing the amount of rebates.

Q.    Okay.  So there have been lots of references related to "additional value" that's being given on Enbrel over time.

Does that show any real additional value being given on Enbrel?

A.    It does not.  I mean, increasing list and increasing rebates, the rebates become kind of funny money because nothing's really happening to the price you're paying.

It would be like going into a store and they say, Well, instead of having $75 with $25 off on this shirt, we're going to give it -- we're going to list it at $100 and give you $50 off on this shirt.  Well, it doesn't make any difference.  You're paying $50 on the shirt no matter what.

So that additional discount, it's not a real discount.  It's not helping you.  It's not lowering the price of the shirt.  So I would not call it additional value.  I would just call it additional rebates that leave the price the same.

Q.    Professor Scott Morton, there have been some references in the testimony earlier today to biosimilars.  I think Mr. Gordon called it a copy.

Can you just explain to the jury what a biosimilar is and what you would expect in terms of the pricing on the biosimilar?

A.    Yeah.  A biosimilar on -- now, remember, it's not a biosimilar on Enbrel.  It's a biosimilar on Humira, but because they're, like, a generic, as Mr. Gordon said, they create intense price competition for -- of the brands that they're entering against.  And Mr. Gordon explained that the rebates on Enbrel are designed to keep the PBMs buying Enbrel in the face of entry from other competitors that compete with Enbrel and from biosimilars that might compete with Enbrel.

Well, if you really thought that Enbrel was facing that additional competition, you would expect to see its price go down, and its list price not to go up.  And we don't.  We see that the price is flat.  So whatever that competition is from the biosimilar, it's not strong enough to be moving down price.

Q.      And I want to unpack that a little bit.  You mentioned -- we're not missing a line here.

There's no Enbrel biosimilar?

A.      No.

Q.      So even though Enbrel's been sold for two decades in the United States, there is no cheaper version of that product?

A.      That's correct.

Q.      So we're not missing a line on that graph?

A.      That's correct.

Q.      Okay.  So -- and -- is -- does Amgen make one of those biosimilars on Humira?

A.      I think they do, yeah.

Q.      Okay.  All right.  So we heard reference to that form of competition.

If that actually existed, would you expect to see that net price line that's flat be going down?

A.      I would expect to see, if Enbrel were really facing increased competition over time, I would expect to see their price declining over time.  That's the normal response that firms have when they're trying to keep their customers.

Q.      And based on the Amgen internal data that you had access to that showed what Enbrel's rebates were, what do you find in terms of Enbrel's net price?

A.      I find Enbrel's net price is flat, and it's only the

rebates and list price that are growing.  There's no real discounting going on to the end customer.

Q.    Okay.  Did you look at similar type of information from Amgen's financial records with respect to Otezla?

A.    I did.

Q.    What did you find?

A.    I found broadly the same story.  The list price is not increasing quite as quickly for Otezla, but the net price is flat.  Again, 18.62 and 18.41 are really close.

Q.    Okay.  I've excerpted here a portion of Amgen's counsel's opening statement to this jury.  And there was a reference to Amgen providing an additional rebate on a drug called Enbrel.  That's what the jury has heard about this ESI portfolio bundling.

      Professor Scott Morton, you analyzed the data from Amgen's own files.  As an economist, did Amgen provide any real additional rebate on Enbrel?

A.    No, they didn't.  We see that the price is flat and the "additional rebate" is just coming -- yeah, rebates are getting bigger because the list is going up, but that's just mechanical.  The price itself is not going down.  There's no additional value being given to the PBM.

Q.    Okay.  We're going to turn to a real-world example, but I just want to reorient you.  This is your teaching example of how you're explaining to the jury this works in

Scott Morton - Direct

the real world.

Is that right?

A.    Yes.  And that -- again, that -- that dark box is this rebate that's coming from the Enbrel -- the Enbrel rebate that's very large and is conditional on the PBM choosing Repatha.  And that is something the PBM is going to lose if they don't buy Repatha.  And they cannot just walk away from Enbrel and Otezla because Enbrel's a really big drug that their patients expect to see.  So the effective cost of the PBM goes up from this strategy.

Q.    Okay.  Did -- was the portfolio bundle at Express Scripts/Ascent that the jury has heard a lot about, was that an example that you analyzed in the record?

A.    Yes, it is.

Q.    Okay.  This is from an internal Express Scripts document dated June 11, 2020.

Why was this document important to your opinions in this case?

A.    Because it illustrates exactly what I was talking about.  It shows that Express Scripts, when they evaluate the Praluent exclusive offer, it's a bit better than the Repatha exclusive offer.  So they see that in head-to-head, they'd rather take Praluent.

But then if you look at that last line in the second box, the additional value Amgen is putting in the

deal blows Regeneron out of the water here.

And that's the magnitude of the rebates that I was talking about. They're just so big that there's no way that Regeneron's Praluent can do anything about that.

Q.    Professor Scott Morton, we see that word again, "additional value."

Is that really additional value?

A.    No. It's -- this is the rebates -- again, the list going up, the rebates going up, and the price staying the same.

Q.    Okay. Did you just take this summary email or did you actually look at the financial modeling that Express Scripts did?

A.    I looked at the financial modeling.

Q.    Okay. What did you -- what did you see?

A.    Well, here, you can see that what Express Scripts is doing is comparing 2021 Repatha exclusive to a 2021 Praluent exclusive.

Q.    That's the top chart that the jury's looking at?

A.    Top chart is Repatha. The bottom chart is Praluent. And if you look at these red boxes, what you can see there is the total amount of rebates that Express Scripts is being offered by each company. So in the top box, you see 5.9 million. And the lower box, you see 6.1 million.

Q.    Can I stop you there, Professor Scott Morton?

So wait a second. It looks like Praluent is the larger number in the 2021 box in the bottom table versus the Repatha 5.99 million box at the top.

Is that how to read that chart?

A.    This is confusing because there's -- rebates getting bigger means the price is getting lower. So in these boxes are the rebates. And so a bigger rebate means the net price is lower. And so that's what we're seeing here with Praluent having a better offer for ESI.

Q.    So Praluent was giving a bigger rebate and had a lower price for Praluent than Repatha did?

A.    That's correct.

Q.    Okay. What was the economic effect on Express Scripts when they modeled this offer? So that was the head-to-head, but did they go on to model the rest of the offer?

A.    They did go on to model the rest of the offer and that's the remainder of these charts. And you can see the individual lines, Enbrel and Otezla and the rebates. And the bottom blue boxes are the sum.

So Express Scripts says, Look, 210 million in rebates over three years. That's about $70 million a year they're going to get in rebates from Amgen because we're putting in now Enbrel and Otezla. When they look -- when Amgen looks at Regeneron and says, What if we did a Praluent

exclusive, because those Enbrel rebates fall, it's now going to be $50 million.  Now, that's over two years.  So let's again divide and call it $25 million a year.  So the top box is $70 million a year.  The bottom box is $25 million a year.  And Express Scripts chooses Repatha because otherwise they're going to lose all that money.

Q.    And is this a real-world example of the penalty from your teaching example?

A.    Yes, it is.

Q.    Okay.  Professor Scott Morton, did you also analyze what the size of the rebates on Repatha would be if you applied the Enbrel overlay, as it was called, onto Repatha?

A.    Yes, I did.

Q.    Okay.  Can you walk the jury through this -- this slide --

A.    Yeah.

Q.    -- step -- line by line?

A.    These are the years, 2020, 2021, and 2022, and here's a close-up of the Repatha net price.  Now, that's a dotted line, but it's not the list.  It's actually the net price of Repatha hovering around 300.

Q.    So that's the -- they're giving a rebate on Repatha, no overlay at that point?

A.    Yeah, that's the Express Scripts' price.

Q.    Okay.

A.    Now, I've plotted here Repatha's variable cost using data from inside Amgen.  This is a calculation of Repatha's variable cost.  You can see that it's below price as we would expect.

Q.    Professor Scott Morton, I think that is the first time we've heard "variable cost" so far in the case.

Can you explain what that is?

A.    Variable costs are the cost of making the drug and marketing the drug.  So the cost -- not inventing the drug, that -- which is a big part of cost at a company like Amgen, but this is after you've invented it.  Basically the cost of making it and getting it out the door.

Q.    Okay.  So what if you apply that Enbrel overlay rebate to the Repatha price?

A.    Well, if you put it in, you can see that the big drop in 2020, and then again in 2022, these are the Enbrel withheld rebates.  If you took the dollar amount of those and you applied them to the Repatha purchases of Express Scripts, this is how it looks relative to the price of Repatha, like it -- Amgen's giving back all of that money.

Q.    So, Professor Scott Morton, I want to start right here in the middle of 2020.  That's where that solid red line goes below the Repatha variable cost.

So at that point, if the Enbrel overlay is applied to Repatha, is Amgen making money on Repatha?

A.      They would not be, but let's remember this is the Enbrel overlay.  So it's Enbrel's rebate and the question you want to ask is:  Is Enbrel making money?

I'm putting it here to show its size relative to Repatha.  The gross-to-net on Repatha is high because that's the whole point of the -- of the strategy.

Q.      And, ultimately, did you see that the size of that Enbrel overlay took even the price of Repatha below zero dollars?

A.      Yes.  If you applied it to Repatha and looked at it that way, you'd get the -- the size of the -- of the withheld rebate is so big, it's bigger than the size of Repatha.

Q.      So for a period -- for the whole time it's below the cost of Repatha, but for a certain point, it's just below zero dollars?

A.      Yeah.  So the -- it's bigger than the size of Repatha.

Q.      As an economist, does that make any sense to you?

A.      It does in -- if you're trying to exclude Praluent.  It means it's really, really expensive to -- for Express Scripts to buy Praluent.

Q.      Professor Scott Morton, turning away from Ascent/Express Scripts, did you analyze the effect of Amgen's portfolio bundling strategy on the formulary

decisions of other -- of the big insurers?

A.    Yes, I did.

Q.    UnitedHealthcare, I think we already looked at that?

A.    Yes.

Q.    What was the outcome there in terms of whether Praluent was covered?

A.    It was the same as Express Scripts, they -- they changed to cover Repatha exclusively.

Q.    What about Humana, was Praluent ever able to get covered there?

A.    No.

Q.    Okay.  Let's talk about CVS and turn to the next slide.

      Was CVS one of the big insurers where Amgen's portfolio bundling strategy raised the cost of Regeneron to compete in the market?

A.    Yes, it was.  Here, you see, again, the bundle with Enbrel, Otezla and Repatha coverage that Amgen plans to offer to CVS.

Q.    And the jury has seen this document.  It's a multi-year portfolio.  We're now in July of 2021, so this is a year after the Ascent/Express Scripts two-and-a-half-year portfolio -- initial portfolio agreement.

      Why was it important to you the reference to the recommendation saying that, "the offer to CVS be similar in

structure to our ESI agreements"?

A.    Because that ESI agreement has all three drugs and it conditions the Enbrel rebate on the PBM using Repatha exclusively.

Q.    Okay.  Earlier today, I believe, Mr. Gordon told the jury that he wasn't bidding for exclusivity here, just 1 of 2.

Does that matter as an economist?

A.    In this context, it does not, because --

Q.    Why not?

A.    Because CVS and -- and -- well, the big PBMs asked for exclusivity.  They wanted to pick one of these drugs.

And why does that make sense?  Because if you pick one, you can make them bid against each other.  Then, they're going to lower their price to be the one you pick.

So if you're a PBM trying to lower your cost and lower the price of drugs, you want an exclusive.  That's going to -- that's going to generate the most price savings and so that's what we see.  It's also the case that Regeneron wants to get in there with their low price strategy as an exclusive.  And if Regeneron is going to have an exclusive, it can't be the case that Amgen is also on the formulary.  That's the opposite.

So if Regeneron's bidding for an exclusive, Amgen's saying, Well, it's fine with us if we share it.

Scott Morton - Direct

It's not fine with Regeneron to share it.  They're bidding for the exclusive.

So both sides understand that this game is about the exclusive and that that's going to require a lower price.  And that's exactly that gross-to-net price erosion that Mr. Gordon does not want to see.

Q.    Okay.  On -- we've talked about raising costs.

Is there a term in economics called "raising rivals' costs"?

A.    Yes, there is.

Q.    Can you explain that to the jury?

A.    That's when a -- the dominant firm -- the big firm's strategy kind of punishes the smaller firm.  It raises their cost in an artificial way that's not their choice and makes it harder for the smaller firm to compete in the marketplace.

And it's not about what we call competition on the merits, it's not saying that the smaller firm is bad at its job.  It's the big firm raising the costs of the small firm.

Q.    Is that what you found occurred in this case?

A.    Yes.

Q.    Okay.  Did you do a similar analysis to the Ascent/Express Scripts' portfolio bundle for the offer that Amgen made to CVS Commercial in the summer of 2021?

A.      Yes, I did.

Q.      Okay.  I'm going to click through this since you walked us through it, but tell us -- cut to the bottom line, Professor Scott Morton:  What did it show you?

A.      Well, it shows you, again, if you take all the money that's being withheld from the Enbrel rebate and compare it to the size of Repatha, it's really big.  It drops -- it drops the -- that line below the cost of making Repatha.

Q.      Okay.  But CVS was one where that was Regeneron's new commercial strategy, you talked about it earlier, that they won in 2020 and were able to keep it in 2021.

        Did you analyze Regeneron's financial information as to how they were able to do that?

A.      They -- they were able to do that because their cost of making Praluent is lower than Repatha's cost of making Repatha.  So when you look at that drop in the Enbrel -- the size of the Enbrel rebate, that level it gets to is actually the same level as Praluent's cost.  And you can see that there in the dashed line.  And Praluent's cost and Praluent's price are basically the same by the time we get to 2022.  And that's what Ms. McCourt explained, that they weren't making any money selling to CVS because the cost and the price were the same.

        And you can see why CVS stayed in because they -- they -- sorry -- why -- why Praluent stayed in at

CVS because from CVS' perspective, they were -- they were able to buy Praluent and still keep their cost down and -- and Regeneron was able to make Praluent for the amount that they were selling for.  So it was just a knife edge result there where it could keep going for a little while.

Q.    So let's do this, Professor Scott Morton, let's just divide this in half.  We have 2021 to the left here and you mentioned Regeneron's cost for Praluent is this gray dotted line.  The price that they were selling to CVS Commercial during that period of 2021 is above that line, and that's the contract that Regeneron won with its new commercial strategy and head-to-head competition.

Was this a profitable contract for Regeneron?

A.    Yes, it was.  And we see that, even though it was a really low price, it's still above their costs.

Q.    Okay.  And -- but then what happens in 2022 when Regeneron's able to keep the contract for another year, but what was the economic effect of that Amgen portfolio bundle, 1 of 2 --

A.    Yeah.

Q.    -- on Regeneron?

A.    The effect of the portfolio bundle is to take this money from Enbrel and say to CVS, "You're going to lose that money unless you buy Repatha at a relatively high price." And the question is:  Can Regeneron, with its efficient

production of Praluent, how low can they go?  And they went as low as they absolutely could go, but -- but there wasn't any cost to Amgen to pushing them down there because this was Enbrel rebates that they were giving away anyway.

So the Enbrel rebates are part of the Enbrel rebate and they've just conditioned on the PCSK9 class.  And it didn't work at first.  This contract in 2022, Regeneron just took its margin down to zero and stayed in the market.

Q.    Is that a long-term strategy?

A.    No, it isn't.  You can't run a business on no cost margin.

Q.    And so what ultimately was the economic effect of Amgen's portfolio bundle on CVS Commercial on Regeneron?

A.    So Regeneron gave up the CVS business.  Amgen pushed a little harder, said, We want -- said, We're going to re-up the bundle.  CVS said to Regeneron, "Do you want to lower yet further and stay in?"  And -- and Regeneron said, "We can't."

Q.    Professor Scott Morton, besides your own economic analysis where you attributed the Enbrel overlay to the price of Repatha, did you look to see in the record if folks at Amgen were looking at it the same way?

A.    Yes, they were.  They were sizing their -- their rebate.  So what they --

Q.    Let's just stop for a second here, Professor Scott

Morton, just to orient everyone.  It's a text message.  It's July 2021.  So same time frame that we're talking about and it's an internal Amgen text message.

Now, can you walk the jury through why this internal Amgen document corroborates the charts that we just showed?

A.     Yes.  What the -- this executive from Amgen is explaining is that the withheld money on Enbrel is so big, because Enbrel's big and Repatha's small, that it translates into an 85-percent effective Repatha rebate.

Now, let me explain.  That's not actually a rebate on Repatha.  That's exactly the thing that Mr. Gordon doesn't want to do, is give a large rebate.  So it -- so he -- instead of giving the large rebate, he makes this penalty structure so that it appears to -- to the PBM that, as I showed in the teaching example, that there's this big black box on top of the Praluent price.  They're going to have to pay that by not getting the rebate.  And the size of it, they understand very well.  It's 85 percent of the size of Repatha.

Q.     If Amgen was competing head-to-head in the PCSK9 market against Regeneron, is that what the portfolio bundled rebate would translate to for Repatha?

A.     I would be surprised because in the record, we don't see anybody giving a rebate as big as that.  Indeed, I think

yesterday, the 60-percent rebate that Regeneron offered on Praluent was described by Mr. Gordon as pretty high and kind of unusual.

So I think if 60 percent is pretty high and I -- we don't see anything higher than that really in the -- in the record, we're not going to get 85. No.

Q. And based on your analysis of Amgen's other costs to make the medicine, put it in the pen, sell it with the sales force that you heard about, would Amgen make any money on Repatha if it gave an 85-percent rebate in head-to-head competition?

A. No, it would not.

MR. HOCHSTADT: Your Honor, I would like to move PTX-555 into evidence, which is the excerpt of the text message on Slide 41 -- I'm sorry -- on Slide 40.

MR. LIVERSIDGE: No objection.

THE COURT: It's admitted.

(PTX Exhibit No. 555 was admitted into evidence.)

BY MR. HOCHSTADT:

Q. So we were just talking about CVS Commercial. Let's talk about CVS Medicare.

Professor Scott Morton, did you analyze whether Amgen's portfolio bundling strategy at CVS Medicare had the same effect on Regeneron?

Scott Morton - Direct

A.      Yes, I did.  You can see, again, that it's the bundle with Enbrel and Otezla, requiring coverage of Repatha, and it's the same strategy with the Medicare PBM.

Q.      And did you find that this same strategy at CVS Medicare raised Regeneron's cost to compete?

A.      Yes, I did.

Q.      And what ultimately was the effect of this strategy on access for Praluent at CVS Medicare?

A.      Praluent was foreclosed from competing at CVS Medicare.

Q.      Okay.

        MR. HOCHSTADT:  Your Honor, I'd ask to move PTX-485, which is the excerpt of the document on Slide 41, into evidence.

        MR. LIVERSIDGE:  No objection.

        THE COURT:  It's admitted.

        (PTX Exhibit No. 485 was admitted into evidence.)

BY MR. HOCHSTADT:

Q.      Okay.  Let's go back to a slide that we looked at before, Professor Scott Morton, but we're going to update it for -- to bring it forward to the present.

        So this is the big insurers and their national formulary coverage in the PCSK9 class; is that right?

A.      Yes.

Scott Morton - Direct

Q.     Okay.  And in 2020, you saw a mix of coverage; is that right?

A.     That's correct.  You can see it on --

Q.     Was that an indicator of normal competition in the market?

A.     Yes, it was.

Q.     And was that at a time when Regeneron was competing head-to-head with its new low-cost strategy against Amgen?

A.     Yes, it was.

Q.     Okay.  What's the result today as a result of Amgen's portfolio bundling strategy?

A.     The portfolio bundling strategy has foreclosed.  That means has -- has kept out, Regeneron, and its drug, Praluent, from these formularies.  And we see that Repatha is exclusive on all of the big formularies today.

Q.     Okay.  Professor Scott Morton, this is just the national formularies, and by -- we touched on a little bit earlier with those pie charts, but we've heard a little bit about the national formularies, the custom formularies, and some suggestion that the custom formularies are sort of an open playing field for competition.

       Did you analyze the data in this case from the PBMs and third-party data as to whether or not those custom formularies follow the decision of the national formulary?

A.     Yes, I did.

Scott Morton - Direct

Q.      And what did you find?

A.      I found that the national formulary choices of coverage flow into the custom formulary.  So those custom formularies tend to copy the national formularies sometimes with a bit of a lag and not a hundred percent, but in a large part, they do.  And if you track them over time, you see that the decisions made at the national formularies end up applying to almost all the custom formularies.

Q.      And that was a decision -- that was analysis based on data that you reviewed in the record?

A.      Yes, looking at the coverage in those formularies and the claims and the prescriptions in those plans.

Q.      Okay.  So that's one real-world effect of not being covered on the national formularies impact on the custom formularies.

        Did you analyze other real-world events, like the impact on the prescribers and the doctors?

A.      Yes.  One of the things about having Repatha be exclusive at all these formularies is that then physicians in the community get used to prescribing Repatha because most of their patients have coverage of Repatha so they kind of forget about Praluent.  And that means that Praluent has an even harder time competing for the -- for the business of consumers.

Q.      And did you analyze the cumulative impact of that on

Praluent's access to the U.S. -- the United States PCSK9 market?

A.     Yes, I did.  I took the -- just the empirical data on both where Praluent can't compete anymore because of the -- the bundled rebate and then also how that spills over into those other formularies and spills over into the community.

Q.     Okay.  And, Professor Scott Morton, just -- let's walk through this a little bit.  Your chart starts in June 2020, goes through January 2024, looks like a staircase.

       Explain to us what's happening here.

A.     Well, you'll recall that Amgen invented this cross-therapeutic bundling and deployed it for the first time in the summer of 2020.  So Express Scripts is the first example of the cross-therapeutic bundle foreclosing Praluent, but then you can see the other PBMs accumulating as we go through time.

       You've got Express Scripts, you've got United, you've got CVS Commercial.  And then at the same time as those national formularies are changing, the custom ones are changing too.  And I built that into this.

Q.     Okay.  And as of January 2024, what percentage of the market -- well, let me back up.  Sorry.

       There's references to foreclosure on this slide. Is that an economic term?

Scott Morton - Direct

A.    Yes, it is.

Q.    And can you explain to the jury what foreclosure means?

A.    Foreclosure means this idea that the smaller company is not able to compete on a level playing field with the bigger one.  And foreclosure could mean literally exclusion from the national formulary, or it can mean raising rivals' costs, like getting onto a custom formulary is now really difficult because the custom formulary copies the national formulary.

      So it -- it's an expression.  It's a term that we use in economics for when the playing field is not level anymore.

Q.    Okay.  So now let's look.

      Professor Scott Morton, by January 2024, okay, how much of the U.S. PCSK9 market was foreclosed to Praluent?

A.    About 80 percent.

Q.    Okay.  And it starts at close to 20 percent in July 2020?

A.    That's correct.

Q.    And it increases over time?

A.    That's correct.

Q.    Okay.  And this is January 2024.  If you look at this today, I think we saw in your chart at UnitedHealthcare

Medicare that national formulary no longer covers Praluent.

Is that after this chart was put together?

A.    That's after this chart was put together, so today that last red bar, if we did a '25, red bar would be even higher.

Q.    Okay.  All right.  Let's turn to -- what's that last segment?

What is the real-world impact of the portfolio bundling strategy on -- by Amgen on Regeneron and the impact on competition in the real world?

So let's start with -- you said Repatha had monopoly power.  Has it gotten weaker or stronger?

A.    It's gotten stronger, and you can see that in the charts that we've seen before, which is the rising list price, the fact that Repatha's actual net price is flat while Praluent's has been going down.  So Praluent's price is half of Repatha's price.  And yet, Repatha's market share is not even just 85 today, but even higher.  Ms. McCourt told us in the 90s.

So we have a product that's twice as expensive as its competitor, and it has a 90-plus percent market share.

Q.    And just let's focus on that pricing chart for a second a little bit, and I think we heard a little bit of this in the exam by Mr. Gordon.  So when Regeneron gets the

rights back to Praluent, Sanofi had been marketing the product.  Looks like the price, the net price of both products were the same when Sanofi was marketing it.

Is that right?

A.    It looks -- they're awfully close.  That's right.

Q.    Okay.  But when Regeneron's in control, Ms. McCourt can come up with a new strategy, low-cost strategy.

For that entire period of time, Praluent has been the low-cost PCSK9 product in the United States?

A.    That's correct.

Q.    And its share as of December 2023 is declined from 30.8 percent to almost 15 percent?

A.    That's correct.

Q.    And what have you heard from Ms. McCourt as of today, what is that share now?

A.    Closer to 10.

Q.    Okay.  And that's for the total prescriptions.  Let's look at the next slide, which is new patients, brand-new patients sort of going forward.

What did you find in the data?

A.    Well, the supply of new patients is even lower as a share for Praluent because, of course, they're not on these big formularies, and the big PBMs control access in the United States.  And so my data ended in January '24 and that's 8 percent.  Ms. McCourt said 6 percent in her

testimony was the most recent number.

Q.    So, Professor Scott Morton, just let's make it concrete.  If there were a hundred new patients getting a PCSK9 tomorrow, you're saying six would get Praluent and 94 would get Repatha?

A.    That's correct.

Q.    Let's say Amgen stopped portfolio bundling tomorrow.

Would the effect of Amgen's conduct continue in the PCSK9 market?

A.    Well, it would depend a little bit on whether they stopped and, also, we could open up the contracts at the PBMs that are two-year or three-year contracts.

But it's certainly the case that -- that while everything would get better and we'd get on a better path, it's not that Regeneron can suddenly snap their fingers and be back to 30 percent or something like that.  They've got to go back into the PBMs.  They've got to recontract. They've got to remind the doctors that they exist.  They've got to help patients understand, et cetera.

Q.    Does it make it harder to get back into the market the lower and lower your share has gotten?

A.    Absolutely, because the marketplace has kind of forgotten about Praluent and Regeneron's going to have to remind them.

Q.    Okay.  Let's turn to patients.  Let's focus on

prices, and you've covered this a fair bit.

But if you can just summarize again, what's the impact on patients of Repatha having the overwhelming market share at the higher net price?

A.    Well, it just means that prices are higher than they need to be.  I mean, we're buying PCSK9s for $200 a month when we have an option out there for $100 a month.  And that harms patients because anybody whose costs -- well, it just harms us all because it raises the cost of healthcare.

So if we could drop the cost of healthcare, we would all experience lower premiums.  We'd have less Government expenditure needed for it.  We would have better benefit design, have lower out-of-pocket cost.  So that's just very clear.  The price is easy to understand.

There's also something I haven't been emphasizing, but when you don't have Praluent competing in the marketplace, the PBMs and all consumers don't have as many choices.  The low dose option, the -- whatever differences that there are between the two medicines, are -- is also relevant to the PBM choosing and sometimes relevant to a doctor choosing, and you want that choice available to customers, also.

Q.    So does the big three, the mega insurers paying double the cost for Repatha, impact the average worker?

A.    Yes, it will because it raises the cost of providing

healthcare, and that's that.

I mean, think about if we could take all drugs in the United States and drop the cost in half.  That would be quite remarkable.  I mean, that's the kind of problem we're talking about here just --

Q.    So --

A.    -- scaling it up.

Q.    -- Professor Scott Morton, just to wrap up, can you just summarize to the jury your opinions based on your review of the record in this case?

A.    Yes.  Repatha and Amgen have weakened competition between the two PCSK9 products and strengthened Repatha's monopoly in the United States going from 69-point-something share up to above 90 today.

And how did that happen?  That happened because of Amgen's strategy of leveraging this cross-therapeutic bundling, taking the Enbrel money and saying you don't -- you can't get the Enbrel money unless you put Repatha on your formulary and take Praluent off your formulary.  And that locks Praluent out.  They can't compete head-to-head, just as a drug with features and a price.

The result of that is that the higher-priced product is on all the formularies of the big PBMs and that that price competition, that gross-to-net that Mr. Gordon said he wanted to avoid and that Regeneron had started,

Scott Morton - Cross

price competition head-to-head, that price competition is effectively evaded and patients pay higher prices and have fewer choices.

MR. HOCHSTADT:  At this time, Your Honor, just all the data that Professor Scott Morton has relied upon that we talked about, I'd like to move that into evidence, subject to seal -- the sealing ruling that we discussed earlier today.  And for the record, for PTX, it's Numbers 882, 883, 885, 886, 1019.  DTX-1125, 1128, 1565 through 1570.

THE COURT:  Any objections?

MR. LIVERSIDGE:  No objection.

THE COURT:  They're admitted.

MR. HOCHSTADT:  Thank you.  I pass the witness.

(PTX Exhibit Nos. 882, 883, 885, 886 and 1019 were admitted into evidence.)

(DTX Exhibit Nos. 1125, 1128 and 1565 through 1570 were admitted into evidence.)

CROSS-EXAMINATION

BY MR. LIVERSIDGE:

Q.    Good afternoon -- good afternoon, Professor.  I'm Sam Liversidge.  I'm one of the attorneys for Amgen.

MR. LIVERSIDGE:  Your Honor, if it would be okay, we'd like to pass out some binders.  I apologize in advance for the number of them.  Hopefully, we can use the

screen mostly.

THE COURT:  That's fine.  You may approach.

THE WITNESS:  These are for me?

Oh, word.

MR. LIVERSIDGE:  I will help you with those.

THE WITNESS:  Good.

MR. LIVERSIDGE:  And, hopefully, we can use the screen as much as possible.

THE WITNESS:  They look a little unsteady.  Let me just put them down here.

BY MR. LIVERSIDGE:

Q.    Professor Scott Morton, you indicated that you're getting paid for your work on this matter; correct?

A.    That's right.

Q.    And to be clear, you're getting paid by Regeneron; right?

A.    Ultimately, the money must be coming from them, yes.

Q.    All right.  And what is your hourly rate for this matter?

A.    1,250.

Q.    1,250?

A.    That's correct.

Q.    And how much have you been paid to date for your work on the case?

A.    I don't know.  There's quite a long lag in when the

payments arrive and they're bundled together with other matters. So I'm not sure.

Q. And you're also affiliated with an economic firm called Charles River; right?

A. Yes, that's where -- my team works at Charles River Associates.

Q. And they're being compensated, too, for their work on this matter?

A. Yes, they are.

Q. How much has Charles River been paid for their work on this case?

A. I don't know.

Q. Is it more than 10 million?

A. I don't know because I'm an external consultant. I don't actually -- I'm not an employee of the firm, so I don't know what the billings are.

Q. I'd like to start by bringing up Slide 17, which is one of the slides that you showed in your presentation.

Do you recall that?

A. I do.

Q. And when you refer to this lower marketing cost strategy that Regeneron had, you're referring to the strategy that they implemented in late 2019 going into 2020; right?

A. The strategy of instead of marketing to doctors,

Scott Morton - Cross

marketing straight to the PBMs with a far smaller sales force.

Q.    Right.  And that strategy was described as cut everything to the bone, but win exclusive contracts and just sit back; right?

A.    I don't recall that phrasing, but that's close to the right answer.

Q.    That's consistent with your understanding of the strategy; right?

A.    Yes, although "sit back," I don't -- I didn't think Ms. McCourt was doing that.  I think she was working pretty hard to sell the product.

Q.    Okay.  Well, let's just look at a document that's already in evidence, which is 1504.

         MR. HOCHSTADT:  Which binder is it?

         MR. LIVERSIDGE:  It should be -- it should start with the DTX numbers, DTX-1504 in ascending order.  And it's on the screen.

BY MR. LIVERSIDGE:

Q.    Let's just look at -- this is an email written by Dr. Schleifer.

         Do you see that?

A.    I do.

Q.    And he's communicating with his counterpart at Sanofi.

Scott Morton - Cross

Do you see that?

A.    I do.

Q.    And he says, "Thanks, Oliver.  I will review your proposals and revert back.  I'm available for dinner on the 15th.  Incidentally, our improvement in our margin for Praluent has nothing to do with COGS.  It all relates to coming up with a different selling model with much less out of pockets and less head count.  But to accomplish this new model, we need substantial exclusivity that would allow us to leverage our other marketing -- leverage other marketing efforts by other companies.  Had you gone along with getting exclusives to Express and CVS, we could have cut the field force and marketing expenses dramatically, but still obtained about a third of the market at a very profitable rate.  You can still take this approach even if you don't give us back Praluent.  Cut everything to the bone, but win exclusive contracts and just sit back."

Do you see that?

A.    I do.

Q.    And it was not only to lower the price and to cut the marketing expenses, but Regeneron needed substantial exclusivity for this plan to work; right?

A.    That's correct.  Because if you're not marketing to doctors in the community, what you're counting on is for the PBM to do your marketing for you, which means that the PBM

is preferring your drug.  The PBM is saying to all of its

customers, We now want you to take Praluent.  And we're

going to cover Praluent and not Repatha.

Q.     And by "substantial exclusivity," Dr. Schleifer meant

that he needed Praluent to be the only PCSK9 on as many

formularies as possible; correct?

A.     That's what he's trying to do by cutting price by

making it very attractive.  That's right.

Q.     And the plan also called for Regeneron to draft off

the marketing efforts by other companies; right?

A.     That's correct.  I -- I explained that.  That's the

PBM that is going to do the marketing of Praluent.

Q.     You think that refers to the PBMs, not Amgen?

A.     Well, this drug is reasonably well known by -- the

category is reasonably well known by now.  It was -- it's

been on the market for at least five years.  So doctors are

aware of the category.  And the marketing that -- the key

thing that's happening is the PBM is doing the marketing for

Regeneron by making the product exclusive.

Q.     Okay.  So when you say "the PBM is doing the

marketing," you mean making it exclusive on its formulary;

right?

A.     Well, that's what causes the doctor to write the

prescription.  There's two ways to get a doctor to write the

prescription.  One, go visit their office and give them

pizza and free pens. And another way is to have the patient pay a low out-of-pocket cost for Praluent, like $20, and a high out-of-pocket cost for Repatha, like $200. And then the pharmacist will say, Let me phone your doctor because there's a cheaper option. And that -- that's the marketing to the doctor that the PBM is doing.

Q. Okay. So just to be clear, your opinion is that Regeneron's plan was to cut all of its marketing expenses, fire its sales force and let the PBMs do the marketing?

A. Yes.

Q. Okay. And are you aware that Regeneron's partner, the pharmaceutical giant Sanofi, said that this plan was naive and would not succeed?

A. Well, that's -- I think, here, we see Dr. Schleifer trying to convince Sanofi to sit back and not run this drug anymore because Regeneron has a better idea, which is to try this low-cost strategy and Sanofi doesn't agree. But Sanofi's plan hasn't been working. Sanofi's plan is not growing the brand and is not making money off the brand.

Q. Are you aware that Sanofi specifically told Regeneron that this plan would not work?

A. What I've seen -- I know that Sanofi had a different plan, so I know that they didn't like Regeneron's plan, but that's a normal thing in strategy. Different firms have different strategies. And they believe different things

about what they can make go in the marketplace.  And it's --
that's fine.  That's not a problem.

Regeneron's strategy was a low-price strategy
and, as I said, that's a very common and usually very
successful strategy.

Q.    Did you consider the evidence of Sanofi's view of
this strategy by Regeneron?

A.    Yes, but, again, Regeneron got the product back from
Sanofi.  They disagreed.  That was part of the reason why
getting the product back from Regeneron was really important
because then they could execute on their plan, which was
different from Sanofi's plan.  Obviously, Sanofi didn't like
the Regeneron plan or they would have been doing it already.
So the two companies disagreed about how to market Praluent.

Q.    Okay.  Well, let me show you one email that you
didn't actually consider.  So this is DTX-1964.  And this is
also in evidence.

And this is an email from a gentleman named
Martin Bick at Sanofi.

Do you see that?

A.    I do.

Q.    Do you know who Martin Bick is?

A.    No.

Q.    Are you aware that he's the head of primary care and
market access for Sanofi?

Scott Morton - Cross

A.      No.

Q.      Do you know how long he's been in the pharmaceutical industry?

A.      No.

Q.      And he writes to Richard O'Neal, who's an executive at Regeneron; right?

A.      Yes.

Q.      And if we look at the third sentence there, he says, "We aren't likely to win or maintain many exclusive positions given the overall commercial underinvestment relative to Repatha and associated underperformance with respect to market share.  Reducing our sales force is only going to exacerbate the access situation.  I know that we don't like to acknowledge that the two are related, but to ignore it is naive at best.  That is what makes our process, our access approach really challenging.  We can't drive enough share to be a serious player for exclusive positioning, and we complain that we lose share in parity. Both are symptomatic of the same issue, which is that Repatha" is significantly -- "significantly outspends Praluent in sales force and promotion."

        That's not an email that you considered in coming up with your opinions in the case; right?

A.      Oh, that general critique is definitely something that I considered at some length.  And he's right, because

Scott Morton - Cross

what Sanofi has been doing is not investing enough.  If they really want to take this, let's educate people, let's market to the doctors, let's run clinical trials, then you have to do much more of that.  They're sort of doing half of it. And it's not winning against Amgen.  It's not working.

And what the people at Regeneron see and understand is, don't do it halfway.  Just stop doing it entirely.  Save the money.  Plow it into low prices, and get customers with the low prices who don't care about the marketing to the doctors.  That's actually really sensible. What -- I don't disagree with this description at all.  And the reason that Regeneron is going to make it -- is going to ask for the drug back is to carry out their strategy.

Q.    And when you say "plow the savings into low prices," you mean plow the savings into paying higher rebates; right?

A.    That's lower prices, yes.

Q.    Okay.  Let's go back to your Slide 17.

Now, PBMs care about things besides low prices; right?

A.    They care about their formulary having enough coverage to treat everybody's diseases.  So they want to have complete coverage.

Q.    And they care about market share when making formulary decisions; right?

A.    Well, they can control market share.  So while it is

Scott Morton - Cross

true that they care about market share, it's something that is under the control of the PBM.  Because if they don't cover Repatha, for example, then Repatha's going to have a low market share at the -- at the plant.

Q.    They also care about whether doctors are prescribing the drug; right?

A.    I don't think I understand the question.

Q.    Do PBMs evaluate which products are being prescribed by doctors in the marketplace?

A.    I'm sure they do.

Q.    Okay.  Unlike Regeneron, Amgen actually preferred and sought a 1 of 2 formulary position; right?

A.    Well, many of the documents we've seen about that 1 of 2 are in response to PBMs asking for 1 of 1.  So I don't think the fact that Amgen was willing to be 1 of 2 is especially relevant in those situations.

Q.    But they generally sought and preferred a 1 of 2 placement; right?

A.    Well, certainly -- okay.  Why does the PBM want 1 of 1?  It's to drive down price.

So, yes, it's consistent with Amgen's preference not to compete on price, not to erode gross-to-net, but they would bid on a 1 of 2, which is a -- which is a higher price than an exclusive bidding on 1 of 1.

So I agree with you that, in general, Amgen

prefers those higher prices and the less intense competition.

Q.    And Amgen's strategy was focused on marketing to doctors and prescribers; correct?

A.    That's exactly right.

Q.    And marketing to doctors is a typical way a pharmaceutical company will try to get sales for its drug; correct?

A.    It's pretty common, that's right.

Q.    And that marketing happens through bodies on the ground, field representatives, and spending that the company does on advertising; right?

A.    Yes.  It's very expensive.

Q.    And Amgen incurred costs related to national direct-to-consumer advertising; correct?

A.    That's correct.

Q.    And historically, Amgen has engaged in more advertising than Regeneron; correct?

A.    That's right.  Its costs are very high.  Mm-hmm.

Q.    And Amgen's higher advertising spend gave it a relative advantage over Regeneron when the firms are competing in a parity position; correct?

A.    When they're competing -- when they're both covered at the same price, then the doctor is going to decide based on which marketing visit that they got most recently.  And

that's going to be Repatha.

When instead the patient comes in and says, "Well, I can pay $20 for Praluent and $200 for Repatha," then the doctor is going to prescribe Praluent usually.

Q.   And this advantage allowed Amgen to get more of the patients that were up for grabs in the market; right?

A.   I don't agree with that.  I mean, that's just a very general sentence.  I don't understand what it means as an economic matter.

Q.   Okay.  Well, let's -- let's just take a look at your report -- at your reply report at Paragraph 30.  That should be in one of the -- one of the binders in front of you.

Let's go to your reply report, Paragraph 30.

A.   Okay.  Yes.

Q.   Okay.  And so let's just start in the second sentence there.

"In the PCSK9 market, Amgen, as part of its strategy to generally pursue parity positions, has historically engaged in more advertising than Regeneron. This higher advertising spend helps Amgen acquire a larger share of the large number of patients that are up for grabs in parity."

You agree with that; right?

A.   In a parity contract, yes, I do.

Q.   Okay.  And, Professor Scott Morton, in coming up with

your opinions in this case, you did not conduct any empirical analysis to determine whether it was Amgen's spending on marketing and promotions that caused Repatha to grow more in the U.S. than Praluent; right?

A.      In what time period are you talking about?

Q.      In any time period.

A.      So my analysis of the relevant time period from 2020 to 2024, I -- my analysis is that it's the -- it's the cross-therapeutic bundle that is forcing PBMs to not buy Praluent.

So, no, the growth of Repatha -- okay.  There's a separate thing, which is the growth of the category as a whole with -- because there's bigger population and more people covered by insurance.  I'm leaving that to one side and just thinking about the growth at the expense of Praluent.  That's caused by the bundle.

Q.      Okay.  But I'm focused on whether the spend that Amgen undertook allowed it to grow more than Praluent in the market.  And you took -- undertook no empirical analysis to determine whether it was Amgen's spending on marketing and promotions that caused Repatha to grow more in the U.S. than Praluent; correct?

A.      No.  I -- so I didn't study the effect of each dollar of marketing that Amgen spent.  What I studied was the effect of the dollars in the rebate, what that did to

Praluent's price.  And that is an empirical fact and has an empirical size and drives share.

Q.    Okay.  I'm not sure if we're talking past each other, but you undertook no empirical analysis to see if it was Amgen's spend on marketing and promotions in 2024 that is the reason Repatha grew more than Praluent in the market; correct?

A.    I did not because there's no need because Praluent can't get onto the PBM's formulary, so it doesn't really matter what the -- what -- what Amgen's doing with marketing.  They are the exclusive on the PBM.  It's -- it's finished.  The marketing, it would be duplicative in a way because the patient is insured to consume Repatha.

Q.    Okay.  So the -- the short answer is you didn't undertake that analysis; right?

A.    Because I don't think it's necessary, that's correct.

Q.    I'd like to ask you just a few questions about CVS.

In 2020, Regeneron won exclusive coverage at CVS on the Commercial formulary; correct?

A.    That's right.

Q.    And it had already had exclusive coverage on CVS Medicare; right?

A.    I think that's right.

Q.    And Praluent replaced Repatha as the exclusive PCSK9 product on the formulary at CVS; correct?

Scott Morton - Cross

A.      What year are you talking about?

Q.      In 2020.

A.      Yes, that's correct.

Q.      And Regeneron maintained its exclusivity on the formulary from July 1st, 2020, through the remainder of 2020; correct?

A.      Yes.

Q.      And into 2021 and for 2022; right?

A.      That's correct.

Q.      It was the single PCSK9 product on the formulary; correct?

A.      That's my understanding.

Q.      Now, in 2021, Regeneron and Amgen engaged in another round of competition to be on the CVS Commercial formulary.

        Do you recall that?

A.      I do.

Q.      And Regeneron wanted to maintain its exclusive position at CVS; right?

A.      That's correct.

Q.      In a bid for exclusivity; right?

A.      That's correct.

Q.      And as part of these negotiations -- we've heard some about this -- in 2021, Amgen offered a -- CVS a portfolio bundle deal with Enbrel value tied to Enbrel, Otezla and Repatha coverage; correct?

A.     That's right.

Q.     And you -- you had a slide on -- on this.  I just wanted to bring that up.  I think it's -- the slide numbers shifted up a little bit, but I think -- we can track it, hopefully.

       Yes, this is Slide 38 in the slides we received last night.  I believe Slide 37 in the one from today, just so we're all on the same page.

       So this is an internal email at Amgen about the portfolio bundle offered to CVS in 2021; correct?

A.     That's right.

Q.     And that offer is approved by Mr. Murdo at Amgen on July 2nd, 2021; right?

A.     By Mr. Gordon, that's right.

Q.     Thank you.  By Mr. Gordon.

       Now, CVS rejected this portfolio bundle offer; correct?

A.     They did initially.

Q.     And they instead accepted the Regeneron bid for 1 of 1 coverage; correct?

A.     That's correct.

Q.     And leading up to these negotiations, Dr. Schleifer approved a 65-percent exclusive bid to CVS.

       Do you recall that?

A.     I do.

Q.    And that was in April of 2021; right?

A.    I don't remember the exact day.

Q.    All right.  Well, let me just quickly show you what is in evidence, DTX-1321.  DTX-1321.

All right.  And if you look at the email, second down, there's an email from Mr. O'Neal asking for approval of this 65-percent exclusive bid to CVS.

Do you see that?

A.    I do.

Q.    And Dr. Schleifer approves it on April 27, 2021.

Do you see that?

A.    I do.

Q.    All right.  And at -- at the time this 65-percent discount offer was approved by Regeneron, it was projecting to generate 32 million in net sales and positive gross margin; right?

A.    Can you highlight that?

I just don't see it.

Q.    It's -- it's not in this analysis.

Did you study what Regeneron was expecting to get out of its exclusive bid to CVS?

A.    Yes.  Along with all the other attributes of the offer, yeah.

Q.    And -- and do you recall if Regeneron was expecting to this -- for this business to be a positive gross margin

Scott Morton - Cross

for it going forward?

A.      Yes, otherwise, they would not have wanted to go in.

Q.      Right.  So let's look at your Slide 39.  I just wanted to ask you a few questions about this slide.

You have the red line here that -- that shows sort of a plunging price; right?

A.      That's correct.

Q.      And the price goes from $350 down to $100; right?

A.      That's correct.

Q.      And is that the Amgen price?

A.      No.  It's not really a real price.  It's taking the Enbrel withheld rebates and applying them to CVS' purchases of Repatha and just showing how big those rebate dollars are by comparing them to the size of Repatha in this scaled way on the price of Repatha.

Q.      So this -- this reflects the Amgen price reflecting the rebates that are included in the portfolio bundle offer; right?

A.      It's a way of scaling those rebates.  Those rebates belong to Enbrel, but they're sufficiently big that if we, instead, imagined Amgen taking those -- that number of dollars and instead discounting Repatha with that same number of dollars, this is what you would get.

Q.      Right.  You're showing how much those rebates would bring down the price of Repatha; right?

A.    If they were applied to Repatha.  They were applied to Enbrel, so they're not doing anything to the price of Repatha in real life.  But this is showing if you took that number of dollars and actually in real life gave them to the PBM, what would that do to the price of Repatha.

Q.    But all of those rebates would be given to the PBM; right?

You're not saying any of the bundled rebates wouldn't be given to the PBM if the deal went forward; correct?

A.    I'm not.  I'm just explaining that the -- what's showing up on that graph is Enbrel money.  It's the rebate that belongs to Enbrel.  I'm doing a -- kind of a hypothetical experiment and saying if you took those -- that same number of dollars and applied it to Repatha, the amount of Repatha CVS buys, what would the discount look like.

Q.    Right.  But all of the rebates that Amgen is paying pursuant to a portfolio bundle inure to the benefit of the PBM; right?

A.    That's correct.  That's right.

Q.    Right.  And additional rebates mean lower prices; right?

A.    They do, except when we think about the path of those rebates over time.  We don't actually see prices going down.  But when a rebate comes, it results in an effectively lower

price.  That's right.

Q.     Right.  You're not contending that Amgen's rebates paid pursuant to a portfolio bundle were not actually paid to the PBM; right?

A.     I'm not.

Q.     And you're not contending that those rebates didn't inure to the benefit of the PBM; correct?

A.     Correct.

Q.     And you are not contending that those rebates did not result in lower prices for the PBM; right?

A.     Well, except in the sense that I keep explaining, which is the bundle prevents price competition between Repatha and Praluent.  So it does lead to higher prices because it takes the Enbrel money and says, Don't engage in price competition over here between Repatha and Praluent, and then we'll continue to give you all your Enbrel rebates.  So it does actually cause higher prices in the end.

Q.     In the end?

A.     In -- in the market, that is, the PCSK9 market, not in the Enbrel market.  I don't have an opinion about that except that, of course, Enbrel's price hasn't gone down.

Q.     So let's look at this chart.  Now, what was the discount that Regeneron used to win the CVS business?

A.     Off of Repatha, I don't recall the exact percentage.

Q.     Regeneron.  Regeneron --

A.    Oh, sorry.  Regeneron.

Q.    -- used the business in 2020.

A.    It's in the 60s.  I don't recall the exact number.

Q.    It's in the 60s?

A.    That's my recollection.  I don't recall exactly.

Q.    And Regeneron offered that discount to win the CVS business without any competition from Amgen; right?

A.    That's not my understanding.  My understanding is that Regeneron was told that this was the level they had to price if they were to try to counteract the bundle.

Q.    In 2020?

A.    In 2020?  Sorry, I thought you were talking about this chart in 2022.

Q.    I'm asking you about 2020.

      When Regeneron won the CVS business in 2020, Amgen had no notice of it; right?

A.    That's what Mr. Gordon told us, and I -- I don't have any further information about that.

Q.    You haven't seen anything otherwise?

A.    That's correct.

Q.    Okay.  And so when Regeneron came up with its price that it was going to bid to try to win this business in 2020, without any competition from Amgen, it gave a 60-percent discount price; right?

A.    Sorry.  I thought -- that previous set of questions,

I thought you were talking about 2022. So I don't -- in terms of the -- what the rebate was offered in 2020, I don't recall that number. I could look it up, but I disagree with your contention that there was no competition that Regeneron faced in 2020.

Quite the contrary. They faced Repatha. And Repatha was on the formulary at CVS. And so they were very much competing with Repatha.

Q. Do you know if Amgen ever gave a bid for the business in 2020?

A. They were in the formulary. They had -- they had an --

Q. That's not my question.

Do you know if they ever made a bid for the business in 2020?

A. I do not know the details, but I do know that CVS is a well-run corporation, and they would solicit whatever bids they felt they needed to get competition. They're two parties in the market who both want to be distributed through CVS. So CVS will make sure they effectuate that competition.

Q. Okay. So looking at your chart, you told me a few minutes ago that the Regeneron price that it approved to try to win the CVS business in 2021 was agreed to in April of '21; right?

A.    The internal discussion at Regeneron was determined in April, yes.  That's right.

Q.    Right.  And we saw earlier that the Amgen bundle -- portfolio bundle offer was approved in July; right?

A.    Yes, I think that's right.

Q.    Right.  So Regeneron agreed on the price it was going to bid on the business before Amgen's portfolio bundle was ever approved; right?

A.    No.  If you look at that email carefully, it gives a range, and obviously, Regeneron doesn't want to lower the price any more than it has to.  So that approval was for a range of prices.

Q.    Right.  And the upper bounds of the range was 65 percent; right?

A.    That's correct.

Q.    And that's what they ended up going with to win the business; right?

A.    I don't recall, but I think that's right.  Yes.

Q.    Okay.  And so that price that they offered to win the business in 2021 was approved before Amgen ever approved the portfolio bundle; right?

A.    It -- that range was what was approved, not the 65.  The fact that the bundle pushes Regeneron all the way to the bottom of their range, the lowest possible price, is an outcome of what happens in those intervening months.  What

was approved in April, the email said it was -- it was a range of prices.

Q.   Right.  It was a range up to $65 that they were happy to bid on to try to win the business.

It was approved by Dr. Schleifer; right?

A.   That range was approved by Dr. Schleifer.  That's correct.

Q.   Do you know for how long the 65-percent discount offered by Regeneron and put in place at the beginning of 2022 stayed in place?

A.   I think about a year.

Q.   Okay.  And did you review the CVS testimony regarding this competition in 2021 between Amgen and Regeneron?

A.   Yes, I did.

Q.   And do you understand that CVS testified that it never used Amgen's offer of an Enbrel overlay to pressure Regeneron into increasing its rebates?

A.   If you show me that, I'll take a look.

Q.   Okay.  Let's bring up the Witter transcript, Page 208, 11 through 25.

A.   Is this the trial transcript?

Q.   This is the deposition transcript.  This is from the CVS corporate representative, his testimony in the case.

"QUESTION:  In fact, you're unaware of CVS or Zinc ever pressuring Regeneron to increase its rebates

Scott Morton - Cross

because of value provided on Enbrel or Otezla by Amgen; right?

"ANSWER:  So our job is to pressure manufacturers every single day.  That's what we do to bring costs of the products down to our downstream clients.

"So we were pressuring Regeneron to get enhanced rebates and discounts, but it does not based off of the Enbrel portfolio.

"QUESTION:  It was solely based on a head-to-head comparison of Repatha and Praluent; correct?

"THE WITNESS:  Correct.  The same way we were pressuring Amgen to get better rates on Repatha."

Did you consider that testimony in coming up with your opinions?

A.     I did.

Q.     And do you accept that testimony?

A.     No.  I had a phone call with the sales representative, some executives at Regeneron, who explained that -- that CVS was, in fact, telling them that they had to set a lower rate to counter the additional value, again, in quotations, coming from other drugs at Amgen.

Q.     So your evidence that you're pointing to for this pressuring came from a phone call that you had with Regeneron?

A.     Yeah.  Steven, Mr. Steven Hyde was the one that I

remember talking to about this issue.

Q.   Okay.   Your conclusion about this pressuring for increased rates was not based on the testimony given by CVS, but based on a phone call that you had with Regeneron; is that right?

A.   It's based on a large amount of other evidence, also, because we see the documents of Amgen saying, We are going to roll out this strategy at UnitedHealthcare and CVS.  So it's clear that it's a strategy of the corporation.

We see internal discussions about executing on the strategy.  We see the modeling of various parameters of the strategy.  Then we see the result that Repatha is -- that Regeneron is pushed to the edge where price equals cost, gives up, Repatha takes the exclusive, and we learn that Regeneron was told -- Mr. Hyde said Regeneron was told, "Don't bother bidding."  You cannot -- you cannot overcome this -- this bundle.

Q.   So you -- you do not accept CVS' testimony on this point?

A.   There's a lot of -- of evidence in the record and I have to take it holistically.  I have to consider everything.  Amgen's got a strategy.  They wrote down that they are -- this bundle was working great at ESI, and they were going to carry it out also at CVS and UnitedHealthcare.  That's exactly what they're doing, and the rest of the

record is very consistent with that.

Q.    And CVS rejected the bundle; right?

A.    The first time.  Regeneron was able to stay in the game by upsetting price equal to cost for a year, but it didn't work after that.

Q.    Well, it stayed in the market all the way until -- on CVS, all the way until 2023 for Commercial and 2024 for Medicare; right?

A.    It's -- that year, that 2023 year was the year in which Regeneron was essentially setting price equal to cost and not making any money on that contract.  And they determined it was not worth staying in that contract because it was too expensive.

Q.    Based on the price that they approved back in April of 2021; right?

A.    Well, remember, that's a price range, and it -- you have to wait to see what your economies of scale look like.  You have to see how many units CVS buys.  You have to look at your cost of doing business, what's the input cost, distribution cost, all those things.  And you net that all out and discover how much money you're making on a contract.

       And it was so close that they, in the end, after a year's experience, decided that they were not making any money.

Q.    Okay.  I'd like to shift gears to ESI.  You provided

some testimony about ESI Commercial.  I'd like to ask you a few questions about that.

If we could bring up -- I think it's our third -- Slide 36 and maybe Slide 35.  These are slides that you -- you showed earlier.

Do you recall that?

A.     I do.

Q.     And you pointed to this 200 million -- 210 million -- excuse me, $210 million figure.

Do you recall that?

A.     I do.

Q.     And you actually did some analysis of your own as -- in the course of your work in this case on the -- the issue of the size of the -- the Enbrel overlay.

Do you recall that?

A.     I do.

Q.     And -- and you concluded, based on your analysis, that the total amount of Enbrel and Otezla rebates made contingent on Repatha exclusivity was estimated by Ascent/ESI to be around 112 million; right?

A.     I'm not seeing that on this slide, but maybe -- oh, I could look at the larger version.

Q.     All right.  Let's look at your opening report.  Let's go to Paragraph 196 in your opening report.

A.     Trying to find that.

Q.    You can bring that up.

A.    Sorry.  What was that, 1 -- 196?

Q.    Yes.  Opening report, Paragraph 196.

A.    I'm there.

Q.    Let's look at your second sentence there.  "The total amount of Enbrel and Otezla rebates made contingent on Repatha exclusivity was estimated by Ascent/ESI to be around" $112 million.

       Do you see that?

A.    I do.

Q.    That was the conclusion you reached based on your analysis; right?

A.    Yes.

Q.    Now, let's go back to the slides.

       Can we go back to Slide 35?  Sorry.

       And I wanted to ask you about this head-to-head competition that is -- that you talked about.  And you pointed to these numbers in here, and you said that -- I think you said the Regeneron rebate was 6.1 million and the Amgen rebate was 5.9 million?

A.    That's what the slides say.  That's correct.

Q.    Right.  And that's very close; right?

A.    Yes.  Well, it's $200,000, which is a significant amount of money to most people.  But we're working in the millions and billions here, so, yes.

Scott Morton - Cross

Q.   And ESI saw it as very close; right?

A.   I think Amy Bricker was the one who said it was very close yesterday.

Q.   Well, one of your slides says it's very close, too; right?

Let's look at Slide 35 -- 34.

In that second part, you -- it says, "There is not much comparison versus Praluent exclusive.  They are very close just looking at the PCSK9s head-to-head"; right?

A.   Yes, that's right.

Q.   ESI saw this as a neck-and-neck race if you just compare the offers head-to-head; right?

A.   Yes.  Although they're not going to go to the second step of pushing anybody to go down further because there's no point because the additional value Amgen is putting in the deal blows Regeneron out of the water.

Q.   Right.  But if they compared the two offers, just based on Repatha and Praluent, they could easily make the decision to go with Repatha just based on this comparison, given the size of the market share that Repatha has; right?

A.   I don't think that's right.  I think that if Praluent is less expensive, that they would go with Praluent.  I mean, first of all, Praluent has a lower list price, so the -- the net price of the drug is going to be below -- below Repatha.  And, again, Express Scripts can control the

Scott Morton - Cross

market share.  That's the point of being a PBM, that you get to say to your customers, Here's what we're all going to consume because it's cheaper.

So you don't have to accept the market share of Repatha that's out there in the community.  You can say, Look, this is the less expensive one, and we're going to incentivize you to take it by giving you a $20 co-pay on this and a $200 co-pay on the other one or no coverage at all on the other one.  And then the market share will return to Praluent.  That's -- that's the job of a PBM.

Q.   Didn't Ms. Bricker say they take market share into account in making these decisions if the offers are close?

A.   Oh, they should take market share into account, but they know very well how to change market share.  That's exactly the expertise of a PBM.

Q.   Now, you talked a little bit about what you called "below cost pricing."

Do you recall that?

A.   Yes.

Q.   And in your analysis, you defined Repatha's variable cost to be the sum of Amgen's cost of sales and total sales and marketing cost that was attributed to Repatha in the U.S.; right?

A.   That's right.

Q.   You also calculated Praluent's variable cost; right?

A.      That's right.

Q.      And when you calculated Praluent's variable cost, you did not include sales and marketing costs; right?

A.      Well, Praluent, remember, doesn't have the big sales force of Amgen.  So they've got a handful of people doing marketing, and they're not broken out separately for Praluent, partly because they're very few, and partly because they sell other things.

        So when they visit a doctor's office, they're marketing other drugs.  So only part of their time is spent on Praluent.  They're going mostly to big, you know, PBMs and big accounts.  They're not visiting doctors in the field.

Q.      I guess my question was just more about your calculations.  When you calculated Amgen's variable cost, you included sales and marketing.  When you calculated Praluent's, you did not; correct?

A.      Praluent doesn't have the kind of sales and marketing that Amgen has.  Amgen has a lot of money in all of that direct-to-consumer marketing, in all of the detailing, representatives would visit people's offices.  Praluent at this time and Regeneron at this time has something, like, 10 or 15 people doing this for the whole country.  And they're not specific to Praluent.

        So it would not be right to include -- first of

all, I can't measure them, but they're very, very small compared to the value of the brand.  So it's a tiny amount of money.  And that's why it's not there.  Not because I don't include it, but because that spending is not there.  That's the whole point of the Regeneron strategy, they're not spending on marketing.

Q.    So you found no sales and marketing expenses at Regeneron?

A.    That's correct.  Not for Praluent.

Q.    Zero?

A.    Well, as I said, there's a dozen people, and they're doing a lot of other things besides talking about Praluent every so often.  And I couldn't get data on exactly how many that would be, but maybe if we guessed that there were a few FTEs, full-time-equivalent people, that would be some hundreds of thousands of dollars in a budget.  That's millions and millions.  So it would not show up as a material difference in the line at all, which is why it's fine to not include it.

Q.    Thank you.

      Let's look at another slide that you talked about, which, I think, is Slide 17.  I think it's 18.

      Yeah.  Thank you.

      You talked a bit about this slide, and you said this was the picture in summer of 2020; right?

A.      That's correct.

Q.      And I think you called this healthy competition; right?

A.      That's correct.

Q.      And at this point in time, Praluent is the exclusive at two of the PBMs and Repatha is the exclusive at one; right?

A.      That's correct.

Q.      And at some point, ESI, Express Scripts Commercial shifted to Repatha, and so there were two Repatha exclusives and two Praluents; right?

A.      And then all the rest of them shifted.

Q.      In 2020.

A.      Yes, that's right.  Well, to take effect in 2021.

Q.      Okay.  And so you've actually taken the position in this case that the market was substantially foreclosed as of April 2020; right?

A.      As of the start of the cross-therapeutic bundle, that's right.

Q.      So even though Praluent's market share grew 20 percent in 2020 alone, your opinion is that they were substantially foreclosed from the market?

A.      Once the cross-therapeutic bundle gets used at ESI, Praluent is foreclosed from ESI.  That's the start of the time of foreclosure.  All -- these PBMs are all very big, so

being foreclosed at any one of them handicaps a rival.
That's one place they can't go with their strategy of low
prices.  It's just out.  So once there's the
cross-therapeutic bundle at ESI, then the foreclosure has
begun.

Q.     Well, let's look at Slide 19.

So this is your slide; right?

A.     That's correct.

Q.     This is 2020?

A.     That's correct.

Q.     Praluent's market share grows 20 percent in 2020
alone, but the opinion that you've offered in the case is
that they were foreclosed from the market starting in April
of 2020; right?

A.     I think what's confusing to you is that we have just
discrete transactions here, one is CVS and one is Express
Scripts.  Regeneron comes in with their low-price strategy
and successfully sells to CVS.  That sets off alarm bells at
Amgen.  And we have Mr. Gordon saying "unnecessarily
aggressive.  Regeneron is starting a battle in exclusives.
They're paying for market share with rebates."  All of these
kinds of remarks about the fact that price competition has
heightened and intensified.

Now, what's the strategy response to that?  It's
the cross-therapeutic bundle.  That forecloses Regeneron

from competing at Express Scripts.  That's the moment where we get foreclosure, and that's a big piece of foreclosure because Express Scripts is very large as a customer.  And then it just gets worse from there.

Q.    But at that point in time, Amgen is the -- has an exclusive positioning in two PBMs and so does Praluent; right?

A.    Well, as I tried to explain earlier, an exclusive is not a problem when it comes from head-to-head competition. If they both come in and offer a price, and one's lower than the other, and the PBM wants to pick the lower one exclusively, that's fine.  Every -- it's a level playing field.  Everybody had a shot to win.  And the PBM chooses the winner, no problem.

The problem comes when the therapeutic bundle stops Regeneron from being able to engage in that price competition.  That's what happens when we get the cross-therapeutic bundle being used at Express Scripts.  So a level playing field exclusive is no -- is not a harm to the competition.  It's kind of a sign competition is in effect.

Q.    Are you offering the opinion that Regeneron was foreclosed from being able to compete in the market in 2020?

A.    After the cross-therapeutic bundle is used by Amgen, yes, Regeneron is foreclosed.  And that occurs in 2020.

That's right.  They're foreclosed at ESI when that happens.

Q.    Even if the amount of the foreclosure is less than 10 percent?

A.    Well, Express Scripts has a very high market share, and being foreclosed from the national formulary at Express Scripts -- at Express Scripts is a major issue.

Q.    I guess my question is still:  If the amount of foreclosure associated with ESI is less than 10 percent, are you offering the opinion that Regeneron was foreclosed from competing in the market?

A.    My opinion's based on the use of the cross-therapeutic bundle at each of these big PBMs.  Okay. I'm just taking the world as we know it, not with a little PBM, but with the PBMs we actually have, all of which are very large in terms of market share.

Q.    So I guess just coming back to my question.  If the amount of the foreclosure associated with ESI Commercial in 2020 is 10 percent or less, are you offering the opinion that Regeneron was foreclosed from competing in the market?

A.    I can't offer that opinion because Express Scripts is not less than 10-percent market share.  Express Scripts has a very big market share.  So getting a -- being excluded from the national formulary at Express Scripts is a big deal.

Q.    You think the market share of Express Scripts'

national formulary is more than 10 percent of the market?

A.     Once again, I'm talking about the whole of Express Scripts.  I explained about the national formulary, the custom formularies and the spillover in the community.  All of that is -- is the Express Scripts' business, which is either completely foreclosed or made much more difficult for Regeneron to get in because it's not on the national formulary.  All of that's at risk, and Regeneron is foreclosed from all of that when the Amgen cross-therapeutic bundle stops then being able to go in with a low price and offer a low price.

Q.     How much of the market is reflected by the Express Scripts Commercial national template formulary as of 2020?

A.     I don't recall that I've memorized that number, but the share of the market of Express Scripts, the PBM, is really big.  We've looked at the cheese wheel a number of times, and it's -- it's substantial in -- I think it might be, you know, 30 or -- anyway, it's large.  It's a big PBM.

          MR. LIVERSIDGE:  Let's bring up Slide 43.  I guess it's 44.  Thank you.

BY MR. LIVERSIDGE:

Q.     This is a slide that you showed towards the end of your direct examination.  And if we look at -- well, first of all, if we look down at the -- there's a little box down below that says, "total foreclosure including spillover";

right?

A.      That's correct.

Q.      So your foreclosure analysis includes something that you're calling "spillover," which you're applying to some of the custom formularies that are not part of the national template formulary; right?

A.      That's correct.

Q.      And in some years, your assessments of spillover, what you're calling "spillover," is, like, half of the foreclosure that you're showing here on this slide; right?

A.      It should be a large fraction because the national formulary has a big impact on the custom formularies. That's why those PBMs are one organization. They try to get as many efficiencies as possible by having as many people as possible on the national formulary. And they market it to the custom formularies. So that's what's supposed to happen.

Q.      So there's a portion of these red bars that you have here that are not the national template formularies, but are custom formularies; right?

A.      That's correct.

Q.      And -- and you defined what you're calling direct foreclosure, as opposed to spillover, as formularies that you believe received or were offered a portfolio rebate; right?

A.    It's the national formularies that Amgen is targeting with the portfolio rebate because they understand very well that once you have altered the national formulary, it will spill over into the custom formularies, which, as you say, are important and have a lot of people in them.  And those, as I show here, result in a large amount of foreclosure for Regeneron.

Q.    Are you aware that in -- if you look at July of 2020, that actually the amount of direct foreclosure in the market is about 3 -- 3 percent?

A.    It doesn't -- the -- this is a package analysis.  I understand that the direct foreclosure is less, because I'm first starting with the national formulary for an individual PBM, and then watching -- empirically, I'm measuring, what happens to the custom formularies in response to the national formulary.  And the custom formularies change to be like the national formulary.  So it just takes a little bit more time, but it rolls out.

Q.    Well, a huge percentage of the custom formularies in your spillover bucket actually made the decision to go Repatha 1 of 1 before the national formulary did; right?

A.    Well, once again, if there's head-to-head competition, those formularies are free to pick an exclusive between Repatha and Praluent.  That's fine.  That's not a sign of any particular problem.

Q.     Right.  But you've included many, many, many custom formularies in your foreclosure analysis that made the decision to go with Repatha 1 of 1 before the national formularies ever did; right?

A.     If it's before the national formulary, then it's not part of -- it can't be part of the foreclosure analysis here, because I first take the cross-therapeutic bundle and the change in the national formulary, and then I measure the impact of that on the custom formularies.

So what was happening before the national formulary is marked, like in this chart, UnitedHealthcare Commercial in September '21.

Whatever was happening before that time is not part of the spillovers.

Q.     Are you aware that there's about 100 custom formularies in your analysis that made the decision to switch to Repatha 1 of 1 before the national formulary?

A.     It would be fine for them to do that.  That's not foreclosure if it's happening before the cross-therapeutic bundle, because everybody's allowed to do whatever they want before the cross-therapeutic bundle.  It's -- there's three competition -- head-to-head price competition between these drugs.

Q.     But you've included them, nonetheless, in your foreclosure assessment?

A.      Only later.  Only -- the -- first, there's the cross-therapeutic bundle.  Then, it gets leveraged at a particular PBM.  That changes the national formulary and that change spills into the custom formularies and into the community.  That's what's measured in this chart.

Q.      Isn't it the case that you took every custom formulary that was Repatha 1 of 1 on January 2024 and included it in your foreclosure calculation?

A.      Well, when Amgen is using the cross-therapeutic bundle to get CVS to switch, then I should be looking at exactly the changes that happen at CVS in that time frame.  That -- that is exactly the idea.

Q.      But you included them if they were Repatha 1 of 1 as of January 2024, even if they made the decision to go Repatha 1 of 1 before the national formulary did; right?

A.      Because anything that happened before this cross-therapeutic bundle is head-to-head competition unimpacted by the cross-therapeutic bundle.  And that's fine.  I don't mind which way that came out.

        Once we have the cross-therapeutic bundle in place, it's forcing the PBM into the Repatha choice.  It's not a free choice anymore because if they don't pick Repatha, they have to pay these big rebates.  They have to -- they lose the big rebates.  So that's why, yes, it counts as foreclosure at that time.

Q.    So even if a formulary decided before the bundle was ever offered that it was going to go with Repatha 1 of 1, after the bundle, you included them in your foreclosure analysis; is that correct?

A.    Because that's the response.  I mean, that's -- that's important because at that time of the cross-therapeutic bundle, there's suddenly a new financial incentive.  The new financial incentive is if you don't take Repatha, you lose Enbrel points.  You lose money on your Enbrel rebate.

So, yes, the decisions starting at that time have to count as foreclosure.

Q.    You understand that Regeneron can still bid for coverage at these custom formularies, even if Amgen wins at the national formulary; right?

A.    Yes, that is technically possible.

Q.    In general, you don't have any insight into why some custom formularies follow the national and some don't; right?

A.    I do as a health economist.  I mean, there's a lot of efficiencies in following the national formulary because that -- that will be the place with the most up-to-date therapeutic advances and best prices.  So custom formularies are going to be inclined to follow the national one because it's supposed to be the best.

Q.     All right.  Let's just look at your deposition for a second.  At Page 267, Line 16 to 25:

        "QUESTION:  So what is your best understanding as to why some of the custom plans follow the -- end up following the principal commercial national formularies and some don't?

        "Objection.  You are asking generally or with respect to this case?

        "In general?

        "ANSWER:  I don't have insight into what preferences are driving those decisions."

        That was your testimony; right?

A.     I think I said differences rather than decisions.

        And that's right, I don't know what drives the differences.  I do know what drives the -- the copying, the sameness.

        MR. HOCHSTADT:  Was the objection in the transcript?

        Your Honor, just for optional completeness, can I read the next question?

        THE COURT:  Why don't we do that on redirect?

        Go ahead.

BY MR. LIVERSIDGE:

Q.     You also have a category of spillover that's prescriber-level spillover; right?

Scott Morton - Cross

A.      That's correct.

MR. LIVERSIDGE:  And if we can bring up the chart again.  Thank you, Matt.

BY MR. LIVERSIDGE:

Q.      And -- and that's doctors; right?

A.      Yes, it is.

Q.      Those are not formularies or PBMs, but you're making some assessment of foreclosure effect on -- on doctors; right?

A.      That's correct.

Q.      So some percentage of what's in these red bars are doctors, or prescribers or some effect on them; right?

A.      That's correct.

THE COURT:  Counsel, let's go ahead and take our afternoon break.  We'll be back at 3:20.

Mr. Koehler.

(Jury leaving the courtroom.)

THE COURT:  All right.  We're in recess.

MR. POLKES:  Thank you, Your Honor.

(Recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  Are we ready to proceed?

MR. LIVERSIDGE:  Yes, Your Honor.

THE COURT:  All right.  Let's have the witness retake the stand.

THE COURT:  All right.  Mr. Koehler.

(Jury entering the courtroom.)

THE COURT:  All right.  Please be seated.

Let's continue.

MR. LIVERSIDGE:  Thank you, Your Honor.

If we could go back to the chart, which is 44.

BY MR. LIVERSIDGE:

Q.    Professor, we were talking about prescriber-level spillover.

What -- what percentage of the foreclosure in your chart is prescriber-level spillover?

A.    I don't have that memorized.  I'm sorry.  I'd have to look it up.

Q.    Is it 50 percent?

A.    I don't recall.

Q.    Could it be 50 percent?

A.    I don't recall.

Q.    Regeneron is not actually foreclosed from marketing Praluent to prescribers or doctors, is it?

A.    Well, foreclosed from marketing?

No, that's not its choice, but it could market if it wanted to.

Q.    Let's look at your opening report, which is Table 3, at Page 91, on this spillover percentage point.  It's on the screen, as well, if that's useful.

Scott Morton - Cross

So this is your foreclosure assessments as of July 2023.

Do you see that?

A.   I do.

Q.   And you say there's total market foreclosure of 65 percent as of July 2023.  And you say 33 percent of that is direct effect and the rest is spillover; right?

A.   That's correct.

Q.   So about 50 percent of your foreclosure in July of 2023 is spillover?

A.   Yes.  Spillover to the -- those smaller formularies and then in the community among physicians.

MR. LIVERSIDGE:  All right.  Let's go to -- let's go back to your chart, 44.  Our Slide 44, sorry.

BY MR. LIVERSIDGE:

Q.   So on this slide, Professor, you have -- above the January 2021, you have Humana Medicare identified there.

Do you see that?

A.   I do.

Q.   And Humana Medicare decided to go with Repatha 1 of 1 back in 2019; right?

A.   That's correct.

Q.   And are you aware that Regeneron is not claiming any damages associated with Humana Medicare?

A.   I have not kept track of where the damages are, no.

Q.     Okay.  You have Express Scripts Medicare above July 2020.

Do you see that?

A.     Above July 2020?

Q.     Yes.

A.     Yes.

Q.     And are you aware that Regeneron is not claiming any damages associated with Express Scripts Medicare?

A.     Again, I am not keeping track of the damages myself.

Q.     Okay.  If -- if we look at these months and years that you've put on your Chart 44 reflecting Praluent's foreclosure, can you tell us what is the percentage breakdown of direct versus spillover for each of the years?

A.     I haven't memorized that.  It's in my report.  As you put up one chart from my report, there's a number of charts in the report, as well as backup materials.  And that could be calculated, but I have not memorized all those numbers.

Q.     Okay.  And are you offering an opinion here that foreclosure of less than 20 percent of the market is substantial foreclosure?

A.     I'm not offering a percentage opinion.  I'm saying that each PBM is really important and; therefore, foreclosure at any one of the three big PBMs in the commercial side and four big PBMs on the Medicare side constitute some -- a substantial chunk of the market in

which Regeneron can no longer compete.

Q.     Okay.  So you're not offering an opinion that there is substantial foreclosure in the market at any particular percentage; correct?

A.     It's not a percentage -- well, obviously, I think that 80 percent is substantial.  But in terms of each -- I also think each individual PBM is substantial because there are only three main buyers.  So, by necessity, each one of them is substantial.

Q.     And do you know what -- can you tell us what foreclosure percentage is associated with any of those particular PBMs on a direct-effect basis?

A.     On the direct-effect basis, that depends on the share of the national formulary.

       So, again, I don't have those numbers memorized. We could go to the cheese wheel and I could show you the percent of each of the four -- of the PBMs themselves, that -- that's easy to -- to read off of the exhibits.

Q.     So for example, on July of 2020, can you -- do you have any sense of what the foreclosure is that's associated with Express Scripts Medicare on a direct-effect basis?

A.     I don't know, sitting here right now.  I have not memorized the share of the national formulary within that PBM contract.  So I don't want to speculate under oath. It's -- that material is all contained in my backup data

because I had to use it to estimate this whole flow over time.

But every PBM is different and their national formulary has a different share.  And it flows out to the custom formularies at a different rate.  So that's not something that -- that I can just read off of this chart.

Q.    Okay.  Let's just talk about market power for a second.

Your position in this case is that the relevant market is the sales of pharmacy-dispensed PCSK9 drugs; correct?

A.    That's correct.

Q.    And you testified that, in your opinion, Amgen has monopoly power in the market for pharmacy-dispensed PCSK9 drugs; correct?

A.    That's correct.

Q.    Now, Novartis has a drug called Leqvio.

You talked a bit about that; right?

A.    That's correct.

Q.    And Leqvio is a PCSK9 product; right?

A.    Yes.  And I'm not a medical expert, so let me just say I know it treats this hard-to-treat cholesterol.

Q.    But you understand that it is a PCSK9 product?

A.    I don't have enough biology or medical training to want to say anything about its mechanism and what

distinguishes it from the others.

Q.    So Leqvio could be a PCSK9 product that's in the market?

A.    It's not in the market because it is distributed entirely differently.  It does not go through the PBM.  It is not distributed through the pharmacy channel.  It's covered under the medical benefit, and a patient who gets it has to go to their doctor's office to -- or an infusion center and sit in the infusion chair for a number of hours and get infused with this product.

So it does not -- from the PBM's perspective, it's not a drug that they can put into the bid grid and get bids on and distribute through CVS pharmacies or anything like that.

Q.    Are you aware that Regeneron itself listed Leqvio as a competitor product for Praluent in its 2022 annual report to investors?

A.    I'm aware those annual reports tend to be extremely conservative and cite lots of factors that could possibly be relevant to the corporate profit.  So I did take that into account, but it's -- the weight of the evidence is not -- not in favor of including Leqvio.

Q.    So would it be fair to say that if Regeneron includes Leqvio in its 10-K, its public filing, as a competitor product to Praluent, that it views Leqvio as a competitor

product to Praluent?

A.     Well, remember, competitor is a wide range -- covers a wide range.  So, for example, if I were looking at cars, it is true that the bus competes with a car, and a motorcycle competes with a car.  But most of the time when I'm out there thinking about buying a Honda Accord, I'm not really considering the bus or the motorcycle.

So the economist is trying to get a useful product definition, which is the cars that are really close, strong competitors to each other.  And distant things, like the bus or the motorcycle are not -- when we do that analytical process of evaluating the market, we leave those out because they're too distant a substitute.

And that's what's happening here.  I mean, yes, it's a substitute, but it's a far distant one.  And as we saw from the documents I put up and the analysis I did, it's not close enough to be affecting prices in the PCSK9 market substitute.

Q.     But it's close enough for Regeneron to report to all of its shareholders that this is a product that it's facing competition from; right?

A.     That's a 10-K or a public securities filing.  That's not the kind of evidence I look at as an economist, which is what do actual substitution patterns look like in the market?  What do the customers think is a substitution and

so forth?

Q.    Well, aren't there laws that require the statements in 10-Ks to be accurate?

A.    Oh, sure.  And the bus is a substitute for a car. That's accurate.  It's just a very inconvenient one.

Q.    Are you aware that Leqvio was listed as a competing drug to Repatha in Amgen's October '22 contract with Emisar, the contracting entity for UHC/Optum?

A.    I don't recall that document.  I'm happy to look at it.

Q.    Okay.  Let's bring up DTX-0254 at Page 41.  If you look down the page there, you see Repatha's second from the bottom, and there are competing drugs listed in the next column.

         Do you see that?

A.    I do.

Q.    And do you see that the competing drugs to Repatha are both Leqvio and Praluent?

A.    I do.

Q.    And this is a contract with a PBM; right?

A.    I don't recall what the -- if you show me the -- the beginning of this document --

Q.    Sure.

A.    -- I'd be happy to answer your question.

         Sorry.  What was the question?

Q.      Sure.  In this agreement with the PBM, there is an indication that Leqvio is one of the competitors, along with Praluent to Repatha; right?

A.      I see that.  Yeah.

Q.      And are you aware that Novartis reported $385 million in net sales for Leqvio in the United States in 2024?

A.      I know that it's -- it's recently become a much bigger drug through the medical benefit and the infusion centers.

Q.      It's growing very fast; right?

A.      I don't know about its growth rate.

Q.      Well, let's look at Table 7 of your report, reply report.

        These are Leqvio claims or prescriptions by channel; right?

A.      That's correct.

Q.      And I mean, this shows, for example, as of January '23, 116,000 claims.  And then by June of 2023, 198,000.

        Do you see that?

A.      I see that, but you're leaving out highlighting the last column, which is the share that's the medical claims. And that's almost all of them.  It's that tiny little difference between 99.82 and a hundred that's going through the pharmacy benefit channel.  That's practically nothing. These are not being sold by PBMs.

Q.     Professor, you did not calculate Repatha's market share in a market where it competes against Leqvio; correct?

A.     I did not in my report, but I know that the sales of Leqvio are not large enough to make a difference because Leqvio is only, in very recent years, getting substantial sales.  The bulk of the time when we had this problem of the cross-therapeutic rebate in 2020 and 2021, Leqvio was not an important competitor in the marketplace of -- in any market.

Q.     What was Leqvio's market share in 2023?

A.     Of what market?

Q.     Of the market you're alleging in this case?

A.     Oh, I don't recall because that's not my -- my testimony is that Leqvio, because it sold on the medical benefit -- and you can see here, very, very few claims run through the pharmacy channel.  So it's not properly included in my market definition.  That would be -- it's not a good substitute because it's an infused drug sold in a different way.  It doesn't compete in the bid grid with all Repatha and Praluent.  So it's not part of my market.

Q.     Right.  So your market where you calculated Repatha's share does not include Leqvio at all; correct?

A.     That's correct.

Q.     So you do not know what Repatha's market share would be in a market if we accept that Leqvio is, in fact, a competitor; right?

Scott Morton - Cross

A.      That's correct, except to say that Leqvio is not a significant competitor.  You can just see the size of it until halfway through our period when the cross-therapeutic bundle has been invented and leveraged.

Q.      When, in your view, does Leqvio become a significant competitor?

A.      Well, zero medical claims and five pharmacy claims is not a significant competitor that -- I'm just making that observation.

Q.      And if the relevant market in this case is not, in fact, limited to pharmacy benefit prescriptions, then you have not calculated the market share for Repatha; right?

A.      I don't think that that's the correct way to do the market definition, but I have not calculated a market share with Leqvio in it.  That's correct.

Q.      Okay.  Do you believe that all branded pharmaceuticals have market power?

A.      The way economists define market power is a price above marginal cost.  And that's pretty much always true with a branded pharmaceutical product, because it has this patent and, therefore, is able to exclude competitors that copy it until it loses patent protection.  So most of the successful branded drugs we see in the marketplace have market power.  That's right.

Q.      And so would it be fair to say that Praluent had

Scott Morton - Cross

market power for some period of time?

A.      Possibly.  I did not look at that, but there --
the -- the margin is only one of the elements to our market
power calculation.  We also include profitability and market
share and entry barriers, as I explained before.  And
Praluent's market share was sufficiently small, especially
recently, that it definitely would not have market power any
time in the recent -- recent data that I've been showing.

Q.      Well, during which period of time could Praluent have
had market power, in your view?

A.      Well, I didn't study this market intensively before
2020, just enough to understand where we were coming from,
but I -- I did not -- I did not make a deep dive into that
kind of question before 2020.

Q.      You provided some testimony about Enbrel.

        Do you recall that?

A.      Yes.

Q.      Do you know what Enbrel's market share is today?

A.      I don't make a market definition for Enbrel, so I --
I don't have any way to give you a share.

Q.      So you don't -- you never calculated Enbrel's market
share in any market as part of your work this case; correct?

A.      That's correct.

Q.      But you do know that Enbrel has a lot of competitors;
right?

A.    Well, I know that there are many autoimmune diseases and -- sorry, autoimmune drugs for the various autoimmune diseases.  Amgen witnesses have described the many competitors of Enbrel.  I know about Humira.  That's about the extent of my knowledge of -- of Enbrel's competitors.

Q.    But even going back to 2020, Enbrel had a huge number of competitors; right?

A.    It -- as I said, it wasn't part of my report.  I didn't study that.  What I did study was Enbrel's markup, its margin and its dollar sales, which are enormous.  Its number of patients, which is also enormous.  And its price, which is very high.

So that price is not declining over time, so that gives me a clue that whoever these competitors are, they're not pushing down Enbrel's price.

Q.    Okay.  But let's take a quick look at your opening report at Paragraph 42.

And you wrote in your report, "In addition, in July 2020, 21 years post-launch, Enbrel remained the number two prescribed biologic in terms of RHU (rheumatoid arthritis market share) (22.6 percent) in a market with 14 competitors."

That's what you wrote; right?

A.    Yes, that market definition is a medical one.  It's rheumatoid arthritis.  That's not something that I've

Scott Morton - Cross

studied as an economist.  It comes just straight out of the drug's classification as rheumatoid arthritis.

Q.     And do you think market share at 22 percent is enough to give a drug with 14 competitors market power?

A.     Well, it is in this case because we've seen the high margins.  We've seen the enormous number of patients.

Patients take this drug over a long time.  So once they're settled on it and it's working for them, physicians and health plans do not like to move people off a drug that's working for them.  So that creates tremendous pressure on the PBM to continue to supply Enbrel to patients who are settled on it.  And we heard about that actually from Mr. Gordon about the grandfathered patients that -- that stay on Enbrel.

So that is a -- all of those pieces together give Enbrel quite a bit of market power.

Q.     And are you aware that the UHC and Optum corporate representative in this case testified that Enbrel competes with every drug indicated for rheumatoid arthritis and psoriasis?

A.     I'm not particularly aware of that, but that makes perfect sense.

Q.     Okay.  And are you aware that UnitedHealthcare and Optum did not cover Enbrel on the preferred tier of their formularies from 2015 to 2022?

A.      The new patients -- my understanding is that new patients at United do not get Enbrel.  But the old patients that already have been taking Enbrel or came into United already taking Enbrel, do get to have it.

Q.      So Enbrel was not on the preferred status on the formulary for new patients from 2015 to 2022; right?

A.      I don't recall the dates, but the new patients were not given Enbrel.  But the old ones -- it was covered for the old ones.

Q.      I just want to go back for a second to your opening report, Table 3, we looked at briefly a little bit ago.  And this is what you're saying is the foreclosure in the market as of July '23.

        Do you see that?

A.      I do.

Q.      And under "Direct Effect," you list some of the PBMs.

        Do you see that?

A.      I do.

Q.      And are those the PBMs that are included in your calculation of direct foreclosure?

A.      That's correct.

Q.      And so as of July 2023, your calculation was 12- percent foreclosure at Express Scripts, 2 percent at OptumRx, 7 percent at CVS and 11 percent at Humana; right?

A.      Those are percentages of the entire market, just to

Scott Morton - Cross

make it clear.  It's not a percent of ESI.  It's a percent

of the entire market.  That's -- you've read that correctly.

Q.    And those are your foreclosure numbers as of

July 2023; right?

A.    That's correct.

Q.    And does OptumRx include UnitedHealthcare?

A.    It's part of UnitedHealthcare.

Q.    And what you have here is ESI at 12 percent.  That

includes Commercial and Medicare?

A.    I believe so.  I would have to check the footnotes to

be entirely sure.

Q.    And this direct foreclosure at CVS at 7 percent, that

includes both Commercial and Medicare; right?

A.    Again, I believe that's right.  I'd have to just look

to make sure that I'm answering correctly.

Q.    So you don't know?

A.    Well, I -- my report is quite long and it's got a lot

of tables, so I would just want to check and make sure that

you're looking at the right table.

Q.    Okay.  Let's look at your reply report at Page 74 and

look at your Table 1.  So this is your foreclosure

calculation as of January 2024; right?

A.    Yes.

Q.    And you say there's direct foreclosure as of

January 2024 of 44 percent; right?

A.     That's right.

Q.     And that is made up, according to your calculation, of Express Scripts at 12 percent; Optum UnitedHealthcare, 2 percent; CVS at 19 percent; and Humana at 11 percent? Right?

A.     That's correct.

Q.     And, again, CVS includes both Medicare and Commercial?

A.     That's my recollection.

Q.     And your Express Scripts' foreclosure as of January 2024 includes both Commercial and Medicare; right?

A.     That's my recollection.

          MR. LIVERSIDGE:  Okay.  Thank you, Professor.  I have no further questions at this time.

          THE COURT:  Anything else?

                    REDIRECT EXAMINATION

BY MR. HOCHSTADT:

Q.     Professor Scott Morton, I'm going to turn back to one of the documents that Amgen's counsel asked you about.

          MR. HOCHSTADT:  Ms. Wu, will you put up on the screen DTX-0254?  And the page number is 41.

          So if we could start with the Repatha category, Kim.

BY MR. HOCHSTADT:

Q.     So that's where -- Professor Scott Morton, Amgen's

counsel asked you about this contract that Amgen had with Emisar, the GPO that covers UnitedHealthcare. And you saw -- you mentioned that Leqvio and Praluent are listed in the right box; right?

A.      That's correct.

MR. HOCHSTADT:  Kim, can we zoom in a little bit closer on Leqvio, because there's something important that was left out?

That box right there.

BY MR. HOCHSTADT:

Q.      There's an asterisk after Leqvio; right?

A.      I see that.

Q.      Did Amgen's counsel ask you about that?

A.      No.  No, he did not.

Q.      Okay.

MR. HOCHSTADT:  Kim, would you zoom out and go back to that asterisk now, which is down below the table?

First one.

BY MR. HOCHSTADT:

Q.      "Leqvio shall be included in the Repatha-defined drug market for a given benefit contract only if such benefit contract has established a pharmacy guideline or policy for Leqvio."

Do you see that?

A.      I do.

Q.    Did Amgen's counsel ask you about that?

A.    No.

Q.    Okay.  Remind us.  Leqvio, can you get Leqvio at the pharmacy?

A.    No.

Q.    Okay.  Is that why that footnote is there?

A.    I believe so, because normally it would be covered under a different benefit, the medical benefit.  And so it would not -- you wouldn't normally see it in the PBM bidding context.

Q.    And I can't show up at the Walgreens and force the pharmacist to give me Leqvio?

A.    They probably would not have it, but you can't get it under your pharmacy benefit, no.

        MR. HOCHSTADT:  Okay.  We can take that document down.

        Kim, can we pull up Professor Scott Morton's deposition transcript at Page 267, Line 16?

BY MR. HOCHSTADT:

Q.    Professor Scott Morton, do you recall Amgen's counsel asked you what you said in your deposition about why national formularies follow custom formularies?

A.    I do.

Q.    Okay.  And in the part that Kim is highlighting, counsel -- Amgen's counsel asked you; right -- this was the

question you were asked:

"What's your best understanding as to why some of the custom plans follow the -- end up following the principal commercial national formularies and some don't?"

"QUESTION:  Again, down below:  "In general."

And the answer that you gave:  "I don't have insight into what preferences are driving those differences."

Do you see that?

A.     I do.

Q.     Okay.  Can we go to the next two questions and answers on the next page?

So Amgen's counsel didn't ask you about these a moment ago.

"QUESTION:  I think you said marketing might make a difference?"

Answer that you gave in your deposition:  "It could."

"QUESTION:  And specific rebates offered to those custom plans might make a difference?"

Answer in your deposition:  "I mean, they could, but you could also just simply offer the rebates to the national formulary."

Were those the additional answers that you gave on that topic in your deposition?

Scott Morton - Redirect

A.      Yes, they are.

MR. HOCHSTADT:  Okay.  You can put that document off the screen.

Kim, can you pull up PDX-004, Slide 44, which is your substantial foreclosure chart from your direct examination?

Okay.

BY MR. HOCHSTADT:

Q.      Let's start with:  Professor Scott Morton, did you analyze -- crunch data to come up with this chart?

A.      Yes, I did.

Q.      What kind of data did you look at?

A.      Well, it's actually a lot of data because it's the formularies for each of these PBMs and sub-PBMs.  That is to say that the -- the main one and the custom ones.  And then also claims data that come from claims in the PCSK9 category in the marketplace so that we can see what spillovers are in the -- among the doctors in the community.

Q.      Okay.  You got asked a question about Humana Medicare August 2020.  And we heard from -- you were here in the courtroom when Ms. McCourt talked about how she had her new go-to-market low-cost strategy to go to the large insurers to get coverage.

Why did you include Humana Medicare on your foreclosure chart if before Regeneron controlled the

product, Repatha was exclusive there?

A.     Because when there isn't a cross-therapeutic bundle and the companies are competing head-to-head to try to sell their drugs, anybody could win.  It's a level playing field, and there isn't any foreclosure, because both have the perfect ability to go in, offer a low price, and win or not win.  So that's not a situation where we have any foreclosure.

And it doesn't matter whether it's Repatha winning.  I would still say there's no foreclosure.  Or Praluent winning, there's no foreclosure when the playing field is level.

Q.     And did you analyze, in this case, after Regeneron got the rights back in August of 2020, whether it tried to get into Humana and wasn't able to because of Amgen's strategy?

A.     Yes, I did.

Q.     And what did you find in the record?

A.     Well, I found that by August 2020 --

MR. LIVERSIDGE:  Your Honor, this is --

THE WITNESS:  -- Amgen had figured out --

THE COURT:  Stand by.  Counsel?

MR. LIVERSIDGE:  This is beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  Amgen had developed the

cross-therapeutic bundle and was, in fact, going to Humana and had made an internal plan that this was the way they were going to get Humana -- to continue to have Repatha be exclusive to Humana.  So it wasn't they weren't going to let Humana have the -- the price competition and choose freely. They were going to use the bundle to get Humana, again, to put Repatha on the formulary and exclude Praluent.

And having made that internal decision, the document that's quite important that I saw in the record is an email saying -- from Humana to -- sorry -- from Amgen to Humana saying, I need to telephone you about this -- about the contract.  I'm not going to write it down and send it to you in an email.

BY MR. HOCHSTADT:

Q.    And the jury heard already and saw a letter that Regeneron sent to Amgen, right, in August of 2020.

Was that around the time frame of that communication?

A.    Yes.  So four days before this communication saying, "I need to phone you to tell you about the contract," is the cease-and-desist letter from Regeneron to Amgen saying, "Stop using the cross-therapeutic bundle.  It's distorting competition.  It's anticompetitive."

So that arrives, and the plan to use the bundle on Humana has been determined internally at Amgen.  And then

thereafter, we get communication by phone, as far as I can tell.

Q.      And so do you include Humana Medicare at that point as a large insurer that's foreclosed to Regeneron because it's trying to get into Humana and can't because of this portfolio bundle strategy?

A.      Yes, that's correct.

Q.      Okay.  Let's just go to the end, because there was a lot of percentages and numbers thrown around.

But just to remind the jury, by January of last year, what's your expert opinion on how much of the market Praluent is foreclosed from?

A.      Eighty percent.

Q.      And sitting here today in May of 2025, is it higher than that?

A.      It's more because there's another PBM that has flipped to using Repatha exclusively, and so the cross-therapeutic bundle has now got really all the big PBMs.

Q.      Is that UnitedHealthcare Medicare?

A.      Yes.

            MR. HOCHSTADT:  Okay.  Kim, we can take that slide down.

            Thank you.

BY MR. HOCHSTADT:

Scott Morton - Redirect

Q.    Professor Scott Morton, for CVS Commercial Medicare -- for CVS Commercial and Medicare 2022 and 2023, when Regeneron still has the contract, but -- you talked about raising rivals' cost.

Can you explain to the jury how Regeneron, having to go even lower on its price in response to Amgen's strategy, is a harm to competition and Regeneron?

A.    Well, I think the easiest way to think about CVS is it happens kind of in slow motion.  The other contracts, there's a level playing field.  The cross-therapeutic bundle comes in and the PBM switches to Repatha.

In the case of CVS, Regeneron is desperate because the last big one that they -- they're about to lose, and they manage to hang on for one more year before the switch happens and the cross-therapeutic bundle gets CVS to move to Repatha.

So there's just this time when -- when the cross-therapeutic bundle is able to push Regeneron down to price equal cost.

Why is that a harm to competition?  Because that's not a sustainable contract.  That's not a contract that freely arises from a level playing field with everybody choosing what price they feel like offering and competing freely.

And it, in the end, causes Regeneron to exit

from that PBM. And the result of that is what I described before, less price competition with Repatha, higher prices, less choice. All the bad things that we get when we have a monopoly instead of competition.

Q.    And just to wrap up because there's been references to 1 of 1, and 1 of 2, and what Amgen's strategy was. As an economist, did Amgen's portfolio bundling strategy for 1 of 2 or better, parity that the jury's heard about, for Repatha coverage, have the economic effect of interfering with Regeneron's ability to compete for formulary coverage for Praluent?

A.    Yes, it did.

Q.    Why?

A.    Because it blocked Praluent from just offering a low price for the business of that PBM and that offering of a low price drives down prices and benefits end consumers. So it's just very harmful to drug prices in America, which are higher as a consequence of this strategy.

            MR. HOCHSTADT:  Thank you, Professor Scott Morton.

            THE COURT:  Thank you very much. You may step down.

            MS. FALK:  Your Honor, we're just preparing some video clips that will be shown.

            THE COURT:  That's fine.

MS. FALK:  My colleague will introduce it.

MS. WILLIAMS:  Good afternoon, Your Honor. Rachel Williams on behalf of Regeneron.  The parties intend to offer deposition testimony from Jay Witter, Associate Vice President of Zinc Health Services at CVS.

Regeneron is offering the following exhibits into evidence:  PTX-557 and PTX-952.

Amgen is offering the following exhibits into evidence:  DTX-1623, DTX-1629, DTX-1632, DTX-1626, DTX-1631 and DTX-1633.

THE COURT:  Any objection to that list?

MR. LIVERSIDGE:  No objection.

THE COURT:  They're all admitted.

(PTX Exhibit Nos. 557 and 952 were admitted into evidence.)

(DTX Exhibit Nos. 1623, 1629, 1632, 1626, 1631, and 1633 were admitted into evidence.)

MS. WILLIAMS:  May I approach?

THE COURT:  Yes.

MS. SPEARS:  May I approach as well, Your Honor?

THE COURT:  Yes.

MS. SPEARS:  Thank you.

(Beginning of videotape deposition of Mr. Witter.)

Q.    Could you please state your name for the record?

A.    Jay Witter.

Q.    And where are you currently employed?

A.    Zinc Health Services.

Q.    And is Zinc a subsidiary of CVS Health?

A.    Yes.

Q.    And what is your current position at Zinc?

A.    Executive director, trade relations.

Q.    In your role at Zinc, both as senior director and executive director, what responsibilities do you have, if any, for negotiating with pharmaceutical manufacturers?

A.    So my team negotiates the commercial -- negotiates contracts for the Commercial book of business.

Q.    How many Commercial formularies?

A.    Template formularies, I believe -- one, two -- two, four, five -- at this time or...

Q.    At this time.

A.    At this time?

      Yes, I believe there are five.

Q.    Okay.  And what do you mean by "custom formulary"?

A.    They're able to make their own formulary decisions.

Q.    So do I have the process correctly to describe that Zinc negotiates, presents the options to CVS Caremark, and then CVS Caremark makes its decisions about its formularies?

A.    Correct.

Q.    And then CVS Caremark presents those decisions about

its formularies to the custom plans?

A.    Yes, I believe they provide custom modeling.

Q.    Okay.  And the custom plans make their own decisions?

A.    Correct.

Q.    Okay.  And what does it mean for a product -- let me restate.

So at a high level, how would you describe the role that -- that Zinc plays in what patients pay for prescription drugs?

A.    So we lower the net cost to the downstream plans and PBMs.  Obviously, those net costs are -- are weighed in by those plans, when they're -- when they're calculating premiums and things of that nature.

Q.    So if a drug is not on a patient's benefit plan, then that patient would either have to get physician authorization or some other sort of authorization to get that drug or pay a higher cost.

Is that fair?

A.    That is fair.

Q.    How does Zinc begin its negotiations with pharmaceutical manufacturers?

A.    Generally, we have therapeutic category bids on an annual basis that are sent out to the manufacturers.  They are allowed about a month to respond to those RFPs, and we work through negotiation -- either negotiations at that

point in time or shortly thereafter.

We then take those in-house and we begin our modeling and present our modeling to CVS Caremark. And then from that point, they make their decisions and we contract all the rates that we receive offers on.

Q.    So, ultimately, the benefit of the rebate is meant to impact the patient, whether it's through lower premium or lower co-pay?

A.    Ultimately, yes.

Q.    So if Zinc is able to get the net costs down lower, that reduction in net cost is then relayed to a patient either through lower co-pay or lower premium?

A.    That's my -- my expectation.

Q.    What, if any, role does retail ID play as part of Zinc's negotiations, if you know?

A.    None.

Q.    Does Zinc typically push back on a pharmaceutical manufacturer's bid?

A.    Yes, absolutely. If there's various conditions to rebates that we don't agree with, if there's various parts of the contract that they're providing supplementals on, yes, we absolutely will push back.

Q.    Is autoimmune a competitive category?

A.    Yes.

Q.    So typically, RFPs go out April/May; is that fair?

A.      Yeah.  March, April, May.  Yeah.

Q.      Is that the same for an annual review process regardless of therapeutic class?

A.      Yes.

Q.      Okay.  So autoimmune, for example, the RFPs are going out at the same time as PCSK9?

A.      Correct.

Q.      Does Zinc even have a process in place to evaluate cross-therapeutic bundles?

A.      Yes.

Q.      And how would it determine net prices in each of the bundled therapeutic areas?

A.      The -- basically, the portfolio products -- and this is where -- where there is a definite distinction.  So the portfolio rates are not included.  So if they have a significant stand-alone rate, that's what we would consider a portfolio.

        Those rates would be included in the modeling, but the additional components, dependent upon the other pieces, would not be included in our modeling.

Q.      And when you say "portfolio rates," are you talking intra-therapeutic or cross-therapeutic?

A.      Yes, both.

Q.      Both.  Okay.

        How would Zinc consider additional value on a

second product as compared to the first products?

A.    Exactly the same.  We would model the actual rates.
The portfolio value is not part of the -- it is not part of
the conversation.

Q.    Okay.  Given that there's no backward pricing, does
that mean that a manufacturer of a product in a competitive
class would have to maintain or increase its rebate rate
offered year over year?

A.    Yes, they would.  Yeah.  Maintain or increase, yeah.
Unless there's extenuating circumstances for one reason or
another.

Q.    Okay.  Aside from extenuating circumstances, if the
manufacturer does not maintain or increase its rebate on a
product, then that bid is considered noncompliant and Zinc
won't consider it?

A.    Correct.

Q.    Does Enbrel have a patient base that would be costly
to move to another therapy?

A.    I don't believe it would be any more costly than any
other product in that category.

Q.    In Zinc's modeling, does Zinc believe it could
convert Otezla patients to other autoimmune products
quickly?

A.    Yes.

Q.    So in 2021, the PCSK9 class was up for review for the

2022 period, correct?

A.    Correct.

Q.    And that process was initiated by Zinc accepting an RFP to manufacturers?

A.    Correct.

Q.    Okay.  Typically, Zinc's agreements are for one-year deals?

A.    They're three-year agreements, but we bid everything out on an annual basis.

Q.    Okay.  Exhibit 8, for the record, is an email from Tanya Johnson to Joseph Stahl, Tyler Haertzen, and Jay.  The Bates number is ZINC0000011, and it's dated June 25th, 2021.

A.    Okay.

Q.    Mr. Witter, looking at this email, does it refresh your recollection that Ms. Johnson was the one to make the push to Amgen after the touch base that occurred the day before?

A.    Yes.

Q.    And at this point in time, Ms. Johnson was responsible for part of the Amgen relationship?

A.    Yes, for the PCSK9 category.

Q.    Okay.  So the day after the touch base meeting that we just discussed, you and others at Zinc received this email from Ms. Johnson describing her discussion with Amgen on their Repatha bid; right?

A.    Yes.

Q.    Ms. Johnson relayed that Amgen "enhanced their bid, but still significantly fall short on an exclusive strategy."

Do you see that?

A.    Yes.

Q.    And she then lays out the comparison between the Amgen offer and the Regeneron offer.

Do you see that?

A.    Yes.

Q.    And Zinc had an all-in -- a proposal for an all-in rebate of 64 percent from Regeneron if they enhance versus an all-in rebate of Amgen of 55 percent; correct?

A.    Correct.

Q.    So Ms. Johnson relays to Amgen that they need to be in the 70s to stay competitive.  Amgen never came back to Zinc with an all-in rebate for Repatha in the 70s; right?

A.    No, I do not believe so.

Q.    Exhibit 9 is an email and attachment from Mr. Witter, to Tyler Haertzen and Joseph Stahl, dated July 6th, 2021. The Bates number is ZINC0000186.

And in this email, you are forwarding, to Tyler and Joe, an attachment from Amgen; correct?

A.    Correct.

Q.    You forward the slides and you say, "Attached is the

portfolio offer from Amgen for 2022 to 2024."

Do you see that?

A.    Yes.

Q.    And what do you mean by "portfolio offer"?

A.    So, as we talked about earlier, so there was an incremental rebate on Enbrel if -- in this initial offer with Otezla and Repatha.  So you would see a 3, 4 and 5 percent rebate increase in the out-years, if that, if all of those products were on formulary.

Q.    So Amgen was offering enhanced Enbrel rebates based on coverage of Repatha on the CVS Caremark formularies?

A.    Correct.

Q.    Okay.  You wrote that in the last line of your email, "Amgen's estimated value of the offer is 200 million per year incremental."

Do you see that?

A.    Yes.

Q.    And that stand-alone rebate offer on Repatha was insufficient to beat Regeneron's offer on Praluent at that time; correct?

A.    Correct.

Q.    So the Enbrel portfolio rebate here is described as 3 percent rebate on Enbrel for '22, 4 percent for '23, and 5 percent in 2024; correct?

A.    Correct.

Q.     To your knowledge, is that where Amgen came up with the 200 million incremental value?

A.     The Repatha -- obviously, there are some enhancements, as well, on Repatha throughout the out-years so everything that --

              (Reporter clarification.)

              THE WITNESS:  Throughout the term here in the out-years, so at this point in time, it would have been '22, '23 and '24.  And the same for -- the same for Enbrel and the same for Otezla.  So there were increases on all three products outside of the portfolio.  So those would be taken into account as well.

Q.     Could you turn to the next page?

              It says, "Eligibility conditions."

              Amgen relayed to Zinc the conditions for the additional rebate on Enbrel; right?

A.     Yes.

Q.     And those conditions were that Enbrel and Otezla were in preferred status, that Repatha was maintained 1 of 2 or better, and that for the period of the portfolio, Zinc did not make a renegotiation request during the evaluation period; is that correct?

A.     Correct.

Q.     And the evaluation period, as listed on the prior page, is for 2022, 2023, and 2024; correct?

A.     Correct.

Q.     And typically, Zinc would be sending out annual reviews during each of those years; correct?

A.     Yes.

Q.     The condition that Repatha be maintained at 1 of 2 or better, that includes Repatha being 1 of 1 exclusive; right?

A.     It could, yes.

Q.     And then Zinc reached out to Amgen to request an Enbrel/Otezla-only offer?

A.     Correct.

Q.     And Amgen responded by offering an Enbrel/Otezla-only portfolio?

A.     Correct.

Q.     Ultimately, Zinc and the CVS Caremark formularies stayed with Praluent in exclusive position on formulary for 2022; correct?

A.     Correct.

Q.     Okay.  So in 2022, was the only viable option for PCSK9 formulary coverage either Repatha exclusive or Praluent exclusive?

A.     Yes.

Q.     What was your perception in 2020 in terms of Regeneron's aggressive effort to obtain exclusivity?

A.     Obviously, they were really very interested in getting into an exclusive position.  Amgen clearly had that

at that point in time, but were looking to provide

aggressive rates to provide that net cost savings to our

downstream -- to CVS' downstream.

Q.     During what time period were you concerned about

Praluent's failure to reach the market share targets that

CVS had for Praluent when it was selected as its 1 of 1 for

the Commercial formularies?

A.     It would have generally been about six months after

the change.  So it would have been starting around -- by the

time we hit data, it would have been in this early part of

2021.

Q.     And do you recall that concern continuing even into

2022 about Praluent's failure to hit market share targets?

A.     I know we were concerned that the market share

didn't -- wasn't being driven as well as we had hoped in the

market, yes.

Q.     And do you have an understanding as to why that

happened?

A.     A couple of reasons that I remember specifically.  I

remember there was an additional indication for Repatha.  It

was a smaller indication -- pardon me.  I don't remember the

name of that indication -- but it was a smaller indication

that I don't believe Praluent had at the time.  And that was

kind of the main issue that we really -- that we really came

up with, and then, you know, just as far as physician

preference.

Q.     What do you mean "just as far as physician preference"?

A.     There -- physicians were continuing to push for Repatha scripts, and they were getting through our -- they were getting through the CVS Caremark approval process.

Q.     And does it make Repatha a more attractive candidate for a 1 of 1 position on the Commercial formularies if physicians prefer it?

A.     So the question that you're asking me is:  Does it make it a better formulary choice if the physicians are writing it?

Q.     Yes.

A.     It would make a transition -- it would make a transition easier, yes.

Q.     And it's a -- potentially a reason why even a higher rebate for Praluent may not be as financially valuable as a lower rebate from Repatha if you assume that Repatha would have a higher share in a 1 to 1 position than Praluent would have; correct?

A.     That would be correct.

Q.     So, in general, Amgen was open to a parity position, giving physicians a choice as to whether they should prescribe Repatha or Praluent when Amgen was providing bids to CVS Commercial in 2021; correct?

A.    Their rates were obviously much, much closer.  So that would be -- that would be the expectation, yeah.

Q.    But it was really Regeneron and the 1 of 2 rate that made parity so economically difficult for CVS Commercial; correct?

A.    Yes, the loss of Regeneron rates could not be overcome by anything associated with an Amgen bid and market share movement.

Q.    The next document you can look at is Exhibit 7.

      Do you recall looking at this document earlier, Mr. Witter?

A.    I do, yes.

Q.    Could you turn to Slide 4 of the presentation?  It's ZINC0000426.

      Do you see that slide?

A.    Yes.

Q.    Could you please read the first bullet under "Praluent (Regeneron)"?

A.    "Regeneron aggressively pursuing exclusive status providing three points from 54% base in admin to 57% base in admin."

Q.    And was it correct that now, mirroring what it did in 2020, in June 2021, Regeneron was, again, aggressively pursuing exclusive status; correct?

A.    Yes, that is correct.

Q.    And, again, in 2021, Regeneron is offering much lower rates for parity as demonstrated in the next bullet; correct?

A.    Yes, that's correct.

Q.    So could you read that next bullet for me?

A.    "Regeneron 1 of 2 parity offer is 24% remaining unchanged."

Q.    And so, again, Regeneron is offering 30 per -- 30 percentage points difference between its 1 to 1 rebate and its 1 to 2 rebate, which makes it very hard for CVS Commercial to cover both products in parity position; correct?

A.    Correct.

Q.    Then up for Amgen in the second bullet, can you read the second dash under "Repatha (Amgen)"?

A.    "Enhanced exclusive rates by two points to 49 percent base in admin and 1 of 2 parity position by six points to 46 percent base in admin."

Q.    And so, again, we're seeing that Amgen only has a 3 percent difference between its 1 of 1 rate for Repatha and its 1 of 2 rate for Repatha; correct?

A.    Correct.

Q.    And that indicates that Amgen was very open to having both Repatha and Praluent on the CVS Commercial formularies in May 2021; correct?

A.    Yes.  Correct.

Q.    Mr. Witter, tell me when you've had a chance to take a look at this document.

A.    (Reviewing document.)  Okay.

Q.    But just to be clear, in this analysis that was provided on July 2, 2021, Zinc was not attributing any value to Enbrel or Otezla rebates when determining which rebates were better in connection with an evaluation of how to determine its PCSK9 placement on its formularies; correct?

A.    That is correct.

Q.    Or better; right?

And so that means that these extra Enbrel rebate -- portfolio rebates of 3 percent, 4 percent and 5 percent were available under this bid if Repatha and Praluent were both on the CVS Commercial formularies; correct?

A.    Yes.

Q.    And what were the competitive products that were going to create significant price pressure on Enbrel?

A.    All of the biosimilars that entered the market, one of which Amgen had.

Q.    Okay.  The biosimilars for Humira; right?

A.    Correct.

Q.    And Humira was also a significant competitor of Enbrel; right?

A.      Yes.

Q.      And that's why biosimilars of Humira could be expected to be significant competitors of Enbrel; right?

A.      Yes.

Q.      And, in fact, CVS has, at times, considered whether to take Enbrel off the formulary and shift share to Humira; correct?

A.      Yes.  CVS has looked at multiple different scenarios, removing any of the autoimmune products based off of this biosimilar entry.

Q.      I'll give you a second to look at this document.

        Do you recognize this document, Mr. Witter?

A.      Yes.

Q.      What is this document?

A.      This is my compilation of a response to the portfolio offer that was provided by Amgen.

Q.      So Otezla competed in a very competitive market?

A.      It did.

Q.      You can answer.

A.      It does.  There's 10 to 12 products at a minimum in this --

Q.      And that's true --

A.      -- in this indication.

Q.      That's true now, and it was true in 2021; right?

A.      Yes.

Q.    Welcome back, Mr. Witter.

        Do you recognize this document?

A.    Yes.

Q.    What is this document?

A.    This would be the 2022 modeling for the PCSK9 category.

Q.    It was modeling conducted in July of 2021 for a contract period in 2022; right?

A.    Correct.

Q.    And if you could look at the attachment and the modeling that was performed, what drug -- what rebates on which drugs are considered?

A.    Praluent and Repatha.

Q.    Okay.  And there's no analysis here of Enbrel rebates, or Otezla rebates or portfolio Enbrel rebates; correct?

A.    Correct.

Q.    And so at this point in time in July 2021, even though Amgen had provided a potent- -- you know, a potential bid with that Enbrel portfolio rebate, CVS was continuing to analyze Repatha and Praluent on a stand-alone basis without considering rebates offered on other drugs; correct?

A.    That's correct.

Q.    Okay.  Okay.  We can go to the next document.

        Do you recognize this document?

A.      Yes.   It's the revised offer for Enbrel and Otezla only.   And the Enbrel portfolio is only -- is only part of those two products.

Q.      So on July 6th, Amgen provided the other portfolio rebate offer.   And then only ten days later, Amgen is now providing what is referred to by Mr. Haertzen as an enhanced portfolio offer; correct?

A.      Correct.

Q.      And in this -- why don't you just tell me, in your own words -- I think you just described that the portfolio rebate for Enbrel is now only conditional on Enbrel and Otezla in this offer; correct?

A.      That's correct.

Q.      And so tell me, in your own words -- was this portfolio rebate, did it have any dependencies on Repatha?

A.      No, it did not any longer.

Q.      Okay.   So you only had an offer from Amgen with Enbrel value conditioned under Repatha coverage for ten days; right?

A.      Yes.

Q.      During this ten-day period, you're not aware of any efforts made by Zinc to pressure Regeneron to improve its rebate because of a portfolio rebate offer on Enbrel provided by Amgen; correct?

A.      Correct.

Q.    In fact, you're not aware of CVS or Zinc ever pressuring Regeneron to increase its rebates because of value provided on Enbrel or Otezla by Amgen; right?

A.    So our job is to pressure manufacturers every single day.  That's what we do to bring cost of the products down to our downstream clients.  So we were pressuring Regeneron to get enhanced rebates and discounts, but it was not based off of the Enbrel portfolio.

Q.    It was solely based on a head-to-head comparison of Repatha and Praluent; correct?

A.    Correct.  The same way we were pressuring Amgen to get better rates on Repatha.

Q.    And that was true in 2021; correct?

A.    Correct.

Q.    And that's true in 2022 as well; correct?

A.    Correct.

Q.    CVS and Zinc, they didn't make any efforts to pressure Regeneron to lower -- to -- sure -- CVS and Zinc did not, to your knowledge, make any efforts to pressure Regeneron to increase its Praluent rebates in 2022 because of value Amgen was offering on Enbrel or Otezla, whether portfolio rebate or otherwise; correct?

A.    I can only speak to Zinc, but, yes, I would agree.

Q.    Okay.  18.  So we can take a look at Exhibit 18 and see how the Enbrel portfolio rebate is the same; right, 3

percent, 4 percent, 5 percent?

That's what it was in Exhibit 9; right, 3 percent, 4 percent 5 percent?

A.    (Reviewing document.)  (Nods head up and down.)

Q.    Is that right?

A.    Yes.

Q.    And the base rebates for Enbrel are the same between the July 6th offer and the July 16th offer; right, 57 percent, 59 percent, and 61 percent in both offers; right?

A.    Yes.

Q.    And the base rate offers for Otezla are the same as well -- 41 percent, 42 percent, and 43 percent; correct?

A.    Yes.

Q.    And so that's -- that's what is in -- being conveyed in this -- in this email; right, that Amgen eliminated the Repatha conditionality, but CVS was still getting the same Otezla and Enbrel value without covering Repatha under this bid; right?

A.    Correct.

Q.    Zinc never contracted with Amgen for a portfolio rebate that -- that conditioned Enbrel or Otezla value on Repatha coverage; correct?

A.    Correct.

Q.    Not in 2020?

A.      Correct.

Q.      Not in 2021?

A.      Correct.

Q.      And not in 2022?

A.      Correct.

Q.      What is this document?

        It's Zinc 0000643.

A.      It's modeling for the 2023 formulary year.

Q.      Okay.  And is there an attachment with modeling in it?

A.      Yes.

Q.      And which -- which drugs are included in the attachment -- in the analysis in the attachment?

A.      Leqvio, Praluent, and Repatha.

Q.      And do you know approximately when Regeneron sent Zinc a notice of nonrenewal of the rebate contract for Praluent?

A.      Yeah, I'm -- I'm pretty sure it was the second half of December in 2022.

Q.      Okay.  What was your reaction to that?

A.      I was a little bit surprised since we'd been -- obviously been partnering with them for a -- for an extended period of time.  But clearly, we -- we got on the phone with them after that point in time to understand what was driving this because they had been our -- our preferred agent for,

at that point in time, you know, two-and-a-half years.

Yeah.

Q.    Okay.  Did Regeneron's nonrenewal of the rebate agreement cause Zinc to believe maybe Regeneron wasn't as reliable a partner as it thought?

A.    Yes.  Obviously, given the fact that we -- we'd had a partner for an extended period of time.

Q.    Okay.  So this was kind of their -- Regeneron's decision not to renew this contract kind of -- was a point against them in terms of future relationship.

       Is that fair?

A.    From a relationship perspective, obviously, yes, it was a hit, because we -- we weren't expecting it and didn't understand it.

Q.    So still, even now, in February 2023, Regeneron is not providing a competitive rate for parity coverage; correct?

A.    That's correct.

Q.    And so putting aside this document, your understanding is that in March of 2023, parity wasn't a good option for Caremark financially as a result of the failure of Regeneron to provide a competitive offer for parity position; correct?

A.    Yes, that's correct.

Q.    Ultimately, in -- ultimately, did Caremark or CVS

make the decision to switch from Praluent to Repatha as the 1 to 1 PCSK-- 1 to 1 -- 1 to 1 cover PCSK9 on its commercial formularies?

A.    Yes.  CVS Caremark made that decision for 7/1/2023.

Q.    Okay.  And neither Zinc nor CVS accepted any kind of portfolio offer conditioning a rebate on any drug other than Repatha when making that decision; correct?

A.    That's correct.

Q.    And, in fact, you're not -- well, in fact, you're not aware of any portfolio offer that was even made by Amgen in 2023 involving Repatha; correct?

A.    Correct.

(Conclusion of videotape deposition of Mr. Witter.)

MS. WILLIAMS:  The parties have one more deposition testimony to offer.  We intend to offer the deposition testimony of Joseph Anderson, Vice President of Caremark trade at CVS.  Regeneron is offering PTX-454 into evidence.  And Amgen is offering DTX-1831 and DTX-1145 into evidence.

MR. POLKES:  It's 20 minutes, Your Honor.

THE COURT:  Okay.  Very good.  Thank you.  Any objections to the exhibits?

MR. LIVERSIDGE:  No, Your Honor.

THE COURT:  All right.  They're admitted.

(PTX Exhibit No. 454 was admitted into evidence.)

(DTX Exhibit Nos. 1831 and 1145 was admitted into evidence.)

MS. WILLIAMS:  May I approach?

THE COURT:  Yes.

(Beginning of videotape deposition of Mr. Anderson.)

Q.    Could you please state your full name for the record?

A.    My name is Joseph Anderson.

Q.    Where are you currently employed?

A.    I work for CVS Caremark.

Q.    In the time you were VP Trade Relations Medicare, did you have negotiations with representatives from Amgen?

A.    Yes.

Q.    And how about with representatives from Regeneron?

A.    Yes.

Q.    Were those pertaining to the PCSK9 class?

A.    Among other topics, yes.

Q.    Okay.  Is the Commercial Government business treated separately from the Medicare business?

A.    Generally speaking, yes.

Q.    So what is the CVS Caremark relationship within CVS Health as it pertains to the Medicare Part D business?

A.    Well, CVS Caremark is the pharmacy benefit management

arm underneath the CVS Health enterprise.  There are two other large parts of the business:  Aetna, as an insurer, and then CVS retail pharmacy.

Within CVS Caremark, there are different pieces of the business that focus on different segments.  So CVS Caremark Part D Services, LLC, for example, is the contracting entity that my Medicare Part D team utilizes to negotiate and contract with pharmaceutical manufacturers for rebates.

Q.    So is it -- so regardless of whether it's affiliated or nonaffiliated, that doesn't change whether Caremark will pass through rebates or other discounts to that client?

A.    The terms of which Caremark would pass through rebates, price protection, or administrative fees would be subject to the terms of the agreements that Caremark had with the particular client.

As I testified earlier, in Medicare, it is very common for it to be 100 percent of the rebates, price protection, and administrative fees are shared with the clients, and are reported as DIR by the plans to CMS.

Q.    And could you just explain for the record what it means to negotiate a higher rebate on the drug?

What's the practical import of that?

A.    I mean, every year my team goes out and attempts to negotiate with manufacturers to lower the net pricing for

our clients.  So in some cases, we have discounts that may be negotiated with pharmaceutical manufacturers in each and every year.  And in a number of those instances, my team will attempt to negotiate even better discounts than the year before.

Q.    And who makes the ultimate decision as to product coverage on a Medicare Part D formulary?

A.    Well, it depends on which formulary you're referring to.  If it's a custom client's formulary, the custom client would make the ultimate decision on that formulary.

If the formulary is managed by Caremark, such as one of our Medicare template formularies, the Formulary Review Committee would be the deciding body of what changes to approve on the formulary, subject to the P&T Committee's approval.

Q.    If a manufacturer gives a bid that, for example, includes cross-therapeutic bundling, would that be considered noncompliant?

A.    We generally ask that manufacturers submit us a compliant bid as part of our process.  Manufacturers who feel challenged to make the offer that they desire compliantly are -- can submit what we would refer to as a supplemental offer.

Whether or not those offers are compliant or not depends on -- or we would consider them to be noncompliant

depends on a number of factors.

Q.    In this situation, if a manufacturer submits a bid that includes contingencies across therapeutic classes and that is their only bid -- that's not an alternative bid, that's their only bid -- is that considered noncompliant?

A.    Again, without reviewing a specific bid and the specific circumstances, it is difficult to say.

For example, that -- they may be submitting a bid that reflects something that may already have been agreed to in a contract before.  And in those circumstances, we -- we may or may not consider that to be compliant.

Q.    What happens to a bid that is noncompliant?

What's the next step?

A.    Generally speaking, we would provide some feedback to the manufacturer, either via a telephone call or a web meeting or an email, that lets them know that their bid was noncompliant or rejected.  We also have the ability to reject those bids within our -- our bid-centered platform.

Q.    Why is it in CVS' requirements that there should be no contingencies or negative impacts, no bundling?

Why -- why does CVS Caremark have that there, the Part D formulary?

A.    So that would be our preference for how manufacturers compete with their products.  Again, our -- our philosophy is that each manufacturers' product should stand on its own

and compete on its own merits.  And whether that be, you know, clinical, financial, or -- or other things, having these requirements contracted makes formulary modeling more complicated.  It makes -- this is making the process or the recommendation process more -- more complicated.  So it's our preference that manufacturers don't provide us offers with these dynamics.

Q.    Sure.

When CVS Caremark is evaluating formulary placement for its Medicare formularies, does it consider the placement on its commercial formularies in its analysis?

A.    No.

Q.    Exhibit 4, for the record, is an October 10th, 2019, email from Gary Loeber to Derica Rice, the Bates number Caremark_0001381.

Mr. Loeber writes at the top of his email that, "The Praluent Sanofi/Regeneron was the lowest net cost for the Med D Plan in 2020.  As such, Praluent will remain our exclusive agent in 2020 on the Med D formulary."

Do you see that?

A.    Yes.

Q.    Mr. Loeber continues on, "Amgen was only more competitive in their enhanced offer for a 1-2 listing position.  There was no appetite from the plan to list both products and attack more PCSK9 users."

Do you see that?

A.    I do.

Q.    Exhibit 5, for the record, is an email and attachment from Steven Hyde to Mr. Anderson, and Andrew Zanin, dated March 12th, 2021, the dates number REGN0100685.

Who is Andrew Zanin?

A.    Andrew Zanin is an employee of CVS Caremark that reports to me.

Q.    Did you have discussions with Mr. Hyde and Mr. O'Neal in this time period about Praluent formulary coverage?

A.    Yes.

Q.    Do you recall Mr. O'Neal asking you, in March 2021, if CVS Caremark's analysis on the PCSK9 category was being done on PCSK9 alone?

A.    I think I recall being asked that question around that time, yes.

Q.    Okay.  And what do you recall responding?

A.    My recollection is telling them that -- that, yes, the analysis we were doing on PCSK9s at the time was being based solely on PCSK9s.

Q.    At this March 2021 time frame, had Amgen presented a potential portfolio offer for Repatha that included an additional discount on Enbrel for the Part D formulary coverage?

A.    Can you describe what you mean by "presented"?

Q.      Sure.

Had anyone at Amgen relayed to you, or anyone else at CVS Caremark, that there was an offer to be had from Amgen for Repatha coverage that included an additional discount on Enbrel?

A.      I mean, at the time, we -- we never received an offer through our bid portal from Amgen that -- that contained an offer as you described.

Q.      Okay.  Understanding it may not have come through the bid portal, did you get that type of offer informally from Amgen, that there was an offer for Repatha coverage that included an additional discount on Enbrel?

A.      From my perspective, an offer from a manufacturer is something that is written down on a piece of paper and -- and has a signature to it, which is something that we can conduct formulary modeling on, if we -- if we so desire.

You know, based on my understanding of what an offer is from manufacturers, we -- we did not receive something to that effect from -- from Amgen at that time.

Q.      So that's a very long-winded way of saying that maybe it was discussed with you, but it wasn't put in writing; isn't that fair?

A.      I think it is fair to say that there were suggestions of a concept, but it was never formalized or modeled or given any consideration in our Medicare Part D process.

Q.     And how did those suggestions of a concept get relayed to you?

A.     Verbally or on a conference call is my recollection.

Q.     By whom?

A.     Tom Moore.  Or I think the gentleman's name was Andy, who worked in Amgen's pricing and contracting team.

Q.     Andy Chiu?

A.     Andy C. is my recollection, yes.

Q.     And what suggestion of a concept was relayed to you about Repatha coverage, including an additional discount on Enbrel?

A.     There was a suggestion that Amgen would be willing to provide some additional -- some additional rebates on -- on other products besides Repatha to help lower our plan's cost.

Q.     And what was the time frame of this conversation?

A.     I would say on or around February of 2021.

Q.     And what additional rebates -- what potential additional rebates were relayed to you on products besides Repatha?

A.     Again, we never received any sort of formal offer, so I can't speak to what potentially was offered.  There were suggestions of value at the time on other products.

Q.     What other products?

A.     Enbrel.

Q.    Was Otezla included?

A.    Not that I recall.

Q.    Do you recall the order of magnitude of suggestions of value on Enbrel?

A.    Relatively small from my perspective.

Q.    A couple percentage points?

A.    Less.

Q.    Had Amgen representatives made such a suggestion about a potential portfolio with Repatha and Enbrel previously?

A.    Previous to when?

Q.    To February 2021.

A.    I mean, maybe in the weeks leading up to it, but not previously in other rebate years.

Q.    Okay.  So looking for the 2022 time period?

A.    Correct.

Q.    Have they made offers or suggestions of concepts of offers for Enbrel and Repatha -- and Repatha since that February 2021 time period?

A.    No.

Q.    So when Mr. O'Neal asked you a month later if CVS' analysis was being done on PCSK9s alone and you said it wasn't -- it was, rather, that's after you had been given this potential Repatha/Enbrel concept from Amgen; right?

A.    It is after some of those suggestions had been made,

yes.

Q.    How did the suggestions of the Repatha/Enbrel concept impact the rates that CVS Caremark then sought from Regeneron for Praluent coverage on the Medicare Part D formularies?

A.    They didn't impact them, from my recollection.

Q.    You don't think that the rebate amounts went up in 2021?

A.    The -- did the rebate amounts go up in 2021 for 2022 or in --

Q.    Yeah, 2021 for 2022.

A.    They -- they did, but not for that reason.

Q.    So as of March 2021, the rebate rate here in this presentation in exhibit -- I've lost track -- 5 -- 5 is 55 percent.

            Do you see that, the exclusive rebate?

A.    On which page?

Q.    It's -- it says, "Exclusive Praluent position is the best-case scenario."  There's no page number on it.

A.    I see that.

Q.    Okay.  And after your meetings with Mr. Hyde and Mr. O'Neal in March 2021, Regeneron increased its rebate for exclusive coverage on Praluent on the Part D formularies; right?

A.    Yes.  My recollection is we -- we ultimately ended up

with a rate that was higher than 55 percent.

Q.    Do you recall in May 2021 having dinner in Minneapolis with Mr. Loeber, Mr. Moore, and Amgen's Jen Norton?

A.    Yes.

Q.    What, if anything, do you recall discussing at that dinner about CVS Caremark's preference for 1 of 1 over 1 of 2 coverage in the PCSK9 category?

A.    I -- I recall the dinner being largely focused around PCSK9s.  Amgen, at the time, was interested in increasing Repatha coverage on our formularies.  And I recall at the time, whether it was then or other periods, a lot of discussions around whether or not a -- an exclusive strategy or a parity strategy were more preferential than the other.

Q.    What do you recall about Amgen wanting to increase Repatha coverage on the CVS formularies?

A.    I -- I recall that it -- Amgen was motivated to -- to do so.

Q.    Do you recall why?  Or why Amgen told you they were motivated to do so?

A.    You know, my recollection from Amgen is that it was, while not a -- a significantly large brand for them, it was an important one to them for future growth, among other reasons.

Q.    Okay.  Do you recall you or Mr. Loeber making a

comment to Amgen about using -- just increasing their rebates and getting rid of their sales force to do so?

A.    I don't recall that statement specifically, but it wouldn't surprise me if that statement had been made at that dinner.

Q.    Why wouldn't it surprise you?

A.    As a PBM, we often think that manufacturers spend money unnecessarily on things like direct-to-consumer advertisements or unnecessarily large sales forces to call on doctors, and -- and we would much prefer that they take the money that they invest in those things and turn them into lower net costs for our clients.

Q.    At the end of 2022, Regeneron terminated its contract with CVS Caremark for Praluent coverage on the Part D formularies; right?

A.    Correct.

Q.    So after Regeneron terminated the CVS Part D formulary contract, what did you do as far as seeking formulary coverage -- or what did you do, rather, as far as negotiations with Amgen and Regeneron for PCSK9 formulary coverage?

A.    So although we received a notice of nonrenewal in December of 2022, our agreement with Regeneron was still in effect through calendar year 2023.

I recall shortly thereafter instructing my

Medicare Part D negotiation team to go out and try and secure a better rebate with Amgen, given we were in the midst of our 2024 negotiations at the time.

Q.    CVS Caremark ultimately decided to switch to Repatha exclusive for its Part D formularies; right?

A.    In 2024, yes.

Q.    Okay.  And why did CVS Caremark decide to go Repatha exclusive for Part D formulary coverage?

A.    Because Regeneron had terminated our agreement and we effectively had zero-percent rate offered on Praluent.

Q.    Was the Repatha rate, then, the lowest net cost rate in the class?

A.    As we modeled that against effectively zero-percent rebate on Praluent, yes, Repatha was the lowest net cost option.

Q.    I've introduced a document.

Do we have it before the witness?

What's the exhibit number?  7.

Okay.  It's CAREMARK2389.

Mr. Anderson, can you let us know once you've had a chance to review?

A.    Okay.

Q.    Do you recognize this document?

A.    I do.

Q.    What is it?

A.    This is a -- an email chain between Andrew Zanin and myself pertaining to our PCSK9 formulary model in Medicare Part D for 2022.

Q.    In this email, there is a reference to -- in this email, there's a reference to -- in this email, there is a reference to a 55-percent rebate for Praluent being offered by Regeneron; is that right?

            For 1 to 1 coverage?

            THE WITNESS:  That's correct.

Q.    Now, does that -- is it your recollection that at this time, late February 2021, both Amgen and Regeneron had offered 55-percent rebates for 1 to 1 -- 1 of 1 coverage for their PCSK9 inhibitor?

A.    My recollection at the time is Amgen had offered us 55 percent for 1 of 2 or better, but Regeneron had offered 55 percent for 1 of 1.

Q.    Okay.  And can you explain what you mean when you said the "three net is much better on Repatha"?

A.    The three net in this context would refer to the net cost to the plan.

Q.    Okay.  And why was the net cost to the plan better on Repatha than on Praluent, even though the rebate was the same in absolute terms?

A.    It could be for a variety of factors.  One is that the average cost per prescription is, on average, slightly

different, and I recall there being a slight difference here.

We -- we also look at how the member phases through the benefit, and some of that depends on other products they're taking.

So as -- as we ran this through our model, that was the result at that rate on a product-by-product basis.

Q.   Okay.  What did he mean when he said "65 percent on Praluent is needed for three net equivalence."

A.   In order for the net cost per prescription on Praluent to be the same as per prescription on Repatha, we would have needed 65 percent from Regeneron.

Q.   Okay.  So based on the 55-percent bids from both, you needed a little bit more from Regeneron on Praluent in terms of rebates in order for them to have the same ultimate net cost; correct?

A.   Correct.  Our -- our modeling suggested that Regeneron would need a higher rebate to have the same net cost on their product as Amgen's.

Q.   Specifically, 65 percent; right?

A.   That is what Andy's analysis here has suggested.

Q.   Did Regeneron make a serious bid for 1 of 2 coverage in February of 2021?

A.   No.

Q.   Could they have made a serious bid for 1 of 2

coverage instead of increasing their 1 of 1 bid?

A.      They could have.

Q.      But they decided not to do that; correct?

A.      Correct.

(Conclusion of videotape deposition of Mr. Anderson.)

THE COURT:  All right.  Thank you very much.

Ladies and gentlemen, that will conclude our trial presentation for today.  We'll see you back here tomorrow.

(Jury leaving the courtroom.)

THE COURT:  All right.  Please be seated.

So just so I have an idea, what are we looking at for tomorrow in terms of the presentation, if we know?

MR. POLKES:  We have one expert coming up first thing in the morning, Your Honor.  I'm telling my friends Gibson Dunn as well.  It's Heather Bates.

Who else is coming next?

MR. HOCHSTADT:  Divya Mathur will also testify.

MR. POLKES:  Divya Mathur, two experts.  And then I think Billy West is coming; right?

So Billy West, who is an Amgen employee, who we will be calling in our case.  Gibson Dunn will start just like we did with Mr. Gordon.

MR. DOREN:  Adam Grennan tomorrow.

MR. POLKES:  Is that good?

And Grennan.

THE COURT:  Okay.  Is that going to get us through the day?

MR. DOREN:  I think it ought to.

MR. POLKES:  I think it will, Judge, and we'll have more ready in case it doesn't.

THE COURT:  Okay.  All right.  Great.  So we're not turning it over tomorrow?

MR. POLKES:  No.

THE COURT:  Okay.  Got it.

Anybody have anything they want to say before we --

MR. STOCK:  Yes, Your Honor, on confidentiality.

THE COURT:  Yes.

MR. STOCK:  The CVS documents that we saw, there's been a request from CVS to protect them from disclosure.

In addition, several of them related to 2023 rebates, so just flagging for the record that we will be seeking redaction of those documents not reflecting comments that were stated publicly in the oral record.

THE COURT:  Okay.  Any objection from the other side regarding that?

MR. POLKES:  No.  Right.  No.  It's fine with

us.

THE COURT:  Okay.  That's fine.  So we'll consider them all admitted conditionally under seal, to the extent that they weren't shown in open court today, and then we'll get redacted versions from you-all.

MR. DOREN:  Just one random thought.  As I was listening to the last two witnesses talk about Zinc, CVS and Caremark, I'm wondering if some sort of agreed-upon statement to the jury to understand who each of those people were in terms of where they've been in those organizations.

THE COURT:  I'm happy to read whatever stipulated facts you-all stipulate to.  So why don't you work on that, and if you have it all printed out for me in the morning, that's fine.

MR. DOREN:  Thank you, Your Honor.

MR. POLKES:  Fine, Your Honor.

One last thing, Your Honor.  I was wondering if we could get an update on the chess clock so we know where we are.

THE COURT:  Yes.

MR. POLKES:  I'm scared to hear it, but...

THE COURT:  From my point of view, we're pushing through it pretty quickly.

MR. POLKES:  Yeah, good.

THE COURT:  This is subject to me confirming

Mr. Koehler's calculations later, if there's an objection, but right now, he has Regeneron at 10 hours, 29 minutes and Amgen at 7 hours, 56 minutes.

Does that sound wildly off to anyone?

MR. DOREN:  Sounds in the range, Your Honor.

THE COURT:  I think we were only about a minute off what you-all had calculated yesterday for yourselves, so...

Okay.  Anything else to address before tomorrow?

MR. DOREN:  No, Your Honor.

MR. POLKES:  No, Your Honor.

THE COURT:  Okay.  Very good.  Have a good night.

COURTROOM DEPUTY:  All rise.

(Court was adjourned at 5:00 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.  /s/ Heather M. Triozzi
                        Certified Merit and Real-Time Reporter
                        U.S. District Court