1                   IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4     REGENERON PHARMACEUTICALS,        )
      INC.,                             ) Volume VII
5                                       )
                     Plaintiff,         )
6                                       ) C.A. No. 22-697-JLH
      v.                                )
7                                       ) JURY TRIAL DEMANDED
      AMGEN, INC.,                      )
8                                       )
                     Defendant.         )
9

10                                      J. Caleb Boggs Courthouse
                                        844 North King Street
11                                      Wilmington, Delaware

12                                      Tuesday, May 13, 2025
                                        8:58 a.m.
13                                      Jury Trial

14
      BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.
15

16    APPEARANCES:

17              WILKS LAW FIRM
                BY:  DAVID E. WILKS, ESQUIRE
18
                          -and-
19
                ORRICK HERRINGTON & SUTCLIFFE
20              BY:  ERIC HOCHSTADT, ESQUIRE

21
                          -and-
22
                WHITE & CASE LLP
23              BY:  JONATHAN D. POLKES, ESQUIRE
                BY:  ADAM B. BANKS, ESQUIRE
24

25                        -and-

```
 1    APPEARANCES CONTINUED:

 2
                      WEIL GOTSHAL & MANGES LLP
 3                    BY:  JESSICA LYNN FALK, ESQUIRE

 4                                For the Plaintiff

 5
                      YOUNG CONAWAY STARGATT & TAYLOR, LLP
 6                    BY:  MELANIE K. SHARP, ESQUIRE

 7                              -and-

 8                    GIBSON DUNN & CRUTCHER LLP
                      BY:  ERIC STOCK, ESQUIRE
 9                    BY:  ASHLEY E. JOHNSON, ESQUIRE
                      BY:  COURTNEY L. SPEARS, ESQUIRE
10                    BY:  RICHARD J. DOREN, ESQUIRE
                      BY:  SAMUEL LIVERSIDGE, ESQUIRE
11                    BY:  BETTY X. YANG, ESQUIRE

12                                For the Defendant

13
                          ***  PROCEEDINGS  ***
14

15                    COURTROOM DEPUTY:  All rise.

16                    THE COURT:  All right.  Please be seated.

17                    Is there anything we need to address before we

18    bring the jury out?

19                    MS. FALK:  Your Honor, just a few changes to the

20    transcript.

21                    THE COURT:  Okay.  Do we need to put those on

22    the record?

23                    That's fine.  Okay.

24                    MS. FALK:  And thank you to both teams for

25    working together to identify these.  Just a couple of notes.
```

08:59:02  1              May 5th transcript, Volume II, Line [sic]

08:59:06  2      291:25, PTX-4243 should be PTX-1443.

08:59:13  3              Page 319, Line 1, DTX-59 should be DTX-1959.

08:59:21  4              Same volume still, 3 -- Page 345, Line 25,

08:59:27  5      PTX-4912 should be PTX-492.

08:59:31  6              And then going to Volume III, which was May 6th,

08:59:36  7      615:22 through 616:16, PTX-1004 should be PTX-1006.

08:59:44  8              Going to May 7th, Line 1015 -- Page 1015,

08:59:49  9      Line 20, DTX-623 should be DTX-1623.

08:59:54 10              May 8th, Line 10 -- Page 1090, Line 22, that

09:00:00 11      should be DTX-1403.

09:00:02 12              And then 1199:4 through 1200:2, DTX-381 should

09:00:09 13      be PTX-381.

09:00:10 14              Same volume, 1222:4, Exhibit 237 should be

09:00:16 15      Exhibit 273.

09:00:18 16              1222, Line 8, PTX-237 should be PTX-273.

09:00:23 17              And then from yesterday's volume, Volume VI,

09:00:29 18      Line 1489:14, PTX-72 should be PTX-725.

09:00:34 19              1610:20 through 23, DTX-1437 should read

09:00:40 20      DTX-1347.

09:00:42 21              Lines -- Page 1612, Lines 13 through 16,

09:00:47 22      DTX-1416 should read DTX-1417.

09:00:52 23              Then Page 1613, Line 24, DTX-1349 should read

09:00:58 24      DTX-1449.

09:01:01 25              And then 1641:17 through 20, DTX-116 should read

09:01:08 1    DTX-0160.

09:01:09 2                    Thank you.

09:01:11 3                    THE COURT:  Thank you.

09:01:12 4                    All right.  Anything else?

09:01:14 5                    MR. STOCK:  Good morning, Your Honor.

09:01:19 6                    THE COURT:  Good morning.

09:01:20 7                    MR. STOCK:  We're doing our best to try to keep

09:01:21 8    the catalog of the confidential documents that were

09:01:23 9    disclosed during the testimony.

09:01:25 10                   THE COURT:  That's great.  I appreciate it.

09:01:26 11                   MR. STOCK:  I can't promise there won't be more,

09:01:29 12   eventually, from the days that have passed.

09:01:33 13                   For contracts:  DTX-1006, DTX-160, DTX-858,

09:01:41 14   DTX-868, DTX-81, DTX-80, PTX-810.

09:01:49 15                   And there was confidential rebate information

09:01:52 16   put in documents DTX-1007, PTX-549, DTX-929, 942, and 924.

09:02:05 17   PTX-682 and 688.

09:02:08 18                   And there was a CVS document, which they

09:02:12 19   requested confidentiality, DTX-1152, DTX-2181, as well as

09:02:21 20   data that was submitted under the same procedure as --

09:02:24 21                   THE COURT:  All right.

09:02:25 22                   MR. STOCK:  -- prescriptions.

09:02:26 23                   THE COURT:  So all of these should be under

09:02:29 24   seal?

09:02:30 25                   MR. STOCK:  Correct.

Gaier - Direct

09:02:30  1                Thank you, Your Honor.

09:02:30  2                THE COURT:  Great.  Thank you.

09:02:33  3                Anything else?

09:02:34  4                All right.  Let's bring out the jury.

09:03:13  5                (Jury entering the courtroom.)

09:03:34  6                THE COURT:  Please be seated.  Welcome back,

09:03:37  7    ladies of the jury.

09:03:38  8                All right.  I believe we have a witness still on

09:03:40  9    the stand.

09:03:48 10                All right.  Dr. Gaier, I'll remind you you're

09:03:59 11    still under oath.

09:04:00 12                THE WITNESS:  Thank you, Your Honor.

09:04:01 13                MR. LIVERSIDGE:  Good morning, Your Honor.

09:04:01 14                THE COURT:  Good morning.

09:04:01 15                CONTINUED DIRECT EXAMINATION

09:04:01 16    BY MR. LIVERSIDGE:

09:04:03 17    Q.    Good morning, Dr. Gaier.

09:04:04 18    A.    Good morning.

09:04:05 19    Q.    When we ended yesterday, we were discussing your

09:04:07 20    below-cost pricing analysis at ESI Commercial.

09:04:11 21                And you had been discussing the test that you

09:04:14 22    ran involving Amgen's forecast.

09:04:18 23                Do you recall that?

09:04:18 24    A.    The projections, yes.

09:04:19 25    Q.    Yes.

Gaier - Direct

09:04:20  1              And you relied on those projections for your

09:04:23  2    analysis?

09:04:23  3    A.     Yes.

09:04:24  4              MR. LIVERSIDGE:  Your Honor, I'd move DTX-1033

09:04:27  5    into evidence.

09:04:29  6              MR. HOCHSTADT:  No objection.

09:04:30  7              THE COURT:  It's admitted.

09:04:31  8              (DTX Exhibit No. 1033 was admitted into

09:04:32  9    evidence.)

09:04:32 10    BY MR. LIVERSIDGE:

09:04:32 11    Q.     Let's turn to UHC Commercial.

09:04:35 12              Dr. Gaier, what conclusions have you reached

09:04:37 13    regarding UHC Commercial?

09:04:38 14    A.     I concluded also here that there was no foreclosure

09:04:42 15    of Praluent.  My bases are that the contract required only

09:04:48 16    parity coverage or better, that UHC testified that the

09:04:52 17    bundle did not affect their coverage decision.  And we also

09:04:57 18    heard testimony that the bundle applied only for one year

09:05:00 19    and then the Enbrel coverage was upgraded.  So the overlay

09:05:05 20    was no longer -- no longer relevant.

09:05:07 21    Q.     And did we hear testimony in the trial that supports

09:05:11 22    your conclusions?

09:05:11 23    A.     Yes.  We heard testimony along those lines supporting

09:05:15 24    those conclusions.  This is testimony from Mr. Grennan from

09:05:20 25    Amgen, and in the second Q and A, he's asked -- and I think

Gaier - Direct

09:05:25 1  he testified:

09:05:26 2          "The only requirement in order to be eligible

09:05:28 3  for that bundle was that Repatha had to be covered on the

09:05:31 4  formulary; is that right?

09:05:33 5          "ANSWER:  Correct.

09:05:34 6          "QUESTION:  Was it ever a condition of that

09:05:36 7  contract that UnitedHealthcare would only receive the bundle

09:05:41 8  rebate if it was covered Repatha 1 of 1?

09:05:43 9          "ANSWER:  No."

09:05:45 10          So he's explaining there that it was -- the

09:05:47 11  contract only required parity coverage.

09:05:53 12  Q.    Did you also see testimony indicating that UHC would

09:05:57 13  have covered Repatha without the Enbrel rebate?

09:05:59 14  A.    Yes.  The UnitedHealthcare representative was asked

09:06:06 15  that question.

09:06:07 16          "So going back, again, to the negotiations, if

09:06:12 17  we -- if -- would UHC have covered Repatha without the

09:06:14 18  Enbrel overlay?"

09:06:15 19          He says, "Yes.  Because that decision had -- was

09:06:18 20  made in March of -- March.  Before that -- any of those

09:06:22 21  negotiations had come to fruition, I realized -- realized

09:06:26 22  that we had re-evaluated it.  But because of the market

09:06:29 23  dynamics, we thought Repatha was likely going to be

09:06:32 24  difficult to manage against the preferred Praluent, so that

09:06:37 25  I felt that that was the direction -- the likely direction

Gaier - Direct

09:06:40 1    all along."

09:06:43 2    Q.    And did Professor Scott Morton offer any testimony at

09:06:46 3    trial that Amgen's portfolio contract at UHC Commercial was

09:06:51 4    below cost?

09:06:52 5    A.    No, sir.

09:06:54 6    Q.    All right.  Let's go on to Humana Part D and ESI

09:06:56 7    Part D.

09:06:57 8        What conclusions have you reached regarding

09:07:00 9    those PBMs?

09:07:01 10   A.    Well, as you, I think, noted in a question yesterday,

09:07:05 11   we haven't heard a lot about Humana Part D or ESI Part D in

09:07:10 12   this case.

09:07:12 13       But any case, when I -- when I looked at the

09:07:14 14   contracts and looked into it, I concluded that there was no

09:07:17 15   foreclosure.  Amgen never bundled Repatha at Humana Part D

09:07:22 16   or ESI Part D.  Amgen never offered Humana Part D a Repatha

09:07:28 17   bundle.  And ESI Part D rejected a bundled offer that

09:07:32 18   actually had been for a preferred brand tier placement, not

09:07:36 19   for exclusive coverage of Repatha.

09:07:40 20   Q.    Okay.  So let's -- let's go back to this chart,

09:07:45 21   Professor Scott Morton's direct foreclosure.

09:07:52 22       So based on everything that you've reviewed,

09:07:55 23   Dr. Gaier, what did you conclude about whether there was --

09:07:59 24   there's any foreclosure of Regeneron in this case?

09:08:02 25   A.    I looked at all these PBMs where Professor Scott

Gaier - Direct

09:08:06 1    Morton is claiming that there was direct foreclosure and I

09:08:09 2    concluded that with respect to none of them there -- in none

09:08:14 3    of them was Regeneron foreclosed.

09:08:20 4    Q.    And you stated it was your conclusion that there was

09:08:22 5    no foreclosure at Ascent/ESI Commercial.

09:08:26 6            Let me ask you:  If we were to assume that

09:08:29 7    Regeneron was foreclosed at Ascent/ESI Commercial, how much

09:08:34 8    of the market would be foreclosed?

09:08:36 9    A.    According to my calculations, only 7 percent would

09:08:43 10   have been foreclosed under that hypothetical.  Again, I

09:08:46 11   don't -- I don't agree with the hypothetical.  I don't think

09:08:49 12   that there was foreclosure at Ascent.  But if we assume that

09:08:52 13   there was foreclosure, Ascent national Commercial

09:08:55 14   formularies represent only about 7 percent of the PCSK9

09:08:59 15   alleged market.

09:09:01 16   Q.    And what does that mean with respect to 93 percent of

09:09:03 17   the market?

09:09:04 18   A.    Well, that shows that 93 percent is available, even

09:09:08 19   under an assumption that Regeneron was foreclosed from

09:09:14 20   Ascent national Commercial formulary.

09:09:15 21   Q.    And from an economic standpoint, would foreclosure

09:09:18 22   from 7 percent of the alleged market be sufficient to

09:09:22 23   foreclose competition?

09:09:23 24   A.    No.  Well, one of the requirements is that the

09:09:27 25   foreclosure has to be substantial enough that Regeneron was

Gaier - Direct

09:09:31 1    unable to compete at other -- at other PBMs.  So that's a

09:09:38 2    notion that we call, as economists, something called

09:09:40 3    substantial foreclosure.  I think you heard some of that

09:09:43 4    discussion in Professor Scott Morton's testimony as well.

09:09:48 5           Economists look at benchmarks for that.  They

09:09:51 6    talk about numbers like 40 percent, for example.  So you

09:09:54 7    would need to see foreclosure that's significant enough,

09:09:59 8    40 percent being a potential benchmark.  Seven percent,

09:10:02 9    obviously, is -- is nowhere near that.

09:10:05 10           But we also know when we look at the facts and

09:10:07 11   circumstances of this case that exclusion from one PBM is

09:10:16 12   not sufficient to injure competition.  And we know that

09:10:18 13   because Professor Scott Morton told us what healthy

09:10:21 14   competition looked like.  She told us what it looked like in

09:10:24 15   2020.  And during 2020, Repatha was excluded from all of the

09:10:31 16   CVS Commercial and Medicare formularies.  This is -- this is

09:10:35 17   her chart.

09:10:37 18           And, of course, Humana had excluded Praluent at

09:10:41 19   the time.  So we know -- this is something she called

09:10:43 20   healthy competition.  And it shows that even under healthy

09:10:47 21   competition, you know, a competitor could be excluded from

09:10:50 22   one or more formularies and still we would call it healthy

09:10:55 23   competition.

09:10:56 24   Q.   And so just so we understand, looking at her chart

09:10:59 25   from the summer of 2020 where she says there was healthy

Gaier - Direct

09:11:03 1    competition, Praluent was the only PCSK9 covered by CVS

09:11:10 2    Commercial and CVS Medicare; is that correct?

09:11:12 3    A.    Yes.

09:11:13 4    Q.    And so was Regeneron -- was Amgen, excuse me,

09:11:19 5    foreclosed from the market in that circumstance?

09:11:21 6    A.    No.  Professor Scott Morton and I, I think, agree

09:11:26 7    that there was healthy competition in 2020 despite the fact

09:11:31 8    that Repatha was excluded from CVS Commercial and CVS

09:11:37 9    Medicare.

09:11:37 10           And on the other hand, Praluent was excluded

09:11:40 11   from Humana Medicare.  That's just part of normal

09:11:43 12   competition, as I explained very early in my testimony, in

09:11:46 13   this market and in many pharmaceutical markets.

09:11:49 14   Q.    And back in 2020, did CVS Commercial and CVS Medicare

09:11:53 15   cover a larger portion of the market than Express Scripts

09:11:57 16   Commercial?

09:11:57 17   A.    Yes.  The combined CVS Commercial and CVS Medicare

09:12:02 18   would be larger than the Express Scripts Commercial.  That's

09:12:07 19   our 7-percent number that we looked at on the previous

09:12:10 20   chart.

09:12:10 21   Q.    So even when Amgen won 1 of 1 coverage at Express

09:12:15 22   Scripts Commercial, Regeneron's CVS coverage covered a

09:12:19 23   larger portion of the market; is that correct?

09:12:21 24   A.    Yes.

09:12:24 25   Q.    Dr. Gaier, do you recall the testimony from

Gaier - Direct

09:12:29  1    Mr. O'Neal yesterday here in court?

09:12:33  2    A.    Yes.

09:12:35  3    Q.    And do you recall him testifying that, although

09:12:40  4    Regeneron was given the opportunity to make parity bids at

09:12:45  5    these PBMs, they declined that opportunity?

09:12:49  6    A.    Yes, I remember him saying that.

09:12:52  7    Q.    Do you recall him testifying that Regeneron was not

09:12:54  8    interested in parity?

09:12:55  9    A.    I recall him saying some words to that effect.

09:12:59 10    Q.    And what do you draw from that testimony?

09:13:03 11    A.    Well, again, this gets back to my scientific method,

09:13:07 12    if you will, critique of Dr. Professor Scott Morton.  You

09:13:11 13    know, they could have offered parity coverage.  They could

09:13:15 14    have bid for parity coverage.  They could have -- you know,

09:13:18 15    according to those PBMs that were interested in those parity

09:13:22 16    bids, they could have been on those formularies.  And, in

09:13:24 17    fact, the contracts that we looked at at UnitedHealthcare,

09:13:27 18    for example, didn't require exclusive coverage of Repatha.

09:13:33 19    Even the offer at CVS didn't require exclusive coverage of

09:13:36 20    Repatha.

09:13:36 21            So we have the PBM saying through Regeneron, we

09:13:39 22    want you to bid for parity.  They chose not to.  Well,

09:13:42 23    that's their strategic decision.  That's their strategic

09:13:46 24    choice.  But it doesn't mean that they were foreclosed.

09:13:49 25    Q.    Now, Professor Scott Morton also showed this chart

Gaier - Direct

09:13:54 1    during her testimony.

09:13:55 2                Do you recall that?

09:13:55 3    A.      Yes.

09:13:57 4    Q.      Does this chart show substantial foreclosure?

09:14:00 5    A.      No.  Professor Scott Morton emphasized that by 2025,

09:14:06 6    Repatha had been excluded from all of the -- I'm sorry.

09:14:11 7    Praluent had been excluded from all of the major national

09:14:14 8    formularies, and that's true.  But, remember what I said

09:14:19 9    early in my testimony, which is evidence of exclusion does

09:14:24 10   not prove foreclosure because we need to go beyond that and

09:14:27 11   understand why they've been excluded.

09:14:31 12               And I think, you know, we've heard a lot of

09:14:33 13   testimony about their strategy choices.  We just talked

09:14:36 14   about one in terms of not bidding for parity coverage.  And

09:14:39 15   so you can't equate -- you can't simply observe that there's

09:14:43 16   been exclusion and conclude that it's because of

09:14:47 17   foreclosure.  You have to look at all the other factors that

09:14:50 18   I explained.

09:14:50 19   Q.      And if we go to our next chart, is this what you're

09:14:54 20   referring to?

09:14:54 21   A.      Yeah, this is just a summary.  I mean, there's other

09:14:56 22   factors, obviously, that I've discussed at some length.  But

09:15:00 23   in the summary fashion, you know, what does Professor Scott

09:15:04 24   Morton ignore when she's concluding that they were excluded

09:15:08 25   and that that exclusion is equal to foreclosure?  She's not

Gaier  -  Direct

09:15:12  1    recognizing that there was no bundle at CVS Commercial.

09:15:16  2    There was no bundle at CVS Medicare.

09:15:18  3              We've seen the testimony at Express Scripts that

09:15:21  4    Repatha had won the competition head-to-head for Express

09:15:26  5    Scripts Medicare.  We saw that there was no bundle.

09:15:29  6              For UnitedHealthcare, we've seen this, you know,

09:15:31  7    testimony numerous times that the bundle there required only

09:15:34  8    1 of 2 coverage.  For UnitedHealthcare Medicare, there was

09:15:39  9    no bundle.  And for Humana, there was also no bundle.

09:15:43 10              So that's just, you know, a very snapshot way of

09:15:47 11    saying what are the -- what are the primary factors that

09:15:50 12    Professor Scott Morton has ignored that I think explain why

09:15:53 13    they're excluded in the end?

09:15:55 14    Q.    Do you recall Professor Scott Morton testifying that

09:16:00 15    Praluent's current market share is around -- now around 10

09:16:05 16    percent?

09:16:05 17    A.    Yes, I heard that.

09:16:07 18    Q.    And does that show that Praluent has been foreclosed

09:16:11 19    from competing in the market?

09:16:13 20    A.    No.  I would say despite their low share -- and,

09:16:18 21    again, that's the result of it being excluded from the

09:16:22 22    formularies, not from being foreclosed -- they do have a

09:16:25 23    relatively low share.  But because they're not paying

09:16:30 24    rebates on the Repatha -- on the Praluent volume that goes

09:16:34 25    through these PBMs, their net sales are actually growing

1805

Gaier - Direct

09:16:38 1   during this period of time.  They grew from 130 million in

09:16:43 2   2022 to 182 million in 2023 to 241.7 million in 2024.

09:16:53 3           So they may be -- have a relatively small share

09:16:58 4   of the market in terms of volume and prescriptions, but

09:17:01 5   they're doing quite well and their profit margins are

09:17:05 6   healthy.  And their revenue is growing very nicely according

09:17:09 7   to this analysis.

09:17:10 8   Q.    And was 2024 their best year in terms of net sales in

09:17:14 9   their history?

09:17:14 10  A.    I think I heard Dr. Schleifer say exactly that.

09:17:17 11  Q.    And have you looked at what level of profit they have

09:17:20 12  in 2024?

09:17:22 13  A.    Yes.

09:17:22 14  Q.    And what is that?

09:17:23 15  A.    It was 119 million in operating income positive in

09:17:30 16  2024.  It was also positive in 2023.  And I can't remember

09:17:36 17  2022, if that was positive.  I think it's closer in 2022.

09:17:40 18          MR. LIVERSIDGE:  Your Honor, I'd move to admit

09:17:42 19  DTX-1748 and 1177.

09:17:46 20          MR. HOCHSTADT:  No objection.

09:17:47 21          THE COURT:  They're admitted.

09:17:48 22          (DTX Exhibit Nos. 1748 and 1177 were admitted

09:17:48 23  into evidence.)

09:17:48 24  BY MR. LIVERSIDGE:

09:17:49 25  Q.    Let's turn our attention to damages.  Your final

Gaier - Direct

09:17:52  1    conclusion is that Regeneron has not incurred any damages.

09:17:56  2         How did you reach that conclusion?

09:17:58  3    A.    Well, in the first instance, my opinion flows from my

09:18:03  4    analysis of foreclosure.  If there hasn't been foreclosure

09:18:07  5    and if Regeneron hasn't been foreclosed from the market,

09:18:10  6    then, you know, as a starting point, there should be no

09:18:12  7    damages.

09:18:14  8    Q.    Was there any other basis for your conclusion?

09:18:17  9    A.    Yes.  I understand that Dr. Stiroh, who I believe

09:18:20 10    will also testify, has concluded that there was also no harm

09:18:24 11    to competition.  So from the standpoint of the economics, if

09:18:28 12    you don't have either of these prongs, then there's no --

09:18:33 13    then there's no basis for damages in the -- you know, in

09:18:35 14    the -- viewed from the perspective of economics.

09:18:38 15    Q.    Let's take a quick look at the analysis of

09:18:43 16    Dr. Mathur, Regeneron's expert.  Do Dr. Mathur's damages

09:18:47 17    calculations depend on Professor Scott Morton's conclusions?

09:18:50 18    A.    Yes.  They depend on her conclusions about the degree

09:18:55 19    of foreclosure, the PBMs from which there was foreclosure

09:18:59 20    allegedly.  But they also -- her calculations depend upon

09:19:03 21    the prices and the rebate amounts that Professor Scott

09:19:07 22    Morton asserts would have prevailed if Amgen had not offered

09:19:12 23    bundles.

09:19:13 24    Q.    Okay.  Let's take a look at her calculations.

09:19:18 25         What amount of damages does she claim?

Gaier - Direct

09:19:20  1   A.      Well, she claims a range of damages from 85.2 million

09:19:26  2   to 135.6 million.

09:19:29  3   Q.      And why does she have a range?

09:19:32  4   A.      She has a range because she makes -- on the lower

09:19:36  5   end, she applies an adjustment for what she calls "operating

09:19:40  6   expenses."  And that's an acknowledgment that if Regeneron

09:19:44  7   had made more sales, if Regeneron had been more successful,

09:19:48  8   that there would have been additional costs associated with

09:19:51  9   that.  And so she -- on the low end of her range, she's

09:19:56 10   deducting $50 million of additional operating expenses,

09:20:02 11   which at least, in that scenario, she's acknowledging

09:20:07 12   Regeneron would have had, if they had had -- been more

09:20:09 13   successful.

09:20:10 14   Q.      And in your view, is that an appropriate amount for

09:20:13 15   the adjustment?

09:20:15 16   A.      I -- I look at it from this perspective:  The reason

09:20:22 17   that, in my view, Praluent hasn't been as successful, at

09:20:28 18   least from a market share standpoint, is because of the lack

09:20:30 19   of investment in marketing.  And they don't get the

09:20:33 20   pull-through and they don't generate the overall value for

09:20:36 21   the PBMs.  And we've seen a lot of testimony about that.

09:20:39 22   And I'm not going to dwell on it.

09:20:41 23           But $50 million is not enough to make those

09:20:45 24   kinds of investments.  And just for -- just for context,

09:20:50 25   Amgen invests about 350 to $400 million a year in marketing

1808

Gaier - Direct

09:20:56  1    to physicians.  And so $50 million over a multi-year period

09:21:01  2    is just, in my view, sort of woefully inadequate.  And I'm

09:21:05  3    not saying they would have invested as much as Amgen

09:21:08  4    invested necessarily, but $50 million is well short of

09:21:11  5    anything that would have been, I think, a more robust

09:21:14  6    strategy.

09:21:14  7    Q.    All right.  Let's take a quick look at some of the

09:21:19  8    percentages here that we see on the chart.

09:21:22  9          How much of Regeneron's claimed damages are from

09:21:25  10   CVS?

09:21:25  11   A.    It's almost exactly 75 percent.

09:21:29  12   Q.    All right.  And does Regeneron claim any damages

09:21:31  13   based on alleged foreclosure from CVS?

09:21:34  14   A.    No.

09:21:37  15   Q.    Well, if they're not claiming foreclosure, what's the

09:21:40  16   basis for the claim of damages?

09:21:41  17   A.    Their claim is that they had to offer lower prices,

09:21:49  18   offer higher rebates than they claim they would otherwise

09:21:52  19   have had to do.  In other words, that Amgen's bundled offer

09:21:56  20   to CVS Commercial caused them to have to offer lower prices

09:22:02  21   to CVS Commercial, for example, than they would have

09:22:06  22   otherwise had to do.

09:22:07  23   Q.    Well, we've heard a lot of testimony in this case

09:22:10  24   about Regeneron's strategy to bring about lower prices.

09:22:14  25         Is Regeneron claiming damages for being unable

Gaier - Direct

09:22:17  1  to charge higher prices?

09:22:19  2  A.    That's a good way to put it.  That's, I think,

09:22:22  3  exactly right.

09:22:22  4  Q.    All right.  Let's look at this chart from

09:22:26  5  Dr. Mathur's presentation.

09:22:28  6        What do we see here?

09:22:29  7  A.    These charts are extracted from Dr. Mathur's

09:22:34  8  presentation.  And in -- whether you look at the Commercial

09:22:38  9  side or whether you look at the Part D side, what it shows

09:22:41 10  is she's claiming that, with Amgen's strategy, they charge

09:22:47 11  $95 at Part D and $94 at Commercial.  But she's saying if

09:22:52 12  Amgen had not offered a bundle, then they would have been

09:22:56 13  able to charge $111 to Commercial and $133 to Part D.

09:23:02 14        So what this shows -- you know, per pen.  So

09:23:06 15  what this shows is that they're calculating damages.  She's

09:23:08 16  calculating damages based on higher prices at CVS, not lower

09:23:13 17  prices.

09:23:14 18  Q.    So Regeneron's position is it should have been able

09:23:19 19  to charge higher prices than it charged?

09:23:21 20  A.    And that's what her calculations are based on.

09:23:27 21  Q.    As an economist, how do you assess Regeneron's claim

09:23:29 22  that it was harmed because it couldn't charge higher prices?

09:23:32 23  A.    Well, remember the prong of my analysis, where I --

09:23:39 24  where I explained that one of the bases to conclude that

09:23:43 25  there are damages, that it has to be associated with a harm

1810

Gaier - Direct

09:23:46 1    to competition.

09:23:47 2              But if CVS is benefiting from what Amgen's

09:23:53 3    strategy purportedly did, then the damages that they're

09:23:57 4    asserting here don't flow from any harm to competition.

09:23:59 5    They're not associated with any harm to competition because

09:24:02 6    lower prices are better for CVS.  CVS is not suffering any

09:24:05 7    harm.  They're benefiting from it.

09:24:08 8              And, therefore, the damages that they're

09:24:11 9    asserting here don't flow from any harm to competition.

09:24:15 10   Q.    Did you hear Dr. Mathur testify that she assumed that

09:24:19 11   Regeneron could have won the business at CVS Part D with a

09:24:23 12   43-percent rebate rate?

09:24:24 13   A.    Yes, on Part D, she did say that.

09:24:27 14   Q.    And did Dr. Mathur indicate that she was relying on

09:24:31 15   Professor Scott Morton for purposes of that 43-percent rate?

09:24:35 16   A.    Yes, she did.

09:24:36 17   Q.    Did Professor Scott Morton say anything about the

09:24:40 18   43-percent rate in her testimony?

09:24:41 19   A.    No, not that I heard.

09:24:45 20   Q.    And as an economist, is it reasonable to assume that,

09:24:49 21   absent Amgen's alleged offer of a bundle, Regeneron would

09:24:53 22   have had a 43-percent rebate rate at CVS Part D throughout

09:24:58 23   all of 2022 and 2023?

09:25:00 24   A.    No, because we know that both Amgen and Regeneron

09:25:07 25   made standalone offers at 55-percent rebates.  So the

Gaier - Direct

09:25:13  1    43 percent would -- would not have continued.  I mean,

09:25:17  2    irrespective of whether Amgen made a bundled offer or not,

09:25:21  3    we see that Amgen did, in a standalone basis, 55-percent

09:25:26  4    rebate for Repatha on February 5th of 2021.  And on

09:25:31  5    March 12th, Regeneron bid 55 percent.  That can't be

09:25:36  6    associated -- you know, that's a matching bid on a

09:25:38  7    head-to-head basis.

09:25:39  8            Now, ultimately, CVS asked Regeneron to go even

09:25:44  9    further to get to the 61 percent.  I think they actually

09:25:48 10    asked for 65, but Regeneron went to 61 percent.  But in any

09:25:52 11    case, it's totally unreliable, in my view, to assert that

09:25:57 12    the 43-percent rebate would have been -- would have been the

09:26:01 13    price that would have prevailed during this multi-year

09:26:05 14    period when we see standalone offers at 55 percent.

09:26:09 15    Q.    And when you say a "standalone" offer, do you mean a

09:26:12 16    head-to-head offer, Repatha versus Praluent?

09:26:15 17    A.    Yes.

09:26:21 18    Q.    In your opinion, is there any basis for Regeneron's

09:26:25 19    claim of damages at CVS, either CVS Commercial or CVS

09:26:29 20    Part D?

09:26:29 21    A.    No.  For the reasons I've explained, there's no basis

09:26:33 22    for damages.

09:26:34 23    Q.    And how would removing CVS from the -- this chart

09:26:38 24    reduce Regeneron's claimed damages?

09:26:41 25    A.    Well, I removed that 70 -- it removed 75 percent of

Gaier - Direct

09:26:46 1    the damages, and what we're left with then is a range from

09:26:49 2    zero to 33.9 million.

09:26:53 3    Q.      All right.  And we're left with UHC/Optum Commercial

09:26:58 4    and Express Scripts Commercial.

09:27:00 5            Is there any basis, in your opinion, for

09:27:03 6    Regeneron's claim of damages at UHC/Optum Commercial?

09:27:08 7    A.      No, and I've spent some time explaining my basis for

09:27:11 8    the fact that there was no foreclosure.  And that if there's

09:27:14 9    no foreclosure at Optum, then there should be no damages.

09:27:18 10   Q.      And how does removing damages at UHC/Optum Commercial

09:27:22 11   affect Dr. Mathur's damages calculations?

09:27:25 12   A.      That the range would be reduced to zero to

09:27:30 13   18.5 million, and we would be left with damages that are

09:27:35 14   associated with Express Scripts.

09:27:38 15   Q.      Okay.  And so the 18.5 million is the damage claim

09:27:41 16   for Ascent/ESI Commercial?

09:27:43 17   A.      Right.  And that's 13 percent, 13.6 percent of her

09:27:49 18   original damage estimates.

09:27:50 19   Q.      In your opinion, is there any basis for Regeneron's

09:27:55 20   claim of damages at Ascent/ESI Commercial?

09:27:58 21   A.      No, again, for the reasons that I've already

09:28:00 22   explained, I don't believe that there was any foreclosure at

09:28:04 23   ESI Commercial.  Even if you were to accept that there was

09:28:09 24   foreclosure at ESI, there would still not, in my opinion, be

09:28:13 25   foreclosure from the market.  And so we wouldn't be

Gaier - Cross

09:28:16  1   satisfying that prong of what an economist would say would

09:28:19  2   be required in order to have damages.  So I don't think

09:28:23  3   there's basis for damages at Express Scripts Commercial,

09:28:27  4   either.

09:28:27  5   Q.    In sum, what's your conclusion regarding whether

09:28:30  6   Regeneron has incurred damages?

09:28:32  7   A.    Well, it's on the screen.  There wouldn't be any

09:28:35  8   damages.

09:28:37  9         MR. LIVERSIDGE:  All right.  Thank you,

09:28:39 10   Dr. Gaier.  Pass the witness.

09:28:40 11         THE COURT:  Thank you.

09:28:54 12         MR. HOCHSTADT:  With the Court's permission, I'd

09:28:56 13   ask my colleague, Matt Tonglet, to pass out the witness

09:28:59 14   binders.

09:29:00 15         THE COURT:  That's fine.  You may approach.

09:29:25 16         THE WITNESS:  Thank you.

09:29:31 17         MR. HOCHSTADT:  Thanks, Matt.

09:29:34 18                   CROSS-EXAMINATION

09:29:34 19   BY MR. HOCHSTADT:

09:29:36 20   Q.    Morning, Dr. Gaier.

09:29:37 21   A.    Morning, Mr. Hochstadt.

09:29:39 22   Q.    Okay.  I want to back up a little bit for this jury.

09:29:41 23   Okay?  And I want to ask you about a really important fact

09:29:44 24   that you have left out that this jury should know when

09:29:48 25   considering your testimony.

Gaier - Cross

09:29:50  1          This is not the first time that you've worked

09:29:52  2    for Amgen.  It's not the second time that you worked for

09:29:56  3    Amgen.  It's not the third, not the fourth, not the fifth.

09:29:59  4          It's the sixth time you've worked for Amgen;

09:30:02  5    right?

09:30:02  6    A.     In different capacities, yes.

09:30:03  7    Q.     Let's talk about a couple of those capacities.

09:30:05  8    A.     Okay.

09:30:06  9    Q.     The most recent matter was you helped Amgen acquire

09:30:09 10    another company with blockbuster drugs for $28 billion;

09:30:13 11    right?

09:30:13 12    A.     I wouldn't put it that way.  I was consulting with

09:30:16 13    them on their acquisition of Horizon.

09:30:21 14    Q.     Another case that you worked on for Amgen beforehand

09:30:24 15    was the patent case between the parties that the jury has

09:30:27 16    heard about; right?

09:30:28 17    A.     Again, in a consulting role, I did, yes.

09:30:31 18    Q.     So when Amgen has a competition issue, like in this

09:30:35 19    courthouse, you're their go-to expert; right?

09:30:37 20    A.     You would have to ask them.

09:30:40 21    Q.     Okay.  And besides the six times that you've worked

09:30:45 22    for Amgen, other experts at your consulting firm have worked

09:30:49 23    for Amgen; right?

09:30:50 24    A.     Yes, I believe that's correct.

09:30:54 25    Q.     Now, you said you were compensated by Amgen.  You're

Gaier - Cross

09:30:57  1    charging $1,350 per hour.  Now, just sitting here in this
09:31:02  2    courtroom like this jury for the past five days, you've
09:31:05  3    charged over $40,000; right?
09:31:08  4    A.    Well, my current rate is actually 1,500.
09:31:12  5    Q.    I underestimated.  I'm sorry about that.
09:31:15  6    A.    So...
09:31:15  7    Q.    Okay.
09:31:16  8    A.    I charge for my time.  My firm charges for my time.
09:31:19  9    That's correct.
09:31:19 10    Q.    Okay.  And other than you, you have a team of
09:31:22 11    economists that you're working with that are charging for
09:31:24 12    your time; right?
09:31:25 13    A.    Yes, sir.
09:31:25 14    Q.    Okay.  And you are a founding member of Bates White.
09:31:28 15    You're on the Board of Directors.  You're on the Executive
09:31:31 16    Committee.
09:31:31 17          Can you turn to this jury and tell them how many
09:31:34 18    millions of dollars Amgen has paid your firm over the years?
09:31:37 19    A.    I really don't know how much it's been.
09:31:39 20    Q.    $50 million?
09:31:40 21    A.    I'm sorry?
09:31:41 22    Q.    $50 million?
09:31:42 23    A.    15 or 50?
09:31:43 24    Q.    5-0, sir.
09:31:44 25    A.    Absolutely not.

Gaier - Cross

09:31:45  1    Q.    A hundred million?

09:31:46  2    A.    Sorry, less than 50 million.

09:31:49  3    Q.    You can't tell the jury how many millions of dollars?

09:31:51  4    A.    I don't know how much it is, but I'd be shocked if it

09:31:54  5    was that much.  It's not on that order at all.

09:31:56  6    Q.    Okay.  Turning to this case, defending Amgen has been

09:31:59  7    good for business at Bates White.  You're advertising the

09:32:04  8    fact, before you've even gotten on the stand in this case,

09:32:07  9    before there's ever been a resolution by this jury, your

09:32:10 10    firm is advertising your work in this case; right?

09:32:13 11    A.    I wasn't aware of that.

09:32:14 12    Q.    You weren't?

09:32:15 13    A.    No.

09:32:15 14    Q.    All right.  Why don't you turn to -- well, let me

09:32:18 15    just see.

09:32:19 16          You know Bates White has a LinkedIn account;

09:32:21 17    right?

09:32:21 18    A.    Yeah, I hope -- I think they do.

09:32:22 19    Q.    You hope they do; right?

09:32:23 20    A.    Yeah.

09:32:24 21    Q.    Okay.  Why don't you look at Tab 1 of your binder.

09:32:31 22          That's a picture of you; right, Dr. Gaier?

09:32:33 23    A.    Yes.

09:32:34 24    Q.    Okay.  And next to that picture, it says, "Partner

09:32:38 25    analyzes alleged foreclosure from PBM formulary coverage due

Gaier - Cross

09:32:43  1    to bundled drug rebates."

09:32:45  2              Do you see that?

09:32:45  3    A.    Yes.

09:32:45  4    Q.    That's this case that you're testifying in right now;

09:32:48  5    right?

09:32:48  6    A.    Yes.  I didn't disclose the parties or -- no, but I

09:32:50  7    am talking -- they are talking about this case.

09:32:53  8    Q.    Right.  And your firm pushed this out on LinkedIn to

09:32:56  9    12,056 followers nine months ago; right?

09:32:59 10    A.    If you say so.  I see that.

09:33:01 11    Q.    Sir, you are the founding member of this firm.  You

09:33:03 12    are on the board.

09:33:04 13              You don't know?

09:33:05 14    A.    I'm a founding member, and in -- getting into the

09:33:11 15    details of our LinkedIn account, I certainly don't manage

09:33:13 16    that.

09:33:14 17    Q.    Okay.  Let's turn a little bit to this case.  Okay.

09:33:19 18              One thing you said you do agree with Professor

09:33:21 19    Scott Morton about is the scientific method; right?

09:33:24 20    A.    Yes.

09:33:24 21    Q.    You shouldn't ignore evidence; right?

09:33:26 22    A.    You shouldn't ignore alternative explanations for

09:33:29 23    that which you've concluded has happened.

09:33:31 24    Q.    All right.  So let's talk about Dupixent.  Okay?

09:33:34 25              One of the things that Amgen wanted you to say

Gaier - Cross

09:33:38 1    in this case is that Regeneron could form its own portfolio

09:33:42 2    bundle with Dupixent.  But the jury has heard from

09:33:45 3    Dr. Schleifer, Marion McCourt and Richard O'Neal that Sanofi

09:33:51 4    controls Dupixent negotiations with the big insurers.  And

09:33:54 5    putting aside that they wouldn't do it, because they believe

09:33:57 6    it hurts competition, they have all said in court that they

09:34:01 7    couldn't do it.

09:34:02 8         But you're here saying they could do it; right?

09:34:04 9    A.    I -- okay.  So there's a lot to unpack in your

09:34:07 10   question.  It's a very lengthy question.  Amgen has not

09:34:11 11   asked me to take that opinion, as your question implied.  I

09:34:15 12   do my own economic analysis.  I look at what the factors are

09:34:19 13   that are relevant for me to consider.

09:34:21 14        And, yes, I came to the conclusion, not as you

09:34:24 15   said that they could do it, but that they had the financial

09:34:26 16   wherewithal to do it.

09:34:28 17   Q.    Well, let's talk, Dr. Gaier.

09:34:31 18        You were not aware that Amgen's own executives

09:34:37 19   knew that Regeneron couldn't do this; right?

09:34:39 20   A.    I don't know what you're talking about.

09:34:43 21   Q.    All right.  You don't?

09:34:44 22        MR. HOCHSTADT:  Okay.  So I'm going to ask

09:34:46 23   the -- my colleague, Kim Wu, to pull up PTX-1005, which is

09:34:52 24   already in evidence.

09:34:52 25   BY MR. HOCHSTADT:

Gaier - Cross

09:34:55  1   Q.    Dr. Gaier, you have the full document in your binder,

09:34:57  2   but I'm going to ask my colleague to pull up Slide Number 4.

09:35:02  3          So you've been sitting here in this courtroom so

09:35:10  4   you've seen this slide.  You were here last week when this

09:35:12  5   came up on the screen; right?

09:35:14  6   A.    Yes.  It was actually a challenge to see from where I

09:35:16  7   was seated, but, yes, I'm familiar with this.

09:35:18  8   Q.    Okay.  This is August 2020, right, after Amgen learns

09:35:22  9   about a loss at CVS Commercial and needs to come up with

09:35:26 10   response strategies, and they have a whole meeting about

09:35:28 11   Regeneron.

09:35:29 12          You recall that; right?

09:35:29 13   A.    I do recall that testimony about that.

09:35:31 14   Q.    All right.

09:35:32 15          MR. HOCHSTADT:  So I'm going to ask my

09:35:33 16   colleague, Kim Wu, to turn to Slide 16.

09:35:33 17   BY MR. HOCHSTADT:

09:35:39 18   Q.    Dr. Gaier, do you see on the left-hand side of this

09:35:43 19   column where Amgen is trying to plot out Regeneron next

09:35:46 20   moves?

09:35:47 21          That's the left side of this column.

09:35:50 22          MR. HOCHSTADT:  Kim, if we can highlight that.

09:35:51 23          THE WITNESS:  Yes.  Yes, I see that.

09:35:52 24   BY MR. HOCHSTADT:

09:35:52 25   Q.    And you see on the right side, it says, "Likelihood

Gaier - Cross

09:35:56 1   of attempt (high, medium and low)."

09:35:59 2            You see that?

09:35:59 3   A.     Yes.

09:36:00 4   Q.     Okay.  And if we go down the column to third up from

09:36:03 5   the bottom, "Portfolio offers (Dupixent)."

09:36:06 6            You see that?

09:36:07 7   A.     I see it.

09:36:07 8   Q.     Amgen's own executives assigned a low likelihood of

09:36:11 9   attempt to that portfolio bundle because it requires

09:36:15 10  Sanofi's alignment.

09:36:16 11           You see that?

09:36:16 12  A.     That's what it says.

09:36:18 13  Q.     You can put that document aside.

09:36:19 14           Let's look at the consulting document that you

09:36:26 15  told the jury about, and you said that that consultant

09:36:31 16  recommended to Regeneron that -- a portfolio bundle with

09:36:34 17  Dupixent.

09:36:35 18           You remember that?

09:36:35 19  A.     The EVERSANA document?

09:36:37 20  Q.     The EVERSANA document.

09:36:39 21  A.     That's right.

09:36:39 22  Q.     But I'm going to show the jury a slide that you

09:36:42 23  didn't put in your -- the three demonstratives that you

09:36:43 24  devoted to that -- that consulting deck, I'm going to show

09:36:46 25  them a different slide.

Gaier - Cross

09:36:47 1    A.      Okay.

09:36:47 2                    MR. HOCHSTADT:  So if we can publish DTX-1403,

09:36:51 3    Page 24.

09:36:51 4    BY MR. HOCHSTADT:

09:36:59 5    Q.      And if we look at Option 2, Dupixent, Praluent --

09:37:04 6    A.      I'm sorry.  Just give me a minute here.

09:37:06 7    Q.      Sure.  It's also up on the screen.

09:37:08 8    A.      Okay.  Go ahead with your question.  I may need a

09:37:10 9    moment after your question.

09:37:11 10   Q.      I'm just going to ask you if you see this?

09:37:14 11                   You see Option 2; right?

09:37:15 12                   Dupixent, Praluent, that's what you've been

09:37:17 13   testifying about here yesterday and today; right?

09:37:19 14   A.      Yes, sir.

09:37:19 15   Q.      Okay.  And if we go down to the bottom row, that's

09:37:23 16   called "Overall Assessment."

09:37:26 17                   Do you see that?

09:37:26 18   A.      Yes.

09:37:27 19   Q.      Okay.  And if we go to Option 2, it says, "Only

09:37:29 20   attractive to payers if significant rebates on Dupixent."

09:37:33 21                   And then there's a little pie chart and we've

09:37:36 22   seen a bunch of pie charts in this case.  And the legend

09:37:40 23   explains that the consultant told Regeneron that "this was

09:37:43 24   the least attractive option."

09:37:45 25                   You see that, sir?

Gaier - Cross

09:37:48    1            Do you see that?

09:37:48    2            That is my question.

09:37:49    3    A.      That's what the legend says.

09:37:50    4    Q.      Okay.  You can put the document down.

09:37:53    5            All right.  Another assignment Amgen gave you

09:38:00    6    was to look at the contracts, which you say are the sources

09:38:03    7    of truth, to see if the portfolio bundles with the mega

09:38:10    8    account insurers foreclosed Regeneron.

09:38:13    9            But one of the things that you ignored was that

09:38:15   10    the goal of Amgen's entire strategy was to foreclose

09:38:19   11    Regeneron; right?

09:38:20   12    A.      No.  I don't think that's right.

09:38:23   13    Q.      Well, let's take a look at a document that you cited

09:38:25   14    in your expert report.

09:38:28   15            MR. HOCHSTADT:  Ms. Wu, would you please publish

09:38:31   16    Number 3 in the demonstrative, PDX -- PDX-5 -- one before

09:38:40   17    that, Kim.  Okay.

09:38:43   18            THE WITNESS:  I'm sorry.  Is this in my binder?

09:38:45   19    BY MR. HOCHSTADT:

09:38:45   20    Q.      It's not in your binder.  It's a screenshot of your

09:38:48   21    materials considered.

09:38:48   22            You're familiar with that; right?

09:38:49   23    A.      Yes, sir.

09:38:50   24    Q.      You put your report together and you disclosed, to me

09:38:52   25    and others, the materials you relied on; right?

Gaier - Cross

09:38:55  1    A.    Yes, sir.

09:38:55  2    Q.    Okay.  And one of those, right, was this UHG

09:39:01  3    Document 6941; right?

09:39:02  4    A.    Yes, sir.

09:39:03  5    Q.    And so we're all clear, that means you relied on this

09:39:05  6    document?

09:39:06  7    A.    Yes, sir.

09:39:07  8    Q.    Okay.  I just want you to first turn to Tab PTX-270

09:39:14  9    in your binder.

09:39:16 10    A.    Yes, sir.

09:39:16 11    Q.    Would you agree with me that PTX-270 in your binder

09:39:23 12    is UHG6941, has the same little label on the right side?

09:39:27 13    A.    Yes, sir.

09:39:28 14    Q.    Okay.

09:39:28 15            MR. HOCHSTADT:  Your Honor, at this time, I move

09:39:29 16    that document into evidence.

09:39:36 17            MR. LIVERSIDGE:  Is this one on your exhibit

09:39:38 18    list?

09:39:39 19            MR. HOCHSTADT:  It is.

09:39:40 20            MR. LIVERSIDGE:  No objection.

09:39:40 21            THE COURT:  It's admitted.

09:39:40 22            (PTX Exhibit No. 270 was admitted into

09:39:42 23    evidence.)

09:39:42 24            MR. HOCHSTADT:  And the witness relied on it, he

09:39:44 25    just said it.

Gaier - Cross

09:39:45  1          All right.  Ms. Wu, can you please pull up that

09:39:48  2  document?  And, Ms. Wu, if you can go to the bottom email on

09:39:57  3  the string.  We've highlighted it here on the demonstrative.

09:39:59  4  So I want to set this up.

09:39:59  5  BY MR. HOCHSTADT:

09:40:01  6  Q.    This says May 13th, 2020; right?

09:40:05  7          You see that date?

09:40:06  8  A.    Yes, I see some emails are May -- some emails are May

09:40:11  9  13th --

09:40:11 10  Q.    I'm focused just on the one on the screen, Dr. Gaier.

09:40:13 11  A.    Okay.  I see where it is.  Yeah.

09:40:15 12  Q.    And that's the day Mr. Niksefat, you were here for

09:40:18 13  it, testified.  He was calling the other large mega account

09:40:22 14  insurers to make sure that they were not going to go with

09:40:25 15  Praluent after Amgen learned it was losing CVS.

09:40:28 16          And you see the subject line is "Repatha and

09:40:32 17  Praluent"; right?

09:40:34 18  A.    Yes, sir.  I'm not sure I know whether it was the

09:40:36 19  same day, but if you represent that, fine.

09:40:39 20  Q.    Okay.  You were here with me, sir.

09:40:42 21          And you see that the email written from

09:40:44 22  Mr. Rogers says, "Gentlemen, I heard from Amgen."

09:40:49 23          So he had a conversation with Amgen that

09:40:53 24  Regeneron is getting aggressive and they're ready to go 1 of

09:40:55 25  1, if pushed --

Gaier - Cross

09:40:57  1                    MR. LIVERSIDGE:  Objection, Your Honor.

09:40:59  2          Can we have a sidebar?

09:41:00  3                    THE COURT:  Yes.

09:41:00  4          (Beginning of conference held at sidebar.)

09:41:53  5                    THE COURT:  Counsel.  Do you need a minute?

09:41:54  6                    MR. LIVERSIDGE:  I apologize.  We're not seeing

09:41:59  7   this on the list.  I want to confirm there was a

09:42:02  8   representation that it is --

09:42:03  9                    MR. HOCHSTADT:  I've been told from my team that

09:42:05 10   it's on the list.  But regardless, as Your Honor said at the

09:42:09 11   final pretrial conference, if it's on expert -- the expert

09:42:12 12   has relied on it, it's coming in as evidence.  And this

09:42:14 13   expert just admitted on the stand, it's on his list of

09:42:17 14   materials considered.  There's no dispute about that.

09:42:19 15   That -- he cites it in his expert report, so it's completely

09:42:22 16   proper.

09:42:22 17                    MR. LIVERSIDGE:  Well, well -- okay.  Okay.

09:42:29 18          I just -- we may need a minute, Your Honor, for

09:42:32 19   it -- just to confirm documents are on the list, but we'll

09:42:36 20   do it as fast as we can.

09:42:38 21                    THE COURT:  Okay.  So we're good to go with this

09:42:39 22   one?

09:42:40 23                    MR. LIVERSIDGE:  Good to go.  Apologize.

09:42:41 24                    THE COURT:  Okay.  That's fine.

09:42:54 25          (Conclusion of conference held at sidebar.)

Gaier - Cross

09:42:54 1          THE COURT:  All right.  Ladies and gentlemen,

09:42:59 2    that objection has been withdrawn.

09:43:07 3          MR. HOCHSTADT:  Ms. Wu, can you pull that

09:43:09 4    document back up?

09:43:13 5    BY MR. HOCHSTADT:

09:43:13 6    Q.    Okay.  So, Dr. Gaier, just to reorient us, May 13th,

09:43:17 7    2020, okay, OptumRx says they heard from Amgen.  And they

09:43:22 8    end up going on to say, "Could be an opportunity."  They

09:43:25 9    wrote, "Their strategy," referring to Amgen, "is to lockout

09:43:30 10   Regeneron."

09:43:31 11         That's what you see here; right?

09:43:32 12   A.    That's how they characterized it.

09:43:32 13   Q.    Right.

09:43:35 14   A.    I mean, not "they," but that's how United Optum

09:43:37 15   characterizes it.

09:43:38 16   Q.    Right.  They didn't characterize it as, Amgen's

09:43:41 17   strategy is to lockout Regeneron from just 7 percent of the

09:43:44 18   market.  They didn't characterize it that way; right?

09:43:46 19   A.    It just --

09:43:48 20   Q.    Yes or no, sir?

09:43:49 21   A.    The words say what they say.  "Their strategy is to

09:43:51 22   lockout Regeneron."  That's how they characterized it.

09:43:53 23   Q.    Right.  Not from just 7 percent, not just from custom

09:43:56 24   formularies; right?

09:43:57 25         It doesn't say any of that; right?

Gaier - Cross

09:43:58 1    A.      It's not getting into those details.

09:44:00 2    Q.      Okay.  And you said -- you just said earlier today

09:44:03 3    that you needed to know the why that Professor Scott Morton

09:44:07 4    had to kick the tires; right?

09:44:08 5            This document answers a lot --

09:44:10 6    A.      No.

09:44:10 7    Q.      -- in terms of -- I'm not done with my question,

09:44:13 8    Dr. Gaier.

09:44:14 9            This document answers the why; right?

09:44:15 10           This is right in the heart of the moment in

09:44:17 11   response to competition, low-priced competition from

09:44:20 12   Regeneron and you have one of the big mega insurers writing

09:44:24 13   down contemporaneously what they were told by Amgen.  And

09:44:29 14   you didn't consider this; right?

09:44:30 15   A.      The offer was a 1 of 2, so it's not consistent with

09:44:33 16   the strategy to lock them out.

09:44:34 17   Q.      When you said "contracts are the source of the

09:44:37 18   truth," this is not the source of truth, according to what

09:44:40 19   you have to say; right?

09:44:42 20   A.      First of all, it's the witnesses who said the

09:44:44 21   contracts are the source of truth, not -- not me.  But what

09:44:47 22   was your question?  I'm sorry.

09:44:48 23   Q.      We can move on.

09:44:50 24           MR. HOCHSTADT:  Ms. Wu, you can take that

09:44:50 25   document down.

Gaier - Cross

09:44:50  1    BY MR. HOCHSTADT:

09:44:52  2    Q.    So let's turn to CVS.  You spent a lot of time

09:44:56  3    telling Amgen's side of the story, that CVS got a portfolio

09:45:01  4    bundled rebate offer from Amgen, but they didn't use that to

09:45:05  5    leverage Regeneron to increase their rebates on Praluent.

09:45:11  6          But you ignored the testimony of Richard O'Neal

09:45:14  7    yesterday, that he said that is, in fact, what happened;

09:45:17  8    right?

09:45:17  9    A.    I saw the notes, yes.

09:45:19 10    Q.    Well, that's exactly what I want to get to, the

09:45:22 11    notes, PTX-545.  Mr. O'Neal testified, he took those notes

09:45:27 12    right after his conversations, each and every time, with

09:45:30 13    those witnesses who you say are the "source of the truth";

09:45:33 14    right?

09:45:33 15    A.    He said that he took those notes, yes.

09:45:37 16    Q.    Right.  And in your entire presentation yesterday and

09:45:40 17    today, not one slide is devoted to those notes; correct?

09:45:43 18    A.    Let me just say it's not --

09:45:44 19    Q.    Is that a yes or no?

09:45:46 20          You don't have a slide that addresses those

09:45:48 21    notes; correct?

09:45:49 22    A.    I don't have a slide that addresses those notes, but

09:45:52 23    I -- it's not for me to decide why there are inconsistencies

09:45:57 24    between what witnesses testified and what Mr. O'Neal's notes

09:46:02 25    show.  There are inconsistencies, but it's not for me to

Gaier - Cross

09:46:05  1   decide who's right.

09:46:06  2   Q.    You just spent the past afternoon and morning going

09:46:11  3   to one side of the ledger of witnesses and documents that

09:46:14  4   you're saying everyone should believe those and now you're

09:46:17  5   saying that's an inconsistency that you're standing away

09:46:17  6   from?

09:46:20  7   A.    I don't agree with your characterization.

09:46:22  8   Q.    Okay.  Let's turn to prices; all right?

09:46:24  9        I want to turn to your demonstrative, DDX-3.9?

09:46:31 10   A.    Okay.  Give me a moment.  I have it.

09:46:32 11   Q.    We'll put it up on the screen as well.

09:46:35 12   A.    3.9?  Okay.

09:46:37 13        Yes.

09:46:37 14   Q.    You recall you testified that, "patients with

09:46:42 15   co-insurance pay a percentage of the list price"?  That's at

09:46:44 16   1679, Lines 7 through 8.

09:46:46 17        You recall that?

09:46:46 18   A.    Yes.

09:46:47 19   Q.    Okay.  We can agree --

09:46:49 20        MR. HOCHSTADT:  I'm going to try and use the

09:46:50 21   pointer if it works, Kim.

09:46:50 22   BY MR. HOCHSTADT:

09:46:54 23   Q.    We can agree, these are the list prices up here.  And

09:46:57 24   as Professor Scott Morton showed in red, Repatha's list

09:47:00 25   price has been higher than Praluent's the entire time;

1830

Gaier - Cross

09:47:04 1    right?

09:47:04 2    A.    During this period of time, that's right.

09:47:07 3    Q.    Right.

09:47:07 4          And now if we go to the net prices, during this

09:47:11 5    entire period of time, Repatha has been double the net price

09:47:15 6    of Praluent; right?

09:47:16 7    A.    Again, if you're looking just at this snapshot for

09:47:19 8    the net prices, that's correct.

09:47:20 9    Q.    Well, let's turn to that.  I want to turn to the next

09:47:24 10   slide, DDX-3.10.

09:47:25 11         You made a big deal about that snapshot; right?

09:47:28 12   A.    And --

09:47:29 13   Q.    And I want to focus, in particular, on the more

09:47:32 14   recent time when Regeneron is actually marketing Praluent.

09:47:35 15   Right here in Q3 2023, you made a big deal that you thought

09:47:38 16   those prices were converging.

09:47:40 17         Do you recall that?

09:47:41 18   A.    I didn't make a big deal of that.  I noted it.

09:47:43 19   Q.    Right.  You noted that in Q1 2023, Q2 2023, the

09:47:50 20   monthly price of Repatha's $200, then it starts to go a

09:47:53 21   little bit down below $200; right?

09:47:55 22         And you said all that stuff it converges,

09:47:57 23   there's something going on there; right?

09:47:58 24         You remember that?

09:47:59 25   A.    I said that they -- they come together there, I

Gaier -- Cross

09:48:01  1    believe.

09:48:01  2    Q.    Right.  But, you know, because you've been sitting

09:48:03  3    back there with Dr. Lauren Stiroh and you mentioned her

09:48:07  4    name, that Amgen has another economic expert in this case,

09:48:09  5    and she looked at Repatha's monthly prices, too, for 2023;

09:48:13  6    right?

09:48:14  7    A.    I don't know that.

09:48:15  8    Q.    You don't know that?

09:48:16  9    A.    No.

09:48:17 10    Q.    Okay.  But you know that she's an expert; right?

09:48:20 11           You know that she was an expert in this case,

09:48:22 12    and you rely on her in certain respects; right?

09:48:24 13    A.    I do for her conclusions about whether there was harm

09:48:27 14    to competition, that's correct.

09:48:28 15    Q.    All right.  So let's go to that.

09:48:30 16           MR. HOCHSTADT:  Ms. Wu, can you publish Number

09:48:32 17    9, which is Dr. Lauren Stiroh -- from Dr. Lauren Stiroh's

09:48:36 18    report, Figure 47.

09:48:36 19    BY MR. HOCHSTADT:

09:48:41 20    Q.    Okay.  And I want to focus on 2023.  Now, it's $130

09:48:48 21    here; right, different than what you were talking about.

09:48:51 22    But the key thing is this is per unit or per pen.  And what

09:48:54 23    we've all heard about is these pens are injected every other

09:48:58 24    week.  So two times per month.  I can do that math, 130

09:49:03 25    times 2 is $260.  So Amgen's other economic expert doesn't

Gaier - Cross

09:49:08  1    agree with you that Repatha's price has come down or started

09:49:11  2    to go down below $200.

09:49:13  3              It's $260 a month in 2023; right, sir?

09:49:16  4    A.    I don't know exactly what this is, but if you take

09:49:22  5    130 and multiply by 2, you would be at 260.  I agree with

09:49:26  6    that.

09:49:26  7    Q.    Right.

09:49:27  8              MR. HOCHSTADT:  You can put that slide down.

09:49:27  9    BY MR. HOCHSTADT:

09:49:28 10    Q.    Let me just end on choices here for a second.  We

09:49:31 11    just talked about prices.  You know that Praluent has the

09:49:34 12    low-dose version and you agree that what Mr. Gordon -- you

09:49:39 13    were here for it -- described as surprising and unusually

09:49:42 14    aggressive competition from Regeneron.

09:49:44 15              It didn't motivate Amgen to compete harder by

09:49:47 16    making a low-dose option of Repatha; right?

09:49:49 17    A.    I heard the testimony from the -- from the doctor

09:49:52 18    yesterday that she didn't think that would be attractive.

09:49:55 19    Q.    Oh, so are you talking about medical practitioner,

09:50:00 20    Suzanne Shugg?

09:50:00 21    A.    Yes.

09:50:00 22    Q.    Oh, no.  So medical practitioner, Suzanne Shugg, said

09:50:04 23    that virtually all of her patients that she prescribes

09:50:07 24    Praluent for on the low-dose because "the rule of thumb is

09:50:11 25    start low, go slow."  That's at 1627, Lines 1 through 13.

Gaier - Cross

09:50:17 1          Did you miss that part of her testimony?

09:50:18 2   A.     No, I heard that, but I was thinking of something she

09:50:20 3   said later, which was that to -- did it ever dawn on her

09:50:23 4   that Amgen should offer a low-dose product, and I think she

09:50:26 5   said no.

09:50:27 6   Q.     And you didn't investigate that in this case?

09:50:29 7          You didn't ask Mr. Gordon why he didn't do that;

09:50:31 8   right?

09:50:32 9   A.     I did not.

09:50:32 10  Q.     Okay.  Let's go to one other point on this.  Amgen,

09:50:35 11  actually, and Suzanne Shugg talked about this.  There are

09:50:39 12  actually two different ways to inject the high dose of

09:50:42 13  Repatha.  There's the pen, which you have to do every other

09:50:44 14  week, but they also had a once-a-month option with a large

09:50:49 15  420-milligram dose that goes on like a patch to your skin.

09:50:53 16         You know that; right?

09:50:54 17  A.     I heard that testimony.

09:50:55 18  Q.     Right?  But -- and you heard from Suzanne Shugg that

09:51:01 19  many of her patients on that particular patch option like it

09:51:05 20  because of the -- either the convenience or they have a

09:51:08 21  needle phobia.  This is at 1633, Lines 9 through 19.

09:51:13 22  A.     I do remember that.

09:51:13 23  Q.     You remember that; right?

09:51:14 24  A.     I do recall that.

09:51:15 25  Q.     And you know that Amgen discontinued that option for

Gaier - Redirect

09:51:18  1    consumers last year; right?

09:51:19  2    A.    I wasn't aware of it.

09:51:22  3              MR. HOCHSTADT:  No further questions.

09:51:38  4                     REDIRECT EXAMINATION

09:51:38  5    BY MR. LIVERSIDGE:

09:51:39  6    Q.    Dr. Gaier, very quickly, you were asked some

09:51:41  7    questions about a strategy to lockout at Optum.

09:51:45  8              Do you recall that?

09:51:46  9    A.    Yes, with a document, I believe, yes.

09:51:49 10    Q.    And can you just remind us, what was Amgen's offer to

09:51:55 11    Optum/United?  Was it 1 of 1 or 1 of 2?

09:51:58 12    A.    1 of 2.

09:51:59 13    Q.    And between the two companies, Amgen and Regeneron,

09:52:03 14    which company's entire strategy is for exclusive contracts?

09:52:08 15    A.    That's Regeneron's strategy.  Amgen's strategy is,

09:52:11 16    the testimony has been, that they would have preferred,

09:52:14 17    actually, the 1 of 2 or the parity coverage.  But it was

09:52:17 18    Regeneron's focus on exclusive bidding that drove the market

09:52:22 19    towards exclusive bids.

09:52:24 20              MR. LIVERSIDGE:  Thank you, Dr. Gaier.

09:52:29 21              THE COURT:  Thank you, Doctor.  You may step

09:52:31 22    down.

09:52:31 23              THE WITNESS:  Okay.  Thank you.

09:52:39 24              MR. LIVERSIDGE:  Your Honor, Amgen calls Jasper

09:53:24 25    Van Grunsven.

Van Grunsven - Direct

09:53:24  1          COURTROOM DEPUTY:  Please remain standing and

09:53:26  2    raise your hand.  Please state and spell your name for the

09:53:34  3    record.

09:53:34  4          THE WITNESS:  Jasper Van Grunsven.

09:53:37  5          COURTROOM DEPUTY:  Can you spell it for me?

09:53:38  6          THE WITNESS:  J-a-s-p-e-r, V-a-n,

09:53:45  7    G-r-u-n-s-v-e-n.

09:53:45  8          COURTROOM DEPUTY:  Do you swear or affirm that

09:53:47  9    the testimony you give to the Court and jury will be the

09:53:50 10    truth, the whole truth, and nothing but the truth, so help

09:53:52 11    you God, or do you so affirm?

09:53:54 12          THE WITNESS:  I do.

09:53:54 13          JASPER VAN GRUNSVEN, the witness herein, after

09:53:54 14    having been duly sworn under oath, was examined and

09:53:54 15    testified as follows:

09:53:56 16          COURTROOM DEPUTY:  Thank you.  You may be

09:53:57 17    seated.

09:53:57 18                    DIRECT EXAMINATION

09:53:57 19    BY MR. LIVERSIDGE:

09:54:03 20    Q.    Good morning, Mr. Van Grunsven.

09:54:05 21    A.    Good morning.

09:54:06 22    Q.    Where are you currently employed?

09:54:07 23    A.    I'm currently employed at Amgen.

09:54:09 24    Q.    And how long have you been employed at Amgen?

09:54:11 25    A.    Close to 12 years.

Van Grunsven - Direct

09:54:15  1    Q.    All right.  In the interest of time, let me take you

09:54:17  2    back to January of 2022.

09:54:20  3             What was your role at the company at that time?

09:54:22  4    A.    January '22 was about the time I started as the Vice

09:54:28  5    President and General Manager for cardiology and nephrology.

09:54:34  6    Q.    What were your responsibilities as the General

09:54:37  7    Manager of cardiovascular and nephrology?

09:54:40  8    A.    I led a cross-functional team, which is a team of

09:54:43  9    different functions, that had basically the high-level goal

09:54:47 10    of bringing our medications in cardiology as well as in

09:54:53 11    nephrology to patients in the U.S.

09:54:54 12    Q.    And was Repatha one of the drugs that you had

09:54:56 13    responsibility for?

09:54:56 14    A.    Yes.

09:54:58 15    Q.    During what period of time were you responsible for

09:55:00 16    Repatha?

09:55:00 17    A.    I was responsible for Repatha from that time, so

09:55:04 18    January '22 until November '24.

09:55:08 19    Q.    So just about until about five months ago?

09:55:11 20    A.    Approximately, yes.

09:55:13 21    Q.    All right.  So when you took over the role as the

09:55:15 22    general manager for Repatha in January of 2022, what was

09:55:20 23    your mandate?

09:55:21 24             What were you asked to do?

09:55:22 25    A.    At the highest level, the goal of the mandate was to

Van Grunsven - Direct

09:55:28  1    basically bring Repatha to more patients in the U.S. and to

09:55:33  2    grow the PCSK9 market.

09:55:36  3    Q.    Okay.  What do you mean when you say "grow the PCSK9

09:55:39  4    market"?

09:55:40  5    A.    Well, that requires a little bit of explanation.  But

09:55:44  6    because Repatha is a cholesterol-lowering drug, which means,

09:55:50  7    of course, it lowers your cholesterol, which is specifically

09:55:53  8    LDL cholesterol, and LDL cholesterol is the biggest risk

09:55:58  9    factor for cardiovascular disease, biggest risk factor for

09:56:02 10    heart attacks and strokes.

09:56:03 11           So when we talk about the market -- when we talk

09:56:07 12    about the market, we generally see one big market.  It has

09:56:11 13    two big groups in it.

09:56:13 14           The first group, I would say, is the patients

09:56:15 15    that are not yet diagnosed with high cholesterol.  So it's

09:56:18 16    patients that are out there, high cholesterol, have a risk

09:56:21 17    for cardiovascular disease, but are not diagnosed yet.

09:56:24 18           The second big group is a group of patients that

09:56:27 19    is diagnosed with high cholesterol and generally gets a

09:56:32 20    treatment that's called statins.  And statins is a very good

09:56:36 21    treatment.  It lowers cholesterol.  But for many of these

09:56:38 22    patients, and that's that big group, it doesn't lower

09:56:41 23    cholesterol well enough.

09:56:42 24           So we have a big group of patients as well on

09:56:44 25    statins.  But still their cholesterol is too high, which

Van Grunsven - Direct

09:56:47  1    means they have a high risk of heart attacks and strokes.

09:56:50  2    We define that as the market.

09:56:52  3            PCSK9 is a drug and Repatha is one of them.

09:56:56  4    PCSK9 are drugs that you can give on top of statins and that

09:57:01  5    further lower cholesterol to generally levels that are good,

09:57:05  6    which means there's lower risk for heart attack and strokes.

09:57:08  7            So PCSK9 of that very big group that I just

09:57:12  8    described only has a very, very small part of that market.

09:57:15  9    So one of my goals -- one of the objectives was to grow that

09:57:20  10   PCSK9 market.

09:57:21  11   Q.    And approximately how small is that percentage of

09:57:25  12   PCSK9 patients as compared to the broader group of patients?

09:57:29  13   A.    Go back to that big group, it's a few percentage.  I

09:57:34  14   think -- I believe it's around 4, 5 percent.

09:57:36  15   Q.    Okay.  And so how did you go about trying to grow

09:57:39  16   this market?

09:57:40  17   A.    Well, a strategy like that has a lot of different

09:57:45  18   elements, but let me point out the one or two most important

09:57:49  19   ones.  And the one that's absolutely most important to us is

09:57:53  20   that we deploy a field force so that we have sales reps, key

09:57:59  21   account managers, MSLs that we send out there in the field

09:58:04  22   educating physicians.  Because I think that is -- we talked

09:58:07  23   about that big market.  It's really about educating

09:58:11  24   physicians, educating them about the unmet need.  So you

09:58:15  25   need to diagnose those patients.  You need to give

Van Grunsven - Direct

09:58:18  1    additional therapy on top of statins.

09:58:20  2            Really educating around that is what we did

09:58:23  3    through the sales force and other people in the field, of

09:58:27  4    course.  And I think that was our most important strategy

09:58:30  5    that we deployed.  And we had, generally speaking, two big

09:58:34  6    groups in there.  We had a group that targeted cardiologists

09:58:37  7    and a group that went to primary care physicians because

09:58:41  8    many of the patients are there.  So I would say that's the

09:58:44  9    biggest tactic or the biggest strategy that we deployed.

09:58:48 10            We also had other strategies.  And the second

09:58:52 11    biggest group is probably what we call marketing.  And

09:58:55 12    things in there are things like media.  And we've all seen

09:58:59 13    the pharmaceutical advertisements on television.  That could

09:59:03 14    be media directed to patients.  We do big disease, state

09:59:06 15    education programs directed at consumers and patients.

09:59:08 16            But we also do digital media to our physicians.

09:59:11 17    So that's the second big group.  And then we have many

09:59:13 18    other, let's call them, smaller strategies.  But I would say

09:59:16 19    those two are the biggest strategies we deployed.

09:59:19 20    Q.    Okay.  And how big was the Repatha field force that

09:59:23 21    was responsible for sales and marketing of Repatha during

09:59:28 22    the time that you were in that role?

09:59:29 23    A.    Well, we grew it a little bit over time, but I would

09:59:34 24    say it's close to a thousand people that we have deployed in

09:59:37 25    the field.  In that, we have -- the two biggest groups in

Van Grunsven - Direct

09:59:41  1   that were the field reps or the field sales reps that we

09:59:47  2   deployed towards cardiologists.  It's around 215 account

09:59:52  3   managers.  The group to our primary care physicians was even

09:59:53  4   bigger.  It was around 450 people that we deployed.  And the

09:59:55  5   rest was across medical teams and key account teams, and you

09:59:59  6   get close to a thousand, more or less.

10:00:01  7   Q.    And in general, how would you describe the education

10:00:04  8   and background of the members of this team?

10:00:06  9   A.    Well, generally, those people that we deployed in our

10:00:12 10   sales forces are -- basically start -- generally speaking,

10:00:15 11   start with a university degree.  But, specifically -- and

10:00:19 12   that's normal in our industry, specifically for the

10:00:21 13   specialists -- sales reps, so cardiologists.

10:00:25 14           In our case, we also, on top of that, really

10:00:28 15   wanted strong experience.  So sales reps that are already

10:00:31 16   experienced, that's done the job for at least a few years at

10:00:34 17   minimum.  So we hired experienced sales reps for our

10:00:38 18   cardiology sales force.

10:00:39 19           We did something different, also, for primary

10:00:42 20   care in a sense that we did something different than our

10:00:44 21   industry generally does.  We deployed the same profile of

10:00:47 22   people for our primary care sales force, so generally

10:00:50 23   university degree and a strong experience already.  And the

10:00:54 24   reason we did that is that we felt that educating primary

10:00:59 25   care physicians was even more difficult.  We all know

Van Grunsven - Direct

10:01:02  1    primary care physicians see many patients every day.

10:01:04  2    Different disease areas.  So educating them around that big

10:01:08  3    unmet need, diagnosing high LDL, convincing them or

10:01:13  4    educating them around the urgency to treat those patients

10:01:16  5    that are currently on a statin, we felt that required

10:01:19  6    experienced sales reps as well.

10:01:21  7    Q.    And during the time you were in the role, did you go

10:01:24  8    out and meet with doctors?

10:01:25  9    A.    Yeah, many times I did that.  Yes, many times.

10:01:29 10    Q.    And why did you do that?

10:01:30 11    A.    Well, as I -- as we just talked about, the sales

10:01:37 12    force or the field force was our most important strategy,

10:01:39 13    and for me, as a general manager, as a leader of that group

10:01:42 14    at the time, it's, of course, very important to see with

10:01:45 15    your own eyes, like, how that -- how the most important

10:01:49 16    strategy is working.  And so that's one.

10:01:51 17                I think the second reason is, hey, it's

10:01:54 18    fantastic to hear directly from physicians, like, what are

10:01:57 19    the challenges you face diagnosing these patients?  What are

10:02:02 20    the challenges you face in treating those patients and

10:02:06 21    giving them additional therapy on top of statins?

10:02:09 22    Q.    Now, does Amgen plan to continue this investment in

10:02:13 23    growing the PCSK9 market out into the future?

10:02:16 24    A.    Yes.

10:02:16 25    Q.    For how long?

Van Grunsven - Direct

10:02:17  1    A.    Well, we -- we make a ten-year planning horizon,

10:02:22  2    which we call LRS, or long-range scenario.  And as far as I

10:02:27  3    know, at least for those ten years, we've made plans to

10:02:29  4    continue to support this market and educate physicians

10:02:34  5    around the unmet need.

10:02:35  6    Q.    Who benefits from Amgen's growth of this overall

10:02:39  7    category?

10:02:39  8    A.    Well, first and foremost, I want to say patients.

10:02:44  9    And my father, three years ago, had a heart attack.  So I --

10:02:49 10    I see every day the impact that a heart attack has on his

10:02:56 11    quality of life.  I see the impact it has on his family.

10:02:59 12    And I think for many patients, that can be prevented by

10:03:02 13    managing LDL properly.  So -- and I think adding PCSK9,

10:03:06 14    adding Repatha to a statin really could help there.  So,

10:03:10 15    first and foremost, I think patient benefits.

10:03:13 16          Second, I think society benefits because getting

10:03:16 17    a heart attack or a stroke is very expensive and impactful.

10:03:20 18          And the third, of course, if more patients are

10:03:24 19    treated with PCSK9, both our competitors, as well as

10:03:30 20    Repatha, as well as Amgen benefits as well.

10:03:35 21    Q.    Let me switch gears quickly.

10:03:37 22          How do you look at competition when it comes to

10:03:39 23    Repatha?

10:03:40 24    A.    Well, to answer that question, I have to bring you

10:03:45 25    back to the market I talked about.  I talked about patients.

Van Grunsven - Direct

10:03:49  1    Generally, there's a big group of patients, generally, on

10:03:51  2    statins.  And I told you that statins, in many cases, don't

10:03:56  3    lower LDL well enough.  And I told you that Repatha can be

10:04:01  4    added to statins to further lower cholesterol.

10:04:04  5            So the way we look at competition is pretty

10:04:06  6    simple in the sense that every other drug that you can add

10:04:09  7    on top of a statin to further lower cholesterol, we see as

10:04:12  8    our competition.  And that means that currently on the

10:04:14  9    market, you could think of ezetimibe, which is available

10:04:19 10    generic.  You could think of bempedoic acid, which is

10:04:21 11    available in brand names, Nexletol, Nexlizet.  And you could

10:04:25 12    think of what we call the PCSK9 class, which includes,

10:04:28 13    indeed, Repatha, which includes Praluent.  And it currently

10:04:30 14    includes Leqvio.

10:04:32 15    Q.    Okay.  We've heard a bit about this.  You mentioned

10:04:34 16    Leqvio.

10:04:35 17            What is Leqvio?

10:04:35 18    A.    Leqvio is also a PCSK9 drug.

10:04:40 19    Q.    All right.  And approximately when was it launched?

10:04:42 20    A.    I think it was approved by the end of '21, so it was

10:04:48 21    launched early '22, I would say.

10:04:50 22    Q.    And how has Leqvio been performing in the market

10:04:53 23    since its launch?

10:04:54 24    A.    I think Leqvio performed very well.  Of course, I'm

10:04:59 25    not in Novartis.  That's the company that brings Leqvio to

Van Grunsven - Direct

10:05:02  1    the market, so I can't judge if they feel it's successful.

10:05:05  2    But from our viewpoint, we think it's been a successful

10:05:09  3    launch.

10:05:09  4           We call -- it's a chronic market because people

10:05:12  5    take these LDL medications for a long time.  And in a

10:05:15  6    chronic market, you generally see a steady -- not like a

10:05:18  7    rapid, but you see a steady increase of sales in the market.

10:05:22  8    And I think Leqvio has been doing that.  I believe their

10:05:25  9    sales in the U.S. in '23 was 200 million.  I believe in '24,

10:05:30 10    I think, it reached to 385 million.  And that's about 20,

10:05:35 11    25-percent share in revenue.  And I think that's a pretty

10:05:38 12    good launch in this market.

10:05:39 13    Q.    And does Amgen view Leqvio as a significant

10:05:42 14    competitor in the PCSK9 space?

10:05:45 15    A.    Well, absolutely.  As I said, for me, competition is

10:05:52 16    when a physician thinks about adding a drug on top of

10:05:55 17    statins.  And we see physicians can choose Leqvio.  And when

10:05:59 18    they choose Leqvio, they can't use Repatha, and I think it's

10:06:03 19    a very important competitor.

10:06:04 20    Q.    You mentioned Novartis was the company that is

10:06:07 21    commercializing Leqvio.

10:06:09 22           Does Novartis have a large sales force for

10:06:12 23    Leqvio?

10:06:12 24    A.    Yeah.  By my knowledge, they have a very -- they have

10:06:16 25    a very large sales force essentially.  Also, when they

Van Grunsven - Direct

10:06:19 1    launched, they had a very large sales force, and they

10:06:21 2    continue to have that.  So they deploy -- they deploy

10:06:25 3    generally the same strategies as I talked about earlier.

10:06:27 4    Q.    And does Novartis market Leqvio in a similar fashion

10:06:32 5    to how Amgen markets Repatha?

10:06:33 6    A.    Yeah.  I talked to you about -- earlier about, like,

10:06:36 7    the field strategy.  I see generally -- we see generally the

10:06:40 8    same strategy that they deploy, sales forces they deploy,

10:06:44 9    medical folks.  They deploy key account teams.  They do the

10:06:47 10   same, and they also invest significantly in marketing, which

10:06:50 11   is the other element I talked about.  So, yes, I would say

10:06:53 12   they -- they absolutely invest significantly behind Leqvio.

10:06:56 13   Q.    And what is Amgen's reaction to Novartis' Leqvio

10:07:00 14   marketing efforts?

10:07:01 15   A.    Well, that's -- that's -- I would say, like, that's a

10:07:10 16   bit complicated to explain, but let me try.

10:07:12 17          Like, first, is the most obvious one.  Like,

10:07:14 18   competition, as I said, happens when a physician decides to

10:07:18 19   add something on top of statins and then he makes a

10:07:21 20   decision, in this case, in this example, between Leqvio and

10:07:24 21   Repatha.  And, of course, that type of competition, we try

10:07:26 22   to convince physicians that Repatha is the better choice.

10:07:30 23   So that's normal competition, which you could say, if they

10:07:33 24   choose Leqvio, is not a good thing for us because we lose

10:07:38 25   market share.

Van Grunsven - Cross

10:07:38 1          But there is a second element that we feel is

10:07:41 2     probably even more important, and that's the element that I

10:07:43 3     just talked about.  Like, there's a very big market of

10:07:47 4     untreated patients out there, patients at risk for heart

10:07:50 5     attack and stroke.  PCSK9 is only added to a very small

10:07:53 6     group of those patients.  And the efforts that Novartis puts

10:07:57 7     in the market, that Leqvio puts in the market on top of our

10:08:00 8     efforts really helps us grow that PCSK9 thing, segment

10:08:05 9     faster, and I think that is the positive effect of

10:08:07 10    competition.

10:08:08 11         So I have a bit of a mixed answer there.  It has

10:08:11 12    a market share component where we try to win, but it also

10:08:14 13    has a positive effect on the total market growth.

10:08:17 14    Q.   And are there new PCSK9 medications coming into the

10:08:20 15    market in the near term?

10:08:21 16    A.   Yes, there is a pretty extensive pipeline, I would

10:08:26 17    say, of PCSK9 drugs in development.  And I don't have the

10:08:32 18    latest, latest because I left the job in November '24, but I

10:08:38 19    believe Merck has an all-PCSK9 development that will launch

10:08:42 20    somewhere in '26.  So, for sure, that's happening.

10:08:46 21         I think there's also other drugs, like I talked

10:08:48 22    about competition.  I know there's also a drug, which is

10:08:53 23    called a C. diff inhibitor from NewAmsterdam Pharma that's

10:08:56 24    also getting geared up to launch.  So I think there are big

10:08:59 25    pipelines and there are drugs that will launch pretty soon

Van Grunsven - Cross

10:09:02 1  in that market.

10:09:03 2  Q.     And do you view the market for PCSK9s and other

10:09:07 3  cardiovascular drugs as highly competitive?

10:09:09 4  A.     Absolutely.  I talked about the today situation where

10:09:14 5  I talked about bempedoic acid, ezetimibe, Repatha, Praluent,

10:09:19 6  Leqvio.  So I think there's a pretty -- a lot of competition

10:09:22 7  today.  And then we just talked about -- we believe in that

10:09:25 8  competition, our competitors in the future, which makes it

10:09:28 9  even more competitive.  So it's competitive now, and it will

10:09:30 10  be even more competitive in the future.

10:09:32 11          MR. LIVERSIDGE:  Thank you, Mr. Van Grunsven.

10:09:35 12          Pass the witness.

10:09:36 13                  CROSS-EXAMINATION

10:09:38 14  BY MS. FALK:

10:09:40 15  Q.     Good morning, Mr. Van Grunsven.

10:09:41 16  A.     Good morning.

10:09:42 17  Q.     Praluent and Repatha are both what's called

10:09:45 18  monoclonal antibodies; right?

10:09:46 19  A.     Correct.

10:09:47 20  Q.     And Leqvio is a small interfering RNA therapy; right?

10:09:52 21  A.     Correct.

10:09:57 22          MS. FALK:  No further questions.

10:10:00 23          MR. LIVERSIDGE:  Your Honor, Amgen calls

10:10:03 24  Dr. Lauren Stiroh.

10:10:04 25          THE COURT:  All right.  Any redirect?

Stiroh - Direct

10:10:05  1          MR. LIVERSIDGE:  No.  Sorry.

10:10:06  2          THE COURT:  You may step down.

10:10:07  3          THE WITNESS:  Thank you.  Let's go ahead and

10:10:09  4   take our morning break a little early this morning.  We're

10:10:11  5   going to take 15 minutes, and we'll be back.

10:10:15  6              (Jury leaving the courtroom.)

10:28:37  7              (Recess was taken.)

10:28:38  8          COURTROOM DEPUTY:  All rise.

10:28:39  9          THE COURT:  Please be seated.  Actually, well,

10:28:43 10   let's bring the jury out.

10:28:44 11          MS. SHARP:  Your Honor, before the jury comes

10:28:49 12   in, could we have a time count?

10:28:51 13          THE COURT:  Sure.

10:28:53 14          MS. SHARP:  Would that be possible?

10:29:30 15          THE COURT:  Okay.  By Mr. Koehler's

10:29:31 16   calculations, if we take out the hour reserved for the

10:29:34 17   closings, Regeneron's got 35 minutes left and Amgen has

10:29:39 18   37 minutes left.

10:29:39 19          Does that sound right to everybody?

10:29:43 20          MS. SHARP:  Yes.

10:29:44 21          MR. POLKES:  Your Honor, can I just ask, if we

10:29:46 22   want to reserve more for closing, can that be taken out of

10:29:49 23   our time?

10:29:51 24          THE COURT:  Yeah, that's fine.  You're

10:29:54 25   responsible for policing your own time.  We'll stop the

Stiroh - Direct

10:29:56  1    clock and --

10:29:56  2                    MR. POLKES:  Yeah.

10:29:56  3                    THE COURT:  If you've got ten minutes left, you

10:29:59  4    can have a hour and ten minutes left for closing.

10:30:02  5                    MR. POLKES:  Yeah.

10:30:03  6                    THE COURT:  So I'm only going to stop folks once

10:30:06  7    this gets down to an hour left for closings.  All right?

10:30:37  8                    MR. LIVERSIDGE:  Your Honor, we would like the

10:30:39  9    Court to read the stipulation regarding Dr. Stiroh.

10:30:41 10                    THE COURT:  Oh, of course.

10:31:04 11                    (Jury entering the courtroom.)

10:31:16 12                    THE COURT:  Please be seated.  Let's have Amgen

10:31:19 13    call its next witness.

10:31:20 14                    MR. LIVERSIDGE:  Thank you, Your Honor.  Amgen

10:31:22 15    calls Dr. Lauren Stiroh.

10:31:35 16                    COURTROOM DEPUTY:  Please remain standing and

10:31:38 17    raise your hand.  Please state and spell your name for the

10:31:45 18    record.

10:31:45 19                    THE WITNESS:  My name is Lauren Stiroh.  It's

10:31:48 20    L-a-u-r-e-n, Stiroh is S-t-i-r-o-h.

10:31:52 21                    COURTROOM DEPUTY:  Do you swear or affirm that

10:31:54 22    the testimony you give to the Court and jury will be the

10:31:57 23    truth, the whole truth and nothing but the truth, so help

10:31:59 24    you God or do you so affirm?

10:32:01 25                    THE WITNESS:  I do.

Stiroh - Direct

10:32:01  1          LAUREN STIROH, the witness herein, after having

10:32:01  2  been duly sworn under oath, was examined and testified as

10:32:02  3  follows:

10:32:02  4          COURTROOM DEPUTY:  Thank you.  You may be

10:32:03  5  seated.

10:32:04  6          THE COURT:  Ladies of the jury, the parties here

10:32:06  7  have stipulated that Dr. Stiroh is qualified to testify in

10:32:08  8  the field of economics.

10:32:11  9                          DIRECT EXAMINATION

10:32:11 10  BY MR. LIVERSIDGE:

10:32:16 11  Q.     Good morning, Dr. Stiroh.

10:32:17 12          Would you please introduce yourself?

10:32:18 13  A.     Yes.  Good morning.  My name is Lauren Stiroh, and

10:32:22 14  I'm another economist in this case.

10:32:29 15  Q.     Dr. Stiroh, where are you currently employed?

10:32:31 16  A.     I work for a firm called NERA Economic Consulting or

10:32:35 17  just NERA for short, and my office is in New York.

10:32:39 18  Q.     And could you describe your educational background?

10:32:41 19  A.     Yes.  As I said, I'm an economist.  I have a BA in

10:32:45 20  economics from the University of Western Ontario.  That's in

10:32:48 21  Canada.  I have an MA in economics from the University of

10:32:51 22  British Columbia.  That's also in Canada.  And I have a PhD

10:32:55 23  in economics in -- from Harvard University.

10:32:58 24  Q.     Dr. Stiroh, are you being compensated for your time

10:33:01 25  spent on this matter?

Stiroh - Direct

10:33:02  1    A.      My firm is, yes.

10:33:04  2    Q.      Okay.  And who retained you in this case?

10:33:06  3    A.      Amgen did.

10:33:07  4    Q.      And what was your assignment?

10:33:09  5    A.      I was asked to evaluate whether Repatha had monopoly

10:33:13  6    power.  I was asked to evaluate whether there were

10:33:17  7    anticompetitive effects from the portfolio bundling in this

10:33:20  8    matter, and I was asked to evaluate Professor Scott Morton's

10:33:24  9    opinions as they related to those same topics.

10:33:27 10    Q.      And have you reached conclusions based on your work?

10:33:29 11    A.      I have.

10:33:30 12    Q.      Are these the conclusions you've reached?

10:33:33 13    A.      Those are my high-level conclusions, yes.

10:33:35 14    Q.      Okay.  Let's start with your conclusion that Repatha

10:33:38 15    does not have a monopoly.

10:33:40 16            And let me start by asking you:  What does it

10:33:44 17    mean to assess whether Repatha has a monopoly?

10:33:46 18    A.      Sure.  So a monopoly is a specific and defined thing

10:33:50 19    in economics.  It is when a firm does not face pricing

10:33:54 20    pressure from other firms that are trying to take sales

10:33:57 21    away.

10:33:58 22            So what a monopolist can do is look at how much

10:34:01 23    can it sell its products for, who's willing to buy them and

10:34:05 24    would consider, can I raise price a little bit more and I'll

10:34:07 25    get more money, but maybe fewer people buy them?  Can I --

Stiroh - Direct

10:34:10  1    should I lower price, and it's less money per sale, but

10:34:14  2    maybe more people buy them?

10:34:15  3             So what a monopolist with no pricing pressure

10:34:17  4    can do is find the sweet spot.  And the sweet spot is what

10:34:21  5    we call the monopoly price where you don't want to raise it

10:34:23  6    more because you'll lose sales.  You don't want to lower it

10:34:26  7    because you'll get more money.  You stay at the sweet spot.

10:34:29  8    But the monopolist can do that if it doesn't have pricing

10:34:32  9    pressure.

10:34:32 10             If there's another firm trying to come in and

10:34:35 11    take those sales away, that brings that price down, then

10:34:39 12    we've got a competitive situation because we have got other

10:34:41 13    firms trying to take sales away by lowering price.

10:34:44 14    Q.    And have you analyzed Repatha's net price in this

10:34:47 15    case?

10:34:47 16    A.    I have.

10:34:48 17    Q.    What did you find?

10:34:49 18    A.    I found that its price has come down over time.  What

10:34:52 19    you see on this chart is the average net price per year from

10:34:57 20    2019 through 2023, and we see it has come down in every

10:35:02 21    year, including the years where the conduct is alleged to

10:35:06 22    have given Amgen a bigger and bigger sale -- share through

10:35:10 23    Repatha.  We still see that price coming down.

10:35:14 24    Q.    And did you look into why Repatha's net price has

10:35:16 25    been declining?

Stiroh - Direct

10:35:17  1    A.      I did.

10:35:18  2    Q.      What did you find?

10:35:19  3    A.      That it is due to competition.  It is due to another

10:35:22  4    firm.  And in this case, the firm with Praluent, competing

10:35:25  5    to try to get prices lower and lower to try to capture more

10:35:29  6    and more sales.

10:35:30  7    Q.      Did you also look at output?

10:35:31  8    A.      I did.

10:35:32  9    Q.      Why is that important?

10:35:33  10   A.      They are, to an economist, two sides of the same

10:35:37  11   coin.  There is the price effect and there's an output

10:35:39  12   effect.

10:35:40  13           So when we are thinking of a classic monopolist,

10:35:43  14   a classic monopolist is something that's trying to -- would

10:35:46  15   try to raise price and do that by pulling back output.  And

10:35:50  16   under competition, price comes down and output goes up, so I

10:35:53  17   look at those two things together.

10:35:54  18   Q.      And what did you find with respect to output?

10:35:56  19   A.      I found that output has gone up over all of the

10:36:00  20   years.  This is, again, since 2019, and we see that this is

10:36:03  21   output of just Praluent and Repatha together.  And it has

10:36:06  22   been growing over time.

10:36:08  23   Q.      And have you looked, also, at Praluent sales

10:36:11  24   performance as part of your work in this case?

10:36:13  25   A.      I have.

Stiroh - Direct

10:36:14  1    Q.    Okay.  What did you find?

10:36:15  2    A.    That Praluent sales performance is improving as well,

10:36:18  3    that this is from 2022 and we see its sales going up from

10:36:23  4    2022 to 2024.  And we heard, I think, Dr. Gaier just say and

10:36:27  5    I agree, "2024 is its best year ever."

10:36:31  6    Q.    Now, Dr. Stiroh, do you recall Professor Scott Morton

10:36:33  7    testifying that Repatha and Praluent are the only

10:36:37  8    competitors in the PCSK9 market?

10:36:39  9    A.    I do.

10:36:40 10    Q.    Do you agree with her?

10:36:41 11    A.    I disagree.

10:36:42 12    Q.    Why is that?

10:36:42 13    A.    A competitor is a company that can take sales away.

10:36:47 14    If -- there's another product that we've heard about called

10:36:49 15    Leqvio that treats the same conditions.  So a patient that

10:36:53 16    is taking Leqvio is not going to be taking Repatha or

10:36:57 17    Praluent, at least for that month.  A sale to Leqvio is a

10:37:00 18    sale not made for Repatha or Praluent.  That's a competitor.

10:37:04 19    Leqvio is another competitor in this market that she didn't

10:37:07 20    include.

10:37:08 21    Q.    Is Leqvio also called inclisiran?

10:37:11 22    A.    It is.

10:37:12 23    Q.    And did you review the evidence in the case related

10:37:14 24    to competition from Leqvio?

10:37:16 25    A.    I did.

Stiroh - Direct

10:37:17 1    Q.      And if you could turn in your binder to DTX-1004.

10:37:28 2    A.      I have it.

10:37:28 3    Q.      And is this one of the documents you reviewed as part

10:37:32 4    of your work in the case?

10:37:33 5    A.      It is.  Yes.

10:37:36 6              MR. LIVERSIDGE:  Move to admit DTX-1004.

10:37:39 7              MS. FALK:  No objection.

10:37:39 8              THE COURT:  It's admitted.

10:37:40 9              (DTX Exhibit No. 1004 was admitted into

10:37:41 10   evidence.)

10:37:41 11   BY MR. LIVERSIDGE:

10:37:41 12   Q.      Dr. Stiroh, what is this document?

10:37:42 13   A.      As you can see from this, this is the title page for

10:37:45 14   it.  It is an Amgen document.  It's a 2024 global brand plan

10:37:50 15   for Repatha.  It says 2024, it is a forward-looking

10:37:55 16   document.  So this was created some time in 2023, looking

10:37:59 17   ahead to what the competitive situation is for Repatha.

10:38:02 18   Q.      Could you turn to Page 20 of the document?

10:38:04 19   A.      I have it.

10:38:12 20   Q.      If you see this slide at Page 20, it says at the top:

10:38:17 21   "Inclisiran remains of greatest competitive relevance for

10:38:21 22   Repatha in 2024."

10:38:23 23              Do you see that?

10:38:24 24   A.      I do.

10:38:25 25   Q.      And what does that mean?

Stiroh - Direct

10:38:26  1    A.    So this is -- this document is -- or this particular

10:38:30  2    page of it is showing from Amgen's perspective what the

10:38:34  3    competitive circumstance looks like for Repatha.

10:38:37  4         You see that big -- the grid on the left-hand

10:38:40  5    side?  That's a way of categorizing different competitors.

10:38:44  6    And so the commercial profile along the bottom, you know,

10:38:47  7    how well known is a product?  And the clinical profile going

10:38:50  8    up at the top, how good is the product at doing what it's

10:38:53  9    supposed to do; how good is it at treating patients?

10:38:55 10         And so up in that, the top right-hand corner, so

10:39:01 11    the shaded a little bit darker gray, you see what's called a

10:39:04 12    "high threat."  And there are two products in that

10:39:07 13    high-threat category.  One is alirocumab.  That's Praluent.

10:39:10 14    That's the other name that Praluent has.

10:39:12 15         And one is inclisiran.  And that's the other

10:39:14 16    name that Leqvio has.  And you see that inclisiran in this

10:39:20 17    document from 2024 is the highest threat.

10:39:22 18    Q.    And so does this indicate that, in Amgen's view,

10:39:27 19    Leqvio was its greatest competitive threat as of 2023-2024?

10:39:32 20    A.    It appears that way from this and there are other

10:39:35 21    statements in the document that say exactly that.

10:39:37 22    Q.    And does it also indicate that Amgen viewed Praluent

10:39:40 23    as a high-risk competitor and threat to it?

10:39:42 24    A.    Yes.  It is also in the high-threat category.  It's

10:39:45 25    just not as high a threat as inclisiran right here.

Stiroh - Direct

10:39:49  1    Q.     Let's look at another document.  If you go to

10:39:51  2    DTX-1508.

10:40:10  3    A.     I have that one.

10:40:11  4    Q.     Okay.  Do you recognize this document?

10:40:13  5    A.     I do.

10:40:14  6    Q.     Is this another document that you relied on for your

10:40:16  7    work?

10:40:17  8    A.     It is.

10:40:18  9            MR. LIVERSIDGE:  I would offer DTX-1508.

10:40:21 10            MS. FALK:  No objection.

10:40:22 11            THE COURT:  It's admitted.

10:40:23 12            (DTX Exhibit No. 1508 was admitted into

10:40:24 13    evidence.)

10:40:24 14    BY MR. LIVERSIDGE:

10:40:25 15    Q.     Can you tell us what this document is, Dr. Stiroh?

10:40:27 16    A.     Yes.  So this is another management planning

10:40:31 17    document.  This time, this is from Regeneron and it's

10:40:33 18    looking at it from Regeneron's perspective.  And we're

10:40:37 19    looking at Praluent now as the product.  And you can see the

10:40:40 20    date on it, that it is a March 2023 document.

10:40:46 21    Q.     All right.  If you'll look at Slide 18 or Page 18 of

10:40:49 22    the document.

10:40:50 23            Can you tell us what we're seeing on this slide?

10:40:52 24    A.     Yes.  So this is reflecting what we would call a SWOT

10:41:03 25    analysis, that is the S-W-O-T.  That stands for strengths,

Stiroh - Direct

10:41:07 1    weaknesses, opportunities and threats.  And that's a fairly

10:41:10 2    common management tool of how to look at the market

10:41:14 3    situation for a particular product.  And so that's what's

10:41:17 4    being reflected here.

10:41:20 5    Q.    And if we look down at the right side of the document

10:41:24 6    under "threats," what do we see?

10:41:25 7    A.    So under "threats," you can see that one of the

10:41:29 8    threats that -- again, this is Regeneron listing for

10:41:31 9    Praluent -- is Novartis' investments in inclisiran.  Again,

10:41:35 10   that's Leqvio.  And the reasons that it is giving is the

10:41:39 11   high awareness, that would be market awareness of the

10:41:42 12   product.

10:41:42 13          SOV means share of voice and that is how much

10:41:46 14   information is -- in the market is available, is accounted

10:41:49 15   for by Novartis promoting Leqvio.

10:41:52 16          And then also the attractive dosing, and we've

10:41:55 17   heard about that.  That Leqvio, you'd only need an injection

10:41:58 18   twice a year instead of every second week.

10:42:02 19   Q.    If we looked over at the left-hand side under

10:42:05 20   "Opportunities," the third bullet, it says, "Leverage

10:42:07 21   inclisiran SOV."

10:42:09 22          What did you draw from that?

10:42:10 23   A.    What I'm drawing from that is that, as of this time,

10:42:14 24   Regeneron is still seeing opportunities for Praluent in the

10:42:17 25   market.  And one of the opportunities for Praluent is to --

Stiroh - Direct

10:42:20  1   where it says, "Leverage inclisiran SOV," as there is more

10:42:25  2   awareness of PCSK9 products, then Praluent can kind of ride

10:42:31  3   along with that and that is a benefit to Regeneron or

10:42:34  4   Praluent if somebody else is doing advertising.

10:42:41  5   Q.     We've heard testimony about how Leqvio is performing

10:42:45  6   in the market.

10:42:45  7          Have you heard that testimony?

10:42:46  8   A.     I have -- sorry.  Yes, I have.

10:42:49  9   Q.     And what have you drawn from that testimony?

10:42:50 10   A.     The testimony that we heard this morning is that

10:42:53 11   Leqvio is growing in the market.  We've seen that there are

10:42:56 12   high sales for Leqvio.  I think there was testimony that

10:43:00 13   says it has 20-to-25-percent share of the revenue on PCSK9

10:43:05 14   products.  So it has become more and more competitively

10:43:09 15   important.

10:43:09 16   Q.     And Professor Scott Morton said Leqvio is not a

10:43:13 17   competitor in the PCSK9 market.

10:43:15 18          Is that a reasonable conclusion, in your view?

10:43:17 19   A.     It is not.

10:43:18 20   Q.     Why do you say that?

10:43:19 21   A.     To the best of my recollection, the reasons she gave

10:43:24 22   were not about competitive reasons.  It was that it is a

10:43:27 23   different type of product or administered in a different

10:43:30 24   way.  And that's not an economic reason to exclude it from

10:43:33 25   the market.

1860

Stiroh - Direct

10:43:34 1      What is in the market are the products that can

10:43:36 2 take sales away from one another.  Leqvio can take sales

10:43:39 3 away from Praluent and Repatha.  A patient being treated

10:43:44 4 with Leqvio is not being treated with Praluent or Repatha.

10:43:46 5 That is competition.

10:43:48 6 Q.      Now, Dr. Stiroh, do you recall Professor Scott Morton

10:43:51 7 testifying that Repatha has a monopoly?

10:43:53 8 A.      I do.

10:43:55 9 Q.      Do you agree with her?

10:43:55 10 A.      I disagree.

10:43:57 11 Q.      Why is that?

10:43:58 12 A.      As, again, for the reasons that I described earlier

10:44:00 13 when I was talking about what a monopoly is.  A monopoly

10:44:03 14 does not face price competition from somebody else trying to

10:44:06 15 take sales away.

10:44:08 16      What's listed on the screen are the three

10:44:10 17 reasons that she gave.  She said there were high prices,

10:44:14 18 high market share and high entry barriers.  And that's just

10:44:16 19 not sufficient.

10:44:17 20      The high price and high market share kind of go

10:44:19 21 together with a monopoly.  But what we've seen in this case,

10:44:22 22 price coming down while that share is increasing, and that

10:44:27 23 means that, even though Amgen may have a high share, it's

10:44:30 24 not able to use that high share to get a high price.  It

10:44:34 25 only got the high share by offering a lower price.

Stiroh - Direct

10:44:37 1      So those two conditions don't hold for her

10:44:40 2    analysis.

10:44:41 3            And then high entry barriers.  I agree, in

10:44:43 4    pharmaceutical markets, there are high entry barriers.  It

10:44:47 5    costs a lot to bring a new drug to market.  But in this

10:44:50 6    market, high entry barriers don't protect Amgen because

10:44:53 7    there's two competitors already there.  There's Praluent and

10:44:57 8    Leqvio.  So it doesn't have a monopoly already when there

10:45:00 9    are other competitors already in the market.

10:45:03 10           And then there are other products in the

10:45:05 11   pipeline that we've heard about as well.

10:45:08 12   Q.    And did you hear Professor Scott Morton give various

10:45:11 13   market share figures for Amgen?

10:45:12 14   A.    I did.

10:45:13 15   Q.    Are those figures correct if Leqvio is included in

10:45:16 16   the market?

10:45:16 17   A.    They are not.  Her -- her -- what she called the

10:45:20 18   market share was the figures with only Praluent and Repatha.

10:45:23 19   She didn't include Leqvio.  And had she included Leqvio,

10:45:27 20   then Leqvio has a share of about 20 to 25 percent.  So her

10:45:32 21   shares would be lower than what she reported.

10:45:35 22   Q.    Let's go to your next conclusion, which is that

10:45:38 23   Amgen's portfolio rebates have not caused anticompetitive

10:45:41 24   effects.

10:45:43 25           How did you reach that opinion?

Stiroh - Direct

10:45:44 1    A.    So, again, I looked at the same types of information

10:45:48 2    that I looked at with respect to monopoly.  And I am seeing

10:45:52 3    that prices coming down and access and availability of the

10:45:56 4    product and sales of the product going up.  And so that is

10:46:00 5    essentially the opposite of what we would expect for

10:46:03 6    anticompetitive effects.

10:46:04 7    Q.    And just briefly, as an economist, what are

10:46:08 8    anticompetitive effects?

10:46:08 9    A.    Yeah.  Sure.  So competition benefits consumers.

10:46:14 10   Procompetitive, something that makes consumers better off.

10:46:17 11   Anticompetitive is something that makes consumers worse off.

10:46:19 12   So we think of anticompetitive effects as things that drive

10:46:24 13   prices higher, that reduce access, that drive sales lower.

10:46:28 14   Q.    We've heard a fair bit in this trial about Enbrel.

10:46:31 15         In your opinion, does Enbrel have the power to

10:46:34 16   bring about anticompetitive effects in the market?

10:46:37 17   A.    It does not.

10:46:38 18   Q.    And just to begin, why did you look at whether Enbrel

10:46:43 19   has market power?

10:46:44 20   A.    It was part of Regeneron's claims that Enbrel had

10:46:48 21   market power, and it was something that Dr. Professor Scott

10:46:51 22   Morton looked at, whether there was power in Enbrel that

10:46:55 23   Amgen could use to force a good outcome for Repatha.  And so

10:46:59 24   I looked at whether Enbrel had market power and could it be

10:47:03 25   used to coerce a PBM into doing something that it didn't

Stiroh - Direct

10:47:07 1    otherwise want to do.

10:47:09 2    Q.    Let's bring up our next slide.

10:47:12 3          What are we seeing here?

10:47:14 4    A.    So we -- this is a slide from -- for ESI.  It's

10:47:18 5    showing their formulary.  And you see inflammatory

10:47:21 6    conditions.  That is what Enbrel is used to treat.  And so

10:47:25 7    for all of these columns, they are all different -- they're

10:47:28 8    acronyms for different conditions.  Enbrel appears in green

10:47:32 9    in the first four of these rows.  It's -- it is something

10:47:35 10   that is available to treat all of these conditions, but

10:47:38 11   there are always other products in green as well.

10:47:42 12         Maybe if we could blow up the RA column.  So

10:47:47 13   rheumatoid arthritis, you see Enbrel there that you can

10:47:49 14   treat it.  But you also see Humira, that's a big selling

10:47:53 15   drug, and five -- or four other products that are also

10:47:56 16   available to patients being treated for rheumatoid

10:48:00 17   arthritis.

10:48:00 18         And then you see another six drugs in yellow.

10:48:03 19   Those are the ones that you'd have to try one of the green

10:48:06 20   products first or you'd have to get some statement that it's

10:48:10 21   medically necessary.  But those are also available, just

10:48:13 22   after usually trying one of the green ones.

10:48:15 23   Q.    And what do you draw from this information?

10:48:17 24   A.    That Enbrel has -- there's other alternatives to

10:48:21 25   treat the same conditions that Enbrel treats.  It faces

Stiroh - Direct

10:48:25  1    competition from these other products.

10:48:27  2    Q.    Did you consider evidence related to Enbrel's share?

10:48:30  3    A.    I did.

10:48:33  4    Q.    If you'll look at a document in your binder, which is

10:48:35  5    DTX-0965.

10:48:47  6    A.    I have it.

10:48:48  7    Q.    Is this a document you relied on for purposes of your

10:48:51  8    work?

10:48:51  9    A.    It is.

10:48:54 10          MR. LIVERSIDGE:  I move to admit DTX-0965.

10:48:58 11          MS. FALK:  No objection.

10:48:59 12          THE COURT:  It's admitted.

10:49:00 13          (DTX Exhibit No. 0965 was admitted into

10:49:00 14    evidence.)

10:49:00 15    BY MR. LIVERSIDGE:

10:49:01 16    Q.    Dr. Stiroh, what are we seeing here on the screen?

10:49:03 17    A.    These are shares.  This document was created by

10:49:06 18    Amgen, and this document -- this page that we're looking at

10:49:09 19    appears in a broader slide deck.  And it is showing the

10:49:13 20    shares of different products that are used to treat

10:49:19 21    rheumatology conditions.  And so that red line at the top

10:49:21 22    with the 39, that is Humira's share.  And then the blue

10:49:25 23    one -- well, I don't know, teal, I guess.  The second one

10:49:28 24    down, that is sort of on a decline and gets down to

10:49:32 25    21 percent, that is Enbrel's share.

Stiroh - Direct

10:49:34  1              So by the end of this period, I think 2021 is at

10:49:37  2       the end, a 21-percent share is Enbrel's share at the end of

10:49:41  3       this period.

10:49:41  4       Q.      And what conclusion did you draw from Enbrel having

10:49:44  5       only a 21-percent share?

10:49:46  6       A.      A 21-percent share is not monopoly power.  It -- it

10:49:50  7       faces lots of competition.

10:49:52  8       Q.      Let's look at another slide.

10:49:54  9              What's reflected on this slide?

10:49:55 10       A.      So this is something that I looked at specifically

10:49:57 11       for economic evidence of substitution.  So I'm not a medical

10:50:04 12       doctor, so I look at what happens in the market and whether

10:50:07 13       I see evidence of substitution; one product being used in

10:50:10 14       place of another.  And this is showing what happened in 2015

10:50:15 15       when OptumRx and UHC took Enbrel off the formulary and put

10:50:20 16       Humira on in its place.

10:50:22 17              And you can see the blue line and the red lines

10:50:25 18       switch there in 2015.  That -- the effect of removing Enbrel

10:50:30 19       from the formulary and putting Humira on, Humira's share

10:50:34 20       goes up, Enbrel's share goes down.  And that's what an

10:50:37 21       economist takes into account.  So even though these are

10:50:40 22       medical things and I'm not a medical doctor, that's the type

10:50:43 23       of thing that I would look at to say, I see substitution.  I

10:50:46 24       see a PBM being able to make a choice of what's on the

10:50:49 25       formulary driving the share and Enbrel losing sales to

Stiroh - Direct

10:50:52 1    Humira because of that.

10:50:54 2    Q.    Now, Dr. Stiroh, you've concluded that Enbrel does

10:50:57 3    not have market power.

10:50:58 4           Have you seen a real-world example in this case

10:51:01 5    demonstrating that Amgen's portfolio rebates aren't

10:51:05 6    coercive?

10:51:05 7    A.    I have.  What's shown on the screen, this is one of

10:51:08 8    the competitions to be on a formulary that you've heard a

10:51:12 9    lot about in this case.  And for CVS Caremark, there was an

10:51:16 10   offer made that included an Enbrel overlay and additional

10:51:22 11   rebates to CVS to have Enbrel, and Otezla and Repatha on the

10:51:28 12   formulary.  And CVS rejected that and decided to keep just

10:51:33 13   Otezla and Enbrel with the Enbrel overlay or negotiated for

10:51:36 14   that, but rejected the offer that had Repatha as part of it.

10:51:42 15   Q.    Did CVS, nonetheless, keep the Enbrel rebates?

10:51:45 16   A.    It did.  Yes.

10:51:47 17   Q.    Let's turn briefly to Otezla.

10:51:49 18          Did you conduct the same analysis for Otezla?

10:51:51 19   A.    I did.  I looked at the same types of things.  I

10:51:55 20   looked at whether there are alternatives to treat the

10:51:57 21   conditions.  I looked at whether there was testimony in the

10:52:00 22   record that there was economic substitutes as well as just

10:52:03 23   being technical substitutes.  And I looked at evidence

10:52:06 24   that -- in the record of Otezla actually being excluded from

10:52:11 25   formularies.  And that's that third bullet that there are

1867

Stiroh - Direct

10:52:14  1    Part D formularies for CVS, OptumRx and Humana that have not

10:52:20  2    included Otezla at all and include other products to treat

10:52:22  3    the same conditions.

10:52:24  4    Q.    And what conclusions did you reach regarding Otezla?

10:52:26  5    A.    That Otezla also does not have market power and can't

10:52:30  6    be used to coerce a PBM into doing something with Repatha

10:52:33  7    that the PBM doesn't want to do for other reasons.

10:52:38  8    Q.    Let's bring up our next slide, and this is a slide

10:52:41  9    that was shown during Dr. Gaier's testimony.

10:52:46 10          As part of your work, Dr. Stiroh, did you

10:52:48 11    consider whether the scope of the claimed foreclosure at

10:52:52 12    ESI/Ascent Commercial was sufficient to cause

10:52:55 13    anticompetitive effects?

10:52:56 14    A.    I did.

10:52:56 15    Q.    What did you conclude?

10:52:58 16    A.    So here, for purposes of my analysis, I'm

10:53:01 17    considering, you know, suppose that there is this -- a

10:53:03 18    particular contract that Regeneron can't compete for.  Does

10:53:08 19    that affect their ability to compute -- compete?  And for me

10:53:12 20    looking at whether there's foreclosure in a whole market, I

10:53:16 21    look at whether there's an ability to continue to compete.

10:53:19 22    And that 7 percent is too small to affect Regeneron's

10:53:22 23    ability to compete.

10:53:24 24          The same -- the contracts that can come up for

10:53:27 25    grabs the next year, the next year, the next year or

Stiroh - Direct

10:53:30 1    whenever the PBM wants to bring them up, and there's

10:53:33 2    93 percent of the market that has every other PBM.  There's

10:53:37 3    also -- there's the custom formularies.  There's the Part D

10:53:40 4    formularies.  You've heard a lot about this.  But there's

10:53:43 5    all of that remaining competition in the market.

10:53:48 6    Q.    Thank you.

10:53:48 7          We've heard a lot about rebates and bundled

10:53:52 8    rebates in this trial.

10:53:54 9          Do rebates have the potential to benefit

10:53:56 10   patients?

10:53:57 11   A.    They do.  Yes.

10:53:58 12   Q.    How so?

10:53:59 13   A.    So the rebates get paid from the drug company to the

10:54:04 14   PBM, and then the PBM passes those through to the insurance

10:54:10 15   company, those are the payers on this slide.  The payer is

10:54:12 16   the insurance company or employers.  They are the people

10:54:15 17   that are paying the insurance costs.  So by having rebates

10:54:19 18   to the PBMs, the insurance costs go down, and that's how

10:54:23 19   patients benefit.  We've heard there's not a direct link

10:54:26 20   between a rebate, and a product and the price on that

10:54:29 21   product.  The linkage is through all of the rebates going to

10:54:32 22   the PBMs, then there's the filter through to the payers and

10:54:36 23   that can affect insurance costs.  So rebates lower the cost

10:54:39 24   of insurance or healthcare for patients.  And that's how

10:54:43 25   they benefit.

Stiroh - Direct

10:54:44 1    Q.    Do you recall Professor Scott Morton testifying that

10:54:48 2    rebates on Enbrel don't benefit Repatha patients and vice

10:54:53 3    versa?

10:54:53 4    A.    I do.

10:54:53 5    Q.    Do you agree with her?

10:54:54 6    A.    No, that's wrong.  There's not that direct connection

10:54:57 7    between a rebate on a particular product and then the price

10:55:00 8    that a patient pays for any sort of medical service it gets.

10:55:05 9    An insured patient pays a co-pay or a co-insurance and, you

10:55:11 10   know, maybe other things, but it's not directly related to a

10:55:15 11   rebate.  And instead, the Enbrel rebates, or the Repatha

10:55:18 12   rebates or the Praluent rebates just don't get collected by

10:55:21 13   the PBMs.  And then they can be passed through and just

10:55:24 14   lower, generally, the cost of insurance.

10:55:27 15   Q.    Are you saying that Enbrel rebates are as important

10:55:30 16   as Repatha rebates?

10:55:31 17   A.    For this, yes.

10:55:34 18   Q.    Did Professor Scott Morton consider the benefit of

10:55:37 19   the additional Enbrel rebates Amgen paid?

10:55:39 20   A.    No, she did not include that in any of her analyses.

10:55:45 21   Q.    Finally, did you hear Professor Scott Morton testify

10:55:48 22   that Amgen's portfolio rebates have caused consumers to have

10:55:52 23   fewer choices in the market?

10:55:53 24   A.    I did.  Yes.

10:55:55 25   Q.    Do you agree?

Stiroh - Cross

10:55:56  1    A.      I don't.

10:55:57  2    Q.      Why is that?

10:55:57  3    A.      There are still the same number of choices.

10:56:00  4            If a PBM wanted Praluent in any sort of

10:56:04  5    strength, it is available.  If a doctor wanted to prescribe

10:56:07  6    it, it is available to the patient.  There are still choices

10:56:10  7    in the market, and we see that there are going to be

10:56:13  8    increased choices going forward from other products in the

10:56:16  9    pipeline.

10:56:16 10    Q.      And also increased choice from Leqvio?

10:56:19 11    A.      Including Leqvio, yes.

10:56:21 12            MR. LIVERSIDGE:  Thank you, Dr. Stiroh.

10:56:28 13                      CROSS-EXAMINATION

10:56:29 14    BY MS. FALK:

10:56:37 15    Q.      Good morning, Dr. Stiroh.

10:56:39 16            I want to ask you a couple of questions about

10:56:40 17    your testimony.  I'm going to start in reverse order, so I'm

10:56:43 18    going to talk about Enbrel and Otezla first.

10:56:45 19            You agree with Professor Scott Morton and

10:56:47 20    Amgen's own witnesses that both Enbrel and Otezla are

10:56:50 21    blockbuster drugs; right?

10:56:51 22    A.      I -- yes, I don't disagree with that.

10:56:53 23    Q.      And you agree with Professor Scott Morton that both

10:56:55 24    Enbrel and Otezla have above 90-percent margins; right?

10:56:58 25    A.      I don't dispute the analysis on that.  That does not

Stiroh - Cross

10:57:02  1    establish monopoly power.

10:57:04  2    Q.    It's a yes-no question.

10:57:06  3          You agree; right?

10:57:06  4    A.    I don't dispute it, yes.

10:57:08  5    Q.    Okay.  And you agree that there are no generics or

10:57:10  6    biosimilars for Enbrel or Otezla; right?

10:57:12  7    A.    Well, for Enbrel or Otezla, that is right.  But for

10:57:16  8    Humira, one of the other products --

10:57:16  9    Q.    I'm not asking you about Humira.  I'm asking you

10:57:19 10    specifically -- if you listen to my question -- for Enbrel

10:57:21 11    and Otezla, you don't dispute that there are no cheaper

10:57:24 12    biosimilars or generics for those drugs?

10:57:27 13          You don't dispute that?

10:57:28 14    A.    I don't think I have that information at my

10:57:32 15    fingertips to know what the prices are of the products.

10:57:35 16    There are Humira biosimilars --

10:57:37 17    Q.    Again, my question was Enbrel and Otezla.

10:57:39 18          You do not dispute that there are no generics or

10:57:42 19    biosimilars for Enbrel or Otezla; right?

10:57:45 20    A.    I -- I believe that is correct.  Yes.

10:57:48 21    Q.    Okay.  You disagree with Professor Scott Morton that

10:57:50 22    Enbrel and Otezla's blockbuster drug status, high margins

10:57:54 23    and broad formulary coverage mean they have market power;

10:57:57 24    right?

10:57:57 25    A.    I disagree with her opinion that they have market

Stiroh - Cross

10:58:00  1    power.  The fact that they would be called a blockbuster has

10:58:04  2    to do with the size of the sales, not the market power of

10:58:07  3    the manufacturer.  They do not have market power for the

10:58:10  4    reasons that I have shown, but I don't disagree they have

10:58:14  5    high sales.

10:58:14  6    Q.    So you understand that the Enbrel overlay isn't

10:58:16  7    giving additional Enbrel to patients; right?

10:58:18  8          That's giving rebates to PBMs; right?

10:58:20  9    A.    I do understand that.  Yes.

10:58:22 10    Q.    And giving money payoffs affect competition in your

10:58:26 11    analysis?

10:58:26 12    A.    In this scenario that I have studied, that additional

10:58:29 13    amount can benefit patients.  And from the analysis that I

10:58:32 14    have done, it does not sway a decision for all of the

10:58:37 15    formularies that don't even accept an Enbrel overlay.

10:58:39 16    Q.    All right.  I'm going to talk now about your opinion

10:58:42 17    on Repatha and its monopoly power.  You don't disagree that,

10:58:45 18    compared to Praluent, Repatha has over 90-percent market

10:58:45 19    share.

10:58:49 20          We've heard that all week; right?

10:58:50 21    A.    I think it matters what point in time you are looking

10:58:53 22    at.  That was exactly part of my analysis -- that as it has

10:58:58 23    gained market share, prices come down.  So I do disagree

10:59:00 24    that that is -- you would draw an inference of monopoly

10:59:03 25    power or market power.

Stiroh - Cross

10:59:04  1    Q.    I think -- that's not my question.  If you could just

10:59:07  2    listen to my question, please, Dr. Stiroh.

10:59:08  3          You don't disagree that, compared to Praluent,

10:59:11  4    Repatha has over 90-percent market share; right?

10:59:14  5    A.    I don't disagree.  No.

10:59:16  6    Q.    Okay.  And you testified in this -- a little bit this

10:59:18  7    morning -- that if you count Leqvio in, there's a certain

10:59:21  8    percentage of market share.  So even with Leqvio included in

10:59:24  9    the marketplace, Repatha still has over 70-percent market

10:59:2810    share based on your figures; right?

10:59:3011    A.    I don't know that that's true.  I thought it maybe

10:59:3212    came down to about 65, but something, yes.

10:59:3413    Q.    All right.  And you don't disagree -- I actually

10:59:3714    think I heard you say you agreed on direct that the PCSK9

10:59:4015    market, like any other pharmaceutical drug market, has high

10:59:4416    barriers to entry; right?

10:59:4517    A.    I absolutely agree, there are high barriers to entry.

10:59:4818    They've just already been overcome.

10:59:4919    Q.    Okay.  You agree that Leqvio falls under medical

10:59:5220    benefits; right?

10:59:5221    A.    I do.

10:59:5222    Q.    Okay.  And Leqvio is a Part B drug that can't market

10:59:5723    directly to PBMs; right?

10:59:5824    A.    That is outside of my field.  I did hear testimony

11:00:0225    that Mr. Niksefat said that, in fact, 45 percent, I think,

Stiroh - Cross

1  of the Leqvio sales are through the pharmaceutical benefit

2  channel.  So not all of its sales are through the medical

3  benefit channel.

4  Q.    You agree, though, that Praluent and Repatha are

5  what's called pharmacy benefit drugs; right?

6  A.    I do, yes.

7  Q.    And the P in PBM is for pharmacy; right?

8  A.    My understanding is that that is, yeah.  Correct,

9  yes.

10  Q.    And PBMs don't negotiate the price of medical benefit

11  drugs; right?

12  A.    I don't know that that is entirely true, that they

13  would negotiate for the drugs that are on the formularies.

14  But their role is to lower costs for the healthcare

15  organizations.

16  Q.    What drugs are on the formularies?

17        Are those pharmacy benefit drugs on the

18  formularies?

19  A.    The -- by definition, that is what --

20  Q.    Yes.  By definition --

21  A.    -- the definition --

22  Q.    -- pharmacy benefit drugs negotiate -- PBMs negotiate

23  for pharmacy benefit drugs; right?

24  A.    PBMs are all just to lower healthcare costs and, if

25  necessary, then they can drive utilization and drive

Stiroh - Cross

11:01:03  1    utilization to the medical channel.  So there -- there are

11:01:06  2    tools for --

11:01:07  3    Q.     I think you need to --

11:01:07  4    A.     -- competition.

11:01:08  5    Q.     -- listen to my question, Dr. Stiroh.

11:01:11  6            By definition, PBMs negotiate for pharmacy

11:01:13  7    benefit coverage; right?

11:01:15  8            Formulary coverage is for pharmacy benefits?

11:01:17  9    A.     I agree with part of what you said --

11:01:19 10    Q.     Okay.

11:01:19 11    A.     -- in your question, but not all of it.

11:01:20 12    Q.     All right.  You're not aware of any PBM, any PBM ever

11:01:24 13    choosing to cover Leqvio on its formulary over Praluent or

11:01:28 14    Repatha; right?

11:01:28 15    A.     I'm aware of ESI considering the fact that it can

11:01:35 16    lower costs for its client, the healthcare organization, by

11:01:39 17    utilization management, which would include pushing sales

11:01:43 18    towards the medical channel, not the pharmacy channel.

11:01:46 19    Q.     Was that choice made by ESI?

11:01:47 20            Is that your testimony that ESI chose to cover

11:01:50 21    Leqvio over Praluent or Repatha?

11:01:52 22            Is that your testimony under oath?

11:01:53 23    A.     It is not my testimony.

11:01:54 24    Q.     Okay.  Thank you.

11:01:55 25    A.     Nor is it what I just said.

Stiroh - Cross

11:01:57  1    Q.     Okay.  To be clear, you're not here to testify that

11:01:59  2    there's any procompetitive benefit to Amgen's conduct;

11:02:03  3    right?

11:02:03  4    A.     I am.  There is a procompetitive benefit to Amgen's

11:02:07  5    conduct, and that benefit comes from if the conduct is found

11:02:11  6    that there is some Enbrel overlay that should not have been

11:02:15  7    there, that's additional rebate in the market.  And that

11:02:19  8    additional rebate should be considered.

11:02:21  9    Q.     But that additional rebate could have just been

11:02:23 10    offered head-to-head on Repatha, couldn't it?  There was no

11:02:26 11    reason for it to come off of Enbrel; right?

11:02:30 12           Do you agree?

11:02:31 13    A.     The additional rebate could be offered in the

11:02:34 14    scenario -- where you're considering there is some

11:02:37 15    additional amount that shouldn't have been there, that

11:02:39 16    additional amount has a procompetitive benefit that it is

11:02:43 17    lowering costs further than what otherwise would have been.

11:02:45 18    Q.     Let me direct you to my question again, Dr. Stiroh.

11:02:47 19    There is no procompetitive reason why that additional rebate

11:02:51 20    didn't have to come off of the top of Repatha and had to

11:02:53 21    come off the top of Enbrel.  They could have just done

11:02:56 22    head-to-head competition, had the same procompetitive

11:02:59 23    benefits, lowering insurance costs.

11:03:02 24           You just testified about that; right?

11:03:03 25    A.     There could have been other ways to structure its

1877

Stiroh - Cross

11:03:05 1    benefits, yes.

11:03:06 2    Q.     Thank you.

11:03:07 3           You heard Dr. Gaier testify this morning that

11:03:09 4    since the challenged conduct occurred in mid-2020, Praluent

11:03:12 5    has had the lower list price and the lower net price; right?

11:03:15 6           You heard that this morning?

11:03:16 7    A.     I heard that, yes.

11:03:17 8    Q.     Okay.  And you've been here the entire trial; right?

11:03:20 9    So you've heard, almost every day, testimony that Amgen can

11:03:23 10   charge higher prices because of Praluent's low market share;

11:03:26 11   right?

11:03:26 12   A.     I think the testimony is that it could offer lower

11:03:30 13   rebates to get the same value to the PBM.

11:03:34 14   Q.     All right.  And Dr. Gaier testified about that

11:03:36 15   yesterday.

11:03:36 16          MS. FALK:  Let's put up 1681 and 1682 from the

11:03:39 17   trial transcript.

11:03:39 18   BY MS. FALK:

11:03:42 19   Q.     And he said, "The idea is that it's not just the

11:03:44 20   rebate amount that matters.  It's the rebate amount

11:03:46 21   multiplied by the market share or the amount of value that

11:03:49 22   can be steered by the PBM to one product or the other."

11:03:51 23          You were here for that testimony; right?

11:03:52 24   A.     I was, yes.

11:03:54 25   Q.     And we -- you know that since 2020, Praluent's share

Stiroh - Cross

11:03:56  1    has dropped from 33 percent down to less than 10 percent;

11:03:59  2    right?

11:03:59  3    A.    I'm aware of that.  Yes.

11:04:01  4    Q.    And despite that, you are telling the jury today that

11:04:04  5    Praluent is just as effective a competitor today with lower

11:04:07  6    market share as it was in 2020?

11:04:09  7    A.    I am.  The prices that you see --

11:04:11  8    Q.    It doesn't matter to you whether it's 30 percent or

11:04:12  9    10?

11:04:12 10    A.    -- today are still low.  They have not gone back up,

11:04:16 11    and that means to me, as an economist, that there are still

11:04:18 12    meaningful, competitive threats.  Whether it's coming from

11:04:21 13    Praluent, or Leqvio or things expected in the future, there

11:04:25 14    are competitive threats that have kept the price low.

11:04:28 15    Q.    So, to you, it makes no difference whether Praluent's

11:04:30 16    at 30 percent of the market, 10 percent of the market, 1

11:04:33 17    percent of the market; right?

11:04:34 18    A.    I'm not sure what you're asking me it makes no

11:04:37 19    difference for, but if the question is does it make a

11:04:39 20    difference for whether Amgen has market power, Amgen does

11:04:43 21    not have market power.  It does not have monopoly power for

11:04:46 22    Repatha.  And we see that by the price effect.

11:04:49 23    Q.    So your testimony -- you're telling the jury that

11:04:51 24    even if Praluent's market share shrinks from the 7 percent

11:04:54 25    it is today, Praluent would still be a constraint on

Stiroh - Redirect

11:04:58 1    Repatha's prices; right?

11:04:59 2    A.    That is what we have seen.  That is what Ms. McCourt

11:05:02 3    testified to earlier, that they are still there trying to

11:05:05 4    get sales.  And we see the effects in what the prices are.

11:05:08 5    Q.    That's just like Professor Scott Morton's testimony

11:05:11 6    where she said that a bus could be a constraint on car

11:05:13 7    prices; right?

11:05:14 8    A.    It is not.  We actually see that.  She did not do an

11:05:18 9    analysis of bus prices and car prices.  I have done an

11:05:22 10   analysis of prices, seen what happened in the market because

11:05:25 11   of the competition, and we see the effect of that

11:05:28 12   competition.

11:05:28 13   Q.    All right.  And one more question for you.

11:05:30 14            MS. FALK:  If we could pull up DTX-1004,

11:05:33 15   Page 20.

11:05:33 16   BY MS. FALK:

11:05:33 17   Q.    It's one of the slides you went through with your

11:05:36 18   counsel on direct.

11:05:38 19            And you testified that inclisiran had the

11:05:41 20   highest threats to Repatha.

11:05:42 21            You saw that?

11:05:43 22   A.    I did.  Yes.

11:05:44 23   Q.    And inclisiran is considered the highest threat

11:05:47 24   because Praluent's market share has gone so much lower;

11:05:50 25   right?

Stiroh - Redirect

11:05:50  1    A.      I'm not sure where you're --

11:05:55  2    Q.      I'll withdraw it.

11:05:56  3    A.      -- reading that.

11:05:56  4            MS. FALK:  I'm done.  Thank you.

11:06:04  5                      REDIRECT EXAMINATION

11:06:06  6    BY MR. LIVERSIDGE:

11:06:12  7    Q.      Dr. Stiroh, if you'll just look in your binder at

11:06:15  8    Exhibit DTX-1154.

11:06:18  9    A.      I have it.

11:06:21 10    Q.      All right.  Thank you.

11:06:22 11            Is this another document that you considered as

11:06:26 12    part of your work in this case?

11:06:27 13    A.      Yes.

11:06:31 14            MR. LIVERSIDGE:  I'll offer DTX-1154.

11:06:36 15            MS. FALK:  No objection.

11:06:37 16            THE COURT:  It's admitted.

11:06:38 17            (DTX Exhibit No. 1154 was admitted into

11:06:38 18    evidence.)

11:06:38 19    BY MR. LIVERSIDGE:

11:06:39 20    Q.      What is this document, Dr. Stiroh?

11:06:40 21    A.      Take my glasses off.  This is an email from Adam

11:06:46 22    Kautzner to Amy Bricker at Express Scripts, ESI.

11:06:50 23    Q.      And if you go over to Page 4 of the document, you see

11:06:53 24    that they are discussing PCSK9, if you look down towards the

11:07:01 25    bottom of the page.

11:07:04  1   A.      I've got it.

11:07:08  2   Q.      And do you have an understanding of what's being

11:07:12  3   discussed here?

11:07:13  4   A.      I can read the words under the PCSK9 and see the

11:07:18  5   discussion at ESI that they see this being -- inclisiran or

11:07:23  6   Leqvio as another competitor to the existing PCSK9s.  It

11:07:28  7   goes on to say, "Payers are starting to really look at cost

11:07:32  8   across the medical and pharmacy side."

11:07:34  9           That is what I was referring to earlier.  The

11:07:38 10   goal for a PBM is keep costs down.  One way to do that is

11:07:42 11   consider trade-offs with the medical side.

11:07:44 12           MR. LIVERSIDGE:  Thank you, Dr. Stiroh.

11:07:48 13           THE COURT:  Thank you, Dr. Stiroh.  You may step

11:07:50 14   down.

11:07:50 15           THE WITNESS:  Thank you.

11:08:01 16           MR. DOREN:  Defense rests, Your Honor.

11:08:03 17           THE COURT:  All right.  Any more witnesses?

11:08:06 18           MR. POLKES:  There's no rebuttal, Your Honor.

11:08:08 19           THE COURT:  All right.  Ladies of the jury, we

11:08:10 20   are done for today.  What's going to happen next is I'm

11:08:13 21   going to cut you loose for today.  You have the afternoon

11:08:16 22   off.  I'm going to work out some issues with the lawyers

11:08:19 23   this afternoon.

11:08:19 24           Tomorrow morning when you come back, I'm going

11:08:21 25   to have some final jury instructions for you.  These are

| | |
|---|---|
| 11:08:24 1 | going to take a long time to read because there are a lot of |
| 11:08:27 2 | them. |
| 11:08:27 3 | After I'm done with that, we'll take a break or |
| 11:08:30 4 | maybe even during them, we might have to take a break.  And |
| 11:08:33 5 | then we'll hear closing arguments from each side and then |
| 11:08:36 6 | we'll send you back to the jury room for your deliberations. |
| 11:08:39 7 | I want to remind you again, as I've reminded you |
| 11:08:41 8 | during the case, that you are not to talk about the case |
| 11:08:44 9 | with each other or anyone else until we've heard the closing |
| 11:08:48 10 | arguments and you've gone back to the jury room to |
| 11:08:51 11 | deliberate. |
| 11:08:51 12 | My hope and expectation is that your lunches, if |
| 11:08:55 13 | they're not here, are going to be arriving shortly.  If you |
| 11:08:58 14 | want to wait around for those and take them to go, that's |
| 11:09:01 15 | fine, or you're welcome to hang out and eat them in the jury |
| 11:09:04 16 | room if you'd like. |
| 11:09:05 17 | If you don't, we'll put them in the fridge for |
| 11:09:07 18 | tomorrow and you can take them to go tomorrow; all right? |
| 11:09:11 19 | Mr. Koehler. |
| 11:09:11 20 | (Jury leaving the courtroom.) |
| 11:09:30 21 | THE COURT:  All right.  Please be seated. |
| 11:09:43 22 | All right.  Is there anything we need to address |
| 11:09:47 23 | right now? |
| 11:09:48 24 | MR. BANKS:  Your Honor, we have a Rule 50 |
| 11:09:50 25 | motion. |

11:09:50  1                    THE COURT:  Okay.

11:09:52  2                    MR. BANKS:  Good afternoon -- good morning,

11:09:58  3   Your Honor.

11:09:59  4                    Acknowledging that Your Honor has indicated that

11:10:03  5   you want to send the case to the jury, I'd like to make a

11:10:05  6   very brief Rule 50 motion, with that understanding, just for

11:10:09  7   the record.

11:10:10  8                    THE COURT:  Of course.

11:10:10  9                    MR. BANKS:  I'm going to start first with

11:10:13 10   Amgen's counterclaim.

11:10:23 11                    THE COURT:  Go ahead.

11:10:24 12                    MR. BANKS:  Sure.

11:10:25 13                    I'll start first with Amgen's counterclaim and

11:10:27 14   Regeneron moves under Rule 50(a) for judgment as a matter of

11:10:32 15   law in Amgen's counterclaim.

11:10:33 16                    Under the California UPA, Amgen represented

11:10:36 17   before trial that it's not proceeding to the jury on this

11:10:39 18   claim and has presented no evidence in support of this

11:10:42 19   claim.  We just wanted to ask the Court to enter judgment in

11:10:45 20   favor of Regeneron on that counterclaim.

11:10:47 21                    THE COURT:  Okay.  I think that was already

11:10:50 22   dropped.

11:10:50 23                    Counsel?

11:10:51 24                    MR. DOREN:  That's correct, Your Honor.

11:10:51 25                    THE COURT:  All right.  So we'll deal with that

11:10:53  1    in the final judgment.  We have an agreement by Amgen not to

11:10:56  2    try it, so...

11:10:57  3          MR. BANKS:  All right.  Perfect.

11:10:59  4          Turning to the antitrust claims, Regeneron moves

11:11:02  5    for judgment as a matter of law on its federal and state

11:11:05  6    antitrust claims.  Considering the evidence that has been

11:11:08  7    heard at trial, a reasonable juror considering that evidence

11:11:12  8    would have to conclude the following things:

11:11:14  9          Number one.  Repatha is a monopoly product.  The

11:11:17 10    evidence overwhelmingly shows that Repatha has a dominant

11:11:20 11    share, which began around 17 percent and now north of

11:11:24 12    90 percent.  Repatha's price had elevated above competitive

11:11:27 13    levels.  There were high barriers for entry and all of those

11:11:30 14    things are true, even if we include Leqvio in the market.

11:11:33 15          Second, Regeneron's strategy was a threat to

11:11:38 16    Amgen's monopoly.  The testimony shows, including from --

11:11:41 17    admissions by Amgen's -- Number 2, Amgen viewed Regeneron's

11:11:48 18    strategic shift as a threat to its monopoly position.  It

11:11:51 19    threatened to compete on price with aggressive bids.

11:11:54 20          Amgen did not want a price war, did not want to

11:11:57 21    compete where prices would erode and Praluent was a threat

11:12:01 22    to that.

11:12:01 23          Amgen responded by entrenching its -- and

11:12:06 24    growing its monopoly with conduct that resulted in

11:12:09 25    substantial harm to competition.  There's no dispute.  Even

11:12:12  1    admitted that Amgen engaged in cross-therapeutic bundling at

11:12:16  2    ESI, where Amgen was successful and intentioned its monopoly

11:12:20  3    position against a threat from Regeneron.  It brought its

11:12:23  4    portfolio bundle to bear hundreds of millions of dollars in

11:12:27  5    rebates in unrelated products.

11:12:29  6            Evidence shows that those were below-cost offers

11:12:32  7    in sales under the *PeaceHealth* framework in which Enbrel

11:12:36  8    rebates are allocated to Repatha.  There's no contrary

11:12:38  9    evidence if the test is applied correctly as *PeaceHealth*

11:12:42 10    directs.

11:12:42 11            Their admissions and -- from testifying

11:12:44 12    witnesses and documents that they -- that Amgen intended to

11:12:48 13    repeat this bundling strategy at the other large PBMs.

11:12:52 14    There's a bundle in the UnitedHealthcare and at CVS.  The

11:12:55 15    picture is clear, that CVS told Regeneron what it needed to

11:12:58 16    do to compete with the bundled offer.  And that resulted in

11:13:03 17    Amgen -- or, excuse me, Regeneron having to offer

11:13:07 18    uncompetitively low prices to CVS.

11:13:10 19            Amgen's bundling agreements,

11:13:14 20    including exclusionary conduct and result in growing

11:13:17 21    entrenched share, harms competition, and reasonably

11:13:20 22    restrains trade.  And it intended to do all of those things

11:13:25 23    and achieve that effect.  It allows Amgen to charge higher

11:13:28 24    and supercompetitive prices and exclude Praluent from the

11:13:31 25    market.

11:13:33 1              Amgen's strategy was particularly effective.

11:13:36 2     Given Repatha's status as a monopoly product, they were able

11:13:39 3     to maintain high prices and win bids, especially because

11:13:42 4     they had high market share.

11:13:44 5              Regeneron's had to offer lower prices to match

11:13:48 6     Amgen's offer because of this lower market share.  We heard

11:13:51 7     testimony from Gaier on that.  That's classic

11:13:53 8     anticompetitive conduct and classic anticompetitive effects.

11:13:56 9              Amgen has provided no procompetitive

11:13:58 10    justification for its conduct.  That's an element on which

11:14:00 11    Amgen bears the burden.  There's insufficient evidence in

11:14:02 12    the record to show that Amgen had procompetitive reasons for

11:14:07 13    its conduct.

11:14:08 14             Maintaining a monopoly is not a valid business

11:14:10 15    reason that excludes -- excuse me -- excuses exclusionary

11:14:15 16    conduct.  And the testimony here has been the primary

11:14:18 17    motivation for the conduct was to keep Repatha's price high

11:14:21 18    to preserve gross-to-net.

11:14:23 19             As a result of all of this, Amgen -- excuse me,

11:14:25 20    Regeneron has suffered damage.  Dr. Mathur has quantified

11:14:28 21    that damage using a conservative measure of damages.

11:14:31 22             Regeneron also moves for judgment as a matter of

11:14:34 23    law on the tortious interference claim, in addition to the

11:14:36 24    state law antitrust claims, based on the conduct that was

11:14:39 25    proved at trial.  A reasonable juror considering the

11:14:43  1    evidence would have to conclude the following things:

11:14:44  2            Regeneron had prospective business relationships

11:14:47  3    with the PBMs.  Amgen was aware of those opportunities,

11:14:51  4    having competed with Regeneron for formulary access for

11:14:54  5    years.  Amgen took deliberate action to ensure that

11:14:57  6    Regeneron could not enter contracts with the PBMs, including

11:15:00  7    the bundled rebate offers and contracts.

11:15:02  8            What Amgen did was wrongful under the antitrust

11:15:05  9    laws and, more broadly, was against the PBM rules and was

11:15:09 10    otherwise wrongful conduct.  But for Amgen's conduct,

11:15:13 11    Regeneron would have seen the benefit of the contracts with

11:15:16 12    the PBMs.

11:15:17 13            Finally, Amgen has asserted a mitigation

11:15:21 14    affirmative defense.  Regeneron moves as a -- for judgment

11:15:24 15    as a matter of law on Amgen's mitigation defense for which

11:15:28 16    Amgen bears the burden of proof.

11:15:30 17            Amgen must show that Regeneron could have

11:15:32 18    mitigated the harm caused by its conduct and that it could

11:15:35 19    have avoided some of the losses by taking deliberate action.

11:15:40 20            As Amgen's proposed instruction on this

11:15:42 21    element -- shows Amgen must prove that Regeneron failed to

11:15:45 22    take a specific step to limit its losses, that this failure

11:15:49 23    to take the step resulted in losses that would have been

11:15:51 24    greater had such steps been taken, and the specific --

11:15:55 25    excuse me, the specific amount by which Regeneron's losses

11:15:57  1    would have been avoided.

11:15:59  2           Amgen has not produced any evidence, much less

11:16:02  3    sufficient evidence to establish any of these factors.

11:16:04  4    Instead, the evidence shows the opposite, that Regeneron

11:16:07  5    learned that Amgen had engaged in this unlawful conduct, it

11:16:11  6    sent a cease-and-desist letter.  Amgen -- putting it on

11:16:13  7    notice of the conduct and the evidence shows that Amgen

11:16:16  8    continued to pursue that anticompetitive conduct replicating

11:16:20  9    it at additional PBMs.

11:16:22 10           Thank you, Your Honor.

11:16:24 11           THE COURT:  Thank you.

11:16:27 12           MS. JOHNSON:  Thank you, Your Honor.

11:16:32 13           Amgen opposes Regeneron's motion and Regeneron

11:16:36 14    has not provided any basis for judgment as a matter of law

11:16:40 15    or any basis to go to the jury, for that matter.

11:16:42 16           First, as to the allegation that it's undisputed

11:16:45 17    that Regeneron has been -- has monopoly power, the evidence

11:16:47 18    has shown that -- that -- excuse me, that Repatha has

11:16:52 19    monopoly power.  The evidence has shown that Amgen has no

11:16:55 20    ability to raise the price of Repatha without losing

11:16:59 21    customers to and losing share to Praluent.

11:17:02 22           The share is not determinative of monopoly power

11:17:05 23    and the evidence in this case does not establish monopoly

11:17:08 24    power or provide a basis to show it.

11:17:10 25           Second, on the allegation that Repatha was a

11:17:14 1    threat or Regeneron was a threat -- excuse me, to Repatha,

11:17:17 2    the threat that Regeneron is complaining about is

11:17:21 3    competition.

11:17:21 4         All that Amgen has been doing is compete

11:17:25 5    legitimately with Praluent and Regeneron, attempted to

11:17:29 6    compete through poor business decisions back.  And they

11:17:32 7    failed.

11:17:33 8         The bundling that Repatha -- that Regeneron

11:17:35 9    points to does not violate the law.  There is nothing

11:17:38 10   wrongful about engaging in bundling and there is no evidence

11:17:40 11   to suggest otherwise.

11:17:42 12        The allegation from Regeneron that there is no

11:17:46 13   dispute as to below-cost price is incorrect.  In fact,

11:17:50 14   Dr. Gaier has testified extensively about why the price was

11:17:54 15   neither below cost at Ascent/ESI, nor projected to be at the

11:17:58 16   time the contract was entered, which is what is relevant.

11:18:00 17        At CVS, Regeneron has offered no evidence to

11:18:04 18   establish antitrust injury or to establish any causation of

11:18:09 19   their additional supposed harms.

11:18:12 20        With respect to harm and competition, as we have

11:18:15 21   discussed extensively, Regeneron has not shown any

11:18:18 22   substantial foreclosure of the market, which is required for

11:18:21 23   all counts, nor has it shown a reduction of input of output

11:18:25 24   or an increase in prices.  Regeneron's own business

11:18:28 25   decisions have harmed it.  Amgen's actions have decreased

11:18:32 1    prices.

11:18:32 2              Regeneron is incorrect in the contingent that

11:18:37 3    there is no evidence of procompetitive benefits; in fact,

11:18:40 4    there's been extensive evidence in this trial that Amgen's

11:18:43 5    competition both lowered prices and increased competition on

11:18:46 6    the merits.

11:18:47 7              With respect to damages, Regeneron not only has

11:18:50 8    not provided evidence from which the Court could take

11:18:53 9    damages from the jury, Regeneron has not provided sufficient

11:18:55 10   evidence of damages at all.

11:18:57 11             Regeneron has not introduced evidence for the

11:18:59 12   key assumptions underlying Dr. Mathur's conclusions, causing

11:19:03 13   Dr. Mathur's opinion to be improper and should be struck.

11:19:07 14             Regeneron also ignores everything that Dr. Gaier

11:19:13 15   and Stiroh testified to in claiming that there is no

11:19:17 16   evidence on these economic issues.

11:19:19 17             Finally, on tortious interference, Regeneron

11:19:22 18   does not -- has still never established or introduced any

11:19:26 19   evidence to identify any specific business relationship with

11:19:31 20   which Amgen supposedly interfered.

11:19:33 21             The entirety of its theory in this case is that

11:19:37 22   Amgen interfered with the PBMs' decisions about what

11:19:40 23   formulary coverage to provide on its formularies.  That is

11:19:43 24   not a business relationship.

11:19:45 25             In addition, Regeneron has not offered any

11:19:48  1   evidence, much less evidence to take the issue from the

11:19:51  2   jury, of wrongful conduct.

11:19:52  3          With respect to the mitigation issue, there has

11:19:55  4   been extensive evidence over the entirety of the trial of

11:19:59  5   all the ways that Regeneron has failed to mitigate its

11:20:02  6   damages.  Among other things, if Regeneron had not adopted a

11:20:06  7   bad business strategy of cutting all sales and marketing

11:20:08  8   efforts, it would have been better positioned to compete,

11:20:12  9   regardless of what measures Amgen was taking.

11:20:14 10          In addition, the evidence has clearly shown ways

11:20:18 11   in which Regeneron has declined to meet requests from the

11:20:22 12   PBMs and has otherwise declined to seek parity.  It has

11:20:27 13   declined to take any of the steps that would be necessary to

11:20:30 14   compete with regard -- while those things mean that Amgen

11:20:33 15   has not engaged in any wrongful conduct causing harm, they

11:20:36 16   also establish the affirmative defense of mitigation.

11:20:39 17          THE COURT:  Thank you very much.

11:20:42 18          Anything to add?

11:20:43 19          MR. BANKS:  Nothing, Your Honor.

11:20:44 20          THE COURT:  All right.  I'll say, again, the

11:20:48 21   Supreme Court has instructed the District Courts that, while

11:20:49 22   they are permitted to enter a judgment as a matter of law,

11:20:53 23   they are not required to do so.  District Courts are, if

11:20:56 24   anything, encouraged to submit the case to the jury rather

11:20:59 25   than grant such motions.  So I will heed that encouragement

11:21:03  1    and I will submit the case to the jury and decide the legal

11:21:07  2    issues raised by the motions after trial.

11:21:09  3            Is there anything else we should talk about

11:21:13  4    right now?

11:21:13  5            MR. DOREN:  Just one other thing, Your Honor.

11:21:15  6            In opening statements, out of respect for the

11:21:18  7    Court and the jury, we didn't object, but there were

11:21:21  8    numerous instances where counsel for Regeneron, I think,

11:21:26  9    violated the Golden Rule, including at 123, Lines 18 to 21:

11:21:32 10    "They're one of the giant insurance companies that decide

11:21:35 11    what medicines will be covered and, therefore, which

11:21:38 12    medicines will be affordable and which ones won't be

11:21:40 13    affordable for you."

11:21:41 14            Page 125, Line 21 to 24:  "So instead of there

11:21:47 15    being fair head-to-head competition between Repatha --

11:21:50 16    Praluent and Repatha, instead of lowest price products

11:21:53 17    winning, which I assume is what everyone here wants."

11:21:57 18            At 126, Line 19 to 22:  "You ever wonder how

11:22:01 19    those decisions get made?  Because they're huge decisions

11:22:04 20    that impact our healthcare system, your health, and the

11:22:08 21    health of your loved ones."  And it goes on.

11:22:10 22            And I would just ask Your Honor, so we can avoid

11:22:14 23    any objections during closings, if you could admonish

11:22:17 24    Regeneron not to approach the issues in that way at this

11:22:21 25    stage of the case.

11:22:22  1                THE COURT:  Counsel.

11:22:23  2                MR. POLKES:  I'm not sure in what way counsel

11:22:26  3      means or -- or what's wrong with any of that or what the

11:22:30  4      basis is that he's suggesting there's an objection and what

11:22:33  5      Golden Rule he's referring to.  Those are all -- seem to be

11:22:38  6      facts that are true and consistent with the evidence that

11:22:42  7      we've heard in the case.

11:22:44  8                THE COURT:  So why don't you -- I assume you're

11:22:45  9      referring to the Golden Rule about asking the jurors to put

11:22:48 10      themselves in the place --

11:22:49 11                MR. DOREN:  Yeah, of course.  He's referring

11:22:51 12      specifically to how the outcome of this case and the issues

11:22:53 13      in this case may impact the jurors personally and/or to put

11:22:58 14      themselves in the shoes of others, and that's inappropriate

11:23:00 15      and improper.

11:23:01 16                THE COURT:  Okay.  So, of course, we can refer

11:23:04 17      to jurors using their common sense to decide the issues,

11:23:09 18      but, in general, we should be staying away from that.

11:23:11 19                I'm not making a decision that that line was

11:23:13 20      crossed in this case, but to the extent that's something

11:23:16 21      we're worried about, I think I've seen nodding from both

11:23:18 22      sides that we'll stay away from that.

11:23:20 23                MR. POLKES:  I understand, Your Honor.

11:23:21 24                MR. DOREN:  Thank you, Your Honor.

11:23:22 25                THE COURT:  Okay.  Anything else?

11:23:27 1          MR. DOREN:  Not here, Your Honor.

11:23:29 2          MS. JOHNSON:  Maybe just two.

11:23:32 3          We have made good progress on jury instructions.

11:23:35 4  We have a much narrower set.  We are going to -- I think

11:23:36 5  we're on track to file something by 1:00.

11:23:38 6          Is 3:00 when you said you wanted --

11:23:40 7          THE COURT:  Oh, yeah.  So I think we talked

11:23:42 8  about filing by 2:00 and then we can see you later, but if

11:23:45 9  you're on track to file something by 1:00 and think you are

11:23:47 10  at an impasse at that point, I'll take them earlier and then

11:23:50 11  we get done earlier.

11:23:50 12          MR. BANKS:  I think we should stick with 2:00,

11:23:51 13  Your Honor.

11:23:51 14          THE COURT:  Okay.  All right.

11:23:51 15          So we'll hear from you at 2:00 with the jury

11:23:54 16  instruction filing.  I want to at least have a chance to

11:23:58 17  flip through and see what it is before you come out, but I

11:24:01 18  also want to move expeditiously.

11:24:03 19          So why don't you plan to be here at 3:00.  But

11:24:11 20  if I need more time, we'll let you know if we can.

11:24:14 21          MS. JOHNSON:  Perfect.

11:24:15 22          THE COURT:  How are we doing on the verdict

11:24:17 23  form?

11:24:18 24          MR. BANKS:  We still need to confer on that,

11:24:20 25  Your Honor.

11:24:20  1                    THE COURT:  Okay.  All right.  Thank you.

11:24:22  2                    MR. STOCK:  One last thing, Your Honor.

11:24:24  3                    THE COURT:  Yes.

11:24:25  4                    MR. STOCK:  You may have noticed during

11:24:27  5      Dr. Stiroh's testimony, one of the documents used was a

11:24:31  6      "2024 Brand Plan."  We just wanted to make sure we got on

11:24:33  7      the record that that's a very highly confidential document.

11:24:36  8      We want to seal all portions that were not used in the

11:24:39  9      public testimony.

11:24:40 10                    THE COURT:  Absolutely.  We'll admit it under

11:24:41 11      seal, pursuant to redactions that were discussed in open

11:24:45 12      court.

11:24:45 13                    MR. STOCK:  Thank you, Your Honor.

11:24:46 14                    THE COURT:  You know what I meant.  Subject to

11:24:49 15      the part that wasn't -- that was discussed in open court,

11:24:51 16      we'll redact the rest.

11:24:52 17                    Anything else?

11:24:53 18                    MR. DOREN:  No, Your Honor.

11:24:54 19                    THE COURT:  All right.  We'll see everybody back

11:24:56 20      this afternoon.

11:24:57 21                    ALL COUNSEL:  Thank you, Your Honor.

11:24:59 22                    COURTROOM DEPUTY:  All rise.

11:26:12 23                    (Recess was taken.)

03:14:07 24                    COURTROOM DEPUTY:  All rise.

03:14:08 25                    THE COURT:  Please be seated.

03:14:33  1                  Okay.  So we received, about an hour ago, a

03:14:51  2       revised joint proposed jury instructions that have still a

03:15:00  3       significant number of disputes, as well as a proposed jury

03:15:09  4       verdict form from each side, each of which has a lot of

03:15:18  5       questions.

03:15:22  6                  All right.  So I guess let's just get started

03:15:25  7       plugging away.  So we'll use the same process we used last

03:15:29  8       night, which is you should feel free to remain seated.

03:15:33  9                  We're not taking this time off the clock.  We

03:15:37 10       need to proceed efficiently, but we don't want to talk over

03:15:43 11       each other, either, because that makes it harder for the

03:15:46 12       court reporter to take it down.

03:15:47 13                  So let's start with Instruction 13 -- by the

03:15:59 14       way, I haven't -- the instructions that I got were still 100

03:16:03 15       pages.  I haven't read all the joint proposed ones to make

03:16:07 16       sure they don't contain plain error.  I assume counsel

03:16:11 17       wouldn't introduce any plain error, but I need to

03:16:15 18       double-check those, so...

03:16:15 19                  MR. BANKS:  Appreciate that, Your Honor.

03:16:16 20                  THE COURT:  I haven't formally adopted those

03:16:18 21       yet, but let's just focus on where there are disputes

03:16:21 22       between the parties.

03:16:22 23                  All right.  So the first one, Amgen just

03:16:27 24       wants -- Amgen just wants to add some additional language.

03:16:30 25       I don't think that's an incorrect statement of the law, but

03:16:32  1    I don't think it's necessary.  So we'll just exclude that

03:16:34  2    language.  That's Proposal 13.

03:16:38  3            We've got somebody from both sides taking all

03:16:41  4    this down, right, because I will need you to incorporate the

03:16:45  5    edits into a revised version.

03:16:47  6            MS. JOHNSON:  Yes.  We'll do that.

03:16:51  7            THE COURT:  Okay.  Great.

03:16:53  8            The next dispute is in Instruction 16.  So this

03:17:04  9    has to do with what I understand to be the parties'

03:17:08 10    positions that Regeneron thinks each claim should be

03:17:11 11    assessed individually.  And Amgen thinks that if the jury

03:17:15 12    finds for Amgen on the antitrust claims, the rest of the

03:17:20 13    claims fall.

03:17:20 14            I don't think that's an unreasonable view of

03:17:22 15    what's happened so far in the case.  That said, I think we

03:17:25 16    need to just instruct them individually on each of the

03:17:28 17    claims.

03:17:28 18            So I've put on the record already, I think,

03:17:31 19    there are too many claims here.  I don't understand the

03:17:34 20    reason for it.  I think it's confusing to the jury.

03:17:36 21            But it's Regeneron's case.  If it wants to

03:17:39 22    assert all these claims, it can do that.  So we will not

03:17:44 23    include -- or we will include the Regeneron proposal, which

03:17:46 24    is to say you should continue to evaluate the remainder of

03:17:57 25    the antitrust claims.  And then if you find that it failed

03:18:00  1    to prove a market, you find in Amgen's favor on antitrust

03:18:04  2    claims.

03:18:04  3            Turning to Instruction 18.  I don't really think

03:18:15  4    I understand what the issue is here.

03:18:18  5            MS. JOHNSON:  Yeah, this is --

03:18:19  6            MR. BANKS:  There's two issues -- oh, sorry.

03:18:20  7            There's two issues.  One is where it goes.

03:18:20  8            THE COURT:  Okay.

03:18:22  9            MR. BANKS:  And the second is the content.

03:18:23 10            THE COURT:  Okay.

03:18:24 11            MR. BANKS:  So let's take the -- if we look at

03:18:27 12    Instruction 32, Your Honor, I think there's -- there, you'll

03:18:28 13    see the dispute on the content.

03:18:34 14            THE COURT:  Okay.

03:18:34 15            MR. BANKS:  Correct?  It may be just easier to

03:18:37 16    start with.

03:18:38 17            THE COURT:  Stand by.

03:18:41 18            MR. BANKS:  Did I accurately describe it?

03:18:43 19            MS. JOHNSON:  Yeah, Yeah.  I think so.  Because,

03:18:44 20    I mean, that relates to -- we think market power is an

03:18:46 21    element of all federal claims.  They think it's only a

03:18:49 22    monopoly -- market or monopoly.  We think either market or

03:18:51 23    monopoly is an element of each federal claim.

03:18:53 24            I think they think the monopoly is an element

03:18:55 25    of the monopoli -- of Section 2 monopolization, I think,

03:18:58  1    market in Section 1.  But we would say market or monopoly

03:19:02  2    for Claim 3, as well.

03:19:04  3                    Anyway, we can talk more about that, but

03:19:06  4    that's -- that's why they're in different places.

03:19:08  5                    THE COURT:  Okay.

03:19:20  6                    MS. JOHNSON:  And it's 33, I think is --

03:19:22  7                    MR. BANKS:  Oh, I'm sorry.  Thirty-three, yeah.

03:19:23  8                    MS. JOHNSON:  Yeah.

03:19:24  9                    MR. BANKS:  On Page 42, at least is what I'm --

03:19:27 10    I think has been submitted to Your Honor.

03:19:30 11                    THE COURT:  Okay.  Okay.  So it sounds like the

03:20:41 12    first thing I need to decide is that there's a legal dispute

03:20:49 13    about whether monopoly power is required for a Section 1

03:20:53 14    claim.

03:20:53 15                    Is that what you're saying?

03:20:55 16                    MS. JOHNSON:  So, no.  We would say --

03:20:56 17                    THE COURT:  Okay.

03:20:57 18                    MS. JOHNSON:  -- market power required for a

03:20:59 19    Section 1, non-per se claim, a rule of reason claim, which

03:21:01 20    this is.  And then we would say monopoly power required for

03:21:06 21    a Section 2 monopolization claim.  Significant market power

03:21:11 22    is required for a Section 2 attempt claim, to have the

03:21:15 23    dangerous probability of getting monopoly power.

03:21:16 24                    And then a Clayton Section 3 claim requires

03:21:19 25    market power.  And so we would put that -- again, *ZF Meritor*

03:21:24 1    addressed all of those sections -- all those statutes

03:21:26 2    together and looked at market power.  You know, it didn't

03:21:29 3    separate out and say, Oh, market power is only required for

03:21:32 4    some of them.

03:21:33 5          So while we -- we were trying to avoid the

03:21:35 6    duplication, which is why we made a market or monopoly power

03:21:39 7    instruction, which we've talked about a lot, as you might

03:21:41 8    imagine, because it is challenging to work this part out,

03:21:46 9    but we felt like we needed some -- some conception of either

03:21:51 10   market or monopoly power for each claim and; therefore, it

03:21:54 11   was a common element and we tried to encompass it in this.

03:21:57 12         MR. BANKS:  Your Honor, I think the only actual

03:21:59 13   dispute as to this is we don't think market or monopoly

03:22:02 14   power is required under Section 3 of the Clayton Act, so;

03:22:04 15   therefore, it should not be presented as a universal element

03:22:07 16   for all of the antitrust claims.

03:22:09 17         So that's -- I think that -- we agree with

03:22:11 18   the -- the monopoly power for Section 2 and market power for

03:22:14 19   Section 1.  We don't think either of those are required for

03:22:18 20   Section 3, which is a prophylactic statute.  And there's

03:22:20 21   case law that says you can have 10 percent of the market and

03:22:24 22   still, you know, violate the -- the Act, so...

03:22:26 23         And the model instructions or the sample

03:22:29 24   instructions with respect to Clayton 3 don't mention market

03:22:31 25   or monopoly power.  So that's that.

03:22:35  1              THE COURT:  Okay.  So -- all right.  So to take

03:22:39  2    a step back then, are there any -- I'm looking at

03:22:43  3    Instruction 18 right now.  Putting aside where it's located

03:22:46  4    in the instructions, is there anything you think that's in

03:22:49  5    this instruction that is an error of law or a misstatement

03:22:52  6    of law?

03:22:53  7              MR. BANKS:  So I think -- you can correct me if

03:22:56  8    I'm wrong, I think what we did to help Your Honor actually

03:22:59  9    see the difference substantively with the instruction is to

03:23:01 10    make our objections to the content within what's now labeled

03:23:07 11    as Instruction 33 --

03:23:07 12              THE COURT:  Okay.

03:23:08 13              MR. BANKS:  -- on Page 42.

03:23:09 14              THE COURT:  All right.

03:23:13 15              MS. JOHNSON:  And, obviously, it's sort of,

03:23:15 16    like, the intro may change a little bit based on where it

03:23:17 17    is.  But sort of, on the main substance of the instruction,

03:23:21 18    we marked up 33 to be the competing proposals.

03:23:31 19              THE COURT:  I know you-all probably feel like

03:23:43 20    you keep telling me the same thing over again.  So what am I

03:23:45 21    supposed to do here right now?  Just look at 33 and pick

03:23:49 22    whose language I like?

03:23:50 23              MR. BANKS:  I think, Your Honor, that's what

03:23:51 24    we're asking.  I'll preface it with I believe our language

03:23:54 25    tracks the model, and I think the deviations are additions

03:23:57  1    or subtractions that Amgen has proposed.

03:24:00  2                    THE COURT:  Got it.  Okay.

03:24:01  3            All right.  So let's start then.  So I'm looking

03:24:03  4    at 33, and it's titled, "Monopolization Existence of

03:24:07  5    Monopoly Power."

03:24:22  6                    Okay.  So the first dispute is between

03:24:25  7    Regeneron's proposal to say "has introduced" and Amgen's

03:24:28  8    proposal to say "had the burden to introduce."  The burden

03:24:32  9    of proof is discussed elsewhere in the instruction, so we'll

03:24:34 10    go with Regeneron on that dispute.

03:24:37 11                    The second --

03:24:38 12                    MS. JOHNSON:  Can I just be clear for the

03:24:40 13    record, Your Honor?

03:24:40 14                    THE COURT:  Yes.

03:24:40 15                    MS. JOHNSON:  Our objection to it was that it

03:24:42 16    sounds like you're blessing the evidence to us.  We

03:24:44 17    appreciate it's in the model, but the way we read that was

03:24:47 18    like you were saying Regeneron has introduced evidence of

03:24:49 19    the structure.

03:24:50 20                    THE COURT:  Got it.

03:24:51 21                    MS. JOHNSON:  That was our issue with it.

03:24:52 22                    THE COURT:  Right.

03:25:00 23                    MR. BANKS:  We'd be fine if you modified it to

03:25:02 24    say, "Regeneron has introduced evidence it claims" or

03:25:05 25    something.

03:25:05  1                    THE COURT:  That's fine.

03:25:05  2                    MS. JOHNSON:  Yeah.

03:25:06  3                    THE COURT:  Let's do that.  Okay.  Perfect.

03:25:09  4              Everybody understand how we're going to proceed

03:25:12  5     on that one?

03:25:13  6                    MS. JOHNSON:  Mm-hmm.

03:25:13  7                    MR. BANKS:  Yes.

03:25:14  8                    THE COURT:  Okay.  All right.

03:25:15  9              And what's Regeneron's objection to Amgen's

03:25:28 10     proposal to use the words "and expansion"?

03:25:32 11                    MR. BANKS:  It's not in the model, Your Honor,

03:25:34 12     but we can agree to it.

03:25:35 13                    THE COURT:  Great.  We'll include that.

03:25:37 14              And then we've got a paragraph from Regeneron

03:25:55 15     that talks about "A market share below 50 percent is

03:26:01 16     ordinarily not sufficient to support a conclusion that the

03:26:03 17     Defendant has monopoly power."

03:26:07 18                    MS. JOHNSON:  So that was in the model and it

03:26:08 19     was in our proposal when the Enbrel issue was in the case.

03:26:12 20     If the jury, as I understood from your ruling yesterday,

03:26:15 21     won't be required to find that Enbrel has market power in

03:26:19 22     order to find a violation, then we don't really think --

03:26:22 23     there's not any dispute that Amgen's share is not -- of

03:26:26 24     the -- no one has presented evidence that Repatha has a

03:26:30 25     share of less than 50 percent of the market.

03:26:32   1          So we don't really think that this is necessary

03:26:34   2    language to give the jury, given that nobody has said that

03:26:38   3    there's a market share less than 50 percent.

03:26:40   4          THE COURT:  That makes sense to me.

03:26:42   5          MR. BANKS:  Your Honor, unless they're going to

03:26:43   6    stipulate that there's market power for Repatha, the

03:26:45   7    instruction should say something about the market shares

03:26:47   8    that are, you know -- presumptively are often significant in

03:26:51   9    this context.

03:26:52  10          THE COURT:  Yeah, but all it says is 50 percent

03:26:54  11    is not sufficient.

03:26:55  12          MR. BANKS:  Yeah.  All right.  Your Honor --

03:27:09  13          THE COURT:  So --

03:27:11  14          MR. BANKS:  -- we're okay with that.

03:27:12  15          THE COURT:  Okay.  So we're going to go with

03:27:14  16    Amgen's proposal on that, which is to remove this paragraph

03:27:21  17    that starts with "A market share below 50 percent."

03:27:41  18          MR. BANKS:  And on the next one, Your Honor,

03:27:43  19    with -- I think this just must be an edit.  Usually -- it

03:27:49  20    came up on the meet-and-confer process, the highlighting.  I

03:27:51  21    don't know if it's on your copy, but we can go with "and

03:27:54  22    increasing."

03:27:55  23          THE COURT:  Okay.  Amgen okay with that?

03:27:58  24          MS. JOHNSON:  It is.

03:27:58  25          THE COURT:  So we're going to go with Amgen's

03:27:58  1    proposal on that.

03:28:01  2                And then we have a paragraph entitled, "Barriers

03:28:03  3    to entry."  Amgen wants language that says, "or expansion

03:28:10  4    into the relevant market."  Regeneron doesn't like that.

03:28:15  5                What's the issue there?

03:28:16  6                MR. BANKS:  I'm not sure the legal support for

03:28:18  7    that, Your Honor.

03:28:18  8                THE COURT:  Is it an incorrect statement of the

03:28:20  9    law?

03:28:20 10                MR. BANKS:  It's not in the model instruction.

03:28:22 11    I'm not sure that that comports with the law.

03:28:26 12                MS. JOHNSON:  It's not.  I agree it's not in the

03:28:29 13    model, but we do think it comports with the law because it's

03:28:31 14    about the strain on power.  And we thought, given the issues

03:28:34 15    in this particular case where Regeneron has the ability to

03:28:36 16    expand, it's a relevant point.

03:28:39 17                MR. BANKS:  I understand the course of entry by

03:28:43 18    competitors, not expansion of the market, which I understand

03:28:45 19    to be the size of the people buying the product.

03:28:49 20                THE COURT:  I understand the positions.  We'll

03:28:51 21    go with Regeneron's proposal on this one.

03:28:53 22                And then Amgen's got another sentence at the end

03:29:04 23    of that paragraph that says, "Barriers to expansion make it

03:29:07 24    difficult for existing competitors to expand their output in

03:29:10 25    a meaningful and timely way."

03:29:15  1                    That's also not in the model; is that right?

03:29:17  2                    MR. BANKS:  I think that's right.

03:29:19  3                    THE COURT:  Okay.  We'll omit that as well.

03:29:21  4                    All right.  Then Regeneron wants to add "entry"

03:29:38  5      in there.

03:29:39  6                    Does that change the meaning of the sentence?

03:29:41  7                    MS. JOHNSON:  I think that follows from what you

03:29:43  8      previously did.  We had taken out "entry" because we were

03:29:46  9      trying to do barriers of entry and expansion.  So without

03:29:49 10      "expansion," "entry" can stay in.

03:29:50 11                    THE COURT:  Okay.  Great.

03:29:52 12                    And then the next proposal to add "expansion,"

03:29:55 13      we'll take out.

03:30:10 14                    And then Regeneron wants to add the words "any

03:30:12 15      of" to the paragraph titled, "Number and Size of

03:30:17 16      Competitors."

03:30:20 17                    MR. BANKS:  We can -- we can omit that,

03:30:22 18      Your Honor.

03:30:22 19                    THE COURT:  Okay.

03:30:28 20                    MS. JOHNSON:  So these last two, Your Honor, are

03:30:31 21      entirely in addition to the model.  This probably requires a

03:30:35 22      little explanation.  There is a separate dispute that we

03:30:39 23      haven't gotten to yet of where we have the exclusive dealing

03:30:43 24      instruction.  We put in -- they -- I guess Regeneron wants

03:30:46 25      a -- one exclusive deal instruction.  We want two.  And the

03:30:49  1    second one gives more information about exclusive dealing.

03:30:51  2             In that exclusive dealing instruction, it talks

03:30:54  3    about how you find market power.  And these are two

03:30:56  4    additional things that are factors towards market power.  So

03:31:01  5    I say that to say we originally put them in here because we

03:31:04  6    didn't have exclusive dealing structured in the way we do in

03:31:07  7    light of everything we did yesterday.

03:31:08  8             If we end up getting the model exclusive dealing

03:31:11  9    instruction we want, we would need these here because it's

03:31:15 10    covered by that.  So it's a little dependent on what we do

03:31:18 11    with the other exclusive dealing instruction.

03:31:19 12             THE COURT:  Okay.  Let's table that for now.

03:31:22 13             MS. JOHNSON:  Yeah.

03:31:22 14             THE COURT:  And you may have to repeat

03:31:24 15    everything you just said when it comes to that time.

03:31:27 16             So one skill you have to have when you do this

03:31:30 17    job is having things just come in decided and then go out

03:31:34 18    the other end, and you have no short or long-term memory

03:31:40 19    anymore.  So apologies in advance.

03:31:44 20             All right.  All right.  And besides that, was

03:31:59 21    that it for that?

03:32:02 22             MR. BANKS:  There's -- I think Amgen's proposed,

03:32:04 23    I think, quote at the end, it says, "If you find monopoly

03:32:06 24    power, then you can go on."  You know, I don't think that's

03:32:09 25    necessary, given the other instructions that will be given

03:32:12  1    in the case in terms of the order of decisions -- the

03:32:15  2    decision tree, so to speak.

03:32:16  3              MS. JOHNSON:  I think it also depends on where

03:32:19  4    it gets placed.  If this is placed as a common element, then

03:32:22  5    we would not need that.  If it's not a common element, we

03:32:24  6    just kind of thought, since it's such a long instruction,

03:32:26  7    it's helpful to wrap it up and move on.

03:32:29  8              THE COURT:  Well, we're already telling the

03:32:32  9    jury, otherwise, they have to find that every element is

03:32:34 10    met; right?

03:32:36 11              MR. BANKS:  Yes.

03:32:36 12              THE COURT:  So the preliminary ruling on this is

03:32:39 13    that it will come out, but after we're finished up, if you

03:32:42 14    think it should come back in, remind me.

03:32:49 15              Okay.  And so then -- now we're talking about

03:32:59 16    where the instruction goes.  So we're back to 18 again.  So

03:33:04 17    the main objection that Regeneron has is that you don't need

03:33:09 18    this instruction for the Clayton Act Section 3 claim.

03:33:14 19              And so shouldn't you have it upfront?

03:33:17 20              MR. BANKS:  Yeah, that's right, Your Honor.  One

03:33:19 21    solution that we discussed is that the instruction can

03:33:23 22    come -- maybe I'm confusing things now about going after --

03:33:30 23              MS. JOHNSON:  Right.  We talked about

03:33:32 24    swapping -- I mean, we still have to decide the Clayton

03:33:34 25    Section 3 issue.  We talked about, we could swap the order

03:33:36 1    of Section 2 and Section 1, since we all agree it applies in

03:33:41 2    Section 2 and Section 1; and therefore, we would be able to,

03:33:43 3    like, cross-reference it.  Because right now, Section 1

03:33:46 4    comes before Section 2, and Section 1 refers to market

03:33:50 5    power, but doesn't define it.

03:33:52 6         So it's sort of you still -- your threshold

03:33:54 7    legal question is still:  Does it apply to Clayton 3?  And

03:33:57 8    then after that, we think we can resolve the rest of it

03:34:01 9    based on swapping order.

03:34:02 10        THE COURT:  Okay.  So I need to turn to -- so

03:34:07 11   now -- okay.  So I guess I need to hear argument on whether

03:34:10 12   or not it applies to Clayton 3.

03:34:11 13        MR. BANKS:  Yeah.  So I'll just say Clayton 3,

03:34:14 14   it's not an element of the offenses as it's typically

03:34:18 15   described.  Clayton 3 is a prophylactic statute, doesn't

03:34:22 16   require showing of market or monopoly power.

03:34:25 17        Initially, Courts have said, including the

03:34:29 18   *Standard Oil* case in the Supreme Court from 1949 that it

03:34:33 19   determines there's a Section 1 violation in the case of

03:34:38 20   having to go on to Section 3.  So it's clearly not a

03:34:43 21   required element.

03:34:44 22        There's sample instructions we've seen that

03:34:50 23   don't list it as an element.  I mean, it's just not a

03:34:53 24   requirement, you know, under Section 3.

03:34:55 25        THE COURT:  And this is just out of curiosity:

03:34:58 1    Isn't the Clayton Act Section 3 generally thought as sort of

03:35:02 2    superfluous to the other section?  So that what you're

03:35:04 3    suggesting is that it's something broader.

03:35:06 4              MR. BANKS:  It's broader in the sense of, like,

03:35:07 5    the conduct.  The conduct can sort of be the same.  But in

03:35:11 6    terms of demonstrating monopoly power or market power as it

03:35:14 7    relates to a particular market, we don't have to show that

03:35:16 8    in advance.

03:35:17 9              THE COURT:  Okay.  Counsel.

03:35:19 10             MS. JOHNSON:  So, yes.  Our view was we were

03:35:21 11   relying mostly on *ZF Meritor*, which was a Section Sherman 1,

03:35:26 12   2 and Clayton 3.  And in *ZF Meritor*, it says on Page 271,

03:35:33 13   "There is no set formula for evaluating the legality of an

03:35:37 14   exclusive dealing agreement, but modern antitrust law

03:35:40 15   generally requires a showing of significant market power by

03:35:43 16   the Defendant, substantial foreclosure contracts of

03:35:47 17   sufficient duration, et cetera."

03:35:48 18             And so that -- *ZF Meritor* was considering all

03:35:51 19   three.  It cites for the proposition that modern antitrust

03:35:54 20   law generally requires a showing of significant market power

03:35:57 21   by the Defendant Tampa Electric.  And *Tampa Electric* is

03:36:01 22   also -- that's a Supreme Court case that's also a Clayton

03:36:05 23   Section 3 case.

03:36:06 24             And in *Tampa Electric*, the Court goes through

03:36:11 25   and analyzes whether there's a sufficient share of the

03:36:14  1    market to have an antitrust harm.  And so that -- that was

03:36:18  2    our -- that was our basis.  We think *ZF Meritor* requires it.

03:36:23  3              MR. BANKS:  It sort of goes to what I had just

03:36:25  4    said, alleges 1, 2 and 3.  So what counsel just read applies

03:36:28  5    to Section 1 claims, also.  And so I don't think it cites

03:36:32  6    the Clayton Act issue that we're talking about.  It already

03:36:35  7    concluded with there was a requirement for Section 1 doesn't

03:36:38  8    have to then separately require or address the separate --

03:36:41  9              THE COURT:  But she just mentioned *Tampa*

03:36:42 10    *Electric*, though.  Isn't that a Claim 3 case?

03:36:45 11              MR. BANKS:  But I think it's also 1 of 2; right?

03:36:45 12              MS. JOHNSON:  *Tampa Electric* is -- is a -- it

03:36:47 13    is.  It addresses Section 3, and then at the end of *Tampa*

03:36:51 14    *Electric*, it says, We don't need to talk about Sherman 1 and

03:36:53 15    2 because they follow.  So it is -- it is addressing

03:36:57 16    Section 3 and then saying, Okay.  All this applies to 1 and

03:36:59 17    2 as well.

03:37:01 18              MR. BANKS:  That's -- I guess, we're saying the

03:37:03 19    same point, though; right?  Because it doesn't have to --

03:37:05 20    because it found there was substantial foreclosure in a

03:37:08 21    relevant market, it didn't have to then decide the same

03:37:11 22    issue later on.  It doesn't say that that's required in the

03:37:13 23    section.

03:37:13 24              THE COURT:  All right.  Let me consult my notes

03:37:15 25    here.

03:37:35  1              All right.  We're going to take it under

03:37:41  2    advisement.  We'll try to get you something as soon as we

03:37:45  3    can after the hearing.  Maybe we'll take a recess.  So put

03:37:48  4    that on our list.

03:38:08  5              MR. BANKS:  Your Honor, if I could just direct

03:38:10  6    your -- when you're looking at the issue, if you look at

03:38:14  7    *Standard Oil of California vs. U.S.*, 337 U.S. 293.

03:38:18  8              THE COURT:  Okay.  All right.  Is there anything

03:38:32  9    else we need to say about 18 and 33?

03:38:42 10              MS. JOHNSON:  I don't think so.

03:38:44 11              MR. BANKS:  No, Your Honor.

03:38:44 12              THE COURT:  Okay.  All right.  21.  Regeneron's

03:39:19 13    got some additional language here.

03:39:21 14              MR. BANKS:  Additional language first with

03:39:22 15    respect to innovation of the benefit competition.  I don't

03:39:24 16    think that's controversial.  It's not in the model, though.

03:39:28 17              MS. JOHNSON:  Right.  All of these are adds to

03:39:30 18    the model, and I think we would say -- just to focus on new

03:39:33 19    innovation first, there's not really been a lot of evidence

03:39:35 20    about innovation in this case.  And so we don't think

03:39:38 21    there's any basis to include it.  And then, of course,

03:39:41 22    again, it's not a model.  So without a good reason, I would

03:39:44 23    go with the model.

03:39:45 24              THE COURT:  Right.  I agree with that, and the

03:39:47 25    instruction makes clear that these are just examples so

03:39:50  1    there's room to argue what you want.  We'll go with the

03:39:52  2    model.

03:39:53  3              Then we have language Regeneron wants to add

03:39:55  4    that says, "Conduct can also harm competition by raising

03:39:58  5    competitors' cost sufficiently to prevent them from growing

03:40:02  6    into effective competitors."  I understand what Amgen's

03:40:05  7    objection is going to be for that.  So we're going to not

03:40:08  8    include that language as well.  It's not in the model.

03:40:11  9              MR. BANKS:  Just to make a record, that reflects

03:40:13 10    our raising values cost.

03:40:14 11              THE COURT:  Understood.  Yeah.

03:40:21 12              Regeneron wants to add some language.  It says,

03:40:23 13    "Reduce qualities and innovation, loss of choice."  That's

03:40:27 14    also in addition to the model.  Again, the instruction, as

03:40:31 15    it reads, talks about other competitive benefit, so we're

03:40:36 16    not going to include that language.

03:40:38 17              That's it for 21?

03:40:48 18              MR. BANKS:  I believe so, Your Honor.

03:40:49 19              THE COURT:  And then 22, I take this to be an

03:41:11 20    attempt on the part of Amgen to explain what the theory is.

03:41:17 21    I take Regeneron's objection to be that it crosses the line

03:41:21 22    into advocacy in the jury instructions.

03:41:24 23              Is that a fair read of what's going on here?

03:41:25 24              MR. BANKS:  I agree, Your Honor.

03:41:27 25              MS. JOHNSON:  Yeah, although I would say we're

03:41:29  1    not trying to advocate, and we'd be happy to change the

03:41:32  2    language if it were different language that was better.  Our

03:41:34  3    concern is that this allocation, *PeaceHealth* concept, is

03:41:37  4    complicated, and that the jury, a little bit more to explain

03:41:42  5    to them, kind of call back to them, This is what Gaier said;

03:41:45  6    this is what Scott Morton said would be helpful to them in

03:41:48  7    figuring out what they're supposed to do with this

03:41:51  8    allocation concept.

03:41:53  9              MR. BANKS:  And our position is that's the

03:41:56 10    argument that we made at summation.

03:41:58 11              THE COURT:  Okay.  Well, let's just, so we make

03:42:00 12    the record.  So from Regeneron's point of view, is this

03:42:04 13    incorrect, that Regeneron claims that rebates for Enbrel and

03:42:08 14    Otezla were conditioned on Repatha coverage and should be

03:42:11 15    incorporated into the Repatha price?

03:42:12 16              MR. BANKS:  That's a correct description of our

03:42:14 17    argument, Your Honor.

03:42:15 18              THE COURT:  Okay.  And then Amgen contends that

03:42:20 19    only Enbrel rebates were conditioned on Repatha coverage

03:42:24 20    and, also, that certain of those rebates should be allocated

03:42:27 21    to Otezla instead of Repatha.

03:42:29 22              Is that Regeneron's understanding about what

03:42:32 23    Amgen is contending?

03:42:33 24              MR. BANKS:  I believe that's what the testimony

03:42:35 25    from Dr. Gaier was.  So, yes.

03:42:41  1          THE COURT:  And then the sentence, "You should

03:42:45  2   evaluate the evidence and determine what you conclude the

03:42:52  3   effective price to have been for Repatha," what's the

03:42:57  4   objection to that?

03:42:59  5          It's that you shouldn't be allocating it to

03:43:01  6   multiple drugs?

03:43:01  7          MR. BANKS:  That's correct.

03:43:08  8          And to be more precise, I think, I would say

03:43:10  9   Amgen's position is not, you know, correct.  Not a correct

03:43:14 10   statement of the law.

03:43:14 11          THE COURT:  All right.  And we've been through

03:43:16 12   this before.  There is something very deep in my memory that

03:43:21 13   feels like déjà vu on this.

03:43:25 14          All right.  We're not going to include any of

03:43:27 15   it.  You-all can argue what you want to argue to the jury.

03:43:52 16          MS. JOHNSON:  Oh, Your Honor, there was one

03:43:54 17   other issue in this one that didn't get captured.  I don't

03:43:56 18   know, are we okay on that or do we still --

03:43:58 19          MR. BANKS:  We'll make the change in the next

03:44:00 20   version.

03:44:01 21          MS. JOHNSON:  Okay.  Okay.  So it's not a

03:44:02 22   dispute.

03:44:02 23          THE COURT:  All right.  Turning to 24.

03:44:16 24          Wait.  Was there -- I think the numbering got

03:44:19 25   mixed up.  So there was no 23, but what I am looking at is

03:44:22  1    24.

03:44:23  2                    MR. BANKS:  That's it on Page 20, Your Honor.

03:44:26  3                    MS. JOHNSON:  Yeah.

03:44:41  4                    THE COURT:  Okay.  Okay.  So it looks like

03:45:34  5    Regeneron tracks the model and Amgen's got additional

03:45:37  6    language.

03:45:38  7                    MS. JOHNSON:  That's right.  We were trying to

03:45:39  8    give a little more explanation of what it means to go to the

03:45:42  9    competition or have a procompetitive justification.

03:45:47 10                    MR. BANKS:  It's more to the last instruction,

03:45:49 11    Your Honor.  I think this veers into --

03:45:52 12                    (Reporter clarification.)

03:45:52 13                    MR. BANKS:  I'd say it's similar to the last

03:45:55 14    instruction we were looking at.  Amgen's position or

03:45:59 15    proposal deviates across the line into advocacy that can be

03:46:03 16    presented at summation.

03:46:05 17                    THE COURT:  Okay.  Yeah.  So we'll go with what

03:46:11 18    the model says with this one, which is Regeneron's proposal.

03:46:21 19                    All right.  Turning to 26, which I'm looking at

03:46:42 20    Page 31, we've got some disputes here about the elements of

03:46:47 21    the Sherman Act.  Section 1 claim.  Let me just review them.

03:47:00 22                    MS. JOHNSON:  If theirs tracks the model here

03:47:12 23    and we -- after our discussion yesterday, we were trying to

03:47:14 24    put substantial foreclosure in Section 1, which was a place

03:47:17 25    we understood that it was relevant.

03:47:19  1          THE COURT:  Right.

03:47:20  2          MR. BANKS:  Yeah.  And, again, our proposal -- I

03:47:22  3   mean, our position is that the model -- the model language

03:47:25  4   incorporates the idea of substantial foreclosure.  But in

03:47:29  5   the language that the model uses and that Your Honor advised

03:47:32  6   that we didn't set for indicia, I provide the standard

03:47:36  7   exclusive dealing.  It appears later, which, again, relates

03:47:39  8   to the concept for substantial foreclosure.  It doesn't use

03:47:41  9   that language, and I think that's a significant inquiry.

03:47:44 10          THE COURT:  Okay.  We're going to go with what

03:47:46 11   the model says here.

03:47:48 12          All right.  And then we have Instruction 27,

03:48:04 13   which are disputes about what an agreement is, which one

03:48:10 14   might have thought this was the --

03:48:12 15          MR. BANKS:  Easiest.

03:48:13 16          THE COURT:  -- easiest one.

03:48:14 17          MR. BANKS:  -- to reach agreement on agreement.

03:48:15 18          THE COURT:  But we're ships passing in the

03:48:19 19   night.

03:48:19 20          MS. JOHNSON:  Your Honor, we thought that --

03:48:19 21   well, our read of *ZF Meritor* was that it had adapted the

03:48:22 22   model to the facts of this claim of bundle or exclusive

03:48:25 23   dealing/rebate whatever case.  And that the standard model

03:48:28 24   agreement is really more suited to, you know, a secret

03:48:32 25   conspiracy with these, like, unspoken things.

03:48:35  1                And so we thought *ZF Meritor*'s Court had done a

03:48:37  2     good job of -- and so we just copied the *ZF Meritor*

03:48:41  3     instruction.

03:48:49  4                THE COURT:  So give me a second to review.

03:48:59  5                MS. JOHNSON:  Actually, I guess we did -- we did

03:49:01  6     edit the *ZF Meritor* a little bit.  I just want to make sure.

03:49:04  7                THE COURT:  Yeah.

03:49:05  8                MS. JOHNSON:  Yeah.

03:49:05  9                THE COURT:  So the first paragraph of the model,

03:49:14 10     which is what Regeneron proposes, I agree with Amgen.  That

03:49:18 11     doesn't really seem to be getting at what the issue is in

03:49:23 12     this case.

03:49:25 13                MR. BANKS:  I --

03:49:26 14                THE COURT:  This is not like a secret

03:49:28 15     price-fixing conspiracy.  Right.  I mean, that's sort of --

03:49:33 16                MR. BANKS:  Sure.  I understand that.

03:49:34 17                THE COURT:  -- what the contract is

03:49:36 18     contemplating.

03:49:36 19                MR. BANKS:  Let me just read one moment.

03:49:38 20                THE COURT:  The thing I don't -- that caught me

03:49:45 21     right away when I read Amgen's proposal is that it had a

03:49:49 22     meeting of the minds in an unlawful arrangement.  And I

03:49:52 23     didn't want to suggest to the jury that they needed to find

03:49:55 24     that the PBMs were in on some unlawful conspiracy in order

03:49:59 25     to find that there was an agreement.  Right?

03:50:01  1          The question here is whether there was an

03:50:03  2   agreement that was conditioned on certain rebates on other

03:50:07  3   drugs.  I don't think a jury needs to find that the PBMs

03:50:09  4   were trying to do something unlawful to find that there was

03:50:12  5   an agreement here.

03:50:14  6          Do you understand what I'm saying?

03:50:16  7          MS. JOHNSON:  Yeah.

03:50:16  8          THE COURT:  So why don't we take that word out.

03:50:18  9          MS. JOHNSON:  I'm thinking --

03:50:21 10          (Discussion held off the record.)

03:50:31 11          MR. BANKS:  Yeah, Your Honor.  If you end the

03:50:33 12   sentence with "minds" there, "meeting of the minds."

03:50:39 13          MS. JOHNSON:  Right, right.  Okay.

03:50:41 14          THE COURT:  I mean, the thing of it is

03:50:43 15   Regeneron's proposal sort of -- when we have an agreement

03:50:46 16   here, the addition is what -- the question is, whether

03:50:48 17   there's an additional agreement; right?

03:50:50 18          MS. JOHNSON:  Right.

03:50:50 19          THE COURT:  So I'm inclined to adopt Amgen's and

03:50:53 20   take out that end of that sentence as Regeneron just

03:50:59 21   proposed "in an unlawful arrangement."

03:51:10 22          Does Regeneron have any other objections to the

03:51:14 23   rest of Amgen's proposal?

03:51:16 24          MR. BANKS:  No, I would just ask maybe if

03:51:17 25   Your Honor would consider adding the second paragraph of our

```
03:51:20  1    proposal with respect to direct and circumstantial evidence,
03:51:24  2    just to make clear that it doesn't have to be an express --
03:51:29  3              THE COURT:  Is that in the model?
03:51:31  4              MR. BANKS:  I believe that's in the model
03:51:35  5    instruction.
03:51:42  6              MS. JOHNSON:  Yeah.  I think it's somewhat
03:51:43  7    captured by the agreements, maybe either expressly stated in
03:51:46  8    the contract or inferred from the circumstances.  It's maybe
03:51:50  9    a longer way of saying that.
03:51:53 10              THE COURT:  Well, but it also captures the idea
03:51:55 11    of direct testimony about it.  So I think it's a reasonable
03:52:02 12    ask to get that language in there.  So let's add the second
03:52:07 13    paragraph of Regeneron's proposal in.
03:52:10 14              Can you-all figure out a place that that should
03:52:12 15    go?
03:52:15 16              MR. BANKS:  I would just add it to follow the
03:52:17 17    first paragraph of what's already in Amgen's proposal.
03:52:22 18              MS. JOHNSON:  Probably maybe before that last
03:52:24 19    sentence.
03:52:24 20              MR. BANKS:  Maybe before the last sentence.
03:52:27 21              MS. JOHNSON:  Yeah.
03:52:27 22              MR. BANKS:  That's fair.
03:52:28 23              MS. JOHNSON:  That makes sense.
03:52:29 24              THE COURT:  Okay.  Just once you put it in, and
03:52:36 25    look at these tonight, just make sure that there's no
```

03:52:39  1    additional -- there are no additional conforming edits that

03:52:42  2    need to be made once we start cutting and pasting.

03:52:45  3                    MS. JOHNSON:  Okay.

03:52:46  4                    THE COURT:  Okay.  We know how we're proceeding

03:52:52  5    on agreement?  Okay.

03:52:55  6                    MR. BANKS:  Yes, Your Honor.

03:52:55  7                    MS. JOHNSON:  Yes, Your Honor.

03:52:56  8                    THE COURT:  All right.

03:53:20  9                    And then we've got the instruction on exclusive

03:53:23 10    dealing.  And this is a dispute we've seen before.

03:53:32 11    Regeneron wants a substantial adverse effect on competition

03:53:35 12    in a relevant market.  Amgen wants a substantial foreclosure

03:53:41 13    of the relevant market.

03:53:43 14                    I take it the model aligns with Regeneron's

03:53:50 15    proposal?

03:53:52 16                    MS. JOHNSON:  That's right, and we had kept it

03:53:54 17    here because of the fact that it was exclusive dealing where

03:53:57 18    I think it's uncontested that that's the law.  But, yes,

03:54:00 19    their version is the model.

03:54:05 20                    THE COURT:  Do you contest that that's the law?

03:54:07 21                    MR. BANKS:  That -- what the model states?

03:54:09 22                    THE COURT:  No, that you'd have to show

03:54:11 23    substantial foreclosure?

03:54:12 24                    MR. BANKS:  I mean, it depends on what

03:54:14 25    "substantial foreclosure" means, Your Honor.  I think

03:54:15 1    that's the -- obviously, the larger debate.  But there has

03:54:18 2    to be, you know, a substantial adverse effect on

03:54:20 3    competition, that depends -- substantial foreclosure, I

03:54:23 4    think, as a number of Courts have said, it's not a strict

03:54:25 5    formula.  There's many factors that go into it.

03:54:28 6              And so I think using it as a term of art in this

03:54:30 7    context is -- is misleading and potentially incorrect.  The

03:54:40 8    corresponding instructions don't ask which claims really

03:54:40 9    explain the content.

03:54:41 10             THE COURT:  All right.  We're going to go with

03:54:43 11   the model.

03:54:46 12             And then we have --

03:54:46 13             MR. BANKS:  The next dispute, Your Honor, I

03:54:47 14   think we can go with -- well, I think -- let me check.

03:54:57 15             MS. JOHNSON:  The model says, "market for

03:54:57 16   Repatha."

03:54:57 17             MR. BANKS:  Yeah, it does.

03:54:59 18             MS. JOHNSON:  We just thought "market" was

03:55:00 19   clearer, but I mean...

03:55:02 20             MR. BANKS:  I think market, I would say -- I

03:55:04 21   think it's probably more correct to say "the relevant

03:55:07 22   market," actually, so...

03:55:09 23             THE COURT:  I think "the relevant market" is

03:55:11 24   more correct.

03:55:11 25             MR. BANKS:  Yes.

03:55:12 1            THE COURT:  All right.  We have an agreement on

03:55:17 2    that last one; right?

03:55:18 3            MS. JOHNSON:  We do, yes.

03:55:19 4            THE COURT:  All right.  Great.

03:55:21 5            MS. JOHNSON:  Celebrate them when we get them.

03:55:25 6            THE COURT:  Right.

03:55:29 7            All right.  We're on to 29.  So --

03:55:38 8            MS. JOHNSON:  So, yes.  There's a couple things

03:55:39 9    here, Your Honor.  We went back and forth about what to call

03:55:43 10   this.  So I don't want the name to suggest it's just a

03:55:47 11   rehash of yesterday.  This is an exclusive dealing

03:55:50 12   instruction.

03:55:50 13           So the model has "Instruction 5" in this

03:55:54 14   section, "Elements of Exclusive Dealing."  And then

03:55:56 15   "Instruction 6, Exclusive Dealing, Additional

03:55:59 16   Considerations."

03:55:59 17           And so this is generally that exclusive dealing,

03:56:04 18   general -- additional considerations instruction.  We have

03:56:05 19   adapted it somewhat, although I don't think very much.

03:56:09 20           Have we?

03:56:11 21           Okay.  Yeah.  No, just -- we've just adjusted

03:56:14 22   the party names and putting "PBM" in for "buyer."  So it is

03:56:16 23   a model instruction.

03:56:18 24           The -- we think that it is helpful to explain

03:56:21 25   what exclusive dealing is and it bears, you know, "you

03:56:24 1   should follow these exclusive dealing instructions" with an

03:56:27 2   instruction to help the jury understand how to evaluate

03:56:31 3   that.

03:56:31 4          The reason we called it "substantial

03:56:33 5   foreclosure" is because we discussed the special

03:56:35 6   interrogatory about substantial foreclosure.  This

03:56:40 7   substantially overlaps with *ZF Meritor*.  So it kind of is an

03:56:44 8   exclusive dealing instruction that's capturing the

03:56:46 9   substantial foreclosure concepts of *ZF Meritor*, which is

03:56:49 10  why -- we called it "substantial foreclosure" thinking this

03:56:52 11  will give the jury what they need to answer a question about

03:56:54 12  substantial foreclosure, and it's a model instruction.

03:56:57 13         If that seems more confusing or less helpful,

03:57:01 14  then we can also call it just an exclusive dealing,

03:57:03 15  additional considerations.  But that's what it is.

03:57:06 16         THE COURT:  Counsel.

03:57:07 17         MR. BANKS:  So our position is that the

03:57:10 18  exclusive dealing instruction that is in the model, that's

03:57:13 19  the general one, that's Instruction 28.  And our proposal is

03:57:16 20  sufficient to cover the issue.  And that's a more detailed

03:57:19 21  and expansive instruction which touches on things that

03:57:21 22  aren't really relevant here, in part, and it adds additional

03:57:26 23  confusion to the case, in particular.

03:57:28 24         There's things in here about the end user of the

03:57:30 25  product.  There's stuff in here, you know, that goes on

03:57:33  1    about, there's other factors relating to market power.

03:57:35  2            I mean, we think this goes on far beyond what *ZF*

03:57:40  3    *Meritor* even says and what's necessary here.  Again, the --

03:57:43  4            THE COURT:  Did you -- just, I can't tell from

03:57:45  5    what I have.

03:57:46  6            You do not want any exclusive dealing

03:57:48  7    instruction?

03:57:48  8            MR. BANKS:  No.  We're okay with the instruction

03:57:50  9    that's proposed, as in, Proposed Instruction 28, which is

03:57:55 10    the one we were just discussing, which is exclusive dealing.

03:57:58 11    And it discusses it --

03:57:59 12            THE COURT:  That -- hold on one sec.

03:58:04 13            So I have that listed under Sherman Act,

03:58:07 14    Section 2 in -- in what I was handed up.

03:58:09 15            MR. BANKS:  Okay.

03:58:10 16            THE COURT:  That's why I'm confused.

03:58:12 17            MR. BANKS:  Oh, I see, Your Honor.  That may

03:58:13 18    be -- that's not what our intention is.

03:58:19 19            THE COURT:  Okay.

03:58:20 20            MR. BANKS:  Yes.

03:58:20 21            MS. JOHNSON:  I'm not sure.  It looks like

03:58:22 22    Section 1 on mine.

03:58:25 23            MR. BANKS:  Yeah.

03:58:25 24            MS. JOHNSON:  Now I'm wondering, I hope we don't

03:58:28 25    have a version issue of some sort.

03:58:30  1                    MR. BANKS:  Well, I'm looking at Page 34,

03:58:32  2    Your Honor.

03:58:33  3                    THE COURT:  Okay.  Thirty-four.  I see.  So

03:58:38  4    that -- okay.

03:58:39  5                    MR. BANKS:  That's agreed as per -- and as we

03:58:41  6    just discussed.

03:58:42  7                    THE COURT:  I see.

03:58:43  8                    MR. BANKS:  Yeah.  So the question for

03:58:45  9    Your Honor is whether to give the additional instruction

03:58:47 10    that's on Page 36, titled "Claim Number 29."

03:58:50 11                    THE COURT:  Okay.  So if we're going to get --

03:58:52 12    everyone agrees we should give 28?

03:58:54 13                    MS. JOHNSON:  Correct.

03:58:55 14                    MR. BANKS:  Right.

03:58:55 15                    THE COURT:  You can see why I'm confused here.

03:58:58 16    Give me one second.

03:59:20 17                    Okay.  So Instruction 28 tracks Instruction 5,

03:59:29 18    elements of exclusive dealing in the ABA model.

03:59:40 19                    Proposed Instruction 29 is an attempt to rewrite

03:59:46 20    Instruction 6, "Exclusive dealing - Additional

03:59:49 21    Considerations."

03:59:49 22                    And Regeneron doesn't think we need to tell them

03:59:53 23    what their additional considerations are or you are okay

03:59:55 24    with the model for that?

03:59:56 25                    MR. BANKS:  No.  Well, two issues.

04:00:00  1          As a threshold, we don't think it's necessary to

04:00:00  2     go into the additional detail having already -- having

04:00:03  3     explained what the elements are in model Instruction 5.

04:00:07  4          To the extent Your Honor is going to go to

04:00:10  5     Instruction 6, there's things in here, I think, that --

04:00:12  6     there's a very long, you know, model that -- it touches on

04:00:16  7     things that we don't think apply here and that will be

04:00:19  8     confusing.

04:00:20  9          And, also, you know, we don't think are correct

04:00:25 10     in the context of this case.  I mean, for example, this

04:00:28 11     paragraph that talks about considering whether the PBM is a

04:00:31 12     final end user of the product.  And I don't think that idea

04:00:34 13     has come up at the trial.  I'm not even sure what it means

04:00:37 14     in this context, so that would have to go.

04:00:39 15          THE COURT:  Right.  So as a threshold issue, I

04:00:44 16     am inclined to include the concepts that are discussed in

04:00:47 17     the additional considerations.

04:00:48 18          So then how do we want to proceed on this?  Go

04:00:52 19     line by line?

04:00:55 20          MR. BANKS:  Or we could confer at a break,

04:00:57 21     Your Honor.

04:00:58 22          MS. JOHNSON:  Yeah.  If we take a recess, when

04:01:00 23     you think about market power, maybe the two of us could get

04:01:02 24     together and work this one out.

04:01:04 25          THE COURT:  Okay.  So we're tabling this one as

04:01:06  1    well.

04:01:28  2              MS. JOHNSON:  And just to sort of orient you,

04:01:30  3    this is the one that I was referring to when I said, if we

04:01:33  4    get this instruction, then it will resolve those extra two

04:01:37  5    paragraphs we added to the market power instruction, because

04:01:40  6    this is the one that includes those concepts.

04:01:43  7              THE COURT:  Okay.  So my ruling that we're going

04:01:46  8    to include some amount of this is probably going to resolve

04:01:50  9    the remaining disputes that we tabled on Instruction 33?

04:01:53 10              MS. JOHNSON:  That's right.

04:01:54 11              THE COURT:  Okay.

04:01:57 12              MS. JOHNSON:  Other than placement ordering of

04:01:59 13    it, obviously.

04:02:00 14              THE COURT:  Okay.  Okay.  That brings us to 32,

04:02:48 15    and that is just a rehash of the dispute about where

04:02:52 16    monopoly power goes?

04:02:53 17              MS. JOHNSON:  I think --

04:02:54 18              MR. BANKS:  Correct.

04:02:54 19              MS. JOHNSON:  -- once you decide where it goes,

04:02:56 20    I think we'll be able to decide which language leads in.

04:03:00 21    It's just about whether -- what the transition language

04:03:03 22    should be.

04:03:06 23              THE COURT:  Okay.  So we need to table that for

04:03:10 24    me to look at Section 3.  Okay.

04:03:13 25              All right.  We already talked about 33.

04:03:47  1            What's the dispute in 34?

04:03:48  2            MS. JOHNSON:  I think 34 is actually joint.  We

04:03:50  3    just need to re-label it.

04:03:51  4            MR. BANKS:  That's correct.

04:03:52  5            THE COURT:  Okay.  Great.

04:03:53  6            And then we have the Clayton Act Section -- oh,

04:04:00  7    no.  We have 35.

04:04:03  8            MR. BANKS:  Thirty-five.  The dispute there, I

04:04:04  9    think, Your Honor is whether we may proceed on both actual

04:04:07 10    and attempted monopolization claims.

04:04:12 11            MS. JOHNSON:  I think, I mean, we -- obviously,

04:04:14 12    they can proceed with them.  I think our issue with it more

04:04:16 13    is it just sort of seems like a little bit of a supplement

04:04:20 14    to say, And just a reminder, you can find for them on a

04:04:23 15    bunch of things if you wanted.

04:04:25 16            THE COURT:  Yeah, I agree.  So I think that the

04:04:26 17    verdict form is going to make clear that they're open to

04:04:29 18    answering all the questions.  So we're going to omit that

04:04:35 19    additional language.

04:04:36 20            All right.  Now, we're on to the Clayton Act

04:04:52 21    Section 3.

04:05:02 22            MS. JOHNSON:  There's no model on this one,

04:05:03 23    which made it a little bit harder.

04:05:05 24            THE COURT:  Right.

04:05:07 25            MR. BANKS:  I believe our proposal tracks what

04:05:09  1    was given in *BASF*.

04:05:17  2                THE COURT:  So what is the main dispute here or

04:05:18  3    what are the main disputes here?

04:05:20  4                MR. BANKS:  So the main disputes in the first

04:05:21  5    two items relate to the market power issue that Your Honor

04:05:24  6    is going to --

04:05:26  7                THE COURT:  Okay.

04:05:30  8                MR. BANKS:  -- advise on.

04:05:31  9                The next dispute is just the way that we

04:05:33 10    described our claim as including Enbrel.

04:05:40 11                THE COURT:  Okay.

04:05:40 12                MS. JOHNSON:  Right.  I think that that dispute

04:05:41 13    is just, we don't think there's been any evidence of any

04:05:44 14    drug other than Enbrel being conditioned on coverage of

04:05:48 15    Repatha.  So we think it should just say, "Enbrel," rather

04:05:50 16    than leaving the jury with this kind of open-ended meaning

04:05:55 17    of anti-inflammatory drugs like Enbrel or Otezla.

04:05:57 18                MR. BANKS:  If we just ended the sentence with

04:05:59 19    "drugs," we have no dispute about that.

04:06:01 20                MS. JOHNSON:  I think that would be okay.

04:06:02 21                MR. BANKS:  Great.

04:06:09 22                THE COURT:  All right.  What's the next dispute

04:06:18 23    on this?

04:06:18 24                MS. JOHNSON:  The next one, I think, is the one

04:06:20 25    that you already -- I think you've already resolved, the --

04:06:24  1    the -- to not -- we think substantial foreclosure is clearly

04:06:26  2    involved in Clayton Section 3, but it's the same issue of

04:06:30  3    substantial foreclosure versus just less than competition.

04:06:34  4          THE COURT:  So we're -- yeah, I do think I've

04:06:35  5    already resolved it.  So that will go with the ruling I've

04:06:38  6    already made on that, substantially less than competition.

04:06:48  7          And the next dispute?

04:07:02  8          MS. JOHNSON:  So, yeah, the last one is just

04:07:04  9    this issue of whether they have to show that we didn't have

04:07:07 10    a valid business justification.

04:07:09 11          We pulled that, I think, from -- the *ZF Meritor*

04:07:12 12    instructions were longer.  They had a little bit more in

04:07:19 13    them, but they did reference a lot of those, including

04:07:23 14    legitimate justification.

04:07:29 15          MR. BANKS:  And we don't think that -- we don't

04:07:30 16    think it's an accurate statement of the law, that they have

04:07:33 17    to show that it's reasonably tailored to the --

04:07:33 18          (Reporter clarification.)

04:07:42 19          MR. BANKS:  There's no -- there's no other

04:07:43 20    reason for doing it.  I think it's a much narrower in the --

04:07:47 21    in the law.

04:07:50 22          THE COURT:  Wait.  Just to make sure I

04:07:52 23    understand what you're saying.

04:07:53 24          If they had a valid business justification, you

04:07:55 25    would say that's a violation still?

```
04:07:57  1              MR. BANKS:  If there were other elements that
04:08:00  2    were present, yeah.  And I don't think having a valid --
04:08:02  3    maybe it's a better way to say it, having a valid business
04:08:05  4    justification isn't standing alone.  The standard is no less
04:08:09  5    an anticompetitive way.
04:08:10  6              THE COURT:  So it's -- this is still analyzed
04:08:13  7    under the rule of reason.
04:08:14  8              MR. BANKS:  Right.
04:08:14  9              THE COURT:  So you would say that the rule of
04:08:15 10    reason instruction already encompasses this idea?
04:08:18 11              MR. BANKS:  That's right, Your Honor.
04:08:19 12              THE COURT:  Okay.  Do you think this is
04:08:23 13    sufficiently covered in the rule of reason instruction?
04:08:33 14              I'm asking Amgen.
04:08:33 15              MS. JOHNSON:  I think that's -- I think that's
04:08:35 16    okay, Your Honor, because it's covered in the substantial
04:08:38 17    justification of competition instruction.
04:08:39 18              THE COURT:  Okay.  So we'll take that out.
04:08:50 19              All right.  And then Regeneron talks about
04:08:55 20    agreement, again, but we've already instructed the jury --
04:08:59 21              MR. BANKS:  That's fair, Your Honor.
04:09:00 22              THE COURT:  -- on agreement; right?
04:09:04 23              Okay.  So we'll take that out.
04:09:06 24              Now, I'm looking at -- it's numbered on my sheet
04:09:17 25    as Instruction 39, on Page 55.
```

04:09:24  1                What's the issue here?

04:09:34  2                MR. BANKS:  We'd like additional language

04:09:36  3    specifying that the -- that the agreements either

04:09:39  4    substantially lessen competition or can create or maintain

04:09:43  5    monopoly.  I think that's from the section -- the Section 3

04:09:46  6    case law that was...

04:09:48  7                MS. JOHNSON:  We think that substantially less

04:09:50  8    in competition, I mean, it covers both of those things.  It

04:09:53  9    seems sufficient, so we just went with the "substantially

04:09:58 10    less than competition."

04:10:00 11                MR. BANKS:  It's in *Tampa Electric* and other

04:10:03 12    cases.

04:10:10 13                THE COURT:  Isn't "substantially less than

04:10:11 14    competition" the same thing?  Is that not encompassed --

04:10:17 15    that idea is not encompassed already?

04:10:29 16                MR. BANKS:  I would say -- I mean, well, the

04:10:31 17    concept of maintaining a monopoly, I think -- I mean, it's

04:10:33 18    going to be a technical matter.  But if you already have the

04:10:36 19    monopoly, you're maintaining it.  It's anticompetitive even

04:10:40 20    if the level of competition isn't going up or down; right?

04:10:44 21    Maybe that's a way to present it.

04:10:45 22                MS. JOHNSON:  I think what he was -- my

04:10:47 23    colleague has just pointed me to is we did just copy it

04:10:50 24    from -- this part from BASF, which is kind of the authority

04:10:53 25    they've used, and *BASF* just said substantially less than

04:10:56  1    competition.  So that's what we did.

04:11:03  2              THE COURT:  Well, here's what I'll say, is that

04:11:10  3    the statute says "substantially less than competition or

04:11:13  4    tend to create a monopoly."  So let's just go with what the

04:11:16  5    statute says.  I think that's probably the safest.

04:11:26  6              It's very rare in antitrust law that we look at

04:11:28  7    the statute.  It turns out it sometimes comes into play.

04:11:35  8              MR. BANKS:  The next dispute, Your Honor, we

04:11:39  9    just wanted to work in the concept that we are talking about

04:11:44 10    their actual or de facto exclusive arrangements, which I

04:11:48 11    think is encompassed within the -- the law.  That's --

04:11:51 12    that's the point with respect to either contractually or

04:11:54 13    practically excluding Regeneron from the market.

04:11:57 14              MS. JOHNSON:  And we, again, have just copied

04:11:59 15    BASF.  And then, also, I think that -- I don't -- I don't

04:12:02 16    really know what practically excluding means, but it sounds

04:12:05 17    really broad, like, maybe if you're, as a practical matter,

04:12:08 18    excluded because you have no sales force, maybe you're

04:12:10 19    practically excluded.  I don't -- I just don't really think

04:12:13 20    that's a very clear phrase.

04:12:25 21              THE COURT:  Yeah.  We're not going to include

04:12:27 22    that language.

04:12:45 23              MS. JOHNSON:  I think the next one may be a

04:12:47 24    holdover, but I think we're fine adding the conduct.

04:12:50 25              THE COURT:  I mean, just going back to that

04:12:52  1    last -- you're not suggesting that they can't argue that the

04:12:55  2    effect -- that the agreement had to -- the exclusion has to

04:13:00  3    be in the contract effective -- I mean, what they're trying

04:13:02  4    to get at is the effect of the contract --

04:13:06  5            MS. JOHNSON:  Right.  They have --

04:13:06  6            THE COURT:  -- to be considered.

04:13:07  7            MS. JOHNSON:  Right.  And they have -- I think

04:13:09  8    the exclusive dealing one references -- is that the one that

04:13:11  9    references de facto?

04:13:12 10            MR. BANKS:  It is, but that's a separate

04:13:14 11    instruction.  I think it's -- we could copy the language

04:13:16 12    that we use there, if that would ease your concern.

04:13:20 13    Your Honor has our concern.

04:13:22 14            MS. JOHNSON:  Yeah, I think that something is --

04:13:23 15    can be tied up because of the agreement without it being

04:13:27 16    that the agreement specifically says it.  Like, I don't

04:13:29 17    think the language without that clause they want to add is

04:13:32 18    so constrained as to prevent their argument.  It just

04:13:35 19    doesn't give the jury this kind of wide -- a wide-open

04:13:39 20    practical --

04:13:39 21            THE COURT:  Right.  Can we include the de facto

04:13:42 22    stuff somewhere in here?

04:13:45 23            MS. JOHNSON:  We could probably find some way to

04:13:47 24    label it an actual or de facto agreement, or something like

04:13:50 25    that.

04:13:50    1                THE COURT:  Okay.

04:13:51    2                MR. BANKS:  Yes, Your Honor.

04:13:52    3                THE COURT:  I think you should be able to get

04:13:53    4    this one worked out.

04:13:54    5                All right.  And then you had a comment on the

04:14:02    6    next one.

04:14:03    7                MS. JOHNSON:  Well, the very next one, I guess,

04:14:04    8    is resolved by your prior ruling.  So I had already skipped

04:14:07    9    on to the next one, which I was saying may be a holdover

04:14:10   10    that we missed in meet and confer, but I think we can add

04:14:13   11    "or conduct."  That's fine.

04:14:15   12                THE COURT:  Okay.  Got it.  Yeah.

04:14:19   13                All right.  Moving on to Instruction 40.

04:14:35   14                MS. JOHNSON:  So this is a revisitation -- not

04:14:39   15    revisitation.  A follow-up, I guess, or a continuation of

04:14:42   16    the issues with recoupment.  We think that under

04:14:46   17    *PeaceHealth*, once recoupment is out as anticompetitive

04:14:49   18    conduct, one of the things that the Court said there is that

04:14:53   19    it didn't think it needed to have a special requirement for

04:14:57   20    an adverse effect on competition because it was part of the

04:15:00   21    general requirement of antitrust injury that a Plaintiff

04:15:03   22    must prove.

04:15:03   23                So given that even under sort of the conception

04:15:06   24    of *PeaceHealth* that the Court has taken, there has to be

04:15:09   25    some possibility of an anticompetitive effect down the road

04:15:13  1    under antitrust injury.  We would like to make that explicit

04:15:19  2    that -- so that the jury understands that even lower prices

04:15:22  3    are going to have to lead to some sort of harm to the

04:15:25  4    antitrust injury.

04:15:26  5              THE COURT:  Okay.  I take it you don't disagree

04:15:28  6    with that, you just don't think this instruction belongs

04:15:30  7    here.

04:15:30  8              MR. BANKS:  Well, Your Honor, again, what --

04:15:32  9    I don't disagree with the concept that they have to show

04:15:34 10    antitrust injury, but we have to show antitrust injury, in

04:15:37 11    addition to the violation.  But I think the rest of the

04:15:39 12    instruction provides the framework for antitrust injury and

04:15:42 13    that we don't need to add this additional language to make

04:15:46 14    that clear in this context.

04:15:48 15              It's also, in our view, not a correct statement

04:15:50 16    of the antitrust injury requirement anyway, so...

04:15:54 17              THE COURT:  Okay.

04:15:55 18              MR. BANKS:  That we have to exit the market, I

04:15:57 19    don't think that's a requirement of antitrust injury.  So,

04:16:01 20    yeah.

04:16:02 21              THE COURT:  All right.  So Amgen's argument has

04:16:06 22    been preserved for the record, but we're not going to

04:16:10 23    include this language.

04:16:14 24              We're already instructing the jury on the rest

04:16:25 25    of the language -- with the rest of the language on

04:16:27  1    antitrust injury.

04:16:28  2                    All right.  Okay.  And that gets us to the state

04:16:51  3    law claims; is that right?

04:16:51  4                    MR. BANKS:  That's right.

04:16:53  5                    MS. JOHNSON:  That's right.

04:16:54  6                    THE COURT:  All right.  Let's all take a

04:16:55  7    breather.  I'll start looking at the *Tampa* -- or the Clayton

04:17:02  8    Act Section 3.

04:17:03  9                    Just going back to one thing, we had a

04:17:11 10    discussion about allocating discounts.  Does anyone remember

04:17:15 11    what instruction that was?

04:17:17 12                    MS. JOHNSON:  That was the below-cost pricing,

04:17:20 13    so 20 -- it was 25.  It may be earlier now.

04:17:25 14                    MR. BANKS:  Twenty-two.  It's on Page 27.

04:17:27 15                    THE COURT:  So I guess one question I had on

04:17:53 16    this as I was sitting here was whether we could say

04:18:05 17    something a little more general about applying the rebates

04:18:09 18    to competitive products from -- as the Court said, something

04:18:16 19    like that, in *PeaceHealth*.

04:18:18 20                    So anyway, maybe that's something you could all

04:18:21 21    discuss --

04:18:22 22                    MS. JOHNSON:  Sure.

04:18:23 23                    MR. BANKS:  Yes.

04:18:24 24                    THE COURT:  -- while we take a recess.

04:18:26 25                    All right.

04:18:29  1              COURTROOM DEPUTY:  All rise.

04:18:50  2              THE COURT:  Be at ease, please.

04:50:41  3              (Recess was taken.)

05:09:27  4              COURTROOM DEPUTY:  All rise.

05:10:58  5              THE COURT:  All right.  Please be seated.

05:10:59  6              All right.  I owe you an answer about whether

05:11:26  7    the jury should be instructed that they have to separately

05:11:31  8    find market or monopoly power for a Clayton Section 3 claim.

05:11:37  9              During the recess, we looked into that and our

05:11:41 10    ruling is that the answer is no.  We're not going to include

05:11:45 11    that instruction.

05:11:46 12              We looked at the cases cited by the parties, as

05:11:49 13    well as the jury instructions from the *BASF* case.  So that's

05:11:54 14    the ruling on that.

05:11:54 15              And I think that resolves -- or is supposed to

05:12:00 16    send us down the path of resolution with respect to the

05:12:03 17    order of the jury instructions.

05:12:07 18              MR. BANKS:  Your Honor, in light of that ruling,

05:12:09 19    which we thank you for, the suggested order that we have

05:12:12 20    that, I think, clears up the -- the dispute would be for

05:12:16 21    Your Honor to give the Section 2 instruction first, in --

05:12:21 22    which you can then give the monopoly power instruction,

05:12:24 23    which would include language that market power is -- I think

05:12:28 24    you have it as sort of a reduced form of monopoly power,

05:12:32 25    whatever your intro is.

05:12:34 1          If it's there, and then the Section 1 claim can

05:12:36 2   reference up to it when it gets there.  And so that way,

05:12:41 3   it's presented in the right -- in the appropriate context

05:12:43 4   and so not to imply that it applies to all three things.

05:12:46 5          THE COURT:  Okay.  So in light of the Court's

05:12:48 6   ruling, do you object to that proposal?

05:12:50 7          MS. JOHNSON:  No.  And if we're -- if it's not

05:12:53 8   going to be applicable to Section 3, but then that is a way

05:12:57 9   of limiting the problem to only one claim.

05:13:00 10         THE COURT:  Okay.  Great.  So that's what we'll

05:13:02 11  do on that.

05:13:03 12         You-all were going to discuss this additional

05:13:06 13  considerations instruction.

05:13:08 14         Did we get any resolution on that?

05:13:11 15         MR. BANKS:  We -- we haven't, Your Honor.

05:13:12 16         THE COURT:  Okay.  Did you settle the case?

05:13:15 17         MR. BANKS:  Well, they're in the lead.

05:13:22 18         I'll say this about that instruction:  You know,

05:13:24 19  we received this at, you know, 2:00 p.m., 1:30, whenever we

05:13:27 20  started.

05:13:28 21         THE COURT:  Yeah.

05:13:28 22         MR. BANKS:  We have not found this -- we

05:13:30 23  appreciate it's in the model.  We have not found an example

05:13:33 24  of this instruction ever given.  It wasn't given in *ZF*

05:13:36 25  *Meritor* or any of the other instructions that we have looked

05:13:38  1    at.  Those instructions do -- they instruct on exclusive

05:13:42  2    dealing, given the more general instruction that is, I

05:13:44  3    think, Number 5 in the model.  And then it's placed in the

05:13:48  4    claim's Section 3 elements.  We think it goes beyond what

05:13:53  5    the Third Circuit law is with respect to *ZF Meritor*.

05:13:58  6          It goes beyond Amgen's concepts that the factors

05:14:03  7    discussed in the instruction are required elements of the

05:14:06  8    inquiry when *ZF Meritor* itself says this is a multifactor

05:14:10  9    test and there's no formula and so forth.  So it leaves the

05:14:14 10    wrong impression that these are required things that the

05:14:17 11    jury must find.

05:14:18 12          We think it repeats the concepts on market power

05:14:22 13    that are unnecessary given the market power -- monopoly

05:14:26 14    power instruction that will be separately given and doesn't

05:14:31 15    need to be repeated.  And then what it adds, we think, is

05:14:33 16    not -- is not generally correct and that's the extent that

05:14:38 17    those concepts are at all relevant in the exclusive dealing

05:14:40 18    context.

05:14:41 19          There is a mention of coercion as a factor in *ZF

05:14:45 20    Meritor*.  It would be wrapped up with respect to that, to

05:14:47 21    the extent that is even in the mix.

05:14:51 22          THE COURT:  Okay.

05:14:51 23          MR. BANKS:  It goes on to talk about causation.

05:14:54 24    It has a thing about whether the PBMs are the end users of

05:14:58 25    the product.  I think that's a concept that's totally

05:15:01 1    foreign to the trial that we just conducted.  It would

05:15:03 2    confuse the jury and so forth.

05:15:04 3          So a long way of saying, we generally object to

05:15:07 4    giving the instruction at all.  We have serious concerns

05:15:11 5    about if it were to be given, what it would say and have not

05:15:17 6    had the opportunity to prepare a counterproposal, given the

05:15:21 7    timing in which it was written to us.

05:15:25 8          THE COURT:  Okay.  So is that a long way of

05:15:27 9    saying that in light of the Court's suggestion that it

05:15:33 10   intends to give the instruction, you need more time to think

05:15:36 11   about how you would want it to word?

05:15:38 12         MR. BANKS:  That is correct.  And then, also, to

05:15:40 13   put on the record that we --

05:15:42 14         THE COURT:  You don't like it.

05:15:43 15         MR. BANKS:  We strongly object to giving the

05:15:45 16   instruction at all.

05:15:46 17         THE COURT:  Okay.

05:15:47 18         MS. JOHNSON:  And, Your Honor, I just want to

05:15:49 19   note that we drew from the same instruction for our

05:15:51 20   substantial foreclosure instruction, so it has been an

05:15:54 21   issue.  I think everybody's known for a very long time that

05:15:58 22   we believe substantial foreclosure is key in this case and

05:16:00 23   that *ZF Meritor* is relevant to this case.  And so we have

05:16:04 24   tried to work with the Court's rulings, and obviously, we

05:16:06 25   didn't get the substantial foreclosure instruction where we

05:16:09  1    wanted it or as a common element.  But, you know, this model

05:16:13  2    has been before them since we cited it long ago in our jury

05:16:17  3    instructions and have relied on it.

05:16:20  4           It very closely tracks *ZF Meritor.*  When we had

05:16:22  5    the chance to confer on it briefly, I have not seen

05:16:26  6    anything.  Everything that's been pointed to me as

05:16:28  7    potentially not the law is, in fact, in *ZF Meritor.*  So we

05:16:31  8    think it is, not only an appropriate instruction, but it is

05:16:35  9    necessary in light of the theories they're proceeding on.

05:16:37 10           THE COURT:  All right.  All right.  Well --

05:16:44 11           MR. BANKS:  One other thing to add, Your Honor.

05:16:46 12    The way that it's introduced here, if it were to be given in

05:16:49 13    any form in which it's proposed, it has to be very specific

05:16:51 14    that it applies only to an exclusive dealing theory under

05:16:55 15    Section 1 and not any broader than that.  And, again, I

05:17:00 16    think to the extent it's -- it delves into concepts that

05:17:07 17    aren't even in *ZF Meritor* or gives the impression that these

05:17:09 18    are factors that are required as anything other than

05:17:14 19    suggestions as you're guiding and so forth in the language

05:17:17 20    that *ZF Meritor* applies, that's, you know, the extent of

05:17:22 21    which it should go.

05:17:24 22           THE COURT:  All right.  We're going to give some

05:17:31 23    form of this instruction.  And so I will give you the

05:17:34 24    opportunity to object to particular parts of the language

05:17:37 25    that you don't like.  We don't have to do this today.  But

05:17:39  1    we need to have it resolved tonight so that the parties can

05:17:45  2    prepare their closing arguments.  And -- or at least have

05:17:50  3    your positions tonight so you can be prepared to see -- at

05:17:57  4    least to know what the Court might say when I decide it

05:18:00  5    tomorrow morning, if that makes sense.

05:18:02  6              So work together.  I appreciate that you just

05:18:05  7    got it.  This is sort of, you know, what it feels like to be

05:18:08  8    in my position now with competing language and having to

05:18:12  9    make quick decisions.  It's just how it goes.

05:18:14 10              All right.  So work together to get that.

05:18:17 11              MS. JOHNSON:  Can I note one more thing while

05:18:19 12    we're on this topic?

05:18:20 13              We understand the ruling that the exclusive

05:18:23 14    dealing is only applicable to Section 1 in Clayton 3, and he

05:18:27 15    was just noting that.  We do think that they should not be

05:18:32 16    permitted in closing to make arguments that exclusive

05:18:35 17    dealing violates Section 2, if we're not going to have an

05:18:38 18    exclusive dealing instruction there.

05:18:39 19              So I am not sure if they intend to argue

05:18:44 20    exclusive dealing under Section 2.  It was in the PTO.  But

05:18:48 21    if they do, we would say that was prejudicial if they are

05:18:52 22    not going to have an instruction there.

05:18:54 23              THE COURT:  I understand that point.

05:18:55 24              Counsel.

05:18:55 25              MR. BANKS:  We disagree with that.  What I would

05:18:57  1    say is, look, we have -- and this goes back to the arguments

05:19:02  2    we had yesterday.  You know, we've proceeded that the

05:19:05  3    conduct that happened here was wrongful under the antitrust

05:19:09  4    laws, under the rule of reason in Section 2.

05:19:11  5         The Section 2 instructions are broad enough to

05:19:14  6    cover a concept of exclusive dealing that applies to

05:19:16  7    Section 2, where it's conduct by a monopolist that

05:19:21  8    substantially affects competition.

05:19:23  9         And that's sort of the language that's in the

05:19:25 10    statute that's in the cases.  It's the language that's in

05:19:28 11    the model instruction.  When we get to Section 1, it's

05:19:31 12    slightly different.  Because as we discussed, monopoly power

05:19:33 13    isn't required under Section 1.  It's some other form of

05:19:35 14    market power, which is why, to the extent it's at all

05:19:39 15    relevant, the instructions in Section 1 go on to talk about

05:19:43 16    substantial foreclosure -- well, it's exclusive dealing in

05:19:46 17    the language that's here at all, and that's why the cases go

05:19:49 18    down that way as well.

05:19:51 19         So I think the way that we're going to talk

05:19:53 20    about it in closing is that these were contracts, the bundle

05:19:58 21    agreements, and the attempted bundle agreements, and the

05:20:00 22    offers of bundled agreements that foreclosed us from

05:20:04 23    particular PBMs in the market and so forth.  But not under

05:20:07 24    the -- not saying that it's an exclusive dealing, like,

05:20:12 25    in -- outside of the context of what I already said.

05:20:15 1          THE COURT:  Okay.  He's going to keep it general

05:20:17 2   and not say that it's exclusive dealing.

05:20:18 3          MR. BANKS:  Well, I'll just say that -- we will

05:20:21 4   say that this, you know -- it resulted in excluding us from

05:20:25 5   the market.  Now, that's a different thing than saying

05:20:28 6   exclusive dealing, but I hope --

05:20:29 7          THE COURT:  Understood.  Yeah.  Okay.

05:20:32 8   Everybody's made their objection for the record.  I don't

05:20:34 9   know what else to say about this.  Yeah.

05:20:35 10          MS. JOHNSON:  No, I think we would only say that

05:20:37 11   I guess we just want to make sure they're on notice -- that

05:20:41 12   everybody's on notice that it's preserved that if they -- we

05:20:43 13   believe under *ZF Meritor*, it's very clear that the legality

05:20:46 14   of an exclusive dealing agreement is always under the same

05:20:48 15   standard.  And so if they get a verdict that is on Section 2

05:20:54 16   and they have argued exclusive dealing, we think they will

05:20:57 17   have a problem of reversible error.  And I guess they can

05:21:01 18   sort of do with that what they will.

05:21:03 19          THE COURT:  Understood.

05:21:04 20          MR. BANKS:  Yeah.

05:21:04 21          THE COURT:  They're -- you're on notice.

05:21:06 22          MR. BANKS:  I suppose.  But, Your Honor, you

05:21:09 23   ruled yesterday in *LePage's*, which doesn't require

05:21:11 24   substantial foreclosure, the valid theory for Section 2

05:21:15 25   liability.  So I, you know -- that's --

05:21:17  1                    THE COURT:  I think she's just putting it on the

05:21:19  2     record for later.

05:21:20  3                    MR. BANKS:  Fair enough.

05:21:22  4                    THE COURT:  Yeah.  This wasn't -- the comments

05:21:24  5     aren't directed to me.  They're directed to the Court above

05:21:27  6     me.  Yeah.

05:21:30  7                    All right.

05:21:32  8                    MS. JOHNSON:  One other thing, Your Honor.

05:21:33  9                    We did have a chance to confer on

05:21:37 10     Instruction 39, which is the substantial lessening of

05:21:40 11     competition.  And the one where we talked about whether it

05:21:42 12     can say de facto, and we talked about just making it say you

05:21:46 13     should consider the structure of the relevant market, and

05:21:49 14     the percentage of the relevant market is closed off by or

05:21:52 15     tied up because of an actual or de facto agreement.

05:21:55 16                    THE COURT:  That works for me.  We're in

05:21:58 17     agreement on that.

05:21:58 18                    MR. BANKS:  That's what you showed me earlier?

05:22:00 19                    MS. JOHNSON:  Yeah.

05:22:01 20                    THE COURT:  All right.  Great.

05:22:02 21                    Are we moving on to the state law claims?

05:22:06 22                    MS. JOHNSON:  Oh, the other thing we did confer

05:22:08 23     on is price cost, the below-cost pricing instruction.  I

05:22:11 24     don't know if you want to visit that one.

05:22:12 25                    THE COURT:  Oh, yeah.  The *PeaceHealth* thing.

05:22:14  1    Yes.

05:22:14  2                MS. JOHNSON:  That I will leave to Mr. Stock.

05:22:18  3                THE COURT:  You can remain seated.

05:22:19  4                MR. STOCK:  We put together --

05:22:20  5                THE COURT:  Oh, you've got something to hand up?

05:22:22  6         Okay.  Is this a joint proposal or --

05:22:37  7                MR. STOCK:  No.

05:22:37  8                THE COURT:  No.  Okay.  This is an Amgen

05:22:39  9    proposal.

05:22:40 10         All right.

05:22:40 11                MR. STOCK:  When you're ready, I'll --

05:22:42 12                THE COURT:  Okay.  Yeah, give me a minute.

05:22:45 13                MR. STOCK:  All right.

05:24:10 14                THE COURT:  You can be seated.

05:24:11 15                MR. STOCK:  So you remember how this came up on

05:24:13 16    the Daubert.  I can go through it quickly.

05:24:14 17                THE COURT:  I -- I don't.  No, I do.

05:24:16 18                MR. STOCK:  Okay.

05:24:17 19                THE COURT:  They tried to exclude your expert

05:24:19 20    testimony because it was not what *PeaceHealth* said

05:24:22 21    essentially.

05:24:23 22                MR. STOCK:  Right.

05:24:23 23                THE COURT:  Yeah.

05:24:24 24                MR. STOCK:  So we -- Dr. Gaier, and then you saw

05:24:26 25    it in the presentation today, he took the bundled rebates

05:24:29 1    for Enbrel, and he divided them across Otezla and Repatha as

05:24:33 2    one of his analyses.  And they tried to exclude that.  And

05:24:37 3    the dispute basically in the briefs was, when you take the

05:24:40 4    bundled rebate for Enbrel, do you take it out only of the

05:24:44 5    product that Regeneron makes that's competitive, you know,

05:24:48 6    that's Repatha, to see if they can meet the price for

05:24:52 7    Repatha taking out those products?  Or could you take it out

05:24:56 8    of any product that's substitutable, that has substitutes,

05:25:00 9    on the theory that the PBM has access to all sorts of

05:25:04 10   competition around?

05:25:05 11          So they could, yes, replace Repatha with

05:25:08 12   Praluent.  But they could also replace Otezla with a

05:25:12 13   competitor.  So if Otezla lacks market power, it makes sense

05:25:15 14   to distribute the bundled agreement across both products.

05:25:20 15          And what you held in your Daubert was that you

05:25:22 16   thought both analyses could be helpful to the jury, and you

05:25:25 17   didn't think, as a matter of law, that one was right and one

05:25:28 18   was wrong.  So our goal in the instruction is not to

05:25:33 19   instruct that one is right and one is wrong, but to allow

05:25:36 20   the jury to consider it.  And we make use, as you suggested,

05:25:40 21   of the language in *PeaceHealth* that talks about competitive

05:25:43 22   product or products.

05:25:51 23          THE COURT:  All right.  And your objection is

05:25:54 24   that it goes beyond *PeaceHealth*?

05:25:57 25          MR. BANKS:  Yeah, that's correct.

05:25:57  1                Mike.

05:25:58  2                MR. MOISEYEV:  Yeah, I mean, I can just briefly

05:25:59  3       add that the -- that the text in *PeaceHealth* makes it clear

05:26:04  4       that they were adopting the arena of healthcare standards,

05:26:08  5       which makes it clear that the question that -- that it's not

05:26:12  6       only the products that are in the bundle, but it's the

05:26:15  7       products for which exclusion is claimed.  And here, the

05:26:19  8       exclusion is claimed between Repatha and Praluent.

05:26:23  9                And, therefore, whatever's happening with Otezla

05:26:25 10       or whatever other products they wanted to add into the

05:26:28 11       bundle shouldn't affect the discount attribution standard.

05:26:32 12       And I'm sorry, that's at 907 in *PeaceHealth*.

05:26:35 13                THE COURT:  Yeah.  All right.

05:26:37 14                MR. STOCK:  I can explain why I disagree, but I

05:26:39 15       think he's just rearguing the Daubert.

05:26:40 16                THE COURT:  Yeah, yeah.  Okay.  I understand

05:26:43 17       both sides' positions.

05:26:44 18                As someone that didn't start out practicing in

05:26:48 19       this area of the law, sometimes often it's unclear to me

05:26:53 20       where the law ends and the economic theory begins, and that

05:26:56 21       changes over time.  And so it is confounding.

05:27:01 22                But what I need to do is decide how the jury

05:27:03 23       should be instructed, and I think the best thing to do then

05:27:05 24       is just to leave it as we had it before the break, which is

05:27:09 25       to say, rebates may be allocated to reduce the implied

05:27:14  1    Repatha price.  And then we have both experts' opinions, as

05:27:18  2    a matter of economic theory, why their assessments are

05:27:24  3    appropriate.  And if somebody else wants to adopt that as

05:27:27  4    law, they're welcome to.  And by "somebody else," I mean

05:27:32  5    another Court.  So that's how we'll leave it.

05:27:35  6             MR. STOCK:  Your Honor, if we don't get the

05:27:37  7    language we added and we don't get this language, Plan C

05:27:40  8    would be to add the words "some or all" before the word

05:27:44  9    "rebates."

05:27:44 10             When calculating Amgen's total price for

05:27:46 11    Repatha, "some or all of the rebates" because, otherwise, it

05:27:50 12    can be implied to endorse Mr. Moiseyev --

05:27:54 13             THE COURT:  Right.  I think -- I understand your

05:28:00 14    request.

05:28:02 15             Do you --

05:28:05 16             MR. BANKS:  Again, we think that would be

05:28:06 17    inconsistent with the law.

05:28:07 18             THE COURT:  That it should be all; right?

05:28:09 19             So I think we're not going to include it, but

05:28:11 20    we've got the word "may" in there later in the sentence,

05:28:14 21    which should give you a little bit of wiggle room in how you

05:28:17 22    argue it to the jury.

05:28:18 23             All right.

05:28:23 24             MS. JOHNSON:  Okay.  State law?

05:28:25 25             THE COURT:  Yeah.  Okay.

05:28:30  1                    MS. JOHNSON:  I actually do think state law may

05:28:32  2      be a little easier, quicker.

05:28:34  3                    THE COURT:  I don't -- can we go off the record

05:28:37  4      for just a second?

05:28:37  5                    (Following a discussion held off the record:)

05:28:55  6                    THE COURT:  We can go back on the record.

05:28:57  7                    All right.  All right.  All right.  Forty-three,

05:29:23  8      California UPA.

05:29:26  9                    MS. JOHNSON:  So I think there's -- the first

05:29:28 10      issue is this -- we added in California because we think

05:29:33 11      that the California statute should be limited to -- in scope

05:29:37 12      to sales made in California and not have nationwide effect.

05:29:42 13                    MR. BANKS:  Yeah, we disagree on this.  The case

05:29:44 14      law that says the element requires --

05:29:46 15                    (Reporter clarification.)

05:29:46 16                    MR. BANKS:  I'm sorry.  The law is that there --

05:29:50 17      all that is required is a nexus that the State of

05:29:54 18      California, such that the State of California is not an

05:29:56 19      unfair body of law to draw from.  Obviously, Amgen is

05:29:59 20      headquartered in California.  It's -- and makes sales in

05:30:01 21      California.  That's also not disputed.

05:30:03 22                    I think the first -- the first element, you

05:30:07 23      know, we could live with.  It's the rest of it to the -- to

05:30:10 24      somehow limit the damages to California sales is where we

05:30:13 25      have the disagreement.

05:30:14 1          THE COURT:  This is a pretty big and important

05:30:17 2    issue.  So what you're saying is that a state could come up

05:30:25 3    with its own antitrust laws and give them nationwide effect?

05:30:29 4          MR. BANKS:  As long as the Defendant has

05:30:32 5    sufficient contact with California and its conduct has

05:30:35 6    sufficient nexus.

05:30:37 7          THE COURT:  It's like extraterritorial damages,

05:30:39 8    though.  That's the -- that's the issue; right?

05:30:42 9          MR. BANKS:  Yeah.  You know, *Staley vs. Gilead*,

05:30:46 10   446 F.Supp.3d 578, Northern District 2020.

05:30:54 11         THE COURT:  All right.  We'll have to take this

05:30:56 12   one under advisement.

05:31:02 13         MS. JOHNSON:  And I can't recall if we put --

05:31:04 14   let's see what cases we cited here.  We cited the *BullWrap*

05:31:08 15   case so you have the cite of it, and then the other case we

05:31:10 16   were relying on is a case called *Norwest Mortgage vs.*

05:31:14 17   *Superior Court*, 72 Cal.App.4th 214.

05:31:29 18         And I'll say, just so we may not have to reargue

05:31:32 19   it when we get to New York, I think it is an easier question

05:31:35 20   on New York because we are not headquartered in New York and

05:31:38 21   have no context with New York.

05:31:39 22         In California, there is definitely -- *the*

05:31:41 23   *BullWrap* case talks about having evidence of whether there's

05:31:44 24   a below-cost sale in California.  We couldn't really find a

05:31:48 25   lot on point.  The *Norwest* case does not allow UCL to apply

05:31:54  1    outside of California's borders, but also it was not a

05:31:56  2    California corporation.  So it was different in that sense.

05:31:59  3    So that is -- that is where we are on the California.

05:32:04  4                MR. BANKS:  In fact, if I could add one more to

05:32:06  5    the California discussion, this comes up with respect to the

05:32:08  6    Cartwright Act.  To make life harder, it's *AT&T Mobility vs.*

05:32:14  7    *AU Optronics*, 707 F.3d 1106, Ninth Circuit 2015.

05:32:27  8                THE COURT:  Okay.

05:32:31  9                MS. JOHNSON:  The -- another thing on this one,

05:32:33 10    Your Honor, that actually isn't on what you see, but I think

05:32:37 11    is agreed based on we were talking about it at the break is

05:32:40 12    I had forgotten to stick in that there is a sentence in the

05:32:44 13    model -- theirs tracks the model or this tracks the model,

05:32:48 14    obviously.  Originally, they had all the state instructions,

05:32:50 15    but after "to overcome this presumption, Amgen must present

05:32:54 16    evidence of a different purpose," the model has a sentence

05:32:58 17    for "Name of Defendant has presented evidence that its

05:33:01 18    purpose was specified purpose."  So we filled in "Amgen

05:33:05 19    claims it has presented evidence that its purpose was to

05:33:08 20    obtain coverage for Repatha and benefit competition."

05:33:11 21                And as long as he -- as long as it's framed

05:33:14 22    towards the Amgen claims, I think they're okay with that.

05:33:16 23                MR. BANKS:  That's right, Your Honor.

05:33:17 24                THE COURT:  Okay.  Great.

05:33:20 25                All right.  And then we've got other disputes

05:33:30  1    here at the bottom of 62 and going on to 63?

05:33:33  2        MS. JOHNSON:  I think they may be encompassed

05:33:35  3    with other things we've said.  But just to make sure, the

05:33:37  4    first one and the first sentence was the idea that the UPA

05:33:42  5    claim falls with the federal claims.  I understand you've --

05:33:44  6        THE COURT:  Yeah.

05:33:45  7        MS. JOHNSON:  Okay.  And then we go into -- the

05:33:49  8    next sentence is about -- well, no.  I guess it is a

05:33:53  9    separate dispute.

05:33:53 10        The next two sentences are about this concept

05:33:55 11    that we're -- we want the jury to be instructed that it's

05:34:00 12    only for below-cost contracts or below-cost sales that there

05:34:05 13    would be damages because, obviously, in this case there's

05:34:08 14    only one contract that is alleged to be below cost and much

05:34:11 15    broader damages.  So the UPA would only, in our view, apply

05:34:14 16    to the ESI sliver even -- even arguably.

05:34:17 17        And so we think the jury should be instructed

05:34:20 18    that if they find Amgen liable, then they have to limit it

05:34:23 19    to damages caused by whatever contract was below cost and

05:34:26 20    made with the, you know, other -- the other -- there's also

05:34:30 21    the other one being met obviously.

05:34:32 22        MR. BANKS:  So where -- I understand your point.

05:34:34 23    I just don't see it.

05:34:35 24        MS. JOHNSON:  It's in the -- in that Amgen

05:34:37 25    proposal, where it says, "it's only when a Defendant sells

05:34:40  1    with," and then the next sentence, "accordingly, if you find

05:34:43  2    Amgen liable for this claim."

05:34:44  3                MR. BANKS:  That language is okay.  We disagree

05:34:54  4    with the first part of the --

05:34:56  5                MS. JOHNSON:  Okay.

05:34:57  6                MR. BANKS:  -- the idea that you have to be

05:34:58  7    liable under the --

05:34:59  8                THE COURT:  Yeah, yeah.  And we're taking that

05:35:01  9    out pursuant to the Court's prior ruling and then the next

05:35:05 10    part we're including in.

05:35:08 11                MS. JOHNSON:  And the last paragraph is the

05:35:09 12    California issue.

05:35:10 13                THE COURT:  Right.  So in light of the evidence

05:35:25 14    we've heard, which is that we haven't seen sales separated

05:35:32 15    out by California.

05:35:32 16                We all agree on that?

05:35:35 17                MR. BANKS:  We do, Your Honor.

05:35:36 18                MS. JOHNSON:  Yes.

05:35:37 19                THE COURT:  I'm wondering whether what we might

05:35:39 20    do is -- because if Amgen wins on this part of the dispute,

05:35:51 21    there's really no basis for the jury to find any damages on

05:35:54 22    this claim because we don't have it separated out by

05:35:57 23    California.  So I'm wondering if what we might do is just

05:36:01 24    put it to the jury and then deal with it in post-trial

05:36:04 25    motions.

05:36:04  1          Would that be a -- would that be legal error to

05:36:08  2    do that?

05:36:09  3          MR. BANKS:  I don't think so, Your Honor.  I'd

05:36:10  4    have to -- I would like to confer with my client before I --

05:36:14  5    for sure.

05:36:14  6          THE COURT:  What do you think, Ms. Johnson?

05:36:15  7          MS. JOHNSON:  Well, I'm in the same spot.  I

05:36:18  8    think that would be okay, because then we would just -- as

05:36:21  9    long as we were going to later consider the question and we

05:36:24 10    would all know that if -- if it had to be limited in

05:36:28 11    California --

05:36:28 12          THE COURT:  They would lose.

05:36:30 13          MS. JOHNSON:  Right.  I wouldn't want them to

05:36:31 14    come back and say, We should get a retrial.

05:36:33 15          THE COURT:  No.  We're not doing that.  We don't

05:36:35 16    have the evidence in there, and we knew that this was an

05:36:37 17    issue because, obviously, you've been -- you proposed these

05:36:41 18    instructions prior to the start of the case.  So, I mean, if

05:36:47 19    everyone agrees that it wouldn't be legal error to proceed

05:36:49 20    in that fashion, that might make our evening tonight a

05:36:54 21    little bit more pleasant.

05:36:55 22          MS. JOHNSON:  I think maybe we both just can

05:36:58 23    confirm with our clients, but --

05:37:00 24          MR. BANKS:  Provisionally, yes.

05:37:02 25          MS. JOHNSON:  Provisionally, I think that works.

05:37:04  1          THE COURT:  Let's do that.

05:37:10  2          MR. BANKS:  Would you give us a minute?

05:37:11  3          THE COURT:  Yeah.

05:39:04  4          (Discussion held off the record.)

05:39:05  5          THE COURT:  Counsel.

05:39:05  6          MS. JOHNSON:  Okay.  That is fine with us.  The

05:39:07  7  one clarification, which I thought I heard, but there was

05:39:09  8  some uncertainty, so if the verdict came back for them on

05:39:14  9  the UPA and nothing else, just to simplify it, then you

05:39:18 10  wouldn't be making an allocation post-trial of how much --

05:39:21 11          THE COURT:  No, no.

05:39:22 12          MS. JOHNSON:  Okay.  Yes.  Then with that

05:39:24 13  understanding, we think that's an appropriate way to

05:39:26 14  proceed.

05:39:26 15          MR. BANKS:  We agree, Your Honor.

05:39:27 16          THE COURT:  Okay.  Great.  Everyone agrees

05:39:30 17  there's no error proceeding that way.  So what we're going

05:39:33 18  to do then in light of that is -- make sure we all agree on

05:39:39 19  this portion of it -- is not include the sentence that

05:39:43 20  starts with "Amgen is not liable for violations of the

05:39:46 21  California Unfair Practices Act."

05:39:49 22          That sentence comes out.  And the next sentence

05:39:52 23  comes out as well.

05:39:57 24          MR. BANKS:  Yes.

05:39:57 25          THE COURT:  And then we're going to sort this

05:39:59  1    out, to the extent that there's a Plaintiff's verdict on

05:40:02  2    this claim.  We'll have the argument from Amgen post-trial,

05:40:07  3    that they didn't sufficiently provide evidence of California

05:40:10  4    sales.

05:40:11  5             MS. JOHNSON:  That's right.  And I guess one

05:40:12  6    other thing I would say is -- and we're agreed that the

05:40:15  7    issue of whether they sufficiently had evidence of

05:40:17  8    California sales is preserved because I'm not sure if I --

05:40:20  9    how much I talked about that in the 50(a) motion.  So I just

05:40:23 10    want to make sure we wouldn't come back and say --

05:40:25 11             THE COURT:  That is absolutely preserved.  I

05:40:27 12    remember you saying that --

05:40:29 13             MS. JOHNSON:  Okay.

05:40:29 14             THE COURT:  Yes.

05:40:32 15             MR. BANKS:  I'd have to look at the transcript,

05:40:33 16    but I --

05:40:35 17             MS. JOHNSON:  I think I just have to make it

05:40:36 18    sometime before the verdict.  So maybe if I didn't make it

05:40:38 19    before, I'd add to my 50(a) motion.

05:40:41 20             THE COURT:  Right.  Good point on that as well.

05:40:51 21             All right.  So add that to your motion before

05:40:53 22    the case goes to the jury if you want to preserve that --

05:40:56 23             MS. JOHNSON:  Okay.

05:40:56 24             THE COURT:  -- to the extent it's not already

05:40:58 25    preserved.

05:40:58  1          MS. JOHNSON:  Can I do it right now or do you

05:41:01  2   need it tomorrow?

05:41:02  3          I can do it in two seconds.

05:41:02  4          THE COURT:  Yeah.  Why don't you do it right

05:41:03  5   now.

05:41:03  6          MS. JOHNSON:  Your Honor, we would add to our

05:41:05  7   50(a) motion by moving to -- that there is insufficient

05:41:08  8   evidence of any damages limited to California or of how much

05:41:12  9   damages were in California.

05:41:14 10          The same is true for New York.  There's

05:41:15 11   insufficient evidence to allow the jury to allocate damages

05:41:18 12   to New York because the California state law claims require

05:41:22 13   the damages be allocated or be allowed only for California.

05:41:25 14          There's insufficient evidence to permit damages

05:41:28 15   for any of the California state law claims; similarly, the

05:41:30 16   New York state law claim, because there's no insufficient

05:41:33 17   evidence for the jury to find how many damages were in New

05:41:36 18   York.  There is insufficient evidence for the jury to award

05:41:38 19   any damages in the New York claims.

05:41:40 20          And then I think the same thing actually would

05:41:42 21   probably apply to the tortious interference claim, and there

05:41:44 22   would be insufficient evidence to allow for a -- damages

05:41:48 23   outside of Delaware.

05:41:51 24          THE COURT:  That one might be a little

05:41:53 25   different, but you preserved it.

05:41:55  1        Counsel.

05:41:55  2        MR. BANKS:  Just for the record, we think that

05:41:58  3    the statute applies or allows a Plaintiff to collect a

05:42:04  4    territoriality for both California and New York, and

05:42:06  5    Delaware to the extent it's called.

05:42:09  6        THE COURT:  Okay.  Fabulous.  So I'm going to

05:42:11  7    submit the case to the jury, subject to the Court's later

05:42:15  8    determination of the -- legal interpretation of the state

05:42:16  9    statutes and tortious interference claim.

05:42:19 10        So we're good on that.

05:42:28 11        Is 44 disputed?

05:42:29 12        MS. JOHNSON:  So the only real dispute we have

05:42:32 13    on 44 is that, because this case has, again, been tried as a

05:42:36 14    federal low-cost pricing and not as state law, there hasn't

05:42:40 15    been any evidence of fixed costs.  And so we think it's a

05:42:45 16    little confusing and misleading to the jury to now give them

05:42:48 17    an instruction about a bunch of costs that are not in the

05:42:51 18    case because there's been no evidence of fixed costs.

05:42:55 19        MR. BANKS:  Let me just look at the prior

05:42:57 20    instruction, Your Honor.

05:42:58 21        THE COURT:  Yeah.

05:43:03 22        MR. BANKS:  We'd be okay eliminating --

05:43:06 23        THE COURT:  So the ask is to eliminate this and

05:43:09 24    we're going to eliminate it.

05:43:12 25        Okay.

05:43:21  1              MS. JOHNSON:  Let me ask --

05:43:53  2              Okay.  Your Honor, yes, we're good with cutting

05:43:56  3    44.

05:43:56  4              THE COURT:  Okay.

05:44:02  5              Forty-five.

05:44:06  6              MS. JOHNSON:  So 45, the -- I don't think we

05:44:14  7    have the same problem with the first sentence because those

05:44:17  8    are variable costs.

05:44:18  9              The Regeneron proposal is in addition to the

05:44:21 10    model that -- we don't think it's helpful to tell the jury

05:44:26 11    this -- these two sort of competing propositions, that sound

05:44:29 12    more legal, about what cost of manufacturing includes.  And

05:44:33 13    so we would not include the Regeneron proposal.

05:44:36 14              THE COURT:  Yeah, just saying what the parties

05:44:38 15    contend, I don't know how helpful that is.

05:44:40 16              MR. BANKS:  Yeah.

05:44:41 17              THE COURT:  Yeah.  So let's cut that out.

05:44:43 18              Forty-six.

05:44:48 19              MR. BANKS:  You would just not give this

05:44:50 20    generally; right, counsel?

05:44:53 21              MS. JOHNSON:  The numbers are off.  Yeah, I

05:44:59 22    think -- so our take was, this one was necessary if there --

05:45:04 23    like, we were objecting to UPA going, so we didn't want 44

05:45:07 24    and 45, because we wanted a UPA claim.

05:45:09 25              But if 44 and 45 were given -- and I'll say,

05:45:12 1    even just if 45 is given, then we think 46 should be given

05:45:15 2    as well.

05:45:16 3                THE COURT:  Okay.

05:45:17 4                MS. JOHNSON:  Given where we are, we think 46

05:45:19 5    should be in.

05:45:20 6                THE COURT:  Okay.

05:45:31 7                Just to make sure for the record that I

05:45:33 8    understand.

05:45:37 9                Forty-five, did Amgen object to having 45 at

05:45:37 10   all?

05:45:40 11               I took that as to mean, you're okay with 45.

05:45:43 12   You just didn't like the second part of it.  I just want to

05:45:46 13   make sure the record is clear on that, because I didn't -- I

05:45:48 14   wasn't considering whether or not to give 45 at all.  I was

05:45:50 15   just looking at the additional language.

05:45:53 16               MS. JOHNSON:  So I think, originally, we had

05:45:55 17   basically grouped 44 and 45, and we were kind of leaving

05:46:00 18   them all out because we weren't instructing the jury on

05:46:03 19   this.  So -- but I don't think -- we don't object to 45

05:46:08 20   standing alone.  If it was referencing back to fixed cost,

05:46:10 21   it was more problematic.

05:46:12 22               THE COURT:  Okay.  Got it.  So we're good with

05:46:14 23   45?

05:46:14 24               MS. JOHNSON:  Yes.

05:46:15 25               THE COURT:  And then, 46, we're good with?

05:46:17  1          MS. JOHNSON:  Right.

05:46:17  2          THE COURT:  Forty-seven.

05:46:20  3          MS. JOHNSON:  So 47 is -- it's the model

05:46:24  4  affirmative defense to below-cost sales of meeting

05:46:27  5  competition.  We think there's been evidence in the case and

05:46:30  6  I -- there was a -- Defense Exhibit 889 where Ascent had

05:46:34  7  told Amgen that it needed to increase its bid to match the

05:46:39  8  Regeneron offer.

05:46:40  9          So we think there's evidence in the record to

05:46:42 10  support the idea that Amgen was bidding in an attempt to

05:46:45 11  meet Regeneron's offer.  So we think there's -- the jury

05:46:48 12  should be instructed on this.

05:46:50 13          MR. BANKS:  So, Your Honor, we just saw this a

05:46:54 14  minute ago.  I mean -- well, a minute ago in the context of

05:46:57 15  our discussions.  I know it feels like longer than a minute

05:47:01 16  for some of us.

05:47:02 17          We had a concern that this wasn't in the

05:47:09 18  Defendant's answer as an affirmative defense that was

05:47:11 19  asserted.  We need to confirm that was our initial -- our

05:47:16 20  initial take.  Otherwise, to the extent that counsel's

05:47:19 21  representing that this is just a model instruction, then we

05:47:21 22  don't have an objection.

05:47:21 23          THE COURT:  Okay.  So we're going to instruct

05:47:23 24  the jury on this.

05:47:27 25          MS. JOHNSON:  Your Honor, we had the 24th

05:47:29 1   affirmative defense, because I actually looked at this

05:47:30 2   earlier in case it came up, was Plaintiff's claims were

05:47:33 3   barred in whole or in part on the basis that any lower

05:47:36 4   prices offered by Amgen to purchasers were, "made in good

05:47:40 5   faith to meet an equally low price by Regeneron."

05:47:42 6           So I think that's --

05:47:43 7           THE COURT:  I think that's sufficient to

05:47:44 8   preserve it.  Yeah.

05:47:47 9           All right.  Only 25 more pages to go.

05:47:55 10          MS. JOHNSON:  I promise they're going to go --

05:47:57 11          MR. BANKS:  If I understand the dispute about

05:47:59 12  the Cartwright and Donnelly Acts, it's not with respect to

05:48:02 13  the language.  But just, I think Amgen's position is that

05:48:06 14  there should be one instruction covering both claims.  We

05:48:10 15  think there should be independent instructions with --

05:48:13 16  between the differences and the language.

05:48:16 17          MS. JOHNSON:  Yes, and I think where we are,

05:48:18 18  based on your prior rulings, is that 49 would be out because

05:48:24 19  49 was our joint -- both of these claims follow -- "joint,"

05:48:28 20  meaning both Cartwright and Donnelly follow from federal.

05:48:31 21  So we're not --

05:48:32 22          THE COURT:  Okay.

05:48:32 23          MS. JOHNSON:  I understand that you're not

05:48:33 24  instructing the jury that way, so it would be out.

05:48:36 25          THE COURT:  So 49 is out and then -- so 48,

05:48:37  1    you're okay with --

05:48:38  2              MS. JOHNSON:  Right.

05:48:39  3              THE COURT:  -- because it's the alternative?

05:48:41  4              MS. JOHNSON:  Right, yeah.

05:48:42  5              THE COURT:  Okay.  So we're good on 48.

05:48:49  6              MS. JOHNSON:  And the same is true of 49.

05:48:53  7    It's -- we didn't have a problem with the text of the

05:48:55  8    instruction.  It was the concept of there doesn't need to be

05:48:58  9    separate instructions on Cartwright.

05:49:00 10              THE COURT:  Okay.

05:49:01 11              MS. JOHNSON:  So...

05:49:01 12              THE COURT:  Right.

05:49:03 13              MS. JOHNSON:  Fifty is now okay --

05:49:04 14              THE COURT:  Fifty is okay.

05:49:05 15              MS. JOHNSON:  -- given where we are.

05:49:06 16              THE COURT:  Yeah.  And 51, too?

05:49:09 17              MS. JOHNSON:  Yes, I was trying to see if that

05:49:11 18    presented the New York issue, but it looks like not.  So I

05:49:15 19    think we're okay with 51 as well.

05:49:22 20              THE COURT:  We're good?

05:49:54 21              MS. JOHNSON:  Yes, yes.  Sorry.

05:49:55 22              THE COURT:  All right.  No, it's fine.

05:49:57 23              All right.  So that's 51.

05:49:58 24              Tortious interference.  We have additional

05:50:03 25    proposed language by Amgen.  For the record, this is

05:50:06  1    Instruction 52.

05:50:08  2          MS. JOHNSON:  Yes.  So the first one was the

05:50:10  3    issue that we said their allegation of wrongful means is the

05:50:13  4    same as the federal antitrust, so it should follow from

05:50:16  5    that.

05:50:16  6          THE COURT:  Yeah.  So that's coming out based on

05:50:18  7    the Court's prior rulings.

05:50:20  8          MS. JOHNSON:  And then on the second page and

05:50:22  9    this -- this is an issue that I did reference yesterday in

05:50:24 10    the 50(a), we've added this quote that we think is helpful

05:50:29 11    at -- there's not a model, so maybe "adding" is not the

05:50:34 12    right word.  Because the language we have included here that

05:50:36 13    Regeneron does not like is adopting this concept of -- "to

05:50:41 14    prove the requirement on," it should say "of" --

05:50:45 15    "interference of the business relationship, Regeneron must

05:50:47 16    identify a specific party who is prepared to enter into a

05:50:51 17    business relationship, but was dissuaded from doing so."

05:50:54 18    And we have cited the case below that says that.

05:50:58 19          THE COURT:  Yeah.  I'm familiar with that case

05:51:00 20    and the individual in that case.  So I -- so that language

05:51:07 21    is not coming in.  That -- I know what that language is from

05:51:11 22    and it comes out of the situation where someone said --

05:51:16 23    someone's allegations are that the Defendant did something

05:51:19 24    to me, and it's caused me to not be able to get contracts

05:51:22 25    with people or to make sales.

05:51:25 1          And that's not tracking what we have going on

05:51:27 2  here.  We have specific counterparties that we're talking

05:51:30 3  about.  So we're not going to include that language.

05:51:34 4          But I think the rest of the proposed instruction

05:51:40 5  covers the concept that Ms. Johnson's talking about,

05:51:42 6  which that there is -- there has to be a prospective

05:51:46 7  business relationship.

05:51:47 8          MS. JOHNSON:  Well, and to be clear, Your Honor,

05:51:48 9  we want the point that, there -- what is interfered with

05:51:52 10 must be a relationship, not the conduct of the PBM.  There

05:51:56 11 must be a relationship that is alleged to not be formed.

05:52:00 12         THE COURT:  Yeah, I think that's covered under

05:52:02 13 the rest of the instruction.

05:52:03 14         MR. BANKS:  Thank you, Your Honor.

05:52:05 15         MS. JOHNSON:  And then what about, we -- I guess

05:52:06 16 we didn't talk about -- I skipped over the first sentence

05:52:07 17 of -- that was actually different.  Just that, "reasonable

05:52:09 18 likelihood of a relationship forming cannot be met based

05:52:13 19 merely upon existence of an existing relationship."

05:52:16 20         THE COURT:  I don't think we need --

05:52:17 21         MS. JOHNSON:  Okay.

05:52:18 22         THE COURT:  -- that, either.  And I don't think

05:52:20 23 it's an error of law not to include it in light of the rest

05:52:25 24 of the instruction, which is that there has to be a

05:52:34 25 relationship or expectancy.  A prospective relationship or

05:52:49 1    expectancy.

05:52:51 2                    Okay.  All right.  Fifty-three.

05:53:00 3                    MS. JOHNSON:  So this one is an affirmative

05:53:02 4    defense.  We pulled it from the jury instructions in the

05:53:06 5    *Cryovac* case.  It follows the language or -- the authority

05:53:13 6    for it is this Third Circuit decision in *Acumed vs. Advanced*

05:53:17 7    *Surgical Services*, which was Pennsylvania law, but the same

05:53:21 8    principle.  And it said, The law necessarily recognizes this

05:53:24 9    privilege, because if more than one party seeks to sell

05:53:27 10   similar products to prospective purchasers, both necessarily

05:53:30 11   are interfering with the other's attempt to do the same

05:53:33 12   thing."

05:53:33 13                   Obviously, they think there's other additional

05:53:35 14   improper stuff going on, but we think we're entitled to an

05:53:38 15   instruction on the affirmative defense, that just competing

05:53:41 16   is not improper interference.

05:53:43 17                   MR. BANKS:  We're okay including it, Your Honor,

05:53:48 18   as long as it's clear that -- and I think it is, that the --

05:53:52 19   has to do -- they have to use -- can't just -- you know, if

05:53:55 20   they use wrongful means to compete, the fact that they're

05:53:58 21   competing doesn't get them out of it.

05:54:00 22                   THE COURT:  Right.  And that says there, "as

05:54:02 23   long as a person does not use wrongful means to compete."

05:54:05 24                   Do you have any other additional language?

05:54:06 25                   MR. BANKS:  No.

05:54:07  1          THE COURT:  You're okay with the rest of it?

05:54:09  2          MR. BANKS:  Yes.

05:54:09  3          THE COURT:  Okay.  Good.

05:54:10  4          All right.  Fifty-four is joint.  Fifty-five is

05:54:14  5   joint.  Fifty-six.  Fifty-seven.

05:54:40  6          All right.  So --

05:54:43  7          MS. JOHNSON:  So this is from -- what the model

05:54:46  8   says is the model has, "Defendant claims that these higher

05:54:51  9   prices occurred as a result" -- obviously, an overcharge --

05:54:54 10   "but occurred as a result of other factors that have nothing

05:54:56 11   to do with the alleged antitrust violation."

05:54:58 12          And then it says, "These include lists as

05:55:01 13   appropriate, Defendant's examples of ways prices could

05:55:04 14   increase in the normal course of business activity."

05:55:06 15          So that's what we were doing, was filling in

05:55:08 16   that part of the model.

05:55:09 17          THE COURT:  Okay.

05:55:11 18          MR. BANKS:  Our view is that can be added to

05:55:17 19   summation.  It doesn't necessarily -- I know the model calls

05:55:19 20   for an insertion, but it's already linked the instruction.

05:55:22 21          THE COURT:  Do you think it's a legal error to

05:55:24 22   include it?

05:55:24 23          MR. BANKS:  It's not a legal error.  Again, I

05:55:27 24   think the parties could make it in summation, given the

05:55:31 25   length of the instructions.

05:55:31  1                    THE COURT:  Understood.  So --

05:55:34  2                    MR. BANKS:  As long as --

05:55:35  3                    THE COURT:  -- consistent with my other rulings

05:55:36  4        and since we don't have any argument that it's legal error,

05:55:39  5        we'll go with Amgen's proposal.

05:55:43  6                    MS. JOHNSON:  And then I think we can go with

05:55:45  7        their language in the next sentence because that is in the

05:55:47  8        model.

05:55:48  9                    THE COURT:  Okay.  Great.

05:55:58 10                    Fifty-eight.

05:55:58 11                    MR. BANKS:  Sorry.  Just one question,

05:56:00 12        Your Honor, on the last one.  My colleague is pointing out,

05:56:04 13        I mean, the --

05:56:06 14                    THE COURT:  Yeah.

05:56:07 15                    MR. BANKS:  What I'm seeing as the proposed

05:56:12 16        insert has to do with Defendant's examples of ways prices

05:56:16 17        could increase.

05:56:17 18                    Is that what you were referring to or we covered

05:56:21 19        that?

05:56:21 20                    MS. JOHNSON:  Which?

05:56:23 21                    MR. BANKS:  This just has to do with 57.

05:56:25 22                    MS. JOHNSON:  Fifty-seven.  For what, our added

05:56:27 23        language or...

05:56:27 24                    MR. BANKS:  Yes.

05:56:28 25                    MS. JOHNSON:  This is -- it's giving examples of

05:56:32  1    what our allegations are for the reason that -- that any

05:56:36  2    profits or sales lost by Regeneron occurred from factors

05:56:39  3    that don't have to do with the antitrust violation.

05:56:43  4                MR. BANKS:  Got it.  Never mind.

05:56:45  5                Okay.  Thank you.

05:56:46  6                MS. JOHNSON:  Oh, okay.

05:56:50  7                Well, I don't know that this matters, but

05:56:53  8    according to the -- I read the wrong section of that note,

05:56:55  9    so...

05:56:56 10                For when it's a competitor, though, it's

05:56:57 11    effectively the same thing.  It still has these -- but what

05:57:00 12    it says is these include lists, as appropriate, Defendant's

05:57:04 13    examples of ways Plaintiff could lose sales in the normal

05:57:07 14    course of competitive business activity.

05:57:09 15                So that's what it should be on our page, rather

05:57:11 16    than what I read the first time was when Plaintiff is a

05:57:14 17    purchaser.

05:57:15 18                MR. BANKS:  I see.

05:57:15 19                Hang on one second.

05:57:18 20                So I think if it's ways that we could have lost

05:57:20 21    sales, then I don't think it's appropriate to refer to

05:57:24 22    Amgen's superior responsiveness to the need and desires of

05:57:27 23    customers.  I think that would be inappropriate as a reason

05:57:31 24    why we would lose sales, if we're talking about what you're

05:57:34 25    doing.

05:57:35  1          MS. JOHNSON:  I was just thinking of it as

05:57:37  2     Regeneron is losing sales because people are preferring

05:57:39  3     Amgen for these other reasons.

05:57:41  4          THE COURT:  Yeah, I -- I still agree with Amgen

05:57:45  5     on this one.  This can be included.  I don't think it's a

05:57:48  6     legal error to include it and I haven't heard any suggestion

05:57:53  7     that it is legal error.

05:57:54  8          All right.  Fifty-eight.

05:58:02  9          MS. JOHNSON:  So the first addition from them

05:58:06 10     that -- before they were rescinded into the future we think

05:58:10 11     is problematic given all the issues that we've briefed in

05:58:14 12     recent weeks about damages sought for Mathur based on other

05:58:18 13     future projections.

05:58:21 14          MR. BANKS:  I will just say for the record, we

05:58:24 15     think, notwithstanding Your Honor's ruling with respect to

05:58:26 16     Dr. Mathur, there is sufficient evidence in the record for

05:58:29 17     the jury to reasonably base an understanding of damages that

05:58:34 18     extend beyond the trial given the -- the contract

05:58:40 19     subsequent.

05:58:40 20          THE COURT:  Well, we had your expert up -- they

05:58:43 21     put a number up there, so that -- so I don't understand how

05:58:45 22     this language -- I don't understand.

05:58:49 23          MR. BANKS:  Well, the number went through a

05:58:50 24     particular period of time, Your Honor.

05:58:51 25          THE COURT:  Right.

05:58:52 1          MR. BANKS:  And I -- look, I appreciate what

05:58:54 2   Your Honor said about the additional supplemental report and

05:58:57 3   so forth, so I'm not rearguing that, though I'm wanting to

05:59:01 4   preserve it.

05:59:02 5          That said, based on the amount of damages that

05:59:04 6   were up on the screen and talked about with respect to the

05:59:07 7   time period in which that analysis ended, I do think there

05:59:10 8   would be a reasonable basis for the jury to understand that

05:59:13 9   damages are still continuing into the future.

05:59:16 10         THE COURT:  But you're not asking them for

05:59:18 11  damages into the future; right?

05:59:19 12         I mean, you're asking for the damages that you

05:59:21 13  had on the screen.

05:59:22 14         MR. BANKS:  We're asking the jury to award

05:59:24 15  damages based on the evidence that was presented in -- in

05:59:26 16  the case, which said what the losses were as of the date,

05:59:29 17  you know, that was provided for.

05:59:33 18         I think that's a different thing than saying the

05:59:36 19  jury can't award a damages verdict that uses that evidence

05:59:42 20  to -- you know, to a proper period of time, which would

05:59:45 21  include up until today for sure.

05:59:47 22         THE COURT:  Okay.  Well, I don't hear Amgen to

05:59:52 23  say that they're going to stand up in front of the jury and

05:59:54 24  say you can't award anything that -- I don't understand what

06:00:00 25  the issue is here.

06:00:02 1          MS. JOHNSON:  No.  I think they -- their damages

06:00:03 2     would be what they have presented and the model doesn't have

06:00:06 3     any sort of, like -- this just sounds like a vague

06:00:10 4     catch-all, like, there could be some other damages we

06:00:13 5     haven't proven to you that you could find.

06:00:14 6          THE COURT:  Right.

06:00:14 7          MS. JOHNSON:  And that seems prejudicial.

06:00:16 8          THE COURT:  Whether or not Regeneron claims that

06:00:17 9     its full damages will extend into the future doesn't have

06:00:20 10    anything to do with what we're instructing the jury on,

06:00:22 11    which is that --

06:00:23 12         MS. JOHNSON:  Right.

06:00:23 13         THE COURT:  -- it claims that it was harmed and

06:00:26 14    if -- if Amgen stands up in closing and says they included

06:00:30 15    money in their damages ask that you shouldn't give them

06:00:34 16    because it hasn't happened yet --

06:00:36 17         MS. JOHNSON:  Right.

06:00:36 18         THE COURT:  -- then -- you're not going to do

06:00:37 19    that, so I don't think it's going to be an issue.  So we're

06:00:40 20    not going to include this language.

06:00:42 21         If you want -- remind me -- the damages ask,

06:01:02 22    what was the end time period for it?

06:01:07 23         Does it extend --

06:01:09 24         MR. BANKS:  2024.  Is that right?

06:01:11 25         2025.

06:01:12    1                    THE COURT:  So it does reach into the future,

06:01:14    2    what your ask is.

06:01:16    3                    MR. BANKS:  Yeah.  Okay.

06:01:16    4                    THE COURT:  So if you're really worried about

06:01:18    5    it, we could change the first sentence.  And instead of

06:01:21    6    saying, it lost profits to, it lost and will lose profits,

06:01:26    7    or something like that, to the extent that that's what your

06:01:29    8    point -- that was your theory of the case.

06:01:31    9                    Does Amgen object to that?

06:01:33   10                    MS. JOHNSON:  I'm trying to think if there's a

06:01:35   11    way to preview or a way to say it that makes sure it's not

06:01:39   12    sort of suggesting an open-ended --

06:01:40   13                    THE COURT:  That they can do whatever they want.

06:01:42   14                    MS. JOHNSON:  Right.  That's the part that

06:01:44   15    bothers me is the idea of, like, we've given you our damages

06:01:47   16    and we may suffer more; right?  That's the part that makes

06:01:50   17    me uncomfortable.

06:01:52   18                    THE COURT:  Right.

06:01:52   19                    MR. BANKS:  Right.  And there's no requirement

06:01:55   20    we prove damages with expert testimony.  Obviously, they can

06:01:59   21    argue that there's not other evidence.  That can be in

06:02:00   22    argument to the jury.  But I think it's -- you know, it's

06:02:03   23    clear in an antitrust case where there's ongoing antitrust

06:02:06   24    violations that it's allowed to go past the date of the

06:02:10   25    expert report and, obviously, the calculated damages as we

06:02:13 1    just discussed.

06:02:14 2                 THE COURT:  Well, now you really are worrying

06:02:16 3    me.  Are you going to get up and say that they can award

06:02:18 4    whatever they want?

06:02:19 5                 MR. BANKS:  No, not whatever -- not whatever

06:02:20 6    they want.  A verdict that's consistent with the evidence,

06:02:22 7    right, so that's where we are.

06:02:24 8                 But I think with respect to making clear that

06:02:30 9    even what was presented extends beyond --

06:02:34 10                THE COURT:  Today.

06:02:35 11                MR. BANKS:  -- today is okay.

06:02:35 12                THE COURT:  Yeah.  So I really feel like you

06:02:37 13   should be able to come up with some language that you both

06:02:40 14   agree on.  You know what my concerns are about it.  So I'm

06:02:44 15   going to let you meet and confer on that tonight.

06:02:50 16                MS. JOHNSON:  Yeah.  He's asking could we say

06:02:51 17   something like, you know, Regeneron claims damages from lost

06:02:56 18   profits and increased cost through the end of 2025 as a

06:03:00 19   result of the federal antitrust violations, or something

06:03:02 20   like that, that makes it cut off rather than just sort of

06:03:06 21   open-ended.

06:03:09 22                MR. BANKS:  Let me confer with my team and

06:03:09 23   then --

06:03:11 24                THE COURT:  Yeah.  Why don't you work it out

06:03:13 25   tonight.

06:03:13 1          All right.  And then Amgen's got some additional

06:03:16 2  language on the bottom, too?

06:03:18 3          MS. JOHNSON:  Yeah.  The end of this instruction

06:03:20 4  says, "You may calculate the net profit by the following

06:03:22 5  measure," and then it just has this sort of vague, "the

06:03:25 6  Court should incorporate case-specific instructions

06:03:28 7  addressing legitimate means of measuring lost profit as

06:03:31 8  appropriate based on the evidence, such as the before-after

06:03:34 9  yardstick or market share measures."

06:03:36 10          So this was kind of our attempt to -- we just

06:03:39 11  thought if you're completing the, what's the lost profits,

06:03:42 12  then you need to note the operating expenses saved, which

06:03:45 13  she put up there, the 50 million or whatever.  So it was

06:03:48 14  kind of -- I mean, I think the prior sentence was added

06:03:51 15  after the right, by the following measure:

06:03:53 16          And we just thought to kind of complete the

06:03:56 17  picture after you say, "more profits," you need to also note

06:03:59 18  the expenses.

06:04:00 19          THE COURT:  That's consistent with the evidence.

06:04:01 20          Counsel.

06:04:02 21          MR. BANKS:  It is, but I think the instruction

06:04:03 22  already talks about net profits.  So I think this is

06:04:08 23  superfluous.

06:04:09 24          MS. JOHNSON:  I'm not sure the jury will pick up

06:04:11 25  on net and remind them -- I mean, I think if we're giving

06:04:16  1    them an instruction on how you calculate, we should do it

06:04:17  2    consistent with what Dr. Mathur said, which is calculate the

06:04:20  3    profits, subtract the increased expenses.

06:04:23  4                MR. BANKS:  Yeah.  But it does say to calculate

06:04:25  5    lost profits, you must calculate net profits, and then have

06:04:27  6    an explanation of how that's done.

06:04:30  7                THE COURT:  All right.  Can I ask Regeneron:  Do

06:04:32  8    you think that Amgen's language is a misstatement of the

06:04:35  9    law?

06:04:36 10                MR. BANKS:  I think it's unclear what a

06:04:43 11    benefit -- what the benefits and losses are.  I mean,

06:04:46 12    it's -- you know, that's broader than -- benefits is broader

06:04:50 13    than numbers, I think.

06:04:52 14                MS. JOHNSON:  What about gains or the increased

06:04:55 15    profits and increased expenses?

06:04:57 16                MR. BANKS:  And losses, yeah.  I think -- again,

06:04:59 17    I think -- this is why I don't want to repeat myself, but I

06:05:05 18    feel when it talks about what the net profits are in the

06:05:08 19    prior two sentences, it says exactly what Dr. Mathur

06:05:12 20    applied.

06:05:12 21                So talking about benefits and losses seems to me

06:05:18 22    to be redundant and confusing.  And then talks about profits

06:05:23 23    and revenues.  Then we have this idea of benefit and losses

06:05:26 24    as if it's something different.

06:05:33 25                THE COURT:  I do think it's captured in the

06:05:36  1   earlier language.  I am open to including something if we

06:05:40  2   can, but I share counsel's hesitation about the word

06:05:45  3   "benefits."  And then if we start changing it too much,

06:05:49  4   making it too specific, it might get more confusing.

06:05:52  5           I'm not hearing Regeneron say that they're going

06:05:54  6   to argue anything different in closing than what their

06:05:57  7   expert said, which is that she took out the saved operating

06:06:01  8   costs.

06:06:02  9           MS. JOHNSON:  I just don't -- yeah.  I don't

06:06:03 10   want to lose those -- I'm trying to see if you could revise

06:06:06 11   the earlier-up sentence in some way to be a little clearer

06:06:10 12   to -- because I just want to make sure that all this talk

06:06:14 13   about net and gross doesn't sort of substitute for telling

06:06:18 14   the jury there's a number and then there's an operating --

06:06:22 15   saved operating expense number and you subtract the two.

06:06:25 16           MR. BANKS:  I think that's argument counsel can

06:06:27 17   make in closing.  You know, Dr. Mathur presented a range.

06:06:29 18   You know, one of her positions is that there aren't any of

06:06:31 19   those things, and so I think that's what we'd be arguing.

06:06:34 20   They can argue the opposite.

06:06:35 21           I think that falls within the range of the

06:06:40 22   instruction without the additional language.  Give us the

06:06:43 23   room to argue that and I don't think it's necessary to add

06:06:46 24   any additional benefits and losses.

06:06:49 25           Again, I think that's making confusion.

06:06:53  1          MR. STOCK:  I think the issue, Your Honor, is

06:06:54  2   that the way both parties are agreeing that the calculation

06:06:57  3   goes is you have to do this lost profit by PBM first, and

06:07:02  4   that includes a net profit.

06:07:04  5          And then both Dr. Mathur and the defense expert

06:07:07  6   agree there's a second step after that to take out the

06:07:11  7   operating profit -- the operating expense savings that are

06:07:15  8   not by PBM.  And they could forget that second step, unless

06:07:19  9   we remind them in a way that is consistent with the law,

06:07:21 10   which I think this sentence does, and we can wordsmith it.

06:07:25 11   But I think it's important to us that that not be lost.

06:07:27 12          THE COURT:  I don't think -- yeah.  And I agree,

06:07:29 13   I don't think it's inconsistent with the law.  I think it's

06:07:32 14   consistent with the law.  And I'm inclined to include it,

06:07:34 15   but it needs to be revised.  So I'm going to ask the parties

06:07:36 16   to figure it out.

06:07:38 17          MS. JOHNSON:  Okay.

06:07:41 18          THE COURT:  Fifty-nine.

06:07:48 19          MS. JOHNSON:  So this is our mitigation

06:07:50 20   instruction.  They object to a mitigation instruction.  The

06:07:54 21   notes to the model say, as the first sentence, the

06:07:57 22   obligation to mitigate damages in an antitrust case is

06:08:01 23   clear.  So I don't think that they're making query, but I'm

06:08:04 24   not sure they're disputing, as a legal matter, because their

06:08:07 25   note at the end is just that they don't believe the evidence

06:08:09  1    supports submitting mitigation to the jury.

06:08:11  2           I think the evidence clearly supports it because

06:08:13  3    we have this position that, had they made an effort to seek

06:08:16  4    parity, then they could have gotten coverage and then,

06:08:18  5    obviously, they would have been better off.  Or they could

06:08:21  6    have met the price -- that even if they thought it was an

06:08:23  7    unfair price, they could have met the price that Optum asked

06:08:26  8    for.  That would have reduced their damages.  So I think

06:08:28  9    there's clearly a factual basis for it.  And it just tracks

06:08:31 10    the model, which says that this obligation is clear.

06:08:35 11           THE COURT:  All right.  Counsel.

06:08:36 12           MR. BANKS:  You heard our Rule 50 on it.

06:08:38 13           THE COURT:  Yes.

06:08:39 14           MR. BANKS:  It's the same points, so --

06:08:40 15           THE COURT:  It is the same points.  So in light

06:08:41 16    of the fact that we are submitting this to the jury, we

06:08:45 17    denied the Rule 50.  So we're going to include this

06:08:48 18    instruction.

06:08:49 19           Was there any objection to any of the language

06:08:53 20    in the instruction?

06:08:54 21           MR. BANKS:  As long as it's -- Counsel's

06:08:57 22    representing it's from the model instruction, then no

06:08:59 23    objection.

06:09:00 24           MS. JOHNSON:  I'm just comparing it to see if

06:09:02 25    there's any difference.  Yeah, it looks like it only changes

06:09:41  1      out the name.

06:09:42  2                  MR. BANKS:  Okay.

06:09:43  3                  THE COURT:  Great.  All right.

06:09:48  4                  Sixty.

06:09:49  5                  MR. BANKS:  On 60, just to short circuit this,

06:09:51  6      Your Honor, we can agree to delete our proposed additional

06:09:54  7      language.  I think it comes from the model, but it's

06:09:56  8      confusing in light of the facts of this case.

06:09:59  9                  THE COURT:  Great.

06:09:59 10                  MR. BANKS:  It talks about rebates, but in a

06:10:01 11      different context.

06:10:03 12                  THE COURT:  All right.  That resolves 60.

06:10:08 13                  Sixty-one was the objection that you just didn't

06:10:14 14      want a separate instruction?

06:10:15 15                  MS. JOHNSON:  That's right.

06:10:16 16                  THE COURT:  Okay.  So in light of the Court's

06:10:19 17      prior rulings, consistent with the Court's prior rulings,

06:10:21 18      we'll keep 61.

06:10:22 19                  What's the issue with 62?

06:10:32 20                  MS. JOHNSON:  I think it's the same.  I was just

06:10:34 21      checking my notes on that.

06:10:42 22                  Is that consistent with your view?

06:10:45 23                  Yeah, we just objected to the giving of the

06:10:48 24      instruction for the reasons we previously said.

06:10:51 25                  THE COURT:  All right.  So we'll include that.

06:10:53  1          Sixty-three.

06:11:02  2          MS. JOHNSON:  So we do have an objection to

06:11:05  3   submitting punitive damages to the jury, Your Honor.  We

06:11:08  4   looked at -- we don't -- I mean, it's not really a punitive

06:11:11  5   damages case, not least because all of us have spent this

06:11:14  6   many hours in a room trying to understand what the law even

06:11:17  7   permits.  I had written down somewhere here that I now don't

06:11:24  8   see, but the *Tackett vs. State Farm* case had stated that --

06:11:28  9   I think the word they used was "egregious," that outside

06:11:31 10   egregious behavior wasn't proper to submit this issue of

06:11:35 11   punitive damages to the jury.

06:11:37 12          And we think that, here, there's just not been

06:11:40 13   anything that would support submitting punitive damages.

06:11:42 14          MR. BANKS:  We just -- we disagree, you know,

06:11:45 15   very strongly with that, Your Honor.  Several cases would

06:11:48 16   say it's irreversible error not to instruct the jury to

06:11:52 17   punitive damages as there's many cases in the Third Circuit

06:11:55 18   that say it's irreversible error not to instruct the jury on

06:11:59 19   punitive damages.  We think the evidence would support

06:12:01 20   giving the instruction.

06:12:02 21          Obviously, they can make factual arguments to

06:12:04 22   the jury about why it's not warranted.  I -- there's no

06:12:08 23   Rule 50 motion with respect to the efficiency of the

06:12:11 24   evidence on punitive damages.  They potentially broke the

06:12:15 25   PBM rules as we've said.  They intentionally continued in

06:12:19 1    the conduct after we put them on notice with the

06:12:22 2    cease-and-desist order.  There's language that Your Honor

06:12:24 3    has seen in the case that rises to the level of what

06:12:29 4    punitive damages would support including references to

06:12:32 5    "shanking," "CVS baby," and so forth.

06:12:35 6              We think, you know, again, this is a jury

06:12:38 7    question, not a question to decide on the law.  For sure,

06:12:42 8    there's no -- there's nothing in the record that would

06:12:44 9    support a finding as a matter of law that punitive damages

06:12:47 10   aren't awarded.

06:12:49 11             THE COURT:  Thank you.

06:12:50 12             So we're going to include the instruction.

06:12:52 13   While I have counsel here, though, on this, just to make

06:12:54 14   sure that we're all clear on what can be said in the closing

06:12:57 15   argument about this.

06:13:00 16             Are you intending to ask for a number, or are

06:13:03 17   you telling them it's up to them?

06:13:05 18             MR. BANKS:  Your Honor, I may need to confer

06:13:09 19   with my team.  I don't -- I don't know that we're intending

06:13:12 20   to ask for a specific number.

06:13:13 21             THE COURT:  Can I have Amgen's position on

06:13:15 22   whether asking for a number would be appropriate or

06:13:18 23   permissible?

06:13:19 24             MS. JOHNSON:  I think I'd have to look at it.  I

06:13:21 25   mean, this is so far from a punitive damages case.

06:13:24  1              THE COURT:  I understand your point.

06:13:25  2              MS. JOHNSON:  So I'm struggling a little bit

06:13:27  3    with understanding what good-faith basis there would be to

06:13:29  4    ask for punitive damages at all, especially since the cases

06:13:33  5    that he apparently thinks he's seeing are not cited here.  I

06:13:36  6    think we'd have to look at it and --

06:13:38  7              THE COURT:  Okay.  You should meet and confer.

06:13:41  8              MS. JOHNSON:  Okay.

06:13:41  9              THE COURT:  Because the last thing I want to

06:13:42 10    have happen is to have somebody throw out a crazy number in

06:13:48 11    front of the jury tomorrow with no warning.

06:13:51 12              MR. BANKS:  Your Honor, I don't think -- I think

06:13:52 13    it would be anchored in the compensatory number; right.

06:13:55 14              Is that right?

06:13:57 15              Strike that.  We'll meet and confer.

06:13:59 16              THE COURT:  Okay.  But you're on notice from me

06:14:02 17    that --

06:14:03 18              MR. BANKS:  Announce --

06:14:04 19              THE COURT:  -- no one is going to throw out a

06:14:05 20    number that I haven't seen up on the screen before in this

06:14:08 21    case without clearing it with me first in the morning.

06:14:10 22              Okay?

06:14:13 23              MS. JOHNSON:  And, Your Honor, just to complete

06:14:15 24    the issue on the record.  We do think that *Tackett* case

06:14:18 25    actually says, don't submit it to the jury when it's -- not

06:14:20  1    unless there's egregious conduct.

06:14:22  2                So the statement that it is always error to not

06:14:26  3    submit punitive damages, no matter how weak the evidence, I

06:14:28  4    think is not an accurate statement of the law.

06:14:31  5                THE COURT:  All right.  Let me pull it up.

06:14:33  6                Did we have a JMOL motion on this?

06:14:37  7                MS. JOHNSON:  I thought we did.  I mean, it --

06:14:39  8    obviously, it was so long that maybe I've forgotten it.  But

06:14:44  9    if I didn't expressly say the words that there wasn't

06:14:47 10    punitive, the fact that I said they have no damages

06:14:50 11    whatsoever would also mean no punitives under *State Farm* and

06:14:53 12    *BMW vs. Gore*.

06:14:55 13                THE COURT:  All right.  Stand by.

06:14:57 14                Everyone agrees that Delaware law applies to

06:15:03 15    this claim?

06:15:03 16                MR. BANKS:  Yes, Your Honor.

06:15:04 17                MS. JOHNSON:  We understand they're making a

06:15:06 18    Delaware law claim.  I don't think -- I mean, obviously, we

06:15:10 19    think it is only applicable to people that live in Delaware.

06:15:11 20    We don't think that it's applicable beyond that.

06:15:13 21                MR. BANKS:  That's a separate dispute,

06:15:15 22    Your Honor, that is governing law.  I think the parties

06:15:18 23    agree --

06:15:42 24                THE COURT:  All right.  We'll take a look at it,

06:15:45 25    but the parties should plan that this will likely go to the

06:15:51  1    jury.

06:15:52  2                    MR. BANKS:  Can I give Your Honor a few

06:15:53  3    additional citations?

06:15:56  4                    Would that be helpful or --

06:15:57  5                    THE COURT:  No.  I don't think so.

06:16:04  6                    MR. BANKS:  Just as -- as long as the record is

06:16:06  7    clear.

06:16:08  8                    THE COURT:  Well, I don't have any more on this

06:16:11  9    paper that was given to me.

06:16:27 10                    So the *State Farm* case had to do with insurance

06:16:32 11    coverage, which is a different situation.

06:16:36 12                    Anyway, let's move on.

06:16:39 13                    Deliberations and verdict, that's Number 64.

06:16:42 14    That's joint.  So we'll take a look at that.

06:16:45 15                    So just to make sure that the record is very

06:16:51 16    clear, we're concluding discussing the parties' remaining

06:16:59 17    disputes over the jury instructions.  And the document that

06:17:02 18    we're working off of is the document that we received from

06:17:12 19    the parties at 2:00 p.m. this afternoon.  I don't see it on

06:17:30 20    the docket.

06:17:30 21                    Was it filed?

06:17:31 22                    MS. JOHNSON:  Not yet, Your Honor.

06:17:34 23                    MR. ADAMS:  I don't know if it's been docketed.

06:17:36 24                    THE COURT:  Well, let's go ahead and make sure

06:17:39 25    that gets docketed, and please put a cover page on it that

06:17:42 1    says that this is the document that the parties discussed

06:17:46 2    with the Court during the charge conference on May 13th, so

06:17:51 3    that we're really clear.

06:17:52 4              Because normally what I do is go through each

06:17:55 5    one and get agreement on the record.  We didn't do that

06:17:59 6    here.  So I'm relying on the fact that the document that

06:18:02 7    we're working from has certain instructions listed as being

06:18:06 8    joint proposals, which I take to mean that there's no

06:18:09 9    disagreement and that both parties agree that those

06:18:12 10   instructions are appropriate.

06:18:13 11             So the only ones we discussed today were the

06:18:16 12   ones that the parties said were disputed.

06:18:19 13             Does anyone think there was a disputed

06:18:21 14   instruction that we didn't cover today?  Because if you

06:18:25 15   don't raise it now, I am going to take it to mean that that

06:18:28 16   was an agreement.

06:18:29 17             MR. BANKS:  Subject to the argument we've

06:18:31 18   already had and the Court's ruling, prior to the submission

06:18:33 19   of this document, nothing from Regeneron.

06:18:38 20             MS. JOHNSON:  I think I agree.  I was just

06:18:39 21   flipping through to make sure there was nothing that we

06:18:43 22   skipped or missed, but I believe that we agree.  And we put

06:18:44 23   in the footnote, as you talked about, you know, the parties

06:18:47 24   are preserving all their prior positions.  And so I think --

06:18:51 25   I assume we're good there.

1990

06:18:52  1              THE COURT:  Yes.

06:18:57  2              MS. JOHNSON:  So I think there are a couple that

06:18:59  3     we're sort of -- have on the take-back list.

06:19:02  4              How do you want to address that?

06:19:07  5              THE COURT:  Why don't you go ahead and file

06:19:09  6     something with me, to the extent there are remaining

06:19:12  7     disputes, by midnight tonight.  And it's unlikely that I'll

06:19:20  8     have a ruling for you after midnight, so you should be

06:19:22  9     prepared that it might not go your way.

06:19:27 10              So you should prepare your closings with that in

06:19:29 11     mind.  And then we'll rule on any remaining disputes in the

06:19:37 12     morning.  If we can get it out by oral order before everyone

06:19:40 13     comes to the court, we will.  If we can't, we'll do it in

06:19:43 14     court, and then we'll print off the jury instructions.

06:19:51 15              If you get a ruling from me prior to coming to

06:19:57 16     court, Plaintiff should make sure to bring enough copies to

06:20:01 17     prepare the final version and bring enough copies for the

06:20:03 18     seven jurors.  We need four copies for the Court.

06:20:09 19              MS. JOHNSON:  Okay.

06:20:10 20              MR. BANKS:  Okay.

06:20:11 21              THE COURT:  All right.

06:20:12 22              MR. BANKS:  Your Honor, what we'll endeavor to

06:20:14 23     do is submit a revised version of this that has as many of

06:20:17 24     the additional disputes.

06:20:18 25              THE COURT:  Right.  There really should be --

06:20:20  1                    MR. BANKS:  That --

06:20:20  2                    THE COURT:  -- no disputes left.

06:20:21  3                    MR. BANKS:  Right, right.  Yeah.  It reflects --

06:20:24  4                    THE COURT:  But if there are, only the ones

06:20:25  5       we've talked about tonight that are still on the table.

06:20:28  6                    MR. BANKS:  Yeah.

06:20:28  7                    MS. JOHNSON:  The only one I remember is the

06:20:30  8       exclusive dealing.

06:20:31  9                    Do you recall any others?

06:20:32 10                    MR. BANKS:  I think there are maybe one or two

06:20:35 11       tweaks that I think we were going to work that I think we

06:20:38 12       should be able to.

06:20:39 13                    MS. JOHNSON:  All right.

06:20:40 14                    THE COURT:  So we'll look forward to getting

06:20:41 15       that from you tonight.

06:20:42 16                    Now, we've got the verdict form, which is a

06:20:51 17       disaster.

06:20:55 18                    MR. BANKS:  So the way we approached it,

06:20:57 19       Your Honor, was make it as simple as possible given that we

06:21:00 20       do want to seek a verdict on each of the claims in the case.

06:21:04 21       If you would -- ours asks two questions for each claim, but

06:21:11 22       we've combined the federal claims into one.

06:21:14 23                    THE COURT:  Stand by.

06:21:16 24                    MR. BANKS:  And that's incorrect.  So ignore me.

06:21:22 25       It's been a long day.

06:21:51  1                    THE COURT:  Okay.  So let me ask Regeneron,

06:21:54  2      you're asking damages for each claim.

06:21:59  3                    MR. BANKS:  So --

06:21:59  4                    THE COURT:  How is the jury supposed to

06:22:02  5      understand that?

06:22:02  6                    MR. BANKS:  -- so here is what we've done, Your

06:22:03  7      Honor.  I've conferred with our team about this.  I think

06:22:05  8      what we'll do is ask one damages number for each -- for all

06:22:08  9      of the federal claims together.

06:22:11 10                    The state law claims -- and we've discussed

06:22:13 11      this -- I think, need separate damages numbers to the extent

06:22:17 12      some of them or all of them are not subject to trebling.  So

06:22:20 13      you need to know if -- if the -- if they're from one number

06:22:24 14      for all of the claims and some are subject to trebling and

06:22:27 15      some aren't, to the extent the jury had different numbers in

06:22:30 16      mind, you wouldn't know what to treble and what not to.

06:22:33 17                    THE COURT:  Are you going to be asking for

06:22:35 18      different -- I see what you're saying.

06:22:38 19                    Is there any basis for the jury to award

06:22:41 20      anything different amongst your different claims besides the

06:22:46 21      ones that have to do with actual below-cost pricing in

06:22:51 22      California?

06:22:52 23                    MS. JOHNSON:  Well, I mean, we would say no

06:22:55 24      because we think the claims follow; right?  But I think if

06:22:58 25      they were to find -- if the jury were to find for them on

06:23:04 1    Section 1 and on California UPA or something, and we don't

06:23:09 2    know what their damages number is for, then we don't know.

06:23:15 3            THE COURT:  Right.  So you agree we need to get

06:23:17 4    some -- we should separate it out.

06:23:19 5            MS. JOHNSON:  I think just -- what we were

06:23:21 6    envisioning doing was have our one damages question, and

06:23:24 7    then maybe we add a subquestion that says, Of this, of the

06:23:27 8    amount you wrote in line, whatever, how much of it is

06:23:31 9    attributable to the federal claims or because --

06:23:36 10           THE COURT:  Yeah.  I don't know that that solves

06:23:38 11   the problem.  That might make it worse.

06:23:39 12           MR. BANKS:  Yeah.

06:23:40 13           MS. JOHNSON:  Why?

06:23:41 14           THE COURT:  Because it could be overlap.  It

06:23:42 15   could be the same damages; right?  They could say, whatever,

06:23:46 16   it's "X" million dollars for the federal.  And it's the same

06:23:50 17   "X" million dollars for the state.  And when you ask the

06:23:54 18   jury how much is attributable to the California, you don't

06:23:56 19   want them to say it's one half of "X."  It should be "X."

06:24:01 20           You know what I mean?

06:24:02 21           MS. JOHNSON:  Right, right.

06:24:03 22           MR. BANKS:  That's our concern, too, Your Honor.

06:24:05 23           MS. JOHNSON:  So...

06:24:06 24           MR. BANKS:  I appreciate it's not the number of

06:24:10 25   questions, but the way we tried to do it --

06:24:12  1                    THE COURT:  But you agree that you can have --

06:24:14  2    you're okay with one damages number for the federal claim?

06:24:16  3                    MR. BANKS:  Yes.

06:24:17  4                    THE COURT:  And I take it Amgen is okay with

06:24:19  5    that.

06:24:19  6                    MS. JOHNSON:  I think it has to be under the

06:24:21  7    Third Circuit law.

06:24:22  8                    THE COURT:  So we need to have it retooled.  So

06:24:24  9    if you find, you know, any one of -- find for Regeneron on

06:24:30 10    any one of the federal claims, what is the damages, total

06:24:34 11    amount of damages.

06:24:35 12                    MR. BANKS:  Yeah, that makes sense, Your Honor.

06:24:39 13                    THE COURT:  You agree?

06:24:40 14                    MS. JOHNSON:  I think so.  Let me see.  Right.

06:24:47 15                    Whatever claims are treblable, which I think we

06:24:50 16    need to pin down and make sure we're on the same page about,

06:24:52 17    there needs to be a number for those.

06:24:55 18                    THE COURT:  Okay.  And how are we going to

06:24:57 19    convey to the jury that they're not awarding double or they

06:25:01 20    are to make sure that they don't?

06:25:03 21                    MS. JOHNSON:  Well, I don't think that that's

06:25:05 22    the problem.  That's why I thought we were going to have to

06:25:07 23    do -- I understand what you're saying now, but I was

06:25:10 24    thinking we were going to have to do it as:  What is your

06:25:13 25    bottom line damages number and then have a subset of it.

06:25:16  1    Because if we have two questions, what damages do you have

06:25:19  2    in federal and what damages do you have in state, I think

06:25:21  3    you run into the problem that the Third Circuit has talked

06:25:24  4    about in a bunch of cases about, well, now we don't know

06:25:26  5    what to do because you can't recover twice for the same

06:25:29  6    harm.

06:25:29  7            So I think that's a problem.  So I think it has

06:25:32  8    to be in some fashion that makes them say what the overall

06:25:37  9    damages are once, so that you make sure you're not double

06:25:41 10    counting.  But then I appreciate somehow then we need to

06:25:46 11    know separately what the treble --

06:25:47 12            THE COURT:  There's a lot more of you than there

06:25:49 13    are of me.  I feel like there's a way we could tell the jury

06:25:53 14    what to do here.

06:25:57 15            MR. BANKS:  I mean, the way we had initially

06:25:58 16    envisioned -- maybe I'm backtracking a little bit, but if we

06:26:01 17    had a separate damages number for each count, then it would

06:26:03 18    be clear to the -- what the jury is finding as a damages for

06:26:06 19    each count and the amount of the judgment.  Obviously, we

06:26:08 20    can work out afterwards based on the verdict that we

06:26:11 21    understand we can't recover twice in the same conduct.

06:26:15 22            THE COURT:  Maybe we just need to be -- the

06:26:16 23    jury's going to be confused by this, and what I don't want

06:26:19 24    to have happen is to have them, you know, find for Regeneron

06:26:23 25    and say, You get a million dollars for Count 1 and a million

06:26:25  1    dollars for Count 2 and a million dollars for Count -- that

06:26:28  2    we can't have happen.  I think that would be wrong.  That's

06:26:31  3    going to be a mess to figure out.

06:26:32  4            So we don't want to have that.  But we also

06:26:35  5    don't want them to say -- well, right.  You see what the

06:26:40  6    issue is here.

06:26:41  7            MR. BANKS:  I see.

06:26:41  8            MS. JOHNSON:  And it's interesting, because I'm

06:26:43  9    just flipping back through some of our samples, and it looks

06:26:46 10    like they just all do one of the two things that we've all

06:26:49 11    just decided you can't do.  Like, *BASF* just asked two

06:26:53 12    questions, federal claims and state claims.  But we didn't

06:26:56 13    have a problem with that.  And then Gionetcom (phonetic)

06:26:59 14    just asked:  What are the total damages?

06:27:00 15            THE COURT:  Right.

06:27:01 16            MS. JOHNSON:  And then --

06:27:02 17            THE COURT:  I'm sure we've all in this room,

06:27:04 18    though, had a sinking feeling in a case before where you

06:27:06 19    look at the verdict form and then realize that we have

06:27:09 20    completely botched this up and how are we going to untangle

06:27:12 21    it.  So I'd rather figure it out now than tomorrow

06:27:15 22    afternoon.

06:27:17 23            MR. BANKS:  We had tried to do this -- let me

06:27:21 24    find the instruction.

06:27:26 25            MS. JOHNSON:  I mean, is there not a way to --

06:27:28  1    because I guess it still seems to me maybe we could somehow

06:27:30  2    word the second question in a way that avoids the problem,

06:27:33  3    like, what damages do you award?

06:27:35  4             And then say, you know, how many damages do you

06:27:41  5    find up to the amount in Question 10 or whatever resulted

06:27:47  6    from behavior that violated Counts 1 through whatever or

06:27:51  7    something.

06:27:52  8             MR. BANKS:  I --

06:27:52  9             THE COURT:  That's still got the same problem, I

06:27:54  10   think.

06:27:55  11            MR. BANKS:  So here's what the introduction to

06:27:57  12   the damages says in -- and this is what we have in

06:28:01  13   Instruction 54.  I'm just noting there was a -- you have an

06:28:09  14   objection at the bottom actually, so I don't know if --

06:28:13  15   notwithstanding --

06:28:13  16            (Reporter clarification.)

06:28:16  17            MR. BANKS:  Sure.  Notwithstanding, it says,

06:28:18  18   "joint" in the heading, there's a footnote with an

06:28:20  19   objection.  So I actually want to make sure that the record

06:28:22  20   is clear.

06:28:22  21            MS. JOHNSON:  Okay.

06:28:23  22            MR. BANKS:  But the intent of this instruction

06:28:25  23   was to provide some guidance with respect to this and, to be

06:28:30  24   clear, our position is the jury should be asked what the

06:28:33  25   damages are for each count.

06:28:36  1          Right.  And then the judgment that's issued, I

06:28:38  2     think, will reflect any impermissible double counting so

06:28:43  3     that, obviously, we would not award double counting where

06:28:46  4     it's not allowed.  But I think this instruction in the

06:28:49  5     verdict form, such that the jury is telling us what the

06:28:51  6     damages are for each count, gives us the information

06:28:54  7     necessary to then later do that exercise without worrying

06:28:59  8     about double counting by the jury or undercounting by the

06:29:03  9     jury.  And then also allowing for trebling of claims that

06:29:07 10     need to be trebled and otherwise.

06:29:10 11          MS. JOHNSON:  There's no -- I don't think that

06:29:12 12     can work because if they found -- like, let's just say they

06:29:15 13     found damages only for Ascent/ESI Commercial, and I'm just

06:29:18 14     using these as illustrative numbers.  If it was 10 million

06:29:21 15     and they did 10 million on Count 1, 10 million on Count 2,

06:29:25 16     10 million on Count 3, we're going to be arguing about

06:29:27 17     whether or not it's 30 million --

06:29:29 18          THE COURT:  That's exactly what we're going to

06:29:30 19     be arguing about.  Yeah.

06:29:42 20          It seems like what I want to convey to them is

06:29:48 21     even more clearly they should consider it separately as if

06:29:51 22     it was the only claim in the case and decide what it is and

06:29:55 23     then go one by one.  And that they shouldn't worry about

06:30:00 24     allocating it amongst the counts, that I will worry about

06:30:03 25     that later.  There's got to be a way to convey that

06:30:07 1    appropriately.

06:30:08 2                    MR. BANKS:  That was -- that was the idea that I

06:30:09 3    was -- that we were trying to convey.

06:30:10 4                    THE COURT:  Right.

06:30:11 5                    MR. BANKS:  I know it may not be successful in

06:30:13 6    this, but that's -- I think we are in agreement with that

06:30:16 7    approach.

06:30:17 8                    THE COURT:  All right.  I'm going to ask you to

06:30:19 9    go back and meet and confer.  I think we've made some

06:30:21 10   progress in the sense that we're in agreement that we're

06:30:23 11   going to have one number for the federal claims, and then we

06:30:26 12   need to have special interrogatories for the state claims.

06:30:32 13   We just need to know how the jury is going to be instructed

06:30:35 14   and what it should say on the verdict form.

06:30:37 15                   MS. JOHNSON:  And I do think that comes to this

06:30:40 16   Instruction 54, which, yeah, I don't know how it got marked

06:30:43 17   "joint," but I think it implicates this same issue because

06:30:46 18   the last sentence says, "You should consider each count

06:30:49 19   separately and may determine Regeneron is entitled to

06:30:53 20   recover the full amount of damages it seeks for more than

06:30:55 21   one of its counts," which suggests to them they'll be

06:30:58 22   getting a verdict form that -- that has you entitled to

06:31:03 23   determine the amounts of damages for each of the counts,

06:31:06 24   which I think is not what we think should happen.

06:31:08 25                   THE COURT:  Right.  I mean, I think some of this

06:31:10  1    is hypothetical in the sense that I don't think or don't

06:31:15  2    expect Regeneron would say during closing, we're going to

06:31:18  3    get -- we should get 5 million for this count and 10 million

06:31:20  4    for this count.

06:31:21  5            You're going to be asking for the full amount

06:31:23  6    for every single count; right?

06:31:26  7            MR. BANKS:  Yes.

06:31:26  8            THE COURT:  And we now know that's what is going

06:31:28  9    to happen.  So I don't think they're going to be confused in

06:31:31 10    that way, but I want to make sure that Amgen has the

06:31:34 11    possibility to say what it needs to say about this as well.

06:31:37 12            MS. JOHNSON:  Right.  Well, and I do think,

06:31:40 13    while they may say that, they're going to be saying whatever

06:31:44 14    the numbers are, you get 10 million for ESI.  You get a

06:31:47 15    hundred million for CVS.  And if they say 10 million across

06:31:52 16    the board, I do think there's still that possibility that

06:31:55 17    the jury, if they buy the 10 million -- if they buy the --

06:31:58 18    whatever it is, 130 or whatever, then we all know it's

06:32:02 19    duplicative and it's great.  But it's where they take a

06:32:05 20    middle, you know, road that we get confused, I think.

06:32:08 21            THE COURT:  Right.  We've got big brains in the

06:32:10 22    room, so I feel confident we can figure out something.

06:32:15 23            Counsel, anything else you want to add about

06:32:17 24    this?

06:32:17 25            MR. BANKS:  Not about this issue, no,

06:32:18 1    Your Honor.

06:32:19 2                    THE COURT:  Okay.  All right.

06:32:55 3                    So the next area of disagreement is that

06:33:03 4    Regeneron wants yes or nos for finding of liability on each

06:33:09 5    count.  And Amgen has it split up into each of the elements

06:33:18 6    for each count.

06:33:19 7                    I will tell you what I had in mind when we had

06:33:21 8    the discussion last night, which is that we would do

06:33:29 9    something that looked a little more like what Regeneron is

06:33:35 10   currently proposing, but that we would separately, at the

06:33:38 11   end of the verdict form, have the special interrogatories on

06:33:41 12   market power and recoupment.

06:33:45 13                   MR. BANKS:  So, Your Honor, that makes sense to

06:33:47 14   us with the exception with the special interrogatories.  Our

06:33:51 15   view is that those should be submitted only after the jury

06:33:56 16   has completed the verdict form because, otherwise, the jury

06:33:59 17   will think that those are important elements with respect to

06:34:02 18   things they are being asked to decide.  And I think we would

06:34:04 19   say that's prejudicial and in error to do it that way, so

06:34:08 20   that doesn't interfere with process of filling out the form

06:34:11 21   and rendering their verdict.  And that's fine.  But then

06:34:14 22   they shouldn't be getting a second form with interrogatories

06:34:16 23   until they complete the first.

06:34:18 24                   THE COURT:  I understand your position.  So I

06:34:19 25   think that's different than what we discussed yesterday.

06:34:21  1   But not only that, I think we can handle that with

06:34:24  2   instructions to say, Now, that you've, you know, finished

06:34:27  3   your findings, I need to ask you to answer some additional

06:34:31  4   questions.  You should not consider the answers to these --

06:34:34  5   well, I don't know.  You should consider these separately

06:34:37  6   from the findings on the individual claims you've already

06:34:43  7   answered or something like that.

06:34:44  8            We're not going to send it back twice in this

06:34:48  9   case.

06:34:48 10            MS. JOHNSON:  Well, and I think the

06:34:50 11   countervailing issue, which may affect that language, too,

06:34:52 12   is, this only works if the jury thinks it's a serious

06:34:55 13   question; that's a serious part of their consideration.  And

06:34:57 14   if there's too much signaling of, like, now, you're done,

06:35:00 15   but please do one more thing.

06:35:01 16            THE COURT:  Right.

06:35:02 17            MS. JOHNSON:  So I don't think -- I think you

06:35:03 18   lose the predictive value that that's what they would have

06:35:06 19   actually done.

06:35:07 20            MR. BANKS:  Of course, the countervailing to

06:35:08 21   that is they think it's actually something that they need to

06:35:10 22   decide.  And I understand Your Honor's going to provide the

06:35:12 23   instruction, I think -- and just for the record, we'll

06:35:14 24   maintain our objection to doing it in that manner.

06:35:17 25            THE COURT:  Well, look.  Amgen's expert

06:35:21  1   testimony was that these things are important in determining

06:35:24  2   whether there's been a harm to competition.  So I get it.

06:35:39  3   Yeah.  We're not going to have two verdict forms and send

06:35:43  4   them back to re-deliberate.  So -- and we'll put them at the

06:35:54  5   end of the verdict form.

06:35:56  6           MR. BANKS:  I'll just, for the record, make my

06:35:57  7   objection that we think that would be improper.

06:36:00  8           THE COURT:  Okay.  But you're welcome to propose

06:36:02  9   whatever language you want to make very clear to them that

06:36:05 10   this is not a finding on your other claims.  I mean, you can

06:36:12 11   propose language to me and I will entertain that.

06:36:14 12           MR. BANKS:  Thank you, Your Honor.

06:36:15 13           THE COURT:  So you have the opportunity to

06:36:17 14   mitigate any damage that you think you're suffering from

06:36:21 15   this.

06:36:22 16           MS. JOHNSON:  And, Your Honor, we would just

06:36:23 17   note, and maybe it's more for the record at this point, but

06:36:27 18   we did track *ZF Meritor* very closely.  That's where these

06:36:30 19   breaking up into the elements came from.  And it worked

06:36:34 20   there.  We think it is helpful, given the length and

06:36:38 21   complexity of the instructions in this case, to put the jury

06:36:41 22   back on, Here's what you're thinking about, rather than just

06:36:44 23   the broad, vague question.

06:36:45 24           THE COURT:  I get it.  So, right, there's pluses

06:36:48 25   and minuses to having general verdict questions versus more

06:36:54 1    specific verdict questions.  And the Court, in its

06:36:57 2    discretion, has to determine what it thinks is appropriate

06:37:00 3    in the case.

06:37:01 4              And so I think the way that this should shake

06:37:03 5    out is by having questions about each claim and then having

06:37:08 6    the separate couple of questions that we discussed

06:37:11 7    yesterday.

06:37:14 8              So we have got the questions about Repatha

06:37:20 9    market power and Enbrel market power.

06:37:22 10             Those you both -- you want to include both of

06:37:24 11   those.

06:37:25 12             MS. JOHNSON:  Yes, Your Honor.

06:37:27 13             THE COURT:  And then Amgen has broken out

06:37:40 14   Count 5 into elements, which we're not going to do.

06:37:43 15             It's broken out Counts 1, 3, 2 and 4 into

06:37:47 16   elements which we're not going to do.  But we do have a

06:37:51 17   highlighted question about substantial --

06:37:55 18             MS. JOHNSON:  And that's --

06:37:56 19             THE COURT:  -- foreclosure.

06:37:57 20             MS. JOHNSON:  That is what we are proposing is

06:38:00 21   the other special interrogatory.

06:38:01 22             THE COURT:  Yeah, and so I'm inclined to do that

06:38:02 23   as well.

06:38:02 24             MR. BANKS:  Your Honor, just to be clear, the

06:38:04 25   first special interrogatory relates to Enbrel market power

06:38:06  1    only?

06:38:08  2                    THE COURT:  And there's going to be one for

06:38:10  3    Enbrel and one for Repatha; right?

06:38:12  4                    MS. JOHNSON:  Right.  Number 1 and Number 2.

06:38:14  5                    MR. BANKS:  As a special -- I mean, Repatha and

06:38:17  6    market power, everyone agrees is an element, at least of the

06:38:20  7    Section 1 claim, and then monopoly power was an element.

06:38:22  8    That's not in dispute.

06:38:24  9                    MS. JOHNSON:  It is.

06:38:24 10                    THE COURT:  Wait, but we just had an argument

06:38:26 11    about the Clayton Act, didn't we?

06:38:29 12                    MR. BANKS:  I see what you're saying.  If you're

06:38:31 13    going to -- if you're going to submit it for the reason of

06:38:34 14    the Clayton Act, then that may be one thing.  But I

06:38:37 15    understood Your Honor to rule that that wasn't --

06:38:40 16                    THE COURT:  That's what I said, but I'm not the

06:38:42 17    final decision-maker here.

06:38:44 18                    MR. BANKS:  Okay.

06:38:44 19                    THE COURT:  So...

06:38:45 20                    MS. JOHNSON:  Right.  So that's how it got put

06:38:47 21    into the questions that were not --

06:38:51 22                    THE COURT:  Yeah.  Okay.

06:38:52 23                    MR. BANKS:  And we would be able to take the

06:38:53 24    findings from the Section 1 claim, which does include market

06:38:57 25    power as an element?

06:38:57  1          THE COURT:  So we don't know how they're going

06:38:59  2     to find on that one.  We have a mixed bag of possible

06:39:03  3     outcomes here.

06:39:05  4          MS. JOHNSON:  In Section 1, we're now in

06:39:07  5     Section 2, we're now in Section 3, we're -- yes, the Clayton

06:39:10  6     Act were, yes, then we would be arguing, Well, the reason

06:39:13  7     that they did that is because they weren't told they had

06:39:15  8     market power.

06:39:16  9          THE COURT:  Yeah.

06:39:16 10          MR. BANKS:  Correct.

06:39:17 11          THE COURT:  Exactly.

06:39:22 12          MS. JOHNSON:  Your Honor, I would propose, this

06:39:23 13     is maybe apropos to nothing, but I think it might be easier

06:39:28 14     to put in headings more, like, we had only because -- maybe

06:39:32 15     it's -- maybe it won't reflect that once there's damages,

06:39:36 16     but it feels like a lot in a row in the way Regeneron has

06:39:39 17     it.

06:39:40 18          THE COURT:  Yeah.  I'm happy -- I'm fine with

06:39:42 19     the headings.  Just to have -- just to say --

06:39:45 20          MR. BANKS:  What was that suggestion?

06:39:46 21          THE COURT:  Just to say, have it by count, Count

06:39:48 22     1.

06:39:48 23          MR. BANKS:  Oh, yes.

06:39:49 24          THE COURT:  Count 2.  Yeah.

06:39:50 25          MR. BANKS:  I think I understand.  I'll confer

06:39:51  1    with counsel.

06:39:52  2            THE COURT:  Okay.  And then the Clayton Act

06:40:06  3    section, we're not going to split that into elements.

06:40:13  4            And then the Cartwright Act, and UPA and the

06:40:30  5    Donnelly, again, the questions on liability will go with

06:40:34  6    Regeneron's.

06:40:36  7            MS. JOHNSON:  And, Your Honor, I'll -- just to

06:40:38  8    note for the record, obviously, the way we had proposed the

06:40:41  9    verdict form was that those would follow from the federal

06:40:44 10    claims.

06:40:45 11            Once you made that ruling, our backup Plan B

06:40:48 12    proposal would have been to break out Cartwright and

06:40:51 13    Donnelly, similar to how we did with the Sherman Act.

06:40:54 14            THE COURT:  Yeah.

06:40:54 15            MS. JOHNSON:  And I understand you're not going

06:40:55 16    to do that, but I just wanted to make that on the record.

06:40:59 17    Yeah.

06:41:00 18            THE COURT:  Of course.

06:41:01 19            Do you think there's a requirement in the law

06:41:03 20    that I ask them about individual elements?

06:41:05 21            The Court's permitted under the law; correct, to

06:41:09 22    ask them about how they find on liability without breaking

06:41:12 23    it out into elements?

06:41:13 24            MS. JOHNSON:  Give me one second.  Yeah.  We

06:41:29 25    generally agree it's within your discretion to decide how to

06:41:32  1    do it and every element does not have to be listed out.

06:41:34  2              I'm not saying -- I think, given the complexity

06:41:37  3    here, we think that it may confuse the jury.  And I guess I

06:41:41  4    am not saying I'll never say that we were prejudiced by it,

06:41:43  5    but we agree that, in general, you have discretion to decide

06:41:46  6    which elements to include.

06:41:48  7              THE COURT:  Yeah.  Okay.

06:41:50  8              All right.  Why don't you include signatures for

06:42:01  9    each of the jurors on the last page?

06:42:12 10              Make sure you delete from the front page that

06:42:14 11    it's the proposed jury verdict form.

06:42:27 12              MS. JOHNSON:  In connection with damages,

06:42:29 13    Your Honor, or in the damages section, we had asked for them

06:42:32 14    to -- the jury to be asked which PBM they were finding

06:42:37 15    liability at.

06:42:38 16              THE COURT:  Oh, that's not a terrible idea.

06:42:41 17    That one, I might be convinced to entertain.  I do think

06:42:47 18    it's going to help us sort it out later.

06:42:49 19              And specifically, in light of Amgen's position,

06:42:55 20    which I know you disagree with, that the damages

06:42:58 21    attributable to CVS don't qualify as an antitrust injury.

06:43:03 22              MR. BANKS:  Yeah.  We disagree.  I mean, we --

06:43:04 23    you know, we are going to allege this as a scheme, in part,

06:43:07 24    and so it goes through all of the PBMs.  So we don't think

06:43:09 25    it's necessarily appropriate for the jury to have to

06:43:12  1    identify each one, one after another.

06:43:18  2                THE COURT:  Well, let me ask Amgen.  I mean, if

06:43:20  3    we get something over a certain dollar amount, we're going

06:43:22  4    to know they include it.

06:43:25  5                MS. JOHNSON:  I mean, maybe or maybe they made

06:43:28  6    an error; right?  But that's the problem.

06:43:28  7                If they think there was only unlawful conduct at

06:43:31  8    ESI Commercial, because this is one of the issues we talked

06:43:34  9    about a little bit with substantial foreclosure, is that if

06:43:38 10    substantial foreclosure of the market is not required, then

06:43:42 11    in order to have an antitrust violation, then I think they

06:43:45 12    can only award damages for wherever the unlawful conduct

06:43:50 13    applied; right?  Or occurred?

06:43:51 14                And so our position would be that if -- if

06:43:55 15    there's not a requirement of substantial foreclosure, then

06:43:58 16    you're in a world where they may -- the jury may return a

06:44:01 17    verdict for Regeneron based on a finding that they think

06:44:05 18    there was unlawful conduct at only one PBM.

06:44:07 19                And if that's the case, then I don't think they

06:44:10 20    can award damages for other PBMs based on unlawful conduct

06:44:16 21    at one PBM.  Because if they didn't find anything bad

06:44:18 22    happened at CVS, they can't award damages at CVS.

06:44:23 23                MR. BANKS:  I'll say the damages are -- I

06:44:27 24    would -- they're not asking for separate damages numbers by

06:44:30 25    PBM, and I think that would be inappropriate.  I think,

06:44:33  1    again, as we alleged in the case, we've alleged it, in part,

06:44:37  2    as a scheme that does not -- you know, that crosses -- that

06:44:42  3    goes across PBMs.  And so breaking it up this way, I think,

06:44:46  4    is inconsistent, in some respect, whether we're alleging the

06:44:50  5    case and invites them to ignore that.

06:44:53  6                 So...

06:44:53  7                 THE COURT:  What if we said, if you awarded

06:45:00  8    damages -- of your damages number, how much of these damages

06:45:04  9    are attributable to lost profits at ESI?  How much of these

06:45:10 10    attributable -- if we phrase it that way, does it solve the

06:45:14 11    concern you're talking about?

06:45:17 12                 Because that's how you've given them the number.

06:45:19 13    I mean, that was the testimony.

06:45:20 14                 MR. BANKS:  That's true, Your Honor.  Let me

06:45:22 15    consider -- let me just take a minute to consider and confer

06:45:25 16    with the client.

06:45:25 17                 THE COURT:  Yeah.  The one thing I'm worried

06:45:27 18    about, too, is that once we make it that complicated, the

06:45:30 19    jurors weren't taking notes, we could get any number of

06:45:34 20    crazy responses here that don't add up to the evidence.  And

06:45:37 21    then we have got a huge problem, depending on who's

06:45:40 22    disappointed in the outcome.

06:45:41 23                 MS. JOHNSON:  We had some concern about

06:45:43 24    separating damages by PBM based on a lack of certainty or

06:45:51 25    something about how the jury would -- whether they would

06:45:54  1    know what to do with operating expenses then.

06:45:56  2         Because since the operating expenses aren't

06:45:59  3    allocated out by PBM, then we got a little stuck on, like,

06:46:04  4    how would that actually work if they wanted to try to

06:46:08  5    decide, you know, Okay, we think it's 135.  There's 50

06:46:12  6    million of operating expenses.  And then what would they do?

06:46:16  7         MR. BANKS:  Also, just to me, it's

06:46:19  8    overcomplicating in ways that I think will be even harder

06:46:21  9    for us than -- I mean, harder for the jury than they are for

06:46:23 10    us.

06:46:24 11         THE COURT:  Yeah.  Given what the testimony was,

06:46:26 12    I am hopeful that we are going to be able to figure out what

06:46:29 13    the jury did, depending on the number that we get, if we can

06:46:34 14    solve the problem that we talked about already.  So that's

06:46:38 15    how we'll proceed.

06:46:39 16         We're going to solve the problem we talked about

06:46:41 17    already, which is we're going to have a number for the

06:46:43 18    federal claims, a number for each of the state law claims,

06:46:45 19    and we're going to convey to them somehow everything we've

06:46:49 20    already discussed.

06:46:50 21         MS. JOHNSON:  And I guess the only thing I would

06:46:51 22    say, you may be able to figure out what they did, but if you

06:46:54 23    take for a minute, for example, 135 million is their total

06:46:58 24    number, which is what I have in my mind.  It may be wrong,

06:47:00 25    but 135 is their total number.

06:47:02  1          If the jury awards 135 and we don't know where

06:47:06  2    they found unlawful conduct, then if we win antitrust injury

06:47:11  3    on appeal, I think it would have to be reversed; right?

06:47:13  4          Because we wouldn't -- so it's sort of whereas

06:47:17  5    if you had 135 and they said, you know, this much was CVS --

06:47:22  6    or there was improper conduct at ESI, but not at CVS, or

06:47:27  7    whatever, then I think we would have a -- be in a better

06:47:30  8    position on appeal to be able to sort through what happened.

06:47:34  9          Or maybe -- actually, I probably didn't even say

06:47:36 10    it the right way.  Probably the right way to say it is if

06:47:40 11    they find a violation only at ESI, but they award

06:47:45 12    135 million, but we don't know they only did ESI, then we're

06:47:48 13    going to be arguing on appeal they can't have awarded

06:47:51 14    135 million because there's no antitrust injury at CVS.

06:47:53 15    But, also, because we don't even know if they found unlawful

06:47:56 16    conduct at CVS and we think substantial foreclosure is

06:47:59 17    required.

06:48:00 18          And so if they found a violation at ESI only and

06:48:04 19    not that the market was substantially foreclosed, then in

06:48:07 20    that world, they can't award 135, in our view.  So you would

06:48:11 21    at least take that piece off if you knew whether they found

06:48:15 22    unlawful conduct at CVS.

06:48:17 23          MR. BANKS:  It seems like the argument then

06:48:19 24    would be that 135 million doesn't support an award for ESI

06:48:23 25    and that's what they would argue, you know.

06:48:25  1                    THE COURT:  Yeah.

06:48:26  2                    MR. BANKS:  If they were successful on appeal

06:48:27  3       with this argument, I think that's the way that would flow.

06:48:30  4                    THE COURT:  So here's what I will say, having

06:48:33  5       listened to all of this, I think we should not separate it

06:48:34  6       out by PBM.

06:48:37  7                    There are two general possibilities of what

06:48:40  8       we're going to get on this verdict form tomorrow.  I've

06:48:43  9       tried, as best I can, to separate out certain questions,

06:48:45 10       which I think pertain to issues for which there's the

06:48:55 11       greatest room for reasonable debate.  But we can't protect

06:49:00 12       against everything, and I am worried that we're going to end

06:49:03 13       up with some weird inconsistent verdict if we do it the

06:49:06 14       other way.

06:49:06 15                    So that's what we'll do.

06:49:10 16                    MS. JOHNSON:  Can I ask Your Honor -- and I

06:49:12 17       don't know if this is already covered -- but just to be

06:49:15 18       clear, we would ask, in light of the absence of substantial

06:49:19 19       foreclosure on some of these instructions, that there be a

06:49:22 20       damages instruction that if they only find unlawful conduct

06:49:25 21       at certain PBMs, that the damages are limited to the PBMs at

06:49:30 22       which they find unlawful conduct.

06:49:34 23                    MR. BANKS:  I think that's, again, adding a

06:49:36 24       level of complexity that is not un -- that's unnecessary for

06:49:40 25       many of the reasons Your Honor just said.

06:49:41 1          MS. JOHNSON:  It may be complex, but it is -- it

06:49:43 2    is correct and I think it is prejudicial to us if the jury

06:49:46 3    is not informed that if they only find damages or only find

06:49:51 4    unlawful conduct at ESI, it is not available to them to

06:49:54 5    award 135 million.

06:49:56 6          MR. BANKS:  Again --

06:49:57 7          THE COURT:  You're not going to argue in

06:49:59 8    closing, right, that you only need to find unlawful conduct

06:50:02 9    at ESI and; therefore, you get 135 million?

06:50:05 10          MR. BANKS:  No, Your Honor, we're not.

06:50:06 11          THE COURT:  Yeah.  And I appreciate your request

06:50:08 12    has been preserved for the record.  We're not going to

06:50:11 13    include that on the verdict form.

06:50:13 14          All right.

06:50:18 15          MS. JOHNSON:  One housekeeping matter, if we're

06:50:20 16    done with the verdict form.

06:50:21 17          We were realizing and looking back through our

06:50:23 18    records.  Yesterday, in my 50(a), I also said in the

06:50:27 19    alternative, we would ask -- move to strike Dr. Mathur's

06:50:31 20    opinions as being unsupported because she relied on

06:50:34 21    assumptions that were not put into the record because that's

06:50:37 22    not officially a 50(a).  I think we may need a ruling from

06:50:39 23    you on that motion for it to be preserved or at least

06:50:44 24    arguably.

06:50:44 25          So I wanted to make sure we closed the loop on

06:50:47  1    the motion to strike Dr. Mathur's testimony as relying on

06:50:54  2    assumptions for which no evidence was put into the record.

06:50:59  3                THE COURT:  Counsel.

06:51:00  4                MR. BANKS:  Look, I think the evidence in which

06:51:03  5    you relied is in the record and she can rely on -- the bases

06:51:06  6    for her opinion were stated in her own testimony.

06:51:09  7                THE COURT:  Okay.  So the motion to strike is

06:51:11  8    denied.

06:51:15  9                All right.  Anything else?

06:51:23 10                MR. BANKS:  Not from us, Your Honor.

06:51:24 11                MS. JOHNSON:  I don't think so.

06:51:27 12                THE COURT:  All right.  So we're going to get a

06:51:30 13    verdict form and jury instructions from you tonight.  As

06:51:35 14    soon as we lay eyes on them, we'll try to communicate to you

06:51:38 15    in some way what the plan is.

06:51:40 16                If we have to keep the jurors here for a little

06:51:42 17    bit while we straighten out any final details, that's fine.

06:51:46 18    I think that we've done a good job of not having them here

06:51:52 19    when they don't need to be here, and I'm very, very

06:51:58 20    appreciative of counsel's ability to work through the

06:52:00 21    disputes tonight, which is getting us all out of here before

06:52:06 22    7:00.

06:52:06 23                MS. JOHNSON:  Well, we appreciate you sitting

06:52:07 24    here with us until 7:00 or whatever.

06:52:10 25                THE COURT:  Okay.

06:52:12  1              MS. JOHNSON:  Okay.  They have one other issue,

06:52:13  2    I guess.

06:52:15  3              MR. STOCK:  So when we went with this language

06:52:20  4    of the statute for Clayton Act Section 3.

06:52:22  5              THE COURT:  Yes.

06:52:23  6              MR. STOCK:  And Your Honor noted that the

06:52:25  7    statute mentions "tends to create a monopoly."

06:52:27  8              THE COURT:  Yes.

06:52:28  9              MR. STOCK:  My colleague is saying that the

06:52:30 10    statute does not say "tend to create or maintain a

06:52:32 11    monopoly."  So we would just, I think, stick with the

06:52:35 12    statute.

06:52:36 13              MR. BANKS:  We agree to following the language

06:52:38 14    of the statute.

06:52:38 15              THE COURT:  Okay.  Great.  Perfect.

06:52:43 16              MS. JOHNSON:  Oh, what I was going to ask you --

06:52:46 17    so and you're going to have them close and then read the

06:52:49 18    instructions; correct?

06:52:49 19              THE COURT:  No.

06:52:50 20              MS. JOHNSON:  No.  Backwards, sorry.

06:52:52 21              THE COURT:  We will read the instructions all

06:52:52 22    the way up to the very last one.  And then the very last one

06:53:02 23    starts with:  Let me finish up by explaining some things

06:53:08 24    about your deliberations in the jury room.  And then we

06:53:14 25    finish that one, and then I send them back.

2017

06:53:18  1              What I'll do is I'll call for a sidebar right

06:53:22  2    before -- or right before you do the -- well, what I'll do

06:53:28  3    is I'll call for a sidebar after I finish most of the jury

06:53:31  4    instructions and that will be your chance to object to the

06:53:36  5    manner in which I read them or any misstatements I might

06:53:39  6    have made.  I haven't had anyone object to my dry reading of

06:53:45  7    them yet, but that will be your chance.

06:53:47  8              And then we'll probably, I think at that point,

06:53:51  9    depending on how long it takes, send the jury back for their

06:53:54 10    break.  And then we'll hear the closings and then we'll have

06:53:57 11    another sidebar, just so everyone has their last chance to

06:54:00 12    say whatever they want to say before we submit the case, and

06:54:03 13    then we'll send the jury back.

06:54:06 14              Did anyone want me to read the jury verdict form

06:54:09 15    to them?

06:54:16 16              MR. BANKS:  We'll get back to you in the

06:54:19 17    morning.  My official view is probably not.

06:54:21 18              MS. JOHNSON:  Right.

06:54:22 19              THE COURT:  Sometimes somebody sneaks in an

06:54:24 20    instruction that says I'm going to read you the jury verdict

06:54:27 21    form in a minute, but no one actually wants me to do that.

06:54:30 22    So if that's in there, let me know.

06:54:32 23              MR. BANKS:  If it's in there, it's not

06:54:34 24    intentional.

06:54:34 25              MS. JOHNSON:  Right.

| | | |
|---|---|---|
| 06:54:35 | 1 | THE COURT:  All right.  Good. |
| 06:54:36 | 2 | All right.  All right.  We'll see you back |
| 06:54:38 | 3 | tomorrow. |
| 06:54:39 | 4 | Thanks, everybody. |
| 06:54:40 | 5 | ALL COUNSEL:  Thank you. |
| 06:54:44 | 6 | MS. JOHNSON:  What time tomorrow?  8:30? |
| 06:54:46 | 7 | THE COURT:  8:30, yeah. |
| 07:02:10 | 8 | (Court was adjourned at 7:02 p.m.) |

9      I hereby certify the foregoing is a true and

10    accurate transcript from my stenographic notes in the

11    proceeding.

12                    /s/ Heather M. Triozzi
                      Certified Merit and Real-Time Reporter
13                    U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25