# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

REGENERON PHARMACEUTICALS, INC.,

        Plaintiff,

v.

AMGEN INC.,

        Defendant.

C. A. No.: 1:22-cv-00697-JLH

**REDACTED PUBLIC VERSION
FILED: June 20, 2025**

## OPENING BRIEF IN SUPPORT OF REGENERON PHARMACEUTICALS, INC.'S MOTION FOR 1) PERMANENT INJUNCTIVE RELIEF; 2) CONSTRUCTIVE TRUST; AND 3) PREJUDGMENT INTEREST

WILKS LAW LLC

David E. Wilks (Bar No. 2793)
Scott B. Czerwonka (Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Email: dwilks@wilks.law
Email: sczerwonka@wilks.law

WHITE & CASE LLP
Jonathan D. Polkes
Adam B. Banks
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8301

ORRICK, HERRINGTON
& SUTCLIFFE LLP
Eric S. Hochstadt
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5282

WEIL, GOTSHAL & MANGES LLP
Michael R. Moiseyev
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000

Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated: June 12, 2025

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.      Regeneron Is Entitled To Permanent Injunctive Relief To Restore Competition After Amgen Monopolized And Engaged In Other Wrongful Conduct In The PCSK9i Market ................................................................................................. 3

     A.      The Evidence At Trial Established That Injunctive Relief Is Necessary ............................................................................................... 4

     B.      The Court Has Broad Discretion To Fashion Remedies That Stop And Undo Amgen's Monopoly And Its Anticompetitive Wrongful Conduct ............................................................................................... 11

     C.      The Court Should Enter A Prohibitory Injunction To Stop Amgen From Engaging In Unlawful Behavior And Restore A Level Playing Field In The PCSK9i Market ................................................................. 14

II.      Amgen Has Been Unjustly Enriched By Its Egregious Misconduct And Regeneron Is Accordingly Entitled To A Constructive Trust ......................... 26

III.      Regeneron Is Entitled To Prejudgment Interest On Its Tortious Interference, Donnelly Act, Federal Antitrust, And Cartwright Act Claims ......................... 30

     A.      Regeneron Is Entitled To Prejudgment Interest On Its Tortious Interference Claim Under Delaware Law ............................................ 31

     B.      Regeneron Is Entitled To Prejudgment Interest On Its Donnelly Act Claim Under New York Law ................................................................. 36

     C.      The Court Should Award Regeneron Prejudgment Interest For At Least One Year On Its Federal Antitrust And Cartwright Act Claims 39

CONCLUSION .............................................................................................................. 45

AMERICAS 130196597

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alexander's Dep't Stores v. Ohrbach's, Inc.*,
42 N.Y.S.2d 703 (App. Div. 1943) ............................................................. 3

*Am. Home Prods. Corp. v. F.T.C.*,
695 F.2d 681 (3d Cir. 1982) ..................................................................... 18

*Amgen Inc. v. Hospira, Inc.*,
336 F.Supp.3d 333 (D. Del. 2018) ............................................................ 45

*B.A.S.S. Group, LLC v. Coastal Supply Co.*,
2009 WL 1743730 (Del. Ch. June 19, 2009) ........................................... 27

*Beard Rsch., Inc. v. Kates*,
8 A.3d 573 (Del. Ch. 2010) ................................................................. 32, 35

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) .................................................................................... 4

*Boyer v. Wilmington Materials, Inc.*,
754 A.2d 881 (Del. Ch. 1999) .................................................................. 32

*Brandywine Smyrna, Inc. v. Millennium Builders, LLC*,
34 A.3d 482 (Del. 2011) ........................................................................... 31

*BVE Prods., Inc. v. Saar Co., LLC*,
835 N.Y.S.2d 555 (App. Div. 1st Dep't 2007) ......................................... 36

*Cantor Fitzgerald, L.P. v. Cantor*,
724 A.2d 571 (Del. Ch. 1998) .................................................................. 28

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986) .................................................................................. 12

*Carl Wagner & Sons v. Appendagez, Inc.*,
485 F.Supp. 762 (S.D.N.Y. 1980) ............................................................ 37

*CertiSign Holding, Inc. v. Kulikovsky*,
2018 WL 2938311 (Del. Ch. June 7, 2018) .............................................. 33

*CFLP v. Cantor*,
2003 WL 21488707 (Del. Ch. June 19, 2003) .......................................... 35

iii

*Citadel Holding Corp. v. Roven*,
603 A.2d 818 (Del. 1992) ............................................................. 32

*Cortazar v. Cortazar*,
2019 WL 2554627 (N.Y. Sup. Ct. June 7, 2019)................................... 37

*Delulio v. 320-57 Corp.*,
99 A.D.2d 253 (N.Y. App. Div. 1st Dep't 1984)................................... 38

*E.I. du Pont de Nemours & Co.*,
366 U.S. 326 ............................................................................ 22

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)...................................................................... 3

*Enhabit, Inc. v. Nautic Partners IX, L.P.*,
2024 WL 4929729 (Del. Ch. Dec. 2, 2024)........................................... 29

*Epic Games, Inc. v. Google LLC, et al.*,
No. 24-6256, 2024 No. 3:21-md-02981-JD (N.D. Cal. 2024).................... 12

*Esprit Health, LLC v. Univ. of Delaware*,
2015 WL 9305644 (D. Del. Dec. 21, 2015)........................................... 36

*Est. of Berland by Gilman v. Lavastone Cap. LLC*,
2022 WL 17084121 (D. Del. Nov. 18, 2022) .......................................... 33

*Est. of Daher v. LSH CO*,
2024 WL 3571642 (C.D. Cal. July 23, 2024).......................................... 33

*F.E. Myers Co. a Div. of McNeil Corp. v. Pipe Maint. Servs., Inc.*,
599 F.Supp. 697 (D. Del. 1984)......................................................... 36

*FlowShare, LLC v. GeoResults, Inc.*,
2020 WL 1921019 (Del. Super. Ct. Apr. 9, 2020)................................... 34

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)...................................................................... 11

*Fortis Advisors, LLC v. Dematic Corp.*,
2023 WL 2967781 (Del. Super. Ct. Apr. 13, 2023).................................. 32

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019).............................................................. 4

*FTC v. Surescripts, LLC*,
No. 1:19-cv-01080 ....................................................................... 17

AMERICAS 130196597

*Gelco Builders & Burjay Constr. Corp. v Simpson Factors Corp.*,
    301 N.Y.S.2d 728 (N.Y. Sup. Ct. 1969) .................................................................. 38

*In re Google Play Store Antitrust Litig.*,
    2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) ........................................................... 12

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*,
    2010 WL 338219 (Del. Ch. Jan. 29, 2010) ............................................................ 32

*Greenly v. Greenly*,
    49 A.2d 126 (Del. Ch. 1946) .................................................................................. 27

*Halperin v. Moreno (In re Green Energy Servs.)*,
    610 B.R. 760 (D. Del. 2019) .................................................................................. 28

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
    834 Fed. App'x 695 (3d Cir. 2020) ................................................................... 27, 28

*Hogg v. Walker*,
    622 A.2d 648 (Del. 1993) ...................................................................................... 28

*Int'l Boxing Club of N.Y., Inc. v. United States*,
    358 U.S. 242 (1959) ............................................................................................... 22

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947) ......................................................................................... 13, 22

*InterMune, Inc. v. Harkonen*,
    2024 WL 3619692 (Del. Ch. Aug. 1, 2024) ........................................................... 33

*Leonard v. Stemtech Int'l Inc.*,
    834 F.3d 376 (3d Cir. 2016) .................................................................................. 35

*Lizden Indus., Inc. v. Franco Belli Plumbing & Heating & Sons, Inc.*,
    95 A.D.3d 738 (App. Div. 1st Dep't 2012) ............................................................ 37

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ............................................................................................... 13

*Marcus v. PQ Corp.*,
    458 F. App'x 207 (3d Cir. 2012) ....................................................................... 30, 31

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1215 ........................................................................................... 15, 19, 22

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007) ....................................................................... 39, 43, 44

v

*McGlothlin v. Petrunich Oral & Maxillofacial Surgery,*
  2023 WL 5747520 (Del. Super. Ct. Sept. 6, 2023).................................... 32

*Michael Grecco Prods., Inc v. GlowImages, Inc.,*
  2020 WL 1866172 (D. Del. Apr. 6, 2020), *report and recommendation adopted,*
  2020 WL 1866000 (D. Del. Apr. 14, 2020)............................................. 45

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.,*
  596 F.2d 573 (3d Cir. 1979)................................................................... 13

*Miller v. Trimont Glob. Real Est. Advisors LLC,*
  587 F.Supp.3d 170 (D. Del. 2022)........................................................... 33

*Milsen Co. v. Southland Corp.,*
  454 F.2d 363 (7th Cir. 1971) ................................................................ 19

*In re Mobilactive Media, LLC,*
  2013 WL 297950 (Del. Ch. Jan. 25, 2013)............................................... 35

*Moose Agric. LLC v. Layn USA, Inc.,*
  639 F.Supp.3d 1150 (D. Colo. 2022)....................................................... 33

*In re Mortg. Lenders Network USA, Inc.,*
  406 B.R. 213 (Bankr. D. Del. 2009) ....................................................... 32

*Nat'l Collegiate Athletic Ass'n v. Alston,*
  594 U.S. 69 (2021)................................................................................ 24

*Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.,*
  850 F.2d 1286 (8th Cir. 1988), amended *878 F.2d 1118 (8th Cir. 1989)* ................ 12

*Nat'l Soc. of Pro. Engineers v. United States,*
  435 U.S. 679 (1978)........................................................................ 12, 14

*Ne. Pennsylvania Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.,*
  938 F.3d 424 (3d Cir. 2019)................................................................... 3

*New York City Housing Authority v. Spectrum Contracting Group, Inc.,*
  2014 WL 912261 (N.Y. Sup. Ct. Mar. 6, 2014) ....................................... 38

*New York v. Microsoft Corp.,*
  224 F.Supp.2d 76 (D. D. C 2002) ..................................................... 19, 26

*Organovo Holdings, Inc. v. Dimitrov,*
  162 A.3d 102 (Del. Ch. 2017).................................................................. 3

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.,*
  604 F.3d 1291 (11th Cir. 2010) .............................................................. 12

AMERICAS 130196597

*Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*,
    2013 WL 3934992 (Del. Ch. July 24, 2013) ............................................................ 35

*Purewick Corp. v. Sage Prods., LLC*,
    666 F.Supp.3d 419 (D. Del. 2023) ....................................................................... 31

*Ramnarain v. City of New York*,
    474 F.Supp.2d 443 (E.D.N.Y. 2007) ..................................................................... 38

*Raymond v. Bd. of Pub. Works of Lewes*,
    1990 WL 63829 (Del. Super. Ct. May 8, 1990) ...................................................... 36

*Ripsom v. Beaver Blacktop, Inc.*,
    1988 WL 32071 (Del. Super. Ct. Apr. 6, 1988) ...................................................... 36

*Schine Chain Theaters, Inc. v. United States*,
    334 U.S. 110 (1948) ................................................................................................ 1

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ................................................................................ 40

*Skretvedt v. E.I. Dupont de Nemours*,
    372 F.3d 193 (3d Cir. 2004) ................................................................................ 27

*Snepp v. United States*,
    444 U.S. 507 (1980) ............................................................................................. 29

*Sperry v. Crompton Corp.*,
    8 N.Y.3d 204 (2007) ............................................................................................ 37

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ............................................................................ 3, 12

*Sun Ship, Inc. v. Matson Navigation Co.*,
    785 F.2d 59 (3d Cir. 1986) .................................................................................. 45

*Taxman v. Bd. of Educ. of Twp. of Piscataway*,
    91 F.3d 1547 (3d Cir. 1996) ................................................................................ 45

*Theis v. Bd. of Educ.*,
    2000 WL 341061 (Del. Ch. Mar. 17, 2000) .......................................................... 27

*Tipaldo v. Lynn*,
    26 N.Y.3d 204 (2015) .......................................................................................... 37

*Tomaszewski v. Trevena, Inc.*,
    482 F.Supp.3d 317 (E.D. Pa. 2020) ..................................................................... 40

vii

*United States v. Apple Inc.*,
    992 F.Supp.2d 263 (S.D.N.Y. 2014), *aff'd* 787 F.3d 131 (2d Cir. 2015) ................. 26

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .................................................................................. 15

*United States v. Dentsply Int'l, Inc.*,
    2006 99-cv-00005-SLR (D. Del. 2006) ................................................................ 15

*United States v. E. I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) ............................................................................................ 12

*United States v. Elec. Payment Servs.*,
    (D. Del. Oct. 14, 1994), *approved by* 1994 U.S. Dist. LEXIS 21234 (Oct. 14, 1994)
    ..................................................................................................................... 16, 20

*United States v. Google LLC*,
    2025 20-cv-03010-APM (D.D.C. 2025) ............................................................... 21

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ....................................................................................... 12, 15

*United States v. Microsoft*,
    231 F.Supp.2d 144 (D.D.C. 2002) ...................................................................... 14

*United States v. Swift & Co.*,
    286 U.S. 106 (1932) ............................................................................................ 23

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) .............................................................................................. 7

*United States v. United Shoe Mach. Corp.*,
    110 F.Supp. 295 (D. Mass. 1953), *aff'd* 347 U.S. 521 (1954) ................................. 19

*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968) ....................................................................................... 12, 23

*United States v. United States Gypsum Co.*,
    340 U.S. 76 (1950) ......................................................................................... 14, 18

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) .............................................................................................. 4

*Urban v. B.R. Guest, Inc.*,
    845 N.Y.S.2d 584 (4th Dep't 2007) ...................................................................... 37

*Vizant Techs. LLC v. Whitchurch*,
    675 F. App'x 201 (3d Cir. 2017) ............................................................................ 4

AMERICAS 130196597

*Weiss v. York Hosp.*,
745 F.2d 786 (3d Cir. 1984)...................................................................... 13

*Wilk v. Am. Med. Ass'n*,
895 F.2d 352 (7th Cir. 1990) ............................................................. 12, 24

*Williams Companies, Inc. v. Energy Transfer LP*,
2022 WL 3650176 (Del. Ch. Aug. 25, 2022) ................................. 32, 33, 34

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969)................................................................. 3, 12, 13, 18

## STATUTES

15 U.S.C.
§ 15............................................................................................... 39, 40, 44
§ 26............................................................................................................ 3, 12

28 U.S.C.
§ 1961...................................................................................................... 31

California
Cal. Bus. & Prof. Code § 16750 ........................................................... 3
Cal. Bus. & Prof. Code § 16761 ............................................... 39, 40, 44

Delaware
6 Del. C. § 21-08.................................................................................... 28
6 Del. C. § 23-01.............................................................................. 32, 33

New York
N.Y. C.P.L.R. § 5001............................................................... 36, 37, 38
N.Y. C.P.L.R. § 5004(a) ........................................................................ 37

## FEDERAL RULES

Fed. R. Civ. P.
Rule 16(a)(2)........................................................................................... 43

## OTHER AUTHORITIES

FTC Press Release, Merck Settles FTC Charges that Its Acquisition of
Medco Could Cause Higher Prices and Reduced Quality for
Prescription Drugs (Aug. 27, 1998)....................................................... 10

AMERICAS 130196597

## PRELIMINARY STATEMENT

"[W]e start from the premise that an injunction against future violations is not adequate to protect the public interest. *If all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact.* They could retain the full dividends of their monopolistic practices and profit from the unlawful restraints of trade which they had inflicted on competitors."

*Schine Chain Theaters, Inc. v. United States*, 334 U.S. 110, 128 (1948).[1]

The Supreme Court's recognition almost eighty years ago—that fixing proven anticompetitive conduct requires more than recovery of lost profits and an injunction against repetition of illegal behavior—remains true today. Compensatory damages, whether trebled or supplemented by punitive damages, will not undo the ongoing harm *to competition* in the PCSK9i market caused by Amgen's conduct or restore Praluent to where it would have been in a competitive marketplace based on head-to-head competition. Nor could such damages fully offset the harm Amgen inflicted. Further injunctive and equitable relief is required to correct the market distortions caused by Amgen's unlawful behavior.

After a seven-day trial, the jury concluded that Amgen sought to unlevel the playing field to cement its monopoly on Repatha—a drug that Amgen estimated to be worth billions of dollars annually. As the trial showed, including through admissions of Amgen's highest-level executives, Amgen did not want to compete on price or on the merits—"*enough is enough.*" Indeed, because Regeneron was willing to do something Amgen was not (*i.e.* aggressively compete on price to secure formulary status with insurers), the only way Amgen could win was by engaging in anticompetitive conduct to ensure it was playing alone.

Time is of the essence now before Praluent is marginalized even further in the market by Amgen. Regeneron submits the following post-trial motion to request that the Court deprive Amgen of its illegitimately entrenched Repatha monopoly and re-level the playing field to

---

[1] Emphasis is added in italics throughout.

1

repair competition in the PCSK9i market. As shown below, this can only happen if the Court grants the following remedies. *First*, the Court should enter a permanent injunction that:

1. Prohibits Amgen from engaging in cross-therapeutic bundling through Praluent's patent expiry in 2032;

2. Prohibits Amgen from continuing to enforce agreements with insurers that use, or were the product of offers using, the cross-therapeutic bundle;

3. Prohibits Amgen from offering rebates to the large insurers (CVS, ESI, Humana, Optum/UHC) for Repatha formulary coverage, and reimburses Regeneron for the marketing efforts it will now have to undertake to correct the misinformation about the limited availability of Praluent in the marketplace, for the earlier of three years or until Praluent achieves a U.S. market share of 35% for four quarters in a row reflecting the market dynamics before Amgen used cross-therapeutic bundling; and

4. Notifies insurers of the jury's decision and that Amgen cannot continue to provide cross-therapeutic bundled rebates, as well as notifies prescribers and the public of the jury's decision and that Praluent remains available in the PCSK9i market.

To ensure that Amgen complies with these remedies to restore competition, the Court should also impose a compliance monitor. These are classic remedies in antitrust cases that courts use to restore markets to competitive levels and protect competition for the future. Indeed, Amgen already agreed to a compliance monitor as a condition of settlement with the U.S. Federal Trade Commission ("FTC") to obtain approval of its $27.8 billion Horizon Therapeutics acquisition.

*Second*, the Court should disgorge Amgen of the ill-gotten proceeds of its "unlawfully built empire" by imposing a constructive trust. This is a well-recognized equitable remedy under Delaware law for tortious conduct that results in unjust enrichment. Amgen reaped substantial proceeds that it would not have otherwise obtained. And, until the playing field is re-leveled, Amgen continues to benefit from a Repatha monopoly due to its wrongful conduct.

*Third*, the Court should award prejudgment interest on Regeneron's claims in order to fully compensate Regeneron for the effects of Amgen's anticompetitive conduct. Prejudgment interest is a necessary component in making Regeneron whole. Only by accounting for the lost time value of the money Regeneron would have received but for Amgen's anticompetitive

2

conduct can Regeneron be properly compensated for the harm. And Amgen should not receive any benefit from retaining Regeneron's money for the last four years.

<u>ARGUMENT</u>

## I. REGENERON IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF TO RESTORE COMPETITION AFTER AMGEN MONOPOLIZED AND ENGAGED IN OTHER WRONGFUL CONDUCT IN THE PCSK9I MARKET

The Court should enter a permanent injunction in Regeneron's favor. All of Regeneron's antitrust claims provide for injunctive relief. *See* 15 U.S.C. § 26 (federal antitrust laws); Cal. Bus. & Prof. Code § 16750 (Cartwright Act); *Alexander's Dep't Stores v. Ohrbach's, Inc.*, 42 N.Y.S.2d 703, 707-08 (App. Div. 1943) (Donnelly Act). Injunctive relief is also "a common and non-controversial remedy for tortious interference with prospective economic advantage." *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017); *see also Vizant Techs. LLC v. Whitchurch*, 675 F. App'x 201, 203, 209 (3d Cir. 2017) (affirming permanent injunction on Delaware law tortious interference claim that barred defendant from "discouraging others to do business with" plaintiff).

To obtain a permanent injunction, Regeneron "must show that (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in its favor; and (4) granting an injunction would not be against the public interest." *Ne. Pennsylvania Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). "The first two elements typically constitute two sides of the same inquiry." *Id.* (quotations omitted).

For Regeneron's antitrust claims, "[t]he Clayton Act tweaks the first factor by authorizing equitable relief where a plaintiff shows 'a significant threat' of irreparable antitrust injury, even if the injury hasn't happened yet." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 705 (4th Cir. 2021) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S.

3

100, 130 (1969)). And there is no *antitrust* injury requirement for Regeneron's tortious interference claim. *See, e.g.*, *Vizant Techs.*, 675 F. App'x at 207-09.

Importantly, a "wrongdoer cannot avoid an injunction by voluntarily ceasing its illegal conduct." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 157 (3d Cir. 2019). An injunction may issue so long as "there exists some cognizable danger of recurrent violation." *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Amgen "bears the risk of the uncertain consequences created by its exclusionary acts" and therefore "***at the least, equitable relief properly goes beyond merely 'undoing the act'; the proper relief is eradicating all the consequences of the act and providing deterrence against repetition; and any plausible doubts should be resolved against the monopolist***." Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 653f (4th ed. 2017) (emphasis added); *cf. Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("[T]he wrongdoer" must "bear the risk of the uncertainty which [its] own wrong has created.").

### A. The Evidence at Trial Established that Injunctive Relief is Necessary

> *1. Amgen's Ongoing Conduct and its Ongoing Effects Have Caused Irreparable Injury to Regeneron With No Adequate Remedy From Past Monetary Damages*

Amgen's conduct, which the jury found to be anticompetitive, has caused—and continues to cause—irreparable harm to Regeneron by significantly limiting Praluent's access to the U.S. PCSK9i market. The testimony at trial demonstrates that this harm is ongoing and will continue for many years due to Amgen's anticompetitive misconduct. Specifically:

- **Repatha's Exclusive Formulary Coverage:** Praluent has no coverage (and Repatha has exclusive coverage) at the national formularies of the "***Big 3***" PBMs

AMERICAS 130196597

(CVS, ESI, Optum/UHC), plus Humana Part D.[2] These major insurers, that Amgen referred to as the "***MEGA accounts***," control between 80-90% of the market.[3]

- **Repatha's Monopoly Power:** As a result of Amgen's anticompetitive actions, Amgen's Repatha market share is ***over 90%*** with Regeneron's Praluent market share now at 9% and falling.[4] Notably, Praluent's market share for new PCSK9i patients is ***only 6%*** and also falling,[5] which will lead to Praluent's overall market share falling further into the future. Amgen internally projected that "they want to have 100 percent share in this market"[6] and, absent meaningful injunctive relief, Amgen is close to achieving this unlawful end.

- **Long-Term Effects of Amgen's Monopoly:** Based on the economic realities of the U.S. PCSK9i market and prescriber behavior, the exclusion of Praluent will continue, with no ability for Regeneron to effectively compete on price or rebates:[7]

  - As Amgen told the jury, once a product achieves significantly more market share, the PBMs become entrenched with that choice because they "can get more rebate value, what they call revenue, from a high-volume product versus a low volume product."[8]

  - As Regeneron's Steven Hyde explained, Amgen's market dominance places Regeneron in a "***point of no return***" where "[n]one of the PBMs are willing to reopen the PCSK9 category for consideration, and they're not willing to accept bids from Regeneron to participate in the PCSK9 category."[9] Absent further relief, the market is "***below the inflection point***" where PBMs can

---

[2] Trial Tr. Vol. II 245:6-12 (Dr. Len Schleifer testified that "[w]e do not have front-line access to any of [the large three insurance companies]" including Part D or Medicare as well as commercial, and that Amgen "basically [has] the entire market."); *id.* at 374:3-10 (Steven Hyde testified that "[c]urrently, for the Commercial and the Part D formularies, at all of those big three PBMs, Praluent is excluded on all of the national template formularies."); Trial Tr. Vol. III 475:20–476:7 (Marion McCourt testified that in May 2025, patients do not have access for Praluent at Express Scripts [Commercial and Part D], CVS [Commercial and Part D], United Healthcare/Optum [Commercial and Part D], or Humana [Part D]).

[3] Trial Tr. Vol. III 677:6-12 (Amgen witness Murdo Gordon admitting that "the three largest PBMs in the U.S." cover "80 to 90" percent of the market); Trial Tr. Vol. VI 1452:15-19 (Amgen's corporate representative Kave Niksefat testifying that "three PBMs manage the prescriptions for over 80 percent of the market"); *see also* PTX-511; PTX-805 ("CVS, UHG, and ESI (which we have internally termed "MEGA" accounts) . . . now represent over 80% of all insured lives within the United States.").

[4] Trial Tr. Vol. III 469:15–470:12 (Marion McCourt).

[5] *Id.*; *see also* D.I. 479, at 7 (Special Interrogatory 15: "Has Regeneron proven by a preponderance of the evidence that Amgen's anticompetitive conduct substantially foreclosed Regeneron from the relevant market? A. Yes.").

[6] Trial Tr. Vol. IV 889:15-18 (Prof. Fiona Scott Morton); PTX-602, at PTX-602-031.

[7] *See infra*, Section I.C.3.

[8] Trial Tr. Vol. III 574:19–575:1. (Murdo Gordon); *see also* PTX-1005 (Amgen Regeneron Scenarios & Amgen Response document noting that "[a]s RGN increases share, they improve their negotiating position with PBMs").

[9] Trial Tr. Vol. II 365:20–366:19; 375:15-22.

5

AMERICAS 130196597

shift the utilization back from Repatha to Praluent.[10] And without the ability to "open up the contracts at the PBMs that are two-year, or three-year contracts" the harm to Regeneron surely continues.[11]

o Most notably, Praluent's "failure to secure new patients who might have Express Scripts" or another PBM, compounds the harm into the future.[12]

o When a product has the high market share that Repatha has, "***providers lose confidence***" in prescribing Praluent because they know Repatha is "going to be covered the majority of the time."[13]

o This creates a habit of prescribing that is hard to break.[14] "[P]hysicians in the community get used to prescribing Repatha because most of their patients have coverage of Repatha so they kind of ***forget about Praluent***."[15]

o Then, as providers continue to use the product, it becomes "much more difficult the next year or the year after that to go back to that same PBM and to try to get them to reconsider your product for their formulary status."[16]

An injunction is thus needed to stop this future harm and re-level the competitive playing field.

### 2. The Balance of Hardships Weighs Decidedly in Regeneron's Favor

**Regeneron is the Victim of Amgen's Monopolization:** Absent injunctive relief, the obstacles to Regeneron recovering its market share—lost due to Amgen's anticompetitive conduct—are insurmountable. With Praluent's current single-digit market share, Regeneron faces an uphill battle to develop and sustain access at the large insurers. Even with a level playing field, Regeneron could not "snap its fingers" and return to where it was before Amgen's conduct. As Prof. Fiona Scott Morton explained, if Amgen stopped its conduct:

[W]hile everything would get better and we'd get on a better path, ***it's not that Regeneron can suddenly snap their fingers and be back to 30 percent or something like that. They've got to go back into the PBMs. They've got to***

---

[10] *Id.* at 403:19-25 (Steven Hyde).
[11] Trial Tr. Vol. IV 944:7-24 (Prof. Fiona Scott Morton).
[12] Trial Tr. Vol. III 463:11-22 (Marion McCourt).
[13] Trial Tr. Vol. II 366:11-19 (Steven Hyde).
[14] Trial Tr. Vol. III 464:3–465:3 (Marion McCourt explaining that "by human nature, when physicians are being bombarded by messages for a particular health plan that's large, but you can only use [one] product, it tends to train them as a habit to [] use that product more.").
[15] Trial Tr. Vol. IV 939:13-24 (Prof. Fiona Scott Morton)
[16] Trial Tr. Vol. II 366:11-19 (Steven Hyde).

AMERICAS 130196597

***recontract. They've got to remind the doctors that they exist.*** They've got to help patients understand, et cetera."[17]

Instead, it takes "a while to build back from the lack of coverage."[18] As Amgen's Senior Vice President, Kave Niksefat admitted, "the value to the PBM equals the rebate times the market share,"[19] and Praluent is significantly disadvantaged due to Repatha's 90%+ monopoly share.

**Amgen Has No Hardship From Competing Fairly:** In contrast to this substantial hardship to Regeneron even with injunctive relief, the hardship to Amgen would be minimal. Amgen will not have to divest its Repatha product and will not be prohibited from selling Repatha. Amgen simply would no longer be "a big, Goliath, who's got multiple other products that's paying [PBMs] all sorts of money" such that the "little guy [gets] shut out."[20] Instead, Amgen would have to comply with competition laws, forego its unlawful monopoly position, and compete on a level playing field. Given Repatha's blockbuster status with over $1 billion in annual U.S. revenue, Amgen's "Goliath" status with $30 billion in annual revenue across its drug portfolio, and a market capitalization of $150 billion, Amgen will not suffer any cognizable hardship from having to compete fairly and without the benefit of its unlawful monopoly.[21] Amgen will simply be restored to the position it would have been in absent its anticompetitive behavior. And having to compete fairly is not a cognizable hardship; to the contrary, it is the bedrock foundation of the antitrust laws. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("***Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise.*** They are as important to the preservation of economic

---

[17] Trial Tr. Vol. IV 944:7-19.

[18] Trial Tr. Vol. III 474:11-19 (Marion McCourt) (explaining Praluent is a great product, and there is "certainly opportunity" to "improve the situation" if Regeneron could secure coverage for Praluent on a level playing field, but even then rebuilding would "simply [] take time").

[19] Trial Tr. Vol. VI 1435:12-20 (explaining that "in a 1 of 1 position, Repatha would deliver 90 percent market share. In a 1 of 1 position, Praluent would deliver roughly 70 percent market share. That difference of 20 points in market share would make a Repatha rebate worth more than a Praluent rebate in a 1 of 1 position.").

[20] Trial Tr. Vol. II 221:20–222:15 (Dr. Len Schleifer).

[21] Trial Tr. Vol. IV 765:9-22 (Murdo Gordon).

7

freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."). Notably, Amgen agreed to much of the same injunctive relief Regeneron seeks here when Amgen secured approval from the FTC for its $27.8 billion acquisition of Horizon Therapeutics. *See* Decision and Order, *In the Matter of Amgen Inc. and Horizon Therapeutics plc*, Dkt. No. 9414, FTC (Dec. 13, 2023) ("Ex. 1").[22] The FTC was concerned that Amgen would leverage its newly acquired drugs to disadvantage competitors in the same way it leveraged Enbrel and Otezla here. *See* Complaint, *In the Matter of Amgen Inc. and Horizon Therapeutics plc*, Dkt. No. 9414, FTC (June 22, 2023) at ¶¶ 4-5, 54-55, 57 ("Ex. 2").

### 3. The Public Interest is Served Through Injunctive Relief

**Lower Repatha Prices:** Unchecked, Amgen could use its monopoly power to keep the net price of Repatha artificially high—and ***more than double the price of Praluent***.[23] Amgen modeled that result for Repatha.[24] And, if Amgen raised its prices further, it would be "very difficult at that point for the insurance companies to fight back."[25] If a competitor decides to lower price (as Regeneron did with its change in strategy), "***those lower prices and that process of competing is what really benefits consumers***."[26] The reduction in net cost is relayed from the PBMs to patients either through lower co-pays or lower premiums.[27] As Prof. Fiona Scott Morton testified, higher prices for drugs "harm[] us all because it raises the cost of healthcare"

---

[22] All numbered exhibit ("Ex.") citations refer to the exhibits identified in the Declaration of Adam B. Banks filed herewith.

[23] *Id*. at 942:6-22 (Prof. Fiona Scott Morton explaining that "Praluent's price is half of Repatha's price. And yet, Repatha's market share is not even just 85 today, but even higher. Ms. McCourt told us in the 90s. So we have a product that's twice as expensive as its competitor, and it has a 90-plus percent market share.").

[24] *Id*. at 887:24–888:16 (Prof. Fiona Scott Morton explaining that Amgen's forecast annual price in a two-player market is $1,600, but that goes up to $2,500 if they're a monopolist); PTX-897 at PTX-897-031.

[25] Trial Tr. Vol. II 244:12-18 (Dr. Len Schleifer).

[26] Trial Tr. Vol. IV 905:19–906:1 (Prof. Fiona Scott Morton).

[27] *Id*. at 1021:7-13 (Jay Witter of Zinc, a subsidiary of CVS Health, explaining that lower co-pay or lower premium is his expectation of the results of reducing net costs).

AMERICAS 130196597

and that "if we could drop the cost of healthcare, we would all experience lower premiums[,] .

. . less government expenditure[,] better benefit design[, and] lower out-of-pocket cost."[28]

**Lower Enbrel and Otezla Prices:** Amgen's behavior affects more than just Repatha

and Praluent patients. Amgen's documents acknowledge that Amgen could "pa[y] for" the

anticompetitive bundled rebate offers through "future price increases."[29] And, as Professor

Scott Morton testified, Amgen in fact did raise prices during the relevant period by as much as

40%.[30] Regeneron, on the other hand, is trying to compete differently by reducing healthcare

costs for patients.[31] As Dr. Schleifer testified, Regeneron's innovative selling model creates the

"virtuous cycle" where "we don't spend all this money [] trying to educate doctors when they

should be educated in a different way" so that "[c]ost would be less for everybody."[32]

**Increased Choice:** Cardiovascular disease is the leading cause of death in the United

States.[33] PCSK9i medications were developed, and continue to be used, to combat this disease.

But Amgen's anticompetitive behavior has removed physician and patient choice of their

PCSK9i medication. As Amgen admits, physician choice, and patient choice, is important.[34]

This is especially significant where there are key differentiating factors, such as Praluent's low-

---

[28] *Id.* at 944:25–945:14.

[29] PTX-276; *see also* Trial Tr. Vol. V 1243:13-25 (Billy West) ("Q. [The] $30 million can be funded by future PI. That's price increases, right? A. Yes, best I can understand . . . [it just says] 30 million can be funded by future PI.").

[30] Based on unrebutted testimony from Prof. Scott Morton analyzing Amgen internal data, Amgen's bundle ultimately allowed it to raise the list prices for Enbrel and Otezla, including a 40% increase for Enbrel, while using "funny money" rebates to compel large PBMs' adherence to Amgen's scheme. *See* Trial Tr. Vol. IV 914:19–920:4 (Prof. Fiona Scott Morton explaining Enbrel's list price rose from $5,287 a month to $7,524 a month).

[31] Trial Tr. Vol. II 233:6-11 (Dr. Len Schleifer testifying that the bundle would "snuff out an innovative company who is trying to get you the best price).

[32] *Id.* at 343:15–344:19.

[33] Trial Tr. Vol. III 470:15-20 (Marion McCourt testified "[c]ardiovasular disease [is] the number one cause of death"); *id.* at 613:12-20 (Murdo Gordon) ("heart disease is the number one killer in America. And, unfortunately, the trends are not moving in the right direction.").

[34] Trial Tr. Vol. III 574:2-13 (Murdo Gordon explaining that "Amgen's preferred approach is to have physicians make the treatment decision for patients."); Trial Tr. Vol. V 1223:1-16 (Billy West discussing the importance of physician and patient choice).

AMERICAS 130196597

dose option, which is now largely unavailable or too expensive for patients because of lack of

insurance coverage and where Praluent has mortality benefits that Repatha does not.[35] Amgen

itself eliminated Repatha in a 420 mg patch version as its monopoly grew,[36] which Amgen's

Doctor of Nursing Practice witness Suzanne Shugg stated many of her patients used.[37]

**New Entrants:** As Dr. Schleifer testified, allowing Amgen to continue its

anticompetitive behavior stifles innovators, including Regeneron, who discover new products

to help cure disease and get those products to patients.[38] The barriers to entry are high in the

---

[35] Trial Tr. Vol. II 182:20–183:19 (Dr. Len Schleifer explaining the importance of Praluent's low dose option); Trial Tr. Vol. III 473:16-25 (Marion McCourt explaining that historically, two thirds of Praluent's sales were of the low-dose option, used often with lower body weight patients such as women, younger patients, and older patients); Trial Tr. Vol. VI 1633:2-3 (Amgen's witness Doctor of Nursing Practice Suzanne Shugg testifying that when she starts a patient on Praluent, she starts them on the 75mg dose, and that the "rule of thumb is start low, go slow."); Trial Tr. Vol. II 186:10-17 (Dr. Len Schleifer) (testifying that Praluent's label includes mortality benefits, but Repatha does not).

[36] *See* Trial Tr. Vol. VII 1833:10–1834:2 (Amgen economics expert Dr. Gaier testifying that he did not know the 420mg patch was discontinued).

[37] Trial Tr. Vol. VI 1639:5-10 (Amgen nurse practitioner witness testifying that many of her patients were on the 420 mg patch due to latex allergy, needle phobia, or convenience).

[38] Trial Tr. Vol. II 232:9-19; *see also* Statement of Chair Lina M. Khan Joined By Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro Bedoya, *In the Matter of Amgen, Inc. and Horizon Therapeutics plc*, at 1-2 (Sept. 1, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/Statement-of-Chair-Lina-M-Khan-re-Amgen-Horizon.pdf ("FTC Amgen-Horizon Merger Statement") ("[K]ickbacks from brand-name pharmaceutical manufacturers to middlemen like pharmacy benefit managers" could "give pharmaceutical companies the power to raise entry barriers and exclude rivals in ways that hike prices, inhibit access, and *suppress innovation*"); FTC Report on Rebate Walls, at p. 3 (May 2021), https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-report-rebate-walls/federal_trade_commission_report_on_rebate_walls_.pdf ("*rebate walls … may reduce incentives for biotechnology companies to develop new medicines and/or invest in biosimilars, harming competition and the quality of care available to patients*"); FTC Press Release, *Merck Settles FTC Charges that Its Acquisition of Medco Could Cause Higher Prices and Reduced Quality for Prescription Drugs* (Aug. 27, 1998) (FTC settled change to pharmaceutical manufacturer's acquisition of a PBM that could have "foreclose[d] the products of manufacturers other than Merck from Medco's formularies" and "*reduce[d] other manufacturers' incentives to develop innovative pharmaceuticals*," on the condition that Medco "take steps to diminish the effects of any unwarranted preference that might be given to Merck's drugs over those of Merck's competitors in connection with the pharmacy benefit management services that it provides").

10

AMERICAS 130196597

pharmaceutical industry.[39] Prof. Fiona Scott Morton testified that a "new competitor [wouldn't] just say, 'Wow, the price of Repatha is high. I'll come in and compete.' [because] they have to invent a drug. Then they have to get it approved by the FDA. Then they patent the drug. So the whole thing takes many years[.]"[40] Even then, as the FTC has stated about Amgen's commercial strategies elsewhere, "***cross-product bundling [] can lock out new competitors— even if their products are more affordable and effective . . . which harm[s] patients in the long run***" by "depriv[ing] Americans of access to affordable drugs," "rais[ing] drug prices, inhibit[ing] access, stifl[ing] innovation, or otherwise hurt[ing] patients."[41]

Accordingly, permanent injunctive relief is necessary to rectify the market distortions caused by Amgen's misconduct. Moreover, only injunctive relief can unfetter the market and prevent future harm to both Regeneron and the American public.

## B. The Court Has Broad Discretion To Fashion Remedies That Stop And Undo Amgen's Monopoly And Its Anticompetitive Wrongful Conduct

It is well-settled in antitrust cases that "[t]he District Court is clothed with large discretion to fit the decree to the special needs of the individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (cleaned up). In crafting remedies to address antitrust violations, courts "***start from the premise that adequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Act***." *United States v. Grinnell Corp.*, 384 U.S. 563, 577 (1966). A remedy for conduct forbidden by Sherman Act § 2 should "unfetter [the] market from anticompetitive conduct," *Ford Motor Co.*, 405 U.S. at 577, and "terminate the illegal monopoly, deny [] the

---

[39] *See* Ex. 2 at ¶¶ 67-71 (identifying challenges to entry in the pharmaceutical industry); Trial Tr. Vol. VII 1873:13-18 (Amgen's expert Dr. Lauren Stiroh agreeing the PCSK9i market, like all pharmaceutical markets, has "high barriers to entry").
[40] Trial Tr. Vol. IV 886:7-13.
[41] FTC Amgen-Horizon Merger Statement at p. 3-4.

11

defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (citing *Grinnell Corp.*, 384 U.S. at 577).[42] Otherwise, cases like this one would become "futile . . . [by] fail[ing] to secure a remedy adequate to redress [the harm,]" *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961), because the recovery of lost profits alone would not achieve the intended effect of "restor[ing] competition." *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 707 (4th Cir. 2021).

Clayton Act Section 16 expressly permits injunctive relief where an entity is "threatened [with] loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The Clayton Act's injunctive and monetary relief provisions operate coextensively; that is, "Sections 4 and 16 are thus best understood as providing complementary remedies for a single set of injuries." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986); *see also Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) ("[T]he damages allowed by § 4 and the injunctive relief provided by § 16 are complementary remedies for a single set of injuries.") (citing *Cargill*, 479 U.S. at 113). Importantly, Clayton

---

[42] *See also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 366-70 (7th Cir. 1990) (affirming injunction, relying on the impact of the "lingering effects" of the defendant's anticompetitive boycott scheme); *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1308 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989) ("the district court has the duty and broad authority to fashion relief that will terminate the unlawful acts found to have occurred, ensure that they will not recur, and eliminate their consequences."); *In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *3 (N.D. Cal. Oct. 7, 2024) ("[I]f the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.") (cleaned up), *appeal filed, Epic Games, Inc. v. Google LLC, et al.*, No. 24-6256 (9th Cir. filed Oct. 15, 2024); Amicus Curiae Brief of the Federal Trade Commission, ECF No. 686-1*, In re Google Play Store Antitrust Litig.*, Civ. No. 3:21-md-02981-JD (N.D. Cal. Aug. 12, 2024) at 4 ("Ex. 3") ("District courts enjoy 'broad power' to fit the decree to the special needs of an individual case. . . . [A] court can go further than 'a simple proscription against the precise conduct previously pursued.'") (quoting *Zenith Radio*, 395 U.S. at 132, and *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 698 (1978)).

12

Act Section 16 does not limit injunctive relief to injuries already sustained by Regeneron and the U.S. PCSK9i market. Instead, where there exists "a significant threat of injury from a continuing violation of the antitrust laws," the Court is empowered to provide an injunction to address both the specific harmful conduct and restrain the defendant from committing other related unlawful acts. *Weiss v. York Hosp.*, 745 F.2d 786, 829 (3d Cir. 1984); *see Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 591 (3d Cir. 1979) ("[Section 16] does not ground injunctive relief upon a showing that injury has been already sustained, but instead makes it available against threatened loss or damage.") (quotations omitted).

Furthermore, "[w]hen the purpose to restrain trade appears from a clear violation of law, *it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed*. This is particularly true in treble-damage cases, which are brought for private ends, but which also serve the public interest in that they effectively *pry open to competition a market that has been closed by defendants' illegal restraints*." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 133 (1969) (cleaned up) (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 400, 401 (1947)) (emphasis added). To that end, this Court is empowered to proactively enjoin Amgen from engaging in both the same conduct that gave rise to the jury's verdict, as well as conduct that "may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio*, 395 U.S. at 132-33. *See also Lorain Journal Co. v. United States*, 342 U.S. 143, 154, 156 (1951) (affirming the grant of a permanent injunction "when [a defendant] *uses its monopoly to destroy threatened competition*" and overruling objections that "the decree covers a broader scope of activities than is required by the evidence" because "[t]he decree is reasonably consistent with the requirements of the case").

Additionally, "[a] trial court . . . has the duty to compel action [] that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance. Such action is *not limited to prohibition of the proven means by which the evil*

13

*was accomplished*, but may range broadly through practices connected with acts actually found to be illegal." *United States v. United States Gypsum Co.*, 340 U.S. 76, 88-89 (1950) (footnote omitted) (emphasis added). ***Indeed, "[a]cts entirely proper when viewed alone may be prohibited." Id.***; *see also Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) (explaining that an antitrust remedy "may curtail the exercise of liberties that the [defendant] might otherwise enjoy" and describing an injunction that "goes beyond a simple proscription against the precise conduct previously pursued" as "entirely appropriate").

### C. The Court Should Enter a Prohibitory Injunction to Stop Amgen from Engaging in Unlawful Behavior and Restore a Level Playing Field in the PCSK9i Market

To repair the market and restore competition, Regeneron's proposed injunction (attached as Ex. A) seeks four categories of permanent relief: (1) Amgen cannot engage in cross-therapeutic bundling through Praluent's patent expiry in 2032; (2) Amgen cannot continue to enforce agreements with PBMs that use, or were the product of offers using, the cross-therapeutic bundle; (3) Amgen cannot offer rebates or other financial incentives to the Big 3 PBMs and Humana Part D for Repatha formulary coverage or purchases for the earlier of three years or until Praluent's market share of 35% before Amgen's conduct began is restored for four consecutive quarters; and (4) notification to prescribers and insurers of the jury's verdict, notification to prescribers of Praluent's continued availability, and notification to insurers of Amgen being prohibited from providing cross-therapeutic bundled rebates. To ensure that competition is restored, Regeneron also seeks a compliance monitor, which is standard in this type of case. Each category of relief is fully supported by the evidence here and precedents in similar cases, and taken together, the relief seeks to repair the market from Amgen's anticompetitive conduct. *See United States v. Microsoft*, 231 F. Supp. 2d 144, 202 (D.D.C. 2002) ("Far from an amalgam of scattered rules and regulations pieced and patched together to restrict Microsoft's anticompetitive business conduct, the proposed final judgment

14

adopts a clear and consistent philosophy such that the provisions form a ***tightly woven fabric***."),

*aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004).

                  *1. Amgen Cannot Engage in Cross-Therapeutic Bundling Through Praluent's Patent Expiry In 2032*

      *First*, Regeneron proposes that Amgen be precluded from offering or using any cross-therapeutic bundled rebate to make Repatha exclusive or preferred over Praluent, including in any existing agreement. Proposed Injunction § II.A. This classic injunction is appropriate. *See, e.g.*, *Grinnell Corp.*, 384 U.S. at 580 (enjoining defendant from acquiring new interests in firms in the accredited station where acquisition of such interests gave rise to the anticompetitive exclusion); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005); Final Judgment, ECF No. 559, *United States v. Dentsply Int'l, Inc.*, 99-cv-00005-SLR (D. Del. Apr. 26, 2006) ("Ex. 4") (prohibiting the anticompetitive conduct; requiring removal of offending dealer requirements).

      Amgen offered or provided cross-therapeutic bundles in Repatha rebate agreements,[43] leveraging Enbrel and Otezla's market power with ESI,[44] United Healthcare,[45] CVS,[46] and

---

[43] *See, e.g.*, Trial Tr. Vol. VI 1474:20-23 (Kave Niksefat) ("Q. Amgen offered its bundle at all of the big three PBMs; right? A. Amgen offered versions of a bundle at all three PBMs, yes.").

[44] *See* Trial Tr. Vol. III 688:13-16 (Murdo Gordon) ("Q. So is it fair to say, you've admitted to us numerous times, that you won the Express Scripts' contract through a cross-therapeutic bundle; right? A. That is correct."); PTX-350 ("Ascent has agreed to our 2.5-year portfolio contract through 2022 covering the PCSK9 and Autoimmune categories… The contract includes claw back language that creates a meaningful disincentive for Ascent to try to renegotiate the deal while through 2022… As a result, we have strengthened our overall relationship and will seek to replicate moving forward with UHC/ORx and CVS/Zinc").

[45] *See* Trial Tr. Vol. IV 804:6-8 (Murdo Gordon) ("Q. … In 2021, you offered the cross-therapeutic bundle, the same one to United Healthcare; correct? A. Yes"); PTX-527 ("we heard official news by UHC announcing Praluent will be excluded on 9/1/21. This is aligned to what UHC have signaled all along and our current all-in rate of 50% for Repatha is in a good place . . . assuming we can complete the Enbrel deal.")

[46] *See* PTX-552 ("Our recommendation is similar in structure to our ESI agreement last summer, with Enbrel value tied to Enbrel, Otezla, and Repatha coverage. ███████████ ███████████████████████████████████████████ ); Trial Tr. Vol. IV 804:9-12 (Murdo Gordon) ("Q. And in 2021, you offered it again to CVS; correct? A. Yes. Q. And you offered it again to CVS in 2022? A. Yes."); PTX-485 ("On Medicare 2022 we offered competitive 1:1 and 1:2 Repatha

15

Humana.[47] By using cross-therapeutic bundled rebates, Amgen prevented head-to-head competition on the merits in the U.S. PCSK9i market. Amgen must be prohibited from offering or using bundled rebates for Repatha's formulary coverage.

Notably, Amgen previously agreed to a similar prohibition to obtain approval of its $28 billion acquisition of Horizon Therapeutics. Specifically, under the consent order, Amgen cannot "directly, indirectly, explicitly, or implicitly condition any Product Rebate on, or any contract terms related to, an Amgen Product, in exchange for either (1) the purchase, coverage, placement, or positioning, individually or in any combination, of KRYSTEXXA or TEPEZZA, or (2) the exclusion, detriment, or disadvantage, individually or in any combination, of a Competitive Product to KRYSTEXXA or a Competitive Product to TEPEZZA." Ex. 1 at 5. As the jury found, Amgen monopolized and engaged in anticompetitive and tortious conduct. Therefore, the analogous remedy Amgen entered into with the FTC should be the starting point for repairing the U.S. PCSK9i market that Amgen broke.

Regeneron has proposed the current end of its patent exclusivity in 2032 as the end date for this injunction because the competitive dynamics in the U.S. PCSK9i market could change significantly after that date. This proposed 7.5-year limitation fits squarely within the length of time for injunctions in antitrust cases. Ex. 4 at § VIII.B (7.5 years); Final Judgment, § VII.C, *United States v. Elec. Payment Servs.*, No. 94-208-SLR (D. Del. Oct. 14, 1994) ("Ex. 5") (10 years), *approved by*, 1994 U.S. Dist. LEXIS 21234 (Oct. 14, 1994). *See also* Stipulated Order

---

rates while enhancing Enbrel & Otezla. Reinforce positive spirit of how Joe Anderson [CVS] is approaching our overall negotiation (Enbrel, Otezla, Repatha) and that we have been happy to provide his team our bids on the requested timelines."); PTX-555 ("[T]he 2022 rate with enbrel overlay @3% and repatha @55% is effectively 85% on repatha [at CVS]"); PTX-688 ("2023 Possible Contracting Scenarios…                                        ").

[47] *See* PTX-379 (Andy Chiu approving an "Annual Enbrel Rebate" contingent on Otezla, Repatha, and Enbrel maintaining applicable Formulary status for the entire given calendar year, with the 4 or 3 incremental points being discussed as an "overlay" for Humana Part D).

16

for Permanent Injunction and Equitable Relief, ECF No. 187, *FTC v. Surescripts, LLC*, No. 1:19-cv-01080, § X (D.D.C. Aug. 9, 2023) ("Ex. 6") (20 years); Ex. 1 § X (15 years); Decision and Order, *In re Broadcom*, Dkt. No. C-4750, FTC (Nov. 4, 2021) ("Ex. 7") (10 years).

Additionally, Regeneron proposes that, based on the facts elicited at trial, this core injunctive relief should include appropriate safeguards as well. The trial revealed that Amgen's unlawful cross-therapeutic bundling scheme involved multiple Amgen executives (*e.g.*, Murdo Gordon, Kave Niksefat, Tom Moore, Jennifer Norton, Andy Chiu, Billy West, and Adam Grennan) who participated in internal and external discussions seeking coverage of both Repatha and other Amgen products, including Enbrel or Otezla, simultaneously, often over the phone and by text message.[48] The trial also revealed that Amgen knew the PBMs had requirements for head-to-head bidding in the U.S. PCSK9i market and separate bids for prescription drugs in unrelated anti-inflammatory markets and that Amgen's most senior executives ignored these requirements as mere "guidelines."[49] Restoring competition to the U.S. PCSK9i market requires preventing Amgen from leveraging cross-therapeutic bundled rebate offers in the future by ensuring that Amgen is following the PBMs' rules and bidding independently for Repatha coverage unrelated in any way to coverage for other Amgen products.

---

[48] *See*, *e.g.*, PTX-378 (text message from Amgen payor access executive to payor representative stating "We are on track to deliver verbal offers to you for Repatha as well as 2021/22 enhancements for your consideration with Otezla/Enbrel."); *see also* PTX-682 (Amgen notes from meeting with Joe Stahl to discuss ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[49] *See*, *e.g.*, Trial. Tr. Vol. IV 769:18-770:10 (Murdo Gordon) ("When we work with the PBMs in the process of submitting a bid… they set out these guidelines. And, yes, these requirements, as if they want to standardize how manufacturers, not just Amgen, but all their manufacturers, submit their offers to the PBM. What we will sometimes do is we will say, okay, we have – we have another offer that doesn't fit these requirements. But we don't want to just send it in. We're going to call them up and deal with our counterparts. We're going to say, 'Look, we know it says this in your requirements, but would you be okay if we sent this, which doesn't fit your requirements?'").

17

Therefore, Regeneron proposes a restriction known as a "firewall" on Amgen employees or representatives who set the strategy for, and negotiate, Repatha formulary coverage with payors from also setting the strategy for, and negotiating, formulary coverage for Amgen's other products including products Amgen co-markets, co-promotes, co-licenses, or otherwise manufactures. *See* Proposed Injunction § II.B. Similarly, to ensure a level playing field, Regeneron proposes that no Amgen employees or representatives who negotiate formulary coverage for any Amgen product can modify the PBM bidding requirements to allow for a cross-therapeutic bundle in any form tied to the coverage of Repatha.[50] Proposed Injunction § II.C. Additionally, Regeneron proposes that, on an annual basis, Amgen employees or representatives who negotiate formulary coverage for any pharmacy-dispensed product that could be covered by a PBM be required to review the Order ultimately entered by the Court and acknowledge in writing (including by email) that they understand and are complying with the obligations of the Order. Proposed Injunction § II.D.

These types of related prohibitions are known as "fencing-in" provisions and courts often use them in appropriate cases to prevent defendants from employing the same or similar tactics to further their anticompetitive, exclusionary practices. *See, e.g.*, *Zenith Radio* 395 U.S. at 132 (reinstating a fencing-in type provision: "[A] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past."); *Gypsum Co.*, 340 U.S. at 90-94 (approving of fencing-in type provisions); *see also*, *e.g.*, *Am. Home Prods. Corp. v. F.T.C.*, 695 F.2d 681,

---

[50] *See, e.g.*, Trial Tr. Vol. IV 771:21-772:2 (Murdo Gordon) ("Q. Isn't it [requirement-setting] also to ensure fairness? A. Probably. Q. Isn't – A. Yes. Q. – it also to ensure that there's a level playing field? A. Yes."); Trial Tr. Vol. II 221:17-20 (Dr. Len Schleifer) Insurance companies "all had policies that you can't bundle unrelated products in order to win the business for the product in discussion. For obvious reasons. The little guy would be shut out.").

18

704-05 (3d Cir. 1982) (noting that those violating the antitrust laws "must expect some fencing in," which is necessary due to there being "no limit to human inventiveness in [unfair practices]").

### 2. Amgen Cannot Continue to Enforce Agreements with PBMs that Use, Or Were the Product of Offers Using, the Cross-Therapeutic Bundle

*Second*, Regeneron proposes that Amgen cannot continue to enforce its agreements with the Big 3 PBMs and Humana Part D because the exclusive formulary coverage for Repatha was the product of Amgen using, or offering, its cross-therapeutic bundled rebate. *See* Proposed Injunction § III.A. By preventing Amgen from enforcing those agreements that were the product of Amgen's anticompetitive behavior, Praluent will have the ability to compete for formulary coverage at each of these "MEGA Accounts" beginning January 1, 2026.

This prohibition on continuing to allow a monopolist to benefit from its exclusionary contracts, including by terminating such offending provisions, is consistent with other antitrust injunctions, and this relief is routinely afforded to antitrust plaintiffs in litigation. *See New York v. Microsoft*, 224 F. Supp. 2d 76, 269 (D.D.C. 2002) (ordering, in part, that "Microsoft shall not enter into any agreement with . . . any [internet access provider (IAP)] that grants Consideration on the condition that such entity distributes, promotes, uses, or supports, exclusively or in a fixed percentage, any Microsoft Platform Software"), *aff'd*, *Massachusetts v. Microsoft*, 373 F.3d at 1211 (affirming district court's entry of injunction prohibiting Microsoft from continuing exclusive arrangements where "[t]he exclusive contracts into which Microsoft entered with IAPs were likewise aimed at foreclosing channels through which rival middleware might otherwise have been distributed").[51] The same is true in the settlement

---

[51] *See also Milsen Co. v. Southland Corp.*, 454 F.2d 363, 369 (7th Cir. 1971) (reversing denial of preliminary injunction because courts "have refused to permit a party to benefit from contractual rights when the contract is an instrument of restraint of trade"); Ex. 4; *United Shoe*, 110 F. Supp. 295 (D. Mass. 1953), *aff'd*, 347 U.S. 521 (1954) (imposing changes to anticompetitive leasing agreements).

19

context. *See* Ex. 5 at § IV.A (For "**ten years** from the date of entry," "Defendant shall not maintain or enforce any . . . *contract*, agreement or arrangement pursuant to which defendant requires any depository institution to obtain ATM processing or authorization processing from defendant; that prohibits or purports to prohibit a depository institution from obtaining ATM processing or authorization processing from any third party processor[.]"), *approved by*, 1994 U.S. Dist. LEXIS 21234 (Oct. 14, 1994); Ex. 6 at 2, 5-6 (enjoining defendant from entering into conditional or exclusive agreements and requiring defendant to terminate prohibited contract terms); Ex. 7 at § II.A (ordering defendant with alleged market power to stop enforcing contracts with prohibited conditional pricing).

### 3. To Re-Level the Playing Field, Amgen Cannot Offer Rebates to the Big 3 PBMs and Humana Part D for Repatha Formulary Coverage or Seek Exclusive Coverage, and Must Reimburse Regeneron for its Corrective Marketing Efforts

*Third*, in an attempt to eliminate Repatha's monopoly and fix the U.S. PCSK9i market, the Court should order that Amgen be prohibited from providing rebates to, or seeking exclusive coverage with, the Big 3 PBMs and Humana Part D. This prohibition would extend only for a relatively short period of time to restore a healthy competitive process: the earlier of three years or until Praluent achieves a 35% U.S. PCSK9i market share for four consecutive quarters as it had before Amgen's cross-therapeutic bundling strategy. *See* Proposed Injunction § IV.A.

Regeneron wants to compete aggressively on a level playing field against Amgen. For that to be possible, the level playing field must be restored. Today, even if Amgen is prohibited from continuing its conduct, the damage has been done—Amgen used its cross-therapeutic bundle to make Praluent, its only PCSK9i competitor, competitively irrelevant.[52] Importantly, Praluent's current share of 9%, already less than a third of its share in the pre-conduct market,

---

[52] Trial Tr. Vol. IV 946:11-14 (Prof. Fiona Scott Morton) ("Repatha and Amgen have weakened competition between the two PCSK9 products and strengthened Repatha's monopoly in the United States going from 69-point-something share up to above 90 today.").

AMERICAS 130196597

is in decline. Praluent currently receives roughly 6% of new PCSK9i prescriptions,[53] which means that Praluent's current share is likely lower than the testimony adduced at trial[54] and even overstates its going-forward competitiveness. With Praluent's current small market share, the product is below the critical level to be viable and able to compete for formulary coverage.[55] Regeneron's proposal corrects this discrepancy by prohibiting Amgen from submitting bids with rebates off Repatha's list price to the "MEGA" accounts where Amgen had offered a bundled rebate, or seeking exclusive coverage for any bid based on the list price of Repatha, until market shares return to pre-conduct levels. Proposed Injunction § IV.A.

Additionally, in order to level the playing field as fast as possible, Amgen should be required to reimburse Regeneron for the marketing and sales efforts that Regeneron will now have to undertake to correct the misinformation about the limited availability of Praluent in the marketplace. With less than 10% market share resulting from anticompetitive conduct that began in 2020, prescribers will need to be reminded that Praluent is a viable option.[56] The

---

[53] Trial Tr. Vol. III 469:8–470:12.

[54] *Compare* Trial Tr. Vol. IV 884:3-10 (Prof. Fiona Scott Morton) ("Q. Okay. Let's turn to the next indicator of monopoly power for Repatha, which is market shares. What did you find based on your analysis of the data in this case? A. I found that Repatha has a high market share. It's almost 70 percent when the period starts. And it's up to 85 by the end of my data. And this is a two-player market. So that means that Praluent has the rest."), *with* Trial Tr. Vol. III 469:16-23 (Marion McCourt) ("Q. ...in terms of a small brand, what's Praluent's market share today? A. So it's embarrassing to give you these numbers, but our market – two products in the marketplace, and our market share of new patients is only about 6 percent and going the wrong way, going down... Our market share is – it's, like, 9 percent now. And again going down.").

[55] Trial Tr. Vol. II 366:11-25 ("Q. And what did you mean by a point of no return? A. What I mean by that is, again, providers lose confidence in prescribing your product and they're just going to start using the easiest product to use because they know it's going to be covered the majority of the time. And then, secondly, it becomes much more difficult the next year or the year after that to go back to that same PBM and to try to get them to reconsider your product for their formulary status. Q. And why would that be more difficult to go back the next year? A. Well, there's a couple reasons, but predominantly it's because providers are using the other product. And the market shares drop significantly, and they're going to ask you for significantly higher rebates and discounts.").

[56] *Cf.* Plaintiffs' Revised Proposed Final Judgment, § IX.E, ECF No. 1184-1, *United States v. Google LLC*, 20-cv-03010-APM (D.D.C. Mar. 7, 2025) ("Ex. 8") (Colorado State Plaintiffs proposing that Google "fund a nationwide advertising and education program designed to

21

amount of Regeneron's marketing and sales expenses to be reimbursed should be no greater than the average of Amgen's marketing expenses over the time period 2020 to 2023. If needed, the compliance monitor described below can obtain information about Regeneron's expenses on corrective marketing, and the Court has continuing jurisdiction to address any disputes over the amount of these expenses. This proposed remedy will expire three years after entry of the order, or upon Praluent recovering to the 35% market share it had before Amgen engaged in its cross-therapeutic bundling scheme for four consecutive quarters, whichever comes sooner.

Restoring market share to pre-conduct levels is an appropriate target for this market, where ill-gotten market share cements Amgen's monopoly. *See supra* pp. 12-14; *see also Int'l Salt Co. v. United States*, 332 U.S. 392, 400 (1947) ("The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market."); *Massachusetts v. Microsoft Corp.*, 373 F.3d at 1215 (approving "forward-looking" remedy requiring "Microsoft to disclose certain of its APIs and communications protocols … [a]lthough non-disclosure of this proprietary information had played no role in our holding Microsoft violated the antitrust laws").[57] Even

---

inform users of the outcome of this litigation, the remedies in this Final Judgment, the purpose of the remedies to restore competition and improve consumer choice, and the mechanisms available to consumers to exercise choice in the selection of [general search engines to] best advance the ability of consumers to make informed choices").

[57] Depriving Amgen of its Repatha monopoly until the marketplace is as competitive as it was before Amgen's cross-therapeutic bundling scheme is short of, but analogous to, an order requiring Amgen to divest itself of its monopoly power. As the Supreme Court has said, "divestiture" is the "most drastic, but most effective, of antitrust remedies … to restore competition." *E.I. du Pont de Nemours & Co.*, 366 U.S. at 326; *see also, e.g., Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 256 (1959) (affirming divestiture of defendants' ownership of Madison Square Garden where championship boxing events were held that defendants controlled the promotion of "in order to put an end to the combination, deprive the appellants of the benefit of their conspiracy and ***break up their monopoly power***").

AMERICAS 130196597

were Regeneron to offer competitive, or even greater, rebates to the large insurers, the value of Regeneron's rebate dollars will be diluted by Praluent's artificially low share due to Repatha's current artificially high share.[58] In such a situation, it would be nearly impossible for the U.S. PCSK9i market to return to competitive levels.

Under Regeneron's proposal, Amgen retains the ability to compete in all other ways, *i.e.,* direct-to-consumer TV advertising, using sales force marketing to prescribers, and by lowering the list price of Repatha. That allows Amgen to sell on the merits to those MEGA accounts. In other words, **with full transparency**, Amgen can continue to compete for formulary coverage at the MEGA accounts. But Amgen would not be able to continue the underhanded tactics this trial uncovered of coercing the Big 3 to cover Repatha exclusively or preferentially based on Amgen's pricing and rebating of its other products, like Enbrel. Importantly, Proposed Injunction § IV.A does not incentivize Regeneron to stand pat. Rather, it provides Regeneron with a three year period in which to aggressively compete for U.S. PCSK9i share without the undue influence of Amgen's anticompetitively obtained monopoly position. As the trial record makes clear, this is the same type of competition Regeneron aggressively pressed for upon regaining control of Praluent and which prompted Amgen to create the illegal cross-therapeutic bundles.[59] Any suggestion that Regeneron would intentionally compete less aggressively contravenes the factual record established in this case.

Courts also have the authority "to modify an injunction in adaptation to changed conditions[.]" *United Shoe*, 391 U.S. at 248 (quoting *United States v. Swift & Co.*, 286 U.S.

---

[58] *See, e.g.*, *supra*, Section I.A.1; *see also* Trial Tr. Vol. VI 1435:12-20 (Kave Niksefat) ("[T]he value to the PBM equals the rebate rate times the market share . . . in a 1 of 1 position, Repatha would deliver 90-percent market share. In a 1 of 1 position, Praluent would deliver roughly 70-percent market share. That difference of 20 points in market share would make a Repatha rebate worth more than a Praluent rebate in a 1 of 1 position.").

[59] *See*, *e.g.*, Trial. Tr. Vol. II 214:21–215:21 (Len Schleifer); Trial Tr. Vol. III 449:9–452:4 (Marion McCourt); *Id.* at 649:16–650:7 (Murdo Gordon).

AMERICAS 130196597

106, 114 (1932)); *see also Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106-07 (2021) ("Judges must be open to clarifying and reconsidering their decrees in light of changing market realities."). Here, Regeneron has proposed self-executing modifications that are easy to administer as Amgen subscribes to third-party data sources in the ordinary course of its business to know when Praluent has achieved a 35% market share for four consecutive quarters.

### 4. Amgen Must Notify the Market of Its Conduct and Praluent's Continued Availability

*Fourth,* Regeneron proposes that Amgen be required to notify prescribers, payors, and the public of the anticompetitive conduct Amgen used to maintain Repatha's monopoly and that Regeneron's Praluent remains available in the marketplace with a copy or hyperlink to its FDA-approved product label. Proposed Injunction § V.A. The content of the notice can easily be adapted from the Court's jury instructions summarizing Regeneron's claims (*see* ECF No. 481, Instruction Nos. 24-25, 29, 32, 35-36, 41, 45, 47-48) and the Judgment (*see* ECF No. 490).

Amgen's anticompetitive scheme relied on leveraging cross-therapeutic bundles to compel the large insurers to provide Repatha favorable formulary positioning and exclude Praluent.[60] Absent a clear statement by Amgen that all such conduct has ceased and will not resume, the incentives created and maintained by Amgen's anticompetitive scheme may continue. Additionally, absent intervention by this Court, the effects of Amgen's conduct on prescribers' and patients' perceptions of Praluent's unavailability will continue.

This Court may address the lingering effects of Amgen's unlawful conduct as part of a complete remedy. *See Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 366-70 (7th Cir. 1990) (relying on the impact of the "lingering effects" of the defendant's anticompetitive conduct to affirm injunction). Requiring Amgen to publicly disavow its cross-therapeutic bundling scheme will work to ameliorate the effects on prescribers' and payors' PCSK9i decision-making. *See id.*

---

[60] *See, e.g.*, *supra*, Section I.C.1, nn. 43-47.

24

(approving a notice provision where "the AMA has never made any attempt to publicly repair [the] damage" done to chiropractors). *See also* Ex. 6 at 2 (requiring Surescripts "publish a notice on [its] website describing the provisions [the order] prohibits Surescripts from enforcing"); Ex. 7 at § III.B (ordering defendant with alleged market power to send letter notice and copy of Order to customers). In *Horizon*, Amgen agreed to a similar notification provision. *See* Ex. 1 (Amgen agreeing to provide notification of the injunction and related materials to payors and on its website).

### 5. A Monitor is Necessary to Ensure Amgen's Compliance

*Finally,* Regeneron's proposal includes an independent antitrust compliance monitor. *See* Proposed Injunction § VI.A. Amgen has demonstrated that it cannot be trusted to abide by antitrust laws, or to be truthful about its conduct. Indeed, Amgen has already lied about its bundling activities in this litigation. *See infra* Section III.C. An independent monitor will ensure confidentiality while protecting against circumvention and reducing the burden on the Court. Compliance monitors are used routinely in antitrust injunctions. *See, e.g.*, Ex. 1; *United States v. Apple Inc.*, 992 F. Supp. 2d 263 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015).[61] Given that Amgen's senior executives facilitated its bundling conduct with the intent of stopping price competition—"*enough is enough*"[62]—Regeneron's proposal also includes a certification of compliance by Amgen's Chief Commercial Officer.

---

[61] *See also*, *e.g.*, Federal Trade Commission, "The FTC's Merger Remedies 2006-2012: A Report on the Bureaus of Competition and Economics," p. 14, n. 26 (January 2017) ("One characteristic that often appears in non-structural remedies [] is the use of monitors. The option to appoint a monitor was included in 97% of orders that involved non-structural remedies"), available at www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.

[62] Trial Tr. Vol. III 699:11-15 (Murdo Gordon) ("I said enough is enough on price erosion at the rate that it was declining. We were trying to slow that rate of declining price erosion down. And we were trying to do that by not fighting with Regeneron at the PBMs for a 1 of 1 position"); *see also, e.g., id.* at 688:13-19 (Murdo Gordon) ("Q. So is it fair to say, you've admitted to us numerous times, that you won the Express Scripts' contract through a cross-therapeutic portfolio bundle; right? A. That is correct. Q. And so I just want to make sure I'm correct. The CEO of your company knew that? A. Yes.").

AMERICAS 130196597

A compliance monitor is particularly important where, as here, an antitrust defendant "failed to demonstrate that it took seriously the burden that its" anticompetitive conduct "imposed on consumers" and cannot be trusted to self-enforce its own antitrust protocols. *Apple Inc.*, 992 F. Supp. 2d at 267; PTX-1014 (Amgen Global Corporate Compliance Policy, Antitrust and Unfair Competition, discussing antitrust protocol on bundled discounts). That the large insurers must also deal with Amgen for formulary placement and rebate negotiations for other drugs also cautions in favor of ensuring Amgen's compliance with the anti-retaliation provision of the Proposed Order. *New York v. Microsoft Corp.*, 224 F. Supp. 2d at 163 ("Given the power wielded by a monopolist like Microsoft, in the absence of protection against retaliation and threats of retaliation, industry participants whose survival hinges on their relationship with such a monopolist will be reluctant to exercise the new-found freedoms offered by the remedy in this case"). Given Amgen's repeated violations of the antitrust laws and efforts to obscure its violations,[63] the appointment of a compliance monitor is necessary to ensure adherence to the Court's remedial actions.

## II. AMGEN HAS BEEN UNJUSTLY ENRICHED BY ITS EGREGIOUS MISCONDUCT AND REGENERON IS ACCORDINGLY ENTITLED TO A CONSTRUCTIVE TRUST

Amgen's misconduct, in addition to violating federal and state anticompetitive laws, also violated Delaware law prohibiting tortious interference with business relationships. The jury concluded not only that Amgen tortiously interfered with Regeneron's business relationships; it found that Amgen did so in such a manner as to warrant the imposition of punitive damages. The jury, therefore, necessarily determined that Amgen acted intentionally and that its conduct was outrageous. *See* D.I. 481, Final Jury Instructions at No. 59. Amgen, of course, profited handsomely by its unlawful bundling scheme and thereby cornered over 90% of the PCSK9i market. That enrichment was manifestly unjust, came at Regeneron's expense,

---

[63] *See infra*, Section III.C.

26

and will continue into the future. The jury's compensatory and punitive damages awards—the only legal remedies it could impose—did not address Amgen's unjust enrichment and is inadequate to remedy the harm that Regeneron sustained and will continue to sustain.

A constructive trust is a flexible remedy that redresses a wrong; however, some fraudulent or unconscionable conduct is essential. *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993). The requesting party must demonstrate that a legal remedy is inadequate. *Greenly v. Greenly*, 49 A.2d 126, 129 (Del. Ch. 1946). To be adequate, the remedy must be full, fair and complete. *Theis v. Bd. of Educ.*, 2000 WL 341061, at *2 (Del. Ch. Mar. 17, 2000). The jury's award does not adequately reflect the scope of harm caused by and the degree to which Amgen has and will unjustly benefit from the scheme that the jury found outrageous and intentional.

The Court may impose a constructive trust when a plaintiff establishes by clear and convincing evidence that the defendant's fraudulent, unfair, or unconscionable misconduct unjustly enriched it, at the expense of another.[64] *Halperin v. Moreno (In re Green Field Energy Servs.)*, 834 Fed. App'x 695, 698 (3d Cir. 2020). A constructive trust allows a plaintiff to obtain not merely what it lost, but also what defendant gained from its misconduct. *Skretvedt v. E.I. Dupont de Nemours*, 372 F.3d 193, 213 (3d Cir. 2004). The purpose of a constructive trust is to restore property—here, Amgen's outsized profits—that was gained by inequitable means. *Id.* Accordingly, the jury's award of compensatory and punitive damages does not preclude the imposition of a constructive trust.

Constructive trusts may be imposed upon specific property, identifiable proceeds of specific property, and money so long as it resides in an identifiable fund to which the plaintiff can trace equitable ownership. *B.A.S.S. Group, LLC v. Coastal Supply Co.*, 2009 WL 1743730,

---

[64] Regeneron reserved the right to seek any relief "the Court may deem just and proper" in its Amended Complaint (D.I. 124 at 115) and in its Statement of Intended Proof contained in the Joint Pretrial Order (D.I. 427-3 at Exhibit 12, ¶ 38).

AMERICAS 130196597

at *7 (Del. Ch. June 19, 2009). Delaware law does not limit the award of damages or equitable remedies in cases of antitrust violations. 6 Del. C. § 2108. The imposition of a constructive trust does not create a continuing relationship between the beneficiary and the trustee. *Hogg*, 622 A.2d at 652. A constructive trustee's only duty is to transfer formal legal title to the property to the equitable owner. *Id.* The duty to transfer the property relates back to the date of the wrongful act that created the constructive trust. *Id.*

The constructive trust remedy is well-suited to remedy harms caused by intentional interference with business relations and other torts. *Halperin v. Moreno (In re Green Energy Servs.)*, 610 B.R. 760, 765 (D. Del. 2019). This Court and the Third Circuit have approved of the entry of a constructive trust in tortious interference cases. *See Halperin*, 834 Fed. App'x at 698. In *Halperin*, this district's bankruptcy court found the defendants liable for tortious interference with contract and recommended the imposition of a constructive trust as a remedy. *Halperin*, 610 B.R. at 777. This Court agreed and imposed the constructive trust despite the defendants' argument that a constructive trust may only be imposed in cases of unjust enrichment, fraud, and breach of fiduciary duty. *Id.* at 777. The Third Circuit affirmed this Court's award of a constructive trust. *Halperin*, 834 Fed. App'x at 698.

Delaware state courts have also imposed a constructive trust where a defendant sells a competitive product in unjust circumstances. *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 576 (Del. Ch. 1998). In *Cantor Fitzgerald*, the plaintiff sued alleging that the defendants, who previously worked with the plaintiff, intended to sell a product to compete directly against the plaintiff. *Id.* The plaintiff brought numerous claims, including tortious interference. *Id.* The Court of Chancery found it reasonably likely that the plaintiff would prove that the defendants cannot retain any benefit resulting from the competitive product justifiably or in accordance with fundamental principles of justice and equity. *Id.* at 586. Thus, the court allowed the plaintiff to pursue a constructive trust as a remedy. *Id.* at 574.

28

To provide complete relief that accounts for Amgen's unjust enrichment achieved through its tortious and unconscionable conduct, a constructive trust should grant Regeneron an equitable property interest in the future profits that Amgen will derive from its misconduct based on Repatha sales until there is once again a level playing field. *See Enhabit, Inc. v. Nautic Partners IX, L.P.*, 2024 WL 4929729, at *14, 41 (Del. Ch. Dec. 2, 2024) (imposing constructive trust whereby plaintiffs could receive an "equitable payment stream" of 43% of future profits, paid quarterly, and 43% of the exit proceeds should the asset be sold); *Snepp v. United States*, 444 U.S. 507, 508 (1980) (constructive trust over "all profits that Snepp might earn from publishing the book in violation of his fiduciary obligations").

The equitable amount of the constructive trust here would be 35% (Regeneron's share of the market prior to Amgen's tortious misconduct) of Amgen's net proceeds from Repatha sales minus Regeneron's then-existing share of the PCSK9i market, measured on an annual basis. For example, if Amgen's net proceeds for FY2026 equal $100 million and Regeneron has a 10% market share, Regeneron would be entitled to an equitable payment of $25 million. The constructive trust should remain in place until Regeneron achieves a 35% market share for four consecutive quarters. Those funds would serve to deprive Amgen of its unjust enrichment and could be used for corrective marketing to restore Praulent's position in the market.

Moreover, Regeneron respectfully requests that the Court also impose a constructive trust on the profits that Amgen unjustly achieved through its anti-competitive bundling scheme to rectify Amgen's past unjust enrichment at Regeneron's expense. Plaintiff has established with clear and convincing evidence that Amgen's unconscionable misconduct resulted in its unjust enrichment. D.I. 479, Jury Verdict Form at 5.

Any profits Amgen obtained as a result of its unlawful actions should be placed in trust for and paid over to Regeneron. Regeneron respectfully submits that the most equitable manner in which to determine that amount is to apply the *status quo ante* conditions to Amgen's sales

29

of Repatha after it first engaged in its unlawful conduct at each PBM. That is, the profit margins—or stated differently, the net sales—on Repatha that Amgen enjoyed before the advent of its scheme would be applied to all Repatha sales that occurred under the scheme's influence. That amount would then be multiplied by Praluent's market share prior to the scheme, less its current market share. In that way, Amgen's unjust enrichment at Regeneron's expense would be fully captured.

The trial record contains evidence sufficient for the Court to impose a constructive trust without the need for an additional evidentiary hearing. Specifically, the evidence that Amgen introduced at trial established that Amgen's pre-scheme profit margin based on the cost of making Repatha was ███.[65] Its U.S. sales of Repatha under the scheme's influence have totaled at least $3.1 billion as of December 31, 2024. PTX-1006.072; PTX-624.067. And Praluent's pre-scheme market share was roughly 35-40% while its post-scheme market share was less than 10%.[66] Applying that evidence to the above formula results in a constructive trust amount, as of December 31, 2024, of $███ million, (*i.e.* Repatha sales x Repatha profit margin x the stolen market share = $3.1 billion x ███ x 25% = ███ million).

## III.  REGENERON IS ENTITLED TO PREJUDGMENT INTEREST ON ITS TORTIOUS INTERFERENCE, DONNELLY ACT, FEDERAL ANTITRUST, AND CARTWRIGHT ACT CLAIMS

The jury awarded Regeneron $135.6 million in compensatory damages for Amgen's violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, California's Cartwright Act, New York's Donnelly Act, and tortious interference. D.I. 479. But these damages "make [Regeneron] whole" *only* when paired with prejudgment interest. *Marcus v. PQ Corp.*, 458 F. App'x 207, 214 (3d Cir. 2012). "Prejudgment interest serves two purposes:

---

[65] *See* Trial Tr. Vol. III 567:16–568:16; DTX-1128; Amgen's Closing Demonstrative at DDX-5.17.

[66] *See* Trial Tr. Vol. III 507:9–508:1 (Marion McCourt). DTX-1378 at 18; DTX-1249; Trial Tr. Vol. II 280:10-23 (Dr. Len Schleifer); Trial Tr. Vol. VII 1872:16–1873:5 (Dr. Lauren Stiroh).

AMERICAS 130196597

first, it compensates the plaintiff for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim." *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011). Given these dual purposes, there is "a strong presumption in favor of awarding prejudgment interest." *Marcus*, 458 F. App'x at 214.

For the reasons discussed below, Regeneron respectfully requests that the Court award prejudgment interest in the amounts identified for each of its respective claims. By moving for prejudgment interest on the particular claims, Regeneron does not elect any specific remedy, nor does it waive its right to elect an appropriate remedy following the resolution of all post-trial motions and subject to modification following the outcome of any appeal. *See* D.I. 489, Joint Letter to Honorable Jennifer L. Hall Regarding Proposed Judgment Following Jury Verdict. Regeneron has provided calculations of prejudgment interest through the date of the Judgment Following Jury Verdict (D.I. 490) in the table below.[67]

| Claim(s) | Prejudgment Interest Amount[68] |
| --- | --- |
| Tortious Interference | $31.1 million |
| Donnelly Act | $22.2 million |
| Sherman and Clayton Acts | $16.4 million |
| Cartwright Act | $45.2 million |

## A. Regeneron Is Entitled To Prejudgment Interest On Its Tortious Interference Claim Under Delaware Law

Because Regeneron's tortious interference claim is governed by Delaware law,

---

[67] The prejudgment interest amounts are also subject to post-judgment interest under 28 U.S.C. § 1961. Post-judgment interest began to accrue on June 2, 2025 (the date of the Judgment Following Jury Verdict) and continues until the judgment is satisfied. D.I. 490, Judgment Following Jury Verdict at ¶ 5. For the avoidance of doubt, the principal forming the basis of post-judgment interest includes the sum of the entire award, including prejudgment interest. *See Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 452 (D. Del. 2023) (awarding post-judgment interest for the *entire* amount of judgment, including prejudgment interest).

[68] All prejudgment calculations are based on the $135.6 million compensatory damage awards. Further explanations of the calculations for each claim are below and in Appendix 1 ("Appx. 1") attached hereto.

31

"[Delaware] law also governs the availability of prejudgment interest" on that claim. *In re Mortg. Lenders Network USA, Inc.*, 406 B.R. 213, 247 (Bankr. D. Del. 2009). Delaware law awards prejudgment interest as a matter of right. *See, e.g.*, *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992). It "is not a matter of judicial discretion." *Fortis Advisors, LLC v. Dematic Corp.*, 2023 WL 2967781, at *1 (Del. Super. Ct. Apr. 13, 2023). Tortious interference claims are no exception. *See, e.g.*, *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 620 (Del. Ch. 2010) (awarding prejudgment interest on tortious interference claim); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *30 (Del. Ch. Jan. 29, 2010) (same).

### 1. *Regeneron is entitled to interest at 5% above the Federal Reserve discount rate, updated and compounded quarterly*

Delaware applies a statutory interest rate of 5% over the Federal Reserve discount rate. 6 Del. C. § 2301(a). While a prevailing party's entitlement to prejudgment interest on a tortious interference claim is a matter of right, courts have "broad discretion" to determine whether the interest rate should be variable—*i.e.*, to account for fluctuating interest rates over the damages period—and how often interest should be subject to compounding. *See, e.g.*, *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 909 (Del. Ch. 1999) (holding courts "[have] broad discretion, subject to principles of fairness, in fixing the [interest] rate to be applied [under Delaware law]." (quotations omitted)). In particular, Delaware law recognizes that when the applicable interest rate fluctuates during the accrual period, "a calculation based on variable interest rates [is] the more accurate method to accomplish [the] purpose" of prejudgment interest, *i.e.*, "to fully compensate a plaintiff for loss sustained by virtue of a defendant unjustly retaining what rightfully belongs to the plaintiff[.]" *McGlothlin v. Petrunich Oral & Maxillofacial Surgery*, 2023 WL 5747520, at *9 (Del. Super. Ct. Sept. 6, 2023); *Williams Companies, Inc. v. Energy Transfer LP*, 2022 WL 3650176, at *6 (Del. Ch. Aug. 25, 2022) ("It is . . . hard[ ] to imagine a corporation today that would seek simple interest on the funds it holds." (quotations omitted)). And Delaware courts routinely hold that prejudgment interest

32

should be "compounded quarterly," *InterMune, Inc.*, 2024 WL 3619692, at *19 (Del. Ch. Aug. 1, 2024), as "a more accurate means of measuring the time value of money." *CertiSign Holding, Inc. v. Kulikovsky*, 2018 WL 2938311, at *29 (Del. Ch. June 7, 2018).[69]

This is particularly true where the plaintiff is a sophisticated business entity. *Williams Companies, Inc.*, 2022 WL 3650176, at *6 ("In the context of sophisticated commercial parties, [c]ompanies neither borrow nor lend at simple interest rates. Instead, compound interest more accurately reflects the fundamental economic reality that [c]ompound interest is the standard form of interest in the financial market."); *Est. of Berland by Gilman v. Lavastone Cap. LLC*, 2022 WL 17084121, at *1 (D. Del. Nov. 18, 2022) ("[F]or a sophisticated commercial entity like [defendant], complex interest is more appropriate" than simple interest under Delaware law); *Miller v. Trimont Glob. Real Est. Advisors LLC*, 587 F. Supp. 3d 170, 200 (D. Del. 2022) (compound interest "is a more accurate means of measuring the time value of money" under Delaware law (quotations omitted)); *Moose Agric. LLC*, 639 F. Supp. 3d at 1157 (awarding prejudgment interest compounding quarterly under Delaware law "[b]ecause the parties here are sophisticated corporations engaged in an industrial-scale contract, and because plaintiffs have produced substantial evidence demonstrating the inequitable impacts of the delay in payment" and further explaining that this is "consistent with most other courts' approaches"); *Est. of Daher v. LSH CO*, 2024 WL 3571642, at *7 (C.D. Cal. July 23, 2024) ("Pursuant to 6 Del. C. § 2301, for suits against sophisticated commercial entities, such as Wells Fargo, Delaware courts award prejudgment interest at a rate of 5% over the federal discount rate on the date that interest is due, with that interest compounding quarterly.").

---

[69] Other courts have gone further and compounded interest *monthly*. *See, e.g.*, *Moose Agric. LLC v. Layn USA, Inc.*, 639 F. Supp. 3d 1150, 1156-57 (D. Colo. 2022) (applying Delaware law and collecting monthly and quarterly compounding interest cases).

33

The Court should therefore use the variable interest rate, updated and compounded quarterly. The lost time value of money for a sophisticated company like Regeneron is particularly acute, because Regeneron is constantly reinvesting capital in research and innovation.[70] Regeneron is a "very productive research organization" that allocates significant investment in developing new lifesaving drugs.[71] Regeneron "spen[ds] one of the highest fractions of [its] revenues on research [and development] in the entire industry."[72] Given Regeneron's financial "sophisticat[ion]," "compound interest is appropriate here because it more accurately reflects the economic realities of the parties." *Williams Companies, Inc.*, 2022 WL 3650176, at *6 (awarding prejudgment interest compounding quarterly, since plaintiff "has been without the use of *its* money.").

### 2. Regeneron is entitled to prejudgment interest beginning with the date of harm

"An award of prejudgment interest generally relates back to the date of the loss or injury[.]" *FlowShare, LLC v. GeoResults, Inc.*, 2020 WL 1921019, at *25 (Del. Super. Ct. Apr. 9, 2020). Here, Regeneron's damages consisted of $135.6 million in lost profits calculated by Dr. Divya Mathur.[73] The harm began to run from Amgen's first instance of anticompetitive conduct in its negotiations at ESI at the time Amgen's anticompetitive bundle took effect at ESI in Q1 2021.[74] The evidence at trial showed that Regeneron suffered damages beginning in 2021 and continuing through 2025.[75] The Court should use the monthly damages accruals

---

[70] Trial Tr. Vol. II 239:6-15 (Dr. Len Schleifer).

[71] *Id.* at 195:10-23 (Dr. Len Schleifer).

[72] *Id.*

[73] Trial Tr. Vol. V 1128:18-20 ("I calculate[d] the damages or the lost profits associated with the harm that Regeneron suffered as a result of Amgen's strategy."); *id.* at 1131:8-10 ("Based on my analysis, Regeneron suffered damages in the form of lost profits from these categories of harm in an amount ranging from $85.2 million up to $135.6 million.").

[74] *See* Trial Tr. Vol. IV 981:9–982:5 (Prof. Fiona Scott Morton); Trial Tr. Vol. V 1133:20–1134:12 (Dr. Divya Mathur).

[75] Trial Tr. Vol. V 1129:16-1130:10; 1133:15–1134:12 (Dr. Divya Mathur); *id.* at 1138:21–1139:5; *see, e.g.*, PDX-003.010; PDX-003.015. The methodology used to calculate the damages amount presented to the jury was included in Dr. Mathur's Report and did not include calculation of prejudgment interest. *See* D. Mathur Opening Report at ¶ 75 (explaining

34

calculated by Dr. Mathur's as the basis for Regeneron's prejudgment interest.[76] *See, e.g.,* *Beard*, 8 A.3dat 620 (finding defendants liable for tortious interference and setting separate accrual dates for 2004 and 2005 lost cash flow); *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *28 (Del. Ch. July 24, 2013) (awarding prejudgment interest compounded quarterly on lost profits award: "The damages from December 2008 shall begin accruing interest as of January 1, 2009, the damages attributable to the year 2009 shall accrue interest as of July 1, 2009, and the damages attributable to 2010 shall accrue interest as of July 1, 2010."); *CFLP v. Cantor*, 2003 WL 21488707, at *1-3 (Del. Ch. June 19, 2003) ("[T]he fair triggering dates are those when [plaintiff] lost the use of its funds"); *see also Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 397-98 (3d Cir. 2016) (holding the district court abused its discretion in denying prejudgment interest because of the "difficulty in calculating prejudgment interest" due to "separate infringements" occurring "on different dates" with "different . . . interest rates"). This approach also ensures that Regeneron receives interest on the lost profits *as the damages accrued.*

>    3. **Regeneron is entitled to $31.1 million in prejudgment interest on its tortious interference claim.**

The Court entered the Judgment Following Jury Verdict on June 2, 2025. Using the above approach (accruing damages on a quarterly basis and compounding quarterly using the variable rate updated quarterly) for the $135.6 million compensatory damages for Regeneron's tortious interference claim, Regeneron is entitled to prejudgment interest in the amount of $31.1 million as of June 2, 2025 for a total of $166.7 million. *See* Appx. 1 at 1-2; *see also In re*

---

calculation of lost profits and <u>not</u> accounting for interest on the damages); *Id.* at ¶ 128 n.238 ("At trial, I can calculate . . . [an] interest amount on past damages based on the appropriate interest rates."). The methodology for calculating monthly damages was disclosed to Amgen in Dr. Mathur's opening report in February 2024 and is contained in the backup data admitted at trial. *See* PTX-882, PTX-883, PTX-885, PTX-886, and PTX-988.

[76] For monthly damage accruals, see Appx. 1 at 7-8.

AMERICAS 130196597

*Mobilactive Media, LLC*, 2013 WL 297950, at *27 (Del. Ch. Jan. 25, 2013) (awarding prejudgment interest from the date of harm "to the date of judgment").

> 4. *In the alternative, Regeneron is entitled to $45.3 million in prejudgment interest running from the date of the Complaint*

However, if the date of harm approach is too complicated given the ongoing harm from 2021 through 2025, the Court may apply the date the Complaint was filed in the alternative. Delaware courts have held that "[i]n the absence of proof sufficient to ascertain" the date or dates of the injury "with some reasonable degree of certainty," "prejudgment interest should begin to accrue" on the "date the . . . complaint was filed[.]" *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071, at *22 (Del. Super. Ct. Apr. 6, 1988); *Raymond v. Bd. of Pub. Works of Lewes*, 1990 WL 63829, at *1 n.1 (Del. Super. Ct. May 8, 1990) ("Where there is confusion as to the date from which the prejudgment runs, the Court, in its discretion, may choose the date.").[77] Accordingly, the Court may use the date the Complaint was filed, May 27, 2022. Using the date of the Complaint, Regeneron is entitled to $45.3 million as of June 2, 2025 for a total of $180.9 million in compensatory damages and prejudgment interest. *See* Appx. 1 at 3.

## B. Regeneron Is Entitled To Prejudgment Interest On Its Donnelly Act Claim Under New York Law

Like Delaware, New York also provides prejudgment interest as a statutory right when damages are awarded "because of an act or omission" that "depriv[es] or otherwise interfer[es] with title to, or possession or enjoyment of, property[.]" *See* N.Y. C.P.L.R. § 5001(a)-(b). This encompasses damages for lost profits. *See, e.g.*, *BVE Prods., Inc. v. Saar Co., LLC*, 835 N.Y.S.2d 555, 556 (App. Div. 1st Dep't 2007) (collecting cases) ("[P]rejudgment interest has

---

[77] *See Esprit Health, LLC v. Univ. of Delaware*, 2015 WL 9305644, at *2 (D. Del. Dec. 21, 2015) (Andrews, J.) (court may "award Plaintiff pre-judgment interest accruing from the date its Complaint was filed" if the appropriate date of harm is "not clear"); *F.E. Myers Co. a Div. of McNeil Corp. v. Pipe Maint. Servs., Inc.*, 599 F. Supp. 697, 705 (D. Del. 1984) ("[I]t is impossible for this Court to determine exactly when the breach occurred. As a result, the Court, in the exercise of its discretion, has chosen the date the complaint was filed[.]").

AMERICAS 130196597

been awarded for damages based on lost profits."); *see also Lizden Indus., Inc. v. Franco Belli Plumbing & Heating & Sons, Inc.*, 95 A.D.3d 738, 739 (App. Div. 1st Dep't 2012) (upholding award of prejudgment interest on an award for lost profits pursuant to N.Y. C.P.L.R. 5001); *Cortazar v. Cortazar*, 2019 WL 2554627, at *6, 10-11 (N.Y. Sup. Ct. June 7, 2019).

That the Donnelly Act is silent on prejudgment interest does not preclude Regeneron's recovery because New York law separately provides for this relief. New York's statute on prejudgment interest broadly defines "*[a]ctions* in which [interest is] recoverable" and states in mandatory language that interest "*shall* be recovered." N.Y. C.P.L.R. § 5001(a) (emphasis added); *see also* David D. Siegel, NEW YORK PRACTICE §§ 411-12 (Patrick M. Connors ed., 6th ed. 2024) ("All actions for money seeking in essence to recover for property loss, whether sounding in contract or tort, get interest as a matter of right."). And New York's highest court has recognized that "where a statute does not specifically list interest as recoverable, interest may be available where a statute's legislative intent is to make its victims whole and its language does not limit the recovery available." *Tipaldo v. Lynn*, 26 N.Y.3d 204, 213 (2015). That is the case here. *See Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 214 (2007) (compensatory award under the Donnelly Act "unquestionably compensates a plaintiff for actual damage").

Regeneron suffered lost profits in the amount of $135.6 million. These damages unquestionably fall within the definition of N.Y. C.P.L.R. § 5001. Accordingly, Regeneron is entitled to prejudgment interest on its Donnelly Act lost profits damages. *See Carl Wagner & Sons v. Appendagez, Inc.*, 485 F. Supp. 762 (S.D.N.Y. 1980) (finding defendant violated the Donnelly Act, awarding prejudgment interest, and trebling damages).

### 1. Regeneron is entitled to prejudgment interest on its Donnelly Act claim at an annual rate of 9%

New York law also provides for 9% interest "per annum" by statute. N.Y. C.P.L.R. § 5004(a). The statutory rate is not discretionary. *Urban v. B.R. Guest, Inc.*, 845 N.Y.S.2d 584, 584-85 (4th Dep't 2007) (court "did not have discretion to impose a different rate of interest").

37

### 2. *Regeneron is entitled to $22.2 million in prejudgment interest*

New York law provides that "interest upon damages incurred . . . shall be computed from the date incurred." N.Y. C.P.L.R. § 5001(b). For the same reasons discussed in Section III.A.2 above, the Court should use the ongoing damages accrual methodology employed by Dr. Mathur as the basis for Regeneron's prejudgment interest. Under that analysis, Regeneron is entitled to $22.2 million in prejudgment interest for its Donnelly Act claim, for a total of $157.8 million as of June 2, 2025. *See* Appx. 1 at 4.

### 3  *In the alternative, Regeneron is entitled to $40.3 million in prejudgment interest running from the date of the Complaint*

As with Regeneron's tortious interference claim, the Court can identify a "reasonable intermediate date" for setting the accrual date if the date of harm is too difficult to administer. N.Y. C.P.L.R. § 5001(b). As numerous New York Courts have recognized in analogous cases, the date of the Complaint is an appropriate intermediate date in cases where the damages were ongoing. *See, e.g.*, *Gelco Builders & Burjay Constr. Corp. v Simpson Factors Corp.*, 301 N.Y.S.2d 728, 730-31 (N.Y. Sup. Ct. 1969) (finding the date of the commencement of the action to be an appropriate date for the calculation of interest when it could not "be determined on what dates the various elements of damage found by the jury were incurred.").[78] Using the date of the Complaint (May 27, 2022), Regeneron is entitled to $40.3 million in prejudgment interest under the Donnelly Act, for a total of $175.9 million as of June 2, 2025. Appx. 1 at 4.

---

[78] *See also Ramnarain v. City of New York*, 474 F. Supp. 2d 443, 447 (E.D.N.Y. 2007) (same (collecting cases)); *Delulio v. 320-57 Corp.*, 99 A.D.2d 253, 255 (N.Y. App. Div. 1st Dep't 1984) (finding that when fixing a single reasonable intermediate date would require conjecture, "the appropriate date from which to compute interest is the date of commencement of the damage action."); *New York City Housing Authority v. Spectrum Contracting Group, Inc.*, 2014 WL 912261, at *2-3 (N.Y. Sup. Ct. Mar. 06, 2014) (same).

AMERICAS 130196597

## C. The Court Should Award Regeneron Prejudgment Interest For At Least One Year On Its Federal Antitrust And Cartwright Act Claims

Regeneron is also entitled to prejudgment interest on its federal and Cartwright Act claims because Amgen delayed this litigation by moving to dismiss based on specious arguments and misrepresentations to the Court. Clayton Act Section 4 and the Cartwright Act both provide that a court may award prejudgment interest "if the court finds that the award of such interest . . . is just in the circumstances." 15 U.S.C. § 15(a); Cal. Bus. & Prof. Code § 16761. "[T]he purpose of this provision is to punish unreasonable delays" and to "discourage opportunistic behavior designed to delay the proceedings." Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 393 (4th ed. 2017).

In determining whether to award prejudgment interest under these statutes, courts consider whether the parties: (1) "made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith," (2) "violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings," and (3) "engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof." *Id.* at n.5; 15 U.S.C. § 15. Congress amended the Sherman Act specifically to allow prejudgment interest. Congress explained that "in some cases, an antitrust plaintiff . . . cannot really be made whole unless fully compensated by the payment of prejudgment interest running from the date of the complaint to the date of judgment." H.R. Rep. No. 96-875, at 60 (1980); *see also id.* at 62 (one of the purposes of the amendment is "to provide the appropriate compensation and interest thereon to the plaintiff in pursuit of an award of damages."). In sum, a defendant is liable for prejudgment interest under federal antitrust laws and the Cartwright Act upon "a finding of bad faith . . . causing a material delay in the adjudication of the dispute." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 435-36 (2d Cir. 2007).

Amgen's conduct during the course of this litigation meets that standard. From the

39

outset, Amgen obscured the facts surrounding its bundling activities, including in misrepresentations to this Court. Amgen's motion to dismiss—which delayed this litigation by over a year—was based on spurious assertions and arguments that are "so lacking in merit as to show . . . bad faith." 15 U.S.C. § 15(a); Cal. Bus. & Prof. Code § 16761. Amgen advanced positions that Amgen knew, or should have known based on a reasonable investigation of its conduct, were not accurate. And if Amgen had been successful, this Court and jury would have been prevented from scrutinizing Amgen's conduct based on the actual evidence in this case.

*First*, Amgen predicated its motion to dismiss on certain unredacted portions of *Amgen's* contracts with ESI Commercial and Optum/UHC Commercial that Amgen submitted with its motion. *See* D.I. 18 ("MTD Br.") at 6-8, 12, 15-17, 19, 22; D.I. 40 ("MTD Reply Br.") at 2-5, 7-10, 12; D.I. 49 ("MTD R&R") at 10 ("Once Amgen's extra-Complaint documents are removed from the analysis, most of its arguments fall away, as the documents are repeatedly referenced throughout Amgen's briefing."). Amgen did so despite its clear understanding that its own contracts were not pleaded or incorporated in the Complaint, nor could they be. *See* MTD Br. at 9. Amgen also knew that Regeneron had no access to those confidential contracts, *see* MTD Reply Br. at 2-3, which meant that Regeneron could not have (1) relied on those contracts in the Complaint, (2) omitted those contracts from the Complaint, or (3) confirmed those contracts' authenticity. Even the minimal diligence would have revealed that, under these circumstances, this Court could not dismiss this case on the authority of the contracts Amgen submitted. *See* MTD R&R at 8-9 (citing *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014), and *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 328 (E.D. Pa. 2020)); D.I. 62, MTD Order at 1 ("I completely agree that Amgen's purported contracts with third-party payors are not the sort of extrinsic evidence that I can consider on a motion to dismiss.").

Amgen's motion did not allow Regeneron to "test [Amgen's] contention" that the contracts Amgen supplied represented "its entire agreement[s] with" Optum or ESI

40

Commercial. MTD R&R at 9. Amgen filed only heavily redacted versions of these contracts, *see* D.I. 19 and 19-1 ("MTD Decl."), providing nothing but its word that the contracts it filed represented the extent of its agreements with PBMs. Discovery and trial revealed this was false.

 *Second*, Amgen misrepresented the nature of its agreements with ESI Commercial and Optum/UHC Commercial. Amgen repeatedly argued, based solely on its contract, that the Complaint must be dismissed because "no Otezla® rebates at all are conditioned on Repatha® coverage." MTD Br. at 17; *see also id.* at 3-4 ("Amgen does not condition *any* discounts for Otezla® on . . . covering Repatha®."); *id.* at 7 ("Amgen does not condition Otezla® rebates on ESI Commercial or Optum Commercial favorably covering Repatha®."); *id.* at 19 ("Amgen does *not* condition Otezla® rebates on Repatha® coverage.") (emphasis in original); *id.* at 22 ("Amgen does not condition Otezla® rebates on Repatha® coverage."); MTD Reply Br. 2 ("[N]o Otezla® rebates are conditioned on Repatha® coverage."); *id.* at 8 ("Amgen's contracts, however, show that it offers no such rebates on Otezla®."); *id.* at 10 ("Amgen *does not* condition Otezla® rebates on Repatha® formulary coverage."); *id.* at 12 (discussing "nonexistent Otezla® rebates."); D.I. 54 ("R&R Objs.") 10 (asserting that Amgen's "agreements show no Otezla® bundling"). All false. And Amgen knew it.

 The full scope of Amgen's agreement with ESI Commercial (not limited to the contract, as reflected in numerous contemporaneous documents) explicitly provided that Amgen's bundled-rebate agreement with ESI Commercial "extend[ed] Enbrel *& Otezla* year-over-year rebate value significantly . . . *to support the Repatha 1 of 1*." PTX-1004. Amgen executives discussed how Amgen was "leveraging *Otezla* and Enbrel" to secure Repatha exclusivity at ESI Commercial. PTX-315. That is also how Amgen reported the bundle to the federal government. *See* PTX-811. Further, ESI Commercial's internal analysis also confirmed that Amgen threatened to withhold rebates on Otezla if Repatha was not exclusive. *See* PTX-318.

 Amgen also repeatedly stressed in its motion that dismissal was required because its

AMERICAS 130196597

bundled-rebate agreement with Optum/UHC Commercial did not "result[] in exclusivity" for Repatha®. R&R Objs. at 10; MTD Br. at 3 ("Regeneron's allegations of exclusivity for Amgen's contract with Optum Commercial are belied by the contract itself."); *id.* at 11 ("Regeneron [] fails to allege Amgen's agreements with . . . Optum Commercial are exclusive or *de facto* exclusive."); *id.* at 12 ("Regeneron's speculation" "that Amgen's agreement with Optum Commercial conditions a[] rebate on Repatha® exclusivity . . . is incorrect"); *id.* at 14 ("Amgen's agreements with … Optum Commercial do *not* provide for a bundled rebate for exclusive coverage of Repatha."); MTD Reply Br. at 7 ("The plain terms of the Optum Commercial agreement do not condition the Enbrel® Portfolio Rebate on Repatha® exclusivity."). That was another misrepresentation, or, at best, a materially disingenuous half-truth. As Regeneron showed at trial, Amgen's contemporaneous documents show that it knew "all along" that, despite papering the rebates as allowing for 1:2 Repatha coverage, its Optum/UHC Commercial "Enbrel deal" entailed that "Praluent will be excluded" from UHC Commercial's formulary. PTX-527. Amgen's lead negotiator reported internally that once UHC "accept[ed]" Amgen's "offers on Enbrel and Repatha" UHC would "prefer Repatha 1:1" and "exclud[e] Praluent," and that UHC announced this change to all prescribers three months in advance of the effective date of its contract with Amgen. PTX-536.[79] This was consistent with Amgen's messaging to UHC that its "strategy is to lock out Regeneron." PTX-270.

Amgen's contract with Optum/UHC Commercial also demonstrates that Amgen knew that UHC Commercial would cover Repatha exclusively. As Heather Bates testified, she had never before seen a pharmaceutical company provide the same rebates for 1:1 and 1:2 coverage, and the fact that the Amgen-Optum/UHC Commercial contract was written in that manner "doesn't make any sense" unless understood as an effort to disguise a 1:1 Repatha deal in the

---

[79] *See also* Trial Tr. Vol. V 1364:24–1366:24 (Adam Grennan).

AMERICAS 130196597

wake of Regeneron's cease and desist letter warning Amgen to stop offering bundled rebates.[80]

This is bad faith. Amgen's motion was premised on patently improper evidence and demonstrable and knowing falsehoods. Amgen's bad faith motion to dismiss, moreover, "caus[ed] a material delay in the adjudication of th[is] dispute." *Masters*, 473 F.3d at 436. The motion to dismiss and motion to stay delayed this Court's entry of a Scheduling Order by approximately eight months. Ordinarily, this Court would have entered a scheduling order by August 12, 2022, 60 days after Amgen's appearance. *See* D.I. 6; Fed. R. Civ. P. 16(a)(2). But, after Amgen filed its bad faith motion to dismiss on August 1, 2022, it asked this Court to postpone entering a scheduling order and to stay discovery until after its motion was decided. *See* D.I. 29 at 5. Though the Court never formally granted either request, it did not issue a Scheduling Order until April 12, 2023, after it recommended denying Amgen's motion to dismiss. *See* D.I. 67. This resulted in a further delay to discovery and ultimately the trial date.

Amgen delayed litigation further by seeking a protracted two-phase discovery process, under the guise that it "offer[ed] significant efficiencies and an opportunity to streamline the case," hinging on Amgen's insistence that its contracts "did not contain any bundled discounts for Otezla®." D.I. 59 at 3 (emphasis in original); *see also* Apr. 4, 2023 Tr. 7:15-16 ("[A]ll of the contracts and all of the emails will show that there is no Otezla bundling"). Based on this premise, Amgen sought to truncate discovery to just contracts and stay or resolve the case in its favor without full discovery. *See* Apr. 4, 2023 Tr. 11:20-22 ("Your Honor would be able to decide it based on a small stack of contracts, so why are we going to multiply discovery by a thousand for all of these extra materials that are not needed?").

Amgen then used the phased schedule to shield itself from discovery from other than a small subset of custodians. Amgen initially refused to produce documents from other than just

---

[80] *Id.* at 1083:18–1086:4.

AMERICAS 130196597

four custodians (Tom Moore, Kave Niksefat, Adam Grennan, and Billy West). *See* D.I.s 99, 105. Regeneron had to file a series of letter motions to overcome Amgen's objections and to expand the number of document custodians and deposition witnesses up to Amgen's CEO, Bob Bradway. *See* D.I.s 105, 169, 213. Amgen achieved delay by dribbling out pieces of an artificial record only to force Regeneron to have to seek Court intervention to get what the full scope of evidence it was entitled to. The Court then ordered Amgen to produce documents from three additional custodians. D.I. 109; June 13, 2023 Tr. 50:9-17.

Under the Scheduling Order, Amgen was permitted to seek leave to file summary judgment at the end of the first phase of discovery but would not be able to move for summary judgment again in the case without leave of Court. D.I. 66 ¶ 11. Amgen ignored the Court's order and instead sought leave "only if the Court is willing to confirm that, if the case continues, the Court would permit Amgen to move for summary judgment on the full record." D.I. 136 at 1. Amgen also abandoned its entire premise for seeking phased discovery—resolving the case based on a "small stack of contracts"—and instead, requested summary judgment and a stay of discovery based on a new theory of substantial foreclosure, D.I. 136, which was outside the scope of the first phase of discovery Amgen insisted on. D.I. 141. Amgen's impudent bait-and-switch made clear that Amgen's goal was never efficiency, but rather, delay and misdirection. Combined, Amgen's dilatory and bad faith tactics led to a delay of at least thirteen months.

An award of prejudgment interest on its federal and Cartwright Act claims "is just in the[se] circumstances." 15 U.S.C. § 15(a); Cal. Bus. & Prof. Code § 16761; *see Masters*, 473 F.3d at 436. This Court may award such interest "for the period beginning on the date of service of [Regeneron's] pleading . . . and ending on the date of judgment, or for any shorter period therein." 15 U.S.C. § 15(a); *accord* Cal. Bus. & Prof. Code § 16761. Interest should accrue from the date of Complaint, May 27, 2022, or, at the very least, from the date thirteen months prior to this Court's entry of its judgment, to account for the delays described above.

44

As for the interest rate, the Cartwright Act provides for a "rate of 10 percent per annum." Cal. Bus. & Prof. Code § 16761. The Clayton Act provides for "simple interest" and is silent on the specific rate. 15 U.S.C. § 15(a). Given the statutory silence, this Court should apply the baseline rule that "[i]n federal question cases, the rate of prejudgment interest is committed to the discretion of the district court." *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986). As this Court and many others have held, the prime rate is the appropriate rate for federal prejudgment interest. *See Michael Grecco Prods., Inc v. GlowImages, Inc*., 2020 WL 1866172, at *4 (D. Del. Apr. 6, 2020) (Hall, J.) (using the "U.S. prime rate" to calculate prejudgment interest), *report and recommendation adopted*, 2020 WL 1866000 (D. Del. Apr. 14, 2020); *Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996) (same); *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 363 (D. Del. 2018) (same). Here, the prime interest was 4.0% in May 2022 and 8.5% in May 2024 (thirteen months prior to the date of entry of the Judgment Following Jury Verdict). As of June 2, 2025, for the federal claims, this results in either $16.4 million or $12.5 million in prejudgment interest (running from the complaint or the thirteen-month delay respectively). And for the Cartwright Act, Regeneron is entitled to $45.2 million, or if the Court limits the period to the thirteen-month delay, $14.8 million, each amount calculated as of June 2, 2025. *See* Appx. 1 at 5-6.

## CONCLUSION

For all the above reasons, the Court should grant Regeneron's motion for 1) Permanent Injunctive Relief; 2) Constructive Trust; 3) Prejudgment Interest.

45

Dated: June 12, 2025

WHITE & CASE LLP
Jonathan D. Polkes
Adam B. Banks
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8301


ORRICK, HERRINGTON
& SUTCLIFFE LLP
Eric S. Hochstadt
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5282


WEIL, GOTSHAL & MANGES LLP
Michael R. Moiseyev
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000

Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

WILKS LAW LLC

*/s/ David E. Wilks*
David E. Wilks (Bar No. 2793)
Scott B. Czerwonka (Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Email: dwilks@wilks.law
Email: sczerwonka@wilks.law

*Attorneys for Regeneron Pharmaceuticals, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that a copy of *Plaintiff Regeneron Pharmaceuticals, Inc.'s Motion for 1) Permanent Injunctive Relief; 2) Constructive Trust; and 3) Prejudgment Interest and supporting documents* were caused to be served on June 12, 2025 upon the following counsel of record in the manner indicated below:

<u>**VIA ELECTRONIC MAIL**</u>
Young Conway Stragatt & Taylor, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Catherine Lynch (No. 7326)
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
Email: msharp@ycst.com
Email: jhiggins@ycst.com
Email: clynch@ycst.com

<u>**VIA ELECTRONIC MAIL**</u>
Gibson, Dunn & Crutcher LLP
Eric J. Stock
Ben A. Sherwood
Kate Wisher
New York, NY 10166-0193
Tel: (212) 351-4000
Email: estock@gibsondunn.com
Email: bsherwood@gibsondunn.com
Email: kswisher@gibsondunn.com

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
Email: sweissman@gibsondunn.com

Richard J. Doren
Samuel Liversidge
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7000
Email: rdoren@gibsondunn.com
Email: sliversidge@gibsondunn.com

Ashley E. Johnson
Betty X. Yang
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel: (214) 698-3100
Email: ajohnson@gibsondunn.com
Email: byang@gibsondunn.com

Courtney L. Spears
3161 Michelson Drive, Suite 1200
Irvine, CA 92612-4412
Tel: (949) 451-3817
Email: cspears@gibsondunn.com

*/s/ David E. Wilks*
David E. Wilks (Bar No. 2793)