IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REGENERON PHARMACEUTICALS, INC. | ) | C. A. No.:  22-00697-JLH |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | ▮▮▮▮▮▮▮▮▮▮ |
| AMGEN INC., | ) | |
| | ) | **REDACTED - PUBLIC VERSION** |
| Defendant. | ) | **FILED JUNE 20, 2025** |

**AMGEN, INC.'S OPENING BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Catherine E. Lynch (No. 7326)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
clynch@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Kate Swisher
Ben A. Sherwood
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Richard J. Doren
Samuel Liversidge
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Betty X. Yang
Ashley E. Johnson
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Courtney L. Spears
3161 Michelson Drive, Suite 1200
Irvine, CA  92612-4412
(949) 451-3800

*Attorneys for Amgen Inc.*

Dated: June 12, 2025

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

LEGAL STANDARD..............................................................................................................3

ARGUMENT .............................................................................................................................4

    I.    Amgen Is Entitled to Judgment as a Matter of Law or to a New Trial Because Regeneron Failed to Prove Damages...........................................................4

        A.    Insufficient Evidence Supports the Jury's Damages Award at CVS. ..........4

            1.    No Evidence Supports Regeneron's Claimed But-For Prices.........................................................................................................4

            2.    The Jury's CVS Damages Award Was Inconsistent with the Evidence..................................................................................................7

        B.    Insufficient Evidence Supports the Jury's Damages Award at Ascent/ESI. ...................................................................................................10

        C.    Insufficient Evidence Supports the Jury's Damages Award at Optum/UHC. .................................................................................................11

        D.    The Damages Award Failed to Account for Avoided Operating Expenditures. ...............................................................................................12

    II.    Amgen Is Entitled To Judgment as a Matter of Law or a New Trial on Regeneron's Antitrust Claims..................................................................................13

        A.    Regeneron Offered Insufficient Evidence of Repatha Market Power. ..........................................................................................................13

            1.    Regeneron Failed To Offer Sufficient Evidence that Repatha and Praluent—Without Leqvio—Constitute a Relevant Product Market. ...............................................................14

            2.    Regeneron Failed To Adduce Circumstantial Evidence of Repatha's Market Power in a Relevant Market. ...........................17

        B.    Regeneron Offered Insufficient Evidence of Anticompetitive Conduct.........................................................................................................18

            1.    Regeneron Lacks Sufficient Evidence To Prevail on Any of Its Three Theories of Anticompetitive Conduct. ..........................18

i

2. The Insufficient Evidence of Substantial Foreclosure Independently Defeats Any Claim of Anticompetitive Conduct. ........................................................................30

3. Regeneron's Lack of Sufficient Evidence To Show that Enbrel Has Market Power Independently Precludes Anticompetitive Conduct. .............................................30

C. Regeneron Offered Insufficient Evidence of Harm to Competition. .........33

D. Regeneron Offered Insufficient Evidence of Antitrust Injury at CVS. ......................................................................................................35

III. Amgen Is Entitled to Judgment as a Matter of Law or a New Trial on Regeneron's Tortious Interference Claim. ..............................................................38

A. Regeneron Offered Insufficient Evidence of Any Prospective Business Relationship with which Amgen Interfered. ..............................38

B. The Insufficiency of Evidence for Regeneron's Antitrust Claims Dooms Its Tortious Interference Claim. ....................................................42

C. The Punitive Damages Award Should be Vacated. ...................................43

IV. Amgen Is Entitled To Judgment on the UCL Claim..............................................45

CONCLUSION.................................................................................................................45

## TABLE OF AUTHORITIES

### Cases

*In re Achaogen, Inc.*,
   649 B.R. 238 (Bankr. D. Del. 2023) .......................................................................................39

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
   561 F.3d 199 (3d Cir. 2009)............................................................................................41, 42

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
   51 F.3d 1191 (3d Cir. 1995)............................................................................................10, 19

*All Seasons Home Improvement Co. v. Arch Concept Constr., Inc.*,
   2018 WL 3928787 (D.N.J. Aug. 16, 2018) ............................................................................12

*Am. Bearing Co., Inc. v. Litton Indus., Inc.*,
   729 F.2d 943 (3d Cir. 1984)...................................................................................................31

*Anderson v. Wachovia Mortg. Corp.*,
   497 F. Supp. 2d 572 (D. Del. 2007).......................................................................................40

*Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*,
   414 F. App'x 334 (2d Cir. 2011) ............................................................................................21

*Atl. Richfield Co. v. USA Petrol. Co.*,
   495 U.S. 328 (1990)................................................................................................................35

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ...............................................................................................36

*Barry Wright Corp. v. ITT Grinnell Corp.*,
   724 F.2d 227 (1st Cir. 1983)..................................................................................................23

*BCD LLC v. BMW Mfg.*,
   360 F. App'x 428 (4th Cir. 2010) ...............................................................................39, 40, 41

*Benjamin v. Peter's Farm Condo. Owners Ass'n*,
   820 F.2d 640 (3d Cir. 1987)....................................................................................................7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)...........................................................................................5, 6, 9, 19, 33

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)...............................................................................................35, 36, 37, 38

*Carney v. B&B Serv. Co.*,
   2019 WL 5579490 (Del. Super. Ct. Oct. 29, 2019) ...............................................................39

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) .................................................................................................37

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................................3

*CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*,
    499 F.3d 184,193 (3d Cir. 2007).................................................................................44

*Cnty. of Tuolumne v. Sonora Comm. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ....................................................................................13

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
    781 F.3d 264 (6th Cir. 2015) ......................................................................................31

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................................10, 11

*Conoco Inc. v. Inman Oil Co.*,
    774 F.2d 895 (8th Cir. 1985) ......................................................................................42

*Deaktor v. Fox Grocery Co.*,
    475 F.2d 1112 (3d Cir. 1973)......................................................................................12

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
    428 A.2d 1151 (Del. 1981) ....................................................................................42, 44

*DP-Tek, Inc. v. AT & T Glob. Info. Sols. Co.*,
    100 F.3d 828 (10th Cir. 1996) ....................................................................................42

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)...............................................................................................13, 16

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016)..............................................................15, 27, 33, 34, 35

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)..........................................................................................7

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ..............................................................23, 25, 26, 34

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
    243 F.3d 980 (6th Cir. 2001) ........................................................................................7

*Fed. Trade Comm'n v. Food Town Stores, Inc.*,
    539 F.2d 1339 (4th Cir. 1976) ....................................................................................16

*Garrison v. Mollers N. Am., Inc.*,
    820 F. Supp. 814 (D. Del. 1993)...................................................................................4

*Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    40 F.3d 63 (3d Cir. 1994).............................................................................................40

*Gumbs v. Int'l Harvester, Inc.*,
    718 F.2d 88 (3d Cir. 1983)............................................................................................7

iv

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
 423 F.3d 374 (3d Cir. 2005)................................................................................13, 14

*Hilton v. Children's Hosp. San Diego*,
 315 F. App'x 607 (9th Cir. 2008) ...............................................................................35

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
 962 F.3d 1015 (8th Cir. 2020) ...................................................................................31

*Intellectual Ventures I, LLC v. Motorola Mobility*,
 LLC, 72 F. Supp. 3d 496 (D. Del. 2014) .....................................................................3

*Jardel Co. v. Hughes*,
 523 A.2d 518 (Del. 1987) ..........................................................................43, 44, 45

*Jester v. Hutt*,
 937 F.3d 233 (3d Cir. 2019)...........................................................................................4

*KT4 Partners LLC v. Palantir Techs. Inc.*,
 2021 WL 2823567 (Del. Super. Ct. June 24, 2021) .................................................38

*LePage's, Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)......................................................................28, 31, 36

*In re Loestrin 24 Fe Antitrust Litig.*,
 261 F. Supp. 3d 307 (D.R.I. 2017)..............................................................................15

*Malcolm v. Little*,
 295 A.2d 711 (Del. 1972) ............................................................................................45

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986).............................................................................................9, 19

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
 708 F.2d 1081 (7th Cir. 1983) ...................................................................................19

*Menkes v. St. Lawrence Seaway Pilots' Assn.*,
 269 F. App'x 54 (2d Cir. 2008) ..................................................................................35

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*,
 877 F.2d 1333 (7th Cir. 1989) .....................................................................................6

*Morgan v. Ponder*,
 892 F.2d 1355 (8th Cir. 1989) ...................................................................................20

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
 838 F.3d 421 (3d Cir. 2016)................................................................15, 16, 31, 32

*Nat'l Reporting Co. v. Alderson Reporting Co., Inc.*,
 763 F.2d 1020 (8th Cir. 1985) ...................................................................................34

*In re NFL "Sunday Ticket" Antitrust Litig.*,
 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)............................................................5, 7

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ..................................................................................................33

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ..................................................................................................19

*Perkins v. Dean Mach. Co.*,
    132 S.W.3d 295 (Mo. App. 2004) .............................................................................44

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018) ................................................................................35, 36

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..................................................................14, 15, 16, 31

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) ..................................................................................26, 28

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
    392 F. Supp. 2d 118 (D.P.R. 2005) .....................................................................20, 21

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ..............................................................................14, 32, 37

*Red Cat Holdings, Inc. v. Autonodyne LLC*,
    2025 WL 432859 (Del. Super. Ct. Feb. 6, 2025) ......................................................42

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ....................................................................................................3

*Safeco Ins. Co. of America v. Burr*,
    551 U.S. 47 (2007) ...............................................................................................43, 45

*Shire US, Inc. v. Allergan, Inc.*,
    375 F. Supp. 3d 538 (D.N.J. 2019) ...........................................................................30

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) ....................................................................................31

*Soterion Corp. v. Soteria Mezz. Corp.*,
    2012 WL 5378251 (Del. Ch. Oct. 31, 2012) ......................................................39, 41

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ..................................................................................................43

*Stearns Airport Equip. Co. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) .....................................................................................19

*Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*,
    63 F.3d 1267 (3d Cir. 1995) ........................................................................................7

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    2021 WL 662292 (E.D. Pa. Feb. 19, 2021) ..............................................................15

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
  2008 WL 1925304 (D.N.J. Apr. 30, 2008) ..............................................................21

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)........................................................................................23

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) ........................................................................1, 5, 6

*Truinject Corp. v. Nestle Skin Health, S.A.*,
  2020 WL 70981 (D. Del. Jan. 7, 2020)..............................................................38, 39

*U.S. Bank Nat'l Ass'n v. Gunn*,
  23 F. Supp. 3d 426 (D. Del. 2014)......................................................2, 38, 42, 44

*U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl.*,
  966 F. Supp. 2d 690 (W.D. Tex. 2013)..........................................................39, 40, 41

*United States v. CIBA Geigy Corp.*,
  508 F. Supp. 1118 (D.N.J. 1976) ....................................................................15

*United States v. Cont'l Can Co.*,
  378 U.S. 441 (1964)........................................................................................15

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)............................................................................36

*United States v. Energy Sol'ns, Inc.*,
  265 F. Supp. 3d 415 (D. Del. 2017)................................................................15

*Verizon Commc'ns v. Trinko*,
  540 U.S. 398 (2004)........................................................................................34

*Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*,
  1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) ......................................................36

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
  257 F.3d 256 (2d Cir. 2001)............................................................................20

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
  69 F. Supp. 2d 571 (S.D.N.Y. 1999)................................................................5

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011)............................................................................13

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop., Inc.*,
  89 F.4th 430 (3d Cir. 2023) ............................................................................13, 32

*ZF Meritor, LLC v. Eaton Corp.*,
  769 F. Supp. 2d 684 (D. Del. 2011)................................................................4

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)..............................13, 22, 23, 25, 26, 27, 30, 33

*Zimmerman v. Direct Fed. Credit Union*,
    121 F.Supp.2d 133 (D. Mass. 2000), *affirmed* 262 F.3d 70 (1st Cir. 2001).............................44

## Other Authorities

Wright & Miller, *Fed. Prac. & Proc.* § 2806 (3d ed. 2025)...........................................................4

**INTRODUCTION**

Amgen is entitled to judgment as a matter of law or a new trial on all of Regeneron's claims. Regeneron's claims fall far outside the limited scope in which the Third Circuit has permitted punishing price competition as anticompetitive conduct. The record at trial confirmed that Regeneron lacks the evidence necessary to establish an antitrust violation—under any theory. But it also highlighted a failing that straightforwardly eliminates the jury's damages award without the need to examine the details of antitrust law. Specifically, Regeneron offered *no evidence* from which a reasonable jury could accept the but-for prices it claims it would have received absent Amgen's challenged conduct. This failing, by itself, warrants judgment on Regeneron's damages claims independent of resolution of any of the more sweeping and complex antitrust issues that also foreclose Regeneron's claims.

Damages. Regeneron's $102 million damages claim at CVS turns on the premise that, but for Amgen's conduct, Regeneron could have charged CVS *higher* prices. There is a complete absence of evidence supporting this theory. Although Regeneron's damages expert, Dr. Mathur, testified that her CVS damages calculation were based on "the difference between the net price that" Regeneron charged for Praluent at CVS and "the price that Professor Scott Morton analyzed and explained would have occurred in the presence of healthy, normal competition," Scott Morton never testified about those but-for prices at trial. Nor did any other Regeneron witness. Mathur thus relied on assumed facts that were never proven. While an expert witness may assume the conclusions of another expert, that "d[oes] not relieve" the party offering the opinion "from their burden of proving the underlying assumptions," including the other expert's conclusions. *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). This defect is fatal to the jury's award of damages at CVS. Regeneron's damages at the other PBMs likewise rest on facts that Mathur assumed but were never proven and in many cases were inconsistent with the evidence.

1

Antitrust Claims.  Regeneron showed neither that the relevant market can be limited to Repatha and Praluent (ignoring Leqvio) nor that Repatha has market power in a properly defined relevant market.  And each of its theories of anticompetitive conduct fails to meet the stringent standards courts impose to avoid chilling procompetitive discounting.  Rather than the coercion that characterizes anticompetitive foreclosure, uncontradicted proof at trial showed that PBMs demanded, and got, precisely the deals they wanted.  Regeneron's antitrust claims also fail because it offered insufficient evidence of anticompetitive harm or antitrust injury at CVS.  Regeneron did not offer evidence of increased prices or decreased output—the only anticompetitive effects available here.  And Regeneron's claimed injury at CVS arises entirely out of *competitive* aspects of Amgen's conduct—Amgen making a more favorable offer to the customer, which is not a harm to competition.  In short, a plaintiff cannot choose to forego competition and then rely on antitrust law to seek the profits it lost by failing to compete.

Tortious Interference.  Regeneron gave its tortious interference claim almost no attention, instead treating it as an automatic corollary of an antitrust violation.  But tortious interference with prospective business relationships applies in a very particular context:  where a "specific party who was prepared to enter into a business relationship . . . was dissuaded from doing so by the defendant."  *U.S. Bank N.A. v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014).  The vast majority of Regeneron's claimed damages do not stem from the loss of any business relationship, but from Regeneron's claim that its business relationship with CVS should have been more profitable.  Its remaining damages are simply the result of the coverage decisions PBMs made under agreements that were in place.  Neither of these is cognizable as tortious interference.

In any event, the punitive damages award must be rejected because Regeneron offered no evidence of the outrageous conduct necessary for punitive damages.  The line between

2

procompetitive price-cutting and anticompetitive bundling is unclear, to say the least; neither Delaware law nor the Due Process Clause permits the courts to punish a defendant for violating a prohibition that was not clearly expressed in any law. Instead, punitive damages are reserved for outrageous and egregious conduct far afield from the business competition here.

In short, Regeneron took two limited agreements by Amgen to provide an additional discount to customers (one of which did not even require exclusivity for Repatha); made almost no attempt to satisfy the requirements of any precedent constraining the antitrust laws; and persuaded a jury to award it nearly a half a billion dollars. And it did so with a complete absence of proof that PBMs would ever have paid it the prices it claims it would have received absent Amgen's discounts. In the absence of sufficient evidence to prove any of Regeneron's claims, Amgen is entitled to judgment as a matter of law. In the alternative, the verdict is against the great weight of the evidence and the damages are excessive, entitling Amgen to a new trial.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50, a party is entitled to judgment as a matter of law on any issue on which "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." In considering a Rule 50 motion, the Court should "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Failure of proof on an essential element of a plaintiff's claim warrants judgment for defendant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves*, 530 U.S. at 150.

On a Rule 50 motion, the movant need not show "there is literally no evidence supporting the non-moving party"; instead, there must be "evidence upon which the jury could *properly* find

3

for the non-moving party." *Intellectual Ventures I, LLC v. Motorola Mobility*, LLC, 72 F. Supp. 3d 496, 502 (D. Del. 2014) (emphasis added).  A "mere scintilla of evidence presented by the plaintiff is not sufficient to deny a motion for judgment as a matter of law." *Id.*

Alternatively, the Court may grant a new trial under Rule 59 when "the great weight of the evidence cuts against the verdict" and "a miscarriage of justice would result if the verdict were to stand," *Jester v. Hutt*, 937 F.3d 233, 239 (3d Cir. 2019), or where the "jury's damage award is excessive," *Garrison v. Mollers N. Am., Inc.*, 820 F. Supp. 814, 820 (D. Del. 1993).  Even if "the jury's verdict is supported by sufficient evidence, the court may, nonetheless, set aside the verdict on the ground that the verdict is against the weight of the evidence." *Garrison*, 820 F. Supp. at 821; Wright & Miller, *Fed. Prac. & Proc.* § 2806 (3d ed. 2025).

"In considering whether a new trial is appropriate under Rule 59, the court need not view the evidence in the light most favorable to the verdict winner." *ZF Meritor, LLC v. Eaton Corp.*, 769 F. Supp. 2d 684, 690 (D. Del. 2011).  Moreover, where—as here—a trial is "'complicated and deals with a subject matter not lying within the ordinary knowledge of jurors, a verdict should be scrutinized *more closely* by the trial judge than is necessary where the litigation deals with material which is familiar and simple[.]'" *Id.* (emphasis added) (citation omitted).

## ARGUMENT

**I.      Amgen Is Entitled to Judgment as a Matter of Law or to a New Trial Because Regeneron Failed to Prove Damages.**

**A.      Insufficient Evidence Supports the Jury's Damages Award at CVS.**

The Court should enter judgment for Amgen on the jury's award of $101.7 million in damages at CVS because the evidence cannot support it.

**1.      No Evidence Supports Regeneron's Claimed But-For Prices.**

Regeneron's damages expert, Dr. Mathur, testified her CVS damages calculations were

4

"based on . . . the difference between the net price that" Regeneron charged for Praluent to CVS "and the price that Professor Scott Morton analyzed and explained would have occurred in the presence of healthy, normal competition" (the "but-for" price). Tr. 1152:5–15 (Mathur).[1] Mathur thus expressly relied on "Scott Morton's analysis" for an essential input into her damages calculations—the but-for prices. Tr. 1173:6–12 (Mathur). Yet Scott Morton never testified about those but-for prices, or her bases for them, at trial. Her testimony on CVS Part D—a mere 42 seconds long—and CVS Commercial said *nothing* about what Praluent's price would have been absent Amgen's conduct. Tr. 936:21–937:10 (CVS Part D), 929:12–936:19 (CVS Commercial). When asked for Praluent's but-for price at CVS Commercial, all Scott Morton said was, "I don't recall that number. I could look it up." Tr. 968:21–969:8.

Given Mathur's admission that her CVS damages calculations depend on a finding of what prices Regeneron would have received at CVS absent Amgen's challenged conduct—and no record evidence addresses that question—no reasonable jury could have relied on Mathur's calculations to award any $101.7 million in damages at CVS.[2] The Supreme Court has long held an expert's opinion "cannot support a jury's verdict" if it was "not supported by sufficient facts to validate it in the eyes of the law." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). "[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999).

---

[1] The excerpted trial transcript is attached as Exhibit AP to the Declaration of Ashley Johnson.

[2] Since the jury awarded precisely the maximum damages calculated by Mathur, it is clear the jury utilized her methodology and awarded her calculated damages at each PBM. *Compare* Tr. 1131:7–10 (Mathur) *with* D.I. 479 (Verdict Form) at 6; *see In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *11 (C.D. Cal. Aug. 1, 2024) (finding it "clear, without speculation," how jury calculated damages because it did not "deviate[] from [the] experts' damages figure").

That an expert witness may assume the conclusions of another expert in offering an opinion at trial "d[oes] not relieve" the party offering the opinion "from their burden of proving the underlying assumptions," including the other expert's conclusions. *TK-7*, 993 F.2d at 732. In other words, Mathur may permissibly rely on Scott Morton's opinion, but Scott Morton must provide the jury with that opinion *at trial*. Scott Morton's failure to do so—and Regeneron's failure to otherwise support the assumptions underlying Mathur's CVS damages opinion—is fatal to the reliability of Mathur's opinions. *See id.* Mathur's "bottom line" CVS damages number, unsupported by reasoned assumptions, "supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).

The Tenth Circuit's decision in *TK-7* is directly on point. In *TK-7*, the Tenth Circuit affirmed a directed verdict where the plaintiff's damages expert calculated lost profits by "assum[ing]" but-for "sales figures projected by" a second expert. 993 F.2d at 731. But the second expert did not testify to but-for sales and "the plaintiff failed to present evidence tending to establish" them. *Id.* at 731–32. Instead, as in this case, the damages expert relied on an assumption the plaintiff never proved. The Tenth Circuit explained that although assuming the but-for sales as facts "d[id] not necessarily make [the damage's expert's] testimony inadmissible," those sales needed to be "shown by the evidence" for the jury to accept the damages expert's testimony. *Id.* at 731. Because the plaintiffs did not prove them, "there was insufficient evidence that plaintiffs had sustained damages" and a directed verdict was necessary. *Id.* at 723. This reasoning applies equally here; Regeneron's failure to offer at trial the evidentiary basis for Mathur's opinion requires overturning the jury's damages award for CVS.

Numerous other cases confirm that Regeneron's failure to present evidence of Praluent's but-for prices at CVS requires the Court to overrule that portion of the jury's damages award. For

example, the Supreme Court in *Brooke Group* affirmed judgment notwithstanding the verdict where an expert "based his opinion" about competitive injury on "evidence" that was "insufficient as a matter of law to support" the injury.  509 U.S. at 242–43.  And the Third Circuit has repeatedly vacated damages awards where a damages expert's "factual predicates" were "not accompanied by evidence."  *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983); *see also Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987) (vacating damages where expert's testimony "was not accompanied by evidence" and "thus without a proper foundation and insufficient for a jury properly to assess . . . damages"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 754–56 (3d Cir. 2000) (remanding for new damages trial where expert's "model relied on several empirical assumptions that were not supported by the record"); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275-76 (3d Cir. 1995) (granting JMOL on damages where key evidence of damage from anticompetitive pricing was expert's conclusory testimony).

Finally, other courts, including in a recent post-trial decision after an antitrust trial, have granted judgment as a matter of law where, as here, a jury "relied on inputs not tied to the record" to determine damages.  *NFL Sunday Ticket*, 2024 WL 3628118, at *11; *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.,* 243 F.3d 980, 991 (6th Cir. 2001) (affirming directed verdict where expert's "model for calculating damages did not adequately allow the jury to assess damages" because the witness's "descri[ption] [of the] calculations" did "'not reflect the number of lost sales'").

### 2.    The Jury's CVS Damages Award Was Inconsistent with the Evidence.

Not only is there no evidence in the trial record to support the but-for prices Mathur (and thus the jury) used to calculate CVS damages, the evidence that *was* produced at trial is inconsistent with Mathur's assumed but-for prices, invaliding the verdict.

*CVS Part D*.  Regeneron's claimed damages for CVS Part D starting in 2022 are based on Mathur's testimony that absent Amgen's conduct, Regeneron "would have continued to win the

7

CVS Part D business" with the "43 percent" rebate for 1:1 coverage it provided in 2021. Tr. 1155:24–1156:4, 1163:9 (Mathur). But the 43% number is contrary to all the evidence. During negotiations in 2021 for coverage in 2022, Amgen and Regeneron each offered CVS Part D *55%* rebates for 1:1 coverage of Repatha and Praluent, respectively. DTX-1006 [Ex. T][3] at 1, 5, 7; PTX-454 [Ex. C] at 5; Tr. 1056:10–16 (Anderson). Crucially, Amgen's 55% bid *did not depend on any bundled rebates* relating to Repatha. DTX-1006 [Ex. T] at 1. After receiving these bids from Amgen and Regeneron, CVS Part D informed Regeneron about Amgen's *unbundled* offer, which CVS viewed as superior to Regeneron's: CVS Part D told Regeneron it was "not taking an Amgen 'bundle deal,'" but "Amgen [had] beat [Regeneron] on the exclusive bid," DTX-1526 [Ex. AG]. That communication caused Regeneron to submit the winning 61% bid. PTX-479 [Ex. E]. Given this chronology, no reasonable jury could have concluded Regeneron would have won CVS Part D with a 43% rebate absent a bundled offer from Amgen.

Nor was there sufficient evidence from which the jury could have plausibly concluded Amgen's 55% offer included a bundle that pressured Regeneron. The only evidence on this point was from a CVS witness who described *a single call* relating to potential bundling at CVS Part D, when Amgen "suggest[ed] . . . a concept" of a bundle that was "never formalized or modeled or given any consideration in [CVS's] Medicare Part D process." Tr. 1049:20–25 (Anderson). The CVS Part D witness also testified CVS Part D did not use that one discussion to negotiate higher rebates from Regeneron. Tr. 1052:2–12 (Anderson). This record does not provide a sufficient basis for the jury's damages award for CVS Part D—2/3 of the total award to Regeneron.

*CVS Commercial*. The bidding chronology for CVS Commercial similarly contradicts the

___

[3]  Citations to admitted trial exhibits include bracketed references to versions attached as exhibits to the concurrently filed Declaration of Ashley Johnson.

8

jury's damages award.  It is uncontroverted that on April 27, 2021, Regeneron's CEO approved offering a 61% rebate, with increases of "up to 65%" if necessary, for "continued exclusivity." DTX-1321 [Ex. AB] at 1–2.  On July 2, 2021, Regeneron made its winning 65% 1:1 bid. Tr. 1564:12-15 (O'Neal); DTX-1246 [Ex. Y]; PTX-545 [Ex. F].  Regeneron claims it only offered the 65% rebate because of pressure resulting from Amgen's bundled offer.  Tr. 1525:1–9 (O'Neal). But on July 2, 2021, when Regeneron bid 65%, Amgen had not yet made, or even approved making, a bundled offer.  In fact, undisputed evidence showed Amgen first approved and made its bundled offer involving Repatha to CVS Commercial on July 6, 2021, four days *after* Regeneron bid 65%.  PTX-549 [Ex. G]; PTX-557 [Ex. H].  The only other evidence potentially relevant to this timeline was testimony from Regeneron's former employee Rich O'Neal, who contended that, on June 29, 2021, CVS pressured him to raise rebates.  Tr. 1520:23–1525:19.  Even if the jury assumed that pressure had anything to do with Amgen—and CVS Commercial's representative testified it did not, Tr. 1037:21–1038:16 (Witter)—it was still *two months after* Regeneron's CEO approved a 61-65% bid.   DTX-1321 [Ex. AB] at 1–2; PTX-545 [Ex. F].

Despite this evidence, Mathur relied on a but-for price at CVS Commercial that was based on a rebate level significantly lower than even 61%—the specific but-for rebate level assumption behind her damages calculation was not disclosed in the trial record.[4]  Thus, there is no evidence to support Mathur's assumption that it was Amgen's unaccepted bundling offer that *caused* Regeneron to bid 65% for CVS Commercial, and that absent Amgen's bundling, Regeneron would have won the bid at a rebate level significantly below 61%.

There was thus no basis on which a reasonable jury could have accepted Mathur's damages

---

[4]  While there is no evidence in the trial record to justify a particular rebate rate at CVS Commercial, Scott Morton's expert report used a 57% but-for rebate there for years "subsequent" to 2021.  D.I. 320, Ex. F ¶ 137; D.I. 320, Ex. K ¶ 305 (same).

models at CVS.    Tr.  1141:19–1142:6,  1155:24–1156:4,  1173:10–12  (Mathur).    "[W]hen indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  *Brooke Grp.*, 509 U.S. at 242; *see also, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986) ("expert opinion [evidence] . . . has little probative value" where it "rest[s] on assumptions" that are "inconsistent with record evidence.").

### B.    Insufficient Evidence Supports the Jury's Damages Award at Ascent/ESI.

To calculate damages at Ascent/ESI, Mathur used a "before-after" methodology that analyzed Regeneron's sales and pricing in the six months before the challenged conduct and assumed that, absent the conduct, such sales and pricing would have continued.  Tr. 1134:22–1135:6, 1129:18–1130:10, 1178:22–1179:3 (Mathur).  As with CVS, Mathur relied on Scott Morton.  Tr. 1136:25–1137:7, 1150:21–1151:4 (Mathur); 1806:15–23 (Gaier).  Yet Scott Morton gave no testimony at trial of but-for prices at Ascent/ESI.  The estimates on which Mathur's model depend thus "lack[ed] a factual basis" and cannot support damages.  *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1198–99 (3d Cir. 1995).

Moreover, the evidence at trial contradicted Mathur's damages theory.  Mathur assumed if Amgen had not bundled Repatha, Regeneron would have maintained the same coverage, share, and price at Ascent/ESI as it had before.  Tr. 1182:1–10 (Mathur).  But it was undisputed that following Regeneron's 2020 takeover of the Praluent business from Sanofi, it had a new strategy of giving much higher rebates (lower prices) to win exclusive contracts—and did not continue the prior strategy of accepting parity coverage.  Tr. 444:1–447:12 (McCourt); 892:4–894:1 (Scott Morton); 1510:15–1511:1, 1540:24–1541:10 (O'Neal).  Regeneron's witnesses testified that absent Amgen's bundled rebate at Ascent/ESI, Regeneron would have successfully obtained *exclusivity* at Ascent/ESI, not maintained parity.  Tr. 1542:24–1547:10 (O'Neal); 458:8–460:22 (McCourt).  Mathur's damages calculations at Ascent/ESI therefore violate the Supreme Court's

10

direction that a party's damages methodology must match its theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (requiring "at trial" that "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation"). Mathur presented no damages analysis premised on Regeneron winning exclusivity.

Finally, even if Regeneron had not disclaimed any intent to obtain parity coverage at Ascent/ESI, there is insufficient evidence that Amgen's conduct, rather than Regeneron's decisions, prevented Regeneron from obtaining such coverage. Ascent/ESI gave Regeneron the option of maintaining its pre-2020 parity coverage, if Regeneron would increase its parity bid by one point from 37% to 38%. DTX-1268 [Ex. AA]. Regeneron refused to do so because its strategy was to win exclusivity. *Id.* ("Hold at 37"). This confirms not only the damages theory mismatch noted above, but also that Regeneron's decisions, not Amgen's bundle, ensured Ascent/ESI would not maintain parity coverage. Tr. 1540:24-1541:10 (O'Neal).

### C.    Insufficient Evidence Supports the Jury's Damages Award at Optum/UHC.

For similar reasons, Amgen is entitled to a reversal of the jury's award of $15.4 million in damages for Optum/UHC Commercial. Mathur's damages analysis assumed, absent Amgen's bundling, Regeneron would have won business at Optum/UHC on roughly the same terms as the past, including parity coverage. Tr. 1179:17–24. But again, Regeneron's strategy was not to seek continued parity coverage, but to increase rebates to win exclusivity, including at Optum/UHC. Tr. 1614:8–13 (O'Neal) ("We had parity bids. We wanted to win with exclusive."); 310:5–15 (Schleifer). Accordingly, Mathur's assumption that Regeneron would have maintained parity coverage is inconsistent with the record and violates *Comcast*, 569 U.S. at 35.

Regeneron's damages theory at Optum/UHC independently fails because nothing about Amgen's bundle kept Regeneron from obtaining parity coverage. Amgen's agreement with UHC

11

provided an extra Enbrel rebate as long as UHC covered Repatha *either* 1:1 or 1:2.  Tr. 1338:18–1339:13 (Grennan) (UHC "would be able to add Praluent at any time" without affecting the negotiated rebate); PTX-598 [Ex. I] (Amgen/Optum).  UHC testified at trial it did not list Praluent on its formulary because "market dynamics were making it extremely difficult to go with Praluent at a 1 of 2 because they were losing market share in a 1 of 2"—independent of any bundle.  Tr. 1485:18–1486:15, 1493:5–13 (Mr. H.).  Optum/UHC would have covered Repatha 1:1 even without the bundled Enbrel rebate.  Tr. 1488:16–25 (Mr. H).  The evidence was thus insufficient to support Mathur's assumption that Optum/UHC would have covered Praluent *at parity*.

### D.    The Damages Award Failed to Account for Avoided Operating Expenditures.

Mathur provided the jury with a range of damages from $85.2 million to $135.6 million and told it to hew closer to $85.2 million "if Regeneron would have incurred some additional costs to make" extra sales in the but-for world.  Tr. 1131:13–23.  But Mathur failed to quantify the costs that would have been avoided, making the $135.6 million verdict speculative and baseless.

The Third Circuit has held that "Plaintiffs' failure to produce evidence concerning the factors essential to establish net profit as opposed to gross profit, in effect, meant that the jury would have had to speculate as to the amount of damages." *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116 (3d Cir. 1973) (affirming directed verdict of no damages in price fixing case).  Later cases agree that "[w]ithout proof of costs, an award of lost profits would be based on pure speculation." *All Seasons Home Improvement Co. v. Arch Concept Constr., Inc.*, 2018 WL 3928787, at *9 (D.N.J. Aug. 16, 2018) (granting partial summary judgment on lost profits).  Mathur admitted it is "important to account for the costs that Regeneron would have incurred in order to make" the sales allegedly lost, and she recognized her $135.6 million figure was equivalent to "gross profits" lost rather than "net profits"—but she gave no information to the jury to allow them to estimate those costs incurred in the but-for world.  Tr. 1143:25–1145:25.  The

12

jury's award of $135.6 million is thus an award assuming *zero* operating costs incurred to make the lost sales in the but-for world.  That is "pure speculation" and must be set aside or remitted by the $50 million in but-for costs Mathur estimated.  *All Seasons*, 2018 WL 3928787 at *9.

## II.  Amgen Is Entitled To Judgment as a Matter of Law or a New Trial on Regeneron's Antitrust Claims.

Regeneron failed to offer sufficient proof of multiple elements of its antitrust claims to support a verdict by any reasonable jury.  First, each of Regeneron's claims requires Repatha to have market power, yet Regeneron failed to prove a relevant market limited to Repatha and Praluent or prove market power in a properly defined market that includes Leqvio.  Second, Regeneron's claims require anticompetitive conduct.  But its theory of anticompetitive conduct was imprecise at best, and none of its theories was supported by sufficient evidence.  Regeneron also failed to show substantial foreclosure or Enbrel market power—necessary predicates to prove anticompetitive conduct.  Third, Regeneron failed to show any anticompetitive effects.  Finally, Regeneron failed to prove that its claimed damages at CVS are antitrust injury.  Each of these failings requires judgment for Amgen on the antitrust claims or, at a minimum, a new trial.

### A.  Regeneron Offered Insufficient Evidence of Repatha Market Power.

Regeneron's claims under Sherman Act § 1 and Clayton Act § 3 required it to prove Repatha has market power, while its claims under Sherman Act § 2 required it to prove Repatha has, or in the case of attempted monopolization has a dangerous probability of having, monopoly power.  *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005); *Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 444 (3d Cir. 2023); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012).[5]  Whereas "[m]arket power is the

---

[5] The same requirements applied to Regeneron's claims under New York's Donnelly Act and California's Cartwright Act.  *See Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n.2 (2d Cir. 2011); *Cnty. of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

ability to raise prices above those that would prevail in a competitive market," *Winn-Dixie*, 89 F.4th at 444, monopoly power is the greater "power to control prices or exclude competition," *Harrison*, 423 F.3d at 381.  A lack of market power thus implies a lack of monopoly power.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

"Market power may be demonstrated through either of two types of proof." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *accord Harrison*, 423 F.3d at 381. "One type of proof is direct evidence," *i.e.*, "evidence of restricted output and supracompetitive prices." *Rebel Oil*, 51 F.3d at 1434.  Regeneron adduced no direct evidence of market power. After all, if Repatha had market power, Amgen would not have had to bundle it with Enbrel to get PBMs to cover it—and CVS, the largest PBM, would not have been able to—as it did—remove it from formulary altogether.  The second type of proof "is circumstantial evidence," which requires proof of a relevant market and that the defendant owns a dominant share of that market.  *Id.*; *accord Harrison*, 423 F.3d at 381.  Regeneron did not prove either.

### 1.    Regeneron Failed To Offer Sufficient Evidence that Repatha and Praluent—Without Leqvio—Constitute a Relevant Product Market.

Regeneron barely mentioned Leqvio in its case.  The only evidence it offered of Leqvio was that while "it's a substitute" for Repatha and Praluent, Tr. 999:15 (Scott Morton), it is generally not subject to formulary management by PBMs because it is mostly administered by doctors instead of dispensed through pharmacies, Tr. 910:15–24, 998:2–14 (Scott Morton), and it has a different mechanism of action than Repatha and Praluent, Tr. 187:8–11 (Schleifer).[6]

This is insufficient to establish Leqvio is not in the same relevant market as Repatha and

---

[6] Scott Morton also offered objectively inaccurate testimony that Leqvio is an "infused" product that requires patients to sit in a chair for hours.  Tr. 910:15–19.  She provided no authority for this bizarre and prejudicial assertion, which has no basis in reality.  Leqvio is an injectable product like Praluent and Repatha.  Tr. 1448:11–24 (Niksefat).

Praluent.  "The Supreme Court and lower courts have consistently held that relevant markets . . . are defined by the same two factors:  reasonable interchangeability of use and cross-elasticities of demand."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 n.18 (3d Cir. 1997).  As to the first, the "test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by *consumers* for the same purposes.'"  *Id.* at 438 (emphasis added)).  Courts in pharmaceutical antitrust cases have thus consistently defined the relevant market for a prescription drug based on reasonable interchangeability by consumers.  *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2021 WL 662292, at *12 (E.D. Pa. Feb. 19, 2021).  Despite the "unique way" in which the "pharmaceutical market functions," with "the doctor select[ing] the drug" and the "insurance company[] pay[ing] for the drug," the patient is still the "consumer."  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 428 (3d Cir. 2016); *Suboxone*, 2023 WL 5617784, at *6 (E.D. Pa. Aug. 30, 2023); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 328 (D.R.I. 2017).

Regeneron offered no evidence that Leqvio is not reasonably interchangeable with Repatha and Praluent for patients.  Nor could it have; the Third Circuit has held the relevant market for a prescription drug includes those that are "clinically comparable" in their "treatment," even when they have different mechanisms of action.  *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 399 (3d Cir. 2016) (relevant market for a drug that was a "low molecular weight heparin (LMWH)" included a drug that was "not a LMWH" because it was "clinically comparable to LMWHs in its treatment"); *see also, e.g.*, *Suboxone*, 2023 WL 5617784, at *2, *6; *United States v. CIBA Geigy*

15

*Corp.*, 508 F. Supp. 1118, 1155 (D.N.J. 1976).[7]

Regeneron also failed to offer any evidence of the "cross-elasticity of demand" between Leqvio and Repatha. *Mylan*, 838 F.3d at 437. Cross-elasticity of demand "measures the responsiveness of the demand for one product to changes in the price of a different product," *Queen City Pizza*, 124 F.3d at 438 n.6 (quotation marks omitted), and is also defined with respect to demand by "consumers," *Eastman Kodak*, 504 U.S. at 469. To prove Leqvio was not in the same relevant market as Repatha and Praluent, Regeneron had to offer evidence that their cross-elasticity of demand with Leqvio was "very small," *i.e.*, that Repatha's and Praluent's "price changes had no effect on patient demand for" Leqvio and vice versa. *Mylan*, 838 F.3d at 437.

Because Regeneron "fail[ed] to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," its "relevant market is legally insufficient." *Queen City Pizza*, 124 F.3d at 436.

Furthermore, the evidence was overwhelming that Leqvio competes vigorously with Repatha and Praluent. Amgen and Regeneron both identify Leqvio as a significant competitor. Amgen calculated that by 2024—just two years after entering the market—Leqvio's market share was already "in the 20 to 25 percent range" with $385 million of sales in 2024. Tr. 1449:5–22 (Niksefat), 1844:4–12 (van Grunsven). Amgen thus concluded that "[i]nclisiran [Leqvio] appears to present highest threat to Repatha," DTX-1004 [Ex. S] at 16, while Regeneron recognized Leqvio

---

[7] Even if market definition did somehow depend on reasonable interchangeability by PBMs, Regeneron's own evidence shows PBMs can substitute Leqvio on their formularies. Regeneron's economic expert admitted Leqvio claims are "going through the pharmacy benefit channel." Tr. 1001:23–24 (Scott Morton). While she suggested there were too few such claims, "complete interindustry competitive overlap need not be shown." *United States v. Cont'l Can Co.*, 378 U.S. 441, 457 (1964). "It is sufficient that there is some overlap, even if that overlap is . . . 'small.'" *United States v. Energy Sol'ns, Inc.*, 265 F. Supp. 3d 415, 439 (D. Del. 2017); *Fed. Trade Comm'n v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) ("The fact that the markets in which the firms compete may be small is irrelevant").

16

as a threat due to "Novartis['] investments" in Leqvio and the drug's "high awareness" and "attractive dosing." DTX-1508 [Ex. AF] at 18. In fact, Regeneron disclosed Leqvio as a competitor to Praluent to its investors. DTX-1748 [Ex. AJ] at 24. PBM contracts also define Leqvio as a competitor to Repatha and Praluent. *See, e.g.*, PTX-810 [Ex. J] at 10; DTX-0254 [Ex. P] at 41. Even before Leqvio was approved by the FDA, ESI viewed "Leqvio as another competitor to the existing PCSK9s" and was "starting to really look at cost across the medical and pharmacy side." DTX-1154 [Ex. W] at 4. "Novartis announced that 45 percent of Leqvio was dispensed from a pharmacy benefit." Tr. 1474:4–15 (Niksefat). Novartis also "heavily promoted" Leqvio to the same doctors who prescribe Repatha and Praluent, who can and do prescribe Leqvio as alternative to Repatha and Praluent. Tr. 1451:21–1452:2 (Niksefat); 1636:24–1637:3, 1637:18–1638:2 (Shugg); 1844:13–19 (van Grunsven).

### 2. Regeneron Failed To Adduce Circumstantial Evidence of Repatha's Market Power in a Relevant Market.

Despite failing to prove a relevant product market limited to Repatha and Praluent, Regeneron only offered proof of Repatha's market power in that market. Scott Morton conceded her testimony regarding Repatha's market share "d[id] not include Leqvio at all," and she "ha[d] not calculated a market share with Leqvio" in the market. Tr. 999:6–15, 999:21–1000:1. Regeneron's other evidence of market share was similarly limited. Tr. 467:10–468:7 (McCourt); PTX-1019 [Ex. N] at 2–3. Moreover, in testifying that entry barriers were high, Scott Morton disregarded that when Amgen first bundled Repatha in 2020, Leqvio was on the precipice of entry, and that by late 2021, it had entered. Tr. 882:19–883:3. As a result, an increase in the price of Repatha and Praluent could be counteracted by expansion of Leqvio.

Because Regeneron lacked evidence that Repatha has market power in a relevant antitrust market, Amgen is entitled to judgment as a matter of law on Regeneron's antitrust claims.

17

B.      **Regeneron Offered Insufficient Evidence of Anticompetitive Conduct.**

Regeneron's antitrust claims require anticompetitive conduct. In addition to offering theories that fail to meet governing law, Regeneron's claim of anticompetitive conduct fails for two independent reasons. First, Regeneron failed to show Amgen's conduct substantially foreclosed a relevant market. Second, Regeneron failed to show Enbrel has market power.

1.      **Regeneron Lacks Sufficient Evidence To Prevail on Any of Its Three Theories of Anticompetitive Conduct.**

Regeneron argued three potential theories for why Amgen's rebate agreements are anticompetitive, none of which is sufficient under the facts of this case and governing case law: (a) below-cost pricing, (b) *ZF Meritor*'s standard for exclusive dealing, which requires substantial foreclosure, and (c) *LePage's* "equally diverse group of products" test.

Amgen continues to contend that liability for bundling of the type alleged by Regeneron is governed by *ZF Meritor* and *Eisai*. Both cases directly apply to analogous facts, and limit *LePage's*, including by limiting the case to situations involving single-product producers, which Regeneron is not. But even treating *LePage's* as a separate path for liability rather than a foundation for the more thoroughly elaborated theory from *ZF Meritor* and *Eisai*, Regeneron's core flaw remains: it offered insufficient evidence to show that Amgen's conditional rebates are anticompetitive under any standard grounded in antitrust law.

(a)      **Regeneron Failed to Adduce Sufficient Evidence of Below-Cost Pricing under *PeaceHealth*.**

Regeneron claims below-cost pricing of Repatha only at Ascent/ESI Commercial. Tr. 926:10–928:22. At trial, Scott Morton's testimony on this point was brief; she summarily asserted that "'[i]f you took the dollar amount" of Enbrel rebates and "applied them to the Repatha purchases of Express Scripts . . . it looks . . . like . . . Amgen's giving back all of that money," and "the size of . . . the withheld rebate is . . . bigger than the size of Repatha." Tr. 927:17–928:13.

Scott Morton neither explained how she reached that conclusion nor quantified the amounts at issue. Nor did she identify any of the data she used. Her testimony amounted to putting up a slide and asserting some vague form of unprofitable sales during some undefined time based on some unidentified data and calculations. Tr. 926:10–928:22.

Such testimony is insufficient as a matter of law to prove below-cost pricing. The Supreme Court has repeatedly cautioned, "[i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009). The Third Circuit thus requires an expert asserting below-cost pricing to offer "'*direct* evidence'" of it. *Advo*, 51 F.3d at 1198 (emphasis in original) (quoting *Matsushita*, 475 U.S. at 584 n.8). Thus, when an expert testified he had "'*estimated*'" the defendant's variable costs and the defendant priced below them, the Third Circuit found that he had "failed to present *facts* establishing . . . whether [the defendant] priced . . below some measure of costs" and his testimony lacked "a factual foundation" to "validate it in the eyes of the law." *Id.* at 1198–99.[8]

Scott Morton does much less than the expert in *Advo*—Regeneron offered no evidence to establish *what* she did, or to demonstrate anything other than her ultimate conclusion. For example, Scott Morton did not describe the costs she included, noting only that she included "the cost of making the drug and marketing the drug," and she did not quantify Amgen's variable costs of Repatha. Tr. 926:25–927:12. She provided a net price of Repatha of "around 300"—but did

---

[8] *See also, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1126-27 (7th Cir. 1983) (setting aside jury verdict where expert "examined every revenue that would be available after deducting all of the normal operating expenses of business," but did not define or describe those deductions, among other flaws, making "the attempted demonstration [] defective for lack of specificity and explanation of key elements"); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 534 (5th Cir. 1999) (rejecting expert opinion on below cost pricing that failed to "explain what [a given cost] represented or state that it was a variable cost").

not give units or state over what increment that price applies (monthly, per year, or per dose).  Tr. 926:18–21.  And she vaguely estimated the value of Enbrel rebates contingent on Repatha at either $70, $50, or $25 million per year—the record is unclear—but did not translate that into a net price reduction, only concluding that the "size of the . . . withheld rebate is so big, it's bigger than the size of Repatha."  Tr. 925:21–926:6; 928:10–13.  The jury was not provided enough information to assess for itself whether Scott Morton had correctly concluded Repatha's price was below cost.

The verdict reinforces the idea that a reasonable jury would not find below-cost pricing here.  Regeneron also brought a claim under California's Unfair Practices Act, which the jury was explicitly instructed required below-cost pricing.  D.I. 481 at 50.  Yet the jury found for Amgen on this claim.  This strongly suggests that this jury did not—given that a reasonable jury *could not*—find below-cost pricing based on the nearly non-existent evidence offered by Regeneron.

A below-cost pricing theory also fails to support anticompetitive conduct here because of the small portion of the market Regeneron claimed was affected.  Courts "must be mindful that low prices are a positive aspect of a competitive marketplace and are encouraged by the antitrust laws."  *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001).  The alleged below-cost pricing at Ascent/ESI covered less than 12% of the PCSK9i market.  Tr. 1007:22–1008:11 (Scott Morton).  Even if Regeneron had offered sufficient proof of below-cost pricing in that 12% (it has not), that would not show anticompetitive conduct because it leaves most of the market open to above-cost competition.  *See infra* Section II.B.2.  Indeed, Regeneron's expert conceded competition was "healthy" when "Praluent [was] the exclusive [PCSK9i] at two of the PBMs."  Tr. 980:24–981:8 (Scott Morton).

Notably, "[c]ourts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged . . . to a single customer."  *Morgan v. Ponder*, 892 F.2d

20

1355, 1362 (8th Cir. 1989) (reversing denial of JNOV).  For example, a district court granted summary judgment where the expert concluded only up to "10 percent of [defendant's] sales . . . were priced below its average variable costs."  *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118, 140 (D.P.R. 2005).  As the court explained, "claims of below-cost pricing on a small percentage of a firm's sales are insufficient to raise a triable issue of predatory pricing . . .  because they are not likely to drive rivals from the market and to permit the predator to raise prices and profits subsequently."  *Id*.  Regeneron did not and could not adduce evidence that the Ascent/ESI contract alone would permit Amgen to "raise prices and profits subsequently."  *Id*.

The Second Circuit similarly affirmed dismissal for failure to state a claim where only one contract was at issue, reasoning, "[i]n a business environment in which the competing parties have entered into numerous contracts with numerous parties . . . an allegation that one of those contracts provides below-cost prices for services is insufficient to allege predatory pricing."  *Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 414 F. App'x 334, 336 (2d Cir. 2011); *see also Syncsort Inc. v. Innovative Routines Int'l, Inc.*, 2008 WL 1925304, at *17 (D.N.J. Apr. 30, 2008) (granting summary judgment on predatory pricing where plaintiff "[had] not presented evidence from which a reasonable jury could conclude that based on these isolated instances of below-cost pricing, [defendant] would be able to monopolize the . . . market").

Regeneron's below-cost pricing theory fails to establish anticompetitive conduct for an independent reason:  to be anticompetitive, below-cost pricing must allow the defendant to drive a competitor out of the market and then raise its prices to a sufficiently supracompetitive level that customers suffer competitive harm when they end up paying more.  Regeneron failed to adduce any evidence that pricing below cost would enable Amgen to later raise its prices *at all*, much less to a supracompetitive level.  In fact, the record shows Regeneron continues to compete with

21

Praluent, Tr. 474:1–4 (McCourt); prices have continued to drop, Tr. 1686:1–15 (Gaier); 1852:14–23 (Stiroh); and Leqvio does and will continue to constrain Amgen's ability to price Repatha in the future, *see supra* Section II.A.

Finally, even if Regeneron had offered sufficient evidence that below-cost pricing was anticompetitive *at Ascent/ESI Commercial*, that would not entitle it to damages for sales at any other PBM. That is, Regeneron's damages theory was that 75% of its damages occurred at CVS Commercial and Part D. Tr. 1131:7–10, 1142:7–1143:1 (Mathur). But it offered no evidence from which a jury could find that Amgen's (supposed) pricing below cost at Ascent/ESI could (or did) proximately cause Regeneron to pay a higher rebate at CVS. Accordingly, evidence of below-cost pricing at Ascent/ESI alone is insufficient to support the damages award.

> **(b)      Regeneron Failed to Adduce Sufficient Evidence of Anticompetitive Exclusive Dealing under *ZF Meritor*.**

While Regeneron challenges Amgen's agreements with PBMs as exclusive dealing agreements, that is a mischaracterization—PBMs do not make any promise to the manufacturer of any particular coverage for any period of time, and Regeneron offered no evidence to the contrary. Further, it is undisputed the large PBMs in this case have significant power and would not be forced to accept any terms, so the contracts are not *de facto* exclusive.

But even if Amgen's contracts could be considered exclusive arrangements, courts have long recognized that "[e]xclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor*, 696 F.3d at 270. Regeneron repeatedly testified that its own strategy of seeking exclusive contracts at large PBMs to keep Repatha off formularies was procompetitive. Tr. 209:16–210:4 (Schleifer) (describing Regeneron's "lower cost" strategy of chasing "exclusive contract[s]" as benefiting patients); Tr. 905:5–7 (Scott Morton) ("What's procompetitive is to have low prices for patients

and consumers[.]").   Regeneron failed to prove Amgen's contracts with PBMs were not similarly "entirely procompetitive," because it failed to show substantial foreclosure under *ZF Meritor*.

***Amount of Foreclosure***.  For exclusive dealing or bundling contracts to violate the antitrust laws, they must "foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor*, 696 F.3d at 271 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)).  This is typically at least "40% to 50%" absent other factors. *Id.* at 286; *see also Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (50% foreclosure is not anticompetitive if the contract terms are short and do not exclude the possibility of purchasing from a competitor).  Regeneron did not present sufficient evidence to show it was foreclosed from a substantial share of the market.  As an initial matter, Regeneron has not offered sufficient evidence that it was *foreclosed*, as opposed to *lost formulary coverage*, anywhere.  Even though Repatha's market share has increased, Praluent is still available to any PBM that wishes to cover it.  Foreclosure occurs only where a defendant's conduct "deprive[d] customers of the ability to make a meaningful choice." *ZF Meritor*, 696 F.3d at 285.  Regeneron's own witnesses explained at trial that PBMs are sophisticated customers with significant bargaining power, Tr. 214:14–215:21, 322:19–323:16 (Schleifer); 1100:24–1102:9 (Bates), and PBM testimony was consistent that none of the PBMs were coerced, *infra* pp. 26–27.   Moreover, Regeneron offered no evidence it could not compete and win with head-to-head bidding.  There is thus insufficient evidence to find *any* foreclosure above zero.  Without any foreclosure, there cannot be substantial foreclosure or anticompetitive exclusive dealing.

Even if the Ascent/ESI Commercial contract had foreclosed Regeneron from competing for coverage at Ascent/ESI Commercial (it did not), Regeneron's expert conceded it covered no more than 10–12% of the market.  Tr. 983:5–984:2; 1007:16–1008:11 (Scott Morton).  This

23

percentage is insufficient as a matter of law to support substantial foreclosure. *ZF Meritor*, 696 F.3d at 286; *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022) (31% foreclosure was not anticompetitive, as "nearly 70% of the U.S. population" could still have coverage of the plaintiff's drug).

Regeneron also presented no evidence, and has no legally viable theory, that it was foreclosed from competing for contracts with any other PBMs. Amgen's contract with Optum/UHC Commercial did not foreclose Regeneron because the negotiated rebate under the contract was not affected by whether Repatha was covered 1:1 or at parity with Praluent. Tr. 1338:18–1339:13 (Grennan); PTX-598 [Ex. I] (Amgen/Optum). At ESI Part D, Amgen's contract did not condition any Enbrel or Otezla rebates on Repatha coverage. DTX-0367 [Ex. Q]; Tr. 528:21–529:10 (Bricker); 867:10–13 (Kitson); 1284:4–1286:1 (West); Tr. 1120:20–1121:4 (Bates). Amgen's contract with Humana Part D never included a rebate on another drug in exchange for Repatha coverage, and Regeneron offered no evidence to support its speculation that Amgen offered an unwritten bundled rebate. Tr. 581:11–16 (Gordon). At CVS/Zinc Commercial, Regeneron admitted it *won* the contract, and its claim that it was pressured to lower prices to compete against Amgen is the essence of price competition—not foreclosure from it. Tr. 498:9–14 (McCourt); 1038:1–23 (Witter); 1048:21–1052:–12 (Anderson). And CVS Part D initially told Regeneron that "Amgen [had] beat [Regeneron] on the exclusive bid," DTX-1526 [Ex. AG], before *accepting* Regeneron's responsive bid of 61% bid for 1:1 coverage, PTX-479 [Ex. E].

Scott Morton's fallback theory that "spillover effects" to custom formularies increased the percentage of Regeneron's market foreclosure fails on the law and the evidence. Scott Morton framed her spillover theory in terms of the choices made by custom formularies and by doctors. In other words, she opined that "custom formularies tend to copy the national formularies," though

24

she conceded "sometimes with a bit of a lag *and not a hundred percent*." Tr. 939:2–8 (emphasis added); 941:4–10. On physician spillover, she testified that "physicians in the community get used to prescribing Repatha because most of their patients have coverage of Repatha so they kind of forget about Praluent." Tr. 939:18–22.

None of this is foreclosure. As the Tenth Circuit held in *EpiPen*—a decision that gave "close consideration" to Third Circuit law because the case had been transferred from a court in the Third Circuit—"spillover foreclosure is not actual foreclosure" and "does not prevent customers from accessing" their drug of choice. 44 F.4th at 980, 992.

Regeneron also failed to show it was foreclosed from reclaiming any "spillover" by competing. Regeneron's witnesses admitted custom clients are not bound to follow any formulary, Tr. 387:19–388:11 (Hyde). Scott Morton did not know "what drives the differences" when "some of the custom plans . . . follow[] the principal commercial national formularies and some don't." Tr. 991:3–16. She further agreed "marketing" and the "specific rebates offered to . . . custom plans"—both tools accessible to Regeneron—can drive coverage. Tr. 1012:15–1013:1.

Physicians could also prescribe Praluent to patients off-formulary. Tr. 278:5–279:3 (Schleifer). The evidence was undisputed that, while Amgen chose to compete for formularies implicated by "spillover effects," Regeneron did not. Tr. 988:15–990:16 (Scott Morton) (100 custom formularies switched to Repatha 1:1 while ESI covered both drugs at parity). And even with the alleged "spillover," Scott Morton estimates foreclosure from Amgen's contracts with ESI Commercial and UHC Commercial to be only 24.4%—far too low to be substantial. *ZF Meritor*, 696 F.3d at 286; *EpiPen*, 44 F.4th at 988.

**Duration and Terminability.** "It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire

25

or make alluring offers to initiate termination." *EpiPen*, 44 F.4th at 988; *see also ZF Meritor*, 696 F.3d at 286-87. The trial record shows Amgen's agreements do not commit any PBM to exclusivity (or to providing coverage at all) for any time period. Multiple witnesses, including Regeneron's expert Bates, testified the contracts give the PBM a "menu" that it will receive if it chooses to provide various levels of coverage. Tr. 1106:4–10 (Bates); 1647:19–1648:2 (Zimmer); 1422:8–15 (Niksefat). So Regeneron could obtain coverage by bringing a better deal to the PBM at any time; the PBM would merely lose access to the pre-negotiated rebate if it excluded Repatha, but gain access to a Praluent rebate. Tr. 528:21–529:10 (Bricker); 1647:19–1648:2 (Zimmer); *see* PTX-936 [Ex. L] (Amgen/Ascent); PTX-598 [Ex. I] (Amgen/Optum); DTX-0160 [Ex. O] (Amgen/CVS). That is a far cry from the long-term agreements in *ZF Meritor*. Even the contract *terms* were short; Amgen's contract with Ascent/ESI Commercial had a two-year initial term. Tr. 518:18–20 (Bricker); 854:12-18; 860:1–6 (Kitson); PTX-936 [Ex. L]. Amgen's agreement with Optum/UHC Commercial to offer an Enbrel overlay had a one-year term, Tr. 1490:24–1491:12 (Mr. H); PTX-598 [Ex. I]. And Amgen's contract with Zinc/CVS Commercial was renegotiated on an annual basis. Tr. 1021:20–1022:5 (Witter); DTX-0858 [Ex. R].

*Coercion.* Whether Amgen's customers were coerced into accepting the alleged bundled rebate contracts is a "fundamental consideration" to an exclusive dealing claim, *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 78 (3d Cir. 2010), because "in the absence of any coercion," courts are "left with the firm and singular conclusion that [Plaintiff] 'need only offer a better product or better deal' to reverse." *EpiPen*, 44 F.4th at 989; *ZF Meritor*, 696 F.3d at 284–85. Here, the absence of coercion is clear from the fact that PBMs *rejected* Amgen's offers of a portfolio rebate between Repatha and other drugs. Tr. 1284:4–1286:1 (West) (ESI Part D rejected portfolio rebate); 581:21–582:6 (Gordon) (same for CVS). In fact, every PBM that testified at trial

26

repudiated the notion that they were coerced into entering an agreement with Amgen, and several testified *they* pressured Amgen to lower net prices. Tr. 865:4–12 (Kitson) ("there was no coercion" at ESI); 1484:7–12 (Mr. H) (Optum aimed to keep Amgen "worried about Repatha so that we can get value on Enbrel"); 1038:1–16 (Witter) (Zinc/CVS "pressur[ed] Amgen to get better rates on Repatha"). Regeneron's theory that PBMs were pressured to negotiate a rebate for Enbrel was contradicted by the PBMs themselves, who testified that Enbrel was not a must-have drug among its competitors. Tr. 1485:5–1486:15 (Mr. H); 1035:5–10 (Witter).

***Additional Anticompetitive Provisions and Competitive Effects.*** Because exclusive dealing is not typically anticompetitive and may "offer consumers various economic benefits, such as assuring them the availability of supply and price stability," *Eisai*, 821 F.3d at 403, courts weigh its anticompetitive and procompetitive effects, *ZF Meritor*, 696 F.3d at 287–89. In *ZF Meritor,* the Court concluded the agreements "were replete with provisions that a reasonable jury could find anticompetitive"—including lengthy terms that "represented a substantial departure from past practice." 696 F.3d at 287–88. And no customer in *ZF Meritor* "ever asked [defendant] to be a sole supplier"—instead, the agreements were "aggressively enforce[d]" against customers, "even when [they] voiced objections." *Id.* at 288–89. Here, by contrast, the PBMs testified without contradiction that they sought Amgen's rebate offers for the procompetitive benefit of stimulating price competition between manufacturers and achieving lower drug prices. Tr. 1022:6–13 (Witter); 852:11–853:13 (Kitson) (ESI compared Repatha and Praluent head-to-head to "increase the value that we can offer to our clients").

***Custom in the Industry.*** Courts also consider whether competitors engage in exclusive dealing, *ZF Meritor*, 696 F.3d at 272, and Regeneron admits it pursued a strategy of chasing exclusive coverage on PBMs' standard formularies before Amgen. *See, e.g.*, Tr. 296:6–299:5,

27

209:10–25 (Schleifer); 207:10–25 (O'Neal). Regeneron's own evidence affirmed that in every case, it "had the clear opportunity to compete… for the exclusive [] contract," which cannot support a finding of anticompetitive conduct. *Race Tires*, 614 F.3d at 84.

> **(c)     Regeneron Failed to Adduce Sufficient Evidence that Any Bundle Involving Repatha Was Anticompetitive under *LePage's*.**

*LePage's at most* presents only a broad framework under which a bundle or exclusive deal *may be* anticompetitive; to determine whether a particular bundle or exclusive deal actually *is* anticompetitive, Third Circuit law requires plaintiffs to satisfy *ZF Meritor* and *Eisai*. Because Regeneron cannot show substantial foreclosure under those cases (*see supra* Section II.B.1(b)), it cannot prevail on a *LePage's* theory.

But even if *LePage's* is treated as a standalone test to determine whether an agreement is anticompetitive, Regeneron had to prove Amgen's bundle harmed competition because it foreclosed a competitor (1) "who does not manufacture an equally diverse group of products," and (2) who "cannot make a comparable offer." *LePage's*, 324 F.3d at 155. Regeneron's antitrust claims fail because it did not present evidence of either condition.

***First***, there is no evidence that Regeneron does not manufacture an equally diverse group of products. Regeneron's CEO testified that by the time of the alleged conduct, Regeneron had seven FDA-approved drugs on the market. Tr. 250:19–23, 251:24–252:1, 251:24–252:1 (Eylea); 251:19–21, 252:2–18 (Dupixent); 253:18–24 (Kevzara and Libtayo); 254:11–13 (Arcalyst); 254:17–19 (Zaltrap). Regeneron claimed at *most* three drugs were involved in Amgen's bundles (Enbrel, Otezla, and Repatha); and a part of a rebate on only *one* drug (Enbrel) was conditioned on coverage of Repatha. An "equally diverse group of products" must only be "equally diverse" to the bundle, not overall; otherwise, a plaintiff with *hundreds* of products could claim that it was anticompetitive for a plaintiff with 3 additional products to create a 2-product bundle, which would

28

be disconnected from any competitive reality.  Because Regeneron's products are *more diverse* than the 2 (or even 3) drugs claimed to be in any bundle, this prong of the test is not met.

**Second**, the evidence overwhelmingly shows that Regeneron could have made a "comparable offer."  To compete, Regeneron only needed to make an offer of comparable value to the affected PBM.  And Regeneron could have made an offer that several PBMs would have found to be of comparable value.  For example, after Amgen offered a bundle to Ascent, Tr. 803:19–24 (Gordon), Ascent asked Regeneron to increase its parity bid to "between 38-40 'all in' to match the competition and keep the ESI commercial business."  DTX-1268 [Ex. AA] at 1.  Regeneron chose not to meet this request to stay on formulary, instead opting to "[h]old at 37"— just one point lower than ESI's ask—because Regeneron did not *want* to go after parity coverage.  *Id.*; 1544:12–1545:12 (O'Neal).  Its *choice* not to compete does not mean it could not make a comparable offer.  The evidence is undisputed that Regeneron's challenge at Optum/UHC was never the bundle, but the PBM's concerns over Regeneron's market share and lack of promotion.  *Supra* Section I.C.  Finally, at CVS, Regeneron won in a head-to-head competition with Amgen.

Regeneron has also failed to produce sufficient evidence from which a reasonable jury could find that it was unable to create a comparable offer through its own bundle.  To the contrary, the evidence demonstrated that Regeneron paid a research firm over $100,000 to explore the possibility of offering PBMs its own bundles, and it concluded that "[p]airing Praluent with a clear market leader such as Dupixent may be an attractive portfolio contract option to improve market access for the product in Cardiovascular."  DTX-1403 [Ex. AC] at 35; Tr. 1619:15–1620:4, 1700:10–1701:1 (O'Neal); DTX-1449 [Ex. AE].  A Dupixent-Praluent bundle would be "comparable" to Amgen's bundle from an economic standpoint, Tr. 1701:17–20 (Gaier), and would "drive value for PBMs and coverage for Regeneron," Tr. 832:12–833:3 (Gordon).

29

Moreover, ESI Commercial even told Regeneron that it could "[i]ncrease discounts on Dupixent" in order to "counter" Amgen's bundled offer. DTX-1417 [Ex. AD] at 1. Regeneron dismissed the idea of a Dupixent bundle as impossible due to Regeneron's business partner, Sanofi. Tr. 1620:13–17 (O'Neal). But no reasonable jury could find that Regeneron proved that claim when the undisputed evidence is that Regeneron never even asked Sanofi. Tr. 1621:10–18 (O'Neal). Regeneron also presented no evidence that it could not have made a deal to get rights to Dupixent, as it did for Praluent, or entered any of countless other business arrangements.

### 2.    The Insufficient Evidence of Substantial Foreclosure Independently Defeats Any Claim of Anticompetitive Conduct.

As explained in Section II.B.1, to be *anticompetitive*, conduct must result in substantial foreclosure. If the law were otherwise, then actions with no effect on *competition* overall would be wrongly treated as actionable under the antitrust laws. Put another way, the legality of a bundle or below-cost pricing agreement, no less than an exclusive dealing agreement, "depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor*, 696 F.3d at 271. There is no reason that the necessity of a sufficiently substantial share of the market "so as to adversely affect competition" would be less if the theoretical underpinning of the challenge to the supposedly coercive contract changed. Accordingly, substantial foreclosure is a core requirement, regardless of the precise theory of *why* a bundled rebate is improper. The jury's verdict that Amgen substantially foreclosed the market is insufficiently supported by evidence, and this alone requires judgment for Amgen.

### 3.    Regeneron's Lack of Sufficient Evidence to Show that Enbrel Has Market Power Independently Precludes Anticompetitive Conduct.

Regeneron also failed to provide sufficient evidence for a reasonable jury to conclude that Enbrel had market power. For a bundled rebate to be coercive and thus anticompetitive, the product being leveraged (here, Enbrel) to drive sales of a second product (here, Repatha) must

30

have market power so that a customer is compelled to buy the first product.  *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 557 (D.N.J. 2019) (dismissing bundled rebate claims that did not allege leveraging products had market power); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1030 (8th Cir. 2020) (same).  In *Shire* and *Inline Packaging*, it was not enough for the defendant to have market power for the product with which the plaintiff's product competed (here, Repatha); the bundling claims were insufficient because the *products being leveraged* lacked market power.  *See also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 277 (6th Cir. 2015) ("Without substantial market power over refurbished printheads, Kodak would be unable to use a threatened printhead price increase to 'force' buyers to buy its ink").

Third Circuit law supports a requirement of monopoly (or market) power for the product being leveraged.  Bundling is anticompetitive when a company "link[s] products *on which [defendant] faced no competition . . .* with a competitive product."  *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) (emphasis added).  In *LePage's*, 3M supposedly used its "monopoly over its Scotch tape brand to gain a competitive advantage in the private label tape portion of the transparent tape market."  324 F.3d at 145.  Thus, to prove a coercive bundling claim under governing precedent, Regeneron had to prove that Enbrel had market power.

Market power "can be demonstrated through direct or indirect evidence."  *Mylan Pharms.*, 838 F.3d at 434; *supra* Section II.A. Regeneron did not define, let alone prove, a relevant market for Enbrel.  "Without a definition of the relevant market, the defendant's ability to exclude competitors cannot be determined."  *Am. Bearing Co., Inc. v. Litton Indus., Inc.*, 729 F.2d 943, 949 (3d Cir. 1984).  Regeneron's expert, asked if she knew "what Enbrel's market share is today," admitted: "I don't make a market definition for Enbrel, so I — I don't have any way to give you a share."  1004:18–20 (Scott Morton).  This dooms any attempt by Regeneron to prove a relevant

31

market for Enbrel through indirect evidence. *Queen City*, 124 F.3d at 436.

Regeneron similarly failed to provide direct evidence that could support a finding of Enbrel market power. Such a showing requires that Regeneron "provide an analysis of the defendant's costs, showing both that the defendant had an 'abnormally high price-cost margin' *and* that the defendant 'restricted output.'" *Mylan*, 838 F.3d at 434 (citation omitted); *accord Rebel Oil*, 51 F.3d at 1434 (requiring "evidence of restricted output and supracompetitive prices"). In *Mylan*, the expert testimony was insufficient because although the expert provided some information about profit margins to suggest they were as high as "83%," the expert failed to explain if those margins were "abnormally high." 838 F.3d. at 434–35.

As in *Mylan,* Scott Morton failed to establish that Enbrel had abnormally high margins. Scott Morton testified that Enbrel's profit margin was "in the mid-80s" and "very big," but did not opine whether they were abnormally high for a branded pharmaceutical product. Tr. 917:1–18. Scott Morton also testified that Enbrel's "price is not declining over time," Tr. 1005:8–15, and that from 2019 to 2023 the "net price is staying the same" for Enbrel, Tr. 918:10–23. But she did not indicate she adjusted these prices for inflation, or otherwise show that these prices were "abnormally" high. The Third Circuit recently affirmed a finding of no market power where, "[m]ost notably, Appellees' expert economist opined that, over the relevant time period, inflation-adjusted . . . prices were 'flat, or even down.'" *Winn-Dixie Stores*, 89 F.4th at 436.

Moreover, and critically, Scott Morton made no mention of any restricted output for Enbrel. This alone is fatal to a finding of market power. *Mylan*, 838 F.3d at 434. No reasonable jury could conclude monopoly or market power has been directly proven without any attempt to "discuss the quantity of" Enbrel that was "manufactured during the relevant period" and show that it was

32

reduced and reflected a restriction on output. *Id*. at 435.[9] But Regeneron in fact emphasized the size of Enbrel sales rather than proving the legally required decreased output.

### C.    Regeneron Offered Insufficient Evidence of Harm to Competition.

Even if Amgen's actions were anticompetitive—and they were not—they are lawful unless "the probable effect of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals." *ZF Meritor*, 696 F.3d at 271. This requires evidence of "reduction of output, denial of consumer choice, [or] increasing price." *Eisai*, 821 F.3d at 407. Regeneron introduced no such evidence. To the contrary—the evidence showed decreasing prices and increasing output, which are hallmarks of a competitive market. *See Brooke Grp.*, 509 U.S. at 233.

None of Regeneron's witnesses testified that Amgen's challenged contracts led to reduced output or that the price of Repatha (or any PCSK9i) increased or was supracompetitive. The only evidence Regeneron offered about Repatha's price was that from the second quarter of 2020 to the second quarter of 2023, Repatha's average net price was higher than Praluent's. Tr. 878:20–879:2 (Scott Morton). But this does not establish that Repatha's price was increasing or "higher than the price one would expect to find in a competitive market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 547–48 (2018). Regeneron's experts conceded that PBMs received *lower* prices as a result of Amgen's conduct. Tr. 924:19–926:6 (Scott Morton) (ESI); 931:23–933:15 (Scott Morton) (CVS); 1151:18–1153:13 (Mathur) (CVS). The evidence is clear that PBMs derived "more value" from Repatha based on a "head-to-head comparison" with Praluent due to Repatha's superior sales.

---

[9] Although Regeneron at times claimed Otezla rebates were also conditioned on Repatha coverage, Regeneron only specifically claimed such discounts were offered as a small part of rebates at one PBM (Ascent/ESI). Tr. 924:11–926:9; PTX-329 [Ex. A]. Scott Morton did not claim that conditional rebates on Otezla alone were anticompetitive. In any event, Regeneron did not introduce adequate evidence of Otezla market power for all the same reasons as Enbrel, including that there was no market definition for Otezla and no evidence of restricted output for Otezla. *See* Tr. 922:3–9.

Tr. 861:25–862:5 (Kitson); 1038:1–16 (Witter); 1495:7–24 (Norton); 1368:17–25 (Grennan).

Indeed, the evidence showed that, over the relevant period, Repatha's net price declined and PCSK9i claims increased—signs of a competitive market. Tr. 1683:23–1686:15 (Gaier); 1852:14–1854:5 (Stiroh); DTX-1125 [Ex. U]; DTX-2180 [Ex. AN]; DTX-2181 [Ex. AO]; DTX-2154 [Ex. AM]; DTX-1808 [Ex. AK]; DTX-1748 [Ex. AJ]. This makes sense given that PBMs instructed drug manufacturers that bids lowering rebates (increasing prices) could be rejected as "noncompliant." Tr. 767:14–770:17 (Gordon); 1024:12–16 (Witter); PTX-474 [Ex. D] at 4. As such, if Amgen tried to raise the price of Repatha, "the contract would again be up for bids." *Nat'l Reporting Co. v. Alderson Reporting Co., Inc.*, 763 F.2d 1020, 1023 (8th Cir. 1985). There is no evidence that Regeneron would not bid if Amgen's bid was rejected. In such a market, competition is "alive and well." *Id.*

Nor is there sufficient evidence for a reasonable jury to find that Amgen's conduct denied consumer choice, or that such a denial is an anticompetitive harm. The U.S. healthcare system "necessarily" limits choice, *EpiPen*, 44 F.4th at 985; that certain insurers cover only Repatha or only Praluent is not an anticompetitive harm. *See Verizon Commc'ns v. Trinko*, 540 U.S. 398, 411 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."). Praluent is still on the market, and Regeneron has no plans to exit. Tr. 474:1–4 (McCourt). Further, rebate agreements do not dictate formulary decisions nor prevent consumers from selecting drugs off-formulary. *Eisai*, 821 F.3d at 407–08 ("[C]ustomers had the ability to switch to competing products. They simply chose not to."); *EpiPen*, 44 F.4th at 985 ("[P]atient could seek a medical necessity exemption or otherwise pay out of pocket"). Regeneron's CEO admitted patients can still access Praluent if they need it, even if it is not covered on formulary. Tr. 278:24–279:9 (Schleifer); DTX-1249 [Ex. Z] at 7. Praluent's record-breaking

34

sales also demonstrate there is no denial of consumer choice here.  Tr. 334:1–335:3 (Schleifer); 1804:14–1805:17 (Gaier); DTX-1808 [Ex. AK]; DTX-1748 [Ex. AJ] at 82, 119; DTX-1177 [Ex. X] at 6, 79.  In fact, patients have *more* choice now due to Leqvio's increasing success in the PCSK9i market.  Tr. 1001:1–9 (Scott Morton); 1448:8–1449:22 (Niksefat); 1843:15–1844:19 (van Grunsven); 1858:5–18 (Stiroh).  Without legally sufficient evidence of anticompetitive harm in the form of "reduction of output, denial of consumer choice, [or] increasing price," *Eisai*, 821 F.3d at 407, judgment for Amgen is warranted.

> ### D.  Regeneron Offered Insufficient Evidence of Antitrust Injury at CVS.

A plaintiff may recover damages under the antitrust laws, including the Cartwright and Donnelly Acts, only to the extent it suffers an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990); *Hilton v. Children's Hosp. San Diego*, 315 F. App'x 607, 609 n.2 (9th Cir. 2008) (Cartwright Act); *Menkes v. St. Lawrence Seaway Pilots' Assn.*, 269 F. App'x 54, 55 (2d Cir. 2008) (Donnelly Act).  "In [*Brunswick*], the Supreme Court rejected the notion that antitrust injury could be alleged by a private plaintiff averring that it would have fared better without the defendant's alleged conduct." *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018).  It has thus been clear for nearly half a century that "[a] plaintiff who wants . . . less competition or higher prices, that would injure consumers, does not suffer antitrust injury." *Id.* at 345 (citation omitted); *see also Brunswick*, 429 U.S. at 488 (deeming it "inimical to the purposes" of the "antitrust laws" to "award damages" to plaintiffs for "profits they would have realized had competition been reduced").

The jury's award of damages at CVS turns this foundational rule of law on its head.  The only damages Regeneron claimed at CVS were "in 2022 and 2023"—while *Praluent* (not Repatha)

was covered exclusively on CVS's national formularies.   The damages the jury awarded Regeneron—higher profits it could have earned at CVS if it had faced less competition from Amgen—are precisely the type of profits *Brunswick* and its progeny held are not recoverable under the antitrust laws.   429 U.S. at 488; *Uber*, 886 F.3d at 343.   It is the most critical tenet of the antitrust laws that harm to a *competitor* is not sufficient to sustain an antitrust claim; there must be harm to *competition*.  *Brunswick*, 429 U.S. at 488.

At trial, Regeneron characterized Amgen's conduct as "rais[ing] the cost of Regeneron to compete," Tr. 929:14–19 (Scott Morton), but the *only* evidence Regeneron proffered of raised costs was its claim that it supposedly had to pay "artificially high rebates" to outcompete Amgen. Tr. 1130:22–1131:1 (Mathur).  Putting aside that such claims were disproven by the trial record, *see supra* Section I.A.2, that would not amount to a viable claim of "raising rivals' costs," which applies only where a competitor imposes costs on rivals by depriving them of key inputs, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191–96 (3d Cir. 2005); *LePage's, Inc.*, 324 F.3d 141, 160 (3d Cir. 2003).  Expanding "raising rivals' costs" to reach circumstances where a plaintiff has to lower its prices to respond to competition would erase *Brunswick* and antitrust injury and turn the antitrust laws into a prohibition *on* competition.  After all, "to hold that antitrust laws protect competitors from paying too much . . . in a competitive auction would render all such auctions illegal, because . . . every losing bidder will raise its rival's costs." *Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*, 1994 WL 561377, at *4–6 (S.D.N.Y. Oct. 12, 1994) (no antitrust injury where Viacom sought "to recoup the loss it suffered as a result of a competitive bidding process"); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986) ("injuries to rivals are byproducts of vigorous competition, and the antitrust laws are not balm for rivals' wounds").

This Court denied Amgen summary judgment on antitrust injury for CVS because it

36

thought Regeneron's lowering of its price could potentially constitute antitrust injury if it were done in response to "below cost" pricing from Amgen.  D.I. 419 at 2.  But even if case law supported this principle (and it does not), Regeneron failed to prove its claim of below-cost pricing at CVS.  *See supra* Section II.B.1.a.  Indeed, the trial record contains not a single piece of evidence quantifying any purported bundled offer (because one was never made) by Amgen at CVS Part D.

For CVS Commercial, Regeneron's expert conceded Regeneron was not forced to sell Praluent below cost; instead, Regeneron "was able to make Praluent for the amount that they were selling for."  Tr. 928:15–929:16 (Scott Morton).  Regeneron thus was *not* "suffer[ing] lost profits" under "the terms it needed to offer to win" the CVS Commercial contract.  D.I. 419 at 3.  In any event, the evidence is clear that Amgen's bundled offer at CVS Commercial did not affect its negotiations with Regeneron.  *See supra* Section I.A.2.

This Court also declined to award Amgen summary judgment on antitrust injury at CVS because it concluded Regeneron did not need to "be foreclosed from the market before it has incurred an actionable antitrust injury," D.I. 419 at 2.  But the Court need not hold otherwise to enter judgment for Amgen.  If Regeneron had shown that Amgen actually *raised Regeneron's input costs*, for example, Regeneron could have argued raising rivals' costs.  But Regeneron claims only that it had to *lower prices* because Amgen did.  Per *Brunswick*, that is not antitrust injury, because Regeneron's injury must "flow[] from that which makes defendants' acts unlawful," 429 U.S. at 489, and not from a defendant's conduct that benefitted consumers and competition.

"Because below-cost pricing is a 'boon to consumers,' the losses inflicted on [rivals] by the pricing are not the stuff of antitrust injury."  *Rebel Oil*, 51 F.3d at 1433–34.  What makes below-cost pricing potentially unlawful is "exclud[ing] an equally or more efficient competitor and thereby reduc[ing] consumer welfare in the long run."  *Cascade Health Sols. v. PeaceHealth*,

37

515 F.3d 883, 897 (9th Cir. 2008).  But Regeneron did not base its claimed damages at CVS on it exiting the market or losing any sales.  Tr. 1195:15–18 (Mathur).  Indeed, CVS rejected Amgen's offers and covered Praluent 1:1 for the entire time for which Regeneron sought damages at CVS.  Tr. 1151:21–23 (Mathur), 961:17–962:12 (Scott Morton).  Regeneron instead sought damages solely because competition forced it to charge "lower prices," Tr. 1130:22–1131:1 (Mathur), which does not "flow[] from that which makes" below-cost pricing potentially unlawful, *Brunswick*, 429 U.S. at 489.  The Court should thus vacate the jury's damages award at CVS.

**III.    Amgen Is Entitled to Judgment as a Matter of Law or a New Trial on Regeneron's Tortious Interference Claim.**

Regeneron's claim for tortious interference with prospective business relations fails *regardless* of the disposition of its antitrust claims because Regeneron did not prove a potential business relationship that Amgen prevented.  However, Regeneron's tortious interference claim is also dependent on its antitrust claims and fails for the same reasons they do.  Regeneron also failed to adduce any evidence of outrageous conduct to support the punitive damages award.

**A.    Regeneron Offered Insufficient Evidence of Any Prospective Business Relationship with which Amgen Interfered.**

To prove tortious interference with a prospective business relationship, a plaintiff must show both "the reasonable probability of a business opportunity" and "the intentional interference by defendant with that opportunity."  *U.S. Bank*, 23 F. Supp. 3d at 436.  In other words, a plaintiff "must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm."  *Id.*; *see also Truinject Corp. v. Nestle Skin Health, S.A.*, 2020 WL 70981, at *17 (D. Del. Jan. 7, 2020) (defendants must have "dissuaded . . . third parties from doing business with" plaintiff).  Plaintiff also must show that the claimed interference was "the proximate cause of the business opportunity's failure."  *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *22 (Del.

Super. Ct. June 24, 2021).  For example, a claim for tortious interference is proper where "but for th[e] interference," the plaintiff and third party "would have closed the transaction," but "due to the difficulties" created by the defendant, the third party had to "end negotiations and walk away from its bid."  *In re Achaogen, Inc.*, 649 B.R. 238, 242–46 (Bankr. D. Del. 2023); *see Carney v. B&B Serv. Co.*, 2019 WL 5579490, at *2 (Del. Super. Ct. Oct. 29, 2019) (third party was "unwilling to contract with Plaintiff to purchase the property as a result of Defendants'" actions).

Regeneron offered no evidence that Amgen's bundled rebate agreements "dissuaded" any third party from entering a relationship with it.  *Truinject*, 2020 WL 70981, at *17.  Regeneron's failure is most evident at CVS.  Though 75% of Regeneron's claimed damages arise from CVS, Regeneron won its business:  CVS *agreed* to cover Praluent 1:1 (and, as Regeneron requested, to exclude Repatha) through the entirety of the damages period.  *See* Tr. 322:19–21 (Schleifer); PTX-1007 [Ex. M]; Tr. 1603:21–1604:6 (O'Neal); DTX-1321 [Ex. AB] at 1; *see also* DTX-1006 [Ex. T]; DTX-1152 [Ex. V]; DTX-1831 [Ex. AL]; DTX-1632 [Ex. AH]; DTX-1633 [Ex. AI] (Amgen's CVS bids from 2019–2022).  Because it did not show that Amgen's conduct prevented the CVS relationship, Regeneron cannot recover damages for tortious interference.  *Truinject*, 2020 WL 70981, at *17; *Soterion Corp. v. Soteria Mezz. Corp.*, 2012 WL 5378251, at *18 (Del. Ch. Oct. 31, 2012) (inquiring if party "refus[ed] . . . to complete" a transaction); *accord BCD LLC v. BMW Mfg.*, 360 F. App'x 428, 436 (4th Cir. 2010) ("A claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party."); *U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl.,* 966 F. Supp. 2d 690, 703-04 (W.D. Tex. 2013).

Regeneron cannot overcome its failure to introduce evidence of any business relationship that CVS was "dissuaded" from entering by pointing to an asserted *change* in the terms of the business relationship it entered.  As an initial matter, Regeneron did not show this factually; as set

39

forth above, *see supra* Section I.A, Regeneron had a total failure of proof with respect to what rebate CVS would have required if Amgen had never raised the idea of a bundle.

Nor is this approach legally viable. The theory that tortious interference caused a business relationship to have different terms is not actionable as a matter of law. The Third Circuit has specifically rejected claims focused only on conduct "causing performance of a contract to be more costly." *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994); *see also Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 583–84 & n.21 (D. Del. 2007) ("[N]o state court in Delaware has ever recognized a cause of action" premised on the theory that defendant's conduct made performance of a contract "more expensive or burdensome"). In the few cases outside Delaware where plaintiffs have raised such a theory as the basis for a claim of intentional interference with a prospective business relationship, courts have rejected it. *See, e.g., BCD*, 360 F. App'x at 436 ("Under South Carolina law, it is irrelevant that a plaintiff could have received a better deal 'but for' the actions of the defendant because the term 'potential' contractual relations does not mean 'full' contractual relations."); *U.S. Enercorp*, 966 F. Supp. 2d at 703–04 ("Merely claiming that the contract would have been more advantageous to [plaintiff] in the absence of Defendants' interference—pleading, in other words, that a contract did not end up being as beneficial as the plaintiff had hoped—does not satisfy the requirement that a business relationship be prevented.").

Similar flaws attend Regeneron's claims at ESI and Optum/UHC. To be sure, Regeneron presented evidence it lost coverage on the national formularies at those PBMs. But a loss in status on one type of formulary at these PBMs is not a lost *business relationship*. In fact, the record reflects Regeneron still had business relationships with PBMs regarding Praluent, even when not covered on the national formulary. Consider PTX-922 [Ex. K], Regeneron's contract with Emisar,

40

the group purchasing organization for OptumRx Commercial and UHC Commercial, effective August 1, 2022. That contract includes an agreed rebate that Regeneron would provide if Praluent were listed 1 of 1 (68.25%) or 1 of 2 (64%). PTX-922 [Ex. K] at 25. At all times, Regeneron had an active contract with all of the PBMs where Amgen had contracts; the PBMs simply have not always taken advantage of the rebates Regeneron offered for Praluent in those contracts. The decision of a PBM to opt for 1:1 coverage of Repatha is not the same as a PBM "refus[ing] to complete [a] transaction" with Regeneron, as required for tortious interference. *Soterion*, 2012 WL 5378251, at *18; *BCD*, 360 F. App'x at 436; *U.S. Enercorp*, 966 F. Supp. 2d at 703–04.

As set forth above (*see* Section I.B-C), Regeneron has not offered sufficient evidence that, but for Amgen's conduct, ESI or Optum/UHC would have chosen to list Praluent on its national formularies either instead of, or in addition to, Repatha (or the rebate terms that would have prevailed). As a result, Regeneron has not shown that other terms would have prevailed if Amgen had never engaged in bundling. *Soterion*, 2012 WL 5378251, at *18; *see Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 220 (3d Cir. 2009) (no prospective business relationship without "an objectively 'reasonable likelihood or probability' that the contemplated contract would have materialized absent the defendant's interference").[10] Even if this theory did not fail on the *facts*, it fails on the law because no case law recognizes a claim for tortious interference with prospective business relationships based on allegedly wrongful conduct that affected the *terms* of a consummated deal. *See BCD*, 360 F. App'x at 436; *U.S. Enercorp*, 966 F. Supp. 2d at 703–04.

---

[10] The Optum/UHC Commercial additional Enbrel rebate was available for non-exclusive coverage, so Regeneron had no evidence that Amgen's contract kept Regeneron from forming a "business relationship" for parity coverage. *See* PTX-598 [Ex. I] (Amgen/Optum, 2021); DTX-0254 [Ex. P] (Amgen/Emisar, 2022) (collectively, contracts providing parity coverage rates). Regeneron simply chose not to pursue parity coverage. *Supra* Section I.C. .

**B.      The Insufficiency of Evidence for Regeneron's Antitrust Claims Dooms Its Tortious Interference Claim.**

To constitute tortious interference, challenged acts must be "wrongful or improper." *Gunn*, 23 F. Supp. 3d at 436. "Common examples of wrongful means include physical violence, fraudulent misrepresentation, and threats of litigation." *Red Cat Holdings, Inc. v. Autonodyne LLC*, 2025 WL 432859, at *9–10 & n.22 (Del. Super. Ct. Feb. 6, 2025). In "considering whether a defendant's actions were improper," the factfinder "must assess these actions 'in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *Gunn*, 23 F. Supp. 3d at 436 (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981) (adopting privilege to compete from Restatement § 767)).

Here, Regeneron did not claim Amgen engaged in any unlawful conduct except bundles. *See*, *e.g.*, Tr. 230:16–231:1 (Schleifer); PTX-344 [Ex. B] at 2; 364:16–365:14 (Hyde); Tr. 465:22–466:9 (McCourt); 931:23–932:1 (Scott Morton); Tr. 1075:10–16 (Bates); 1052:2–12 (Anderson). Accordingly, if Regeneron has failed to offer sufficient evidence that the bundles are unlawful and anticompetitive, the tortious interference claim must fail for the same reasons.

Under Delaware law, Amgen enjoys a "privilege to compete" that precludes its conduct from being tortious interference unless it is "independently actionable," such as under the antitrust laws. *Acumed*, 561 F.3d at 220. Winning a bid is not tortious interference. *DeBonaventura*, 428 A.2d at 1153–54 (no tortious interference where plaintiff made "deliberate decision not to compete with the favored shops on repair prices"); *DP-Tek, Inc. v. AT & T Glob. Info. Sols. Co.*, 100 F.3d 828, 833–36 (10th Cir. 1996) (winning a competitive bid is not "wrongful" conduct). The "mere offer of a more competitive bid epitomizes the goal of" the privilege to compete. *DP-Tek*, 100 F.3d at 835; *Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir. 1985) ("bidding against" a competitor "to obtain a customer for itself did not constitute a wrongful means of competition").

Since there is no wrongful conduct here without an actionable antitrust violation, the evidentiary failure of Regeneron's antitrust claims dooms its tortious interference claim.

### C.    The Punitive Damages Award Should be Vacated.

Even if Regeneron had proven tortious interference, its evidence comes nowhere close to the type of "egregious" conduct required for an award of punitive damages (much less in the exorbitant amount awarded here).  Regeneron's only theory of wrongful conduct is coterminous with its claim of an antitrust violation, and the governing antitrust principles must be gleaned from multiple potentially conflicting cases.  An array of legal issues, if decided in Amgen's favor by this Court or on appeal, will allow Amgen's supposedly unlawful conduct to be recognized as the procompetitive price-cutting that Amgen has always contended it was.  Indeed, this Court understandably remarked that "although we hear a lot of challenging patent cases . . . this was maybe the most challenging [case] legally that we've had in the court." Tr. 2241:10–16.

If the law is so unclear or indeterminate that a reasonable person cannot clearly discern the line separating the lawful from the unlawful, then a party may not, as a matter of due process, be *punished* for crossing that muddled line. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 70 (2007).  Nor does Delaware law permit punitive damages in such circumstances.  It is simply impossible to maintain that Amgen—even if it did not properly anticipate how the Third Circuit or this Court would interpret the mix of decisions in this area—somehow acted "so reprehensibl[y] to warrant the imposition of further sanctions," such as by showing "intentional malice" or "reckless disregard" for Regeneron's rights. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  After all, it is well established that mere mistakes and errors of judgment "will not suffice." *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987).  And nothing in the complicated academic and jurisprudential debate of when permissible price-cutting becomes anticompetitive foreclosure makes conduct that is on the wrong side of that line "outrageous,

43

because of evil motive or reckless indifference to the rights of others." *Id.* at 529 (cleaned up).

Unsurprisingly, then, Amgen has not identified a single published case in which punitive damages were awarded on a claim for tortious interference with prospective business relations under Delaware law—much less where the challenge to the conduct was a novel antitrust theory. In rare cases where other courts approved punitive damages on tortious interference claims, the defendant engaged in "outrageous" conduct such as forgery, fraud, extortion, or defamation with knowingly false statements—invariably driven by "evil motive" and facially improper without the need to resort to an expert analysis of antitrust law.[11]   But Regeneron offered no evidence that Amgen acted with an evil motive or engaged in objectively outrageous behavior.   Instead, Regeneron claims Amgen's bundling in *two* instances crossed an amorphous line that no case lays out.  Regardless of whether this Court or the Third Circuit permits Regeneron's creative expansion of the antitrust laws, there is nothing *outrageous* or *egregious* or *reprehensible* about competing through discounts that are later adjudged to be *too* hard to compete with.  *U.S. Bank*, 23 F. Supp. 3d at 436; *DeBonaventura*, 428 A.2d at 1153–54; *see supra* Section I.A.2.

Nor has Regeneron adduced evidence that Amgen acted with "reckless indifference" to Regeneron's rights.  A punitive damages award must "bear[] a reasonable relationship to the reprehensibility of [defendant's] tortious conduct," *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499 F.3d 184,193 (3d Cir. 2007), which turns on "***foreseeability***" that the conduct at issue was wrongful and would violate Regeneron's rights, *Jardel*, 523 A.2d at 530.  As noted above, it was unforeseeable that Amgen's price cutting could violate the antitrust laws.

---

[11] *E.g.*, *Zimmerman v. Direct Fed. Credit Union*, 121 F.Supp.2d 133, 144–45 (D. Mass. 2000), *affirmed* 262 F.3d 70 (1st Cir. 2001) (punitive damages appropriate where defendant had "evil motive," undertook a "deliberate, calculated, systematic campaign to humiliate and degrade" plaintiff at work); *Perkins v. Dean Mach. Co.*, 132 S.W.3d 295, 299 (Mo. App. 2004) (punitive damages warranted where defendant forged financial documents to take plaintiff's property).

Because Amgen's conduct, even if "erroneous, was not objectively unreasonable," Amgen cannot possibly have acted with "reckless disregard." *Burr*, 551 U.S. at 69–70; *Jardel*, 523 A.2d at 530.

In essence, Amgen's conduct amounted to offering lower prices to customers, in circumstances under which no one could have predicted with certainty would be found unlawful. As such, no reasonable jury could award punitive damages on the evidence presented, and any such award would violate due process and Delaware law. The Court should grant judgment as a matter of law, or, at minimum, grant a new trial because the award is excessive and contrary to the weight of evidence. *Malcolm v. Little*, 295 A.2d 711, 713–14 (Del. 1972) (vacating punitive damage award because it "shocked" the "judicial conscience" where the applicable law was unclear and "courts have never had to determine" how conflicting rules operate, "keeping always in mind that the compensatory damages have already made the victim 'whole'").

## IV.    Amgen Is Entitled to Judgment on the UCL Claim

Regeneron has indicated it will seek judgment on its UCL claim, which is a claim to be decided by the Court. Amgen will oppose Regeneron's motion on the timeline set by the Court. But, if necessary here, Amgen contends it is entitled to judgment because no element is supported by sufficient evidence. Specifically, Regeneron has offered insufficient evidence of unlawful, unfair, or fraudulent conduct (*supra* Sections II-III); or that any such conduct caused harm to Regeneron (*supra* Section I). Amgen reserves the right to advance additional arguments in response to Regeneron's brief.

## CONCLUSION

Regeneron did not meet its evidentiary or legal burdens set forth by the Supreme Court and the Third Circuit for antitrust claims, and by Delaware state and federal courts for Delaware tortious interference. The Court should grant judgment to Amgen on all claims. At a minimum, Amgen is entitled to a new trial because the verdict is against the great weight of the evidence.

45

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Catherine E. Lynch (No. 7326)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
clynch@ycst.com

*Attorneys for Amgen Inc.*

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Kate Swisher
Ben A. Sherwood
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Richard J. Doren
Samuel Liversidge
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Betty X. Yang
Ashley E. Johnson
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Courtney L. Spears
3161 Michelson Drive, Suite 1200
Irvine, CA  92612-4412
(949) 451-3800

Dated: June 12, 2025

**CERTIFICATE OF SERVICE**

I, Melanie K. Sharp, Esquire, hereby certify that on June 12, 2025, I caused to be electronically filed a true and correct copy of Amgen Inc.'s Opening Brief in Support of its Renewed Motion for Judgment as a Matter of Law or in the Alternative, Motion for a New Trial with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

David E. Wilks
Scott B. Czerwonka
Wilks Law LLC
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
dwilks@wilks.law
sczerwonka@wilks.law

I further certify that on June 12, 2025, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Jessica L. Falk
Robert Niles-Weed
Rachel Williams
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
jessica.falk@weil.com
robert.niles-weed@weil.com
rachel.williams@weil.com

Michael R. Moiseyev
Priyata Y. Patel
Weil, Gotshal & Manges LLP
2001 M. Street , NW
Washington, DC 20036
michael.moiseyev@weil.com
priyata.patel@weil.com

Jonathan D. Polkes
Adam B. Banks
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
jonathan.polkes@whitecase.com
adam.banks@whitecase.com

Eric S. Hochstadt
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
ehochstadt@orrick.com

/s/ Melanie K. Sharp
Melanie K. Sharp (No. 2501)