IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REGENERON PHARMACEUTICALS, INC.    )
                                   )
        Plaintiff,                 )      C. A. No.:  22-00697-JLH
                                   )
            v.                     )      **JURY TRIAL DEMANDED**
                                   )
AMGEN INC.,                        )      ██████████████████
                                   )
        Defendant.                 )

**DEFENDANT AMGEN INC.'S
ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF REGENERON
PHARMACEUTICALS, INC.'S MOTION FOR 1) PERMANENT INJUNCTIVE
RELIEF; 2) CONSTRUCTIVE TRUST; AND 3) PREJUDGMENT INTEREST**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Catherine E. Lynch (No. 7326)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
clynch@ycst.com

GIBSON, DUNN & CRUTCHER LLP
Richard J. Doren
Samuel Liversidge
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Eric J. Stock
Kate Swisher
Ben A. Sherwood
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Ashley E. Johnson
Betty X. Yang
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Courtney L. Spears
3161 Michelson Drive, Suite 1200
Irvine, CA  92612-4412
(949) 451-3800

*Attorneys for Amgen Inc.*

Dated:  June 27, 2025

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................3

I.    The Court Should Deny Regeneron's Request for a Permanent Injunction. ......................3

    A.    Regeneron Has Shown Neither an Ongoing Threat of Injury Nor Irreparable Injury with No Adequate Remedy at Law.............................3

    B.    The Sweeping and Unlawful Injunction Regeneron Seeks Would Damage the Public Interest and Inflict Undue Hardship.......................................7

        1.    Regeneron's Request To Destroy Competition by Banning Repatha Rebates Is Unlawful and Defies the Public Interest....................................9

        2.    Regeneron's Demand To Cancel Amgen's Current Repatha Rebate Contracts Would Injure Competition and Patients. ...................................18

        3.    Regeneron's Demand for a Blanket Prohibition on Bundling and to Subject Amgen to Needless "Fencing in" Should Be Denied. .................19

        4.    There Is No Basis To Appoint a Compliance Monitor. ............................24

        5.    Regeneron's Demand for Notice to Payors, Prescribers, and the Public Is Unwarranted................................................................................26

II.    Regeneron Is Not Entitled to a Constructive Trust..........................................................29

    A.    Regeneron's Failure To Plead Disgorgement Through a Constructive Trust Waives the Claim. ...........................................................................29

    B.    Regeneron Cannot Satisfy Any Element for Seeking Disgorgement Through a Constructive Trust. ..............................................................30

    C.    Disgorgement Through a Constructive Trust Would Be an Impermissible Double Recovery. .....................................................................34

III.    Regeneron Is Not Entitled to Prejudgment Interest on Any of Its Claims.........................36

    A.    Prejudgment Interest is Unavailable on Regeneron's Claims...............................36

        1.    Prejudgment Interest is Unavailable on the Sherman Act, Clayton Act, and Cartwright Act Claims.................................................................36

2.      Regeneron Is Not Entitled to Prejudgment Interest on its Donnelly Act Claim. ...................................................................................39

3.      Regeneron Is Not Entitled to Prejudgment Interest on its Tortious Interference Claim. ...............................................................40

B.      Regeneron's Calculation of Prejudgment Interest Is Also Wrong........................41

1.      Regeneron Errs in Arguing that Prejudgment Interest Is Compound and in Proposing an Alternative Start Date for Prejudgment Interest...........................................................................................41

2.      Prejudgment Interest Is Not Calculated on Multiple Claims. ...................44

IV.     All of Regeneron's Requested Relief Fails to the Extent It Relies on Facts Not Proven at Trial.........................................................................................44

V.      The Court Should Enter Judgment on Regeneron's Abandoned UCL Claim. .................45

CONCLUSION...........................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*3Shape TRIOS A/S v. Align Tech., Inc.*,
  2020 WL 2559777 (D. Del. May 20, 2020)...............................................................8, 9

*Acumed LLC v. Stryker Corp.*,
  551 F.3d 1323 (Fed. Cir. 2008)...................................................................................18

*Aiellos v. Zisa*,
  2009 WL 3486301 (D.N.J. Oct. 20, 2009)...................................................................46

*American Home Products Corp. v. F.T.C.*,
  695 F.2d 681 (3d Cir. 1982).........................................................................................24

*Anheuser-Busch, Inc. v. Abrams*,
  71 N.Y.2d 327 (1988) ...................................................................................................41

*Ario Underwriting Members of Syndicated 53 at Lloyds for 1998 Year of Acct.*,
  618 F.3d 277 (3d Cir. 2010)..........................................................................................38

*Auto. Prods., plc v. Tilton Eng'g, Inc.*, 1993 WL 660164 (C.D. Cal. Sept. 16,
  1993) ..........................................................................................................................38, 40

*B.A.S.S. Group, LLC v. Coastal Supply Co.*,
  2009 WL 1743730 (Del. Ch. June 19, 2009)............................................................31, 33

*Bain v. California Tchrs. Ass'n*,
  891 F.3d 1206 (9th Cir. 2018) ......................................................................................30

*Balooshi v. GVP Global Corp.*,
  2022 WL 576819 (Del. Super. Feb. 25, 2022) *aff'd*, 285 A.3d 839 (Del. 2022)...................43

*Beard Rsch., Inc. v. Kates*,
  8 A.3d 573 (Del. Ch. 2010) *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11
  A.3d 749 (Del. 2010) ....................................................................................................42

*Black L. Enf't Officers Ass'n v. City of Akron*,
  920 F.2d 932 (6th Cir. 1990) ........................................................................................46

*Brandywine Smyrna v. Millenium Builders*,
  34 A.3d 482 (Del. 2011) ............................................................................................41, 42

*Brown v. Court Square Capital Management, L.P.*,
  2024 WL 1655418 (Del. Ch. Apr. 17, 2024), *aff'd*, 331 A.3d 1270 (Del. 2024) ...................43

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)......................................................................................................12

*Cantor Fitzgerald, L.P. v. Cantor*,
  724 A.2d 571 (Del. Ch. 1998).......................................................................................32

*Carl Wagner & Sons v. Appendagez, Inc.*,
    485 F. Supp. 762 (S.D.N.Y. 1980) ................................................................. 40

*Cascade Health Sol'ns v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ................................................................. 19, 20

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
    903 F. Supp. 2d 198 (S.D.N.Y. 2012) ........................................................... 4

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ..................................................................... 29

*Dresser-Rand Co. v. Virtual Automation Inc.*,
    361 F.3d 831 (5th Cir. 2004) ....................................................................... 5

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................... 3, 9

*Enhabit, Inc. v. Nautic Partners IX, L.P.*,
    2024 WL 4929729 (Del. Ch. Dec. 2, 2024) ................................................. 32

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ................................................................ 11, 12

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ................................................................................. 28

*Fineman v. Armstrong World Indus., Inc.*,
    980 F.2d 171 (3d Cir. 1992) ...................................................................... 45

*Fishman v. Est. of Wirtz*,
    594 F. Supp. 853 (N.D. Ill. 1984), *aff'd in relevant part*, 807 F.2d 520 (7th
    Cir. 1986) ........................................................................................... 34, 35

*Fox v. Board of Trustees of State Univ. of N.Y.*,
    42 F.3d 135 (2d Cir. 1994) ....................................................................... 30

*FTC v. Direct Mktg. Concepts, Inc.*,
    648 F. Supp. 2d 202 (D. Mass. 2009), *aff'd,* 624 F.3d 1 (1st Cir. 2010) ................ 25

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019) ....................................................................... 4

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ................................................................. 21

*In re G-Fees Antitrust Litig.*,
    584 F. Supp. 2d 26 (D.D.C. 2008) .............................................................. 4

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
    817 A.2d 160 (Del. 2002) ......................................................................... 42

*Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*,
    201 F. App'x 7 (1st Cir. 2006) ................................................................... 30

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*,
 2010 WL 338219 (Del. Ch. Jan. 29, 2010) ........................................................42

*In re Green Field Energy Servs., Inc.*,
 594 B.R. 239 (Bankr. D. Del. 2018), *aff'd Halperin*, 610 B.R. 776 .......................31

*Greenly v. Greenly*,
 49 A.2d 126 (Del. Ch. 1946) ............................................................................31, 33

*Halperin v. Moreno (In re Green Energy Servs.)*,
 610 B.R. 760 (D. Del. 2019) ....................................................................................31

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
 834 Fed. App'x 695 (3d Cir. 2020) ..........................................................................33

*Harris v. Univ. of Massachusetts Lowell*,
 43 F.4th 187 (1st Cir. 2022) .....................................................................................30

*Herrara v. 12 Water St. Gourmet Cafe, Ltd.*,
 2016 WL 1274944 (S.D.N.Y. Feb. 29, 2016), *report and recommendation
 adopted*, 2016 WL 1268266 (S.D.N.Y. Mar. 31, 2016) ..........................................43

*Hino Motors Mfg. U.S.A., Inc. v. Hetman*,
 2022 WL 16709717 (E.D. Mich. Aug. 4, 2022), *adopted sub nom.*, 2022 WL
 10422675 (E.D. Mich. Oct. 18, 2022) ......................................................................30

*Hogg v. Walker*,
 622 A.2d 648 (Del. 1993) .....................................................................31, 33, 34, 35

*Ingevity Corp. v. Basf Corp.*,
 2024 WL 579069 (D. Del. Feb. 13, 2024) ...............................................................45

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
 466 U.S. 2 (1984) .....................................................................................................20

*Kairys v. Southern Pines Trucking, Inc.*,
 75 F.4th 153 (3d Cir. 2023) .....................................................................................45

*Kokesh v. S.E.C.*,
 581 U.S. 455 (2017)..................................................................................................36

*Leonard v. Stemtech Int'l Inc.*,
 834 F.3d 376 (3d Cir. 2016).....................................................................................44

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)........................................................................................8

*Lewis v. Smith*,
 480 F. App'x 696 (3d Cir. 2012) ........................................................................38, 39

*LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*,
 2025 WL 1545444 (Del. Super. Ct. May 15, 2025) ................................................43

*In re Linerboard Antitrust Litig.*,
  504 F. Supp. 2d 38 (E.D. Pa. 2007) ...................................................................37

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
  478 U.S. 421 (1986) .........................................................................................25

*Longview Energy Co. v. Huff Energy Fund LP*,
  533 S.W.3d 866 (Tex. 2017)............................................................................33

*Mallet & Co. Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ...................................................7, 8, 9, 19, 21, 27

*Mass. v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004)............................................................17, 18, 23

*Masters v. Wilhelmina Model Agency, Inc.*,
  473 F.3d 423 (2d Cir. 2007)...............................................................................37

*McMahon v. New Castle Assocs.*,
  532 A.2d 601 (Del. Ch. 1987)..........................................................31, 32, 33, 34, 35

*Metro Ambulance, Inc. v. E. Med. Billing, Inc.*,
  1995 WL 409015 (Del. Ch. July 5, 1995)....................................................33, 35

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011), *as amended* (Mar. 7, 2012) ...........................1, 2, 5, 6

*Nash v. Schock*,
  1997 WL 770706 (Del. Ch. Dec. 3. 1997) ......................................................33

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  594 U.S. 69 (2021)...............................................................2, 3, 10, 12, 14, 20

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) ...............................................................................29

*New York v. Microsoft Corp.*,
  224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004)
  .......................................................................2, 6, 7, 10, 13, 14, 17, 19, 26, 27

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  669 F.2d 490 (7th Cir. 1982) .....................................................................12, 14

*Ortho Biotech Prods., L.P. v. Amgen Inc.*,
  2006 WL 3392939 (D.N.J. Nov. 21, 2006) .......................................................5

*Parseghian v. Frequency Therapeutics, Inc.*,
  2022 WL 2208899 (Del. Ch. June 21, 2022).................................................33, 35

*Patane v. Romeo*,
  652 N.Y.S.2d 142 (App. Div. 1997) .................................................................43

*Pike v. Commodore Motel Corp.*,
  1989 WL 57026 (Del. Ch. Ct. May 25, 1989) .................................................33

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    278 F.3d 175 (3d Cir. 2002)..................................................................................39

*Rapposelli v. State Farm Mut. Auto. Ins. Co.*,
    988 A.2d 425, 427 (Del. 2010), *as corrected* (Feb. 5, 2010)..............................42

*Rodriguez v. Kalata*,
    133 N.Y.S.3d 787 (2020) ......................................................................................40

*Seven Gables Corp. v. Sterling Recreation Org.*,
    686 F. Supp. 1418 (W.D. Wash. 1988)..................................................................39

*Skretvedt v. E.I. DuPont De Nemours*,
    372 F.3d 193 (3d Cir. 2004)......................................................................31, 33, 34

*Snepp v. United States*,
    444 U.S. 507 (1980)...............................................................................................31

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).................................................................................................7

*Spodek v. Park Property Dev. Assocs.*,
    96 N.Y.2d 577 (2001)............................................................................................43

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ..................................................................................6

*Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
    895 F.3d 1304 (Fed. Cir. 2018)..............................................................................36

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) .................................................................................12

*Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc*,
    731 F. Supp. 2d 937 (N.D. Cal. 2010) ..................................................................44

*Trans World Airlines, Inc. v. Hughes*,
    449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds sub nom. Hughes Tool Co.
    v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973)..............................................40

*U.S. v. Am. Tel. & Tel. Co.*,
    552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. U.S.*, 460 U.S.
    1001 (1983)............................................................................................................26

*U.S. v. Apple Inc.*,
    992 F. Supp. 2d 263 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015) .....24, 26

*U.S. v. Armour & Co.*,
    402 U.S. 673 (1971)...................................................................................21, 26, 28

*U.S. v. Microsoft Corp.*,
    56 F.3d 1448 (D.D.C. 1995) ..................................................................8, 15, 16, 21

*U.S. v. Osage Wind, LLC*,
    2020 WL 3578351 (N.D. Okla. July 1, 2020) ...................................................30

*U.S. v. U.S. Gypsum Co.*,
    340 U.S. 76 (1950) ...................................................................................24

*U.S. v. United Foods, Inc.*,
    533 U.S. 405 (2001)............................................................................17, 27

*U.S. v. Vulcan Soc'y, Inc.*,
    2010 WL 2160057 (E.D.N.Y. May 26, 2010) ...........................................25

*U.S. v. W. T. Grant Co.*,
    345 U.S. 629 (1953) ...................................................................................4

*United States v. Loc.*
    *1804-1, Int'l Longshoremen's Ass'n*, 812 F. Supp. 1303 (S.D.N.Y.), *aff'd sub nom. U.S. v. Carson*, 52 F.3d 117 (2d Cir. 1995) .....................................46

*US Airways, Inc. v. McCutchen*,
    663 F.3d 671 (3d Cir. 2011), *vacated on other grounds*, 569 U.S. 88 (2013).......................35

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)....................................................................10, 13, 15

*Vizant Techs. LLC v. Whitchurch*,
    675 F. App'x 201 (3d Cir. 2017), *as amended* (Feb. 2, 2017) ...................5

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015) ...................................................45

*Westport Taxi Serv., Inc. v. Westport Transit Dist.*,
    664 A.2d 719 (Conn. 1995) (1995)...........................................................38

*White v. Iris Nova Ltd.*,
    2023 WL 4931646 (S.D.N.Y. Aug. 2, 2023) ...........................................43

*Wilk v. Am. Med. Ass'n*,
    895 F.2d 352 (7th Cir. 1990) ...................................................................28

*Williams v. Ozmint*,
    716 F.3d 801 (4th Cir. 2013) ...................................................................30

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................29

*Zapata v. Gulf Marine Corp. v. Puerto Rico Maritime Shipping Authority*,
    133 F.R.D. 481 (E.D. La 1990)................................................................39

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)..................................................4, 9, 15, 16, 21, 24

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971)..................................................................................35

## Statutes

6 Del. C. § 2301 ...........................................................................................................41

6 Del. C. § 2301(d) .................................................................................................41, 44

15 U.S.C. § 15(a)(1) ...................................................................................................39

15 U.S.C. § 15(a)(1)-(3) .............................................................................................37

15 U.S.C. § 15(a)(3) ...................................................................................................39

15 U.S.C. § 78(d)(5) ...................................................................................................36

Cal. Bus. & Prof. Code § 16761(a)–(c) .....................................................................37

## Other Authorities

Carmody-Wait, 2d New York Practice § 63:93 (2025) ...............................................43

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2602.1 (3d ed. 2025) ...............................................................................................24

David S. Siegel, Practice Commentary to CPLR 5001(1992) .....................................43

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 393a (4th ed. 2024) ...........................................37

## Rules

Fed. R. Civ. P. 8(a)(3) ...............................................................................................29

Fed. R. Civ. P. 53 ......................................................................................................24

Fed. R. Civ. P. 65(d)(1)(B) ........................................................................................27

N.Y. CPLR § 5001(b) .................................................................................................44

## Treatises

Restatement (Third) of Restitution and Unjust Enrichment § 160 (2011)....................31

Restatement (Third) of Restitution and Unjust Enrichment § 55 (2011).....................33

**INTRODUCTION**

Regeneron asks this Court for injunctive relief that can only be described as outlandish and contrary to any recognized principle of law. The requested relief is designed to decimate Repatha through judicially imposed anticompetitive restraints that would exclusively benefit Regeneron while harming customers and patients. In particular, Regeneron asks this Court to intervene in the market to (i) prohibit Amgen from providing any rebates of any kind on Repatha; (ii) cancel all of Amgen's existing contracts; (iii) prohibit Amgen from providing PBMs with the option of exclusivity (even when requested by a PBM); (iv) prohibit bundles of any kind, regardless of their legality; and (v) mandate a minimum market share of 35% for Praluent (while requiring Amgen to pay for Regeneron's marketing of its drug to achieve that level). Regeneron seeks this outrageous relief despite the fact that no one—including Regeneron—has ever claimed that the broad swath of conduct prohibited by the injunction actually violates any law.

But Regeneron does not stop there. Regeneron also seeks billions of dollars in additional relief through disgorgement on a never-before-mentioned theory of constructive trust. Having already recovered its supposed lost profits at trial—plus treble and punitive damages—Regeneron asks to recover them *again* as equitable relief. It concludes by asking this Court to assess an astronomical amount of prejudgment interest in the absence of a single case to support its request.

Regeneron's request for equitable relief must be seen for what it is—an overbroad and cynical attempt to enlist this Court in its effort to destroy competition and obtain a market position it was entirely unable to achieve even before Amgen's allegedly anticompetitive conduct. The Court should deny Regeneron's motion across the board.

*First*, Regeneron is not entitled to an injunction because its claimed injury is fully reparable by money damages. Such an injury is not "irreparable" as a matter of law. *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011), *as amended* (Mar. 7, 2012). And Regeneron

has never alleged any injury aside from its "purely economic injury" of lost profits.  *Id.*

Even were injunctive relief potentially available, the specific injunction Regeneron seeks exceeds anything authorized by the law.  By prohibiting Amgen from engaging in virtually every type of available competition, the Court would give Regeneron free rein to minimize the rebates it offers, increasing its own profits and harming customers and patients.  This requested prohibition on lawful price competition defies the Supreme Court's direction that in "fashioning an antitrust remedy," courts must exercise "caution" to avoid decrees that "could wind up impairing rather than enhancing competition."  *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102, 106 (2021).  Not surprisingly, Regeneron's motion cites no authority supporting this suppression of competition at the behest of the competitor that would benefit from it.  To the contrary, courts consistently recognize that their role is "not to engineer a particular market outcome," even after a finding of antitrust liability, *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 189 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004).  Regeneron asks this Court to do just that by tying Amgen's hands from competing until Regeneron achieves the market share it deems appropriate.

*Second*, Regeneron long ago waived its request for a constructive trust when it omitted to plead it.  Plaintiffs cannot spring entirely different and duplicative demands for relief on defendants and the Court for the first time after trial.  Moreover, even had Regeneron timely sought a constructive trust, it is not a proper remedy here.  Constructive trusts are equitable relief for a very particular circumstance:  when the plaintiff holds legal or equitable title to specifically identifiable or traceable property wrongly held by a defendant.  That is not the case here.  Instead, Regeneron simply seeks to duplicate the award of lost profits.  Tellingly, Regeneron has not identified a single case imposing a constructive trust to disgorge past and future profits from a competitor as part of the relief for a tortious interference claim.

*Finally*, Regeneron's request for compound prejudgment interest is foreclosed by controlling law. Delaware law requires a written settlement demand before prejudgment interest can be awarded, and Regeneron never made one. Regeneron identifies no Sherman Act, Donnelly Act, or Clayton Act claim awarding such interest, particularly in a case like this one where there is no evidence of bad faith, the legal requirements are complex, and the case moved efficiently to trial. Regeneron doubles down on its error by seeking compound interest, which is disfavored by Delaware law, barred by New York statute, and unavailable under the Cartwright Act.

The Court should deny every request for relief in Regeneron's motion for the reasons discussed below.

## ARGUMENT

### I.    The Court Should Deny Regeneron's Request for a Permanent Injunction.

Regeneron's core claim in this case is that it lost profits due to Amgen's competition, and lost profits are a textbook example of monetary loss fully compensable with money damages. Nothing about Regeneron's claimed harm permits equitable relief. But the injunction Regeneron seeks is also fatally overbroad and anticompetitive. Under the guise of an antitrust remedy, Regeneron asks the Court to forbid Amgen from competing on price with Praluent and to forbid it from obtaining exclusive coverage. Because Regeneron's requested relief improperly "impair[s] rather than enhanc[es] competition," *Alston*, 594 U.S. at 102, it is barred as a matter of law.

#### A.    Regeneron Has Shown Neither an Ongoing Threat of Injury Nor Irreparable Injury with No Adequate Remedy at Law.

To obtain a permanent injunction, Regeneron must show "it has suffered an irreparable injury" that "remedies available at law, such as monetary damages, are inadequate to compensate[.]" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). This requires proof of "significant threat of injury from an impending violation of the antitrust laws or from a

contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969).

As a threshold matter, Regeneron's claim of irreparable harm fails because it offered no evidence about the current (or anticipated future) state of the market. ████████████████ ████████████████████████████████████████████████████, PTX-598 [Ex. 1][1] at 23–32 ████████████████, and the rebate that Regeneron claims Amgen *offered* at CVS many years ago was never accepted. The only bundled rebate provision that was ever conditioned on exclusivity was with ESI Commercial, *see, e.g.*, DTX-081 [Ex. 2], and that exclusivity requirement is no longer in place. Regeneron did not (and could not) adduce any evidence to the contrary. Regeneron thus cannot meet its burden of showing a "cognizable danger of recurrent violation" of the antitrust laws. *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

Regeneron's only response to this absence of evidence is that voluntary cessation of unlawful conduct is insufficient to moot an injunction request. D.I. 499 at 4. But that is beside the point, as a Court cannot award such relief absent proof of a "cognizable danger of recurrent violation." *Id.* (quoting *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 157 (3d Cir. 2019)). Showing such a threat requires more than boilerplate assertions that an injunction is necessary "to remedy the anti-competitive market effects caused by the unlawful conduct of Defendants, and . . . assure that similar anti-competitive conduct does not occur in the future." *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 210 (S.D.N.Y. 2012) (rejecting as "wholly speculative" a claim for injunctive relief that did not "demonstrate which drugs might be involved, or what [unlawful] conduct might be undertaken" in the future); *see also In re G-Fees Antitrust*

---

[1] Citations to admitted trial exhibits and trial transcripts include bracketed references to versions attached as exhibits to the concurrently filed Declaration of Ben A. Sherwood.

*Litig.*, 584 F. Supp. 2d 26, 35 (D.D.C. 2008) (failure to "identify any future conduct by defendants" violating antitrust laws precluded injunctive relief).  Regeneron's failure to meet this burden means its request for a permanent injunction should be denied.[2]

Separately, Regeneron has failed to establish that the harm it claims is irreparable.  "As a general matter, a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement[.]"  *Minard Run Oil Co.*, 670 F.3d at 255 (internal quotation marks omitted).  Here, Regeneron claims only economic injury, and it does not argue or present evidence that its claimed economic injury is somehow unique and cannot be addressed through money damages.

Courts are especially loath to award injunctive relief where the movant has "established by its own trial testimony that its claim of . . . lost profits would have provided it fair and proper compensation."  *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004). Regeneron has always claimed exactly that.  Regeneron sought (and was awarded) damages based on the "profits that Regeneron would have earned if Amgen had not engaged in [a] cross-therapeutic bundling strategy," thereby fully addressing any "lost profits associated with the harm that Regeneron suffered as a result of Amgen's strategy."  Tr. 1129:21–23, Tr. 1128:18–20 (Mathur).  Other than trying to recast its lost profits claim as an injury to market share, D.I. 499 at 6, Regeneron made no claim that it ultimately suffered any harm beyond lost profits.

Additionally, Regeneron does not assert that the economic injury it claims is great enough to "threaten the existence of [Regeneron's] business."  *Minard*, 670 F.3d 236 at 255; *Ortho Biotech Prods., L.P. v. Amgen Inc.*, 2006 WL 3392939, at *7 (D.N.J. Nov. 21, 2006) (loss of market share

---

[2] Nor can Regeneron's tortious interference claim support such a sweeping injunction.  Its only cited tortious interference case awarded relief tailored to an ongoing violation—enjoining the defendant from "discouraging others to do business" with the plaintiff.  *Vizant Techs. LLC v. Whitchurch*, 675 F. App'x 201, 203 (3d Cir. 2017), *as amended* (Feb. 2, 2017).  Regeneron has not shown evidence of ongoing tortious interference, and requests relief untethered from such a claim.

can only be irreparable "where consumers are brand-loyal and will likely result in a permanent loss of customers, or where the company may be rendered insolvent by continuing antitrust violations"). Regeneron admits Praluent had its best year in net sales in 2024, Tr. 334:22–335:3 (Schleifer), and remains on the market with no plans to exit. Tr. 474:1–4 (McCourt). Courts look to the threat to the *business* as a whole, not a single product, and there is no dispute that Regeneron—which continues to earn billions in profits every year, DTX-1720 [Ex. 3] at 74—is far from "bankruptcy," "shut[ting] down," or otherwise suffering irreparable loss. *Minard*, 670 F.3d at 255; *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 718–24 (4th Cir. 2021) (denying injunctive relief as to "earlier injuries" that did not "threaten [the business's] survival").

Regeneron asserts that an injunction is "needed" to "re-level the competitive playing field" from Amgen's conduct. D.I. 499 at 6. But lost profits are still economic damages, regardless of whether they allegedly result from an asymmetric playing field. Regeneron's request to "re-level" the field to match its desired result defies the fundamental proposition that in creating an antitrust remedy, the court's role is "not to engineer a particular market outcome." *New York*, 224 F. Supp. 2d at 189. In *New York v. Microsoft*, for example, the court rejected the government's proposal that Microsoft be forced to include with its Windows operating system a program that was compliant with the system of its competitor Sun, despite the government's argument that such relief was the only "means by which Java [the compatible product] can achieve sufficient distribution to provide a viable platform." *Id.* The court concluded that it was not "an appropriate remedy" to "single[] out particular competitors and anoint[] them with special treatment." *Id.* It further reasoned that once "anticompetitive restraints" had ceased, "any continuing lack of industry interest in Sun-compliant Java is . . . the problem of a particular competitor and not competition itself and, therefore, not appropriate for redress under antitrust law." *Id.* The same is true here.

6

Regeneron's own experts testified that the PBMs "control market share" and can "return [market share] to Praluent" at any time—making heavy government involvement in the free market even more unwarranted.  Tr. 956:17-25; 978:9–10 (Scott Morton); 1101:14 (Bates) ("the market share can be changed by the PBM"); *see also infra* at 14 (collecting evidence).

Finally, Regeneron's antitrust claims are subject to treble damages, and the jury awarded it punitive damages.  While the jury's verdict should be overturned for all the reasons set forth in Amgen's separate motion for judgment as a matter of law (*see* D.I. 497), the fact remains that to the extent Regeneron can show a violation, the antitrust laws already provide a remedy that gives Regeneron far more than its alleged lost profits.  Regeneron has adduced no evidence of any injury it will suffer that requires more relief than these sky-high damages, let alone the broad injunctive relief sought here.  Its request for an injunction should therefore be denied.

### B.    The Sweeping and Unlawful Injunction Regeneron Seeks Would Damage the Public Interest and Inflict Undue Hardship.

It is axiomatic that courts must be "careful to avoid constructions of § 2 which might chill competition, rather than foster it."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  Because this is particularly important where a remedial proposal comes from a competitor who will benefit from diminished competition, courts must take "pains to ensure that the remedy . . . is not a vehicle by which . . . competitors can advance their own interests."  *New York*, 224 F. Supp. 2d at 111 (collecting cases).  Injunctions should "be narrowly tailored to reach only those acts that closely relate to the unlawful conduct giving rise to an entitlement to injunctive relief" and "should not restrain competitors from engaging in lawful business activities."  *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 389 (3d Cir. 2021).

Regeneron defies these principles by targeting "lawful business activities," *Mallet*, 16 F.4th at 390, that are "unrelated to violations found by the court," *U.S. v. Microsoft Corp.*, 56 F.3d 1448,

1460 (D.D.C. 1995).  Regeneron did not claim that offering PBMs rebates for formulary coverage is unlawful; indeed, its entire case was about Amgen supposedly preventing its rebate offers from being competitive.  Nor did it claim that obtaining exclusive coverage is unlawful; it sought such coverage itself.  And it does not allege that *all* bundles, or even *all* cross-therapeutic bundles, are anticompetitive.  Even stretching *LePage's* to its broadest possible scope, and ignoring the subsequent case law limiting it, *LePage's* does not prohibit every bundle; it *still* requires that "portions of the market" be "foreclose[d]" to a competitor who "cannot make a comparable offer." *LePage's Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003).  As this Court previously recognized, *LePage's* should not be read to hold that a violation occurs anytime a single-product producer faces a multi-product discount from a "dominant seller," because that reading would not "require any consideration of the size of the discount," a key element in whether there is foreclosure. *3Shape TRIOS A/S v. Align Tech., Inc.*, 2020 WL 2559777, at *8 (D. Del. May 20, 2020).  As Scott Morton put it, "[t]here's a lot of perfectly harmless bundles."  Tr. 906:25.

Despite the much more limited scope of its claims in the litigation, Regeneron's injunction would prohibit Amgen from not only seeking exclusive coverage of Repatha from the "Large Payors,"[3] but also from offering Large Payors *any* "Rebates"[4] at all on Repatha—even non-bundled rebates—for one to three years, even though the evidence incontrovertibly established that rebates provided based on formulary coverage are how drug manufacturers compete on price. D.I. 498-1 § IV(A).  With Amgen barred from competing on price, Regeneron would be freed from the need to do so.  The injunction would also require Amgen to cease paying any Repatha

---

[3] Regeneron defines the "Large Payors" as Ascent/ESI Commercial, ESI Part D, Zinc/CVS Commercial, CVS Part D, OptumRx/UHC Commercial, UHC Part D, and Humana Part D.  D.I. 498-1 § I(B).

[4] Regeneron's proposed injunction defines "Rebates" expansively to include "any . . . concession . . . provided by Amgen to a payor."  D.I. 498-1 § I(H).

Rebates required by its current contracts with the Large Payors, regardless of whether those contracts include any of the provisions Regeneron challenged in this case. *Id.* § III. Regeneron's injunction would also prohibit Amgen from offering any bundled rebates on Repatha, without any attempt to address this Court's recognition, compelled by Third Circuit precedent, that the antitrust laws cannot be read to condemn all such rebates. *Id.* § II; *3Shape*, 2020 WL 2559777 at *8. Finally, Regeneron's proposed injunction would subject Amgen to compliance monitoring without basis, D.I. 498-1 § VI, and implement Regeneron's free-riding strategy by compelling Amgen to send gratuitous notices to promote Praluent that Regeneron is free to send, *id.* § V.

Such draconian punishment would flout the most basic principles of appropriate injunctive relief by enjoining "lawful" conduct that is completely "unrelated to the violations found by the court." *Zenith*, 395 U.S. at 133; *Mallet*, 16 F.4th at 390. Moreover, by ejecting Amgen from competing, the requested relief would impair competition and injure the very customers and patients the antitrust laws protect by forcing them to change to Praluent at an increased price. It thus fails to meet the basic requirements "that the public interest would not be disserved by a permanent injunction," and that "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted." *eBay*, 547 U.S. at 391.

### 1. Regeneron's Request to Destroy Competition by Banning Repatha Rebates Is Unlawful and Defies the Public Interest.

Section IV of Regeneron's proposed injunction drastically limits Amgen's admittedly *lawful* competition until Regeneron obtains the market share that it wants, which violates the guardrails set out by the Third Circuit to avoid harming competition. D.I. 498-1 § IV. Specifically, Section IV imposes draconian restrictions on unquestionably lawful competition for three years or until Praluent has at least a 35% share of Regeneron's artificially crafted market for four consecutive quarters. *Id.* Regeneron bases this number on its market share years *before* it cut its

sales force and marketing efforts, effectively asking this Court to use the power of the government to ensure that its failed "naïve" business strategy has *no effect* on its sales.  DTX-1964 [Ex. 4].

Any prohibition on lawful conduct for Praluent to obtain a pre-determined market share is improper.  By dictating that it should have at least 35% market share, Regeneron asks the Court to manage the marketplace as if it were "a regulatory agency," *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004), which improperly transcends "the practical limits of judicial administration."  *Alston*, 594 U.S. at 102; *see New York*, 224 F. Supp. 2d at 100 ("Equitable relief in an antitrust case should not . . . adopt overly regulatory requirements which involve the judiciary in the intricacies of business management." (citations omitted)).  It is a fundamental premise of the antitrust laws that "markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare."  *Alston*, 594 U.S. at 106. Unsurprisingly, Regeneron cites no case where a court determined what a plaintiff's market share "should be" and then suppressed competition to achieve it.

The market realities illustrate the problem with judicially imposed restraints on competition.  The alleged market has changed dramatically since Regeneron had a 35% share, including because Regeneron put itself at a competitive disadvantage by firing its sales force.  Tr. 1694:12–1696:20 (Gaier).  Market evolution will only continue; ██████████████████████████ ████████████████████ (DTX-1004 [Ex. 5] at 18).[5]  Moreover, Praluent's market share had fallen

---

[5] *See also Merck Announces Positive Topline Results From the First Two Phase 3 CORALreef Trials Evaluating Enlicitide Decanoate for the Treatment of Adults with Hyperlipidemia*, MERCK (June 9, 2025), https://www.merck.com/news/merck-announces-positive-topline-results-from-the-first-two-phase-3-coralreef-trials-evaluating-enlicitide-decanoate-for-the-treatment-of-adults-with-hyperlipidemia/; *AZD0780, A Novel Oral PCSK9 Inhibitor, Demonstrated Significant LDL Cholesterol (LDL-C) Reduction in PURSUIT Phase IIb Trial*, AstraZeneca (March 31, 2025), https://www.astrazeneca.com/media-centre/press-releases/2025/azd0780-a-novel-oral-pcsk9-inhibitor-demonstrated-significant-ldl-cholesterol-ldl-c-reduction-in-pursuit-phase-iib-trial.html.

well below 35% market by the time the challenged conduct began.[6]   Regeneron does not show—or even *try* to show—that Praluent would have a 35% market share now without Amgen's alleged misconduct.

> **(a)    Regeneron's Requested Prohibition on Amgen Paying Rebates on Repatha Would Destroy Competition and Injure Patients, Customers, and the Public Interest.**

As Regeneron's witnesses testified, Amgen and Regeneron engage in "price competition" by offering PBMs "rebate[s]" linked to formulary coverage. Tr. 893:16–894:1 (Scott Morton); Tr. 1510:1–9 (O'Neal) (equating "compet[ing] on price" with offering larger rebates); Tr. 190:16–19 (Schleifer) (discounts are "done by what's called a rebate").   Rebates typically vary based on PBM formulary decisions; they may be higher where a PBM determines to grant exclusive coverage. Tr. 930:13–19 (Scott Morton).   Rebates are "a benefit to patients because it means the cost of healthcare has fallen."   Tr. 883:2–7, 905:24–25 (Scott Morton); Tr. 1868:23–24 (Stiroh); *see In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 967 (10th Cir. 2022) ("Patients are . . . enriched [by rebates] in the form of reduced premiums and reduced cost-sharing."). Scott Morton testified in Congress that exclusive coverage is <u>procompetitive</u> because "[t]he way you get low prices in the pharmaceutical industry is by the ability to exclude drugs."   *EpiPen*, 44 F.4th at 987 ("No one can seriously dispute that exclusive rebate agreements stimulate price competition.").

Yet Regeneron seeks to enjoin Amgen from offering *any* Repatha rebates, whether for exclusive coverage or any other type of coverage.   Such an order would obliterate this competition and the significant benefits it bestows on patients through a prohibition on rebating that is unheard of in the industry.   PBMs' "goal is to increase the value that [they] can offer to [their] clients" by

---

[6] Regeneron claims Amgen foreclosed it beginning in April 2020; its economist testified that its market share around that time was 27.6%. Tr. 897:21–898:3, 981:15–19. The evidence Regeneron cites for the 35% figure, D.I. 499 at 30 n.66, concerns Praluent's share from much earlier periods. *E.g.*, *id.* (citing Tr. 507:9–508:1 (McCourt) (discussing DTX-1378 [Ex. 6], from December 2018)).

negotiating larger rebates. Tr. 853:10–13 (Kitson); *see also* Tr. 191:18–23 (Schleifer), 737:18–738:6 (Gordon), 893:8–12 (Scott Morton), 1044:24–1045:5 (Anderson), 1038:4–6 (Witter). If Amgen were prohibited from offering any Repatha rebates, then instead of offering rebates for Praluent of "up to 65%," as Regeneron has done, it could simply "run the table," DTX-1238 [Ex. 7] at 1, by offering paltry Praluent rebates far lower than anything Amgen or Regeneron has offered in the past.[7] DTX-1321 [Ex. 8]. The significant savings patients enjoy from the rebate competition fostered by PBMs would be decimated.

The antitrust laws forbid such a perverse outcome. For more than half a century, the Supreme Court has held that "[t]he antitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). It has unanimously instructed that "[j]udges must be sensitive" to the risk that a remedial decree "could wind up impairing rather than enhancing competition." *Alston*, 594 U.S. at 102, 106; *see also, e.g.*, *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 496 (7th Cir. 1982) (an antitrust remedy "should restore competition, not diminish it"); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1009–10 (9th Cir. 2008) (affirming denial of permanent injunction "where the injunction would hinder, rather that [sic] promote, competition").

Nowhere is this risk more serious than where injunctive relief is crafted by a competitor for its own benefit. *New York*, 224 F. Supp. 2d at 111. It is no concern of the antitrust laws—and should be no concern to this Court—if Repatha continues to win against Praluent (as it did prior to the challenged conduct) as long as that results from patient and customer choice. But Regeneron

---

[7] If Leqvio and other competitors constrain Praluent's price, the anticompetitive effect of banning Amgen from competing would be mitigated. But Regeneron is estopped from claiming that Leqvio or other drugs would constrain the supracompetitive price it would charge because its claims depend on its unproven and erroneous market limited to Repatha and Praluent. D.I. 497 at 17.

will advocate for relief that maximizes its own profits, so the Court must "take[] pains to ensure that the remedy . . . is not a vehicle by which such competitors can advance their own interests." *Id.* Regeneron's proposed remedy is just that, and it cites no case granting injunctive relief to confer market success. Instead, Section 2 cases aim only to promote a level playing field.[8]

Regeneron's attempted reassurance that it would not "intentionally compete less aggressively," D.I. 499 at 23, is no substitute for competition. The core principle of the antitrust laws is that *competition* is good, not that its absence can be excused if a market participant promises to set reasonable prices without it. And the evidence demonstrated that competition from Amgen is precisely what drives Regeneron to offer higher rebates on Praluent. As just one example, CVS Part D informing Regeneron that it was "not taking an Amgen 'bundle deal,'" and that "Amgen beat [Regeneron] on the exclusive bid," is what spurred Regeneron's Marion McCourt to "recommend[]" a "best and final bid for exclusive" to Dr. Schleifer. DTX-1526 [Ex. 9].

Nor does Regeneron's suggestion that Amgen may still "lower[] the list price of Repatha" avoid the harm to competition. D.I. 499 at 23. PBMs do not pay for drugs. They instead earn rebates from their sales, which is how they provide "value . . . to [their] clients," and there is no evidence that PBMs earn material value from unrebated sales. Tr. 853:10–11 (Kitson). There is, accordingly, no evidence that PBMs would have any incentive to cover Repatha at a lower list price if they can earn rebates on Praluent. The ability to lower list price thus does not change the fact that prohibiting Amgen from rebating destroys the rebate competition that PBMs rely upon to

---

[8] Indeed, the Supreme Court has held that "[t]he Sherman Act . . . does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Trinko*, 540 U.S. at 415–16. If altering a way of business is not necessarily appropriate even when doing so "might yield greater competition," then such an alteration is clearly inappropriate where, as here, it would *destroy* competition. *Id.*

generate value for their customers and, ultimately, patients.[9]

Regeneron's other contentions also lack merit.  Regeneron claims Praluent's market share "is below the critical level to be viable and able to compete for formulary coverage."  D.I. 499 at 20–21.  As an initial matter, this assertion does not permit an artificial increase in prices to make it easier for Regeneron to compete.  Anticompetitive relief remains contrary to the public interest, which is why Regeneron offers no examples of courts providing it.  *See, e.g.*, *Alston*, 594 U.S. at 102; *Ohio-Sealy*, 669 F.2d at 496; *New York*, 224 F. Supp. 3d at 111.  But the evidence adduced in this case also disproves Regeneron's assertion; a PBM can switch its coverage to include Praluent at any time if Regeneron provides a competitive bid.  CVS's witness testified that ██

███████████████████████████████████████████████████████████████████████████

Declaration of Ben A. Sherwood, Ex. 15 (Sekili Tr.) at 42:21–43:13.  Regeneron's economic expert testified emphatically that PBMs "know very well how to change market share.  That's exactly the expertise of a PBM."  Tr. 978:13–14; *see also* Tr. 956:25, 978:5–23 (PBMs "control market share" and therefore "don't have to accept the market share of Repatha").  They can instead "say to [their] customers . . . here's what we're all going to consume" and "the market share *will return to Praluent*."  Tr. 978:2–3 (Scott Morton) (emphasis added).  Similarly, Regeneron's internal analysis shows PBMs can rapidly shift share between Repatha and Praluent.  *See* DTX-1378 [Ex. 10] at 31.  And McCourt testified that Praluent could recover because "the physician community" will "remember Praluent."  Tr. 475:12–14 (McCourt).  Having obtained a jury verdict by making this argument, Regeneron cannot now get an injunction by making the *opposite*

---

[9] Regeneron notes its economic expert said Praluent was sold for half the price of Repatha.  D.I. 499 at 8.  Her statistics were misleading.  Repatha obtains a higher percentage of non-preferred and thus unrebated sales than Praluent.  DTX-1249 [Ex. 11]; Tr. 1495:19–21.  Repatha's average net price was thus inflated due to prescriber preference for it.  Once Praluent lost coverage at CVS, its average price inflated dramatically.  Dr. Gaier explained this phenomenon.  Tr. 1686:1–1689:4.

argument.

Finally, Regeneron's claim that it would be "easy to administer" a prohibition on Repatha rebates is both irrelevant and wrong.  D.I. 499 at 24.  Banning competition does not become permissible merely because it is easy to do.  In any event, the requested injunction would not be easily administrable.  It "requires . . . [the] court[] to act as [a] central planner[]" for Amgen, "identifying the proper price . . . and other terms of dealing—a role for which [courts] are ill suited." *Trinko*, 540 U.S. at 408.  If, for example, Amgen's inability to compete on price prompts Regeneron to decrease its rebates and its market share increases to 90%, should the Court intercede somehow?  Or if an oral PCSK9 launches and acquires market share, should the benchmark for Regeneron remain at 35%?  The antitrust laws defer such decision to the market.

**(b)      Offering Rebates and Bidding for Exclusive Coverage Are Not Remotely in "the Same Type or Class" as the Claimed Bundled Rebate Violations.**

Regeneron's request to prevent Amgen from offering any rebates on Repatha for exclusive (or non-exclusive) coverage would also flout the basic requirement that "remedies must be of the 'same type or class' as the violations.'" *Microsoft*, 56 F.3d at 1460 (quoting *Zenith*, 395 U.S. at 132–33).  Regeneron did not complain about Amgen's single-product rebates or bids for exclusive coverage—both of which it now seeks to enjoin.  To the contrary, Regeneron's economist admitted that "if you're a PBM trying to lower your cost . . . you want an exclusive" coverage position to generate even greater rebates.  Tr. 930:16–17  (Scott Morton).  Regeneron also premised its entire case on the principle that "normal price competition" occurs only where competition is "head-to-head," *i.e.*, where there are no bundled rebates.  Tr. 914:15–23; *see also id.* 983:8–9 ("[A]n exclusive is not a problem when it comes from head-to-head competition.") (Scott Morton).  And Regeneron's entire business strategy was to cut its sales and marketing expenses and use the money saved to offer more aggressive rebates and obtain exclusive coverage.  DTX-1504 [Ex. 12].

15

Regeneron only attacked the *particular* bundles that Amgen entered, offered, or supposedly offered on Enbrel, because Regeneron claimed that Enbrel's greater size and supposed importance made those bundles coercive.  Tr. 907:6–10 (Scott Morton).  So rebates on or exclusive coverage of Repatha are not the "'same type or class' as the violations" in this case.  *Microsoft*, 56 F.3d at 1460 (quoting *Zenith*, 395 U.S. at 132–33).  Nor are the numerous other types of discounts, fees, and concessions that Regeneron's sweeping injunction on "Rebates" would prohibit, such as the "administrative," "portal," and "data" fees that GPOs and PBMs require of every drug manufacturer, including Regeneron.  *See* D.I. 498-1 § I(H) (defining "Rebate").

> **(c)    Regeneron's Demand that Amgen Fund Regeneron's Sales and Marketing Expenditures While Amgen Is Prohibited from Competing Is Preposterous and Has No Basis in the Law.**

Regeneron makes the audacious request that this Court order Amgen to "reimburse Regeneron for its sales and marketing expenses of Praluent" D.I. 498 § IV(B)—that is, the expenses that Regeneron voluntarily cut so that it could "leverage other marketing efforts by other companies" (*i.e.*, free ride).  DTX-1504 [Ex. 12].  Regeneron asks the Court to undo the effects of its bad business judgment by making Amgen pay for its marketing to the level of Amgen's own marketing—far more than Regeneron has been willing to pay when shouldering its own costs. Essentially, Regeneron is looking to free-ride on Amgen paying for its marketing expenses so that it can spend to Amgen's level of marketing without incurring any cost and in a manner that is contrary to the minimal sales/marketing business strategy that Regeneron claimed was innovative and would have been successful in a competitive environment.

This relief, too, is unprecedented and contrary to law.  Regeneron cites no case where a court ordered a defendant to fund a plaintiff's sales and marketing expenditures until the supposed monopoly dissipated.  Moreover, while Regeneron claims that it needs "to correct the misinformation about the limited availability of Praluent," D.I. 499 at 21, Regeneron offered no

16

evidence at trial of any misinformation. The evidence instead showed that in 2019, well before Regeneron claims Amgen offered a bundle involving Repatha, Regeneron "c[am]e up with a different selling model" for Praluent that "cut the field force and marketing expenses" to "the bone." DTX-1504 [Ex. 12]; *see also* Tr. 208:8–16 (Schleifer) ("[W]e changed the strategy . . . [to] cut back the sales force, bare bones."). Regeneron fired hundreds of its sales representatives, leaving it with only 16, whom it transferred away from Praluent shortly thereafter. Tr. 318:12–319:11 (Schleifer). There is thus no causal connection, let alone a "*significant causal connection*," from Amgen's supposed monopoly to Regeneron's lack of marketing (or need for more marketing) for Praluent; Amgen achieved its claimed monopoly *after* Regeneron stopped marketing Praluent. *Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1230 (D.C. Cir. 2004) (emphases in original).

Regeneron stood by its decision at trial, testifying that if it could "fix the coverage situation" in the future, it "wouldn't spend a penny more on" marketing. Tr. 475:4–11 (McCourt). Indeed, because Amgen has invested so many millions of dollars in growing the market, Tr. 568:25–569:12 (Gordon), benefitting both Regeneron and Amgen, Regeneron planned to rely on that marketing. DTX-1504 [Ex. 12]. Regeneron's request that Amgen now fund its marketing until it obtains the market share it seeks is just another attempt to "advance [Regeneron's] own interests" instead of restoring competition. *New York*, 224 F. Supp. 2d at 111. Compounding the error in Regeneron's approach, forcing Amgen to subsidize its competitor's marketing would raise unnecessary First Amendment concerns. *U.S. v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *see infra* at 27. This aspect of Regeneron's proposed injunction should therefore also be denied.[10]

---

[10] Regeneron argues that it faces an "uphill battle" to expand Praluent's market share. D.I. 499 at 6 (addressing balance of hardships). But the results of a company's own "business decision" does not "tip the balance of hardships in [its] favor." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (refusing to weigh a company's expenses in balance of hardships where the company could have decided to offer a different product design). The evidence was undisputed

### 2.    Regeneron's Demand To Cancel Amgen's Current Repatha Rebate Contracts Would Injure Competition and Patients.

Regeneron's request that Amgen cease paying any Repatha rebates under its current contracts with the Large Payors, *see* D.I. 498 § III(A), is an extension of its anticompetitive request to enjoin Repatha rebates and should be denied for the same reasons. While Regeneron also tries to justify the request by claiming the contracts "were the product of Amgen's anticompetitive behavior," D.I. 499 at 19, such sweeping relief "requires a clearer indication of a *significant causal connection* between the conduct and the creation . . . of market power." *Mass.*, 373 F.3d at 1230. Regeneron has adduced no evidence of any such connection between Amgen's current agreements and the agreements entered (or offers made) several *years* earlier that it challenged at trial. *See, e.g.*, D.I. 497 at 8–9. Amgen's current agreements are not even in the record. Instead, Regeneron now uses a jury verdict, which makes no specific findings about any particular PBM, as a basis to invalidate PBM contracts with no bundle. Notably, Regeneron opposed any jury verdict separated by PBM, Tr. 2008:12–2009:1. As a result, PBMs who are not party to this case and never entered any bundled arrangement with Amgen would, under the requested injunction, lose their negotiated contractual rights without any showing that those contracts were unlawful.

This is not permissible, and Regeneron offers no authority to justify it. Regeneron's cited authorities confirm that enjoining contractual clauses other than those found to violate the antitrust laws would flout the proscription on "restrain[ing] competitors from engaging in lawful business activities." *Mallet*, 16 F.4th at 390. Thus, for example, the court in *New York* declined to enjoin all agreements, but instead limited its ruling to the particular types of conditional agreements that "the appellate court determined . . . violated § 2." 224 F. Supp. 2d at 169, 269.

---

that Regeneron cut its sales force and pursued a strategy of seeking exclusive formulary status. Having already claimed monetary damages for its lost profits from the outcome of this strategy, Regeneron cannot force Amgen to compensate it *again* for its self-inflicted loss in market share.

### 3.    Regeneron's Demand for a Blanket Prohibition on Bundling and to Subject Amgen to Needless "Fencing in" Should Be Denied.

Regeneron also asks the Court for an order, effective through the end of 2032, (1) enjoining bundles between Repatha and any other drug; (2) prohibiting any Amgen employee who negotiates Repatha formulary coverage from negotiating formulary coverage of any other drug, and firewalling any Amgen employee who negotiates formulary coverage of any other drug from accessing information about Repatha; (3) prohibiting Amgen from "deviat[ing] in any way from" the supposed "requirements" in an RFP for formulary coverage of Repatha; and (4) requiring all Amgen employees who are "direct[ly] involve[d]" in formulary coverage to certify injunction compliance annually.  D.I. 498 at § II.  Regeneron calls (2), (3), and (4) "'fencing-in' provisions." D.I. 499 at 18.  The demanded relief is legally baseless and factually unsupported.

### (a)    The Court Should Reject Regeneron's Blanket Prohibition on Bundling Repatha.

Regeneron's proposed prohibition on bundles, like its prohibition on rebates, bans a wide swath of permissible price competition.  The case law and economic theory surrounding bundled rebates conclude that such rebates can be "procompetitive"; they "allow the buyer to get more for less" and the seller to earn "savings" by "sell[ing] multiple products at the same time." *Cascade Health Sol'ns v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2008) (collecting cases); *id.* at 895 n.6 ("The Supreme Court has recognized the principle that package pricing is usually procompetitive" and "'entirely consistent with the Sherman Act.'" (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).  While the parties disagree about the legal standard governing the challenged bundles, none of those standards automatically condemns bundled rebates.  *See* D.I. 497 at 18; *PeaceHealth*, 515 F.3d at 896 ("[W]e should not be too quick to condemn price-reducing bundle discounts as anticompetitive, lest we end up with a rule that discourages legitimate price competition.").  As Scott Morton said, "[t]here's a lot of perfectly harmless bundles."  Tr. 906:25.

No law requires that "enterprises employ the least restrictive means of achieving their legitimate business objectives," and "[w]hen it comes to fashioning an antitrust remedy," "[j]udges must resist the temptation" to impose such a requirement. *Alston*, 594 U.S. at 106. Regeneron's injunction would defy these well-established principles by prohibiting Amgen from bundling "*any Other Amgen Product*" with Repatha irrespective of the merits of the bundle.[11] While Regeneron claims this is necessary to restore "head-to-head competition,"[12] it did not even attempt to show that the law mandates only head-to-head competition, or that all bundled Repatha rebates violate the antitrust laws. For example, the only evidence Regeneron offered of whether a bundled rebate was anticompetitive was the utterly insufficient and summary testimony of Scott Morton that at Ascent/ESI Commercial, "'[i]f you took the dollar amount" of Enbrel rebates, "the size of . . . the withheld rebate is . . . bigger than the size of Repatha." Tr. 927:15–928:13; *see* D.I. 497 at 18–22. But even that observation was specific to that bundle—*i.e.*, the Enbrel rebates applied "to the Repatha purchases of Express Scripts." *See* Tr. 927:13–928:18 (Scott Morton). The most Regeneron could have possibly proved, then, was that the specific bundle at Ascent/ESI Commercial was somehow unlawful—not that all bundles, or even just ones involving drugs in different therapeutic classes, are somehow unlawful. *See* Tr. 1091:2–5 (Bates) (conceding there is not necessarily "anything wrong" with "cross-therapeutic bundles").

---

[11] Although Regeneron labels this section as a prohibition on "[c]ross-[t]herapeutic [b]undling," the language of the proposed injunction is broader. D.I. 498-1 § II. Specifically, Regeneron defines "Other Amgen Product" as "any product in which Amgen has a financial interest . . . except for Repatha." D.I. 498-1 § I(C).

[12] Regeneron errs on this point. In fact, the corporate representatives of ESI, OptumRx/UHC, and Zinc/CVS Commercial all testified at trial that during the period of Amgen's challenged conduct, they decided which drug to cover "based solely on a head-to-head comparison of Praluent versus Repatha and not considering value provided on any other drug." Tr. 861:25–862:2 (Kitson); Tr. 1493:19–1494:3 (Mr. H); Tr. 1038:9–16 (Witter). CVS Part D told Regeneron that it was "not taking an Amgen 'bundle deal'" and was evaluating the drugs head-to-head. DTX-1526 [Ex. 9].

Regeneron has not shown that every bundled rebate Amgen could theoretically offer in the future—*i.e.*, regardless of the amount of rebate, the conditions on its applicability, and how widespread it may be used—would harm competition or even Regeneron. Accordingly, a blanket injunction on all future bundling of Repatha would be inconsistent with the law and "unrelated to violations found" by the jury, *Microsoft*, 56 F.3d at 1460 (quoting *Zenith*, 395 U.S. at 133), and "restrain [Amgen] from engaging in lawful business activities." *Mallet*, 16 F.4th at 390.

Regeneron tries to justify its demand by pointing to a settlement Amgen entered with the FTC in unrelated litigation over Amgen's acquisition of Horizon Therapeutics. D.I. 499 at 16. As an initial matter, an FTC settlement is not analogous to a court-ordered injunction, because in such an agreement "the parties each give up something they might have won had they proceeded with the litigation." *U.S. v. Armour & Co.*, 402 U.S. 673, 681 (1971). Even if the FTC had needed judicial injunctive relief, a lower standard would have applied than the four-part test applicable here; for example, "the FTC need not show any irreparable harm" to get a preliminary injunction against the merger and the FTC is "entitled to a presumption against the merger on the merits." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1034–35 (D.C. Cir. 2008).

But the Horizon settlement is also distinguishable. It does not address cross-therapeutic bundles generally. Rather, it prohibits Amgen from bundling KRYSTEXXA and TEPEZZA, drugs billed as medical benefits, with other Amgen drugs. *See* D.I. 500-1, Ex. 1 at 5. Bundling KRYSTEXXA and TEPEZZA with other Amgen drugs had been merely "theorized" by the FTC; in fact, Amgen had already "committed" not to do it. D.I. 352, Ex. 5 at 2, 22. And given that KRYSTEXXA and TEPEZZA are medical benefit drugs, the prohibition in the settlement agreement does not address bundles of drugs that are billed as pharmacy benefits, which witnesses testified (and documents reflected) occur from time to time. DTX-1403 [Ex. 13] at 13 (listing

bundles by GSK, Pfizer, AbbVie, Eli Lilly, Novo Nordisk, and Gilead); Tr. 1081:7 (Bates) ("I've seen a few in my career.").[13]

>    (b)    **The Court Should Reject Regeneron's So-Called "Fencing-in" Demands.**

The "fencing-in" provisions of Regeneron's requested injunction, which would also last until the end of 2032, are unwarranted. *See* D.I. 498-1 § II(B)–(D).

Any prohibition on Amgen submitting bids that do not meet PBMs' purported bidding requirements, *id.* § II(C), would impair competition by preventing Amgen from competing in the same way that Regeneron competes. As an initial matter, the evidence at trial established that PBMs' bidding requirements are not requirements at all. *See* Tr. 1565:13–15 (O'Neal) (testifying that as long as you "talk" to the PBM about submitting a noncompliant bid and the PBM "says it's okay, it's okay"); Tr. 657:16–19 (Gordon) (testifying that PBM bidding requirements are "less about rules and more about guidelines . . . because [PBMs] eventually and, in many cases or for many companies, take deals that don't match" them). Regeneron itself has submitted one or more bids that did not comport with PBM bidding "requirements." Tr. 1564:25–12 (O'Neal). The only basis for enjoining Amgen from "deviat[ing] in any way from, or modify[ing]," PBM bidding guidelines, D.I. 498-1 § II(C), would be to disadvantage Amgen. Moreover, this would require the Court to *mandate* that all terms of Amgen's rebate agreements must conform to the preference of the PBMs, putting an unwarranted thumb on the scale of negotiations in the market. Yet the Court has no particular experience or expertise in whether any particular term that a PBM purports to require is even reasonable, much less should be enforced by a federal court injunction.

---

[13] Regeneron suggested at trial that these bundles were "hypothetical," Tr. 1116:19–1117:1 (Bates), but DTX-1403 calls them examples from "rebate-based agreements that [Eversana, Regeneron's hired consultant] tested in primary research." DTX-1403 [Ex. 13] at 13. Eversana used them to propose "hypothesized portfolio contract structures" for Praluent and Dupixent. *Id.*

Regeneron's requested firewall, D.I. 498-1 § II(B), would be similarly punitive.  Amgen's market access professionals focus on particular PBMs, not drugs.  *See* Tr. 1198:14–17 (West) (ESI); Tr. 1308:2–5 (Grennan) (OptumRx/UHC).   Walling off the Amgen employees who negotiate Repatha coverage from those who negotiate coverage of other drugs would require Amgen to restructure its entire market access business unit, including for products other than Repatha.  "Structural relief," however, "requires a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of market power."  *Mass.*, 373 F.3d at 1230 (quotation marks omitted).  Regeneron has adduced no evidence connecting Amgen's supposed market power to employees having negotiating responsibilities for multiple drugs.  *Id.* Moreover, a firewall would frustrate Amgen's ability to conduct its business by removing key executives, such as its Chief Commercial Officer, from decision-making for its drugs.  Regeneron offers no support for such a restructuring of Amgen's business.

Because these "fencing-in" obligations are unwarranted, requiring certifications of compliance with those obligations is also unwarranted.  D.I. 498-1 § II(D).  More generally, it would be improper to require repeated certifications from such a vast swath of Amgen employees. Regeneron cites not a single authority for such a sweeping requirement.  *See* D.I. 499 at 17–19.

The few cases Regeneron cites also provide no support for any fencing in.  *See* D.I. 499 at 18–19.  None concerns the type of "fencing in" relief Regeneron seeks here, and each was premised on distinguishing factors not present here.  The Supreme Court in *Zenith* enjoined an unlawful conspiracy "to prevent Zenith from exporting . . . into any foreign market," even though the record showed only a "conspir[acy] to exclude Zenith . . . from the Canadian market," because conspiracies directed to other markets were also "unlawful."  395 U.S. at 132–33.  By contrast, it is obviously not unlawful to submit a bid to a PBM outside the four corners of its self-created bid

grid, as both Amgen and Regeneron have done, or to have an employee with responsibilities for more than one drug.  Similarly, *American Home Products Corp. v. F.T.C.* concerned "a habitual violator" against which the FTC had "entered three litigated cease and desist orders" for the same type of conduct.  695 F.2d 681, 707 (3d Cir. 1982).  There is no evidence whatsoever that Amgen is a "habitual violator" of the antitrust laws.  And the injunction in *U.S. v. U.S. Gypsum Co.* policed "a long-continued conspiracy" among a vast array of market participants and therefore required additional safeguards.  340 U.S. 76, 80, 90 (1950).  The conduct in this case, by contrast, is discrete and limited to only Amgen.

### 4.  There Is No Basis or Reason To Appoint a Compliance Monitor.

Regeneron's proposal for a compliance monitor until the end of 2032 is equally unjustified.  D.I. 498 § VI.  Post-trial "masters are the exception, not the usual or common practice." 9C Charles Alan Wright & Arthur R. Miller *Federal Practice and Procedure* . § 2602.1 (3d ed. 2025).  They are "appropriate when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent."  Fed. R. Civ. P. 53 advisory committee's note to 2003 amendment.  *See U.S. v. Apple Inc.*, 992 F. Supp. 2d 263, 280 (S.D.N.Y. 2014) (similar), *aff'd,* 787 F.3d 131 (2d Cir. 2015).  The Supreme Court has approved a compliance monitor upon a finding of an "established record of resistance to prior state and federal court orders designed to end their discriminatory membership practices." *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 482 (1986).  Other judicial appointments rely on similar findings.  *See FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 216 (D. Mass. 2009) (monitoring appropriate because "defendants violated a preliminary injunction issued by this Court and have demonstrated a history of poor diligence"), *aff'd,* 624 F.3d 1 (1st Cir. 2010); *U.S. v. Vulcan Soc'y, Inc.*, 2010 WL 2160057, at *1, *4 (E.D.N.Y. May 26, 2010) (monitor warranted due to "chronic—now bordering on recalcitrant—failure to fulfill [the defendant's] court-ordered obligations").

Regeneron has offered no evidence that Amgen has ever disregarded any order of this Court, nor that it ever *would* do so. It instead tries to sully Amgen by accusing it of "l[ying] about its bundling activities in this litigation." D.I. 499 at 25. According to Regeneron, Amgen was not "truthful" because it said that it never conditioned any Otezla rebates on Repatha formulary coverage, and because it argued that its contract with OptumRx/UHC Commercial did not require Repatha exclusivity. *Id.* at 25. This accusation is false. The record is replete with evidence that Amgen never conditioned any Otezla rebates on Repatha formulary coverage and that UHC Commercial would have earned the bundled rebate even if it also covered Praluent. *See* DTX-081 [Ex. 2] at 16–19 (Ascent contract); PTX-598 [Ex. 1] at 18 (OptumRx/UHC Commercial contract); Tr. 867:14–22 (Kitson) (testifying that "[w]hat is in that contract is absolutely what matters, not documents and lms," and "that is the source of truth."); Tr. 1260:8–16 (West) ("It's just Enbrel" rebates conditioned on Repatha formulary coverage at Ascent); Tr. 1334:24-1335:17 (Grennan) (it was not a condition for UHC to earn the Enbrel overlay that Repatha be covered 1:1). Regeneron never even presented evidence to support its original claim that Amgen engaged in widespread conditioning of Otezla rebates on Repatha coverage. At most, Regeneron and its expert argued that a small portion of the bundled rebate at one client, ESI Commercial, implicitly consisted of Otezla rebates. PTX-329 [Ex. 14] at 2–3 (internal ESI analysis showing ~$1 million incremental Otezla value in 2021 for "Repatha Exclusive option"); Tr. 925:13–926:6 (Morton) (discussing ESI internal analysis). Both Amgen and ESI disputed the allegation, and the jury's verdict does not resolve this issue, much less suggest that Amgen lied to the Court or would disregard a court order.

Regeneron's other arguments are equally unpersuasive. Amgen's agreement to a monitor in its settlement of the Horizon merger challenge provides no support for a monitor here since in a consent decree, "the parties each give up something they might have won had they proceeded

with the litigation." *Armour*, 402 U.S. at 681; *see also U.S. v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982), *aff'd sub nom. Maryland v. U.S.*, 460 U.S. 1001 (1983) (affirming that "a lower standard of review must be applied in assessing proposed consent decrees").  Regeneron suggests Amgen "cannot be trusted to self-enforce its own antitrust protocols," but cites no record evidence to support this.  D.I. 499 at 26; *contra* Tr. 813:7–17 (Gordon).  Similarly, Regeneron's reliance on *Apple*, 992 F. Supp. 2d at 280, is misplaced because that case involved a court's view that there was "blatant and aggressive disregard for the requirements of the law," *id*. at 291, which Regeneron offers no evidence of and which the Court has already implicitly acknowledged did not happen by noting the complexity and uncertainty of the law of bundling.  Tr. 1766:13–17. Similarly inapposite is Regeneron's citation to *New York*'s statement that "industry participants whose survival hinges on their relationship'" with Microsoft "'will be reluctant to exercise the new-found freedoms offered by the remedy."  D.I. 499 at 26 (quoting 224 F. Supp. 2d at 163).  In contrast, the PBMs hold the power in formulary decisions.  *See* Tr. 215:19–21 (Schleifer).

> **5.    Regeneron's Demand for Notice to Payors, Prescribers, and the Public Is Unwarranted.**

Finally, Regeneron's demand that Amgen provide certain notices to payors, prescribers, and the public (D.I. 498-1 § V) is simply another request to "advance [Regeneron's] own interests" rather than restore competition.  *New York*, 224 F. Supp. 2d at 111.  Regeneron is free to inform anyone about the jury's verdict or any injunction issued by the Court.  Indeed, it can provide the Court's public orders and judgment to anyone to substantiate its statements.  There is no basis to compel *Amgen* to do so or indeed for the Court to get involved in publicizing its ruling at all.

As with Regeneron's injunction (and business practices) more broadly, this request simply reinforces that Regeneron's strategy is to free ride off Amgen; as its CEO testified, it sought to "leverage other marketing efforts of other companies," *i.e.*, "Amgen," and "just sit back."  Tr.

298:5–299:4 (Schleifer).  Requiring Amgen to inform prescribers and the public "that Regeneron's Praluent is still available," especially when there is no evidence anyone does not know that, would compel Amgen to do what Regeneron refused to do even before the challenged conduct—market Praluent.  D.I. 498-1 § V(A)(2).  Regeneron's proposed injunction would also require Amgen to provide notice in person to an undefined set of "Prescribers," which could include anyone qualified to prescribe a drug.  D.I. 498-1 § V(A)(2).  "Such vagueness places an unduly harsh burden on [Amgen] and is not in accord with the mandate of Rule 65 that . . . injunction[s] shall be in specific terms."  *Mallet*, 16 F.4th at 389 (quotation marks omitted); *see also* Fed. R. Civ. P. 65(d)(1)(B).

Compelling Amgen's speech to payors, prescribers, and the public would also raise serious First Amendment concerns.  "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views, or from compelling certain individuals to pay subsidies for speech to which they object."  *United Foods*, 533 U.S. at 410 (internal citations omitted).

Again, Regeneron offers no case law that supports its proposal. It cites settlement agreements in government actions, which merit much stronger presumption that they serve the public interest.  D.I. 499 at 24–25; *see Armour*, 402 U.S. at 681; *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 at 171 (2004).  Even those did not require in-person communication to a diffuse set of downstream customers like prescribers.  D.I. 500 Ex. 1 § III.C (requiring notice on "website" and to contracting customers), Ex. 6 § I.B.5 (notice on website), Ex. 7 § III.B ("letter" to customers with "a current contract" or who completed "onboarding process").

Beyond the inapplicable settlements, Regeneron only offers *Wilk v. Am. Med. Ass'n* for the proposition that the Court can address "lingering effects" of anticompetitive conduct in the injunction.  895 F.2d 352, 366–70 (7th Cir. 1990); *see* D.I. 499 at 24.  But in *Wilk*, what the Court

27

deemed anticompetitive was the AMA's publication of the assertion that "it was unethical for medical physicians to associate with chiropractors." *Id.* at 355.  The Court thus required the AMA to mail out the order and to revise its "national ethical publication." *Id.* at 371.  There are two key distinctions from this case.  First, the notice was "tailored to avoid constitutional objection" by directly unwinding the very conduct at issue in the case. *Id.*  Regeneron's proposed notice has no such symmetry.  Regeneron challenged Amgen's rebates, not its speech or its characterizations of Praluent.  Amgen does not need to say anything about Praluent to address the challenged conduct.

The second key distinction is that in *Wilk*, the plaintiffs were four individual chiropractors. *Id.* at 355.  Those four plaintiffs could not speak at the scale of the AMA to the community of medical physicians.  Here, Regeneron is a competitor with a "team of individuals that call the health insurers and PBMs." Tr. 1513:9–10 (O'Neal).  Indeed, Regeneron's expert contemplated that it would be Regeneron, not Amgen, telling prescribers of Praluent's availability.  Tr. 944:7–24 (Scott Morton) ("Regeneron's going to have to remind" doctors about Praluent).

*      *      *

To obtain injunctive relief, Regeneron must show that the balance of hardships "tilts 'decidedly' in [its] favor" over Amgen's, *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991), and that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  For all of the foregoing reasons, Regeneron cannot satisfy either factor.  Its requested relief would unduly harm Amgen, including by restraining its ability to lawfully compete and imposing onerous and costly requirements on Amgen's business.  Regeneron has shown no hardship to itself in the absence of an injunction, only that it would not be able to improperly award itself a competitive advantage in the market. *See supra* I.A.  Similarly, the harms to competition from Regeneron's requested relief would raise prices for customers and

patients and injure the public interest. *See supra* I.B. Regeneron has failed to meet its burden to show that a permanent injunction is warranted, and its request must be denied.

## II.    Regeneron Is Not Entitled to a Constructive Trust.

Regeneron asks the Court to impose a constructive trust disgorging more than $500 million in past profits and more in future profits on Repatha. D.I. 499 at 26–30. But Regeneron has waived any such remedy by failing to request it in the operative complaint, and its request for a constructive trust finds no support whatsoever in the caselaw. The Court should deny it.

### A.    Regeneron's Failure To Plead Disgorgement Through a Constructive Trust Waives the Claim.

Regeneron has never asserted a claim for unjust enrichment, which is a distinct claim under Delaware law. *See Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). It also never pled disgorgement as part of the relief sought for its claims. Because such pleading is mandatory to obtain such relief, Regeneron's request should be denied.

A pleading must contain a *specific* "demand for the relief sought." Fed. R. Civ. P. 8(a)(3). Regeneron's pleading only claimed monetary loss by *Regeneron*, not that *Amgen* was unjustly enriched or that Regeneron was entitled to disgorge Amgen's profits. D.I. 124 ¶¶ 278-79 (alleging that "Regeneron . . . lost revenues, profits, and business volume"). While Regeneron's Prayer seeks a variety of relief, it does not seek disgorgement of Amgen's profits. Regeneron's failure to preserve or provide adequate notice of a disgorgement demand is fatal to its eleventh-hour request for a constructive trust. *See Hino Motors Mfg. U.S.A., Inc. v. Hetman*, 2022 WL 16709717, at *2 (E.D. Mich. Aug. 4, 2022), *adopted sub nom.*, 2022 WL 10422675 (E.D. Mich. Oct. 18, 2022); *U.S. v. Osage Wind, LLC*, 2020 WL 3578351, at *6 & n.4 (N.D. Okla. July 1, 2020).

The prejudice to Amgen of Regeneron's attempt to raise a new remedy post-trial is obvious: Regeneron's new, unpled theory of recovery exponentially multiplies Amgen's

29

exposure.  Because Amgen had no notice of these unpled theories of recovery, it had no occasion to test those theories through motion practice, conduct discovery, or present evidence at trial.

Sensing this problem, Regeneron avers in a footnote that it sought "any relief 'the Court may deem just and proper" in its Amended Complaint and in its statement of intended proof in the Joint Pretrial Order.  *See* D.I. 499 n.64 (citing D.I. 124 at 115; D.I. 427-3 at Ex. 12, ¶ 38).  That falls far short of the mark.  Courts have roundly rejected the proposition that a "boilerplate prayer for 'such other relief as the Court deems just and proper'" preserves an unenumerated claim for relief.  *Fox v. Board of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 141–42 (2d Cir. 1994); *accord Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 193 (1st Cir. 2022); *Bain v. California Tchrs. Ass'n*, 891 F.3d 1206, 1213 (9th Cir. 2018); *Williams v. Ozmint*, 716 F.3d 801, 810 –11 (4th Cir. 2013); *Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*, 201 F. App'x 7, 9 (1st Cir. 2006). The Court should deny Regeneron's request on this basis alone.

**B.    Regeneron Cannot Satisfy Any Element for Seeking Disgorgement Through a Constructive Trust.**

Regeneron's request for a constructive trust also fails on the merits.

***Amgen owed no fiduciary duty to Regeneron***.  Under Delaware law, a constructive trust may be imposed when "one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another *to whom he or she owes some duty*."  *Hogg v. Walker*, 622 A.2d 648 at 652 (Del. 1993) (citing Restatement of Restitution § 160, cmt. d) (emphasis added); *McMahon v. New Castle Assocs*, 532 A.2d 601, at 608 (Del. Ch. 1987); *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 212–213 (3d Cir. 2004) (similar). Regeneron has never alleged or proven that Amgen owed it any such duty.  The cases Regeneron cites are inapposite, because each arose out of a resulting trust or breached fiduciary duty relating to the very property the plaintiff

sought to recover through a constructive trust.[14]  Regeneron cites *Halperin v. Moreno (In re Green Energy Servs.)*, 610 B.R. 760 (D. Del. 2019), suggesting the court disagreed that a constructive trust "may only be imposed in cases of unjust enrichment, fraud, or breach of fiduciary duty."  D.I. 499 at 28.  That is wrong.  In fact, the court imposed a constructive trust on a former CEO's $10 million-dollar residence *precisely because* the CEO "malicious[ly]" breached a loan agreement and his fiduciary "obligations to the company" by misappropriating the company's loan proceeds to obtain the property.  *In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 304–06 (Bankr. D. Del. 2018), *aff'd Halperin*, 610 B.R. at 776–78.  And while Regeneron relies on *Snepp v. United States*, 444 U.S. 507 (1980), and *Enhabit, Inc. v. Nautic Partners IX, L.P.*, 2024 WL 4929729 (Del. Ch. Dec. 2, 2024), both involved breaches of fiduciary duty; a "fiduciary and contractual obligation" to safeguard "confidential information" in *Snepp*, and a corporate officer's "duty of loyalty" in *Enhabit*.  Neither is on point here.[15]

Further, while Regeneron acknowledges that it must prove "fraudulent" or "unconscionable" conduct in breach of a duty (D.I. 499 at 27), it has never attempted to do so. Regeneron points to the jury's award of punitive damages—suggesting Amgen's conduct was "outrageous"—but those damages were not supported by sufficient evidence (*see* [D.I. 497 at 43–

---

[14] *Hogg*, 622 A.2d at 650–54 (defendant "was subject to a resulting trust in favor of [plaintiff] because of [her] equitable title to" jointly purchased property); *Greenly v. Greenly*, 49 A.2d 126, 129–30 (Del. Ch. 1946) (conveyance of real property made based on fraudulent promises); *B.A.S.S. Group, LLC v. Coastal Supply Co.*, 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (real property purchased with funds embezzled by plaintiff in breach of its fiduciary duty); *Skretvedt*, 372 F.3d at 213–14 (benefits employer had fiduciary duty to deliver were improperly withheld).

[15] Regeneron also claims *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571 (Del. Ch. 1998) supports "impos[ing] a constructive trust where a defendant sells a competitive product in unjust circumstances."  D.I. 499 at 28.  But the court there *denied* an injunction to prevent launch of a competing product, in part because plaintiff's injury might be "fully compensated … by an award of damages."  And while it found, preliminarily, that if plaintiff proved a breach of their fiduciary duty, defendants likely could not "retain any benefit resulting from the success of [the competing venture]," *id.* at 585–86, that again reflects the centrality of the fiduciary duty requirement.

45]), and Regeneron's punitive damages claim ostensibly turned on the allegation that Amgen's acted with "reckless disregard" to Regeneron's rights, which is very different from "outrageous" or "unconscionable" conduct (*see id.*). Neither Regeneron's tortious interference claim nor its demand for punitive damages turned on breach of a fiduciary (or other) duty owed to it by Amgen. Because Amgen owed Regeneron no fiduciary or other duty, this remedy fails at the outset.

*Amgen's profits on Repatha are not "specifically identifiable" or "traceable" property to which Regeneron holds equitable title*. A constructive trust may only be imposed on "specific property" or "identifiable proceeds of specific property," *McMahon*, 532 A.2d at 608; *accord Hogg*, 622 A.2d at 652; *Nash v. Schock*, 1997 WL 770706, at *6 (Del. Ch. Dec. 3. 1997).[16] Not surprisingly, nearly every case Regeneron cites imposes a constructive trust on specifically identifiable *real property* or its traceable proceeds. *See, e.g.*, *Hogg*, 622 A.2d at 650–54 (dispute over shared interest in a house); *Greenly v. Greenly*, 49 A.2d 126, 129 (Del. Ch. 1946) (dispute over marital real property); *Halperin v. Moreno (In re Green Field Energy Servs.)*, 834 Fed. App'x 695, 698 (3d Cir. 2020); *B.A.S.S. Group v. Coastal Supply Co.*, 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (dispute over embezzled funds "that can be traced directly to the [real] property").

Delaware courts have repeatedly *rejected* the notion—now urged by Regeneron—that a claim for untraceable money damages implicates "specific property" subject to a constructive trust. *McMahon*, 532 A.2d at 608–9; *Parseghian v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *9–10 (Del. Ch. June 21, 2022); *Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *3–4 (Del. Ch. July 5, 1995). And Regeneron does not cite a single Delaware case— and Amgen has not found one—imposing a constructive trust to *disgorge profits* held in general

---

[16] *See also* Restatement (Third) of Restitution and Unjust Enrichment § 55, cmt. g (2011) ("A claimant who … cannot identify such [specifically identifiable] property in the hands of the defendant, is not entitled to the remedy of constructive trust.").

business accounts on a tortious interference claim.  The case law rejects such requests out of hand.[17]

Regeneron points to *Skretvedt*, 372 F.3d 193, for the broad proposition that a "constructive trust allows a plaintiff to obtain not merely what it lost, but also what defendant gained from its misconduct."  D.I. 499 at 27.  But that is not what *Skretvedt* held.  *Skretvedt* is consistent with other Delaware precedent that constructive trust is appropriate only where a plaintiff has "sufficiently identified specific funds traceable to the defendant . . . that belong in good conscience to him," *id.* at 213–15.  It merely adds that a plaintiff can "obtain, not merely what he lost, but gains received by the defendant *from the property's increase in value, from its transfer, from its use in a business operation.*"  *Skretvedt*, 372 F.3d at 213 (emphasis added).

***Regeneron's demand is improper because it would require a continuing relationship with burdensome judicial supervision.***  Regeneron proposes a remedy that is anathema to the constructive trust doctrine, which traditionally "*avoids* a continuing relationship with the beneficiary" by required a *one-time* "transfer of the property to the plaintiff who has established an equitable entitlement."  *Hogg*, 622 A.2d at 652 (emphasis added); *McMahon*, 532 A.2d at 608.  Remarkably, in the same breath that Regeneron claims "imposition of a constructive trust does not create a continuing relationship" (D.I. 499 at 28), it requests appointment of a monitor who would track Amgen's revenues, provide a semiannual accounting to the court, and enforce periodic

---

[17] *See*, *e.g.*, *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872–76 (Tex. 2017) (applying Delaware law; rejecting constructive trust to disgorge "commingled" oil leases because plaintiff lacked sufficient evidence "tracing any specific leases [defendant] acquired" to challenged conduct); *Pike v. Commodore Motel Corp.*, 1989 WL 57026, *5 (Del. Ch. Ct. May 25, 1989) (if a constructive trust could be imposed on assets that "cannot be traced … in any tangible, meaningful sense"—"then the reach of the tracing doctrine would be without limits"); Restatement (Third) of Restitution and Unjust Enrichment § 55, cmt. h (2011) ("Recognizing a 'constructive trust' over untraceable property—a contradiction in terms—would allow the claimant to select particular assets of the defendant and take them in satisfaction of a nonspecific liability in restitution.  Constructive trust has no such effect.").

payments of disgorged profits on Repatha *for a period of four years* (D.I. 498 at 8).  Regeneron fails to identify any authority for such a constructive trust as a remedy for tortious interference.

In the only case Amgen identified where a plaintiff requested a similar remedy on antitrust and tortious interference claims, the court rejected it as impractical and contrary to equitable principles.  *Fishman v. Est. of Wirtz*, 594 F. Supp. 853, 891 (N.D. Ill. 1984), *aff'd in relevant part*, 807 F.2d 520, 562 (7th Cir. 1986).  There, plaintiffs sought a constructive trust that would return partial ownership of the Chicago Bulls NBA franchise.  *Fishman*, 594 F. Supp. at 885–86, 891.  The court declined this request, including because it would "impos[e] upon the parties and the court a forced business relationship," and would "undoubtedly result in additional litigation or extended court supervision."  *Id.* at 885–86.  The same concerns are present here.  The constructive trust Regeneron requests would impose a forced profit-sharing relationship with Amgen, which would require the perpetual court supervision a constructive trust is meant to avoid.

***Regeneron has an adequate legal remedy***.  Finally, as Regeneron concedes, it is axiomatic that a constructive trust is available only when a legal remedy—such as "money damages"—"either [does] not exist or [is] found to be inadequate."  *McMahon*, 532 A.2d at 605, 608–09; *Hogg*, 622 A.2d at 652.  Regeneron has never articulated why money damages—premised on a theory of lost profits—would be inadequate.  It certainly never pled that a constructive trust would be necessary to provide complete relief.  Delaware courts routinely deny requests for constructive trusts where—as here—money damages are determinable and adequately redress any alleged harm.  *Metro Ambulance*, 1995 WL 409015, at *3–4; *accord McMahon*, 532 A.2d at 608–09; *Parseghian*, 2022 WL 2208899, at *9; *Fishman*, 807 F.2d at 562.

### C.    Disgorgement Through a Constructive Trust Would Be an Impermissible Double Recovery.

"Equity abhors a windfall."  *US Airways, Inc. v. McCutchen*, 663 F.3d 671, 679 (3d Cir.

2011), *vacated on other grounds*, 569 U.S. 88, 106 (2013).  The law thus "does not permit a plaintiff to recover double payment" for an injury.  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 348 (1971).  Yet if Regeneron were granted the constructive trust it now seeks, that would be duplicative of both the compensatory and punitive damages awarded at trial.

At trial, Regeneron pursued compensatory damages for the profits it would have made at ESI and Optum and the higher prices it would have charged CVS—but for Amgen's challenged conduct.  Tr. 1143:25–1145:25, 1173:13–23, 1130:22–1131:1 (Mathur).  Now Regeneron seeks disgorgement of a portion of *Amgen's* net proceeds for sales of Repatha to those same PBMs during the same time period.  D.I. 499 at 29.  In other words, Regeneron seeks to disgorge Amgen's profits from the very same sales already captured by the compensatory damages award in the form of Regeneron's lost profits.  This is improper.  *See Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1328–29 (Fed. Cir. 2018) (holding that profit disgorgement award for trade secret misappropriation and patent infringement damages were duplicative where based on sales of the same products for the same period).

Regeneron's request is especially egregious as to CVS, where Regeneron sought (and was awarded) $101.7 million in compensatory damages based on a theory that it could have charged *higher* prices while Praluent (not Repatha) was the exclusive PCSK9i on formulary.  Tr. 965:3–23 (Scott Morton); 1151:21–23, 1130:22–1131:1 (Mathur).  Having already secured profits at CVS from exclusive coverage from 2021-2023, as well as compensatory damages for supposed lost profits in that period despite failing to establish antitrust injury, D.I. 497 at 35–38, Regeneron's additional demand for disgorgement of Amgen's Repatha-related proceeds from the same three-year period at CVS—sales that Amgen made when Repatha was off formulary and for which Amgen offered no bundled rebates—veers toward *triple* recovery.

35

The disgorgement that Regeneron requests would also duplicate the punitive damages awarded at trial.  The equitable remedy of disgorgement is quasi-punitive.  *Kokesh v. S.E.C.*, 581 U.S. 455, 457 (2017) (characterizing SEC disgorgement orders as a penalty) *superseded by statute under* on other grounds, 15 U.S.C. § 78(d)(5).  But the punitive damages Regeneron obtained at trial were based on Amgen's challenged conduct as to the same PBM contracts, for the same time period.  As such, Regeneron's requested disgorgement of Amgen's historical net proceeds on Repatha would effectively impose a second punitive sanction for the same alleged conduct.

Regeneron cites to 6 Del. C. § 2108 to argue that "Delaware law does not limit the award of damages or equitable remedies in cases of antitrust violations."  D.I. 499 at 28.  But Section 2108 does not authorize a double recovery for the same purported injury; it simply identifies the types of relief available to the state.  The statute refers to antitrust suits *parens patriae—i.e.*, brought *by the Attorney General*.  This provision has no bearing on *competitors* bringing claims under the Delaware Antitrust Act.  In any event, Regeneron requests disgorgement exclusively on its claim for tortious interference—not its antitrust claims, and has never even asserted a claim under the Delaware Antitrust Act.  Thus, Section 2108 does not apply.

**III.    Regeneron Is Not Entitled to Prejudgment Interest on Any of Its Claims.**

Prejudgment interest is wholly inappropriate in this case.  Regeneron also miscalculates what prejudgment interest would be, if it were applicable.

**A.    Prejudgment Interest is Unavailable on Regeneron's Claims.**

**1.    Prejudgment Interest is Unavailable on the Sherman Act, Clayton Act, and Cartwright Act Claims.**

"Federal antitrust law has never permitted an award of pre-judgment interest."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 393a (4th ed. 2024).  Under the Clayton Act, prejudgment interest is available "only"

when a party "intentionally delay[s] or otherwise act[s] in bad faith," "violate[s] any applicable rule, statute or court order providing for sanctions for dilatory behavior," or "engage[s] in conduct primarily for the purpose of delaying the litigation."  15 U.S.C. § 15(a)(1)–(3).  The Cartwright Act is similar.  Cal. Bus. & Prof. Code § 16761(a)–(c); *see In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 64 (E.D. Pa. 2007) ("a plaintiff in a private antitrust action cannot recover prejudgment interest unless the opposing party acted in bad faith"); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 435-36 (2d Cir. 2007).  Due to the lack of cases awarding prejudgment interest on antitrust claims, courts require a showing of "*extreme* bad faith" to do so.  *Auto. Prods., plc v. Tilton Eng'g, Inc.*, 1993 WL 660164, at *9 (C.D. Cal. Sept. 16, 1993) ("[A]lthough § 15 permits the imposition of pre-judgment interest, neither AP nor Tilton has been able to find a case that actually awards them, suggesting that they can only be awarded in cases of extreme bad faith"); *Westport Taxi Serv., Inc. v. Westport Transit Dist.*, 664 A.2d 719, 742 (Conn. 1995) (1995).

Requiring "extreme bad faith" is consistent with the fact that Amgen has a constitutional right to defend itself, so "bad faith should not be lightly inferred."  *Lewis v. Smith*, 480 F. App'x 696, 699 (3d Cir. 2012).  The Court cannot infer that an argument was "patently unmeritorious or frivolous" simply because it found the argument "ultimately unpersuasive."  *Ario Underwriting Members of Syndicated 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 297 (3d Cir. 2010).

Regeneron disregards this well-established requirement and instead seeks to lower the standard to sweep in any Amgen legal position that Regeneron disagrees with.  That Amgen denies Regeneron's allegation of unwritten agreements falls far short of extreme bad faith.  *See supra* at 24–25.  Regeneron barely argued at trial, and no jury has ever found, that Amgen had agreements "not limited to the contract"—with ESI or otherwise. D.I. 499 at 41. The PBMs consistently agreed with Amgen that "[w]hat is in that contract is absolutely what matters, not documents and IMs."

Tr. 867:14–22 (Kitson).  Regeneron also points to run-of-the-mill litigation disagreements about custodians, schedules, and production.[18]  But no law *suggests* that a defendant displays extreme bad faith by declining to defer to the plaintiff on all discovery issues.  Regeneron's recounting of the discovery background is slanted and misleading in any event.  For example, it notes that Amgen was required to produce documents from an additional three custodians while omitting that Regeneron had sought to compel documents from an additional *twenty* custodians.  D.I. 105 at 2.

Regeneron also does not meet the requirement of showing that Amgen acted "*intentionally*" or with the "*primary purpose*" of delaying the litigation.  15 U.S.C. § 15(a)(1), (3) (emphasis added).  Even Regeneron's lengthy diatribe about Amgen's misconduct in daring to defend itself stops short of accusing Amgen of *intentionally* delaying the litigation.  Instead, Regeneron contends Amgen made arguments that (i) Regeneron believes were unreasonable and (ii) made the litigation longer than if Amgen had not made any arguments.  That does not satisfy the statute, which instead requires such issues as "multiplied the proceedings at nearly every turn" or judge shopping.  *See, e.g.*, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 190 (3d Cir. 2002); *Lewis*, 480 F. App'x at 698–99.

Finally, Regeneron cannot even show that Amgen's conduct in fact "delayed" the proceedings in this case.  As the Court itself acknowledged in commending the "talent and skill of the attorneys that appeared," this presented a legally "challenging" case.  Tr. 2241:10–16.  Yet the case "went from filing to trial on the merits within approximately 3 years," a timeline that is

---

[18]  Regeneron complains, too, that Amgen asked the Court to consider documents outside the pleadings on a motion to dismiss.  As the Court acknowledged, Amgen "rightly point[ed] out" that the Third Circuit permits courts to consider some documents not attached to the complaint. D.I. 49 at 9.  The notion that Regeneron should receive tens of millions of dollars in prejudgment interest because Amgen argued that contracts referenced in a complaint should be considered in a motion to dismiss is nonsensical.

entirely "reasonable" in a case of this scale and "complexity." *Seven Gables Corp. v. Sterling Recreation Org.*, 686 F. Supp. 1418, 1427 (W.D. Wash. 1988) (denying motion for prejudgment interest); *see also Zapata v. Gulf Marine Corp. v. Puerto Rico Maritime Shipping Authority*, 133 F.R.D. 481, 486–87 (E.D. La 1990) (denying motion for prejudgment interest even given arguably bad faith filings because there was "no significant delay" in the case). At bottom, Amgen has done no more than "vigorously defend this action at every step of the proceedings," and Regeneron has made no showing that this is a case warranting "the rare exception of granting pre-judgment interest." *Auto. Prods.*, 1993 660164 at *9.

### 2.    Regeneron Is Not Entitled to Prejudgment Interest on its Donnelly Act Claim.

Regeneron insists that it is entitled to prejudgment interest on its Donnelly Act claim under CPLR § 5001(a), but neither the statute nor case law supports it. Section 5001(a) provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property. . . ." It does not mention the Donnelly Act, and Regeneron has not identified a single case awarding pre-judgment interest in the Act's 125-year history. Regeneron's careful description of the one Donnelly Act case it cites as "finding defendant violated the Donnelly Act, awarding prejudgment interest" is misleading, at best. In *Carl Wagner & Sons v. Appendagez, Inc.*, cited at D.I. 499 at 37, the court explicitly awarded prejudgment interest on a breach of contract claim alone: "Pre-judgment interest *in breach of contract cases* is mandatory under [§] 5001(a)." 485 F. Supp. 762 (S.D.N.Y. 1980) (emphasis added; internal citation omitted).

In the absence of case authority or statutory support, Regeneron argues that prejudgment interest is appropriate because it suffered "lost profits," and because such interest may be available under New York law where the statute seeks to make a plaintiff whole. But New York courts

recognize where a plaintiff has "been awarded treble damages, [he] is not entitled to prejudgment interest." *Rodriguez v. Kalata*, 133 N.Y.S.3d 787 (2020); *see also Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 80 (2d Cir. 1971) (holding, prior to the amendment of 15 U.S.C. § 15 to allow for prejudgment interest in narrow circumstances involving bad faith, that it "is reasonable to interpret Congress's silence on the matter as indicating that trebled damages are sufficient penalty and that interest need not be included"), *rev'd on other grounds sub nom. Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973).   Nor should Regeneron's unsupported expansion of the remedies available under New York's antitrust laws be adopted when doing so would provide relief contrary to the Clayton and Sherman Acts.   New York's highest court has held that the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335 (1988).   Regeneron identifies no such difference in state policy or statutory language and history.

### 3. Regeneron Is Not Entitled to Prejudgment Interest on its Tortious Interference Claim.

Regeneron concedes that the availability of prejudgment interest on its tortious interference claim is governed by 6 Del. C. § 2301. *See* D.I. 499 at 32 (citing § 2301).   Yet it ignores the language of § 2301, which makes clear that in "any tort action for compensatory damages . . . interest shall be added to any final judgment entered for damages awarded, calculated at the rate established in subsection (a) of this section, commencing from the date of injury, *provided that prior to trial the plaintiff had extended to defendant a written settlement demand valid for a minimum of 30 days in an amount less than the amount of damages upon which the judgment was entered*." 6 Del. C. § 2301(d) (emphasis added).   Regeneron did not make any such settlement demand here, so prejudgment interest on its tortious interference claim is unavailable.

40

This statutory prerequisite is confirmed in a case Regeneron cites.  In *Brandywine Smyrna v. Millenium Builders*, the Supreme Court of Delaware held that "under section 2301(d), [plaintiff] was not entitled to the recovery of prejudgment interest" for its tort claim absent a settlement demand for less than the damages awarded "insofar as the[] claim lies in *tort*"—even though "prejudgment interest is awarded in Delaware as a matter of right" on contract claims.  34 A.3d 482, 485 (Del. 2011).  And Delaware's Supreme Court has explained that there is good reason for requiring a prior settlement demand before awarding prejudgment interest: the settlement demand provision in § 2301 was enacted to "promote earlier settlement of claims by encouraging parties to make fair offers sooner, with the effect of reducing court congestion."  *Rapposelli v. State Farm Mut. Auto. Ins. Co.*, 988 A.2d 425, 427 (Del. 2010), *as corrected* (Feb. 5, 2010).

Regeneron cites two Chancery Court decisions where prejudgment interest was awarded on tortious interference claims.  *Beard Rsch., Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010) *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219 (Del. Ch. Jan. 29, 2010).  But neither of these cases says anything about the requirement of a settlement demand, much less purports to overrule it.  Indeed, neither of these cases discusses § 2301(d) at all.  But to the extent this Court interprets these opinions to conflict with *Brandywine Smyrna* or intend to invalidate § 2301(d)'s requirement of a settlement demand, this Court must follow the higher court's ruling and the plain language of the statute.  34 A.3d 482.  As such, Regeneron's request for prejudgment interest on its tortious interference claim should be denied.

## B. Regeneron's Calculation of Prejudgment Interest Is Also Wrong.

### 1. Regeneron Errs in Arguing that Prejudgment Interest Is Compound and in Proposing an Alternative Start Date for Prejudgment Interest.

***Tortious Interference.***    "Delaware courts have traditionally disfavored compound

interest." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002). And while Regeneron points to a series of Chancery Court opinions that have awarded compound prejudgment interest, it ignores that *only* the Chancery Court has the discretion to award compound, rather than simple, interest absent a showing of bad faith. *See, e.g.*, *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2025 WL 1545444, at *5 (Del. Super. Ct. May 15, 2025) ("While the Court of Chancery has discretion to award compound interest, this Court typically does not award compound interest absent 'bad faith.'"); *Brown v. Court Square Capital Management, L.P.*, 2024 WL 1655418, at *3–4 (explaining that "the Court of Chancery can award compound interest, but the Superior Court cannot," and that compound interest is appropriate when "simple interest [is] manifestly unfair"); *Balooshi v. GVP Global Corp.*, 2022 WL 576819, at *14 (Del. Super. Feb. 25, 2022) (declining to award compound interest because of lack of bad faith) *aff'd*, 285 A.3d 839 (Del. 2022). Because there is no bad faith here, even if Regeneron had made the required settlement demand, the Court would still not be able to award compound prejudgment interest on the tortious interference claim.

> **Donnelly Act.** As for its Donnelly Act claim, Regeneron seeks interest compounded annually. D.I. 503 at 4. Regeneron cites no authority for its requested compounding. Nor could it. "Under New York law, prejudgment interest is calculated as simple interest and not compound interest." *White v. Iris Nova Ltd.*, 2023 WL 4931646, at *2 n.3 (S.D.N.Y. Aug. 2, 2023); *see also, e.g.*, *Spodek v. Park Property Dev. Assocs.*, 96 N.Y.2d 577, 581 (2001) (CPLR 5001 is a "statutory provision for simple interest"); *Patane v. Romeo*, 652 N.Y.S.2d 142 (App. Div. 1997) (prejudgment interest "must be calculated at the simple annual rate"); David S. Siegel, Practice Commentary to CPLR 5001(1992) ("The compounding of interest is not allowed under CPLR 5001(a). The interest is simple."); 8B Carmody-Wait 2d New York Practice § 63:93 (2025)

("Prejudgment interest is calculated on a simple interest basis."); *Herrara v. 12 Water St. Gourmet Cafe, Ltd.,* 2016 WL 1274944, at *7 (S.D.N.Y. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 1268266 (S.D.N.Y. Mar. 31, 2016).

*Cartwright Act.* As with its Donnelly Act claim, Regeneron requests that any prejudgment interest awarded on its Cartwright Act claim be compounded annually. D.I. 503 at 6. But again, Regeneron cites no authority supporting this request. As noted above, the provision of the Cartwright Act providing for prejudgment interest mirrors its federal counterpart. And Regeneron concedes that the "*Clayton Act* provides for 'simple interest.'" D.I. 499 at 45 (emphasis added). Thus, because courts "interpret[] the Sherman Antitrust Act or the Clayton Act as persuasive authority as to the meaning of the Cartwright Act to the extent the Cartwright Act incorporates the substance of those federal statutes," the Cartwright Act similarly only allows simple interest. *Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc*, 731 F. Supp. 2d 937, 941 (N.D. Cal. 2010).

Separately from compound interest, Regeneron proposes an alternative calculation in which prejudgment interest begins based on the date of the complaint. By this calculation, all of Regeneron's damages accrue at the date the complaint was filed rather than the date Regeneron's injuries were sustained. See 6 Del. Code § 2301(d), N.Y. CPLR § 5001(b). That is not the proper calculation method. 6 Del. Code § 2301(d) (interest should be calculated "commencing from the date of injury"); N.Y. CPLR § 5001(b) (damages accrued after cause of action existed "shall be computed from the date incurred" or "from a single reasonable intermediate date"). Regeneron cannot resort to simplistic, improper calculations due to the "difficulty in calculating prejudgment interest." *Leonard v. Stemtech Int'l Inc*., 834 F.3d 376, 397–98 (3d Cir. 2016). Rather, as the "prevailing party" it "must provide" this Court with "sufficient information to calculate the interest," and if it fails to "provide . . . this information, such an award may be denied"; this is so

43

even when there are "separate infringements." *Id*. at 397–98.

### 2.    Prejudgment Interest Is Not Calculated on Multiple Claims.

Finally, although Regeneron makes vague references to electing remedies, it asks for overlapping awards of prejudgment interest on multiple claims.  D.I. 498 at 9.  If prejudgment interest were an available remedy here (which it is not), Regeneron would recover such interest only once, on one claim; not on each claim individually where all of its claims are premised on "a single course of conduct . . . and a single injury."  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 218-19 (3d Cir. 1992); *see also Ingevity Corp. v. Basf Corp.*, 2024 WL 579069, at *2 (D. Del. Feb. 13, 2024).

## IV.    All of Regeneron's Requested Relief Fails to the Extent It Relies on Facts Not Proven at Trial.

As discussed with respect to particular arguments above, Regeneron repeatedly relies on allegations never proven—or never even *presented*—at trial.  Some—like the foundations of the unpled constructive trust—were not even including in pretrial filings.  But Regeneron also litters unproven facts throughout its motion, such as references to supposed unwritten agreements that never existed or an implicit assumption that Amgen's existing contracts were affected by bundled rebate offers.  This Court need not, and should not, assume that every fact Regeneron ever alleged was accepted by the jury where the jury's verdict does not "necessarily impl[y]" as much.  *Kairys v. Southern Pines Trucking, Inc.*, 75 F.4th 153, 161 (3d Cir. 2023).  Nor should it adopt as truth Regeneron's many allegations that are unsupported by evidence.  Instead, where Regeneron has failed to offer the evidence to make a factual finding that would be necessary to its relief—such as evidence pertaining to the effect of its outlandish injunctive relief on the customers who would be its victims—the appropriate response is to reject Regeneron's requested findings.

**V.      The Court Should Enter Judgment on Regeneron's Abandoned UCL Claim.**

California's Unfair Competition Law is "equitable in nature," and remedies are "limited to injunctive relief and restitution." *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1091 (C.D. Cal. 2015). This Court instructed that "Regeneron's requests for relief and judgment on Count 7 of the amended complaint under California's Unfair Competition Law" were to "be addressed in [its] post-trial briefing," along with its other requests for equitable relief. D.I. 490 at 2. Regeneron's failure to even mention its UCL claim in its opening brief in support of its equitable claims for relief abandons the claim. *See, e.g.*, *Black L. Enf't Officers Ass'n v. City of Akron*, 920 F.2d 932 (6th Cir. 1990) (plaintiffs abandoned claims for relief "because they did not address them in their post-trial brief"); *United States v. Loc. 1804-1, Int'l Longshoremen's Ass'n*, 812 F. Supp. 1303, 1309 (S.D.N.Y.), *aff'd sub nom. U.S. v. Carson*, 52 F.3d 117 (2d Cir. 1995) (same). And Regeneron's reply brief may not resuscitate the claim. *Aiellos v. Zisa*, 2009 WL 3486301, at *1 (D.N.J. Oct. 20, 2009) ("It is hornbook law that arguments raised for the first time in a reply brief are waived."). Even if Regeneron had raised its UCL claim, its failure to offer sufficient evidence of any unlawful, unfair, or fraudulent conduct that caused harm to Regeneron would still preclude relief. *See* D.I. 497 at 45. Judgment must be entered in favor of Amgen on the UCL claim.

## CONCLUSION

Regeneron's requested equitable relief dramatically overreaches and seeks to harm not only Amgen, but also customers, patients, and competition itself. To the extent Regeneron's antitrust verdict finding unlawful Amgen's price competition can survive at all—which, for all the reasons set forth in Amgen's motion for judgment, it cannot—Regeneron has been substantially more than fully compensated for any profits it lost. Further relief is not necessary to prevent irreparable harm and is starkly contrary to the public interest. Regeneron's motion should be denied.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

GIBSON, DUNN & CRUTCHER LLP
Eric J. Stock
Kate Swisher
Ben A. Sherwood
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

Richard J. Doren
Samuel Liversidge
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Ashley E. Johnson
Betty X. Yang
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Courtney L. Spears
3161 Michelson Drive, Suite 1200
Irvine, CA  92612-4412
(949) 451-3800


Dated:  June 27, 2025

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Catherine E. Lynch (No. 7326)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
clynch@ycst.com

*Attorneys for Amgen Inc.*

46

## <u>CERTIFICATE OF SERVICE</u>

I, Melanie K. Sharp, Esquire, hereby certify that on June 27, 2025, I caused to be electronically filed a true and correct copy of Defendant Amgen Inc.'s Answering Brief in Opposition to Plaintiff Regeneron Pharmaceuticals, Inc.'s Motion for 1) Permanent Injunctive Relief; 2) Constructive Trust; and 3) Prejudgment Interest with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

David E. Wilks
Scott B. Czerwonka
Wilks Law LLC
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
dwilks@wilks.law
sczerwonka@wilks.law

I further certify that on June 27, 2025, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**<u>BY E-MAIL:</u>**

Jessica L. Falk
Robert Niles-Weed
Rachel Williams
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
jessica.falk@weil.com
robert.niles-weed@weil.com
rachel.williams@weil.com

Michael R. Moiseyev
Priyata Y. Patel
Weil, Gotshal & Manges LLP
2001 M. Street , NW
Washington, DC 20036
michael.moiseyev@weil.com
priyata.patel@weil.com

Jonathan D. Polkes
Adam B. Banks
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
jonathan.polkes@whitecase.com
adam.banks@whitecase.com

Eric S. Hochstadt
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
ehochstadt@orrick.com

_____
        */s/ Melanie K. Sharp*
Melanie K. Sharp (No. 2501)