# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REGENERON PHARMACEUTICALS, INC.,

        Plaintiff,

v.

AMGEN INC.,

        Defendant.

C. A. No.: 1:22-cv-00697-JLH



**REDACTED PUBLIC VERSION
FILED: July 14, 2025**

## REPLY BRIEF IN SUPPORT OF REGENERON PHARMACEUTICALS, INC.'S MOTION FOR 1) PERMANENT INJUNCTIVE RELIEF; 2) CONSTRUCTIVE TRUST; AND 3) PREJUDGMENT INTEREST

**WILKS LAW LLC**

David E. Wilks (Bar No. 2793)
Scott B. Czerwonka (Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Email: dwilks@wilks.law
Email: sczerwonka@wilks.law

*Attorneys for Regeneron Pharmaceuticals, Inc.*

Dated: July 7, 2025

**WHITE & CASE LLP**
Jonathan D. Polkes
Adam B. Banks
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8301

**ORRICK, HERRINGTON
& SUTCLIFFE LLP**
Eric S. Hochstadt
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5282

**WEIL, GOTSHAL & MANGES LLP**
Michael R. Moiseyev
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000

Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ........................................................................................................ 2

I.    INJUNCTIVE RELIEF IS NECESSARY TO RESTORE COMPETITION................2

    A.    Amgen fails to address the necessity of injunctive relief to restore competition in the PCSK9i market. ........................................2

    B.    Amgen's remaining objections to the injunctive relief are unavailing. .............5

II.    A CONSTRUCTIVE TRUST IS AN APPROPRIATE REMEDY ..........................13

    A.    Regeneron properly preserved its right to seek a constructive trust. ...............13

    B.    A fiduciary duty is not required to impose a constructive trust. ......................14

    C.    The constructive trust does not result in a double recovery...........................16

III.    REGENERON IS ENTITLED TO PREJUDGMENT INTEREST ..........................17

    A.    Tortious interference claim. ..........................................................17

    B.    Donnelly Act claim. ....................................................................19

    C.    Sherman Act, Clayton Act, and Cartwright Act claims.................................21

CONCLUSION.....................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## <u>CASES</u>

*Arbitrium (Cayman Islands) Handels AG v. Johnston,*
    1995 WL 606310 (Del. Ch. Oct. 6, 1995) ................................................................. 16

*Ario Underwriting Members of Syndicated 53 at Lloyds for 1998 Year of Acct.,*
    618 F.3d 277 (3d Cir. 2010) ...................................................................................... 21

*Aryeh v. Canon Bus. Sols., Inc.,*
    55 Cal. 4th 1185 (2013) ............................................................................................ 22

*Bain v. California Tchrs. Ass'n,*
    891 F.3d 1206 (9th Cir. 2018) .................................................................................. 14

*Balooshi v. GVP Glob. Corp.,*
    2022 WL 576819 (Del. Super Ct. Feb. 25, 2022) ...................................................... 19

*Beard Rsch., Inc. v. Kates,*
    8 A.3d 573 (Del. Ch. 2010) ................................................................................ 17, 18

*Bigelow v. RKO Radio Pictures,*
    327 U.S. 251 (1946) .............................................................................................. 3, 6

*Boynton v. Headwaters, Inc.,*
    2010 WL 2991056 (W.D. Tenn. July 27, 2010) ....................................................... 16

*In re Bracket Holding,*
    2020 WL 764148 (Del. Super. Ct. Feb. 7, 2020) ...................................................... 18

*Brandywine Smryna, Inc. v. Millennium Builders, LLC,*
    34 A.3d 482 (Del. 2011) .......................................................................................... 18

*Brown v. Court Square Cap. Mgmt,*
    2024 WL 1655418 (Del. Ch. Apr. 17, 2024) ............................................................ 19

*Carl Wagner & Sons v. Appendagez, Inc.,*
    485 F. Supp. 762 (S.D.N.Y. 1980) ........................................................................... 20

*Carr v. Dewey,*
    730 F. Supp. 591 (D. Del. 1990) .............................................................................. 18

*Cavic v. Beograd,*
    2019 Cal. Super. LEXIS 96164 (Cal. Super. Dec. 8, 2019) ...................................... 22

iii

*In re Cipro Cases I & II*,
   61 Cal. 4th 116 (2015) ................................................................. 22

*Citadel Holding Corp. v. Roven*,
   603 A.2d 818 (Del. 1992) ............................................................ 17

*In re DDAVP Indirect Purchaser Antitrust Litigation*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) ......................................... 4

*Duffield Assocs., Inc. v. Lockwood Bros., LLC*,
   2017 WL 2954618 (Del. Ch. July 11, 2017) ............................... 15

*Erhart v. BofI Holding, Inc.*,
   2023 WL 6382479 (S.D. Cal. Sept. 28, 2023) ............................. 22

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972) .................................................................. 3, 8

*Fortis v. Dematic*,
   2023 WL 2967781 (Del. Super. Apr. 13, 2023) ......................... 19

*Fox v. Board of Trustees of State Univ. of N.Y.*,
   42 F.3d 135 (2d Cir. 1994) .......................................................... 14

*Francois v. Francois*,
   599 F.2d 1286 (3d Cir. 1979) ...................................................... 13

*FTC v. Cephalon, Inc.*,
   100 F. Supp. 3d 433 (E.D. Pa. 2015) ......................................... 14

*FTC v. Shire ViroPharma, Inc.*,
   917 F.3d 147 (3d Cir. 2019) .......................................................... 4

*FTC v. Superior Ct. Trial Lawyers Ass'n*,
   493 U.S. 411 (1990) .................................................................... 12

*FTC v. Surescripts, LLC*,
   1:19-cv-01080 (D.D.C. Aug. 9, 2023) ...................................... 6, 7

*In re G-fees Antitrust Litigation*,
   584 F. Supp. 2d 26 (D.D.C. 2008) ............................................... 4

*Gotham v. Hallwood*,
   817 A.2d 160 (Del. 2002) ............................................................ 19

*Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*,
   201 F. App'x 7 (1st Cir. 2006) .................................................... 14

*Great Am. Opportunities, Inc. v. Cherrydale*,
    2010 WL 338219 (Del. Ch. Jan. 29, 2010) .......................................................... 17, 18

*In re Green Field Energy Servs., Inc.*,
    594 B.R. 239 (Bankr. D. Del. 2018) ............................................................................ 14

*Halperin v. Moreno (In re Green Energy Sers.)*,
    610 B.R. 760 (D. Del. 2019) ...................................................................... 14, 15, 16

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
    700 F. App'x 251 (4th Cir. 2017) ............................................................................... 11

*Harris v. Univ. of Massachusetts Lowell*,
    43 F.4th 187 (1st Cir. 2022) ....................................................................................... 14

*Hawaii v. Standard Oil Co. of California*,
    405 U.S. 251 (1972) ...................................................................................................... 6

*Heritage Handoff Holdings v. Fontanella*,
    2019 WL 1056270 (D. Del. 2019) .............................................................................. 19

*Hogg v. Walker*,
    622 A.2d 648 (Del. 1993) ........................................................................................... 15

*Int'l Boxing Club of N.Y., Inc. v. United States*,
    358 U.S. 242 (1959) ...................................................................................................... 5

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947) ...................................................................................................... 3

*Int'l Telecharge, Inc. v. Bomarko, Inc.*,
    766 A.2d 437 (Del. 2000) ........................................................................................... 15

*Lewis v. Smith*,
    480 F. App'x 696 (3d Cir. 2012) ............................................................................... 22

*LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*,
    2025 WL 1545444 (Del. Super Ct. May 15, 2025) .................................................... 19

*Lizden Indus., Inc. v. Franco Belli Plumbing & Heating & Sons, Inc.*,
    945 N.Y.S.2d 86 (App. Div. 2012) ............................................................................ 20

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ................................................................................................. 9, 12

*Marine Corp. v. Puerto Rico Maritime Shipping Auth.*,
    133 F.R.D. 481 (E.D. La. 1990) ................................................................................. 22

*McGovern v. General Holding, Inc.*,
   2006 WL 1468850 (Del. Ch. May 18, 2006) ........................................................... 15

*Nat'l Soc. of Pro. Engineers v. United States*,
   435 U.S. 679 (1978) ................................................................................................. 12

*New York v. Microsoft Corp.*,
   224 F. Supp. 2d 76 (D.D.C. 2002) .......................................................................... 4, 7

*Ortho Biotech Prods., L.P. v. Amgen Inc.*,
   2006 WL 3392939 (D.N.J. Nov. 21, 2006) ................................................................ 9

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   278 F.3d 175 (3d Cir. 2002) ..................................................................................... 22

*Radian Memory Sys. v. Samsung Elecs. Co. Ltd. et al.*,
   2:24-cv-01073 (E.D. Tex. 2025) ................................................................................ 9

*Rapposelli v. State Farm Mut. Auto. Ins.*,
   988 A.2d 425 (Del. 2010) ......................................................................................... 18

*Rodriguez v. Kalata*,
   100 N.Y.S.3d 518 (App. Div. 2019) ......................................................................... 20

*Rodriguez v. Kalata*,
   133 N.Y.S.3d 787 (App. Div. 2020) .................................................................... 19, 20

*In re Saxton*,
   712 N.Y.S.2d 225 (App. Div. 2000) ......................................................................... 20

*Schine Chain Theatres, Inc. v. United States*,
   334 U.S. 110 (1948) ................................................................................................... 8

*Seven Gables Corp. v. Sterling Recreation Org.*,
   686 F. Supp. 1418 (W.D. Wash. 1988) ..................................................................... 22

*Shahin v. Boney*,
   2016 WL 3152575 (Del. C.P. Apr. 13, 2016) ........................................................... 18

*Skretvedt v. E.I. DuPont de Nemours*,
   372 F.3d 193 (3d Cir. 2004) ..................................................................................... 15

*State of New York v. New York State Mar. Highway Transp., LLC*,
   84 Misc. 3d 1245 (N.Y. Sup. Ct. July 1, 2024) ........................................................ 20

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ...................................................................................... 4

*Tipaldo v. Lynn*,
 26 N.Y.S.3d 204 (2015) .......................................................................... 19

*Trans World Airlines, Inc. v. Hughes*,
 449 F.2d 51 (2d Cir. 1971) .................................................................... 19

*United States v. Am. Soc'y of Composers, Authors, Publishers*,
 2001 WL 1589999 (S.D.N.Y. June 11, 2001) ...................................... 11

*United States v. Dentsply Int'l, Inc.*,
 399 F.3d 181 (3d Cir. 2005) ..................................................................... 6

*United States v. Dentsply Int'l, Inc.*,
 99-cv-00005-SLR (D. Del. 2006) ........................................................ 6, 7

*United States v. Elec. Payment Servs.*,
 94-208-SLR (D. Del. Oct. 14, 1994) ................................................... 6, 7

*United States v. Grinnell Corp.*,
 384 U.S. 563 (1966) ............................................................................. 3, 8

*United States v. Lane Labs-USA, Inc.*,
 324 F. Supp. 2d 547 (D.N.J. 2004) ....................................................... 14

*United States v. Sindel*,
 53 F.3d 874 (8th Cir. 1995) ................................................................... 11

*United States v. Swift & Co.*,
 286 U.S. 106 (1932) ................................................................................. 3

*United States v. United Shoe Mach. Corp.*,
 391 U.S. 244 (1968) ................................................................................. 8

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) ................................................................................. 9

*In re Wholesale Grocery Antitrust Litig.*,
 752 F.3d 728 (8th Cir. 2014) ................................................................. 13

*Wilk v. Am. Med. Ass'n*,
 895 F.2d 352 (7th Cir. 1990) ................................................................. 12

*Williams v. Ozmint*,
 716 F.3d 801 (4th Cir. 2013) ................................................................. 14

*Wooley v. Maynard*,
 430 U.S. 705 (1977) ............................................................................... 11

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969) ................................................................................................ 9

## STATUTES

N.Y. C.P.L.R.
    § 5001 ...................................................................................................................... 20

N.Y. C.R.R.
    9 § 2526.1 (d) ......................................................................................................... 20

## FEDERAL RULES

Fed. R. Civ. P.
    Rule 54(c) ............................................................................................................... 14

## PRELIMINARY STATEMENT

Amgen continues to ignore that there was a trial. Amgen made its case to the jury and the jury unequivocally found that Amgen's anticompetitive conduct broke the U.S. PCSK9i market. Amgen incredulously asserts that "no one" has claimed that the conduct prohibited by the proposed injunctions "violates any law." D.I. 519 ("Opp.") 1. Wrong: the proposed injunctions, individually and collectively, address the very conduct that the jury confirmed violated state and federal antitrust laws, foreclosing Regeneron from the market "intentionally" and "unreasonably." *See* D.I. 481 at 20-22, 72. Indeed, the trial proved that Amgen never wanted competition for Repatha, so it sought to eliminate it. The equitable relief Regeneron requests is necessary to restore and protect competition going forward in the PCSK9i market.

*First*, the requested injunctive relief is necessary to re-level the playing field, restore Regeneron to the position it would have been absent Amgen's conduct, and prohibit Amgen from further anticompetitive actions. The harm Amgen caused to the market cannot be undone simply by writing a check—a rounding error to a company with $30+ billion in annual revenue. Regeneron has been severely handicapped in the market and lost years of building a patient base; indeed, the testimony Amgen itself elicited at trial showed that market share (or lack thereof) is a key factor in formulary coverage. The requested injunctive relief is targeted at removing the anticompetitive advantage Amgen gained through its conduct. Nothing in the relief stops Amgen from competing on the merits, and its bristling at being asked to do so suggests Amgen wants to continue the same anticompetitive conduct that led to this case.

*Second*, Regeneron did not waive its right to a constructive trust. Amgen should not be permitted to retain the profits from its anticompetitive scheme. Disgorgement is a common remedy that has previously been invoked in analogous situations. And the constructive trust Regeneron proposes is narrowly tailored to avoid double recovery.

*Third*, Regeneron is entitled to prejudgment interest on all its claims. As for the

Delaware tortious interference claim, "Delaware Courts award prejudgment interest as a matter of right." Amgen cites a settlement-demand requirement under Section 2301(d), but that requirement, by the statute's plain text, applies only to actions brought in the Superior Court or the Court of Common Pleas (*i.e.* state courts of law), and even there, only to claims for "bodily injuries, death or property damage." It does not apply here. Likewise, Amgen's attempt to resist prejudgment interest under New York's Donnelly Act fails because New York law is clear that prejudgment interest is available, even if a statute is silent on the question, where, as here, the purpose of the statute is to make plaintiffs whole. And Amgen cannot overcome Regeneron's showing that it is entitled to prejudgment interest under the federal and California antitrust laws because it wrongfully delayed this case. Finally, no law identified by Amgen precludes this Court from awarding compound interest. Indeed, far from being "disfavored" by Delaware law, compound interest is the norm in cases involving sophisticated companies to properly account for the time value of money lost to a monopolist.

The relief Regeneron seeks is a crucial step to restore competition in the PCSK9i market. Otherwise, Amgen will continue to leverage its ill-gotten and illegally entrenched Repatha monopoly to eradicate Praluent from the market—achieving its goal of a one-product market (while only having to pay a small price to Regeneron). The Court should grant each of the requests for relief identified in the motion to ensure that Amgen does not retain any benefit from its anticompetitive behavior and guarantee that it does not reap further unlawful benefits.

## ARGUMENT

## I.    INJUNCTIVE RELIEF IS NECESSARY TO RESTORE COMPETITION

### A.    Amgen fails to address the necessity of injunctive relief to restore competition in the PCSK9i market.

Regeneron showed that well-settled Supreme Court precedent (1) requires a judicial remedy to restore competition in the PCSK9i market where Amgen has cemented its Repatha monopoly, (2) grants this Court broad discretion to achieve this cognizable, pro-competitive

goal, and (3) resolves all doubts and uncertainties about the scope of relief against the antitrust-wrongdoer.[1] Conspicuously absent from Amgen's response is any attempt to address this controlling law. Amgen thus concedes that ample authority exists for the Court to award permanent injunctive relief to remedy the harm a jury found Amgen caused.

But, according to Amgen, Regeneron is not entitled to any permanent injunctive relief because (1) it is speculative that Regeneron will suffer irreparable harm from Amgen's cross-therapeutic bundling, and (2) the jury's damages award is sufficient to redress Regeneron's harm. Opp. 3-7. Both arguments are wrong as a matter of fact and law.

The jury found that Amgen's dominance in the PCSK9i market broke competition; Regeneron is now at "point of no return" with a less than 10 percent market share because Amgen foreclosed Praluent from the Big 3 PBMs and Humana.[2] Amgen asserts that Repatha's "exclusivity requirement is no longer in place" at ESI Commercial and that it has not been "in effect" at UHC "for many years." *Id.* at 4. Amgen cites no supporting evidence. And the jury concluded otherwise: Regeneron proved ***ESI Commercial was coerced into renewing the Repatha exclusive agreement*** through 2024. Tr. 912:23-914:11; PTX-655 at 018. The trial was based on a discovery record that closed in 2024, which proved that Amgen used a bundled rebate conditioned on Repatha exclusivity for at least ***4 years*** at the Big 3 PBMs ***(Jan. 2021 - Dec. 2024)***.[3] Amgen did not elicit any testimony from its executives that it has not continued the cross-therapeutic bundle at ESI Commercial.[4] Amgen's position fails for this reason alone.

---

[1] D.I. 499 ("Br.") 1, 3-4, 11-14, 22-24 (citing, *inter alia*, *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932), *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946), *Int'l Salt Co. v. United States*, 332 U.S. 392, 400 (1947), *United States v. Grinnell Corp.*, 384 U.S. 563, 577 (1966), *Ford Motor Co. v. United States*, 405 U.S. 562, 273 (1972)).

[2] Br. 4-6 (citing, *inter alia*, Tr. 365:20-366:19; 375:15-22; 403:19-25 (S. Hyde), 469:15-470:12 (M. McCourt); 574:19-575:1 (M. Gordon)).

[3] Amgen uses a similar sleight of hand with its cross-therapeutic bundled rebate at UHC, where the bundled rebate was in the agreement for ▮▮▮▮▮▮▮ ***(Sept. 2021-*** ▮▮▮▮▮ ***)***. PTX-598.

[4] Also, if Amgen has stopped bundling rebates with Repatha in its contracts, it makes little sense that Amgen elsewhere is arguing against such an injunction. Opp. 19-22.

In any event, Regeneron has to show only "'a significant threat' of irreparable antitrust injury, *even if the injury hasn't happened yet*." *Steves & Sons, Inc. v. JELD-WEN, Inc.,* 988 F.3d 690, 705 (4th Cir. 2021) (emphasis added); *see also* Br. 3. The unrebutted evidence shows that, at any time now or in the future, Amgen can use a cross-therapeutic bundled rebate for Repatha coverage to continue dominating the PCSK9i market.

The cases Amgen relies on are procedurally and substantively inapposite. In *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159-60 (3d Cir. 2019), there was no irreparable harm; the anticompetitive conduct stopped *five years before* the lawsuit and the monopoly-product at issue was divested *two years before* the lawsuit. In *In re DDAVP Indirect Purchaser Antitrust Litigation*, 903 F. Supp. 2d 198, 210-11 (S.D.N.Y. 2012), the plaintiffs conceded there was no threat of future injury from wrongful patent enforcement because the patent was held to be *unenforceable* and, as to any future anticompetitive conduct involving "other drugs," the plaintiffs "failed to demonstrate which drugs might be involved, or what fraudulent conduct might be undertaken, or which Plaintiffs might buy the drugs at supra-competitive prices." The court dismissed the pleading in *In re G-fees Antitrust Litigation*, 584 F. Supp. 2d 26, 34-35 (D.D.C. 2008), because the plaintiff class of past and current mortgage borrowers sought future damages that an injunction could not remedy. Here, Amgen continues to reap the benefits of its ill-gotten Repatha monopoly and has the ability and incentive to continue bundling rebates on unrelated products (*e.g.*, Enbrel, Otezla) to illegally maintain its monopoly.[5]

---

[5] Amgen's reliance on *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), is misplaced. There, the court rejected a proposal that would require Microsoft to distribute a competitor's product alongside its own. *Id.* at 189. Regeneron is not requesting that Amgen sell Praluent alongside Repatha. Notably, Amgen ignores that the same court ordered Microsoft to stop using exclusive contracts to maintain its monopoly. Br. 19 (citing *id.* at 269). Bigger picture, Amgen misses the forest for one tree in the numerous remedies that were considered by the *Microsoft* court, which awarded injunctive relief: "The Court's remedy exceeds a mere proscription of the precise conduct found to be anticompetitive and is forward-looking in the parameters of the relief provided." *Microsoft Corp.*, 224 F. Supp. 2d at 193.

4

Finally, Amgen's suggestion that Regeneron's case was never about injunctive relief and that money damages are sufficient to remedy the significant and ongoing harm are patently false. Opp. 3, 5-7. Regeneron has sought this injunctive relief from **"Day 1"**.[6] As for Regeneron's damages, Dr. Divya Mathur testified that her calculation was very "conservative" (Tr. 1131:25-1132:9) because (1) she did not calculate future damages stemming from the ongoing effects of Amgen's conduct, including on prescriber behavior (Tr. 1147:14-1148:1), (2) she did not calculate damages at all the PBMs where Amgen used a cross-therapeutic bundle, but only where reliable data was available (Tr. 1146:13-1147:1), and (3) she was only able to calculate damages at CVS for 2022 and 2023 (Tr. 1195:15-24) and the bulk of the damages at ESI and UHC were from the past. Monetary damages thus fail to fully remedy the past and ongoing harm caused by Amgen's ongoing use of its cross-therapeutic bundle.

### B.    Amgen's remaining objections to the injunctive relief are unavailing.

Amgen's response boils down to an assertion—with no new supporting evidence—that an injunction will somehow hurt competition more than Amgen has already. *See* Opp. 1, 9, 11, 18. To level set, Amgen has unlawfully benefitted from its Repatha monopoly for years and, despite a jury finding that Amgen violated numerous antitrust laws, Amgen gets to keep its ***$1+ billion blockbuster "workhorse"*** for the future. Tr. 351:4-20.[7] Amgen does not seriously grapple with any of the evidence and commercial realities that Regeneron showed necessitates pro-competitive injunctive relief that is in the public interest to: (1) lower Repatha's prices, (2) lower Enbrel and Otezla prices, (3) increase consumer and prescriber choice, and (4) lower barriers to entry to new entrants bringing innovative medicines to market. Br. 8-11.

---

[6] *See, e.g.*, D.I. 1 at 102 (Regeneron's Complaint including, in its Prayer for Relief, "injunctive relief restraining and enjoining Defendant Amgen from continuing its unlawful conduct"); D.I. 36 at 16 (Regeneron's brief in opposition to Amgen's Motion to Stay, describing Regeneron's request for injunctive relief "to stop the anticompetitive conduct and ongoing irreparable harm" from Amgen); D.I. 427 at 8 (Joint Pretrial Order noting "Regeneron seek (i) injunctive relief").

[7] Amgen fails to appreciate that the law allows a remedy to "break up [its] monopoly power." Br. 22 n.57 (citing *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 256 (1959)).

### 1.    Prohibition on future cross-therapeutic bundled Repatha rebates.

Regeneron showed that permanent injunctive relief barring future anticompetitive conduct, including the offending practice, is standard.[8] Regeneron also showed that the ten-year timeframe for the injunction is standard. Amgen fails to address the precedents Regeneron cited confirming the propriety and length of this relief.

Instead, Amgen flips the burden on Regeneron to prove a negative, *i.e.*, that every hypothetical cross-therapeutic bundled rebate for Repatha that Amgen could concoct in the future would not hurt competition. That is not the law; any uncertainties are resolved against Amgen. *See Bigelow*, 327 U.S. at 265. In any event, the jury found that Amgen has monopoly power with Repatha, so Amgen's conditioning of Repatha coverage on rebates tied to other Amgen products would entrench Amgen's monopoly and be exclusionary conduct.

Notably, Amgen already agreed to this *same* relief for *15 years* to obtain FTC approval of its $27.8 billion acquisition of Horizon Therapeutics. But Amgen argues that settlement is somehow irrelevant because it reflects a bargain with the government. Opp. 21-22. But the antitrust laws provide for dual enforcement between the government and private parties; Regeneron is acting as a "private attorney general." *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262 (1972). Regardless, the FTC, suing on behalf of the public, believed that such an injunction was a piece of an effective remedy. The same is even more true here, coming *after* a jury found that Amgen used cross-therapeutic bundling to monopolize the market.

As for the "fencing-in" provisions that will help ensure that Amgen cannot use cross-therapeutic bundling to ensure Repatha coverage, Amgen says that having to comply with PBM bidding requirements is unnecessary because they are not "requirements" and that having to

---

[8] Br. 15-17 (citing, *e.g.*, *FTC v. Surescripts, LLC*, 1:19-cv-01080, § X (D.D.C. Aug. 9, 2023), *United States v. Elec. Payment Servs.*, 94-208-SLR (D. Del. Oct. 14, 1994), and *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005); Final Judgment, ECF No. 559, *United States v. Dentsply Int'l, Inc.*, 99-cv-00005-SLR (D. Del. Apr. 26, 2006)).

firewall executives who work on Repatha coverage would "restructure" its business. Opp. 22-24. It is telling that Amgen still will not agree to comply with the PBMs' requirements. Indeed, Amgen's reliance on Mr. Murdo Gordon's testimony that those "requirements" are mere "guidelines,"[9] only underscores why Amgen must be ordered to comply with the PBM bidding requirements.[10] As to the firewall, Amgen continues to dispute the evidence of its misconduct, showing that numerous current executives (Murdo Gordon, Kave Niksefat, Adam Grennan, Billy West) approved and implemented the cross-therapeutic bundling scheme.[11] This is far from Amgen's sanitized framing of its conduct as "discrete and limited." And the case law amply supports such "fencing-in" relief. *Compare* Br. 18-19, *with* Opp. 23-24. That Amgen has to take some steps to comply with the antitrust laws is not a valid objection.

### 2.    Prohibition on current cross-therapeutic bundled Repatha rebates.

As Regeneron showed, courts have ordered permanent injunctive relief terminating agreements that were the product of the anticompetitive conduct.[12] Amgen does not deny the propriety of such relief in other contexts, Opp. 18, but claims that there is no "significant causal connection" between its current PBM agreements and its cross-therapeutic bundled rebates, *id.* at 17. Not so. The evidence before the jury overwhelmingly showed that all Big 3 PBMs plus

---

[9] *Compare id.* at 22, *with* PTX-474 at 004 (CVS/Zinc Request for Proposal: "As you complete, the Rebate Response Matrix, please consider the following ***requirements***: . . . 5. No contingencies . . . with respect to your other Products will be considered (i.e. ***no bundling***).").

[10] Amgen's protest that "Regeneron itself has submitted one or more bids that did not comport with PBM bidding 'requirements,'" Opp. 22, mischaracterizes the record. Mr. O'Neal testified that he submitted a handwritten response on one occasion at a PBM's request because the PBM's website portal was not operating. Tr. 1562:13-1565:12 (R. O'Neal).

[11] *E.g.*, PTX-299 (email from B. West to ESI containing "Formulary Compliance" bundled rebate offer across Repatha, Enbrel, and Otezla); PTX-351 (internal Amgen email stating "our ability to develop and execute this [Ascent] contract required us to act in a nimble fashion ***across our business***"); PTX-536 (internal Amgen email crediting "great teamwork" by "V&A" [value and access] teams and others for conducting a "multi-year negotiation on ***both Enbrel and Repatha***" and effectuating the bundled rebate at UHC).

[12] Br. 19-20 (citing, *e.g.*, *New York v. Microsoft*, 224 F. Supp. 2d 76, 269 (D.D.C. 2002), *United States v. Elec. Payment Servs*., 94-208-SLR (D. Del. Oct. 14, 1994), *FTC v. Surescripts, LLC*, 1:19-cv-01080, § X (D.D.C. Aug. 9, 2023), and *In re Broadcom*, Dkt. C-4750, FTC (Nov. 4, 2021)).

Humana covered Repatha exclusively and either had agreements with Amgen that contained cross-therapeutic bundled rebates throughout the relevant period (*i.e.*, ESI Commercial, PTX-351, and UHC Commercial, PTX-598) or were offered such rebates before entering into agreements where Repatha was covered exclusively, Tr. 1469:17-20 (K. Niksefat); PTX-378; PTX-379; PTX-526; Tr. 673:14-20, 674:25-673:1, 804:4-12 (M. Gordon).

### 3. Temporary prohibition on Repatha rebates, exclusive Repatha coverage, and reimbursement for corrective Praluent marketing.

Amgen claims that having to compete for only one to three years without giving rebates on Repatha to the Big 3 PBMs and Humana Medicare or seeking exclusivity, and reimbursing Regeneron for the marketing efforts it will have to undertake to correct the misinformation about Praluent, will impede lawful competition. Opp. 9-17. That is incorrect.

*First*, Amgen starts from the mistaken premise that it has engaged in lawful competition and there is nothing to remedy. That is a non-starter; the jury rejected that premise. Starting from the correct premise, rooted in the jury's verdict, that Amgen's conduct broke the competitive process, decades of precedent—that Amgen ignores—holds that courts must "***unfetter [the] market from anticompetitive conduct***," *Ford Motor*, 405 U.S. at 577, and "***terminate the illegal monopoly, deny [] the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future***," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (citing *Grinnell Corp.*, 384 U.S. at 577); Br. 11-12. As Regeneron showed—and as Amgen also ignores—the Supreme Court has made clear that "***[i]f all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact***." *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128 (1948). Br. 1. The temporary remedies

Regeneron proposes fit squarely within this long-standing Supreme Court precedent.[13]

   *Second*, Amgen complains *post*-trial that it cannot compete for Repatha sales without rebating (for exclusive or non-exclusive coverage) by lowering Repatha's high list price. Opp. 13-16. Again Amgen pretends as if the trial did not happen. The evidence was unrebutted that (1) Amgen has a monopoly position with Repatha's 90%+ market share, and (2) Praluent is beyond the "***point of no return***": it is "***below the inflection point***" where PBMs can shift the volume to Praluent.[14] Amgen is reaping the benefits of its bundling and now desires to maintain its monopoly by tying Repatha's coverage to stand-alone rebates off Repatha's high list price. This runs afoul of controlling law. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 133 (1969) ("When the purpose to restrain trade appears from a clear violation of law, ***it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed***") (citations omitted); *Lorain Journal Co. v. United States*, 342 U.S. 143, 156 (1951) (overruling an objection to an injunction that "the decree covers a broader scope of activities than is required by the evidence"). As for Repatha's high list price, *during* trial, Amgen touted to the jury how it *increased* Repatha's sales by lowering the list price in 2018. Tr. 2178:8-12 ("[I]n October 2018, Mr. Gordon had the price of Repatha lowered by 60 percent . . . [a]nd that, too, expanded the number of prescriptions being written"); *see also* DTX-1896; DTX-1897. Amgen also highlighted how Repatha generated sales at CVS even when it was not covered during 2022-2023.[15] Amgen cannot flip flop to avoid an injunction

---

[13] *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 415 (2004), is inapposite; it involved pleading sufficiency and a refusal-to-deal claim in the telecom industry that separately regulated forced sharing between carriers. Opp. 10.

[14] Trial Tr. 363:3-11; 365:20-266:19; 373:7-14; 402:15-25 (S. Hyde). Amgen's citation to an inapposite *preliminary* injunction ruling on a thin factual record in *Ortho Biotech Prods., L.P. v. Amgen Inc.*, 2006 WL 3392939 (D.N.J. Nov. 21, 2006), is distinguishable on this basis too where Praluent's market share is permanently lost if Amgen can use its anticompetitive bundle.

[15] Tr. 1443:6-21 (K. Niksefat); DTX-2042 (Repatha with a 35-41% share at CVS Medicare when Praluent was exclusive from 2018-19). Also, Regeneron's "loss of control over a unique product or business opportunity" to sell Praluent in a free market is irreparable harm. *See* U.S.

9

with the feigned claim that it cannot compete by lowering Repatha's price—and benefitting consumers and competition—when it told the jury and this Court the opposite.[16]

*Third*, Amgen's reimbursement of Regeneron's corrective marketing of Praluent after the damage that Amgen has done to this life-saving product is necessary to restore competition to the PCSK9i market. The evidence was overwhelming at trial that Amgen has put Praluent in an increasingly limited corner of the market.[17] Amgen's focus on what Regeneron's marketing strategy was before it had a 6% market share of new PCSK9i patients is irrelevant to correcting the market it monopolized. Similarly, Amgen's quibbling over the level of Praluent market share (35%) that would trigger an earlier expiration of this remedy is meritless because there was evidence that Praluent's market share before Amgen's conduct was above 40%. Tr. 429:14-25 (M. McCourt). In sum, reimbursement of marketing expenses, combined with the other aspects of the injunction, will expedite the goal of getting back to the state of *healthy* competition that existed before Amgen unleashed its anticompetitive strategy.

*Finally*, Amgen claims the injunction would make the Court "a regulatory agency." Opp. 10. Amgen is wrong. The time frame for this aspect of the proposed relief is a *self-executing* outside date of three years from entry of the injunction, or earlier based on an objective metric of Praluent having a 35% market share for four consecutive quarters. Br. 20. If the marketplace rapidly changes fundamentally in Regeneron's favor as Amgen speculates,

---

Stmt. of Interest, D.I. 52 at 8, *Radian Memory Sys. v. Samsung Elecs. Co. Ltd. et al.*, 2:24-cv-01073 (E.D. Tex. June 24, 2025) (collecting cases).

[16] Amgen's assertion that PBMs will not cover Repatha without rebates is rank speculation. Opp. 13-14. To the extent PBMs will adjust their contracts with their employer-clients if important classes of drugs become cheaper without using rebates, doing so will keep costs down and be a pro-competitive result. The FTC's pending enforcement action against the Big 3 PBMs to get them to cover lower the list price of insulins confirms this point. *See* Press Release, *FTC Sues Prescription Drug Middlemen for Artificially Inflating Insulin Drug Prices*, at https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-sues-prescription-drug-middlemen-artificially-inflating-insulin-drug-prices (last visited July 6, 2025).

[17] Tr. 374:3-10 (S. Hyde); 469:15-23 (M. McCourt); 1016:10-19 (F. Scott Morton).

Amgen can move to modify the injunction; Regeneron would welcome such a restoration of normal competition.[18] But Amgen would have the burden of proving that it should be released from some or all of the Court's order based on a record and not lawyer argument or speculation.

### 4. Notice of Amgen's wrongdoing and remedies to insurers, prescribers, and the public.

Amgen reiterates that Regeneron seeks to "free ride" by requiring Amgen to notify key stakeholders in the PCSK9i market (i) of the jury's decision, (ii) that Amgen cannot continue to provide cross-therapeutic bundled rebates tied to Repatha coverage, and (iii) that Praluent remains available. Opp. 26-29. This hollow argument ignores Regeneron's showing that numerous courts have granted such injunctive relief. Br. 24-25. Indeed, Amgen agreed to similar provisions in its own settlement with the FTC to close its Horizon Therapeutics merger. For the reasons disused above, this is powerful evidence undermining Amgen's arguments. Amgen's attempt to dismiss the notification provision because this was a settlement term to resolve the government's challenge to the Horizon merger case goes nowhere considering the FTC believed this was important relief and the dual enforcement system empowers private parties like Regeneron to seek such relief under the antitrust laws. *See supra* § I(B)(1).

Amgen also argues that Regeneron is "compelling speech" in violation of the First Amendment. Opp. 27. That is not true because Amgen does not have to espouse an "ideological point of view [it] finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977); *see also United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) ("A First Amendment protection against compelled speech . . . has been found only in the context of governmental compulsion to disseminate a particular political or ideological message."); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 253 (4th Cir. 2017) (affirming injunction

---

[18] *See, e.g., United States v. Am. Soc'y of Composers, Authors, Publishers*, 2001 WL 1589999, at *1 (S.D.N.Y. June 11, 2001); Order Reopening and Modifying Order, *In re Toys "R" Us*, Dkt. 9278 (F.T.C. Apr. 11, 2014).

that required defendant to circulate a retraction email under the Lanham Act and rejecting "compelled speech" concerns "in the context of commercial speech"). Regardless, if Amgen were right, then no antitrust case or settlement would include such relief. Amgen also fails to recognize that the Supreme Court has repeatedly held that the First Amendment does not supersede or limit the antitrust laws. *See Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 697-98 (1978). And even if there were a curtailment of Amgen's liberty, "that is a necessary and, in cases such as this, unavoidable consequence of [Amgen's] violation." *Id.*[19]

### 5. Compliance monitor will ensure that Amgen does not circumvent the relief to fix the PCSK9i market.

Amgen tries to escape the same compliance monitoring it agreed to in the Horizon Therapeutics settlement with the FTC by arguing that a monitor is the exception, not the rule. Opp. 24.[20] Tellingly, Amgen does not cite an antitrust case to support that proposition and there is none. As shown in Regeneron's opening brief, monitors are standard in antitrust cases which, by definition, involve intentional wrongdoing to thwart competition. Br. 25-26.

The remainder of Amgen's response is its sanitized and selective version of the evidence, attempting to prove that it would never violate this Court's order on injunctive relief. Opp. 25. But what the evidence actually shows is that Amgen cannot be trusted to follow the law or rules because, among other things, (1) it did not stop using its cross-therapeutic bundling strategy after Regeneron sent its cease-and-desist letter, PTX-375, (2) it did not follow the

---

[19] *See also FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 431-32 (1990) (rejecting the First Amendment and a related "expressive conduct" defense to the *per se* rule of automatic illegality to condemn a boycott); *Lorain Journal*, 342 U.S. at 156 (affirming an injunction after a monopolization finding that required "notice of [the injunction's] terms must be published at least once a week for 25 weeks"); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 371 (7th Cir. 1990) (rejecting a First Amendment challenge to an order requiring publication of the injunction as "a reasonable attempt at eliminating the consequences of the" anticompetitive conduct).

[20] Amgen asserts that the proposed injunctions would impose "onerous and costly requirements on Amgen's business." Opp. 28. This unsupported statement deserves no credit. Amgen fails to offer any sworn testimony even attempting to quantify such costs, in isolation or relative to the $1 billion-plus in annual Repatha sales. Given that Amgen has agreed to some of the same relief to close its deal with Horizon, it should thus know the scope of any such costs.

PBMs' requirement not to bundle other products, PTX-474, and (3) it minimized its paper trial after it got caught. PTX-379. Amgen did all of this because Repatha is an important blockbuster product: Amgen forecasted billions more in Repatha revenue through 2028 without competition from Praluent. PTX-132, at .004; PTX-602, at PTX-602.031. But with competition threatening Repatha's monopoly, Amgen decided, as the second most senior executive of the company put it, "*enough is enough*" when it comes to price competition. With the anticompetitive tone set at the top, Amgen's executives were ready for "*hand to hand combat*" (PTX-492), "*defending against the onslaught*" (PTX-261), with the goal to "*lock out Regeneron*" (PTX-270). In short, the trial showed a public company engaging in a widespread anticompetitive scheme that went all the way to the top. None of the conditions that led Amgen to cross so many lines have gone away.[21] Given that Amgen has already made efforts to obfuscate its behavior and reduce its paper trail, it stands to reason that Amgen is incentivized to hide its wrongdoing going forward. This is a quintessential case for a compliance monitor.

## II.  A CONSTRUCTIVE TRUST IS AN APPROPRIATE REMEDY

### A.  Regeneron properly preserved its right to seek a constructive trust.

Amgen wrongly asserts that Regeneron waived its right to a constructive trust because its complaint did not contain that "specific" request for relief. Opp. 29. Regeneron's pleading seeks any remedy "this Court deems just and proper," D.I. 124 at 115; *see also* D.I. 427-3 at Ex. 12 ¶ 38 (same), which the Third Circuit has held includes a request for disgorgement via constructive trust. *See Francois v. Francois*, 599 F.2d 1286, 1293-95 (3d Cir. 1979). Courts have rejected Amgen's argument, holding that a prayer for "such other and further relief as it deems just and proper" is "sufficient to encompass the equitable relief" including "restitution

---

[21] *See In re Wholesale Grocery Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014) ("Perhaps there are aspiring monopolists foolish enough to reduce their entire anticompetitive agreement to writing…. But most would-be *monopolists probably can be expected to display a bit more guile*, jotting down only a few seemingly common terms while sealing their true anticompetitive agreement with a knowing nod and wink.").

or disgorgement." *United States v. Lane Labs-USA, Inc.*, 324 F. Supp. 2d 547, 578 (D.N.J. 2004). In *FTC v. Cephalon, Inc.*, for example, the court held that in the Third Circuit, "so long as a cause of action for equitable relief is 'in fact inherent in the [pleadings], such relief may be granted,'" "even [if] the complaint did not [explicitly] request [such] relief." 100 F. Supp. 3d 433, 439 (E.D. Pa. 2015).[22]

Rather than confront *any* authority from this Circuit, Amgen relies solely on inapposite decisions from the First, Second, Fourth and Ninth Circuits. Opp. 30. None of its cases address the question presented here—whether a prayer for "just and proper" relief, together with other requests for equitable relief, includes constructive trusts. Instead, those cases answer a different question: whether a case is moot because it lacks a claim for damages.[23] Nor can Amgen reasonably claim that it had no inkling that Regeneron would seek equitable remedies, including a constructive trust, or that it would have conducted discovery differently if it had. Opp. 30. The only relevant discovery at this remedies stage is the profits that Amgen has wrongfully enjoyed as a result of its egregious misconduct. No one knows that information better than Amgen. Accordingly, Regeneron is not precluded from seeking a constructive trust.

### B.    A fiduciary duty is not required to impose a constructive trust.

Amgen suggests that Regeneron must establish that Amgen owed it a fiduciary duty to permit a constructive trust. Opp. 30-31. Not so. Courts regularly impose constructive trusts absent fiduciary duties. For example, the Third Circuit agreed in *Halperin v. Moreno (In re*

---

[22] Fed. R. Civ. P. 54(c) provides: a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Courts have awarded constructive trusts under Rule 54(c) where not explicitly requested. *See In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 305 n.22 (Bankr. D. Del. 2018) ("[B]ecause constructive trusts are remedies rather than causes of action, they need not be plead in the complaint.").

[23] *See Fox v. Board of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 141-42 (2d Cir. 1994) (declining to read a claim for nominal damages into a complaint to avoid mootness); *Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 193 (1st Cir. 2022) (same); *Bain v. California Tchrs. Ass'n*, 891 F.3d 1206, 1213 (9th Cir. 2018) (dismissing appeal as moot); *Williams v. Ozmint*, 716 F.3d 801, 810-11 (4th Cir. 2013); *Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*, 201 F. App'x 7, 9 (1st Cir. 2006) (same).

14

*Green Energy Sers.)*, 610 B.R. 760 (D. Del. 2019), *aff'd,* 834 Fed. App'x 698, that a constructive trust is an appropriate remedy in a tortious interference case like this. Amgen dismisses that decision, but it ignores that the Court separately analyzed (i) the fiduciary duty claims, and (ii) the tortious interference and contract claims. The court described them as "two conceptually separate sets of claims . . . arising from two discrete, yet parallel factual patterns." *Id.* at 764. *Halperin* thus imposed a constructive trust for tortious interference alone. The Delaware Court of Chancery likewise ordered the imposition of a constructive trust in *Duffield Assocs., Inc. v. Lockwood Bros., LLC*, for violation of the Uniform Fraudulent Transfer Act where no fiduciary duty was required or shown. 2017 WL 2954618 (Del. Ch. July 11, 2017).

To be sure, constructive trusts are "most often imposed to remedy breaches of fiduciary duty or the wrongful acquisition of title to property through fraud." 2 *Corp. & Commercial Practice in DE Court of Chancery* § 16.07 (2025). But Delaware law "defer[s] substantially to the discretion of the trial court [to] determin[e] the proper remedy." *Int'l Telecharge, Inc. v. Bomarko, Inc*., 766 A.2d 437, 439 (Del. 2000). Delaware's "Supreme Court has emphasized the capacious remedial discretion of [Chancery Courts] to address inequity." *See also McGovern v. General Holding, Inc*., 2006 WL 1468850, at *24 (Del. Ch. May 18, 2006).

Amgen also ignores a tenet of Delaware law that equitable remedies in general—and constructive trusts in particular—are flexible. "A [constructive trust] is an equitable remedy of great flexibility and generality, and is viewed as a remedial and not substantive institution. . . . [It] is the formula through which the conscience of equity finds expression." *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) (internal quotations omitted). Indeed, a constructive trust is appropriate in tortious interference cases precisely because it is a flexible remedy that grants a plaintiff not only what it has lost, but what the defendant has gained through its wrongful misconduct. *Skretvedt v. E.I. DuPont de Nemours,* 372 F.3d 193, 213 (3d Cir. 2004).

At bottom, the jury found that Amgen's conduct was outrageous and reprehensible. D.I.

15

481 at 72. Regeneron has established all the elements of a constructive trust, that Amgen has richly profited from its misconduct and will continue to do so until the effects of that misconduct are eradicated, and that the ill-gotten funds are easily identifiable from Amgen's records and public filings. Amgen has offered no alternative means of calculating the amounts to be placed into a trust other than rejecting the whole idea. The Court should grant Regeneron's proposal, which is balanced, equitable, and satisfies the goals of a constructive trust.

### C.    The constructive trust does not result in a double recovery.

Amgen contends that forfeiting a portion of its ill-gotten gains would result in a double recovery for Regeneron. Opp. 34-36. Compensatory damages and constructive trusts are not mutually exclusive. Both were awarded in *Halperin.* 610 B.R. at 764-65; *see also Boynton v. Headwaters, Inc.*, 2010 WL 2991056, at *2 (W.D. Tenn. July 27, 2010) (scope of constructive trusts and compensatory damages differed and therefore awarding both).

Amgen's argument again ignores the purpose of a constructive trust, which is to prevent a defendant from enjoying a windfall from its misconduct. Amgen's illegal accumulation of a 90% share of the PCSK9i market is a windfall: Regeneron's conservative estimate of lost profits did not account for *Amgen's* past profits achieved after the misconduct began. Accordingly, a constructive trust over Amgen's past profits is not a double recovery.

Amgen fails to meaningfully address Regeneron's claim for a constructive trust over future profits that Amgen will pocket from its misconduct until the playing field is re-leveled. The bulk of the jury's compensatory award redressed past harm. *See supra* § I(A). Absent a constructive trust, Amgen will continue reaping ill-gotten gains despite the jury's condemnation of its conduct. *Cf. Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1995 WL 606310, at *4 (Del. Ch. Oct. 6, 1995) (interim constructive trust to restore status quo *pendente lite*). The market distortions that Amgen caused cannot be rectified overnight. Until they are, a constructive trust over Amgen's wrongfully obtained profits is proper.

16

## III.    REGENERON IS ENTITLED TO PREJUDGMENT INTEREST

Regeneron established it is entitled to prejudgment interest and quantified the amounts due for each claim. Br. 30-45. Amgen asserts meritless objections to Regeneron's entitlement to prejudgment interest and compounding that ignore settled law and practice. Opp. 36-45. Regeneron provides its prejudgment interest amounts in this table, and, as discussed below, includes the corresponding amounts using simple interest should the Court opt for that method:

| Claim(s) | Prejudgment Interest | Prejudgment Interest (Simple) |
|---|---|---|
| Tortious Interference | $31.1 million | $28.8 million |
| Donnelly Act | $22.2 million | $26.3 million |
| Sherman and Clayton Act | $16.4 million | $16.4 million (same) |
| Cartwright Act | $45.2 million | $41.0 million |

### A.    Tortious interference claim.

Amgen's only argument as to why this Court should deny Regeneron prejudgment interest on its Delaware law tort claim is that Regeneron did not provide Amgen with a settlement demand under Section 2301(d). Opp. 40-41. But the demand requirement in Section 2301(d) does not apply here. By its plain text, the Section 2301(d) demand requirement applies only to tort actions "[1] in the Superior Court or the Court of Common Pleas [and 2] seeking monetary relief for bodily injuries, death or property damage[.]" Neither is applicable here.[24]

*First*, as is obvious, Regeneron's tort claim is in neither the Superior Court nor the Court of Common Pleas. It is in federal district court; Section 2301(d)'s demand requirement does not apply here. As the *Chancery Court* put it, "Delaware Courts award prejudgment interest *as a matter of right*." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 619-20 (Del. Ch. 2010); *see also Great Am. Opportunities, Inc. v. Cherrydale*, 2010 WL 338219, at \*31 (Del. Ch. Jan. 29, 2010) ("Delaware Courts routinely award [prejudgment] interest.") (collecting cases).[25]

---

[24] Regeneron provided Amgen several opportunities to forego this lawsuit by warning it would seek legal action, PTX-375, and attempting to settle prior to trial, D.I. 427 at 28-29; D.I. 461.
[25] *See also, e.g.*, *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (same).

*Second*, Section 2301(d) is inapplicable because the jury awarded Regeneron damages for lost profits—not for "bodily injuries" "death" or "property damage." In *Carr v. Dewey*, the court explained that "property damage, bodily injury or death" does not include lost profits without "physical damage to the property itself." 730 F. Supp. 591, 601-02 (D. Del. 1990); *see also Shahin v. Boney*, 2016 WL 3152575, at *3 (Del. C.P. Apr. 13, 2016) *aff'd* 204 A.3d 1266 (Del. 2019) (economic loss alone does not constitute "property damage"). When a claim does not involve a category specified in Section 2301(d), "the statute is inapplicable." *In re Bracket Holding*, 2020 WL 764148, at *14-15 (Del. Super. Ct. Feb. 7, 2020) (rev'd on other grounds).

Amgen's criticism that *Beard* and *Great American* do not mention Section 2301(d) proves both points. Opp. 41. *First*, both were Chancery Court cases, so neither involved a tort action "in the Superior Court or the Court of Common Pleas"—making Section 2301(d) inapplicable, as it is in this case. *Second*, none of the plaintiffs sought monetary relief for "bodily injuries," "death," or "property damage" covered by Section 2301(d). *Beard*, 8 A.3d at 619 (trade secret misappropriation); *Great Am. Opportunities*, 2010 WL 338219, at *1 (breach of contract inducement). Amgen's own citations enforcing the demand requirement further underscore these points. Both *Brandywine Smryna, Inc. v. Millennium Builders*, LLC, 34 A.3d 482, 484 (Del. 2011), and *Rapposelli v. State Farm Mut. Auto. Ins.*, 988 A.2d 425, 427 (Del. 2010), originated in Superior Court where Section 2301(d) applies. And plaintiffs in *Brandywine* and *Rapposelli* sought damages for property damage or bodily injury. *Brandywine*, 34 A.3d at 485 (water damage in showroom); *Rapposelli*, 988 A.2d at 427 (car accident).

Amgen does not dispute any aspect of Regeneron's Delaware law prejudgment interest calculation, except for arguing that—although the Chancery Court may award compound interest—the Superior Court may not do so "absent a showing of bad faith." Opp. 41-43. But this Court is not bound by Superior Court decisions alone. And Regeneron's federal cases show the opposite and award compound interest under Delaware law without any analysis of bad

faith. Br. 33; *see also Heritage Handoff Holdings v. Fontanella*, 2019 WL 1056270, at *13 (D. Del. 2019) (interest compounded quarterly is "consistent with the approach taken by Delaware courts"). Amgen's cited cases also confirm that compound interest is appropriate when the parties are "sophisticated" like they are here. *Brown v. Court Square Cap. Mgmt*, 2024 WL 1655418, at *4 (Del. Ch. Apr. 17, 2024).[26] In any event, Regeneron demonstrated that Amgen engaged in bad faith litigation delay. Br. 39-45. Still, should the Court opt for simple interest, Regeneron provided all the inputs for the Court to calculate interest. D.I. 503 ("Appx. 1") at 7-8. Using those inputs, Regeneron would be entitled to $28.8 million. *See* Appx. 2 at 4-5.

## B.    Donnelly Act claim.

Amgen argues that prejudgment interest is not available under the Donnelly Act because 1) the Act is silent on prejudgment interest, and 2) *one* other New York statute that allows treble damages expressly prohibits prejudgment interest. Opp. 39. As Regeneron showed, prejudgment interest is available on a New York statutory claim if the statute is silent on prejudgment interest but, as here, intends to make "victims whole." *See* Br. 37; *Tipaldo v. Lynn*, 26 N.Y.S.3d 204, 213 (2015). Amgen's reliance upon *Trans World Airlines, Inc. v. Hughes* is misplaced. 449 F.2d 51, 80 (2d Cir. 1971). The *Trans World* court addressed only the availability of prejudgment interest under the Sherman Act, refusing to award prejudgment interest on the federal claim where the federal statute was silent (prior to the 1980 amendment). *Id. Trans World* says nothing about interpreting the Donnelly Act or New York law.

Amgen responds only by citing *Rodriguez v. Kalata*, which it claims prohibits

---

[26] Amgen's remaining authorities are unavailing because they are from Delaware Superior Court, which is bound to "award[] simple interest," notwithstanding that the Delaware Supreme Court has found that simple interest "has nothing to commend it[.]" *Gotham v. Hallwood*, 817 A.2d 160, 173 (Del. 2002). This includes *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2025 WL 1545444, at *5 (Del. Super Ct. May 15, 2025), and although that case mentions a bad-faith standard, it relies upon Amgen's other cases which say nothing about it. *See Brown*, 2024 WL 1655418, at *4; *Balooshi v. GVP Glob. Corp.*, 2022 WL 576819, at *14 (Del. Super Ct. Feb. 25, 2022); *see also Fortis v. Dematic*, 2023 WL 2967781 (Del. Super. Apr. 13, 2023).

prejudgment interest on any statutory claim that provides for treble damages. Opp. 40; 133 N.Y.S.3d 787 (App. Div. 2020). Amgen is wrong: *Rodriguez* concerned the Rent Stabilization Act, which is not silent on prejudgment interest, but explicitly *prohibits* awarding both prejudgment interest *and* treble damages. *Rodriguez v. Kalata*, 100 N.Y.S.3d 518 (App. Div. 2019); 9 NYCRR (Rent Stabilization Code) § 2526.1 (d). Thus, Amgen cites *no* authority contradicting that where the New York statute is silent on the availability of prejudgment interest (like the Donnelly Act), prejudgment interest is available under N.Y. C.P.L.R. § 5001.

Amgen also argues that *Carl Wagner & Sons v. Appendagez, Inc.*, 485 F. Supp. 762 (S.D.N.Y. 1980), awarded prejudgment interest only on a contract claim, not a separate Donnelly Act claim. But *Carl Wagner* trebled the damages award *including* prejudgment interest, making clear that it awarded prejudgment interest on the Donnelly Act claim (otherwise there would be no basis to treble interest). At bottom, Amgen fails to identify any case that prohibits prejudgment interest on a Donnelly Act claim, and Amgen does not dispute that N.Y. C.P.L.R. § 5001 applies to lost profits. Br. 36; *see, e.g.*, *Lizden Indus., Inc. v. Franco Belli Plumbing & Heating & Sons, Inc.*, 945 N.Y.S.2d 86, 87 (App. Div. 2012).

Amgen does not contest that the statutory rate in New York is 9% per annum and that the Court may use the dates of harm to determine when the damages accrued. *See* Opp. 43. This Court has the "considerable discretion" to award compound interest to fully compensate Regeneron for the time value of its delayed recovery. *See In re Saxton*, 712 N.Y.S.2d 225, 232 (App. Div. 2000); *State of New York v. New York State Mar. Highway Transp., LLC*, 84 Misc.3d 1245(A), at *11 (N.Y. Sup. Ct. July 1, 2024). Should the Court opt for simple interest, Regeneron provided all the necessary inputs for that calculation. Appx. 1 at 4, 7-8. Using those inputs, Regeneron would be entitled to $26.3 million. *See* Br. 38; Appx. 2 at 7-8.[27]

---

[27] Simple interest from the date of the Complaint would total $36.8 million. Regeneron's conservative approach to annual compound interest assumed that Regeneron incurred losses

C.      **Sherman Act, Clayton Act, and Cartwright Act claims.**

Amgen concedes Regeneron is entitled to prejudgment interest under its federal and Cartwright Act claims if Amgen "act[ed] in bad faith" or "engage[d] in conduct primarily for the purpose of delaying litigation." Br. 37. Regeneron showed that Amgen knowingly advanced false positions early on in this proceeding by: (i) basing its Rule 12(b)(6) motion on its redacted contracts with ESI and Optum/UHC; (ii) misrepresenting repeatedly that Amgen (a) did not condition Otezla rebates on Repatha coverage, and (b) did not provide a bundle to Optum/UHC resulting in exclusivity for Repatha; and (iii) requesting truncated discovery to conceal the extracontractual portions of its scheme. Br. 40-44. Amgen's three responses each fail.

Amgen attempts to minimize its misrepresentations and dilatory conduct by reframing them as "run-of-the-mill litigation disagreements" and "legal position[s] that Regeneron disagrees with." Br. 37-38. Not so. Amgen repeatedly misrepresented the facts—now found to be lies by the jury—about its bundling in bad faith attempts to dismiss the case and delay discovery of its true conduct. Br. 40-44. Amgen relegates the fact that it selectively redacted ESI and UHC contracts on its motion to dismiss to a footnote, ignoring that it falsely represented that the contracts were the complete record of its agreements with PBMs, while its internal documents showed that Amgen bundled Otezla with Repatha. Opp. 38 n.18. At bottom, Amgen's argument that "no jury has ever found" Amgen has extra-contractual agreements with PBMs ignores that the jury credited Regeneron's wealth of evidence, including that Amgen had an agreement with UHC for Repatha exclusivity. Opp. 37; *see* D.I. 521 at 7-8, 32-33.

To distract from its bad faith conduct, Amgen attempts to graft additional requirements onto the "bad faith" standard, citing cases about sanctions and attorneys' fees. *See Ario Underwriting Members of Syndicated 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 297

---

on the last day of the year, to align with the compounding period. Br. 38. *See* Appx. 1 at 4. Under Regeneron's simple interest calculation, interest accrues on the amount of profits that Regeneron lost on a monthly basis. Appx. 1 at 7-8; *see also* Appx. 2 at 7-9, 13-14.

(3d Cir. 2010) (Rule 11); *Lewis v. Smith*, 480 F. App'x 696, 699 (3d Cir. 2012) (28 U.S.C. § 1927); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 190 (3d Cir. 2002) (same). None of these cases concern the statutory provisions governing here, which make no mention of the "extreme" bad faith standard that Amgen peddles. Br. 37.

Finally, Amgen contends that because the case resolved in three years, Amgen's tactics did not cause material delay. *See* Opp. 38-39. The length of a case, much like a film's run time, says nothing about whether it was "too long." Tellingly, Amgen does not deny that its tactics caused a 13-month delay, Br. 44, which distinguishes this case from those Amgen cites where a party's conduct did not delay trial, *Seven Gables Corp. v. Sterling Recreation Org.*, 686 F. Supp. 1418, 1427 (W.D. Wash. 1988), or did so by only weeks, *Zapata v. Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth.*, 133 F.R.D. 481, 486-87 (E.D. La. 1990).

Amgen does not dispute that Regeneron accurately calculated interest on its Clayton Act claim, or that the Cartwright Act provides for a 10% rate. Amgen instead argues that the Cartwright Act provides only for simple interest, because that is what the Clayton Act allows. Opp. 43. This argument ignores that the Cartwright Act is "broader in range and deeper in reach than the Sherman Act," *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160 (2015), federal law is "not conclusive[] when construing the Cartwright Act," *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1195 (2013), and compound interest is permitted under California law, *Erhart v. BofI Holding, Inc.*, 2023 WL 6382479, at *7-8 (S.D. Cal. Sept. 28, 2023) (compounding annually); *Cavic v. Beograd*, 2019 Cal. Super. LEXIS 96164, at *2 (Cal. Super. Dec. 8, 2019) (10% interest compounded). If the Court favors simple interest, Regeneron is entitled to either $41.0 million using a simple 10% interest yearly rate from the date of the complaint, or alternatively, $14.8 million for the thirteen-month delay. *See* Appx. 2 at 12.

## CONCLUSION

For all the above reasons, the Court should grant Regeneron's motion.

Dated: July 7, 2025

WHITE & CASE LLP
Jonathan D. Polkes
Adam B. Banks
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8301


ORRICK, HERRINGTON
& SUTCLIFFE LLP
Eric S. Hochstadt
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5282


WEIL, GOTSHAL & MANGES LLP
Michael R. Moiseyev
2001 M Street, NW
Washington, D.C. 20036
Telephone: (202) 682-7000

Jessica L. Falk
Robert Niles-Weed
Rachel Williams
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

WILKS LAW LLC

*/s/ David E. Wilks*
David E. Wilks (Bar No. 2793)
Scott B. Czerwonka (Bar No. 4844)
4250 Lancaster Pike Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Email: dwilks@wilks.law
Email: sczerwonka@wilks.law

*Attorneys for Regeneron Pharmaceuticals, Inc.*

23

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of *Plaintiff Regeneron Pharmaceuticals, Inc.'s Reply Brief in Support of Motion for 1) Permanent Injunctive Relief; 2) Constructive Trust; and 3) Prejudgment Interest* were caused to be served on July 7, 2025 upon the following counsel of record in the manner indicated below:

**VIA ELECTRONIC MAIL**
Young Conway Stragatt & Taylor, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Catherine Lynch (No. 7326)
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
Email:  msharp@ycst.com
Email: jhiggins@ycst.com
Email: clynch@ycst.com

**VIA ELECTRONIC MAIL**
Gibson, Dunn & Crutcher LLP
Eric J. Stock
Ben A. Sherwood
Kate Wisher
New York, NY 10166-0193
Tel: (212) 351-4000
Email: estock@gibsondunn.com
Email: bsherwood@gibsondunn.com
Email: kswisher@gibsondunn.com

Stephen Weissman
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
Email: sweissman@gibsondunn.com

Richard J. Doren
Samuel Liversidge
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7000
Email: rdoren@gibsondunn.com
Email: sliversidge@gibsondunn.com

Ashley E. Johnson
Betty X. Yang
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel: (214) 698-3100
Email: ajohnson@gibsondunn.com
Email: byang@gibsondunn.com

Courtney L. Spears
3161 Michelson Drive, Suite 1200
Irvine, CA 92612-4412
Tel: (949) 451-3817
Email: cspears@gibsondunn.com

*/s/ David E. Wilks*_____
David E. Wilks (Bar No. 2793)